LYLE S. HOSODA             3964-0
KOURTNEY H. WONG           10827-0
SPENCER J. LAU             11105-0
HOSODA LAW GROUP, AAL, ALC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaiʻi 96813
Telephone:   (808) 524-3700
Facsimile:   (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com


KRISTINA S. BAEHR   *Pro Hac Vice*
JAMES BAEHR         *Pro Hac Vice*
JUST WELL LAW, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 693-8029
Email: kristina@well.law; jim@well.law


FREDERICK C. BAKER    *Pro Hac Vice*
JAMES W. LEDLIE       *Pro Hac Vice*
KRISTEN HERMIZ        *Pro Hac Vice*
CYNTHIA A. SOLOMON    *Pro Hac Vice*
SARAH O. COUCH        *Pro Hac Vice*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: fbaker@motleyrice.com; jledlie@motleyrice.com;
khermiz@motleyrice.com; csolomon@motleyrice.com;
scouch@motleyrice.com


*Attorneys for the plaintiffs*

*(case caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| PATRICK FEINDT, JR., Individually, and as Next Friend to his minor children P.G.F. and P.R.F, NASTASIA FREEMAN, Individually, and as Next Friend to her minor children, K.F., D.F., and N.F., JAMIE SIMIC, Individually, and as Next Friend to her minor children, M.S. and J.S.[1]; | CIVIL NO. 1:22-cv-397-LEK-KJM (FEDERAL TORT CLAIMS ACT) |
| Plaintiffs, | THIRD AMENDED COMPLAINT AND CERTIFICATE OF SERVICE |
| vs. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

---

[1] There are hundreds of additional Red Hill claimants, including civilians, in the administrative process of the Federal Tort Claims Act. Red Hill water contamination harmed thousands because of the negligence of the United States. Their claims will be added to this lawsuit for adjudication as soon as possible. Plaintiffs added in the First Amended Complaint are listed on Attachment 1. There are no additional plaintiffs in the Third Amended Complaint.

## THIRD AMENDED COMPLAINT

Nearly a year and a half after the Navy's catastrophic November 2021 infusion of thousands of gallons of jet fuel into the water supply around Red Hill Bulk Fuel Storage Facility on Oʻahu, Hawaiʻi, hundreds of military family members and civilians suffering from toxic exposure continue to voice this simple and urgent question: "What was in our water?"

The government continues to proclaim that it has no duty to warn residents that their water is poisoned – nor what chemicals are in the toxic water the government allowed them to drink.[2] And sixteen months later, the government still refuses to notify victims of the full extent of their exposure. It is now clear that the government knew that the Red Hill victims were not only exposed to Jet Propellant-5 (JP-5), but also to additives like antifreeze: 2-(2-Methoxyethoxy) ethanol, a fuel system icing inhibitor added to the JP-5 at the Red Hill facility. Contemporaneous test results show that the government knew that this additional chemical presented in unsafe levels in the drinking water.

Just this week the government finally notified residents that a previously undisclosed PFAS (Per- and polyfluoroalkyl substances) spill occurred at the Red

---

[2] In its briefing to narrow the case, the government claims immunity for failing to warn residents not to drink contaminated water. ECF No. 61.

Hill facility in 2019.[3] Although the spill of these dangerous "forever chemicals" contaminated the soil, the government did not inform regulators nor warn residents. Even today, it denies any obligation to do so. And then on November 29, 2022, *another* leak of PFAS occurred at Red Hill when approximately 1,100 gallons of toxic fire-suppressing foam leaked into topsoil and into the underground facility, according to the Hawaiʻi state health department.[4] Prior PFAS leaks render it more probable that these chemicals were also released in 2021.

But the truth as to what happened at Red Hill in 2021 is indisputable. Before, during and after the contamination, as more than 93,000 military service members, their family members, and civilians relied on the government for safe water on the island of Oʻahu, the Navy harbored toxic secrets. As these families would discover, the water they drank and bathed in was dangerously contaminated. And government officials knew all along. In at least two separate incidents, May 6, 2021, and November 20, 2021, United States personnel at the Red Hill Bulk Fuel Storage Facility made negligent errors that released jet fuel, additives, and cleaning materials, directly into the Navy water line. The November 20th blast lasted more

---

[3] Sophie Cocke, *Toxic Red Hill Spill in '19 Affected Soil, Navy Reveals*, Honolulu Star Advertiser (March 18, 2023), https://www.staradvertiser.com/2023/03/18/hawaii-news/toxic-spill-in-2019-affected-soil-navy-reveals/.

[4] State of Hawaiʻi, Department of Health, *Red Hill AFFF Fire Suppressant Spill – Dec. 2 Update* (Dec. 2, 2022), https://tinyurl.com/RHSpillDecUpdate.

than 34 hours and was so severe that residents smelled the fuel in their homes.[5]

The government failed to disclose the November blast for *twelve days*—holding town halls to reassure residents that their water was safe to drink while thousands of people went to the emergency room with acute poisoning symptoms.

News reports have since revealed that the government then destroyed water sample vials collected from over one thousand family homes—*every sample taken prior to flushing*. Water samples that could have revealed the chemicals present in these family's waters—for health and for accountability—were trashed instead.

While the government later disclosed the exposure of JP5, the government failed to disclose the other additives (and likely other forever chemicals) that infiltrated the water source during the blast and cleanup thereafter. But no matter, the government proclaims in briefing, it is immune from any failure to tell people about chemicals that may cause suffering for the rest of their lives. ECF No. 61.

Hundreds of military family members and civilians continue to suffer from a widening range of frightening, debilitating health effects of toxic exposure, while the Navy's reluctant, inconsistent delivery of medical care to the injured, its secrecy, and its blaming of Red Hill victims has left many of them fearing for their families and futures.

---

[5] Christina Jedra, *The Defueling of the Red Hill Storage Facility is in this Admiral's Hands*, CIVIL BEAT (Oct. 3, 2022), https://tinyurl.com/CivilBeat.

The Federal Tort Claims Act offers a legal remedy. Those who have been harmed by the negligence of the United States are entitled to compensation for the harm. And, indeed, this case is what the Federal Tort Claims Act was designed for.

This Third Amended Complaint adds a premises liability claim and more details as to the government's failure to warn Red Hill victims not to drink toxic water and continued failure to identify the chemicals therein.

TABLE OF CONTENTS

**NATURE OF THE CASE** .......................................................................2

**PARTIES** ...........................................................................................3

**FACTUAL BACKGROUND** ...................................................................3

A.  On May 6, 2021, the negligent "operator error" of a federal officer caused a 19,000-gallon fuel leak into the fire suppression system at Red Hill. ...........5

B.  On November 20, 2021, another negligent "operator error" of a federal officer caused a train cart to strike and break a pipe valve that erupted in a blast that injected thousands of gallons of fuel into the Red Hill water system. .......................................................................................9

C.  The Safe Drinking Water Act and EPA regulations required the Navy to warn. ...............................................................................................13

D.  After the blast, the Navy failed to warn residents of the danger................14

E.  The Navy did not announce the leak until December 2, 2021— twelve days after the blast. .............................................................................17

F.  The Navy took responsibility for the blast and failure to warn. .................18

G.  The Navy knew it was not safely operating the Red Hill fuel tank system. 19

H.  The Navy's "flushing" and other cleanup efforts added insult to injury for affected families and compounded the toxic harm. ....................................21

I.  Federal officers failed to provide appropriate medical care to families affected, compounding injuries that the Navy had caused..........................26

J.  After the filing of the initial complaint in this matter, reports emerged that the Navy discarded critical evidence that would have revealed the extent of the harm they caused. ....................................................................28

K.  The Navy's operations at Red Hill likely violated additional regulations...31

L.  Affected families have suffered extraordinary, compensable harm. ...........33

a. The Feindt Family ................................................................... 35

b. The Freeman Family ............................................................... 38

c. The Simic Family ................................................................... 42

d. The Arnold Family ................................................................. 46

e. The Aubart Family ................................................................. 46

f.  The Boggs Family .................................................................. 47

g. The Coberley Family ............................................................. 48

h. The Dietz Family ................................................................... 51

i.  The Flewellen-Reynolds Family ............................................ 52

j.  The Fritz Family .................................................................... 53

k. The Grow Family ................................................................... 54

l.  The Jessup Family .................................................................. 55

m. Kelly Jones ............................................................................ 58

n. The Kirkpatrick Family ......................................................... 59

o. The Lamagna Family ............................................................. 60

p. The Maben Family ................................................................. 62

q. The Maloon Family ............................................................... 63

r.  The McClanahan Family ........................................................ 64

s.  The Miles Family ................................................................... 65

t.  The Morris Family ................................................................. 66

u. The Overbaugh Family .......................................................... 68

v. The Perez Family ................................................................... 69

w. The Pulou Family .................................................................. 70

x. The Quintero Family ............................................................. 72

y. The Staple Family .................................................................. 73

z.  The Traina Family ................................................................. 74

aa. The Watson Family ............................................................... 79

bb. The Wheeler Family .............................................................. 81

cc. The Wilson Family................................................................. 82

    dd. The Witt Family ....................................................................83

    ee. The Zawieruszynski Family ................................................85

**CAUSES OF ACTION** .............................................................**87**

    COUNT I: NEGLIGENCE..........................................................87

    COUNT II: NEGLIGENT UNDERTAKING .................................89

    COUNT III: NUISANCE ...........................................................95

    COUNT IV: MEDICAL NEGLIGENCE, FAILURE TO TREAT, DELAYED CARE ..........97

    COUNT V: INFLICTION OF EMOTIONAL DISTRESS...................99

    COUNT VI: NEGLIGENT SPOLIATION OF EVIDENCE ............100

    COUNT VII: PREMISES LIABILITY .......................................102

**CAUSATION**...........................................................................**105**

**NO EXCEPTIONS APPLY** ....................................................**107**

**JURISDICTION, VENUE & SERVICE** ...............................**108**

**CONDITIONS PRECEDENT** ...............................................**110**

**DAMAGES** ..............................................................................**113**

**PRAYER** ..................................................................................**114**

This case arises out of the negligence by the United States of America and its agencies that caused the poisoning of the water supply with jet fuel and other contaminants at Red Hill, Hawai'i on or around May 6 and November 20, 2021, and failed to provide appropriate treatment thereafter.

The plaintiffs, Patrick Feindt, Jr., individually, and as Next Friend to his minor children P.G.F. and P.R.F., Nastasia Freeman, individually, and as Next Friend to her minor children, K.F., D.F., and N.F., Jamie Simic, individually, and as Next Friend to her minor children, M.S. and J.S., Barbie Arnold, Crystal Arnold, individually, and as Next Friend to her minor children, J.A.A., J.E.A., and J.B.A.; Kevin Aubart, Saori Aubart; Cheryl Mello, AnnMarie Boggs, individually, and as Next Friend to her minor child, R.B.; Adrianna Coberley, individually, and as Next Friend to her minor children, A.M., J.M., K.M., B.C., and O.C.; Richelle Dietz, individually, and as Next Friend to her minor children, B.D., and V.D; Tiffany Flewellen-Reynolds, individually, and as Next Friend to her minor children, T.R., and A.R.; Jeff Fritz and Anayansi Fritz; Aitbeth Mudcha, Alexander Grow, Adriana Grow, individually, and as Next Friend to her minor children, At.G., Au.G., A.C.G., and Ap.G.; Sheena Jessup, individually, and as Next Friend to her minor children, B.B.J., B.J.J, and N.J.; Kelly Jones; Ashley Kirkpatrick, individually, and as Next Friend to her minor children, D.K., and E.K.; Audrey Lamagna, individually, and as Next Friend to her minor children, Au-J.L., and Ai-

1

J.L.; Joseph and Patricia Maben; Isabel Maloon, M.D., K. M., L.M., A.M., P.M.,
and C.M.; Katherine McClanahan, individually, and as Next Friend to her minor
child, E.M., Brian McClanahan, and William McClanahan; Belinda Miles,
individually, and as Next Friend to her minor children, W.M., and L.M.; Kelly
Morris and Hailey Morris; Tiffany Overbaugh, individually, and as Next Friend to
her minor children, J.O., and B.O.; Kandyce Perez, individually, and as Next
Friend to her minor children,  L.P., A.P., E.P., and F.P.; Harry Pulou, Lorelei
Pulou, individually, and as Next Friend to her minor children, V.P., S.P., J.P., H.P.,
I.P., and F.P.;  Lacey Quintero, individually, and as Next Friend to her minor
children, C.J.Q., and C.E.Q.; Joshua Staple, individually, and as Next Friend to his
minor children, J.S., G.S., N.S., S.S., K.S., and A.S.; Daniel Traina, individually,
and as Next Friend to his minor children, Z.T., and J.R.; Chad Watson,
individually, and as Next Friend to his minor child, M.T.; Paige Wheeler,
individually, and as Next Friend to her minor children, J.W., A.W., and S.W.;
Lindsey Wilson individually, and as Next Friend to her minor child, L.W.;
Elizabeth Witt; Amanda Zawieruszynski, individually, and as Next Friend to her
minor children, J.Z., V.Z., and S.Z., bring this Second Amended Complaint under
the Federal Torts Claims Act, 28 U.S.C. § 2674.

## NATURE OF THE CASE

1.    This complaint is filed pursuant to the provisions of the Federal Tort

Claims Act, Title 28, U.S.C §§ 1346(b), 2671, *et seq.*, against the United States of America for negligence, nuisance, medical malpractice, and intentional infliction of emotional distress resulting in physical and emotional injuries where the government of the United States of America, if a private party, would be liable to the plaintiffs.

PARTIES

2.      Each of the plaintiffs resided in or visited a home and ingested water provided by the Red Hill shaft that was owned and operated by the United States Department of the Navy during the time frame of acts or omissions alleged herein.

3.      Defendant is the United States of America.

FACTUAL BACKGROUND

4.      On at least two separate occasions, on May 6 and November 20, 2021, United States personnel at Red Hill Bulk Fuel Storage Facility (Red Hill Facility) made negligent errors that released thousands of gallons of jet fuel and other contaminants into the drinking water of families on the Navy water line on the island of Oʻahu. Because government personnel then failed to disclose those leaks as required, the plaintiffs continued to ingest jet fuel and became sick from that exposure. Instead of promptly and appropriately addressing the harm, government officials conducted a woefully inadequate clean-up and clearing effort, while government doctors provided medical care far below the standard of care. The

plaintiffs continue to suffer from severe illness, inconvenience, trauma, and fear.

5.      The needless and foreseeable leaks at the Red Hill Facility were caused by a specific series of negligent actions by federal officers. Congress foresaw and passed laws to avoid precisely this harm, and the Navy is and was bound by specific statutes, regulations, orders, and decrees that were ignored or violated. These statutes, regulations, orders, and decrees also constituted undertakings by Congress and the agencies, negligently conducted. The specific nature and extent of those violations will be further delineated through jurisdictional discovery.

6.      The Navy owns and operates the Red Hill Facility on the island of Oʻahu, Hawaiʻi to maintain strategic fuel reserves in the Pacific. The facility has been operational since 1943 and consists of 20 steel-lined tanks that measure 100 feet in diameter and 250 feet high and can hold 12.5 million gallons of fuel each. Altogether, these underground storage tanks can store up to 250 million gallons of fuel. The tanks are connected to three pipelines that run 2.5 miles through a concrete tunnel to fueling piers at Pearl Harbor.

7.      The Red Hill Facility currently stores and dispenses at least three types of fuels – necessary for powering military assets but toxic if imbibed by humans. Fuels currently stored in the tanks include marine diesel for ships and two types of jet fuel, Jet Propellant-5 (JP-5) and Jet Propellant-8 (JP-8). "Chemicals of

concern" in these fuels include "total petroleum hydrocarbons (TPH), benzene, toluene, ethylbenzene, xylenes, naphthalene, and methylnaphthalenes" according to the Environmental Protection Agency (EPA).

8.    EPA Region 9 is responsible for monitoring the Red Hill Facility and ensuring compliance with all federal water regulations.

9.    The Navy also owns and operates a water system that pumps water from underground aquifers to provide drinking water to the military community and facilities associated with Joint Base Pearl Harbor-Hickam (JBPHH), including military housing that is run as a public-private venture. Three wells supply the Navy's drinking water system: the Red Hill Shaft, Navy Aiea-Halawa Shaft, and Waiawa Shaft.

10.    The Red Hill Facility sits 100 feet above an aquifer that supplies drinking water to approximately 763,000 Oʻahu residents, according to the EPA.

### A. On May 6, 2021, the negligent "operator error" of a federal officer caused a 19,000-gallon fuel leak into the fire suppression system at Red Hill.

11.    On May 6, 2021, a Control Room Operator and United States Government employee at Red Hill failed to follow the required valve opening and closing sequence and released what the Navy then said was approximately 1,618 gallons of jet fuel. An initial command investigation determined that this failure was due to "operator error"—a breach of the standard of care and safety protocol.

This safety violation was not discretionary and involved no weighing of policy considerations.

12.    The Navy then claimed the majority of the fuel had been recovered and denied that the leak contaminated any drinking water. But at a December 22, 2021, State of Hawaiʻi Department of Health (DOH) hearing, Captain James Meyer, USN, Commander of the Navy Facilities Engineering Command, revised the estimate of the amount spilled from 1,600 gallons to 19,000 gallons.

13.    The Navy identified the root cause of the May 6 incident to be a "disregard of proper valve sequencing dictated in the specific Operations Orders," as well as several other factors, all of which could have been prevented by proper adherence to the rules.

14.    In an October 27, 2021, interview on Hawaiʻi Public Radio, Captains Gordie Meyer and Albert Hornyak, United States Navy, explained what happened with the May fuel spill. Captain Hornyak noted that, "[e]rrors on the part of the Red Hill system operator was the primary cause of the release… Specifically, the system operator not clos[ing] all of the valves as specified in the Operations Order before beginning a fuel transfer." Interview with Navy Capts. Gordie Meyer and Bert Kornyak, Hawaiʻi Public Radio (Jan. 12, 2022), https://tinyurl.com/MeyerKornyak, *see also* https://fb.watch/fcQOdUe319/. Both men clarified that the acts were committed by government employees, not

contractors, with Captain Meyer stating, "The 6 May event was by operators who are government employees…" *Id.*

15.    An October 2021 Mitigations Report in the wake of the May incident prescribed corrective actions, including proper construction of the pipeline system, safety alarms to be restored and updated to proper working order, and clear instructions to follow the existing rules set forth by the Department of Defense. The operators of the Red Hill facility did not implement the corrective actions outlined in the Mitigations Report. The failure to take the required corrective actions led to devastating results a mere month later in November 2021.

