UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., Individually ) | Case No. 22-CV00397LEK-KJM |
| and as next of Fried to his minor ) | |
| children P.G.F. and P.R.F., ET ) | November 13, 2023 |
| AL., ) | 1:00 p.m. |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | U.S. District Court |
| ) | 300 Ala Moana Boulevard |
| THE UNITED STATES OF AMERICA, ) | Honolulu, HI 96850 |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

TRANSCRIPT OF PLAINTIFFS' MOTION FOR DISCOVERY SPOLIATION
SANCTIONS; PLAINTIFFS' MOTION FOR LEAVE TO FILE
ADDITIONAL EXHIBITS TO MOTION FOR DISCOVERY SPOLIATION
SANCTIONS BEFORE THE HONORABLE KENNETH J. MANSFIELD
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Feindt Plaintiffs:      Kristina Baehr, Esq.
                                James Baehr, Esq.
                                Just Well Law, PLLC
                                2606 W. 8th Street, Unit 2
                                Austin, TX  78702

For the Feindt Plaintiffs:      Lyle S. Hosoda, Esq.
                                Hosoda Law Group
                                Three Waterfront Plaza, Suite 499
                                500 Ala Moana Boulevard
                                Honolulu, HI  96813

For the Defendant:              Rosemary C. Yogiaveetil, Esq.
                                Department of Justice
                                Civil Division
                                1100 L Street, NW, Suite 702
                                Washington, D.C.  20005

APPEARANCES: (Continued)

For Defendant:                    Dana A. Barbata, Esq.
                                  U.S. Attorney's Office
                                  300 Ala Moana Boulevard, #6100
                                  Honolulu, HI  96850


Transcription Service:            Jessica B. Cahill, CER/CET-708
                                  Maukele Transcribers, LLC
                                  467 Maukele Place
                                  Wailuku, Maui, HI  96793
                                  Telephone: (808)244-0776

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

```
 1  NOVEMBER 13, 2023                              1:00 P.M.

 2          THE CLERK:  All rise.  The United States District Court

 3  for the District of Hawaii with the Honorable Kenneth J.

 4  Mansfield, United States Magistrate Judge presiding, is now in

 5  session.  The gallery may be seated.

 6          Civil number 22-00397LEK-KJM Patrick Feindt, Jr., et

 7  al. v. United States of America.  This hearing has been called on

 8  Plaintiffs' motion for discovery, spoliation sanctions.

 9          Counsel, please make your appearances for the record,

10  starting with the Plaintiff.

11          MR. HOSODA:  Good afternoon, your honor.  Lyle Hosoda,

12  James Baehr and Kristina Baehr, appearing on behalf of the

13  Plaintiffs.

14          THE COURT:  Good afternoon to all of you.

15          MS. YOGIAVEETIL:  Good afternoon, Your Honor.  Rosemary

16  Yogiaveetil for the United States.  And I'm joined by Dana

17  Barbata, who's appearing for Sydney Spector.

18          THE COURT:  Okay.  Good afternoon to both of you as

19  well.  Thank you for the briefing on the motion.

20          I suppose we should start with the motion that was

21  filed Friday first.  And I know -- I haven't said anything about

22  it and the Government hasn't said anything about it, but I guess

23  I would like to at least hear any further remarks from the

24  Plaintiff, and I'll certainly give the Government a chance to

25  respond.
```

 1              MR. HOSODA:  Your Honor, Mr. Baehr will be handling the

 2    argument this afternoon.

 3              THE COURT:  Okay.  Thank you.

 4              MR. BAEHR:  Thank you so much, Your Honor.  May it

 5    please the Court?

 6              The Plaintiff submitted that request to add additional

 7    exhibits to our motion in an abundance of caution.  We know that

 8    the Court wants information as soon as possible, and we wanted to

 9    provide the Court with essentially two additional exhibits to

10    support the spoliation motion.  We believe there's good cause to

11    do so at this time because they were not received until after the

12    opposition briefing.

13              THE COURT:  Okay.  My question about the good cause is

14    my understanding from the briefing is that there was, at best, a

15    short-circuited meet and confer on this.  And certainly the

16    Government says that one of the Plaintiff's failures here was not

17    asking, hey, where else might these texts exist?  And if I'm to

18    take them at their word, then why is there a good cause?  You

19    could have asked for this information earlier.  You didn't.  You

20    filed your motion without it, so why should I take it up now?

21              MR. BAEHR:  So, Your Honor, first, obviously, in the

22    course of this motion, we're happy to talk about our meet and

23    confer.  We believe we met all of our obligations.

24              THE COURT:  Did you wait seven days?

25              MR. BAEHR:  Did we wait seven days from the meet and

1    confer?

2           THE COURT:  Yeah, to file the motion?

3           MR. BAEHR:  The meet and confer, I believe, was on

4    September -- I can find the date, sir.

5           THE COURT:  Okay.  You can go on.

6           MR. BAEHR:  Yes, sir.  So in terms of these additional

7    exhibits, Your Honor, we have a hearing here today, obviously,

8    and we could call witnesses and we could present evidence.  It's

9    our job to do so for a spoliation motion to put forth evidence

10   such as, you know, the declaration from our expert and other

11   things like that.

12          So we could have just requested the Court would take

13   additional exhibits here today during the hearing, but we

14   submitted that filing because we wanted to apprise the Court of

15   that beforehand so that there was no surprise.

16          THE COURT:  Okay.  My concern is in your motion, you

17   just come out and say these texts are unrecoverable.  And now you

18   file something Thursday saying exactly the opposite of what you

19   said in your motion.

