LYLE S. HOSODA           3964-0
KOURTNEY H. WONG         10827-0
SPENCER J. LAU           11105-0
HOSODA LAW GROUP, AAL, ALC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawai'i 96813
Telephone:   (808) 524-3700
Facsimile:   (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com


KRISTINA S. BAEHR        *Pro Hac Vice*
JAMES BAEHR              *Pro Hac Vice*
MARY M. NEUSEL           *Pro Hac Vice*
JUST WELL LAW, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 994-6241
Email: kristina@well.law; jim@well.law; maggie@well.law


FREDERICK C. BAKER       *Pro Hac Vice*
JAMES W. LEDLIE          *Pro Hac Vice*
KRISTEN HERMIZ           *Pro Hac Vice*
CYNTHIA A. SOLOMON       *Pro Hac Vice*
SARA O. COUCH            *Pro Hac Vice*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: fbaker@motleyrice.com; jledlie@motleyrice.com;
khermiz@motleyrice.com; csolomon@motleyrice.com;
scouch@motleyrice.com
*Attorneys for the Plaintiffs*


*(case caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., Individually, and as Next Friend to his minor children P.G.F. and P.R.F, NASTASIA FREEMAN, Individually, and as Next Friend to her minor children, K.F., D.F., and N.F., JAMIE SIMIC, Individually, and as Next Friend to her minor children, M.S. and J.S.; <br><br> Plaintiffs, <br><br> vs. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | CIVIL NO. 1:22-cv-397 (FEDERAL TORT CLAIMS ACT) <br><br> **BELLWETHER PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE UNITED STATES' MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF DR. STEVEN BIRD [ECF NO. 234]** <br><br> HEARING: <br> Date:  February 22, 2024 <br> Time:  10:30 A.M. <br> Judge:  Hon. Leslie E. Kobayashi <br><br> JUDGE: Hon. Leslie E. Kobayashi <br> TRIAL DATE:  April 22, 2024 |

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

I.      STATEMENT OF FACTS ......................................................................1

II.     LEGAL STANDARD ............................................................................3

III.    ARGUMENT..........................................................................................4

        A.    Dr. Bird's Opinions Regarding Causation are Reliable........................4

              i.     Dr. Bird's general causation analysis was conducted in
                     accordance with generally accepted methods...........................6

              ii.    Dr. Bird's specific causation analysis was conducted in
                     accordance with generally accepted methods.........................14

              iii.   Dr. Bird properly analyzed the Plaintiffs' dose of exposure....15

        B.    Dr. Bird's Medical Surveillance Opinions are Supported by Reliable
              Methods .......................................................................................18

        C.    Dr. Bird's Reports Satisfy Requirements of Rule 26.........................20

        D.    The Opinions of the Plaintiffs' Experts that Rely on Dr. Bird's
              Opinions Should not be Stricken......................................................25

IV.     CONCLUSION......................................................................................25

## TABLE OF AUTHORITIES

### Cases

*Celador International Ltd. v. Walt Disney Co.*,
2008 WL 11338778 (C.D. Cal. May 9, 2008)......................................................21

*City of Pomona v. SQM North America Corp.*,
750 F.3d 1036 (9th Cir. 2014)..........................................................................24

*Clausen v. V/V New Carissa*,
339 F.3d 1049 (9th Cir. 2003)..........................................................................16

*Daniels-Feasel v. Forest Pharmaceuticals, Inc.*,
2023 WL 4837521 (2d Cir. July 2023) ........................................................ 13, 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .........................................................................................4

*Erickson v. Baxter Healthcare, Inc.*,
131 F. Supp. 2d 995 (N.D. Ill. 2001)..................................................................13

*Heller v. Shaw Industries, Inc.*,
167 F.3d 146 (3d Cir. 1999)..............................................................................16

*Henricksen v. ConocoPhillips Co.*,
605 F. Supp. 2d 1142 (E.D. Wash. 2009) ...................................................... 15, 16

*In re Central European Industrial Development Co.*,
427 B.R. 149 (Bankr. N.D. Cal. 2009)................................................................24

*In re Zoloft (Sertaline Hydrochloride) Products Liability Litigation*,
858 F.3d 787 (3d Cir. 2017) ..............................................................................9

*Jager v. Andrade-Barraza*,
2019 WL 6896643 (D.N.M. Dec. 18, 2019) .......................................................21

*Krizek v. Queen's Medical Center*,
2020 U.S. Dist. LEXIS 172766 (D. Haw. Sept. 21, 2020) ...................................4

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .........................................................................................4

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
606 F.3d 262 (6th Cir. 2010)............................................................................24

*Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*,
2023 WL 5960237(D. Minn. Sept. 13, 2023) .....................................................12

*United States v. Hermanek*,
  289 F.3d 1076 (9th Cir. 2002)...............................................................................4

*United States v. King*,
  703 F. Supp. 2d 1063 (D. Haw. 2010) ...............................................................4

*Westberry v. Gislaved Gummi AB*,
  178 F.3d 257 (4th Cir. 1999) .............................................................................16

## **Rules**

Fed. R. Civ. P. 26(a) Advisory Committee Note (1993) .......................................21

Fed. R. Evid. 702 ..............................................................................................3, 25

**INTRODUCTION**

The Government's motion to exclude Dr. Bird's expert report and testimony (ECF No. 234) is legally and factually flawed and should be denied. First, Dr. Bird is qualified to offer expert opinions in this case about general causation, specific causation, and medical surveillance – a fact the Government does not dispute. Second, the methodologies utilized by Dr. Bird are relevant and reliable. Third, Dr. Bird's reports satisfy the Requirements of Rule 26. Accordingly, there is no basis to strike his reports or the reports of Plaintiffs' experts who rely on his opinions.

