ELLIOT ENOKI #1528
Executive Assistant U.S. Attorney
District of Hawaii
Attorney for the United States, Acting
under Authority Conferred by 28 U.S.C. § 515
SYDNEY SPECTOR #11232
Assistant U.S. Attorney

J. PATRICK GLYNN, Director
CHRISTINA FALK, Assistant Director
ERIC REY, Trial Attorney
Environmental Tort Litigation
Civil Division, U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Tel: (202) 616-4224
Fax: (202) 616-4473
Email: eric.a.rey@usdoj.gov

*Attorneys for the United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR. et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | CIVIL NO. 22-cv-00397-LEK-KJM <br> THE UNITED STATES' FINAL PRETRIAL STATEMENT; CERTIFICATE OF SERVICE <br><br> FPT CONF: April 16, 2024 <br> TIME: 10:00 A.M. <br><br> TRIAL DATE:  April 29, 2024 <br> JUDGE:  Hon. Leslie E. Kobayashi |

**THE UNITED STATES' FINAL PRETRIAL STATEMENT**

Defendant United States of America, by and through its undersigned counsel, hereby submits its Final Pretrial Statement pursuant to Rule 16 of the Federal of Civil Procedure and Rule 16.4(b) of the Local Rules.

**TABLE OF CONTENTS**

A.   PARTY .............................................................................................4

B.   JURISDICTION AND VENUE ........................................................4

C.   SUBSTANCE OF ACTION ..............................................................4

D.   UNDISPUTED FACTS .....................................................................5

  1.   United States' Liability – Negligence and Nuisance ....................5

  2.   Scope of Plaintiffs' Damages .......................................................6

  3.   Findings of Fact and Conclusion from the U.S. Navy's April 2022 Investigation Report .....................................................................6

  4.   Other Facts Not Reasonably Disputable ......................................7

E.   DISPUTED FACTS ..........................................................................14

F.   RELIEF SOUGHT ...........................................................................16

G.   POINTS OF LAW..............................................................................17

  1.   Causation ......................................................................................17

    a.   Need for Expert Testimony When Causal Relationship Outside the Everyday Experience, Observations, and Judgment of the Factfinder.............18

    b.      General and Specific Causation .............................................18

  2.   Damages .......................................................................................21

    a.   Prohibition on Speculative Damages .......................................22

    b.    Apportionment Among Multiple Causes, Including Pre-Existing Conditions .................................................................................22

    c.   Offsets ......................................................................................23

H.   PREVIOUS MOTIONS ....................................................................24

  1.   Dispositive Motions.....................................................................25

  2.   *Daubert* Motions.........................................................................26

  3.   Motions in Limine .......................................................................28

4.  Discovery Motions ...................................................................................29

5.  Other .........................................................................................................29

I.  WITNESSES TO BE CALLED ............................................................................31

1.  Trevor Bingham ........................................................................................31

2.  Lyle Burgoon ............................................................................................32

3.  John Daly ..................................................................................................32

4.  Aaron Darley ............................................................................................32

5.  Carmen De Leon .......................................................................................32

6.  Timur Durrani ...........................................................................................33

7.  Sherri Eng .................................................................................................33

8.  Walter Grayman ........................................................................................33

9.  Barry Gordon ............................................................................................34

10.  Michael Kosnett .......................................................................................34

11.  Michael McGinnis .....................................................................................34

12.  Jeremy Mitchell ........................................................................................34

13.  Duane Morita ............................................................................................35

14.  Robyn Prueitt ...........................................................................................35

15.  Richard Ruck ............................................................................................35

16.  Eric Smith .................................................................................................35

17.  Caroline Tuit .............................................................................................36

18.  Erick West ................................................................................................36

J.  EXHIBITS, SCHEDULES, AND SUMMARIES ..................................................36

K.  FURTHER DISCOVERY OR MOTIONS ............................................................40

L.  STIPULATIONS ..................................................................................................41

M.  AMENDMENTS, DISMISSALS .........................................................................42

N.  SETTLEMENT DISCUSSIONS ..........................................................................42

O.  AGREED STATEMENT ......................................................................................43

P.  BIFURCATION, SEPARATE TRIAL OF ISSUES ..............................................43

Q.  REFERENCE TO A MASTER OR MAGISTRATE JUDGE .........................43

R.  APPOINTMENT AND LIMITATIONS OF EXPERTS ..................................43

S.   TRIAL ................................................................................................43
T.   ESTIMATE OF TRIAL TIME ..........................................................44
U.   CLAIMS OF PRIVILEGE OR WORK PRODUCT ......................................44
V.   MISCELLANEOUS ....................................................................44

A.   **PARTY**

This statement is filed on behalf of Defendant United States of America.

B.   **JURISDICTION AND VENUE**

Plaintiffs contend that the Federal Tort Claims Act (FTCA), 28 U.S.C.

§ 1346 *et. seq.*, provides subject-matter jurisdiction over this case. "The FTCA

provides a limited waiver of the Government's sovereign immunity for tort

claims." *Bennett v. United States*, 44 F.4th 929, 933 (9th Cir. 2022). The United

States disputes that the FTCA confers subject-matter jurisdiction over certain of

Plaintiffs' claims, including the claim related to proper remediation, which is the

subject of a pending motion to dismiss, where briefing was completed on March 6,

2024. *See infra* at H.1.b. The United States agrees that, to the extent that there is

jurisdiction, venue is proper in the District of Hawaii. 28 U.S.C. § 1402(b).

C.   **SUBSTANCE OF ACTION**

This is a personal injury and property damages case arising from a

November 20, 2021 spill of jet fuel (JP-5) from the U.S. Navy's Red Hill Bulk

Fuel Storage Facility (Red Hill) impacting the Joint Base Pearl Harbor Hickam

(JBPHH) water system. In this trial, 17 Bellwether Plaintiffs assert the following

4

causes of action: (1) negligence; (2) negligent undertaking; (3) nuisance; (4) infliction of emotional distress; and (5) premises liability. Those 17 Bellwether Plaintiffs are: (1) Kevin Aubart; (2) Richelle Dietz; (3) B.D.; (4) V.D.; (5) Patrick Feindt, Jr.; (6) P.G.F.; (7) P.R.F.; (8) Nastasia Freeman; (9) K.F.; (10) D.F.; (11) N.F.; (12) Sheena Jessup; (13) B.B.J.; (14) B.J.J.; (15) N.J.; (16) D.J.; and (17) Elizabeth Witt (hereinafter, collectively referred to as "Bellwether Plaintiffs").

## D.   UNDISPUTED FACTS

There are many facts in this case that are not reasonably disputable, which the United States organizes into the following four non-mutually exclusive categories: (1) United States' Liability – Negligence and Nuisance; (2) Scope of Plaintiffs' Damages; (3) Findings of Fact and Conclusion from the U.S. Navy's April 2022 Investigation Report; and (4) Other Facts Not Reasonably Disputable.

1. United States' Liability – Negligence and Nuisance

By stipulation, the United States admitted that:

1. "[T]he November 20, 2021 spill at the Red Hill Bulk Fuel Storage Facility (Red Hill) caused a nuisance for those Plaintiffs who owned or leased residences subject to the Hawaii Department of Health's November 29, 2021 advisory (hereinafter, 'Resident Plaintiffs') and this nuisance lasted for as long as this advisory was in effect for each Resident Plaintiff's residence;"

2. "between May 6, 2021, and November 20, 2021, the United States breached its duty of care to the Resident Plaintiffs to exercise ordinary care in the operation of Red Hill, resulting in the May 6, 2021 and November 20, 2021 spills;" and

3. "as a result of the aforementioned nuisance or breach, Resident Plaintiffs suffered injuries compensable under the Federal Tort Claims Act (FTCA). The nature and extent of these injuries will be the subject of further discovery."

