IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., et al., | CIVIL NO. 22-cv-00397-LEK-KJM |
| Plaintiffs, | TRIAL DECLARATION OF DR. ROBYN PRUEITT; EXHIBITS A-Z DEMONSTRATIVES AA-AC |
| v. | |
| UNITED STATES OF AMERICA, | TRIAL DATE: April 29, 2024 |
| Defendant. | TIME: 8:30 a.m. JUDGE: Hon. Leslie E. Kobayashi |

## DECLARATION OF ROBYN L. PRUEITT

Pursuant to 28 U.S.C. § 1746, I, Robyn L. Prueitt, Ph.D., DABT, make the following Declaration as my direct testimony for trial, under penalty of perjury. My opinions below are based on a review of a substantial number of case-specific, scientific, and regulatory documents, as well as my education, training, and experience in toxicology and risk assessment. I hold the below opinions to be true to a reasonable degree of certainty in the field of toxicology and risk assessment.

## **TABLE OF CONTENTS**

I.    Qualifications and Background ....................................................................4

II.   Scope of Work and Summary of Opinions ................................................5

III.  Methodology.................................................................................................8

    A.    Information Reviewed and Analysis Performed ..................................8

    B.    Evaluating Risks from Chemical Exposure ........................................10

        1.    Toxicology ....................................................................................10

        2.    Regulatory Toxicity Guideline Values .......................................11

        3.    Regulatory Toxicology vs. Causation Analysis...........................17

IV.   Plaintiff Exposure and Health Claims.......................................................21

    A.    Kevin Aubart ..........................................................................................22

        1.    Exposure Claims ..........................................................................22

        2.    Health Claims ...............................................................................22

    B.    Dietz Family ...........................................................................................23

        1.    Exposure Claims ..........................................................................23

        2.    Health Claims ...............................................................................24

    C.    Feindt Family .........................................................................................25

        1.    Exposure Claims ..........................................................................25

        2.    Health Claims ...............................................................................26

    D.    Freeman Family ......................................................................................28

        1.    Exposure Claims ..........................................................................28

        2.    Health Claims ...............................................................................28

    E.    Jessup Family .........................................................................................30

        1.    Exposure Claims ..........................................................................30

        2.    Health Claims ...............................................................................31

    F.    Elizabeth Witt.........................................................................................33

        1.    Exposure Claims ..........................................................................33

2.       Health Claims ................................................................34

V.      General Causation ..................................................................35

A.      Jet Fuel ..............................................................................36

B.      Total Petroleum Hydrocarbons (TPH) ..............................38

C.      Benzene .............................................................................41

D.      Toluene ..............................................................................42

E.      Ethylbenzene .....................................................................43

F.      Xylene ................................................................................44

G.      Naphthalene .......................................................................45

H.      DGME ................................................................................46

I.       Health Effects Associated with Odors ..............................47

VI.     Specific Causation ..................................................................52

A.      Plaintiffs' Exposure Assessments ....................................53

1.       Water Exposure Point Concentrations for Plaintiffs' Residences .54

2.       Indoor Air Exposure Point Concentrations for Plaintiffs' Residences ................................................................56

3.       Exposure Equations and Assumptions ...............................58

a.       Ingestion Exposure Intake ...................................58

b.       Dermal Exposure Intake ......................................60

c.       Inhalation Exposure Concentrations ....................63

4.       Summary of Daily Intakes and Exposure Concentrations ............64

B.      Comparison of Exposures to PODs Used to Set Agency Toxicity Values ..............................................................................64

1.       Guideline Toxicity Values and Points of Departure ......................66

2.       Margins of Exposure ..........................................................68

C.      Comparison of Exposures to Health Effect Levels ...........................74

D.      Conclusions .......................................................................78

VII.    Comments on the Report of Dr. Steven Bird .........................................79

3

## I.   **Qualifications and Background**

1.   I am a board-certified toxicologist with expertise in toxicology, carcinogenesis, and human health risk assessment.

2.   I received a BS degree in biology from Pacific Lutheran University and a Ph.D. in cell and molecular biology/human genetics from the University of Texas Southwestern Medical Center at Dallas.  I was a postdoctoral fellow at the National Cancer Institute, where I managed multiple projects related to breast and prostate carcinogenesis.  I was also a staff scientist at Fred Hutchinson Cancer Research Center, where I studied prostate tumor biology and biomarkers.

3.   I joined Gradient in 2007, and my work has focused on evaluating human, experimental animal, and *in vitro* toxicology studies for health risk assessments of cancer and non-cancer endpoints, with special emphasis on mechanistic and weight-of-evidence evaluations of health risk and causation for chemical exposures.

4.   I have been active in the Society of Toxicology since 2008.  I have published multiple articles on toxicology, carcinogenesis, and risk assessment in peer-reviewed journals, books, and meeting proceedings, and I have been a peer reviewer for multiple toxicology journals.

5.      A true and accurate copy of my *curriculum vitae* is attached in **Exhibit A**,

Trial Exhibit DX-3127.

## II.    Scope of Work and Summary of Opinions

6.      I evaluated whether it can be concluded to a reasonable degree of scientific

certainty that the seventeen bellwether Plaintiffs' alleged health effects were

attributable to exposures to JP-5 jet fuel and its main constituents in the Joint

Base Pearl Harbor-Hickam water system following the November 20, 2021

the accidental release of jet fuel at the Red Hill Bulk Fuel Storage Facility

(Red Hill).

7.      To conduct my analysis, I followed a number of well-established principles

and methods in the fields of toxicology and risk assessment, including:

      a.  I analyzed human and experimental animal toxicology data

identified from secondary toxicological reviews, as well as studies

identified from literature searches, for the chemicals of interest in

this matter.

      b.  I also assessed the potential health risks from the alleged exposures

of Plaintiffs to the chemicals of interest by estimating Plaintiffs'

exposures and comparing these exposures to health effect levels

reported in the literature, including those used as the basis to set

regulatory guidance values. In doing so, I relied upon the modeled

water concentration data provided by Dr. Grayman and the modeled

indoor air exposure data provided by Dr. Burgoon.

c.   Using these data, as well as conservative assumptions, I estimated

daily intakes of these constituents for each Plaintiff.   I then

conducted a margin of exposure (MOE) analysis that compared the

daily intakes to health effect levels used as the basis for guidance

values established by regulatory agencies.   This comparison helps

with the interpretation of the toxicological significance of potential

exposures at the Plaintiffs' residences and whether any health effects

might be expected from such exposures.

8.   Overall, my analysis indicates that Plaintiffs were not exposed to JP-5 fuel

and its constituents at levels high enough to cause toxicological effects.

a.   The results of my MOE analyses, as well as my consideration of the

underlying toxicology and epidemiology literature, demonstrate that

adverse toxicological effects from the Plaintiffs' alleged exposures

to the chemicals of concern in this matter are not expected.   Even

with the highly conservative exposure assumptions that I used in my

analysis (including the water concentrations modeled by Dr.

Grayman using a maximum average concentration of 85.25 mg/L),

which resulted in overestimates of Plaintiffs' exposures, the MOEs

are all >1, with most being >100, indicating that the Plaintiffs' overestimated exposures were generally 2-8 orders of magnitude lower than exposure levels associated with non-cancer and cancer health effects in the literature.

b. A comparison of Plaintiffs' exposures to health effect levels in the literature for chemicals for which there are no Points of Departure (PODs)[1] available from US EPA or ATSDR (and therefore a MOE analysis is not possible) also indicates that Plaintiffs' overestimated exposures were at least 6-fold lower (and in most cases 3-8 orders of magnitude lower) than the reported health effect levels.

9.   Certain health symptoms can occur in individuals in response to an odorous chemical that is perceived to be unpleasant or unhealthy at exposure concentrations lower than the toxicity threshold, but these symptoms are a result of stress-induced responses to perceptions of the odor as a health risk (*i.e.*, a non-toxicological mechanism).  These symptoms are not the result of a chemical-induced toxicological mechanism, and they do not indicate that the odorous chemical itself caused a toxic effect.

---

[1] A POD is the dose or concentration estimated to be near the lower end of the observed range of health effects.

10. Dr. Bird (Plaintiffs' toxicologist) does not follow an appropriate general causation or specific causation methodology, and therefore his opinions are speculative.

   a. Rather than providing any evidence that the Plaintiffs had exposure to chemicals in JP-5 fuel of sufficient magnitude and duration to cause any of their health effects, Dr. Bird attributed nearly all of the health effects experienced by the Plaintiffs since the time of the JP-5 fuel release to their alleged exposure.

   b. It is unclear how Dr. Bird can state that the Plaintiffs received a significant exposure to JP-5 that was sufficient to cause all of their alleged health claims when he did not assess their exposure levels or compare them to health effect levels reported in the literature.

## III. Methodology

### A. Information Reviewed and Analysis Performed

11. My opinions are based on a review of a substantial number of documents, as well as my training and experience in toxicology and risk assessment. The documents I relied upon are listed in **Exhibit B**, Trial Exhibit DX-3128, which is a true and accurate copy of all of the references for this declaration and for all the other exhibits, unless otherwise indicated in a particular

exhibit with its own reference list.  The types of information on which I relied for this report include:

    a.  Case-specific documents, including complaints; Plaintiff medical records; deposition transcripts; and expert reports.

    b.  Publicly available environmental and regulatory documents by agencies such as the United States Environmental Protection Agency (US EPA), the Agency for Toxic Substances and Disease Registry (ATSDR), the Hawaii Department of Health (HIDOH), and other regulatory bodies.  These include general guidance documents, toxicity criteria, and secondary toxicological reviews.

    c.  General scientific literature in the fields of toxicology and risk assessment, including peer-reviewed studies and review articles in journals relating to the chemicals of interest in this matter.

12.   The specific analyses I performed include the following:

    a.  I analyzed human and experimental animal toxicology data identified from secondary toxicological reviews, as well as studies identified from literature searches, for the chemicals of interest in this matter.

    b.  I conducted targeted searches of the scientific literature using the PubMed and Scopus search databases for literature related to the

potential toxicity of the chemicals of interest that were published after the cut-off periods for inclusion in the secondary toxicological reviews.

c.  I assessed the potential health risks from the alleged exposures of Plaintiffs to the chemicals of interest by comparing relevant exposure data to health effect levels reported in the literature, including those used as the basis to set regulatory guidance values.

d.  I evaluated the scientific bases of the opinions expressed by the Plaintiffs' expert, Dr. Steven Bird.

## B. Evaluating Risks from Chemical Exposure

### 1. Toxicology

13.  Toxicology is the study of the adverse (*i.e.*, toxic) effects of chemical or physical agents on living organisms.

14.  One of the most fundamental concepts in the field of toxicology is the dose-response relationship, commonly expressed as "the dose makes the poison" (Aleksunes and Eaton, 2019).  Dose is not the concentration of the chemical in water, but rather the amount of the chemical that is absorbed into the body. An increase in dose generally will result in an increased level of biological response.  For most chemicals, biological effects occur only when the dose exceeds a threshold level for a certain period of time.  At doses

below this threshold, biochemical or physiological mechanisms prevent any adverse effects from being observed.

15.  Dose is what differentiates whether or not a chemical may be harmful; thus, the mere presence of a chemical is not by itself a cause for concern.  Other factors that can influence toxicity include the frequency and duration of dose or exposure, the route of exposure, metabolism, and individual-level factors such as genetics, nutritional status, and overall health status (Aleksunes and Eaton, 2019).

16.  An understanding of toxicology is necessary to determine how much of a chemical one can be exposed to, and under what conditions, without the likelihood of harm.

### 2. Regulatory Toxicity Guideline Values

17.  For chronic non-cancer effects, regulatory agencies typically characterize toxicity by using a chemical-specific reference dose (RfD) for ingested chemicals or reference concentration (RfC) for inhaled chemicals.

18.  The RfD or RfC is an estimate of a daily oral exposure or continuous inhalation exposure, respectively, of a human population (including particularly sensitive subpopulations) that is likely to be without an appreciable risk of adverse health effects during a lifetime (US EPA, 2011a).

