IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., et al., | CIVIL NO. 22-cv-00397-LEK-KJM |
| Plaintiffs, | THE UNITED STATES' TRIAL DECLARATION OF DR. BARRY GORDON, M.D., Ph.D.; EXHIBITS A-F; CERTIFICATION OF SERVICE |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | TRIAL DATE: April 29, 2024 TIME: 8:30 a.m. JUDGE: Hon. Leslie E. Kobayashi |

**TRIAL DECLARATION OF DR. BARRY GORDON**

Pursuant to 28 U.S.C. § 1746, I, Barry Gordon, M.D., Ph.D., make the following declaration as my direct testimony for trial, under penalty of perjury. I make the following statements on the basis of my personal knowledge, educational background, training, and my experience as a neurologist, in addition to my review of a substantial number of case-specific documents and medical records, the scientific literature, and my independent medical examination of the adult Ms. Nastasia Freeman. I hold the below opinions to a reasonable degree of medical probability.

## <u>TABLE OF CONTENTS</u>

I.      Summary of Opinions ................................................................. 3

II.     Qualifications and Background .................................................. 6

III.    Methodology ............................................................................... 8

IV.     Analysis ..................................................................................... 12

V.      Rebuttal Opinions .................................................................... 29

        A. Dr. Storage .......................................................................... 29

        B. Dr. Bird ................................................................................ 32

        C. Dr. Andruska ....................................................................... 33

VI.     Conclusion ................................................................................ 37

## I.  **Summary of Opinions**

1.  Based on my interview and my neurologic physical exam of Ms. Freeman, as well as a detailed review of her records, I conclude that Ms. Freeman does not have any long-term (current) organic (i.e., physical) neurologic problems from the alleged exposure(s) at Red Hill, to a reasonable degree of medical probability.  There is no reliable evidence that she has had a long-term exacerbation of the frequency nor the intensity of the neurologic problems or possibly neurologic problems that she had that pre-existed the alleged exposure(s).  Nor is there any reliable evidence that she has developed any new long-term organic neurologic problems or possibly organic neurologic problems after the alleged exposure(s). Moreover, based upon the general causality described in the Expert Report of Robyn L. Prueitt, Ph.D., DABT, of Oct. 9. 2023, plus generally-accepted principles within the discipline of neurology as to how temporally-limited neurologic injuries may express themselves over time, there is no plausible reason to have expected from general principles that Ms. Freeman would have developed organic neurologic problems or exacerbations of the kinds claimed or that may be claimed, as a result of the alleged exposure(s). Moreover, I have direct and permanently recorded objective evidence from my interview/examination of Ms. Freeman for non-organicity of at least one of her complaints that she

attributes to the alleged exposure(s). I will elaborate on these opinions and their bases below.

2.    I further completely disagree with the opinion(s) of Dr. Storage, Dr. Bird, and Dr. Andruska, and with the methods they used to arrive at their opinions. I will elaborate on the bases for this disagreement in the Rebuttal section of the Declaration, but I will summarize the bases for my disagreement common to all these individuals here, and then summarize my specific bases for disagreement with each individual immediately following this paragraph: Drs. Storage, Bird, and Andruska made incorrect assumptions about general causality, with respect to the alleged exposure(s) in particular, and/or with respect to neurologic conditions; they did not have full and/or accurate knowledge of her history, both before and/or after the alleged exposure; they did not examine her in person or at all; what if any televideo interview they did was incomplete, did not test for potentially relevant features, it was not recorded (which would have allowed objective and independent analysis), and did not apparently allow the findings from their examination(s) to influence their opinion(s); and they did not apparently adequately consider alternative explanations.

3.    Specifically in the case of Dr. Storage, based upon his deposition and other materials, in my opinion his conclusions about Ms. Freeman's neurologic or

possibly neurologic conditions are incorrect, and his opinion that they resulted or were aggravated by the alleged exposure is incorrect. He failed to take into account relevant aspects of her medical history, including panic attacks that predated the alleged exposure(s), and he did not perform a physical examination.

4. With respect to Dr. Bird: He did not do an examination of Ms. Freeman. And what he is calling "seizures" were shown by direct testing to be psychogenic. These were not organic and therefore could not be caused by her alleged exposure(s).

5. Dr. Andruska appears to have relied upon incomplete and/or inaccurate information about Ms. Freeman's neurologic and possibly neurologic history. Dr. Andruska did not herself do an in-person physical neurologic examination of Ms. Freeman that may have informed her opinion(s), whereas I did. The observations that Dr. Andruska could have made from the video tele-interview that she did of Ms. Freeman do not seem to have affected her opinion(s). Dr. Andruska may have also relied upon incorrect or inaccurate notions of general and specific causality in Ms. Freeman's case. Moreover, Dr. Andruska did not appear to do a differential diagnosis that considered plausible alternative causes of Ms. Freeman's alleged neurologic and possibly neurologic problems. For these reasons

summarized here, and given in more detail in the Rebuttal section, I disagree

with any and all of Dr. Andruska's opinions that Ms. Freeman has long-term

neurologic conditions that were caused by and/or aggravated (in frequency

and/or intensity) by the alleged exposure(s).

## II.    Qualifications and Background

6.    I am a Board-certified neurologist, with over 40 years of training and

experience in medicine, neurology, behavioral neurology, cognitive

neuroscience, experimental psychology, neuropsychology, and brain

disorders.  My Curriculum Vitae is attached hereto as **Exhibit A**, Trial

Exhibit DX-3156. I currently do medicolegal consulting through Intelligence

Amplification Inc., a company I have owned since 1984.

