IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., et al., | CIVIL NO. 22-cv-00397-LEK-KJM |
| Plaintiffs, | TRIAL DECLARATION OF DR. CAROLINE B. TUIT; EXHIBITS A-R |
| v. | |
| UNITED STATES OF AMERICA, | TRIAL DATE: April 29, 2024 |
| Defendant. | TIME: 8:30 a.m. |
| | JUDGE: Hon. Leslie E. Kobayashi |

**TRIAL DECLARATION OF DR. CAROLINE B. TUIT**

In accordance with 28 U.S.C. § 1746, I, CAROLINE B. TUIT, Ph.D., make the following declaration as my direct testimony for trial, under penalty of perjury. I make the following statements on the basis of my educational background, relevant experience, related expertise in the field of environmental chemistry, my review of data and documents associated with the Joint Base Pearl Harbor Hickam (JBPHH) water system, guiding principles of environmental and analytical chemistry and data quality, and discussions with laboratory staff at the U.S. Navy's NAVFAC Hawaii Environmental Services Lab, previously known as the Public Works Center (PWC), Pearl Harbor, PWC Environmental Laboratory ("Environmental Laboratory").

# TABLE OF CONTENTS

Pages

I.    General Background and Experience ....................................................3

II.   Scope of Analysis and Opinions.........................................................4

III.  Analytes at Issue ...............................................................................7

      A.  Petroleum Hydrocarbons and Methods of Analysis........................8

      B.  DiEGME ....................................................................................10

IV.  General Overview of Method Holding Times....................................10

V.   Total Organic Carbon and the Navy's Method of Sample Analysis.................15

VI.  Inability to Use TOC Screening Samples for Subsequent Analyses.................18

      A.  Sample Holding Times ................................................................18

      B.  Sample Headspace.......................................................................20

      C.  Sample Volume ...........................................................................23

      D.  Sample Preservation ...................................................................24

VII. Conclusion......................................................................................26

I.    **General Background and Experience**

1.    I am an environmental chemist and Principal at Gradient, an environmental
      sciences firm that specializes in contaminant fate and transport analyses,
      human health risk assessment, and environmental chemistry.

2.    I hold a Ph.D. in Oceanography from the Massachusetts Institute of
      Technology/Woods Hole Oceanographic Institution Joint Program and
      bachelor's degrees in Chemistry and Geology from Beloit College. I was a
      Hess Post-doctoral Fellow in the Department of Geosciences at Princeton
      University. Throughout my graduate education, I performed extensive
      laboratory work in Class 100 clean labs that required a high degree of
      concern regarding analytical precision, accuracy, sensitivity, and other
      criteria related to data quality assessment and usability.

3.    During my 17 years at Gradient, I have evaluated the quality and usability of
      data involving petroleum hydrocarbons, polyaromatic hydrocarbons (PAHs),
      polychlorinated biphenyls (PCBs), per- and polyfluoroalkyl substances
      (PFAS), volatile organic compounds (VOCs), including 1,2,3-
      trichloropropane, 1,4-dioxane, and formaldehyde, and metals. I have
      designed and directed total petroleum hydrocarbons (TPH) and PAH
      forensics sampling and analysis plans for CERCLA and other sites, which
      included the preparation of quality assurance project plans and data

3

validation, that generated data accepted by allocators and regulators. I have led efforts to evaluate the quality, reliability, and usability of sampling methods used during environmental investigations conducted in response to the Deepwater Horizon oil spill. I have evaluated the history of analytical methods for emerging contaminates, such as 1,2,3-trichloropropane and PFAS, and the evolution of method detection limits in drinking water as well as evaluated the data quality and usability of PFAS measurements in drinking water for several toxic tort and cost recovery cases.

4.      In addition, I have testified on the appropriateness of sampling and analytical methods for exposure and forensics analysis in consumer products and building materials. This experience is in addition to a number of papers that I have published, as well as talks and presentations on sampling and analysis methods and environmental forensics that I have given.

5.      A full list of my educational and professional experience, including recent publications and testimonial experience, is set forth in my *Curriculum Vitae*, attached hereto as **Exhibit A**, Trial Exhibit DX-3233.

