UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

PATRICK FEINDT, JR., et al.,

          Plaintiffs,

     vs.

UNITED STATES OF AMERICA,

          Defendant.

CIV. NO. 22-00397 LEK-KJM

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO EXCLUDE THE EXPERT REPORTS
AND TESTIMONY OF DRS. SPIRA AND KEIFER, AND DENYING
DEFENDANT'S MOTION IN LIMINE TO EXCLUDE DRS. CLARK AND VARGO**

Before the Court are Defendant United States of

America's ("Defendant" or "United States") Motion to Exclude the

Expert Reports and Testimony of Drs. Spira and Keifer ("Spira

Motion"), [dkt. no. 232,] and Defendant's Motion in Limine to

Exclude Drs. Clark and Vargo ("Clark and Vargo Motion"), [dkt.

no. 237,[1]] both filed on January 16, 2024. On March 5, 2024,

Plaintiffs filed their oppositions to both motions, [dkt

nos. 303, 304,] and on March 8, 2024, Defendant filed their

_____

[1] The original memorandum in support of the Clark and Vargo
Motion, [dkt. no. 237-1,] has been replaced. See The United
States' Notice of Filing Materials in Response to ECF No. 249,
filed 1/24/24 (dkt. no. 254) ("Notice of Filing Re Clark and
Vargo Motion"), United States' Memorandum of Law in Support of
Its Motion in Limine to Exclude Drs. Clark and Vargo. All
citations to the memorandum in support of the Clark and Vargo
Motion refer to version filed with the Notice of Filing Re Clark
and Vargo Motion.

replies, [dkt. nos. 313, 311]. The Court finds these matters suitable for disposition without a hearing pursuant to Rule LR7.1(c) of the Local Rules of Practice for the United States District Court for the District of Hawaii ("Local Rules"). For the reasons set forth below, the Spira Motion is granted in part and denied in part in that Dr. Spira's opinions are excluded except insofar as Dr. Spira opines on Plaintiffs' trauma and the psychological impact of institutional betrayal. The Court deems the Spira Motion withdrawn as it relates to Dr. Keifer. The Clark and Vargo Motion is denied in its entirety.

## BACKGROUND

The parties are familiar with the facts of this case and the Court will not repeat them here, except as relevant to the issues at hand. Briefly, this case arises out of the May 6 and November 20, 2021 fuel leaks from the United States Navy's ("the Navy") Red Hill Bulk Fuel Storage Facility on Joint Base Pearl Harbor-Hickam ("Red Hill" and "JBPHH"). [Fifth Amended Complaint, filed 12/1/23 (dkt. no. 210), at pgs. iii, 1; ¶¶ 4, 9.] Plaintiffs allege that Defendant owns and operates Red Hill and the water system that serves JBPHH, as well as the housing that Plaintiffs leased and resided in. [Id. at ¶¶ 6, 9, 530.] Defendant was allegedly negligent in releasing fuel into the water supply, among other things. [Id. at ¶¶ 4, 467, 481.] Plaintiffs allege the following claims against Defendant: (1) a

2

negligence claim ("Count I"); (2) a negligent undertaking claim ("Count II"); (3) a nuisance claim ("Count III"); (4) a medical negligence claim alleging failure to treat and delayed care ("Count IV"); (5) an infliction of emotional distress claim ("Count V"); and (6) a premises liability claim alleging breach of the duty to control force ("Count VII"). [Id. at pgs. 161-79.] Plaintiffs seek damages for, among other things, past and future: pain and suffering, emotional distress, medical expenses, loss of income and earning capacity, physical impairment, loss of enjoyment and quality of life; as well as increased risk of future harm and medical monitoring for life, and loss of life expectancy, among other things. [Id. at pgs. 190-91.]

