LYLE S. HOSODA          3964-0
KOURTNEY H. WONG        10827-0
SPENCERJ. LAU           11105-0
HOSODA LAW GROUP, AAL, ALC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaii 96813
Telephone: (808) 524-3700
Facsimile: (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com

KRISTINA S. BAEHR      *Pro Hac Vice*
JAMES BAEHR           *Pro Hac Vice*
MARY M. NEUSEL        *Pro Hac Vice*
JUST WELL LAW, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 994-6241
Email: kristina@well.law;
jim@well.law; maggie@well.law

FREDERICK C. BAKER    *Pro Hac Vice*
JAMES W. LEDLIE       *Pro Hac Vice*
KRISTEN HERMIZ        *Pro Hac Vice*
CYNTHI SOLOMON*Pro Hac Vice*
SARA O. COUCH
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: fbaker@motleyrice.com; jledlie@motleyrice.com;
khermiz@motleyrice.com; csolomon@motleyrice.com; scouch@motleyrice.com

*Attorneys for the plaintiffs*

*(case caption continued on next page)*

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., et al.<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Civil No. 1:22-cv-397-LEK-KJM<br>(Federal Tort Claims Act)<br><br>**DECLARATION OF ANDREW CLARK, M.D.** |

## <u>DECLARATION OF DR. ANDREW CLARK</u>

I, Andrew Clark, M.D., declare as follows:

## I.   **Background and Qualifications**

1.      My name is Dr. Andrew Clark. I am a licensed physician with Board Certifications in Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry.

2.      I attended the University of Michigan Medical School in Ann Arbor, Michigan, where I earned my medical degree. I completed three residencies, including a residency in Pediatrics at Boston City Hospital and a residency in Psychiatry and, separately, a residency in Child and Adolescent Psychiatry at Massachusetts General Hospital. I did a one-year fellowship in Infant and Parent

Mental Health at the University of Massachusetts. A copy of my CV is attached.[1]

3.    I have previously served as an Instructor in psychiatry at Harvard Medical School, a Clinical Associate in Psychiatry at Massachusetts General Hospital, and I am currently an Assistant Professor in Psychiatry at Boston University School of Medicine.

4.    I have previously co-authored the textbook chapter "Posttraumatic Stress Disorder in Adolescents" in Comprehensive Adolescent Health Care (1998), as well as "Posttraumatic Stress Disorder" in Saunders Manual of Pediatric Practice (1998).

5.    I have been permitted to testify in court numerous times.

6.    As a result of my education, training, and experience, I am knowledgeable about post-traumatic stress disorder and other mental health impacts related to exposure to traumatic events.

7.    I have been retained by the Plaintiffs as an expert witness in this case.

8.    I was asked to evaluate each minor Bellwether Plaintiff and provide an opinion as to each minor Plaintiff's mental status, any mental health diagnosis, and the impact of the water contamination at Red Hill on their mental health. I was also asked to provide recommended treatment plans.

9.    My findings and conclusions are held to reasonable degree of

---

[1] Curriculum Vitae of Andrew Clark, MD, PX-1587, at Tab 1.

psychiatric certainty and are based on my knowledge, skill, experience, and training in the field of psychiatry, as well as a review of the materials provided and academic literature.

10.     In this case I prepared four reports – one for each Bellwether Plaintiff family with minor children – all dated July 24, 2023.

11.     I was deposed on this case on October 10, 2023.

12.     I am being compensated at a rate of $500 per hour for all activities.

13.     My compensation is in no way related to the outcome of this case.

## II.    Methodology

14.     In my review of this case, I utilized widely accepted methodology in the field of psychiatry.

15.     This includes the standard practice of reviewing available medical records, conducting a clinical interview and evaluation, and providing a recommended treatment plan.

16.     For each minor child, I reviewed all medical and school records available at the time of my report. This includes extensive medical records, speech therapy records, school records, and other collateral records.

17.     These resulted in thousands of pages of records that documented medical and behavior changes for each child and support my opinions given here.

18.     In addition to this extensive record review, I also interviewed the

4

parent(s) of each of the minor children.

19.     It is standard practice in the field of psychiatry to conduct interviews of parents to assist in assessing children and adolescents.

20.     I have reviewed the Government's expert psychologist's report, and I am aware that he obtained information directly from parents via a pare for several of the minor children and in one instance solely obtained information from the parent to assess the minor child.

21.     This is consistent with forensic psychiatry guidelines, which note that parental interviews can be used but that the limitations in doing so should be noted. I have done so here.

