IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., et al., | CIVIL NO. 22-cv-00397-LEK-KJM |
| Plaintiffs, | THE UNITED STATES' TRIAL DECLARATION OF DR. MICHAEL KOSNETT |
| v. | |
| UNITED STATES OF AMERICA, | TRIAL DATE: April 29, 2024 |
| Defendant. | TIME: 8:30 a.m. JUDGE: Hon. Leslie E. Kobayashi |

## DECLARATION OF DR. MICHAEL J. KOSNETT

Pursuant to 28 U.S.C. § 1746, I, Michael J. Kosnett, M.D., MPH, FACMT, make the following declaration as my direct testimony for trial, under penalty of perjury. I make the following statements on the basis of my personal knowledge, educational background, training, and my experience as medical toxicologist, in addition to my review of a substantial number of case-specific documents, medical records, and scientific literature and my independent medical examinations of the adult Bellwether Plaintiffs. I hold the below opinions to a reasonable degree of medical probability.

## TABLE OF CONTENTS

I.     Summary of Opinions ................................................................. 5

II.    Qualifications ............................................................................. 6

III.   Methodology ............................................................................. 7

       A. General Causation ............................................................... 8

       B. Dose .................................................................................... 9

       C. Temporality ...................................................................... 18

       D. Differential Diagnosis ...................................................... 18

       E. Risk of Latent Disease ..................................................... 19

IV.    Analysis and Opinions Regarding Adult Plaintiffs ................ 19

       A. Kevin Aubart ................................................................... 19

           1. Mr. Aubart's Water Usage ........................................... 20

           2. Mr. Aubart's History of Present Illness ...................... 21

           3. Specific Causation Analysis for Mr. Aubart's Claimed Injuries .... 23

               a.  General Causation ................................................ 23

               b.  Dose ...................................................................... 24

               c.  Temporality .......................................................... 26

               d.  Differential Diagnosis .......................................... 27

           4. Dr. Bird's Future Treatment Recommendations ........... 29

       B. Richelle Dietz ................................................................. 31

           1. Ms. Dietz's Water Usage ............................................ 32

           2. Ms. Dietz's History of Present Illness ........................ 32

               a.  Gastrointestinal Complaints ................................ 32

               b.  Neurological Complaints ...................................... 33

               c.  Dermatological Complaints .................................. 35

           3. Specific Causation Analysis for Ms. Dietz's Claimed Injuries ...... 36

               a.  General Causation ................................................ 37

               b.  Dose ...................................................................... 38

               c.  Temporality .......................................................... 40

               d.  Differential Diagnosis .......................................... 41

4. Dr. Bird's Future Treatment Recommendations ...........................42

C. Patrick Feindt, Jr. ...............................................................43

   1. Mr. Feindt's Water Usage ...............................................44

   2. Mr. Feindt's History of Present Illness .......................45

      a. Neurological Complaints .......................................45

      b. Sleep Complaints ..................................................49

      c. Chronic Pain ........................................................50

      d. Gastrointestinal Complaints .................................51

   3. Specific Causation Analysis for Mr. Feindt's Claimed Injuries .....52

      a. General Causation.................................................53

      b. Dose.......................................................................54

      c. Temporality ...........................................................56

      d. Differential Diagnosis ..........................................57

   4. Dr. Bird's Future Treatment Recommendations ..........................58

D. Nastasia Freeman ...............................................................59

   1. Ms. Freeman's Water Usage ..........................................60

   2. Ms. Freeman's History of Present Illness ...................61

      a. Neurological Complaints .......................................62

      b. Cardiac Complaints...............................................70

      c. Pelvic Complaints .................................................72

      d. Dermatological Complaints ..................................73

   3. Specific Causation Analysis for Ms. Freeman's Claimed Injuries .75

      a. General Causation.................................................76

      b. Dose.......................................................................78

      c. Temporality ...........................................................80

      d. Differential Diagnosis ..........................................81

   4. Dr. Bird's Future Treatment Recommendations ..........................83

E. Sheena Jessup ....................................................................84

   1. Ms. Jessup's Water Usage .............................................84

   2. Ms. Jessup's History of Present Illness........................86

a.  Gastroesophageal Complaints ..................................................86

b.  Menstrual Complaints ............................................................87

c.  Abdominal Complaints ...........................................................88

3. Specific Causation Analysis for Ms. Jessup's Claimed Injuries.....89

a.  General Causation..................................................................90

b.  Dose......................................................................................93

c.  Temporality ..........................................................................96

d.  Differential Diagnosis ..........................................................98

4. Dr. Bird's Future Treatment Recommendations ...........................99

F.  Elizabeth Witt ...............................................................................100

1. Ms. Witt's Water Usage:..............................................................101

2. Ms. Witt's History of Present Illness:..........................................102

a.  Rash ....................................................................................102

b.  Headaches............................................................................102

c.  Palpitations .........................................................................103

d.  Menstrual Irregularities......................................................104

3. Specific Causation Analysis for Ms. Witt's Claimed Injuries ......104

a.  General Causation................................................................105

b.  Dose....................................................................................105

c.  Temporality ........................................................................108

d.  Differential Diagnosis ........................................................108

4. Dr. Bird's Future Treatment Recommendations ..........................110

V.    Risks of Developing Latent Disease....................................................110

References ..........................................................................................112

I. **Summary of Opinions**

1.    I have been retained by the United States to evaluate and opine on:

    a.    whether the adult Bellwether Plaintiffs' ("Adult Plaintiffs")[1] claimed physical injuries (including illnesses) resulted from exposure to JP-5 and its main constituents as a result of the November 20, 2021 fuel leak from the Red Hill Bulk Fuel Storage Facility ("Red Hill");

    b.    whether the Adult Plaintiffs' face increased risk of latent disease as a result of their exposure to JP-5; and

    c.    whether any course of medical surveillance is necessary due to their exposure to JP-5.

2.    It is my opinion that there is no evidence to support, to a degree of reasonable medical probability, that any of the Adult Plaintiffs' claimed injuries of long-term adverse effects were the result of exposure to JP-5 and its main constituents from the November 20, 2021 accidental release of JP-5 into the Joint Base Pearl Harbor Hickam drinking water system.

3.    It has not been established to a reasonable degree of medical probability that the Adult Plaintiffs face any significant future risk of latent disease caused

---

[1] The adult Bellwether Plaintiffs are Kevin Aubart, Richelle Dietz, Patrick Feindt, Jr., Nastasia Freeman, Sheena Jessup, and Elizabeth Witt.

by exposure to JP-5.

4.      It has not been established to a reasonable degree of medical probability that

the Adult Plaintiffs require any particular course of medical treatment as a

result of their exposure to JP-5.

## II.    Qualifications

5.      I am a physician, board-certified in the fields of internal medicine, medical

toxicology, and preventive medicine (occupational medicine).

6.      I received a Bachelor of Science degree from Yale University, an M.D. from

the University of California, San Francisco, and a Master's Degree in Public

Health from the School of Public Health at the University of California,

Berkeley.

7.      I completed an internal medicine residency, primary care track at the

University of Washington, and an occupational medicine residency at the

University of California, San Francisco.

8.      I have served as an Associate Clinical Professor in the Department of

Medicine at the University of Colorado School of Medicine since 1995. I

also have served as an Associate Adjunct Professor at the Department of

Environmental and Occupational Health at the Colorado School of Public

Health since 2008.

9.      Over the course of my career, I have served as an expert medical

toxicologist in litigation dozens of times, with testimony on behalf of both plaintiffs and defendants. My current *curriculum vitae* is attached hereto as **Exhibit A**, Trial Exhibit DX-3153.

### III.    **Methodology**

10.    I evaluated each of the Adult Plaintiffs to determine whether (1) their claimed injuries were attributable to exposure to JP-5 and its constituents as a result of the November 20, 2021 leak from Red Hill; (2) the Adult Plaintiffs are at any heightened risk of latent injury; and (3) any course of medical surveillance was warranted.

11.    In forming my opinions, I performed an in-person comprehensive occupation, environmental, medical, and medical toxicology evaluation of each Adult Plaintiff, including a detailed review of their medical history. Each examination lasted for several hours.

12.    I also conducted a thorough review of relevant toxicology literature, case documents, including depositions and discovery responses, and the Adult Plaintiffs' medical records.

13.    The determination of whether each Adult Plaintiff's medical conditions or complaints were caused by exposure to JP-5 contamination of his or her residential tap water involves systematic consideration of four key criteria: (a) general causation for the type of medical condition; (b) the magnitude of

the dose sustained by the Adult Plaintiff in relation to the dose necessary for the medical condition to occur; (c) the temporal relationship between the occurrence of the medical condition and the sustained dose and (d) other factors in the Adult Plaintiff's history as likely or more likely to be responsible for the condition (differential diagnosis). These four criteria are widely recognized within medical toxicology and occupational and environmental medicine as necessary for the determination of whether a toxic exposure caused an individual's medical conditions. (Fed. Jud. Ctr., 2011) (Prueitt, July 2023).

## A. General Causation

14.   General causation involves determining whether exposure to a particular substance is capable of producing an exhibited adverse health effect.

15.   When evaluating general causation for each Adult Plaintiff, I considered whether the Adult Plaintiff had a medically diagnosed illness or signs and symptoms known to be caused by JP-5.

16.   In evaluating this criterion, I considered the general causation analysis performed by Dr. Robyn Prueitt, as well as my own review of toxicological literature. I also considered the report by Plaintiffs' expert toxicologist Dr. Steven Bird. As a medical toxicologist, I commonly rely on medical literature as well as the work of other toxicologists and scientists.

**B. Dose**

17.    Dose, broadly speaking, constitutes the amount of a drug or chemical which

is absorbed into a person's body. When calculating a dose, one must

consider not only the total amount of a substance present in an individual's

environment (e.g., chemicals in tap water), but the amount of that substance

that was consumed and absorbed into the individual's body.

18.    When assessing this criterion, I considered whether each Adult Plaintiff

sustained a dose of JP-5 of sufficient magnitude to cause their alleged

adverse health effects.

19.    JP-5 is a high flash point refined kerosene-based jet fuel. A 2022 analysis of

recently produced JP-5 performed by the Newfields corporation laboratory

for the Hawaii Depart of Health found it to be composed of 79% >C8-C18

aliphatic hydrocarbons, 19% >C8 aromatic hydrocarbons, and 0.42% C5-C8

aliphatic hydrocarbons (Brewer, 2023a). The JP-5 fuel also contained an

icing inhibitor, diethethylene glycol monomethyl ether (DEGMME) at an

estimated concentration of 0.11% (Brewer, 2023a). Because JP-5 is similar

to kerosene and diesel in consisting largely of C9-C16 hydrocarbons, the

analyte "total petroleum hydrocarbons – diesel" (TPH-d) that corresponds to

hydrocarbon content in this size range has been used to assess the

contamination of water by JP-5 (ATSDR, 2017; HDOH, 2022).

20.   In evaluating each Adult Plaintiffs' exposure, I relied in part on estimates generated by other experts of the dose of JP-5 or its constituents (TPH-d and specific aromatic hydrocarbons) which Plaintiffs may have sustained by acute ingestion (e.g. in the initial days after the incident) and by inhalation and dermal absorption subchronically over the next several weeks to months after they were no longer ingesting the water but sometimes still using it for bathing and washing.

21.   In his report, Dr. Walter Grayman PhD, PE applied analysis of water samples from the Red Hill well and other locations and a water distribution system model to estimate the temporal pattern of TPH-d, benzene, toluene, ethylbenzene, xylene, and naphthalene at each Plaintiff's residential tap water from November 26 through December 6, 2021 (Grayman report, 2023).

22.   Based on these estimated chemical concentrations in the water, Dr. Lyle Burgoon (Burgoon report, 2023) used a model to estimate inhalation exposure to JP-5 and its constituent chemicals associated with residential use of tap water.

23.   Dr. Prueitt (Pruiett report, 2023) applied the data presented in the Grayman and Burgoon reports and plaintiff-specific and/or EPA recommended risk assessment exposure parameters to estimate acute and subchronic oral and

dermal doses (in mg/kg-day) of JP-5 and its constituent chemicals (total petroleum hydrocarbon fractions) for each Plaintiff. For the inhalation pathway, Dr. Prueitt estimated the airborne concentration of the chemicals in residential air in mg/m$^3$ to which the Plaintiffs would have been exposed, assuming occupancy of the homes 24 hours a day for the 11-day interval from November 26 through December 6, 2021.

24.    In evaluating dose, I reviewed Dr. Prueitt's estimated daily intakes for each Plaintiff. In addition, I considered the results of direct chemical analyses, including that of total organic carbon, conducted on the Red Hill water in the initial days to weeks after the November 20, 2021 incident that were included or cited in the reports of Dr. Grayman and Dr. Caroline B. Tuit.

25.    This analysis was two-fold:

    a.  For those chemicals and routes of exposures with regulatory guideline toxicity values, Dr. Prueitt compared the Adult Plaintiffs' estimated dose to the points of departure (the dose or concentration estimated to be near the lower end of the observed range of health effects) used to generate these values, concluding that the Adult Plaintiffs' exposures were all an order of magnitude (and, in many cases, multiple orders of magnitude) below the relevant guideline value, even under conservative exposure assumptions. This is

11

known as a margin of exposure (MOE) analysis; under an MOE analysis, the "margin" is the safety buffer between the level at which toxicity is observed and the estimated exposure level. The MOE is a ratio comparing point of departure of a chemical to an individual's estimated exposure level. As Dr. Prueitt explains, "if the MOE is greater than 1, the exposure is less than the toxicity effect (or no effect) level. Thus, the higher the MOE, the less likely it is that the chemical poses an unreasonable health risk." (Prueitt 2023).

b. For the remaining chemicals and routes of exposure, Dr. Prueitt compared the Adult Plaintiffs' estimated dose to the No Observed Adverse Effect Levels (NOAELs) and the Lowest Observed Adverse Effect Levels (LOAELs)in the scientific literature. Here, again, Dr. Prueitt found that the Adult Plaintiffs' exposures were all well below these literature values (and, in many cases, several multiple orders of magnitude below).

26.    I also considered the data and analysis concerning chemical concentrations in drinking water generated by Hawaii Department of Health exposure analyst Dr. Roger Brewer (Brewer, 2023b). Notably, a summary table on the health risk posed by JP-5 constituents in drinking water contained in Dr.

Brewer's August 2023 report has apparently misconstrued the manner in which uncertainty factors have been applied to EPA's subchronic reference doses. According to this report, the subchronic screening levels for chemicals in tap water impacted by the Red Hill fuel leak were derived from EPA Regional Screening Levels, which were in turn based on EPA IRIS reference doses or EPA Peer-Reviewed Provisional Toxicity Values that have applied uncertainty factors typically on the order of 100 to 1000 to NOAEL or LOAELs. Accordingly, the unreferenced "subjective" contention in footnote 3 to Table 6 in Brewer, 2023b, (page 46) that concentrations of chemicals in drinking water 10 to 30 times higher than the Hawaii subchronic screening levels for JP-5 constituents represent a "high health risk" are incorrect and without scientific foundation. In fact, doses 10 to 30 times higher than the Hawaii subchronic screening level would still be far below the levels known to pose human health risk.

27.    In addition, I compared each Adult Plaintiff's estimated dose of JP-5 to the Minimal Risk Levels (MRLs) established by the U.S. Agency for Toxic Substances and Disease Registry (ATSDR) for JP-8. The ATSDR MRL is a type of regulatory guideline value that Dr. Prueitt utilized. As noted by ATSDR, JP-5 and JP-8 are very similar in that they are kerosene-based fuels consisting of C9-C16 hydrocarbons that are a combination of n-parrafins,

nathenes, and aromatics. (ATSDR 2017). Accordingly, the MRL for JP-8 is instructive when evaluating a dose of JP-5.

28. An MRL "is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse noncancer health effects over a specified duration of exposure." (ATSDR 2017). ATSDR establishes the MRL by identifying the lowest dose for any endpoint relevant to human health that has been found to have No Observed Adverse Effects (NOAEL) in animals and humans, and then decreasing that dose by uncertainty factors, or safety factors, which may range from 10-fold to several thousand-fold. Thus, as ATSDR emphasizes, "Exposure to a level above the MRL does not mean that adverse health effects will occur." *Id*. MRLs developed by ATSDR, like Reference Doses developed by EPA, are considered ***safe doses***, as opposed to doses that are a threshold for toxicity to appear.

29. ATSDR has established an acute-duration (≤ 14 days) oral MRL for JP-8 of 3 mg/kg-day (i.e., 3 milligrams of JP-8 per kilogram of body weight per day). ATSDR also has established an intermediate-duration (15 to 365 days) inhalation MRL for JP-5 vapor of 2 mg/m$^3$ (i.e., 2 milligrams of JP-5 vapor per cubic meter of breathing air). As of 2017, the Threshold Limit Value (TLV) (recommended occupational exposure limit) established by the

14

American Conference of Governmental Industrial Hygienists (ACGIH) and

adapted by the US Air Force for occupational exposure to jet fuels has been

200 mg/m$^3$ (measured as total hydrocarbons).

30.    In order to evaluate each Adult Plaintiff's dose, I compared both their

estimated ingestion dose and their estimated inhalation dose to these

ATSDR MRLs.

31.    In comparison, Dr. Bird did not evaluate the dose of JP-5 sustained by each

Plaintiff in accordance with reliable scientific methods. Dr. Bird opined that

each Adult Plaintiff sustained a dose of a sufficient magnitude to cause

health effects based upon Plaintiffs' reports of a sheen, odor, or taste in their

tap water (Bird, July 2023; Bird, November 2023). However, odor, sheen,

and taste of jet fuel may be present at concentrations well below the toxic

threshold. (Prueitt, 2023). In addition, concentration is only one factor in

dose, as each Plaintiffs' dose also depends on the volume of water

consumption, duration of exposure, and body weight. **<u>Demonstrative</u>**

**<u>Exhibit B</u>** illustrates dose and its components, including concentration,

volume, and body weight. Dr. Bird's report did not analyze any of these

factors and instead assumed a uniform qualitative dose for each Plaintiff.

