IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., et al., | CIVIL NO. 22-cv-00397-LEK-KJM |
| Plaintiffs, | THE UNITED STATES' TRIAL DECLARATION OF DR. TIMUR DURRANI |
| v. | |
| UNITED STATES OF AMERICA, | TRIAL DATE: April 29, 2024 |
| Defendant. | TIME: 8:30 a.m. |
| | JUDGE: Hon. Leslie E. Kobayashi |

## DECLARATION OF TIMUR DURRANI

Pursuant to 28 U.S.C. § 1746, I, Timur Durrani, make the following Declaration as my direct testimony for trial, under penalty of perjury. Except as may be otherwise stated below, I make the following statements on the basis of personal knowledge, my expertise in the fields of medical toxicology, preventive medicine, occupational medicine, and family medicine, my personal independent medical evaluations of the Minor Bellwether Plaintiffs, discussions with their parents, my review of the Minor Bellwether Plaintiffs' medical records, and the relevant literature.

# TABLE OF CONTENTS

I.  Summary of Opinions.................................................................5

II.  Qualifications .....................................................................6

III.  Methodology ......................................................................10

IV.  Specific Causation of Minor Bellwether Plaintiffs' Claimed
Injuries ...........................................................................13

A. Critiques of Dr. Bird's Specific Causation Analysis.......................13

B. V.D.................................................................................17

    1.  General Causation and Dose................................................18

    2.  Temporality..................................................................18

    3.  Differential Diagnosis......................................................19

    4.  Dr. Bird's Future Treatment Recommendations.......................21

C. B.D.................................................................................23

    1.  General Causation and Dose................................................24

    2.  Temporality..................................................................24

    3.  Differential Diagnosis......................................................25

    4.  Dr. Bird's Future Treatment Recommendations.......................26

D. B.B.J...............................................................................26

    1.  General Causation and Dose................................................27

    2.  Temporality..................................................................27

    3.  Differential Diagnosis......................................................28

        a.  Tinnitus................................................................28

        b.  Tremor.................................................................29

    4.  Dr. Bird's Future Treatment Recommendations.......................30

E. B.J.J...............................................................................32

    1.  General Causation and Dose................................................32

    2.  Temporality..................................................................33

    3.  Differential Diagnosis......................................................33

        a.  Goiter..................................................................33

b. Abnormal Uterine Bleeding................................................35

4. Dr. Bird's Future Treatment Recommendations.......................36

F. N.J.....................................................................................38

1. General Causation and Dose..............................................39

2. Temporality....................................................................39

3. Differential Diagnosis......................................................40

a. Dermatologic Changes ................................................40

b. Behavior Abnormalities................................................41

4. Dr. Bird's Future Treatment Recommendations.......................42

G. D.J.....................................................................................43

H. P.G.F...................................................................................44

1. General Causation and Dose..............................................44

2. Temporality....................................................................45

3. Differential Diagnosis......................................................46

a. Cough and Shortness of Breath.......................................46

b. Abdominal Symptoms and Mastocytosis...........................48

c. Rash.........................................................................51

d. Behavioral Alterations..................................................51

4. Dr. Bird's Future Treatment Recommendations.......................52

I. P.R.F...................................................................................54

1. General Causation and Dose..............................................54

2. Temporality....................................................................55

3. Differential Diagnosis......................................................56

a. Abdominal Symptoms and Mastocytosis...........................56

b. Worsened Asthma.......................................................58

c. Dermatitis.................................................................59

4. Dr. Bird's Future Treatment Recommendations.......................60

J. N.F....................................................................................61

1. General Causation and Dose..............................................62

2. Temporality.................................................................63

3. Differential Diagnosis..................................................63

   a. AMPS.....................................................................63

   b. Abdominal Symptoms.............................................65

   c. Headaches..............................................................66

   d. Cough and Wheezing.............................................66

4. Dr. Bird's Future Treatment Recommendations........67

K. K.F. ......................................................................68

1. General Causation and Dose.......................................69

2. Temporality.................................................................69

3. Differential Diagnosis..................................................70

   a. Decreased Hearing and Vestibular Abnormalities.........70

   b. Abdominal Complaints...........................................71

   c. Cough with Wheezing.............................................71

   d. Headaches..............................................................72

   e. Weakness...............................................................72

4. Dr. Bird's Future Treatment Recommendations........73

L. D.F. ......................................................................74

1. General Causation and Dose.......................................75

2. Temporality.................................................................75

3. Differential Diagnosis..................................................76

   a. Tremor...................................................................76

   b. Abdominal Complaints...........................................76

   c. Headaches..............................................................77

4. Dr. Bird's Future Treatment Recommendations........77

V.    Risk of Latent Disease................................................78

References .................................................................80

## I. **Summary of Opinions**

1.  There is no evidence to support, to a degree of reasonable medical probability, that any of the Minor Bellwether Plaintiffs'[1] claimed injuries of long-term adverse effects as ascribed by Plaintiffs' expert toxicologist Dr. Steven Bird, were the result of exposure to JP-5 and its main constituents from the accidental releases of jet fuel into the Red Hill drinking water well on November 20, 2021.

2.  In comparing Dr. Bird's review and analysis to the published literature, I am unable to find anything in Dr. Bird's analysis that assesses specific causation of exposure to JP-5 and its main constituents (to include broadly defined analogous exposures to similar chemicals) to any of the Minor Bellwether Plaintiffs' claimed injuries. The lack of this type of analysis results in the inability to support his opinions that the exposure JP-5 and its main constituents in drinking resulted in any long-term injury.

3.  There is no evidence to support, to a reasonable degree of medical probability, that any of the Minor Bellwether Plaintiffs will need additional long-term medical care or monitoring, as prescribed by Dr. Bird, as a result of their alleged exposure.

---

[1] The Minor Bellwether Plaintiffs are the eleven Bellwether Plaintiffs who were under the age of 18 at the time of the incident in November 2021: B.D., V.D., B.B.J., B.J.J., N.J., D.J., P.G.F., P.R.F., N.F., K.F., and D.F.

4.     There is no evidence to support, to a reasonable degree of medical probability, that any of the Minor Bellwether Plaintiffs will develop any future medical conditions as ascribed by Dr. Bird, as a result of their alleged exposure.

## II.     Qualifications

5.     I am a Clinical Professor of Medicine and Pharmacy in the Department of Medicine, Division of Occupational and Environmental Medicine and the School of Pharmacy at the University of California at San Francisco. I have been licensed to practice medicine in the State of California since 2005. I am the Site Occupational Medical Director for Health Services at the Lawrence Berkeley National Laboratory. I am an assistant Medical Director for the California Poison Control System, San Francisco Division. Among my major current responsibilities is Attending Physician for the Medical Toxicology Inpatient Service at the University of California at San Francisco, San Francisco General Hospital and Trauma Center.

6.     I received a Bachelor of Science Degree in Medical Technology from the University of Arizona in 2000. I received a Medical Degree and a Master of Public Health from University of Arizona College of Medicine and School of Public Health in 2004. I completed my residency in Family Medicine at the University of California Los Angeles (UCLA) in 2007. I completed my

residency in General Preventive Medicine and Public Health in the California Department of Public Health, posted to Los Angeles County Department of Public Health in 2008. I completed a combined Occupational and Environmental Medicine residency and Medical Toxicology fellowship at the University of California San Francisco in 2012. I am quadruple board certified in Family Medicine, General Preventive Medicine and Public Health, Occupational Medicine and Medical Toxicology by the American Boards of Medical Specialties.

7. I am a member of multiple professional organizations including the American College of Medical Toxicology. I am a past President of the California Academy of Preventive Medicine. I have served in the U.S. Army Reserve for 28 years, serving 5 years as an enlisted medic and laboratory technician, and 23 years as a Medical Officer.

8. I have served on numerous committees and panels related to occupational and environmental medicine and toxicology, including the Zuckerberg San Francisco Hospital Infection Control Committee and University of California San Francisco Chemical and Environmental Safety Committee, the Lawrence Berkeley National Laboratory Human Subjects. Committee and Institutional Biosafety Committee. I have authored or co-authored more than 15 medical and scientific articles in peer-reviewed journals and book

chapters. I have served as an ad hoc editor for the Journal of Medical

Toxicology, Journal of Pediatrics, Environmental Research, and JAMA

Neurology.

9.    As the Medical Director of Health Services at Lawrence Berkeley National

Laboratory (LBL). My duties entail managing a health service with

physicians, nurse practitioners, medical assistants, non-clinical professionals

and an optometrist. We provide preventive care and treatment to over 4500

workers at LBL. In addition, I serve as the Assistant Medical Director for the

San Francisco Division of the California Poison System, where I precept

students (Medicine and Pharmacy), residents (Pediatrics, Internal Medicine

and Emergency Medicine) and toxicology fellows in the management of

poisoned patients. I am the Faculty of Record for several courses relating to

toxicology at the University of California San Francisco. I serve as an

attending physician on the inpatient Medical Toxicology service at SFGH,

Parnassus, Mission Bay and Children's Hospital of Oakland. Evaluating

pediatric exposures to toxins is regular part of my practice. I also serve in the

Occupational Medicine Clinic at Mt. Zion, where I evaluate patients of all

ages with occupational or environmental toxic exposures. I serve as a

Medical Toxicology consultant for the Agency for Toxic Substances and

Disease Registry, region 9, and the Environmental Protection Agency,

region 9 and the Western States Pediatric Environmental Health Specialty Unit (PEHSU). Through the PEHSU, I provide training and clinical advice to clinicians and the public.

10.   In the course of my clinical work at the University of California, I have examined and treated hundreds of patients with toxicologic diseases. As a Medical Toxicologist, I have frequently evaluated patients who have sustained environmental exposures. I have ten years of experience in the determination of whether chemical exposure is likely to cause disease among populations. I have experience in the design and implementation of programs to evaluate populations following environmental exposures.

11.   I served on the Aliso Canyon Gas Leak Independent Expert Scientific Advisory Panel for the California Office of Environmental Health Hazard Assessment following Governor Brown's Proclamation of a State of Emergency and Order on the Aliso Canyon gas leak. I served on the Los Angeles County Department of Public Health Proposal Evaluation Committee for the Aliso Canyon Disaster Health Research Study (Health Study). The review helped select and fund research proposals regarding whether exposures to chemicals or toxins from the disaster may have contributed to short- and long-term impacts on the health, quality of life and wellbeing.

12.    I have collaborated with the California Department of Toxic Substances Control, in conjunction with the California Office of Office of Environmental Health Hazard Assessment in determining a health-based cleanup standard for homes identified as the location of former methamphetamine labs. I have also assisted in Establishing Standards for the Assessment and Decontamination Cleanup of Opioid-Contaminated Properties. During my deployment to Kuwait, as a Preventive Medicine Officer, I participated in air sampling. I also participated in the use of the Deployment Volatile Organic Compound (VOC) Surveillance equipment.

13.    A copy of my CV is attached as **Exhibit A**, Trial Exhibit DX-3154.

### III.    **Methodology**

14.    In preparing my opinions, I assessed what causal relationship, if any, exists between the individual Minor Bellwether Plaintiffs' alleged exposure to JP-5 and its main constituents from the accidental releases into the Red Hill drinking water well on November 20, 2021 and their claimed injuries. In analyzing specific causation for each of the Minor Bellwether Plaintiffs' claimed injuries, I utilized four widely used criteria identified by the Federal Judicial Center Reference Guide on Toxicology, Reference Manual on Sci. Evid. 633, 665-670 (3d Ed. 2011):

a. **(1) General causation**:  whether the medical conditions the Minor Bellwether Plaintiffs claimed were known to be associated with exposure to JP-5 and its main constituents in drinking water;

b. **(2) Dose**: whether the Minor Bellwether Plaintiffs sustained a dose of JP-5 and its main constituents in drinking water sufficient to cause those conditions(s);

c. **(3) Temporality**: whether the temporal pattern between the exposure and the medical conditions were consistent with a causal relationship;

d. **(4) Differential Diagnosis**: whether there were other factors in their history, as likely or more likely, to be responsible for their symptoms.

15. For the first two criteria—general causation and dose— I reviewed Dr. Robyn Prueitt's general and specific causation analysis, which concluded that the Minor Bellwether Plaintiffs were not exposed to JP-5 at levels sufficient to cause toxicological effects. Specifically, even using conservative assumptions, Dr. Prueitt concluded that the Minor Bellwether Plaintiffs were not exposed to JP-5 and its constituents at exposure levels associated with health effects in the most sensitive human and/or experimental animal studies of each chemical.

16. In evaluating temporality, I considered whether the temporal relationship between the alleged injury and the November 2021 spill was consistent with

causation, including whether the onset of symptoms predated the spill. I also considered whether acute symptomatology was present and whether delayed symptomatology was consistent with recognized latency of disease development.

17.    In performing the differential diagnosis, I evaluated potential causes of the claimed injuries, including other exposures, behavioral and genetic factors and random occurrence. I evaluated whether exposure to other agents could be eliminated or determined to be of less importance than the exposure from the November 2021 release. This was particularly important as the injuries in question are common in occurrence and have many potential causes.

