LYLE S. HOSODA          3964-0
KOURTNEY H. WONG        10827-0
SPENCER J. LAU          11105-0
HOSODA LAW GROUP, AAL, ALC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawai'i 96813
Telephone: (808) 524-3700
Facsimile: (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com

KRISTINA S. BAEHR       *Pro Hac Vice*
JAMES BAEHR             *Pro Hac Vice*
MARY M. NEUSEL          *Pro Hac Vice*
JUST WELL LAW, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 994-6241
Email: kristina@well.law;
jim@well.law; maggie@well.law

FREDERICK C. BAKER      *Pro Hac Vice*
JAMES W. LEDLIE         *Pro Hac Vice*
KRISTEN HERMIZ          *Pro Hac Vice*
CYNTHIA A. SOLOMON      *Pro Hac Vice*
SARA 0. COUCH
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: fbaker@motleyrice.com; jledlie@motleyrice.com;
khermiz@motleyrice.com; csolomon@motleyrice.com; scouch@motleyrice.com

*Attorneys for the Plaintiffs*

*(case caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| PATRICK FEINDT, JR., et al. | Civil No. 1:22-cv-397-LEK-KJM (Federal Tort Claims Act) |
| Plaintiffs, | |
| vs. | **DECLARATION OF CYNTHIA L. FRICKE** |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

## DECLARATION OF
## CYNTHIA L. FRICKE, RN, BSN, CCM, CLCP, CNLCP

I, CYNTHIA L. FRICKE, declare as follows:

1.      I have personal knowledge of the facts set forth in this declaration unless otherwise specified.

2.      My name is Cynthia L. Fricke.  My qualifications and resume are attached hereto at **Tab A (PX-1588),** which is a true and correct copy of my curriculum vitae**.**

3.      I am the founder and owner of Island Legal Nurse Consulting, LLC, a case management and life care planning consulting business. I started my business in May 2000.  I am a licensed registered nurse in the State of Hawaiʻi with additional certifications in case management and life care planning. I have been a registered nurse for approximately 40 years and a critical care nurse for

approximately 30 years.  I have been a Nurse Case Manager for 20 years, and a

Certified Case Manager (CCM) and Certified Life Care Planner (CLCP) for twelve

(12) years.  I am also a Certified Nurse Life Care Planner (CNLCP).

4.      I graduated from the University of Rhode Island in 1983 with a

Bachelor of Science Degree in Nursing.  I also graduated from the Legal Nurse

Consulting Certificate Program at the University of San Diego in 1998, and the

Life Care Planning Certificate Program at Capital University Law School

(Columbus OH) in 2011.

5.      I currently work as an independent worker's compensation nurse case

manager, legal nurse consultant, and life care planner.  Presently, a majority of my

work is as a life care planner.

6.      As a nurse case manager and life care planner, I frequently meet with

physicians of many different specialties, consult with therapists, and consult with

other medical providers to develop treatment plans for injured clients. Each

treatment plan is individually formulated through the collaborative efforts of the

injured client, their family, and significant others, treating physicians, treating

medical providers, ancillary personnel, medical experts, accountants, economists,

and at times, their employers and insurance carriers.

7.      I have provided an expert report in over one hundred (100) state and

federal matters.

8.      I have provided arbitration, deposition testimony, and/or court testimony in approximately twenty (20) cases. One (1) of these matters is the present case before the United States District Court for the District of Hawaiʻi.

9.      I have been qualified to render an expert opinion in the area of life care planning in the Circuit Courts of the State of Hawaiʻi, the Superior Court for the Commonwealth of the Northern Mariana Islands, in arbitrations and mediations before Dispute Prevention & Resolution, Inc. of Hawaii, and I am scheduled to testify in this matter before the United States District Court for the District of Hawaiʻi.

10.     To the best of my knowledge, none of my expert opinions or testimony have been excluded.

11.     As a retained expert in this litigation, I was retained by Plaintiffs to prepare life care plans for Richelle Dietz, B.D., V.D., and Kevin Aubart (collectively, "Plaintiffs").  I completed Plaintiffs' life care plans in July 2023, December 2023, and April 2024.

## II.    DATA REVIEWED

12.     A life care plan is a comprehensive, dynamic document, that estimates costs associated with the reasonable and necessary present and future healthcare needs of individuals who have sustained injuries and/or have chronic healthcare issues. It is a roadmap for a patient's needs going forward throughout their lifetime

3

to try to make them whole after an injury and try to return them to the state that they were in the day before they were injured.

