UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., et al., | CIV. NO. 22-00397 LEK-KJM |
| Plaintiffs, | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO EXCLUDE THE EXPERT REPORT AND
<u>TESTIMONY OF DR. STEVEN BIRD, [FILED 1/16/24 (DKT. NO. 234)]</u>**

Defendant United States of America ("Defendant" or

"United States") files the instant motion seeking to exclude the

expert report and opinion testimony of Steven Bird, M.D. ("Dr.

Bird"), an expert witness designated by Plaintiffs, because it

contends that Dr. Bird's opinions regarding general and specific

causation for Plaintiffs' injuries, and Plaintiffs' need for

future medical monitoring are not the result of reliable and

accepted methods, and that Dr. Bird's report fails to contain a

complete statement of his opinions as required by Federal Rule

of Civil Procedure 26(a)(2)(B). <u>See</u> Def.'s Motion to Exclude the

Expert Report and Testimony of Dr. Steven Bird, filed 1/16/24

(dkt. no. 234) ("Motion"). Plaintiffs filled their Opposition to

the Motion to Exclude ("Mem. in Opp.") on February 5, 2024, and

Defendant filed its reply on February 12, 2024. [Dkt. nos. 264, 270.] These matters came for a hearing on February 22, 2024.

On February 26, 2024, the Court issued an entering order informing the parties of its summary ruling granting in part and denying in part Defendant's Motion to Exclude the Expert Report and Testimony of Dr. Steven Bird, among other things. [Dkt. no. 282.] This Order supersedes that entering order. The Motion is granted in part and denied in part as set forth more fully below. In short, the Motion is granted as to Dr. Bird's opinions regarding causation of long-term adverse effects from JP-5 exposure, future care needs and medical surveillance, Plaintiffs' reasonable fear of significant long-term effects from JP-5 exposure, and insofar as Dr. Bird's opinions regarding specific causation of short-term injuries from JP-5 exposure are based exclusively on animal studies. The Motion is denied in all other respects.

## BACKGROUND

The parties are familiar with the facts of this case and the Court will not repeat them here, except as relevant to the issues at hand. Briefly, this case arises out of the May 6 and November 20, 2021 fuel leaks from the United States Navy's ("the Navy") Red Hill Bulk Fuel Storage Facility on Joint Base Pearl Harbor-Hickam ("Red Hill" and "JBPHH"). [Fifth Amended Complaint, filed 12/1/23 (dkt. no. 210), at pgs. iii, 1; ¶¶ 4,

9.] Plaintiffs allege that Defendant owns and operates Red Hill
and the water system that serves JBPHH, as well as the housing
that Plaintiffs lease and reside upon. [Id. at ¶¶ 6, 9, 530.]
Defendant was allegedly negligent in releasing fuel into the
water supply, among other things. [Id. at ¶¶ 4, 467, 481.]
Plaintiffs allege that they suffered health issues, economic
harm and fear as a result of the spills and their aftermath.
Plaintiffs allege they are at increased risk of future medical
conditions due to their exposure to contaminated water, and
require medical monitoring. [Id. at ¶¶ 82-86.] Plaintiffs seek
damages for past and future: pain and suffering, emotional
distress, medical expenses, loss of income and earning capacity,
physical impairment, loss of enjoyment and quality of life; as
well as increased risk of future harm and medical monitoring for
life, and loss of life expectancy, among other things. [Id. at
pgs. 190-91.]

        Dr. Bird submitted an expert report, which stated his
opinions as well as his educational background and professional
experience in the field of medical toxicology. [Defendant's
Notice of Filing Exhibits A and B, in Support of Its Local
Rule 56.1 Concise Statement of Facts [ECF Nos. 205-1, 205-2],
filed 2/12/24 (dkt. no. 272) ("Refiled Summary Judgment
Exhibits"), Exh. A (report by Dr. Bird, dated 7/24/23) ("Bird
Report"); see also Motion, Decl. of Caroline W. Stanton

3

("Stanton Decl.") at ¶ 2 (noting the Bird Report is cited as
Exhibit A in support of the Motion). Dr. Bird summarized his
opinions:

