UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., et al., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | CIV. NO. 22-00397 LEK-KJM |

**ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. WALTER GRAYMAN PURSUANT TO DAUBERT AND FEDERAL RULE OF EVIDENCE 702; AND DENYING PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DRS. MICHAEL KOSNETT, TIMUR DURRANI, LYLE BURGOOD AND ROBYN PRUEITT PURSUANT TO *DAUBERT* AND FEDERAL RULE OF EVIDENCE 702**

Before the Court are the Bellwether Plaintiffs' Motion to Exclude the Opinions and Testimony of Dr. Walter Grayman Pursuant to Daubert & Federal Rule of Evidence 702 ("Grayman Motion"), [dkt. no. 235,] and the Bellwether Plaintiffs' Motion to Exclude the Opinions and Testimony of Drs. Michael Kosnett, Timur Durrani, Lyle Burgoon and Robyn Prueitt Pursuant to Daubert & Federal Rule of Evidence 702 ("Kosnett et al. Motion"), [dkt. no. 240,] both filed on January 16, 2024. On March 5, 2024, Defendant United States of America ("Defendant" or "United States") filed its oppositions to both motions, [dkt. nos. 301, 302,] and on March 8, 2024, Plaintiffs filed their replies, [dkt. nos. 309, 310]. The Court finds these matters suitable for disposition without a hearing pursuant to Rule

LR7.1(c) of the Local Rules of Practice for the United States District Court for the District of Hawaii ("Local Rules"). For the reasons set forth below, the Grayman Motion is denied, and the Kosnett et al. Motion is denied.

## BACKGROUND

The parties are familiar with the facts of this case and the Court will not repeat them here, except as relevant to the issues at hand. Briefly, this case arises out of the May 6 and November 20, 2021 fuel leaks from the United States Navy's ("the Navy") Red Hill Bulk Fuel Storage Facility on Joint Base Pearl Harbor-Hickam ("Red Hill" and "JBPHH"). [Fifth Amended Complaint, filed 12/1/23 (dkt. no. 210), at pgs. iii, 1; ¶¶ 4, 9.] Plaintiffs allege that Defendant owns and operates Red Hill and the water system that serves JBPHH, as well as the housing that Plaintiffs leased and resided in. [Id. at ¶¶ 6, 9, 530.] Defendant was allegedly negligent in releasing fuel into the water supply, among other things. [Id. at ¶¶ 4, 467, 481.] Plaintiffs allege the following claims against Defendant: (1) a negligence claim ("Count I"); (2) a negligent undertaking claim ("Count II"); (3) a nuisance claim ("Count III"); (4) a medical negligence claim alleging failure to treat and delayed care ("Count IV"); (5) an infliction of emotional distress claim ("Count V"); and (6) a premises liability claim alleging breach of the duty to control force ("Count VII"). [Id. at pgs. 161-

79.] Plaintiffs seek damages for, among other things, past and future: pain and suffering, emotional distress, medical expenses, loss of income and earning capacity, physical impairment, loss of enjoyment and quality of life; as well as increased risk of future harm and medical monitoring for life, and loss of life expectancy. [Id. at pgs. 190-91.]

I. **Dr. Grayman**

Defendant retained Walter M. Grayman, Ph.D., P.E. as an expert witness to model the movement of JP-5 contaminated water from the Red Hill Shaft through the Joint Base Pearl Harbor Hickman ("JBPHH") water distribution system to specific points of use.[1] See Grayman Motion, declaration by Frederick C. Baker ("Grayman Motion Baker Decl."), Exh. 1 (Expert Report Dr. Walter M. Grayman, Ph.D., P.E., dated 10/6/23) ("Grayman Report") at 3. Dr. Grayman has "practiced as a civil/environmental engineer in the field of water resources for over 50 years, and [his] field of specialization since the mid-1980s has been modeling and assessment of the movement of water through a water distribution system." [Id.] Dr. Grayman has a Bachelor of Science degree in Civil Engineering from Carnegie

---

[1] "JP-5" refers jet propulsion 5 jet fuel. See, e.g., Order Granting in Part and Denying in Part Defendant's Motion to Exclude the Expert Report and Testimony of Dr. Steven Bird, [Filed 1/16/24 (Dkt. No. 234)], filed 4/9/24 (dkt. no. 410), at 4.