16.    In the meantime, evidence mounted that the May event contaminated the plaintiffs' water. After the May 6 release event, tests at the Red Hill Shaft showed elevated readings that exceeded environmental action levels on multiple occasions:



Exhibit D24, *Dept. of Health v. U.S. Dept. of Navy,* Dkt. No. 21-UST-EA-02 (Dec. 21, 2021).

17.    The Navy did not reveal these elevated test results to the state for months according to state environmental health officials. Alex Horton and Karoun Demirjian, *Military families say they were ill months before jet-fuel leak brought scrutiny to Pearl Harbor's tap water*, WASH. POST (Dec. 21, 2021), https://tinyurl.com/WashPostSick. "This is an early warning sign of something going on. And yet the [health] department was not aware of it, which is a concern," said one such official, Felix Grange. *Id.* Following the May spill, many families showed up at hospitals to report symptoms such as eczema, rashes, skin breakouts, stomach conditions, nausea, headaches, forgetfulness, and extreme fatigue: symptoms known to be consistent with fuel exposure. *Id.*

**B. On November 20, 2021, another negligent "operator error" of a federal officer caused a train cart to strike and break a pipe valve that erupted in a blast that injected thousands of gallons of fuel into the Red Hill water system.**

18.     On November 20, 2021, a United States Government employee operating a train cart negligently struck a fire suppression discharge pipe that contained thousands of gallons of fuel and water from the May 6 error. The damage triggered a catastrophic spill that injected jet fuel into the Red Hill well, the drinking water source for the plaintiffs.

19.     Although the Navy initially claimed that there was no video coverage of the event, a source leaked a video:



Civil Beat, *Fuel Leak at the Navy's Red Hill Facility Nov. 20, 2021,* Youtube, https://www.youtube.com/watch?v=GEGohRlLrSA&t=3s.

20.     Admiral Samuel Paparo, USN, Commander of the U.S. Pacific Fleet, ordered a command investigation of the incident that was endorsed by him on January 20, 2022, and on June 6, 2022, by the Vice Chief of Naval Operations. The report broadly confirmed the findings of the first investigation. S.J. Paparo, *First Endorsement of RDML Christopher J. Cavanaugh, USN, ltr 5830 of 14 Jan 22 w/ encl: Command Investigation into the 6 May 2021 and 20 November 2021 Incidents at Red Hill Bulk Fuel Storage Facility*, (Jan. 20, 2022), https://tinyurl.com/CavanaughReport [hereinafter Cavanaugh Report].

21.     The report confirmed the Navy's culpability under the FTCA for both incidents. "The Navy is responsible for the 6 May 2021 and 20 November 2021 fuel spills at the Red Hill Bulk Fuel Storage Facility . . . and subsequent water contamination," the Cavanaugh Report reads. "[H]uman error was the primary cause" of both fuel spills "which led to as much as 3,322 gallons[6] of fuel contaminating the Navy drinking water system." *Id.*

22.     The human errors (negligence) were further delineated in the Findings of Fact and Opinions (emphases added) in the reports:

Finding of Fact 41: "On 6 May 2021, Red Hill operators *improperly* executed a fuel transfer procedure, resulting in two piping joint ruptures and subsequent JP-5 fuel spill. Although unknown at the time, a fire

---

[6] This amount was later increased to 5,542 gallons (noted as "unrecovered") in the Cavanaugh Report.

suppression system sump pump transferred most of the fuel [up to 16,999 gallons] into a retention line, where it remained until 20 November."

Finding of Fact 174: "On 20 November 2021, the Red Hill rover *inadvertently* struck a fire suppression system retention line drain valve with the passenger cart of a train, cracking the PVC pipe near Adit 3. Although not known at the time, this retention line contained up to 16,999 gallons of JP-5 fuel from the 6 May spill. A portion of this fuel was released to the environment and ultimately entered the Red Hill well and the Navy water distribution system." Appendix C notes: "A total of 3,322 gallons of remain unaccounted for, and some or all of that fuel contaminated the Red Hill well and Navy water distribution system."

Opinion 1: "The proximate cause of the fuel spill on 6 May 2021 was *human error*. The [Control Room Operator] and pump operator took *intentional shortcuts* when transitioning between procedures. Their improper valve operations resulted in drawing a vacuum in the JP-5 line, then rapidly pressurizing it. This pressure surge caused mechanical failure of two piping joints. This opinion is consistent with a root cause analysis conducted by Austin Brockenbrough and Associates, LLC, a private engineering and consulting firm."

Opinion 20. "The proximate cause of the fuel spilled from the fire suppression system retention line on 20 November 2021 was a failure to properly account for the fuel spilled on 6 May 2021 (*human error*) . . ."

Opinion 21: "The Red Hill rover *inadvertently* struck the drain valve hand wheel with the passenger cart of a train, causing the PVC pipe to crack and leak. This train is used to transit the tunnel system and likely contacted the valve hand wheel multiple times, weakening and finally cracking the pipe. FLC Pearl Harbor conducted a preliminary inquiry regarding this event, and the report postulates *excessive speed* may have caused the train to jump. The investigation team assesses it is more likely that the weight of fuel in the 14-inch diameter PVC pipe caused it to sag over time. Worn paint on the hand wheel suggests the train rubbed against it on several occasions…"

11

Opinion 30: "The proximate cause of contaminated drinking water was
a failure to properly respond to the fuel spill on 20 November 2021
(*human error*)."

*Id.*

23.     These Findings of Fact and Opinions establish negligence and lack of

due care on the part of government personnel. The operative actions are not

discretionary functions—the federal operators had no discretion to "improperly"

transfer fuel by violating a required procedure or to operate a train in a manner that

would "inadvertently" strike and crack pipes. There was no weighing of policy or

intentional decisions here – just negligence on the part of federal employees.

24.     Moreover, the plastic material of the pipes—in defiance of military

mandates for fire suppression systems—contributed to the explosion. The Navy

violated the Department of Defense requirement to use steel pipes for fuel

transmission. The Unified Facilities Criteria specifications for the Department of

Defense's Fire Protection Engineering for Facilities, UFC 3-60-01, Section 9-9.2.1

. . . mandates "schedule 40 steel pipe" for such fire suppression systems like the

AFFF system at the Red Hill Facility. Department of Defense Fire Protection

Engineering for Facilities, UFC 3-60-01 (8 August 2016 as amended in 2020),

https://wbdg.org/FFC/DOD/UFC/ARCHIVES/ufc_3_600_01_2016_c5.pdf. The

weaker PVC pipes cracked under the pressure when hit by the cart—ultimately

leading to the blast and release of tens of thousands of gallons of jet fuel.

25.     On Thanksgiving weekend, November 27-28, 2021, residents of

military housing neighborhoods began to complain to the Navy and the DOH that their water wasn't right. They could smell fuel. They could see a sheen. The water reacted to flames.

26.     But by November 30, ten days after the blast, the Navy had still not advised anyone on their water line that there had been a fuel leak that affected their water source or warned they should not use or drink the water. The Navy held town halls to address the odor in the water but failed to disclose the blast or warn of the resulting contamination.

**C. The Safe Drinking Water Act and EPA regulations required the Navy to warn.**

27.     The Safe Drinking Water Act and EPA regulations required the Navy to issue a Tier 1 public notice within 24 hours of confirming the Red Hill Shaft had been contaminated with JP-5 fuel. The federal government has expressly waived sovereign immunity under the Safe Drinking Water Act as an operator of a public water system. 42 U.S.C. §§ 300f-300j (1996); SAFE DRINKING WATER ACT AMENDMENTS OF 1996, 1996 Enacted S. 1316, 104 Enacted S. 1316 ("The United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any such substantive or procedural requirement").

28.     40 CFR §141.201 outlines "General public notification requirements:" "Each owner or operator of a public water system . . . *must* give notice for all violations of national primary drinking water regulations (NPDWR). . ." A Tier 1

13

public notice is required for NPDWR violations and situations with significant

potential to have serious adverse effects on human health as a result of short-term

exposure, including:

> "occurrence of a . . . waterborne emergency" (such as . . . a chemical
> spill or unexpected loading of possible pathogens into the source water
> that significantly increases the potential for drinking water
> contamination.

40 CFR §141.201.

29.    The Navy was required to "[p]rovide a public notice as soon as

practical but *no later than 24 hours* after the system learn[ed] of the violation." 40

CFR §141.202(b). The Navy was required to "provide the notice within 24 hours in

a form and manner reasonably calculated to reach all persons served. The form and

manner used by the public water system are to fit the specific situation, but must be

designed to reach residential, transient, and non-transient users of the water

system." Minimum notice requirements are laid out in the regulation.

### D. After the blast, the Navy failed to warn residents of the danger.

30.    The Navy knew of a chemical spill that "significantly increase[d] the

potential for drinking water contamination" on November 20, 2021. But the Navy

failed to issue a Tier 1 notice to water system customers.

31.    Despite a legal obligation to do so noted by the EPA in their

investigation report, the Navy failed to provide notification to water system

customers in the required timeframe after "confirming the Red Hill Shaft had been

contaminated with JP-5 fuel." *See* Redacted National Enforcement Investigation

Center Civil Investigation Report, Joint Base Pearl Harbor-Hickam Public Water

System, Environmental Protection Agency at 5,

https://tinyurl.com/EPAInvestigation.

32.     On November 21, 2021, the Navy public affairs office issued a media

release regarding the JP-5 fuel spill, stating that "personnel responded to what was

initially assessed as a water leak shortly after 1700 (5:00 pm) on November 20,

2021. This pipe is not connected to the Red Hill Fuel tanks or main fuel pipelines,

all of which are secure. Overnight, the release began to contain some amount of

fuel which increased into Sunday (November 21, 2021) morning. Approximately

14,000 gallons of a mix of water and fuel was contained in the lower tunnel . . .

and has been recovered and transferred to an above-ground storage tank as of

midday Sunday. The Navy made initial notification to the DOH Saturday night

(November 20, 2021) and is providing updates Sunday. *There are no signs or

indication of any releases to the environment and the drinking water remains safe

to drink*." *Id.* at 5 (emphasis added).

33.     On Saturday, November 27, 2021, at 1817 (6:17 p.m.), a JBPHH

housing manager received the first customer complaint of a chemical smell in the

water. By 0500 (5:00 a.m.) on November 28, 2021, JBPHH housing managers had

received 42 customer complaints regarding water quality. *Id.* at 6.

34.     On the evening of Sunday, November 28, 2021, a water sample was collected that "smelled of fuel" and the Red Hill main pump #2 was secured, but the Navy did not notify water customers.

35.     On November 29, the Hawaiʻi DOH put out an advisory to "all Navy water system users avoid using the water for drinking, cooking, or oral hygiene." The advisory covered Aliamanu Military Reservation, Red Hill and Nimitz Elementary schools, and military housing. Officials said that all of the complaints received were from users of the Navy's water system. "As a regulated water system under the jurisdiction of the DOH's Safe Drinking Water Branch, the Navy is responsible for maintaining a safe and reliable source of drinking water to its customers and to provide alternative sources of drinking water for human consumptive uses as deemed necessary," the advisory said.

36.     On November 29, by contrast, the Navy stated there was no "immediate indication" that the water was unsafe. Captain Erik Spitzer, USN, Commander of Joint Base Pearl Harbor-Hickam, told residents in military housing communities on November 29, "My staff and I are drinking the water on base this morning, and many of my team live in housing and drink and use the water as well."

37.     Ten days after the blast, on November 30, 2021, the Resident Services Office sent an email to families stating that the Navy had not detected petroleum

constitutes in the water. They asked that all JBPHH residents flush their water systems. And they stated that they were still investigating the "source" of the odor.

38.    These actions constituted negligent undertaking and failure to warn. The misrepresentations (that the water was safe to drink) were only collateral to the significant operational negligence described that primarily caused the injury. They are not excepted under the misrepresentation exception. *Holcombe v. United States*, 388 F. Supp. 3d 777, 794 (W.D. Tex. 2019) ("The government is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved.") Indeed, the fact that the government chose to lie as to the condition of the water is beside the point. The government had a duty to *warn* affected families of the contamination and failed to do so.

### E. The Navy did not announce the leak until December 2, 2021— twelve days after the blast.

39.    On December 2, 2021, the Navy finally announced that it detected petroleum products in its Red Hill Shaft. Rear Admiral Blake Converse stated "We identified the petroleum products from two different tests. One test was taken on Sunday night shortly after this incident was identified to the Navy. And that test identified trace amounts of very volatile hydrocarbons, which would normally be associated with something like a JP-5 or a diesel fuel," Converse said. The second test found "clear indications of petroleum products in the gas space just above the waterline in the Red Hill well," Converse said. "With both of those, we have pretty

conclusive indications that there are volatile petroleum products in the well and

we've determined that is the likely source of the contamination of our water

distribution system."

40.   Follow on tests were no more encouraging. On December 10, test

results from the DOH showed that hydrocarbons associated with diesel fuel were

detected at 350 times the level the health department considers safe (the

Environmental Action Level). A California lab found 140,000 parts per billion of

total petroleum hydrocarbons as diesel or TPH-d. The DOH Environmental Action

Level is 400 ppb. The water in the Red Hill shaft also showed gasoline

hydrocarbons 66 times higher than the level considered safe. The lab found total

petroleum hydrocarbons as gasoline at 20,000 ppb. The Environmental Action

Level for TPH-g is 300 ppb.

### F.  The Navy took responsibility for the blast and failure to warn.

41.   Later, the Navy took responsibility for the failures at Red Hill. In

January 2022, Admiral Blake Converse said, "I want to start by saying that the

Navy caused this problem, we own it, and we're gonna fix it." Later, Admiral

Paparo reiterated:

> The Navy is responsible for the 6 May 2021 and 20 November 2021 fuel
> spills at the Red Hill Bulk Fuel Storage Facility (Red Hill) and subsequent
> water contamination.
>
> The Navy has a moral obligation and ethical duty to fix our mistakes,

safeguard the environment, and rebuild trust. We must act.

*See* Cavanaugh Report at 127.

### G. The Navy knew it was not safely operating the Red Hill fuel tank system.

42.     The Navy knew that it was not properly operating the Red Hill fuel

tank system in a manner that would prevent a fuel leak.

43.     In an effort to mitigate the risk associated with inadvertent releases of

fuel from the Red Hill facility, the Navy established an agreement with the State of

Hawaiʻi in January 2008: "Red Hill Bulk Fuel Storage Facility Final Groundwater

Protection Plan" (GPP). The GPP documented leaks from various tanks from the

1940s to the 1980s, totaling up to 200,000 gallons of dangerous fuel. The Plan

stated:

> In order to mitigate the risk associated with future releases, the U.S.
> Navy *will*: Implement a rigorous tank maintenance program, and
> Continue to research and investigate a viable leak detection system for
> the Facility. . .

Department of the Navy, Commander Naval Facilities Engineering

Command, Pacific, *Red Hill Bulk Fuel Storage Facility Final Groundwater*

*Protection Plan: Pearl Harbor Hawaiʻi* (Jan. 2008),

https://tinyurl.com/RHFGPP (emphasis added).

44.     The Navy's own audit confirmed that it was not complying with the

requirements of the Final Groundwater Protection Plan. Between October 2008 and

May 2010, the Navy conducted an audit of the Red Hill facility. In August 2010, the Navy completed its audit report and found "four areas of concern" that included: "groundwater contamination; tank inspection and maintenance requirements and schedule; detection of fuel releases; and completion [non-compliance] of response actions *required* by the GPP." Naval Audit Service, *Audit Report: Department of the Navy Red Hill and Upper Tank Farm Fuel Storage Facilities (Redacted)* at 9 (Aug. 16, 2010) (made available by the Board of Water Supply), https://tinyurl.com/NavyAudit (emphasis added). "Based on the results of the audit work, we determined that the environment and groundwater sources in the Pearl Harbor area have not been sufficiently protected." *Id.* at 11.

45.     In January 2014, an improperly repaired fuel tank leaked up to 27,000 gallons of JP-8 jet fuel at the facility. Test results in soil vapor and groundwater in and around the tank indicated a spike in levels of hydrocarbons.

46.     In the wake of this error and in order to prevent additional fuel leaks, the Navy entered into an Administrative Order on Consent (AOC) with agencies including the DOH and the EPA to take steps to ensure that the groundwater resource in the vicinity of the Facility is protected and the Facility is operated and maintained safely—an order that remains in effect to this day.

47.     The "Frequently Asked Questions" in the AOC indicated a full awareness of the threats facing the Red Hill facility:

20

What is the likelihood of a future catastrophic release at the Facility?
. . .
The most likely catastrophic release scenario would be a piping failure
with a release into the lower access tunnel. This vulnerability is being
addressed by the Navy and DLA with the installation of oil tight doors
in the tunnel system, along with a new fire suppression system to
reduce the threat of a release caused by fire. Furthermore, the piping
in the lower tunnel system is not buried or concealed and is visually
inspected daily.

*Red Hill Bulk Fuel Storage Facility – Frequently Asked Questions*, Environmental

Protection Agency, https://tinyurl.com/EPARHFAQ.

48.     A risk assessment report prepared by defendant's own consultant in

2018 described the chances of future fuel releases at the Red Hill facility as:

- Greater than 27% probability of a sudden release of between 1,000
  and 30,000 gallons of fuel each year.

- Greater than 34% chance of a sudden release of more than 120,000
  gallons from the [Red Hill] in the next 100 years.