20          MR. BAEHR:  So we don't believe that, sir.  Just to

21   clarify, we don't think that they're -- we believe that texts are

22   unrecoverable, and we explain in our motion why they are

23   unrecoverable.  The information provided by the Government is not

24   text messages from Captain Spitzer and Captain Meyer, and it's

25   not all the relevant text messages from Captain Meyer or from

1    Captain Spitzer, which we maintain are unrecoverable.  We think

2    that the evidence that the Government has given us subsequently,

3    which includes lots of text messages from other people and some

4    text messages from -- that were basically backward engineered

5    through other folks that Captain Meyer, for example, said that he

6    spoke with --

7              THE COURT:  So they were recovered from other people.

8    Some of them.

9              MR. BAEHR:  Some of them.  Yes, sir.

10             THE COURT:  Right.  That's not what your motion says.

11   Your motion says they're all gone.

12             MR. BAEHR:  Your Honor, we don't believe that they're

13   all gone.  I believe that we mentioned in our motion that they

14   could be -- some of them can be recovered through backward

15   engineering.  Our argument was that because they were sent via

16   text message or via iMessage --

17             THE COURT:  I understand that.

18             MR. BAEHR:  -- yes, sir, there's no way for us to

19   backward engineer at all.  And if you look at Paisley Park or

20   other similar cases, it didn't require backward engineering in

21   exactly the same circumstances.  They didn't say, you have to go

22   to the carrier call log and find it.

23             In this case, the carrier call log, as our expert has

24   testified or declared, can't recover any iMessages.  And you know

25   from the exhibits we put forward that they were communicating

1  through iMessage, and so we can't get those messages except

2  onesies and twosies from other people.

3          THE COURT:  Sure.  Okay.  All right.  Thank you.

4          MR. BAEHR:  You're just listening on the first issue?

5          THE COURT:  Yeah.  Just on this motion, Ms.

6  Yogiaveetil.

7          MS. YOGIAVEETIL:  Thank you.  Your Honor, first, the

8  United States was only made aware of the Plaintiffs' motion to

9  add additional exhibits when the motion was filed, so we are not

10 aware which of the 2,000 plus pages of curative discovery that we

11 have produced, Plaintiffs intend to seek admission of at this

12 time.

13         Additionally, as the Court has pointed out, we have

14 produced over 2,000 pages of curative discovery.  Plaintiffs now

15 point to this as having good cause to show further that, you

16 know, this demonstrates that text messages must have existed.

17 They speculate such text messages must have existed between

18 Captain Spitzer and Captain Meyer.

19         Based on the limited submission that was filed on

20 Thursday night, that's not the case.  What they have submitted

21 actually indicates that the testimony is accurate.  Captain

22 Spitzer and Captain Meyer communicated with others, and in the

23 context of a group text.  Moreover, Captain Spitzer and Captain

24 Meyer communicated with members of their own command.  They were

25 chiefs of staff -- sorry.  They were commanding officers of two

1    different commands and, therefore, had very limited reason to

2    communicate with one another, which makes their belief that such

3    text messages exist further speculative.

4           Therefore, we don't think that the text messages that

5    they now proffer should be admissible, given that they have

6    little to no bearing on the facts of this case or the motion that

7    is before the Court.

8           THE COURT:  Okay.  Thank you.  So here's what I'm going

9    to do.  I'm going to allow -- I'm going to grant the motion and

10   allow the additional exhibits to be submitted as part of this

11   motion, but I'm going to give the Government a chance to address

12   those exhibits.  So I'll give you a week and say by November

13   20th, you can say whatever it is you want to say about those

14   exhibits, ten pages or less.

15          MS. YOGIAVEETIL:  Thank you, Your Honor.

16          THE COURT:  Okay.  That way we'll have the full record,

17   but the Government can expand on what you were just articulating,

18   and we'll consider that in resolving the motion.

19          MS. YOGIAVEETIL:  Thank you, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          Okay.  Mr. Baehr, you can take up the underlying

22   motion.

23          MR. BAEHR:  Thank you, Your Honor.  The motion is based

24   on the Government's wiping of two of the key leaders of Red

25   Hill's phones, two of the witnesses that are critical for the

1   Plaintiffs' failure to warn claims.  The Government, of course,

2   does not concede and does not stipulate in any way for the

3   failure to warn claims.  It was obviously the subject of a recent

4   motion, so we are expecting and anticipating an issue regarding

5   that.  But these were two of the most relevant witnesses for our

6   side, and they were the ones that were identified as custodians.

7          As the Government pointed out, these are Captain Meyer

8   and Captain Spitzer.  And we believe that the subsequent

9   discovery, which we'll all have an opportunity to brief on,

10  actually proves that the representations that those gentlemen

11  made in their depositions were inaccurate, and we think that this

12  does go to prejudice.

13         And, specifically, Captain Meyers, he confirmed that,

14  according to the Government's opposition, while he had additional

15  text messages on his phone, he provided all messages related to

16  Red Hill to investigators.  But the reality is, as the Government

17  just indicated, it's provided additional text messages which are

18  no doubt relevant.

19         And so we believe that proves that he was not accurate

20  in his deposition.  The same is true for Captain Spitzer, who

21  testified he did not use text messages to substantively

22  communicate with others.  That's in their opposition at 11.  But

23  as these subsequent messages reveal, he texted over 100 times

24  with others about Red Hill, in detail with his superiors.

25         In terms of the recoverability issue, any text messages

 1  between Captain Spitzer and Captain Meyer are, obviously,

 2  unrecoverable.  And moreover, the backward engineering is

 3  impossible through the iMessages, as we pointed out.