## I.    STATEMENT OF FACTS

Dr. Bird is a medical toxicologist and an emergency medicine clinician, board certified in both specialties. *See* Report of Dr. Steven Bird, 7/24/23, ECF Nos. 205-1 (public) and 209-1 (sealed) ("Rpt.") (Govt. Ex. A) 1-2. He is a Professor of Emergency Medicine at the University of Massachusetts Medical School and also works at the UMassMemorial Health toxicology clinic, where he evaluates and provides advice to patients on their toxicological exposures and potential health effects. *See* Dep. of Steven Bird, MD ("Bird Dep.") (Ex. 2), 355:8-356:20. He has practiced in the fields of medical toxicology and emergency medicine for over twenty years. *See id.*; *Curriculum Vitae*, Steven B. Bird, MD, ("CV") (Ex. 1) 1-15. He serves on the editorial board of Academic Emergency Medicine and was a founding member of the Journal of Medical Toxicology. *See id.*; Ex. 1, CV 10. He

is a manuscript reviewer for medical journals and is published in peer-reviewed journals. *See* Ex. 1, CV 15-19.

Dr. Bird regularly evaluates and advises patients exposed or potentially exposed to a variety of toxic substances, including hydrocarbons, regarding current and potential health effects of their exposure where numerical quantification of toxicologic dose in not always present but where consideration of exposure information is gathered and considered. *See* Govt. Ex. A, Rpt. 2; *see* Ex. 2, Bird Dep. 34:24-39:2. He has advised on thousands of different types of potentially toxic exposures. *See id.* 352:12-23. These consultations have included those with and for the Massachusetts-Rhode Island Poison Center, outside facilities around New England, and patients in the emergency department, hospital wards, and the ICU. *See id.* 16:13-17:22; 351:21-352:11; 353:24-355:7.

Dr. Bird was asked in this case to provide an opinion as to the acute and chronic effects of each of the Bellwether Plaintiffs' (the "Plaintiffs") exposure to JP-5. *See id.* 48:20-49:4. Applying reliable and widely accepted methodology, and based on his knowledge, skill, experience, and training in the field of medical toxicology and emergency medicine, he concluded that each Plaintiff received a sufficient exposure to JP-5 to cause the short- and long-term harms identified in his reports. *See* Govt. Ex. A, Rpt. 55-56, 69-72, 77; 11/30/23 Rebuttal Report, ECF Nos. 221-5 (public) and 224-5 (sealed) ("Rebuttal") (Govt. Ex. H) 3, 4-16; Ex. 2, Bird

2

Dep. 326:24-327:23, 376:2-13. Moreover, he found that "[g]iven the toxic exposure experienced by the people at JBPHH as well as the association of jet fuel, kerosene, benzene, and hydrocarbons with cancers (that may have a significant latency), the fear people exposed to jet fuel at JBPHH have of developing cancer in the future is reasonable and supported by science." Govt. Ex. A, Rpt. 52. He further opined there is a need for medical surveillance of individuals exposed to the JP-5 contaminated water, including the Plaintiffs, "given the myriad of significant health effects caused by jet fuel, the acute complaints made by so many individuals on the water line in the days and weeks following the fuel leak at Red Hill, the chronic effects many of these individual are still experiencing, and the plausibility of latent health effects . . . ." *Id.* at 6. *See also id.* at 76-77; 10/23/23 Supplemental Report, ECF Nos. 221-4 (public) and 224-4 (sealed) ("Supp. Rpt.") (Govt. Ex. G) (providing medical surveillance recommendations for each Plaintiff).

## II.    LEGAL STANDARD

An expert may testify if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As an initial matter, a court must determine if the expert is qualified by "knowledge, skill, experience, training, or education" to render an expert opinion. That is, "the trial court is required to determine whether a proposed

3

expert is qualified to give expert testimony" in the relevant field. *Krizek v. Queen's Med. Ctr.*, 2020 U.S. Dist. LEXIS 172766, *9 (D. Haw. Sept. 21, 2020).

Expert testimony must satisfy two requirements: relevance and reliability. *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 592-93 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. To be reliable, the Court must make a preliminary determination of whether the expert's methods are adequately explained, well-reasoned, and not speculative. *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002). To be relevant, the opinion must "fit," meaning that it must be relevant to, and helpful in resolving, the question before the Court. *See Daubert*, 509 U.S. at 591 (ruling that "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful") (citation and internal quotation marks omitted). A court's determination of relevancy "must be tied to the facts of the particular case." *United States v. King*, 703 F. Supp. 2d 1063, 1068 (D. Haw. 2010).