ECF No. 200; *see also* ECF No. 98. The United States does not dispute that all the Bellwether Plaintiffs meet the definition above for "Resident Plaintiffs."

2. <u>Scope of Plaintiffs' Damages</u>

All 17 Bellwether Plaintiffs stipulated "that they are pursuing damages only for injuries arising after the November 20, 2021 spill at the Red Hill Bulk Fuel Storage Facility, including the exacerbation of prior physical or mental conditions." ECF No. 201 ¶ 5. Therefore, evidence regarding, among other things, alleged exposure from events prior to the November 20, 2021 spill are not relevant to the Bellwether Plaintiffs' claims.

3. <u>Findings of Fact and Conclusion from the U.S. Navy's April 2022 Investigation Report</u>

In response to Plaintiffs' Requests for Admission, the United States admitted to all the factual findings and opinions in Sections III and IV of the April 15, 2022

*Supplement to the Command Investigation into the 6 May 2021 and 20 November 2021 Incidents at the Red Hill Bulk Fuel Storage Facility* ("Waters Report"), which spans over 86 pages single-spaced and includes detailed factual findings. *See* ECF No. 280-3. These factual findings cover the following topics relevant to Plaintiffs' claims:

a. The layout and history of Red Hill Bulk Fuel Storage Facility, including the retention line struck on November 20, 2021, and the Red Hill Well;

b. The May 2021 spill, including its cause and the Navy's response thereto;

c. The November 2021 spill, including its cause and the Navy's response thereto; and

d. The November 2021 spill's impacts to the JBPHH water system and the Navy's response thereto.

4. <u>Other Facts Not Reasonably Disputable</u>

The parties continue to engage in extensive meet and confer discussions to identify potentially additional stipulations of fact to narrow the issues for trial. The United States believes the following additional, material facts are not reasonably disputable:

7

a.  The November 20, 2021 spill at Red Hill resulted in JP-5 entering the Red Hill Well, which is one of the three sources of water for the JBPHH water system.

b.  Thereafter, the first documented complaint of a petroleum odor or taste in the water was received on November 27, 2021.

c.  The Navy shutdown (*i.e.*, stopped pumping from) the Red Hill Well on November 28, 2021, around 2100 hours. The Red Hill Well briefly resumed pumping between 1200 and 1400 on November 29, 2021. This was the last time the Red Hill Well provided water to the JBPHH water system.

d.  Within days, the various public notices were issued by the Hawaii Department of Health (HDOH) and the U.S. Navy, including:

   i.  On November 29, 2021, HDOH issued a press release recommending "all Navy water system users avoid using the water for drinking, cooking, or oral hygiene." Produced at US_RHFTCA_00021337. This is known as the "Public Health Advisory."

   ii.  On November 29, 2021, the Navy issued "guidance for Joint Base Pearl Harbor-Hickam military housing residents . . . to report any chemical or petroleum odors associated with their

8

potable water. If chemical or petroleum odors are present, recommend avoiding ingestion as a cautionary measure." Produced at US_RHFTCA_00021139.

    iii. On November 30, 2021, the Navy again provided guidance for JBPHH military housing residents "to report any abnormal odors associated with their potable water. If abnormal odors are present, avoid drinking and cooking with the water." Produced at US_RHFTCA_00021165.

    iv. On December 1, 2021, HDOH recommended that "all Navy water system users should avoid using the water for drinking, cooking, or oral hygiene. Navy water system users who detect a fuel-like odor from their water should avoid using the water for drinking, cooking, bathing, dishwashing, laundry or oral hygiene (brushing teeth, etc.)." Produced at GSI_002753.

e. The Bellwether Plaintiffs ceased drinking the water from the JBPHH on the following dates:

    i. Kevin Aubart – November 28, 2021

    ii. The Dietz Family – November 28, 2021

    iii. The Feindt Family – December 8, 2021

    iv. The Freeman Family – November 29, 2021

9

> v.    The Jessup Family – November 29, 2021
>
> vi.   Elizabeth Witt – December 1, 2021

f.   In response to the November 20, 2021 spill, the following four agencies formed the Interagency Drinking Water System Team (IDWST) to remediate the JBPHH and ensure the drinking water meets all applicable water quality standards: (1) HDOH; (2) U.S. Environmental Protection Agency; (3) the Navy; and (4) the U.S. Army. The IDWST issued various remediation and sampling plans, oversaw the work under these plans, and submitted documentation of the work and results to HDOH for review as part of HDOH's decision-making on whether to lift the Public Health Advisory.

g.   The HDOH lifted the Public Health Advisory on a zone-by-zone basis—*i.e.*, they "declare[d] the water . . . safe" "for all purposes including drinking, cooking, and oral hygiene" and "consumption by pets"—between February 14, 2022 and March 18, 2022.[1]

h.   In response to the November 20, 2021 spill, HDOH established a water quality standard ("Incident Specific Parameter" or "ISP") for

---

[1] *E.g.*, HDOH, *DOH Declares Navy drinking water distribution system Zones F1, F2, H2 & H3 safe* (Mar. 11, 2022), *available at* https://health.hawaii.gov/news/files/2022/03/22-031-DOH-declares-Navy-drinking-water-distribution-system-Zones-F1-F2-H2-H3-safe.pdf.

TPH-d of 266 µg/L (266 parts per billion). TPH-d stands for total petroleum hydrocarbon diesel and is a surrogate for JP-5.

i.   Between March 11, 2022 and January 31, 2024, 7,948 samples (from 5,767 locations within the JBPHH water system) were analyzed for TPH-d—none exceeded HDOH's ISP of 266 µg/L.

j.   The Bellwether Plaintiffs lived in the following zones:

    i.   Kevin Aubart – Zone F2 (Advisory lifted March 11, 2022).

    ii.   The Dietz Family – Zone D3 (Advisory lifted March 18, 2022).

    iii.   The Feindt Family – Zone A2 (Advisory lifted March 1, 2022).

    iv.   The Freeman Family – Zone H3 (Advisory lifted March 11, 2022).

    v.   The Jessup Family – Zone F2 (Advisory lifted March 11, 2022).

    vi.   Elizabeth Witt – Zone D2 (Advisory lifted March 13, 2022).

k.   For the duration of the Public Health Advisory, the United States offered the following relevant categories of JBPHH residents free lodging in hotels not on the JBPHH water system: (i) servicemembers and their dependents (which included the Dietz, Feindt, Freeman, Jessup, and Witt families); and (ii) federal civilian employees and

11

their dependents (which included Mr. Aubart). Of the Bellwether
Plaintiffs:

    i.   Mr. Aubart – used the free hotel to shower from December
2021 to mid-February 2022, but decided not to stay there
overnight.

    ii.   The Feindt Family – stayed in the free hotel from December 13,
2021, to March 6, 2022.

    iii.   The Freeman Family – stayed in the free hotel from December
3, 2021, to December 15, 2021, and then from December 16,
2021, to February 2, 2022.