11

19.   RfDs and RfCs are often derived from a point of departure (POD) for a chemical, which is the dose or concentration estimated to be near the lower end of the observed range of health effects (Prueitt *et al.*, 2023).

a.   The POD can be a data point or an estimated point that is derived from observed dose-response data.

b.   It can be a no observed adverse effect level (NOAEL) or lowest observed adverse effect level (LOAEL) from a human or laboratory animal study, or the lower-bound estimate of a dose or concentration that produces a predetermined change in the response rate of an adverse effect compared to background (*e.g.*, a benchmark dose limit [BMDL]).

c.   For the purposes of deriving toxicity guideline values, the POD is based on the most-sensitive, credible effect (*i.e.*, the chemical-related effect that occurs at the lowest exposure concentration).

d.   To account for potential uncertainties and variability (differences between humans and laboratory animals, variation in sensitivity among individuals, use of a LOAEL instead of a NOAEL, insufficient study duration, missing key toxicological studies, *etc.*), the POD is divided by uncertainty factors (UFs), typically factors of 10 each, to account for inter- and intraspecies variability and, if

necessary, other sources of variability and uncertainty (US EPA, 2002). The application of UFs helps ensure that exposures at or below the RfD or RfC are associated with negligible (if any) risk, even in the most sensitive subpopulations.

e. However, because of the conservative assumptions in the RfD/RfC methodology, adverse health effects will not necessarily occur even at exposures greater than the RfD or RfC. US EPA (2000); (US EPA, 2019).

20. For cancer effects, regulatory agencies typically characterize toxicity by using a cancer slope factor (CSF) for ingested chemicals or inhalation unit risk (IUR) for inhaled chemicals.

a. As part of a regulatory risk assessment, US EPA frequently uses mathematical models to extrapolate cancer risks observed at high doses (either in humans or animals) down to low doses that are typical of actual exposure levels.

b. Using these models, either a CSF or IUR[2] is identified, which represents the incremental (*i.e.*, above background) upper-bound

---

[2] US EPA defines the IUR as the upper-bound excess lifetime cancer risk estimated to result from continuous exposure to an agent at a concentration of 1 $\mu g/m^3$ in air (US EPA, 2005).

risk of an additional cancer per dose (in mg/kg-day) or concentration (in $\mu g/m^3$) of the chemical, usually based on the conservative assumption that there is no threshold for cancer (*i.e.*, the dose-response relationship is linear at low doses) (US EPA, 2005).

c.  Because the CSF and IUR are upper-bound values, US EPA recognizes that actual (or "true") cancer risks would likely be lower than those calculated using these values (US EPA, 2005).

d.  Assuming linearity at low doses is a conservative assumption that is used as a default when chemical-specific information regarding the shape of the dose-response curve at low doses is uncertain. Based on current understanding of the mechanisms of carcinogenesis, many scientists have concluded that the linear no-threshold (LNT) model is likely to overestimate cancer risks for many chemicals (see, for example, US EPA [2005], Cohen and Arnold [2011], Aschner *et al*. [2016], Boobis *et al*. [2016], Cohen [2017], and Greim and Albertini [2015]).

e.  Cancer risks are typically characterized as the incremental probability that an individual will develop cancer during his or her lifetime due to chemical exposure under the specific exposure scenarios evaluated.

i.   The term "incremental" refers to risk above the background cancer risk experienced by all individuals during daily life.

ii.   According to American Cancer Society (ACS, 2023), the lifetime probability of developing cancer (*i.e.*, background cancer risk) is approximately 0.409 (409 cases in a population of 1,000) in men, and 0.391 (391 cases in a population of 1,000) in women.

iii.   Cancer risks are expressed as a unitless probability (*e.g.*, 1 in 1,000,000 or $1 \times 10^{-6}$) of an individual developing cancer over their lifetime, above the background probability of developing cancer, due to exposure to a chemical.

iv.   These calculations of cancer risks are theoretical estimates that are conservative and may not represent actual risks (US EPA, 2004). In fact, in many cases where exposure to a certain chemical is low, the risk may be negligible or even zero.

21.   The toxicity guideline values such as RfDs/RfCs and CSFs/IURs do not predict whether specific exposures will cause adverse health effects. Rather, such values represent levels below which no health effects are anticipated and include many safety factors and conservative assumptions so that they

purposely overestimate risk in order to ensure the protection of public health.

22.   The same applies to US EPA's Regional Screening Levels (RSLs), which are risk-based screening values for individual chemicals in residential and industrial soil, air, and drinking water, and they are derived by combining generic, conservative exposure assumptions with US EPA toxicity guideline values.  The RSLs are considered to be health protective for humans (including sensitive subpopulations) over a lifetime, as they intentionally use exposure assumptions that overestimate chemical intake (US EPA, 2023).  RSLs are not intended to (and do not) indicate levels at which human health effects can or will occur; rather, they are used to identify chemicals of interest at a site for the purposes of further investigation and decision making (US EPA, 2023).

23.   As a result, it is recognized that exceeding a regulatory guideline value or a RSL does not indicate that an adverse health effect has occurred or will occur in the future (*e.g.*, US EPA, 1996).  Thus, while the use of such values may be appropriate for public health decisions, it is not appropriate to use them for predicting the occurrence of disease in a specific individual or the likelihood that adverse health effects will occur for specific individuals or

groups exposed to a particular chemical. (US EPA, 1993Federal Judicial Center and NRC, 2011; ATSDR, 2018).

### 3. *Regulatory Toxicology vs. Causation Analysis*

24.   In contrast to regulatory evaluations, the assessment of the likelihood of adverse effects in an individual (such as in a specific causation analysis, as discussed below) requires an estimate of actual risk, based on an individual exposure assessment, dose or exposure characterization, evaluation of the evidence that the chemical can cause adverse health effects in humans (and the doses associated with those effects), and comparison of the individual dose characterization to doses associated with health effects in the literature (Federal Judicial Center and NRC, 2011; Olsen *et al*., 2014; Faustman, 2019), such as in a MOE analysis. This analysis is often organized as (a) general causation; and (b) specific causation.

   a.   General Causation:

      i.   The Plaintiffs in this matter allege a variety of health effects as a result of their alleged exposures to JP-5 fuel.

      ii.   I assessed general causation by evaluating whether exposure to the chemicals in JP-5 fuel have been associated with the various health effects alleged by the Plaintiffs in general, and, if so, I

evaluated the exposure conditions (dose, duration, route) at which the effects are seen.

iii. I relied primarily on secondary sources from reputable agencies, such as extensive reviews of the health effects literature for each chemical published by ATSDR or US EPA, but also conducted targeted literature searches to identify studies not included in the secondary sources.

iv. If there is evidence for general causation, one must evaluate whether each Plaintiff's alleged exposures were sufficient to be a likely cause or contributor to their alleged health effects, which is part of a specific causation analysis, as discussed below.

v. If there is not evidence for general causation, there cannot be evidence for specific causation regardless of how high an exposure an individual has experienced.

b. Specific Causation:

i. Specific causation generally describes the establishment of a link between exposure to a chemical (or chemicals) and a health effect in an individual.

ii.   To evaluate whether an individual's exposure to a chemical actually caused their disease, exposure-related health effects of the chemical must be determined for the exposure level estimated for the individual based on concentration, frequency, and duration of exposure.

iii.  Considerations for a specific causation analysis include the following (Olsen *et al*., 2014; Faustman,; Cullen and Rosenstock, 2005; Federal Judicial Center and NRC, 2011):

1. The agent(s) in question must be shown to cause the observed health effects in epidemiology studies.

2. An individual's exposure to the agent must be estimated and described along with any uncertainties in the estimation.

3. The magnitude and duration of an individual's exposure should be similar to or higher than exposure levels reported in the epidemiology studies used to support the existence of an association between an exposure and a disease.

4. Other potential causes of the disease, including other exposures, behavioral and genetic factors, and random occurrence, should be examined and must be eliminated or determined to be of less importance than the exposure to the

agent.  This is particularly important when the disease in question is common in occurrence or has many potential causes.

iv.   Without meeting these considerations, it cannot be concluded, to a reasonable degree of scientific certainty, that any individual's disease was caused by a chemical exposure or that any individual is likely to contract a specific disease due to a specific chemical exposure (Eaton, 2003; Olsen *et al*., 2014).

v.   I evaluated the first three specific causation considerations listed above to determine whether the Plaintiffs' estimated exposures to JP-5 and its constituents were of a sufficient magnitude and duration to be a likely cause or contributor to their alleged health effects.  It is my understanding that Drs. Michael Kosnett and Timur Durrani will provide opinions regarding the fourth consideration listed above (alternative causes of the Plaintiffs' alleged health effects).

vi.   Toxicologists use a margin of exposure (MOE) analysis to assess a specific individual's or a group's risk from exposure to a particular chemical.

20

1. The MOE for exposure is the ratio of a POD (such as a LOAEL or NOAEL)[3] to the estimated exposure level of an individual.

2. If the MOE is greater than 1, the exposure is less than the toxicity effect (or no effect) level, and therefore the exposure is not expected to cause adverse toxicological effects.

3. Thus, the higher the MOE, the even less likely it is that the exposure would cause adverse toxicological effects.

## IV.   **Plaintiff Exposure and Health Claims**

25.   This section summarizes information on the Plaintiffs' use and ingestion of their tap water after the November 20, 2021, release, as described in their depositions. The health effects that the Plaintiffs claimed to have developed from their alleged exposure to JP-5 fuel in their tap water (as described in their depositions), as well as the health effects that Dr. Steven Bird (Plaintiffs' toxicologist) attributes to their alleged exposure to JP-5 fuel are also summarized in the sections below.

---

[3] POD is the dose or concentration estimated to be near the lower end of the observed range of health effects (Prueitt *et al.*, 2023). *See supra* at 11.

## A. Kevin Aubart

### 1. *Exposure Claims*

26.    Mr. Aubart claimed he could smell an odor of jet fuel from the tap water on

November 28, 2021 (Aubart, 2023).  On November 28, 2021, Mr. Aubart

stopped using tap water and used bottled water as much as possible until he

had access to the Honolulu Airport Hotel from December 5, 2021, to

January 10, 2022 (Aubart, 2023).

27.    Mr. Aubart stated that he drank 1-2 gallons of water per day from the tap

before November 28, 2021, and his meals were prepared with unfiltered tap

water during this time (Aubart, 2023).

### 2. *Health Claims*

28.    Mr. Aubart claims health effects from exposure to jet fuel in tap water,

including rashes, nausea, abdominal pain, diarrhea, vomiting, bloating,

infection, joint and muscle pain, brain fog/trouble concentrating, eye

irritation, postnasal drip and sinus problems, stomachaches, headaches,

cough, memory loss, confusion, mood swings, anxiety, fatigue, eye

irritation, and sleep apnea (Aubart, 2023).

29.    Dr. Bird (2023) claims that Mr. Aubart experienced acute and long-term

anxiety, headaches, and brain fogginess as a result of his exposure.

**B. Dietz Family**

*1. Exposure Claims*

30.     The Dietz family members claimed that they noticed a smell of jet fuel

coming from the water taps on November 28, 2021.  Richelle Dietz stated

that the family stopped drinking the tap water on November 28, 2021, after

she read a social media post about the alleged contamination (R. Dietz,

2023).  Immediately after learning about the water on the night of November

28, 2021, the family started using bottled water for consumption and also

switched to bottled water for hand washing on November 29, 2021, and for

showering on November 29, 2021, or November 30, 2021 (R. Dietz, 2023).

The family also began to use a camping shower for bathing (R. Dietz, 2023).

Sometime after December 3, 2021, the family bought an electric shower

pump and began utilizing the water distribution program and the free

laundry service (R. Dietz, 2023).

31.     Before November 28, 2021, the family did 12-14 loads of laundry per week

and washed their hands frequently.  For drinking water, they used tap water

filtered through a Brita filter.  In addition, the family used approximately

one case of bottled water per week.  They washed some dishes by hand and

used a dishwasher for approximately two or three loads per day (R. Dietz,

2023; B.E. Dietz, 2023).

32.    Ms. Dietz estimated that before November 28, 2021, she drank 1 gallon of water per day, and used 1 gallon per day for cooking.  She stated that she took two showers per day, each of which were 15-40 minutes long (R. Dietz, 2023).