7.    I graduated from Pennsylvania State University in 1971 with a B.A. as part

of a Five-Year Cooperative Program in Medicine (getting accepted into

medical school from high school). I received my M.D. from Jefferson

Medical College in 1973 as part of that Five-Year program. I did a medical

internship at New York Hospital/Cornell Medical Center in 1973-74, and

then a neurology residency at The Johns Hopkins Hospital in 1974-77.

Immediately after my residency, I joined the faculty of The Johns Hopkins

University ("Johns Hopkins") and School of Medicine in 1977. While on the

faculty, I entered the Ph.D. program in Psychology at Johns Hopkins, receiving my M.A. in Psychology in 1980, and my Ph.D. in 1981.

8.   There are perhaps several aspects of my qualifications which should be noted in the context of this particular case: While my medical specialty is neurology, my subspecialty is in behavioral neurology (cognitive neurology), that is, the intersection of neurology and the behavioral and cognitive neurosciences which are concerned with understanding normal behaviors and their underlying bases in both the mind and brain, and with disorders of the mental and physical bases for these behaviors. In addition, I have extensive training and experience in the use, administration, scoring, and interpretation of neuropsychological tests. (I do not call myself a clinical psychologist or a neuropsychologist, because those terms are used to refer to psychologists, not to medical doctors.)

9.   I have been retained by the United States to offer my opinion(s) as to whether Ms. Freeman has long-term (current) neurologic problems from the alleged exposure(s) at Red Hill. In addition, I have commented on the methodology and/or the opinions of Ms. Freeman's health care providers and of Plaintiff's expert(s), insofar as these are known or can be inferred, with respect to the neurologic or possibly neurologic issues related to the alleged exposure(s) in Ms. Freeman.

10. I am opining from the perspectives of my particular areas of expertise, which are those of a physician who is a neurologist specializing in behavioral neurology (cognitive neurology), with expertise in neuropsychology.

11. My opinions stated here are given to the standard of a reasonable degree of medical probability. My opinions are based upon my education, training, experience (including my knowledge of the medical-scientific literature), the records and materials made available to me in this case, and my neurologic interview and examination of Ms. Freeman, done on Oct. 4, 2023 (including the video/audio recording of that interview and examination, my reviews of that recording, and the transcription done).

III. **Methodology**

12. As part of the basis for preparing my opinions below, I performed a neurological interview and physical examination of Ms. Freeman on October 4, 2023, for a total of over 1 ½ hours. I should note that I was also examining physical aspects of Ms. Freeman during my interview, not just during the part called by convention the "physical examination." Among other things, I was examining Ms. Freeman for her level of alertness and responsiveness; her speech comprehension and expression; her word choices; her articulation; the posture of her head and body; her eye movements (cranial nerves 3, 4, and 6, and more central functions); her

8

facial expressions (the 7th cranial nerve and more central functions);
functions of other cranial nerves; the movements of her head, limbs, and
trunk (including speed, accuracy, and the presence of any tremors); her
strength; her balance (including the balance of her head on her body, and of
her body as a whole); her deep tendon reflexes; and her sensation.

13.    I reviewed records and materials related to Ms. Freeman; addressed potential
causal relationships, including general causation; analyzed the temporal
pattern between the alleged exposure(s) and Ms. Freeman's alleged
neurological conditions; and performed a differential diagnosis. Overall, in
considering the underlying nature of Ms. Freeman's neurologic or possibly
neurologic symptoms, I used standard methods of historical analysis and
differential diagnosis, taking into account all the information available to me
as to the nature of her purported symptoms, signs, laboratory test results, any
changes over time (or lack thereof), and possible confounds.

14.    In conducting my review, I reviewed Dr. Prueitt's October 9, 2023, report.
Specifically, I relied on Dr. Prueitt's statements regarding Ms. Freeman's
potential exposure routes and windows following the November 2021 spill. I
was aware Dr. Andruska indicated that exposure could have been as early as
May 2021, so I took that into account in my differential diagnosis and
reasoning, even though I now understand that Ms. Freeman has since limited

her alleged injuries in this case to those "arising after the November 2021 spill . . . . including the exacerbation of prior physical or mental conditions." ECF No. 201 ¶ 5.

15.    With respect to general causality: I defer to Dr. Prueitt in general. It is my understanding that Dr. Prueitt's conclusion, based upon her toxicologic expertise, is that even with highly conservative exposure assumptions, long-term neurological effects would not have been expected from Ms. Freeman's alleged exposure. If this is indeed the case (and I have no reason from my positions of expertise to dispute Dr. Prueitt's expert conclusion as a toxicologist), then none of Ms. Freeman's current neurologic or possibly neurologic symptoms or conditions would be due to the alleged exposure.

16.    In addition to Dr. Prueitt's opinions, in keeping with good medical-scientific practice, I also took into account in my differential diagnosis and my reasoning the possibility that there might be some as-yet un-discovered general causality for neurologic conditions from the alleged exposure. I applied several general principles I believe are relevant (one of Ms. Freeman's treating physicians alluded to at least one of these as well). These principles are either held in common with toxicological expertise, or bridge from it into neurologic expertise:

a. "The dosage makes the poison" (e.g., Spencer et al., 2000, pg. 56). This is true not only in amount but also in time (duration) of exposure.

b. Most neurotoxic effects will express themselves either immediately, or within a relatively short period of time after the exposure (e.g., Spencer et al., 2000, pg. 56).

c. Most neurotoxic effects then behave as a time-limited injury to the nervous system and subsequently usually behave:

   i. With a gradual recovery of neurologic functions over time (e.g., Spencer et al., 2000, pg. 56) or, less likely, as a relatively static deficit in neurologic functions.

   ii. The neurologic dysfunctions these static injuries produce are themselves relatively static, not varying appreciably over time scales on the order of days to months (e.g., Gordon & Server, 1982). Even dysfunctions affecting higher cerebral functions, such as speech, which can exhibit more variability over short time periods (e.g., seconds; cf. Gordon & Server, 1982), still typically show a deeper constancy which can be recognized by an expert.