## II.    Scope of Analysis and Opinions

6.      I was retained by the United States to respond to claims that remnants from total organic carbon (TOC) screening samples that were collected by the U.S. Navy in the immediate response to the November 2021 spill from the

Red Hill Bulk Fuel Storage Facility (Red Hill) could have been retained and subsequently reanalyzed under different methods. These TOC screening samples were collected from November 28, 2021, through approximately December 13, 2021. *See* Immediate Drinking Water Sampling Plan and Results, attached hereto as **Exhibit B**, Trial Exhibit JX-0044.

7.    The TOC screening samples were analyzed on-island in the Environmental Laboratory. *See* Findings of Fact, Waters Report, ¶ 236, Trial Exhibit JX-0028; given the length of the Stipulated Exhibit and for convenience, an excerpt from the Waters Report that contains the relevant paragraph is attached hereto as **Exhibit C**. The results of the TOC analyses are contained in the Immediate Drinking Water Sampling Plan and Results, Exhibit B, and in the Water Sampling Log, attached hereto as **Exhibit D**, Trial Exhibit JX-0045.

8.    I understand that the Court has dismissed Plaintiffs' claims that the TOC screening samples should have been analyzed for "petroleum chemicals" instead. *See* ECF No. 275. Therefore, I focus here on Plaintiffs' claims that the Navy should have retained what was left from the TOC screening samples. *See* ECF No. 210, ¶ 68.

9.    Specifically, I evaluated the appropriateness of the Navy's sample retention procedures for the TOC screening samples and the data usability for

exposure assessment of any potential additional data generated from what remained from these samples after the TOC analysis was completed.

10.    In conducting my analysis, I examined groundwater and drinking water quality data available on the JBPHH Safe Waters website, Trial Exhibit JX-0006, scientific literature, and general guidance documents in the fields of environmental and analytical chemistry and data quality by agencies such as the U.S. Environmental Protection Agency (EPA) that cover analytical methods and data validation guidelines, among other things. A full list of the materials that I considered in forming my opinions are set forth in Appendix B of my expert report, which is attached hereto as **<u>Exhibit E</u>**, Trial Exhibit DX-3162.

11.    In my opinion, to a reasonable degree of scientific certainty, any remaining water in the TOC screening samples following TOC analysis would have been outside the holding time for JP-5 analytes of interest at the time of their disposal in mid-January 2022.

   a.    The holding time for aqueous TOC analysis is 28 days with acidification of $pH \leq 2$ and cooling to $\leq 6$ °C. Samples that are analyzed outside of holding time may be rejected, as they may not be reliable or usable for their intended purpose. The Environmental

Laboratory analyzed the TOC samples within the appropriate method holding time.

b. Moreover, the aqueous holding time for other JP-5 analytes of interest range from 7 to 14 days.

12. Additionally, in my opinion, to a reasonable degree of scientific certainty, reanalysis of TOC screening samples for JP-5 analytes of interest after they had been analyzed by the Environmental Laboratory could not have produced reliable or usable data. This is because the TOC screening samples would not have satisfied stringent requirements in the methods for analyzing other JP-5 analytes of interest, including: (1) method holding time; (2) headspace; (3) sample volumes; and (4) preservation. These differences more likely than not would have caused loss of JP-5 related analytes in the samples due to degradation and volatilization.

## III. Analytes at Issue

13. For the purposes of my analysis, I considered the analytes of interest in this case to include petroleum hydrocarbons and additives associated with JP-5 jet fuel, specifically: benzene (B), toluene (T), ethylbenzene (E), xylenes (X), naphthalene (N), 1-methylnaphthalene (1-MN), 2-methylnaphthalene (2-MN) (collectively, BTEXMN), TPH (for gasoline range organics [TPH-

g], diesel range organics [TPH-d], and oil range organics [TPH-o]), and diethylene glycol monomethyl ether (DiEGME).

## A.    Petroleum Hydrocarbons and Methods of Analysis

14. Petroleum releases are mixtures of hundreds of hydrocarbons and their weathering products, only a small fraction of which are typically targeted for individual analysis (Exh. E at 5-6 (citing ITRC, 2018; ATSDR, 1999; HIDOH, 2017). Petroleum releases in the environment can be characterized based on measurements of individual compounds (*i.e.*, BTEXMN) or groups of related but undifferentiated compounds.