## I. **Dr. Spira**

The Spira Motion as it relates to Dr. Keifer was withdrawn, so only background pertinent to James L. Spira, PhD, MPH, ABPP will be briefly summarized. See Opp. to Spira Motion at 1 n.1. Plaintiffs retained Dr. Spira to assess the impact that the contamination from the jet fuel leak at Red Hill had on Plaintiffs, regarding their experiences with the military health system and military health professionals. [United States' Notice of Filing Exhibits A and H in Support of its Motion to Exclude the Expert Reports and Testimony of Drs. Spira and Keifer, filed 1/22/24 (dkt. no. 250) ("Notice of Filing Re Spira Motion"),

3

Exh. A (Effects of Red Hill Jet Fuel Contamination on Military Family Attitudes Toward Military Health System and Relationship to Department of Defense, by James L Spira PhD, MPH, APP, dated 7/23/23) ("Spira Report") at 1.] Dr. Spira is a licensed psychologist, and is board-certified in Clinical Health Psychology by the American Board of Professional Psychology. Dr. Spira obtained his received his doctoral degree from the University of California, Berkeley, and completed his internship and postdoctoral fellowship at Stanford University. Dr. Spira has served as a member of the medical school faculties at Duke University, the University of California, San Diego, and the University of Hawai`i. Dr. Spira has also served as the President of the Hawai`i Psychological Association and as President of the American Academy of Clinical Health Psychology, among other positions. Dr. Spira also worked as a treating psychologist for several persons who experienced water contamination from the 2021 Red Hill fuel spill. Dr. Spira has twenty-five years of experience working with military members and veterans in areas including behavioral health education, prevention, clinical intervention, and research. Id. at 1-2; see also id. at PageID.11618-20 (portion of Biographical Sketch of Dr. Spira). For example, Dr. Spira worked at the Naval Medical Center in San Diego as the head of the health psychology division, and as director of the United States Department of

4

Veterans Affairs, National Center for PTSD, Pacific Islands
Division. [Id. at PageID.11619.]

Dr. Spira's expert report consists of summaries of
interviews with five of the Plaintiffs (Natasia Freeman
("Freeman"), Amanda Feindt ("Feindt"), Elizabeth Witt ("Witt"),
Kevin Aubart ("Aubart"), and Richelle Dietz ("Dietz")), Dr.
Spira's identification of common themes from the interviews, and
his conclusions. Dr. Spira's opinions are based on these
interviews with Plaintiffs, his review of documents provided by
the United States Department of Defense ("DOD"), the Defense
Health Agency, the Centers for Disease Control and Prevention,
town hall briefings by DOD representatives, among other
documents. [Id. at 2-3, 9, 12, 14;, 16 id. at PageID.11634-11636
(Document[s] Considered by James L. Spira, PhD MPH).]

Dr. Spira opines: that, "for active-duty members,
. . . faith in leadership [– or lack thereof –] impacts
sensitization and resilience to stressors"; [id. at 24;] that
"the more one reacts to [a medical problem] with attention and
anxiety, the worse the symptoms"; [id. at 23;] that the response
to the contamination by military leadership after November 2021
led to widespread trauma; and that Plaintiffs' fear of future
harm is reasonable under the circumstances, [id. at 25].

Dr. Spira opines that "[m]ilitary medicine is
inadequate to manage the effects of large scale disasters on the

5

health of its members"; [id.;] and "the government's response
fell short of standard of care expected to be received," [id. at
26]. Finally, Dr. Spira concludes "families should be provided
civilian care for any future illness or symptoms related to
their exposure to jet fuel, including future medical care and
surveillance. Simply put, people should not be forced to receive
medical treatment from the same entity that made them sick in
the first place." [Id.]

## II.  **Dr. Clark**

Andrew Clark, M.D. was retained by Plaintiffs to
"assess any potential psychological, developmental, or
psychiatric impacts of the fuel spill and its aftermath" to
minor Plaintiffs. See Notice of Filing Re Clark and Vargo
Motion, Exh. 1 (Psychiatric Assessment Report regarding the
Dietz Family, by Dr. Clark, dated 7/24/23) ("Clark Dietz
Report") at 1; id., Exh. 2 (Psychiatric Assessment Report
regarding the Feindt Family, by Dr. Clark, dated 7/24/23)
("Clark Feindt Report") at 1; id., Exh. 3 (Psychiatric
Assessment Report regarding the Freeman Family, by Dr. Clark,
dated 7/24/23) ("Clark Freeman Report") at 1; id., Exh. 4
(Psychiatric Assessment Report regarding the Jessup Family, by
Dr. Clark, dated 7/24/23) ("Clark Jessup Report") at 1.
Dr. Clark is a psychiatrist, and is board-certified in child and
adolescent psychiatry by the American Board of Psychiatry and

Neurology. [Clark Deitz Report, Exh. A (Curriculum Vitae of Andrew B., M.D., dated 6/1/22) at 2.]