## III.   Summary of Opinions

22.     Each of the minor Bellwether Plaintiffs experienced a traumatic event: the Red Hill jet fuel water contamination.

23.     The exposure to the contaminated water at Red Hill has caused disruption to the family life of each minor Bellwether Plaintiff.

24.     The exposure to contaminated water at Red Hill has substantially contributed to many of the minor Bellwether Plaintiffs' mental health symptoms and diagnoses.

25.     Based upon my experience and training, I make specific mental health treatment recommendations for each of the affected minor Bellwether Plaintiffs.

## IV.   Detailed Statement of Opinions

***Opinion 1***: **Each of the minor Bellwether Plaintiffs experienced a traumatic event: the Red Hill jet fuel water contamination.**

26.     In preparing my opinions, I conducted a literature review of other water contamination events and the recognized impacts on mental health.

27.    The impact of population wide exposure to oil spills has been studied for several years, including the aftermath of the Exxon Valdez spill and the Deepwater Horizon oil rig spill. In sum, there are known to be an increased incidence of mental health disorders in exposed populations, particularly depression, anxiety, psychological stress, and post-traumatic stress disorder.[2]

28.    Of note, the nature of social and family support has been found to be an important mediator of outcome, which is consistent with the current understanding that a child's response to a traumatic experience is greatly influenced by the caregiving adults in their lives. Studies that have focused specifically on children in such situations have demonstrated that stress associated with an oil spill is an important predictor of subsequent Posttraumatic Stress Disorder.[3]

29.    Other researchers have looked at what is known as "secondary exposure," referring to the panoply of associated disruptions and stressors that occur

---

[2] Laffon, B et al. Effects of exposure to oil spills on human health: An updated review. *Journal of Toxicology and Environmental Health, Part B,* 2016, Vol 19, 105-128.

[3] Osofsky, J et al. Effects of stress related to the Gulf Oil spill on child and adolescent mental health. Journal of Pediatric Psychology, 2016, 41(1), 65-72.

in such situations independent of actual exposure to the toxic substance. These include the disruptions to family, neighborhood and community, the disruptions of daily routines, the distress and illness of loved ones, the strain of relocation, and the economic strains involved. Children, it is thought, are particularly vulnerable to the effects of such events, due to their physiologic and emotional immaturity, their dependence on others, and their limited coping capacity.[4]

30.   The Center for Disease Control survey of self-reported symptoms following the Red Hill contamination is consistent with what is known about similar events, with significant numbers of respondents reporting mental health symptoms such as anxiety, agitation, depressed mood, and sleep difficulties.[5]

31.   It is clear therefore that children such as the Bellwether children who have been exposed to community wide toxic exposures such as what happened on Oahu face significant risks of developing an array of mental health problems as a result, even apart from the potential medical effects of direct exposure.

**Opinion 2: The exposure to contaminated water at Red Hill has contributed to many of the minor Bellwether Plaintiffs' mental health symptoms and diagnoses.**

---

[4] Beedasy, J et al. Gulf Coast parents speak: Children's health in the aftermath of the Deepwater Horizon oil spill. Environmental Hazards. 2020. https://doi.org/10.1080/17477891.2020.1772188.

[5] Self-reported health symptoms following petroleum contamination of a drinking water system- Oahu, Hawaii, November 2021-February 2022. MMWR. May 27, 2022, PX-1583, at Tab 2.

32.     Specifically, the Bellwether minor Plaintiffs have the following mental health diagnoses, each of which is directly caused or contributed by their exposure to the jet fuel leak at Red Hill, that is the result of my clinical interview and evaluation. I will next walk the Court through each of my assessments that form the basis of this opinion.

33.     I will first start with the Dietz family. B.D., age 12 at time of my examination, was born with a condition known as Type 1 Chiari malformation. This condition was treated with a successful surgical procedure in May of 2022. B.D. continues to have some residual symptoms associated with this condition, but they are effectively managed. B.D. has had anxiety and anxiety-related conditions prior to 2021, including a diagnosis of Inflammatory Bowel Syndrome, which is thought to be closely linked with anxiety and stress. This has been associated with excessive fatigue and constant complaints of being tired. He has been attending therapy sessions for this anxiety.[6] As of April 2023, his depression screening in his well visit was positive.[7]

34.     In my opinion, the jet fuel water contamination on Oahu in 2021, in part due to the stresses and disruptions associated with it, contributed substantially to B.D.'s anxiety, and places B.D. at an elevated risk going forward of developing a

---

[6] B. D. Composite Medical Record, PX-2250.
[7] Id.

more severe anxiety disorder than the one he has at present. As stated in my deposition of October 23, 2023, it is my opinion that B.D. meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V.