32.    In comparison, Dr. Bird did not evaluate the dose of JP-5 sustained by each

Plaintiff in accordance with reliable scientific methods. Dr. Bird opined that

each Adult Plaintiff sustained a dose of a sufficient magnitude to cause

health effects based upon Plaintiffs' reports of an odor and a sheen in their

tap water (Bird, July 2023; Bird, November 2023), and the fact that large

numbers of people in Oahu reported symptoms at health care facilities in the

initial days to weeks following the incident (Bird Dep. 143-144).

33.    For several reasons these three factors cited by Dr. Bird provide insufficient

evidence to conclude that the Plaintiffs sustained a dose of JP-5 sufficient to

induce adverse health effects on a toxicological basis. Jet fuel, which is

almost entirely kerosene, is an odiferous compound, and water contaminated

with jet fuel may have a discernible odor at concentrations far below that

which might induce toxic effects at typical volumes of consumption (Prueitt

at 53). In like manner, water contaminated with jet fuel may exhibit a

surface sheen at concentrations below that associated with adverse effects at

typical volumes of consumption. Therefore, the fact tap water had an odor or

exhibited a surface sheen is not a reliable indicator that consumption of the

water would result in toxicologically induced health effects.

34.    Moreover, knowledge of the concentration of a chemical substance in a

person's tap water alone is insufficient to determine if the person ingested a

toxic dose of the chemical. As illustrated in **<u>Demonstrative Exhibit B</u>**,

assessment of the daily dose sustained by a consumer of contaminated tap

water also requires knowledge of the quantity of the water they ingested or
internalized on a daily basis. For example, if, as was the case for several
Adult Plaintiffs discussed further below, a person only consumed one
swallow or other small quantity of tap water, their dose would have been far
less than that had they consumed two liters. Dr. Bird's report did not analyze
any of these factors. In addition, he did not relate the chemical concentration
and volume of tap water consumed by each Adult Plaintiff to their body
weight, a requirement to estimate their dose in terms of the standard
toxicological metric of mg/kg-day (milligrams of chemical per kilogram of
body weight per day). Finally, as discussed further *infra* ¶ 59, members of a
community who are worried that they may have been exposed to a
hazardous substance in the setting of an environmental incidence may often
report nonspecific health symptoms despite not having sustained a toxic
dose. Dr. Bird argues that the fact that community members served by the
JBPHH water system presented to health care facilities expressing
nonspecific symptoms in the aftermath of the November 2021 incident is
somehow an indication of causation, but neither Dr. Bird nor the data he
cites differentiate whether their symptoms were the result of environmental
worry vs. sustaining a toxic dose of chemical contaminants.

17

**C. Temporality**

35.    Temporality is the assessment of whether the temporal pattern between the

occurrence of the illness and the alleged exposure has been consistent with a

causal relationship.

36.    In evaluating temporality, I considered whether each Adult Plaintiff's

alleged injury predated the November 20, 2021 spill, or, if the date of onset

was after the date of the spill, whether the time frame between exposure and

onset is consistent with causation as established in the medical literature.

**D. Differential Diagnosis**

37.    Differential diagnosis requires consideration of other factors in an

individual's medical and personal history that could be responsible for the

claimed injury.

38.    The operative question is whether there are factors in each Adult Plaintiff's

history unrelated to JP-5 exposure that are as likely or more likely to be

responsible for an alleged injury.

39.    In evaluating a differential diagnosis, I considered other potential causes for

the Adult Plaintiffs' injuries, and whether, considering all available evidence

including their medical records, testimony, and medical literature, those

alternative causes were as likely or more likely to be responsible for the

claimed health effects. This involved a review of each Adult Plaintiff's

medical history through review of medical records, answers provided to IME

questionnaire, and discussion at the examination.

### E. Risk of Latent Disease

40. With regard to risk of developing latent disease, I utilized the criteria

identified in 1995 by the ATSDR, which include:

> Previous studies on human populations must demonstrate a reasonable association between a particular exposure and an adverse health effect. In order to make that inference, consideration should be given to the strength, specificity, and consistency of the association among the identified studies. The period of exposure (including the timing and duration of the exposure) and its relationship to the latency period for the disease or illness should also be examined if information is available.

(ATSDR, 1995). Although initially developed by ATSDR to consider the

appropriateness of implementing medical monitoring at Comprehensive

Environmental Response, Compensation, and Liability Act (CERCLA)

Superfund sites (hazardous waste sites), the ATSDR criteria have gained

widespread recognition in medical toxicology and environmental health as

guidelines applicable to medical monitoring as a public health activity for any

community exposed to hazardous chemicals (Verrier and Greenberg, 2017).

### IV.  Analysis and Opinions Regarding Adult Plaintiffs

#### A. Kevin Aubart

41. Kevin Aubart is 58-year-old, retired information technology specialist for

the U.S. Army Regional Cyber Center-Pacific. In 2016, Mr. Aubart moved

from South Korea to Navy Housing at 3162 Snyder Court in Honolulu,

located in the Doris Miller Park neighborhood of JBPHH. He lived there

until he moved to his current home in Waipahu, HI on April 30, 2023.

42. Dr. Bird has offered opinions that Mr. Aubart suffered "acute and long-term

anxiety," "headaches, "and brain fogginess" due to his exposure to JP-5.

(Bird, July 2023).

### 1. *Mr. Aubart's Water Usage*

43. Mr. Aubart informed me during his IME that he did not typically use the tap

water at his home for direct cooking or drinking, instead utilizing bottled

water from a large dispenser. Mr. Aubart utilized the tap water for filling his

Keurig coffee machine for preparing and drinking 4 cups of water per day.

44. Mr. Aubart reported that he first noticed issues with his household water on

Sunday, November 28, 2021, when he detected the odor of jet fuel in a cup

of water. The vapor from the water also stung his eyes, and he could feel it

irritating his throat. Mr. Aubart reported that he stopped using the water for

any drinking and cooking that same day.

45. Mr. Aubart continued to use the water for taking showers, washing dishes,

and washing clothes until the first week of December 2021. At that point,

Mr. Aubart and his wife began showering in a hotel room. Mr. Aubart and

his wife continued to live at their home on Snyder Court, but did not use the

water for drinking, cooking, or showering after the first week of December

2021 until the Hawaii Department of Health (HDOH) lifted its advisory for his home on March 11, 2022.

### 2. Mr. Aubart's History of Present Illness

46.  Mr. Aubart recalled that when he took a "fast shower" at home on Sunday night November 28, 2021 he experienced some burning of his eyes, as well as headache and fatigue. He also complained that he had an occasional headache and nausea for a few days afterwards. Mr. Aubart did not consider these symptoms severe enough to seek medical attention.

47.  As recorded in his medical records and as discussed at his IME, Mr. Aubart experienced fatigue and headaches from approximately 2018 to mid-2023. The headaches were initially characterized by sharp pain over both temples. From mid-2022 through the Spring of 2023 he described them as "migraines" with throbbing pain behind his eyes. He attributed the headaches and fatigue to stress and poor sleep. *See* **Exhibit C**, Trial Exhibit DX-3212, Kevin Aubart Composite Med. Rec. at 30, 33. 39.[2] A clinic note from Kaiser Permanente Honolulu, dated July 3, 2018, recorded, "He does admit to being stressed recently at work as a cyber-security consultant but denies feeling down with mood." *Id.* at 17. He was prescribed medication to

---

[2] All page number cites to composite medical records are to the exhibit pagination indicated in the upper right-hand corner.

address the physical effects of the stress. *Id*. A follow-up note, dated

September 6, 2018, recorded in part, "[s]ays he's been under a lot of stress at

work, and has some stiffness of his shoulders which he attributes to this….

Says his sleep is "not good" because he sleeps with his dog, but this is not

new." *Id*. at 20. Mr. Aubart's stress improved after the resolution of a years-

long employment dispute in 2023. *Id*. at 3. Mr. Aubart told me that, with less

stress, his sleep improved and his fatigue diminished. He no longer

experiences headaches or fatigue and has no cognitive complaints.

48.    Mr. Aubart reported during his IME that he experienced transient redness to

the skin of his chest whenever he took a shower (starting before the

November 20, 2021 spill, present while showering at the hotel off the

JBPHH water system and dissipating once he started showering with cool

water) and that he experienced gradual onset of pain in his shoulder and

right elbow. While I discussed these conditions with Mr. Aubart and

reviewed medical records associated with these symptoms, Dr. Bird did not

opine that these two conditions were related to the November 2021 spill in

any of his reports. In the absence of any alleged causal link between these

conditions and the November 2021 spill, I do not provide further analysis of

these conditions here.

### 3. *Specific Causation Analysis for Mr. Aubart's Claimed Injuries*

49.  In evaluating whether there is a causal relationship between Mr. Aubart's potential exposure to JP-5 and the long-term effects ascribed by Dr. Bird of anxiety, headaches, and "brain fog," I applied the four criteria discussed *supra* Section III. It is my assessment that Mr. Aubart has a history of tension headaches and sleep disturbance, with secondary fatigue, from 2018 to 2023, which have since resolved. It is my opinion that this history has no causal relationship to toxicological effects of JP-5 exposure.

       a.  General Causation

50.  It has not been established that Mr. Aubart suffered from a medical condition known to be caused by JP-5 or its constituents. Mr. Aubart's prior problems with tension headache were not of a character known to be caused by the toxic effects of JP-5 or its constituents. Studies in workers with moderate to high exposure to raw petroleum in oil spill clean-up operations (e.g., Krishnamurthy et al 2019), to jet fuel in jet engine manufacturing (Knave et al, 1976), and to JP-8 during U.S. Air Force operations have observed an association between such exposure and self-report of headache, often in conjunction with eye irritation, dizziness, and other neurological symptoms. Mr. Aubart reported experiencing headaches without other associated neurological symptoms in relation to psychosocial stress from

2018 through mid-2023. Given the absence of consistent attendant

neurological symptoms, coupled with Mr. Aubart's history of such

headaches, it cannot be established that the tension headaches that Mr.

Aubart claims constitute known diagnoses related to jet fuel exposure.

b.  <u>Dose</u>

51.    It cannot be concluded that Mr. Aubart sustained a dose of JP-5 of sufficient

magnitude to cause his reported medical conditions. Based upon the dose

calculations conducted by Dr. Prueitt, the estimated dose of JP-5 and its

constituents that Mr. Aubart sustained is far lower than that demonstrated to

cause any toxicologically induced adverse effects in experimental animal or

human studies.

52.    Per Dr. Prueitt's calculations, as set forth in her October 24, 2023 report, the

MOE relating the regulatory dose guideline value to Mr. Aubart's estimated

dose are all well above the threshold of 1, indicating that his estimated dose

was significantly less than the regulatory guideline values. For the remaining

chemicals and exposures Dr. Prueitt evaluated, Mr. Aubart's estimated doses

were also orders of magnitude below the NOAELs and LOAELs in the

scientific literature.

53.    In addition, comparison of Mr. Aubart's estimated dose to the ATSDR

MRLs shows that his estimated exposure was well-below the known risk

level. Dr. Prueitt's estimates of Mr. Aubart's peak oral dose of TPH-d of

0.044 mg/kg-day or 0.37 mg/kg-day assuming Dr. Grayman's likely and

worst-case estimates of Red Hill well shaft JP-5 contamination are

approximately 68-fold and 8-fold less than the ATSDR acute-duration oral

MRL for JP-8, which itself incorporates an additional "uncertainty factor" or

"safety" margin of 100-fold below the NOAEL. **Demonstrative Exhibit D**

visually depicts the relationship between Mr. Aubart's estimated acute oral

dose and the ATSDR acute oral MRL, as well as for the doses of the other

Adult Plaintiffs.

54.    The air concentration of TPH-d (total petroleum hydrocarbon-diesel) that

Dr. Prueitt conservatively estimated to have been present in Mr. Aubart's

residence subchronically from November 26, 2021, onward was 0.032

mg/m$^3$, a concentration approximately 62-fold lower than the MRL. The

airborne concentration of TPH-d estimated to have been sub-chronically

present in his home was >4600- fold lower than the 150 mg/m$^3$ airborne

concentration of JP-5 that ATSDR identified as the lowest observable

adverse effect level (ATSDR, 2017).

55.    I have reviewed Dr. Prueitt's Supplemental Expert Report of November 27,

2023, in which she provided an updated exposure assessment, MOE

analysis, and comparison of exposures to health effect levels for the

Plaintiffs using an assumption of 85.25 mg/L for the maximum

concentration of TPH-d in the Red Hill well shaft JP-5 for demonstrative

purposes. The new higher maximum concentration of TPH-d was proffered

by Plaintiffs' expert, Dr. Jospeh Hughes. The higher doses calculated by Dr.

Prueitt using Dr. Hughes' higher estimated water concentration do not

change my conclusion that Mr. Aubart was not exposed to a sufficient dose

to cause any toxicologically induced adverse effects.

     c.  Temporality

56.    The temporal pattern between Mr. Aubart's reported medical conditions and

his exposure to JP-5 is inconsistent with a causal relationship. As well

documented by his medical history and the medical records, Mr. Aubart's

complaints of headache, fatigue, and sleep disturbance preceded the

November 2021 jet fuel spill by several years and continued for 18 months

or longer after any exposure to JP-5 would have terminated. *See* **Exhibit C**,

Trial Exhibit DX-3212 at 30, 33, 39. When he resolved his employment

dispute and retired from the military, his headache, fatigue, and sleep

disturbance notably resolved. *Id.* at 3. Accordingly, this temporal pattern of

prolonged effects with an onset prior to the spill and continuing well after

the cessation of exposure (and resolving contemporaneously with the

resolution of an employment dispute) is inconsistent with a causal

relationship.

d.  Differential Diagnosis

57.  Factors in Mr. Aubart's medical history unrelated to the toxicological effects

of JP-5 are as likely or more likely to account for his medical complaints.

Mr. Aubart's complaints of headache are consistent with tension headache

caused by the psychosocial stressors he has faced since 2018. He reports, as

the medical records document, that psychosocial stress contributed to sleep

disturbance. Fragmented and nonrestorative sleep may contribute to daytime

sleepiness, fatigue, and decreased mental performance. (Tinajero et al,

2018). **Demonstrative Exhibit E** highlights these scientific findings.

58.  Notably, in concluding that Mr. Aubart's headaches and "brain fogginess"

were the result of JP-5 exposure, Dr. Bird never discusses the potential

alternative causation of Mr. Aubart's ongoing psychosocial stress due to his

employment dispute. Failure to rule out this likely alternative cause,

particularly because these symptoms predated Mr. Aubart's exposure, does

not reflect reliable toxicological methodology.

59.  Additionally, Mr. Aubart's adverse reaction to the initial odor of JP-5

contamination of his water, and his concern that his tap water was

contaminated with hazardous chemicals, may have contributed, in a manner

unrelated to direct toxicity, to his short-term complaints of headache and

27

other somatic symptoms after November 28, 2021. Researchers from the California Department of Health Services have reported that the assessment of nonspecific symptoms such as headache and nausea are strongly influenced by the extent to which members of a community experience "environmental worry," independent of their actual exposure to environmental pollutants or their personal experience of a documented illness. (Shusterman et al, 1991, Lipscomb eta l, 1991; Neutra et al, 1991; Lipscomb et al, 1992). The perception of a disagreeable environmental odor, which may elicit symptoms without direct toxicity, may act synergistically with environmental worry to increase the reporting of somatic symptoms. (Shusterman et al, 1992; Shusterman et al, 1991). **<u>Demonstrative Exhibit F</u>** illustrates these scientific findings.

60.   In an analysis of nonspecific symptoms associated with occupational and environmental health investigations, it is important to assess how psychosocial factors, such as stress, personality, and behavior patterns, and preexisting psychosocial and physical conditions influence the reporting of symptoms. (Spuugeon et al, 1996). Both awareness of a potential environmental or chemical hazard and the context of the inquiry influence the extent to which individuals affirmatively report symptoms. (Brauer and Mikkelsen, 2003). In a clinical investigation involving healthy volunteers,

28

heightened baseline psychosocial distress on a neuropsychological

questionnaire was associated with an increase in symptoms following one

hour of airborne exposure to a solvent at concentrations above the odor

threshold but devoid of toxic effects. (Andersson et al, 2013).

61.    In view of all the foregoing findings, it cannot be concluded with reasonable

medical probability that Mr. Aubart's medical complaints were caused by

exposure to JP-5 in his residential tap water following the November 20,

2021 fuel spill.

### 4. Dr. Bird's Future Treatment Recommendations

62.    Dr. Bird recommends that Mr. Aubart receive an MRI of his brain, as well as

a neurological evaluation annually for 3 years, then every 5 years until he

reaches age 65 for "ongoing medical management and surveillance." (Bird

Oct. 2023). While these recommendations were made in the context of

recommended medical monitoring, which I understand is no longer an issue

in this matter, to the extent this was recommended for treatment, I now

address these recommendations.

63.    In my opinion, it is incorrect, and methodologically unreliable, to conclude

that Mr. Aubart requires ongoing neurological assessment for complaints

that have no probable toxicological etiology and that are no longer present.

Dr. Bird does not identify the goal of any of these recommended medical

tests or visits, nor how they would address Mr. Aubart's claimed injuries.

64.    Likewise, Dr. Bird recommends that all Plaintiffs, including Mr. Aubart

receive an annual "neurocognitive evaluation" [not otherwise defined],

"yearly physical examination preferably by an occupational or

environmental physician", and the following laboratory tests: complete

blood count (CBC), comprehensive metabolic panel, urinalysis, and thyroid

studies." Even to the extent these recommendations are construed as

treatment rather than surveillance, they were made without documentation

that these modalities have been validated and recommended by the U.S.

Preventive Services Task Force (USPSTF) or other medical authorities for

early detection and primary or secondary prevention of specific illnesses.

Indeed, the specificity and positive predictive value of the tests Dr. Bird

recommended are so low in asymptomatic, low risk populations that they are

not routinely used for medical screening in other settings. As noted by

Vearrier and Greenberg (2017) in their recent review on medical monitoring,

> The use of tests and test panels (*e.g.*, liver function panel)
> without a scientifically sound and evidence-based rationale
> increases the risk that results will be abnormal due to chance
> alone. Further investigation (*e.g.*, invasive confirmatory testing)
> of these abnormal results may then lead to greater risk and
> increased costs…. Monitoring tests with low positive predictive
> values will result in unfavorable risk– benefit ratios due to
> over-diagnosis and unnecessary further diagnostic testing and
> treatment.