18.    In performing a differential diagnosis, I completed the following:

   a.    I conducted an Independent Medical Evaluation, which included obtaining an in-person history and examination of each Minor Bellwether Plaintiff;

   b.    I reviewed each Minor Bellwether Plaintiff's medical records and testing results;

   c.    I reviewed the deposition testimony of Minor Bellwether Plaintiffs, if available, and their family members, as well as interrogatories and RFA responses;

d.  I assessed the frequency and duration (exposure dose) of chemicals to each Minor Bellwether Plaintiff, as detailed in the reports of Dr. Walter Grayman, Dr. Lyle Burgoon, and Dr. Prueitt. The exposure dose is used in the differential diagnosis to determine if signs, symptoms or disease outcome is consistent with the reported exposure dose.

e.  I reviewed the scientific literature to determine possible causes of each Minor Bellwether Plaintiff's conditions; and

f.  I applied my education, experience, and training, and the scientific literature to evaluate possible causes of Plaintiffs' symptoms to reach my ultimate opinion.

## IV. <u>Specific Causation of Minor Bellwether Plaintiffs' Claimed Injuries</u>

### A. Critiques of Dr. Bird's Specific Causation Analysis

19. Dr. Bird's report states that he rendered his specific opinions on each Minor Plaintiff based upon his experience, review of their medical records, interviews with their parents, and Plaintiffs' additional expert reports. (Bird, July 2023).

20. However, Dr. Bird's report does not indicate that he conducted detailed review of any of the Minor Bellwether Plaintiffs' medical history or records, as he does not identify any specific records relevant to their injuries.

21. While Dr. Bird's report summarily states that he conducted a "differential etiology methodology," (Bird, July 2023), his report fails to comply with standard medical toxicology principles regarding differential diagnosis for several reasons.

22. First, Dr. Bird states that he conducted a differential diagnosis in determining his specific causation opinion, yet he does not cite to any medical records to support his assertions that other causes were ruled out by the treating providers. (Bird, November 2023). Dr. Bird's reports do not explain how he came to his conclusions regarding each Minor Bellwether Plaintiff, what methodology he used regarding specific causation, or which medical records he relied upon.

23. Second, Dr. Bird's failure to cite to particular medical records or literature prevents another physician from replicating or evaluating his differential diagnosis. Consideration of prior medical evaluation is standard medical practice in evaluating or treating causes of disease.

24. Third, Dr. Bird failed to consider any other causes for the Minor Bellwether Plaintiffs' claimed injuries other than exposure to jet fuel. In the process of creating a differential diagnosis, the first step is to consider alternate possible causes. The next step is to evaluate the possible causes, then decide which are more or less likely by ranking them based on the known

information (such as family history, social history, past medical or surgical history, disease incidence and prevalence). Using the ranking system, the clinician has a list of a differential diagnosis, which can then be further evaluated by taking an in-depth history, referring to a specialist or obtaining clinical testing. Contrary to Dr. Bird's assertions in his rebuttal report, this methodology does not require every patient undergo every type of evaluation or test to rule out every conceivable cause. Rather once the initial step of just considering alternate causes is undertaken, further evaluation can occur to narrow the differential diagnosis. Dr. Bird failed to complete this initial step of defining the universe of alternative causes and the second step of evaluating the relative likelihood of such causes in light of a patient's symptoms and history. At deposition, Dr. Bird explained that he did not rule out other causes because he considered JP-5 exposure to be a "known ruled in." Bird Dep. 179:12. Such conclusory analysis does not reflect standard principles of medical toxicology.

25. Fourth, Dr. Bird incorrectly combines the methodology of a specific causation using the differential diagnosis (possible causes of disease) with working diagnosis of the treating clinicians. Dr. Bird then states he created his own differential diagnosis, without citing any of the providers' methods. Dr. Bird states because the treating providers did not diagnose a possible

cause (utilizing the differential diagnosis), they must have ruled it out, however the medical records do not reflect this, and he cites no affirmative statement eliminating alternate causes. Similarly, Dr. Bird is unable to cite a single treating provider that provides an affirmative statement that exposure to JP-5 was the cause of any of the Minor Bellwether Plaintiffs' symptoms.

26. This approach does not reflect reliable toxicological methodology for determining a causal relationship between an exposure and a claimed injury.

    a. Dr. Bird relies on his discussion of general causation of potential health effects from jet fuel exposure. However, general causation – whether the toxic substance is generally capable of producing a specific health effect – differs from specific causation, which examines whether an individual's toxic exposure, including dose and duration, was the likely cause of their injuries. Dr. Bird did not demonstrate that the specific injuries have a specific causal connection with JP-5, including any analysis of dose or duration.

    b. As noted in my report, I addressed only the Minor Bellwether Plaintiffs' claims of long-term injury and do not offer opinions on their alleged acute injuries. However, Dr. Bird fails to consider the temporal analysis necessary in attributing long-term injuries to exposure. Dr. Bird asserts delayed and chronic symptomatology

16

due to a singular exposure event over the time course of two weeks, at most. Dr. Bird fails to address the delayed onset of symptoms that are claimed for the first time months after the exposure ceased. While there are models of latency of disease, such as for cancer, Dr. Bird fails to provide any analysis that latency between JP-5 exposure and any of the Minor Bellwether Plaintiffs' injuries has ever been documented in the medical literature.

27.    With regard to mental health effects, Dr. Bird opines that B.D., B.B.J., B.J.J., and P.R.F. suffer from anxiety as a result of their alleged exposure. However, Dr. Bird does not cite any evidence to conclude that their claimed anxiety is a physiological reaction due to exposure to JP-5 and its main constituents in drinking water, and I am aware of none. I rely upon Dr. Eric Smith to address any non-toxicological causes for the Minor Bellwether Plaintiffs' anxiety.

**B. V.D.**

28.    V.D. is a 5-year-old female who alleges that she experienced exposure to drinking water contaminated with JP-5 after the November 20, 2021 spill from Red Hill, when she was three years old. Dr. Bird opined that acutely V.D. suffered from "abdominal pain, nausea, vomiting, and diarrhea, as well

as shortness of breath with decreased exercise tolerance and wheezing. She also acutely developed dry skin and a cough." (Bird, July 2023). Dr. Bird ascribed the following long-term health effects to V.D.'s alleged exposure to JP-5: "wheezing, shortness of breath, and a cough." *Id.*

29.    In my analysis, I considered the four criteria noted above in Paragraph 14 in assessing whether there is a causal relationship between V.D.'s alleged exposure and the long-term health effects Dr. Bird attributes to exposure, specifically wheezing, shortness of breath, and cough.

### 1. *General Causation and Dose*

30.    For general causation and dose, as outlined in Paragraph 15, although I considered qualitative reports of sheen and odor, I rely upon Dr. Prueitt's estimation of V.D.'s dose of JP-5. I adopt Dr. Prueitt's conclusions that, even with highly conservative exposure assumptions, long-term health effects, including wheezing, shortness of breath, and a cough, are not expected from V.D.'s dose of JP-5 and its main constituents.

### 2. *Temporality*

31.    V.D.'s reported development of shortness of breath began after the exposure, which may indicate a temporal relationship. However, V.D.'s medical record demonstrates that her cough and wheezing, which are symptoms closely related to shortness of breath, predated the spill.

32. Wheezing was reported at least four times in V.D.'s medical records prior to the exposure: **Exhibit B**, Trial Exhibit DX-3219, V.D. Composite Med. Rec. at 61-62 (11/16/2018); 58 (11/21/2018), 71 (9/18/2019); 92 (12/23/2019.[2]  It was reported once since V.D.'s alleged exposure. *Id.* at 52.

33. Cough was reported in V.D.'s medical records at least eight times prior to the alleged exposure. *See id.* at 63 (11/12/2018); 61 (11/16/2018); 100 (8/30/2019); 90 (12/27/2019); 88 (2/07/2020); 83 (2/26/2020) ;74 (4/14/2020); 34 (7/1/2021). It was reported twice after the alleged exposure, *id.* at 52, 174.

34. It is clear from V.D.'s records that both her wheezing and cough pre-dated the alleged exposure. Dr. Bird's failure to analyze the temporal relationship of V.D.'s claimed injuries to her preexisting conditions does not reflect reliable toxicology principles.

### 3. *Differential Diagnosis*

35. Other factors in V.D.'s history may be responsible for her wheezing, shortness of breath, and cough, and must be ruled out.

36. For example, asthma is both common and may explain V.D.'s wheezing, cough, and other respiratory complaints. (Comberiati P, Di Cicco ME,

---

[2] All page number cites to composite medical records are to the exhibit pagination indicated in the upper right-hand corner.

D'Elios S, & Peroni DG 2017, Lecerf & Prince, 2022, Pender & Pollack, 1990). Gastroesophageal reflux (Burton, Pransky, Katz, Kearns, & Seid, 1992) vocal cord dysfunction (Hseu et al., 2016) could likewise cause these symptoms. Dr. Bird failed to discuss any of these in his analysis.

37.   In his rebuttal report, Dr. Bird notes that "in general pediatric population the presence of cough is the most common complaint for which medical care is sought," and argues therefore that "mere presence of medical visits with some complaint of cough is to be expected." (Bird, November 2023). That prevalence is precisely the point; given the frequency of complaints of cough in the pediatric population, reliable diagnostic methodology requires consideration of a multitude of causes. (Bird, November 2023).

38.   Dr. Bird also did not discuss alternate etiologies in his report as it relates to the cause of V.D.'s shortness of breath. Alternate etiologies that Dr. Bird should have discussed include vocal cord dysfunction (Hseu et al., 2016), laryngospasm (Lands, 2017), subglottic stenosis (Szadkowski & Hagen, 2020), malformations (e.g., tracheal web), anxiety, and anemia (Lands, 2017).

39.   Overall, Dr. Bird does not apply reliable toxicology principles or methodology in attributing V.D.'s wheezing, shortness of breath, and cough to the spill because he did not demonstrate that these injuries have a specific

causal connection with JP-5, he did not examine the dose or duration to decide if effects are probable or not, he did not analyze the temporal relationship of these claimed injuries to preexisting conditions, and he did not perform a differential diagnosis.

### 4. Dr. Bird's Future Treatment Recommendations

40.    Dr. Bird makes a number of recommendations for V.D.'s "ongoing medical surveillance and evaluation," including an annual pulmonology evaluation and continued use of her Flovent inhaler and nebulized Albuterol until she reaches the age of 65. (Bird, October 2023). Dr. Bird avers that he is not offering an opinion that prescribe particular medications or dose for Plaintiffs' alleged conditions (Bird. Dep. 337:23-338:11), but then fails to explain why he recommends life-long use of the medications indicated, particularly given that the medications V.D. needs, given her age, will necessarily evolve overtime as she grows.

41.    While I understand medical surveillance is no longer at issue, to the extent these recommendations are construed as medical treatment, I do not agree that such treatment is necessary as a result of V.D.'s alleged exposure to JP-5, given that there is no evidence that V.D.'s injuries have any plausible toxicological etiology. As explained above, V.D.'s respiratory issues pre-date the alleged exposure.

42.    Dr. Bird also recommends that all Plaintiffs, including V.D. receive until the age of 65 (1) a "yearly physical examination preferably by an occupational or environmental physician"; (2) a yearly complete blood count, urinalysis, comprehensive metabolic panel, and thyroid studies; and (3) a yearly neurology evaluation, plus an EMG every 5 years. (Bird, July 2023). He also recommends the following laboratory tests: complete blood count (CBC), comprehensive metabolic panel, urinalysis, and thyroid studies. *Id.*

43.    Any future medical care for any Minor Bellwether Plaintiff, including V.D., should be evidence-based care driven by best practices. The American Academy of Pediatrics, in conjunction with the U.S. Department of Health and Human Services has developed the Bright Futures program which outlines the content and periodicity of physical examinations from birth to age 21. The Bright Futures Guidelines provide theory-based and evidence-driven guidance for all preventive care screenings and health supervision visits. Similarly, the U.S. Preventive Services Task Force provides evidence-based guidelines for preventive health care for those over the age of 21.

44.    Dr. Bird does not identify the specific indication for these examinations, nor what these examinations will accomplish. Additionally, there is no evidence to support this medical care, nor are these consistent with any evidence based published health care recommendations, such as Bright Futures or the

U.S. Preventive Health Task Force. There is no explanation for the basis of these recommendations. Such testing is excessive and unwarranted, particularly in light of the absence of any specific need and the potential stress and discomfort resulting from such unnecessary examinations.

45.  While V.D. should continue to receive appropriate, evidence-based pediatric care, Dr. Bird offers no basis, and I can think of none, for why such treatment is warranted for the next six decades of V.D.'s life. Finally, conditions change as people age, warranting changes in treatment. There is no evidence to support requiring a singular treatment regimen for a child who will develop over the course of their lifetime.

**C. B.D.**

46.  B.D. is a 13-year-old male who alleges that he experienced exposure to drinking water contaminated with JP-5 after the November 20, 2021 spill from Red Hill. According to Dr. Bird, B.D. "suffered acute headache and balance disturbances, as well as abdominal pain, nausea, and diarrhea. Acutely, he also had general fatigue, dry skin, sore throat, and anxiety." (Bird, July 2023). Although Dr. Bird did "not attribute B.D.'s chronic headaches to being substantially caused by his jet fuel exposure" (Bird, October 2023), he later testified at deposition that be believed JP-5 exposure exacerbated B.D.'s headaches. (Bird. Dep. 208:17-21).