13.    A life care plan outlines an individual's future needs with a focus on maximizing their functioning in a least restrictive environment, and it attempts to reduce any secondary medical and psychological complications.

14.    A life care plan involves consultation with treating and consulting medical professionals including physicians, physical occupational, and speech therapists, psychologists, and any other care providers. Medical and rehabilitation records are reviewed, and the prevailing charge for each item included in the plan is researched using relevant health care databases, vendor quotes, and bill reviews.

15.    In preparing Plaintiffs' life care plans, I reviewed the medical records and fact sheets that counsel provided to me and the deposition transcripts of the patients for whom I prepared life care plans.

16.    I also interviewed Plaintiffs Richelle Dietz and Kevin Aubart telephonically.  We discussed their symptoms, medical history, and any long-term effects (i.e., residual symptoms) they may have been experiencing.  In my conversations with Mrs. Dietz, we also discussed the symptoms and medical history of her minor children, B.D. and V.D.

17.    I also conducted teleconferences with Melissa Vargo, M.A., PsyD., Steven Bird, M.D. (toxicologist), and Jason Keifer, M.D. (psychiatrist). Plaintiffs'

life care plans were developed from information contained in their medical records, patient interviews, and the recommendations I received from Dr. Vargo, Dr. Bird, Dr. Keifer, and Andrew Clark, M.D. (pediatric psychologist).  I also reviewed the expert reports of Dr. Clark, Dr. Keifer, and Dr. Bird.

18.    Medical care is priced using common procedural terminology ("CPT") codes and based on the geographic location of each patient.  To determine the prevailing charge for each item included in Plaintiffs' life care plans, I used the CPT codes from the following healthcare databases: (1) Medical Fees, 2024, (2) Context 4 Healthcare; and (3) Find-A-Code.  These three databases are sources commonly used in my field of work and regularly relied upon by life care planners. The data collected by these sources reflects millions of insurance claims nationwide.

19.    All the costs in Plaintiffs' life care plans were based on dollar figures as of April 6, 2024, without regard for inflation, cost of living, applicable taxes, or other economic considerations.

20.    Each cost item contained in Plaintiffs' life care plans was based on a specific recommendation from another consulting physician expert in this case.  In preparing life care plans, I generally rely upon specialists (rather than general practice physicians) because they typically have a better understanding of the injuries at issue and the treatment modalities required to treat those injuries.

21.    My life care plans also included calculations regarding life expectancy. In calculating Plaintiffs' life expectancy, I used nationally available statistics of life expectancy identified in "life tables" published by the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention ("CDC").  Attached hereto at **Tab B** (PX-1265) is a true and correct copy of the U.S. Department of Health and Human Services, *Centers for Disease Control and Prevention, National Vital Statistics Reports,* Volume 71, No 1,  dated August 8, 2022.

## III.    LIFE CARE PLANS

22.    The opinions contained in my life care plans are made within a reasonable degree of nursing and life care planning certainty.

23.    As identified above, the sources and resources used to identify the costs included in my life care plan are reasonable and consistent with the charges for items and services available to Plaintiffs in their respective geographic locations.

24.    On July 22, 2023, I conducted a teleconference with Dr. Keifer regarding his recommendations for future medical surveillance for all patients at risk of neurological harm from the Red Hill water exposure. Dr. Keifer recommended a complete neurological cognitive assessment for all patients who were on the water line in November 2021. Dr. Keifer recommended that Red Hill

6

patients establish ongoing care with a traumatic brain injury treatment specialist, that they receive comprehensive CREYOS cognitive assessments every 6-12 months, and that the initial and annual assessments include specific laboratory workups. Dr. Keifer indicated that neuropsychiatric monitoring, including twice-annual exams, should extend until patients are 65 years of age. Dr. Keifer's specific recommendations for surveillance are contained in the tables that accompany my 2023 life care plans.

### A.    **Richelle Dietz**

25.    At the time of my 2023 life care plans, Mrs. Dietz was a 36-year-old female.

26.    In the absence of an expert opinion, the life expectancy charts provided that Richelle Dietz's anticipated life expectancy was 82.1 years.[1]

27.    Ms. Dietz's 2023 life care plans identified her future medical treatment needs.

28.    In preparing Ms. Dietz's 2023 life care plans, I reviewed Ms. Dietz's medical records, interviewed Ms. Dietz telephonically on July 20, 2023, and incorporated the recommendations from Dr. Vargo, Dr. Bird, and Dr. Keifer,

---

[1] *Please see* Tab B at Table 3: Life Table for Females between the ages of 36 and 37 years of age, Page 19.