> 1.   Based on data detailed below, individuals on
>      the water line, including the Plaintiffs'
>      [sic], were exposed to water contaminated
>      with [jet propulsion 5 jet fuel ("JP-5")]
>      via three routes: dermal, inhalation, and
>      ingestion.
>
> 2.   The dose and duration of JP-5 were
>      sufficient to cause acute and long-term
>      injuries.
>
> 3.   Studies support that acute symptoms of JP-5
>      exposure would include skin irritation and
>      rash; abdominal pain; vomiting; diarrhea;
>      headache; brain "fogginess"; irregular
>      menstrual cycles; fatigue; anxiety; and
>      other protean neurological symptoms. These
>      symptoms are consistent with what the CDC
>      and government provides sic are expected
>      symptoms from such exposure. Most of the
>      Plaintiff experienced many of these symptoms
>      soon after the water became contaminated.
>
> 4.   Studies support that exposure to jet fuel
>      can result in long term health effects to
>      various organ systems, including the
>      neurologic, gastrointestinal, hematologic,
>      dermal, immune, renal, hepatic, endocrine,
>      psychiatric, and reproductive/developmental
>      systems.
>
> 5.   Many of the Plaintiffs are or have
>      experienced long term effects from the JP-5
>      exposure, including abdominal pain;
>      headaches; tremors; fatigue; rashes;
>      abnormal menstrual cycles; anxiety; and
>      fear.

6.    Studies suggest that exposure to jet fuel may result in latent effects, especially for individuals exposed *in utero* or as children, including behavioral, psychiatric, renal, pulmonary, dermal, immunologic, as well as cancer.

7.    Individuals on the water line, including Plaintiffs, have a reasonable fear of significant long term effects from their exposure to jet fuel-contaminated water.

8.    There is a need for medical surveillance of exposed individuals, including year [sic] medical evaluations and testing. If abnormalities in the physical exam, blood testing, or new complaints develop, then other more advanced testing would be indicated.

[Bird Report at 5-6.]

## STANDARD

Federal Rule of Evidence 702 provides that expert opinion evidence is admissible if: (1) the witness is sufficiently "qualified as an expert by knowledge, skill, experience, training, or education"; (2) the witness's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) the witness's "testimony is based on sufficient facts or data"; (4) the witness's "testimony is the product of reliable principles and methods"; and (5) the witness has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702. Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ("Daubert I"), a

trial judge is required to apply a gatekeeping role to expert
witness testimony. White v. Ford Motor Co., 312 F.3d 998, 1007
(9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d
833 (9th Cir. 2003). The Rule 702 inquiry under Daubert I,
however, "'is a flexible one,' and the 'factors identified in
Daubert may or may not be pertinent in assessing reliability,
depending on the nature of the issue, the expert's particular
expertise, and the subject of his testimony."[1] Id. (quoting Kumho
Tire Co. v. Carmichael, 526 U.S. 137, 150, 119 S. Ct. 1167
(1999)).

     To fulfil its substantive gatekeeping obligations,
courts must determine if the proffered testimony is reliable,
and if it fulfills the "fit" requirement, meaning that the
expert's testimony "logically advances a material aspect of the
proposing party's case." Daubert v. Merrell Dow Pharms., Inc.,
43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II").

     To determine reliability,

> [s]cientific evidence is reliable "if the
> principles and methodology used by an expert are
> grounded in the methods of science." Clausen v.
> M/V New Carissa, 339 F.3d 1049, 1056 (9th Cir.
> 2003). The court's focus "must be solely on
> principles and methodology, not on the
> conclusions that they generate." Daubert v.
> Merrell Dow Pharms., Inc., 509 U.S. 579, 595

---

[1] The factors identified in Daubert I are: methodology,
testing, peer review and publication, rates of error and control
standards, and "general acceptance" in the "relevant scientific
community." 509 U.S. at 593-94.

(1993). Courts must determine whether the
reasoning or methodology underlying testimony is
scientifically valid and whether that reasoning
or methodology can be applied to the facts in
issue. Id. at 592-93. Among the factors
considered in determining whether to admit expert
testimony under Rule 702 are: (1) whether the
expert's theory or method is generally accepted
in the scientific community; (2) whether the
expert's methodology can be or has been tested;
(3) the known or potential error rate of the
technique; and (4) whether the method has been
subjected to peer review and publication. Id. at
593-94.