Mellon University, and a Master's degree and Ph.D. in Civil Engineering from Massachusetts Institute of Technology. Dr. Grayman developed "the first dynamic water distribution system model for modeling chemicals and water age in distribution systems," while working as a consultant to the United States Environmental Protection Agency ("EPA"). [Id.] Dr. Grayman has published extensively on water distribution system modeling. See id.; id., App'x C (Curriculum Vitae of Walter M. Grayman, Ph.D., P.E.) at 4-11 (listing over 100 publications); id., App'x D (Walter M. Grayman, Ph.D., P.E.'s Publications Related to Water Distribution Analysis).

Dr. Grayman opines that his "best estimate is that the average concentration of jet fuel entering the distribution system followed an S-shaped growth curve over a period of about 36 hours or less starting around November 26 to a maximum of 2,000 µg/L[2] entering the distribution system." [Grayman Report at 31, ¶ 3.]

Dr. Grayman based his model on the Navy contractor AH/BC JV Navy LLC's model ("AH Model") developed for the Naval Facilities Engineering Systems Command Pacific ("NAVPAC"), which ran with software called WaterGEMS. Dr. Grayman used a converted file of that AH Model to do his own modeling with the software

---

[2] µg/L means micrograms per liter. 1,000 µg/L is equivalent to 1 mg/L (milligram per liter).

4

EPANET. [Id. at 7-8.] The AH Model Dr. Grayman used as a starting point modelled the flow within the JBPHH water system from November 24, 2021 to December 5, 2021. [Id. at 8.] Dr. Grayman verified the AH Model by comparing it to the Navy's Supervisory Control and Data Acquisition ("SCADA") records. [Id. at 9-11.]

Dr. Grayman then changed the model's assumptions of when jet fuel entered the JBPHH water system. [Id. at 11-16.] Dr. Grayman then modelled a range of values for the average total petroleum hydrocarbons - diesel ("TPH-d") concentrations that entered the JBPHH water system: 2,000 µg/L, 6,000 µg/L, 17,000 µg/L, and later 85,250 µg/L. [Id. at 16-18; Grayman Motion Baker Decl., Exh. 16 (Report in Response to Rebuttal Expert Report of Dr. Joseph B. Hughes Dated November 8, 2023 in the Matter of Feindt et al. v United States, by Walter M. Grayman, Ph.D., P.E., F. EWRI, dated 11/20/23) ("Grayman Rebuttal Report") at 2-3.]

Dr. Grayman then verified his model through comparison to quantitative sample results. [Grayman Report at 16-23.] For each of the four starting concentrations, Dr. Grayman estimated the concentrations of TPH-d at each of the Bellwether Plaintiffs' residences hourly. [Id. at 23-27.] Dr. Grayman did the same for the five other JP-5 constituents: benzene, toluene, ethylbenzene, xylene, and naphthalene. [Id. at 27.]

5

## II. Drs. Kosnett, Durrani, Burgoon, Prueitt

Defendant retained Michael J. Kosnett, MD, MPH; Timur S. Durrani, MD, MPH; Lyle D. Burgoon, Ph.D., ATS; and Robyn L. Prueitt, Ph.D., DABT to opine on the Bellwether Plaintiffs' exposure to the jet-fuel contaminated water and air, and whether such exposures were sufficient to cause their injuries. [Kosnett et al. Motion, Mem. in Supp. at 1.]

Dr. Kosnett was retained by Defendant to conduct Independent Medical Examinations ("IMEs") for adult Bellwether Plaintiffs Kevin Aubart, Elizabeth Witt, Natasia Freeman, Patrick Feindt, Jr., Richelle Dietz, and Sheena Jessup to assess whether they "had experienced medical problems attributable on a toxicological basis to constituents of JP-5 jet fuel that may have been present in [their] residential tap water subsequent to an accidental fuel release on November 20, 2021." See, e.g., Bellwether Plaintiffs' Notice of Filing Exhibits 1 through 6 and 9 through 19 in Support of Bellwether Plaintiffs' Motion to Exclude the Opinions of Drs. Michael Kosnett, Timur Durrani, Lyle Burgoon and Robyn Prueitt Pursuant to Daubert & Federal Rule of Evidence 702 ("Notice of Refiling"), filed 1/18/24 (dkt. no. 246), Exh. 1 (excerpt of Medical Toxicology and Occupational and Environmental Medicine Report on Kevin Aubart by Michael J. Kosnett, MD, MPH, dated 11/3/23) at PageID.11519 (footnote omitted).