NAVFAC Pacific, *Quantitative Risk and Vulnerability Assessment Phase 1: Red*

*Hill Bulk Fuel Storage Facility, NAVSUP FLC Pearl Harbor, HI (PRL)*

(November 2021) at pp. 12-29, 14-1, https://tinyurl.com/RHRisk.

### H. The Navy's "flushing" and other cleanup efforts added insult to injury for affected families and compounded the toxic harm.

49.      As the extent of the crisis became undeniable, a series of senior U.S.

Government officials apologized and promised to make things right. Captain

Spitzer, who had previously told families the water was safe to drink, backtracked

and apologized, "I regret I did not tell our families not to drink the water." On

December 6, Secretary of the Navy Carlos Del Toro, on a previously scheduled

visit to Hawaiʻi for the 80th Anniversary of the attack on Pearl Harbor, toured the

facility. He publicly apologized for the crisis and said, "We are committed to

rebuilding this trust. We're doing everything we can try to fix the problem." He

also finally announced to the public that the Navy had temporarily suspended the

use of the fuel tank facility nine days earlier on November 27 – days before they

warned residents of any toxic danger to their water.

   50. On December 14, the Deputy Secretary of the Department of Defense,

Dr. Kathleen Hicks, visited. "At DoD, we recognize the need to continue to care

for all affected personnel and their families and help them return to their homes in

a safe and expeditious manner," she said, "We also recognize we need to double

down on our efforts to earn the trust and confidence of the people of Hawaiʻi in our

ability to manage this situation. . . I am committed to ensuring the health and well-

being for our Service Members, their families, the people of Hawaiʻi, and the

environment." Statement by Deputy Secretary of Defense Dr. Kathleen Hicks

Following Her Visit to the Red Hill Bulk Storage Facility in Hawaiʻi, (Dec. 14,

2021), https://tinyurl.com/HicksStatement.

   51. In spite of the promises, the actual efforts to remediate the water

situation only compounded the harm. The Navy's initial flushing program asked

residents to run their water, and flush toilets and other devices to remove

contaminants. Some residents reported that chemical fumes became overwhelming

when they started flushing. The Agency for Toxic Substances and Disease Registry

(ATSDR) makes clear that fuel fumes constitute additional exposure to the

chemicals—as does the military's occupational risk protocol for exposure to

benzene. Families will testify that the flushing exacerbated their symptoms. In

addition, many of the government personnel flushing these homes did so

negligently, leaving water damage and more toxicity behind—causing further

harm. Air tests of affected homes show that the aerosolized jet fuels were

measurable weeks later. Most flushing teams emptied water heaters directly into

the yards—adding the toxins to the soil, which would then infiltrate the ground

water and further contaminate the environment.

52.     The Navy also opened water hydrants to run into residential streets,

yards, and storm drains that run into the ocean—in violation of law. The Clean

Water Act (CWA) regulates the discharge of pollutants and defines "discharge of

pollutants" as "any discernable, confined and discrete conveyance from any point

source." 33 U.S.C. § 1362(12). The Act aims to prevent, reduce, and eliminate

pollution in the nation's water in order to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To

accomplish this goal, Section 301(a) prohibits the discharge of any pollutant into

waters of the United States that are not authorized by a National Pollutant

Discharge Elimination System (NPDES) permit issued pursuant to section 402(b).

33 U.S.C. §§ 1311, 1342(b).

53.    Section 301(a) of the CWA provides that "the discharge of any

pollutant by any person shall be unlawful" unless the discharger is in compliance

with the terms of an NPDES permit. 33 U.S.C. § 1311(a). The Navy is a "person"

as defined in the CWA and has waived its sovereign immunity under the Act. *See*

42 U.S.C. § 6903(15); 33 U.S.C. § 1365(a)(1).

54.    On November 29, 2021, residents of the military housing

communities captured video of Navy personnel illegally flushing contaminated

water directly into residential streets and storm drains. The DOH confirmed that

such flushing of tainted water occurred in violation of the CWA and Hawaiʻi

Revised Statutes Chapter 342D-50, which prohibits the discharge of pollutants to

state waters without a permit issued by the Director of Health. The brazen violation

of environmental laws constitutes negligence. The DOH issued a cease-and-desist

order to the Navy to stop the illegal flushing.

55.    Furthermore, the Child Development Centers run by the military to

provide childcare on base continued to have children use dangerous and

contaminated water long after the contamination began. Despite repeated attempts

to have the centers verify that children's porous plastic drink cups had been

replaced, the Child Development Center was unable to confirm the replacement of all contaminated items known to pose a risk of exposure.

56.     The Navy's response only compounded the harm to affected families. On December 2, the U.S. Army authorized evacuation and lodging expenses for affected families. The Navy did not do so until a day later, almost a week after water complaints began to flood in. The Navy estimates approximately 3,200 families were displaced from military housing to live temporarily in hotels. Families of four remained in single hotel rooms, where they lived for months.

57.     On February 14, 2022, water in one portion of the Red Hill housing complex was cleared as safe to drink by the DOH. This clearance was based on testing only 10% of the affected homes despite repeated requests from families to test all the homes. The "tests" did not test for petroleum and the vial samples were destroyed as set forth below.

58.     The Navy's flushing efforts did not include replacement of plastics or water heaters. Nor did the flushing effort include scrubbing the air of the air contaminants—a common practice in remediation.

59.     Once the government cleared neighborhoods as "safe," families were forced to move back into the homes that made them sick. Many families got sick immediately upon moving back into the homes. Residents reported that sediment from the fuel remained in the bottom of the water heaters, and they continued to

get burned during showers and experience other symptoms. Many families

continued to avoid use of the water.

**I.   Federal officers failed to provide appropriate medical care to families affected, compounding injuries that the Navy had caused.**

60.    After May 2021, active-duty military families, covered by the

TRICARE health care program, reported to military health care facilities with

symptoms of toxic exposure. They suffered from stomach cramps, vomiting,

diarrhea, and rashes. Some asked about polyps and lesions they had noticed. Many

reported slower thinking (brain fog), and that their children, previously well

behaved and advanced for their age, had begun to behave erratically, regress in

developmental milestones, recede into themselves, or become confused.

61.    The standard of care for exposure to jet fuel or other drinking

contaminants requires a neuropsychological assessment and baseline labs,

including a comprehensive chemistry panel to test renal function, liver function,

electrolytes, and complete blood count (CBC). Patients should also likely receive

an X-Ray or EKG.

62.    In fact, the United States Government recognizes the risk of benzene

exposure in its' own policies and procedures—and has a clear testing approach to

addressing such risk. In DODD 6055.05-M, military personnel who have

occupational exposure to benzene get an initial and annual exam. They are

"required" to get a "complete blood count" with "results reviewed by an examining

physician." If they have faced "emergency exposure," they are to receive an "end of shift urinary phenol test." The Department of Defense Occupational Health Surveillance Manual, DODD 6055.05-M (4 May 1998 as amended in 2018).

63.    These standards were not met. When the plaintiff families presented to emergency rooms or "exposure tents" that were set up by the Army and Navy, most were denied any tests or labs. Families have even been told that testing is "impossible" and that the toxicologist at Walter Reed advised against ordering labs or other tests for fear of the implications of the care that would be required thereafter.

64.    Not only did military providers fail to meet the standard of care upon initial exposure, they failed to follow the appropriate protocols to treat the plaintiff families thereafter. Their care has been rife with medical delay, failure to treat, and failure to diagnose.

65.    For example, military providers have failed to screen for the illnesses that the United States itself has documented as related to exposure to water contaminated with jet fuel. Military providers repeatedly told patients that there is simply "no research" on the issue—notwithstanding the volumes of government research on similar circumstances at Camp LeJeune. Camp Lejeune, North Carolina, Agency for Toxic Substances and Disease Registry, https://www.atsdr.cdc.gov/sites/lejeune/index.html.

**J.   After the filing of the initial complaint in this matter, reports emerged that the Navy discarded critical evidence that would have revealed the extent of the harm they caused.**

66.     In September 2022, reports emerged that water samples taken by government personnel from over 1,000 affected homes were "never tested for fuel" and were ultimately discarded. Sophie Cocke, *Hundreds of Water Samples Never Tested for Fuel*, HONOLULU STAR ADVERTISER (Sept. 6, 2022), https://tinyurl.com/RHWaterSamples. Military officials such as Admiral Timothy Kott, USN, told families in town halls after the contamination, "We are working aggressively to try to figure out what is in the water." *Id.*

67.     However, the Navy's flushing of its "main distribution system" and family homes "likely diluted" the presence of contaminants and diminished the ability to ascertain the chemical composition in the contaminated water. *Id.* The Navy ultimately collected water samples from over 1,000 homes, but never tested these samples for "petroleum chemicals":

> Instead, the Navy did a rough screening of the samples for total organic carbon, which can indicate that the water is contaminated but not with what.

*Id.* The Navy then represented these tests on their online database as "non-detect." *Id.*

68.     "The Navy could have sent the samples that it collected from homes to the EPA labs for additional testing, but instead *says it dumped the water and*

*threw out the vials after one month of storage*." *Id.* (emphasis added).

69.     The Hawai'i Supreme Court recognizes the elements of a negligent

spoliation of evidence claim:

> For a claim of negligent spoliation of evidence, jurisdictions generally
> require that the plaintiff prove: (1) the existence of a potential civil
> action; (2) a legal or contractual duty to preserve evidence that is
> relevant to the potential civil action; (3) destruction of that evidence;
> (4) significant impairment in the ability to prove the lawsuit; (5) a
> causal relationship between the destruction of evidence and the
> inability to prove the lawsuit, and (6) damages.

*Matsuura v. E.I. du Pont de Nemours & Co.*, 102 Hawai'i 149, 166-67, 73 P.3d

687, 704-05 (2003) (cleaned up). Here, the Navy was well aware of the existence

of a potential civil action. Beyond the unprecedented media attention on the issue,

plaintiffs began filing SF-95 claims starting in February 2022. The chemical

composition of contaminated water in the Navy's possession was highly "relevant

to the civil action" as it would have helped prove the families' chemical exposure.

The Navy destroyed the evidence, creating a "significant impairment in the ability

to prove the lawsuit" while will in turn cause damage.

### K. Additional leaks of dangerous substances from the Red Hill facility raise additional questions as to contaminants in the water from the fuel leak.

70.     On November 29, 2022, another leak of dangerous substances

occurred at Red Hill. Late that day, approximately 1,100 gallons of toxic fire-

suppressing foam leaked into topsoil and into the underground facility, according

to the Hawaiʻi state health department. State of Hawaiʻi, Department of Health,

*Red Hill AFFF Fire Suppressant Spill – Dec. 2 Update* (Dec. 2, 2022),

https://tinyurl.com/RHSpillDecUpdate. So-called "forever chemicals" – or PFAS –

were released into the environment by the spill. Often used to suppress fuel fires,

the aqueous film forming foam (AFFF) contains chemicals known to cause cancer.

U.S. Centers for Disease Control, *Per- and Polyfluorinated Substances (PFAS)*

*Factsheet - CDC*, https://www.cdc.gov/biomonitoring/PFAS_FactSheet.htm. So

far, the Navy has refused to release videos of the incident, prompting more distrust

of the Navy around Oʻahu. Sophie Cocke, *Navy Refuses to Publicly Release Video*

*of Latest Red Hill Spill*, HONOLULU STAR ADVERTISER (Dec. 6, 2022),

https://tinyurl.com/RefusesRelease; *Off The News: Navy's Changing Story on*

*Video*, HONOLULU STAR ADVERTISER (Dec. 6, 2022),

https://tinyurl.com/VideoEditorial.

71.    Just this week, the government for the first time acknowledged that

another PFAS spill occurred in December 2019 and contaminated the soil outside

of the Red Hill Facility. Sophie Cocke, *Toxic Red Hill Spill in '19 Affected Soil,*

*Navy Reveals*, HONOLULU STAR ADVERTISER (March 18, 2023),

https://www.staradvertiser.com/2023/03/18/hawaii-news/toxic-spill-in-2019-

affected-soil-navy-reveals/. The Navy told no one about this contamination for

over three years, claiming it was "not required to report the incident to regulatory

agencies." *Id.*

72.    Contemporaneous tests also showed the presence of 2-(2-Methoxyethoxy) ethanol in plaintiff's contaminated water, a fuel system icing inhibitor added to the JP-5 at the Red Hill facility. This dangerous chemical has shown reproductive toxicity effects on laboratory animals. Despite any belated warnings about jet fuel contamination, plaintiffs have never been warned that their contaminated water also contained this form of antifreeze.

73.    The government has still not disclosed the full list of contaminants released from the fire suppression hose in November 2021, and many are rightfully concerned that PFAS was among them. Victims deserve to know what they consumed so they can monitor for the appropriate lifetime risks with doctors they trust.

### L.  The Navy's operations at Red Hill likely violated additional regulations.

74.    Upon information and belief, Navy officers violated additional regulations and mandatory requirements at Red Hill. Investigations are ongoing.

75.    Congress foresaw the public health harm posed by hazardous substances such as jet fuel and passed key legislation to prevent toxic exposure. In the 1970s, Congress passed the CWA and the Safe Drinking Water Act (SDWA), 42 U.S.C. §300f et seq, requiring the EPA to establish regulations ensuring clean and safe drinking water for the public. The legislation and implementing

regulations are intended to prohibit the discharge of "oil and hazardous substances" into the environment because of the serious and severe threat to public health posed by these substances. *See, e.g.,* 33 U.S.C. § 1321.

76.    The SDWA was established to protect the quality of drinking water in the U.S. This law focuses on all waters actually or potentially designed for drinking use, whether from above ground or underground sources. The Act authorizes the EPA to establish minimum standards to protect tap water and requires all owners or operators of public water systems to comply with these primary (health-related) standards.

77.    National Primary Drinking Water Regulations (NPDWRs or primary standards) are legally enforceable standards that apply to public water systems. Primary standards protect public health by limiting the levels of contaminants in drinking water. The EPA provides a table listing the Maximum Contaminant Level (MCL) for various chemicals, the highest level of a contaminant that is allowed in drinking water. MCLs are enforceable standards. The MCL sets enforceable limits for benzene (.005 milligrams per liter), toluene (1 milligram per liter), ethylbenzene (0.7 milligrams per liter), xylene (10 milligrams per liter), and other light petroleum distillates.

78.    The State of Hawaiʻi has adopted a State Water Code, codified in Chapter 174C of the Hawaiʻi Revised Statutes, which states in relevant part:

**Declaration of policy.** (a) It is recognized that the waters of the State are held for the benefit of the citizens of the State. It is declared that the people of the State are beneficiaries and have a right to have the waters protected for their use.

Haw. Rev. Stat. 174C-2.

79.     Hawai'i law also regulates potable water. The Hawai'i Department of Health Rules Relating to Hawai'i Potable Water Systems (Hawai'i Administrative Rules [HAR] Title 11, Chapter 20) set forth Maximum Contaminant Levels of certain chemicals in public and private drinking water systems. These MCLs are analogous to the National Primary Drinking Water regulations but additional substances are regulated.

80.     Federal and State programs for the management of underground storage tanks such as Red Hill were first published in the 1980s. In January 2000, the State of Hawai'i promulgated rules requiring owners and operators of such facilities to report suspected or confirmed releases from USTs.

81.     All of these regulations provide mandatory requirements for federal agencies and federal officers, and the extent of the Navy's violations at Red Hill will be subject to discovery.

### M. Affected families have suffered extraordinary, compensable harm.

82.     The Navy's jet fuel leaks—and conduct thereafter—have resulted in extraordinary inconvenience, illness, economic injury, and fear for each of the affected families. As set forth below, these families have experienced trauma not

only from the poisoning but also from the aftermath. They were forced back into

the homes that made them sick, only to render many of them ill again. Some

families then spent their life savings or gave up important careers to uproot their

families and move off the island or off the water line. And for many, the search for

medical care has been a wild goose chase, as Navy officials continue to proclaim

that there is no long term-harm.

83.    Initial reported symptoms for these families were wide ranging,

including abdominal issues, anxiety, exhaustion, headaches, muscle and joint pain,

skin issues (rashes, blisters, dry skin). Many of these physical symptoms have

persisted over time, and over 94% of families reported still struggling with anxiety.

84.    The symptoms these families identified track closely with the

symptoms reported in a survey conducted by the Centers for Disease Control:

> Most participants reported experiencing one or more new or worsened
> symptoms after the incident (1,980; 87%), many of whom reported
> symptoms lasting ≥30 days (1,493; 75%). The largest percentages of
> reported symptoms were those related to the nervous system (62%),
> followed by the gastrointestinal system (58%), skin (58%), ear, nose,
> and throat (47%), mental health (46%), eyes (42%), and respiratory
> system (31%).

Alyssa N. Troeschel, et al. *Notes from the Field: Self-Reported Health Symptoms*

*Following Petroleum Contamination of a Drinking Water System — Oahu,*

*Hawaii, November 2021–February 2022*. MMWR Morb Mortal Wkly Rep

2022;71:718–719. DOI: http://dx.doi.org/10.15585/mmwr.mm7121a4external

icon.

85.     A follow-up survey conducted in September 2022 found continuing

problems. 41% of respondents "reported an existing condition that had worsened,"

"31% reported a new diagnosis" and "25% reported a new diagnosis with no pre-

existing condition." Mahealani Richardson, *Alarming new CDC survey shows*

*'worse health' among those impacted by Red Hill fuel spills*, Hawaii News Now,

(Nov. 9, 2022), https://tinyurl.com/CDCRDSurvey. 80% of respondents reported

health symptoms in the previous 30 days, and 65% had "high or very high

confidence" the symptoms relate to the water contamination. Navy Water

Contamination Follow-Up Survey Results, https://tinyurl.com/CDCFollowUp.

86.     All of the affected families are at increased risk of future medical

conditions associated with the components present in their contaminated drinking

water and will require, at a minimum, medical monitoring.

### a.  The Feindt Family[7]

87.     The Feindts, Patrick, Amanda (Major, U.S. Army),[8] and their children

---

[7] A more expansive explanation of the damages suffered by each of the below
families is available in the attachment to their SF-95 form.