 4       So we think that this goes to fundamental issues of

 5  prejudice and intent to deprive, which I think are the key issues

 6  in contention.  Whether reasonable efforts were made, our expert

 7  has said that the Government could have done much to preserve

 8  this evidence that they didn't.  A party's legal sophistication,

 9  a party's technical sophistication, the committee notes say the

10  Court should take into account.

11       THE COURT:  So what do you think the Government should

12  have done differently here in terms of the reasonableness of

13  their preservation efforts?

14       MR. BAEHR:  Yes, sir.  The Government should have

15  copied the phone's contents as soon as it knew that these

16  individuals were key custodians, key players in the case.

17       THE COURT:  So have you done that on your side?

18       MR. BAEHR:  In terms of capturing the information

19  requested by the Government?

20       THE COURT:  Yeah.  For all of your clients.  Have you

21  copied all of their cell phones?

22       MR. BAEHR:  We've made efforts to capture -- I'm not

23  sure if we've copied all of their cell phones, sir, but we've

24  done everything we can to comply and talk with them and get

25  information from them and things like that.

```
 1              THE COURT:  I'm just -- I mean, if you think the rule

 2   in this case should be that everybody copies custodian cell

 3   phones, well, your clients are parties, actually, they're not

 4   just custodians.  So it's a big case with lots of custodians, and

 5   what's fair is fair.  So is this a two-way street or am I just

 6   going to impose this copying obligation on one side?

 7              MR. BAEHR:  So the Government's -- well, I think that

 8   you're right, Your Honor.  You've got to be fair about this.  The

 9   Government hasn't brought any kind of motions for issues that

10   have been our issues with Plaintiffs.  The case of --

11              THE COURT:  I mean, you're saying what they did was

12   unreasonable, and so I'm just asking, what have you done?  You

13   don't seem to want to answer the question.  And I don't suppose

14   you're monitoring your clients and what they're doing with their

15   cell phones.  And if they're upgrading phones or switching

16   carriers or anything like that.

17              MR. BAEHR:  We've told our clients not to do anything

18   to harm evidence --

19              THE COURT:  Which is what they did, right?

20              MR. BAEHR:  Yes, sir.

21              THE COURT:  Okay.

22              MR. BAEHR:  Well, I don't know exactly what they did,

23   sir, because we don't have any -- we have the actual litigation

24   hold.  We don't know the counters of it.

25              THE COURT:  Okay.
```

 1            MR. BAEHR:  We don't know what they --

 2            THE COURT:  Have you given them your litigation holds?

 3            MR. BAEHR:  We told them that we've talked to our

 4  clients.  We've called our clients, we've apprised our clients,

 5  we've sent letters.

 6            THE COURT:  So the same thing they told you.

 7            MR. BAEHR:  They did not --

 8            THE COURT:  They said, we told them to preserve

 9  everything.  And you're telling me that's what you've done.  And

10  so I'm just saying, why should this standard be different?  It's

11  a big case with lots of custodians and lots of resources being

12  expended.

13            MR. BAEHR:  The sophistication of the party. That the

14  ease of doing this, as our expert said, in terms of just clicking

15  a button and the Navy being able to capture this information and

16  the importance of these particular witnesses.  These particular

17  witnesses, we believe, are extremely important to the case.  I

18  mean, they were individuals that the investigators were talking

19  to and were asking for relevant text messages.

20            THE COURT:  And there should be a different standard

21  for Plaintiffs?

22            MR. BAEHR:  No, sir.  And we've told our Plaintiffs not

23  to destroy any discoverable evidence.  We've sent them a letter

24  regarding that.  We've talked to them about it repeatedly.

25            THE COURT:  You get my point?  That's the same thing

 1    I'm hearing that the Government did.

 2              MR. BAEHR:  Okay, sir, but we don't know --

 3              THE COURT:  And you're saying they should have done

 4    more, but I'm not hearing that you've done more.

 5              MR. BAEHR:  Okay.  Your Honor, I don't know what the

 6    Government has done besides saying that they sent a litigation

 7    hold.  I don't know whether that was a letter.  I don't know

 8    whether that us a call and the Government hasn't told us.  And

 9    they have, obviously, some attorney-client protections and they

10    haven't told us the content of those messages.

11              So, you know, we don't know the full extent.  I will

12    say, of course, that we deposed Captain Spitzer and he didn't

13    remember receiving a litigation hold, so it didn't make much of

14    an impression on him.

15              THE COURT:  Yeah.

16              MR. BAEHR:  And he had the obligation, and the Navy had

17    the obligation to preserve the information.  And having one copy

18    of the information in some of these cases they found was not

19    sufficient.

20              THE COURT:  Were any of those cases a case of this size

21    with this many custodians?  I think if we take all the

22    Government's custodians and all of your custodians, it's over

23    1,000 custodians, right, on both sides?

24              MR. BAEHR:  Our custodians -- well, I think the

25    Youngevity international case that I cited goes to that, sir.

1    And so in that case the other side argued, hey, we've got 3,000

2    custodians and we've got 70,000 documents.  And the Court said

3    that doesn't obviate them of the need of these particularly

4    relevant materials.  So I think our case would be that apple case

5    that was cited in Youngevity would go to that issue in this case.

6              THE COURT:  So the same would apply to the Plaintiffs

7    then.

8              MR. BAEHR:  The other issue --

9              THE COURT:  On a different standard for each side.

10             MR. BAEHR:  I want a different standard, sir.  But the

11   other thing --

12             THE COURT:  I think you do.  That's what I'm hearing

13   from you.