## III.    ARGUMENT

### A.    Dr. Bird's Opinions Regarding Causation are Reliable

4

The Government wrongly asserts that Dr. Bird failed to consider the Plaintiffs' exposure and other causes of Plaintiffs' acute and long-term injuries and that he instead provides "sweeping opinions" that the spill was a substantial cause of each of the Plaintiffs' injuries based solely on the fact that a spill occurred. Mem. 1. As a preliminary matter, Dr. Bird employs reliable methods in forming his opinions regarding both general causation and specific causation. He utilized scientifically valid and reliable methods to perform his research of the known toxicological effect of fuel exposures, followed by a differential etiology methodology considering the medical condition and history of each Plaintiff, and consideration of the weight of the evidence and the Bradford Hill criteria. Govt. Ex. A, Rpt. 2. *See also id.* at 19-55 (discussing relevant literature on adverse health effects due to JP-5 and other jet fuels on specific organ systems or development) & 72-75 (applying the Bradford Hill analysis); Govt. Ex. H, Rebuttal 1-2 (describing his process of employing the differential etiology methodology in this case). He reviewed literature related to the toxicity of jet fuels; chemical toxicity databases such as the Hazardous Substances Data Bank, United States Environmental Protection Agency's (EPA) Integrated Risk Information System (IRIS), and Agency for Toxic Substances and Disease Registry (ATSDR); and case-specific documents. Govt. Ex. A, Rpt. 2-3. The latter included documents related to each of the Plaintiffs' exposure to JP-5 via their tap water; the available information relating to the

pervasiveness and estimates of JP-5 in the water system; other observed facts describing the quality of the water following the spill, health effects associated with and expected to be seen after exposure to jet fuel and its constituents; the health impacts reported by or regarding individuals exposed to JP-5 at JBPHH; Government testimony; and records of each Plaintiff's health before and after the event. *See, e.g.*, Affidavit of Dr. Steven Bird, ECF Nos. 221-2 (public) and 224-2 (sealed) ("Aff.") (Ex. 3) ¶¶18-20, 23-25, 30, 39.

### i. Dr. Bird's general causation analysis was conducted in accordance with generally accepted methods.

The Government wrongly asserts that Dr. Bird did not apply the Bradford Hill framework in accordance with reliable methods. Mem. 8. He did. Dr. Bird conducted a separate Bradford Hill analysis for every potential adverse health effect that "he considered there to be causation with the jet fuel and that specific outcome," Ex. 2, Bird Dep. 82:15-24, and concluded that "when the body of research on jet fuel exposure is considered in light of the Bradford Hill criteria, I am able to opine that exposure to jet fuel causes adverse health impacts," Govt. Ex. A, Rpt. 74. Specifically, in his Bradford Hill analysis, Dr. Bird considered all nine principles: strength of association, consistency, specific, temporality, biological gradient, plausibility, coherence, experiment, and analogy. *Id.* at 72. He also reviewed approximately 250 studies in his strength of association analysis, *see* Ex. 2, Bird Dep. 91:20-92:6, and found that although there are limited human studies involving

jet fuel exposure, "studies of jet fuel- and hydrocarbon-exposed people with odds ratios of greater than 1.0 for the occurrence of PTSD, depression, autoimmune disorders, abnormal, menstrual cycles, developmental /cognitive delay, and renal cancer, amongst others [exist]," Govt. Ex. A, Rpt. 72.

In his consistency analysis, Dr. Bird found that "[s]tudies using methods of *in vitro*, animal studies and human studies consistently demonstrated adverse health effects in various organ systems," and that the consistency factor is met for each organ system he discussed in his report. Ex. 2, Bird Dep. 95:8-23. As regards the specificity criteria, Dr. Bird explained that this criterion – met if an exposure causes a single disease without any other likely explanation – is difficult to meet with jet fuel because "the available evidence supports that jet fuel exposure does cause multi-system effects on exposed individuals." Govt. Ex. A, Rpt. 73. As regards the temporality factor, Dr. Bird explained that every adverse health effect discussed in his report and supplemental report regarding the Plaintiffs developed or, if pre-existing, worsened after the November 2021 release. Ex. 2, Bird Dep. 106:11-107:11. This determination was based on his review of the Plaintiffs' fact sheets, interrogatory responses, medical records, and his discussions with Plaintiffs. *Id.* 107:13-21. Dr. Bird explained that the concept of biological gradient, which refers to the concept of a dose-response, is difficult to establish for the Red Hill contamination for multiple reasons, including that the numerical quantification of

the jet fuel exposure of the Plaintiffs was not possible given the absence of real time water sampling. Govt. Ex. A, Rpt. 73. As to biological plausibility, his report contains references and descriptions of research into the mechanism of action and varied outcomes after hydrocarbon exposure. He concluded that the biological plausibility standard has been met with regards to jet fuel exposure and varied end-organ effects. *Id.* After reviewing data, particularly "decades of animal experimental research which demonstrate the numerous and varied adverse effects of jet fuel exposure," Dr. Bird found that coherence has been met in the case of hydrocarbon exposure and the effects on the Plaintiffs. *Id.* at 19-55, 74; Ex. 2, Bird Dep. 114:2-21; 115:6-15. Regarding experimentation, Dr. Bird again points to the decades of animal experimental research demonstrating the numerous and varied adverse effects of jet fuel exposure for support, as "[c]learly one cannot ethically expose individuals (particularly children) for any significant length of time to jet fuel by any method of exposure." Govt. Ex. A, Rpt. 74. In reviewing the analogy criteria, Dr. Bird provides "[t]here is ample evidence of hydrocarbon fractions causing symptoms such as diarrhea, vomiting, headaches, neurological changes, etc. It therefore follows that jet fuel (which contains more than 1,000 different hydrocarbons) can also cause those symptoms." *Id.* In sum, Dr. Bird applied the Bradford Hill framework in a systematic and reliable manner. Dr. Bird also explained the methodology applied in

8

this case is fully consistent with the methodology he employs in his clinical practice

of medical toxicology and emergency medicine. *See* Ex. 2, Bird Dep. 371:8-373:10.