    iv.   Elizabeth Witt – stayed in the free hotel for one night, and then
returned home.

l. The United States also provided affected residents (including the
Bellwether Plaintiffs) free bottled water, additional potable water,
showering facilities, and laundry facilities.

m. In addition to compensation for hotels, the United States already has
paid the Bellwether Families the following amounts for meals and
incidental expenses while the Public Health Advisory applied to their
residence:

    i.   Mr. Aubart - $18,788.55;

     ii.    The Dietz Family – $18,207;

    iii.    The Freeman Family – $8,339;

    iv.    The Feindt Family – $24,700.98;

     v.    The Jessup Family – $27,101.80; and

    vi.    The Witt Family – $12,007.10

n. The following Bellwether Families moved off the island of Oʻahu on the following dates:

     i.    The Freeman Family – February 2, 2022

    ii.    The Feindt Family – April 20, 2022

    iii.    The Jessup Family – May 15, 2022

    iv.    Elizabeth Witt – March 2023

o. The United States has paid health expenses for all the Bellwether Plaintiffs (except Mr. Aubart[2]) since the November 20, 2021 spill through TriCare—the health care program for active duty service members, their family members, retirees, and their family members.

p. Brian Jessup—husband of Bellwether Plaintiff Sheena Jessup and father of Bellwether Plaintiffs B.B.J, B.J.J., N.J., and D.J.—retired from active service with 20 years or more of service. Therefore, he,

---

[2] Mr. Aubart was a federal civilian employee at the time, not a service member, and therefore did not have TriCare.

his spouse, and his children (until age 21 or, if they go to college, 23) continue to have their healthcare covered by TriCare.

q.  Major Amanda Feindt—wife of Bellwether Plaintiff Patrick Feindt, Jr. and mother of Bellwether Plaintiffs P.G.F. and P.R.F.—entered active duty on May 8, 2006 and will obtain 18 years of active service on May 8, 2024, at which point her retirement is statutorily protected (10 U.S.C. § 632(a)(3)) and she, her spouse, and her children (until age 21 or, if they go to college, 23) continue to have their healthcare covered by TriCare.

r.  Chief Petty Office Bryan Dietz—husband of Bellwether Plaintiff Richelle Dietz and father of Bellwether Plaintiffs B.D. and V.D.— entered active duty on November 3, 2005.

s.  Many of the Bellwether Plaintiffs had health conditions predating the November 20, 2021 spill.

t.  In May of 2022, Mr. Feindt started a new job making $85,000 base salary, plus commission and bonuses.

**E.    DISPUTED FACTS**

Given the facts above that are not reasonably in dispute, the majority of the disputed factual issues pertain to causation and damages, including the following categories of issues:

14

1. Whether the Bellwether Plaintiffs were exposed to JP-5 and, if so, the dose and duration of the Bellwether Plaintiffs' exposure to JP-5.

2. Whether the Bellwether Plaintiffs were exposed to JP-5 at levels high enough to cause, toxicologically, their alleged health effects.

3. Whether and the extent to which the Bellwether Plaintiffs' alleged exposure to JP-5 caused or exacerbated pre-existing health conditions.

4. Whether and the extent to which the Bellwether Plaintiffs' alleged exposure to JP-5 or the November 20, 2021 spill caused the Bellwether Plaintiffs' other alleged damages.

5. Whether Patrick Feindt, Jr. has any lost future wages caused by the November 20, 2021 spill after he secured his new job in May 2022 making the same as he did in Hawaii.

6. Whether and the extent to which Nastasia Freeman's future earning capacity has diminished because of health effects caused or exacerbated by the November 20, 2021 spill.

7. The nature and extent to which the November 20, 2021 spill impacted the JBPHH water system, including whether all parts of the system were impacted (*e.g.*, Ford Island).

8. Whether low-level detects of total petroleum hydrocarbons in the JBPHH
   water system after the Public Health Advisory was lifted are due to
   residual JP-5 from the November 20, 2021 spill.

## F.     **RELIEF SOUGHT**

The United States requests that the Court find that:

1. The Bellwether Plaintiffs' exposure to JP-5 (if any) did not,
   toxicologically, cause or exacerbate their alleged personal injuries.

2. The November 20, 2021 spill did not cause or continue to exacerbate any
   chronic physical or psychological condition.

3. The United States is not liable for any future medical or psychological
   expenses.

4.  Patrick Feindt, Jr. has not suffered any lost wages as a result of the
   November 20, 2021 spill after securing his new job in May of 2022.

5. If liability, causation, and damages are found against the United States,
   then any award of damages should be reasonable and appropriate based
   on the evidence, including (a) admissible expert opinions, (b) the
   Bellwether Plaintiffs' duty to mitigate damages, (c) causal
   apportionment, (d) payments the United States has made to the
   Bellwether Plaintiffs (or to their parent or spouse on their behalf), and (e)

16

that the United States will pay for many of the Bellwether Plaintiffs'
future medical care through TriCare.

## G.     POINTS OF LAW

The United States focuses here on points of law related to causation and
damages—the primary focus of the parties' dispute—and bearing in mind the L.R.
16.4(b)(7)'s instruction that "[e]xtended legal argument is not to be included in the
pretrial statement."

### 1. Causation

Hawaii tort law, which the FTCA applies in this case, requires Plaintiffs to
prove causation. *E.g.*, *Montalvo v. Lapez*, 884 P.2d 345, 359 (Haw. 1994) ("[The]
plaintiff has the burden of proving that the damages were legally caused by a
defendant's negligence.").[3] Two aspects of causation appear to be primarily in
dispute: (a) need for expert testimony; and (b) general and specific causation.

---

[3] *Kaanapali Tours, LLC v. Hawaii Dep't of Land & Nat. Res.*, No. CIV. 11-00555
LEK, 2012 WL 1080999, at *8 (D. Haw. Mar. 29, 2012) (Kobayashi, J.)
(negligence); *Lake v. Ohana Mil. Communities, LLC*, No. CV 16-00555 LEK,
2019 WL 4794536, at *22 (D. Haw. Sept. 30, 2019) (Kobayashi, J.) (nuisance),
vacated on other grounds, 14 F.4th 993 (9th Cir. 2021).

      *a.  Need for Expert Testimony When Causal Relationship Outside the Everyday Experience, Observations, and Judgment of the Factfinder*

In complex cases, where the "causal relationship between the violation of a duty and an injury" are beyond the "everyday experience, observations, and judgment" of the factfinder, Hawaii law requires expert testimony to prove causation. *See Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*, 172 P.3d 1021, 1043-44 (2007) (quoting *Bernard v. Char*, 903 P.2d 676, 682 (Haw. App. 1995)); *see also Lake v. Ohana Mil. Cmtys., LLC*, No. CV 16-00555 LEK, 2019 WL 4794536, at *17 (D. Haw. Sept. 30, 2019) (holding that whether a housing area "could be considered unsafe and uninhabitable" required expert testimony because it "requires knowledge that is beyond the 'everyday experience, observations, and judgment' of" the factfinder) (quoting *Exotics Hawaii-Kona*, 172 P.3d at 1043-44), *vacated on other grounds,* 14 F.4th 993 (9th Cir. 2021).