33.    Ms. Dietz estimated that her son B.D. drank 0.5 gallons of water per day, and took one to four showers per day that were 20-60 minutes long (R. Dietz, 2023).  Ms. Dietz estimated that her daughter V.D. drank 0.25 gallons of water per day, and took one bath per day that was 30-60 minutes long (R. Dietz, 2023).  Her children also played outside with water toys using the sprinkler and hose, approximately once per week for B.D. and two or three times per week for V.D. (R. Dietz, 2023).  These activities ended after November 28, 2021 (R. Dietz, 2023; B.E. Dietz, 2023).

### 2. Health Claims

34.    Richelle Dietz's claimed health effects include gastrointestinal issues (stomach upset, pain, burning, diarrhea, and stress-related symptoms), headaches, eczema, heavy menstruation, ovarian and uterine cysts, and anxiety (R. Dietz, 2023). Dr. Bird (2023) stated that Richelle Dietz experienced acute effects including abdominal pain, nausea, vomiting, diarrhea, burning eyes and throat, daily headaches, cough, rash, and anxiety; and long-term effects including headaches, visual changes, rash, and anxiety.

35.    The family's claims for B.D. include exacerbation of Chiari malformation symptoms (headaches, neuropathy, nausea, vomiting, incontinence), temporary rash, and anxiety (R. Dietz, 2023; B.E. Dietz, 2023).  Dr. Bird (2023) stated that B.D. experienced acute effects including abdominal pain, nausea, diarrhea, general fatigue, dry skin, sore throat, and anxiety; and a long-term effect of anxiety. Dr. Bird subsequently clarified that he does "not attribute [B.D.'s] chronic headaches to being substantially caused by his jet fuel exposure." Dr. Bird's October 23, 2023 Supplemental Report at 2.

36.    The family's claims for V.D. include temporary gastrointestinal symptoms (nausea, vomiting), rash, temporary vaginal pain, and breathing issues (cough, easily winded, sleep apnea, respiratory inflammation requiring tonsillectomy and adenoidectomy) (R. Dietz, 2023; B.E. Dietz, 2023).  Dr. Bird (2023) stated that V.D. experienced acute effects including abdominal pain, vomiting, diarrhea, shortness of breath, decreased exercise tolerance, wheeze, dry skin, and cough; and long-term effects including wheezing, shortness of breath, and cough.

### C. Feindt Family

#### 1. Exposure Claims

37.    The Feindt family stopped consuming the water on December 9, 2021 (P.R. Feindt, 2023a,b) but continued to use the water for showering, washing,

laundry, and dishwashing before moving into a hotel on December 13, 2022 for over 2 months (P.R. Feindt, 2023a,b; A. Feindt, 2023).

38. Mr. Feindt estimated that prior to December 9, 2021, he drank 1-2 gallons of water per day. The family used both tap water and water from a delivery service for drinking. Mr. Feindt also used tap water for power washing household items (P.R. Feindt, 2023a,b).

39. P.G.F. and P.R.F. attended the Ford Island Child Development Center for approximately 9-10 hours per day and drank tap water at the school. Their parents removed them from the school on December 10, 2021 (P.R. Feindt, 2023a,b; A. Feindt, 2023). P.G.F. and P.R.F both took daily baths 20-25 minutes long, and played in an inflatable pool filled with water from the hose one to four times per week (P.R. Feindt, 2023a,b; A. Feindt, 2023).

### 2. Health Claims

40. Patrick Feindt Jr.'s health claims include gastrointestinal issues (vomiting, stomach cramps, diarrhea, headache), vestibular dysfunction and vertigo, migraines, neuropathy (pain in right side, back, testicle, under rib cage), loss of a major organ (gallbladder), internal bleeding, and cognitive issues (difficulty with memory and rational thought) (P.R. Feindt, 2023a,b). Dr. Bird (2023) stated that Patrick Feindt Jr. experienced acute effects including nausea, vomiting, diarrhea, cough, burning in the nose and mouth, general

malaise, memory loss, and alteration in mood; and long-term effects including dizziness/vertigo, mastocytosis, and intermittent abnormalities in liver tests (slight elevations in liver function enzymes in a blood test in February 2023).

41. The health claims for P.G.F. include temporary gastrointestinal issues (vomiting, nausea, abdominal pain, diarrhea), behavioral issues (developmental delays), pulmonary issues (cough, damaged lungs, need for inhaler), and skin issues (rash, birthmarks that have "continued to grow") (P.R. Feindt, 2023a,b; A. Feindt, 2023). Dr. Bird (2023) stated that P.G.F. experienced acute effects including cough, abdominal pain, vomiting, and diarrhea; and long-term effects including shortness of breath, rashes, and mastocytosis.

42. The health claims for P.R.F. include lung damage (asthma, chronic coughs), behavioral issues, sleep issues (apnea, restless sleeping), vomiting, loose stools, lethargy, and rash (P.R. Feindt, 2023a,b; A. Feindt, 2023). Dr. Bird (2023) stated that P.R.F. experienced acute effects including abdominal pain, nausea, vomiting, diarrhea, headache, cough, wheezing (exacerbation of his asthma), and anxiety/fear; and long-term effects including abdominal pain, worsened asthma, and anxiety.

### D. Freeman Family

#### *1. Exposure Claims*

43.  The Freeman family stopped drinking the tap water in their home on November 29, 2021.  They continued to use the water to bathe but stopped at an unspecified time (N. Freeman, 2023).  Sometime between November 29, 2021, and December 3, 2021, the Freeman family used water delivered by the US military for cooking and bathing (N. Freeman, 2023). According to Nastasia Freeman (N. Freeman, 2023), the family did start to drink the water and use it for cooking in early December, but they had stopped again by the time they moved into a hotel on December 3, 2021.  They stayed in the hotel until February 2, 2022 (N. Freeman, 2023).  Ms. Freeman does not remember whether the family stopped using the water for laundry, hand-washing, or food preparation (N. Freeman, 2023).  Prior to November 29, 2021, the family used tap water for drinking, laundry, gardening, washing the cars, and playing outside (K. Freeman, 2023).

#### *2. Health Claims*

44.  Nastasia Freeman's claims include headache, diarrhea, nausea, vomiting, exacerbation of seizures, vestibular issues, dizziness, and exacerbation of psoriasis (N. Freeman, 2023).  Dr. Bird (2023) stated that Ms. Freeman experienced acute effects including exacerbation of seizures, headaches, abdominal pain, nausea, vomiting, diarrhea, rash, exacerbation of psoriasis,

28

and menstrual irregularities (irregular cycles); and long-term effects including exacerbation of seizures, brain fog, vestibular disorder, nausea, exacerbation of psoriasis, menstrual cycle abnormalities, and goiter with low thyroid tests.

45.   The family's claims for N.F. include vomiting, diarrhea, headaches, weakness, nerve issues (pain in skin and bones), vestibular issues (dizziness, nausea), and rashes (N. Freeman, 2023; K. Freeman,).  Dr. Bird (2023) stated that N.F. experienced acute effects including abdominal pain, nausea, vomiting, diarrhea, cough, wheeze, headaches, tinnitus, body and bone pain; and long-term effects including shortness of breath, cough, muscle/bone pain associated with fatigue, headaches, abdominal pain, nausea, vomiting, diarrhea, abnormal blood work, and abnormal thyroid tests.

46.   The family's claims for K.F. include vomiting, diarrhea, headaches (migraines), nausea, blood in his stool, rash, and gastroesophageal reflux disease (N. Freeman, 2023; K. Freeman, 2023).  Dr. Bird (2023) stated that K.F. experienced acute effects including abdominal pain, nausea, vomiting, diarrhea, cough, rash, and headaches; and long-term effects including persistent abdominal pain, nausea, vomiting, diarrhea, cough, wheezing, headaches, weakness, decreased hearing, and vestibular abnormalities.

47. The family's claims for D.F. include nausea, vomiting, diarrhea, rash, and regressing verbally and behaviorally (N. Freeman, 2023; K. Freeman, 2023). Dr. Bird (2023) stated that D.F. experienced acute effects including abdominal pain, vomiting, diarrhea, headache, regression in development (speech and toilet training), and rash; and long-term effects including tremor, abdominal pain, vomiting, diarrhea, and headaches.

**E. Jessup Family**

   *1. Exposure Claims*

48. Sheena Jessup only consumed bottled water both prior to and after November 28, 2021 (B.B. Jessup, 2023). The remaining members of the Jessup family stopped drinking tap water the night of November 28, 2021 (B.B. Jessup, 2023; S. Jessup, 2023; B.S. Jessup, 2023).

49. Ms. Jessup stated that she continued to bathe and wash her hands in the tap water because of time constraints (S. Jessup, 2023).

50. Prior to November 30, 2021, the family used tap water for cooking, cleaning, laundry, showering/bathing, oral hygiene and hand washing. Water was also used in their floor vacuum (S. Jessup, 2023).

51. Ms. Jessup stated that her son N.J. had a bottle of formula made with 6 ounces of water six to eight times per day, and her son D.J. had a 4-ounce

bottle approximately every 3 hours (S. Jessup, 2023).  She also noted that D.J. bathed daily for a duration of about 30 minutes (S. Jessup, 2023).

52. B.B.J. stated that prior to the time they stopped drinking the tap water, he used it for drinking (3-4 cups per day), for daily showers (10-15 minutes long), and washing dishes and bottles in the morning (B.B. Jessup, 2023). He sometimes played with his brother outside with the hose.  He did his own laundry, and washed his hands at least three times per day (B.B. Jessup, 2023).

53. B.J.J. stated that before the leak she used tap water to bathe, shower, play outside with the hose, brush her teeth, and wash her hands.  She drank both tap and bottled water, in the amount of two to three "hydro flasks" per day (B.J. Jessup, 2023).  She stated that she showered for about 15 minutes each day.  She also helped wash dishes (B.J. Jessup, 2023).  B.J.J. stated that after the leak, the family used water for a short time, because she recalls that the smell went away and they did not see a sheen on the water (B.J. Jessup, 2023).

## 2. Health Claims

54. Sheena Jessup's health claims include abdominal issues (pain, diarrhea, vomiting, bloating), burning esophagus, anxiety, depression, mood swings, brain fog, cough, eye irritation, fatigue, hair loss, headaches, weight

changes, increased thirst, memory loss and confusion, muscle and joint pain, shakes or trembles, loss of balance, skin blisters and rashes, tumors/skin growths, and heavier menses that exacerbated her anemia (S. Jessup, 2023). Dr. Bird (2023) stated that Ms. Jessup experienced acute effects including abdominal pain, nausea, rash, cough, eye irritation, headache, anxiety, fatigue, numbness, and balance problems; and long-term effects including menstrual abnormalities (heavier flow, with resultant anemia), and anxiety.

55.   B.B.J.'s health claims include abdominal issues (pain, cramps, diarrhea, nausea, vomiting, bloating), anxiety, depression, brain fog, fatigue, headaches, memory loss and confusion, muscle and joint pain, rash/blisters/dry skin, shakes or trembles, loss of balance, cough, eye irritation, and burning sensation in the nose, throat, or chest (B.B. Jessup, 2023). Dr. Bird (2023) stated that B.B.J. experienced acute effects including abdominal pain, nausea, headaches, sore throat, cough, balance problems, brain fog, irritated eyes, rash, and muscle aches; and long-term effects including tremor, tinnitus, and anxiety.

56.   B.J.J.'s health claims include depression, rash (temporary), thyroid lump, heavier menstrual bleeding, sore/dry throat, skin pigment loss, rash (exacerbation of eczema), and exacerbation of scoliosis (B.J. Jessup, 2023). Dr. Bird (2023) stated that B.J.J. experienced acute effects including

abdominal pain, nausea, diarrhea, sore throat, eye irritation, rash, headache, fatigue, muscle aches and anxiety; and long-term effects including menstrual irregularities (heavier flow), anxiety, behavioral issues, and goiter.

57. The family's health claims for N.J. include severe vomiting, diarrhea, and developmental delays related to exacerbation of autism symptoms (S. Jessup, 2023; B.S. Jessup, 2023). Dr. Bird (2023) stated that N.J. experienced acute effects including abdominal pain, vomiting, diarrhea, cough, eye irritation, headaches, anxiety, and behavioral abnormalities/swings; and long-term effects including dermatologic changes and behavior abnormalities. Dr. Bird (2023) noted that N.J.'s behavioral issues were not caused by his exposure, but were exacerbated by the disruption of his normal feeding routine.