17.    I also had to consider in my differential diagnosis and my reasoning the fact that many neurologic symptoms and signs are nonspecific (i.e., not specific to a particular condition) (e.g., Murphy, 1997).

## IV.    **Analysis**

18.    Overall, it is my opinion that Ms. Freeman does not have any organic (i.e., physical) neurologic conditions resulting from the alleged exposure to the jet fuel release on November 20, 2021, to a reasonable degree of medical probability. What follows are the more detailed bases for my overall opinion(s). (These points are also among the bases for my criticisms of Drs. Storage, Bird, and Andruska).

19.    In Ms. Freeman's case, the history and results of her evaluations are less reliable and/or less complete than would otherwise be expected and/or desirable, for reasons including: Ms. Freeman reports a complex symptomology, a complex medical history, and multiple providers at multiple locations. There are few records from before 2021 and Ms. Freeman did not keep personal records from prior to 2021, such as she did following the spill. Memories of conditions prior to 2021 can be expected to be faded or distorted, especially since Ms. Freeman reports "memory problems" and "brain fog."

20.     In addition, video-EEG testing done at Walter Reed in 2022 showed that

episodes Ms. Freeman flagged as her "seizures" (the three episodes of

"dizziness" she experienced) did not have an EEG correlate. As the notes

from Walter Reed stated: "The recorded events had no EEG correlation,

therefore, are likely non-epileptic in nature." **Exhibit B**, Trial Exhibit DX-

3215 at 266 (RH_Pls_MR001514). That is, they were psychogenic, not

organically based (that is, they were "psychogenic nonepileptic seizures").

"Psychogenic nonepileptic seizures" "are episodes of altered movement,

sensation, or experience similar to epilepsy. However, they are not caused

by abnormal electrical discharges in the brain but by a psychological

process." (Reuber et al., 2003) In addition, she had an episode for which she

was hospitalized on January 3, 2023, which was thought to be possibly

nonorganic. Again, possibly psychogenic, and not necessarily organically

based.

21.     I have direct evidence from my interview/examination of Ms. Freeman

(done on Oct. 4, 2023, and audio- and video-recorded) for the nonorganicity

of at least one of the alleged symptoms and signs that she attributes to the

November 2021 exposure(s): When I began testing the horizontal

movement of her eyes at the beginning of the physical exam portion of my

interview/examination, she immediately reported to me that the maneuver

had brought on nausea, which was likely to persist for hours. (I therefore did not further attempt to formally test her eye movements.) **Exhibit C**, Trial Exhibit DX-3158. Ms. Freeman reported to me that this was an example of her "vestibular dysfunction." **Exhibit C.** One of her health care providers had also reported that attempted eye movement testing brought on "nausea." Yet throughout the earlier times in the interview/exam, and subsequent to that one self-reported episode, the video recording demonstrates that she was making dozens if not hundreds of such eye movements, without apparent complaints. **Exhibit D**, Trial Exhibit DX-3159. These were eye movements both with her head relatively still, and with her head moving (when the eyes move within the orbits, to stay still with respect to a visual target but necessarily therefore move with respect to the head). Moreover, when her eye movements were tested at the LoBue Laser & Eye Medical Centers on Sept. 1, 2023, just a month before my own examination of them, there were "no restrictions" by report, and no report of Ms. Freeman's complaining of "nausea." **Exhibit B** at 122 (PLAINTIFFS_RH_0120449). Therefore, my interview/examination gives objective evidence that at least one of the symptoms/signs that Ms. Freeman attributes to the alleged exposure(s) could not be due to the alleged exposure(s), and further evidence that it is nonorganic.

22.  Regardless of the precise basis or bases for these nonorganic or apparently
nonorganic events, they raise strong concerns about the validity of assuming
that Ms. Freeman's *other* reported symptoms, signs, and/or the results of any
testing requiring Ms. Freeman's conscious effort, necessarily reflect true
organic conditions.  This is not just because the existence of psychogenic
problems undermines the assumption of organicity for other problems, but
also because individuals with psychogenic nonepileptic seizures (as they
have been sometimes termed) have a higher incidence of other psychiatric
issues, such as somatiform disorders (e.g., Kuyk et al., 2003; Reuber et al.,
2003).

23.  I should also note that, had Drs. Storage, Bird, or Andruska done an in-
person physical examination of Ms. Freeman, they might have witnessed for
themselves this finding. They then would have had to take it into account in
their differential diagnosis and in formulating their conclusions about the
origin(s) of her symptoms and signs.

24.  As a result of all the complexities, uncertainties, unknowns, and
circumstances in Ms. Freeman's case, it would have been very difficult, if
not impossible, for her treating health care providers to have formulated
accurate diagnostic impressions and/or evaluated her response to proposed
treatments. Moreover, because of the risks of missing or misdiagnosing

organic disease, and because of the implications of the diagnosis of non-organic conditions (particularly of malingering), non-organicity is often not one of the conditions considered early in the differential diagnostic process in clinical neurology. For these and other reasons, therefore, Ms. Freeman's healthcare providers would not necessarily have raised this issue of non-organicity, nor fully explored all of its implications for her diagnoses and for their treatment plans.

25. **Conditions Prior to November 2021**: Ms. Freeman had a number of documented conditions prior to November 2021. Notably, Ms. Freeman's history includes presumed bacterial meningitis between the ages of 6-8 and the subsequent development of what her physicians at the time believed were seizures. Her pre-November 2021 history is also notable, among other features, for a back injury around 2016 that led to lower back pain, a history of anxiety and panic attacks, and many episodes or periods of "brain fog," "presyncope," "facial" and "arm" "numbness," "balance problems," "unsteady gait," etc., before the alleged exposure(s) on Nov. 20, 2021, or even prior to May 2021. As noted below, a number of these conditions persist today.