15. TPH concentrations often are reported in different boiling point and/or carbon ranges that are based on the Equivalent Carbon Number Index. For samples collected in the JBPHH water system during the immediate response, TPH was reported as:

   a.  TPH-g includes hydrocarbons with 6-12 carbon atoms (C6 to C12) fractions by Method 8260B;

   b.  TPH-d includes hydrocarbons with 9 to 25 carbon atoms (C9 to C25) fractions by Method 8015B; and

   c.  TPH-o includes hydrocarbons with 24 to 40 carbon atoms (C24 to C40) fractions by Method 8015B.

These methods allow overlap of the TPH-g and TPH-d carbons ranges and may double-count analytes in the C9 to C12 range. A demonstrative containing an annotated chromatogram of JP-5 that shows the Total Petroleum Hydrocarbon Ranges for gasoline (TPH-g) in blue and diesel (TPH-d) in orange is attached hereto as **Exhibit F**. The overlapping range in green shows where compounds may be double counted by these methods.

16.    In addition to product ranges, TPH can be grouped into fractions based on chemical properties as well as carbon range, most commonly aliphatics, which include saturated[1] or unsaturated[2] straight-chain, branched, or cyclic hydrocarbon compounds, and aromatics, which include compounds with one or more benzene or heterocyclic ring. Aromatic compounds tend to have higher water solubility and lower Henry's Law constants than aliphatic compounds with similar carbon numbers (Table 1; ITRC, 2018). Modern formulations of JP-5 jet fuel are primarily TPH-d range aliphatic (79%) and aromatic (20%) hydrocarbons, but also contain trace amounts of TPH-g range aromatics (0.42%; HIDOH, 2023a). The JP-5 Fuel chromatogram shown in Exhibit F identifies aliphatic [*e.g.* n-decane (1); n-undecane (3) n-dodecane(6); n-tridecane (10)] and aromatic [*e.g.* C4-benzene (2);  C5-

---

[1] Molecule containing only single bonds.
[2] Molecule containing one or more double or triple bonds.

9

benzene (5); naphthalene (6)] compound peaks. However, TPH chemical

fractionation data (aliphatics and aromatics) tends to be less readily available

than product range data (TPH-g, TPH-d, etc.).

    **B.**    **DiEGME**

17.    Diethylene glycol monomethyl ether (DiEGME) (also known as methyl

carbitol or 2-(2-methoxyethoxy)ethanol [CAS RN 111-77-3]) is a common

solvent that is used as a fuel icing inhibitor in jet fuel (Eckel *et al*., 1996).

## IV.   <u>General Overview of Method Holding Times</u>

18.    Sampling projects, such as that undertaken by the Navy in response to the

November 2021 JP-5 fuel spill, generally share certain data quality

objectives.  Maintaining sample integrity and representativeness during

sample collection and analysis are common goals of any measurement

process.

19.    Representative samples are those that reflect the sample population of a

matrix. For example, in this case, a representative sample would be one that

can reliably determine the benzene concentration of drinking water delivered

to a specific home during a specific period of time.

20.    As soon as a sample is collected and removed from the parent population, it

is subject to new physical and chemical conditions and processes that can

alter the concentration or speciation of the analytes of interest, including

photodegradation, biodegradation, evaporation, adsorption on filter and bottle materials (i.e., wall loss), and contamination—among other factors.

21. There are means for preserving sample integrity and representativeness during the sampling and analysis process. In part, this involves selection of appropriate sampling bottles, preservatives, and storage conditions for the analyte or chemical of interest.

   a. Sample bottles are selected to be inert (i.e., unlikely to adsorb, contaminate, or react with the analyte of interest), gas tight for volatiles, and light blocking for compounds subject to photodegradation.

   b. Preservatives for aqueous matrices include treatments to neutralize oxidants (chlorine), or to reduce pH < 2, to limit abiotic and biotic degradation and to prevent wall loss.

   c. Storage temperatures of ≤ 4 to 6 °C are recommended to limit or slow biodegradation and volatilization.

22. Yet none of the methods described in Paragraphs 21.a-c can eliminate degradation processes completely.

23. Method holding times—the maximum time allowed between sample collection and sample extraction or analysis—are critical for preserving sample integrity and representativeness. That is why EPA-certified drinking

water sampling methods have a specified amount of time that can lapse between when a sample is collected and when it is prepared for analysis. Method holding times were developed based on studies that determined the maximum holding time (MHT), or the maximum amount of time that can lapse between sample collection and sample analysis before there is a measurable change in analyte concentration, for a wide range of individual analytes in specific matrices (*e.g.* surface water, drinking water, *etc.*) and under various preservation and storage conditions. The method holding time is generally determined by the analyte with the shortest MHT.