Dr. Clark opines on each of the eleven minor Plaintiffs and concludes for many of them that the contamination in the water contributed substantially to their mental health difficulties, such as anxiety and trauma. See, e.g., Clark Dietz Report at 7; Clark Feindt Report at 13-14. In forming his opinions, Clark conducted interviews with parents and one minor child. See Clark Jessup Report at 2; Notice of Filing Re Clark and Vargo Motion, Exh. 5 (transcript excerpts of 10/23/23 video deposition of Dr. Clark) ("Clark Depo.") at 126. In forming his opinions, Dr. Clark reviewed, among other things, medical records, other therapy records, and academic literature. See, e.g., Clark Dietz Report at 1-2; Clark Dietz Report, Exh. D (Dr. Clark Reliance List for Dietz Report).

For example, Dr. Clark interviewed one of the minor children's parents for one hour and reviewed documents including the Fourth Amended Complaint, [filed 6/13/23 (dkt. no. 121),] and the minor child's medical records and occupational therapy records. [Clark Dietz Report at 1-2.] Dr. Clark opines that the water contamination from the 2021 fuel spill, "in part due to the stresses and disruptions associated with it, contributed substantially" to the minor child's anxiety, and placed this

7

minor "at an elevated risk going forward of developing a more severe anxiety disorder." [Id. at 7.]

## III. **Dr. Vargo**

Melissa Vargo, M.A., Psy.D. was retained by Plaintiffs to provide a mental examination of adult Plaintiffs. See Notice of Filing Re Clark and Vargo Motion, Exh. 7 (report regarding Aubart by Dr. Vargo, dated 7/24/23) ("Vargo Aubart Report") at 1-2. Dr. Vargo is a psychologist in private practice. [Id. at 1; id., Exh. A (Dr. Vargo's curriculum vitae).]

Dr. Vargo opines that the contamination of Plaintiffs' tap water from the Red Hill fuel spill was a traumatic event to the adult Plaintiffs she assessed. See, e.g., Vargo Aubart Report at 6-7. Dr. Vargo bases her opinions on interviews with those Plaintiffs, the P.T.S.D. Checklist (Civilian Version) ("PTSD Checklist") completed by those Plaintiffs, the Beck Depression Inventory II and Beck Anxiety Inventory completed by those Plaintiffs, and a review of those Plaintiffs' medical and psychological records that Plaintiffs' counsel provided to her. See, e.g., id. at 3. Dr. Vargo provided each adult Plaintiff with a mental health diagnosis, a prognosis for that diagnosis, and a recommendation for psychotherapy sessions to address the Plaintiff's mental health needs. See, e.g., id. at 6-7.

8

**STANDARD**

Federal Rule of Evidence 702 provides that expert opinion evidence is admissible if: (1) the witness is sufficiently "qualified as an expert by knowledge, skill, experience, training, or education"; (2) the witness's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) the witness's "testimony is based on sufficient facts or data"; (4) the witness's "testimony is the product of reliable principles and methods"; and (5) the witness has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702. Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ("Daubert I"), a trial judge is required to apply a gatekeeping role to expert witness testimony. White v. Ford Motor Co., 312 F.3d 998, 1007 (9th Cir. 2002), opinion amended on denial of reh'g, 335 F.3d 833 (9th Cir. 2003). The Rule 702 inquiry under Daubert I, however, "'is a flexible one,' and the 'factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[2] Id. (quoting Kumho

---

[2] The factors identified in Daubert I are: methodology, testing, peer review and publication, rates of error and control standards, and "general acceptance" in the "relevant scientific community." 509 U.S. at 593-94.

Tire Co. v. Carmichael, 526 U.S. 137, 150, 119 S. Ct. 1167 (1999)).

Preliminarily, the Court must determine if the proposed expert is sufficiently qualified by the requisite "knowledge, skill, experience, training, or education" on the subject matter. Fed. R. Evid. 702; see also United States v. Alo-Kaonohi, 635 F. Supp. 3d 1074, 1079 (D. Hawai`i 2022). Rule 702 "'contemplates a **broad conception** of expert qualifications,'" and therefore only a "**minimal foundation** of knowledge, skill, and experience [is] required in order to give 'expert' testimony." Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1015, 1016 (9th Cir. 2004) (quoting Thomas v. Newton Int'l Enters., 42 F.3d 1266, 1269 (9th Cir. 1994)) (emphases in Hangarter). However, "[a] person qualified to give an opinion on one subject is not necessarily qualified to opine on others." Rogers v. Raymark Indus., Inc., 922 F.2d 1426, 1431 (9th Cir. 1991).