35.    V.D., age 5 at my examination, appears to be doing well at this time.

36.    Next, I will discuss the Feindt family. P.G.F., age 5.5 at my examination, was seen on 9/9/2020 at the AMC Tripler Clinic for a behavioral health consultation with Stephanie Vann. The mother described P.G.F. as a high energy child, constantly on the go, who could be defiant at time. She might have an extreme meltdown if asked to transition to a new activity, and the tantrums could last from 3-5 minutes. P.G.F. had, by report, been having behavioral issues like these for the six months prior to the recent move to Hawaii. The parents were concerned about possible autism. The clinician very much doubted that P.G.F. had autism but did state that "strongly suspect she will eventually have a diagnosis of ADHD based on family history and her current behavior, but many of her behaviors today were age appropriate."[8] Additional records in 2020 discussed the possibility of an ADHD diagnosis.[9]

37.    P.G.F. began to experience a deterioration in her behavior beginning in

---

[8] P.G.F. Composite Medical Record, PX-2253.
[9] Id.

October or November of 2021. Her medical records indicate Speech Therapy visits between 10/4/21 and 11/22/21, and her behavior was unremarkable during those visits.[10] In 12/16/2021, however, P.G.F. had a primary care visit in which her father raised concern about her behavior; the doctor noted in the record that P.G.F. had a "florid evidence of hyperactivity and inattentiveness."

38.    P.G.F. also presented with her parents reporting abdominal pain in January of 2022 and concern of water contamination.[11] At this visit the treater noted that P.G.F. presented signs of ADHD but given her age behavioral therapy was considered the first option.[12]

39.    P.G.F. and her mother had multiple contacts with the behavioral health clinicians in the subsequent three and a half months, with ongoing reports of a precipitous deterioration in P.G.F.'s behavior, attention, impulse control, emotional regulation, neediness, aggression and volatility. This included reports such as P.G.F. yelling "I'm going to set this house on fire," and "I'm gonna take you to the roof and throw you off the building."[13] This also included a period of regression in potty training. The parents, it appears from the records, were quite alarmed at this sudden change.[14]

---

[10] Id.

[11] Id.

[12] Id.

[13] Id.

[14] Id.

40.    After moving to Colorado in April of 2022 the parents re-established care for P.G.F., engaged her in ongoing therapy, participated in PCIT work, and managed to find a helpful medication for her, so that her behavior improved over the course of several months.[15]

41.    P.G.F. appears to have some post-traumatic stress symptoms (but not PTSD) related to her experiences during the water crisis. The mother reports that P.G.F. will spontaneously break into tears around water related issues, which her pediatrician has reportedly suggested may be a trauma response. P.G.F. continues to worry that water is unsafe to drink, and the GI clinician in September of 2022 noted that P.G.F. would refuse to drink water due to the trauma of the experience during the crisis.[16] Her therapist, Deanne Kitrell, has given her the diagnosis of Other Specified Trauma and other stressor related disorder.[17]

42.    In addition to the impact on P.G.F. directly, the water crisis also resulted in the family's displacement from their home and P.G.F. being pulled out of day care, with the loss of all the structure and stability that move entailed. It is generally understood that children thrive with structure, and are reassured by knowing that they can count on certain bedrocks of stability in their homes, their schools, and their communities. Children with ADHD or emotional dysregulation

---

[15] Id.

[16] Id.

[17] Id.

seem to do particularly well in highly structured environments. For P.G.F., the dramatic loss of structure around this time likely contributed to her dysregulation. It addition, the concurrent stress on the parents likely diminished their capacity to respond to P.G.F. in as skillful and attentive a manner as they might wish.

43.    It is perhaps easy to overlook the fact that ongoing distressing physical symptoms such as P.G.F. has experienced are stressful and difficult on their own, and that extensive medical evaluations and frequent doctor's visits take their own toll on a child. P.G.F.'s experience in the time subsequent to the jet fuel crisis, in which she suffered a precipitous global exacerbation of her behavioral and developmental vulnerabilities, set her back substantially on her developmental course, and appears to have left her somewhat fragile emotionally. Although she is doing relatively better at present, she is at a significant risk of regression in the context of some additional stressor, and is at risk of developing worsening anxiety or post traumatic symptoms as well. She has lost, in my opinion, a great deal of resiliency by having gone through this experience.