65.   Dr. Bird's report does not identify the specific latent illnesses his
recommended surveillance might detect in Mr. Aubart, nor did his
recommendations adhere to widely recognized criteria for conducting
medical surveillance of individuals or populations exposed to toxic
substances (ATSDR, 1995; Vearrier and Greenberg, 2017).

66.   For these reasons, Dr. Bird's recommended treatment is unadvisable and
does not comport with recognized principles of medicine, public health, or
medical toxicology.

   **B. Richelle Dietz**

67.   Richelle Dietz is a 37-year-old, information technology specialist for a
payroll management company. Ms. Dietz resides in Navy Housing at 731
Ohana Nui Circle, Honolulu HI, located in the Earhart Village neighborhood
of JBPHH.

68.   Dr. Bird has offered opinions that Ms. Dietz suffered the following acute
effects of her alleged exposure to JP-5: abdominal pain, nausea, vomiting,
diarrhea, burning of her eyes and throat, daily headaches, cough, rash, and
anxiety. (Bird, July 2023). Dr. Bird attributes the following long-term health
conditions to Ms. Dietz's alleged exposure to JP-5: headaches, visual
changes, rash, and anxiety. *Id.*

### 1. *Ms. Dietz's Water Usage*

69.  Ms. Dietz informed me that she first learned of potential water issues from a
     Facebook post on Sunday, November 28, 2021. She testified at deposition
     that she then checked and detected the odor of fuel in her running water tap
     water in her bathroom. Her husband then purchased bottled water for her
     family, and as of Monday, November 29, 2021 the family consumed only
     bottled water for drinking and food preparation.

70.  On November 30, 2021, the Dietz family stopped using household water
     entirely, including for bathing and washing clothes. Bottled water, including
     some eventually delivered to the home in large multi-gallon containers, was
     used for bathing with a camp shower equipped with an electric pump.

71.  The Dietz family did not relocate to a hotel, and resumed using the tap water
     in March 2023 after HDOH lifted the advisory for their home.

### 2. *Ms. Dietz's History of Present Illness*

a. Gastrointestinal Complaints

72.  Ms. Dietz has a history of gastroesophageal reflux disease (GERD),
     requiring treatment with medications such as omeprazole and esomeprazole,
     since she was a teenager. As reflected in Ms. Dietz's medical records, Ms.
     Dietz reported that her episodes of GERD have been associated with "severe
     abdominal pain up to 10/10, nausea, constipation and diarrhea." *See* **Exhibit
     G**, Trial Exhibit DX-3213, Richelle Dietz Med. Rec. Composite at 80-81.

For many years, Ms. Dietz has had a history of irritable bowel syndrome, with intermittent constipation or diarrhea, that reportedly has improved when avoiding gluten. *Id.* at 36.

73.    During her IME, Ms. Dietz reported that on November 22 or 23, 2021, she experienced two consecutive days of stomach burning and diarrhea after buying a cup of coffee from a food truck at the Navy base, after which she decided to no longer patronize that food truck. On November 25, 2021, Ms. Dietz hosted Thanksgiving dinner at her home, and used residential tap water to prepare the meal. The next day, November 26, 2021, she experienced "acid stomach" and nausea without vomiting, along with a burning discomfort throughout her entire esophagus and stomach that was more severe than her usual GERD symptoms.

74.    Ms. Dietz reported that she continued to experience episodic nausea throughout 2022 that she attributed to anxiety resulting from the jet fuel incident, particularly when prompted by press reports.

      b.   Neurological Complaints

75.    Ms. Dietz informed me that beginning on November 21, 2021, she began to experience daily headaches after taking a shower in the morning and at night. The headaches, characterized by a dull pressure sensation throughout her head, came on gradually. Headaches would no longer be present when

33

she awoke in the morning. The headaches resolved entirely after December 2, 2021. She denied any prior history of recurrent headaches or migraine.

76. Ms. Dietz's neurological history is also remarkable for an apparent transient ischemic attack (TIA) on January 10, 2010 and diarrhea. *See* **Exhibit G**, Trial Exhibit DX-3213 at 69.

77. Dr. Madamba's clinic note of November 1, 2021 recorded that she had an episode seven or eight years earlier associated with lightheadedness, blurry vision, and a near blackout when standing. *Id*. Workup was reportedly negative except for low ferritin. *Id.*

78. Ms. Dietz informed me during her IME that on July 18, 2023, Ms. Dietz experienced an episode of transient diminution in right-sided vision accompanied by a rainbow-like pattern. She consulted an optometrist, who noted elevated intraocular pressure in her right eye. She was referred for a neurology consultation, the records were not available for review as of the date of my report.

79. Ms. Dietz has had a history of Meniere's Disease since 2013, when she presented with vertigo, nausea and vomiting, tinnitus, and hearing loss. Meniere's Disease is an inner ear problem that can cause vertigo, dizziness, and balance problems. **Exhibit G**, Trial Exhibit DX-3213 at 41; 69. Mrs. Dietz's mother also had a history of Meniere's Disease. *Id*. At the time of an

audiology evaluation by Rindy Ito, AuD on June 23, 2023, Ms. Dietz

reported a history of recurrent Meniere's disease attacks, the last occurring 3

years ago, associated with loud roaring tinnitus bilaterally. *Id.*

80.    The audiology notes recorded her report of "daily dizziness to some degree,

prone to becoming dizzy when turning too fast or walking down grocery

store aisle. *Id.* Ms. Dietz had multiple ear infections as a child, and has

required numerous tympanostomies, the last placed in 2005. *Id.* Her

audiogram on June 23, 2023 was positive for mild hearing loss at 250 Hz in

the left ear. *Id.*

c.    Dermatological Complaints

81.    Ms. Dietz reported experiencing a rash consisting of raised bumps on both

sides of her epigastrium (middle abdomen) that was sensitive but not pruritic

for 1 to 2 days in early winter 2021-2022. It resolved with topical

hydrocortisone.

82.    Ms. Dietz stated that she developed a bilateral underarm rash in February

2022 that didn't respond to topical over-the-counter hydrocortisone. In June

2022 she began to experience it on her abdomen. She was diagnosed at the

Kitagawa Dermatology Clinic on June 23, 2022 with eczema characterized

by "bilateral lower neck, bilateral axilla, left mid back, under breast and

abdomen waxing and waning rash." *Id.* at 34. When initial treatment with

betamethasone did not resolve the eczema, the diagnosis was revised to

atopic dermatitis, and she was started on Opzelura 1.5% topical cream

(ruxolitnib) with improved control. *Id*. at 32.

83.  At the time of her IME, Ms. Dietz said her dermatitis is now under better

control than ever before.

### 3. *Specific Causation Analysis for Ms. Dietz's Claimed Injuries*

84.  It is my assessment and opinion that Ms. Dietz had the following conditions:

1. Chronic history of gastroesophageal reflux disease (GERD), associated with stomach and esophageal discomfort, and diarrhea, since age 16;

2. Chronic history of irritable bowel syndrome, with intermittent diarrhea and constipation, predating November 2021 by many years;

3. Self-limited daily headaches November 21, 2021 to December 2, 2021;

4. Episodic history of self-limited transient neurological events associated with visual changes and lightheadedness, occurring in 2010, 2021, and July 2023;

5. History of Meniere's disease since 2013, last attack 2020, but with minor daily dizziness;

6. Atopic dermatitis, since February 2022;

7. Chronic heavy menstrual bleeding since 2011 with associated anemia and fatigue, status post supracervical hysterectomy, bilateral salpingo-oophorectomy, and removal of a right paraovarian cyst, April 2023;

8. Chronic sleep disturbance, not further characterized. History

of obesity (BMI 35).

85.    In evaluating whether there is a causal relationship between Ms. Dietz's

potential exposure to JP-5 and her gastrointestinal, neurological, and skin

complaints, ascribed by Dr. Bird as long-term effects of exposure to JP-5, I

applied the four criteria discussed *supra* Section III.

   a.   General Causation

86.    It has not been established that Ms. Dietz suffered from a medical condition

known to be caused by JP-5 or its constituents. Studies in workers with

moderate to high exposure to raw petroleum in oil spill clean-up operations

(e.g., Krishnamurthy et al 2019), to jet fuel in jet engine manufacturing

(Knave et al, 1976), and to JP-8 during U.S. Air Force operations have

observed an association between such exposure and self-report of headache,

often in conjunction with eye irritation, dizziness, and other neurological

symptoms. Ms. Dietz reported experiencing headaches without other

associated neurological symptoms while at home from November 21, 2021

through December2, 2021. However, as discussed further below, neither the

estimated dose nor time frame of her headaches establish probable causation

by a toxicological action of JP-5.

87.    In like manner, although high oral doses of jet fuel in experimental animals

and kerosene in humans been shown to cause gastrointestinal irritation, it is

possible but improbable that Ms. Dietz's limited oral dose of dilute JP-5 in
her tap water would have caused an exacerbation of her chronic GERD-
related symptoms.

88.    Her other medical conditions are unrelated to the known toxicological action
of JP-5 at any dose.

       b.  <u>Dose</u>

89.    It cannot be concluded that Ms. Dietz sustained a dose of JP-5 of sufficient
magnitude to cause her reported medical conditions. Based upon the dose
calculations conducted by Dr. Prueitt, the estimated dose of JP-5 and its
constituents that Ms. Dietz sustained is far lower than that demonstrated to
cause any toxicologically induced adverse effects in experimental animals or
humans.

90.    Per Dr. Prueitt's calculations as set forth in her October 24, 2023 report, the
MOE between regulatory toxicity values for chemical dose and Ms. Dietz's
estimated dose are all well above the threshold of 1, indicating that her dose
is significantly less than the regulatory guideline values. For the remaining
chemicals and exposures Dr. Prueitt evaluated, Ms. Dietz's doses were all
orders of magnitude below the NOAELs in the scientific literature.

91.    In addition, comparison of Ms. Dietz's estimated dose to the ATSDR MRL
shows that her estimated dose was well-below the MRLs for JP-8 or JP-5.

Dr. Prueitt conservatively calculated Ms. Dietz's peak oral dose of TPH-d from total (direct and indirect) tap water ingestion to be 0.033 mg/kg-day or 0.28 mg/kg-day, assuming Dr. Grayman's likely and worst-case estimates of Red Hill shaft JP-5 contamination of 2 mg/L or 17 mg/L respectively. These estimates are approximately 100-fold and 10-fold less than the ATSDR acute-duration oral MRL for JP-8, which itself incorporates an additional "uncertainty factor" or "safety" margin of 100 -fold below the NOAEL.

92. The air concentration of TPH-d that Dr. Prueitt conservatively estimated to have been present in Ms. Dietz's residence subchronically from November 26, 2021 onward was 0.025 mg/m$^3$, a concentration approximately 80-fold lower than the JP-5 MRL. The airborne concentration of TPH-d estimated to have been sub-chronically present in her home was 6000- fold lower than the 150 mg/m$^3$ airborne concentration of JP-5 that ATSDR identified as the lowest observable adverse effect level (ATSDR, 2017).

93. After preparing my report on Ms. Dietz, I reviewed Dr. Prueitt's updated dose assessment, MOE analysis, and comparison of exposures to health effect levels for Ms. Dietz using an assumption of 85.25 mg/L for the maximum concentration of TPH-d in the Red Hill well shaft. The higher estimated dose does not change my conclusion that Ms. Dietz was not exposed to a sufficient dose to cause any toxicologically induced adverse

effects.

      c.  <u>Temporality</u>

94.    The temporal pattern between Ms. Dietz's reported medical conditions and her exposure to JP-5 is inconsistent with a causal relationship. As well documented by her medical history and the medical records, Ms. Dietz's gastrointestinal and neurological complaints predate her exposure to JP-5, while her dermatological complaints are also inconsistent with a causal relationship to her alleged exposure.

95.    Ms. Dietz's episodically symptomatic GERD, which as noted medical records caused her to experience 10/10 (maximum possible) upper GI tract discomfort and pain, began years before the November 2021 jet fuel incident. *See* **<u>Exhibit G</u>**, Trial Exhibit DX 3213 at 80-81.

96.    Ms. Dietz's intermittent episodes of neurological symptoms featuring vision changes first occurred years before and have continued more than a year and a half after her tap water may have contained JP-5. *Id*. at 41-44.

97.    Ms. Dietz's recurrent rashes, which were ultimately diagnosed as atopic dermatitis, were prominent beginning in February 2022, months after she stopped bathing with her home's tap water. *Id*. at 31-34. There is no known toxicological mode of action by which ≤ 4 days of bathing with water containing highly dilute (≤0.1 to 1%) TPH-d in late November 2021 would

have caused atopic dermatitis that prominently appeared and persisted

beginning in February 2022.

    d.  <u>Differential Diagnosis</u>

98.  Factors in Ms. Dietz's medical history unrelated to the toxicological effects

of JP-5 are as likely or more likely to account for his medical complaints.

Several of Ms. Dietz's medical problems, including GERD, irritable bowel

syndrome, and atopic dermatitis, are prevalent conditions in the general

population, and as noted above have no causal link with JP-5 exposure. For

example, the prevalence of atopic dermatitis, a common skin disease that

was diagnosed in Ms. Dietz, has varied by country and survey but is

commonly between 1 to 20 percent for all adults (Da Veiga, 2012; Bylund et

al, 2020).

99.  Ms. Dietz has had chronic problems with Meniere's Disease (a vestibular

disorder) that was first diagnosed in 2013. It is a well-recognized cause of

chronic dizziness.

100.  Ms. Dietz's episodic complaints of transient visual changes, which as noted

earlier have had no temporal relationship to JP-5 exposure, were attributed

on at least one occasion to a transient ischemic attack (TIA), a condition that

may have played role in subsequent episodes. Her family history is positive

for a history of thrombosis in her mother and her sister, suggesting a

possible heritable component.

101.  As discussed *supra* ¶59-60, Ms. Dietz's adverse reaction to the initial odor

of JP-5 and her concern that the water was contaminated, may have

contributed in a manner unrelated to direct toxicity to her report of

symptoms.

102.  In view of all the foregoing findings, it cannot be concluded with reasonable

medical probability that Ms. Dietz's medical conditions or complaints were

caused by exposure to JP-5 in her residential tap water following the

November 20, 2021 fuel spill.

### 4.  Dr. Bird's Future Treatment Recommendations

103.  Dr. Bird recommends that Ms. Dietz have a yearly neurology follow up as

well as a yearly dermatology follow-up for three years, then every 5 years to

age 65 for "ongoing surveillance and evaluation."

104.  While these recommendations were made in the context of recommended

medical monitoring, which I understand is no longer an issue in this matter,

to the extent this was recommended for treatment, I now address these

recommendations.

105.  In my opinion, it is incorrect, and methodologically unreliable, for Dr. Bird

to opine that Ms. Dietz requires a specific schedule of dermatological care

for the next 28 years for a condition, atopic dermatitis, that has no causal

relationship to JP-5 exposure. The same applies for his recommendation of an annually scheduled neurological evaluation for dizziness and "vision change" on the basis of JP-5 exposure, when 1) a toxicological etiology is improbable, 2) her dizziness is readily attributable to her pre-existing Meniere's disease, and 3) the underlying cause of her pre-existing episodic diminution in vision had yet to receive an initial neurological evaluation to assess the well-established and non-toxicological causes of this problem.

106. Dr. Bird does not identify the goal of any of these recommended visits, nor how they would address Ms. Dietz's claimed injuries.

107. For the reasons discussed *supra* ¶¶ 64-65, I do not believe that Dr. Bird's recommendations for annual exams, blood tests, and neurology screening adhere to widely recognized criteria for conducting medical surveillance of individuals or populations exposed to toxic substances.

108. For these reasons, Dr. Bird's recommended treatment is unadvisable and does not comport with recognized principles of medicine or medical toxicology.

**C. Patrick Feindt, Jr.**

109. Patrick Feindt, Jr. is a 44-year-old, golf course general manager. Mr. Feindt moved in to JBPHH housing in the Ford Island neighborhood in May 2021.

110. Dr. Bird has offered opinions that Mr. Feindt suffered the following acute

effects of his alleged exposure to JP-5: headaches, nausea, vomiting, diarrhea, coughing, burning sensation in his nose and mouth, muscle pain, general malaise, memory loss, and alteration in mood. (Bird, July 2023). Dr. Bird also opines that Mr. Feindt suffers from long-term effects of intermittent dizziness and vertigo, chronic pain, headaches, and mastocytosis, as well as intermittent abnormalities in liver tests as a result of his alleged exposure to JP-5. *Id.*

### 1. *Mr. Feindt's Water Usage*

111.  During his IME, Mr. Feindt reported that while he was living on Ford Island prior to December 8, 2021, his primary source of water for direct consumption was bottled water delivered in three-gallon jugs from the Hawaiian company Menehune Water. The family ordered bottled water because the household tap water tasted strongly of chlorine – "it was horrible" he recalled.

112.  Mr. Feindt reported that he typically consumed three 12-ounce cups of coffee per day with the tap water in a Keurig machine. Tap water was also used for food preparation. He did not recall the water ever tasting or smelling of jet fuel. He drank bottled water during the daytime when he worked at The Golf Sim located in Ward Centre in Honolulu.

113.  Mr. Feindt informed me that he first learned of concerns in the water supply

when he returned to his home after the Thanksgiving holiday in November

2021. Mr. Feindt recalled receiving a notification from the base commander

on November 29, 2021, and indicated that his family stopped using the

household tap water for drinking, cooking, or brushing teeth on either

December 8 or 9, 2021. Mr. Feindt continued to use the water for washing

clothes and "quick showers" until the family moved in a hotel in mid-

December.

114.   From mid-December until the HDOH advisory for their reference was lifted

in March 2022, the Feindt family resided at a series of hotels in downtown

Waikiki. They moved back into their home in March 2022 and moved to

Colorado in mid-April 2022.

## 2. *Mr. Feindt's History of Present Illness*

### a. Neurological Complaints

115.   Medical records indicate that Mr. Feindt presented to the Tripler Emergency

Department on December 11, 2021 "due to concerns about contaminated

water exposure." **Exhibit H**, Trial Exhibit DX-3214, Patrick Feindt, Jr.

Composite Med. Rec. at 88. He was evaluated by William Wagner, MD.