47.    In my analysis, I considered the four criteria noted above in Paragraph 14 in assessing whether there is a causal toxicological relationship between B.D.'s alleged exposure and the health effects Dr. Bird attributes to exposure, specifically exacerbated headaches.

### 1. General Causation and Dose

48.    For general causation and dose, as outlined in Paragraph 15, although I considered qualitative reports of sheen and odor, I rely upon Dr. Prueitt's estimation of B.D.'s dose of JP-5. I adopt Dr. Prueitt's conclusions that, even with highly conservative exposure assumptions, long-term health effects are not expected from B.D.'s exposure to JP-5 and its main constituents.

### 2. Temporality

49.    B.D. experienced headaches following the November fuel leak, which Dr. Bird attributes to his exposure. However, later in his deposition and supplemental report, Dr. Bird clarified that he only attributed B.D.'s acute headaches and not his chronic headaches to exposure. (Bird, October 2023). Dr. Bird was unable to explain how he differentiated between B.D.'s chronic and acute headaches, which makes it impossible to assess the relevant temporal relationship between the exposure and alleged exacerbation or replicate his methodology. Bird Dep. 204:13-208:21.

### 3. *Differential Diagnosis*

50. B.D. has a prior history of a Chiari I malformation, a brain condition that was surgically treated in March 2022. Chiari I malformation frequently causes headaches, and his medical records note that he "has had headaches for most of his life." **Exhibit C**, Trial Exhibit DX-3218, B.D. Composite Med. Rec. at 1.

51. While Dr. Bird attributes the exacerbation of B.D.'s headaches to JP-5, his report does not discuss how B.D.'s prior history of Chiari I malformation and chronic headaches may have alternately caused exacerbation of his symptoms. For example, B.D.'s medical records include discussion of his headache triggers, such as seasonal allergies. *Id.* at 7. Dr. Bird's reports do not reflect that he considered or ruled out these other known triggers for B.D.'s exacerbated headaches. Nor does Dr. Bird offer any analysis regarding the relative intensity, duration, or frequency of B.D.'s pre-existing headaches compared to the alleged exacerbation.

52. The lack of this type of analysis results in the inability to support his opinions that the exposure JP-5 and its main constituents in drinking resulted in any long-term injury.

53. Dr. Bird does not apply reliable toxicology principles or methodology in attributing B.D.'s anxiety to the spill because he did not demonstrate that

25

B.D.'s exacerbated headaches had a specific causal connection with JP-5, he did not examine the dose or duration to decide if effects are probable or not, he did not analyze the temporal relationship of B.D.'s headaches to any preexisting headaches, and he did not perform a differential diagnosis.

### 4. Dr. Bird's Future Treatment Recommendations

54.    Dr. Bird does not make any specific future treatment recommendations for B.D.

55.    As discussed, *supra* Paragraphs 42-45, Dr. Bird's generalized recommendations for annual medical evaluation are not consistent with any evidence-based published health care recommendations, such as the American Academy of Pediatrics' Bright Futures or the U.S. Preventive Health Task Force. While B.D. should continue to receive appropriate, evidence-based pediatric care, Dr. Bird offers no basis, and I can think of none, for why his recommended testing is warranted for B.D..

**D. B.B.J.**

56.    B.B.J. is an 18-year-old male who alleges that he experienced exposure to drinking water contaminated with JP-5 after the November 20, 2021 spill from Red Hill. Dr. Bird opines that B.B.J. suffered acute "abdominal pain, nausea, and headaches, as well as burning of his throat, [] a cough…. balance problems, brain fog, irritated eyes, a rash, and muscle aches." (Bird,

26

July 2023). Dr. Bird has ascribed the following long-term adverse effects to his alleged exposure to JP-5: "tremor, tinnitus, and anxiety." *Id*.

57.    In my analysis, I considered the four criteria noted above in Paragraph 14 in assessing whether there is a causal relationship between B.B.J.'s alleged exposure and the long-term health effects Dr. Bird attributes to exposure, specifically tremor and tinnitus.

### 1. *General Causation and Dose*

58.    For general causation and dose, as outlined in Paragraph 15, although I considered the qualitative indications of contamination cited by Dr. Bird, such as sheen and odor, I rely upon Dr. Prueitt's estimation of B.B.J's dose of JP-5. I adopt her conclusions that, even with highly conservative exposure assumptions, long-term health effects, including tremor and tinnitus, are not expected from B.B.J.'s exposure to JP-5 and its main constituents.

### 2. *Temporality*

47.    B.B.J.'s development of tremor and tinnitus reportedly began in January or February 2022 following the exposure, which may indicate a temporal relationship. A temporal relationship, by itself, is not sufficient to determine causality. Additional information, including investigation into all potential causes, is necessary to determine causation.

### 3. Differential Diagnosis

48.    Other factors in B.B.J.'s history may be responsible for his tremor and tinnitus and must be ruled out. While Dr. Bird opines that B.B.J.'s tinnitus and tremor were caused by his alleged exposure to JP-5, his medical records do not reflect any treating provider making this attribution.

### a. Tinnitus

49.    B.B.J. has several recognized risk factors for tinnitus, including repeated ear infections, eustachian tube dysfunction, tympanostomy tube placement, and anxiety. *See* **Exhibit D**, Trial Exhibit DX-3220, B.B.J. Composite Med. Rec. at 15 (ear infection Aug. 2006); 16 (ear infection Oct. 2006); 17 (ear infection Dec. 2007); 43 (ear infection Sept. 2008); 12 (ear infection March 2010); 22 (eustachian tube dysfunction Oct. 27, 2006); 8 (tympanostomy tube placement May 20, 2010). Given that B.B.J. was diagnosed with recognized risk factors for tinnitus, there are other factors in his history as likely or more likely to be responsible for his tinnitus.

50.    Tinnitus afflicts a substantial portion of the youth population in the United States. A cross-sectional analyses of U.S. adolescents and their audiometric data from 2005 to 2008 using the National Health and Nutrition Examination Survey (NHANES), evaluated the prevalence, characteristics, and associated risk factors of tinnitus. The study's authors reported tinnitus lasting 5

minutes or more in the preceding 12 months was reported by 7.5% of the 12- to 19- year-old population. This represented about 2.5 million adolescents in the United States. The prevalence of chronic tinnitus was 4.7%, corresponding to about 1.6 million adolescents in the United States. (Mahboubi, Oliaei, Kiumehr, Dwabe, & Djalilian, 2013).

51.    I am unable to agree with Dr. Bird that B.B.J.'s tinnitus was caused by JP-5 exposure because Dr. Bird failed to rule out more likely potential causes, including B.B.J.'s known risk factors and the general prevalence of tinnitus among adolescents. Dr. Bird failed to discuss alternate etiologies in his analysis, including outer ear pathology such as impacted cerumen (known as ear wax); middle ear pathology such as conductive hearing loss; or inner ear pathology such as sensorineural or mixed hearing loss (Chan, Jensen, & Gao, 2018). In his rebuttal, Dr. Bird argues that these alternative causes have been ruled out by B.B.J.'s treating physicians. (Bird, November 2023). Dr. Bird fails to cite any records, and I am aware of none, to support this claim.

   b.  *Tremor*

52.    Essential tremor is common: up to 5% of the adult population have essential tremor, and 5-30% of those report symptom onset during childhood. Anatomic distribution of essential tremor includes the hands 90 – 100% of the time (Ferrara & Jankovic, 2009).

53.    Dr. Bird did not analyze alternate etiologies regarding tremor in his report, such as physiologic tremor, (Kocaman, Ardıçlı, & Yılmaz, 2022), nor did he discuss autoimmune diseases, hyperthyroidism, or vitamin E, D, or B12 deficiency (Blackburn & Parnes, 2021). As with tinnitus, Dr. Bird argues that these alternative causes have been ruled out by B.B.J.'s treating physicians. (Bird, November 2023). Dr. Bird fails to cite any records, and I am aware of none, to support this claim.

54.    Overall, Dr. Bird does not apply reliable toxicology principles or methodology in attributing B.B.J.'s tremor and tinnitus to the spill because he did not demonstrate that these injuries have a specific causal connection with JP-5, he did not examine the dose or duration to decide if effects are probable or not, he did not analyze the temporal relationship of these claimed injuries to preexisting conditions, and he did not perform a differential diagnosis.

### 4. Dr. Bird's Future Treatment Recommendations

55.    Dr. Bird makes a number of recommendations for B.B.J.'s "ongoing medical surveillance and evaluation, including that he see a neurologist annually and that he "*may* need an EMG or other diagnostic test every five years to evaluate upper extremity nerve function" until the age of 65. (Bird, October 2023) (emphasis added). I do not agree with Dr. Bird that such treatment is

warranted. Dr. Bird does not explain why B.B.J. may or may not need an EMG, the specific indication for these examinations, and what such an exam would accomplish. While an EMG is non-invasive, it can be painful. Dr. Bird does not describe, what the benefit of this would be for B.B.J., or how this would alter the management of his care. This recommendation is not supported by any medical literature or standard practice.

56.  As discussed, *supra* Paragraphs 42-45, Dr. Bird's generalized recommendations for annual medical evaluation are not consistent with any evidence-based published health care recommendations, such as the American Academy of Pediatrics' Bright Futures or the U.S. Preventive Health Task Force. While B.B.J. should continue to receive appropriate, evidence-based care, Dr. Bird offers no basis, and I can think of none, for why his recommended testing is warranted for B.B.J.

57.  Dr. Bird further recommends that B.B.J. be "evaluated for consideration of medical management…" (Bird, October 2023). Dr. Bird does not explain what this "medical management" would entail, what such an evaluation would consist of, or what it would accomplish in terms of treatment. Instead, B.B.J. should continue to receive appropriate, evidence-based care.

### E. B.J.J.

58. B.J.J. is a 16-year-old female who alleges injuries related to exposure to drinking water contaminated with jet fuel for less than two weeks when she was 13. Dr. Bird opines that B.J.J. suffered acute "abdominal pain, nausea, and diarrhea. She also developed throat burning, eye irritation, and a rash. Other acute effects of the exposure included headaches, fatigue, muscle aches, and anxiety." (Bird, July 2023). Dr. Bird has ascribed the following long-term adverse effects to B.J.J.'s alleged exposure to JP-5: "menstrual irregularities, anxiety and behavioral issues, and goiter." *Id.*

59. In my analysis, I considered the four criteria noted above in Paragraph 14 in assessing whether there is a causal relationship between B.J.J.'s alleged exposure and the long-term health effects Dr. Bird attributes to exposure, specifically menstrual irregularities and goiter.

#### 1. *General Causation and Dose*

60. For general causation and dose, as outlined in Paragraph 15, although I considered the qualitative indications of contamination cited by Dr. Bird, such as sheen and odor, I rely upon Dr. Prueitt's estimation of B.J.J.'s dose of JP-5. I adopt her conclusions that, even with highly conservative exposure assumptions, long-term health effects, including menstrual irregularities and

goiter, are not expected from B.J.J.'s exposure to JP-5 and its main constituents.

### 2. Temporality

61.     B.J.J.'s development of menstrual irregularities and goiter reportedly began after the exposure, which may indicate a temporal relationship. A temporal relationship, by itself, is not sufficient to determine causality. Additional information, including investigation into all potential causes, is necessary to determine causation.

### 3. Differential Diagnosis

62.     B.J.J. has other factors in her history that may be responsible for her reported goiter and abnormal uterine bleeding. While Dr. Bird opines that B.J.J.'s complaints were caused by her alleged exposure to JP-5, her medical records do not reflect any treating provider making this attribution.

#### a. Goiter

63.     Contrary to Dr. Bird's assertion, there is no evidence in her medical records that B.J.J. had a goiter.

64.     Goiter is defined as the growth of the thyroid gland. It may be classified as diffuse or nodular and be associated with normal or abnormal thyroid function. Euthyroid or non-toxic multinodular goiter may develop multiple non-neoplastic nodules with normal thyroid function (García-García, López-González, Cabello-Laureano, & Navarro-González, 2017). The most

common cause of acquired goiter among children and adolescents in
developed nations is chronic autoimmune thyroiditis while iodine deficiency
remains the most common cause of goiter worldwide.

65.    There is no evidence of goiter in B.J.J., and her thyroid studies in June 2022
were all within normal limits with TSH 1.87 (reference 0.5 – 4.3 mU/L) and
T4 1.0 (reference 0.9 – 1.5 ng/dL)). **Exhibit E**, Trial Exhibit DX-3221,
B.J.J. Composite Med. Rec. at 19 (6/16/22 thyroid study results). The term
goiter appears in context of billing codes. On June 20, 2022, B.J.J.
reportedly had a thickened left thyroid based on physical exam. *Id.* at 14.
There are no records of imaging or an ultrasound to evaluate this, nor is
there any diagnosis of goiter in her medical records. *See generally id.* She
has had repeated physical exams since June 6, 2022, none of which report an
abnormal finding. *Id.* In June of 2023, her mother reported a previous
thyroid nodule and that B.J.J. was feeling tired, so she requested additional
thyroid studies, which were not available for review as of the date of my
report. *Id.* at 1.