29.     Ms. Dietz informed me that following the Red Hill exposure, she developed nausea, vomiting, and diarrhea and panic attacks. Ms. Dietz reported that she is currently receiving treatment from a dermatologist for treatment of the eczema that has developed on her arms, abdomen, and left leg.

30.     Ms. Dietz reported experiencing visual disturbances on July 17, 2023 for which she was evaluated by her primary care provider, and a brain MRI and neurology and ophthalmology consultations were scheduled.

31.     Ms. Dietz also informed me in 2023 that she had not begun therapy for her anxiety related to the Red Hill exposure, and that she was on a waiting list for treatment.

32.     On September 20, 2022, Ms. Dietz was evaluated by Rebecca Pell, NP at Manakai O Malama for symptoms related to jet fuel exposure from the Red Hill spill. Ms. Dietz reported persistent symptoms of diarrhea, skin issues, and dizziness. She was diagnosed with toxic effects of benzene, chronic fatigue, chronic GERD, dizziness, vitamin D deficiency, abnormal iron saturation, elevated ANA levels, and eczema. Serum laboratory studies for heavy metals were ordered.

33.     During her October 20, 2022 follow-up with Rebecca Pell, NP at Manakai O Malama, Ms. Dietz reported that she experienced more gastrointestinal symptoms when she was drinking the water before she knew that it contained jet fuel, and that the water felt as if it was burning her esophagus and stomach. She

8

reported headaches that started in May, and were constant, which she attributed to allergies. Ms. Dietz noted that since the time she stopped drinking the water, her headaches and the burning in her esophagus improved, but she had residual digestive issues.

34.     On November 15, 2022, Ms. Dietz informed Rebecca Pell, NP that she was feeling better. She stopped taking Omeprazole, she was eating bland foods, and taking Tums as needed. Ms. Dietz was started on HCL/pepsin supplementation.

35.     On December 13, 2022, Ms. Dietz reported left ankle swelling and noted that she sustained multiple ankle injuries, and that she continues to roll her ankle at times. Rebecca Pell, NP informed Ms. Dietz that her laboratory studies revealed high levels of 2-Hydroxysobutyric Acid, N-acetylphenyl cysteine, Bisphenol A, 2-Hydroxyethyl Mercapturic Acid, Diethylphosphate, and moderate levels of mono phthalate (MEHHP). NP Pell advised Ms. Dietz to initiate a Detox supplement protocol in light of the toxic overload results in her laboratory studies. NP Pell diagnosed Ms. Dietz with chronic left ankle pain and unintentional toxic effects of benzene.

36.     On April 28, 2023, Eesha Bhattacharyya, MD performed a laparoscopic supracervical hysterectomy surgery on Ms. Dietz because of her dysmenorrhea, pelvic pain, and abnormal bleeding.

37.    On June 28, 2023, I conducted a teleconference with Dr. Vargo who

informed me that she diagnosed Ms. Dietz with a general anxiety disorder. Dr.

Vargo's future treatment recommendations include once weekly psychotherapy for

1 year. Dr Vargo also indicated that an additional two psychological assessments

and 22 psychotherapy sessions should also be available to Ms. Dietz for treatment

of any medical condition for periods of stress related to her Red Hill water

exposure.

38.    In 2023, Dr. Bird provided the following additional recommendations

for inclusion in Ms. Dietz's life care plan:

-    Neurology follow up annually to age 65; and
-    Dermatology follow up annually for 3 years, then every 5 years
     to age 65.

39.    Based upon the recommendations of other physician experts in this

case, my 2023 life care plans for Ms. Dietz identified the specific projected cost of:

-    Therapeutic evaluations;
-    Therapeutic modalities;
-    Routine future medical and surgical care;
-    Diagnostic testing/laboratory studies; and
-    Additional testing based upon individual patient symptoms

40.    In preparing Ms. Dietz's 2023 life care plans, I did not identify any

need for: (1) future surgical intervention or treatment; (2) medications; (3)

orthotics/prosthetics; (4) durable medical equipment and supplies; (5)

wheelchair/mobility needs; (6) assistive technology/aids for independent function;

(7) home care/facility care; (8) architectural renovations; (9) home furnishings and accessories; (10) transportation; (11) health and strength maintenance; and (12) vocational/educational needs.