Zucchella v. Olympusat, Inc., CV 19-7335 DSF (PLAx), 2023 WL

2628107, at *1 (C.D. Cal. Jan. 10, 2023). A trial court has

"broad latitude" in determining whether an expert's testimony is

reliable as well as deciding how to determine the reliability of

that testimony. Hangarter v. Provident Life & Acc. Ins. Co., 373

F.3d 998, 1017 (9th Cir. 2004) (citations omitted).

For evidence to be relevant, it must meet the "fit"

requirement. However,

the "fit" requirement is not merely a reiteration
of the relevancy standards in Federal Rules of
Evidence 401-403. Because "[e]xpert evidence can
be both powerful and quite misleading [given] the
difficulty in evaluating it," "the judge in
weighing possible prejudice against probative
force under Rule 403 of the [Federal Rules of
Evidence] exercises more control over experts
than over lay witnesses." Id. at 595, 113 S. Ct.
2786 (citation omitted). Courts must therefore
exclude proffered expert testimony pursuant to
Rules 702 and 403 unless they are convinced that
the testimony speaks clearly and directly to a
disputed issue and that it will not mislead the
jury. Daubert II, 43 F.3d at 1321 n.17
(discussing scientific expert evidence,

        specifically). And to be admissible, "the subject
        matter [of the testimony] at issue must be beyond
        the common knowledge of the average layman."
        United States v. Finley, 301 F.3d 1000, 1007 (9th
        Cir. 2002); United States v. Hanna, 293 F.3d
        1080, 1086 (9th Cir. 2002).

United States v. Alo-Kaonohi, 635 F. Supp. 3d 1074, 1079-80 (D.

Hawai`i 2022) (some alterations in Alo-Kaonohi) (emphases added)

(some citations omitted). "Expert opinion testimony is relevant

if the knowledge underlying it has a valid connection to the

pertinent inquiry." Primiano v. Cook, 598 F.3d 558, 565 (9th

Cir. 2010) (quoting United States v. Sandoval-Mendoza, 472 F.3d

645, 654 (9th Cir. 2006)).

      District courts have wide discretion when acting as a

gatekeeper for the admissibility of expert testimony. Kumho

Tire, 526 U.S. at 151-52. Further, the Daubert gatekeeping

function of courts is intended to protect juries, making the

inquiry less relevant and the barriers less stringent in a bench

trial. See United States v. Flores, 901 F.3d 1150, 1165 (9th

Cir. 2018).

## DISCUSSION

      Plaintiffs offer Dr. Bird as an expert qualified to

testify in the areas of medical toxicology and clinical

emergency medicine. Defendant does not dispute that Plaintiffs

have shown that Dr. Bird is generally qualified to render expert

opinions in these fields. Dr. Bird was asked "to provide an

opinion as to the acute and chronic effects of each of the [Plaintiffs'] exposure to JP-5." [Mem. in Opp. at 1-2 (citing Exh. 2 (Deposition of Dr. Bird taken on 11/14/23) ("Bird Depo.") at 48-49).] Plaintiffs submit that Dr. Bird applied "reliable and widely accepted methodology, and based on his knowledge, skill, experience, and training in the field of medical toxicology and emergency medicine, he concluded that each Plaintiff received a sufficient exposure to JP-5 to cause the short-and long-term harms identified in his reports." [Id. at 2 (citations omitted).]

Defendant argues that Dr. Bird's opinions must be excluded because he did not employ reliable principles and methods, and failed to explain his conclusions and the underlying reasons for these conclusions. [Motion, Mem. in Supp. at 7.] Specifically, Defendant challenges Dr. Bird's opinions on general and specific causation; medical monitoring; and failure to comply with Rule 26 requirements. Defendant contends that Dr. Bird's general causation analysis is flawed because, in applying the Bradford Hill criteria, he failed to explain how his conclusions were drawn for each of the criterion, and how the criteria was weighed relative to one another. [Id. at 10-12.] Defendant argues, as to his specific causation opinion, that Dr. Bird was required to examine whether the particular toxic exposure caused a specific injury to a particular plaintiff but