6

Dr. Durrani was retained by Defendant to conduct IMEs for each minor Bellwether Plaintiff in order to assess whether each minor Bellwether Plaintiff's exposures to JP-5 jet fuel from the JBPHH drinking water system resulted in long-term injuries or future increased risk of injury as claimed in the instant case, and the scope of any long-term medical monitoring due to such exposures. See, e.g., Notice of Refiling, Exh. 9 (excerpt of report by Timur S. Durrani, M.D., M.P.H., dated 11/2/23 regarding Sheena Jessup's minor child) at PageID.11551. Dr. Durrani is a clinical professor of medicine and pharmacy in the Department of Medicine, Division of Occupational and Environmental Medicine and the School of Pharmacy at the University of California, San Francisco ("UCSF"), among other roles. He is currently an attending physician for the Medical Toxicology Inpatient Service at UCSF's San Francisco General Hospital and Trauma Center. [Id. at PageID.11551.]

Dr. Burgoon was retained by Defendant to opine on Plaintiffs' exposure to the chemical constituents of JP-5 from the November 20, 2021 fuel spill through air inhalation while showering, cooking, using the washing machine, washing hands, and washing dishes. [Kosnett et al. Motion Opp., Decl. of Caroline W. Stanton, Exh. A (Report of Lyle D. Burgoon, Ph.D., ATS, dated 10/6/23) at 1, 5-7.] Dr. Burgoon is certified in toxicology by the Academy of Toxicological Sciences. Dr. Burgoon

7

has a dual Ph.D. in Pharmacology and Toxicology with Environmental Toxicology from Michigan State University. [Id. at 2.]

Dr. Prueitt was retained by Defendant to opine on whether the Bellwether Plaintiffs' health effects were attributable to exposure to JP-5 from the release of JP-5 into the JBPHH water distribution system from the November 20, 2021 fuel spill. See Kosnett et al. Motion, Baker Decl., Exh. 24 (excerpt of Expert Report of Robyn L. Prueitt, Ph.D., DABT, dated 10/9/23) at 1. Dr. Prueitt is "a board-certified toxicologist with expertise in toxicology, carcinogenesis, and human health risk assessment." [Id.] She received her Ph.D. in cell and molecular biology/human genetics from the University of Texas Southwestern Medical Center. [Id. at 1.]

## STANDARD

Federal Rule of Evidence 702 provides that expert opinion evidence is admissible if: (1) the witness is sufficiently "qualified as an expert by knowledge, skill, experience, training, or education"; (2) the witness's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) the witness's "testimony is based on sufficient facts or data"; (4) the witness's "testimony is the product of reliable principles and methods"; and (5) the witness

8

has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702. Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ("Daubert I"), a trial judge is required to apply a gatekeeping role to expert witness testimony. White v. Ford Motor Co., 312 F.3d 998, 1007 (9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003). The Rule 702 inquiry under Daubert I, however, "'is a flexible one,' and the 'factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" Id. (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 119 S. Ct. 1167 (1999)).

To fulfil its substantive gatekeeping obligations, courts must determine if the proffered testimony is reliable, and if it fulfills the "fit" requirement, meaning that the expert's testimony "logically advances a material aspect of the proposing party's case." Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II").

To determine reliability,

> [s]cientific evidence is reliable "if the principles and methodology used by an expert are grounded in the methods of science." Clausen v. M/V New Carissa, 339 F.3d 1049, 1056 (9th Cir. 2003). The court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert v.

9

> Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993). Courts must determine whether the reasoning or methodology underlying testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue. Id. at 592-93. Among the factors considered in determining whether to admit expert testimony under Rule 702 are: (1) whether the expert's theory or method is generally accepted in the scientific community; (2) whether the expert's methodology can be or has been tested; (3) the known or potential error rate of the technique; and (4) whether the method has been subjected to peer review and publication. Id. at 593-94.