[8] As an active-duty soldier, Major Amanda Feindt's legal ability to pursue tort
claims against the United States is limited under the doctrine enunciated in *Feres v.
United States*, 340 U.S. 135 (1950). Major Feindt and all other active-duty soldier
spouses of named plaintiffs in this litigation are still evaluating their potential
claims in light of the recent exception to *Feres* passed in the National Defense

P.G.F. and P.R.F., lived in the Ford Island neighborhood of Honolulu, Hawai'i. The Feindt family moved from their off-base home in Ewa Beach to Ford Island military housing on Joint Base Pearl Harbor-Hickam at the end of April 2021.

88.    In late November and early December, as her family struggled with an onset of debilitating symptoms such as nausea, vomiting, dehydration, diarrhea, migraines, lethargy, and neurological changes, Major Feindt got several notices in her email from government officials about the jet fuel spill that told her the "water was safe to drink." The Feindts also received notification that their children were being provided clean water at their on-base Child Development Center since 29 Nov 2021, but the Navy did not supply clean water to the center until December 10, 2021. Despite the family's exposure through their home and her children's secondary exposure endured at the Child Development Center on the same water line, Major Feindt and her husband's pleas for testing and information went repeatedly unanswered by government officials.

89.    Patrick and their two children were denied basic testing when they presented at Tripler Army Medical Center with acute reactions to the

_____

Authorization Act of 2020 permitting administrative claims against the United States for personal injury or death of a member of the uniformed services that was the result of medical malpractice caused by a Department of Defense health care provider. Although this First Amended Complaint covers their families, none of the active-duty family members waive any of their potential claims.

contamination, breaching the standard of care. Tellingly, Major Feindt was given a battery of tests as a military officer (consistent with the appropriate standard of care) that were denied to her own family. Their children's lives have been turned upside down as multiple doctors have tried to explain and treat their symptoms.

90.     Initially moved into a hotel for months, the Feindts were finally transferred off of the island after immense effort and financial and professional sacrifice. Although the Feindts have moved to Colorado, the health problems caused by the water contamination have come with them.

91.     Patrick (a PGA Golf Professional) has had more than six medical procedures and internal bleeding as the doctors struggled to find the cause of illness. He continues to experience debilitating abdominal and flank pain that radiates down to his testicle which required exploratory surgery, during which three small hernias, stomach ulcers, large and small intestine damage was noted. He was given a capsule camera, endoscopy, a colonoscopy, and the surgeons took several biopsies. He was also given a double balloon procedure to view his intestines. The gastroenterologists have ruled out most suspected gastrointestinal issues and they are now turning to neurology to find a possible source of his pain. He will need a brain scan in the coming weeks. Mr. Feindt had to resign from his Director position in Hawaiʻi and file for unemployment, leaving Major Feindt as the sole provider for the family.

92.     Both children have experienced sustained symptoms including diagnosed regressive and hyperactive behavioral changes, P.G.F. is currently seeing a pediatric specialist, psychiatrist, psychologist, hematologist, immunologist, dermatologist, speech and occupational therapist(s), and neurologist and was placed on new medication for the behavioral issues. P.R.F. has seen a pediatric specialist, pulmonologist, dermatologist, and was denied hematology, which the family is currently fighting.

93.     Patrick Feindt and his entire family have suffered from the reasonable fear and lasting trauma of the government's water contamination and lack of transparency. To this day they have no idea the full extent of the exposure of their children at their home or the Child Development Center because the government has refused to provide requested information. They look to the families affected by Camp LeJeune and reasonably fear for their medical futures.

### b.  The Freeman Family

94.     The Freeman family, Nastasia, her husband (an active-duty Navy Ensign), and their children, K.F., D.F., and N.F., lived in the Aliamanu Military Reservation neighborhood of Honolulu, Hawai'i.

95.     Nastasia Freeman's family has been plagued with abdominal pain, vomiting, memory loss, skin rashes, brain fog, eye irritation, seizures, and teeth and gum issues because of the fuel leaks caused by the Navy. A dormant,

preexisting seizure disorder flared up for Nastasia[9] in the wake of the Navy's jet

fuel negligence and she began suffering from multiple seizures a day, ending any

chance of continuing her life as usual.

96.     During these episodes, Nastasia becomes disoriented, panicked, and

sometimes loses consciousness. When the seizure passes, Nastasia is exhausted

and stutters for much of the rest of the day. Because of the unpredictable and

debilitating nature of these episodes, the mother of four was forbidden to drive and

is wary of bodies of water, for fear of drowning if she were to lose consciousness

in the water.

97.     On December 9, 2021, after learning of her exposure to fuel-

contaminated water, Nastasia had a virtual appointment with her primary care

manager at Tripler. She expressed concern for her exposure and resurgence of

seizure activity, as well as insomnia, migraine, and psoriasis. Her doctor ordered a

referral to neurology but neglected to order appropriate labs to ensure Nastasia's

---

[9] Under Hawaiʻi law, the Navy is responsible for any predisposition to injury or
preexisting injury (known or unknown) that were exacerbated by its negligence.
Indeed, the Hawaiʻi Supreme Court has made clear that a tortfeasor is responsible
"for all injuries legally caused by the defendant's negligence. However, it is well
settled that a tortfeasor is liable not only for damages resulting from direct and
unique injuries inflicted on the victim, but also for damages resulting from the
aggravation of the victim's pre-existing disease, condition, or predisposition to
injury." *Montalvo v. Lopez*, 77 Hawaii 282, 294, 884 P.2d 345, 357 (Haw. 1994).
Many of the plaintiff families had preexisting injuries that the Navy exacerbated.

health after this exposure. On December 29, Nastasia visited her primary care

manager with flu symptoms. They ordered flu, COVID-19, and strep testing, but

again neglected to order appropriate blood work.

98.     While doctors attribute these maladies to their water, the military has

failed to provide the most basic levels of healthcare for the Freeman family,

breaching the standard of care. Military providers refused to order basic blood

screening panels to check their liver and kidney function after toxic exposure. It

was not until Nastasia ended up in the emergency room at the Mayo Clinic—off

the island—that she was finally given the tests that she had needed all along. Her

provider there was surprised by the lack of care she had received on base.

99.     The Freemans were initially moved into a hotel but sought, through

multiple requests, to get off of the island. At great expense and difficulty, they

moved to the mainland in February, but their harm has continued. The Freeman's

purchased an $850,000 home so that they had a permanent address and could

receive medical care in California. A CT scan in April showed calcifications on

Nastasia's bladder wall and the urologist found blood still present in her urine,

prompting pending cancer screening on her bladder. She was referred to pelvic and

genetic therapy, and the doctors did a screening for a family history of cancer.

MRIs revealed multiple lesions on her brain and there is abnormal peripheral

displacement of the pituitary gland which is causing the area to fill with spinal

fluid. After multiple setbacks, she was admitted to Walter Reed to monitor brain activity and run more medical tests. Walter Reed questioned her increased dosage of seizure medication and was told that it was not controlling her symptoms. She was taken off the medication and some of her symptoms got better, but she knows she will be prescribed different medication soon. While at Walter Reed she learned she was also suffering from vestibular dysfunction. The doctors questioned why her medication was raised from 500 mg to 3000 mg on her seizure medication while in Hawaiʻi. She will be treated by her ENT doctor for the vestibular issues. A nephrologist is monitoring her kidneys. She was assured by Walter Reed that a team was available to continue her care back in San Diego, but so far, they have not been able to replicate the treatment plan.

100.   Financially, Nastasia's work as a therapist has ground to a halt with her family's medical challenges. The cost of the move, the house, and the medical procedures has left her family in dire financial straits.

101.   The Freeman children continue to suffer from the exposure. Their son, D.F., underwent evaluation for developmental delays and autism markers and was diagnosed with autism level 2. He is still experiencing symptoms and was hospitalized in April after going limp and losing consciousness. K.F. and N.F. are also still stick. Both K.F. and N.F. had abnormal lab results in August, which noted concerning areas in the liver, kidney, and pancreas. K.F. also had blood in his

urine. N.F. woke up and was in so much pain that he was vomiting and could not move in mid-August. He was taken to the hospital on August 18 and 21, 2022, unable to support himself and with a fever.

102.   Nastasia Freeman's medical care has been riddled with mistake, delay, failure to diagnose, and failure to treat. These medical failures have resulted in life-threatening injury—all while relocating and taking care of the rest of their sick family. Nastasia is beside herself. "I did nothing wrong; my kids did nothing wrong. However, the treatment, the retaliation, the negligence, the lack of decency to communicate between commands, and the responsibility and failure to provide medical screenings put my life at risk."

### c.  The Simic Family

103.   The Simics, Jamie, her husband, a Senior Chief Petty Officer in the United States Navy, and their children, M.S., and J.S., lived in the Hale Na Koa neighborhood of Honolulu, Hawai'i.

104.   Once an active and attentive mother of two, Jamie found her life forever changed by the water contamination at Red Hill. Jamie has a condition called Ehlers-Danlos Syndrome. This condition often intensifies her symptoms from contaminated water. As mentioned above, Hawai'i law makes clear that the tortfeasor is responsible for their victims as they find them, including preexisting conditions.

105.    From July 2021 to November 2021, Ms. Simic was in the emergency

room five times. Her doctors discovered a benign cyst on her kidney, a cyst on her

breast, teratoma tumor on her ovary, and three legions that were removed from her

colon and esophagus bone from September to December. She has undergone two

colonoscopies, two endoscopies, a barium swallow study, multiple blood draws

that revealed elevated levels of lipase, blood in her urine, heart monitoring,

excessive menstrual bleeding, severe leg pain and swelling that makes it difficult to

walk, leg paralysis, and swelling/itching under her arms. After dropping below 98

pounds, she began telling her children things they should know if she passed away.

106.    Jamie was again admitted to the emergency room on December 6,

2021, for exposure to hydrocarbons. "The ER doctor only admitted me because my

colon was swollen, and I was throwing up and severely ill. He tried to send me

home saying there was no way I was this sick because the leak was only two days,

max two weeks." Jamie remained in the hospital for four nights. During that time,

she was not given the standard care for an exposure of this kind: EKG,

neuropsychological assessment, kidney and liver panels, and CBC panels.

107.    Since falling ill, Ms. Simic's doctors have found multiple cysts,

legions, and tumors throughout her body. Her two children have similarly suffered

from neurological challenges, respiratory symptoms, and lesions.

108.    While the Simics were finally diagnosed with their exposure, they

have not received the basic level of medical care. Eight-year-old J.S. and nine-

year-old M.S. suffered from the same symptoms as Jamie. Bouts of diarrhea,

stomach aches, and vomiting would send the kids home from school. Both children

suffered from infections on their face, and J.S. lost five teeth since December 4 –

four requiring surgical removal. Their parents noticed a change in their behavior as

the kid's displayed aggression and became lethargic around the home. They are

still suffering from bloody stool and diarrhea, headaches, leg and kidney pain,

shortness of breath, heart palpitations, vomiting and lesions.

109.   Jamie and her family have been in and out of the hospital multiple

times since leaving the island in March. She has been to the emergency room over

five times and hospitalized twice. She has had a colonoscopy, endoscopy, and

several biopsies which revealed issues with her stomach lining.

110.   Jamie's son, M.S., sought medical care at Tripler Army Medical

Center multiple times with various symptoms. Dates of visits include June 8, 2021,

August 30, 2021, December 6, 2021 (ER; SF600 reported diarrhea, headache; no

labs ordered), December 10, 2021 (PCM for routine well checkup, diarrhea,

headache, and ear pain; no labs ordered), and January 11, 2022 (PCM follow-up,

diarrhea, nausea, and headache reported). Medical providers at Tripler Army

Medical Center knew or reasonably should have known about the fuel leaks and

the significant threat to public health they posed. Through their training and

protocol, military medical providers possess an understanding of appropriate risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure the health of M.S. after his known exposure to fuel-contaminated water.

111.   Similarly, Jamie's daughter, J.S. sought medical care at Tripler Army Medical Center multiple times with various symptoms. Dates of visits include May 7, 2021, May 27, 2021, August 6, 2021, August 12, 2021, August 17, 2021, August 24, 2021, October 20, 2021, December 4, 2021 (SF600 submitted; rash, diarrhea, nausea, headache, and fatigue), and January 11, 2022. Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocol, military medical providers possess an understanding of appropriate risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure the health of J.S. after her known exposure to fuel-contaminated water.

112.   Financially, the Red Hill leak has devastated the Simics, who threw out prized family possessions in their effort to leave the island and the contamination. They are considering selling their home to move where the family can get better treatment and say that this has wrecked them financially.

113.   Psychologically, Jamie and her family remain riddled with fear about

what happened with the water, exacerbated by the government's lack of transparency. She has debilitating concerns about the contaminates and their lasting effects on her and her family. "We don't even know what all was in the water. I just want answers."

### d. The Arnold Family

114.   Crystal Arnold, her four children, J.R.A., J.A.A., J.E.A., and J.B.A., and her mother-in-law, Barbie Arnold, lived in the Earhart military housing community on JBPHH. Over the summer and fall of 2021, the family began experiencing skin issues, headaches, facial pain, brain fog, memory issues, stomach pains, diarrhea, nausea, and vomiting. Despite numerous visits to their doctors at Tripler, they were told that there were no available tests for their exposure.

115.   After the November 2021 fuel spill, the family was forced to relocate to a hotel. This upheaval was incredibly stressful for the special needs family with a child with autism.

116.   The Arnolds left the island in July 2022, but still experience many of the symptoms they acquired after their exposure, including fatigue, mood changes, and hair loss. They are worried about the possible health implications for their children and feel guilty for inadvertently exposing them to toxins.

### e. The Aubart Family

117.   With a distinguished thirty (30) year career working for the DOD and as a former Airman, Kevin Aubart and his wife Saori moved to Doris Miller Park, a military housing community on JBPHH from Korea in 2016.

118.   Soon after the November 20, 2021, fuel spill, the Aubarts began to experience upset stomachs, burning throats, eye irritation, headaches, rash and dry skin, muscle and joint pain, brain fog, and anxiety. Many of these symptoms have persisted as of November 2022.

119.   Being displaced in December 2021 was extremely difficult for the Aubarts. The life disruption continues as the family now spends several hundred dollars a year on bottled water. They will never trust the water in their home again and are terrified of the possible health implications that may await them.

### f.  The Boggs Family

120.   AnnMarie Boggs and her daughter, R.B., as well as AnnMarie's mother, Cheryl Mello, were thrilled when they moved into the Radford Terrace military community in August 2021.

121.   Almost immediately after moving in, the Boggs family battled dry skin, rashes, headaches, fatigue, nausea, hair loss, and burning eyes. After the November 20, 2021, fuel spill, many of their previous symptoms escalated as they also experienced additional symptoms of burning chest, joint pain, and racing heartbeat. At the Makalapa Clinic, they were told that there were no specific tests

they could do. For months, they were forced to use bottled water for all drinking and hygiene needs, retrieving their water daily.

122.   As of November 2022, the Boggs family continues to experience these symptoms, as well as anxiety, depression, brain fog, cough, irregular periods, muscle aches, stuffy nose, and abdominal pain. A family member was affected by the water contamination at Camp Lejeune, and they are terrified about what their exposure means for their future health.

### g.  The Coberley Family

123.   Adrianna Coberley and her five (5) children, A.M., J.M., K.M., B.C., and O.C., struggled with their health for months in their home located in the Aliamanu Military Reservation military housing community.

124.   Leading up to the November 20, 2021, blast, while Adrianna's husband was deployed, the family experienced headaches, increased irritability, rashes, missed milestones, and stomach pains.

125.   Over the months that followed, the family battled additional symptoms of fatigue, joint pain, burning sensations, nausea, coughing, cold-like symptoms, skin irritation, mouth sores, kidney issues, and lasting anxiety and depression. The Coberley family's symptoms were recorded by Tripler military officials, and Adrianna was later refused toxic testing by Ohana Clinic care providers.

126.   The family's December 2021 displacement impacted their daily lives,

financial stability, physical health, family dynamics, and mental health profoundly.

Adrianna was forced to haul clean water daily unassisted, and for months the

family used bottled water for consumption, hygiene, and household chores.

Adrianna became overwhelmed with anxiety as she helped her nine-year-old son

battle suicidal thoughts and actions. The Coberley family was denied an Early

Return of Dependents.

127.   A.M. reported multiple symptoms to Army medical staff. Dates of

visits include December 5, 2021 (SF600 submitted; GI upset, headache, eye

burning, and mouth sores). Medical providers at Tripler Army Medical Center

knew or reasonably should have known about the fuel leaks and the threat to public

health they posed. Through their training and protocols, military medical providers

possess an understanding of risk assessment and treatment for toxic exposure.

Toxicological testing was not performed in a timely and proactive manner, nor was

suitable treatment given, to ensure health after a known exposure to fuel-

contaminated water.

128.   K.M. reported multiple symptoms to Army medical staff. Dates of

visits include December 5, 2021 (SF600 submitted; GI upset, headache, eye

burning, nasal congestion, nausea, and mouth sores). Medical providers at Tripler

Army Medical Center knew or reasonably should have known about the fuel leaks

and the threat to public health they posed. Through their training and protocols, military medical providers possess an understanding of risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a known exposure to fuel-contaminated water.

129.   B.C. reported multiple symptoms to Army medical staff. Dates of visits include December 5, 2021 (SF600 submitted; fussiness, diarrhea, rash, and stomachache). Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocols, military medical providers possess an understanding of risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a known exposure to fuel-contaminated water.

130.   O.C. reported multiple symptoms to Army medical staff. Dates of visits include December 5, 2021 (SF600 submitted; fussiness, diarrhea, rash, and stomachache). Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocols, military medical providers possess an understanding of risk assessment and treatment for toxic exposure.

Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a known exposure to fuel-contaminated water. They eventually relocated to Washington to escape the contamination. As of November 2022, many of their symptoms remain. The family is now hyper vigilant about their water and purchased water filtration systems as well as all new kitchenware because of intrusive worries about water safety. Intense fears regarding their current and future health continue.