14             MR. BAEHR:  I think that the Government was conducting

15   an investigation.  They have tremendous capabilities and

16   resources.  It would not have been difficult.  We've asked --

17   we've told our Plaintiffs not to destroy information as well.  So

18   I think that --

19             THE COURT:  That's all you've done, right?

20             MR. BAEHR:  And we've called them, and we've talked to

21   them repeatedly.  And, again, we don't know exactly what they've

22   done. But we do know, right, that we have an ESI order about what

23   to do in terms of phone wiping.

24             THE COURT:  Uh-huh.

25             MR. BAEHR:  And the issue here is not just about text

1    messages, it's also about the phone wiping.  And the order shows

2    that the Government knows what to do when there's a wipe that

3    happens.  And the ESI order says you must make a copy before a

4    phone wipe occurred.  And the difference here is that they knew

5    they were doing upgrades, and phone wipes, and flank speed, and

6    these other operations.  They knew they were changing phones and

7    upgrading and switching from one commander to another particular

8    phone, whereas that's not the case for our Plaintiffs.

9            So these --

10           THE COURT:  I'm not sure I follow you.  My impression,

11   and you can correct me if I'm wrong, is that what happened

12   happened without someone calling up legal counsel and saying, you

13   know, my phone's going to get wiped.  Do you want to jump in?  I

14   don't suspect your clients are going to do that either.  If they

15   go down to the Verizon kiosk and make a change, they're not going

16   to stop and ask you about it.  I just wouldn't expect them to do

17   that.  I think that's what happened here.

18           MR. BAEHR:  Well, I certainly think that the order in

19   this case says that if we're going to wipe ESI, that we have to

20   do that.

21           THE COURT:  Right.  Right.

22           MR. BAEHR:  And so we would certainly want -- we've

23   told our clients to do that.

24           The Government, in this case -- it's a couple of

25   different folks because it's these particular people, two

1   individuals who are serving the military.

2            THE COURT:  Uh-huh.  Yeah.

3            MR. BAEHR:  It's the Navy and then it's the DOJ.  And

4   these are all three different entities, and particularly the Navy

5   and these folks that had that obligation.  And the Navy certainly

6   knew it was doing a massive system upgrade.  They certainly knew

7   that some phones would be switched over and be turning to bricks.

8   There was a lack of communication on all those points to preserve

9   that information.

10            THE COURT:  I agree.  I agree.

11            MR. BAEHR:  So the question is whether reasonable

12   efforts were made and that's the first one we've just discussed

13   pretty extensively.  Whether there's a way to restore or

14   reproduce.  And we're correct that the particular text messages,

15   obviously, between Captain Spitzer and Captain Meyer cannot be

16   reproduced.  There's no contention from the Government that they

17   can.

18            The Government cites the information they provided is

19   their additional discovery.  But those are messages between other

20   people to other people.

21            THE COURT:  Right.

22            MR. BAEHR:  The call logs, as we know from our

23   declaration, and as everybody knows who uses an iPhone, are not

24   going to capture those iMessages, either the contents or when

25   they occurred.  We put before you, Your Honor, the particulars of

1  that night in question and those critical messages that Captain

2  Meyer was sending, that we do have from that one text chain we do

3  have, we don't have on his call log.

4         So there is an argument is there is no way to restore

5  or reproduce it.  And if you look at cases like Paisley Park,

6  very similar facts.  People who had cell phones that they turned

7  in to upgrade couldn't get the prior text messages.  While

8  somebody could have looked at a carrier call log and tried to

9  backward engineer the Court didn't require it.  And they found

10 prejudice, they found intent, and they found there might be a

11 cause for sanctions in that case.

12        Fundamentally, the issue of prejudice is the next step

13 that we have to take.  And it's a challenging one, obviously,

14 because you don't know what you don't have.  But arguments are

15 that the case law makes clear that if you have a valid reason to

16 think that there might be some valuable evidence that's relevant,

17 that there could be prejudice.  And again, I point to the RG

18 Abrams case, where they say that text message that was missing

19 could have been that evidence of the conspiracy.  These are two

20 senior leaders involved in every aspect of this response here,

21 and it would certainly help to have their text messages.

22        THE COURT:  But again, to the question of you don't

23 know what you don't know, didn't -- I think you deposed each of

24 them, or at least I thought I saw your name.

25        MR. BAEHR:  Yes, I did, sir.

1      THE COURT:  And so you had the opportunity to question

2  each of them about this.  And I thought, I can't recall -- I

3  think it was Captain Spitzer, I might be wrong.  One of them, I

4  thought, said we were seeing each other daily, so we were talking

5  daily.  And then, so there's not -- I thought they each testified

6  to the effect of there wasn't much text messaging between the two

7  of us because we were seeing each other, and we were having those

8  conversations direct.

9      So how do I -- again, how do you fill in that gap for

10  what is hard for you to do?

11      MR. BAEHR:  Yes, sir.  You're absolutely --

12      THE COURT:  How do I make that leap, to assume there

13  was something and that it's critical or it's prejudicial?

14      MR. BAEHR:  You're absolutely right.  Yes, sir.  You're

15  absolutely right.  They said that they didn't text much.

16      THE COURT:  Yeah.

17      MR. BAEHR:  And again, that goes to our point, that

18  when we finally got some of these messages, we found out there

19  wasn't just one relevant text, there were a ton.  That there were

20  a bunch of substantive messages that the captains

21  (indiscernible).