In support of its argument, the Government relies on *In re Zoloft (Sertaline*

*Hydrochloride) Products Liability Litigation*, 858 F.3d 787 (3d Cir. 2017). Mem. 2-

3. There, unlike here, the expert (Dr. Jewell) was excluded because:

> [A]fter alluding to this presumably reliable mathematical calculation
> technique for analyzing trends in even insignificant results, Dr. Jewell
> did not actually implement it; instead, he qualitatively discussed the
> general trend in the data.  In light of the opportunity to actually conduct
> such quantitative analysis, his refusal to do so – without explanation –
> suggests that he did not reliably apply his stated methodology.

*In re Zoloft*, 858 F.3d at 797. The Third Circuit went on to note that:

> [W]ithout explanation, Dr. Jewell performed a meta-analysis on two
> studies but not on any of the other studies. . . .  He also inexplicably
> excluded    another    study    (Kornum    (2010))    utilizing    similar
> methodology.  Again, while there may have been legitimate reasons for
> these inconsistencies, the fact that he did not give an adequate
> explanation for doing so makes his testimony unreliable.

*Id.* at 798. Here, Dr. Bird addressed each of the Bradford Hill criteria and noted

limitations to his analysis. *See* Govt. Ex. A, Rpt. 72-75; Ex. 2, Bird Dep. 82:15-24.

The Government's argument that Dr. Bird did not apply the Bradford Hill

criteria to an epidemiological study, Mem. 9, is misleading because few such studies

exist. As Dr. Bird points out, "[t]here have been limited epidemiological studies

performed for jet fuel exposure via inhalation, ingestion, and dermal routes

(particularly in children), simply due to the (fortunately) rare nature of this kind of

water contamination." Govt. Ex. A, Rpt. 73. *See also id.* at 54 (explaining the incident at Red Hill is novel, so there has never been an epidemiological study of health effects in this type of situation).[1] Indeed, a recently published study, which Dr. Bird "considered and analyzed," Ex. 2, Bird Dep. 101:4-20, on the health impacts after the jet fuel release at Red Hill, notes that it is the first study to report health symptoms experienced by adults following exposure to JP-5 contaminated drinking water and the first reported incident of JP-5 exposure in children. *See* Miko, S, *et al.* Community Health Impacts After a Jet Fuel Leak Contaminated a Drinking Water System: Oahu, Hawaii, November 2021, J Water and Health. 2023 Jul;21(7):956-971, 966-67. (Ex. 5). Furthermore, Dr. Bird emphasized that many of the exposed individuals in this case were children, and that very few studies exist of jet fuel exposure in children. Govt. Ex. A, Rpt. 74.

Despite this, Dr. Bird reviewed and discussed multiple relevant epidemiologic studies. *See, e.g.*, Govt. Ex. A, Rpt. 2 (human epidemiologic studies have repeatedly demonstrated neurotoxicity from PAHs through occupational environmental

---

[1] Hawaii State Toxicologist, Dr. Diana Felton, confirms this. *See* Dep. of Diana Felton, MD (Ex. 4) 212:23-213:12 ("Q.  And is there any scientific literature to help predict the effects of human exposure to JP-5 in the water at JBPHH?  A. … there is a very scant amount of information to help us understand.  There are a few papers that center on occupational exposure to young Navy workers filling planes and getting dermal and maybe inhalational exposures only. There's a few like rat and mice studies. But there are no studies that model the type of exposure that – that the people we're talking about experienced, so drinking JP-5 in your tap – or being exposed to in your tap water, diluted in water.").

exposure); *id.* at 23 (neurological toxicity of TPH as a collective group is generally derived from epidemiologic studies of individuals from petrochemical plan[t]s or major industrial accidents involving oil); *id.* at 29 (human epidemiological studies of workers exposed to inhaled benzene have demonstrated statistically significant decreases in total leukocytes, lymphocytes, and neutrophils); *id.* at 30 (epidemiologic studies in the general population have linked environmental naphthalene exposure to asthma and other allergic conditions); *id.* at 32 (human epidemiologic studies have shown structural and functional immunosuppression in occupationally and environmentally exposed individuals).

Against this background, the Government's assertion that Dr. Bird acknowledges that his report does not include, identify, and assess any studies supporting a causal link between JP-5 and certain adverse effects claimed by plaintiffs (macrocytosis, chronic pain or adverse health effects in general) is misplaced. Mem. 9. First, Dr. Bird testified that he is not aware of any articles *specific to JP-5* that support his conclusions, not that he did not identify or assess any studies supporting a causal link between JP-5 and these health effects. *See, e.g.*, Ex. 2, Bird Dep. 229:11-21 (testifying regarding chronic pain: "So I am not aware of an article specific to JP-5.  But there are known neurotoxins, within the thousand-plus chemicals present in jet fuel, … which have been shown to cause nerve injury"). Second, Dr. Bird discussed and analyzed each of these conditions. *See, e.g.*, Govt.

11

Ex. A, Rpt. 32 (three of the Plaintiffs have been diagnosed with systemic mastocytosis since the water contamination, providing it is a rare disorder, and citing studies regarding mast cell activation from fuel exposure).