      *b.  General and Specific Causation*

In toxic tort cases such as this, causation is often organized into: (1) general causation, which "has been defined by courts to mean whether the substance at issue had the capacity to cause the harm alleged;" and (2) specific causation, which "refers to whether a particular individual suffers from a particular ailment as a result of exposure to a substance." *In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002); *see also Golden v. CH2M Hill Hanford Grp., Inc.*, 528

18

F.3d 681, 683 (9th Cir. 2008) (requiring plaintiff in a toxic tort case "to show that he was exposed to chemicals that could have caused the physical injuries he complains about (general causation), and that his exposure did in fact result in those injuries (specific causation).").

"In determining whether an alleged chemical exposure caused a particular disease or illness, an expert must establish the following criteria: (1) the toxic substance at issue must have been demonstrated to cause in humans the disease or illness suffered by the plaintiff; (2) the individual must have been exposed to a sufficient amount of the substance in question to elicit the health effect in question; (3) the chronological relationship between exposure and effect must be biologically plausible; and (4) the likelihood that the chemical caused the disease or illness in an individual should be considered in the context of other known causes." *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1156 (E.D. Wash. 2009) (citing David L. Eaton, Scientific Judgment and Toxic Torts–A Primer in Toxicology for Judges and Lawyers, 12 J.L. & Pol'y 5, 38–40 (2003)); *accord McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242-43 (11th Cir. 2005).[4]

---

[4] *See also McClain*, 401 F.3d at 1242 ("To help federal judges deal with *Daubert* issues in toxic tort cases, the Federal Judicial Center published several articles in the *Journal of Law and Policy* under the title "Science for Judges I: Papers on Toxicology and Epidemiology." 12 J.L. & POL'Y 1 (2003). The article entitled 'Scientific Judgment and Toxic Torts—A Primer in Toxicology for Judges and Lawyers' by Dr. David Eaton provides valuable insight for understanding how to assess *Daubert* issues in these cases.").

Central to these four lines of inquiry is the concept of dose-response—"the relationship in which a change in amount, intensity, or duration of exposure to a chemical is associated with a change in risk of disease." *Henricksen*, 605 F. Supp. 2d at 1156; *see also* Federal Judicial Center, Reference Manual on Scientific Evidence 403 (2d ed. 2000) ("There are three central tenets of toxicology. First, 'the dose makes the poison'; this implies that all chemical agents are intrinsically hazardous—whether they cause harm is only a question of dose. Even water, if consumed in large quantities, can be toxic."); *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) ("'Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case.'") (quoting *Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)); *White v. Dow Chem. Co.*, 321 F. App'x 266, 273 (4th Cir. 2009) (granting summary judgment due to failure to establish causation where plaintiff failed to "demonstrate the amount, duration, intensity, and frequency of exposure").

"While precise or exact information concerning dosage or the dose-response relationship is not always required, the boundaries of allowable expert testimony are not so wide as to permit an expert to testify as to specific causation without having any measurements of a plaintiffs' exposure to the allegedly harmful substance." *Henricksen*, 605 F. Supp. 2d at 1157. That is in part because "all

20

chemical agents are intrinsically hazardous—whether they cause harm is only a question of dose." Reference Manual on Scientific Evidence 403 ("Even water, if consumed in large quantities, can be toxic.").

The parties' *Daubert* briefing clearly demonstrates that the parties dispute the required elements of specific causation and the necessity of evaluating each plaintiff's exposure and dose in determining specific causation.

2. Damages

Plaintiffs also bear the burden in establishing damages, *Lima v. Deutsche Bank Nat'l Tr. Co.*, 494 P.3d 1190, 1197 (Haw. 2021), including "that the damages were legally caused by a defendant's negligence," *Montalvo v. Lapez*, 884 P.2d 345, 359 (Haw. 1994) (citation omitted). The FTCA's "limited waiver of the Government's sovereign immunity for tort claims" *Bennett*, 44 F.4th at 933, does not extend to punitive damages, *Nurse v. United States*, 226 F.3d 996, 1004 (9th Cir. 2000) (plaintiff "has no right to either punitive damages or attorney's fees in her FTCA claims") (citing, *inter* alia, 28 U.S.C. § 2674)). This leaves compensatory damages, which "seek to 'compensate the injured party for the injury sustained,' in hopes of 'restor[ing] a plaintiff to his or her position prior to the tortious act[.]" *Lima*, 494 P.3d at 1198 (citations omitted). The following aspects of compensatory damages appear to be primarily in dispute: (a) prohibition on speculative damages; (b) how to apportion damages; and (c) offsets.

21

### a. *Prohibition on Speculative Damages*

"In Hawaii and elsewhere, a tort plaintiff must establish the 'fact of damage' with certainty and cannot recover 'speculative' damages." *Matsuura v. E.I. du Pont de Nemours & Co.*, 330 F. Supp. 2d 1101, 1122 (D. Haw. 2004), *rev'd on other grounds and remanded sub nom. Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005); *see also McDevitt v. Guenther*, 522 F. Supp. 2d 1272, 1287 (D. Haw. 2007) ("The Hawaiʻi Supreme Court has noted that speculative damages are not recoverable in actions arising under contract or in tort.") (citing *Roxas v. Marcos*, 969 P.2d 1209, 1258-59 n.33 (Haw. 1998)); *State v. Davis,* 499 P.2d 663, 670 (Haw. 1972) ("Mere fear of contingent injury which may never occur, and the happening of which is speculative and uncertain, is not a showing of damage" under Hawaii law).

### b. *Apportionment Among Multiple Causes, Including Pre-Existing Conditions*

A "defendant should not be made to pay for injuries he did not cause." *Montalvo*, 884 P.2d at 362 (citation omitted). In the context of pre-existing medical conditions that are not "fully recovered," "dormant," or "latent," a tortfeasor is only liable for his respective portion of the damages: the factfinder "must apportion." *Id.* at 363. The same applies when there are multiple causes of the alleged injuries. *See id.* at 362. "If the [finder of fact] is unable to apportion, even roughly, then it must divide the damages equally among the various causes." *Id.*

22

Importantly, in determining whether a plaintiff's pre-existing condition is "dormant," "latent," or "fully recovered from," that "is a question of fact for which medical testimony is especially appropriate." *Id.* Even if "fully recovered from any pre-existing condition" or it is otherwise "dormant or latent," a tortfeasor is liable only for the incremental "aggravation" and not the entire condition. *Id.* at 362 n.16 & 363.

### c.  Offsets

Like most jurisdictions, Hawaii law follows the collateral source rule, which "in general, provides that benefits or payments received on behalf of a plaintiff, from an independent source, will not diminish recovery from the wrongdoer." *Warren v. United States*, 669 F. Supp. 3d 987, 1027-28 (D. Haw. 2023). In contrast, "[a] payment made by a tortfeasor or by a person acting for him to a person whom he has injured" is not a collateral source—*i.e.*, "is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability." Restatement (Second) of Torts § 920A (1979), *cited in Bynum v. Magno*, 101 P.3d 1149, 1154 (Haw. 2004). This includes per diem and hotel payments the United States has paid to the Bellwether Plaintiffs.

This also includes past medical expenses paid by TriCare—the government provided health insurance program. *See Murphy v. United States*, No. CIV. 06-00304 BMK, 2009 WL 454627, at *6 (D. Haw. Feb. 23, 2009) ("[t]he vast

23

majority of courts to consider this issue . . . have concluded that

TriCare/CHAMPUS benefits are *not* a collateral source, holding that they are

benefits derived from general revenues of the United States." (quoting *Lawson v.*

*United States*, 454 F. Supp. 2d 373, 414 (D. Md. 2006))).