58. The family's health claims for D.J. include severe vomiting and diarrhea (S. Jessup, 2023). Dr. Bird (2023) stated that D.J. experienced acute effects including diarrhea, eye irritation, and dry skin. Dr. Bird did not note any long term effects from exposure for D.J.

**F. Elizabeth Witt**

**1. *Exposure Claims***

59. Ms. Witt stopped using the tap water for consumption and washing dishes on December 1, 2021. At that time Ms. Witt limited her showers to about 5

minutes per day, but did not change her laundry habits (Witt, 2023). She
stopped using the hose for yard work and stopped washing the car and the
dog. Around December 9, 2021, she moved into a hotel for approximately
one afternoon, then moved back to her home and used bottled water (Witt,
2023).

60. Ms. Witt testified that before December 1, 2021, she used tap water to
shower, wash dishes, do laundry, cook, do yard work, wash the car, clean,
and bathe the dog (Witt, 2023). She estimated that she drank 1 gallon of tap
water per day and used 1 gallon per day for cooking (Witt, 2023). She
washed her hands about six times per day, did two loads of laundry per day,
used water for yard work once per week, bathed in a tub one or two times
per month, showered twice per day for 15-20 minutes, washed the dog once
every 2 weeks, and washed the car twice per month (Witt, 2023).

### 2. Health Claims

61. Ms. Witt's health claims include abdominal issues, rash/blisters/dry skin,
exacerbation of acne, excessive night sweats, heart palpitations, anxiety,
exacerbation of depression, increased menstrual cycles, and cramping (Witt,
2023).

62. Dr. Bird (2023) stated that Ms. Witt experienced acute effects including
exacerbation of menstrual irregularities (cramping), heart palpitations,

abdominal pain, abdominal cramping, rash, and anxiety; and long-term
effects including anxiety/fear.

## V.   **General Causation**

63.   The chemical of concern with regard to this matter is JP-5 fuel, which is a
kerosene-based, petroleum hydrocarbon fuel comprised of a mixture of
aliphatic and aromatic hydrocarbons (including benzene, toluene,
ethylbenzene, xylenes, naphthalene, and 1- and 2-methylnaphthalene, which
together make up less than 2% of JP-5) and additives such as deicers
(HIDOH, 2023).  The primary de-icing ingredient in JP-5 fuel at the Red
Hill fuel storage facility is diethylene glycol monomethyl ether (DGME)
(HIDOH, 2023).

64.   Below, I evaluate the health effect levels and exposure conditions at which
the health effects alleged by the Plaintiffs are observed for JP-5 fuel and its
constituents, as reported in the scientific literature.

65.   As reliable health effects data are sparse for JP-5 fuel specifically, I also
evaluated a similar fuel, JP-8 (ATSDR, 2017), as well as total petroleum
hydrocarbon (TPH) fractions and the individual JP-5 constituents of
benzene, toluene, ethylbenzene, xylenes, naphthalene, 1- and 2-
methylnaphthalene, and DGME.

66.   The literature regarding the potential health effects of JP-5 fuel constituents is voluminous, so I rely primarily on secondary sources (*i.e.*, extensive reviews of the health effects literature) from authoritative scientific and regulatory agencies. **Exhibit C**, Trial Exhibit DX-3129, is a true and accurate copy tabulation of all the available studies I identified from these sources. I included in **Exhibit C**, Trial Exhibit DX-3129, studies conducted in both humans and experimental animals, as quantification of exposure is often more reliable in experimental animal studies.

67.   I also conducted targeted literature searches for JP-5 and each constituent to identify relevant studies not included in the secondary sources.  From these searches, I did not identify any high quality studies reporting health effect levels that are lower than those reported in the studies included in the secondary sources.

**A. Jet Fuel**

68.   Studies of effects in experimental animals exposed to jet fuel (JP-5 or jet propellant-8 [JP-8]) have been conducted with inhalation, oral, and dermal exposure routes (ATSDR, 2017).  **Exhibit D**, Trial Exhibit DX-3130, is a true and accurate copy of my tabulation of the most reliable studies of jet fuel (*i.e.*, those that include reliable exposure measurements and treatment-related outcomes) with the lowest LOAELs, or the highest NOAELs that do

not exceed the lowest LOAELs, for any exposure duration for each of the target organs or systems that are relevant to the Plaintiffs' health claims.

69.     Epidemiology studies of humans exposed to jet fuel are limited to a case study of acute inhalation exposure to JP-5 and to occupational studies involving exposure to JP-8 and other jet fuels (ATSDR, 2017).  However, in most studies, the study populations were exposed to various jet fuels (*e.g.*, JP-8, jet propellant-4 [JP-4], Jet A) along with gasoline and diesel fuels and other chemicals (*i.e.*, multiple co-exposures).  In addition, inadequate exposure information was provided and the actual amount of jet fuel exposure was unknown (ATSDR, 2017).  In other cases, it was assumed that the primary exposure was to jet fuel (*e.g.*, JP-8), but exposure was estimated by either total hydrocarbon concentrations or through the use of surrogate chemicals (*e.g.*, naphthalene, benzene) (ATSDR, 2017), which are discussed separately in the sections below.  No reliable NOAELs and LOAELs could be derived from these studies.  No studies were located regarding human exposure to jet fuel through either oral or dermal exposure pathways (ATSDR, 2017).

70.     Although **Exhibit D**, Trial Exhibit DX-3130, includes the animal studies for non-cancer effects of JP-5, no animal studies were located that evaluated associations between inhalation or ingestion exposure to JP-5 and cancer

(ATSDR, 2017).  Studies of dermal application of JP-5 in mice have not produced reliable evidence of cancer.  In the NTP (1986) study, malignant lymphomas were increased in female mice that received chronic dermal exposure to 250 mg/kg JP-5, but not in the higher dose group of 500 mg/kg-day, indicating a lack of a dose-response relationship.  In male mice, there was an inverse relationship between dose and malignant lymphomas, with lower rates of disease in the exposed animals than in the controls.  No skin cancer was observed in any of the dose groups (NTP, 1986). US EPA has not classified jet fuels, including JP-5 or JP-8, as to their carcinogenicity.

**B. Total Petroleum Hydrocarbons (TPH)**

71. TPH is a term that encompasses the mixture of hydrocarbon chemicals found in crude oil and in products that come from crude oil, such as fuel oil, gasoline, kerosene, *etc*.  There are many sources of exposure to TPH, including gasoline fumes, spilled oil on pavement, chemical products, and some pesticides (ATSDR, 1999).

72. Because this group contains so many different hydrocarbons, they are typically measured as (and discussed in terms of) a total, or fractions of the total divided by carbon chain length and chemical properties (aromatic *vs.* aliphatic) (ATSDR, 1999

73.    According to (ATSDR, 2017), most of the TPH in generic JP-5 fuel is
comprised of C9-C16 aliphatics; C5-C8 aliphatics and aromatics make up a
smaller percentage (≤25%).

    a.    The C5-C8 aliphatics include *n*-pentane, *n*-hexane, *n*-heptane, *n*-
octane, the dimethylbutanes and methylpentanes, cyclopentane,
some branched chain alkanes including the trimethylpentanes, and
cycloalkanes, including cyclohexane, methylcyclopentane, and
methylcyclohexane, and some alkenes (ATSDR, 1999). **Exhibit E**,
Trial Exhibit DX-3131, contains a true and accurate copy of my
summaries of the available literature on exposures to C5-C8
aliphatics.

    b.    The C9-C16 aliphatics fraction of TPH includes *n*-nonane, *n*-
decane, various branched-chain C9-C16 compounds, a number of
substituted cycloalkanes and alkenes, *n*-undecane, *n*-dodecane,
pentylcyclopentane, and *n*-tri-, tetra-, penta-, and hexadecane
(ATSDR, 1999). **Exhibit E**, Trial Exhibit DX-3131, contains a
true and accurate copy of my summaries the available literature on
exposures to C9-C16 aliphatics.

    c.  The C5-C9 aromatics fraction includes benzene, toluene, ethylbenzene, and xylenes; these chemicals are discussed in the sections below.

74.   The >C9-C16 aromatics fraction includes cumene (isopropylbenzene), *n*-propylbenzene, the methyl-ethylbenzenes, some trimethylbenzene isomers, branched-chain butylbenzenes, *n*-butyl and *n*-pentylbenzene, various multi-substituted alkylbenzenes, indan, methylindans, naphthalene, longer-chain and multi-substituted alkyl benzenes, biphenyls, the mono- and dimethylnaphthalenes, and some polycyclic aromatic hydrocarbons. **Exhibit E,** Trial Exhibit DX-3131, contains a true and accurate copy of my summaries of the available literature on exposures to the >C9-C16 fraction.

75.   The >C16-C35 aromatics fraction includes anthracene; fluorene; phenanthrene; pyrene; benz(a)anthracene; benzo(b)-, benzo(j)-, and benzo(k)fluoranthene; benzo(g,h,i)perylene; benzo(a)- and benzo(e)pyrene; chrysene; dibenz(a,h)anthracene; fluoranthene; indeno(1,2,3-c,d)pyrene; and substituted fluorenes, anthracenes, and phenanthrenes (ATSDR, 1999).

**Exhibit E**, Trial Exhibit DX-3131, contains a true and accurate copy of my summaries of the available literature on exposures to the >C16-C35 fraction.

### C. Benzene

76.   Benzene is a colorless liquid at room temperature, with high volatility

(ATSDR, 2007; NTP, 1986; IARC, 2018).  It occurs naturally in the

environment as emissions from volcanoes and forest fires, and in crude oil.

77.   Aside from natural occurrences, people may be exposed to benzene in

tobacco smoke, automobile service stations, exhaust from motor vehicles,

and industrial emissions (ATSDR, 2007). The largest source of benzene in

the environment is automobile exhaust (WHO, 2010).

78.   Studies of effects in experimental animals exposed to benzene have been

conducted with inhalation, oral, and dermal exposure routes.  Epidemiology

studies of humans exposed to benzene are limited to inhalation and oral

exposures.  **Exhibit F**, Trial Exhibit DX-3132, is a true and accurate copy of

my tabulation of the most reliable studies of benzene with the lowest

LOAELs, or the highest NOAELs that do not exceed the lowest LOAELs,

for each of the target organs or systems that are relevant to the Plaintiffs'

health claims.

79.   Benzene is classified as a "human carcinogen" by US EPA (2017), "known

to be a human carcinogen" by NTP (2021), "carcinogenic to humans" by the

International Agency for Research on Cancer (IARC, 2018) and a

"confirmed human carcinogen" by the American Conference of

Governmental Industrial Hygienists (ACGIH, 2001).  These classifications are all based on benzene's association with acute myeloid leukemia (AML) at sufficiently high exposures in occupational studies.  **Exhibit G**, Trial Exhibit DX-3133, is a true and accurate copy of my summary of studies that evaluated benzene carcinogenicity.

### D. Toluene

80.  Toluene is used in many industries (*e.g.*, paint, cosmetic, rubber, petroleum) and is present in a variety of household products.  Sources of inhalation exposure in the general public include vehicle exhaust and tobacco smoke (ATSDR, 2017).

81.  Studies of effects in experimental animals exposed to toluene have been conducted with inhalation, oral, and dermal exposure routes.  Epidemiology studies of humans exposed to toluene are limited to inhalation exposures. **Exhibit H**, Trial Exhibit DX-3134, is a true and accurate copy of my tabulation of the most reliable studies of toluene with the lowest LOAELs, or the highest NOAELs that do not exceed the lowest LOAELs, for each of the target organs or systems that are relevant to the Plaintiffs' health claims.

82.  US EPA (2005) classified toluene as having "inadequate information to assess the carcinogenic potential."  It has been classified as having "no evidence of carcinogenic activity" by NTP (1990), as "not classifiable as to

its carcinogenicity to humans" by IARC (1999), and as "not classifiable as a human carcinogen" by ACGIH (2020).

### E. Ethylbenzene

83.    The main use of ethylbenzene is in the production of styrene.  It is also a component of gasoline for automobiles, boats, or aircrafts, and is used in paints, varnishes, and solvents (ATSDR, 2010).