26. Ms. Freeman has or has had a large number of conditions documented in her records, in the past and at the current time. With respect to neurologic or

possibly neurologic conditions, it is my understanding that Ms. Freeman and/or her experts are claiming that these are either new, or have been of greater frequency and/or severity, since the alleged exposure(s) in November 2021. But in fact, even judging from the incomplete records now available in her case, most of these were in fact present before the alleged exposure(s) in November 2021, in both nature and apparent frequency. To help show these temporal relationships and to help organize her complex history, I list a number of them here, emphasizing those that are neurologic or possibly neurologic in nature:

a.    "History of anxiety with panic attacks and headaches" "mental fogginess" "tingling of hands and mouth" "panic, palpitations, dizziness." **Exhibit B**, at 304 (RH_Pls_MR013625). "I was diagnosed with anxiety in San Diego. It was when my husband was deployed the second time, I believe." (N. Freeman deposition, pg. 131)

b.    Multiple psychosocial and situational stressors;

c.    Obesity;

d.    Psoriasis;

e.    Subclinical hyperthyroidism; **Exhibit B** at 248 (RH_Pls_MR001351)

f.    Thyrotoxicosis; **Exhibit B** at 231 (RH_Pls_3rdMR_00012041)

g.    Mild tricuspid regurgitation; **Exhibit B** at 336 (RH_Pls_MR014671)

h.    History of orthostatic hypotension;

i.  History of hydronephrosis; **Exhibit B** at 290
    (RH_Pls_MR012821)

j.  History of gross hematuria; **Exhibit B** at 292
    (RH_Pls_MR012825)

k.  Back pain beginning in 2016; **Exhibit B** at 268
    (RH_Pls_MR001531)

l.  Scoliosis

m.  Functional neurologic illness or illnesses have been considered
    diagnostic possibilities by Ms. Freeman's health care providers

n.  Episodes since childhood as described, which have been
    attributed to seizures (presumably, left temporal lobe in origin,
    corresponding to the left temporal lobe abnormalities seen on
    repeated EEGs and to e.g. her reported olfactory hallucinations
    and other phenomena), and treated with anticonvulsants
    (intermittently). I cannot locate in the records whether these
    episodes have been verified as seizures through e.g. video-EEG
    monitoring. One reason to raise this question is because these
    episodes – assuming there has been a continuity with any
    present ones -- seemed to have been described differently in the
    past.

o.  Non-epileptic "dizzy" spells during video-EEG recording at
    Walter Reed in 2022. As not made explicit in the Walter Reed
    records, but as made explicit in Dr. Andruska's report, these
    were therefore verified to be "Psychogenic nonepileptic
    seizures (PNESs)" which "are episodes of altered movement,
    sensation, or experience similar to epilepsy. However, they are
    not caused by abnormal electrical discharges in the brain but by
    a psychological process." (Reuber et al., 2003) This is
    significant not only in its own regard, but also because
    individuals with psychogenic nonepileptic seizures have a
    higher incidence of other psychiatric issues, such as somatiform
    disorders (e.g., Kuyk et al., 2003; Reuber et al., 2003).

p.  The records are not clear if other episodes Ms. Freeman has
    been reporting, that at times she seems to have labeled as

"seizures," are similar to the "dizzy" spells experienced at Walter Reed

q.  "Empty sella syndrome/Idiopathic Intracranial Hypertension" were included in the differential diagnoses on the formal reading of an MRI of the brain Ms. Freeman had done on 7/13/2022. **Exhibit B** at 233 (RH_Pls_MR001171). The abnormality responsible for this differential diagnosis had not been formally reported on an MRI done on 1/26/2016 (before the alleged exposure). At least by official report, then, this is a new problem that has developed at some point between 2016 and 2022.

I do note that the 2016 MRI was informally re-read by a neurologist in 2022, and it reportedly showed the same sella abnormality as was seen on the 2022 MRI. **Exhibit B** at 287 (PH_Pls_MR012804). Therefore, this may not be a new or pathologic finding. However, this was an informal, unofficial, reading; the original scan does not appear to have been formally reinterpreted. I note that Idiopathic Intracranial Hypertension can produce transient or permanent visual disturbances, and can be associated with headaches, which are complaints Ms. Freeman has reported (see below).

r.  Episode of "right-sided problems."

s.  Speech difficulties occurring in the afternoons, by her report at the time of my interview on Oct. 4, 2023. However, she has reported speech difficulties at various times, including at least one episode where she "couldn't talk for a day." I note that on my 1 ½ hour interview and exam, occurring in the morning but at a time when Ms. Freeman described herself as "exhausted" "so exhausted", I did not detect any speech difficulties. Dr. Andruska, the Plaintiff's expert neurologist, who interviewed Ms. Freeman via Zoom for approximately 80 minutes, also did not report any speech difficulties in her July 24, 2023, report.

t.  "Memory problems" and "brain fog" as described. I note, as reported above, that "brain fog" had in fact been a symptom reported in the records prior to the alleged exposure. At the time of my exam on Oct. 4, 2023, Ms. Freeman reported that

she was not able to remember even over very short intervals. If this were true, then Ms. Freeman's memory (recollection) should be impaired over longer intervals. However, on my exam her recollection ability did not appear to be impaired. During my interview, she exhibited adequate immediate auditory verbal memory, with no apparent deficit in longer-term retention.

u.    Sleep problems, including reportedly periods of apnea and "drenching night sweats." Is very fatigued by 2 o'clock in the afternoon.