24.    MHTs – and, therefore, method holding times – are based on extensive scientific studies. For example, studies have confirmed that, even with the most favorable preservation techniques (acidification to pH <2 with hydrochloric acid and storage at 4 °C), BTEX compounds in groundwater showed 10 to 14% losses after 14 days. In another study that investigated BTEXMN holding times, it was determined that BTEXMN stored at room temperature with acid preservation – similar to the conditions under which TOC samples were stored following analysis in the Environmental Laboratory – experienced losses on the order of 10-20% over 14 days or less.

25.    Thus, compliance with method holding times is a central requirement of

many regulatory compliance regimes, including the Safe Drinking Water

Act (SDWA). The SDWA incorporates Clean Water Act (CWA) methods

(Title II of 40 CFR Part 136), including holding times, by reference. *See* 40

CFR 141.24. What this means is that, in practice, drinking water samples

analyzed in excess of method holding times will be rejected if submitted to

the Hawaii Environmental Health Administration and the U.S. EPA for

public water system reporting for the SDWA.

26.    For the targeted compound and TPH analyses, the method holding times are

generally 7 days if the sample is not preserved and 14 days if the sample is

correctly preserved and stored. A demonstrative list of methods used to

analyze the water in the JBPHH drinking water system, including the

method hold times and preservation requirements, is attached hereto as

**Exhibit G** (listing the various, potentially applicable methods).

27.    While drinking water methods exist for most of the individual analytes of

interest (primarily BTEXMN), they are not available for TPH-d or other

petroleum hydrocarbon fractions. Instead, SW-846 Methods (Superfund) are

used, specifically 8260B for TPH-g and VOCs, 8015B for TPH-d and 8270

for SVOCs. The different methods for the TPH fractions are due to the

relative volatility of the constituents, some of which require measurement

via purge and trap techniques (i.e., TPH-g). A demonstrative table setting

forth information about the individually targeted compounds of interest

related to JP-5, including information related to their volatility, solubility,

and vapor pressure, is attached hereto as **Exhibit H**. It is also worth noting

that, DiEGME is not typically detected by VOC methods that rely on purge

and trap techniques.

28.    A demonstrative explaining the U.S. EPA's guidance on Superfund Method

holding times for aqueous VOCs (i.e., BTEXN, TPH-g) is attached hereto as

**Exhibit I**. As discussed above and shown in the demonstrative, method

holding times impact the usability of data derived from samples used for

VOC analysis. Data derived from samples that have not been acidified to

pH<2 that were held for more than 7 days before they were analyzed is

subject to additional scrutiny; such data may be deemed unusable (and

therefore rejected) or qualified. Similarly, data derived from acidified

samples that were analyzed after 14 days are subject to additional scrutiny

and, again, may be deemed unusable or qualified.

29.    A demonstrative explaining the U.S. EPA's guidance on method holding

times for aqueous SVOCs (i.e., 1-MN, 2-MN, N, DiEGME) is attached

hereto as **Exhibit J**. As with VOCs, method holding times impact the

usability of data derived from samples used for SVOC analysis. If a sample,

stored at the appropriate temperature, has not been extracted within 7 days, the resulting data from any analysis will be rejected or qualified. Even if a sample has been extracted within 7 days, if it has not been analyzed within 40 days, any resulting data from SVOC analyses would be unusable (and therefore rejected) or qualified.

**V.    Total Organic Carbon and the Navy's Method of Sample Analysis**

30.    As stated *supra*, I understand that the goal of the TOC analyses conducted by the Environmental Laboratory was to rapidly screen for potential JP-5 impacts within the JBPHH drinking water system.

31.    During the immediate response, the only analytical test available on the island capable of screening water samples for the presence of JP-5 related analytes was TOC testing through the Environmental Laboratory, and the turnaround time for TOC analysis at the Environmental Laboratory ranged from 0 to 12 days. *See* Exhibit D.

32.    The TOC samples were collected by Navy personnel with 40 ml volatile organic analysis (VOA) vials that were provided by the Environmental Laboratory. VOA vials include a gas-tight septa that can be pierced with a needle to draw a sample aliquot for analysis. These containers minimize loss of volatile analytes from the sample. A demonstrative photograph of three 40 ml VOA vials, such as that used by the Environmental Laboratory, is

attached hereto as **Exhibit K**. For scale, the demonstrative includes two 1L amber glass bottles (normally required for TPH-d and SOC analysis) and a quarter.