To fulfil its substantive gatekeeping obligations, courts must determine if the proffered testimony is reliable, and if it fulfills the "fit" requirement, meaning that the expert's testimony "logically advances a material aspect of the proposing party's case." Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II").

> The reliability inquiry focuses on the expert's "principles and methodology, not on the conclusions that they generate." Daubert I, 509 U.S. at 595, 113 S. Ct. 2786. The reliability inquiry is flexible; although Daubert I lists factors for the reliability inquiry, courts have discretion to determine whether those factors are reasonable measures of reliability in a particular case. Kumho Tire, 526 U.S. at 152–53, 119 S. Ct. 1167.

Alo-Kaonohi, 635 F. Supp. 3d at 1079. When evidence is not scientific, and "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it," the Daubert I factors are not reasonable indicia of reliability. United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000) (citing Kumho Tire, 119 S. Ct. at 1175) (holding that the district court did not abuse its discretion when it assessed the expert testimony without considering the Daubert I factors). "[A] trial court . . . has broad latitude in determining whether an expert's testimony is reliable" as well as in deciding how to determine whether that testimony is reliable. Hangarter, 373 F.3d at 1017 (citations omitted).

For evidence to be relevant, it must meet the "fit" requirement. However,

> the "fit" requirement is not merely a reiteration of the relevancy standards in Federal Rules of Evidence 401–403. Because "[e]xpert evidence can be both powerful and quite misleading [given] the difficulty in evaluating it," "the judge in weighing possible prejudice against probative force under Rule 403 of the [Federal Rules of Evidence] exercises more control over experts

11

> than over lay witnesses." [Daubert I, 509 U.S.]
> at 595, 113 S. Ct. 2786 (citation omitted).
> Courts must therefore exclude proffered expert
> testimony pursuant to Rules 702 and 403 unless
> they are convinced that the testimony speaks
> clearly and directly to a disputed issue and that
> it will not mislead the jury. Daubert II, 43 F.3d
> at 1321 n.17 (discussing scientific expert
> evidence, specifically). And to be admissible,
> "the subject matter [of the testimony] at issue
> must be beyond the common knowledge of the
> average layman." United States v. Finley, 301
> F.3d 1000, 1007 (9th Cir. 2002); United States v.
> Hanna, 293 F.3d 1080, 1086 (9th Cir. 2002).

Alo-Kaonohi, 635 F. Supp. 3d at 1079–80 (some alterations in

Alo-Kaonohi) (some citations omitted). "Expert opinion testimony

is relevant if the knowledge underlying it has a valid

connection to the pertinent inquiry." Primiano v. Cook, 598 F.3d

558, 565 (9th Cir. 2010) (quotation marks and citation omitted).

District courts have wide discretion when acting as a

gatekeeper for the admissibility of expert testimony. Kumho

Tire, 526 U.S. at 151–52. "[S]haky but admissible" expert

testimony is best attacked by cross examination, contrary

evidence, and attention to the burden of proof, not by

exclusion. Daubert I, 509 U.S. at 596. Further, the Daubert

gatekeeping function of courts is intended to protect juries,

making the inquiry less relevant and the barriers less stringent

in a bench trial. See United States v. Flores, 901 F.3d 1150,

1165 (9th Cir. 2018).

## DISCUSSION

### I.   Dr. Spira

Defendant argues that Dr. Spira's opinions go beyond the scope of his expertise, that Dr. Spira's opinions on the medical standard of care should be excluded, and that Dr. Spira did not reliably apply the "grounded theory" methodology. Defendant contends Dr. Spira simply accepted plaintiffs' subjective experiences as true. [Spira Motion, Mem. in Supp. at 10-20.]