44.    P.G.F., in my opinion, had a number of challenges prior to the water crisis in late 2021, but she and her parents had worked hard to manage them largely successfully. The water crisis at Red Hill precipitated in her a dramatic deterioration in her behavior, emotional equilibrium, and developmental level, alongside an array of medical symptoms. It is my opinion that the jet fuel contamination of the water

supply for this community contributed substantially, either directly or indirectly, to P.G.F.'s deterioration at this time. It is my opinion that P.G.F. meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V.

45.    P.R.F., age three years old at my examination, has experienced a number of physical symptoms coincident with the jet fuel spill, including dermatological problems, GI symptoms, and a recurrent cough. This includes presenting to the emergency department in December 2021 with vomiting.[18] At this time exposure to jet fuel water contamination was considered as a potential cause of symptoms.[19]

46.    P.R.F. was seen on 9/6/2022 at Wee Care Pediatrics by Margot Crossley, M.D. She elicited a history that P.R.F. had projectile vomiting and severe abdominal pain sometime after December 11, 2021, and P.R.F. ended up being hospitalized. The doctor wrote, "ever since the spill first happened, P.R.F. has developed a deep nonproductive cough day and night. It let up for a while when they moved into the hotel, but restarted with a vengeance when they returned to base housing. His gut started hurting again also, and he had multiple episodes of vomiting . . . he started this with a red irritated rash in his whole diaper area . . . he has had

---

[18] P.R.F. Composite Medical Record, PX-2254.
[19] Id.

problems sleeping since all this occurred, and wakes up multiple times a night."[20]

47.     Most recently, P.R.F. has had a difficult time adjusting to living in Virginia apart from his mother and sister and has begun to exhibit significant behavioral challenges both at home and at day care.

48.     I believe it likely that P.R.F.'s experiences in the context of the water crisis, including the multiple disruptions and moves, the illnesses of his parents and sister, and the innumerable medical appointments have made it difficult for him to establish a secure emotional base. As such, it may be difficult for him to be separated from his mother at this time and have confidence that she will come back to him. The risk for P.R.F. is that all of the disruptions associated with the water crisis will interfere with him forming a secure attachment to his parents, which is one of the primary developmental tasks of this age child. Security of attachment is thought to mediate a wide range of behaviors, relationships and psychological functioning throughout the life span. In sum, it is my opinion that the Red Hill jet fuel spill has contributed substantially to P.R.F.'s current emotional difficulties and psychological risks. It is my opinion that P.R.F. meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V.

49.     Next, I turn to the Freeman family. N.F., age 13 at my examination, is the oldest son in the Freeman family. Before the water crisis N.F. was described by

---

[20] Id.

his mother as engaged and active, with a good group of friends. Since that time however he has experienced a number of disabling medical conditions including nausea and vomiting, migraine headaches, and chronic severe body pain that has been diagnosed as Amplified Musculoskeletal Pain Syndrome.[21]

50.     N.F.'s sixth grade experience was fragmented by the disruptions and illnesses that he experienced, and his seventh grade in California has been spent almost entirely at home due to his illness. His mother reports that N.F. rarely leaves the home except for medical appointments, and his peer interactions are limited to on-line video games. He often experiences dizziness when standing, discomfort when wearing a back pack, and has been having memory and executive function difficulties, according to the medical records.[22]

51.     N.F. is reported to have experienced a range of emotional responses to the water crisis and his various illnesses, including initial anger, frustration and withdrawal. More recently, perhaps over the last year or so, his mother describes him as depressed and at times hopeless, although he has never expressed suicidal thinking.

52.     In addition to the myriad medical difficulties that N.F. has been dealing with over the last 19 months, he has also experienced a number of psychological and

---

[21] N.F. Composite Medical Record, PX-2256.
[22] Id.

developmental insults. For one, the community that he had developed in Hawaii, including his school and his friends, was lost to him, and his medical condition has severely limited his ability to construct a new community for himself in California. Children in the early adolescent years typically begin to turn away from family and establish deeper and broader relationships with peers and other adults, in the service of both developing their skills and interests and developing a more stable sense of identity. N.F. has been unable to do so over the last 19 months, and it is not clear when, if ever, his condition will allow him to. In this way he is likely falling ever further behind his same age peers in terms of psychological development. He will be at increased risk thereby of failing to establish a coherent mature sense of identity, as well as in developing satisfying peer and romantic relationships in the future.