According to Dr. Wagner's note, he complained of

> headache intermittently for the past 6 weeks. He had a headache
> this morning that was more intense and like his previous
> headaches… Patient also complains of gastrointestinal issues
> for the past several months, having seen GI and had a

> colonoscopy performed. He reports more frequent GI
> discomfort and occasional nausea, vomiting and loose stools
> over the past 6 weeks…. He denies any change in balance or
> any focal weakness, numbness, or tingling.

*Id*.

116. Physical examination was unremarkable, and Mr. Feindt was discharged

with Tylenol, Motrin, Zofran, and Maalox for his symptoms. *Id*. at 89. When

I asked about this visit, Mr. Feindt remarked that he reported to the ED that

"I was in a fog – something wasn't right," however that complaint was not

documented in the medical record.

117. Mr. Feindt had a pre-existing history of migraine headaches and sinus

headaches. The sinus headaches, which were worse with allergies, have

occurred for at least the past 5 to 10 years. He recalled experiencing an

episode of ocular migraine associated with the appearance of a kaleidoscope

pattern in his visual field beginning in 2020, and he was concerned when he

experienced three additional episodes in the summer of 2021. During that

summer, he also experienced the onset of debilitating, painful migraine

headaches associated with nausea, vomiting, photophobia, and unsteadiness

on his feet. Throbbing pain would radiate from the occipital area of his skull

to the top of his head. On average, these migraine attacks occurred once a

week and would last for a minimum of half a day. Tylenol offered no relief.

He continued to experience the migraine headaches throughout 2022.

**Exhibit H**, Trial Exhibit DX-3214 at 26, 29.

118. A neurology consultation by Michele Gatheridge at Peak Neurology in Colorado Springs on July 5, 2022 documented a normal neurological examination. An MRI reviewed by Dr. Gatheridge was negative for acute findings but did note "mild to moderate paranasal sinus mucosal thickening, may serve as a source of headache." *Id*. at 27. Her clinic note also recorded, "He notes a lot of other issues like forgetfulness, temper changes. Feels he could be going somewhere or going to get something and forget where he was supposed to be going. Happens a few times a week." *Id*.

119. Mr. Feindt was referred for neuropsychological evaluation by Dr. Gatheridge, a referral also recommended by the Peterson Family Medicine Clinic in September 2022. Clinic records noted, "He seems very overwhelmed and anxious." *Id*. at 86. Mr. Feindt reported to me that he was unable to appear for a neuropsychological evaluation because of childcare and scheduling issues. The records of any subsequent neuropsychological examination that may have been conducted were not available for review as of the date of my report.

120. In October 2022, Dr. Gatheridge prescribed nortryptiline for the migraine headaches. She also noted that Mr. Feindt was awaiting a CPAP trial for diagnosed mild sleep apnea. *Id.* at 28.

121. On December 29, 2022, Mr. Feindt presented UC Health Memorial North

47

medical center in Colorado Springs with symptoms of headache, vertigo, and neck pain of two days duration. Head CT and CT angiogram of the neck were negative. *Id.* at 105. Physical examination was remarkable for nystagmus on right lateral gaze and subjective decreased sensation in the left hand and arm. *Id.* at 110. He was admitted for further evaluation and management, which included a lumbar puncture that was positive for enterovirus (aseptic viral meningitis) on the meningoencephalitis panel. He was also considered have status migrainosus (intractable migraine persisting for > 72 hours). *Id.* at 176. After no response to multiple migraine medications, he had some relief from Fioricet. *Id*. at 177. He was discharged on January 4, 2023. *Id*. He received outpatient follow-up with neurologist Dr. Kevin Scott, who switched him to venlafaxine, and then later back to Fioricet and rizatriptan. *Id*. at 42.

122. At the time of his IME, Mr. Feindt reported that he was still experiencing daily migraine symptoms, but that they were relatively subdued. Migraines were accompanied by nausea, vomiting and photophobia two to three times a month. Mr. Feindt expressed concern that chemical exposures may have caused him to experience immune dysregulation that contributed to his aseptic meningitis.

123. Family medicine physician Taunya Ann Kiefer MD referred Mr. Feindt to

the Bettner Vision Neurooptometry clinic in March 2023 for the diagnoses

of hypophoria, diplopia, and esophoria. *Id*. at 43. Mr. Feindt said that new

glasses prescribed in May, 2023 had been helpful with his diplopia (double

vision).

      b.  <u>Sleep Complaints</u>

124.   Mr. Feindt underwent a polysomnogram on September 1, 2016 that was

positive for "severe obstructive sleep apnea with moderate oxygen

desaturations." *Id*. at. 139 AHI was 16.5/hour and RDI was 33.1/hour. *Id*. He

terminated a follow-up CPAP titration polysomnogram prematurely on

September 8, 2016 because he was intolerant of CPAP. *Id.* at 179. He

underwent a septoplasty on December 13, 2016, and a uvulopalatoplasty in

2020. However, at the time of a primary care evaluation on June 16, 2022,

Brianna McMurray DO noted that his snoring was "worse in last 6 to 8

months. More groggy. Thinks he's sleeping well but wife states he's snoring

a lot. Patient feels like he stops breathing or gasps, sometimes wakes up with

acid in mouth/choking." *Id*. at 92.

125.   Mr. Feindt underwent another polysomnogram on July 17, 2022 that was

positive for "mild sleep apnea of variable origin which caused mild oxygen

desaturation" with an AHI of 5.0/hour. *Id*. at 53-54. The interpreting

physician David Slamowitz, MD wrote, "Based on the patient's

symptomatology a trial of CPAP is warranted." *Id*. At his IME, Mr. Feindt

said that he had not yet followed up on this recommendation.

    c.  <u>Chronic Pain</u>

126. On May, 22, 2022 Mr. Feindt presented to the St. Francis Medical Center

ED in Colorado Springs with three days of right-sided abdominal pain that

radiated to his right testicle. *Id*. at 121-22. Extensive workup including

abdominal CT scan, pelvic ultrasound, and laboratory testing were negative

and he was discharged for outpatient follow-up. *Id*. at 122-129.

127. Mr. Feindt reported to me that he has continued to experience right sided

abdominal pain and flank pain radiating to his right testicle "every single

day" ever since. Further gastroenterology and surgical evaluations and

interventions from 2022 through early 2023 have included right inguinal

hernia repair in June, 2022 and cholecystectomy on November 1, 2022. *Id.*

at 152-53. At the time of his cholecystectomy, an exploratory laparoscopy

revealed that his right colon and his sigmoid colon were adherent to the

peritoneal sidewall. Because the adhesions were dense it was decided not to

attempt lysis. *Id*.at 5-6.

128. His pain persisted following these surgeries, and he was evaluated by Major

Blaise Pascale, MD, MPH at the Evans Army Community Hospital

outpatient pain clinic in December 2022. *Id.* at 152-53. He underwent an

ilioinguinal nerve block on January 19, 2023 that at the time of follow-up on
February 7, 2023 was noted to have resulted in 90 percent improvement in
overall testicular pain. *Id*. However, because pain under his right costal
margin and in his right flank persisted, he subsequently underwent an
intercostal nerve block on April 23, 2023 and an erector spinae plane block
on May 9, 2023. *Id*.

129.  Neither provided relief. Dr. Pascal wrote on May 12, 2023 that a consultant
at Walter Reed Army Medical Center suggested a T8 dorsal root ganglion
block or a T8 radiofrequency ablation might be considered in the future
following Mr. Feindt's relocation to the Richmond, VA area. *Id*. at 152. As
of the time of his IME, Mr. Feindt had not yet pursued these options.

d.  Gastrointestinal Complaints

130.  Mr. Feindt reported the onset of chronic diarrhea in 2016 that was treated
with Imodium. Further gastrointestinal evaluation revealed internal
hemorrhoids with blood in stool, and an anal fissure. *Id*. at 35. Colonoscopy
in 2018 revealed diverticulosis without diverticulitis. *Id*. at 91. He was
prescribed nifedipine for the fissures. *Id*. at 35.

131.  He has had gastroesophageal reflux for more than 10 years treated as needed
with nonprescription Prilosec.

132.  Gastroenterologist Brian Kavanaugh, MD noted on September 28, 2022 that

a recent colonoscopy with biopsy was positive for elevated mastocytes,

resulting in treatment of his chronic diarrhea with Gastrochrom (cromolyn).

*Id*. at 70. An upper endoscopy on August 10, 2022 was positive for gastric

and duodenal ulcers of unspecified chronicity, for which treatment with

Famotidine 40 mg qd was initiated. *Id*. A tryptase level was ordered, but the

result could not be located in the available records. Stool for ova and

parasites was negative.

### 3. *Specific Causation Analysis for Mr. Feindt's Claimed Injuries*

133.   It is my opinion and assessment that Mr. Feindt has the following

conditions:

1. Mastocytosis with gastrointestinal tract involvement, with associated symptoms of abdominal cramping, diarrhea, and ulcers;

2. Chronic migraine headaches, with history of status migrainosus;

3. History of recurrent sinus headaches;

4. Chronic right abdominal and flank pain syndrome involving T8 dermatome, probably of neuropathic origin;

5. Peritoneal adhesions, possibly contributory to chronic pain;

6. History of aseptic meningitis (December 2022);

7. Obstructive sleep apnea;

8. Chronic neck pain, history of C4-C5 radiculopathy;

9.  Gout;

10. Exercise-induced asthma

134. In evaluating whether there is a causal relationship between Mr. Feindt's potential exposure to JP-5 and his neurological, gastrointestinal, and pain complaints, I applied the four criteria discussed *supra* Section III.

a.  General Causation

135. It has not been established that Mr. Feindt suffered from a medical condition known to be caused by JP-5 or its constituents. None of the medical complaints reported by Mr. Feindt subsequent to the November 20, 2021 jet fuel spill have been linked to a diagnosed medical condition known to be caused by JP-5 or its constituents.

136. Mr. Feindt has been diagnosed, by a colonic biopsy, with mastocytosis involving the gastrointestinal tract. This condition has a well described association with chronic diarrhea, abdominal cramping, gastric and duodenal ulcers, all of which have been present in Mr. Feindt (Pohl, 2012; Hamilton, 2023). It has recently been suggested that mastocytosis may also be associated with neuropathic pain syndromes, and cognitive symptoms (Novak et al, 2022).

137. Mr. Feindt also has also been diagnosed following formal medical evaluations with chronic migraine headaches, obstructive sleep apnea, and a

chronic pain syndrome involving the T8 dermatome.

b. <u>Dose</u>

138.    It cannot be concluded that Mr. Feindt sustained a dose of JP-5 of sufficient

magnitude to cause his reported medical conditions. The water distribution

modeling performed by Dr. Grayman estimated that Mr. Feindt's residential

tap water at his Ford Island home was not contaminated by JP-5. In response

to questioning during his IME, Mr. Feindt did not report any odor or sheen

on the water that were reported by other residents whose water may have

been impacted by the November 20, 2021 jet fuel spill.

139.    Notwithstanding these findings, I evaluated the dose of JP-5 to which Mr.

Feindt was exposed, relying on the highly conservative dose calculations

conducted by Dr. Prueitt regarding the estimated dose of JP-5 that Mr.

Feindt sustained acutely and subchronically by ingestion of residential tap

water, inhalation of residential air, or dermal contact with tap water through

bathing or washing.

140.    Specifically, Dr. Prueitt conservatively calculated Mr. Feindt's peak oral

dose of TPH-d from total (direct and indirect) tap water ingestion to be

0.074 mg/kg-day, assuming Dr. Grayman's worst-case estimates of Red Hill

shaft JP-5 contamination of 17 mg/L. The estimated peak oral dose was

approximately 40-fold less than the ATSDR acute-duration oral MRL for

JP-8 of 3 mg/kg-day, which itself incorporates an additional "uncertainty factor" or "safety" margin of 100-fold below the NOAEL.

141. The worst-case airborne concentration of TPH-d estimated to have been sub-chronically present in his home was ≈ 1800-fold lower than the 150 mg/m$^3$ airborne concentration of JP-5 that ATSDR identified as the lowest observable adverse effect level (ATSDR, 2017).

142. Per Dr. Prueitt's calculations, as set forth in her October 24, 2023 report, the MOE for those chemicals with regulatory toxicity doses and Mr. Feindt's estimated doses are all well above the threshold of 1, indicating that his dose is significantly less than the regulatory guideline values. For the remaining chemicals and exposures Dr. Prueitt evaluated, Mr. Feindt's doses were all orders of magnitude below the NOAELs and LOAELs in the scientific literature.

143. As discussed above, I have reviewed Dr. Prueitt's Supplemental Expert Report of November 27, 2023, in which she provided an updated dose assessments using an assumption of 85.25 mg/L for the maximum concentration of TPH-d in Red Hill well shaft for demonstrative purposes. The higher doses calculated by Dr. Prueitt do not change my conclusion that Mr. Feindt did not sustain a dose sufficient to cause any toxicologically induced adverse effects.

c. <u>Temporality</u>

144. The temporal pattern between Mr. Feindt's reported medical conditions and
his exposure to JP-5 is inconsistent with a causal relationship.
Notwithstanding that even the worst-case estimates for JP-5 dose sustained
by Mr. Feindt were far below that known to be associated with his overt
symptoms and medical conditions, the temporal pattern of his reported
complaints is inconsistent with them having been caused by JP- 5 exposure.
At the time of his presentation to the Tripler Emergency Department on
December 11, 2021, he reported that he had been experiencing headaches
intermittently for "the past 6 weeks" and increased gastrointestinal
symptoms over "the past 6 weeks" indicating an onset prior to November 21,
2021. **Exhibit H**, Trial Exhibit DX-3214 at 88.

145. The history provided by Mr. Feindt at his IME and that documented in the
medical records indicate that Mr. Feindt had complaints of chronic diarrhea
for several years prior to the November 20, 2021 jet fuel spill, and recurrent
debilitating migraine headaches since the summer of 2021. *See id*. at 26, 29,
70.

146. Mr. Feindt reported that the chronic right upper quadrant pain and radiating
right flank that he continues to experience began rather abruptly in May,
2022.

147.  The mid-size hydrocarbons found in JP-5 undergo metabolism and excretion and are not known to persist or undergo long term bioaccumulation (Sterner et al, 2008). There is no established toxicological or pharmacological mode of action that would link brief exposure to JP-5 that ended in December 2021 to the onset of neuropathic pain that abruptly emerged in May, 2022 and has since persisted.

d.  Differential Diagnosis

148.  Factors in Mr. Feindt's medical history unrelated to the toxicological effects of JP-5 are as likely or more likely to account for his medical complaints. As noted above, Mr. Feindt has undergone extensive medical evaluation resulting in the diagnosis of well-characterized medical conditions, including mastocytosis of the gastrointestinal tract, and chronic migraine and sinus headache syndromes, that may readily account for his chronic gastrointestinal symptoms and chronic headaches. He has also been diagnosed with obstructive sleep apnea, a condition well known to contribute to, cognitive dysfunction, fatigue, and peritoneal adhesions involving his colon, a condition that may potentially contribute to chronic abdominal pain (Engleman and Douglas, 2004; Van Goor, 2007; Pichetshorte and Pimentel, 2019). **Demonstrative Exhibit I** illustrates these scientific findings.

149.  Dr. Pascal, a pain medicine specialist, considered that localized neuropathic pain involving the T8 dermatome may be responsible for his chronic abdominal and flank pain. **Exhibit H**, Trial Exhibit DX-3214 at 151-152.

150.  As discussed *supra* ¶59-60, Mr. Feindt's concern that the tap water was contaminated may have contributed in a manner unrelated to direct toxicity to his report of symptoms.

151.  In view of all of the foregoing findings, it cannot be concluded with reasonable medical probability that Mr. Feindt's medical conditions or complaints were caused by exposure to JP-5 in his residential tap water following the November 20, 2021 fuel spill.

### 4.  *Dr. Bird's Future Treatment Recommendations*

152.  Dr. Bird set forth a long-term schedule, in some cases extending 21 years into the future, of specialty medical care that he believed would be necessary to manage Mr. Feindt's medical conditions, including care by an "allergist/immunologist for evaluation of his mastocytosis", a neurologist for his migraines, a pain management specialist for his pain, as well as a gastroenterologist for his abdominal pain. He also indicated that Mr. Feindt would need chronic medication and annual pulmonary function tests for his asthma, a condition Mr. Feindt has had since childhood.

153.  Even if construed as treatment rather than monitoring, as discussed above,

for numerous reasons it cannot be concluded with reasonable medical
probability that any of these conditions bear any causal relationship to JP-5
exposure, and as such, Dr. Bird's development of this plan of ongoing
evaluation and treatment on the premise of JP-5 causation is without reliable
toxicological foundation.

154.    For the reasons discussed above *supra* ¶¶ 64-65, I do not believe that Dr.
Bird's recommendations for annual exams, blood tests, and neurology
screening adhere to widely recognized criteria for conducting medical
surveillance of individuals or populations exposed to toxic substances.

155.    For these reasons, Dr. Bird's recommended treatment is unadvisable and
does not comport with recognized principles of medicine or medical
toxicology.

**D. Nastasia Freeman**

156.    Nastasia Freeman is a 36-year-old mental health counselor who resided at
Aliamanu Army Reservation housing located at 185 Halawa View Loop
from May 2021 through February 2, 2022 when she and her family moved to
California.

157.    Dr. Bird has offered opinions that Ms. Freeman suffered the following acute
effects of her alleged exposure to JP-5: exacerbation of seizures, headaches,
abdominal pain, nausea, vomiting, diarrhea, rash, exacerbation of psoriasis,

and menstrual irregularities. (Bird, July 2023). Dr. Bird also opines that Ms.

Freeman suffered long-term effects as a result of her exposure to JP-5,

including "worsening/exacerbation of her seizure disorder, brain fog,

vestibular disorder, nausea, exacerbation of psoriasis, menstrual cycle

abnormalities, goiter with low thyroid tests, urinary problems and Post-

Traumatic Stress Disorder and Generalized Anxiety Disorder. (Bird, July

2023; Bird, October 2023).

### 1. *Ms. Freeman's Water Usage*

158.  Ms. Freeman reported to me that prior to November 2021, it was common

for her drink 1 or 2 cups of coffee each day, plus a large tumbler of water

and another cup during the day while working. She said that it was typical

for 6 or 7 lunches and dinners per week to be prepared at home.