66.    Dr. Bird's report fails to identify any medical records to indicate that B.J.J.
in fact had a goiter or identify any literature that links the development of
goiter to exposure to JP-5 or its constituents. Even if B.J.J. had a goiter, Dr.

Bird does not address why he believes JP-5 exposure was the more likely cause, rather than the most common causes such as simple iodine deficiency.

### b. Abnormal Uterine Bleeding

67.   Dr. Bird opines that B.J.J. has irregular and abnormally heavy menstrual cycles, starting more than a year after her exposure in approximately January 2022 (Bird, July 2023). Abnormal uterine bleeding (AUB), is defined as excessively heavy, prolonged and/or frequent bleeding of uterine origin. There are many etiologies of AUB, the one most likely among otherwise healthy adolescents is dysfunctional uterine bleeding (DUB), which is characterizing any AUB when all possible underlying pathologic causes have been previously excluded. The most common cause of DUB in adolescence is anovulation, which is very frequent in the first 2–3 post-menarchal years and is associated with immaturity of the hypo thalamic – pituitary – ovarian axis. The average menstrual cycle interval is 32.2 days in first gynecologic year, then typically 21–45 days, the average menstrual flow length is 7 days or less with three to six pads or tampons per day ("ACOG Committee Opinion No. 651: Menstruation in Girls and Adolescents: Using the Menstrual Cycle as a Vital Sign," 2015).

68.   I am unable to agree with Dr. Bird that B.J.J.'s AUB was caused by JP-5 exposure because Dr. Bird failed to rule out causes such as adolescent

anovulation. In his rebuttal report, Dr. Bird asserts that this cause and others have been ruled out by B.J.J.'s treating providers (Bird, November 2023). Dr. Bird cites no medical records to support this assertion, and I am aware of none.

69.    Overall, Dr. Bird does not apply reliable toxicology principles or methodology in attributing B.J.J.'s menstrual irregularities and goiter to the spill because he did not demonstrate that these injuries have a specific causal connection with JP-5, he did not examine the dose or duration to decide if effects are probable or not, he did not analyze the temporal relationship of these claimed injuries to preexisting conditions, and he did not perform a differential diagnosis.

### 4. Dr. Bird's Future Treatment Recommendations

70.    Dr. Bird makes a number of recommendations for B.J.J.'s "ongoing medical surveillance and evaluation," including that "[g]iven her goiter" B.J.J. should receive an endocrinology evaluation "1 time per year for five years (Bird, October 2023). First, as explained above, I do not agree that B.J.J.'s medical records indicate she has a goiter, therefore, there is no evidence to support this type of care. Second, I do not agree with Dr. Bird that such treatment is warranted. Dr. Bird does not explain what the endocrinology evaluation would entail, or what such an exam would accomplish. Third, the

timing and frequency of the exams is not supported by any medical literature. Each exam should dictate the necessity of the next exam, and at what interval. Requiring 5 exams, over the course of 5 years, without considering the course of a condition is not standard medical practice.

71.    Dr. Bird further recommends that B.J.J. receive a gynecology exam "2 times per year for 2 years, then 1 time per (sic) year for 5 years" (Bird, October 2023). Regular gynecology exams would be recommended for any female experiencing menses. As with his recommendations regarding endocrinology, I do not believe Dr. Bird's recommendations regarding timing and frequency of the exams is supported by standard medical principles or literature. Finally, twice yearly gynecologic examinations on a 16 year old is excessive, particularly in light of the absence of any specific need and the potential stress and discomfort resulting from such unnecessary examinations.

72.    As discussed, *supra* Paragraphs 42-45, Dr. Bird's generalized recommendations for annual medical evaluation are not consistent with any evidence-based published health care recommendations, such as the American Academy of Pediatrics' Bright Futures or the U.S. Preventive Health Task Force. While B.J.J. should continue to receive appropriate,

evidence-based care, Dr. Bird offers no basis, and I can think of none, for why his recommended testing is warranted for B.J.J.

73. Dr. Bird additionally recommends that B.J.J. is "evaluated for consideration of medical management…" (Bird, October 2023). As discussed, *supra* Paragraph 57, Dr. Bird does not explain what this "medical management" would entail, what such an evaluation would consist of, or what it would accomplish in terms of treatment. Instead, B.J.J. should continue to receive appropriate, evidence-based pediatric care.

**F. N.J.**

74. N.J. is a 7-year-old male who alleges that he was exposed to drinking water contaminated with JP-5 following the November 20, 2021 spill from Red Hill when he was 4 years old. Dr. Bird opines that N.J. suffered acute "abdominal pain, vomiting, and diarrhea due to the jet fuel. He also developed a cough and eye irritation from the exposure, as well as headaches, anxiety, and behavior abnormalities swings" (Bird, July 2023). Dr. Bird attributes long-term adverse effects of "dermatologic changes and behavior abnormalities," to N.J.'s alleged exposure to JP-5. *Id*. His medical records do not reflect this attribution. While he has been evaluated for these symptoms, none of his medical providers (not engaged in the lawsuit as an

expert witness) have stated these symptoms were due to her alleged exposure to drinking water contaminated with JP-5.

75.  In my analysis, I considered the four criteria noted above in Paragraph 14 in assessing whether there is a causal relationship between N.J.'s alleged exposure and the long-term health effects Dr. Bird attributes to exposure, specifically "dermatological changes" and "behavioral abnormalities."

### 1.  General Causation and Dose

76.  For general causation and dose, as outlined in Paragraph 15, although I considered qualitative indications of contamination relied upon by Dr. Bird, such as reports of sheen and odor, I rely upon Dr. Prueitt's estimation of N.J.'s dose of JP-5. I adopt her conclusions that, even with highly conservative exposure assumptions, long-term health effects, including "dermatological changes" and "behavioral abnormalities," are not expected from N.J.'s exposure to JP-5 and its main constituents.

### 2.  Temporality

77.  Any temporal relationship between N.J.'s claimed injuries and the spill are more likely attributable to the fact that N.J. is a developing child, whose body will naturally change.

78.  Dr. Bird ascribes "dermatologic changes" and "behavior abnormalities," as long-term effects of the alleged exposure. "Dermatologic changes" are not a

diagnosis, particularly in a growing child who, by definition, will have dermatologic changes. (King A, Balaji S, & Keswani, SG 2013) (noting that "The skin is anatomically mature at birth, but continues to functionally develop through the first year of life. The glandular components of skin are strongly influenced by hormonal changes, with further development seen at the onset of puberty.").

### 3. Differential Diagnosis

79. There are other factors in his history as likely or more likely to be responsible for N.J.'s "dermatological changes" and "behavioral abnormalities."

### a. Dermatologic Changes

80. "Dermatologic changes," are not an indication of injury. N.J., as he is growing, is expected to have dermatologic changes. In his rebuttal report, Dr. Bird offers additional opinions that, in his view, N.J.'s medical records reflect a diagnosis of "some form of atopic dermatitis" as a result of his alleged exposure in 2021 (Bird, November 2023). Dr. Bird again fails to cite any medical records to support this assertion. Additionally, atopic dermatitis is a common affliction among children with many potential causes. The fact that other individuals also complained of this symptom does not indicate causality from JP-5, particularly given the general prevalence of dermatitis.

### b. *Behavior Abnormalities*

81.  N.J. was diagnosed with Autism Spectrum Disorder at the age of 3, and has a history of behavioral challenges. **Exhibit F**, Trial Exhibit DX-3222, N.J. Composite Med. Rec. at 33. Dr. Bird opines that the exposure to JP-5 caused N.J. behavioral challenges to "dramatically worsen," but does not explain what behaviors he refers to, how they compared to pre-spill behaviors, or how these could be toxicologically linked to his exposure (Bird, July 2023).

82.  Although he has and is likely to continue to have behavior challenges due his diagnosis with Autism Spectrum Disorder, there is no evidence to conclude these are a physiological reaction due to exposure to JP-5 and its main constituents in drinking water. Dr. Bird cites no literature, and I am aware of none, identifying a causal link between exposure to JP-5 and these behavioral challenges.

83.  Overall, Dr. Bird does not apply reliable toxicology principles or methodology in attributing N.J.'s "dermatological changes" and "behavioral abnormalities" to the spill because he did not demonstrate that these injuries have a specific causal connection with JP-5, he did not examine the dose or duration to decide if effects are probable or not, he did not analyze the temporal relationship of N.J.'s behavioral or dermatological conditions to preexisting conditions, and he did not perform a differential diagnosis.

Moreover, Dr. Bird did not account for the fact that N.J. is growing and certain dermatological and behavioral changes are to be expected.

### 4. Dr. Bird's Future Treatment Recommendations

84.  Dr. Bird makes a number of recommendations for N.J.'s "ongoing medical surveillance and evaluation," including a recommendation that N.J. be "evaluated for consideration of medical management…" (Bird, October 2023). As discussed, *supra*, Paragraph 57, Dr. Bird does not explain what this "medical management" would entail, what such an evaluation would consist of, or what it would accomplish in terms of treatment. Instead, N.J. should continue to receive appropriate, evidence-based pediatric care.

85.  As discussed, *supra* Paragraphs 42-45, Dr. Bird's generalized recommendations for annual medical evaluation are not consistent with any evidence-based published health care recommendations, such as the American Academy of Pediatrics' Bright Futures or the U.S. Preventive Health Task Force. While N.J. should continue to receive appropriate, evidence-based care, Dr. Bird offers no basis, and I can think of none, for why his recommended testing is warranted for N.J. Such testing is excessive, particularly in light of the absence of any specific need and the potential stress and discomfort resulting from such unnecessary examinations.

## G. D.J.

86.    D.J. is a 3-year-old male who alleges that he was exposed to drinking water
contaminated with JP-5 following the November 20, 2021 spill from Red
Hill when he was 10 months old. Dr. Bird opines that D.J. suffered acute
"diarrhea as well as eye irritation and dry skin…" (Bird, July 2023). There is
no claim of any long-term adverse health effects for D.J., nor any
individualized recommendations for future treatment or surveillance. This is
supported by D.J.'s medical records, which do not reflect any medical
concerns related to alleged exposure or otherwise. *See generally* **Exhibit G**,
Trial Exhibit DX-3223, D.J. Composite Med. Rec.

87.    Dr. Bird offers no specific treatment recommendations for D.J., as he does
not have any claimed injuries. As discussed, *supra* Paragraphs 42-45, Dr.
Bird's generalized recommendations for annual medical evaluation are not
consistent with any evidence-based published health care recommendations,
such as the American Academy of Pediatrics' Bright Futures or the U.S.
Preventive Health Task Force. While D.J. should continue to receive
appropriate, evidence-based care, Dr. Bird offers no basis, and I can think of
none, for why his recommended testing is warranted for D.J.

### H. P.G.F.

88.   P.G.F. is a 6-year-old female who alleges that she was exposed to drinking water contaminated with JP-5 following the November 20, 2021 spill from Red Hill when she was 3 years old. Dr. Bird opines that P.G.F. suffered acute "cough, abdominal pain, vomiting, and diarrhea. She also suffered a setback/regression in her toilet training, language development, and behavior" (Bird, July 2023). Dr. Bird has ascribed the following long-term adverse effects to P.G.F.'s alleged exposure to JP-5: "abdominal pain, cough, shortness of breath, rashes, behavior alterations, as well as mastocytosis." *Id.*

89.   In my analysis, I considered the four criteria noted above in Paragraph 14 in assessing whether there is a causal relationship between P.G.F.'s alleged exposure and the long-term health effects Dr. Bird attributes to exposure, specifically abdominal pain, cough, shortness of breath, rashes, behavior alterations, and mastocytosis.

#### 1. *General Causation and Dose*

90.   For general causation and dose, as outlined in Paragraph 15, although I considered qualitative indications of contamination relied upon by Dr. Bird, I rely upon Dr. Prueitt's estimation of P.G.F.'s dose of JP-5. I adopt Dr. Prueitt's conclusions that, even with highly conservative exposure

assumptions, long-term health effects, including abdominal pain, cough, shortness of breath, rashes, behavioral alterations, and mastocytosis, are not expected from P.G.F.'s exposure to JP-5 and its main constituents.

## 2. Temporality

91.    P.G.F.'s development of abdominal pain, cough, shortness of breath, rashes, and behavior alterations began prior to November 2021, which is inconsistent with a temporal relationship between the claimed injuries and the spill. Her Plaintiff Fact Sheet alleges that symptoms including "constant chest colds," "cough and postnasal drip," "dry cough," "coughing, but more so at night," "wheezing or difficulty breathing," and rashes that began in May 2021. This is consistent with her mother's report during the IME that her symptoms began right after they moved into their Ford Island home in the spring of 2021. Similarly, Mrs. Feindt reported that P.G.F.'s abdominal pain started right after Halloween 2021, which is consistent with the December 11, 2021 medical records indicating that she had been having abdominal pain for 6 weeks. While P.G.F.'s evaluation for mastocytosis began following the exposure, her abdominal symptoms underlying that evaluation predated the spill.