41.    In April 2024, I prepared a supplemental life care plan table for Ms. Dietz that supplants the 2023 life care plan tables prepared for her based on a further review of additional medical records, an interview with Ms. Dietz, and a teleconference with Dr. Bird.

42.    Attached hereto at **Tab C** is a true and correct copy of Ms. Dietz's April 2024 life care plan which supplants the 2023 life care plans.

**B**.    **B.D.**

43.    At the time of my 2023 life care plans, B.D. was a 13-year-old male.

44.    In the absence of an expert opinion, the life expectancy charts provided that B.D's anticipated life expectancy was 75.4 years.[2]

45.    B.D.'s 2023 life care plans identified his future medical treatment needs.

46.    In preparing B.D.'s 2023 life care plans, I reviewed B.D.'s medical records, interviewed his mother, Richelle, telephonically on July 20, 2023, and incorporated the recommendations from Dr. Clark, Dr. Bird, and Dr. Keifer.

---

[2] *Please see* Tab B at Table 3: Life Table for Males between the ages of 12 and 13 years of age, Page 17.

47.     Ms. Dietz informed me that when B.D. was exposed to the contaminated Red Hill water, he experienced nausea, vomiting, diarrhea, and a rash on his back and stomach. She informed me that his headaches worsened and he developed balance issues after his arrival in Hawaii and underwent surgery for treatment of his Chiari I malformation with Dr. Grant in March 2022.

48.     Ms. Dietz informed me that B.D. experienced more severe headaches 1-2 times monthly which required treatment with Acetaminophen or Ibuprofen. When B.D.'s headaches were more severe, Ms. Dietz informed me that he may miss or depart school early so that he can lie down with an ice pack on his head until they resolve.

49.     Ms. Dietz noted that B.D. is experiencing anxiety from his Red Hill exposure and he currently attends therapy with Xplor Counseling.

50.     In addition to daily vitamin supplements, B.D. also takes Flonase and Loratadine for allergies. B.D. has begun the process of receiving immunotherapy for the allergies and has an EpiPen available should he require urgent treatment.

51.     On December 6, 2021, Vinson Diep, MD[3] noted that B.D. was exposed to the toxic effect of petroleum products when his home water was affected by the Navy Red Hill drinking water incident in 2021.

---

[3] Based upon information and belief, Dr. Diep is a board-certified pediatrician at the Kapiʻolani Medical Center for Women & Children in Honolulu, Hawaiʻi.

52.    On January 6, 2022, Nicole Hodgeboom, APRN[4] noted that B.D. was experiencing headaches and coordination problems.

53.    On March 16, 2022, Gerald Grant, MD[5] performed a Chiari decompression via suboccipital craniectomy and Cl laminectomy with duraplasty on B.D.

54.    B.D. experienced decreased strength, difficulty with fine and gross motor skills, and bilateral coordination. B.D. was diagnosed with dyspraxia and dysgraphia for which he received occupational therapy treatment.

55.    In his July 17, 2023 report, Dr. Clark confirmed that B.D. required 48 individual psychotherapy sessions for treatment of his anxiety and for general support.

56.    In July 2023, I discussed B.D.'s medical status and his frequent headaches with Dr. Bird who confirmed that as a result of his Red Hill exposure, B.D.'s life care plan should include annual neurology evaluations until he reaches age 65.  In December 2023, Dr. Bird withdrew his recommendation for annual neurology evaluations for B.D. until he reaches age 65.

---

[4] Based upon information and belief, Ms. Hodgeboom is a Pediatric Nurse Practitioner specializing in Pediatric Neurology at the Kapiolani Medical Center for Women & Children.

[5] Based upon information and belief, Dr. Grant is a neurosurgery specialist.

57.     Based upon the recommendations of other physician experts in this case, my 2023 life care plans for B.D. identified the specific projected cost of:

- Therapeutic evaluations;
- Therapeutic modalities;
- Routine future medical and surgical care;
- Diagnostic testing/laboratory studies; and
- Additional testing based on individual patient symptoms

58.     In preparing B.D.'s 2023 life care plans, I did not identify any need for: (1) future surgical intervention or treatment; (2) medications; (3) orthotics/prosthetics; (4) durable medical equipment and supplies; (5) wheelchair/mobility needs; (6) assistive technology/aids for independent function; (7) home care/facility care; (8) architectural renovations; (9) home furnishings and accessories; (10) transportation; (11) health and strength maintenance; and (12) vocational/ educational needs.