Dr. Bird admitted that he failed to analyze the dose of or duration of exposure to JP-5 for each plaintiff. [Id. at 14-17.] Further, Defendant contends that Dr. Bird failed to evaluate potential causes of each plaintiff's injuries other than exposure to JP-5 and to eliminate these alternatives by performing a differential diagnosis. [Id. at 18-20.] As to Dr. Bird's opinion that Plaintiffs will require yearly medical monitoring examination for the detection and treatment of disease, Defendant submits that he has failed to identify specific illnesses that the testing might detect, the increased risk of these illnesses, and how the testing would enable the early treatment of these illnesses. [Id. at 21-22.] Because other expert witnesses relied on Dr. Bird's opinions regarding causation and medical monitoring, Defendant asks to exclude these experts' opinions as well. [Id. at 25.]

Lastly, Defendant seeks to strike Dr. Bird's reports for failing to comply with Rule 26, Federal Rules of Civil Procedure because he has not provided an explanation of the basis for his conclusions regarding causation and medical monitoring. [Id. at 23.]

Dr. Bird's opinions are scientific opinions and thus "the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance . . . ." Primiano,

598 F.3d at 564 (footnote omitted). This "inquiry is a flexible

one . . . ." and "[s]haky but admissible evidence is to be

attacked by cross examination, contrary evidence, and attention

to the burden of proof, not exclusion." Id. Within this

framework, Dr. Bird's opinions regarding general causation,

specific causation and future medical monitoring are examined.

## I.   **General Causation**

> Causation in toxic tort and pharmaceutical
> personal injury cases "is typically discussed in
> terms of generic and specific causation." In re
> Hanford Nuclear Reservation Lit., 292 F.3d 1124,
> 1133 (9th Cir. 2002). The general causation
> question asks "whether the substance at issue had
> the capacity to cause the harm alleged." Id.
> Thus, in Hanford the Ninth Circuit explained the
> general causation inquiry is "whether exposure to
> a substance for which a defendant is responsible,
> such as radiation at the level of exposure
> alleged by plaintiffs, is capable of causing a
> particular injury or condition in the general
> population." Id.

In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod.

Liab. Litig., 424 F. Supp. 3d 781, 792–93 (N.D. Cal. 2020).

Dr. Bird's opinions that "[t]he dose and duration of

JP-5 exposure were sufficient to cause acute and long-term

injuries[]" and that "[s]tudies support that exposure to jet

fuel can result in long term health effects to various organ

systems," are opinions regarding general causation.

[Bird Report at 5-6.] Dr. Bird employed the Bradford Hill criteria, a generally reliable and accepted method for determining causation. See, e.g.,

Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1235 n.4 (9th Cir. 2017).

> As explained in In re Roundup Prod. Liab. Litig., 390 F. Supp. 3d 1102, 1116 (N.D. Cal. 2018), "[w]hether the agents cause the outcomes, however, ordinarily cannot be proven by epidemiological studies alone; an evaluation of causation requires epidemiologists to exercise judgment about the import of those studies and to consider them in context." To that end, "[o]nce epidemiologists have concluded from the studies that there is an association between an agent and an outcome, they often assess causation through a framework called the "Bradford Hill criteria," named for Sir Austin Bradford Hill, who wrote a 1965 article that articulated nine "viewpoints" now generally accepted to be relevant to assessing causation. Id. Broadly, these factors are: (1) the strength of the association; (2) consistency; (3) specificity; (4) temporality; (5) biological gradient or dose response; (6) biological plausibility; (7) coherence with other scientific knowledge; (8) experimental evidence; and (9) analogy. Id.

In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig., 424 F. Supp. 3d 781, 794 (N.D. Cal. 2020) (footnote omitted).

The first criterion is "the strength of association" - that is, the strength of the association between exposure to a substance and an outcome. Dr. Bird opined that the statistical significance for the occurrence of an adverse health effect from

exposure to jet fuel was a relative risk factor of greater than 1.0. [Bird Report at 72.] This relative risk factor is significant in that

> any properly-performed epidemiological study that finds a relative risk greater than 1.0 signifies that exposure to an agent increases the probability of contracting the disease. Where the study properly accounts for potential confounding factors and concludes that exposure to the agent is what increases the probability of contracting the disease, the study has demonstrated *general* causation — that exposure to the agent "is capable of causing [the illness at issue] in the general population." In re Hanford,[] at 1134.