Zucchella v. Olympusat, Inc., CV 19-7335 DSF (PLAx), 2023 WL 2628107, at *1 (C.D. Cal. Jan. 10, 2023). "[A] trial court . . . has broad latitude in determining whether an expert's testimony is reliable" as well as in deciding how to determine the reliability of that testimony. Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1017 (9th Cir. 2004) (citations omitted).

For evidence to be relevant, it must meet the "fit" requirement. However,

> the "fit" requirement is not merely a reiteration of the relevancy standards in Federal Rules of Evidence 401–403. Because "[e]xpert evidence can be both powerful and quite misleading [given] the difficulty in evaluating it," "the judge in weighing possible prejudice against probative force under Rule 403 of the [Federal Rules of Evidence] exercises more control over experts than over lay witnesses." [Daubert I, 509 U.S.] at 595, 113 S. Ct. 2786 (citation omitted). Courts must therefore exclude proffered expert testimony pursuant to Rules 702 and 403 unless they are convinced that the testimony speaks

10

> clearly and directly to a disputed issue and that it will not mislead the jury. Daubert II, 43 F.3d at 1321 n.17 (discussing scientific expert evidence, specifically). And to be admissible, "the subject matter [of the testimony] at issue must be beyond the common knowledge of the average layman." United States v. Finley, 301 F.3d 1000, 1007 (9th Cir. 2002); United States v. Hanna, 293 F.3d 1080, 1086 (9th Cir. 2002).

United States v. Alo-Kaonohi, 635 F. Supp. 3d 1074, 1079-80 (D. Hawai`i 2022) (some alterations in Alo-Kaonohi) (some citations omitted). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010) (quotation marks and citation omitted).

District courts have wide discretion when acting as a gatekeeper for the admissibility of expert testimony. Kumho Tire, 526 U.S. at 151-52. Further, the Daubert gatekeeping function of courts is intended to protect juries, making the inquiry less relevant and the barriers less stringent in a bench trial. See United States v. Flores, 901 F.3d 1150, 1165 (9th Cir. 2018).

## DISCUSSION

### I. Dr. Grayman

It is clear that Dr. Grayman's opinions will aid the trier of fact. Plaintiffs object to Dr. Grayman's testimony on qualification and reliability grounds. Plaintiffs argue that Dr. Grayman's opinions must be excluded because he is not

qualified to model JP-5 contamination in a water distribution system, and he did not employ reliable principles and methods. [Grayman Motion, Mem. in Supp. at 1.] Plaintiffs argue Dr. Grayman is not qualified to model two-phase contaminants like JP-5, which has both a dissolved phase and a non-aqueous liquid ("NAPL") phase, through a water distribution system because Dr. Grayman has never done work analyzing petroleum hydrocarbon contamination, and Dr. Grayman incorrectly treated JP-5 as a single-phase contaminant. [Id. at 9-10.] Next, Plaintiffs argue Dr. Grayman's "core opinion" – that 2,000 µg/L of JP-5 entered the JBPHH water distribution system – is unreliable because: (1) the software he used, EPANET, is incapable of modeling dual-phase contaminants like petroleum; (2) the timeframe of the model – November 24, 2021 to December 5, 2021 - was not long enough; [id. at 11-12;] and (3) "Dr. Grayman did not account for observed empirical evidence of sheen to validate his modeling methodology," [id. at 13]. Finally, Plaintiffs contend the sampling inputs for his higher-level input analyses of 17,000 µg/L and 85,250 µg/L are flawed because they include four low-flow pump samples and one pre-chlorination spigot sample, which, Plaintiffs contend, are not designed to collect multi-phase contaminant samples. [Id. at 15-16.]