### h.  The Dietz Family

131.   Richelle Dietz, B.D., and V.D, moved to the Earhart Village military housing community on JBPHH in February 2021. The family had been suffering from constant headaches, burning of the skin and throat, stomach pain, vomiting, and diarrhea. After the November spill, B.D.'s headaches became so severe that the family spent $5,000 to fly B.D. to California and have a risky operation done on his brain. On March 16, 2022, B.D. had surgery for a condition that was considered under control before the exposure to the fuel-contaminated water. Now, he is recuperating and has many questions and anxiety about the water. He has been unable to do the one thing that would once relieve his chronic headaches: take a long, hot shower.

132.   The family still experiences diarrhea, rashes, general malaise, hair loss, abdominal pain, and had a recent diagnosis of eczema. Richelle has also

developed cysts on her ovaries, and her doctor is recommending a partial hysterectomy. They have incurred additional expenses due to medical co-pays, purchasing water from a delivery service, and replacing their porous materials.

### i.   The Flewellen-Reynolds Family

133.   Tiffany Flewellen-Reynolds, her husband, Antonio, and their children, T.R. and A.R., were loving their time in their home in the AMR neighborhood on JBPHH. But over the summer of 2021, the family noticed an increase in headaches and skin irritation. Tiffany began to experience urinary tract infection symptoms and a burning sensation after showering. The family's symptoms spiked the week before Thanksgiving. They had skin irritation, dry skin, burning eyes/throat, diarrhea, abdominal pain, headaches, nausea, cough, muscle pain, dry throat, numbness, and runny noses.

134.   After the Reynolds learned about the contaminated water, the anxiety in the home skyrocketed. Tiffany's concerns about her health and the disruption to A.R.'s routine became overwhelming, and their out-of-pocket costs piled up.

135.   The water crisis also took a toll on the Reynolds relationship. Tiffany often feels too sick to leave the home or participate in their usual family activities and was diagnosed with generalized anxiety because of the spill.

136.   In 2022, the Reynolds are still experiencing depression, anxiety, headaches, and runny noses. They continue to spend additional funds to purchase

bottled water and have concerns about their future health.

### j.  The Fritz Family

137.   Jeff Fritz proudly served his country for twenty-six (26) years as a
decorated Air Defense Officer in the U.S. Army before he retired as a Lieutenant
Colonel and moved to Hale Na Koa military housing in Ohana Navy Communities
with his wife, Anayansi. Over the summer and fall of 2021, the couple's retirement
plans were shattered when Jeff began to have serious health complications. His VA
doctors discovered skin cancer under his left eye, which was surgically removed.
He also began experiencing blurred vision, migraines, and low levels of Vitamin
D.

138.   After the November 2021 fuel spill, Anayansi left the island because
of contamination concerns. The family was not offered a hotel, and the couple
lived apart for many months. Jeff had to change his holiday plans with his children,
which meant canceling and purchasing new plane tickets during Christmas. After a
second skin lesion was discovered on Jeff's cheek, he had no choice but to give up
his retirement dream.

139.   Jeff had to give up his six-figure job with Booz-Allen Hamilton and
spent almost $20,000 out of pocket to move off-island. He incurred substantial out-
of-pocket costs because of the spill and was not reimbursed because he was a
retired civilian. The news about his health had a deep impact on his children who

were still mourning the loss of their mother. With the added anxiety and pressure on Jeff, and his kids fearful they might lose their father as well, he made the decision to move to Florida to be closer to his children, even though he was not able to transfer his job there.

140.   As of November of 2022, the family still experiences depression, anxiety, mood swings, general malaise, headaches, joint pain, abdominal pain, and brain fog. They also have fears about the unknown future of their health.

### k.  The Grow Family

141.   Adriana and Alexander Grow moved to Hawaiʻi and into their Kapilina Beach Home, with their four children, At.G., Au.G., A.C.G. and Ap.G., in September 2021. Alexander is a 100% disabled veteran and had been medically retired from the Army after serving our country for ten (10) years. The Grow family was excited to start a new life on the island with their exchange student, Aitbeth Mudcha.

142.   Joy quickly turned to grief as the family suffered the loss of their seven-month-old son, Apollo, in October. While the family grieved the loss, they also began to suffer from dry, itchy skin, stomach pains, eye irritations, headaches, hair loss, and fatigue during the fall of 2021.

143.   After the November fuel spill, they continued to suffer from eye irritation, increased thirst, muscle and joint pain, nausea, dry skin, difficulty

54

breathing, and stuffy, runny noses. They were forced to throw away their contaminated items and sell the rest of their belongings just to pay for tickets off the island and return to the mainland, unsure where they would be living.

144.   As of November 2022, the Grow family is expecting another child. But they are still experiencing depression, dry cough, burning sensations in the nose and throat, and weakened immune systems. Adriana is unable to enjoy being pregnant because she was diagnosed with Gestational Diabetes and is bedridden. Having already experienced the loss of a baby, she is especially fearful that the long-term effects from the spill will impact her pregnancy or the health of her unborn child.

### l.  The Jessup Family

145.   Sheena Jessup, and her children, B.B.J., B.J.J., and N.J., lived in the Radford Terrace military housing community on JBPHH since 2017. The Jessup family welcomed their son, D.J., in January 2021.

146.   In June 2021, a month after the May fuel spill at Red Hill, Sheena Jessup began to have severe abdominal pain. Medical testing revealed an unexplained eight (8) millimeter growth on her liver. By Thanksgiving 2021, the family experienced intermittent stomach pain, unexplained headaches, nausea, dizziness, chills, muscle aches, rashes, lethargy, vomiting, diarrhea/changes in stool, burning skin, burning esophagus, and disorientation.

147.   The family's symptoms were reported to Tripler medical providers at a triage tent, where Sheena was denied medical care and evaluation. For months, the family was forced to acquire potable water for consumption, hygiene, and household chores. In search of safe water, the family was forced to separate for five months, nearly doubling their living expenses.

148.   B.B.J. reported multiple symptoms to Army medical staff. Dates of visits include December 7, 2021 (SF600 submitted; nausea, diarrhea, abdominal pain, and headache). Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocols, military medical providers possess an understanding of risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a known exposure to fuel-contaminated water.

149.   B.J.J. reported multiple symptoms to Army medical staff. Dates of visits include December 7, 2021 (SF600 submitted; nausea, diarrhea, abdominal pain, sore throat, and lethargy). Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocols, military medical providers possess an understanding of risk assessment and treatment for toxic exposure.

Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a known exposure to fuel-contaminated water.

150.   N.J. reported multiple symptoms to Army medical staff. Dates of visits include December 7, 2021 (SF600 submitted (child not present); chills, vomiting, diarrhea, and headaches). Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocols, military medical providers possess an understanding of risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a known exposure to fuel-contaminated water.

151.   D.J. reported multiple symptoms to Army medical staff. Dates of visits include December 7, 2021 (SF600 submitted; vomiting, change in stool consistency, and rash). Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocols, military medical providers possess an understanding of risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a known exposure to fuel-

contaminated water.

152.   During their relocation, their trauma was compounded because of re-exposure at a Ford Island hotel, causing burns and months of additional fear for one of the children. The family has since discovered a growth on another child's thyroid. As of November 2022, the family is furious about the exposure their children endured and are deeply worried about their future health.

### m. Kelly Jones

153.   Kelly Jones, a resident of Maryland, was visiting a friend for the Thanksgiving holiday at her military home in Radford Terrace. She experienced intense stomach pains and diarrhea, and her trip was ultimately disrupted because of her symptoms.

154.   After the spill in November 2021, Kelly returned home and was treated by several local doctors who tried to help with her symptoms of abdominal pain, cramping, diarrhea, lack of appetite, difficulty going to the bathroom, changes in her menstrual cycle, and heartburn. She was also given a urinalysis which revealed blood in her urine. Kelly has missed several days of work because of her symptoms. She was unable to eat many of her favorite foods because they increased her symptoms and she struggled to maintain her bowels.

155.   In October 2022, Kelly was diagnosed with gastritis after a colonoscopy. Her bacteria breath test came back with signs of hydrogen gas in her

intestines and many of Kelly's medical specialists have to be paid out of pocket as her insurance does not cover the expenses. She remains fearful about permanent health damage, and her potential for having children in the future. She still has symptoms of depression, anxiety, diarrhea, irregular menstrual cycles, general malaise, hair loss and abdominal pain.

### n.  The Kirkpatrick Family

156.   Ashley Kirkpatrick and her son, D.K., lived in the Earhart Village military housing community on Joint Base Pearl Harbor-Hickam. Later that year, the family welcomed a baby boy, E.K.

157.   Over the summer and fall of 2021, the family began to experience headaches, skin issues, mouth sores, light sensitivity, nausea, vomiting, confusion, irritability, migraines, developmental delays, pregnancy complications, postpartum complications, and vision loss. Two-year-old D.K. and Ashley both had sores in their mouths. Despite numerous primary care and emergency room visits on base, the family was told there were no tests available for petroleum exposure.

158.   The family faced undue financial and tremendous personal stress. Ashley's severe Binocular Vision Dysfunction led to the loss of her ability to drive, as well as the loss of her career in the Hawaiʻi Air Force National Guard. After the November 2021 fuel spill, the family was forced to evacuate their home and care for a newborn in a small hotel room. In December of 2021, while newly

postpartum, Ashley and her family moved into a new home in the Schofield

Barracks neighborhood.

159.   The family left the island in September 2022 but continue to struggle

with many of the symptoms and health concerns they acquired after their exposure.

As of November 2022, Ashley is in the process of receiving a diagnosis for tumors

that have appeared on her thigh. She is concerned with these new health issues and

for her family's future health. Ashley is worried that the lack of care received on

the island will continue to wreak havoc on her family's health.

### o. The Lamagna Family

160.   Audrey Lamagna, as well as her children Au-J.L. and Ai-J.L. were

affected in their military home in Moanalua Terrace. Stomach pains, nausea, and

skin irritation symptoms were brushed off by the doctors in the fall of 2021.

Audrey suffered an ectopic pregnancy and the surgeons had to remove one of her

fallopian tubes after having a lack of adequate health care that led to weeks of

spotting, abdominal pain, and mental anguish from the miscarriage.

161.   After the November spill, the children's lives were disrupted, and they

struggled because of lack of sleep and added anxiety. Audrey was burdened with

hauling and collecting water and extra driving, while grieving the loss of her

unborn child. She also felt anxiety and exhaustion as the family looked for a way

off the island. They were unable to leave until her active-duty spouse retired and

they were able to move back to the mainland.

162.   A.L. reported multiple symptoms to Army medical staff. Dates of
visits include December 9, 2021 (SF600 submitted; bloating, abdominal pain,
headache, lethargy, and muscle aches). Medical providers at Tripler Army Medical
Center knew or reasonably should have known about the fuel leaks and the threat
to public health they posed. Through their training and protocols, military medical
providers possess an understanding of risk assessment and treatment for toxic
exposure. Toxicological testing was not performed in a timely and proactive
manner, nor was suitable treatment given, to ensure health after a known exposure
to fuel-contaminated water.

163.   Au-J.L. reported multiple symptoms to Army medical staff. Dates of
visits include December 9, 2021 (SF600 submitted; changes in stool consistency,
abdominal pain, headache, lethargy, and rash). Medical providers at Tripler Army
Medical Center knew or reasonably should have known about the fuel leaks and
the threat to public health they posed. Through their training and protocols,
military medical providers possess an understanding of risk assessment and
treatment for toxic exposure. Toxicological testing was not performed in a timely
and proactive manner, nor was suitable treatment given, to ensure health after a
known exposure to fuel-contaminated water.

164.   Ai-J.L. reported multiple symptoms to Army medical staff. Dates of

visits include December 9, 2021 (SF600 submitted; lethargy, and rash). Medical

providers at Tripler Army Medical Center knew or reasonably should have known

about the fuel leaks and the threat to public health they posed. Through their

training and protocols, military medical providers possess an understanding of risk

assessment and treatment for toxic exposure. Toxicological testing was not

performed in a timely and proactive manner, nor was suitable treatment given, to

ensure health after a known exposure to fuel-contaminated water.

165.   Audrey and her family have had to completely restructure their daily

routines, stripped of all sense of normalcy. As of November 2022, the family is

still dealing with anxiety, mood swings, irregular periods, headaches, runny noses,

fluctuation in weight, and brain fog. The family was hit hard financially, having to

throw away their contaminated items and spend extra money on disposable kitchen

supplies and laundry. They are fearful about the increased risk of cancer in the

future.

### p.  The Maben Family

166.   Joseph and Patricia Maben visited Hawaiʻi in November 2021 to

spend time with their daughter, son-in-law, and grandchildren, the Feindts. They

stayed at the Feindts' home in the Ford Island community on JBPHH. Shortly after

returning home from their visit, they developed nausea, diarrhea, abdominal pain,

and dizziness. Patricia was subsequently diagnosed with a stomach ulcer causing

her daily discomfort.

167.   The most painful part of the last year has been watching their daughter's family suffer through the aftermath of their exposure to the fuel-contaminated water. The Mabens are anxious and scared of what may be in store for their family in the years to come.

### q.  The Maloon Family

168.   Isabel Maloon was ecstatic when her husband received military orders to Hawaiʻi. Their children, M.D., K.L., L.M., A.E., P.D., and C.T., were excited to move into their new home in Aliamanu Military Reservation military housing on JBPHH. In the summer of 2021, Isabel noticed a change in the family's health. Symptoms of coughing, difficulty breathing, dry skin, acne, brain fog, abdominal pain, and urinary tract infection (UTI) symptoms were increasingly common yet dissipated when the family left the island to travel.

169.   Isabel Maloon reported multiple symptoms to Army medical staff. Dates of visits include January 15, 2022. Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocols, military medical providers possess an understanding of risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a

known exposure to fuel-contaminated water.

170.   After the jet fuel spill in November 2021, tropical island life turned into a daily battle to get clean, safe water. The family worries about the long-term symptoms. Emotionally drained from the ordeal, the family cannot wait to leave.

171.   The weight of the unknown looms over the family. Isabel is worried about the long-term consequences. As of November 2022, the family still experiences anxiety, diarrhea, rashes, eye irritation, general malaise, hair loss, headaches, muscle and joint pain, runny noses, abdominal pain, and brain fog. Isabel has recurring yeast infections along with UTIs, and her vision is declining. The financial blow has yet to be absorbed as the family continues to pay out of pocket for things like clean water.

### r.  The McClanahan Family

172.   Katherine McClanahan, her husband Brian (a military reservist), and their children, William (18) and E.M., have been living in Hawai'i on Officer Field, on JBPHH military housing. In the summer and fall of 2021, Katherine began experiencing troublesome symptoms. She had shortness of breath, joint pain, skin rashes, burning sensations that felt UTIs, black stool, and urgency for bowel movements. Brian also had shortness of breath.

173.   After the November 2021 fuel spill, Katherine continued to experience the same symptoms and had blood work and urinalysis done. As

Katherine waits for answers, she cannot help but feel disappointed in the military for putting her family in the situation that they find themselves in. Brian became sick and his job was affected. The family is fearful about their future and worried about the repercussions to their health.

174.   As of November 2022, the family still reports symptoms of anxiety, diarrhea, rashes, eye irritation, general malaise, hair loss, headaches, muscle and joint pain, brain fog, and shortness of breath. Katherine experiences high frequency tremors, migraines with auras, Central Vestibular Dysfunction, and neurology issues. She has been to countless specialists, to no avail.

175.   Brian lost his job and so the family must now pack their belongings and leave the island—without the help of the military. They are now not only financially devastated but also homeless.

### s.  The Miles Family

176.   Twenty-year Navy Veteran Belinda Miles, and her children, W.M. and L.M., lived in the Ford Island military housing community on JBPHH. In the summer and fall of 2021, the family began to experience symptoms that progressively worsened including swelling of extremities, intestinal distress, nausea, fatigue, dizzy spells, night sweats, lymph swelling, skin issues, genital irritation, earaches, headaches, vision changes, behavioral changes, developmental regression, anxiety, and depression. After Belinda's mother visited in early

December, she experienced headaches, upset stomach, light sensitivity, fatigue, and brain fog.

177.   After Belinda learned about the contaminated water, she paid for chemical testing for herself and her children. When she brought the alarming reports to Tripler Army Medical Center, her health concerns were dismissed. She was denied further testing and labs by multiple medical providers on multiple occasions.

178.   After the November 2021 fuel spill, the family was forced to evacuate to a hotel. The displacement was incredibly disruptive for the special needs family.

179.   As of November 2022, symptoms of skin sensitivities, abdominal pain, muscle and joint pain, headaches, fatigue, dry cough, ear ringing, and mental health concerns continue. Inconvenience has amplified as the family spends thousands of dollars a year on veterinarian visits, out-of-network medical bills, and water delivery. They have been forced to adjust career goals and plan to return to the mainland as soon as possible, no longer trusting that the water in their home or at the children's on-base school is safe. The family feels that they will not receive adequate healthcare on the island. The family has since lost a beloved pet. Belinda can't sleep at night and is terrified her children will get cancer, a lesion, or fall ill. She is also worried for the future health of herself and her husband.

**t.  The Morris Family**

180.   Kelly Morris, a nurse, and her daughter, Hailey, lived in the Kapilina

Beach Homes community near JBPHH. In the fall of 2021, they noticed unusual

and alarming developments in their health including hormonal changes, breast

lumps, unexplained fever, tremors, heart palpitations, unusual vaginal bleeding,

urinary burning/pain, rectal bleeding, pain in extremities, anxiety, and depression.

The family dogs also suffered from constant illness.

181.   Due to their nonmilitary status, Kelly and Hailey were unable to

evacuate their home. For months, they were unable to cook in their home,

showered at a local gym, used out of home laundry services, and received bottled

water for all drinking and hygiene needs. Between the medical bills, lost wages,

costs for bottled water, and extra food costs, the Morris's were faced with

substantial debt that forced them to leave the island on their own dime.

182.   As of November 2022, the Morris family has relocated back to the

mainland, but their physical and mental health continues to suffer. Kelly has since

undergone a breast biopsy and discovered a new thyroid nodule. She now has

chronic urinary infections and awaits further gastrointestinal testing for new

difficulty swallowing. Both Kelly and Hailey now have crippling anxiety and

depression and will never trust their tap water again. They are frightened of

increased risk of cancer, Hailey's ability to have children, and future unknown

health issues.