22      So what they said in their deposition was inaccurate.

23  But the reason it's so important is because we also deposed Joe

24  Neal, who's a water system engineer.  And he said on the

25  afternoon of the 28th, we were in Captain Meyer's office, and we

1   smelled the fuel, and Captain Meyer said, "we have to tell the

2   people about this."  The next day, Captain Spitzer sends the

3   message saying there's no indication that there's any harm to the

4   water.  And so that's a critical piece.

5            Now, Captain Meyer denied that he said that to Joe Neal

6   on that day, right.  And because he denied it, we now have a

7   credibility issue.  And I don't have text messages to say that

8   Joe Neal, the water system worker, is telling the truth and

9   Captain Meyer, the, you know, Commander Navy Region, Hawaii, is

10  not.

11           THE COURT:  So you can impeach him at trial on that,

12  but you want me to make this next leap that he went ahead and

13  texted something to Captain Spitzer, and then Captain Spitzer

14  sent out the email anyway, right?  I think that's ultimately what

15  you're asking the Court to do.

16           MR. BAEHR:  So, Your Honor, I'd just like to quote a

17  tiny bit from the RG Abrams case, which does a really deep and

18  immersive analysis of each aspect of this.  And they say that

19  "the 9th Circuit found prejudice when a party's refusal to

20  provide certain documents forced Plaintiffs to rely on the

21  incomplete and spotty evidence at trial."  Later they say,

22  "proving the lost evidence is relevant can be difficult task,

23  however, because the evidence no longer exists.  A party need

24  only come forward with plausible, concrete suggestions as to what

25  the destroyed evidence might have been."

1          And we have done that.  And we've shown that two senior

2     leaders, who we know talked a lot, and we believe communicated

3     with each other, could have communicated something that indicated

4     that Joe Neal is telling the truth and Captain Meyer is not.

5     That's why this is so essential.

6          THE COURT:  And because that could have happened, and

7     that's all we have, that might have happened, you suspect it did,

8     the Government suspects it didn't, that you think that's enough?

9          MR. BAEHR:  Coupled with the misrepresentations they

10    made in the deposition, and you will be the judge of them.

11    You're going to see the emails and you're going to see what they

12    said.  Coupled with that, yes, it is.  Do they have -- you know,

13    the Court obviously evaluates credibility every day.  Who has

14    bias?  Who has motives to misrepresent?  What are they saying?

15    How does it align with common sense?  And the Court will make

16    that judgment.

17         But for us, it is.  These people had a reason and

18    rationale to minimize the nature of this spill, and they

19    minimized the nature of the spill.  And the information that came

20    out in the deposition didn't get backed up when the Government

21    finally provided the additional discovery.

22         So I do think that the Government had enough, and it's

23    very similar to what the Court had in RG Abrams and in Paisley

24    Park.  Those cases where exact -- very similar facts, destruction

25    of cell phone evidence.

 1          I can't point to a smoking gun, I don't have anything

 2    where Captain Meyers says, you know, hey, let's hide this

 3    information.  I don't have that because --

 4          THE COURT:  You took their depositions and you didn't

 5    get much there.

 6          MR. BAEHR:  They denied it.  You're right, Your Honor.

 7    You're absolutely right.  So it's a credibility determination,

 8    which obviously the Court is authorized to do.  And that goes to

 9    the remedy issue.  And I think the RG Abrams case really outlines

10    some of the potential remedies, which are fairly broad.  The

11    court has broad discretion, in our view, to remedy the harm.

12          And the specific things that they did in that were

13    threefold.  In that case, they said that the Court would take a

14    mandatory, irrebuttable presumption.  That the facts were

15    unfavorable.  They said that in motions hearings, they would

16    consider the facts unfavorable, and they would also allow the

17    jury to hear information about this spoliation issue and

18    spoliation claim.

19          This case is unique because it's a bench trial.  So

20    it's fundamentally different.  And that's why we asked for the

21    remedy that we did.  We could have asked for -- there's a broad

22    range terminating sanctions, attorney's fees, which don't make

23    sense in a contingency case or something in the middle.  And we

24    believe we asked for something in the middle, which is

25    essentially a mandatory adverse inference that the Court would

1   make, for itself, that there was this failure to warn issue.

2          THE COURT:  Do I have to find intent to reach the

3   remedy you want?

4          MR. BAEHR:  Yes, Your honor.

5          THE COURT:  And so where's the intent here?  Help me

6   with that.

7          MR. BAEHR:  Okay.  And so, again, this goes to those

8   two cases that we've cited.  And in those cases, they found that

9   taken altogether, they found an intent to deprive, or what they

10  call willful spoliation in those cases.

11         Now, again, no smoking guns.  But in one case, several

12  Defendants upgraded their phones at the same time, wiped their

13  phones.  The text messages were unavailable, you know, and the

14  Court found that that was evidence of an intent to deprive

15  Plaintiffs of the information.

16         So what did they consider in that, some factors?

17  Control.  Who had control of the phones.  In this case, Captain

18  Spitzer and Captain Meyer had control of the phones.  The Navy

19  has control of the overall system, so the Navy has control of the

20  phones, and the text messages were destroyed.  The Court also

21  considered the happenstance of it all.  You know, and the

22  happenstance is something that could be considered.

23         So without a smoking gun, the Court was still able to

24  find intent.  Similar situation in <u>Paisley Park</u>.  This is a

25  really interesting case about music rights for the artist Prince,

1    or artist formerly known as Prince, excuse me, and a dispute over

2    that.  And again, it's a situation where folks had disabled or

3    not disabled the auto delete function so that the iPhone has an

4    auto delete function that was enabled.  They didn't disable that.