The Government cites to two studies regarding abnormal menstrual cycles to argue that certain studies upon which Dr. Bird relied do not establish an association between JP-5 and particular adverse effects. Mem. 10. That is a classic question for cross examination, not exclusion. Notwithstanding, when asked about these two studies, Dr. Bird testified that to answer the questions asked about the Lemasters study, he needed to look at the full 86-page study, not just the sections he was shown. Ex. 2, Bird Dep. 131:5-133:16. Further, in forming his opinion that exposure to JP-5 can cause heavy menstrual bleeding, Dr. Bird testified that he "reviewed and analyzed and considered lots of information," including the dozens of other studies outlined in his report regarding this topic. *Id.* 127:7-14.

The Government's assertion that Dr. Bird's failure to identify, by name, during deposition, which studies have certain odds ratios rises to the level of his failing to support how his Bradford Hill conclusions are drawn is also without merit. Mem. 11-12. A deposition is not a memory test. *See Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*, 2023 WL 5960237, at *11 (D. Minn. Sept. 13, 2023) ("[D]epositions are not memory tests and Watkins may update her testimony at trial and be cross-examined regarding the same."). Dr. Bird directed the Government to

12

the studies in question and simply noted he did not have certain information "committed to memory." Ex. 2, Bird Dep. 83:4-89:24.[2] Accordingly, this is nothing like *Erickson v. Baxter Healthcare, Inc.*, 131 F. Supp. 2d 995, 1000 (N.D. Ill. 2001), upon which the Government relies, where the plaintiff argued defendants' expert did not "provide any support for the opinion," to which the defendants referred the court "to the bibliography attached to Dr. Volberding's report and to his curriculum vitae."

The Government also argues that Dr. Bird did not consider any studies that do not support association, which, it contends, "is an improper application of the Bradford Hill analysis." Mem. 12. This, too, is incorrect. Dr. Bird testified that he took independent data and considered it, analyzed it, and came to a conclusion. Ex. 2, Bird Dep. 79:11-23. Again, the facts are far afield from the Government's case law. In *Daniels-Feasel v. Forest Pharmaceuticals, Inc.*, 2023 WL 4837521 (2d Cir. July 2023), a summary order, the Second Circuit noted that the district court excluded the expert's testimony "because, among other things, Dr. Moyé cherry-

---

[2] Dr. Bird's report contains multiple references to studies with odds ratios greater than one. *See, e.g.*, Govt. Ex. A, Rpt.19 (large scale exposure to chemical toxins and PTSD, depressive symptoms, and anxiety); *id.* at 23 (exposure to crude oil and depression, PTSD, headache, eye complaints, and throat complaints); *id.* at 30 (autoimmune disorders after occupational toluene exposure); *id.* at 38 (exposure to jet fuel and abnormal menstrual cycles including painful menstrual cycles, heavy menstrual bleeding, and abnormal menstrual cycle length); *id.* at 40 (exposure to environmental toluene and risk of preterm birth); *id.* (miscarriage in lab workers exposed to toluene); *id.* (decreased menstrual periods associated with xylene exposure); *id.* (miscarriage in lab workers exposed to xylene); *id.* at 51 (incidence of renal cancer after exposure to jet fuel).

picked only favorable studies to support his causal conclusion and did not rigorously explain the weight he attached to each Bradford Hill factor" and did "not explicitly identify exactly which factors he believes support a causal relationship between maternal use of SSRIs and ASD in children." *Id.* at *3, *4. Such is not the case here. *See, e.g.*, Ex. 2, Bird Dep. 93:7-94:9 (testifying that studies he reviewed with odds ratios of less than 1.0 informed and are part of his opinion).

### ii.    Dr. Bird's specific causation analysis was conducted in accordance with generally accepted methods.

As regards specific causation, Dr. Bird performed a "differential etiology methodology considering the facts and circumstances of each Plaintiff's medical condition and weighed all other available evidence to determine which health effects, if any, were caused or worsened as a result of each Plaintiff's exposure to JP-5 fuel released into the Joint Base Pearl Harbor-Hickam water distribution system." Govt. Ex. H, Rebuttal 1. His analysis involved "determining whether the exposure is capable of causing the disease/effect." *Id.* Employing the differential etiology methodology involved taking "into consideration what symptoms a patient is having or what signs they have, thinking about what kind of causes of those signs or symptoms there are, and then, you know, ruling in or ruling out." Ex. 2, Bird Dep. 375:4-23. To do this, Dr. Bird interviewed the Plaintiffs,[3] and reviewed each

---

[3] The Government's criticism of Dr. Bird for not conducting a physical exam of the Plaintiffs is misplaced. Mem. 3. Dr. Bird conducted his interviews on Zoom and saw

14

Plaintiff's medical records. Further, he reviewed the Plaintiff's responses to IME questionnaires and the results of exams performed by Drs. Durrani, Kosnett, Gordon, and Smith. Govt. Ex. H, Rebuttal 3. He employed the same methodology in this case as he does in his clinical practice. As here, he talks to the patient and the family members, reviews labs, previous records, the circumstances of exposure, what they have been exposed to, and what medications they take. *See* Ex. 2, Bird Dep. 371:8-373:23. And based on this differential etiology of each of the Plaintiff's medical symptoms and conditions subsequent to November 20, 2021, he found that each Plaintiff suffered acute symptoms from their exposure to JP-5 and many continue to suffer chronic symptoms from their exposure. *See* Govt. Ex. A, Rpt. 69-72; Govt. Ex. G, Supp. Rpt. 1-7; Govt. Ex. H, Rebuttal 1-16.