In addition, the United States will argue that TriCare offsets certain future

medical expenses (if the Court awards any) for 11 of the 17 Bellwethers (Jessups,

Feindts, and Dietzs). These Plaintiffs have secured TriCare coverage by their

spouse or parent (1) obtaining 20 years of service already (Jessups); (2) securing

full retirement benefits in the midst of trial (Feindt); or (3) being on the verge of 20

years of service (Dietz). *See, e.g.*, *Dempsey v. United States*, 32 F.3d 1490, 1495

(11th Cir. 1994) (federal medical costs offset by CHAMPUS—TriCare's

predecessor—in the case of a retiree's dependent); *Short v. United States*, 908 F.

Supp. 227, 239 (D. Vt. 1995) (same for veteran's future care). For this reason and

others, the United States' argument in this case is distinguishable from other

decisions rejecting TriCare offsets. *E.g.*, *Warren v. United States*, 669 F. Supp. 3d

987, 1028–30 (D. Haw. 2023); *Galbreath v. United States*, No. CV 20-00373

LEK-KJM, 2022 WL 18717579, at *2–3 (D. Haw. Feb. 17, 2022).

### H.   PREVIOUS MOTIONS

The parties have made the following motions in this action:[5]

---

[5] For the sake of brevity, this list does not include motions to seal.

1. <u>Dispositive Motions</u>

    a. *First Partial Motion to Dismiss (FTCA's misrepresentation exception and failure to state a claim)* – The United States first filed this motion in December 2022 (ECF No. 44), but then had to refile on several occasions due to Plaintiffs amending their complaint. *See* ECF Nos. 52, 129, and 190. The Court ultimately granted-in-part and denied-in-part this partial motion to dismiss. ECF No. 227. The Court dismissed Plaintiffs claims of failure to warn with regard to Counts II (negligent undertaking) and IV (medical negligence), but permitted Plaintiffs' failure to warn claims with regard to Count I (negligence) under a premises liability theory.

    b. *Second Partial Motion to Dismiss (FTCA's discretionary function exception)* – After the close of fact discovery, the United States moved to dismiss Plaintiffs' failure-to-test claims regarding the Navy's testing of water samples immediately after the spill and failure-to-remediate claims regarding the Navy's in-home flushing program under the FTCA's discretionary function exception. ECF No. 213. The Court dismissed the failure-to-test claim, held that the first prong of the discretionary function exception was met as to the failure-to-remediate claim, and ordered further briefing on the second

prong of the discretionary function exception regarding the failure-to-remediate claim. ECF No. 275. That supplemental briefing has been filed. ECF Nos. 288 & 308.

c. *Partial Motion for Summary Judgment* – The court preliminarily granted-in-part and denied-in-part the United States' motion for summary judgment on Plaintiffs' claims for damages for fear of latent injuries, holding that "Plaintiffs may testify as to their generalized fear of adverse health effects based on personal knowledge" as a layperson and dismissing "Plaintiffs' request for special damages for testing and medical monitoring for future medical injury." ECF No. 282 at 3.

2. <u>*Daubert* Motions</u>

a. *Dr. Bird* – The Court preliminarily granted-in-part and denied-in-part the United States' motion to exclude the opinions of Plaintiffs' expert toxicologist Dr. Steven Bird, excluding that the following two opinions (but denying the motion in all other respects):

   i. "Individuals on the water line, including Plaintiffs, have a reasonable fear of significant long term effects from their exposure to jet fuel-contaminated water;" and

   ii. "There is a need for medical surveillance of exposed individuals, including year [sic] medical evaluations and

testing. If abnormalities in the physical exam, blood testing, or new complaints develop, then other more advanced testing would be indicated." ECF No. 282 at 1-2.

b. *Drs. Spira and Keifer* – After the United States moved to exclude the opinions of Plaintiffs expert psychologist Drs. Spira and expert psychiatrist Dr. Jason Keifer, Plaintiffs withdrew the opinions of Dr. Keifer. ECF No. 303 at 1 n.1. This motion is fully briefed, and a hearing has been set for March 29, 2024. ECF Nos. 232, 257, 303 & 319.

c. *Drs. Clark and Vargo* – The United States moved to exclude the opinions of Plaintiffs' experts Drs. Andrew Clark and Melissa Vargo regarding psychological injury to Plaintiffs. This motion is fully briefed, and a hearing has been set for March 29, 2024. ECF Nos. 237, 257, 304 & 311.

d. *Dr. Grayman* – Plaintiffs moved to exclude the opinions of the United States' expert water modeler Dr. Walter Grayman. This motion is fully briefed, and a hearing has been set for March 29, 2024. ECF Nos. 235, 257, 304 & 309.

e. *Drs. Burgoon, Durrani, Kosnett, and Prueitt* – Plaintiffs moved to exclude the opinions of the United States experts Drs. Lyle Burgoon

(air exposure), Timur Durrani (medical toxicology), Michael Kosnett (medical toxicology), and Robyn Prueitt (toxicology). This motion is fully briefed, and a hearing has been set for March 29, 2024. ECF Nos. 240, 257, 302 & 310.

3.  Motions in Limine

The United States filed four motions in limine. Specifically, the United States moved to exclude:

a.  Motion in Limine No. 1 – Opinions from treating providers in violation of the parties' stipulation (ECF No. 179). ECF No. 278. In response, Plaintiffs withdrew Dr. Keifer as a treating provider, but otherwise oppose. ECF No. 296 at 2 (withdrawing Dr. Keifer). The remaining portion of this motion seeks to prohibit improperly parroted opinions of treating physicians who will not be testifying at trial. This motion is fully briefed and ripe for decision.

b.  Motion in Limine No. 2 – Evidence of operations at Red Hill prior to November 20, 2021, which Plaintiffs oppose. ECF Nos. 280 & 295. This motion is fully briefed and ripe for decision.

c.  Motion in Limine No. 3 – Evidence related to medical negligence, which Plaintiffs oppose. ECF Nos. 281 & 294. This motion is fully briefed and ripe for decision.

28

    d.  Motion in Limine No. 4 – Hearsay evidence of Patrick Feindt Jr.'s

        alleged raises, which Plaintiffs oppose. ECF Nos. 284 & 298. This

        motion is fully briefed and ripe for decision.

4.  <u>Discovery Motions</u>

    a.  *Protective Order* – Judge Mansfield granted the United States' motion

        for a protective order, under the *Morgan* doctrine, relating to the

        deposition of Admiral Paparo. ECF No. 128.

    b.  *Scope of Discovery* – To resolve the parties' dispute regarding the

        scope of discovery (ECF Nos. 105 & 106), Judge Mansfield instructed

        Plaintiffs to choose between (i) more discovery and a six-month

        continuance or (ii) limited discovery and the then-current trial date.

        ECF No. 116. Plaintiffs elected limited discovery and to keep their

        trial date. ECF No. 119.

    c.  *Independent Medical Examinations* – Judge Mansfield entered the

        United States' proposed order regarding independent medical

        examinations. ECF No. 146.