84.    Trace exposures can come from internal combustion engine exhaust, food, soil, water, and tobacco smoke.  In general, environmental exposures to ethylbenzene are well below levels associated with toxic effects in animals and humans (ATSDR, 2010).

85.    Studies of effects in experimental animals exposed to ethylbenzene have been conducted with inhalation, oral, and dermal exposure routes.  **Exhibit I**, Trial Exhibit DX-3135, is a true and accurate copy of my tabulation of the most reliable studies of ethylbenzene with the lowest LOAELs, or the highest NOAELs that do not exceed the lowest LOAELs, for each of the target organs or systems that are relevant to the Plaintiffs' health claims, as well as those studies regarding exposure to ethylbenzene and cancer.

86.    ATSDR (2010) did not identify any reliable studies of human exposure to ethylbenzene.

87.   The classification of ethylbenzene for carcinogenicity varies among agencies.  According to US EPA (1991), it is "not classifiable as to human carcinogenicity."  It has also not been classified as a carcinogen by NTP (2021), but has been classified as "possibly carcinogenic to humans" by IARC (1999) and as a "confirmed animal carcinogen with unknown relevance to humans" by ACGIH (2014).

**F. Xylene**

88.   Xylenes exist in three isomeric forms:  meta-xylene, ortho-xylene, and para-xylene (m-, o-, and p-xylene).  If an isomer is not specified in this declaration, I am referring to mixed xylene isomers.

89.   Xylenes, commonly used as industrial solvents, are components of paints, coatings, and adhesive removers (ATSDR, 2007).  They are also present in gasoline (ATSDR, 2007), and the main sources of exposure to xylenes are industrial emissions and automobile exhaust (ATSDR, 2007).  People can also be exposed to xylenes from cigarette smoke (ATSDR, 2007).  In addition, xylenes are naturally present in plants and are also formed in forest fires (IARC, 1999).

90.   **<u>Exhibit J</u>**, Trial Exhibit DX-3136, is a true and accurate copy of my tabulation of the most reliable studies (*i.e.*, those that include reliable exposure measurements and treatment-related outcomes) of xylene with the

lowest LOAELs, or the highest NOAELs that do not exceed the lowest

LOAELs, for each of the target organs or systems that are relevant to the

Plaintiffs' health claims.

91.   Xylene has been classified as having "no evidence of carcinogenicity" by

NTP (1986), and "not classifiable" as to human carcinogenicity (*i.e.*,

insufficient evidence of carcinogenicity) by IARC (1999) and ACGIH

(2014).

**G. Naphthalene**

92.   The major industrial use of naphthalene is in production of polyvinyl

chloride plastics.  It is also used in the production of dyes, resins, leather

tanning agents, the insecticide carbaryl, and as a moth repellent (mothballs

or crystals) and toilet deodorant.  Naphthalene occurs naturally in fossil

fuels, and is produced from burning wood or tobacco (ATSDR,).

93.   1-Methylnaphthalene and 2-methylnaphthalene are used in dye and resin

production, and are present in cigarette smoke, wood smoke, tar, and asphalt

(ATSDR, 2005).

94.   **Exhibit K**, Trial Exhibit DX-3137, is a true and accurate copy of my

tabulation of the most reliable studies of naphthalene with the lowest

LOAELs, or the highest NOAELs that do not exceed the lowest LOAELs,

for each of the target organs or systems that are relevant to the Plaintiffs' health claims.

95.   Epidemiology studies of humans exposed to naphthalene are limited to case studies of acute exposures and one occupational study involving inhalation, dermal, and ocular exposure.  In most cases, the amount of exposure was unknown.  No reliable NOAELs and LOAELs could be derived from these studies.

96.   Naphthalene's carcinogenicity has been classified as "cannot be determined" by US EPA (1998), "reasonably anticipated to be a human carcinogen" by NTP (2011), Group 2B (possibly carcinogenic to humans) by IARC (2002), and A3 (confirmed animal carcinogen with unknown relevance to humans) by ACGIH (2014).

97.   **Exhibit L**, Trial Exhibit DX-3138, is a true and accurate copy of my summary of studies regarding exposure to naphthalene and cancer.

**H. DGME**

98.   DGME, also called 2-(2-methoxyethoxy)ethanol, is a de-icing additive and antimicrobial agent used in liquid hydrocarbon fuels such as jet fuels and diesel fuel.  It is also used as a solvent in paints, printing inks, nitrocellulose resins, waxes, and dyes, and as an inert ingredient in pesticides (US EPA, 2015).

99.   Studies of effects in experimental animals exposed to DGME have been
      conducted with inhalation, oral, and dermal exposure routes.  **<u>Exhibit M</u>**,
      Trial Exhibit DX-3139, is a true and accurate copy of my tabulation of the
      most reliable studies of DGME with the lowest LOAELs, or the highest
      NOAELs that do not exceed the lowest LOAELs, for each of the target
      organs or systems that are relevant to the Plaintiffs' health claims.

100.  Epidemiology studies of humans exposed to DGME are limited to one case
      study of suspected but not confirmed *in utero* exposure.  However, no
      exposure levels were determined in this study.  In addition, no occupational
      or other studies involving inhalation, dermal, or oral exposure in humans are
      available.  Therefore, no reliable human NOAELs or LOAELs could be
      determined for DGME.

101.  No data are available regarding the carcinogenic effects of DGME in
      humans or animals, and DGME has not been classified as a carcinogen or a
      potential carcinogen by US EPA (2015), NTP (2021), IARC (2020), or
      ACGIH (2023).

**I.   Health Effects Associated with Odors**

102.  As discussed above, several of the Plaintiffs claimed that they could smell
      the odor of jet fuel from their drinking water.  While many chemicals have
      detectable odors that indicate their presence in air, the detection of an odor

does not indicate the level of exposure to the odorous chemical. The levels at which odors are detected differ from the levels at which odorous chemicals may induce toxicity, such as irritant effects.

103.  The nasal cavity detects airborne chemicals by two physiological mechanisms – olfaction (*i.e.*, the sense of smell or act of smelling), and irritation (*i.e.*, chemical sensation), which are mediated by the olfactory and trigeminal nerves, respectively (Shusterman, 1992; Smeets and Dalton, 2005; Greenberg *et al.*, 2013; Bruning *et al.*, 2014).

    a.  An odor threshold refers to the theoretical minimum concentration of an odorous substance necessary for its detection through olfaction by some percentage of the population (usually 50%) (US EPA, 1992).

    b.  By contrast, an irritation threshold is defined as the level of exposure to a substance where annoying sensory effects begin, such as burning and tingling of the eyes, throat, and nasal passages (Smeets and Dalton, 2005), regardless of whether an odor is detected from the exposure.

104.  Several thorough compilations of odor and irritation or toxicity thresholds for airborne chemicals reported no fixed relationship between odor detectability and irritation or toxicity (Amoore and Hautala, 1983; Ruth, 1986; Cometto-Muñiz and Abraham, 2016).

105.   Toxicity thresholds for many odorous chemicals are much higher than their odor thresholds, indicating that the potential toxicity of a chemical is not associated with its odorant properties.

a.   For example, the toxicity threshold of JP-5 jet fuel (as represented by the POD of 150 mg/m$^3$) is approximately 20- to 200-fold higher than its reported odor threshold range of 0.082-1 ppm (0.68-8.3 mg/m$^3$) (ATSDR, 2017).

b.   In addition, the World Health Organization's "Guidelines for Drinking-water Quality" state that "a number of the most soluble aromatic hydrocarbons will be detectable by taste or odour at concentrations below those concentrations of concern for health, particularly for short-term exposure" (WHO, 2022).

106.   Although the presence of odor alone does not necessarily produce irritation or other toxicological effects, some individuals may respond to the presence of an odor with symptoms similar to chemical irritation, even at exposures below the odorous chemical's irritation threshold.  Symptoms that are commonly reported in response to unpleasant odors include headaches, nausea, lightheadedness, sleep disorders, and irritation of the eyes, nose, throat, and skin (Neutra *et al*., 1991; Shusterman, 1992).  Because most odorous chemicals typically have odor thresholds far lower than their

irritation or toxicity thresholds, these symptoms are likely the result of non-toxicological mechanisms rather than actual toxic effects (Bulsing *et al*., 2009; Dalton, 1996, 2003; Devriese *et al*., 2004; Neutra *et al*., 1991; Schiffman and Williams, 2005; Shusterman *et al*., 1991; Shusterman, 1992, 2001; Smeets and Dalton, 2005; Vrijheid, 2000).

107.  Non-toxicological mechanisms differ from toxicological mechanisms in several ways, including the lack of a dose-response relationship, the occurrence of symptoms at exposures below toxicological thresholds (most often those for irritation), and the dependence upon odor perception.

    a.  With regard to odor perception, reports of health symptoms in response to environmental odors were higher in those who perceived unpleasant odors than those who did not (Bulsing *et al*., 2009; Dalton, 1996, 2003; Neutra *et al*., 1991; Schiffman and Williams, 2005; Shusterman *et al*., 1991; Shusterman, 1992, 2001, 2002; Wolkoff and Nielsen, 2017).  Bulsing *et al*. (2010) found that the expectation of an adverse effect, such as irritation, from an odorous substance altered the perception of the odor, and this expectation was influenced by the unpleasantness of the odor.

    b.  Other studies have shown that cognitive factors, such as an expectation of perceived health risk, can influence individual

responses to odors (Dalton, 1996; Andersson *et al*., 2013; Wolkoff and Nielsen, 2017).

c. By contrast, for a true toxicological mechanism, any health effects depend on the exposure concentration of the chemical regardless of the perception of its odor.

108. Health symptoms occurring at exposures below irritation or toxicity thresholds may involve responses triggered by the odor (Neutra *et al*., 1991; Shusterman, 1992). Detection of an unknown odor, particularly if it is considered unpleasant, can produce observable physiological changes mediated through the autonomic nervous system (Smeets and Dalton, 2005; Piccardo *et al*., 2021). Thus, the mere thought of an odor (or the sense of alarm from an odor) can cause physical effects, but it is not the source of the odor itself (*e.g*., the odorous chemical) causing the effects. Such effects can include increased heart rate, more forceful contractions or heart "pounding," sweating, nausea, headache, dizziness, anxiety, and panic (Shusterman, 1992; Dalton, 2002; Smeets and Dalton, 2005). These effects stop once the odor ceases to be detected and they are not a result of any tissue damage or other toxicity.

109. Overall, the scientific literature demonstrates that the detection of odor itself is not an indicator of chemical dose or toxicity. Many odorous substances

have odor thresholds that are far lower than levels that are of concern for irritation or other adverse health effects (Amoore and Hautala, 1983; Ruth, 1986; Piccardo *et al.*, 2021). Physical symptoms can occur in certain individuals in response to an odorous chemical at exposure concentrations lower than the toxicity threshold, however, but these symptoms are a result of stress-induced responses to perceptions of the odor as a health risk (*i.e.*, a non-toxicological mechanism). These symptoms are not the result of a chemical-induced toxicological mechanism; as such, they do not indicate that the odorous chemical itself caused a toxic effect.

VI.  **Specific Causation**

110. Using the modeled data from Drs. Grayman and Burgoon on the concentrations of JP-5 fuel constituents in drinking water and indoor air at Plaintiffs' residences, as well as conservative assumptions, I estimated daily intakes of these constituents for each Plaintiff. I then compared the daily intakes to PODs used to set agency criteria to evaluate whether the Plaintiffs' alleged health effects may be expected from potential exposures to JP-5 fuel constituents in the drinking water at their residences. **Exhibit N**, Trial Exhibit DX-3140, is a true and accurate copy of the detailed spreadsheets of my exposure and risk calculations from these analyses. I

also compared the Plaintiffs' exposures to health effect levels reported in the literature.