v.    Headaches ("migraine headaches") as described. Again, I note that there is an extensive history of headaches in her records, going back to at least 2005.

w.    Ms. Freeman reported at some point that she could not see out of her left eye in the January 3-4, 2023, interval. However, this symptom is not mentioned in the contemporaneous medical records from that hospitalization, nor was it reported as a finding on any examination from that hospitalization. An outpatient examination that included visual testing on January 4, 2023, did not show any deficits. The episode of January 3, 2023, that led to her hospitalization then was in fact suspected by her health care providers to be non-organic. **Exhibit B** at 226-229 (RH_Pls3rdMR_00009630-33).

x.    History of "a new black spot in the lower part of her vision" **Exhibit B** at 239 (PH-Pls_MR001292)

y.    Self-reported abnormal eye movements

z.    She reports "irritation in swallowing," where her throat feels restricted, or like she is going to choke.

aa.   Left ear pulsatile tinnitus **Exhibit B** at 244 (RH_Pls_MR001350)

bb.   "Vestibular dysfunction": Although Ms. Freeman has repeatedly stated this was a diagnosis made by Walter Reed in 2022, (with the first reference to this that I can find being in her diary: ""7/27/22 Dr. Denkensohn informed be that what I was

dealing with was a Vestibular Dysfunction..."), I cannot find any such terms in the Walter Reed documentation, in neither the medical discharge documentation nor in the patient information sheets. Moreover, I would be surprised if the Walter Reed neurologists specializing in epilepsy would have ventured to make such a diagnosis outside of their subspecialty, and outside of the scope of their evaluation. I note that on repeated neurologic and other exams, Ms. Freeman's balance has been normal. Her audiogram and some other tests of eye movement and vestibular function have been normal. She apparently had computerized dynamic posturography (apparently on 10/25/2022, **Exhibit B** at 299 (RH_Pls_MR013029)), but she has never had the videonystagmography (VNG) that had been recommended. I cannot locate anywhere in her medical records where she has been diagnosed as having "vestibular dysfunction" by one of her treating physicians.

cc.  Ms. Freeman reported becoming "nauseated" when, during my examination on Oct. 4, 2023, I attempted to test her eye movements (the functions of Cranial Nerves 3, 4, and 6, and the brainstem centers for eye movement control). She had also reported this during eye movement testing by one of her health care providers, according to the records. She associated this with her "vestibular dysfunction." However, on other parts of my interview/examination, she could be observed to make numerous eye movements (both with her head relatively steady, and with head motions), without any such complaint. **Exhibits C & D.**

dd.  Numbness in face, hands, and feet, by her report.

ee.  "'nerve pain' described as a tingling sensation that lasted for about 3 days…" **Exhibit B** at 237 (RH_Pls_MR001211)

ff.  "…clusters of symptoms described [as] head pressure, facial tingling sensation and fatigue…nausea, dizziness, imbalance and brain fog…"

gg.  Intermittent urinary incontinence; **Exhibit B** at 48 (PLAINTIFFS_RH_0043585)

hh. "severe coccyx pain and low back pain…left L34 disk protrusion and L45 retrolithesis…" **Exhibit B** at 217 (RH_Pls_3rdMR_00001488)

ii. Episodes of pain down both legs

jj. Episodes of "total body pain" **Exhibit B** at 1 (PLAINTIFFS_RH_0043036)

kk. Vaginal pain **Exhibit B** at 251 (RH_Pls_MR001354), **Exhibit B** at 268 (RH_Pls_MR001531)

ll. Polypharmacy, including reportedly experiencing side effects **Exhibit B** at 221-222 (RH_Pls_3rdMR_00009427-28)

mm. Ms. Freeman's understanding or misunderstanding of her condition(s) may be a factor in her symptomatology. **Exhibit B** at 221-222 (RH_Pls_3rdMR_00009427-28)

27. The following chart may help better show that the neurological symptoms/sign (or possibly neurologic symptoms/signs) that Ms. Freeman listed as part of her claim were present, in nature, magnitude and/or frequency, prior to 2021. The leftmost column lists the symptoms/signs that Ms. Freeman claims, with citations; the rightmost column lists the description I found of these in the available records, with citations. (Because the descriptions applied to Ms. Freeman's "seizures" have been different over the years – including the descriptions she herself has provided – I have divided these up into four "types" of "spells," with footnotes giving the basis or bases for my classification.)

| Symptom/sign | Pre-2021 |
|---|---|
| Anxiety with panic attacks  **Gordon Exhibit E**, Trial Exhibit DX-3205 | 10/24/2017 "History of anxiety with panic attacks and …" "mental fogginess" "tingling of hands and mouth" "panic, palpitations, dizziness" "word-finding difficulty, forgetfulness"  **Exhibit B** at 304 (RH_Pls_MR013625) |
| Spell Type 1[1] | (5/52016) "…Differentiates these from her seizures which begin with metallic taste and from her migraines which begin with aura of spots in vision followed by pounding headache…" **Exhibit B** at 313 (RH_Pls_MR013703) |

---

[1] Spell Type 1: ""… The patient states she has been 'fainting' since the third grade. She states she was always given a diagnosis of dehydration when it occurred. The last time she had an episode was in mid-December [2005]. She felt sick. She got up and was dizzy, and went to the bathroom. She remembers falling and hitting the side of the sink. Her roommate found her and helped her get up. She fell again later, but does not remember much about it. The last time she fell was at a restaurant, while she was sitting down. She states she used to pass out when she was sitting in class. At one point in time, she had episodes every 3 months After the episode, she feel sick, nauseated, and drained. She does not have a headache, and it has never been any tongue biting or incontinence with an episode. She is not certain how long she is out, but she thinks it may be about a minute. She denies any lapses or spacey episodes, or daydreaming type episode during the day…" **Exhibit B** at 329 (RH_Pls_MR013886)