33.    Only 1 VOA vial was collected per location. This was due to concerns that they would run out of vials. After collection, samples were delivered back to the Environmental Laboratory, where they were preserved with sulfuric acid and stored in a refrigerator until analysis.

34.    The Environmental Laboratory uses Standard Methods 5310B for TOC analysis. *See* Environmental Laboratory "Total Organic Carbon (NPOC)[SOP]," attached hereto as **Exhibit L**, Trial Exhibit DX-3161. The samples were analyzed by Standard Methods 5310B using a Shimadzu TOC-VCPH/TOC-VCPN Analyzer with a Shimadzu ASI-V Autosampler ("the Shimadzu Analyzer"). The Shimadzu Analyzer pierces the septa of the VOA vial with a needle to draw a sample aliquot into the instrument for analysis. Gas is then bubbled through the acidified sample to remove inorganic carbon [sample sparging or purging]. The purged sample is then injected into the combustion tube, where its organic carbon contents are combusted, oxidized and measured *via* infrared analysis.

35.    Previously, the Environmental Laboratory had primarily done TOC testing

on wastewater for National Pollutant Discharge Elimination System

(NPDES) compliance.

36.    Per my conversations with Environmental Laboratory Director Duane

Morita, I understand that the Environmental Laboratory modified its TOC

SOP to account for project-specific needs. U.S. EPA Method 5310B

analyzes TOC as non-purgeable organic carbon (NPOC) and includes a

purging step, whereby the acidified sample is sparged for 10 minutes to

remove inorganic carbon from the sample. This is consistent with SDWA

regulations that require inorganic carbon to be removed from samples prior

to analysis.

37.    Sparging entails bubbling gas through a sample to combine with and

eliminate other dissolved gases or volatile components from the sample.

Sparging, therefore, may also remove VOCs present in the sample. Per Mr.

Morita, to address that concern, the Environmental Laboratory reduced the

sparge time in their TOC SOP to 1.5 minutes – the minimum allowed by the

Shimadzu Analyzer, to limit the amount of volatile hydrocarbon loss.

38.    After the Environmental Laboratory completed their TOC analysis, I

understand from Mr. Morita that there remained at most 10 – 20 ml of

sample material in the VOA vials.

39. While neither the Environmental Laboratory TOC SOP, *see* Ex. L, nor the

    SM 5310B Method provide a method hold time, both 40 CFR Section 136.3

    Table II and 40 CFR Section 141.131(d)(3) give a maximum holding time

    (and therefore a method holding time) of 28 days for analysis of acidified

    TOC samples by Standard Method 5310 B.

40. The samples included in the Water Sampling Log for which results were

    provided were all analyzed within the TOC 28-day holding time. *See* Ex. D.

**VI.    Inability to Use TOC Screening Samples for Subsequent Analyses**

41. The samples collected for TOC analyses could not have been sent to other

    labs for additional testing in compliance with EPA-certified methods due to

    differences in method requirements for (a) sample holding times, (b) sample

    headspace, (c) sample volume, and (d) sample preservation methods.

    **A.    Sample Holding Times**

42. As noted *supra*, the estimated turnaround time for TOC screening was 0 to

    12 days. Method holding times for VOC and SVOC analytes associated with

    JP-5 vary from 7 to 14 days depending on preservation conditions. *See*

    *supra*, ¶ 26; Ex. G.

43. Thus, all of the immediate response samples would have been out of the

    method holding times for the other JP-5 analytes by mid-January 2022.

44.    As discussed *supra*, method holding times are critical to ensure sample

integrity and representativeness, as samples degrade over time. For example

maximum holding time studies have determined that:

    a.    BTEX compounds in preserved (pH<2) and chilled (4 °C)

        groundwater can experience 10 to 14% losses after 14 days.

    b.    BTEXMN – when stored at room temperature with acid

        preservation, similar to the conditions of the TOC samples

        following analysis – can experience losses on the order of 10-20%

        over 14 days or less.

    c.    DiEGME – A maximum holding time study is unavailable for

        DiEGME in preserved samples; however, it is biodegradable at

        low concentrations (<7,000 ug/L) in aqueous environments. The

        environmental half-life of DiEGME has been estimated as 2 to 16

        days, with some studies reporting its half-life in water to be 15

        days and others indicating DiEGME experiences greater than 60%

        degradation in 10 days.