Defendant is correct that many of Dr. Spira's opinions extend beyond the scope of his expertise. Plaintiffs have failed to demonstrate that Dr. Spira has the requisite knowledge, skill, experience, training or education to testify as to the question of whether the military medical system breached its standard of care, and as to the more general inadequacies of military medicine. See Spira Report at 25-26. While Dr. Spira has experience as a psychologist who has worked at the Navy Medical Center, and in the departments of psychiatry and medicine at medical schools, among other things, see Spira Report at PageID.11619 (portion of Biographical Sketch of Dr. Spira), Dr. Spira is not a licensed medical physician, has "never prescribed or treated as a physician," has never "published any articles on the standard of care a treating physician should employ when confronted with somebody who

13

presents with possible environmental contamination exposure,"
and is not a toxicologist. See Spira Motion, Decl. of Alanna
Horan ("Horan Decl.") Exh. B (transcript excerpts of 10/27/23
video deposition of Dr. Spira) ("Spira Depo.") at 24-26. Dr.
Spira's experience as a psychologist who is familiar with
military medicine is insufficient to qualify him as an expert on
military medicine. See Krizek v. Queen's Med. Ctr., CIV. NO. 18-
00293 JMS-WRP, 2020 WL 5633848, at *5-7 (D. Hawai`i Sept. 21,
2020) (finding proposed expert not qualified to opine on the
standard of care in emergency medicine, where the proposed
expert was an intensive care unit physician, but not an
emergency room physician).

Second, Dr. Spira may not testify as to the question
of whether Plaintiffs' fear of future harm was reasonable. Under
Hawai`i law, the issue of whether a plaintiff has sustained
emotional distress is within the discretion of the trier of fact
and medical testimony is not a prerequisite for recovery for
emotional distress. Campbell v. Animal Quarantine Station, 63
Haw. 557, 564, 632 P.2d 1066, 1070-71 (1981). An expert witness
may testify when "scientific, technical, or other specialized
knowledge will help the trier of fact to understand the evidence
or to determine a fact in issue." Fed. R. Evid. 702(a). The
Court concludes that specialized knowledge is not necessary for
the Court to evaluate the issue of whether Plaintiffs' fear of

14

developing long-term illnesses or effects in the future is
reasonable and Dr. Spira's opinion on this issue is not relevant
and thus not admissible.

However, Dr. Spira is qualified to testify regarding
the trauma that Plaintiffs suffered due to institutional
betrayal that is included within his expert report, including
his opinion that losing faith in leadership impacts
sensitization and resilience to stressors. See Spira Report at
24. These opinions are not mere regurgitations of Plaintiff's
opinions as Defendant contends. The Court finds that Dr. Spira's
opinions regarding Plaintiffs' trauma and the psychological
impact of institutional betrayal are founded on sufficient facts
or data to render these opinions "more than subjective belief or
unsupported speculation." See Daubert I, 509 U.S. at 590.

The Court is unpersuaded by Defendant's argument that
Dr. Spira's opinion is unreliable because he did not disclose
data regarding his private patients that he relied upon in his
grounded theory methodology. [Spira Motion, Mem. in Supp. at 17-
18.] Dr. Spira may use his experience, including his experience
with private patients, to inform his opinions. See, e.g.,
Messick v. Novartis Pharms. Corp., 747 F.3d 1193, 1198 (9th Cir.
2014) ("there is nothing wrong with a doctor relying on
extensive clinical experience when making a differential
diagnosis"). Further, Defendant raises flaws with Dr. Spira's

interview questions being biased. <u>See</u> Spira Motion, Mem. in Supp. at 18-19. However, there is no indication that Dr. Spira's questions to Plaintiffs were biased in favor of a predetermined hypothesis, or were conducted in any manner other than an open-minded approach. <u>See, e.g.</u>, Horan Decl., Exh. H (emails between Dr. Spira and Amanda Feindt). These alleged flaws go to the weight of Dr. Spira's opinions, not admissibility. "Imperfect application of methodology may not render expert testimony unreliable because a minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method does not render expert testimony inadmissible." <u>Hardeman v. Monsanto Co.</u>, 997 F.3d 941, 962 (9th Cir. 2021) (brackets, quotation marks, and citation omitted). Challenges to his opinion will be left to cross examination, contrary evidence, and attention to the burden of proof at trial.

Dr. Spira's opinions regarding Plaintiffs' trauma and institutional betrayal are pertinent to Plaintiffs' emotional distress damages and will aid the trier of fact. Accordingly, Dr. Spira's opinions regarding Plaintiffs' trauma and institutional betrayal are admissible under Rule 702.