53.    It is well established that children undergoing stressful or traumatic experiences, including chronic illness, rely heavily on the coping abilities of their family, and especially their parents. Parents with a chronically ill child typically marshal their resources to provide additional support, both emotional and logistical, for the child in need. In such circumstances parents find that they may neglect their own needs or the needs of the other children in order to do so.

54.    The Freeman family has experienced an event that has impacted not just one of their children but all five of them concurrently, imposing substantial additional burdens on the parents and the family unit. To that extent, they are likely

to be stretched exceptionally thin, and less likely to be able to support N.F. as fully and effectively as they might wish to. The mother's illness in particular has undoubtedly placed a strain on all of them, and the children witnessing her collapse was no doubt a frightening moment for them as well.

55.    In the context of all of this, N.F. has by his mother's report become depressed, and feels particularly low during times when his physical health is poor (which is most of the time). This is consistent with an assessment conducted by Dr. Faber at the Amen Clinic in December 2022, primarily via remote interview with Mrs. Freeman. Dr. Faber characterized N.F. as "depressed and stressed" and with "low energy."[23] His pulmonologist recently raised a similar concern for anxiety.[24] Given what we know about the burden of chronic illness, the exposure to toxic substances, and the impact of community wide disasters, N.F. becoming depressed seems rather unsurprising.

56.    It is difficult to predict at this point the course of N.F.'s mood difficulties going forward, but it is clear, in my opinion, that the impact of the jet fuel spill in 2021 has placed N.F. at a substantially increased risk of developing a psychiatric mood disorder in the years to come. It has, in addition, placed him at risk of failing to achieve expected developmental milestones, thereby endangering his

---

[23] Id.

[24] Id.

long term psychological adjustment. As stated in my deposition of October 23, 2023, it is my opinion that N.F. meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V.

57.     K.F., age 10 at my examination, was reported to be a healthy and well-adjusted boy prior to November of 2021. He was described as friendly and relaxed, and he used to feel as if soccer was his life. Like everyone in his family K.F. began to develop physical symptoms around December of 2021. Similar to his brother, K.F. has experienced nausea and vomiting, headaches, abdominal pain, bloody stool, nosebleeds, and dizziness.[25] K.F. has had numerous consults with medical specialists for his various symptoms, with little relief to date. At this time K.F. is, like his brother, unable to attend school, and is said to have very limited physical endurance. He has been unable to play soccer.

58.     Ms. Freeman reports that K.F. has developed anxiety about his medical care, with a specific anxiety around blood draws. In addition, during the relatively brief time that he attended school in the fall of 2022 he had anxiety about throwing up while there.

59.     K.F., like his brother, has experienced two academic years of fragmented or limited school, which has likely led to a significant learning loss for him. And, like his brother, his family's ability to provide him with additional support

---

[25] K.F. Composite Medical Record, PX-2257.

has been compromised by the exceptional demands placed on all of them.

60.    The developmental tasks of 10-year-old boys are thought to revolve around competence and focused activity, with playground sports a common passion for children of this age. For K.F., losing the ability to play soccer has removed what had likely been for him a primary vehicle for psychological development, peer interaction, physical activity, and simple joy. His experience of staying out of school while dealing with ongoing disabling physical symptoms and medical appointments leaves his experience over the last 19 months similar in many ways to those of a child with a pediatric cancer, whose illness often removes them from typical developmental pathways.

61.    K.F.'s anxiety around blood draws and doctor's visits is like the anxiety and post-traumatic symptoms of medically ill children who have endured too many aversive experiences as part of their medical care.

62.    The risks for K.F. therefore are in being significantly delayed psychologically and developmentally, which would carry a serious risk for his future adjustment as an adolescent and young adult. His learning loss raises concerns as to his academic function once he is able to return to school. Finally, his ongoing anxiety around medical procedures carries a risk of persisting and even worsening over time. It is common for children with chronic medical conditions requiring intensive interventions to develop Post Traumatic Stress Symptoms or full-fledged Post

Traumatic Stress Disorder as a result of their aversive medical experiences, and there is a clear risk for K.F. that his current anxious state could worsen in that way.

63.    It is difficult to predict at this point the course of K.F.'s anxiety difficulties going forward, but it is clear, in my opinion, that the impact of the jet fuel spill in 2021 has placed K.F. at a substantially increased risk of developing a psychiatric disorder in the years to come. It has, in addition, placed him at risk of failing to achieve expected developmental milestones, thereby endangering his long term psychological adjustment. As stated in my deposition of October 23, 2023, it is my opinion that K.F. meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V.