159.  Ms. Freeman recalled making a homemade Thanksgiving dinner on

November 25, 2021 using the household tap water and did not recall that the

water tasted abnormal. Ms. Freeman further reported that on a day shortly

after Thanksgiving (she could not recall the precise date), she and her

husband detected an odor similar to gasoline while running the tap water in

the laundry room and downstairs bathroom of their home. Her husband

recognized the odor as jet fuel.

160.  According to her deposition testimony, Ms. Freeman called the nurse advice

line on November 29, 2021 regarding her water and was advised to stop

drinking it immediately, which she and her family promptly did.

161.    Sometime later, her family briefly resumed drinking the tap water after

seeing a video on the internet that said the water was fine. During her IME

she said, "Maybe we didn't drink it" after detecting the odor, but she

continued to prepare meals with the tap water and use it for bathing. Within

a few days and prior to December 3, 2021, they ended all use of the tap

water. She reported that soon afterward they received a call from the base

housing office advising them to flush the plumbing in their homes.

162.    On December 3, 2021, Ms. Freeman and her family were relocated to a hotel

in Honolulu that was not served by the JBPHH water system. The Freemans

remained in the hotel until February 2, 2022, when they moved to California.

### 2. *Ms. Freeman's History of Present Illness*

163.    Ms. Freeman said at the time of her IME that she and members of her family

had nausea and vomiting at some point prior to moving to the hotel, and that

these symptoms abated once they moved.

164.    On December 8, 2021, Ms. Freeman sent an email to Joshua Waxenbaum,

DO of Tripler Family Medicine. **Exhibit J**, Trial Exhibit DX-3215, Nastasia

Freeman Composite Med. Rec. at 243. She requested to initiate care with a

neurologist in Hawaii to prescribe her medication she had been using for

prophylaxis of migraine headaches. She also wrote in the email, "I live in

AMR which was one of the communities affected by the water

contamination and in addition to stomach issues, a rash, vomiting, and

diarrhea, I have also begun to have some neurological effects such as

persistent headaches, blurred vision in conjunction with headaches as well as

numbness and tingling which are common symptoms associated with my

seizure disorder." *Id*.

      a.  Neurological Complaints

165.  On December 9, 2021, Ms. Freeman had a telemedicine visit with Emily

Ann Robinson NP (nurse practitioner) of the Primary Care Outpatient Clinic.

*Id.* at 257. The narrative note of NP Robinson did not record any complaints

regarding gastrointestinal symptoms, and to the contrary the Review of

Systems in the note included the notations: "Head: NO [sic] headache,

Gastrointestinal: NO abdominal pain, nausea, vomiting, Neurological: NO

lightheadedness, dizziness." *Id*. at 258. NP Robinson did write, "She reports

that the numbness is from the temple down to the ear on side with migraine

history…She has been seizure free over the past year and a half." *Id*. Ms.

Freeman reported that she had been taking Tylenol for headaches and

requested a prescription for Topamax (topiramate) that had been helpful in

the past for seizure and migraine control. *Id.* at 257. She also reported that

she had a history of psoriasis and seborrheic dermatitis and had been free of

psoriasis since June 2021. *Id.* at 258. She reported that her current

medications included topical calcipotriene-betamethasone, topical

clindamycin, topical clobetasol, and ketoconazole shampoo. *Id.* at 257. She

was provided a prescription for Topamax and was scheduled for primary

care follow-up. *Id.*

166.    Ms. Freeman's next contact with Primary Care was a virtual visit for upper

respiratory infection symptoms on December 29, 2021. *Id.* at 255. A

narrative note by Supatha Peters NP recorded that Ms. Freeman's husband

had tested positive for Covid-19 the day before, and that she had

experienced symptoms of cough, nasal congestion, body chills, fatigue sore

throat and constant headache for three days. *Id.* at 256. On the day of the

virtual visit, she began to experience stomach cramping and nausea without

diarrhea. *Id.* She did not complain of dizziness or cognitive problems. *Id.*

She was advised to stay at home and stay hydrated, and to report to the ED

for worsening symptoms. *Id*. Ms. Freeman reported during her IME that she

did not test positive for Covid.

167.    Ms. Freeman received a virtual neurology consultation from Matthew

Blattner, MD on January 4, 2022. *Id.* at 260-62. His narrative note included:

> She reports an increase in seizures over the last three months.
> She started to have an increase in episodes around late

> October/November which also seemed to coincide with the
> water contamination problem in the Red Hill/AMR area. They
> are consistent with her typical seizures with disorientation,
> panic and compulsion to go to water but not necessarily drink.
> She will sometimes progress to LOC [loss of consciousness]
> but recently she is mostly having these type of seizure auras
> without LOC. She also reports experiencing significant
> cognitive symptoms with stumbling over her words. She works
> as a therapist and this is significantly affecting her work. She is
> currently having these episodes two times a day on average but
> her cognitive symptoms are constant.

*Id.* at 261.

168. He also noted that in the past, Ms. Freeman's typical seizures were

associated with symptoms that

> will typically last for about 45 seconds after which she will feel
> exhausted and her speech will be abnormal and she will stutter
> for much of the rest of the day. The onset of her seizure
> disorder was a year after she suffered from meningitis as a
> child. She was ultimately diagnosed with epilepsy at around age
> 14. She had EEG studies done which showed focal left
> anterior/mid temporal slowing with intermittent sharp waves.

*Id*. at 262.

169. Dr. Blattner elected to continue treatment with topiramate 25 mg twice daily

and to resume her prior use of levetiracetam 500 mg twice daily. *Id.* at 261.

An EEG performed on January 14, 2022 was interpreted as abnormal due to

focal (theta) slowing in the left anterior/mid-temporal region without clear

evidence of epileptiform activity or electrographic seizure. *Id.*at 260. Dr.

Blattner progressively increased her dose of levetiracetam over the next

several months. *See id*. at 259.

170.  Dr. Blattner noted, as did Ms. Freeman during her IME, that she had been

diagnosed with a seizure disorder since childhood. *Id*. at 262. At her IME,

Ms. Freeman explained that she had a history of four distinct neurological

symptoms. She described her typical "seizures", which began when she was

8 years old presumably following an episode of meningitis, that were

characterized by loss of consciousness with tonic convulsions. Ms. Freeman

reported that these were currently under control and the last had occurred in

February 2023. Ms. Freeman reported that she had also been diagnosed at

the UCSD Epilepsy Center with "focal aware seizures" lasting less than one

minute that were characterized by brief problems with comprehension and

loss of her train of thought. She reported that at present she experiences

these on a daily basis. A third neurological symptom consisted of episodic

loss of balance that could be triggered by quick movements of her head or

when looking down from heights. Her dizziness episodes last for minutes to

hours and occur on a daily basis. She had been referred for a

videonystagmography and posturography evaluation in November 2022, but

this was apparently never performed. The fourth neurological condition was

chronic migraine headache that began in her late teens. She said the migraine

headaches currently occur once a week but can be aborted with use of

rizatriptan.

171.   In July, 2022, Ms. Freeman underwent three days of video EEG monitoring
at Walter Reed Army Medical Center as she was tapered off anticonvulsant
medication. *Id.* at 263-267. No EEG changes occurred during three
subjective reports of dizziness. *Id.* Anti-convulsant medication was not
continued at discharge. *Id.*

172.   On the evening of January 3, 2023, Ms. Freeman presented to Temecula
Valley Medical Center after reportedly having felt lightheaded and nauseous
at home, followed by being subsequently found by her husband on the
ground unresponsive; Ms. Freeman was very week and had labored
breathing. *Id.* at 14-15. Earlier in the day she had been seen at the Naval
Hospital Camp Pendleton Emergency Department for low back pain, chest
pain, and palpitations, and had been administered diazepam, ketorolac, and
morphine. *Id.* at 281-283. She was discharged from Temecula Valley the next
day and was seen at the UCSD Neurology Clinic by Eric Gutflais, MD on
January 5, 2023. *Id.* at 90-93. Dr. Gutflais wrote in his note:

> The most recent episode days prior was likely non-epileptic in
> nature and related to pain medications. I query if many other
> episodes are psychogenic non-epileptic in nature. She's tried
> many AED [anti-epilepsy drugs] in the past and has developed
> intolerant side effects to all of them. She does not want to
> consider another AED ever again.

*Id.* at 93.

66

173.  Dr. Gutflais referred her to the UCSD Epilepsy Center, where she was

evaluated by David Lee MD, PhD. *See id.* at 220-225. After the initial

evaluation of Ms. Freeman on February 8, 2023, Dr. Lee's "working

diagnosis" was "non-lesional focal epilepsy." *Id.* at 225. He prescribed

treatment with Lamotrigine (Lamictal). *Id.* at 224. At the time of the last

available follow-up note dated May 11, 2023, Dr. Lee wrote in part,

> She has been under a lot of stress, and will be seeing a
> psychiatrist soon because her memory problems and brain fog
> is starting again. She has not had any seizures, but she feels
> mentally exhausted and needs psychotherapy. Her larger
> recognizable seizures are rare (about once a year so it is
> difficult to characterize with repeat VEG, [sic] but she is having
> recurrent auras (probable focal aware seizures) every other day
> (sometimes a strange burning smell, feeling hot and compulsion
> to get in or around water, a sense of things slowing down -
> duration less than 1 minute.

*Id*. at 222.

174.  At the time of her IME, Ms. Freeman reported that daily episodes of losing

her train of thought were her "main problem."

175.  It is notable that medical records reveal that Ms. Freeman reported episodic

difficulties with cognition and concentration beginning at least seven years

ago. On September 29, 2016, when she was in the last trimester of her fourth

pregnancy, a visit to the obstetrics clinic at NMC San Diego recorded that

"Patient describes feeling mental fogginess and dizziness since January time

frame but more prominent since +HCG [positive pregnancy test]." *Id.* at

308. On October 24, 2017, Ms. Freeman consulted neurologist Joel Apides MD for a complaint of headaches. Dr. Apides wrote in his consultation note:

> …She has also been experiencing mental fogginess (as in the past), tingling of her hands and mouth. Has history of anxiety (panic, palpitations, dizziness in the past) …. In addition to her headaches, she describes mental fogginess, word-finding difficulty, forgetfulness and has to work harder for her lessons (taking masters in forensic psychology). She sleeps 4-5 hours per night and despite this describes fatigue and exhaustion.

*Id*. at 304.

176. Dr. Apides' assessment included, "she has multiple other symptoms including mental fogginess, forgetfulness, fatigue, word finding difficulty, lack of sleep and exhaustion, tingling of hands and mouth. Suspect related to anxiety but will rule out organic etiology." *Id*. at 305.

177. At the time of her IME, Ms. Freeman reported disturbed and fragmented sleep. She described typically waking up at 4 or 5 a.m., and then taking a nap from approximately 1:00 p.m. until dinner time when her husband awakens her. After dinner, she goes back to sleep until her husband again wakes her at 10:00 p.m. so she can take her medications. She then sleeps until 4:00 or 5:00 a.m. the following morning. Ms. Freeman noted that when she first arrived in Hawaii in May 2021 she weighed approximately 160 lbs., but then subsequently gained weight and now weighs approximately 200 lbs.

178. In a sleep questionnaire in the medical records that Ms. Freeman completed

on January 13, 2023, she indicated that she felt "excessively tired or sleepy during the daytime" for the prior 14 months, a condition she attributed to poor quality sleep. *Id.* at 177-178. Ms. Freeman was seen in consultation by Sleep Medicine specialist Sunitha Nune, MD on March 2023. In the history of present illness section of her note, Dr. Nune wrote:

> She reports snoring, breathing pauses during sleep witnessed by others, awakenings choking/gasping, awakenings with shortness of breath, unrefreshing sleep, daytime fatigue, daytime sleepiness, awaking to urinate 2 or more times a night, restless sleep, perspiration during sleep, waking up with dry mouth/sore throat and morning headaches. She has gained about 60 lbs. and [has] thyroid issues…. She is more sleepy than fatigued. She reports difficulty falling asleep, difficulty maintaining sleep, tendency to use bedtime for thinking/worrying/planning, preoccupation with poor sleep, anxiety/tension associated with bedtime, tendency to look at the clock when unable to fall asleep and tendency to remain in bed when unable to sleep. She is not taking anything for it…. She is having severe night sweats and sometimes she catches herself breathing and sweating profusely.

*Id.* at 341.

179.    Ms. Freeman underwent a polysomnogram on April 26, 2023. *See id.* at 172-175. Her AHI was negative at zero events per hour, but her RDI [respiratory disturbance index] was abnormal at 8.4/hour, consistent with sleep disordered breathing. *Id.* at 173-174. Approximately 8.4 % of her total sleep time was associated with an oxygen saturation less than 90%, with the lowest saturation event of 81%. *Id.*

69

b. <u>Cardiac Complaints</u>

180.  Ms. Freeman reported that she has had episodes of palpitations where she

perceives that her heart is racing, but she could not recall when this first

began. Medical records indicated that she was evaluated for subjective

tachycardia and palpitations by internal medicine and cardiology consultants

in 2016 when she was pregnant with her fourth child (January 2016). An

internal medicine consultation by Kara Teruya, MD on May 16, 2016

recorded in part, "Episodes start with her 'body feeling very tight and

extremely warm' followed by lightheadedness and palpitations ('heart

pulsing and skipping')." *Id.* at 313. These were said to have been present

since childhood, distinct from her seizures and migraines:

> Has not had repeat syncope but has near constant positional
> lightheadedness and palpitations limiting her ability to do basic
> activities such as move around her house and care for her
> children. States she essentially lies in bed all day and continues
> to feel poorly. Initially had nausea/vomiting earlier in first
> trimester but has resolved and has been trying to increase fluid
> intake to help symptoms. She is extremely frustrated and was
> tearful during interview.

*Id*.

181.  The evaluation noted orthostatic intolerance, with seated HR 94, BP 94/58,

and standing two minutes: "(worsening of symptoms + palpitations): HR

120+ (auscultating), BP 84/56." *Id.* at 314. Echocardiogram was negative.

*Id.* at 315. Monitoring in the hospital observed no arrythmias. *Id.* After

consultation with cardiology and OB/GYN consultants, Ms. Freeman was

started on Florinef (fludrocortisone) and encouraged to increase hydration

and salt intake. *Id.* at 320. An obstetrics note in September 2016 indicated

that after she ran out of the prescription over the summer her symptoms

didn't worsen and may have improved, so it was not resumed. *Id.* at 310.

182.    Cardiologist Candice Kim, MD conducted a cardiac evaluation for Ms.

Freeman's complaints of palpitations beginning on October 6, 2022. *Id.* at

185-186. In her initial consult, Dr. Kim recorded that Ms. Freeman told her

(contrary to the aforementioned documentation) that the palpitations began

in December 2021. *Id.* at 185. They were occurring daily and sometimes

multiple times per day. *Id.* Dr. Kim's evaluation over the next six months

included a seven-day ambulatory heart monitor (Ziopatch) that was negative

for arrhythmias, frequent PACs or PVCs (all < 1% burden), with sinus

rhythm at the time of her symptoms. *Id.* at 199-203. Echocardiogram, carotid

ultrasound, treadmill stress test and a 30-day DMS heart monitor were also

negative. *Id.* at 197-198; 204-209. Thyroid function testing had revealed a

slightly low TSH in August 2022 of 0.3, that was normal on repeat testing in

September 2022, with TSH 0.6 and fT4 1.2 (both within reference range). *Id.*

at 186. Despite "no significant findings from a cardiac standpoint," Ms.

Freeman was prescribed a low dose of the beta-blocker metoprolol (12.5 mg

twice daily). *Id.* at 194, At the time of her IME, Ms. Freeman reported that she was taking metoprolol 25 mg daily and that her palpitations and sensation of racing heartbeat continued, and were worse now than they were in 2022, featuring more prolonged symptomatic periods.

183. After Ms. Freeman complained of chronic dyspnea (labored breathing) in February 2023, she was referred for pulmonary function tests which revealed normal total lung capacity, FVC 2.02 (87 percent predicted), FEV1 2.21 (77 percent of predicted), and FEV1/FVC ratio of 73%. *Id.* at 296, The response to inhaled bronchodilator, a standard component of testing to diagnose asthma, could not be performed because the patient had to leave for child care. *Id.* DLCO was 91% of predicted. *Id.* Dr. Brian Tran decided to begin Ms. Freeman on an Advair inhaler. *Id.* 279.

　　　c.　Pelvic Complaints

184. Ms. Freeman has had pelvic pain and dyspareunia since approximately June 2021. At the time of gynecological examination on June 13, 2022 she was considered to have a diagnosis of pelvic floor dysfunction. *Id.* at 46. Heavy menstrual bleeding was not present at that time. *Id*. This problem developed after mid-2022, and at the time of the IME Ms. Freeman said it became most prominent within the past 3 months. PA-C Belknap noted on June 28, 2022 that a pelvic ultrasound revealed a mildly heterogeneous uterine

myometrium consistent with adenomyosis. *Id.* at 336. At the time of her

IME, Ms. Freeman said that gynecologist Dr. Christine Todd had scheduled

an endometrial biopsy in one week. Records detailing the results of that

evaluation were not available as of the date of my report.

185.  Ms. Freeman was noted to have hematuria in February 2022. According to

the records of nephrologist Eric Yan, MD, work-up included a negative

uterine cystoscopy, a CT urogram on April 27, 2022 remarkable for punctate

calcification of the superior bladder wall margin and a right ovarian cyst,

and a negative renal and bladder ultrasound on June 4, 2022. *Id.* at 50-51;

61. A urinalysis on at the time of follow-up consultation with Dr. Yan on

August 22, 2022 revealed no hematuria. *Id.* at 61. Dr. Yan doubted that her

prior hematuria was of glomerular origin, however he ordered serologies to

evaluate for glomerulonephritis. *Id.* at 62. The results were not in the

available records as of the date of my report. His note indicated no need for

a renal biopsy. *Id*.

d.  Dermatological Complaints

186.  Ms. Freeman has a long history of psoriasis. She presented for a

dermatology evaluation by Dr. John Landers on May 16, 2012 with a

complaint of scaling and itching of her scalp and a rash on her feet and

hands. *Id.* at 323. The examination revealed lesions on the hands and feet

73

"suspicious for palmoplantar psoriasis." *Id*. Topical medications were

prescribed. *Id*. at 323-24.

187.   PA-C Belknap noted during a primary care visit on April 22, 2022 a history

of psoriasis localized to her feet and scalp and that "previous treatment

regimens were not helpful other than light box treatment (PUVA)." *Id.* at 11.