92.    In his rebuttal, Dr. Bird argues that even if P.G.F.'s symptoms predated her exposure, they all significantly worsened after her exposure (Bird,

November 2023). But Dr. Bird fails to cite any records in support of this conclusion, nor does he offer any analysis regarding the change in severity, frequency, or duration of P.G.F.'s symptoms after her exposure. Such information is crucial to determine whether her symptoms did in fact worsen, and whether any such exacerbation is temporally consistent with causation.

### 3. Differential Diagnosis

93.    Other factors in P.G.F.'s history may be responsible for her abdominal pain, cough, shortness of breath, rashes, behavior alterations, and mastocytosis and must be ruled out. While Dr. Bird opines that P.G.F.'s symptoms were caused by her exposure to JP-5, her medical records do not reflect any treating provider making this attribution.

### a. Cough and Shortness of Breath

94.    P.G.F. has undergone extensive evaluation of for her cough and shortness of breath, to include a bronchoscopy and CT scan of her chest. Dr. Bird's report does not discuss any of these medical records, nor potential alternative causes for these symptoms. Her bronchoscopy found airway edema, her CT scan found mild bronchial wall thickening, with otherwise normal results. **Exhibit H**, Trial Exhibit DX-3224, P.G.F. Composite Med. Rec. at 181. Cytology report found moderate acute and chronic

inflammation. *Id.* at 194. Intracytoplasmic bacterial forms were identified. *Id.* Bacterial culture of bronchoalveolar lavage revealed Moraxella catarrhalis and Group A beta hemolytic Streptococcus. *Id.* at 189. She was noted to be feeling better after the bronchoscopy and prescribed antibiotics. *Id.* at 175.

95.    Cough was reported at least fifteen times in P.G.F.'s medical records prior to the alleged exposure on November 20, 2021: 4/5/2018, *id.* at 298; 4/26/2018, *id.* at 294; 8/23/2018, *id.* at 288; 10/15/2018, *id.* at 283; 3/31/2019, *id.* at 216; 11/15/2019, *id.* at 278; 11/19/2019, *id.* at 271; 1/21/2020, *id.* at 265; 1/30/2020, *id.* at 209; 12/13/2020, *id.* at 204; 12/14/2020, *id.* at 209; 12/17/2020, *id.* at 242; 01/11/2021, *id.* at 231; 01/19/2022, *id.* at 82; 3/3/2021 *id.* at 222. It was reported six times since the exposure, on 9/13/2022, *id.* at 130; 10/21/2022, *id.* at 1; 11/15/2022, *id.* at 126; 12/6/2022, *id.* at 184; 12/19/2022, *id.* at 55; 1/24/2023, *id.* at 163.

96.    The presence of P.G.F.'s cough prior to the alleged exposure indicates that the cough may be attributable to another cause. Dr. Bird did not discuss alternate etiology for P.G.F.'s cough, such as asthma, gastroesophageal reflux disease, upper airway cough syndrome, or post nasal drip. (Lands, 2017). P.G.F. has a family history of asthma, which underscores the need to rule out this particular alternative cause. **Exhibit H**, Trial Exhibit DX-3224

at 143. Further, as discussed in Paragraph 33, Dr. Bird's cited prevalence of cough in pediatric populations underscores the need for a thorough differential diagnosis. Dr. Bird's claim that these alternate causes have been ruled out, (Bird, November 2023), is once again unsupported by citations to medical records.

### b. Abdominal Symptoms and Mastocytosis

97.    P.G.F. has undergone extensive evaluation for her abdominal pain, including flexible sigmoidoscopy and esophagogastroduodenoscopy on December 28, 2022 with Dr. Hadley, a pediatric gastroenterologist. On January 10, 2023, Dr. Hadley found these results were within normal limits and did not attribute her abdominal pain to the JP-5 exposure. **Exhibit H** at 67.

98.    Notwithstanding Dr. Hadley's findings, Dr. Bird did not discuss alternate causes for abdominal pain in his analysis, including functional (somatic) abdominal pain, (Gomez-Suarez, 2016), functional constipation (Marin & Alpern, 2011), cyclic vomiting syndrome (Zeiter, 2017), and asthma (Marin & Alpern, 2011). Nor does Dr. Bird discuss P.G.F.'s history of constipation, predating the spill, as an alternative cause for her abdominal pain. **Exhibit H** at 222; 260.

99.    Dr. Bird notes P.G.F. was diagnosed with mastocytosis by Dr. Hadley, and attributes that diagnosis to P.G.F.'s alleged exposure. However, there are no

medical records that support a diagnosis of mastocytosis, and Dr. Bird does not identify any specific records that support his conclusion (Escribano, Akin, Castells, Orfao, & Metcalfe, 2002).

100. Mastocytosis represents a heterogeneous group of disorders characterized by an abnormal accumulation of mast cells in one or more organ systems. Mastocytosis is divided into cutaneous and systemic forms based on the sites of involvement, laboratory findings, and degree of organ impairment. Cutaneous mastocytosis is diagnosed in the presence of skin involvement and absence of extracutaneous disease, and is most commonly seen in the pediatric population. Systemic mastocytosis, the disease form most commonly seen in adults, is characterized by the presence of multifocal, compact (dense) mast cell aggregates in the bone marrow or other extracutaneous organs. The mast cells may display atypical, often spindle-shape morphology and/or aberrant CD2 and/or CD25 expression.

101. The diagnostic criteria for systemic mastocytosis (major and one minor or three minor criteria are needed) are:

    a.  Major: Multifocal dense infiltrates of mast cells in bone marrow and/or other extracutaneous organs

    b.  Minor:

      i.  More than 25% of the mast cells in bone marrow aspirate smears or tissue biopsy sections are spindle shaped or display atypical morphology

     ii.  Detection of a codon 816 c-kit point mutation in blood, bone marrow, or lesional tissue

   iii.  Mast cells in bone marrow, blood, or other lesional tissue expressing CD25 or CD2

   iv.  Baseline total tryptase level of greater than 20 ng/ml/

102.   P.G.F. underwent Flexible Sigmoidoscopy and esophagogastroduodenoscopy on December 28, 2022. **Exhibit H** at 108. Dr. Hadley noted the entire colon was normal. He also noted the esophagus and duodenum were normal, and there was erythematous mucosa in the stomach. Surgical pathology found no significant histopathologic changes of the duodenum, stomach, distal esophagus, colon, sigmoid colon and rectal mucosa. *Id.* On January 10, 2023 he found these results were within normal limits. A surgical pathology report dated January 19, 2023 found up to 22 mast cells identified per high power field, however no mast cell clustering, spindled architecture or other atypia was identified. *Id.* at 49. These results to not satisfy the diagnostic criteria for mastocytosis (Doyle et al., 2014).

103. Even assuming P.G.F. had in fact been diagnosed with mastocytosis, Dr.
Bird does not cite any literature, nor am I aware of any, linking the
development of mastocystosis to exposure to jet fuels. Nor does Dr. Bird
discuss other potential causes of mastocytosis, such as a heritable component
given P.G.F.'s father's history of mastocystosis.

     *c. Rash*

104. Dr. Bird attributes P.G.F.'s ongoing rash, consisting of "red, dry, skin" to
her alleged 2021 exposure to JP-5 and its constituents (Bird, July 2023). Dr.
Bird did not discuss alternate etiology in his report for P.G.F.'s rash.
Common causes of rash include eczema (Schroeder, Frantz, Osten, & Cho,
2021), psoriasis *id.*, and contact dermatitis (Friedlander, 1998). Dr. Bird
states these alternate causes have been ruled out in medical records, however
he has not identified any specific records, and I am aware of none to support
his conclusion.

     *d. Behavioral Alterations*

105. Dr. Bird opines that P.G.F. has suffered a "setback in her behavior" as a
result of her alleged exposure (Bird, July 2023). Dr. Bird does not explain
or cite to any toxicological link between the exposure and these alleged
behavioral challenges. As Dr. Bird notes, P.G.F. had a preexisting diagnosis
for 16p13.11 microduplication syndrome, which can lead to behavioral

issues such as hyperactivity and developmental delays. **Exhibit H**. at 59.

The available literature for this genetic based difference does not describe

increased risk of physical long-term effects as ascribed by Dr. Bird (Arslan,

Zamani, & Yıldırım, 2022; Atli et al., 2022).

106.   Overall, Dr. Bird does not apply reliable toxicology principles or

methodology in attributing P.G.F.'s abdominal pain, cough, shortness of

breath, rashes, behavior alterations, and mastocytosis to the spill because he

did not demonstrate that these injuries have a specific causal connection with

JP-5, nor did he properly analyze Dr. Hadley's findings as it relates to

P.G.F.'s mastocytosis and abdominal pain specifically. Moreover, Dr. Bird

did not examine the dose or duration to decide if effects are probable or not,

he did not analyze the temporal relationship of these claimed injuries to

behavioral or dermatological conditions, and he did not perform a

differential diagnosis.

### 4. Dr. Bird's Future Treatment Recommendations

107.   Dr. Bird makes a number of recommendations for P.G.F.'s "ongoing

medical surveillance and evaluation," including that P.G.F. visit an

allergist/immunologist annually until age 65, as well as continued use of

cromolym until age 65 (Bird, October 2023). As discussed, *supra* Paragraph

40, Dr. Bird avers that he is not offering an opinion as to Plaintiffs'

medications, but then fails to explain why he recommends life-long use of the medications indicated, particularly given that the medications P.G.F. needs, given her age, will necessarily evolve over time as she grows.

108.  Dr. Bird does not explain why P.G.F. would need to see an allergist or immunologist—i.e., whether it would be for her cough or some other claimed injury. He does not explain why an allergist may be more appropriate than an immunologist or vice versa. Moreover, Dr. Bird does not explain what such treatment would accomplish in the short term. Conditions change as people age, warranting changes in treatment. There is no evidence to support requiring a singular treatment regimen for child who will develop over the course of their lifetime.

109.  Dr. Bird additionally recommends that P.G.F. be "evaluated for consideration of medical management…" (Bird, October 2023). As discussed, *supra* Paragraph 57, Dr. Bird does not explain what this "medical management" would entail, what such an evaluation would consist of, or what it would accomplish in terms of treatment. Instead, P.G.F. should continue to receive appropriate, evidence-based pediatric care.

110.  As discussed, *supra* Paragraphs 42-45, Dr. Bird's generalized recommendations for annual medical evaluation are not consistent with any evidence-based published health care recommendations, such as the

American Academy of Pediatrics' Bright Futures or the U.S. Preventive Health Task Force. While P.G.F. should continue to receive appropriate, evidence-based care, Dr. Bird offers no basis, and I can think of none, for why his recommended testing is warranted for P.G.F.

**I.  P.R.F.**

111.  P.R.F. is a 4-year old male who alleges that he was exposed to drinking water contaminated with JP-5 following the November 20, 2021 spill from Red Hill when he was 1 year old. Dr. Bird opines that P.R.F. suffered acute "abdominal pain, nausea, vomiting, and diarrhea," as well as "a cough and wheezing (exacerbation of his asthma) as well as anxiety/fear." (Bird, July 2023). Dr. Bird has ascribed the following long-term adverse effects to P.R.F.'s alleged exposure to JP-5: "abdominal pain, mastocytosis, dermatitis, and worsened asthma." *Id.*

112. I considered the four criteria noted above in Paragraph 14 in assessing whether there is a causal relationship between P.R.F.'s alleged exposure and the long-term health effects Dr. Bird attributes to exposure, specifically abdominal pain, mastocytosis, dermatitis, worsened asthma, and anxiety.

### 1.  General Causation and Dose

113.  For general causation and dose, as outlined in Paragraph 15, although I considered qualitative indications of contamination relied upon by Dr. Bird,

such as reports of sheen and odor, I rely upon Dr. Prueitt's estimation of his dose of JP-5. I adopt Dr. Prueitt's conclusions that, even with highly conservative exposure assumptions, long-term health effects, including abdominal pain, mastocytosis, dermatitis, and worsened asthma are not expected from P.R.F.'s exposure to JP-5 and its main constituents.

### 2. Temporality

114. P.R.F.'s development of abdominal pain, dermatitis and worsened asthma began prior to November 2021, which is inconsistent with a temporal relationship between the claimed injuries and the spill. His Plaintiff Fact Sheet alleges that symptoms including "constant chest colds," "cough and postnasal drip," "dry cough," "coughing, but more so at night," "wheezing or difficulty breathing," diarrhea, and rashes began in May 2021. This is consistent with his mother's report during the IME that P.R.F.'s symptoms began right after they moved into their Ford Island home in the spring of 2021 and that he suffered rashes and cough throughout summer of 2021. P.R.F.'s December 2021 ER visit records note he had been having GI concerns for 6-8 weeks, thus predating the exposure. **Exhibit I**, Trial Exhibit DX-3225, P.R.F. Composite Med. Rec. at 121. While P.R.F.'s evaluation for mastocytosis began following the exposure, his abdominal symptoms underlying that evaluation predated the spill.

115.  Dr. Bird's failure to analyze the temporal relationship of P.R.F.'s claimed injuries to his preexisting conditions does not reflect reliable toxicology principles.