59.     In April 2024, I prepared a supplemental life care plan table for B.D. that supplants the 2023 life care plan tables prepared for him based on a further review of additional medical records, an interview with Ms. Dietz, and a teleconference with Dr. Bird.

60.     Attached hereto at **Tab D** is a true and correct copy of B.D.'s April 2024 life care plan which supplants the 2023 life care plans.

**C.     <u>V.D.</u>**

61.     At the time of my 2023 life care plans, V.D. was a 5-year-old female.

62.    In the absence of an expert opinion, the life expectancy charts provided that V.D.'s anticipated life expectancy was 80.6 years.[6]

63.    V.D.'s 2023 life care plans identified her future medical treatment needs.

64.    In preparing V.D.'s 2023 life care plans, I reviewed V.D.'s medical records, interviewed her mother Richelle telephonically on July 20, 2023, and incorporated the recommendations from Dr. Clark, Dr. Bird, and Dr. Keifer.

65.    Ms. Dietz informed me that when V.D. was exposed to the contaminated Red Hill water, she experienced abdominal upset, vomiting, diarrhea, and a rash to her stomach and back. After V.D. stopped all use of the Red Hill water, these symptoms resolved. In additional to vitamin supplements, V.D. was receiving Flovent inhalations twice daily. V.D. also used nebulized Albuterol as needed for coughing and wheezing.

66.    On December 6, 2021, Dr. Diep noted that V.D. was exposed to the toxic effect of petroleum products when her home water was affected by the Navy Red Hill drinking water incident in 2021.

67.    Following her exposure, V.D. was diagnosed with dermatitis/possible molluscum contagiosum, tonsillar hypertrophy, wheezing associated respiratory

---

[6] *Please see* Tab B at Table 3: Life Table for Females between the ages of 5 and 6 years of age, Page 19.

infection (WARI), adenotonsillar hypertrophy, observed sleep apnea, chronic

cough, and prolonged upper respiratory infections.

68.     On June 13, 2023, Patrick O'Donnell, MD performed a tonsillectomy,

adenoidectomy, and bilateral myringotomy tube placement surgery on V.D.

69.     In his July 17, 2023 report, Dr. Clark confirmed that V.D. did not

require any psychotherapy at that time.

70.     In 2023, I discussed V.D.'s recent asthma diagnosis and her

prescribed medications with Dr. Bird.  In July 2023, Dr. Bird confirmed that

V.D.'s life care plan should include an annual pulmonology evaluation, pulmonary

function studies, an annual chest x-ray, and continued use of her Flovent inhaler

and nebulized Albuterol until she reaches age 65.  In December 2023, Dr. Bird

withdrew his recommendations for pulmonary function studies and an annual chest

x-ray.

71.     Based upon the recommendations of other physician experts in this

case, my 2023 life care plans for V.D. identified the specific projected cost of:

- Therapeutic evaluations;
- Routine future medical and surgical care;
- Diagnostic testing/laboratory studies;
- Medications; and
- Additional testing based on individual patient symptoms.

72.     In preparing V.D.'s 2023 life care plan, I did not identify any need for:

(1) therapeutic modalities; (2) future surgical intervention or treatment; (3)

16

orthotics/prosthetics; (4) durable medical equipment and supplies; (5) wheelchair/mobility needs; (6) assistive technology/aids for independent function; (7) home care/facility care; (8) architectural renovations; (9) home furnishings and accessories; (10) transportation; (11) health and strength maintenance; and (12) vocational/educational needs.

73.    In April 2024, I prepared a supplemental life care plan table for V.D. that supplants the 2023 life care plan tables prepared for her based on a further review of additional medical records, an interview with Ms. Dietz, and a teleconference with Dr. Bird.

74.    Attached hereto at **Tab E** is a true and correct copy of V.D.'s April 2024 life care plan which supplants the 2023 life care plans.

### D.    Kevin Aubart

75.    In 2023, Mr. Aubart was a 58-year-old male.

76.    In the absence of an expert opinion, the life expectancy charts provided that Mr. Aubart's anticipated life expectancy was 80.7 years.[7]

77.    Mr. Aubart's 2023 life care plans identified his future medical treatment needs.

---

[7] *Please see* Tab B at Table 2: Life Table for Males between the ages of 57 and 58 years of age, Page 17.