In re Silicone Gel Breast Implants Prod. Liab. Litig., 318 F. Supp. 2d 879, 893 (C.D. Cal. 2004) (emphasis in original). Thus, the risk factor of more than 1.0 is not a strong association but does not necessarily preclude a conclusion that general causation exists. It is, however, far short of a relative risk factor of 2.0, which supports both general and specific causation. [Id. at 893.] While Defendant points out that Dr. Bird has not explained the basis for his conclusion that the factors of temporality and coherence are met nor does he give an explanation as to how he went about weighing and evaluating evidence for each of the Bradford Hill criterion, the Court has broad latitude in deciding reliability (particularly where the trial is non-jury) and concludes Dr. Bird's opinion on general causation are sufficiently reliable and thus admissible. Challenges to his opinion will be left to cross examination,

contrary evidence, and attention to the burden of proof at trial.

Further, Defendant's request to exclude the expert reports of Kristin Andruska, M.D., Ph.D. and Jason R. Keifer, M.D. because both experts relied on Dr. Bird's general causation opinions is denied, for the reasons set forth above. See Motion, Mem. in Supp. at 25; see, e.g., Defendant's Notice of Filing the Memorandum and Exhibits B, C, D, and E in Support of its Motion to Exclude the Expert Report and Testimony of Dr. Steven Bird, filed 1/22/24 (dkt. no. 251) ("Refiled Motion Exhibits"), Exh. E (report of Dr. Andruska, dated July 24, 2023) at PageID.11761; Def.'s Motion in Limine to Exclude the Expert Reports and Testimony of Drs. Spira and Keifer, filed 1/16/24 (dkt. no. 232), Decl. of Alanna Horan, Exh. C (report of Dr. Keifer dated July 24, 2023) ("Keifer Report") at PageID.9362; Motion, Stanton Decl. at ¶ 7 (noting the Keifer Report is cited as Exhibit F in support of the Motion).

## II.  **Specific Causation**

Dr. Bird opined that the strength of association factor was a risk factor of more than 1.0, which is far short of the risk factor of 2.0 that is probative of specific causation. Under Hawai`i law, "the plaintiff will ordinarily satisfy his or her evidentiary burden with respect to legal causation by establishing, by a preponderance of the evidence, that the

14

defendant's conduct was a substantial factor in bringing about the harm." O'Grady v. State, 140 Hawai`i 36, 47, 398 P.3d 625, 636 (2017). This standard is virtually identical to the California tort law standard applied in Daubert II, so the Court finds the same specific causation standards articulated in Daubert II applicable. For an epidemiology study to be probative of specific causation, the study must show the relative risk is greater than 2.0, indicating that the chemical more than doubles the risk of getting the adverse health consequence. See Daubert II, 43 F.3d at 1321. Defendant argues that Dr. Bird failed to estimate the dose received by Plaintiff, the concentration of JP-5 that was necessary to produce a sheen or odor as reported by Plaintiffs, the volume of consumption by each of the Plaintiffs, and to compare an estimated dose to a dose known to be associated with adverse health effects.

> Specific causation is defined simply as "whether exposure to an agent was responsible for a given individual's disease." Federal Judicial Center, Reference Manual on Scientific Evidence 396 (2d ed. 2000). In determining whether an alleged chemical exposure caused a particular disease or illness, an expert must establish the following criteria: (1) the toxic substance at issue must have been demonstrated to cause in humans the disease or illness suffered by the plaintiff; (2) the individual must have been exposed to a sufficient amount of the substance in question to elicit the health effect in question; (3) the chronological relationship between exposure and effect must be biologically plausible; and (4) the likelihood that the chemical caused the disease or illness in an

> individual should be considered in the context of
> other known causes. <u>See</u> David L. Eaton,
> Scientific Judgment and Toxic Torts – A Primer in
> Toxicology for Judges and Lawyers, 12 J.L. &
> Pol'y 5, 38-40 (2003) ("Eaton").

<u>Henricksen v. ConocoPhillips Co.</u>, 605 F. Supp. 2d 1142, 1156

(E.D. Wash. 2009).