First, Dr. Grayman is qualified to model JP-5 movement through a water distribution system. "Rule 702 contemplates a broad conception of expert qualifications," and therefore only a "minimal foundation of knowledge, skill, and experience [are] required in order to give expert testimony." Hangarter, 373 F.3d at 1015-16 (emphases, citations, and quotation marks omitted). Dr. Grayman has a great deal of expertise in the field of water modelling. He developed the first dynamic water distribution system model for modeling chemicals and water age in distribution systems, while working as a consultant to the EPA. [Grayman Report at 3.] Dr. Grayman has published extensively on modelling water systems. See id.; Grayman Report, App'x C at 4-11 (listing over 100 publications); Grayman Report, App'x D (Walter M. Grayman, Ph.D., P.E.'s Publications Related to Water Distribution Analysis).

Dr. Grayman is not required to be hyperspecialized in modeling a two-stage dissolution rather than single-stage dissolution flow of a water distribution system in order for his opinions to be admitted. "[A]s long as an expert stays within the reasonable confines of his subject area," lack of specialization is an issue of "weight, not admissibility." Avila v. Willits Env't Remediation Tr., 633 F.3d 828, 839 (9th Cir. 2011) (citation and quotation marks omitted). Here, Dr. Grayman stayed within the confines of his subject matter expertise,

13

using the EPANET software he helped develop in constructing his model. Insofar as Dr. Grayman has not previously modelled a two-stage dissolution contaminant such as JP-5, this goes to weight rather than admissibility. See id.; see also Johnson v. Nissan N. Am., Inc., Case No. 3:17-cv-00517-WHO, 2022 WL 2869528, at *9 (N.D. Cal. July 21, 2022) ("The general rule is that courts do not prevent experts from testifying merely because, though otherwise qualified, they do not have expertise in some hyperspecialized corner of their field that they are competent to testify in from their more general expertise." (brackets, citation, and internal quotation marks omitted)); Abarca v. Franklin Cnty. Water Dist., 761 F. Supp. 2d 1007, 1028 (E.D. Cal. 2011) ("Defendants take an overly-narrow view of the degree of expertise necessary to calculate fugitive air emissions in the context of air modeling. An air modeler, who is also an experienced atmospheric scientist and meteorologist, does not need to have a 'sub-specialty' or advanced degree in chemistry or soil science before that person has sufficient qualifications to perform air emissions [modeling].").

      The Court is unpersuaded by Plaintiffs' argument that Dr. Grayman's opinions are unreliable. Dr. Grayman's estimations of the concentrations of JP-5 in the JBPHH water distribution system and his opinions on the representativeness of his estimations are scientific opinions. As such, "the court must

14

assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance . . . ." Primiano, 598 F.3d at 564. This "inquiry is a flexible one," and "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Id. Dr. Grayman's opinions are examined within this framework.

As to Plaintiffs' contention that the software Dr. Grayman used, EPANET, is incapable of modeling dual-phase contaminants like petroleum, Dr. Grayman admits that the EPANET software only models single-phase contaminants. See Grayman Motion Baker Decl., Exh. 6 (transcripts excerpts of 11/6/23 deposition of Dr. Grayman) ("Grayman Depo.") at 57. However, Defendant points out that Plaintiffs' own expert, Paul E. Rosenfeld, Ph.D. does not separately model a dissolved phase and a light NAPL ("LNAPL") phase. See Kosnett et al. Motion Opp., Declaration of Eric Rey ("Rey Decl."), Exh. 4 (transcript excerpts of 11/29/23 remote videotaped deposition of Dr. Rosenfeld) ("Rosenfeld Depo.") at 174. Dr. Grayman's decision to use EPANET software as opposed to a well-mixed model akin to the one that Dr. Rosenfeld used can be challenged through cross-examination and presentation of contrary evidence rather than by exclusion. See Abarca, 761 F. Supp. 2d at 1031

15

("In this Circuit, an expert's decision to use one form of scientific methodology over another goes to the expert's credibility rather than the admissibility of the testimony." (citing United States v. Garcia, 7 F.3d 885, 889-90 (9th Cir. 1993))).

Similarly, Plaintiffs' contention that the timeframe of Dr. Grayman's model is too short goes to weight rather than admissibility. "Criticisms over the start date or an input for a model, rather than a criticism of the model itself, are factual disputes that do not go against the reliability of the expert." ImprimisRx, LLC v. OSRX, Inc., Case No. 21-cv-01305-BAS-DDL, 2023 WL 7390842, at *10 (S.D. Cal. Nov. 8, 2023) (citations omitted).