### u.  The Overbaugh Family

183.   Tiffany Overbaugh and her children, J.O. and B.O., lived in the Ford Island military community on JBPHH. Having just arrived on the island in mid-November 2021, the family was unaware of their exposure while staying in a nearby hotel and learned of the contaminated water on November 30, after receiving a copy of the press release issued by the Navy, just eight (8) hours after signing their lease. If the Overbaughs knew that the water in military housing communities had been poisoned with jet fuel, they would have never agreed to live there.

184.   When the Overbaughs moved into their Ford Island home in January, the entire family's health rapidly went downhill. Symptoms included fatigue, brain fog, hair loss, headaches, brain fog, yeast infections, menstrual changes, abdominal pain, sore throat, runny nose, cough, dry skin, rash, diarrhea, genital irritation/burns, back spasms, mouth sores, sore legs, muscle and joint pain, behavioral changes, developmental regression, and anxiety.

185.   The family stayed in their home and was denied installation of a water filtration system, forcing them to rely on bottled water for all drinking and hygienic needs. After developing open wounds on her private areas from bathing, Tiffany's daughter was left with permanent scars and began to panic when her diaper was changed. Her son developed a fear of water and associates water with

pain.

186.   When the Overbaughs submitted urine samples to a lab to test for toxins, they discovered shocking levels of various chemicals, including methyl tertiary-butyl ether (MTBE) and ethyl tertiary-butyl ether (ETBE).

187.   As of November 2022, the family lives separately. Despite leaving the island, many symptoms continue, with new symptoms of neurological impairment, balance issues, twitching, and tingling in extremities. Tiffany has been diagnosed with severe anxiety disorder and has undergone a hysterectomy. Inconvenience and costs mount as the family has purchased a new car, replaced household goods and clothing, undergone detoxification protocols, and must now pay for travel to reunite intermittently.

188.   Tiffany relives the trauma of their exposure with each new doctor she meets in search of answers and is now leery of receiving medical care. She is terrified over the unpredictable future of her family's health and is overwhelmed with guilt for exposing her children to contaminated water.

### v.  The Perez Family

189.   Kandyce Perez and her children, L.P., A.P., E.P., and F.P., moved to their new home on Aliamanu Military Reservation on JBPHH in September 2020. Over the summer and fall of 2021, when the kids started to get headaches, their parents made them drink more tap water to stay hydrated. As fatigue, brain fog,

eye irritation, developmental delays, behavioral changes, joint pain, skin rashes,
distorted vision, and a dry cough set in, Kandyce became worried.

190.   After the November 2021 fuel spill, the family was left to pick up the
pieces as they tried to deal with the stress, and lingering symptoms of fatigue, brain
fog, and neuropathy. Kandyce struggled to do more than two tasks a day and felt
exhaustion and brain fog. The Perez family feels that their trust in the military has
been broken as they now face a lifetime of questions and concerns about their
health.

191.   In November 2022, the family reported they were still having
symptoms of depression, anxiety, mood swings, rashes, general malaise, and
neuropathy. Financially, the family has struggled with the additional costs of
bottled water, filters, and trying to see additional doctors out of pocket. Kandyce
has to avoid the news and information about the spill because it makes her feel
hopeless and anxious as she worries for the safety of her family.

### w. The Pulou Family

192.   Harry, Lorelei Pulou, and their six children, V.P., S.P., J.P., H.P., I.P.,
and F.P., have lived in Aliamanu Military Reservation military neighborhood since
July 2017. Harry spent twenty-five (25) years serving this country as a soldier in
the U.S. Army and had high hopes of enjoying retirement in Hawaiʻi following his
last assignment on the island.

70

193.   The year 2021 should have brought the family joy as they celebrated Harry's career in the military. But over the summer and fall of 2021, the family began feeling sick with brain fog, abdominal issues, behavior/mood changes, fatigue, rashes, migraines, eye irritation, shortness of breath, and hair loss. V.P. never got a menstrual period from after July, and she was diagnosed with polycystic ovary syndrome (PCOS). In October, Lorelei's symptoms became so severe she was admitted to Tripler due to migraines, body aches, dizziness, and vomiting. She was diagnosed with benign vertigo.

194.   After the spill, their symptoms continued to worsen and the Pulous grew concerned about the long-term consequences of their exposure to the fuel-contaminated water. F.P. was rushed to the hospital several times due to her ongoing severe skin issues. F.P reported multiple symptoms to Army medical staff. She was admitted to Tripler Army Medical Center in December 2021 due to an eczema infection and Hand Foot and Mouth Disease. J.P. was having trouble with his eyes and went to an optometrist. The entire Pulou family reported to military medical providers after the exposure; none were appropriately treated. The family still reports that their symptoms have continued as of November 2022.

195.   Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocols, military medical providers

possess an understanding of risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a known exposure to fuel-contaminated water.

### x.  The Quintero Family

196.   When Lacey Quintero, a proud Navy veteran, and her daughters, C.J.Q. and C.E.Q., arrived at the Navy Lodge on JBPHH's Ford Island in November of 2021, they noticed a petroleum smell coming from the shower. The family immediately began experiencing changes in behavior, fatigue, nausea, lack of appetite, aching bodies, brain fog, dry/itchy skin, and pancreatic pain. Later that month, after moving into their home in Officer Field, their symptoms worsened as they also experienced burning throat, UTI-like symptoms, vomiting, diarrhea, stomach pains, rashes, nose bleeds, mouth sores, and vertigo.

197.   After only a few weeks in their new home, inconvenience and financial stress mounted as the family was forced to evacuate back into a hotel. Additional financial stress was added when they paid out of pocket to move off base in search of safe water. Lacey felt betrayed by her country, for which she once fought to protect and serve. This was not the life after her military career she had envisioned.

198.   As of November 2022, the family experiences hair loss, tinnitus,

vision issues, muscle and joint pain, skin issues, and abnormal thyroid levels. Since moving off base the family feels isolated from losing the comfort and support of their military peers. Lacey endures trauma responses related to visiting doctors and the base itself. She is fearful of her family's ongoing symptoms.

199.   After seeing recent updates about Camp Lejeune victims, Lacey is terrified of what her family's exposure means for their future health, especially her children's fertility. She searches for signs of leukemia, and wonders who will die first: herself, or one of her children.

### y.  The Staple Family

200.   Disabled Army Veteran Joshua (Josh) Staple, his wife Kathleen (Katie), and their kids, J.S., G.S., N.S., S.S., K.S., and A.S., lived in the Aliamanu Military Reservation military community on JBPHH. After the 2021 fuel spills at Red Hill, the Staples experienced gastrointestinal issues, headaches, fatigue, brain fog, abdominal pain, chest pain, anxiety, and depression.

201.   The biggest toll was on Joshua's emotional health. At the end of November, as Josh's physical and emotional symptoms began to weigh on the veteran, he disappeared, leaving a suicide note. The Staples had no idea that the reason for this dramatic decline was Josh's consumption of fuel-contaminated water. After several days missing, Josh was returned home safely, and later checked into an inpatient facility.

202.   The family reported their symptoms to a military triage tent, where they were offered no specialized care, and were instead told to report to Tripler if they wanted treatment. In December, S.S., a normally healthy eight-year-old, suffered chest pain that caused his parents to call 911. When paramedics arrived, his episode began to subside. After they made sure the child was stable, his mother immediately took him to the emergency room where they performed an EKG. The Staples were given no answers as to the cause of their son's alarming chest pain.

203.   After the November 2021 fuel spill, the family was forced to evacuate their home during an already emotionally turbulent time, during which they also had to incur the cost of boarding their dog. The stress of displacement and the uncertainty of his family's health led to Joshua checking into a month-long inpatient care facility for extra PTSD and mental health support. The family had to use bottled water for all cooking, drinking, and oral hygiene.

204.   As of November 2022, Joshua's gastrointestinal issues and mental health concerns remain unresolved. He and his wife battle anxiety, sleepless nights, and overwhelming guilt about their family's exposure and what it means for their future health. They will never trust the water in their home again.

### z.  The Traina Family

205.   Daniel (Dan) Traina, a disabled veteran, his wife, Diann, and their two children, Z.T. and J.R., moved to Aliamanu Military Reservation (AMR) military

74

housing in JBPHH in August 2020. After a few months of intense physical therapy due to suffering a stroke in November 2020 and a suspected stroke two months later, he was back to surfing, attending car shows, and enjoying outdoor activities with his wife and children.

206.   Following the November 2021 fuel spill, the smell of fuel permeated Dan's house. On or about November 27, Dan stood up but immediately fell to the floor. The thirty-eight (38) year old had lost all feeling on the left side of his body and was experiencing a splitting migraine. Dan was rushed to Tripler where he stayed for the next six (6) days.

207.   J.R. was flushing his surgery site from wisdom teeth surgery with the contaminated water, resulting in a painful, swollen face and extended healing times. He also suffered from headaches and rashes. Z.T. suffered from headaches, nausea, and rashes as well.

208.   The once-surfer was now struggling to do basic tasks around his home and move throughout his community. Months of rigorous physical therapy earned Dan near normalcy, yet in a matter of weeks, he was forced to use a cane or walker just to stand. When his family is not there to assist him, he sometimes has to postpone basic needs such as eating meals, showering, and other self-care.

209.   The Trainas were displaced from their home on December 3. With these hotels being far from his home and lacking necessities, they charged upwards

of $10,000 to their credit card to cover the extra expenses. Due to Dan's new limitations, being displaced for three and a half months was especially difficult. When his wife and children planned family outings, Dan was forced to stay behind.

210.   Dan has spent the last several months juggling up to seven doctors' appointments per week. He often gets lost on his way to his appointments even though he has appointments at that facility three times per week. To account for this, he leaves up to two hours early for an appointment that is only 15 minutes away. By the time he gets to his destination, Dan is exhausted. Because of his weakness, just working the pedals is a struggle.

211.   The challenge of his commute continues once he reaches the parking lot. Unable to walk to the door, he sometimes has to circle the parking lot multiple times to get a handicapped parking spot. He then has to maneuver his heavy wheelchair out of the back seat because he is unable to get to the door using a walker.

212.   After an arduous drive to physical therapy in August 2022, Dan's legs couldn't support him long enough to get his wheelchair out of his car. He had a particularly hard fall in the parking lot, relying on the help of bystanders to get into his chair. Because of the increased frequency of falls at home and elsewhere, his doctor is considering revoking Dan's driver's license. If this happens, the 39-year-old veteran will lose the last bit of freedom and independence he has, effectively

rendering him home-bound due to his lack of resources and support.

213.   Without access to adequate home-healthcare, Dan worries about and has to plan for contingencies that most people don't give a second thought to. Before making the decision to go to the grocery store, or to go get the mail, or to go upstairs in his own home, he worries about what he would do if the motorized shopping carts aren't charged, or if there is a crack in the sidewalk, or if he will have the strength to get back downstairs if he gets thirsty.

214.   While Dan so desperately wishes for a return to the life he knew before, he continues to suffer from weakness on the left side of his body, memory loss, headaches, trouble breathing, exhaustion, loss of balance, depression, anxiety, esophageal burning, devastating mobility deficits, and overall loss of independence.

215.   The pain of his deteriorating physical condition has also taken a toll on Daniel's mental health, family dynamic, and marriage. His children have become caregivers and he reports that his wife has "caregiver burnout." The strain that this has left on the family has impacted them so significantly that Diann has filed for divorce. Knowing that he will eventually have to leave his children and move back to the mainland is the most painful aspect of his new reality.

216.   Dan Traina sought medical care at Tripler Army Medical Center multiple times with various symptoms. Dates of visits include but are not limited to

November 27, 2021 to December 3, 2021 (ER-admitted; left side weakness,

migraines, potential stroke), December 7, 2021 (cardiology evaluation), January 4,

2022 (ER follow-up, migraines), January 13, 2022 (telehealth Neurology consult

"[m]y opinion is that the water contamination fuel exposure likely contributed to

his worsening headaches"), January 28, 2022 (follow-up, stroke and migraine).

Medical providers at Tripler Army Medical Center knew or reasonably should

have known about the fuel leaks and the threat to public health they posed.

Through their training and protocol, military medical providers possess an

understanding of appropriate risk assessment and treatment for toxic exposure.

Toxicological testing was not performed in a timely and proactive manner, nor was

suitable treatment given, to ensure health after a known exposure to fuel-

contaminated water.

217.   Z.T. reported multiple symptoms to Army medical staff. Dates of

visits include December 9, 2021 (SF600 submitted; nausea, diarrhea, headache,

confusion, abdominal pain, and itchy skin and eyes). Medical providers at Tripler

Army Medical Center knew or reasonably should have known about the fuel leaks

and the threat to public health they posed. Through their training and protocols,

military medical providers possess an understanding of risk assessment and

treatment for toxic exposure. Toxicological testing was not performed in a timely

and proactive manner, nor was suitable treatment given, to ensure health after a

known exposure to fuel-contaminated water.

218.   J.R. reported multiple symptoms to Army medical staff. Dates of visits include December 9, 2021 (SF600 submitted; nausea, diarrhea, headache, dizziness, and mouth swelling/pain). Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocols, military medical providers possess an understanding of risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a known exposure to fuel-contaminated water.

219.   The Trainas exposure to this contaminated water has had a devastating effect on every facet of their lives. Soon, Dan will be 3,000 miles away from his children, divorced, home-bound, and financially drained. He is terrified of how he is going to afford the care that he needs after losing Tricare benefits in the divorce. Unsure of what the future holds for their health, the family will perpetually suffer from anxiety.

### aa. The Watson Family

220.   Chad Watson and his wife Elizabeth moved to Halsey Terrace on JBPHH in July 2020 with their son, M.T. After the November 2021 fuel spill, the whole family began suffering from abdominal issues that were so severe they

struggled to leave the house. M.T. also began to exhibit unusual behaviors.

221.   They moved into a hotel on December 3. Throughout the month, the

Watsons experienced coughing, congestion, fatigue, abdominal issues, and

migraines. Chad's symptoms became unbearable, and he went to Tripler for his

symptoms on December 18 and again on December 31. He was not offered testing

for the water contamination.

222.   Chad Watson reported multiple symptoms to Army medical staff.

Dates of visits include December 18, 2021 (cough) and December 30, 2021

(cough). Medical providers at Tripler Army Medical Center knew or reasonably

should have known about the fuel leaks and the threat to public health they posed.

Through their training and protocols, military medical providers possess an

understanding of risk assessment and treatment for toxic exposure. Toxicological

testing was not performed in a timely and proactive manner, nor was suitable

treatment given, to ensure health after a known exposure to fuel-contaminated

water.

223.   Chad was referred to the dermatologist for an abnormal mole and

facial irregularity. His dermatologist said that there was a "strong possibility" that

the contaminated water was related to the growth. Though most of their symptoms

subsided after they stopped using the water, Chad is worried about the long-term

risk of stomach ulcers or cancer.

### bb.   The Wheeler Family

224.   Paige Wheeler, her husband, and their children J.W., A.W., and S.W. lived in the Radford Terrace military community on JBPHH. Since May 2021, Paige, who is medically fragile due to Hashimoto's disease, suffered from hair loss, rashes, weakness, brain fog, headaches, upset stomach, chest pain, chills, and spots in her vision. Her children had chronic blistering rashes, skin growths, headaches, and more.

225.   In May 2021, Paige's entire left side radiated so much pain she was unable to walk and was rushed by ambulance to Tripler Army Medical Center. Despite Paige's agony, Tripler neglected to perform any scans or investigate the source of her pain. Instead, they ordered a complete blood count (CBC), gave her a lidocaine patch and painkillers then sent her on her way. Later, her Primary Care Physician (PCP), attributed her pain to sciatica and age and recommended she see a chiropractor.

226.   Due to the fuel-contaminated water, the Wheelers applied for an Early Return of Dependents and Reassignment for Humanitarian Reasons, which was denied. The Wheelers faced undue financial stress as Paige, the children, and the family pets, were forced to return to the mainland in search of safer water on their own dime. Paige and the children now live in a friend's home on the mainland, until her active-duty husband fulfills his contract.

227.   As of November 2022, the family's concerns for the future remain as
Paige is overwhelmed with anxiety, depression, and guilt about letting her children
and pets drink contaminated water. One of their beloved pets has since passed due
to cancer. Paige is anxious about her family's exposure causing long term mental
health issues. Paige fears that the toll taken on her already taxed immune system
will exacerbate her Hashimoto's, and she worries about her children's increased
risk for cancers or autoimmune diseases.

### cc. The Wilson Family

228.   Lindsey Wilson and her son, L.W., lived in AMR on JBPHH in 2021.
After learning about the fuel spills, she felt betrayed and angry for her son.
Because of their exposure, the Wilsons experienced headaches, brain fog, fatigue,
indigestion, and diarrhea. When two-year-old L.W. started complaining of an upset
stomach over the fall of 2021, she became worried.

229.   Lindsey feared the worst after reading about the jet fuel contamination
in November 2021. After the Army Garrison denied the possible symptoms from
drinking the contaminated water in a direct Facebook message, Lindsey knew she
had to protect her family. Despite the dismissal, she turned to drinking bottled
water as her son developed skin rashes on the lower part of his body. Lindsey felt
lethargic and experienced brain fog, which she had never had before. Her stomach
was upset, and she began to have diarrhea. L.W. also experienced stomach pain,

and even though he was only two, he began asking for his parents to hold his tummy while he was on the toilet because of the pain.

230.   Lindsey Wilson reported multiple symptoms to Army medical staff. Dates of visits include March 7, 2022 (shortness of breath and brain fog). Medical providers at Tripler Army Medical Center knew or reasonably should have known about the fuel leaks and the threat to public health they posed. Through their training and protocols, military medical providers possess an understanding of risk assessment and treatment for toxic exposure. Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure health after a known exposure to fuel-contaminated water.