5    And then later they upgraded their phones and they wiped their

6    phones.  And again, the Court couldn't point to some specific

7    nefarious statement or statement of conspiracy, but they did,

8    taken altogether, determine that there was intent to deprive

9    Plaintiffs in those cases.

10           So we believe the Court has wide ranging authority to

11   do that here.  There are good precedential reasons to do it.

12   There are good policy reasons to do it, as the Court must -- as

13   the Court knows, upholding discovery in general.

14           THE COURT:  Okay.

15           MR. BAEHR:  So those are arguments and I appreciate the

16   court's consideration.

17           THE COURT:  Okay.  Thank you.  I don't have any further

18   questions for you.  Ms. Yogiaveetil?

19           MS. YOGIAVEETIL:  Your Honor, Plaintiffs cannot satisfy

20   Federal Rule of Civil Procedure 37(e)(2)'s requirements for an

21   adverse influence, as they cannot demonstrate that the United

22   States intended to deprive Plaintiffs of text messages from

23   Captain Spitzer and Captain Meyer's phones.

24           The United States has produced over 2,000 pages of

25   curative discovery in this matter, including the call logs of

 1  Captain Spitzer and Captain Meyer, as well as the text messages

 2  and voicemails from three other command cell phones, Captain

 3  Guenther, Captain Harmeyer and Captain Frame, all of whom were

 4  identified by Captain Spitzer and Captain Meyer as individuals

 5  with whom they would have texted.  This is in contrast to their

 6  testimony about whether or not they would have texted with one

 7  another, where both of them indicated, in the case of Captain

 8  Spitzer, "I seldom texted with Captain Meyer."  And in the case

 9  of Captain Meyer, that if he ever texted Captain Spitzer, it

10  would have been in the context of a group text chain, including

11  with some of the officers for whom curative discovery has now

12  been produced.

13         Additionally, Plaintiffs have premised their motion on

14  the speculative belief that such text messages exist exclusively

15  between Captain Spitzer and Captain Meyer.  Again, that is

16  untethered to the facts given the testimony in this case.

17         Mr. Baehr just testified that -- or just explained that

18  he believes that there's some smoking gun or some sort of text

19  message that indicates Captain Meyer and Captain Spitzer would

20  have been communicating with one another regarding whether or not

21  the Navy knew about the contamination of the water on November

22  28th.

23         Plaintiffs are familiar with the makeup of the Navy

24  from discovery in this case, Captain Spitzer was the Commanding

25  Officer of Joint Base Pearl Harbor Hickam.  His command was

1  Command Navy Region Hawaii.  He received information from Captain

2  Guenther, his Chief of Staff and other subordinates or

3  individuals who were dual hated, such as Sherri Eng.  Captain

4  Meyer, on the other hand, was the Commanding Officer of NAVFAC

5  Hawaii.  He received communications from those under him.

6  Sometimes those communications involved others on Captain

7  Spitzer's team, such as Captain Guenther.  But as he explained,

8  he rarely ever -- he rarely texted with Captain Spitzer and when

9  he did, it was only in the context of a group communication.

10 While Mr. Baehr says that those messages must have existed, there

11 is no testimony and there is no evidence to support that belief.

12         Additionally, Mr. Baehr has gone on about how there are

13 -- it would have been very easy to capture these phones and

14 regarding the reasonableness of the Government's preservation

15 efforts.  Unfortunately, it is not as easy as Mr. Baehr would

16 like to hope.  Phones on the Flank Speed network, as indicated by

17 Mr. Paris' declaration, cannot be preserved through iTunes.  In

18 fact, the Navy cannot preserve data through iTunes regularly,

19 given security concerns.  As a result, these phones have to be

20 photographed.

21         The command cell phones that we have produced in this

22 matter had screenshots taken of them after being shipped off

23 island to a contractor who has a specialized camera, an IPEVO

24 camera that takes images of every single screen.  Those are the

25 phones that we have now produced as curative discovery.  It is

1   not an easy process and requires the commanding officer or any

2   officer who is in possession of a command cell phone to send

3   their phone off island, which is not feasible when responding to

4   an emergency such as the Red Hill spill.  As such, that does not

5   hold true.

6          Moreover, there has been discussion about whether or

7   not it's reasonable -- whether the Government's efforts have been

8   reasonable.  As this Court has noted in prior decisions, the rule

9   does not require perfection.  It requires reasonable efforts.  It

10  is foreseeable that some information could be lost despite such

11  reasonable efforts.  The Government issued a far reaching lit

12  hold.  We have 862 individuals at the Navy alone under litigation

13  hold for this case.  We have produced tens of thousands of

14  documents in this matter.  We have now produced 2,000 more of

15  curative discovery that we could have produced earlier if the

16  Plaintiffs had met and conferred with us.

17         Notwithstanding all of that, the Government is clearly

18  not trying to hide the ball.  We have stipulated to nuisance.  We

19  have stipulated to duty and breach here.

20         THE COURT:  Okay.  Let me pause you there.  What do you

21  mean by that statement?  I've heard it in court a number of

22  times.  I've seen it in writing a number of times, most recently

23  from you, I think, in the second sentence of your memo saying

24  you've admitted negligence and nuisance.  Where have you done

25  that?

1          MS. YOGIAVEETIL:  The Government submitted a

2    stipulation with Plaintiffs' counsel, a joint stipulation saying

3    that there was a nuisance for the period of May 5th, I believe,

4    through the November spill, as well as until the water advisory

5    was lifted by Hawaii Department of Health.

6          THE COURT:  Okay.  So that stip never uses the word

7    admit, correct?