### iii.    Dr. Bird properly analyzed the Plaintiffs' dose of exposure.

The Government next contends that *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142 (E.D. Wash. 2009), "is instructive" because the "plaintiff's expert 'did not attempt to quantify dose or even estimate [plaintiff's] level of exposure to benzene.'" Mem. 16 (citing *Henrickson*, 605 F. Supp. 2 at 1148). Not so. The court held "it is not always necessary for a plaintiff to quantify exposure levels precisely

---

each of the individuals he interviewed. Ex. 2, Bird Dep. 71:19-23. If he had felt a physical exam was warranted for his opinion, he would have done one. *See id.* 71:24-72:11. This comported with his typical clinical work. *See id.* 73:1-12.  And as the Plaintiffs answered questions during their interviews, he incorporated them into this report, "just like I do when I'm seeing patients." *Id.* 74:15-22.

15

or use the dose-response relationship, provided that whatever methods an expert uses to establish causation are generally accepted in the scientific community." *Henricksen*, 605 F. Supp. 2d at 1157.[4] *See also Clausen v. V/V New Carissa*, 339 F.3d 1049, 1059 (9th Cir. 2003) ("The fact that the minimum threshold level of oil necessary to cause harm to shellfish has not yet been established with any degree of certainty does not render Dr. Elston's evaluation mere guesswork, ... While 'precise information concerning the exposure necessary to cause specific harm [is] beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic … and need not invariably provide the basis for an expert's opinion on causation.'" (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999); *Heller v. Shaw Indus., Inc.*,167 F.3d 146, 157 (3d Cir. 1999) ("even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness"))).

In this case, Dr. Bird did not perform a quantitative analysis of dose and exposure. Ex. 2, Bird Dep. 153:1-12. That was based on his "understanding that 'no sample data collected within the JBPHH system exist that document actual exposure conditions at the time of acute to subchronic health effects experienced by

---

[4] The expert exclusion issue in *Henricksen* is readily distinguishable on the facts as well. There, the expert "testified in his deposition that he did not find it important or relevant to support his opinion by studies" and was unable "to point to any source which reliably supports his conclusion, render[ing] his opinion merely personal opinion." 605 F. Supp. 2d at 1161. Such is not the case here.

16

residents.'" Govt. Ex. A, Rpt. 5 (quoting DOH_RH_0048663, Brewer R. Exposure Assessment: November 2021 Release of JP-5 Jet Fuel into the Joint Base Pearl Harbor-Hickam Drinking Water System, June 2023, 3 (Ex. 6)). *See* Ex. 3, Aff., ¶¶23-24. Indeed, in circumstances "[w]hen limited data exists, generally recognized methodology does not require that mathematical gymnastics using data that were not measured be used, but reliable methodology does include consideration of all known data available including qualitative data. Those data include the use of medical records, fact sheets, interviews with the Plaintiffs, and the known facts about the water contamination . . . ." Govt. Ex. H, Rebuttal 3; Ex. 2. *See* Bird Dep. 361:19-365:9; Ex. 3, Aff., ¶29.[5] *See also* Ex. 3, Aff., ¶27 (explaining it is not uncommon in environmental exposure cases to not know the dose or exposure level).

In addition to considering Plaintiff-specific information from interviews and medical records regarding type and duration of exposure, Ex. 3, Aff., ¶18, as well as

---

[5] The Government's expert in medical toxicology and occupational environmental medicine agrees that dose can be calculated using qualitative information. *See* Dep. of Michael Kosnett, MD (Ex. 7) 152:3-153:3 ("Q. … do you always have to have the dose in order to determine causation? . . .  A.  . . . Dose is fundamental to causation in toxicology.  Sometimes it can be quantitative.  Sometimes it can by qualitative. *** Q. In other words, it had to have existed. The toxin and the person had to have come together, and then the analysis can by empirical or qualitative. Is that correct?  A. Well, it depends, again. The way in which you interpret the dose can sometimes be qualitative as opposed to, like, an exact milligram per kilogram per day. In some situations, you don't need that."). *See also id.* at 160:11-17 (testifying that if there's no quantitative information but you have qualitative information or analogous information then you can sometimes rely on that).

17

health impacts, Dr. Bird examined other lines of evidence – including quantitative evidence – to opine that each Plaintiff received a sufficient exposure to JP-5 to cause the harms enumerated in his report. Govt. Ex. A, Rpt. 77; Govt. Ex. H, Rebuttal 3-4. This evidence includes reports of Dr. Roger Brewer; reports of other experts, including Dr. Paul Rosenfeld and Ms. Lacey Keller; the fact that over 4,000 residents on the JBPHH water system presented to medical facilities with exposure-related complaints in close temporal relationship to the November 20, 2021, fuel spill; the CDC, ATSDR, and DHA statistics on the number of exposed individuals that have reported worsened or new persistent symptoms since November 2021 as well as the types of symptoms reported; the number of complaints of fuel smell, taste, and sheen in the tap water; the concentration of jet fuel in the water that a fuel sheen indicates; and the fact that government officials, Dr. John Oh and Dr. Diana Felton, found that there was enough JP-5 in the water to make people sick. *See id.*; Ex. 3, Aff., ¶30.