5.  <u>Other</u>

    a.  *Bellwether Selection* – Judge Mansfield resolved the parties' dispute

        over bellwether selection by instructing the parties to each select two

        families and to randomly select two more. ECF Nos. 46, 47 & 50.

b. *Motion to Consolidate* – Judge Mansfield denied the United States' motion to consolidate primarily due to scheduling impacts, but encouraged all parties to coordinate discovery. ECF No. 89.

c. *Motion for Leave to File Third Amended Complaint* – Judge Mansfield granted Plaintiffs' motion for leave to file the Third Amended Complaint, adding a premises liability claim. ECF No. 100.

d. *Motion to Strike Dr. Keifer as Expert on Medical Standard of Care* – Judge Mansfield granted the United States' motion to strike Dr. Keifer as an expert on medical standard of care because none of the Bellwether Plaintiffs asserted a medical negligence claim. ECF No. 177.

e. *Motion for Leave to File Amended Complaint* – Plaintiffs withdrew their motion for leave to file an amended complaint to add medical negligence claims for certain of the Bellwether Plaintiffs after the amendment deadline. ECF Nos. 174 & 185.

f. *Partial Motion to Stay (FECA)* – The United States withdrew its motion to stay the claims of Mr. Aubart and Ms. Witt. ECF No. 247.

g. *Motion for Sanctions* – Judge Mansfield denied Plaintiffs' motion for sanctions related to lost text messages from two Navy officials. ECF No. 215.

h. *Motion to Strike Dr. Bird's Affidavit* – The Court preliminarily granted the United States' motion to strike the affidavit of Dr. Bird attached to Plaintiffs' opposition to the United States' motion for partial summary judgment. ECF No. 282 at 2.

i. *Motion to Consolidate and Coordinate Discovery* – Although not directly impacting the upcoming trial, the United States also has moved to (i) consolidate *Feindt* with two other related cases filed by the same counsel (*Whaley* and *Hughes*), (ii) place future proceedings on the same schedule to avoid duplication, and (iii) order these cases to join an existing discovery coordination in other related FTCA cases. *See* ECF Nos. 277 & 312. These motions will be heard by Judge Mansfield on April 10, 2024. ECF Nos. 287 & 314.

## I. <u>WITNESSES TO BE CALLED</u>

The United States intends to call the following 18 witnesses via declaration. These witnesses are in addition to the deposition testimony that the United States intends to designate.

### 1. <u>Trevor Bingham</u>

Cmdr. Trevor Bingham, the Facilities Management Division Director at JBPHH from 2021 to 2022, will testify to the Navy's response to the Red Hill fuel spill, including remedial flushing efforts.

2.  Lyle Burgoon

Dr. Lyle Burgoon, a toxicologist and biostatistician, will offer opinions regarding the air exposure of the Bellwether Plaintiffs to JP-5.

3.  John Daly

Lt. Cmdr. Daly, a civil engineer and former Facilities Engineering & Acquisitions Division Director for the Marine Corps Base Hawaii in Kaneohe Bay, will offer testimony and opinions regarding the flushing and recovery of the JBPHH water system, including (a) the technical considerations and justifications for how the system was flushed; (b) the flushing activities' compliance with applicable requirements; and (c) the technical and scientific justifications for seeking to amend the drinking water health advisories for various zones after flushing completed.

4.  Aaron Darley

Mr. Darley, Chief Engineer, NAVFAC Hawaii, will offer testimony and opinions regarding the potential pathways via which the November 2021 release migrated to the Red Hill drinking water shaft.

5.  Carmen De Leon

Ms. De Leon, Nurse Consultant, TriCare Health Plan, Clinical Oversight & Integration Section, Defense Health Agency, will offer testimony and opinions regarding the subject matter of TriCare coverage for certain services and goods,

32

including the extent to which TriCare will cover the Bellwether Plaintiffs'
anticipated future medical costs.

6.  Timur Durrani

Dr. Timur Durrani, a medical toxicologist and family medicine specialist,
will offer opinions regarding whether the minor Bellwether Plaintiffs' claimed
injuries can be causally linked to the November 20, 2021 spill and whether the
Bellwether Plaintiffs are at increased risk of latent disease.

7.  Sherri Eng

Ms. Eng, Environmental Director, Navy Region Hawaii, will offer opinions
and testimony regarding the Navy's response to the May 2021 and November 2021
spills, including (a) sampling and flushing efforts that the Navy performed; (b) her
membership on the Interagency Drinking Water System Team (IDWST) and the
IDWST's work; (c) the Navy's long-term monitoring of the JBPHH system after
the Public Health Advisory was lifted; and (d) recent analyses of the cause of the
low-level TPH-d detections in the JBPHH system after the Public Health Advisory
was lifted.

8.  Walter Grayman

Dr. Walter Grayman, an environmental/civil engineer who focuses on water
distribution modeling, will offer opinions about the fate and transport of JP-5

contaminants within the JBPHH water distribution system after the November 20, 2021 spill.

9. <u>Barry Gordon</u>

Dr. Barry Gordon, a neurologist, will offer opinions about the neurological impact, or lack thereof, of the November 20, 2021 spill on Nastasia Freeman.

10. <u>Michael Kosnett</u>

Dr. Michael Kosnett, a medical toxicologist, will offer opinions regarding whether the adult Bellwether Plaintiffs' claims injuries can be causally linked to the November 20, 2021 spill and whether the Bellwether Plaintiffs are at increased risk of latent disease.

11. <u>Michael McGinnis</u>

Dr. McGinnis served as the chief medical advisor for the U.S. Pacific Fleet from January 2020 through July 2022. Dr. McGinnis will provide testimony regarding the Navy's responsive actions to the November 20, 2021 spill, including the Navy's communications regarding water quality and medical response.

12. <u>Jeremy Mitchell</u>

Mr. Mitchell, Deputy Operations Officer for NAVFAC Hawaii and former Utilities Program Manager and Industrial Commodities Engineer with NAVFAC Hawaii and Deputy Public Works Officer for JBPHH, will offer testimony

regarding the infrastructure and operation of the JBPHH water system and the JBPHH immediate flushing program.

13. Duane Morita

Mr. Morita, Supervisory Chemist, NAVFAC Hawaii Environmental Services Lab, will offer testimony and opinions regarding water sampling and testing methods utilized by the Navy's on-island laboratory to analyze drinking water samples in the immediate response to the November 20, 2021 spill.

14. Robyn Prueitt

Dr. Prueitt, a toxicologist, will offer opinions about whether the Bellwether Plaintiffs' alleged exposure to JP-5 was high enough to cause the toxicological effects Plaintiffs claim.

15. Richard Ruck

Dr. Ruck, Chief Medical Officer, TriCare Health Plan, will offer testimony regarding manner in which TriCare coverage (a) applies to military personnel, their spouses and their dependents, (b) applies to retired military personnel, and (c) interacts with other insurance coverage, such as Medicare.

16. Eric Smith

Dr. Smith, a forensic psychologist, will offer opinions about the psychological impact, or lack thereof, that the Red Hill spill had on the Bellwether Plaintiffs' mental health.

17. Caroline Tuit

Dr. Tuit, an environmental chemist, will offer opinions about the applicable standards for preserving, holding, and analyzing certain samples, as well as and associated laboratory procedures.

18. Erick West

Erick West, an economist, will offer opinions about the net present value of the Bellwether Plaintiffs' claimed future medical costs and the alleged lost income of Patrick Feindt, Jr. and Nastasia Freeman.