## A. Plaintiffs' Exposure Assessments

111. Dr. Walter Grayman modeled the water concentrations of the following JP-5 fuel constituents at the six Plaintiff residences from November 24, 2021, to December 6, 2021: total petroleum hydrocarbons in the diesel range (TPH-d), benzene, toluene, ethylbenzene, xylene, and naphthalene (Grayman, 2023Grayman, 2023b).

    a. Dr. Grayman provided only one set of modeled concentrations for benzene, toluene, ethylbenzene, xylene, and naphthalene.

    b. For the modeling of TPH-d, Dr. Grayman provided model outputs using four assumptions for the maximum concentration of TPH-d in the water supply well: 2 mg/L, 6 mg/L, 17 mg/L, and 85.25 mg/L. For my analysis, I used 2 mg/L, 17 mg/L, and 85.25 mg/L, even though Dr. Grayman opined that the 2 mg/L scenario was the better representation of the average concentration of the impacted water that entered the water system.

112. For analysis of indoor air exposures at the Plaintiffs' residences, Dr. Lyle Burgoon modeled indoor air concentrations of the JP-5 fuel constituents for each Plaintiff based on Dr. Grayman's modeled water concentrations,

considering potential volatilization of the constituents from household uses of water (Burgoon, 2023a, Burgoon 2023b).

113.   Drs. Grayman's and Burgoon's modeling results were provided to me, and I used these results as estimates of concentrations of the JP-5 fuel constituents at the Plaintiffs' residences in my analysis.  I assume that the modeling was conducted using appropriate and valid methods.

114.   I quantified exposures by using drinking water and indoor air concentrations from use of drinking water expressed as exposure point concentrations (EPCs) to calculate potential daily intakes for the Plaintiffs (as generic adults, adolescents, or children) who ingested or otherwise used impacted drinking water at each residence.

### *1.  Water Exposure Point Concentrations for Plaintiffs' Residences*

115.   In water, the EPC calculations for TPH fractions, 1-methylnaphthalene, 2-methylnaphthalene, and DGME are based on Dr. Grayman's modeling of TPH-d starting with maximum well concentrations of 85.25 mg/L, 17 mg/L or 2 mg/L TPH-d and the percentage makeup of these constituents in JP-5.  I identified this makeup by calculating the percentages of these chemicals from the concentration data indicated in Table 2 (column of dissolved contaminants + JP-5 sheen) of the exposure assessment for the JP-5 release into the Red Hill drinking water well conducted by HIDOH (2023),

assuming that the percentage makeup of each chemical would stay the same regardless of the overall TPH-d concentration.

116.   The EPCs for benzene, toluene, ethylbenzene, xylenes, and naphthalene in water are based on Dr. Grayman's modeling of these constituents.  I calculated EPCs both as the average of the daily averages of JP-5 constituent concentrations over 11 days of exposure (beginning on the first day that the chemical was identified as being present in the water from the modeling, which was either November 25 or November 26, 2021), to indicate subchronic exposure, as well as the maximum daily average among those 11 days to indicate acute exposure.

117.   The results of Dr. Grayman's modeling indicate that the drinking water at the Feindt residence did not contain a measurable amount of JP-5 fuel constituents.  To be conservative, however, I assumed for my analysis that the Feindt residence did have impacted drinking water from the JP-5 fuel release, and I used the lowest EPCs for each JP-5 constituent among the other Plaintiffs' residences to represent the EPCs at the Feindt residence. The water EPCs are presented in the exhibits listed in **Exhibit N**, Trial Exhibit DX-3140.

### 2. *Indoor Air Exposure Point Concentrations for Plaintiffs' Residences*

118.  I relied on the indoor air concentrations modeled by Dr. Burgoon for each

Plaintiff.  I used the average concentration over 11 days (from November 26,

2021, to December 6, 2021) for the subchronic evaluation, and the highest

one-day concentration among those 11 days for the acute evaluation.

   a.  It is my understanding that Dr. Burgoon modeled 24-hour average

   indoor air concentrations, accounting for water use for

   handwashing, cooking, dishwashing, laundering, and showering.

   b.  Dr. Burgoon modeled air concentrations for the following

   compounds; benzene, toluene, ethylbenzene, xylene, naphthalene,

   1- and 2-methylnaphthalene, DGME, and TPH-d for maximum

   well concentrations of 2 mg/L, 6 mg/L 17 mg/L, 85.25 mg/L,

   though I only used the concentrations associated with the

   maximum well concentrations of 2, 17 mg/L, and 85.25 mg/L in

   my analysis, in order to match my analysis exposures in water.  I

   used the TPH-d concentrations to calculate the air concentrations

   for three TPH fractions (as discussed in the next paragraph).

   c.  The air concentrations for DGME were considered to be zero for

   all Plaintiffs because Dr. Burgoon indicated that this compound is

   unlikely to volatilize (Burgoon, 2023).

  d. The air concentrations for all compounds at the Feindt residence were also considered to be zero, based on the lack of a measurable amount of JP-5 in the water at this residence (as noted in Section 5.1.1); therefore, I conservatively used the lowest concentration from the other Plaintiffs to represent concentrations at the Feindt residence.  The air EPCs are presented in the exhibits listed in **Exhibit N**, Trial Exhibit DX-3140.

119. To partition the air concentrations of TPH-d into fractions for my MOE analysis, I used the percentage makeup for each fraction from the average of Day 0 and Day 20 in Table 4 (HIDOH, 2023)[4]; this included C5-C8 aliphatics (18%), C9-C18 aliphatics (77%), and C9-C12+ aromatics (3.7%). I assigned the 3.7% solely to the C9-C10 Aromatics fraction, because the other aromatic fraction included in my analysis (C10-C32 aromatics) has a very low Henry's law coefficient ($4.6 \times 10^{-7}$ atm-m$^3$/mol, *vs* $6.4 \times 10^{-3}$ atm-m$^3$/mol for the C9-C10 aromatics), indicating low potential for volatility, and the US EPA RSL table does not list the "Aromatic High" fraction (C10-C32 aromatics) as being volatile (US EPA, 2023).  Therefore, I assumed that the C10-C32 aromatic concentrations in air were zero in my analysis.

---

[4] Table 4 in Attachment 4 of the HIDOH (2023) exposure assessment presents the results of water-fuel headspace experiments to determine the relative carbon range makeup of vapors emitted from JP-5 fuel.

### 3. Exposure Equations and Assumptions

120.   I estimated exposures to JP-5 fuel constituents for each Plaintiff using

equations and assumptions based on US EPA exposure assessment

methodology and guidelines.  As these methods and guidelines make clear,

one's exposure is not simply the concentration of the chemical in the water

or air, but is a function of the frequency and duration of exposure, as well as

other factors and assumptions as presented below. When available, I used

Plaintiff-specific exposure assumptions; otherwise, I used values

recommended by US EPA for estimating chemical exposures in the general

population. **<u>Exhibit O</u>**, Trial Exhibit DX-3141, contains a true and accurate

summary of the exposure assumptions used in my analysis and their bases.

### a. Ingestion Exposure Intake

121.   I used the following equation to calculate daily intake from ingestion of

drinking water for each Plaintiff:

$$Intake = \frac{EPC_{DW} \ \times IR_{DW} \ \times EF \ \times ED}{BW \ \times AT}$$

where:

| | | |
|---|---|---|
| $EPC_{DW}$ | = | Exposure Point Concentration in Drinking Water (mg/L) |
| $IR_{DW}$ | = | Drinking Water Ingestion Rate (L/day) |
| EF | = | Exposure Frequency (days/year) |
| ED | = | Exposure Duration (years) |
| BW | = | Body Weight (kg) |
| AT | = | Averaging Time (days) |

Of these, the water concentration is one variable—*i.e.*, $EPC_{DW}$.

122. Although some Plaintiffs estimated the amount of drinking water they ingested each day in their depositions, I conservatively used US EPA's recommended residential ingestion water rates for adults, adolescents, and children, which are high-end estimates of water ingested directly, as well as water added in the preparation of food or beverages, and are the same ingestion rates that US EPA uses to develop its RSLs to represent reasonable maximum exposure (RME) conditions (US EPA, 2022c, 2011b, 2014b).

123. I used an exposure frequency of 11 days per year for the subchronic analysis and 1 day per year for the acute analysis.

124. To streamline the analysis, I evaluated exposures for three age groups: adult, adolescent (age 11-16 years), and child (age 0-6 years). I assigned each Plaintiff to one of these three age groups based on their age at the end

of November, 2021.[5] I assumed body weights of 15, 56.8, and 80 kg for child, adolescent, and adult residents, respectively, which are the weighted mean values for children < 6 years old, adolescents 11-16 years old, and adults 21-78 years old (US EPA, 2011b, 2014b).

125. For the averaging time, I used the total exposure duration of 11 days to characterize subchronic exposures for non-cancer endpoints, 1 day to characterize acute exposures for non-cancer endpoints, and 25,550 days (equivalent to a 70-year lifetime) as recommended by US EPA (2014b) for cancer endpoints.

### b. *Dermal Exposure Intake*

126. I used the following equation to calculate dermal exposure to contaminants in water while showering or bathing. The dermal absorbed dose (DAD) was calculated according to the recommended equations in US EPA's Supplemental Guidance for Dermal Risk Assessment (US EPA, 2004a).

$$DAD \left(\frac{mg}{kg \cdot day}\right) = \frac{DA_{event}\left(\frac{mg}{cm^2 \cdot event}\right) \times SA\,(cm^2) \times EV\left(\frac{events}{day}\right) \times EF\left(\frac{days}{year}\right) \times ED\,(years)}{BW\,(kg) \times AT\,(days)}$$

Where:

DAD =    Dermal Absorbed Dose (mg/kg-day)

---

[5] Plaintiff K.F. was 8.5 years old in November, 2021, and does not fall within the adolescent (11-16 years) or child (0-6 years) age range; to be conservative, I assigned him to the child age group for my analysis.

$DA_{event}$ = Absorbed Dose per Event (mg/cm$^2$-event)
EV = Event Frequency (events/day)
SA = Skin Surface Area Exposed (cm$^2$)
EF = Exposure Frequency (exposure events/year)
ED = Exposure Duration (years)
BW = Body Weight (kg)
AT = Averaging Time (days)

Of these, the water concentration is part of one variable—*i.e.*, $DA_{event}$.

127. The absorbed dose per event ($DA_{event}$) from dermal contact with water was calculated using standard US EPA equations (US EPA, 2004a).

   a. For organics in water, US EPA uses a mathematical model to predict absorption from exposures to water.  Compounds for which there are sufficient data to predict dermal absorption with acceptable confidence are said to be within the model's "effective predictive domain" (EPD).

   b. There is significant uncertainty associated with the evaluation of dermal absorption for highly lipophilic chemicals (such as petroleum hydrocarbons) that fall outside the EPD.

   c. In this case, two of the constituents (C9-C18 aliphatics and C10-C32 aromatics) fell outside of the EPD.  US EPA provides guidance on the quantification of dermal risk from chemicals in water that fall outside the EPD (US EPA, 2004a).  Therefore, although there is low confidence in the dermal permeability coefficient values for chemicals

61

outside the EPD (*i.e.*, in the prediction of their dermal absorption into the body), I was still able to use US EPA guidance to calculate dermal exposure for these two constituents.

128. There are no input parameters available for TPH-d as a whole. As a conservative, worst-case scenario, I assumed that the TPH-d is comprised solely of C9-C18 aliphatics, because this fraction had the highest dermal absorption, even though this fraction is outside the EPD and, thus, the estimate of dermal absorption is highly uncertain.

129. Residents could be dermally exposed to water while showering/bathing. I relied upon US EPA standard methods to quantify this exposure. Specifically:

    a. Although some Plaintiffs estimated the amount of time they spent showering/bathing in their depositions, to streamline the analysis, I used US EPA's recommended event duration of 0.54 hour/event and 0.71 hour/event for the child and adult, respectively, based on the 90th percentile time spent bathing/showering (US EPA, 2014b).

    b. For the adolescent, the amount of time spent showering was 0.67 hour/event, which is the recommended default value for adolescents ages 11-16 (U.S. EPA 2011, Table 16-1).

    c.  The skin surface area exposed to water while bathing or showering

was 2,372 cm² for a child, based on the 95th percentile for surface

area of children 0-6 years (US EPA, 2014); 3,527 cm² for an

adolescent, based on the 95th percentile for surface area of

adolescents 11-16 years (US EPA, 2011); and 6,032 cm² for an adult

based on the 95th percentile for surface area of adults 21 years and

older, assuming whole body exposure (US EPA, 2014).