"….She stated that on December 7, 2005 she was seen and treated at a local ER because of a fainting spell at home. She states she has had fainting spells all her life, as of early childhood - they had never been evaluated or worked up. Mom stated to provider at that time that she has had witnessed events and has never had shaking, tongue biting or loss of bowel or bladder control. Was told when event occurred she was told it was due to dehydration. Saw a neurologist in 2005 and had EEGs strobe light tests but never reproduced the spells. Neurologist told her it was seizures and gave her medication but she stopped because she lost military health coverage. Did not have any spells from 2008 until 12-12-2011 when she was working as as CNA on oncology floor and she felt lightheaded, turned pale, did not

| Symptom/sign | Pre-2021 |
| --- | --- |
| Spell Type 2 – "seizures"[2] | (5/5/2016) "….Differentiates these from her seizures which begin with metallic taste…" **Exhibit B** at 313 (RH_Pls_MR013703) |

---

lose consciousness. Coworker had her lie down and gave her some juice and felt better after 30 minutes but felt exhausted. No spells since Monday…." **Exhibit B** at 325 (RH_Pls_MR013825)

"Patient reports she has been affected by frequent presyncopal symptoms and recurrent syncope since childhood, recalling episodes as far back as age 8. Occur unpredictably even waking her at night. Differentiates these from her seizures which begin with metallic taste and from her migraines which begin with aura of spots in vision followed by pounding headache, photo/phonophobia. Episodes start with her 'body feeling very tight and extremely warm' followed by lightheadedness and palpitations ('heart pulsing and skipping'). Symptoms would prompt her to look for ways to cool down though she also felt worse upon sitting up / standing. Notes she would often go to sink, bathtub, or refrigerator, and that her mom occasionally found her collapsed in front of them. States she was taken to doctor multiple times but was always told she was dehydrated. She is unsure if she was evaluated by Cardiology. Denies ever having syncope during exertion and was athlete in school and continued to run and work out regularly until episode earlier this year. Has not had repeat syncope but has near constant positional lightheadedness and palpitations limiting her ability to do basic activities such as move around her house and care for her children. States she essentially lies in bed all day and continues to feel poorly. Initially had nausea/vomiting earlier in first trimester but has resolved and has been trying to increase fluid intake to help symptoms. She is extremely frustrated and was tearful during interview...." **Exhibit B** at 313 (RH_Pls_MR013703)

[2] Spell Type 2: "seizures which begin with a metallic taste.." **Exhibit B** at 313 (RH_Pls_MR013703)

| Symptom/sign | Pre-2021 |
|---|---|
| Spell Type 3 (non-epileptic) [3]**Exhibit E** (*"seizures"*) | |
| Spell Type 4[4] - "non-lesional focal epilepsy, possibly Left temporal" (Dr. Lee's "working diagnosis") **Exhibit B** at 222 (RH_Pls_3rdMR_00009428) | |
| "Brain fog" ("difficulty in focusing") **Exhibit E** | 3/14/2016 "...over the past week, she has mental fogginess…" **Exhibit B** at 322 (RH_Pls_MR013741) |
| "General malaise" **Exhibit E** | 2006 **Exhibit B** at 329-31 (RH_Pls_MR013886-88) |

---

[3] Spell Type 3:  non-epileptic "seizures" see for example Dr. Andruska deposition, pg. 114 and pp. 131-132.

[4] Spell Type 4: (unclear if these are intended to be the same as what I am labeling here 'Type 3') Dr. Lee's "working diagnosis (sic)" of ""non-lesional focal epilepsy, possibly Left temporal." **Exhibit B** at 222 (RH_Pls_3rdMR_00009428)

| Symptom/sign | Pre-2021 |
|---|---|
| "Headaches" **Exhibit E** | [2006] "…She states she has a lot of headaches which last up to two days. She uses over-the-counter migraine medications. She tends to curl up in a ball and go to bed. She has photophobia and sonophobia, but no nausea or vomiting. The headache is described as a throbbing pain, and she has some lightheadedness. It may awaken her at night from a sound sleep. A bad headache may last about a day. One headache was present for a week or two…" **Exhibit B** at 331 (RH_Pls_MR013888)<br><br>(5/5/2016) "…her migraines which begin with aura of spots in vision followed by pounding headache…" **Exhibit B** at 313 (RH_Pls_MR013703) |
| "Light sensitivity" | **Exhibit B** at 331 (RH_Pls_MR013888) |
| "Memory loss and confusion"  **Exhibit E** | 2006 **Exhibit B** at 329-35 (RH_Pls_MR013886-92) |
| "Muscle and joint pain" **Exhibit E** | 2006 "burning and pain in the feet" cited in review of systems<br><br>**Exhibit B** at 331 (RH_Pls_MR013888) |
| "Numbness in extremities" **Exhibit E** | 2006 **Exhibit B** at 329-35 (RH_Pls_MR013886-92) |

| Symptom/sign | Pre-2021 |
|---|---|
| "Shakes or trembles" **Exhibit E** | [cf. anxiety with panic attacks] |
| "Whooshing sound and pulsing in left ear" **Exhibit E** | |
| "Dizziness" **Exhibit E** | 2006 **Exhibit B** at 331 (RH_Pls_MR013888) |
| 'vestibular' 'dizziness which could be accompanied by nausea…it triggers the vestibular issue in the car, and..also – if I'm up high..' (N. Freeman deposition, pg. 148) | 2006 "spinning sensations" **Exhibit B** at 331 (RH_Pls_MR013888) |

28.  Taking into account all the available history, including the various sources
of evidence as to the occurrence over time of her various neurologic
symptoms and/or signs, laboratory test results (including blood studies,
audiologic and other related tests, EEGs, video-EEGs, head CT scans, brain
SPECT scans, and head MRIs), the causality of the alleged exposures
detailed by Dr. Prueitt in her October 25, 2023 and November 27, 2023
reports, and general principles as to the expected temporal pattern of
neurologic problems as may result from toxic exposures, there is no reliable
evidence nor reason(s) to believe that Ms. Freeman has any current

neurologic problem(s) from organic effects of the alleged exposures, to a reasonable degree of medical probability.