45.    A demonstrative timeline showing when method holding times expired for

the analytes of interest in this case under the applicable Standard Methods is

attached hereto as **<u>Exhibit M</u>**. Using the last date for TOC sample collection

(December 14, 2021), the method holding times for samples to be analyzed

for certain VOCs and SVOCs using Standard Methods 8270 (N, 1-MN, 2-MN, DiEGME), 8015 (BTEX, TPH-g, TPH-d, TPH-o) if not preserved, or 8260 (BTEXN, TPH-g) if not preserved,  was seven days after collection – December 21, 2021. The method holding times for samples to be analyzed using Standard Methods 524.2 (BTEXN), 525.2 (N, 1-MN, 2-MN, DiEGME), 8015 (BTEX, TPH-g), and 8260 (BTEXN, TPH-g), if preserved to pH < 2, was fourteen days after collection – December 28, 2021.

46.    Given such degradation, any testing conducted on remaining sample volumes after the method holding time would have resulted in unreliable and unusable data. *See* Exs. I, J (demonstrative flowcharts).

47.    These concerns would have been further compounded by uncertainty due to excess headspace (Section VI.B), low sample volume (Section VI.C), and incompatible sample preservation and storage conditions (Section VI.D), *see infra*, ¶¶ 48-63.

**B.    Sample Headspace**

48.     Any attempt to measure VOCs in the TOC screening samples would be subject to considerable uncertainty and bias. This is because excess headspace in VOA vials can lead to low biased concentration for VOCs in the water due to the ability of VOCs to partition out of the water and into the gas phase.

49. To avoid this, sampling instructions for volatile analysis by purge and trap methods (used for VOCs) state variously that no air bubbles should be trapped in the sample when a bottle is sealed, that samples with air bubbles should be discarded and re-collected, and that any bubbles formed during sample degassing should be less than 5-6 mm to limit partitioning to the gas phase. *See* Ex. G.

50. I understand that the TOC screening samples did not have stringent headspace requirements for collection, which is consistent with TOC methods. Moreover, many of the TOC samples that were analyzed by the Environmental Laboratory were collected with headspace. This would render the TOC samples unacceptable for VOC analysis.

51. Moreover, after TOC analysis, the sample vials would have 20 to 30 ml headspace compared to 10 to 20 ml of water. A demonstrative illustrating different headspaces is attached hereto as **Exhibit N**. The demonstrative shows four images: a photograph of an empty vial (i.e., prior to TOC sample collection), a cartoon of a vial with no visible headspace, a cartoon of a vial with an "acceptable" amount of headspace, and a cartoon of a vial reflecting the average amount of headspace remaining in a VOA vial following TOC analysis. There is a stark difference between the amount of "acceptable"

headspace (second vial from the right) and the average amount of headspace remaining following TOC analysis (far right).

52. Given the stringent headspace requirements for VOC methods described *supra*, the remaining sample after TOC analysis would not have produced reliable results for any VOCs: The gas phase would have comprised 50% or more of the vial volume, resulting in VOC loss and biased results.

53. Storage at ambient temperatures—as the TOC vials were after analysis—would have exacerbated headspace issues for volatiles and enhanced loss of BTEXNM compounds. This would have rendered any subsequent VOC or SVOC analysis unreliable and any resulting data unusable.

54. A demonstrative showing the effects of headspace and storage temperatures on the loss of VOCs in any remaining TOC sampling volume is attached hereto as **Exhibit O**. Based on Henry's Law, the concentration of dissolved gas in a liquid is proportional to the concentration in the gas above the liquid for a given temperature and pressure. As seen in the demonstrative, immediately after TOC analysis, with storage at 4°C, roughly 12% of Benzene would be lost to the gas phase. When stored at 25°C, 29% of Benzene would be lost to the gas phase. This would result in a low sample bias and unreliable results.

### C.    Sample Volume

55.    Following TOC analysis, only 10 to 20 ml of water remained in the 40 ml

VOA sample vial.

56.    Such low volume is not enough for reanalysis under potentially applicable

methods. For example:

  a.  Method 8270 for SVOCs also typically has a 500 ml to 1 L sample

  size.

  b.  SW_846 Chapter 4 recommends collection of four 1 L samples.

  c.  Method 525.2 (used for DiEGME, N, 1-MN, 2-MN) recommends

  1 L or 1 quart samples.

  d.  Method 8270 (used for DiEGEME, N, 1-MN, 2-MN) recommends

  1 L samples.

*See* Ex. G.