## II.  <u>Dr. Clark</u>

It is clear Dr. Clark has the requisite experience and training in the field of psychiatry, and that his specialized knowledge in psychiatry will aid the trier of fact. Defendant's

16

objection to Dr. Clark's opinion testimony is on reliability
grounds. Defendant argues Dr. Clark's opinions recommending
treatment are unreliable because he spoke to parents rather than
to the children themselves – with the exception of conducting
one interview with a minor. Further, the interviews he did
conduct were shorter than those he conducts in his clinical
practice. [Clark and Vargo Motion, Mem. in Supp. at 3-5.]
Defendant also contends Dr. Clark's causation opinions did not
use reliable methodology and did not have adequate facts and
data because he did not interview the children themselves (with
one exception), the parents interviewed were interested in the
outcome of the case, he did not review all available records,
and he disregarded other sources of trauma. [Id. at 6-10.] The
foregoing arguments are appropriately raised on cross-
examination, and do not warrant exclusion of Dr. Clark's
opinions.

First, regarding Dr. Clark primarily interviewing
parents:

> Conclusions about persons who have not been
> directly examined may be drawn on the basis of
> available records, including medical, mental
> health, police, educational, armed services, and
> other records; information from informants who
> have been or are in contact with the person,
> which may derive from interviews by the expert,
> prior testimony, depositions, police reports, and
> other sources . . . . Although it may be possible
> to draw valid conclusions on the basis of such
> data, conclusions generally are more limited and

17

> have a lesser degree of certainty than when a
> direct evaluation has taken place. The ethics
> statements of the major forensic psychiatry and
> forensic psychology organizations offer words of
> caution about such testimony . . . .

Federal Judicial Center, Reference Manual on Scientific Evidence
(3d ed. 2011), Paul S. Appelbaum, Reference Guide on Mental
Health Evidence at 878, *available at* 2011 WL 7724265, at *40.
Dr. Clark testified that in his clinical practice, his typical
procedure when seeing a new child patient is to interview the
child's parents, interview or interact with the child, and then
make his assessments, findings, and recommendations. [Clark
Depo. at 58-59.] Therefore, while it may be the better practice
to interview minor children personally, rather than just
interviewing their parents, doing so is not a requirement of
admissibility. See United States v. Vallejo, 237 F.3d 1008, 1021
(9th Cir. 2001) ("[T]he district court did not rely upon, nor
does the government cite, any cases which require a
psychological or medical expert's testimony to be based on a
personal physical examination. In fact, the Supreme Court has
explicitly held to the contrary. In Daubert, the Court stated
that 'an expert is permitted wide latitude to offer opinions,
including those that are not based on firsthand knowledge or
observation.'" (quoting Daubert, 509 U.S. at 592, 113 S. Ct.
2786)). Dr. Clark had a sufficient factual basis to render his
opinions, and the fact that he did not interview most of the

minor plaintiffs is an issue of weight rather than admissibility.

Similarly, Dr. Clark's alleged disregard of other possible sources of trauma and failure to review all medical records also go to weight rather than admissibly. See Primiano, 598 F.3d at 565 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."); see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 969 (9th Cir. 2013) (stating the district judge should screen "unreliable nonsense opinions, but not exclude opinions merely because they are impeachable").

Further, Dr. Clark may recommend treatment based on his experience as a psychiatrist. Dr. Clark's experience in child psychiatry allows him to opine on what treatment will be needed for the Bellwether Plaintiffs who are minors. See Kumho Tire, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); id. at 150 ("In [some] cases, the relevant reliability concerns may focus upon personal knowledge or experience"); see also Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts

or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Further, Dr. Clark's admission that it is difficult to predict how a person could respond to therapy and the difficulty in estimating how many therapy sessions a plaintiff would need in the future do not make his testimony inadmissible. See Clark Depo. at 198. "Lack of certainty is not, for a qualified expert, the same thing as guesswork. . . . [I]t is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." Primiano, 598 F.3d at 565; see also id. at 567 ("physicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties to make a sound judgment" (brackets and quotation marks omitted)).

Accordingly, Dr. Clark's opinions assessing the psychological and psychiatric impacts of the fuel spill and its aftermath on minor Plaintiffs are admissible.

## III. **Dr. Vargo**

It is clear that Dr. Vargo has the requisite experience and training in the field of psychology. Defendant objects to Dr. Vargo's opinion testimony on reliability grounds. Specifically, Defendant argues that Dr. Vargo's opinions are based upon unreliable methodology and inadequate facts or data because: (1) Dr. Vargo only provided the symptomology portion of

the PTSD Checklist to all but one of the Plaintiffs she opined on, rendering the test unreliable; and (2) Dr. Vargo did not gather facts about alternative causes, meaning there are insufficient facts or data to reach Dr. Vargo's conclusions. Therefore, Defendant contends, Dr. Vargo "cherry-picked" her data. Additionally, Defendant contends Dr. Vargo's opinions are ones of correlation not causation. [Clark and Vargo Motion, Mem. in Supp. at 13-20.]