64.    D.F., the youngest child, was 6 at the time of my examination. He attended preschool in Florida prior to the family moving to Hawaii in May of 2021. School records from the Temecula, California district indicate that D.F.'s pediatrician in Florida submitted paperwork over three separate years indicating that neither the parents nor the doctor had any health or developmental concerns about him.[26] At the same time, Dr. Nunn's evaluation for that same school district indicated that the preschool had expressed concerns about D.F.'s refusal to potty train and his tendency to play alone.

65.    Ms. Freeman reports that soon after moving to Hawaii they began to

---

[26] D.F. Composite Medical Record, PX-2258.

notice a regression in his speech along with a more general sense of withdrawal, and they sought out an assessment by a pediatrician in August of 2021. Dr. Yonkin at that time understood Mr. Freeman to be expressing a concern with D.F.'s communication, and assessed him as being behind in certain milestones, and so referred D.F. for a speech and language evaluation and to Developmental Pediatrics.[27] Dr. Cole, the developmental pediatrician who saw D.F. in November and December of 2021 elicited a history that there had been some concerns about D.F.'s language when he was three and four years of age. After an extensive evaluation D.F. was diagnosed with Autism Spectrum Disorder, mild to moderate range.[28]

66.    D.F. had a second comprehensive evaluation in September of 2022 by Greg Nunn, Ph.D., on behalf of the Temecula Valley School District. D.F. was found to have both expressive and receptive language delays, and he scored particularly poorly on communication skills. Of note, neither D.F.'s mother nor his teacher gave him concerning scores on the Autism Rating Scale.

67.    Further, Ms. Freeman had filled out one scale, the Adaptive Behavior Assessment System, for both this evaluation and for the one done in Hawaii in December 2021. Per her assessment D.F. had shown substantial improvement

---

[27] Id.
[28] Id.

overall in that interval, going from the 13th to the 47th percentile in the General Adaptive Score. Dr. Nunn concluded that although D.F. had some variability in his psychological processing and academic skills he did not have Autism Spectrum Disorder, and he posited that D.F.'s health related problems may have come from the jet fuel water contamination.

68.    Ms. Freeman reports a substantial deterioration in D.F.'s function beginning in the summer of 2021 and continuing until they left Hawaii in February of 2022. This is documented both in my interview and the medical records from the Amen Clinic and the history obtained by Dr. Faber.[29] These included a substantial deterioration in his speech, regression in his toilet training, difficulties with balance, grasp and coordination, erratic sleep, and general withdrawal and lassitude. This was in addition to the physical symptoms of vomiting and physical discomfort. Ms. Freeman also reports that D.F. has made significant progress over the course of the school year, and is slated to progress to the first grade next year with rather minimal supports and accommodations.

69.    It is my opinion that the information gathered here best supports the hypothesis that D.F. experienced a deterioration in his overall functioning sometime after the family moved from Florida to Hawaii in May of 2021. Not only do the parents report this to be the case, and not only does the available medical record

---

[29] Id.

document their ongoing concerns at that time, but I would think it highly unusual for D.F. when in Florida to have been as impaired as he was at the time he saw Dr. Cole in December of 2021 and that not to have generated more concern amongst the pediatrician, the parents, and the day care staff.[30]

70.    In my opinion, if it is the case that D.F. was exposed to toxic chemicals during the summer and early fall of 2021, at the time his various physical, neurological, and behavioral symptoms developed, then I would opine that such exposure was a major contributing factor in his deterioration. Although D.F. has shown a great deal of improvement since moving to California, it appears as if has suffered some more long-lasting changes in his emotional fragility, confidence, and tendency to become overwhelmed, all of which are sequalae associated with his Hawaii based deterioration. D.F. will likely continue to benefit from school-based services such as Speech and Language Therapy as well as Occupational Therapy. It is my opinion that D.F. meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V.

71.    Next, I turn to the Jessup Family. B.B.J., age 17, is reported by the mother to have experienced several neurological symptoms around the time of the water crisis, such as a loss of balance, "brain fog," and tremors. The hand tremors have reportedly persisted, and B.B.J. is slated to see a neurologist for this. B.B.J. has

---

[30] Id.

also experienced a moderate level of anxiety particularly around the medical issues, as noted by his pediatrician last year.[31] Finally, Ms. Jessup noted that she learned second hand that B.B.J. had described himself as depressed last year, and he reportedly engaged in some cutting behaviors last year as well.