She requested a dermatology consultation, as her last had occurred in May

2021 prior to moving to Hawaii. *Id*. She was referred to Advanced

Dermatology and Skin Cancer Specialists in Temecula, where a punch

biopsy of a toe lesion on May 31, 2022 was interpreted by clinic providers as

positive for plaque psoriasis. *Id.* at 127; 131; 254. A maternal history of

psoriasis was noted. *Id.* at 323. She reported that previously in Florida she

had symptomatic improvement with PUVA (phototherapy). *Id.* at 160. At

the time of a dermatology follow-up visit on September 2, 2022 it was noted,

"Scalp and hands with erythema and scaling, feet with fissuring bsa [body

surface area] 8% - patient has underlying joint stiffness and possible

psoriatic arthritis." *Id*. at 154.

188.   In early 2023 she was begun on treatment with Humira. Clobetasol,

methotrexate and folate were later added to her regimen without adequate

response. *Id.* at 164. Additional treatments included the biologicals Cosentyx

and Zoryve, however the psoriasis continued to flare. *Id.* The latest

74

dermatology consult note on October 17, 2023 indicated that her psoriasis

had progressed to 15 percent body surface area over the prior 18 months,

and that she experienced difficulty walking due to the lesions on her feet. *Id.*

at Attempts were underway to obtain insurance approval for treatment with

the medication Skyrizi. *Id.* at 154.

### 3.  *Specific Causation Analysis for Ms. Freeman's Claimed Injuries*

189.  It is my assessment and opinion that Ms. Freeman has the following medical

conditions:

1.  Spells with neurological symptoms, of variable length, not otherwise characterized, with onset in childhood.

2.  Chronic migraine headaches, onset > 15 years ago.

3.  Chronic balance difficulties, not otherwise characterized, onset ≥ 7 years ago.

4.  Psoriasis, moderate to severe, onset > 10 years ago.

5.  History of fragmented sleep pattern, daytime sleepiness, and sleep disordered breathing. Abnormal polysomnogram March 2023 with positive respiratory disturbance index = 8.4, but negative AHI.

6.  Chronic history of palpitations with negative cardiology evaluation for arrhythmias, onset > 7 years ago.

7.  Chronic pelvic pain, onset June 2021, diagnosed as pelvic floor dysfunction.

8.  Heavy menstrual bleeding, pelvic ultrasound consistent with uterine adenomyosis.

9. History of short-term hematuria, without proteinuria,
February 2022, s/p negative cystoscopy and urological
evaluation.

190. In evaluating whether there is a causal relationship between Ms. Freeman's

potential exposure to JP-5 and her neurologic, cardiac, pelvic, and

dermatologic complaints, I applied the four criteria discussed *supra* Section

III.

    a. General Causation

191. It has not been established that Ms. Freeman suffered from a medical

condition known to be caused by JP-5 or its constituents. None of the

complaints or medical conditions reported by Ms. Freeman have been linked

to a diagnosed medical condition known to be caused by JP-5 or its

constituents. She reported nonspecific gastrointestinal symptoms of nausea

and vomiting and diarrhea in the days following Thanksgiving, November

2021, which were no longer present at the time of a virtual primary care

encounter on December 9, 2021. Concentrated kerosene has defatting and

irritant properties, and human case reports of oral ingestion of small

quantities has been associated with gastroenteritis. However, as discussed

further below, the concentration of JP-5 (which is predominantly kerosene)

present in her tap water was likely far lower than that causing overt clinical

gastroenteritis on a toxicological basis. No experimental or clinical

toxicological studies have demonstrated that ingestion or inhalation exposure to JP-5, particularly at low concentrations, have caused or exacerbated the multiple pre-existing medical problems reported and evaluated in Ms. Freeman, including episodic spells with neurological symptoms, migraine headaches, chronic balance disorders, psoriasis, palpitations, pelvic pain, and heavy menstrual bleeding.

192.    Exposure to JP-5 or similar hydrocarbon mixtures is not a recognized risk factor for causing or exacerbating heavy menstrual bleeding in either the toxicological or gynecological literature (James, 2016; Lebduska et al, 2023; Kaunitz, 2023). As noted in the ATDSR Toxicological Profile for JP-5, JP-8 and Jet A Fuels these compounds have not been associated with menstrual disorders or endocrine disruption (ATSDR, 2017). A cross-sectional study of menstrual symptoms was conducted in 170 women of reproductive age employed by the US Air Force (Lemasters, 1999; Gordley et al, 2000). Sixty-six (38.8%) of the subjects reported occupational contact with fuels at work. In multiple logistic regression analysis, there was no relationship between fuel exposure and the prevalence of hypermenorrhea, defined as menses excessive in duration (>7 days) or if the subject reported their amount of menstrual bleeding as "heavy" rather than "spotting," "light," or "moderate." **Demonstrative Exhibit K** illustrates these scientific findings.

    b. <u>Dose</u>

193.  It cannot be concluded that Ms. Freeman sustained a dose of JP-5 of

sufficient magnitude to cause her reported medical conditions. In evaluating

the dose of JP-5 to which Ms. Freeman was exposed, I relied in part on the

dose calculations conducted by Dr. Prueitt regarding the estimated dose of

JP-5 that Ms. Freeman sustained acutely and subchronically by ingestion of

residential tap water, inhalation of residential air, or dermal contact with tap

water through bathing or washing. Specifically, Dr. Prueitt conservatively

calculated Ms. Freeman's peak oral dose of TPH-d from total (direct and

indirect) tap water ingestion to be 0.0087 mg/kg-day or 0.074 mg/kg-day,

assuming Dr. Grayman's likely and worst-case estimates of Red Hill shaft

JP-5 contamination of 2 mg/L or 17 mg/L respectively. These doses are

approximately 345-fold and 40-fold less than the ATSDR acute-duration

oral MRL for JP-8, which itself incorporates an additional "uncertainty

factor" or "safety" margin of 100 -fold below the NOAEL.

194.  Per Dr. Prueitt's calculations, as set forth in her October 24, 2023 report, the

MOE relating regulatory toxicity doses with Ms. Freeman's estimated doses

are all well above the threshold of 1, indicating that her dose is significantly

less than the regulatory guideline values. For the remaining chemicals and

exposures Dr. Prueitt evaluated, Mr. Freeman's exposures were all orders of

magnitude below the NOAELs and LOAELs in the scientific literature.

195.    The air concentration of TPH-d that Dr. Prueitt conservatively estimated to have been present in Ms. Freeman's residence subchronically from November 26, 2021 onward was 0.013 mg/m$^3$, a concentration approximately 154-fold lower than the MRL. The airborne concentration of TPH-d estimated to have been sub-chronically present in her home was $\approx$11,500-fold lower than the 150 mg/m$^3$ airborne concentration of JP-5 that ATSDR identified as the lowest observable adverse effect level (ATSDR, 2017).

196.    As of 2017, the Threshold Limit Value (TLV) (recommended occupational exposure limit) established by the American Conference of Governmental Industrial Hygienists (ACGIH) and utilized by the US Air Force for occupational exposure to jet fuels has been 200 mg/m$^3$ (measured as total hydrocarbons). Clinical research conducted on US Air Force personnel with a range of occupational exposure to JP-8 well below the TLV observed no adverse effect of exposure on postural balance (mean exposure in high and low exposure groups of 4.4 and 0.9 mg/m3 respectively, Maule et al, 2013), or on neuropsychological test performance (mean exposure in high and low exposure groups of 7.6 and 1.2 mg/m3 respectively, Heaton et al, 2017). Demonstrative **<u>Exhibit L</u>** highlights the Maule findings, while

Demonstrative **Exhibit M** highlights the Heaton findings.

197.    After I submitted my report, I reviewed Dr. Prueitt's Supplemental Expert
Report of November 27, 2023 and her updated exposure estimates using an
assumption of 85.25 mg/L for the maximum concentration of TPH-d in the
Red Hill well shaft. The higher doses calculated by Dr. Prueitt do not change
my conclusion that Ms. Freeman was not exposed to a sufficient dose to
cause any toxicologically induced adverse effects.

c.    Temporality

198.    With the exception of brief gastroenteritis, the temporal pattern between Ms.
Freeman's reported medical conditions and her exposure to JP-5 is
inconsistent with a causal relationship. Ms. Freeman's complaints of no
more than a few days of nausea, vomiting, and diarrhea in the week
following Thanksgiving Day 2021 would be temporally consistent with
causation by a sufficiently elevated concentration of JP-5 in the water.

199.    However, all of Ms. Freeman's other medical problems were not temporally
consistent with causation by her JP-5 exposure. As well-documented in the
medical records, and as described by Ms. Freeman at her IME, the onset of
her recurrent problems with neurological spells, migraine headaches,
balance difficulties, psoriasis, and palpitations pre-dated the November 20,
2021 jet fuel spill by many years. The medical records indicate that Ms.

Freeman's reports of cognitive difficulties, including accounts of "mental fogginess, word-finding difficulties, and forgetfulness" were noted by her neurologist six years ago. *See* **Exhibit J**, Trial Exhibit DX-3215 at 305. Ms. Freeman's report of heavy menstrual bleeding began sometime after mid-2022 and has been most prominent in the past few months, more than 18 months after the November 2021 jet fuel spill. The mid-size hydrocarbons found in JP-5 undergo metabolism and excretion and are not known to persist or undergo long term bioaccumulation (Sterner et al, 2008). There is no established toxicological or pharmacological mode of action that would link brief exposure to JP-5 that ended in early December 2021 to the onset of heavy menstrual bleeding that began more than 7 months later and was most pronounced nearly 2 years later.

    d. <u>Differential Diagnosis</u>

200. Factors in Ms. Freeman's medical history unrelated to the toxicological effects of JP-5 are as likely or more likely to account for his medical complaints. Ms. Freeman's migraine headaches, heavy menstrual bleeding, and psoriasis are relatively common conditions in women of her age. Migraine headaches have been estimated to occur in approximately 20 percent of United States women (Burch et al, 2015). Heavy menstrual bleeding is likewise estimated to affect 20 percent of menstruating women

(Gursel et al, 2014). The presence of uterine adenomyosis on Ms. Freeman's ultrasound is a recognized cause of heavy menstrual bleeding, and the findings of a potentially more diagnostic uterine biopsy may soon be available. The prevalence of psoriasis in adults in the United States is approximately 3 percent (Armstrong et al, 2021).

201. The medical records and the description offered by Ms. Freeman at her IME indicated marked problems with fragmented and non-restorative sleep. The polysomnogram conducted earlier this year objectively confirmed sleep disordered breathing characterized by an elevated respiratory disturbance index. Fragmented and nonrestorative sleep may contribute to daytime sleepiness and decreased mental performance, both of which were complaints voiced by Ms. Freeman (Tinajero et al, 2017; Matsumoto and Chin, 2019). *See* **Demonstrative Exhibit E**.

202. As discussed *supra* ¶59-60, Ms. Freeman's concern that the water was contaminated may have contributed in a manner unrelated to direct toxicity to her report of symptoms.

203. In view of all of the foregoing findings, it cannot be concluded with reasonable medical probability that Ms. Freeman's medical conditions or complaints were caused by exposure to JP-5 in her residential tap water following the November 20, 2021 fuel spill.

### *4. Dr. Bird's Future Treatment Recommendations*

204.  Dr. Bird stated that Ms. Freeman was required to undergo a specific schedule of specialty medical evaluations over the next 5 to 29 years to assess and manage her neurological, dermatological, and gynecological problems. (Bird, October 2023). In my opinion, it is incorrect, and methodologically unreliable, to conclude at this time that Ms. Freeman requires a predetermined schedule of evaluation in this matter because 1) a toxicological etiology is improbable, and 2) the precise nature of several of her neurological complaints (*i.e.* spells and balance difficulties) and her heavy menstrual bleeding have not been fully assessed for non-toxicological etiologies. Dr. Bird has presented no reliable scientific foundation for his assertion that the few days of exposure that Ms. Freeman may have sustained to dilute JP-5 in tap water in late November 2021 has been responsible for the progression years later of her pre-existing psoriasis, and that it was the JP-5 exposure that created the need for future decades of dermatological care.

205.  For the reasons discussed *supra* ¶¶ 64-65, I do not believe that Dr. Bird's recommendations for annual exams, blood tests, and neurology screening adhere to widely recognized criteria for conducting medical surveillance of individuals or populations exposed to toxic substances.

206. For these reasons, Dr. Bird's recommended treatment is unadvisable and does not comport with recognized principles of medicine or medical toxicology.

**E. Sheena Jessup**

207. Sheena Jessup is a 37-year-old woman who resided in Navy Housing at 2632 Stowell Circle in Honolulu HI from 2017 through May 15, 2022. Ms. Jessup's home was located in the Radford Terrace neighborhood.

208. Dr. Bird has offered opinions that Ms. Jessup suffered the following acute effects of her alleged exposure to JP-5: abdominal pain and nausea, rash, cough, eye, irritation, headaches, anxiety, fatigue, numbness, and problems with balance. Dr. Bird opines that Ms. Jessup suffers from menstrual abnormalities (with resultant anemia) and anxiety as long-term effects of her alleged exposure.

***1. Ms. Jessup's Water Usage***

209. Ms. Jessup informed me that she first became aware of potential contamination in JBPHH water during her work at Target on Sunday, November 28, 2021 when she observed many customers at purchasing bottled water. She reported that learned from a fireman in the store that there had been a jet fuel spill at Red Hill earlier in the week. Upon returning home that evening she turned on the water tap to the bathtub in the upstairs

bathroom and immediately perceived that the surrounding air "smelled like a gas station." Ms. Jessup stated that she and her family stopped consuming water directly from the tap that evening.

210. On the morning of November 29, 2021 Ms. Jessup took one gulp of coffee prepared with kitchen tap water and immediately perceived a burning sensation in her throat. All direct and indirect consumption (*i.e.*, in beverages or food) of her household tap water was completely terminated as of that moment.

211. Ms. Jessup recalled that in the week prior to November 29, 2021 her residential tap water consumption typically consisted of 3 cups used to prepare coffee per day. Her indirect tap water consumption may have involved the preparation of approximately five meals containing rice or pasta that were prepared with the tap water. Tap water for direct consumption and for ice was often obtained via the refrigerator's filtered dispenser.

212. Aside from the foregoing, Ms. Jessup was a regular consumer of bottled water, a practice she had adhered to since her most recent pregnancy in June 2020.

213. In the week following November 29, 2021, she washed the family clothing at the Navy base laundromat, and she initially attempted to use bottled water

for bathing. However, beginning in early December, she personally bathed with tap water in the home's bathtub approximately every other day. During the first few baths, she perceived a slight odor of fuel, and some oily qualities to the water. She denied experiencing a rash after bathing.

214. Ms. Jessup and her family moved from Hawaii to Arizona in May 2022.

### 2. *Ms. Jessup's History of Present Illness*

#### a. Gastroesophageal Complaints

215. Ms. Jessup stated that in the hours after the gulp of coffee on November 29, 2021, she temporarily "lost her voice" and subsequently she experienced a hoarseness to her voice for at least the next six months. At the time of her IME, she stated that she still had a persistent "scratchy dry throat" that was not present prior to November 29, 2022. Ms. Jessup also reported that she experienced intermittent nausea, but no other gastrointestinal symptoms over the next several days.

216. Ms. Jessup appeared for an appointment at an Operation Ohana clinic established by the Navy for evaluation of potential water-related health complaints on December 17, 2021. **Exhibit N**, Trial Exhibit DX-3216, Sheena Jessup Composite Med. Rec. at 43. A clinic note signed by Dr. Kushner recorded, "The worst symptom is the throat/swallowing which is really mostly today. Symptoms on and off as early as late October." *Id.* at

44. The note also indicated that Ms. Jessup "feels like coordination and balance are off" but no neurological examination was recorded. *Id.* Ms. Jessup circled every symptom on a checklist for "history of current illness" at the top of the Ohana Clinic form and wrote in response to the question about date of symptom onset and duration, "Unsure. Duration: Ongoing (we believe since late October) …" *Id*. at 42-43.

      b.  <u>Menstrual Complaints</u>

217.  Ms. Jessup reported that her predominant medical problem at present consists of heavy menstrual bleeding, a pattern that she said first appeared in early 2022 and has persisted to the present time. She noted that her heavy menstrual bleeding is actually worse now than ever before.

218.  Ms. Jessup was found to have iron deficiency anemia on November 15, 2019, when laboratory tests included a hemoglobin of 11.4 (reference range 11.7 -15.7), ferritin 4.25 (reference range 4.6 -204), and iron 17 μg/dL (reference range 50 -170). *Id.* at 23. She was prescribed ferrous sulfate. Her primary care provider, Heatherann Bal, D.O., wrote in a note dated January 3, 2023 that "She complains of heavy periods for the last couple of years after her last pregnancy" [which resulted in the birth of her son Derek in January 2021]. *Id.* at 3. Dr. Bal ordered laboratory testing that revealed the presence of iron-deficiency anemia, with low serum ferritin and hemoglobin

of approximately 11.5 g/dL. *Id*. at 2. Ms. Jessup reported to me that her

impression that the anemia has contributed to fatigue. The anemia has

persisted despite iron supplements, however, because she finds that the iron

is constipating, and she sometimes takes it every other day rather than the

standard daily dosage.

219.  Ms. Jessup's most recent gynecological follow-up has been by Michelle

Martin, MD in Phoenix, AZ. The last encounter for which records are

available consisted of a negative pelvic ultrasound on September 8, 2023. *Id.*

at 14.

c. Abdominal Complaints

220.  Ms. Jessup has a history of intermittent recurrent abdominal pain that

predated the November 2021 incident. A clinic note dated July 16, 2021

noted that she reported "almost daily" left upper quadrant (LUQ) abdominal

pain. Physical examination was positive for LUQ abdominal pain. *Id.* at 46.

A gastroenterology consult by James Grobe MD, on January 26, 2022 noted

that she

> has been having upper abdominal distress intermittently for
> over a year... [A]n abdominal CT scan done at Tripler
> 07/06/21, which demonstrated bile duct dilation to 9 mm, with
> some intrahepatic ductal dilation in the left lobe and small
> densities, too small to be characterized, with normal pancreas,
> no pancreas duct dilation. As a result of that, she had an
> abdominal ultrasound at Tripler on 07/14/21, which revealed a
> single hepatic cyst and no evidence of biliary duct dilation,

intrahepatic or extrahepatic, with normal visualized portions of
the pancreas and normal gallbladder.