### 3. Differential Diagnosis

116.  Other factors in P.R.F.'s history may be responsible for his abdominal pain, mastocytosis, dermatitis, and worsened asthma, and must be ruled out.

#### a. Abdominal Symptoms and Mastocytosis

117.  P.R.F. has undergone extensive evaluation for his abdominal pain, including flexible sigmoidoscopy and esophagogastroduodenoscopy on December 28, 2022, with Dr. Hadley, a pediatric gastroenterologist. On January 10, 2023, Dr. Hadley found these results were within normal limits and did not attribute his abdominal pain to the JP-5 exposure. *Id.* at 20.

118.  Notwithstanding Dr. Hadley's findings, Dr. Bird did not discuss alternate etiology for abdominal pain, including functional (somatic) abdominal pain (Gomez-Suarez, 2016), functional constipation (Marin & Alpern, 2011), cyclic vomiting syndrome (Zeiter, 2017), and asthma (Marin & Alpern, 2011). Although Dr. Bird claims these alternatives have been ruled out (Bird, November 2023), he does not cite any particular medical records to support these conclusions.

119. Dr. Bird notes P.R.F. was diagnosed with mastocytosis by Dr. Hadley, but the medical records do not support this. Dr. Bird does not offer any support for this diagnosis. P.R.F. underwent Flexible Sigmoidoscopy and esophagogastroduodenoscopy on December 28, 2022. Dr. Hadley noted the entire colon was normal. **Exhibit I** at 26. He also noted the esophagus and duodenum were normal, and there was erythematous mucosa in the stomach. Surgical pathology found no significant histopathologic changes of the duodenum, stomach, distal esophagus, colon, sigmoid colon and rectal mucosa. On January 10, 2023 he found these results were within normal limits. *Id.* at 15. A surgical pathology report dated January 19, 2023 found up to 20 mast cells identified per high power field, however no mast cell clustering, spindled architecture or other atypia was identified. *Id.* at 20. This is not considered diagnostic of mastocytosis (Doyle et al., 2014). The diagnostic criteria for systemic mastocytosis is explained above in Paragraph 112.

120. There are no medical records for P.R.F. that support a diagnosis of mastocytosis, nor does Dr. Bird identify any specific records that support this diagnosis (Escribano, Akin, Castells, Orfao, & Metcalfe, 2002). Dr. Crossley, P.R.F.'s former pediatrician who did not complete the GI evaluation, added a code "Idiopathic mast cell activation syndrome" to P.R.F.'s assessment on

4/12/2023. **Exhibit I** at 32. But there are no records that she made the diagnosis. On 9/6/2022, Dr. Crossley notes P.R.F.s father had "been scoped and found to have multiple ulcers and erosions, small bleeds, and a high mast cells." *Id.* at 49.

121. As with P.G.F., even if P.R.F. had in fact been diagnosed with mastocytosis, Dr. Bird does not cite any literature, nor am I aware of any, linking the development of mastocystosis to exposure to jet fuels. Nor does Dr. Bird discuss other potential causes of mastocytosis, such as a heritable component given P.R.F.'s father's history of mastocytosis.

    b. *Worsened Asthma*

122. Dr. Bird opines that P.R.F.'s "asthma was exacerbated" after the November 2021 fuel spill, but does not discuss how the severity, duration, or presentation of his symptoms differed from his pre-existing asthma, nor whether the exacerbation is persistent or has returned to baseline (Bird, July 2023). Without this information, it is difficult to assess what particular health effect Dr. Bird is ascribing to the spill.

123. P.R.F. has undergone extensive evaluation of his worsened asthma to include a bronchoscopy and CT scan of his chest. **Exhibit I** at 88. His bronchoscopy found the right adenoid was <25% occluding the nasopharynx. *Id.* at 78. Copious thick secretions in nares and oropharynx. *Id.* Otherwise, the

bronchoscopy findings reported normal anatomy. *Id.* The cytology from the bronchoalveolar lavage found Acute and chronic inflammation. *Id.* at 81. His CT scan found mild curvilinear opacities within the right middle lobe, lingula and lung bases which are favored to reflect atelectasis although mild scarring may have a similar appearance. *Id.* at 90. Otherwise, it was a normal high-resolution CT scan of the chest. Cytology report found acute and chronic inflammation and blood contamination and/or hemorrhage. *Id.* at 81. These clinical findings indicate chronic inflammation. There is no evidence that chronic inflammation is caused by a singular exposure to JP-5 in the drinking water in any of the literature that I reviewed.

124. There are multiple alternative causes for P.R.F.'s worsened asthma that must be considered in analyzing causation. P.R.F.'s family history is positive for a history of asthma in his father, suggesting a possible heritable component. Dr. Bird failed to discuss the heritable component in his analysis, along with other alternate etiologies including vocal cord dysfunction (Hseu et al., 2016) or hypersensitivity pneumonitis (Roy & Milgrom, 2003).

       *c. Dermatitis*

125. Dr. Bird also did not discuss alternate etiologies for dermatitis in his analysis, including common conditions, such as: eczema (Schroeder, Frantz, Osten, & Cho, 2021), psoriasis (Schroeder, Frantz, Osten, & Cho, 2021), and

contact dermatitis (Friedlander, 1998). In particular, because as Dr. Bird acknowledged, P.R.F.'s rash began months before the spill, these alternate and common causes must be fully considered and ruled out.

126. Overall, Dr. Bird does not apply reliable toxicology principles or methodology in attributing P.R.F.'s abdominal pain, mastocytosis, dermatitis, and worsened asthma to the spill because he did not demonstrate that these injuries have a specific causal connection with JP-5. Dr. Bird did not properly account for Dr. Hadley's findings as it relates to P.R.F.'s mastocytosis or P.R.F.'s family history with regards to his asthma. Moreover, Dr. Bird did not examine the dose or duration to decide if the claimed effects are probable or not, he did not analyze the temporal relationship of these claimed injuries to preexisting conditions, and he did not perform a differential diagnosis.

### 4. Dr. Bird's Future Treatment Recommendations

127. Dr. Bird makes a number of recommendations for P.R.F.'s "ongoing medical surveillance and evaluation," including that P.R.F. receive a yearly pulmonology follow-up until he is 65 years old, including pulmonary function tests (PFTs) (Bird, October 2023). Dr. Bird does explain the basis for his opinion that such exams are warranted for the next six decades of P.R.F.'s life. Moreover, because there is no causal connection between

P.R.F.'s worsened asthma and alleged exposure, there is no indication that even if such treatment were warranted that it is due to his exposure to JP-5.

128. Dr. Bird further notes that P.R.F. is currently taking albuterol, fluticasone, and cromolym, and that "these three medications are related to his symptoms and medical problems arising as a result of the JP-5 water contamination." *Id.* Dr. Bird does not advise whether P.R.F. should continue taking this medication, however, conditions change as people age, warranting changes in treatment. There is no evidence to support requiring a singular treatment regimen for child who will develop over the course of their lifetime.

129. As discussed, *supra* Paragraphs 42-45, Dr. Bird's generalized recommendations for annual medical evaluation are not consistent with any evidence-based published health care recommendations, such as the American Academy of Pediatrics' Bright Futures or the U.S. Preventive Health Task Force. While P.R.F. should continue to receive appropriate, evidence-based care, Dr. Bird offers no basis, and I can think of none, for why his recommended testing is warranted for P.R.F.

**J. N.F.**

130. N.F. is a 13-year old male who alleges that he was exposed to water contaminated with JP-5 following the November 20, 2021 spill from Red Hill when he was 11 years old. Dr. Bird opined that N.F. acutely suffered

"abdominal pain, nausea, vomiting, and diarrhea[,]" "cough with wheezing," as well as "headaches and tinnitus." (Bird, July 2023). Dr. Bird attributed the following long-term adverse effects to N.F.'s alleged exposure to JP-5: "shortness of breath and cough[,]" "severe muscle/bone pain associated with fatigue[,]" "headaches as well as abdominal pain, nausea, vomiting, and diarrhea." *Id.*

131.    In my analysis, I considered the four criteria noted above in Paragraph 14 in assessing whether there is a causal relationship between N.F.'s alleged exposure and the long-term health effects Dr. Bird attributes to exposure, specifically Amplified Musculoskeletal Pain Syndrome ("AMPS"), abdominal pain, nausea, vomiting, diarrhea, a cough with wheezing, headaches, weakness, and muscle/bone pain.

### *1. General Causation and Dose*

132.    For general causation and dose, as outlined in Paragraph 15, although I considered qualitative reports of contamination relied on by Dr. Bird, such as reports of sheen and dose, I rely upon Dr. Prueitt's estimation of N.F.'s dose of JP-5. I adopt Dr. Prueitt's conclusions that, even with highly conservative exposure assumptions, long-term health effects, including AMPS, abdominal pain, nausea, vomiting, diarrhea, a cough with wheezing,

headaches, weakness, and muscle/bone pain are not expected from N.F.'s exposure to JP-5 and its main constituents.

### 2. *Temporality*

133. The temporal pattern of many of N.F.'s complaints is inconsistent with causation from exposure from the November 20, 2021 spill. According to N.F.'s Plaintiff Fact Sheet, his "abdominal issues (pain, diarrhea, vomiting and bloating)" began in October 2021, while his nausea began in August 2021. His medical records also reveal that he presented to the ER with abdominal pain in October of 2021 and was diagnosed with constipation, which continued after the exposure. **Exhibit J**, Trial Exhibit DX-3226, N.F. Composite Med. Rec. at 81.

134. N.F. also reported on his Plaintiff Fact Sheet that his cough began in September 2021 while his wheezing began in October 2021, which are also inconsistent with causation from the November exposure.

### 3. *Differential Diagnosis*

135. Other factors in N.F.'s history may be responsible for N.F.'s AMPS, abdominal pain, nausea, vomiting, diarrhea, cough with wheezing, headaches, weakness, and muscle/bone pain and must be ruled out.

### a. *AMPS*

136. Dr. Bird states affirmatively that N.F. has a diagnosis of AMPS, (Bird, July 2023), but none of the medical records I reviewed for N.F. include an

affirmative diagnosis of AMPS. Dr. Bird later clarified that he derived this diagnosis from a conversation with N.F.'s father, (Bird, November 2023), but that is not a sufficient medical basis to conclude N.F. in fact has this condition. Dr. Bird does not offer any support for this diagnosis.

137. Notwithstanding this, I am unable to agree with Dr. Bird that if N.F. does have AMPS, that it could have been caused by JP-5 exposure because Dr. Bird failed to rule out more likely potential causes. AMPS is a term that encompasses the spectrum of manifestations of chronic pediatric musculoskeletal pain. The differential diagnosis for AMPS should include autoimmune disease such as lupus, (Yunus & Masi, 1985), juvenile idiopathic arthritis (Hoffart & Sherry, 2016; Hoffart & Wallace, 2014, Buskila & Ablin, 2012), juvenile ankylosing spondylitis (Buskila & Ablin, 2012), and chronic fatigue syndrome  and fibromyalgia (Yunus & Masi, 1985; Carter, Kronenberger, Edwards, Michalczyk, & Marshall, 1996, (Hoffart & Sherry, 2016; Hoffart & Wallace, 2014, Buskila & Ablin, 2012).

138. N.F.'s has been evaluated by a pediatric rheumatologist for his joint pain. This evaluation included review of blood and X-rays. The differential diagnosis considered by his treating providers has included juvenile idiopathic arthritis and "early arthritis vs. AMPS." **Exhibit J**, Trial Exhibit DX-3226 at 4. Despite this clearly stated in the medical record, Dr. Bird

notes "Noah has abnormal blood work that is concerning for juvenile rheumatoid arthritis, but the work-up has been negative so far." (Bird, July 2023). However Dr. Bird fails to cite any evidence that supports his claim that "the work-up has been negative so far." *Id.* Similarly, Dr. Bird's assertion that N.F.'s father indicated a diagnosis of AMPS is unsupported by the medical records. *See* Exhibit J, Trial Exhibit DX-3226 at 4. Dr. Bird does not discuss how he concluded that none of these other alternative causes are more likely than JP-5 exposure to be the cause of N.F.'s symptoms. Dr. Bird does not identify, and I am not aware of any, literature linking associating AMPS or pediatric autoimmune disease to exposure to jet fuels.

### b. *Abdominal Symptoms*

139.    Dr. Bird also failed to rule out alternate causes for N.F.'s abdominal pain, vomiting, and diarrhea. Dr. Bird failed to discuss alternate etiology in his analysis, including gastroparesis (Scorza, Williams, Phillips, & Shaw, 2007), functional (somatic) abdominal pain (Gomez-Suarez, 2016), functional constipation (Marin & Alpern, 2011), cyclic vomiting syndrome (Zeiter, 2017), ulcer, gastroesophageal reflux, or inflammatory bowel disease (Gomez-Suarez, 2016).

### c. Headaches

140.    I am unable to agree with Dr. Bird that N.F.'s headaches were caused by

JP-5 exposure because Dr. Bird failed to rule out more likely potential

causes. In his analysis, Dr. Bird did not rule out migraines, tension type

headache, and cluster headache (Kelly, Strelzik, Langdon, & DiSabella,

2018, Merison & Victorio, 2021, Ozge et al., 2011; Patel et al., 2022;

Rossi, 1989).