78.     In preparing Mr. Aubart's 2023 life care plans, I reviewed Mr.

Aubart's medical records, interviewed Mr. Aubart telephonically on July 19, 2023,

and incorporated the recommendations from Dr. Vargo, Dr. Bird, and Dr. Keifer.

79.     Mr. Aubart informed me that on June 30, 2023, he and his wife moved

out of the military housing he was living in during the time of the Red Hill

incident.

80.     Mr. Aubart stated that following exposure to the Red Hill water, he

experienced nausea, fatigue, headaches, rashes, muscle and joint pain, and xiphoid

process pain.

81.     In 2023, Mr. Aubart noted that his symptoms had resolved with the

exception of persistent headaches that occurred several times per week, xiphoid

process pain, and anxiety. In 2023, Mr. Aubart took one Ibuprofen tablet

approximately 3 times weekly when his headaches were more severe. Mr. Aubart

discussed his concern regarding the Red Hill water exposure and expressed his

desire to undergo petroleum byproduct testing.

82.     In 2023, Mr. Aubart noted that he was anxious regarding his future

health status in light of this exposure, and informed me that he was attending

psychotherapy sessions with Dr. Vargo.

83.     On September 26, 2022, Mr. Aubart sought treatment from his

primary care physician, Hisami Oba, M.D. Mr. Aubart reported concern about the

18

fuel that was detected in his water in November 2021. Mr. Aubart noted that he smelled the fuel in his sink and toilet water and that he continued to live in the same home during this timeframe. Mr. Aubart reported improvement in his symptoms of nausea, fatigue, headaches, shoulder pain, and minor rash. Dr. Oba reassured Mr. Aubart that it was likely that he was not currently experiencing effects of petroleum poisoning, but acknowledged that his prior symptoms of nausea and fatigue may be related to petroleum toxicity.

84.     Dr. Oba noted that integrated behavioral health referred Mr. Aubart to psychotherapy for treatment of his depression and anxiety.

85.     On June 28, 2023, I conducted a teleconference with Dr. Vargo who informed me that she diagnosed Mr. Aubart with post-traumatic stress disorder (PTSD).

86.     Dr. Vargo's future treatment recommendations included twice weekly exposure therapy for 6 months, and then weekly sessions for 6 months. An additional two psychological assessments and 22 psychotherapy sessions should also be available to Mr. Aubart for treatment of any medical condition for periods of stress related to Mr. Aubart' s Red Hill water exposure.

87.     In July 2023, I discussed the residual headaches Mr. Aubart reported during my telephone interview with Dr. Bird, and he related that the headaches may be related to fuel water exposure and could be migraine or migraine-like

headaches. Dr. Bird advised that Mr. Aubart should undergo a neurology

evaluation annually for 3 years, then every 5 years until he reaches age 65.

88.    In his October 23, 2023 supplemental report, Dr. Bird made additional

recommendations for Mr. Aubart which include one brain MRI.

89.    Based upon the recommendations of other physician experts in this

case, my 2023 life care plans for Mr. Aubart identified the specific projected cost

of:

- Therapeutic evaluations;
- Therapeutic modalities;
- Routine future medical and surgical care;
- Diagnostic testing/laboratory studies; and
- Additional testing based on individual patient symptoms

90.    In preparing Mr. Aubart's 2023 life care plans, I did not identify any

need for: (1) future surgical intervention or treatment; (2) medications; (3)

orthotics/prosthetics; (4) durable medical equipment and supplies; (5)

wheelchair/mobility needs; (6) assistive technology/aids for independent function;

(7) home care/facility care; (8) architectural renovations; (9) home furnishings and

accessories; (10) transportation; (11) health and strength maintenance; and (12)

vocational/educational needs.

91.    In April 2024, I prepared a supplemental life care plan table for Mr.

Aubart that supplants the 2023 life care plan tables prepared for him based on a

further review of additional medical records, an interview with Mr. Aubart, and a

teleconference with Dr. Bird

     92.    Attached hereto at **Tab F** is a true and correct copy of Mr. Aubart's

April 2024 life care plan which supplants the 2023 life care plans.

     I declare under penalty of perjury that the foregoing is true and correct

and that this declaration was executed on _____*April 8,*_____, 2024 in Kailua,

Hawai'i.

                              *Cynthia L. Fricke*

                         CYNTHIA L. FRICKE

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed and served on counsel of record via the U.S. District Court's CM/ECF electronic filing system.

*/s/ Kristina Baehr*
Kristina Baehr