### A.  **Short-Term or Acute Injuries**

Dr. Bird states, and Defendant does not dispute, that

> [i]n January 2022, the Hawai`i Department of
> Health published an initial TPH concentration
> action level for drinking water of 211 mg/L (this
> action concentration was later revised to 266
> mg/L). Flushing of the drinking water system was
> done by zones and continued for roughly three
> months, until all zones were deemed clean in
> March, 2022. At that time, residents who were
> moved off-base were required to return to on-base
> hearing.

[Bird Report at 5.] Further, Dr. Bird stated that he assumed

> that significant amount of hydrocarbons continue
> to be detected in the tap water at JBPHH, with
> total petroleum hydrocarbons in the 50-60 ug/L
> range . . . more than one year after the
> contamination incident. Despite notifying
> residents that their water was safe for all
> purposes, in March of 2022, there have still been
> over 10000 TPH-D detections in the water system
> between January 2022 and May 2023.

[<u>Id</u>. (citing July 24, 2023 Expert Report of Paul Rosenfeld,

Ph.D).] Dr. Bird's opinion that the risk factor of more than 1.0

under the Bradford Hill criteria is too low by itself to allow

Dr. Bird to opine about specific causation. Therefore, the Court

proceeds to examine the five criteria for specific causation:

First, is there scientific evidence to support that JP-5 causes in humans the diseases or illnesses suffered by Plaintiffs? Dr. Bird references studies of military personnel who had acute exposure to jet fuel and experienced decreased vestibular functionality and neurological deficits, [Bird Report at 20-21;] neurological toxicity of persons exposed to oil spills, [id. at 23-24;] adverse effects to humans from exposure to jet fuel on skin, gastrointestinal and hepatic systems, [id. at 24-25;] limited human data on immunotoxicity from exposure to jet fuel, [id. at 28, 32;] abnormal menstrual cycles from exposure to jet fuel, [id. at 37-38;] renal cancer from exposure to jet fuel, [id. at 51], among other health effects. Where medical studies exist involving humans and exposure to jet fuel, the Court concludes that there is scientific evidence to support Dr. Bird being permitted to testify as to short-term causation for the conditions or adverse effects suffered by Plaintiffs. However, when Dr. Bird relies exclusively on animal studies to support specific causation for certain conditions, Dr. Bird is not permitted to testify as to specific causation for those conditions. See In re Silicone Gel Breast Implants Prod. Liab. Litig., 318 F. Supp. 2d at 910 ("The animal studies, however, do not support any conclusion about specific causation. While there may be a scientific basis to conclude that PUF-coated implants are generally capable of causing cancer in humans, the animal

studies say nothing about the cause of [the deceased's] cancer."). Animal studies, standing alone, do not demonstrate that a specific Plaintiff's exposure to jet fuel caused that specific Plaintiff's injuries. However, where there are short-term effects and the onset of symptoms are close in time to the exposure of JP-5, the Court will exercise its discretion and permit Dr. Bird to opine on specific causation for short-term or acute injuries.

Second, was the individual exposed to a sufficient amount of the substance in question to elicit the health effect in question? This inquiry relates to quantity or dosage. Dr. Bird is unable to quantify the amount of JP-5 that individual Plaintiffs were exposed to or ingested. Dr. Bird's opinion is that "the concentration of JP-5 in the water was significant enough to be a substantial factor in causing each Plaintiff's symptoms as described below." [Id. at 55.] It is not necessary for a plaintiff to use a dosage-response relationship so long as an expert uses methods generally accepted in the scientific or medical community to establish specific causation. See Henrickson 605 F. Supp. 2d at 1157 ("[T]he boundaries of allowable expert testimony are not so wide as to permit an expert to testify as to specific causation without having any measurements of a plaintiffs' exposure to the allegedly harmful substance." (citing Hardyman v. Norfolk & Western Ry. Co., 243

F.3d 255, 264 (6th Cir. 2001)). Here, Dr. Bird's opinion on
exposure amounts is based on the estimation by Paul Rosenfeld,
Ph.D. of the relative concentration of jet-fuel exposure in the
JBPHH water distribution system as outlined in Dr. Rosenfeld's
Report. [Bird Report at 3-4, 55.] The Court concludes this
criterion has been met.