As to Dr. Grayman's failure to account for sheen in the water to validate his modeling methodology, this again is an issue of weight rather than admissibility. Here, Dr. Grayman chose not to rely on reports of sheen because said reports are qualitative rather than quantitative. [Rey Decl., Exh. 1 (Grayman Depo.) at 102.] Comparing a water distribution model to quantitative data as Dr. Grayman did appears to be an accepted means of verifying water distribution models, and Plaintiffs offer no caselaw or other sources to the contrary. See id. at 48 (stating comparing modeled results to empirical evidence is "a fairly common way to" perform verification of water models).

16

Insofar as the means by which Dr. Grayman verified his model relates to what facts he relied on for verification, "[t]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." See Hangarter, 373 F.3d at 1018 n.14 (quoting Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 865 (8th Cir. 2004)). Therefore, challenges to Dr. Grayman's model verification will be left to cross examination, presentation of contrary evidence, and attention to the burden of proof at trial.

Finally, Plaintiffs contend Dr. Grayman's sampling inputs for his higher-level input analyses of 17,000 µg/L and 85,250 µg/L are flawed because they include four low-flow pump samples and one pre-chlorination spigot sample, which – Plaintiffs contend - are not designed to collect multiphase contaminant samples. [Grayman Motion, Mem. in Supp. at 15-16.] Because these challenges take issue with the inputs to the model, not the methodology itself, this goes to weight rather than admissibility. See CZ Servs., Inc. v. Express Scripts Holding Co., No. 3:18-CV-04217-JD, 2020 WL 4518978, at *8 (N.D. Cal. Aug. 5, 2020) ("These challenges take issue with the inputs Ms. Snow used, and not the model itself, and so go to the weight rather than admissibility of her testimony." (citing Alaska

17

Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 968-70 (9th Cir. 2013)).

Accordingly, Dr. Grayman's opinions are admissible. Challenges to his opinion will be left to cross examination, presentation of contrary evidence, and attention to the burden of proof at trial.

## II. **Drs. Kosnett, Durrani, Burgoon, and Prueitt**

Plaintiffs do not object to the qualifications of Drs. Kosnett, Durrani, Burgoon, and Prueitt, and it is clear that each of these experts has the requisite experience and training, and that their specialized knowledge will aid the trier of fact. Plaintiffs seek to exclude the opinions of Drs. Kosnett, Burgoon, and Prueitt in their entirety, and Dr. Durrani's opinions pertaining to the exposure and dose of contamination experienced by the minor Bellwether Plaintiffs because these opinions are based on Dr. Grayman's water concentration data and modelling. [Kosnett et al. Motion, Mem. in Supp. at 12-13.]

In light of the denial of the Grayman Motion, the Court will not exclude the expert opinions of Drs. Kosnett, Burgoon, Prueitt and Durrani on the basis that they relied on Dr. Grayman's opinions. Insofar as the weight of Dr. Grayman's opinions ultimately may be discounted at trial, so too may the

weight of the opinions of Drs. Kosnett, Burgoon, Prueitt and Durrani insofar as they rely on Dr. Grayman's opinions.

## CONCLUSION

For the foregoing reasons, the Bellwether Plaintiffs' Motion to Exclude the Opinions and Testimony of Dr. Walter Grayman Pursuant to Daubert & Federal Rule of Evidence 702, filed January 16, 2024, is DENIED in its entirety. The Bellwether Plaintiffs' Motion to Exclude the Opinions and Testimony of Drs. Michael Kosnett, Timur Durrani, Lyle Burgoon and Robyn Prueitt Pursuant to Daubert & Federal Rule of Evidence 702, filed January 16, 2024, is DENIED in its entirety.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, April 11, 2024.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**PATRICK FEINDT, JR., ET AL. VS. USA; CV 22-00397 LEK-KJM; ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. WALTER GRAYMAN PURSUANT TO DAUBERT AND FEDERAL RULE OF EVIDENCE 702; AND DENYING PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DRS. MICHAEL KOSNETT, TIMUR DURRANI, LYLE BURGOOD AND ROBYN PRUEITT PURSUANT TO DAUBERT AND FEDERAL OF EVIDENCE 702**