231.   As of November 2022, Lindsey still has anxiety and remains fearful when she hears stories about the jet fuel spill because water had consumed her every thought for many months. After her husband retired, he had to abandon their plan of taking a DOD job in Hawai'i because of their concerns about the safety of their tap water. Financially, the family was burdened with extra expenses while living in their military home because of water purchases, out-of-pocket parking while staying in a hotel, and water and air filters for their home. They also had extra expenses leaving the island which they had not planned on.

### dd.   The Witt Family

232.   In August 2021, Elizabeth Witt and her husband were excited to begin

their life in Hawai'i and hoped to start a family. They both worked near their home in Officer Field on JBPHH, utilizing the island's close resources to their benefit and getting by with one vehicle.

233.   During the fall of 2021, Elizabeth experienced increased menstrual cramping and a longer menstrual cycle. She also had increased headaches and stomach pain. On or around December 8, she reported her symptoms to Task Force Ohana and began to document her medical issues. The SF600 Chronological Record of Medical Care noted her symptoms and "hydrocarbon exposure." Elizabeth emailed her doctor and requested testing for petroleum poisoning. She was told there were none available, and the military doctors dismissed her concerns.

234.   Around December 9, the Witts got a government-procured hotel, but found it was too difficult to stay there. The room was on the 25th floor, making it difficult to take their dog to the hotel. Both Elizabeth and Konner were working, while sharing one car. They returned to their home and used bottled water.

235.   Elizabeth was thrilled when she got pregnant in early 2022, but she is still worried about the safety of her unborn child and the long-term impacts on the family's health. She struggles with the decision to start a family in a contaminated home daily. She still experiences depression and anxiety regarding the contaminated water. The family has been hit financially because of the additional

expense of bottled water and disinfectants that they use to avoid exposing their unborn child to the water in their home.

### ee. The Zawieruszynski Family

236.   Amanda Zawieruszynski, her husband, and their children, J.Z., V.Z., and S.Z., moved to the Halsey Terrace community on JBPHH in 2017. After the November 2021 fuel spill, the Zawieruszynskis exhibited symptoms such as severe headaches, gastrointestinal problems, sore throat, rash, and more. With the prompt onset of severe symptoms of toxic exposure, the impact of the water crisis was felt in the family immediately. Within four months of their exposure, Amanda developed nerve damage in her brain, requiring excruciating injections every four weeks.

237.   On or around December 1, Amanda went to the emergency room at Tripler because her throat and mouth hurt so badly that she was almost completely unable to eat, and she had a splitting headache. There, she was told that the pain in her throat and mouth was likely a chemical burn from her repeated ingestion of jet fuel. After discharge, Amanda discovered her medical records stated she suffered from a "virus" instead.

238.   On or around December 3, she attempted to go to her primary care doctor at the Makalapa Clinic but was turned away because her issues were related to the water contamination. Amanda was sent to the Water Ohana Taskforce Clinic

where she was told that they were "not doing any labs for the water."

239.   Amanda was dismissed on multiple occasions and suffered for weeks before receiving the news that she had nerve damage in her brain. Amanda's concerns and requests for proper medical care for her daughter, V.Z., were also dismissed by military doctors.

240.   As a result of the November 2021 fuel spill, the Zawieruszynski family was evacuated to three hotels over the next few months, all of which were uniquely unpleasant. One happened to be infested with termites. The displacement was extremely difficult for the family. During that time, the family was forced to humanely euthanize their beloved family dog, who had become sick after the fuel exposure.

241.   Over the last year, the Zawieruszynskis lives have changed more than they could have ever imagined. Amanda and Michael's marriage was hit hard by the unimaginable stress and turmoil, causing them to separate in June of 2022. As of November 2022, symptoms of headaches, skin irritation, runny nose, brain fog, vomiting, bloody nose, memory loss, vision changes, spinal disc concerns, menstrual changes, mood changes, anxiety, and depression persist and have a profound effect on the family's daily life. Amanda takes daily medication and has undergone uterine surgery to address the abnormal bleeding that started after her exposure. She undergoes monthly treatments to numb and isolate the pain she

experiences from the nerve damage caused in November 2021, something she also takes daily medication for.

242.    Amanda relies on the goodwill of friends to help care for her family as she continues to suffer. She also continues to buy bottled water for safe drinking, as she will never trust tap water again. After the family's exposure, Amanda feels numb, anxious, and helpless regarding the future health of her family.

CAUSES OF ACTION

COUNT I: NEGLIGENCE

243.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

244.    The United States owns and operates the Red Hill Bulk Fuel Storage Facility.

245.    The United States had a duty to exercise reasonable care in the operation and maintenance of the Red Hill Bulk Fuel Storage Facility.

246.    Federal officers breached the duty to exercise ordinary care at Red Hill in at least the following respects:

a.    Officers failed to adhere to the proper valve sequencing in May 2021;

b.    Officers failed to implement mandatory corrective actions after the May 2021 leak and prior leaks;

c.    Officers violated mandatory provisions of the Safe Drinking Water

Act;

d.  Officers failed to install or replace pipes with mandatory steel piping;

e.  Officers operated the train cart on November 20, 2021, negligently and at excessive speed;

f.  Officers knew or should have known of the fuel buildup in the PVC piping between May and November 2021 and failed to take corrective action;

g.  Officers failed to warn residents that the leaks had occurred in violation of federal and state law;

h.  Officers ordered junior servicemembers to flush hazardous fuel into groundwater without a permit and in violation of federal and state law;

i.  Officers knew that maintenance failures had compromised Red Hill and failed to take corrective action to prevent harm;

j.  Officers failed to test water samples for petroleum and destroyed water samples from affected homes; and

k.  Various other safety violations and breaches to be determined upon discovery.

247.   As a direct and proximate result of defendant's breach of duty of care, the plaintiffs have been injured.

248.   As a direct and proximate result of the negligence of defendant and its

officials, the plaintiffs suffered substantial injuries and damages, including severe

mental and emotional distress.

249.   As a direct and proximate result of the negligence of defendant and its

officials, the plaintiffs suffered special damages and will require testing/medical

monitoring to be determined by expert testimony.

250.   Plaintiffs are entitled to actual damages in a fair and reasonable sum

in an amount to be determined at trial sufficient to compensate the plaintiffs for the

negligence of the United States.

COUNT II: NEGLIGENT UNDERTAKING

251.   Plaintiffs incorporate by reference the allegations set forth in the

preceding paragraphs as if fully set forth here at length.

252.   "The Supreme Court has repeatedly found that the United States can

be held liable under the Federal Tort Claims Act if a private person would face

good Samaritan liability under state law." *Williams v. United States*, 711 F. Supp.

2d 1195, 1207 (D. Haw. 2010) (citing *Indian Towing Co. v. United States*, 350

U.S. 61, 69 (1955)).

253.   Hawaiʻi state law recognizes liability related "to the voluntary

assumption of a duty or undertaking." *Id.*

254.   The Navy voluntarily undertook the responsibility to provide safe

drinking water to all those on the Navy water line on Oʻahu. Having undertaken

that responsibility, the Navy was required to do so with reasonable care.

255.   Furthermore, federal law and "regulations can give rise to a state-law duty under the good Samaritan doctrine. *Id.* at 1208.

256.   The United States Congress voluntarily undertook the creation of laws such as the Safe Drinking Water Act and the Clean Water Act to avoid the foreseeable harms of toxic water contamination. United States agencies such as the Environmental Protection Agency and the Department of Defense undertook to establish specific regulations, orders, and decrees to implement those laws and avoid harms to public drinking water systems, including:

   a. Establishing "specific Operations Orders" to conduct appropriate valve opening and closing sequencing to avoid fuel spills.

   b. Mandating the use of "schedule 40 steel pipe" instead of PVC plastic piping for fire suppression systems like the Red Hill system under the Unified Facilities Criteria specifications for the Department of Defense's Fire Protection Engineering for Facilities, UFC 3-60-01, Section 9-9.2.1.

   c. Requiring the issuance of a Tier 1 public notice "no later than 24 hours" after learning of violations of the national primary drinking water regulations with "significant potential to have serious adverse effects on human health" as required by 40 CFR §141.201.

    d. Prohibiting the "discharge of any pollutant into waters of the United

       States" without authorization under 33 U.S.C. § 1311(a).

    e. Establishing standards of care when military personnel experience

       exposure to benzene, including requiring "complete blood count" with

       "results reviewed by an examining physician," and if they faced

       "emergency exposure," receiving an "end of shift urinary phenol test"

       under The Department of Defense Occupational Health Surveillance

       Manual, DODD 6055.05.

257.  Furthermore, the Department of Defense explicitly undertook to
pursue "corrective actions" on multiple occasions regarding water contamination at
Red Hill, including:

    a. Establishing a Final Groundwater Protection Plan with the State of

       Hawaiʻi in 2008 to "mitigate the risk associated with future releases"

       from the fuel tanks, including plans to "implement a rigorous tank

       maintenance program" and "research and investigate a viable leak

       detection system."

    b. Entering into an Administrative Order on Consent in 2014 with

       agencies including the Hawaiʻi Department of Health and the EPA to

       take steps to ensure that the groundwater resource in the vicinity of the

       Facility is protected and the Facility is operated and maintained safely,

with a specific focus on a "catastrophic release scenario" involving "a piping failure with a release into the lower access tunnel" that was "being addressed by the Navy and [Defense Logistics Agency]."

c. Undertaking in a 2021 Mitigations Report the proper construction of the pipeline system, safety alarms to be restored and updated to proper working order, and clear instructions to follow the existing rules set forth by the Department of Defense (October 2021 Mitigations Report).

d. After the fuel blast, frequent statements by defendants accepted responsibility for failures at Red Hill and undertook to "fix" them.

   i. In January 2022 Admiral Converse stated, "the Navy caused this problem, we own it, and we're gonna fix it."

   ii. On December 6, Secretary of the Navy Carlos Del Toro, publicly apologized for the crisis and said, "We are committed to rebuilding this trust. We're doing everything we can try to fix the problem."

   iii. On December 14, 2021, Deputy Secretary of Defense Dr. Kathleen Hicks stated, "I am committed to ensuring the health and well-being for our Service Members, their families, the people of Hawaiʻi, and the environment."

258.   Follow up audits and reports show that these undertakings were
conducted negligently:

a.   The Navy's audit confirmed it was not complying with the
requirements of the Final Groundwater Protection Plan by finding
"four areas of concern" including "groundwater contamination; tank
inspection and maintenance requirements and schedule; detection of
fuel releases; and completion [non-compliance] of response actions
required by the GPP." This audit led to additional commitments in the
audit itself to the undertaking to "sufficiently" protect the environment
and groundwater sources.

b.   The Cavanaugh Report shows that these undertakings were conducted
negligently, and the Navy again undertook to fix the problems: "The
Navy has a moral obligation and ethical duty to fix our mistakes,
safeguard the environment, and rebuild trust. We must act."

259.   The United States, through Congress and its agencies, rendered these
services because Congress and the agencies recognized that they were necessary
for the protection of individuals like the plaintiffs.

260.   Federal officers breached the duty to exercise ordinary care after an
undertaking in at least the following respects:

a.   Officers failed to adhere to the proper valve sequencing in May 2021;

b.  Officers failed to implement mandatory corrective actions after the
May 2021 leak and prior leaks;

c.  Officers violated mandatory provisions of the Safe Drinking Water
Act;

d.  Officers failed to install or replace pipes with mandatory steel piping;

e.  Officers operated the train cart on November 20, 2021, negligently and
at excessive speed;

f.  Officers knew or should have known of the fuel buildup in the PVC
piping between May and November 2021 and failed to take corrective
action;

g.  Officers failed to warn residents that the leaks had occurred in
violation of federal and state law;

h.  Officers ordered junior servicemembers to flush hazardous fuel into
groundwater without a permit and in violation of federal and state law;

i.  Officers knew that maintenance failures had compromised Red Hill
and failed to take corrective action to prevent harm;

j.  Officers failed to properly remediate affected homes;

k.  Officers failed to test water samples for petroleum and destroyed water
samples from affected homes; and

l.  Various other safety violations and breaches to be determined upon

discovery.

261.   As a direct and proximate result of defendant's breach of duty of care, the plaintiffs have been injured.

262.   As a direct and proximate result of the negligence of defendant and its officials, the plaintiffs suffered substantial injuries and damages, including severe mental and emotional distress.

263.   As a direct and proximate result of the negligence of defendant and its officials, the plaintiffs suffered special damages and will require testing/medical monitoring to be determined by expert testimony.

264.   Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate the plaintiffs for the negligence of the United States.

COUNT III: NUISANCE

265.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

266.   Plaintiffs are, or during some or all of the pertinent times were, in lawful possession of their properties on the Red Hill Navy water line, and used them, or had the right to use them, as residences or for other legitimate uses.

267.   The United States owned and materially controlled the Red Hill Bulk Fuel Storage Facility in close proximity to the plaintiffs' properties and the water

well that provided water to the plaintiffs' properties.

268.   The United States is liable for the creating a condition at the plaintiffs' residences that interfered with their right to use and enjoy those properties. The officers' conduct in operating the Red Hill Bulk Fuel Storage Facility thereby caused a nuisance to the plaintiffs.

269.   The plaintiffs' right to use and enjoy their properties has been impaired by the United States allowing fuel to leak from the Red Hill Bulk Fuel Storage Facility into its water well, contaminating the water delivered to the plaintiffs' properties.

270.   The nuisance caused by the United States has substantially impaired the plaintiffs' use and enjoyment of their property, has caused inconvenience, decreased quality of life, physical and mental discomfort, reasonable fear of disease, and adverse health effects.

271.   The United States has engaged in improper or negligent operation of the Red Hill Bulk Fuel Storage Facility, causing harm to the plaintiffs.

272.   Defendant's conduct has been unreasonable. Reasonable persons, generally, looking at defendant's conduct, the problems caused by it, and by the nature of the harm to the plaintiffs' properties and health, would consider defendant's conduct to be unreasonable.

273.   The invasions, harms, and injuries complained of herein by the

plaintiffs are substantial invasions, harms, and injuries to the plaintiffs' health, both physical and mental.

274.   The United States had full knowledge during some or all of the pertinent times when the Red Hill Bulk Fuel Storage Facility leaked fuel into the water supply and caused nuisance injury and harm to the plaintiffs.

275.   The United States knew or should have known that leaking fuel into the water supply would invade the plaintiffs' properties and substantially impair the plaintiffs' health and use and enjoyment of their properties.

276.   While knowing that practicable technologies and methods are available to abate fuel leaks, defendant has failed to abate the causes of nuisance.

277.   Defendant's conduct described above constitutes a series of recurring abatable nuisance, which defendant has failed to remedy within a reasonable period of time, and for which defendant is liable.

278.   As a result of defendant's liability for recurring abatable nuisance, the plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

COUNT IV: MEDICAL NEGLIGENCE, FAILURE TO TREAT, DELAYED CARE

279.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

280.   Medical negligence claims under this count are brought for the

97

following plaintiffs at this time: Jamie Simic, as Next Friend to her minor child
M.S.; Jamie Simic, as Next Friend to her minor child J.S.; Adrianna Coberley as
Next Friend to her minor child A.M.; Adrianna Coberley as Next Friend to her
minor child K.M.; Adrianna Coberley as Next Friend to her minor child B.C.;
Adrianna Coberley as Next Friend to her minor child O.C.; Sheena Jessup as Next
Friend to her minor child B.B.J.; Sheena Jessup as Next Friend to her minor child
B.J.J.; Sheena Jessup as Next Friend to her minor child N.J.; Sheena Jessup as
Next Friend to her minor child D.J.; Audrey Lamagna; Audrey Lamagna as Next
Friend to her minor child Au-J.L.; Audrey Lamagna as Next Friend to her minor
child Ai-J.L.; Isabel Maloon; Lorelei Pulou; Lorelei Pulou as Next Friend to her
minor child V.P.; Lorelei Pulou as Next Friend to her minor child S.P.; Lorelei
Pulou as Next Friend to her minor child J.P.;  Lorelei Pulou as Next Friend to her
minor child H.P.; Lorelei Pulou as Next Friend to her minor child F.P.; Daniel
Traina; Daniel Traina as Next Friend to her minor child Z.T.; Daniel Traina as
Next Friend to her minor child J.R.; Chad Watson. Other plaintiffs did not receive
medical care and do not bring medical negligence claims at this time.

281.   The United States has negligently failed to treat these plaintiffs'
medical conditions caused by the Red Hill Bulk Fuel Storage Facility fuel leaks.

282.   The United States has failed to monitor these plaintiffs' conditions,
perform required medical tests, or treat the illnesses caused by the negligent

conduct relating to the Red Hill Bulk Fuel Storage Facility fuel leaks.

283.   The United States has failed to adhere to the accepted standards of care for these plaintiffs.

284.   The United States has failed to timely address the health conditions of each of these plaintiffs or perform the standard of care in a timely manner, including appropriate referrals.

285.   In some instances, the United States has failed to treat these plaintiffs altogether, refusing appropriate tests or treatment.

286.   The United States failed to clearly communicate the important facts regarding the Red Hill Bulk Fuel Storage Facility fuel leaks to these plaintiffs or their medical care providers, allowing them to become ill, with no transparency in communicating the origin of the harm.

287.   Defendant's conduct described above constitutes a medical failure to treat or delay to treat medical conditions of these plaintiffs, for which the United States is liable.

288.   As a result of defendant's liability for recurring abatable medical negligence and failure to treat, these plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

COUNT V: INFLICTION OF EMOTIONAL DISTRESS

289.   Plaintiffs incorporate by reference the allegations set forth in the

preceding paragraphs as if fully set forth here at length.

290.   By its acts and omissions, the United States caused fuel to leak into the water system and injure residents, which thereby caused the plaintiffs worry, anxiety, anguish, suffering, and grief.

291.   The United States knew that the Red Hill facility has a history of fuel leak water contamination, and that it was probable that additional leaks would occur and cause substantial damage if it did not act.

292.   The United States must now pay for the exact consequences that it knew would happen and for which it accepted the risk.

293.   Plaintiffs, as well as their children, spouses, and other occupants of their homes, have suffered, are suffering, and will continue to suffer because of the defendant's acts and omissions.