8          MS. YOGIAVEETIL:  That is correct, Your honor.

9          THE COURT:  And the Government hasn't even answered the

10   complaint, correct?

11         MS. YOGIAVEETIL:  We have a pending motion to dismiss,

12   Your Honor, but --

13         THE COURT:  So to answer my question --

14         MS. YOGIAVEETIL:  That is correct.

15         THE COURT:  -- you haven't even answered the complaint.

16   So you have not -- the Government has not admitted any counts,

17   correct?

18         MS. YOGIAVEETIL:  That is correct, Your Honor.

19         THE COURT:  It has not admitted liability to any

20   portion of any count, correct?

21         MS. YOGIAVEETIL:  That is correct, Your Honor.

22         THE COURT:  I think you need to use your words much

23   more carefully.  When you throw in your brief, we've admitted

24   negligence and nuisance, and you have not -- you've filed a stip

25   saying you do not dispute certain breaches.  That's very, very

1    different.  And I'm uncomfortable when you keep coming to court

2    saying, well, this discovery doesn't matter because we've

3    admitted certain things when you in fact have not.  If you want

4    to admit something, admit it.  You can do it now.  You can file a

5    new stip, you can answer the complaint that's been pending for so

6    long.  You've done none of those things, correct?

7            MS. YOGIAVEETIL:  That's correct, your honor.

8            THE COURT:  So please choose your words more carefully.

9            MS. YOGIAVEETIL:  Understood, Your Honor.

10           Regarding the reasonableness of the Government's

11   litigation hold, however, the Government issued the litigation

12   hold.  Captain Meyer clearly understood the importance of the

13   information on his phone.  When his phone had experienced

14   technical failure, I believe he called it turning into a brick,

15   he had no access to his messages.  He had no access to his apps.

16           He contacted IT personnel who were equipped to deal

17   with these sort of things, and they determined after speaking

18   with him and talking about the phone, that there was no way to

19   restore the phone, they had to do a hard reset.  Absent a hard

20   reset, that phone was inoperable and basically a brick.

21           In the case of Captain Spitzer, he did acknowledge the

22   litigation hold about a week after it was issued, and there

23   appears to have been a miscommunication with IT when he turned

24   the phone in at the end of his command.  He did not try to keep

25   it.  He did not try to wipe it.  It was turned into IT, and,

1  unfortunately, it was wiped.

2          With that said, the Government has gone and tried to

3  get curative discovery based on the testimony of both Captain

4  Spitzer and Captain Meyer.  Based on their testimony, we looked

5  at the individuals with whom they indicated they could have

6  texted, and we immediately pulled the phones for all of those --

7  for three of those individuals with whom we recognized they could

8  most likely have communicated based on their roles, and we

9  produced those to Plaintiff.  We produced those expeditiously and

10 we would have been willing to produce them earlier, but

11 Plaintiffs never reached out to us for curative discovery.

12         In fact, during the belated meet and confer that

13 Plaintiffs requested on October 25th, the day before the reply

14 was due, Plaintiffs indicated that they didn't think that there

15 is any point to curative discovery and that they only wanted us

16 to agree to an adverse inference, which, again, in the absence of

17 intent, is both improper and given the nature of the inference

18 that Plaintiffs are seeking conflicts with the misrepresentation

19 exception of the Federal Tort Claims Act.

20         Additionally, Your Honor, given the curative discovery

21 that has been produced in this case, there is no evidence of

22 prejudice.  Plaintiffs now have filed a second motion indicating

23 that there's additional text messages with others.  There's also

24 text messages on group text chains between Captain Meyer and

25 Captain Spitzer.  Captain Spitzer is on those chains.  So there

1  is evidence to support Captain Meyer's testimony that should

2  there have been any actual communication, it would have been in

3  that context.

4        The other text messages that are referenced in their

5  brief motion deal with Captain Spitzer, Captain Guenther, his

6  Chief of Staff, and Sherri Eng, who was dual hated with NAVFAC.

7  Again, it came from people that were under him, not with someone

8  that would have been solely in NAVFAC like Captain Meyer.

9        Finally, the adverse inference that Plaintiffs seek is

10 inappropriate.  In addition to the lack of intent, the United

11 States has moved on the misrepresentation exception.  The

12 misrepresentation exception bars failure to warrant claims such

13 as the one Plaintiffs have pled in their complaint.

14       A discovery sanction cannot be used to confer subject

15 matter jurisdiction that a court might not otherwise possess.

16 That was from Williams v. Texaco from the District of New Mexico,

17 and also citing the United States Supreme Court in Insurance

18 Corp. of Ireland v. Compagnie de Bauxites.  No action of a party

19 can confer subject matter jurisdiction over a federal court.

20 This includes discovery sanctions that's been held in many courts

21 in the Ninth Circuit and others.

22       Therefore, the United States submits that Plaintiffs'

23 motion is improper.  The United States has made significant

24 efforts to provide curative discovery in this matter of its own

25 volition.

1    And I do want to clarify, Your Honor, as to the point

2  you raised earlier about whether the rule should be the same for

3  everyone.  The United States has had several meet and confers

4  with Plaintiffs' counsel in this matter regarding failures to

5  produce certain information in a timely fashion, failure to

6  disclose medical providers, failure to provide communications via

7  text message, as well as email that have been indicated in

8  depositions, and others.

9    We did not move on those items for one reason.  We met

10 and conferred, and we were able to resolve many of those issues.

11 We were able to avoid motion practice due to our adherence to the

12 Local Rule.  Moreover, you know, we have -- and I will say that

13 we are missing certain emails.  We know that certain emails

14 between one Plaintiff to their children's school is missing.