### B.    Dr. Bird's Medical Surveillance Opinions are Supported by Reliable Methods

The Government argues that Dr. Bird's medical monitoring opinions are unreliable as Dr. Bird has failed to conduct a reliable causation analysis. Mem. 20-21. This argument fails for the reasons above. The Government further asserts that Dr. Bird's reasoning and methodology in determining the necessity of medical monitoring do not comply with generally recognized scientific principles and cannot "properly be applied to the facts at issue." *Id.* at 21-22. Again, the Government is

18

wrong. In his report, Dr. Bird explained that "exposure to jet fuel may result in latent effects, especially for individuals exposed *in utero* or as children, including behavioral, psychiatric, renal, pulmonary, dermal, immunologic, as well as cancer." Govt. Ex. A, Rpt. 6. Further, he explained that "given the myriad of significant health effects caused by exposure to jet fuel, the acute complaints made by so many individuals on the water line in the days and weeks following the fuel leak at Red Hill, the chronic effects many of these individuals are still experiencing, and the plausibility of latent health effects, the people exposed from the Red Hill contamination clearly warrant ongoing medical surveillance." *Id.* at 76. To support this recommendation, he points to two publications whose recommendations include "rapid development and implementation of protocols for baseline clinical evaluations, including respiratory function; biospecimen banking; short and longer-term medical surveillance and monitoring of exposed people; and development of psychosocial interventions." *Id.* (citing McCoy MA. Assessing the effects of the Gulf of Mexico oil spill on human health; 2010:1-201 (Ex. 8); Institute of Medicine. Review of the Proposal for the Gulf Long Term Follow-Up Study: Highlights from the September 2010 Workshop 2010:1-19 (Ex. 9)).[6]

---

[6] *See also* Ex. 3, Aff. ¶30(l) & n. 25 (regarding recommendations for a health surveillance registry).

As regards testing, he explained that "[t]he frequency with which that testing should occur, the duration of medical surveillance, and the details of the specific testing may be different depending on the amount of exposure, previous and ongoing symptoms, as well as the age of the individual at the time of their exposure." *Id.* at 76. Detailed recommendations for medical surveillance for each Plaintiff are contained in his October 23, 2023 report. *See* Govt. Ex. G, Supp. Rpt., 1-7. At deposition, Dr. Bird testified that as regards medical surveillance, "I'm giving an opinion about . . . a significant toxicologic injury and poisoning of people. This is what I do as a medical toxicologist. . . . But you know, my opinion is based on my education, training and experience. And this is what I do." Bird Dep. 316:22-317:7. Dr. Bird testified that monitoring is necessary to detect abnormalities, not necessarily specific diseases, *id.* 318:8-22, and that the abnormalities could enable him to make early intervention on specific diseases, *id.* 318:24-319:18.

### C.    Dr. Bird's Reports Satisfy Requirements of Rule 26

The Government next argues that Dr. Bird's report should be struck for failing to comply with Rule 26, specifically that "Dr. Bird fails to explain either the 'how' or the 'why' of his conclusions regarding causation and medical monitoring." Mem. 23. Again, the Government is incorrect. Rule 26(a)(2)(B) requires, in pertinent part, that an expert report contain: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered

20

by the witness in forming them." This is not in dispute. "The purpose of this requirement is to allow the opposing party 'a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'" *Celador Int'l Ltd. v. Walt Disney Co.*, 2008 WL 11338778, at *2 (C.D. Cal. May 9, 2008) (citing Fed. R. Civ. P. 26(a) Advisory Committee Note (1993)). "There is no precise measurement of the amount of detail required in an expert report by Rule 26(a)(2)(B)(i). Rather, the standard in each individual case is informed by the general aims of Rule 26(a)(2): to allow the opposing party a reasonable opportunity for preparation . . . and to 'avoid unfair surprise.'" *Jager v. Andrade-Barraza*, 2019 WL 6896643, at *4 (D.N.M. Dec. 18, 2019) (citations omitted).

Here, Dr. Bird submitted three expert reports, totaling 100 pages, in which he provided a complete statement of his opinions, including the "how" and "why" regarding causation and medical monitoring, as well as the facts and data he considered in forming those opinions. The "how" and "why" of his opinions are articulated in the detailed sections of his report.[7] For example, Dr. Bird opines that

---

[7] *See* "Incident Summary," Govt. Ex. A, Rpt. 3; "Hydrocarbons," *id.* at 10; "Jet Fuel," *id.* at 11; "Hawai'i Department of Health Studies on JP-5," *id.* at 14; "Absorption, Distribution, Metabolism, and Elimination of Jet Fuel and Hydrocarbons," *id.* at 17; "Adverse Health Effects Due to JP-5 and Other Jet Fuels," *id.* at 19; "Exposure of the Plaintiffs," *id.* at 55; "Medical History of the Plaintiffs," *id.* at 56; "Summary of Acute and Long-Term Effects on Each Plaintiff as a Result of Exposure to JP- 5 from Red Hill Spill," *id.* at 69; "Bradford Hill Analysis," *id.* at 72; and "Medical Evaluation and Ongoing Surveillance of Exposed Individuals," *id.* at 76.

"Studies support that acute symptoms of JP-5 exposure would include skin irritation and rash; abdominal pain; vomiting; diarrhea; headache; brain 'fogginess'; irregular menstrual cycles; fatigue; anxiety; and other protean neurological symptoms. These symptoms are consistent with what the CDC and the government provides are expected symptoms from such exposure. Most of the Plaintiffs experienced many of these symptoms soon after the water became contaminated." (In other words, the "how"). *See* Govt. Ex. A, Rpt. 5-6.  Dr. Bird supports this opinion in his detailed analysis of each Plaintiff's medical histories, including his explanation of his application of a differential etiology to the Plaintiffs in his Rebuttal Report. *See* Govt. Ex. H, Rebuttal 1-16. Dr. Bird supports this opinion (the "why"), in his description of the medical histories of the Plaintiffs.  *See id.* at 56-69; Govt. Ex. G, Supp. Rpt. 2-7; Govt. Ex. H, Rebuttal 4-16. He further supports this opinion with a detailed analysis of adverse health effects due to JP-5 and other jet fuels, *see* Govt. Ex. A, Rpt. 19-55, as well as his section on hydrocarbons, *see id.* at 6-10. *See also id.* at 75 (noting that self-reported symptoms persisting for greater than or equal to 30 days after contamination of the water system at Red Hill are consistent with what would be expected based on the literature he has referenced).[8] This is far from a

---

[8] *See also* Ex. 3, Aff., ¶30(a) & n. 9 (citations supporting opinions regarding exposure-related complaints).