## J.  EXHIBITS, SCHEDULES, AND SUMMARIES

The parties have held weekly meetings for almost two months wherein they discuss, *inter alia*, stipulating to the authenticity and admissibility of exchanged exhibits. The United States provides below a working list summarizing categories of exhibits that it intends to present at trial and will identify any additional exhibits to Plaintiffs by the April 2, 2024 deadline. ECF No. 293. The list denotes which categories of exhibits are likely to be admitted by stipulation ("Stip."), highlights any partial stipulations, and identifies any unique issues to a particular category and the parties' progress on that front.

|   | Exhibit Description | Witness/Status |
|---|---|---|
| 1. | Medical records of Elizabeth Witt | Stip.<br><br>The parties have agreed to create a stipulated exhibit containing a composite set of medical records for |

|  | **Exhibit Description** | **Witness/Status** |
|---|---|---|
|  |  | each bellwether Plaintiff and are in the process of exchanging proposed pages for the composite exhibit. |
| 2. | Medical records of Kevin Aubert | Stip. *See supra* Med. R. of E. Witt. |
| 3. | Medical records of Patrick Feindt Jr. | Stip. *See supra* Med. R. of E. Witt. |
| 4. | Medical records of P.R.F | Stip. *See supra* Med. R. of E. Witt. |
| 5. | Medical records of P.G.F | Stip. *See supra* Med. R. of E. Witt. |
| 6. | Medical records of Nastasia Freeman | Stip. *See supra* Med. R. of E. Witt. |
| 7. | Medical records of N.F. | Stip. *See supra* Med. R. of E. Witt. |
| 8. | Medical records of K.F. | Stip. *See supra* Med. R. of E. Witt. |
| 9. | Medical records of D.F. | Stip. *See supra* Med. R. of E. Witt. |
| 10. | Medical records of Sheena Jessup | Stip. *See supra* Med. R. of E. Witt. |
| 11. | Medical records of B.B.J | Stip. *See supra* Med. R. of E. Witt. |
| 12. | Medical records of B.J.J | Stip. *See supra* Med. R. of E. Witt. |
| 13. | Medical records of D.J. | Stip. *See supra* Med. R. of E. Witt. |
| 14. | Medical records of N.J. | Stip. *See supra* Med. R. of E. Witt. |
| 15. | Medical records of Richelle Dietz | Stip. *See supra* Med. R. of E. Witt. |
| 16. | Medical records of V.D. | Stip. *See supra* Med. R. of E. Witt. |
| 17. | Medical records of B.D. | Stip. *See supra* Med. R. of E. Witt. |
| 18. | Federal government reports, including the Waters Report and Cavanaugh Report | Partial stip., Sherri Eng, and possible additional witnesses<br><br>The parties have agreed to stipulate to the authenticity and admissibility of the Waters and Cavanaugh reports and are meeting and conferring on specific appendices and exhibits that the parties wish to use at trial. Thus far, the parties have stipulated to the two appendices identified by Plaintiffs. At this juncture, the United States does not anticipate using appendices that will require |

|  | Exhibit Description | Witness/Status |
|---|---|---|
|  |  | additional witnesses, but awaits any additional proposals from Plaintiffs. |
| 19. | Schematics of water system | Stip. |
| 20. | Schematics of Red Hill shaft | Stip. |
| 21. | Reports created by the IDWST, including Drinking Water Long-Term Monitoring Plan, Drinking Water Sampling Plan, Drinking Water Distribution System Recovery Plan, Flushing Plans and Standard Operating Procedures | Stip.; Sherri Eng |
| 22. | Call Logs | Partial stip.

The parties have generally stipulated to the authenticity of such records and continue to meet and confer regarding admissibility concerns. |
| 23. | SCADA Data (i.e., data of the JBPHH water system) | Stip.; Jeremy Mitchell |
| 24. | Sampling Data (e.g., sampling data and lab reports resulting from Navy, HDOH, and contractors available on the Safe Waters website; the Immediate Drinking Water Sampling Plan & Results) | Stip.; Sherri Eng |
| 25. | Documents of the immediate flushing process (e.g., maps; estimated volumes) | Stip.; Sherri Eng, Jeremy Mitchell; CDR Trevor Bingham, LCDR John Daly |
| 26. | HDOH Notices/Press Releases | Stip. |
| 27. | Navy Notices/Press Releases | Stip. |
| 28. | Documentation to Amend Drinking Water Health Advisories for Zones A2, D2, D3, F2, H3 | Stip. |
| 29. | Expert CVs | Stip. |

| | Exhibit Description | Witness/Status |
|---|---|---|
| 30. | Exhibits for the opinions of expert Erik West | Partial stip. and Mr. West<br><br>The United States is awaiting Plaintiffs' responses to some proposed exhibits. |
| 31. | Exhibits for the opinions of expert Lyle Burgoon (e.g., floor plan, results of calculations) | Partial stip. (floor plan) and Dr. Burgoon |
| 32. | Exhibits for the opinions of Dr. Walter Grayman (e.g., sampling data, AH model, modeling results) | Partial stip. (sampling data, AH model) and Dr. Grayman |
| 33. | Exhibits for the opinions of Dr. Robyn Prueitt (e.g., exposure calculations, information related to PODs, NOAELs, LOAELS) | Dr. Prueitt |
| 34. | Exhibits for the opinions of Dr. Caroline B. Tuit (e.g., sampling data, charts related to method holding times) | Partial stip. (sampling data) & Dr. Tuit |
| 35. | Exhibits for the opinions of Dr. Michael Kosnett | Stip. (medical records) & Dr. Kosnett |
| 36. | Exhibits for the opinions of Dr. Timur Durrani | Stip. (medical records) & Dr. Durrani |
| 37. | Exhibits for the opinions of Dr. Barry Gordon | Stip. (medical records) & Dr. Gordon |
| 38. | Exhibits for the opinions of Dr. Eric Smith | Stip. (medical records) & Dr. Smith |
| 39. | Social media posts from Plaintiffs | Potential Stip.<br><br>The United States will send select posts to Plaintiffs for consideration. |
| 40. | Records related to the lost wages claims of Nastasia Freeman | Potential Stip., Nastasia Freeman, and Mr. West<br><br>The United States awaits Plaintiffs' response to its proposed list of exhibits |

|     | Exhibit Description | Witness/Status |
| --- | --- | --- |
|     |     | (included in its list related to Mr. West's testimony) and will introduce any additional records through Mrs. Freeman and Mr. West. |
| 41. | Records related to the lost wages claims of Patrick Feindt, Jr. | Patrick Feindt, Jr. and Mr. West<br><br>Some of these records are subject to the United States' pending Mot. in Limine, No. 4. The United States will introduce any additional records through Mr. Feindt and Mr. West. |

The United States reserves its rights to introduce other documents previously produced or identified for rebuttal, particularly as it awaits clarification from Plaintiffs as to witnesses they intend to call at trial.

On March 14, 2024, Plaintiffs' counsel notified the United States that they have roughly 1000 exhibits that they plan to introduce. The United States requested that Plaintiffs provide this list immediately so that the parties may begin to work through that list in advance of the April 8, 2024 deadline for meeting and conferring on possible stipulations to the authenticity and admissibility of those proposed exhibits. ECF No. 293.

## K.   FURTHER DISCOVERY OR MOTIONS

Fact discovery closed on September 5, 2023, and expert discovery closed on November 30, 2023.