*c.  Inhalation Exposure Concentrations*

130. Organic compounds such as petroleum hydrocarbons can volatilize from

water into indoor air from household uses of water.  I relied on the indoor air

concentrations modeled by Dr. Burgoon that accounted for these household

uses, as described above.

131. For inhalation of volatiles from water, the exposure concentration was

calculated as:

$$EC \left(\frac{mg}{m^3}\right) = \frac{C_{air} \left(\frac{mg}{m^3}\right) \times ET \left(\frac{hours}{day}\right) \times EF \left(\frac{days}{year}\right) \times ED \ (yr) \times \frac{1 day}{24 hours}}{AT \ (days)}$$

where:

| | | |
|---|---|---|
| EC | = | Exposure Concentration (mg/m³) |
| $C_{air}$ | = | Exposure Point Concentration of Chemical in Air (mg/m³) |
| ET | = | Exposure Time (hours/day) |
| EF | = | Exposure Frequency (days/year) |
| ED | = | Exposure Duration (years) |

AT    =    Averaging Time (days)

Of these, the air concentration is one variable—*i.e.*, $C_{air}$.

132.  As a conservative assumption, I assumed the Plaintiffs were exposed to indoor air 24 hours/day.

### 4.  Summary of Daily Intakes and Exposure Concentrations

133.  **Exhibits P-U**, Trial Exhibits DX- 3142 to DX-3147, contain true and accurate copies of my calculated estimates of the daily intakes of each chemical of concern for ingestion and dermal exposure, as well as the exposure concentrations of each chemical of concern for inhalation exposure, for each Plaintiff.

134.  **Exhibit V**, Trial Exhibit DX-3148, contains a true and accurate copy of my summaries of the daily intakes (for ingestion and dermal exposure combined) and exposure concentrations for each Plaintiff that were used in the MOE analysis (*i.e.*, for the chemicals with available POD values).

### B. Comparison of Exposures to PODs Used to Set Agency Toxicity Values

135.  I performed an MOE analysis that compares the estimated exposure levels for the JP-5 fuel constituents to health effect levels used as the basis for agency criteria. This comparison helps with the interpretation of the toxicological significance of potential exposures at the Plaintiffs' residences and whether any health effects might be expected from such exposures.

136. The MOE is the ratio of the POD to the calculated intake, where the POD and intake are in units of mg/kg-day for oral and dermal exposures and mg/m³ for inhalation exposures:

$$MOE = \frac{POD}{Intake}$$

137. The MOE is an indication of the magnitude by which the POD for the health effect exceeds the estimated exposure for an individual; thus, an MOE greater than 1 indicates that the exposure estimate is lower than the health effect level, and the higher the MOE, the less likely it is that the chemical poses a health risk.

138. For this MOE analysis, I compared the intakes calculated per Section VI.A above to PODs selected by US EPA and ATSDR, as described below.

    a. The PODs used for the MOE analysis correspond to health effect levels, which are either the NOAELs, LOAELs, or BMDLs for the critical effects in the studies selected as the bases of the regulatory values.

    b. For comparison of human exposures to PODs from experimental animal studies, the PODs are often converted to human equivalent doses (HEDs) or human equivalent concentrations (HECs) to account for differences in half-lives of the chemicals (*i.e.*, how long they stay in the body) between animals and humans.

### *1. Guideline Toxicity Values and Points of Departure*

139. **Exhibit W**, Trial Exhibit DX-3149, contains a true and accurate copy of my listing of the guideline values and PODs that US EPA and ATSDR have used to derive acceptable exposure limits for chemicals that are the main constituents of JP-5 fuel, as well as guideline values from other agencies.

   a. I use the non-cancer PODs identified by US EPA from studies with subchronic exposures, as well as PODs identified by US EPA from cancer studies of the chemicals that are considered by US EPA to be human carcinogens, in my MOE analysis of non-cancer and cancer effects.

   b. If such PODs are not available from US EPA for any of the JP-5 constituents, I use intermediate (*i.e.*, subchronic) PODs for non-cancer effects identified by ATSDR.

   c. I also use acute PODs identified by ATSDR in the MOE analysis of non-cancer effects.

140. For cancer risk from ingestion, US EPA (2022) chose benzo(a)pyrene as the indicator chemical for the provisional oral slope factor of 1 $(mg/kg\text{-}day)^{-1}$ for C10-C32 aromatics. This value is based on increased alimentary tract tumors in mice (Beland and Culp, 1998, as cited by US EPA, 2017). The POD for this value is the $BMDL_{10}$ of 0.071 mg/kg-day. For inhalation

cancer risk, US EPA (2022) chose benzo(a)pyrene as the indicator chemical for the provisional inhalation unit risk of 0.6 $(mg/m^3)^{-1}$ for C10-C32 aromatics. This value is based on increased incidence of tumors in the upper respiratory and upper digestive tracts in hamsters chronically exposed to benzo(a)pyrene by inhalation (Thyssen *et al.*, 1981). The POD for this value is the $BMCL_{10}$ of 0.16 $mg/m^3$.

a. The use of benzo(a) pyrene as an indicator chemical for the C10-C32 aromatic fraction of JP-5 fuel is overly conservative, as it assumes that the entire fraction consists of benzo(a)pyrene and is as toxic as benzo(a)pyrene. The C10-C32 aromatic fraction of petroleum hydrocarbons is a mixture of multiple C10-C32 aromatic hydrocarbons rather than consisting of only benzo(a)pyrene.

b. According to the Hawaii Department of Health, benzo(a)pyrene is not a constituent that is targeted as a chemical of concern for risk assessment of JP-5 fuel (such as benzene, toluene, and other constituents evaluated in this report) (HIDOH, 2023).

c. Because benzo(a)pyrene is not representative of the C10-C32 aromatic fraction of JP-5 fuel and is not a targeted chemical of concern in assessing risks of JP-5 fuel, I use the US EPA (2022)

PODs for this fraction in my MOE analysis with caution, and only for completeness.

141. **Exhibit X**, Trial Exhibit DX-3150, contains a true and accurate copy of the PODs from subchronic and cancer studies that I used in my MOE analysis.

**Exhibit Y**, Trial Exhibit DX-3151, contains a true and accurate copy of the PODs from acute studies that I used in my MOE analysis.

### 2. Margins of Exposure

142. **Exhibit Z**, Trial Exhibit DX-3152, is a true and accurate copy of the MOE results from my analysis as ranges of MOEs across all chemicals examined for each Plaintiff.

143. The minimum MOE in these tables excludes the results from the C10-C32 aromatics fraction and instead uses the PODs for JP-5 fuel itself (which evaluates all of the hydrocarbon fractions combined), because:

  a. The C10-C32 fraction uses a toxicity surrogate of benzo(a)pyrene to represent the entire fraction, and benzo(a)pyrene is not representative of this fraction in JP-5 fuel and it is not a chemical of concern in assessing risks of JP-5 fuel, as discussed above in Paragraph 140.

  b. In addition, benzo(a)pyrene ($C_{20}H_{12}$) is a C20 compound, and the C17-C21 aromatics fraction comprises only 0.23% of the total

TPH-d,[6] so any amount of benzo(a)pyrene in JP-5 fuel would be expected to be miniscule.

144.  The results of the MOE analysis for non-cancer effects demonstrate that, even when using the modeled drinking water concentrations from Dr. Grayman's highest average concentration of 85.25 mg/L, all of the MOEs are >1, with most being >100 and some up to the hundreds of millions for subchronic effects and tens of millions for acute effects. **Demonstrative AA** hereto presents an example MOE calculation and result for acute benzene non-cancer effects for one of the Bellwether Plaintiffs (Kevin Aubart) whose MOE falls at the low range of Plaintiffs for acute benzene non-cancer effects.  This example indicates that Mr. Aubart's estimated exposure to benzene by inhalation (using Dr. Grayman's highest average concentration of 85.25 mg/L for the maximum TPH-d concentration in the water supply well) is approximately 220,000-fold lower than the POD for acute benzene non-cancer effects. **Demonstrative AB** hereto presents all of the exposure and POD values used in the MOE analyses conducted for Mr. Aubart, and depicts the buffer (*i.e.*, margin) between his exposure and the higher levels at which toxicological effects may begin to be expected.  I selected Mr. Aubart for these demonstratives because he is the most representative of the

---

[6] Table 3a of Attachment 6 of the HIDOH (2023) exposure assessment.

Plaintiffs at the low end of the range of MOEs.  Mr. Aubart has the lowest
MOEs for the inhalation exposure route among all Plaintiffs and the lowest
MOEs for the ingestion and dermal exposure routes among all adult
Plaintiffs and most of the child Plaintiffs (though his MOEs are still within
the same order of magnitude as those of the few child Plaintiffs whose
MOEs are lower than his).

145.   The MOE analysis indicates that the Plaintiffs' estimated exposure intakes
from the JP-5 release are all well below (generally by at least 100-fold) the
exposure levels associated with non-cancer health effects in human and
experimental animal studies.  Based on these results, acute and subchronic
toxicological effects are not expected for the Plaintiffs based on their alleged
exposures to JP-5 fuel and its constituents.

146.   The results of the MOE analysis for cancer effects demonstrates that, even
when using the modeled drinking water concentrations from Dr. Grayman's
highest average concentration of 85.25 mg/L, all of the MOEs are >1, and in
fact all range from the tens of thousands to hundreds of millions.

   a.   This indicates that the Plaintiffs' estimated exposure intakes from
the JP-5 release are all well below (by more than 10,000-fold) the
exposure levels associated with cancer in human and experimental
animal studies.

    b.  Based on these results, the Plaintiffs were not exposed to any chemicals at levels high enough to increase the incidence of cancer.

147.  The exposure analysis that I conducted to calculate the estimated intakes for each Plaintiff for use in the MOE analysis is conservative and generally uses high-end assumptions intended to overestimate likely exposures. For example:

    a.  I analyzed water concentrations that were modeled assuming a maximum concentration of 85.25 mg/L in the water supply well as a highly conservative, worst-case scenario, even though these concentrations were based on a maximum concentration in the water supply well that Dr. Grayman believes greatly exaggerates the average concentration that entered the drinking water system (Grayman, 2023b).

    b.  I also used high-end assumptions for water ingestion rates to develop ingestion intakes, as well as for exposure time while bathing and skin surface area to develop dermal exposure intakes. These assumptions are default values recommended by US EPA for estimating high-end exposures and are based on the 90-95[th]

percentile values for water ingestion rates, bathing exposure time, and skin surface area in the general population.

c.  I used worst-case input parameters for assessing dermal absorption of TPH-d by assuming it was comprised of only C9-C18 aliphatic hydrocarbons, as this fraction has the highest dermal absorption.

d.  Dr. Burgoon indicated that his inhalation exposure analysis focused on a worst-case exposure scenario that used conservative assumptions intended to overestimate exposures when Plaintiff-specific information was not available (Burgoon, 2023).

e.  I assumed that all Plaintiffs were exposed to contaminated indoor air 24 hours per day, even when not inside the home or when the tap water was not being used.

148.  Another reason that my exposure analysis is conservative is because I assumed all Plaintiffs were exposed to the highest average daily EPC for the analysis of acute effects and that all were exposed for an 11-day duration (November 26, 2021, through December 6, 2021) for the analysis of subchronic effects.

a.  This is not the case, however, as most families indicated in their depositions that they stopped drinking the water (and often using

the water altogether) between November 28, 2021, and December 1, 2021.

   b. In fact, Sheena Jessup only drank bottled water instead of tap water even before the JP-5 release, so she would have limited exposure to the water by ingestion unless it was a small amount form use of the water for preparing food or other beverages.

   c. In addition, because the Feindt family had modeled exposure levels of zero for all JP-5 fuel constituents in their water and air (Grayman, 2023a, 2023b), my use of the lowest EPCs among the other families for the Feindt EPCs is highly conservative.

149. Even with the multiple conservatisms in my exposure analysis, resulting in overestimates of Plaintiff exposure intakes to JP-5 fuel and its constituents, all of the resulting MOEs are >1 (and most are >100), indicating that the Plaintiffs' estimated exposures were well below (generally by 2-8 orders of magnitude) exposure levels associated with non-cancer health effects and cancer in the literature, and that their exposures are not of toxicological concern.