29.  Moreover, if all of the available evidence or purported evidence is taken into account, then conditions other than organic effects of the alleged exposure(s) must be considered in the differential diagnosis of Ms. Freeman's current neurologic or possibly neurologic condition(s). That is, anyone opining that Ms. Freeman's current neurologic or possibly neurologic condition(s) are due to the alleged exposures would have to consider a multitude of other potential explanations in their differential diagnosis, including functional neurologic illnesses (non-organic conditions).

30.  It is well known that having a belief that a disease is present, even if false, such as a belief that neurologic conditions are due to an alleged exposure, can have significant negative consequences for an individual's well-being and behavior. (e.g., see the DSM-V (2013) diagnostic categories of "Illness Anxiety Disorder" and "Somatic Symptom Disorder.")  These consequences also have to be considered in the differential diagnosis in Ms. Freeman's case.

## V.  Rebuttal Opinions

### A. Dr. Storage

31.  Dr. Storage opined that "the jet fuel exposure is a primary cause for Ms. Freeman's neurologic and psychiatric symptoms." (Storage Deposition, pg. 12).

32.  Dr. Storage's neurologic or possibly neurologic opinions are not supported by Ms. Freeman's medical records or Dr. Storage's virtual evaluations.

33.  According to his deposition, Dr. Storage based his opinions on such sources as: historical information provided by Ms. Freeman, but largely compiled by others at the Amen Clinic where he worked; his four virtual sessions with Ms. Freeman (on 9/19/22, 11/10/22, 5/12/23, and 7/7/23; Deposition, pp. 23-24); brain SPECT scans done through the Amen Clinic; a "Total Brain Assessment" battery done by the Amen Clinic (Deposition, pg. 31); and outside labs.

34.  I disagree with Dr. Storage's methods and conclusions, insofar as they relate to his opinions as to "neurologic …symptoms." Specifically:

　　a.  Dr. Storage was not apparently aware of Ms. Freeman's prior history of anxiety and panic attacks, nor of her complaints of "brain fog" that long predate the alleged exposure(s), nor was he

aware of other potentially relevant aspects of her history through which to interpret her symptoms and their potential cause(s);

b.  Dr. Storage did not differentiate between organic and psychogenic seizures (i.e., seizures that are not coming from organic disease of the brain, but rather someone's psyche);

c.  Dr. Storage did not take into account the effects her "overwhelming anxiety" that he himself reported may have had on her neuropsychological performance (including, e.g., her speech);

d.  Dr. Storage did not do a physical examination;

e.  Dr. Storage did not apparently appreciate the limitations of the "Total Brain Assessment" that was done by the Amen Clinic and that he relied upon.  It is not altogether clear just what Dr. Storage is referring to as the "Total Brain Assessment."  However, insofar as I can determine from the available records, what the Amen Clinic calls its "Total Brain Assessment" appears to be derived from a variety of self-reported scales and some tests of mental functions. The "Total Brain Assessment" that Dr. Storage cites presumably also includes any other mental function tests done by the Amen Clinic, such as the Connors Continuous Performance Test. From my perspectives a neurologist and behavioral

(cognitive neurologist) with expertise in neuropsychology, the Amen Clinic "Total Brain Assessment" and the additional mental testing that was done has numerous serious limitations, including, but not necessarily limited to: incompleteness, unreliability, lack of specificity, and lack of validity for the kinds of problems Ms. Freeman allegedly had.

f.  Dr. Storage did not seem to appreciate the limitations of the brain SPECT scanning that was done by the Amen Clinic. Brain SPECT (Single Photon Emission Computed Tomography) with the 99m Tc hexamethypropylene amine oxime (HMPAO), when properly done and interpreted, is a well-recognized although somewhat superceded method of functional brain imaging. It is a method I myself had used clinically and in research, as noted in my Qualifications. However, as done and interpreted by the Amen Clinic, it has a number of serious limitations, including, but not necessarily limited to: inappropriateness, unreliability, lack of validity, and a high false positive rate. Dr. Storage was either not aware of these problems, and/or did not take them into account in his use of the Amen Clinic SPECT test results.

**B. Dr. Bird**

35. Dr. Bird opines that, because of Ms. Freeman's exposure, she had "…Long-term…worsening/exacerbation of her seizure disorder as well as brain fog and vestibular disorder." (I assume Dr. Bird would have included her "headaches" in this list, although he did not explicitly list them as "long-term effects.")

36. Dr. Bird is wrong about every one of these conditions, both in terms of her history and in terms of any organic connection to the alleged exposure.

37. As noted above, Ms. Freeman had significant headaches long predating the alleged exposure (noted in records from 2005, for example).

38. The "seizure disorder" Dr. Bird references was shown to be psychogenic, and therefore not an organic disease caused by organic effects of the alleged exposure(s).

39. The medical records I reviewed report Ms. Freeman complaining of "brain fog" long before the alleged exposure. Moreover, she does not have organic brain problems that might potentially result in what might colloquially be called "brain fog,"

40. As noted repeatedly above, Ms. Freeman has never been diagnosed by any of her treating physicians as having a "vestibular disorder," nor does she have evidence of any "vestibular disorder" on examination. The term

"vestibular disorder" seems to be a term that Ms. Freeman herself introduced into her records, as I have noted earlier (Paragraph 26, #bb).