57.    For example, I understand from my review of documents produced in this

case that the Drinking Water Sampling Plan created by the Interagency

Drinking Water System Team (IDWST) required three, 40 ml VOA vials

filled with no headspace for VOC analysis. A copy of the Drinking Water

Sampling Plan is attached hereto as **Exhibit P**, Trial Exhibit JX-0012. This

requirement also complies with state and federal regulations for analysis and

certain Standard Methods for VOC analysis (*see, e.g.*, Ex. G, Standard

23

Method 8260). This required sample volume is far greater than any

remaining sample material following early TOC analysis during November

and December 2021. A demonstrative illustrating the difference between the

volume of three, filled 40 ml VOA vials and the remaining sample volume

following TOC analysis is attached hereto as **Exhibit Q**.

58.    Similarly, the Drinking Water Sampling Plan required two, filled 1L glass

bottles for TPH-d and SVOC analysis. *See* Ex. P. A demonstrative showing

the difference between that requirement and the remaining sample volume

following TOC analysis is attached hereto as **Exhibit R**. Once again, there is

insufficient sample volume to yield reliable results.

59.    Reducing the sample size could also impact the detection limit, yielding

unreliable screening results. For example, the method detection limit (MDL)

for TPH-d using Method 8015 under the Draft Drinking Water Sampling

Plan was 200 µg/L. *See* Ex. P. Reducing the sample size would increase the

detection limit in the remaining sample to 5,000 µg/L – well above TPH-d

screening levels.

### D.    Sample Preservation

60.    Method-specific preservation requirements are also critically different

between TOC screening samples and other JP-5 analytes in drinking water,

meaning that samples preserved for purposes for TOC analysis will not be properly prepared to be reanalyzed for another method.

61.  U.S. EPA TOC sample preservation requirements only call for acidification to pH < 2.

62.  In contrast, other drinking water methods require additional preservation to prevent chlorine in the drinking water from affecting the sampling results. *See* Ex. G. This is because chlorine is a strong oxidant and may react with organic compounds, resulting in the production of disinfection byproducts and potential degradation of analytes of interest in this case. For example:

   a.  U.S. EPA drinking water methods for VOCs and SVOCs require an additional preservative in addition to acidification in the form of sodium thiosulfate in order to scavenge free chlorine.

   b.  SW-846 VOC and SVOC methods also recommends preservation of water samples with sodium thiosulfate if residual chlorine is present.

   c.  Failure to add sodium thiosulfate to VOC samples drops the method hold time from 14 to 7 days.

   d.  Any unreacted chlorine in the samples may also result in degradation of DiEGME, as glycols are incompatible with halogens and other strong oxidizing agents.

25

63. Thus, preservation of samples using TOC protocols would have led to uncertainty and bias in any subsequent VOC or SVOC analyses, rendering any results unreliable and unusable.

## VII. <u>Conclusion</u>

64. In conclusion, to a reasonable degree of scientific certainty, the Environmental Laboratory waited to dispose of the TOC screening samples until the conclusion of the method holding time for aqueous TOC analysis, which is 28 days with acidification of pH $\leq$ 2 and cooling to $\leq$ 6 °C. Moreover, as the aqueous holding time for other JP-5 analytes of interest range from 7 to 14 days, any remaining water in the TOC screening samples following TOC analysis would have been outside the holding time for JP-5 analytes of interest in mid-January 2022, rendering any resulting data both unreliable and unusable.

65. Additionally, reanalysis of TOC screening samples after they had been analyzed by the Environmental Laboratory for JP-5 analytes of interest could not have produced reliable or usable date. TOC screening samples would not have satisfied stringent requirements in the methods for analyzing other JP-5 analytes of interest, as they would have been analyzed outside the method holding time for the BTEXMN analytes of interest, would have excess headspace, low sample volumes, and would not have the necessary

additives for preservation for VOC or SVOC methods. The conditions

warranted by the TOC method employed by the Environmental Laboratory

would have caused loss of JP-5 related analytes in any remaining sample

volume due to degradation and volatilization.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: April 5, 2024

_____

Dr. Caroline B. Tuit

27