First, regardless of the causation terminology that Dr. Vargo uses, her opinions regarding the same are admissible, and it is up to the factfinder to determine whether causation exists. Under Hawai`i law, "[w]hen causation of the injury is a medical issue, as it is here, [the] matter does not turn on the use of a particular form of words by the physicians in giving their testimony, since it is for the trier of facts, not the medical witnesses, to make a legal determination of the question of causation." Bachran v. Morishige, 52 Haw. 61, 67-68, 469 P.2d 808, 812 (1970) (internal quotation marks omitted).

Second, the Court finds that Dr. Vargo's opinions are founded on sufficient facts or data to render these opinions "more than subjective belief or unsupported speculation." See Daubert I, 509 U.S. at 590. Dr. Vargo had access to Plaintiffs' medical records and Plaintiffs' fact sheets, and later had access to Plaintiffs' deposition transcripts. See, e.g., Notice

of Filing Re Clark and Vargo Motion, Exh. 10 (report regarding
Freeman by Dr. Vargo, dated 7/24/23) ("Vargo Freeman Report") at
3 (listing the medical records reviewed); Opp. to Clark and
Vargo Motion at 19 (stating Dr. Vargo had access to Plaintiff
fact sheets and depositions and pointing out that Dr. Vargo did
not modify or revise her opinions in light of the deposition
testimony). Dr. Vargo's methodology of administering the
symptom-only portion of the PTSD Checklist and interviewing
Plaintiffs appears to be an accepted practice in the field of
psychology. See Clark and Vargo Motion, Decl. of Lucas R. White
("White Decl."), Exh. 21 (National Guide for PTSD, Using the
PTSD Checklist for DSM-5 (PCL-5)) at 1 ("The PCL-5 should not be
used as a stand-alone diagnostic tool. When considering a
diagnosis, the clinician will still need to use clinical
interviewing skills, and a recommended structured interview
. . . to determine a diagnosis."); Opp. to Clark and Vargo
Motion, Decl. of Sara Couch in Supp. of Opp. ("Couch Decl."),
Exh. F (transcript excerpts of 11/17/23 video deposition of Eric
Smith, Ph.D.[3]) ("Smith Depo.") at 142 (testimony regarding the

---

[3] Dr. Smith is an expert retained by Defendant, and is a
clinical and forensic psychologist. Dr. Smith opined on whether
certain Plaintiffs, including minor Plaintiffs, experienced
psychological injuries due to their exposure to contaminated
drinking water from the November 2021 Red Hill fuel spill, and
the nature and scope of the mental health therapies said
Plaintiff should receive. See, e.g., White Decl., Exh. 6 (report
(. . . continued)

PCL-5). Dr. Vargo's lack of awareness of other trauma suffered by Plaintiffs or her failure to ask about such traumas during her interviews with Plaintiffs is appropriately addressed on cross-examination, and does not affect admissibility. See Primiano, 598 F.3d at 565.

Accordingly, Dr. Vargo's opinions regarding the adult Plaintiffs' experiences of trauma stemming from the contamination of Plaintiffs' water due to the Red Hill fuel spill are admissible. Challenges to her opinion will be left to cross examination, contrary evidence, and attention to the burden of proof at trial.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Exclude the Expert Reports and Testimony of Drs. Spira and Keifer, filed January 16, 2024, is GRANTED IN PART AND DENIED IN PART. The Sprira Motion is DENIED as to Dr. Spira's opinions regarding Plaintiffs' trauma and the psychological impact of institutional betrayal. The Spira Motion is GRANTED insofar as Dr. Spira's other opinions are excluded. Defendant's Motion in Limine to Exclude Drs. Clark and Vargo, filed January 16, 2024, is DENIED in its entirety.

---

regarding Sheena Jessup and her children by Dr. Smith, dated 11/3/23) at 1.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, April 8, 2024.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**PATRICK FEINDT, JR., ET AL. VS. UNITED STATES OF AMERICA; CV 22-00397 LEK-KJM; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DRS. SPIRA AND KEIFER, AND DENYING DEFENDANT'S MOTION IN LIMINE TO EXCLUDE DRS. CLARK AND VARGO**