72.    B.B.J. has also had to transfer into a new high school for his junior year, which can be challenging for a teenager. By the mother's report, he had endured some bullying there this year.

73.    Given the stress that B.B.J. has been experiencing, the notable anxiety, and the history of self-injurious behavior, B.B.J. is at an elevated risk of developing a more severe mood or anxiety disorder at some point in the future. His history of having engaged in cutting raises concerns that he may lack effective coping strategies to manage the emotional distress stemming from all of these changes and challenges.

74.    In my opinion the jet fuel contamination crisis at the Oahu naval base substantially contributed to B.B.J.'s current mental health struggles. As stated in my deposition of October 23, 2023, it is my opinion that B.B.J. meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V.

75.    B.J.J., now 15 years of age, experienced some headaches, dizziness and

---

[31] B.B.J. Composite Medical Record, PX-2260.

stomach pain in the aftermath of the water crisis, but those symptoms eventually abated. She has also recently been diagnosed with a non-toxic thyroid goiter, and per the mother's report she (along with all of the other members of the family) is exceptionally tired most of the time.

76.     B.J.J. has a history of ADHD since at least 2019 or age 11.[32] Recently, in June 2023, B.J.J. was assessed with generalized anxiety disorder by her treating physician.[33] In 2022, B.J.J. reported depressed mood, but at that time her treating physician did not feel she met criteria for depressive disorder.[34]

77.     B.J.J. has been engaged in heated conflict with her mother over the last several months, which appears to be uncharacteristic for her.[35] Partly for that reason I elected to interview B.J.J. directly. In my opinion, B.J.J. is suffering from Major Depressive Disorder - 5, and is experiencing a great deal of irritability as a result.

78.     It is well understood in psychiatry that stressful life events can at times contribute to the development of a depressive episode. B.J.J. has experienced a number of stresses and losses associate with the jet fuel spill. For one, she had to leave her school and her good friends and transfer into a new community where she has struggled to fit in. This can be exceptionally difficult for an adolescent girl, for

---

[32] B.J.J. Composite Medical Record, PX-2261.
[33] Id.
[34] Id.
[35] Id.

whom peer acceptance is often of paramount importance. Second, B.J.J. was apart from her father for five months, and missed him a great deal during that time. Third, the exceptional strain on the family over the last 19 months, and on Ms. Jessup in particular, has likely contributed to the volatility of the mother-daughter relationship. It is an open question as to whether B.J.J. would have experienced depression without the drinking water crisis had she been able to stay in her Oahu community with her friends, and had her family been able to remain harmonious. It is clear, however, that these changes have been quite difficult for her to bear.

79.    B.J.J.'s current episode of depression warrants intervention at this point, and the mother has obtained a referral for her to see a psychologist. It is quite possible, I believe, that she will need to go on antidepressant medication. A first episode of depression is generally thought to be responsive to treatment, but it does put B.J.J. into a category of increased risk for any number of unwelcome outcomes, such as treatment resistant depression, recurrent episodes of depression, self-injurious behaviors (such as cutting), substance use disorder, and suicide.

80.    In my opinion therefore, the jet fuel contamination crisis at the Oahu naval base substantially contributed to B.J.J.'s current mental health struggles. As stated in my deposition of October 23, 2023, it is my opinion that B.J.J. meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V.

81.    B.J.J., in my opinion, could benefit from individual psychotherapy to help treat her depression, manage her irritability, and provide general support for her in this difficult time. The parents could also benefit from work with an adolescent mental health clinician in a parent guidance model, to help them hone their skills in dealing with a challenging adolescent child.

82.    N.J., the third child of the Jessup family, is a six-year-old boy with Autism Spectrum Disorder. Per the mother's report, N.J. experienced some regression in the context of the water crisis, such as him repeating the same phrase over and over again, or vehemently refusing to come into therapy sessions. It is expected that young children, when faced with significant stress, are likely to regress in some ways, reverting to a younger or less developed set of behaviors. For example, a three year old who has been dry at night for several months might start bed wetting again when a new sibling arrives. In addition, children with autism typically do not adjust to change readily, and can in fact be exceptionally resistant. For both these reasons therefore N.J.'s reported regression in this time of crisis is not at all surprising, even independent of any potential toxic effects of the jet fuel itself.