*Id*. at 27.

221.   In a note dated May 6, 2022 following a work-up that included an upper

endoscopy and a colonoscopy, Dr. Grobe's assessment of Ms. Jessup's

gastrointestinal status was gastroesophageal reflux disease with hiatal hernia

and dyspepsia. *Id.* at 26. He recommended treatment with proton pump

inhibitors, and possible follow-up imaging of the pancreaticobiliary tree and

liver. *Id*.

### 3.   *Specific Causation Analysis for Ms. Jessup's Claimed Injuries*

222.   It is my assessment and opinion that Ms. Jessup has had the following

medical conditions:

1.   Subjective pharyngeal irritation following indirect ingestion
     of ≈1 to 4 ounces of tap water in coffee November 29, 2021
     contaminated with JP-5, possibly caused in part by short
     term (days) irritant effects of JP-5 exacerbating prior
     pharyngitis.

2.   Subjective short-term complaints of nausea and balance
     difficulty for less than four weeks after November 28, 2021;
     one day recurrence with headache and eye irritation
     following two residential water flushing events. Not caused
     by direct toxic effects of JP-5 in residential water.

3.   Chronic, pre-existing heavy menstrual bleeding, with
     secondary anemia and fatigue, not caused or exacerbated by
     JP-5 in residential water.

4.   Chronic pre-existing, recurrent abdominal pain, associated

with hiatal hernia and gastroesophageal reflux disease, not
caused or exacerbated by JP-5 in residential water

223.    In evaluating whether there is a causal relationship between Ms. Jessup's

potential exposure to JP-5 and her pharyngeal, menstrual, and abdominal

complaints, I applied the four criteria discussed *supra* Section III.

a.    General Causation

224.    It has not been established that Ms. Jessup suffered from a medical condition

known to be caused by JP-5 or its constituents. None of the medical

complaints reported by Ms. Jessup subsequent to the contamination of her

residential tap water following the November 20, 2021 spill have been

linked to a diagnosed medical condition known to be caused by JP-5 or its

constituents.

225.    Ms. Jessup reported a prominent burning sensation in her throat following a

gulp of coffee prepared with her residential tap water on November 29,

2021, and she believes that she experienced a persistent hoarse voice for the

next six months. Available medical records did not provide physical

examination confirmation of pharyngeal irritation or dysphonia (impairment

of voice production). Concentrated kerosene has defatting and irritant

properties, and human case reports of oral ingestion of small quantities has

been associated with pharyngeal irritation, gastroenteritis, and aspiration

pneumonia. However, as discussed further below, the concentration of JP-5

(which is predominantly kerosene) present in her tap water was likely far

lower than that associated with overt pharyngeal injury.

226. Ms. Jessup reported at the Project Ohana clinic on December 17, 2021 that

she had pharyngitis since late October, 2021, which could have been

infectious or related to her gastroesophageal reflux disease. *See Id.* at 43-44.

As such, it is possible that a low concentration of JP-5 in the gulp of coffee

she ingested on November 29 could have reversibly exacerbated any

underlying or pre-existing pharyngeal irritation.

227. Ms. Jessup reported short term symptoms of nausea and balance difficulties

in the days to weeks following the November jet fuel spill. She also reported

one day of headaches and eye irritation on two days when her residential

plumbing was extensively flushed. No available medical documentation

confirmed that Ms. Jessup exhibited abnormal neurological findings during

this interval. Although acute high dose ingestion or inhalation of JP-5 or

similar hydrocarbon mixtures may cause headache or CNS depression

potentially associated with disequilibrium (Gerarde, 1959; Jacobziner and

Raybin, 1963; Porter, 1990; Das et al, 1992; Seymour and Henry, 2001), as

detailed further below there is no indication that Ms. Jessup sustained an

acute or subchronic dose of JP-5 sufficient to elicit any of these conditions

on a toxicological basis.

228.    Ms. Jessup has complained of heavy menstrual bleeding that began prior to

and has persisted long after the November 2021 JP-5 spill. Heavy menstrual

bleeding, also known as menorrhagia or hypermenorrhea, is a common

condition among women of reproductive age that may have multiple

etiologies that include endocrinological, hematological, and uterine

abnormalities, such as uterine fibroids. Surveys have found it may affect

approximately 20 percent of menstruating women (Gursel et al, 2014). It is

notable that the medical records available as of September 2023 do not

reveal that Ms. Jessup has undergone a comprehensive medical evaluation

by endocrine, hematology, or gynecological specialists to establish the

underlying diagnosis for her heavy menstrual bleeding. The latest work-up

records available, from gynecologist Dr. Martin through September 2023,

include a negative pelvic ultrasound. **Exhibit N**, Trial Exhibit DX-3213 at

11-16.

229.    However, because the sensitivity of ultrasound for detection of uterine

fibroids that may contribute to menorrhagia is limited (Lebduska et al,

2023), further evaluation, which is apparently ongoing, is needed to establish

her diagnosis.

230.    Exposure to JP-5 or similar hydrocarbon mixtures is not a recognized risk

factor for causing or exacerbating menorrhagia in either the toxicological or

gynecological literature (James, 2016; Lebduska et al, 2023; Kaunitz, 2023).

As noted in the ATDSR Toxicological Profile for JP-5, JP-8, and Jet A Fuels

these compounds have not been associated with menstrual disorders or

endocrine disruption (ATSDR, 2017, at page 138 noting that "No significant

association was found between exposure to JP-8 and higher odds of

menstrual disorders."). A cross-sectional study of menstrual symptoms was

conducted in 170 women of reproductive age employed by the U.S. Air

Force (Lemasters, 1999; Gordley et al, 2000). Sixty-six (38.8%) of the

subjects reported occupational contact with fuels at work. In multiple

logistic regression analysis, there was no relationship between fuel exposure

and the prevalence of hypermenorrhea, defined as menses excessive in

duration (>7 days) or if the subject reported their amount of menstrual

bleeding as "heavy" rather than "spotting," "light," or "moderate." *See*

**Demonstrative Exhibit K**.

      b.  <u>Dose</u>

231.  It cannot be concluded that Ms. Jessup sustained a dose of JP-5 of sufficient

magnitude to cause her reported medical conditions. As demonstrated in the

analysis conducted by Dr. Pruiett, the estimated dose of JP-5 that Ms. Jessup

sustained acutely or subchronically by ingestion of residential tap water,

inhalation of residential air, or dermal contact with tap water through

bathing or washing is far lower than that demonstrated to cause any toxicologically induced adverse effects in experimental animals or humans.

232.   Per Dr. Prueitt's calculations, as set forth in her October 24, 2023 report, the MOE relating regulatory toxicity doses to the doses estimated for Ms. Jessup are all well above the threshold of 1, indicating that her dose is significantly less than the regulatory guideline values. For the remaining chemicals and exposures Dr. Prueitt evaluated, Ms. Jessup's dose were all orders of magnitude below the NOAELs and LOAELS in the scientific literature.

233.   A separate comparison of Ms. Jessup's estimated dose to ATSDR MRLs is instructive. Ms. Jessup's oral ingestion of JP-5 consisted of a "gulp" of coffee on November 29, 2021 that was prepared with tap water estimated to contain TPH-d (a surrogate for JP-8) at a concentration of 1.4 mg/L or 12 mg/L, depending on Dr. Grayman's likely estimate or high-end estimate, respectively. It may be conservatively assumed that a gulp of coffee equates to up to four ounces (0.12 liters). Therefore, her oral dose of JP-5 on that day was either 0.17 mg (=0.12 L x 1.4 mg/L) or 1.4 mg (=0.12 L x 12 mg/L) respectively. Ms. Jessup's weight was recorded as 81 kg (178 lbs.) on October 22, 2021. Her estimated acute oral dose of JP-5 would therefore be expressed as either 0.002 mg/kg-day (=0.17 mg/81 kg-day) (likely estimate), or 0.017 mg/kg-day (= 1.4 mg/81kg-day) (high-end estimate). These values

are approximately 1500-fold lower, or 176-fold lower, respectively than the acute oral MRL of JP-8. The margin between her high-end dose and the acute oral NOAEL dose for JP-8 of 250 mg/kg-day (ATSDR, 2017, p. 19) found to be without any adverse effects in experimental animal studies is more than 14,000-fold.

234.  Dr. Prueitt conservatively calculated Ms. Jessup's inhalation exposure of TPH-d from air concentration in her residence subchronically from November 26, 2021 onward to be 0.015 mg/m$^3$, a concentration approximately 133-fold lower than the MRL. The airborne concentration of TPH-d estimated to have been sub-chronically present in her home was 10,000-fold lower than the 150 mg/m$^3$ airborne concentration of JP-5 that ATSDR identified as the lowest observable adverse effect level.

235.  As noted above, I have reviewed Dr. Prueitt's Supplemental Expert Report of November 27, 2023, in which she provided updated exposure assessments using an assumption of 85.25 mg/L for the maximum concentration of TPH-d in the Red Hill water supply shaft for demonstrative purposes. The higher doses calculated by Dr. Prueitt do not change my conclusion that Ms. Jessup was not exposed to a sufficient dose to cause any toxicologically induced adverse effects.

c.  Temporality

236.  The temporal pattern between Ms. Jessup's reported medical conditions and her exposure to JP-5 is inconsistent with a causal relationship. Notwithstanding that the estimated acute oral dose of JP-5 sustained by Ms. Jessup is far below that known to be associated with her overt symptoms and medical conditions, the temporal pattern of her reported complaints is inconsistent with them having been caused by JP-5 exposure.

237.  For example, at the time of her visit to the Project Ohana clinic on December 17, 2021 she reported that her recent symptoms, including her throat irritation, emerged in late October 2021, prior to the November 20, 2021 jet fuel spill. **Exhibit N**, Trial Exhibit DX-3216 at 43. It is toxicologically implausible for her ingestion of a gulp of coffee containing highly dilute JP-5 on November 29, 2021 to have caused her to have throat pain lasting six months. The high-end estimated concentration of JP-5 in her drinking water was 12 mg/L, or 0.0012 percent (weight/volume). Although concentrated kerosene has irritant properties, this is not a property of highly dilute kerosene, which could not have caused persistent pharyngeal irritation in Ms. Jessup. A dose-ranging clinical study of kerosene induced irritant dermatitis in healthy volunteers determined that no irritation was induced by a 40 percent (400,000 mg/L) solution of kerosene (Tagami and Ono, 1973).

**Demonstrative Exhibit O** illustrates these findings.

238.  It cannot be concluded that Ms. Jessup's reported short term symptoms, such as headache and eye irritation, on the days in which her home plumbing was flushed in December 2021 and February 2022, were temporally associated with increased airborne exposure to JP-5. As assessed by Dr. Grayman, flushing would not have significantly increased the concentration of JP-5 in the water, or by extension in the residential air. According to Ms. Jessup, water samples for JP-5 obtained on the dates of the flushing yielded non-detectable results for the chemicals analyzed.

239.  The temporal pattern of Ms. Jessup's complaint of heavy menstrual bleeding is inconsistent with it having been caused or exacerbated by exposure to JP-5. Her physician Dr. Bal in January 2023 recorded that the problem had been present prior to November 2021. **Exhibit N**, Trial Exhibit DX-3216 at 3. At the time of her IME, Ms. Jessup reported that her heavy menstrual bleeding had recently progressed and was presently more severe than ever. Notwithstanding that JP-5 exposure has not been established to cause heavy menstrual bleeding, and that Ms. Jessup's estimated dose was well below that associated with any adverse effects, there is no established toxicological or pharmacological mode of action that would link exposure to JP-5 that ended prior to early 2022 to uterine bleeding that progressed in intensity

more than a year later. Mid-size hydrocarbons found in JP-5 undergo

metabolism and excretion and are not known to persist or undergo long term

bioaccumulation (Sterner et al, 2008).

240.    In like manner, it is well-documented in Ms. Jessup's medical records that

she had prominent complaints of chronic, recurrent abdominal pain in 2021

well before the November jet fuel incident.

      d.  <u>Differential Diagnosis</u>

241.    Factors in Ms. Jessup's medical history unrelated to the toxicological effects

of JP-5 are as likely or more likely to account for his medical complaints.

Heavy menstrual bleeding is a common medical complaint in menstruating

women that may arise from multiple endocrine, hematological, or uterine

factors entirely unrelated to JP-5 exposure (James, 2016; Lebduska et al,

2023; Kaunitz, 2023). Ms. Jessup has yet to complete the comprehensive

evaluation that is recommended in the medical literature, although she

recently (mid to late 2023) has had a gynecological work-up initiated by Dr.

Martin. *See* **<u>Exhibit N</u>**, Trial Exhibit DX-3216 at 11-16.

242.    Ms. Jessup's chronic recurrent abdominal pain may also be attributable, in

part or in whole, to numerous factors, including her diagnosed hiatal hernia

and gastroesophageal reflux disease (GERD), as well as intermittent

cholelithiasis that was potentially responsible for her bile duct dilatation on

abdominal CT scan in July, 2021. *See id*. at 48-49. In addition, Ms. Jessup's

ongoing oral iron supplementation, which may cause gastric irritation, also

may be a factor in her abdominal pain (Low et al, 2016; Micromedex, 2023).

243.    As discussed *supra* ¶59-60, Ms. Jessup's adverse reaction to the initial odor

of JP-5 and her concern that the water was contaminated may have

contributed in a manner unrelated to direct toxicity to her short-term somatic

complaints.

244.    In view of all of the foregoing findings, it cannot be concluded with

reasonable medical probability that Ms. Jessup's medical conditions or

complaints were caused by exposure to JP-5 in her residential tap water

following the November 20, 2021 fuel spill.

### 4.  *Dr. Bird's Future Treatment Recommendations*

245.    Dr. Bird stated that Ms. Jessup is required to undergo a specific schedule of

gynecological evaluations over the next five years to assess her heavy

menstrual bleeding. (Bird, October 2023).

246.    While these recommendations were made in the context of recommended

medical monitoring, which I understand is no longer an issue in this matter,

to the extent this was recommended for treatment, I now address these

recommendations.

247.    In my opinion, it is incorrect, and methodologically unreliable, to conclude

at this time that Ms. Jessup's heavy menstrual bleeding requires an extended schedule of specialized gynecological evaluation for an alleged toxicant-induced problem when 1) a toxicological etiology is improbable, and 2) the underlying cause of the heavy menstrual bleeding has yet to complete the standard hematological, endocrinological and gynecological diagnostic assessments (including a complete initial gynecological evaluation) that would evaluate the well-established and non-toxicological causes of this problem.

248. Dr. Bird does not identify the goal of any of these recommended visits, nor how they would address Ms. Jessup's claimed injuries.

249. For the reasons discussed *supra* ¶¶ 64-65, I do not believe that Dr. Bird's recommendations for annual exams, blood tests, and neurology screening adhere to widely recognized criteria for conducting medical surveillance of individuals or populations exposed to toxic substances.

250. For these reasons, Dr. Bird's recommended treatment is unadvisable and does not comport with recognized principles of medicine or medical toxicology.

**F. Elizabeth Witt**

251. Elizabeth Witt is a 31-year-old human resources specialist who resided in the Officer Field section of Joint Base Pearl Harbor-Hickam from August

2021 to March 2023.

252.    Dr. Bird has offered opinions that Ms. Witt suffered the following acute

effects of her alleged exposure to JP-5: menstrual irregularities and

palpitations, abdominal pain, abdominal cramping, rash, and anxiety. (Bird,

July 2023). Dr. Bird also opines that Ms. Witt suffered anxiety as a long-

term result of her alleged exposure to JP-5. *Id.*

### 1. *Ms. Witt's Water Usage:*

253.    Ms. Witt informed me that she learned of potential contamination in the

JBPHH water supply on December 1, 2021 after she returned home from a

vacation over the Thanksgiving holiday.

254.    Prior to that date, it had been her routine to use tap water filtered with a Brita

filter for direct water consumption and for making expresso. Beginning in

October 2021, she would regularly fill a 16-ounce tumbler with Brita filtered

tap water for consumption during the day. She used unfiltered tap water for

cooking and bathing.

255.    Ms. Witt said that soon after learning of the jet fuel water contamination

incident on December 1, 2021, she began using bottled water for all direct

and indirect ingestion.

256.    After she visited the Project Ohana Clinic on December 6, 2021, she also

discontinued use of the residential tap water for washing dishes but

continued to use household water for "quick" showers.

257.   During her IME, Ms. Witt did not recall the tap water ever having an abnormal odor or taste. In December 2021, she did notice a rainbow-like residue pattern on some washed glassware.

258.   Ms. Witt and her family moved from Hawaii to Colorado in March 2023.

### 2.   Ms. Witt's History of Present Illness:

259.   Ms. Witt reported that she had no medical problems currently. Her only medication is Zoloft (sertraline), an anti-depressant medication she has taken for control of depression since high school.

   a.   Rash

260.   At the time of her IME in September 2023, Ms. Witt described two days of skin rash and of crampy abdominal pain that first emerged during the week prior to December 6, 2021. These symptoms were noted in the record of her visit to the Navy's Project Ohana clinic on December 6, 2021. **Exhibit P**, Trial Exhibit DX-3217, Elizabeth Witt Composite Med. Rec. 4. Ms. Witt recalled that the skin rash consisted of a pruritic bumpy red rash localized to her left arm that occurred one day after taking a quick shower. It resolved within one to two days without treatment.

   b.   Headaches

261.   Ms. Witt reported a history of migraine headaches that began while she was residing in Florida in August 2020. Rizatriptan prescribed for use at the

onset of the migraines effectively aborted their progression. *Id*. at 34. She

experienced migraines once or twice a month through 2021 and 2022 but did

not use rizatriptan during her pregnancy. Her last migraine episode occurred

in November 2022.

      c.  Palpitations

262.  Ms. Witt experienced episodic palpitations in 2021 and 2022. A cardiology

clinic consultation by Kristine Yearwood, NP (nurse practitioner) dated May

6, 2022 recorded that the palpitations began in August 2021. *Id*. at 6-7. The

palpitations were noted to be random, occurring 3 to 4 times a week, and

lasting for approximately 60 seconds. *Id*. Ms. Witt said they reached their

peak around Christmas 2021 without affecting her exercise capacity. Her

work-up included a Holter monitor in March 2022 that revealed an isolated 5

beat run of ventricular tachycardia, and rare PACs and PVCs (< 1 percent

burden) that were not temporally coincident with symptomatic palpitations

recorded on a diary. *Id*. at 6, 11.