### d. Cough and Wheezing

141.    Dr. Bird also did not rule out more likely potential causes in his analysis of

N.F.'s cough with wheezing. A differential diagnosis of cough with

wheezing should include asthma, vocal cord dysfunction (Hseu et al.,

2016), or gastroesophageal reflux (Burton, Pransky, Katz, Kearns, & Seid,

1992; Gomez-Suarez, 2016).  While Dr. Bird makes a conclusory

statement that N.F.'s symptoms are inconsistent with these alternative

diagnoses, he does not offer any explanation underlying that conclusion,

which makes it impossible to assess the reliability of his conclusion.

142.    Overall, Dr. Bird does not apply reliable toxicology principles or

methodology in attributing N.F.'s AMPS, abdominal pain, nausea,

vomiting, diarrhea, a cough with wheezing, headaches, weakness, and

muscle/bone pain to the spill because he did not demonstrate that these

injuries have a specific causal connection with JP-5, he did not examine the dose or duration to decide if effects are probable or not, he did not analyze the temporal relationship of these claimed injuries to preexisting conditions, and he did not perform a differential diagnosis.

### 4. Dr. Bird's Future Treatment Recommendations

143. Dr. Bird makes a number of recommendations for N.F.'s "ongoing medical surveillance and evaluation," including that he see a rheumatologist "twice per year for 5 years, then 1 time per year thereafter." (Bird, October 2023). Dr. Bird also recommends that N.F. receive a gastroenterology evaluation every 5 years until the age of 65. *Id.* Dr. Bird further recommends that N.F. receive an annual neurology evaluation until the age of 65. *Id.* I do not agree that such treatment is necessary given there is no evidence that N.F.'s alleged injuries have any plausible toxicological etiology. Instead, N.F. should continue to obtain evidence based, appropriate pediatric care. The timing and frequency of the exams is not supported by any medical literature. Each exam should dictate the necessity of the next exam, and at what interval. Requiring exams, every 5 years, without considering the course of a condition, is not standard medical practice.

144. Additionally, Dr. Bird advises that Noah "will continue to need medications" and that he currently is taking "gabapentin, 300mg, 3 times per

day; rizatriptan, 5 mg, 1 time per week; dicyclomine, 20 mg, three times per day; and ondansetron, 4 mg every 8 hours as needed." (Bird, October 2023). As discussed, *supra* Paragraph 40, Dr. Bird avers that he is not offering an opinion as to Plaintiffs' medications, yet apparently does so for N.F., while not specifically identifying what medications N.F. will need, and whether these medications will change over time as he grows.

145.  As discussed, *supra* Paragraphs 42-45, Dr. Bird's generalized recommendations for annual medical evaluation are not consistent with any evidence-based published health care recommendations, such as the American Academy of Pediatrics' Bright Futures or the U.S. Preventive Health Task Force. While N.F. should continue to receive appropriate, evidence-based care, Dr. Bird offers no basis, and I can think of none, for why his recommended testing is warranted for N.F..

**K. K.F.**

146.  K.F. is a 10-year-old male who alleges that he was exposed to water contaminated with JP-5 following the November 20, 2021 spill from Red Hill when he was 8 years old. Dr. Bird opines that K.F. suffered acute "abdominal pain, nausea, vomiting, and diarrhea," as well as "cough, rash, and headaches." Dr. Bird has ascribed the following long-term adverse effects to K.F.'s alleged to JP-5: "abdominal pain, nausea, vomiting,

diarrhea[,]" as well as "cough with wheezing[,]" "headaches, weakness, as well as decreased hearing and vestibular abnormalities." (Bird, July 2023).

147.     In my analysis, I considered the four criteria noted above in Paragraph 14 in assessing whether there is a causal relationship between K.F.'s alleged exposure and the long-term health effects Dr. Bird attributes to exposure, specifically abdominal pain, nausea, vomiting, diarrhea, a cough with wheezing, headaches, weakness, decreased hearing, and vestibular abnormalities.

### 1. General Causation and Dose

148.     For general causation and dose, as outlined in Paragraph 15, although I qualitative indications of water contamination relied upon by Dr. Bird, such as reports of sheen and odor, I rely upon Dr. Prueitt's estimation of K.F.'s dose of JP-5. I adopt Dr. Prueitt's conclusions that, even with highly conservative exposure assumptions, long-term health effects, including abdominal pain, nausea, vomiting, diarrhea, a cough with wheezing, headaches, weakness, decreased hearing, and vestibular abnormalities are not expected from K.F.'s exposure to JP-5 and its main constituents.

### 2. Temporality

149.     K.F.'s development of abdominal pain, nausea, vomiting, diarrhea, a cough with wheezing, headaches, weakness, decreased hearing, and vestibular

abnormalities began after the exposure, which may indicate a temporal relationship. A temporal relationship, by itself, is not sufficient to determine causality. Additional information, including investigation into all potential causes, is necessary to determine causation.

### 3. Differential Diagnosis

#### a. Decreased Hearing and Vestibular Abnormalities

150. Although Dr. Bird opines that K.F. suffered decreased hearing as a result of the spill, (Bird, July 2023), but there is no evidence to support decreased hearing for K.F. He had an audiogram which was interpreted as within normal limits on 12/21/2022. **Exhibit K**, Trial Exhibit #3227, K.F. Composite Medical Record at 22.

151. Notwithstanding this, even if K.F. does have decreased hearing loss, Dr. Bird did not rule out other potential causes of hearing loss, such as blockage by cerumen (ear wax), tympanic effusion, traumatic eardrum perforation, hereditary hearing impairment and noise-induced hearing impairment. (Dimitrov & Gossman, 2023; Isaacson & Vora, 2003; Zahnert, 2011).

152. Nor did Dr. Bird discuss alternate etiologies for vestibular symptoms including benign paroxysmal vertigo of childhood, Meniere disease, migraine-related vestibular disorders (Duarte et al., 2020) and psychogenic

causes (Brandt, Strupp, & Dieterich, 2016; Duarte et al., 2020; Szirmai, 2010; Tian, Zhang, Xie, Ding, & Jiang, 2022).

    *b.  Abdominal Complaints*

153.   K.F. has undergone extensive evaluation for his abdominal pain, nausea, vomiting and diarrhea, including flexible esophagogastroduodenoscopy. These results found GERD with esophagitis and gastritis, and these findings were not attributed to the JP-5 exposure. **Exhibit K** at 39.

154.   In his analysis of K.F.'s abdominal pain, nausea, vomiting, and diarrhea, Dr. Bird did not rule out other more likely potential causes, such as Gastroparesis (Scorza, Williams, Phillips, & Shaw, 2007), abdominal migraine (McCollough & Sharieff, 2006), functional abdominal pain (Gomez-Suarez, 2016), functional constipation (Marin & Alpern, 2011), cyclic vomiting syndrome (Zeiter, 2017).

    *c.  Cough with Wheezing*

155.   I am unable to agree with Dr. Bird that K.F.'s cough with wheezing was caused by JP-5 exposure because Dr. Bird failed to rule out more likely potential causes. A differential diagnosis of cough with wheezing should include asthma, upper airway cough syndrome, and post nasal drip (Lands, 2017).

### d. Headaches

156. Dr. Bird also failed to rule out more likely potential causes in the case of
K.F.'s headaches. A differential diagnosis should include migraines,
pediatric, tension type headache, and cluster headache (Kelly, Strelzik,
Langdon, & DiSabella, 2018; Merison & Victorio, 2021; Ozge et al., 2011;
Patel et al., 2022; Rossi, 1989).

### e. Weakness

157. I am further unable to agree with Dr. Bird that K.F.'s weakness was caused
by JP-5 exposure because Dr. Bird failed to rule out more likely potential
causes. Dr. Bird did not discuss alternate etiologies in his report, such as
complicated migraine, vitamin B12 deficiency, or folate deficiency (Cohen
et al., 2020), Graves' disease, systemic lupus erythematosus (Tsao, 2014),
or rheumatoid arthritis (Chitnis, 2013).

158. Overall, Dr. Bird does not apply reliable toxicology principles or
methodology in attributing K.F.'s abdominal pain, nausea, vomiting,
diarrhea, a cough with wheezing, headaches, weakness, decreased hearing
and vestibular abnormalities to the spill because he did not demonstrate
that these injuries have a specific causal connection with JP-5, he did not
examine the dose or duration to decide if effects are probable or not, he did

not analyze the temporal relationship of these claimed injuries to

preexisting conditions, and he did not perform a differential diagnosis.

### 4. Dr. Bird's Future Treatment Recommendations

159. Dr. Bird makes a number of recommendations for K.F.'s "ongoing medical

surveillance and evaluation," including that K.F. "continue to see a

gastroenterologist at an interval of every 2 years for 10 years, then every 5

years to the age of 65." (Bird, October 2023). Dr. Bird also advises that

"continued medication use of omeprazole and carfate is expected" for K.F.

(Bird, October 2023). As discussed, *supra* Paragraph 40, Dr. Bird avers that

he is not offering an opinion as to Plaintiffs' medications, but then fails to

explain why he recommends life-long use of the medications indicated,

particularly given that the medications K.F. needs, given his age, will

necessarily evolve overtime as he grows.

160. Dr. Bird further recommends that K.F. "should have vestibular and/or

occupational therapy twice per week for 6 to 8 weeks – although the

frequency and duration of the therapy should be determined by his treating

clinician." *Id.* Moreover, he recommends that K.F. see a neurologist "every

year for 5 years, and then every 5 years thereafter until age 65" for his

headaches, muscle aches and weakness. *Id.*

161.   I do not agree that such treatment is necessary given there is no evidence that K.F.'s alleged injuries have any plausible toxicological etiology. Instead, K.F. should continue to obtain evidence based, appropriate pediatric care. The timing and frequency of the exams is not supported by any medical literature. Each exam should dictate the necessity of the next exam, and at what interval. Requiring exams, over the course of 5 years, without considering the course of a condition is not standard medical practice.

162.   As discussed, *supra* Paragraphs 42-45, Dr. Bird's generalized recommendations for annual medical evaluation are not consistent with any evidence-based published health care recommendations, such as the American Academy of Pediatrics' Bright Futures or the U.S. Preventive Health Task Force. While K.F. should continue to receive appropriate, evidence-based care, Dr. Bird offers no basis, and I can think of none, for why his recommended testing is warranted for K.F.

**L. D.F.**

163.   D.F. is a 7-year-old male who alleges that he was exposed to water contaminated with JP-5 following the November 20, 2021 spill from Red Hill when he was 5 years old. Dr. Bird opines that D.F. suffered acute "abdominal pain, vomiting, and diarrhea[,]" as well as "headaches and a regression of his development and a rash." (Bird, July 2023). Dr. Bird has

ascribed the following long-term adverse effects to D.F.'s alleged exposure to JP-5: "tremor, abdominal pain, vomiting, diarrhea, and headaches." *Id.*

164.   In my analysis, I considered the four criteria noted above in Paragraph 14 in assessing whether there is a causal relationship between D.F.'s alleged exposure and the long-term health effects Dr. Bird attributes to exposure, specifically tremor, abdominal pain, vomiting, diarrhea, and headaches.

### 1. General Causation and Dose

165.   For general causation and dose, as outlined in Paragraph 15, although I considered qualitative indications of water contamination relied upon by Dr. Bird, such as reports of sheen and odor, I rely upon Dr. Prueitt's estimation of D.F.'s dose of JP-5. I adopt her conclusions that, even with highly conservative exposure assumptions, long-term health effects, including tremor, abdominal pain, vomiting, diarrhea, and headaches are not expected from D.F.'s exposure to JP-5 and its main constituents.

### 2. Temporality

166.   D.F.'s development of tremor, abdominal pain, vomiting, diarrhea, and headaches began after the exposure, which may indicate a temporal relationship. A temporal relationship, by itself, is not sufficient to determine causality. Additional information, including investigation into all potential causes, is necessary to determine causation.

### 3. Differential Diagnosis

167.    There are other factors in his history may be responsible for D.F.'s tremor, abdominal pain, vomiting, diarrhea, and headaches, and they must be ruled out.

#### a. Tremor

168.    In his analysis, Dr. Bird failed to discuss any alternate etiologies of D.F.'s tremor. The differential diagnosis for tremor in D.F. is broad and includes physiologic tremor (Kocaman, Ardıçlı, & Yılmaz, 2022), as well as autoimmune diseases, hyperthyroidism, and vitamin E, D or B12 deficiency (Blackburn & Parnes, 2021). While Dr. Bird opines that D.F. has had a neurology evaluation that ruled out many differential diagnoses (Bird, November 2023), he does not cite to any clinical notes or test results that support his conclusion that any cause was ruled out. **Exhibit L**, Trial Exhibit DX-3228, D.F. Composite Med. Rec. While D.F. had normal EEG results (indicating no seizures), that result alone does not complete a differential diagnosis.

#### b. Abdominal Complaints

169.    The cause of D.F.'s abdominal pain, vomiting, diarrhea requires further investigation. In his analysis, Dr. Bird failed to discuss alternate etiologies, such as gastroesophageal reflux disease, functional abdominal pain (Gomez-Suarez, 2016), functional constipation (Marin & Alpern, 2011),

cyclic vomiting syndrome (Zeiter, 2017), and abdominal migraine (McCollough & Sharieff, 2006).