Third, was the chronological relationship between
exposure and effect biologically plausible? Plaintiffs reported
illnesses and adverse effects within a short time of reporting
that the water emitted from the water lines had a particular
odor and sheen. See Bird Report at 55-69. The Court concludes
from these reports that the temporal relationship between the
exposure to the water from the water line and when the illnesses
and other complaints were reported as having been experienced
meets this requirement for biological plausibility.

Fourth, was the likelihood that the chemical caused
the disease or illness in an individual considered in the
context of other known causes? For this inquiry, the Court
considers whether the expert analyzed whether there are other
known causes for the signs and symptoms reported by Plaintiffs,
i.e., conducted a differential diagnosis. The Court concludes
that Dr. Bird did not consider other known causes since he
testified that he did not medically examine the individual

Plaintiffs, nor did he provide a differential diagnosis for each
of them and thus this factor is not met.

As Defendant has ably pointed out, Dr. Bird fails to
provide a differential diagnosis. Based on the broad latitude in
deciding reliability (particularly where the trial is non-jury),
however, the Court concludes Dr. Bird's opinion on specific
causation for short-term or acute conditions as set forth more
fully above are sufficiently reliable and thus admissible – to
the extent his opinions do not exclusively rely on animal
studies to demonstrate specific causation. Dr. Bird is not
permitted to testify on specific causation of short-term or
acute injuries to the extent he exclusively relies on animal
studies. Challenges to his opinion, such as on the issue of a
differential diagnosis, will be left to cross examination,
contrary evidence, and attention to the burden of proof at
trial.

### B.  Long-Term Injuries or Conditions

Dr. Bird's opinions that the dose and duration of JP-5
exposure were sufficient to cause long-term injuries; that
studies support that exposure to jet fuel can result in long-
term health effects to various organ systems; that many of
Plaintiffs are or have experienced long-term effects from the
JP-5 exposure; and that there is a need for medical surveillance
of exposed individuals must be excluded. While Dr. Bird provides

studies that support correlation between exposure to jet fuel and long-term health effects, he does not adequately support the leap to specific causation of long-term illnesses. As with the short-term or acute injuries, a risk factor of over 1.0, standing alone, is insufficient to support specific causation. However, unlike his opinions on short-term or acute injuries, Dr. Bird provides little by way of principles and methodology to support his opinions that exposure to jet fuel causes specific long-term illnesses. He couches his opinions in terms of "expected long-term effects of exposure to aromatic hydrocarbons in the literature" and the "[p]otential long-term effects" without any application of an accepted methodology. [Bird Report at 54.] These opinions by Dr. Bird fail to pass the admissibility test under Rule 702. Because his opinions about the specific causation between exposure to jet fuel and long-term illnesses are not admissible, Dr. Bird's opinion about the need for medical surveillance for potential long-term illnesses is likewise not admissible.

Further, Plaintiffs' life care planning experts Margot Burns ("Burns") and Cynthia Fricke ("Fricke"), prepared life care plans based in part on Dr. Bird's opinion that Plaintiffs will need medical surveillance and treatment for long-term illnesses. See Motion, Mem. in Supp. at 25; see, e.g., Refiled Motion Exhibits, Exh. C (reports by Margot Burns, dated July 24,

2023) ("Burns Reports") at PageID.11730-31; id., Exh. D
(excerpts of report by Cynthia Fricke, dated July 24, 2023)
("Fricke Report Excerpts") at PageID.11744-46. Both Burns's and
Fricke's opinions are excluded to the extent that they rely on
the excluded opinions of Dr. Bird. If there is another basis for
their opinions, then admissibility will have to be examined
separately as to this other basis.