294.   Defendant's conduct was a substantial factor in causing the plaintiffs' severe emotional distress.

295.   Plaintiffs have been damaged in an amount to be proven at the time of trial.

COUNT VI: NEGLIGENT SPOLIATION OF EVIDENCE

296.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

297.   By its acts and omissions, the United States caused fuel to leak into

the water system and injure residents.

298.   These injuries created the "existence of a potential civil action."

*Matsuura v. E.I. du Pont de Nemours & Co.*, 102 Hawai'i 149, 166-67, 73 P.3d

687, 704-05 (2003). Such a civil action was obvious to the defendants immediately

and undeniable by February 2022 with the filing of plaintiff's SF-95 claims.

299.   The United States had a legal or contractual duty to preserve evidence

relevant to that potential civil action, including water sample vials collected from

over 1,000 homes that would have shown the chemical composition of the water.

300.   The United States did not specifically test the water samples for

petroleum.

301.   The United States destroyed the evidence.

302.   The destruction of the evidence will cause "significant impairment in

the ability to prove the lawsuit" because the United States will seek to minimize its

damages by claiming minimal exposure of plaintiffs to minimally contaminated

water.

303.   There is a causal relationship between the destruction of evidence and

challenges of proof.

304.   Failure to either prove the lawsuit or to prove the extent of harm will

lead to damages for plaintiffs.

305.   Defendant's conduct described above constitutes a negligent

spoliation of evidence, for which the United States is liable.

306.   As a result of defendant's liability for negligent spoliation of evidence, the plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

COUNT VII: PREMISES LIABILITY, DUTY TO CONTROL FORCE

307.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

308.   The United States is the occupier, owner, and possessor of the following premises: the Red Hill Bulk Fuel Storage Facility, the water system, and the housing which Plaintiffs leased and resided upon. While generally, "a landowner is not liable for injuries occurring after a lessee takes possession of the land," there are two well established exceptions:

309.   A lessor may be liable for a known but hidden condition. And a lessor may also be liable for nuisance emanations "that invade an individual's property from another location" and "interfere with an individual's right to use and enjoy land." *Mitchell v. United States*, No. 11-00088 HG-KSC, 2011 U.S. Dist. LEXIS 103409, at *18-21 (D. Haw. Sep. 9, 2011) (citing *Renz v. 33rd Dist. Agricultural Assn.*, 39 Cal. App. 4th 61, 46 Cal. Rptr. 2d 67 (Cal. Ct. App. 1995)).

310.   As an occupier, owner, and possessor of land, the United States has a duty to use reasonable care for the safety of all persons reasonably anticipated to

be on the premises.

311.   By its acts and omissions, the United States failed to use reasonable care for the safety of persons reasonably anticipated to be on the premises it controlled.

312.   By its acts and omissions, the government failed to warn of a known but latent hazardous condition.

313.   By its acts and omissions, the United States created a nuisance that invaded plaintiffs' property and interfered with their right to use and enjoy the land.

314.   "[T]o prove [a] claim for premises liability under Hawai'i law, [plaintiff] must prove by a preponderance of the evidence that a condition existed . . . which posed an unreasonable risk of harm, and that Defendant failed to take reasonable steps to eliminate that risk or to adequately warn visitors about it." *Paredes v. United States*, No. 19-00161 WRP, 2022 U.S. Dist. LEXIS 63535, at *18 (D. Haw. Feb. 24, 2022).

315.   A condition existed which posed an unreasonable risk of harm. The United States contaminated plaintiffs' water system with fuel and other contaminants. That contamination was known to the government but latent to others.

316.   The United States failed to take reasonable steps to eliminate that risk

or to adequately warn residents about it. The government failed to warn residents of the May 2021 leak altogether. And the government waited *twelve days* to disclose the blast that occurred on November 20, 2021. And then, while the government disclosed the presence of JP-5, the government failed to disclose the presence of harmful additives like antifreeze.

317.   The United States knew or should have known of the hazard or defect that caused the injury.

318.   The United States was also in immediate control of a force—jet fuel at Red Hill Bulk Fuel Storage Facility and contaminated water in its drinking water system—that it knew or had reason to know was in dangerous proximity to persons on the land that it possessed, including Plaintiffs.

319.   The United States failed to control the force to prevent it from doing harm to plaintiffs.

320.   The United States failed to give a warning which was reasonably adequate to enable plaintiffs to protect themselves. The government could have avoided medical harm to the plaintiffs had the government disclosed the leaks and warned residents not to drink—or bathe in—contaminated water.

321.   As a direct and proximate result of defendant's breach of duty of care to those on its premises and in dangerous proximity to the force controlled by the United States, the plaintiffs have been injured.

322.   As a direct and proximate result of the negligence of defendant and its officials, the plaintiffs suffered substantial injuries and damages, including severe mental and emotional distress.

323.   As a direct and proximate result of the negligence of defendant and its officials, the plaintiffs suffered special damages and will require testing/medical monitoring to be determined by expert testimony.

324.   Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate the plaintiffs for the negligence of the United States.

325.   Defendant's conduct described above constitutes premises liability, for which the United States is liable.

326.   As a result of defendant's premises liability, the plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

CAUSATION

327.   But for the conduct of the federal officers at Red Hill, the plaintiff families would not have suffered inconvenience, illness, economic injury, and fear.

328.   As a general matter, the ingestion of jet fuel and its contaminants causes medical harm. Fuel is composed of toxic hydrocarbons that are highly dangerous to the human body. The Agency for Toxic Substances and Disease Registry (ATSDR) of the United States Department of Health and Human Services

describes the long-lasting health effects of exposure to fuel chemicals. Such exposure can occur by breathing air in an area where an accident or leak of these jet fuels has occurred, touching contaminated soil, swimming in waters where jet fuels have been spilled, living near a hazardous waste site where jet fuels are disposed or, most directly, drinking such fuel.

329.   In the near-term, symptoms of such exposure regularly include headaches, fatigue, nausea, drowsiness, irritation of the throat and stomach, difficulty breathing, fever, and vomiting. In the long term, permanent damage to the central nervous system can result, as well as pneumonia, cancer, decreased immune response, decreased neurological function, impaired hearing, and skin alteration. Drinking too much jet fuel can lead to unconsciousness and death. Affected organ systems include the respiratory tract, gastrointestinal tract, nervous system, liver, kidneys, reproductive system, and harm to a developing fetus— miscarriages have been reported. Benzene, just one of the chemicals the EPA identified as present in the Red Hill fuel, causes chronic conditions such as aplastic anemia, leukemia, and potentially multiple myeloma.[10]

---

[10] Benzene featured prominently as a substance present in another military water contamination case: the Camp Lejeune water contamination crisis. From the 1950s through the 1980s, people living or working at the U.S. Marine Corps Base Camp Lejeune, North Carolina, were exposed to drinking water contaminated with industrial solvents, including benzene. For those exposed to that contaminated water, the Department of Veterans Affairs now considers the following health

330.   Specifically, each plaintiff has suffered inconvenience and life disruption, economic injury, illness, and fear and trauma.

331.   Each plaintiff is also at increased risk of future medical harm and will need medical monitoring for the associated long-term illnesses.

NO EXCEPTIONS APPLY

332.   None of the plaintiffs' claims asserted herein are subject to any of the exceptions to sovereign immunity found in 28 U.S.C § 2680.

333.   None of the negligent acts described herein were discretionary or subject to policy analysis.

334.   None of the acts or omissions described herein are protected by the misrepresentation exception.

---

conditions to be presumptively connected to their service:

- Adult leukemia
- Aplastic anemia and other myelodysplastic syndromes
- Bladder cancer
- Kidney cancer
- Liver cancer
- Multiple myeloma
- Non-Hodgkin's lymphoma
- Parkinson's disease

335.   The United States, including the US Navy and its employees, failed to meet the required reporting obligations as described herein.

336.   The United States, including the US Navy and its employees, failed to exercise due care in the execution of its duties under the required report obligations described herein.

### JURISDICTION, VENUE & SERVICE

337.   This Federal District Court has federal-question jurisdiction because this action is brought pursuant to and in compliance with the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

338.   Venue is proper in this district pursuant to 28 U.S.C. § 1402(b) because the United States is a defendant, and this is the judicial district where the acts or omissions complained of in this complaint occurred.

339.   The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure. Service is affected by serving a copy of the Summons and Complaint on the United States Attorney for the District of Hawai'i by certified mail, return receipt requested at her office:

> United States Attorney's Office
> ATTN: Civil Process Clerk
> 300 Ala Moana Blvd # 6-100
> Honolulu, HI 96850

340.   Service is also affected by serving a copy of the Summons and

Complaint on Merrick Garland, Attorney General of the United States, by certified

mail, return receipt requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

## LIABILITY OF THE UNITED STATES

341.   This case is commenced and prosecuted against the United States of

America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort

Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. §

2674 because the personal injuries and resulting damages of which the Complaint

is made were proximately caused by the negligence, wrongful acts or omissions of

representatives, employees, or agents of the United States of America working for

the United States Department of the Navy, Army, or Defense, while acting within

the scope of their office, employment, or agency under circumstances where the

United States of America, if a private person, would be liable to the plaintiffs in the

same manner and to the same extent as a private individual.

342.   Through the Federal Torts Claim Act, the United States has waived its

sovereign immunity for the acts and omissions described here. *E.g.*, *Evans v.

United States*, 876 F.3d 375, 380 (1st Cir. 2017), *cert. denied*, 139 S. Ct. 81 (2018).

343.   The defendant, the United States of America, through its agencies, at

all times material to this lawsuit, owned and operated the Red Hill Bulk Fuel

109

Facility and staffed its facilities and vehicles with its agents, servants, and

employees.

CONDITIONS PRECEDENT

344.   Pursuant to 28 U.S.C. § 2675(a), all plaintiffs timely presented their

claims to the United States by submitting Forms SF-95 to the Vice Admiral Darse

E. Crandall, Office of the Judge Advocate Office, General Tort Claims Unit

Norfolk, 9620 Maryland Avenue, Suite 205, Norfolk, Virginia 23511-2949, via

USPS Priority Mail Express, on February 22, 2022. *See* Forms SF-95 and cover

letters for February claims, attached as Exhibit A, and Forms SF-95 and cover

letters for May claims, attached as Exhibit B.

345.   Receipt of the February claims (Patrick Feindt, Jr., Navy File No.

J220411; P.R.F, Navy File No. J220412; P.G.F, Navy File No. J220413; Nastasia

Freeman, Navy File No. J220393; K.F., Navy File No. J220394; D.F., Navy File

No. J220395; N.F., Navy File No. J220396; Kelly Jones, Navy File No. J220403;

Joseph Maben, Navy File No. J220414, Patricia Maben, Navy File No. J220415;

Jamie Simic, Navy File No. J220404; M.S., Navy File No. J220405; J.S., Navy

File No. J220406; by the Department of the Navy on February 24, 2022 and March

2, 2022 was acknowledged by Ms. Andrea R. Ladner and Ms. Amanda Cook, Tort

Claims Assistants, Tort Claims Unit Norfolk, Office of the Judge Advocate

General, Department of the Navy.

346.    As of August 23, 2022, more than six (6) months elapsed since the February 22 claims were presented to defendant and defendant has not made a final disposition of the plaintiffs' claims. Accordingly, the claims of the plaintiffs are deemed denied pursuant to 28 U.S.C. § 2675(a).

347.    Receipt of the May claims (Barbie Arnold, Navy File No. J220596, Crystal Arnold, Navy File No. J220592, J.A.A., Navy File No. J220593, J.E.A., Navy File No. J220594, J.B.A. Navy File No. J220595; Kevin Aubart, Navy File No. J220598, Saori Aubart, Navy File No. J220599; Cheryl Mello, Navy File No. J220602, AnnMarie Boggs, Navy File No. J220600, R.B., Navy File No. J220601; Adrianna Coberley, Navy File No. J220603, A.M., Navy File No. J220606, J.M., Navy File No. J220607, K.M., Navy File No. J220608, B.C., Navy File No. J220604, O.C., Navy File No. J220605; Richelle Dietz, Navy File No. J220609, B.D., Navy File No. J220610, V.D., Navy File No. J220611; Tiffany Flewellen-Reynolds, Navy File No. J220644, T.R., Navy File No. J220647, A.R., Navy File No. J220646; Jeff Fritz, Navy File No. J220649, Anayansi Fritz, Navy File No. J220650; Aitbeth Mudcha, Navy File No. J220657, Alexander Grow, Navy File No. J220651, Adriana Grow, Navy File No. J220652, At.G., Navy File No. J220655, Au.G., Navy File No. J220656, A.C.G., Navy File No. J220654; Sheena Jessup, Navy File No. J220658, B.B.J., Navy File No. J220662, B.J.J, Navy File No. J220661, N.J., Navy File No. J220659, D.J., Navy File No.J220660; Ashley

111

Kirkpatrick, Navy File No. J220663, D.K., Navy File No. J220664, E.K., Navy

File No. J220665; Audrey Lamagna, Navy File No. J220666, Au-J.L., Navy File

No. J220667, Ai-J.L., Navy File No. J220668; Isabel Maloon, Navy File No.

J220669, M.D., Navy File No. J220674, K.M., Navy File No. J220672, L.M.,

Navy File No. J220683, A.M., Navy File No. J220670, P.M., Navy File No.

J220673, C.M., Navy File No. J220671; Katherine McClanahan, Navy File No.

J220676, E.M., Navy File No. J220677, Brian McClanahan, Navy File No.

J220675, William McClanahan, Navy File No. J220678; Belinda Miles, Navy File

No. J220679, W.M., Navy File No. J220681, L.M., Navy File No. J220680; Kelly

Morris, Navy File No. J220703, Hailey Morris, Navy File No. J220704; Tiffany

Overbaugh, Navy File No. J220700, J.O., Navy File No. J220701, B.O., Navy File

No. J220702; Kandyce Perez, Navy File No. J220699, L.P., Navy File No.

J220694, A.P., Navy File No. J220695, E.P., Navy File No. J220698, F.P., Navy

File No. J220697; Harry Pulou, Navy File No. J220686, Lorelei Pulou, Navy File

No. J220687, V.P., Navy File No. J220688, S.P., Navy File No. J220689, J.P.,

Navy File No. J220690, H.P., Navy File No. J220692, I.P., Navy File No. J220691,

F.P., Navy File No. J220693; Lacey Quintero, Navy File No. J220653, C.J.Q.,

Navy File No. J220685, C.E.Q., Navy File No. J220684; Joshua Staple, Navy File

No. J220639, J.S., Navy File No. J220638, G.S., Navy File No. J220637, N.S.,

Navy File No. J22064l, S.S., Navy File No. J220642, K.S., Navy File No. J220640,

A.S., Navy File No. J220636; Daniel Traina, Navy File No. J220633, Z.T., Navy

File No. J220635, J.R., Navy File No. J220634; Chad Watson, Navy File No.

J220629, M.T., Navy File No. J22063l; Paige Wheeler, Navy File No. J220625,

J.W., Navy File No. J220626, A.W., Navy File No. J220628, S.W., Navy File No.

J220624; Lindsey Wilson, Navy File No. J220623, L.W., Navy File No. J220622;

Elizabeth Witt, Navy File No. J220620; Amanda Zawieruszynski, Navy File No.

J220615, J.Z., Navy File No. J220616, V.Z., Navy File No. J220617, and S.Z.,

Navy File No. J220618) by the Department of the Navy on May 16, 2022 was

acknowledged by Amanda Cook, Tort Claims Assistants, Tort Claims Unit

Norfolk, Office of the Judge Advocate General, Department of the Navy.

348.   As of November 6, 2022, more than six (6) months elapsed since the

May 6 claims were presented to defendant and defendant has not made a final

disposition of the plaintiffs' claims. Accordingly, the claims of the plaintiffs are

deemed denied pursuant to 28 U.S.C. § 2675(a).

349.   Plaintiffs have exhausted their administrative remedies under the

Federal Tort Claims Act and have fully complied with the statutory prerequisites

for bringing this tort action against the United States.

DAMAGES

350.   As a result of the negligence of federal employees, agents, or

representatives, the plaintiffs have sustained damages and injuries including:

113

a.  Past and future physical pain and suffering;

b.  Past and future mental anguish and emotional distress;

c.  Past and future medical, healthcare, and attendant care expenses;

d.  Past and future lost income and of earning capacity;

e.  Past and future physical impairment;

f.  Past and future loss of enjoyment and quality of life;

g.  Past and future loss of enjoyment of property;

h.  Increased risk of future harm and medical monitoring for life;

i.  Loss of life expectancy;

j.  Nuisance damages, including inconvenience, illness, and fear;

k.  Out of pocket expenses;

l.  Loss of personal property;

m. Costs;

n.  Prejudgment and post-judgment interest as provided by law, at the

    maximum legal rate; and

o.  Such other and further relief to which the plaintiffs may be justly

    entitled.

PRAYER

WHEREFORE, plaintiffs pray that this Court:

a.  Award the plaintiffs compensatory damages, in an amount to be

114

determined at trial;

b. Award the plaintiffs pre-judgment and post-judgment interest and any

other costs, expenses, or fees to which they may be entitled by law;

and

c. Grant the plaintiffs such other and further relief as this Court deems

just and proper.

DATED:  Honolulu, Hawaiʻi, May 23, 2023.

*Lyle S. Hosoda*

/s/ Lyle S. Hosoda                          /s/ Kristina S. Baehr
LYLE S. HOSODA                          KRISTINA S. BAEHR
KOURTNEY H. WONG                   JAMES BAEHR
SPENCER J. LAU

                                                      */s/ Frederick C. Baker*
                                                      FREDERICK C. BAKER
                                                      JAMES W. LEDLIE
                                                      KRISTEN HERMIZ
                                                      CYNTHIA A. SOLOMON
                                                      SARA O. COUCH

*Attorneys for Plaintiffs*

115

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was filed and served on counsel of record via the U.S. District Court's CM/ECF electronic filing system on May 23, 2023.

<em>/s/ Kristina S. Baehr</em><br>
Kristina S. Baehr

116