15 They know we know that no longer exists.  But the rule does not

16 require perfection, and therefore, the United States did not feel

17 that was necessary in order to meet their burden, which we don't

18 have a burden, but in order to meet -- make their case to the

19 court.  Thank you.

20    THE COURT:  Okay.  Thank you.

21    MR. BAEHR:  Thank you, sir.  Just to respond very

22 briefly to some points made by esteemed opposing counsel.  The

23 Plaintiffs -- the Government has made much of their willingness

24 to provide this additional discovery.  The Plaintiffs sent a

25 letter on or about July 26th, 2023 regarding their concerns about

this issue. There's a phone call with Mr. Rey then. The Government did not offer any additional discovery until two days before its opposition was due. And then ultimately, of course, we did have the meet and confer before, which the Court is correct, was not seven days before, but then we also had an additional meet and confer. And the reason why that additional meet and confer after the Government filed its opposition as they offered to do so in the letter, was important is because the Government didn't agree -- does not agree with Plaintiffs on what the appropriate remedy is.

So we're not able to resolve this without judicial intervention. We weren't able to agree on the value of this curative discovery. And, you know, I feel like I'm living in an alternate universe sometimes with the Government on this curative discovery. I cannot get call logs that show me the text messages from Captain Meyer to Captain Spitzer. And we focus a lot on those two gentlemen because we know that's completely unrecoverable.

But other relevant messages that Captain Meyer sent to other people that he didn't remember or tell me in the deposition and that Captain Spitzer sent to other people are also relevant. And the case is the Court can make an unfavorable determination about the facts of any of those communications that Plaintiffs haven't received.

The Government points out the Flank Speed issue in

1   their Paris declaration of their IT expert.  They say, hey, Flank

2   Speed, we couldn't -- it wasn't easy for us to capture this

3   information.  Well, Captain Meyers phone wasn't Flank Speed until

4   it turned into a brick, right.  And there's no testimony and

5   there's no evidence in the record.  And the Government hasn't put

6   on its expert regarding how difficult it was before.  We have put

7   forth our expert declaration saying, actually, that the

8   Government should have been able to do that.

9         So Flank Speed for Captain Meyer doesn't solve the

10  problem.  And in fact, as we pointed out, the Government -- or

11  Navy posts online and says, hey, Flank Speed's coming back up

12  your phones.  And so how does the Government square that with

13  saying these phones can't be backed up or this information can't

14  be received?  It doesn't match their declaration.  It doesn't

15  match what they're representing online.

16        The Plaintiffs understand their obligations not to have

17  the phones wiped of any of the Plaintiffs and have communicated

18  with their clients to that, and no other Plaintiff has

19  transferred phones or wiped it.  Richelle Dietz transferred her

20  phone and backed it up.  But we have asked the Plaintiffs that,

21  and we're monitoring that and making sure we comply with our

22  discovery obligations.  So I think that's all we have for our

23  response.

24        THE COURT:  Okay.  Thank you.

25        MS. YOGIAVEETIL:  Your Honor, may I just respond to a

1    couple of things that were said to provide the Court with some

2    context?  Sorry.

3            THE COURT:  Sure.  I'll give you another chance, Mr.

4    Baehr.

5            MR. BAEHR:  Okay.

6            MS. YOGIAVEETIL:  Your honor, I just wanted to clarify

7    a couple of the facts.  Captain Meyer's phone was on Flank Speed

8    at the time.  That was one of the reasons it could not be

9    preserved earlier.  He was waiting for it to be collected and

10   preserved through the IPEVO process.  That's part of the reason

11   that it was not able to be captured despite his concerns.

12           Second, the meet and confer that Plaintiffs referred to

13   in July that dealt with six letters that the United States sent

14   to Plaintiffs' counsel regarding document collection of

15   Bellwether Plaintiffs.  In fact, the letter that they attached to

16   their reply from July 26th goes through some of those issues and

17   their response to our concerns that Plaintiffs were not

18   adequately collecting their records and were not documenting what

19   they had done.

20           They do acknowledge that they have been notified about

21   Captain Spitzer's cell phone.  This is, again, before the United

22   States and Plaintiffs' counsel were aware of the issues with the

23   other phone.  And the request is that they've not withheld

24   anything damaging or embarrassing and that personal phones have

25   been checked.  All of that has been done.  They don't reference

1    any other curative discovery.  They have not ever sought any

2    other curative discovery.  And again, as Plaintiffs' counsel has

3    indicated just now, all Plaintiffs seek here is a sanction.  They

4    do not seek a means to cure.  Thank you.

5            THE COURT:  Okay.  Thank you.  Mr. Baehr.

6            MR. BAEHR:  I think we're fine, sir.

7            THE COURT:  All right.

8            MR. BAEHR:  Thank you.

9            THE COURT:  Thank you.  All right.  The matter is under

10   submission.  Again, I did grant ECF 194.  So Plaintiffs may file

11   those additional exhibits and the Government may file a response

12   of no more than ten pages by Monday the 20th.

13           MS. YOGIAVEETIL:  Thank you, Your Honor.

14           THE COURT:  All right.  Thank you, counsel.  We'll be

15   in recess.

16           THE CLERK:  All rise.  Court stands adjourned.

17       (Proceedings concluded at 1:39 p.m.)

18

19

20

21

22

23

24

25

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that pursuant to 28 U.S.C. §753, the foregoing is a complete, true, and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated: November 17, 2023

_____
Jessica B. Cahill, CER/CET-708