"cursory analysis [that] fails to give the United States or this Court fair notice of Dr. Bird's opinions and the bases for them." Mem. 23.

Likewise, the Government is wrong when it argues that Dr. Bird did not "provide any explanation for how he determined that certain of Plaintiffs' pre-existing health effects were 'exacerbated' by their exposure to the fuel, nor could he explain his methodology at trial." *Id.* at 24. To the contrary, Dr. Bird

> *did* in fact do a differential etiology methodology considering the facts and circumstances of each Plaintiff's medical condition and weighed all other available evidence to determine which health effect, if any, were caused or worsened as a result of each Plaintiff's exposure to JP-5 fuel released into the Joint Base Pearl Harbor-Hickam water distribution system.

Govt. Ex. H, Rebuttal 1. Further, Dr. Bird opines: "Toxic exposure can cause exacerbation of individuals preexisting conditions, including increased intensity or frequency of symptoms." *Id.* at 7. By way of example, Dr. Bird testified that he

> did examine the temporal relationship of the jet fuel exposure to ███ [Dietz]'s symptoms. . . . I considered the Bradford-Hill criterion of temporality: that the exposure preceded the onset of symptoms. It is clear that ███ symptoms began after exposure to the jet-fuel contaminated water. . . . It is my opinion given all of the records available (including my discussion with his mother), it is my opinion that his worsened anxiety is a direct result of the jet fuel water contamination. The process/methodology of my medical decision making is largely contained in the paragraph above. Namely that anxiety is a well-established result of hydrocarbon exposure, ███ symptoms worsened proximate to the water contamination, and there is no other as likely or greater etiology for his symptoms.

Govt. Ex. H, Rebuttal 5. Again, this is more than sufficient to satisfy Rule 26's "how" and "why" requirements. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d

23

1036, 1046 (9th Cir. 2014) ("Dr. Sturchio's expert report details how he analyzed the relevant data and applied the data to reach his conclusions. . . . The district court's conclusion to the contrary was an abuse of discretion.").

The Government cites *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010), to argue that the "[f]ailure to explain the basis for an expert's conclusion is a 'critical error' and does not satisfy the requirements of Rule 26(a). Mem. 23 (citing *R.C. Olmstead*, 606 F.3d at 271). The expert report at issue in that case was merely a "two-page report." *R.C. Olmstead*, 606 F.3d at 270. Accordingly, the court found that "[a]fter reading Reid's report, CUI was only slightly more informed about the basis of Olmstead's argument that CUI had copied Olmstead than CUI would have been by merely reading Olmstead's complaint." *Id.* at 271.[9] This is a far cry from the number of and types of opinions at issue here and the robust support for each of these opinions.

In sum, Dr. Bird's opinions readily satisfy the requirements of Rule 26(a)(2)(B). Dr. Bird's opinions were properly, fully, and timely disclosed. The Government had notice, the opportunity to, and did hire its own opposing experts, and deposed Dr. Bird for close to seven hours. Further, it will have its opportunity

---

[9] In *In re Central European Industrial Development Co.*, "the only portion of [the expert's] Report that could arguably be considered an opinion on the Time to Sell is the noted single sentence statement found on page 41. [The expert]'s statement is nothing more than a conclusory opinion with no explanation of the basis and reasons therefor." 427 B.R. 149, 156 (Bankr. N.D. Cal. 2009).

24

to cross examine Dr. Bird at trial. *See* Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amend. ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" (citation omitted)).

> **D.    The Opinions of the Plaintiffs' Experts that Rely on Dr. Bird's Opinions Should not be Stricken**

The Government argues that expert opinions reliant on Dr. Bird's opinions should be stricken as unreliable. Mem. 25. As discussed above, Dr. Bird's opinions are reliable and relevant and should not be stricken. Accordingly, none of the opinions of experts who rely on Dr. Bird's opinions should be stricken.

## IV.   CONCLUSION

For the foregoing reasons, the United States' Motion to Exclude Expert Report and Testimony of Dr. Steven Bird (ECF No. 234) should be denied. Further, the opinions of Plaintiffs' experts that rely on opinions of Dr. Bird should not be stricken.

Date:  February 5, 2023

*/s/ Lyle S. Hosoda*
LYLE S. HOSODA
KOURTNEY H. WONG
SPENCER J. LAU

*/s/ Kristina S. Baehr*
KRISTINA S. BAEHR
JAMES BAEHR
MARY M. NEUSEL

*/s/ Frederick C. Baker*
FREDERICK C. BAKER
JAMES W. LEDLIE
KRISTEN HERMIZ

CYNTHIA A. SOLOMON
SARA O. COUCH

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed and served on counsel of record via the U.S. District Court's CM/ECF electronic filing system.

*/s/ Frederick C. Baker*
FREDERICK C. BAKER

26