## L.     **STIPULATIONS**

In addition to the United States' and Plaintiffs' stipulations discussed in Sections D.1 and D.2 above, Plaintiffs also stipulated that the only "Medical Providers[6] they will rely upon or otherwise use for Any Litigation Purpose[7] in the First Bellwether Proceeding will be those identified in Plaintiffs' First Amended Designation of Testifying Experts, ECF No. 169." ECF No. 179 ¶ 1. In practice, this means that Plaintiffs agreed that the only treating provider they will call at trial will be Dr. Storage (who only treated Ms. Freeman).

In addition to these stipulations, the parties continue to meet and confer on stipulations of fact and stipulations as to the authenticity and admissibility of exhibits in an effort to further streamline the presentation of evidence at trial. The

---

[6] ECF No. 179 ¶ 2 ("'Medical Provider' means any person who at any time (now or in the future) has provided, opined on, or otherwise has been involved in Plaintiffs' medical, physical, emotional, psychological, psychiatric, or any other specialized healthcare treatment regardless whether employed by or operating as a public, governmental, or private entity. Those persons and institutions listed on Exhibit A to Plaintiffs' Third Supplemental Rule 26(a)(1) Disclosures are non-exhaustive examples of Medical Providers.").

[7] ECF No. 179 ¶ 3 ("For purposes of this Stipulation, "Any Litigation Purpose" means any purpose in this First Bellwether Proceeding, including but not limited to: a. Providing Testimony for any purpose at trial; b. Providing Testimony for any other purpose in this First Bellwether Proceeding, including but not limited to in court filings or in court hearings; or c. Providing any reports or documents (except for medical records generated in the ordinary course of business) so that any other person can perform the tasks in Paragraph 3(a) and 3(b) above on behalf of Plaintiffs.").

United States has asked that Plaintiffs stipulate to the fact that the United States

paid: (1) for hotel rooms for the Aubart, Feindt, and Freeman Bellwether Plaintiffs;

and (2) per diems for meals and expenses to all of the Bellwether Plaintiff families.

These facts are not reasonably in dispute, including because Plaintiffs testified—or

otherwise admitted—to these facts under oath. Nevertheless, the Plaintiffs have

thus far declined to stipulate to these facts.

## M.   AMENDMENTS, DISMISSALS

Plaintiffs last amended their operative complaint on December 1, 2023 (ECF

No. 210; Fifth Amended Complaint), and the amendment deadline has passed. On

June 14, 2023, Plaintiffs voluntarily dismissed the claims of Saori Aubart and Elsa

Guerra (ECF No. 124). The United States is not aware of any additional planned

amendments or dismissals.

## N.   SETTLEMENT DISCUSSIONS

The parties have engaged in settlement discussions since October 2022,

including: (1) virtual settlement conferences with Judge Mansfield on May 5,

2023, May 24, 2023, and February 6, 2024; (2) an in-person settlement conference

with Judge Mansfield on December 15, 2023; and (3) various discussions among

counsel, including an in-person December 5, 2023 meeting. On March 18, 2024,

the United States had a settlement conference with Judge Mansfield. The United

States remains willing to discuss settlement, but believes further negotiations likely will not be productive.

**O.**   **AGREED STATEMENT**

In addition to the Undisputed Facts in Section D and the existing stipulations outlined in Part L above, the parties have been meeting and conferring since February 1, 2024, on further proposed stipulations to simplify the issues and evidence to be presented at trial. Those discussions are ongoing.

**P.**   **BIFURCATION, SEPARATE TRIAL OF ISSUES**

See Section V (Miscellaneous) below.

**Q.**   **REFERENCE TO A MASTER OR MAGISTRATE JUDGE**

Reference to a master or magistrate judge does not appear necessary.

**R.**   **APPOINTMENT AND LIMITATIONS OF EXPERTS**

Appointment of experts does not appear necessary. The United States filed three *Daubert* motions, with the Court: (1) already ruling on the one pertaining to Plaintiffs' toxicologist, Dr. Bird (ECF No. 282); and (2) scheduling a hearing on the parties' remaining *Daubert* motions for March 29, 2024 (ECF No. 257).

**S.**   **TRIAL**

The non-jury trial is scheduled to begin on April 29, 2024, at 9:00 a.m. (ECF No. 293).

**T.      ESTIMATE OF TRIAL TIME**

Per the parties' joint February 29, 2024 letter (ECF No. 292), the parties

estimated a 2.5–3 week trial, assuming a daily trial schedule of 8:30 a.m.–2:30

p.m. without a lunch break. Since then, Plaintiffs have indicated that they may call

16 additional witnesses, which may lengthen the trial time. The parties are meeting

and conferring on whether these additional witnesses are necessary.

**U.      CLAIMS OF PRIVILEGE OR WORK PRODUCT**

None of the information required to be stated by Local Rule 16.4(b)(21)

**V.      MISCELLANEOUS**

Although the United States is prepared to present its TriCare offset

arguments and supporting evidence during the April 29, 2024 trial (*see* Section

G.2.C.), for the "just, efficient, and economical determination" of this issue, L.R.

16.4(b)(22), the United States presents another option: hold a separate evidentiary

hearing on this issue after the Court issues its ruling on the damages.[8] This would

streamline the presentation of evidence at trial, by reducing the number of

witnesses by two (Dr. Ruck and Ms. De Leon), and would be more efficient, by

---

[8] *E.g.*, *Dempsey v. United States*, 32 F.3d 1490, 1493 (11th Cir. 1994) ("Following
the bench trial in this case, the magistrate judge held a supplemental evidentiary
hearing for the sole purpose of determining whether the Government was entitled
to a setoff for a portion of Loren's award for future medical costs because those
costs were already covered under CHAMPUS"—the predecessor to TriCare).

44

allowing the parties and the Court to focus on the future medical expenses (if any) the Court may award.

Plaintiffs oppose a separate hearing on three grounds. First, they do not want the Bellwether Plaintiffs to have to be recalled for testimony, but the hearing would not require further testimony from them beyond their deposition and trial testimony. The United States envisions the separate hearing focusing on the testimony of the United States' two non-retained TriCare experts (Dr. Ruck and Ms. De Leon) and the parties' arguments on whether TriCare offsets future medical costs and, if so, the extent of the offset. Second, Plaintiffs contend that the offset is the United States' burden to prove, and therefore should be part of the trial. But a separate hearing does not change the burden of proof and has been utilized before. *E.g.*, *Dempsey*, 32 F.3d at 1493. Third, Plaintiffs fear the delay this hearing may cause. Given the Court's Trial Procedures, however, this hearing could be scheduled between when the Court issues its ruling and before the Court issues its findings of fact and conclusions of law, such that the results can be combined into the findings of fact and conclusions of law.

Dated: March 19, 2024           Respectfully submitted,

BRIAN BOYNTON
 Principal Deputy Assistant Attorney
 General, Civil Division

CHETAN PATIL

45

Acting Deputy Assistant Attorney General
Torts Branch

J. PATRICK GLYNN
Director

CHRISTINA FALK
Assistant Director


/s/ Eric Rey
ERIC REY (DC Bar # 988615)
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Environmental Tort Litigation
1100 L Street, NW
Washington, DC 20005
Phone: 202-616-4224
E-mail: eric.a.rey@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I certify that, on March 19, 2024, a true and correct copy of the foregoing was filed and served on counsel of record via the U.S. District Court's CM/ECF electronic filing system.

*/s/ Eric Rey*
Eric Rey