## C. Comparison of Exposures to Health Effect Levels

150. However, some of the chemicals do not have PODs[7] available from US EPA or ATSDR agencies for subchronic exposure, acute exposure, or both.  This includes:

   a.  1-methylnaphthalene and 2-methylnaphthalene for acute and subchronic inhalation exposure;

   b.  JP-5 and naphthalene for acute inhalation exposure; and

   c.  benzene, ethylbenzene, and DGME for acute ingestion exposure.

151. Therefore, for these chemicals and exposures, I compared the Plaintiffs' intakes for these chemicals to the no observed adverse effect levels (NOAELs) or lowest observed adverse effect levels (LOAELs) listed in the tables provided in **Exhibits D, F, H, I, J, K, and M**, Trial Exhibits DX-3130, 3132, 3134 to 3137, and 3139.  These tables list the highest NOAELs (that do not exceed the lowest LOAELs) among studies of any exposure duration that have reliable exposure assessments and report treatment-related outcomes in humans or experimental animals for each of the target organs or systems that are relevant to the Plaintiffs' health claims.

152. Based on this comparison, I found:

---

[7] Exposure levels associated with health effects in the most sensitive human and/or experimental animal studies.

a. The lowest NOAELs for inhalation of 1-methylnaphthalene and 2-methylnaphthalene are 26 ppm (4.47 mg/m$^3$) and 39 ppm (6.7 mg/m$^3$), respectively, both for acute neurological effects in experimental animals (see **Exhibit K**, Trial Exhibit DX-3137). Plaintiff exposure concentrations for these two chemicals were estimated to be in the  $10^{-3}$ to $10^{-2}$ mg/m$^3$ range, indicating that Plaintiff exposures were 3-4 orders of magnitude lower (even with highly conservative assumptions) than the lowest exposure level reported to have no adverse effects in the literature.

b. The lowest NOAEL for naphthalene inhalation is 2 ppm (0.38 mg/m$^3$), based on acute respiratory effects in experimental animals (see **Exhibit K**, Trial Exhibit DX-3137).  Plaintiff exposure concentrations for naphthalene were estimated to be in the $10^{-6}$ to $10^{-4}$ mg/m$^3$ range, indicating that Plaintiff exposures were 5-7 orders of magnitude lower (even with highly conservative assumptions) than the lowest exposure level reported to have no adverse effects in the literature.

c. The lowest NOAEL for inhalation of JP-5 fuel is 45 mg/m$^3$, based on subchronic respiratory effects in experimental animals exposed to JP-8 fuel as a surrogate (see **Exhibit D**, Trial Exhibit DX-3130).

75

Exposure concentrations for JP-5 fuel were no higher than 7.2 mg/m$^3$ among all Plaintiffs, indicating that Plaintiff exposures were more than 6-fold lower (even with highly conservative assumptions) than the lowest exposure level reported to have no adverse effects in the literature.

d. The lowest LOAEL for ingestion of benzene is 0.29 mg/kg-day, based on hematological effects in humans with subchronic exposure to benzene (see **<u>Exhibit F</u>**, Trial Exhibit DX-3132). Plaintiff exposure intakes for benzene were estimated to be in the range of 10$^{-6}$ to 10$^{-5}$ mg/kg-day, indicating that Plaintiff exposures were 4-5 orders of magnitude lower (even with highly conservative assumptions) than the lowest exposure level reported to have adverse hematological effects in the literature.

e. The lowest NOAEL for ingestion of ethylbenzene is 136 mg/kg-day, based on renal effects in experimental animals with chronic exposure (see **<u>Exhibit I</u>**, Trial Exhibit DX-3135). Plaintiff exposure intakes for ethylbenzene were estimated to be in the range of 10$^{-6}$ to 10$^{-5}$ mg/kg-day, indicating that Plaintiff exposures were 7-8 orders of magnitude lower (even with highly conservative

assumptions) than the lowest exposure level reported to have no adverse effects in the literature.

f.  The lowest NOAEL for ingestion of DGME is 1,286 mg/kg-day, based on renal effects in experimental animals with subchronic exposure (see **Exhibit M**, Trial Exhibit DX-3139).  Plaintiff exposure intakes for DGME were estimated to be in the range of $10^{-4}$ to $10^{-3}$ mg/kg-day, indicating that Plaintiff exposures were 6-7 orders of magnitude lower (even with highly conservative assumptions) than the lowest exposure level reported to have no adverse effects in the literature.

153.  Overall, the Plaintiffs' exposures to the chemicals for which no PODs were available for use in the MOE analysis were far lower (up to 8 orders of magnitude) than the exposure levels associated with no adverse effects (or the lowest level associated with effects, in the case of benzene) in the literature, even with the highly conservative assumptions used in my exposure analysis.  **Demonstrative AC** presents all of the exposure intakes and lowest NOAELs (or LOAELs) that were compared in the analysis for Mr. Aubart, depicting the margin between his exposure and the higher levels at which toxicological effects may begin to be expected.

### D. Conclusions

154. The results of my analyses, as well as my consideration of the underlying toxicology and epidemiology literature, demonstrate that adverse toxicological effects from the Plaintiffs' alleged exposures to the chemicals of concern in this matter are not expected.

155. Even with the highly conservative exposure assumptions that I used in my analysis (including the use of water concentrations modeled assuming a starting maximum concentration of TPH-d of 85.25 mg/L) that resulted in overestimates of Plaintiffs' exposures:

   a. The MOEs are all >1, with most being >100, indicating that the Plaintiffs' overestimated exposures were generally 2-8 orders of magnitude lower than exposure levels associated with non-cancer and cancer health effects in the literature.

   b. A comparison of Plaintiffs' exposures to health effect levels in the literature for chemicals for which there are no PODs available from US EPA or ATSDR also indicates that Plaintiffs' overestimated exposures were at least 6-fold lower (and in most cases 3-8 orders of magnitude lower) than the reported health effect levels.

## VII.    Comments on the Report of Dr. Steven Bird

156.  Dr. Bird opined that all the Bellwether Plaintiffs "received a sufficient toxicological exposure to JP-5" to cause various adverse health effects, and that "the dose and duration of JP-5 exposure were sufficient to cause acute and long-term injuries" (Bird, 2023).  He stated that he generally followed a "weight of the evidence" approach to evaluate adverse health effects from jet fuel exposure and that he considered the Bradford Hill "criteria" in his analysis (Bird, 2023).

157.  The contents of his report do not support his opinions, however, and he did not follow an appropriate weight-of-evidence (WoE) approach nor fully consider the Bradford Hill criteria in his evaluation of general causation.  He also did not conduct an appropriate analysis of specific causation, so his overall opinions regarding the cause of the Plaintiffs' alleged health effects are speculative.

158.  A scientifically valid and credible methodology is required to establish a reliable link between a chemical exposure and adverse health effects (*i.e.*, establishing general causation) (Federal Judicial Center and NRC, 2011).

      a.  An appropriate WoE approach for establishing general causation involves an examination of the body of literature regarding a particular chemical exposure and potential health effects, including

studies with both positive and negative results (Goodman *et al.*, 2013; Rhomberg *et al.*, 2013; Rhomberg, 2015).  To assess whether there is reliable evidence to indicate that the chemical can be causally associated with a specific adverse health effect, the evaluation should consider the strengths and weaknesses of the studies, weigh their points of agreement and contradiction, and consider alternative explanations for any reported associations (Federal Judicial Center and NRC, 2011; Goodman *et al.*, 2013; Rhomberg *et al.*, 2013; Rhomberg, 2015; Dorne *et al.*, 2016).  Dr. Bird did not conduct a balanced analysis of the available evidence; rather, he selected only one or a few studies with positive results to cite for each chemical and each endpoint, which is akin to "cherry picking" only the evidence that supports his conclusion of causation.

b. Dr. Bird's consideration of the Bradford Hill criteria is incomplete and misinterprets some of the criteria.  For example:

i. One cannot evaluate the strength of associations or the consistency of effects across studies based on evaluation of only one or a few studies of each chemical and each health effect.  If he made his judgments regarding the Bradford Hill

criteria on a larger body of literature than what is cited in his report, he should have included this literature as evidence that his judgments are scientifically supported.

ii.   He also did not appropriately evaluate the criterion of biological gradient, as he did not discuss the doses and exposure durations for the majority of the studies he cited and, therefore, he did not evaluate dose-response relationships (as discussed further below).

iii.   He glossed over the criterion of biological plausibility without discussing any plausible modes of action for jet fuel or its constituents to cause health effects and he did not describe support for his conclusion that the criterion of coherence was met.

iv.   He misinterpreted the criterion of experiment by stating that because experimental animal studies of jet fuel exposure have shown adverse effects, this criterion is met, but the criterion of experiment refers to natural experiments in exposed human populations to examine potential reductions in health effects after interventions resulted in cessation of exposure (Hill, 1965).

v.   Dr. Bird's conclusion that exposure to jet fuel causes adverse
health effects is not specific to any constituent of jet fuel or any
adverse health effect because he considered all constituents and
health effects together in his analysis of the Bradford Hill
criteria.

159.   Most importantly, Dr. Bird did not conduct an appropriate analysis of
specific causation, which (as discussed in Paragraph 24) includes an estimate
of an individual's exposure to a chemical; provides evidence that the
exposure was of sufficient magnitude and duration to cause the alleged
health effect(s); and rules out other potential causes of the health effect(s),
particularly if the effects are common or have many potential causes (Olsen
*et al.*, 2014; Faustman, 2019; Aleksunes and Eaton, 2019; Federal Judicial
Center and NRC, 2011).  Dr. Bird did not include any of these things in his
analysis.

a.   In his deposition, he disclaimed performing any quantitative
estimate or analysis of Plaintiffs' alleged exposure and instead
presumed they were all exposed to a "significant exposure"—a
term he does not quantify—sufficient to be "a substantial factor in
causing each Plaintiffs' symptoms." It is not possible to know
whether Plaintiffs had an exposure sufficient to cause their

symptoms without any type of quantitative estimate of their alleged exposure.

b.  Without an estimate of the exposures for the Plaintiffs, Dr. Bird fails to compare them to the exposures in the human and experimental animal studies he cited, as is necessary for a credible analysis of specific causation (Olsen *et al*., 2014; Faustman, 2019; Aleksunes and Eaton, 2019; Federal Judicial Center and NRC, 2011).

c.  In fact, he did not even discuss the exposure concentrations or durations used in the majority of the studies he cited.  Without knowing the exposure concentrations and durations of the studies, he could not compare them to the concentrations estimated for the Plaintiffs and he could not show that studies with short-term exposure at levels alleged by the Plaintiffs cause long-term health effects.

d.  For example, one of the few instances where he discussed exposure concentrations and durations in the studies he cited is on page 21 of his report, where he noted that neurological effects were reported in humans with acute inhalation exposures to xylene concentrations ranging from 90-300 ppm (Bird, 2023).  If Dr. Bird

assumed that the vapor concentrations of JP-5 constituents reported in the table on page 16 of his report are representative of the air concentrations of these chemicals in the Plaintiffs' residences after the JP-5 release into the water system, the concentrations in the xylene studies he cited are approximately 3- to 11-fold higher than the highest xylene concentration from that table (115,700 μg/m$^3$, which is equivalent to 26.7 ppm)—*i.e.*, the assumed xylene concentration in the Plaintiffs' residences (26.7 ppm) was not high enough to be associated with the neurological effects reported in the cited studies.

160. Rather than providing any evidence that the Plaintiffs had exposure to chemicals in JP-5 fuel of sufficient magnitude and duration to cause any of their health effects, Dr. Bird simply attributed nearly all of the health effects experienced by the Plaintiffs since the time of the JP-5 fuel release to their alleged exposure (the lone exception being B.D.'s chronic headaches, which Dr. Bird withdrew after my initial report making this critique was served).

161. Most of the health effects claimed by the Plaintiffs are common and have multiple potential causes, but Dr. Bird did not fully consider whether they could be caused by other factors, particularly for acute, reversible effects

that were not experienced by Plaintiffs until many months after the contamination when they were no longer using the drinking water.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: April 5, 2024

Robyn L. Prueitt, Ph.D., DABT