## C. Dr. Andruska

41.    Dr. Andruska opines that "Mrs. Nastasia Freeman experienced a constellation of new and worsened neurologic symptoms beginning in November 2021…Beginning in November 2021 Mrs. Nastasia Freeman's neurologic symptoms were notably distinct in nature and increased in frequency and severity, as compared to her neurologic baseline… Mrs. Freeman suffered from a profound neurologic syndrome…."

42.    I have a large numbers of reasons why I find fault with Dr. Andruska's apparent methods, and why I completely disagree with her reported opinions.

43.    One major issue I have is that Dr. Andruska is simply unclear as what "neurologic symptoms" she is referring to, and what she means by a "profound neurologic syndrome." She did not clarify either, in either her report or her deposition. Regardless of this lack of specificity on her part, as a neurologist, I have not identified any long-term "neurologic symptoms" nor any long-term "neurologic syndrome" in Ms. Freeman as the result of the alleged exposure(s).

44.     Another major issue I have with Dr. Andruska's report is that one cannot
determine what Dr. Andruska used as Ms. Freeman's "baseline," but that it
appears to be based upon incomplete and/or inaccurate information.  Dr.
Andruska does not seem to have been aware of the records from prior to
Nov. 2021 that I had been provided (please refer to my extensive earlier
listing and table, in Paragraphs 25 and 26, and the comparison chart in
Paragraph 27).  She also seems to have based her "baseline" assessment as
to the "nature and ...frequency and severity" on Ms. Freeman's self-report.
Yet in addition to all the usual reasons why self-report can be unreliable, in
Ms. Freeman's case there is Ms. Freeman's own self-reported problems with
"memory" and "brain fog." If taken at face value, Ms. Freeman's self-
reported problems with "memory" and "brain fog" would have been
expected to further limit her ability to provide a reliable past history and to
provide a reliable pre-exposure baseline (or, for that matter, to have given
anybody reliable information about these, including anybody in the materials
Dr. Andruska may have relied upon).

45.     As documented in the records I have listed in Paragraphs 25, 26, and 27, Ms.
Freeman's "baseline" (pre-alleged exposure(s)) includes essentially all the
neurologic or possibly neurologic problems that she is alleging have
occurred since the alleged exposure(s).  Dr. Andruska was either apparently

unaware of these facts, or for some reason chose to not take them into account in her reasoning and in her differential diagnosis.

46. In addition, Dr. Andruska acknowledged that Ms. Freeman's "seizures" were actually pseudo-seizures (Dr. Andruska deposition, pp. 114, 131-132), and therefore psychogenic rather than organic in origin. Yet she does not seem to take into account the implications of this for interpreting the rest of Ms. Freeman's self-reported history, her alleged symptoms, and reported laboratory results.

47. Dr. Andruska did not examine Ms. Freeman in person. But Dr. Andruska agreed at deposition that a number of Ms. Freemans alleged symptoms she opined on could have been assessed in person. In particular, she acknowledged that an examination could have been useful in general for determining "eye movement problems," "vestibular disorder or dysfunction," "numbness on their face," or "numbness in arms and hands" (Andruska Deposition, pp. 134-138). These are all problems Ms. Freeman has alleged to have followed the alleged exposure(s).

48. One of Ms. Freeman's alleged symptoms and signs that Dr. Andruska could have evaluated during the video interview would have been Ms. Freeman's reported speech difficulties. Yet Dr. Andruska did not report hearing any speech difficulties on Ms. Freeman's part, despite listening to her during the

approximately 80 minutes that she spent. And Dr. Andruska does not seem
to have considered the implications of this direct observation on Dr.
Andruska's assessment of the reliability and validity of the other symptoms
and signs Ms. Freeman reported to her, or that Dr. Andruska saw in the
records.

49.    Dr. Andruska does not seem to take the reported MRI finding(s) into account
in her differential diagnosis. Idiopathic Intracranial Hypertension, which was
a diagnostic possibility raised by the MRI findings in Ms. Freeman's case
(as noted above), is a well-known cause of headaches and of visual loss and
may be associated with obesity and female gender. Dr. Andruska's report is
mute as to this possible explanation of some of Ms. Freeman's reported
symptoms.

50.    For these reasons, and for the specific details behind these reasons, I
conclude that Dr. Andruska did not conduct a full differential diagnosis. She
did not fully consider Ms. Freeman's pre-existing conditions, nor functional
neurological illnesses, in her differential diagnosis and causal analysis.

51.    Dr. Andruska's opinion on causation is not supported by the evidence. I see
no reliable evidence nor plausible arguments in Dr. Andruska's report or in
her deposition that Ms. Freeman's current neurologic or possibly neurologic
symptoms are due to long-term organic effects of the alleged exposure,

whether in whole or in part (that is, as a "substantial contributing factor," to use the wording Dr. Andruska used; Dr. Andruska report, pg. 29).

## VI.    <u>Conclusion</u>

52.    In my opinion, based upon all of the available evidence, Ms. Freeman does not presently have any long-term organic neurologic problems from the alleged exposure(s) at Red Hill, to a reasonable degree of medical probability. There is no reliable evidence that she has had an exacerbation of the frequency nor intensity of the neurologic problems or possibly neurologic problems that she had that pre-existed these periods of time, nor any reliable evidence that she developed any new organic neurologic problems or possibly organic neurologic problems after these periods of time, that could be organically related to the alleged exposure(s).

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: April 7, 2024

BARRY GORDON, M.D., Ph.D.