83.    The treatment of Autism Spectrum Disorder is typically thought to require intensive in-person therapy, often for several hours a week, especially for individuals such as N.J. who have a severe language based disability. Therapy is considered most effective when implemented fairly early, ideally in the preschool

years. In the context of the jet fuel spill N.J. began to refuse to engage with his familiar therapist, then moved to Arizona where he was put on a wait list for one to two months. In all, he completely missed about eight months of treatment. When he did begin to work with therapists again in Arizona, Ms. Jessup did not find them to be helpful, and N.J. has only fairly recently begun to work with a new set of therapists. It stands to reason, therefore, that N.J. would have experienced a significant degree of regression as a result of him not being engaged in therapy at all for eight months, and potentially not being engaged in effective therapy for much longer.

84.     The combination of N.J.'s regressing around the time of the water crisis, and his missed opportunities for effective therapy since then have likely resulted in his failing to achieve developmental gains that he would have otherwise. With a severely impaired child such as N.J. those developmental gains are of critical importance, and cannot necessarily be easily made up.

85.     In my opinion therefore, the jet fuel contamination crisis at the Oahu naval base substantially contributed to N.J.'s regression since that time, and delayed effective therapy for him.

86.     N.J., in my opinion, will require rather intensive services for the challenges associated with his Autism for many years to come.

87.     D.J. was 10 months old in late November of 2021. He did not develop

specific symptoms, and he was not drinking tap water directly. However, his mother reports that he appeared to her to be "in a fog" at times in the house between January and March 2022, and that on several occasions she took him out of the house and observed him to regain his alertness.

88.     In my opinion therefore, the jet fuel contamination crisis at the Oahu naval base may have exposed D.J. to a set of toxic chemicals at a young and vulnerable age, with unknown long term effects on his cognitive and behavioral functioning.

89.     D.J. does not appear to be in need of services at this time, but it would be helpful, in my opinion, for him to have neuropsychological testing done once he is in elementary school in order to assess for any cognitive deficits resulting from his toxic exposure as an infant.

90.     Based upon my clinical experience and education, I have provided a recommended course of treatment for each minor Bellwether Plaintiff. This is discussed below in detail.

91.     This includes an initial evaluation and then subsequent sessions of cognitive behavior therapy and exposure therapy as needed.

92.     Cognitive behavior therapy is a standard psycho-social intervention that aims to reduce symptoms of depression and anxiety disorders. It is considered an

effective means of treatment.[36]

93.    Specifically, the Bellwether Minor Plaintiffs have the following mental health treatment plan recommendations based upon my clinical interview and evaluation:

94.    N.F.: Three hours a week of tutoring over 60 weeks for educational catch up. Forty-eight sessions of individual therapy for treatment of depressed mood and general support.

95.    K.F.: Three hours a week of tutoring over 60 weeks for educational catch up. Forty-eight sessions of individual therapy for treatment of anxiety and general support.

96.    D.F.: Currently, receiving adequate services through the school.

97.    P.G.F.: Forty-eight  sessions of individual therapy for anxiety, ADHD and behavior (P.G.F. is currently in therapy). Twenty-four sessions of parent child interactive therapy for the parents (the mother is currently engaged in this). Monthly medication follow up sessions with a child psychiatrist or developmental pediatrician (ongoing).

98.    P.R.F.: No therapy needed at this time.

99.    V.D.: No services needed at this time.

100.    B.D.: Forty-eight sessions of individual psychotherapy for help with

---

[36] https://www.apa.org/ptsd-guideline/patients-and-families/cognitive-behavioral.

anxiety and general support. (B.D. is currently in therapy).

101.   B.B.J.: Twenty-four sessions of individual psychotherapy (cognitive behavioral) to address anxiety.

102.   B.J.J.: Forty sessions of individual psychotherapy to address depression. In addition, a psychiatric evaluation for consideration of medication, and 24 follow up psychopharmacology sessions. Also, 12 sessions of parent guidance for the parents for assistance and support in managing her mood and behavioral challenges.

103.   N.J.: Weekly speech and language, and weekly Occupational therapy sessions for 8 years. Sixteen sessions of feeding therapy. The feeding therapy sessions would be for treatment of his preexisting condition of Autism.

104.   D.J.: One neuropsychological evaluation in his early elementary school years.

I, _____Andrew Clark_____, *declare under penalty of perjury that the foregoing is true and*

*correct.*

*Executed on April ___, 2024.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was filed and served on counsel of record via the U.S. District Court's CM/ECF electronic filing system.

*<u>/s/ Kristina Baehr</u>*
Kristina Baehr