263.  An echocardiogram was negative. *Id*. She was advised by the cardiology

clinic to increase her fluid intake and to consider biofeedback and deep

breathing strategies to manage symptoms, and to return for further

evaluation after her pregnancy if the symptoms continued. *Id.* at 6.

### d. Menstrual Irregularities

264.  Ms. Witt reported to me that prior to her pregnancy, in September 2021, Ms.

Witt began to experience increased menstrual cramping and menstrual blood

flow that continued for her next several cycles. She reported this to the

national Vaccine Adverse Event Report System (VAERS) because this

pattern began shortly after receiving the Covid-19 vaccine and she wondered

if it might be related.

### *3. Specific Causation Analysis for Ms. Witt's Claimed Injuries*

265.  It is my assessment and opinion that Ms. Witt has the following medical

conditions:

1.  Brief skin rash on left arm and crampy abdominal pain each lasting two days during the week prior to December 6, 2021; improbable causal relationship to JP-5 exposure.

2.  Past history of migraine headaches, palpitations, night sweats, and dysmenorrhea with onset preceding the November 2021 jet fuel incident; no causal relationship to JP-5 exposure

3.  Past history of depression onset > 13 years ago, stable on medication

266.  In evaluating whether there is a causal relationship between Ms. Witt's

potential exposure to JP-5 and her complaints of menstrual irregularities,

palpitations, abdominal pain, and rash, I applied the four criteria discussed

*supra* Section III.

a. General Causation

267.  It has not been established that Ms. Witt suffered from a medical condition

known to be caused by JP-5 or its constituents. Ms. Witt recalled that she

experienced two days of crampy abdominal pain in the week prior to

December 6, 2021. Concentrated kerosene has defatting and irritant

properties, and animal studies and human case reports of oral ingestion have

associated it with gastroenteritis (Gerarde,1959; Seymour and Henry, 2001).

However, as discussed further below, the concentration of JP- 5 (which is

predominantly kerosene) present in her tap water was likely much lower

than that associated with crampy abdominal pain, a nonspecific symptom

with multiple potential etiologies.

268.  The self-limited, papular pruritic rash that Ms. Witt reported was unlikely to

be the result of the toxic effects of JP-5 present in her bathing water, in part

because the rash was confined only to her left arm even though her water

exposure was diffuse, and because the concentration of JP-5 that was present

in the water was likely too diluted to cause any dermal irritation (see below).

b. Dose

269.  It cannot be concluded that Ms. Witt sustained a dose of JP-5 of sufficient

magnitude to cause her reported medical conditions. As demonstrated in the

analysis conducted by Dr. Pruiett, the estimated dose of JP-5 that Ms. Witt

sustained acutely or subchronically by ingestion of residential tap water,

inhalation of residential air, or dermal contact with tap water through

bathing or washing is far lower than that demonstrated to cause any

toxicologically induced adverse effects in experimental animals or humans.

270. Specifically, Dr. Prueitt conservatively calculated Ms. Witt's peak oral dose

of TPH-d from total (direct and indirect) tap water ingestion to be 0.019

mg/kg-day or 0.16 mg/kg-day, assuming Dr. Grayman's likely and worst-

case estimates of Red Hill shaft JP-5 contamination of 2 mg/L or 17 mg/L

respectively.

271. Per Dr. Prueitt's calculations, as set forth in her October 24, 2023 report, the

MOE relating regulatory toxicity doses and the doses estimated for Ms. Witt

are all well above the threshold of 1, indicating that her dose was

significantly less than the regulatory guideline values. For the remaining

chemicals and exposures Dr. Prueitt evaluated, Ms. Witt's doses were all

orders of magnitude below the NOAELs and LOAELS in the scientific

literature.

272. In addition, comparison of Ms. Witt's estimated exposure to the ATSDR

MRLs shows that his estimated exposure was well-below the known risk

level. Dr. Prueitt's estimates of Ms. Witt's peak oral dose of TPH-d of 0.019

mg/kg-day or 0.16 mg/kg-day assuming Dr. Grayman's likely and worst-

case estimates of Red Hill shaft JP-5 contamination of 2 mg/L or 17 mg/L respectively. are approximately 158-fold and 19-fold less than the ATSDR acute-duration oral MRL for JP-8, which itself incorporates an additional "uncertainty factor" or "safety" margin of 100 -fold below the NOAEL.

273.   Dr. Pruiett estimated the peak TPH-d concentration in Ms. Witt's tap water to be 5.3 mg/L, or approximately 0.0005 percent (weight to volume). This dilute of a solution of TPH-d, (a surrogate for kerosene, the primary component of JP-5), is far lower than that found to elicit dermatitis in humans. A dose-ranging clinical study of kerosene-induced irritant dermatitis in healthy volunteers found that no irritation was induced by a 40 percent solution of kerosene (400,000 mg/L) applied topically under occlusion for 24 hours (Tagami and Ono, 1973). **Demonstrative Exhibit O** illustrates these findings.

274.   As noted above, I have reviewed Dr. Prueitt's Supplemental Expert Report of November 27, 2023, in which she provided an updated exposure assessments using an assumption of 85.25 mg/L for the maximum concentration of TPH-d in Red Hill supply well. The higher doses calculated by Dr. Prueitt do not change my conclusion that Ms. Witt was not exposed to a sufficient dose to cause any toxicologically induced adverse effects.

   c.   Temporality

275.   The temporal pattern between Ms. Witt's reported medical conditions and

her exposure to JP-5 is inconsistent with a causal relationship. Ms. Witt's

complaints of crampy abdominal pain during the week prior to December 6,

2021 would be temporally consistent with causation by a sufficiently

elevated concentration of JP-5 in the water. The occurrence of a rash during

that week would also be temporally consistent, but the limited two-day

duration of the rash would appear to be inconsistent with causation by JP-5

in the water in view of her continued daily use of the water for bathing.

276.   Ms. Witt's medical complaints of migraine headaches, palpitations, night

sweats, and dysmenorrhea were not temporally consistent with a causal

relationship to JP-5 exposure. As detailed in her history, the onset of each of

these conditions preceded her potential exposure to JP-5 in tap water as a

consequence of the November 20, 2021 jet fuel spill. Moreover, the

conditions continued, and in some cases progressed in intensity, after her

consumption of residential tap water ended, and after the estimated

concentration of JP-5 in her tap water markedly declined.

   d.   Differential Diagnosis

277.   Factors in Ms. Witt's medical history unrelated to the toxicological effects

of JP-5 are as likely or more likely to account for his medical complaints. As

108

noted earlier, the crampy abdominal pain that Ms. Witt reported experiencing in the week prior to December 6, 2021 is a highly nonspecific symptom with multiple possible etiologies. It is notable that at the time of her Project Ohana clinic visit on December 6, 2021, she circled "chills" as one of the other symptoms she had experienced. **Exhibit P**, Trial Exhibit DX-3217 at 4. This suggests that an infectious cause of her abdominal pain may have occurred.

278.    Short-term pruritic papular rashes may also occur sporadically in some individuals without a clear etiology. In this regard, it is notable that Ms. Witt previously, in January 2020, experienced a similar episode of a pruritic papular rash on her lower extremities that had no identified precipitating factors. *See id*. at 26.

279.    As discussed *supra* ¶59-60, Ms. Witt's adverse reaction to the initial odor of JP-5 and her concern that the water was contaminated, may have contributed in a manner unrelated to direct toxicity to her short-term somatic complaints.

280.    In view of all of the foregoing findings, it cannot be concluded with reasonable medical probability that Ms. Witt's medical conditions or complaints were caused by exposure to JP-5 in her residential tap water following the November 20, 2021 fuel spill.

#### 4. Dr. Bird's Future Treatment Recommendations

281.  Dr. Bird does not recommend any particular treatment of Ms. Witt. As Ms.
Witt's physiological symptoms have resolved, she does not require any
further course of treatment or evaluation.

282.  As discussed *supra* ¶¶ 64-65, Dr. Bird's recommendations that Ms. Witt
receive yearly medical testing are not supported by reliable toxicological
methodology. As Dr. Bird has not opined that Ms. Witt suffers any long-
term symptoms as a result of her alleged exposure, none of these prescribed
tests could be construed as treatment for any medical condition.

### V.  Risks of Developing Latent Disease

283.  Contrary to Dr. Bird's opinion that "exposure to jet fuel may result in latent
effects" I do not believe, to a reasonable degree of medical probability, that
any of the Adult Plaintiffs face a substantially increased risk of latent disease
as a result of their alleged exposure to JP-5.

284.  When analyzing an individual's risk of developing specific latent diseases as
consequence of a chemical exposure, medical toxicology requires
consideration of (1) the strength, specificity, and consistency of the
association between the chemical exposure and the specific disease(s)
demonstrated in the scientific literature; (2) the timing and duration of
chemical exposure; and (3) the latency period for appearance of the disease

in the relevant studies (ATSDR, 1995).

285.   In his reports, Dr. Bird did not define the magnitude of exposure or dose of

       JP-5 that the Plaintiffs sustained, nor did he compare such doses to those

       known to be causal of noncancer adverse human health effects. In fact, in

       not one of his reports did Dr. Bird identify the specific latent illnesses that

       each Adult Plaintiff may be at risk of contracting as a direct consequence of

       exposure to JP-5, nor the associated latency interval.

286.   With respect to future cancer risk in each Adult Plaintiff, Dr. Bird did not

       specify the type of cancer(s), nor the magnitude of excess risk that he

       believes each Adult Plaintiff faces.

287.   Such an approach does not comply with reliable principles of medical

       toxicology.


I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: April 8, 2024

_____
     Michael Kosnett, M.D., MPH, FACMT

# REFERENCES

Andersson L, Claeson AS, Ledin L, et al.  The influence of health-risk perception and distress on reactions to low-level chemical exposure.  *Front Psychol* 4:816; 2013.

Agency for Toxic Substances and Disease Registry (ATSDR), ATSDR's final criteria for determining the appropriateness of a medical monitoring program under CERCLA, Federal Register, 60: 38840-44, 1995.

Agency for Toxic Substances and Disease Registry (ATSDR) Toxicological Profile for JP-5, JP-8, and Jet A fuels. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service. 2017.

Armstrong AW, Mehta M, Schupp CW, et al. Psoriasis prevalence in adults in the United States. *JAMA Dermatol* 157(8):940-946; 2021.

Bird, Steven, Exp. Rep. for *Feindt v. United States* 22-cv-397 (D. Haw.), July 24, 2203.

Bird, Steven, Suppl. Exp. Rep. for *Feindt v. United States* 22-cv-397 (D. Haw.), Oct. 23, 2023.

Bird, Steven, Suppl. and Rebuttal Exp. Rep. for *Feindt v. United States* 22-cv-397 (D. Haw.), Nov. 30, 2023.

Brauer C., Mikkelsen S.  The context of a study influences the reporting of symptoms.  *Int Arch Occup Environ Health* 76(8):621-624 2003.

Bylund S, Von Kobyletzki LB, Svalstredt M, et al. Prevalence and incidence of atopic dermatitis: a systematic review. *Acta Derm Venerol* 100:320-329; 2020.

Das PS, et al. Kerosene abuse by inhalation and ingestion. *Am J Psychiatry* 149(5):710; 1992.

Da Veiga SP. Epidemiology of atopic dermatitis: a review. *Allergy Asthma Proc* 33(3):227-234; 2012.

Engleman, H. M., N. J. Douglas (2004). Sleep · 4: Sleepiness, Cognitive Function, And Quality Of Life In Obstructive Sleep Apnoea/Hypopnoea Syndrome. *Thorax*, 59(7), 618–622.

Gerarde HW. Toxicology studies on hydrocarbons v kerosine. *Toxicology and Applied Pharmacology* 1:462-474; 1959

Gordley, L. B., Lemasters, G., Simpson, S. R., & Yiin, J. H. (2000). Menstrual Disorders And Occupational, Stress, And Racial Factors Among Military Personnel. *Journal of Occupational and Environmental Medicine*, 42(9), 871–881.

Gursel T, Biri A, Kaya Z, et al. The frequency of menorrhagia and bleeding of university students. *Pediatric Hematology and Oncology* 31:467-474; 2014

Hamilton MJ. Gastrointestinal disease in mastocytosis. *Immunology Allergy Clin N Am* 43:711- 722; 2023

Heaton, K. J., Maule, A. L., Smith, K. W., Rodrigues, E. G., McClean, M. D., & Proctor, S. P. (2017). JP8 Exposure And Neurocognitive Performance Among US Air Force Personnel. *NeuroToxicology*, 62, 170–180.

Jacobziner H, Raybin HW. Kerosene and other petroleum distillate poisonings. *New York State J Med* Dec 1:3428-3430; 1963

James AH. Heavy menstrual bleeding: work-up and management. *Hematology* Dec2(1):236-242; 2016.

Lebduska E, Beshear D, Spataro BM. Abnormal uterine bleeding. *Med Clin N Am* 107:235-246; 2023.

Kaunitz AM. Cause of female genital tract bleeding. UpToDate online database 2023.

Knave B, Persson HE, Goldberg JM.  Long-term exposure to jet fuel: an investigation on occupationally exposed workers with special reference to the nervous system, *Scand J Work Environ Heath* 3:152-164; 1976.

Krishnamurthy J, Engel LS, Wang L, et al. Neurological symptoms associated with oil spill response exposures: Results from Deepwater Horizon oil spill Coast Guard cohort study. *Environment International* 131:1-9; 2019.

Lemasters GL. Female reproductive effects of exposure to jet fuel at US Air Force bases. US Army Medical Research and Material Command, Award #DAMD17-96-2-6015, Ft. Detrick MD 1-26; 1999.

Lipscomb JA, Goldman LR, Satin KP, et al.  A follow-up study of the community near the McColl waste disposal site.  *Environ Health Perspect* 94:15-24; 1991.

Lipscomb JA, Satin KP, Neutra RR.  Reported symptom prevalence rates from comparison populations in community-based environmental studies.  *Arch Environ Health* 47(4):263-269; 1992.

Low MSY, Speedy J, Styles CE, et al. Daily iron supplementation for improving anaemia iron status and health in menstruating women (Review). *The Cochrane Collection, Cochrane Library, Cochrane Database of Systematic Reviews* i-283; 2016.

Matsumo T, Chin K.  Prevalence of sleep disturbances: sleep disordered breathing, short sleep duration, and non-restorative sleep.  *Respiratory Investigation* 57:227-237; 2019.

Maule, A. L., Heaton, K. J., Rodrigues, E., Smith, K. W., McClean, M. D., & Proctor, S. P. (2013). Postural Sway And Exposure To Jet Propulsion Fuel 8 Among US Air Force Personnel.  *Journal of Occupational and Environmental Medicine*, 55(4), 446–453.

Micromedex. Datafile for Iron. Ann Arbor: *Merative Micromedex* 2023.

Neutra R, Lipscomb J, Satin K, et al.  Hypotheses to explain the higher symptom rates observed around hazardous waste sites.  *Environ Health Perspect* 94:31-38; 1991.

Novak P, Giannetti MP, Weller E, et al. Mast cell disorders are associated with decreased cerebral blood flow and small fiber neuropathy. *Ann Allergy Asthma Immunol* 128:299-306; 2022.

Pichetshorte N, Pimentel M. An approach to the patient with chronic undiagnosed abdominal pain. *Am J Gastroenterology* 114:726-732; 2019.

Pohl J, Schmidt-Klinik H. Colonic involvement in systemic mastocytosis. Video Journal and Encyclopedia of GI Endoscopy; 2012 online at: http://dx.doi.org/10.1016/S2212-0971(13)70135-3

*Porter HW. Aviators intoxicated by inhalation of J-5 fuel vapors. Aviation Space and Environmental Medicine 61(7):654-656; 1990*

Prueitt, Robyn, Exp. Rep. for *Feindt v. United States* 22-cv-397 (D. Haw.), Oct. 9, 2023.

Prueitt, Robyn, Exp. Rep. for *Feindt v. United States* 22-cv-397 (D. Haw.), Nov. 27, 2023.

Seymour FK, Henry JA. Assessment and management of acute poisoning by petroleum products. *Human and Experimental Toxicology* 20:551-562; 2001

*Reference Guide on Epidemiology* excerpted from the *Reference Manual on Scientific Evidence* (Fed. Jud. Ctr. 3d ed. 2011).
*Reference Guide on Toxicology* excerpted from the *Reference Manual on Scientific Evidence* (Fed. Jud. Ctr. 3d ed. 2011).

Seymour FK, Henry JA. Assessment and management of acute poisoning by petroleum products. *Human and Experimental Toxicology* 20:551-562; 2001

Shusterman, D., Lipscomb, J., Neutra, R., & Satin, K. (1991). Symptom Prevalence And Odor-worry Interaction Near Hazardous Waste Sites. *Environmental Health Perspectives*, 94, 25.

Shusterman D. Critical review: the health significance of environmental odor pollution. *Archives of Environmental Health* 47:76-87; 1992.

Spurgeon A, Gompertz D, Harrington JM. Modifiers of non-specific symptoms in occupational and environmental syndromes. *Occup Environ Med* 53(6):361-366; 1996

Sterner TR, Robinson PJ, Merrill EA, etal. Modeling of complex mixtures: JP-8 toxicokinetics. U.S. Airforce Research Laboratory, i-61; 2008.

Tagami, H., & Ogino, A. (1973). Kerosine Dermatitis-Factors Affecting Skin Irritability to Kerosine. *Dermatologica*, 146:123–131.

Tinajero, R., Williams, P. G., Cribbet, M. R., Rau, H. K., Bride, D. L., & Suchy, Y. (2018). Nonrestorative Sleep In Healthy, Young Adults Without Insomnia: Associations With Executive Functioning, Fatigue, And Pre-sleep Arousal. *Sleep Health*, 4(3), 284–29.

Van Goor H. Consequences and complications of peritoneal adhesions. *Colorectal Dis. Suppl* 2:25-34; 2007.

Vearrier D, Greenberg M. The implementation of medical monitoring programs following potentially hazardous exposures: a medico-legal perspective, *Clinical Toxicology* 55:956-969; 2017.