### c. Headaches

170.   I am unable to agree with Dr. Bird that D.F.'s headaches were caused by JP-5 exposure because Dr. Bird failed to rule out more likely potential causes. In his analysis, Dr. Bird failed to discuss alternate etiologies, including migraines, tension type headache, and cluster headache (Kelly, Strelzik, Langdon, & DiSabella, 2018, Merison & Victorio, 2021, Ozge et al., 2011; Patel et al., 2022; Rossi, 1989).

171.   Overall, Dr. Bird does not apply reliable toxicology principles or methodology in attributing D.F.'s abdominal pain, vomiting, diarrhea, rash and reportedly had a regression of his development to the spill because he did not demonstrate that these injuries have a specific causal connection with JP-5, he did not examine the dose or duration to decide if effects are probable or not, he did not analyze the temporal relationship of these claimed injuries to preexisting conditions, and he did not perform a differential diagnosis.

### 4. Dr. Bird's Future Treatment Recommendations

172.   As discussed, *supra* Paragraphs 42-45, Dr. Bird's generalized recommendations for annual medical evaluation are not consistent with any

evidence-based published health care recommendations, such as the American Academy of Pediatrics' Bright Futures or the U.S. Preventive Health Task Force. While D.F. should continue to receive appropriate, evidence-based care, Dr. Bird offers no basis, and I can think of none, for why his recommended testing is warranted for D.F.

## V.    <u>Risk of Latent Disease</u>

173.  Given the lack of exposure to a dose of JP-5 and its main constituents in drinking water sufficient to cause long-term adverse effects, the lack of any medical issues known to be associated with the exposure, and the other factors as likely or more likely to be responsible for the Minor Bellwether Plaintiffs' symptoms, there is no evidence to support that they will develop any future medical conditions as a result of the exposure as ascribed by Dr. Bird.

174.  I have found nothing in my review of Dr. Bird or in my review of the literature that would support Dr. Bird's reports that the Minor Bellwether Plaintiffs are at an increased risk for future medical conditions, given the information available about their medical histories and their exposures.

I declare, under penalty of perjury, that the foregoing is true and correct.


Dated: April 8, 2024

_____
TIMUR DURRANI

## References

ACOG Committee Opinion No. 651: Menstruation in Girls and Adolescents: Using the Menstrual Cycle as a Vital Sign. (2015). Obstetrics and Gynecology, 126(6), e143-e146. doi:10.1097/aog.0000000000001215

Arslan, A. B., Zamani, A. G., & Yıldırım, M. S. (2022). Novel findings, mini-review and dysmorphological characterization of 16p13.11 microduplication syndrome. International Journal of Developmental Neuroscience, 82(4), 289-294. doi:10.1002/jdn.10188

Atli, E. I., Yalcintepe, S., Atli, E., Demir, S., Mail, C., & Gurkan, H. (2022). Clinical Implications of Chromosome 16 Copy Number Variation. Molecular Syndromology, 13(3), 184-192. doi:10.1159/000517762

Bird, Steven, Exp. Rep. for Feindt v. United States 22-cv-397 (D. Haw.), July 24, 2203.

Bird, Steven, Suppl. Exp. Rep. for Feindt v. United States 22-cv-397 (D. Haw.), Oct. 23, 2023.

Bird, Steven, Suppl. and Rebuttal Exp. Rep. for Feindt v. United States 22-cv-397 (D. Haw.), Nov. 30, 2023.

Blackburn, J., & Parnes, M. (2021). Tics, tremors and other movement disorders in childhood. Current Problems in Pediatric and Adolescent Health Care, 51(3), 100983. doi:10.1016/j.cppeds.2021.100983

Brandt, T., Strupp, M., & Dieterich, M. (2016). Vestibular paroxysmia: a treatable neurovascular cross-compression syndrome. Journal of Neurology, 263 Suppl 1, S90-96. doi:10.1007/s00415-015-7973-3

Burton, D. M., Pransky, S. M., Katz, R. M., Kearns, D. B., & Seid, A. B. (1992). Pediatric airway manifestations of gastroesophageal reflux. Annals of Otology, Rhinology and Laryngology, 101(9), 742-749. doi:10.1177/000348949210100905

Buskila, D., & Ablin, J. (2012). Pediatric fibromyalgia. Reumatismo, 64(4), 230-237. doi:10.4081/reumatismo.2012.230

Carter, B. D., Kronenberger, W. G., Edwards, J. F., Michalczyk, L., & Marshall, G. S. (1996). Differential diagnosis of chronic fatigue in children: behavioral and emotional dimensions. Journal of Developmental and Behavioral Pediatrics, 17(1), 16-21. doi:10.1097/00004703-199602000-00003

Chan, K. H., Jensen, E. L., & Gao, D. (2018). Pediatric tinnitus: A clinical perspective. Laryngoscope, 128(3), 727-731. doi:10.1002/lary.26851

Chitnis, T. (2013). Pediatric demyelinating diseases. Continuum (Minneap Minn), 19(4 Multiple Sclerosis), 1023-1045. doi:10.1212/01.Con.0000433285.84973.43

Cohen, A., Owolabi, F. S., Dowdell-Smith, C. P., Laufman, J., Iacobas, I., Bass, L., & Foradori, D. (2020). Weakness, Anemia, and Neutropenia in a 9-Year-Old Girl With Influenza. Pediatrics, 145(4). doi:10.1542/peds.2019-2574

Comberiati P, Di Cicco ME, D'Elios S, Peroni DG. How Much Asthma Is Atopic in Children? Front Pediatr. 2017 May 26;5:122. doi: 10.3389/fped.2017.00122. PMID: 28603709; PMCID: PMC5445121. de Jongste, J. C., & Shields, M. D. (2003). Cough . 2: Chronic cough in children. Thorax, 58(11), 998-1003. doi:10.1136/thorax.58.11.998

Doyle, L. A., Sepehr, G. J., Hamilton, M. J., Akin, C., Castells, M. C., & Hornick, J. L. (2014). A clinicopathologic study of 24 cases of systemic mastocytosis involving the gastrointestinal tract and assessment of mucosal mast cell density in irritable bowel syndrome and asymptomatic patients. Am J Surg Pathol, 38(6), 832-843. doi:10.1097/pas.0000000000000190

Dimitrov, L., & Gossman, W. (2023). Pediatric Hearing Loss. In StatPearls. Treasure Island (FL): StatPearls Publishing

Duarte, J. A., Leão, E. M., Fragano, D. S., Marquez, G. J., Pires, A., Silva, M. L. S., & Ganança, F. F. (2020). Vestibular Syndromes in Childhood and Adolescence. Int Arch Otorhinolaryngol, 24(4), e477-e481. doi:10.1055/s-0039-3402443

Escribano, L., Akin, C., Castells, M., Orfao, A., & Metcalfe, D. D. (2002). Mastocytosis: current concepts in diagnosis and treatment. Annals of Hematology, 81(12), 677-690. doi:10.1007/s00277-002-0575-z

Ferrara, J., & Jankovic, J. (2009). Epidemiology and management of essential tremor in children. Paediatric Drugs, 11(5), 293-307. doi:10.2165/11316050-000000000-00000

Friedlander, S. F. (1998). Contact dermatitis. Pediatrics in Review, 19(5), 166-171. doi:10.1542/pir.19-5-166

García-García, E., López-González, M., Cabello-Laureano, R., & Navarro-González, E. (2017). Multinodular goiter in children: treatment controversies. Journal of Pediatric Endocrinology and Metabolism, 30(8), 847-850. doi:10.1515/jpem-2016-0368

Hseu, A., Sandler, M., Ericson, D., Ayele, N., Kawai, K., & Nuss, R. (2016). Paradoxical vocal fold motion in children presenting with exercise induced dyspnea. International Journal of Pediatric Otorhinolaryngology, 90, 165-169. doi:10.1016/j.ijporl.2016.09.007

Hoffart, C. M., & Sherry, D. D. (2016). Fibromyalgia--Toward a Definition in Children. Journal of Pediatrics, 169, 9-10. doi:10.1016/j.jpeds.2015.11.034

Isaacson, J. E., & Vora, N. M. (2003). Differential diagnosis and treatment of hearing loss. American Family Physician, 68(6), 1125-1132.

Kelly, M., Strelzik, J., Langdon, R., & DiSabella, M. (2018). Pediatric headache: overview. Current Opinion in Pediatrics, 30(6), 748-754. doi:10.1097/mop.0000000000000688

Kocaman, G. E., Ardıçlı, D., & Yılmaz, D. (2022). Clinical and laboratory features of children with tremor: a single-center experience. Acta Neurologica Belgica, 122(2), 479-484. doi:10.1007/s13760-021-01804-0

Lands, L. C. (2017). Dyspnea in Children: What is driving it and how to approach it. Paediatric Respiratory Reviews, 24, 29-31. doi:10.1016/j.prrv.2017.03.013

Lecerf, K., & Prince, B. T. (2022). Paediatric asthma – all that wheezes is not necessarily asthma - current diagnostic and management strategies. Curr Opin Pulm Med, 28(3), 258-265. doi:10.1097/mcp.0000000000000874

Mahboubi, H., Oliaei, S., Kiumehr, S., Dwabe, S., & Djalilian, H. R. (2013). The prevalence and characteristics of tinnitus in the youth population of the United States. Laryngoscope, 123(8), 2001-2008. doi:10.1002/lary.24015

Marin, J. R., & Alpern, E. R. (2011). Abdominal pain in children. Emergency Medicine Clinics of North America, 29(2), 401-428, ix-x. doi:10.1016/j.emc.2011.01.001

McCollough, M., & Sharieff, G. Q. (2006). Abdominal pain in children. Pediatric Clinics of North America, 53(1), 107-137, vi. doi:10.1016/j.pcl.2005.09.009

Merison, K., & Victorio, M. C. C. (2021). Approach to the Diagnosis of Pediatric Headache. Seminars in Pediatric Neurology, 40, 100920. doi:10.1016/j.spen.2021.100920

Ozge, A., Termine, C., Antonaci, F., Natriashvili, S., Guidetti, V., & Wöber-Bingöl, C. (2011). Overview of diagnosis and management of paediatric headache. Part I: diagnosis. Journal of Headache and Pain, 12(1), 13-23. doi:10.1007/s10194-011-0297-5

Patel, V. A., Liaw, J., Saadi, R. A., Isildak, H., Kalmar, C. L., & Polster, S. P. (2022). Headache Diagnosis in Children and Adolescents. Otolaryngologic Clinics of North America, 55(3), 633-647. doi:10.1016/j.otc.2022.02.007

Prueitt, Robyn, Exp. Rep. for Feindt v. United States 22-cv-397 (D. Haw.), Oct. 9, 2023.

Prueitt, Robyn, Exp. Rep. for Feindt v. United States 22-cv-397 (D. Haw.), Nov. 27, 2023.

Reference Guide on Toxicology excerpted from the Reference Manual on Scientific Evidence (Fed. Jud. Ctr. 3d ed. 2011)

Rossi, L. N. (1989). Headache in childhood. Child's Nervous System, 5(3), 129-134. doi:10.1007/bf00272112

Roy, S. R., & Milgrom, H. (2003). Management of the acute exacerbation of asthma. Journal of Asthma, 40(6), 593-604. doi:10.1081/jas-120018776

Schroeder, J. C., Frantz, T., Osten, A. W., & Cho, S. (2021). Visual Diagnosis: Rash and Fatigue in a 6-year-old Girl. Pediatrics in Review, 42(4), e13-e16. doi:10.1542/pir.2018-0218

Scorza, K., Williams, A., Phillips, J. D., & Shaw, J. (2007). Evaluation of nausea and vomiting. American Family Physician, 76(1), 76-84.

Szirmai, A. (2010). Vestibular disorders in childhood and adolescents. European Archives of Oto-Rhino-Laryngology, 267(11), 1801-1804. doi:10.1007/s00405-010-1283-2

Tian, R., Zhang, H., Xie, D., Ding, J., & Jiang, J. (2022). A Preliminary Study on the Characteristics and Standard Diagnosis and Treatment of Vestibular Dysfunction in Children. Ear, Nose, and Throat Journal, 1455613221139399. doi:10.1177/01455613221139399

Tsao, C. Y. (2014). Muscle disease. Pediatrics in Review, 35(2), 49-61; quiz 61. doi:10.1542/pir.35-2-49

Yunus, Y., Sefer, U., Dondu, U. U., Ismail, O., & Yusuf, E. (2016). Abdominal epilepsy as an unusual cause of abdominal pain: a case report. African Health Sciences, 16(3), 877-879. doi:10.4314/ahs.v16i3.32

Zahnert, T. (2011). The differential diagnosis of hearing loss. Dtsch Arztebl Int, 108(25), 433-443; quiz 444. doi:10.3238/arztebl.2011.0433

Zeiter, D. K. (2017). Abdominal Pain in Children: From the Eternal City to the Examination Room. Pediatric Clinics of North America, 64(3), 525-541. doi:10.1016/j.pcl.2017.01.012