### C.    **Reasonable Fear of Significant Long-Term Effects**

Dr. Bird's opinion that Plaintiffs have a reasonable
fear of significant long-term effects from their exposure to jet
fuel is not admissible. First, because Dr. Bird provides little
by way of principles and methodology to support his opinions
that exposure to jet fuel causes long-term illnesses, he cannot
be permitted to testify about specific causation for long-term
effects. Second, he never medically examined Plaintiffs and
therefore his opinion on whether their fear is reasonable is not
relevant. Last, under Hawai`i law, the issue of whether a
plaintiff has sustained emotional distress is within the
discretion of the trier of fact and medical testimony is not a
prerequisite for recovery for emotional distress. Campbell v.
Animal Quarantine Station, 63 Haw. 557, 564, 632 P.2d 1066, 1071
(1981). An expert witness may testify when "scientific,
technical, or other specialized knowledge will assist the trier
of fact to understand the evidence or determine a fact in

issue." Fed. R. Evid. 702. The Court concludes that specialized knowledge is not necessary on the issue of whether Plaintiffs' fear of developing long-term illnesses or effects in the future is reasonable and Dr. Bird's opinion on this issue is not relevant and thus not admissible.

### III. __Federal Rule of Civil Procedure 26__

As to Defendant's argument that Dr. Bird's reports should be stricken for failing to comply with Federal Rule of Civil Procedure 26 because he has not provided an explanation of the basis for his conclusions regarding causation and medical monitoring, see Motion, Mem. in Supp. at 23, the argument as it relates to medical monitoring and causation for long-term adverse effects from JP-5 exposure is inapposite in light of the Court's ruling on those issues. The Court therefore considers the argument as it relates to causation for short-term or acute injuries.

Experts retained to offer testimony at trial must submit a written report, which must contain "a complete statement of all opinions the witness will express and the basis and reasons for them," and "the facts or data considered by the witness in forming them," Fed. R. Civ. P. 26(a)(2)(B)(i) and (ii). "The purpose of this requirement is to allow the opposing party 'a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other

witnesses.'" <u>Celador Int'l Ltd. v. Walt Disney Co.</u>, 2008 WL
11338778, at *2 (C.D. Cal. May 9, 2008) (citing Fed. R. Civ. P.
26(a) Advisory Committee Note (1993)). The Court finds
Plaintiffs properly disclosed Dr. Bird's opinions on causation
regarding short-term or acute injuries, as well as the facts or
data Dr. Bird considered in forming these opinions. <u>See
generally</u>, Bird Report at 3, 19-42, 69-72, 77; Stanton Decl. at
¶ 8 (incorporating as Exh. G in support of the Motion dkt.
no. 221-4, the 10/23/23 supplemental expert report of Dr. Bird
("10/23 Bird Supplemental Report")); <u>id.</u>, at ¶ 9 (incorporating
as Exh. H in support of the Motion dkt. no. 221-5, the 11/30/23
supplemental and rebuttal expert report of Dr. Bird ("11/30 Bird
Rebuttal and Supplemental Report")) at 1-16 (analyzing
individual Plaintiffs' medical histories and explaining how he
applied a differential etiology methodology in evaluating
individual Plaintiff's health effects from JP-5 exposure).[2]]
Insofar as Defendant seeks Dr. Bird's opinions to be struck on
the basis of Rule 26, the Motion is denied.

<b><u>CONCLUSION</u></b>

The Motion is GRANTED IN PART AND DENIED IN PART: the
Motion is GRANTED to the extent that the Court FINDS Dr. Bird's

---

[2] Unredacted versions of the 10/23 Bird Supplemental Report
and the 11/30 Bird Rebuttal and Supplemental Report are filed
under seal at docket numbers 224-3 and 224-4, respectively.

opinions regarding causation of long-term adverse effects from JP-5 exposure, future care needs and medical surveillance, and Plaintiffs' reasonable fear of significant long-term effects from JP-5 exposure are not admissible. The Motion is GRANTED to the extent that Dr. Bird's opinions regarding specific causation of short-term injuries from JP-5 exposure to the extent the opinions are based exclusively on animal studies are not admissible. The Motion is GRANTED to the extent that Plaintiffs' experts Margot Burns's and Cynthia Fricke's opinions are excluded to the extent that they rely on the excluded opinions of Dr. Bird. The Motion is DENIED in all other respects.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, April 9, 2024.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**PATRICK FEINDT, JR., ET AL. VS. USA; CV 22-00397 LEK-KJM; CV 22-00397 LEK-KJM; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DR. STEVEN BIRD, [FILED 1/16/24 (DKT. NO. 234)]**