LYLE S. HOSODA            3964-0
KOURTNEY H. WONG      10827-0
SPENCER J. LAU          11105-0
HOSODA LAW GROUP, AAL, ALC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaii 96813
Telephone:    (808) 524-3700
Facsimile:    (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com


KRISTINA S. BAEHR        *Pro Hac Vice*
JAMES BAEHR              *Pro Hac Vice*
MARY M. NEUSEL           *Pro Hac Vice*
JUST WELL LAW, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 994-6241
Email: kristina@well.law; jim@well.law; maggie@well.law


FREDERICK C. BAKER       *Pro Hac Vice*
JAMES W. LEDLIE          *Pro Hac Vice*
KRISTEN HERMIZ           *Pro Hac Vice*
CYNTHIA A. SOLOMON       *Pro Hac Vice*
SARA O. COUCH            *Pro Hac Vice*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: fbaker@motleyrice.com; jledlie@motleyrice.com;
khermiz@motleyrice.com; csolomon@motleyrice.com;
scouch@motleyrice.com


*Attorneys for the Plaintiffs*

*(case caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| PATRICK FEINDT, JR., et al., <br><br> vs. <br><br> THE UNITED STATES OF AMERICA, <br><br>           Defendant. | Civil No. 1:22-CV-00397-LEK-KJM <br>(FEDERAL TORT CLAIMS ACT) <br><br> **PLAINTIFFS' TRIAL BRIEF; CERTIFICATE OF SERVICE** <br><br> FINAL PRETRIAL CONFERENCE: <br>Date:  April 17, 2024 <br>Time:  11:00 a.m. <br>Judge:  Hon. Leslie E. Kobayashi <br><br> TRIAL DATE:  April 29, 2024 <br>JUDGE: Hon. Leslie E. Kobayashi |
| JESSICA WHALEY,  et al., <br><br>       Plaintiffs, <br><br> vs. <br><br> THE UNITED STATES OF AMERICA, <br><br>           Defendant. | CIVIL NO. 1:23-cv-457 <br>(FEDERAL TORT CLAIMS ACT) <br><br><br><br><br> TRIAL DATE: May 12, 2025 <br>JUDGE:  Hon. Leslie E. Kobayashi |
| JACLYN HUGHES, et al., <br><br>       Plaintiffs, <br><br> vs. <br><br> THE UNITED STATES OF AMERICA, <br><br>           Defendant. | CIVIL NO. 1:24-cv-00059 <br>(FEDERAL TORT CLAIMS ACT) <br><br><br><br><br> TRIAL DATE: Not Set <br>JUDGE:  Hon. Leslie E. Kobayashi |

**PLAINTIFFS' TRIAL BRIEF**

# TABLE OF CONTENTS

I.  FACTUAL BACKGROUND ................................................................................3

   A.  The Government Foresaw the Risks at Red Hill ...................................4

   B.  The Government Contaminated the Water in 2021 ...........................10

   C.  The Government Did Not Issue a Proper Do Not Use Notice ...............15

   D.  Plaintiffs Used Enough of the Water to Get Sick and Suffered Injury ........22

      1.  General Causation: Health Effects ...........................................22

      2.  Specific Causation: Health Effects ..........................................30

   E.  The Plaintiffs' Experiences .................................................................34

      1.  Kevin Aubart .............................................................................34

      2.  The Dietz Family ......................................................................37

      3.  The Feindt Family .....................................................................41

      4.  The Freeman Family .................................................................44

      5.  The Jessup Family .....................................................................48

      6.  Elizabeth Witt ...........................................................................52

   F.  Plaintiffs' Experts on Psychological and Emotional Harm .................54

   G.  Lost Wages and Earnings ....................................................................60

   H.  Long Term Physical Injury .................................................................63

II.  ELEMENTS OF CAUSES OF ACTION ........................................................65

   A.  Negligence ...........................................................................................65

      1.  Duty ...........................................................................................66

      2.  Breach .......................................................................................66

      3.  Cause .........................................................................................67

      4.  Harm/Damages .........................................................................68

   B.  Negligent Undertaking ........................................................................68

   C.  Nuisance ..............................................................................................71

   D.  Negligent Infliction of Emotional Distress (NIED) ..........................72

      1.  Negligent Conduct ...................................................................73

2. Serious Emotional Distress ...................................................73

3. Cause .................................................................................75

4. Harm..................................................................................77

E. Premises Liability/Duty to Control Force ....................................78

III. ELEMENTS OF DAMAGES ...........................................................83

A. The Government Must Compensate Plaintiffs for Pain and Suffering ........85

B. The Government Must Compensate Plaintiffs for Emotional Distress. ......86

C. The Government Must Compensate for the Value of Reasonable Medical Care for the Bellwether Plaintiffs' Mental Health Injuries.........................87

1. A Tricare Offset is Not Appropriate for Future Medical Care .............88

D. The Government Must Compensate for Lost Income and Earning Capacity for Plaintiffs Nastasia Freeman and Patrick Feindt......................................90

E. The Government Must Compensate for Plaintiffs' Loss of Enjoyment of Life and Loss of Enjoyment of Property ......................................................92

1. Loss of enjoyment of life and property................................................92

F. The Government Must Compensate for Plaintiffs' Loss of Consortium – Marital and Filial ..........................................................................95

G. The Government Must Compensate for Plaintiff Beau Jessup's Tremor ....98

IV. Conclusion .......................................................................98

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Brown v. KFC Nat'l Management Co.,* 82 Hawai'i 226, 921 P.2d 146,
  *reconsideration denied,* 82 Hawai'i 360, 922 P.2d 973 (1996) ...........................73

*Burch v. United States*, No. 3:02-cv-556-J-25HTS, 2006 WL 4876954 (M.D. Fla.
  Feb.3, 2006) ...................................................................................................88

*Bynum v. Magno*, 106 Hawai'i 81, 101 P.3d 1149 (2004) ......................................94

*Campano v. USA*, Case No. 1:15-cv-00439-KSC, ECF No. 106 (June 5, 2017)....89

*Castro v. Melchor*, 142 Hawai'i 1, 414 P.3d 53 (2018) ..........................................92

*Collins v. Greenstein*, 61 Haw. 26, 595 P.2d 275 (Haw. 1979) .............................78

*Cunha v. Ward Foods, Inc.*, 804 F.2d 1418 (9th Cir. 1986)...................................78

*Doe Parents No. 1 v. State, Dep't of Educ.,* 100 Hawai'i 34, 58 P.3d 545 (2002) .72

*Estate of Frey v. Mastroianni*, 146 Hawai'i 540, 463 P.3d 1197, 1206-07 (2020).66

*First Ins. Co. v. Lawrence*, 77 Hawai'i 2 (1994) ....................................................77

*Fukida v. Hon/Haw. Serv. & Repair*, 97 Hawai'i 38 (2001) ..................................92

*Galbreath v. United States*, No. 20-00373 LEK-KJM, 2022 U.S. Dist. LEXIS
  238365 (D. Haw. Feb. 17, 2022) .........................................................................89

*Geremia v. State*, 58 Haw. 502, 573 P.2d 107 (1977) ............................................69

*Gilding v. State*, 130 Hawai'i 347, 310 P.3d 1048 (App. 2012)..............................87

*Goran Pleho, LLC v. Lacy,* 144 Haw. 224, 439 P.3d 176, 190–91 (2019) .............73

*Greene v. Texeira*, 54 Haw. 231, 505 P.2d 1169 (1973) .........................................91

*Harvey v. United States*, Civil Action No. 3:09CV122-S, 2013 WL 2898785 (W.D.
  Ky. June 13, 2013)...............................................................................................88

*Haynes v. Haas*, 146 Hawai'i 452, 463 P.3d 1109, 1115-16 (2020)................ 71, 93

*Jendrusch v. Abbott*, 39 Haw. 506 (1952) ..............................................................90

*John & Jane Does, 1-100 v. PHP, Inc.*, 91 Hawaiii 470, 985 P.2d 661 (1999)......77

*Kennedy v. United States*, No. CV08-02988 GAF (OPx), 2009 WL 3348404 (C.D.
  Cal. Oct. 13, 2009)...............................................................................................88

*Kimberly v. State*, No. 23954, 2005 Haw. LEXIS 392 (July 29, 2005) ........... 54, 85

*Lauer v. YMCA*, 57 Haw. 390, 557 P.2d 1334 (1976)............................................85

*Lawson v. United States*, 454 F. Supp. 2d 373 (D. Md. 2006) ................................88

*Masaki v. Gen. Motors Corp.*, 71 Haw. 1 (1989) .................................. 73, 77, 95, 97

*Molokoa Village Development Co. v. Kauai Electric Co.*, 60 Haw. 582, 593 P.2d 375 (Haw. 1979) ................................................................................................78

*Molzof v. United States*, 6 F.3d 461 (7th Cir. 1993) ..............................................88

*Montalvo v. Lapez*, 77 Hawai'i 282, 884 P.2d 345 (1994).....................................92

*Morioka v. Lee*, 134 Hawai'i 114 (App. 2014)................................................ 72, 75

*O'Grady v. State*, 140 Hawaii 36, 398 P.3d 625 (2017)..........................................76

*Peake v. Labatad*, 150 Hawai'i 363 n.9, 501 P.3d 332 (App. 2021)......................90

*Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509 (1970).............................. 72, 73, 83

*Silong v. United States*, No. CV F 06-0474 LJO DLB, 2007 WL 2580543 (E.D. Cal. Sept. 5, 2007) ..............................................................................................88

*Siverson v. United States*, 710 F.2d 557 (9th Cir. 1983) ........................................88

*Tabieros v. Clark Equip. Co.,* 944 P.2d 1279 (Haw. 1997) ....................................69

*Takayama v. Kaiser Found. Hosp.*, 82 Hawai'i 486, 923 P.2d 903, 915-16 (1996) ....................................................................................................................65

*United States v. Olson*, 546 U.S. 43 (2005)............................................................69

*Vanhoy v. United States*, Civil Action No. 03-1090, 2006 WL 3093646 (E.D. La. Oct. 30, 2006) ...................................................................................................88

*Walden v. United States*, 31 F. Supp. 2d 1230 (S.D. Cal. 1998) ............................90

*Wemple v. Dahman*, 103 Hawai'i 385 (2004) ........................................................81

*Williams v. United States*, 711 F. Supp. 2d 1195 (D. Haw. 2010) .........................68

*Wolsk v. Hawaii*, 711 P.2d 1300 (Haw. 1986)........................................................78

**Statutes**

10 U.S.C.S. § 2872a ................................................................................................81

Restatement (Second) of Torts § 361 (1965)...........................................................78

The Restatement (Second) of Torts § 324A (1965)..................................................69

## PLAINTIFFS' TRIAL BRIEF

In November 2021, thousands showed up to medical providers with acute poisoning symptoms. Why? Because the Government had contaminated their water with jet fuel and neglected to tell them when it should have. The Government failed to follow its own safety protocols, leading to a catastrophic release of jet fuel into the drinking water of the Navy water line on the island of Oahu. Then, after the release, the Government again failed to follow its own protocols to issue a "do not use" notice to prevent residents from using the contaminated water.

Plaintiffs are among those thousands who were injured by the Government's conduct, suffering physical injury and emotional distress, dislocation, inconvenience, and disruption to their lives. Accordingly, this trial brief is submitted on behalf of Bellwether Plaintiffs, Kevin Aubert, Richelle Dietz and her children, B.D. and V.D., Patrick Feindt, and his children P.R.F and P.G.F., Nastasia Freeman and her children K.F., D.F., and N.F., Sheena Jessup, and her children, Beau Jessup, B.J.J., N.J., and D.J, and Elizabeth Witt, who seek redress for injuries and damages sustained from the Government's contamination of the water system which served them.

The Government has already stipulated to negligent breach and to nuisance, this trial is about causation and appropriate damages. Second Joint Stipulation as to Plaintiffs' Nuisance and Negligence Claims, ECF No. 200 (D. Haw. Nov. 27,

2023). To assist the Court in its determination, this trial brief focuses on acute injuries, disruption, emotional trauma, and institutional betrayal suffered by the Plaintiffs. In addition, Plaintiff Nastasia Freeman suffered a seizure disorder after exposure to the contaminated water that her military neurologist attributed to her exposure and for which he recommended she move off the island for treatment. Expert Drs. Andruska and Storage will testify that Ms. Freeman's exposure caused lasting neurological harm and brain injury.

This trial brief outlines 1) the facts relied upon by Plaintiffs to prove their claims, 2) the elements of Plaintiffs' causes of action, and 3) the elements of damages sought as a result of the Government's tortious conduct.

Plaintiffs' claims are laid out in their Fifth Amended Complaint (ECF 210), filed December 1, 2023. They assert five operative causes of action stemming from this incident: Count I) Negligence; Count II) Negligent Undertaking; Count III) Nuisance;[1] Count V) Infliction of Emotional Distress;[2] and, Count VII) Premises Liability, Duty to Control Force.

---

[1] Count IV) Medical Negligence, Failure to Treat, Delayed Care was asserted in the Complaint but does not apply to any of the Plaintiffs.

[2] Count VI) Spoliation of Evidence was removed from the Fifth Amended Complaint.

## I.    FACTUAL BACKGROUND

In November and December 2021, 5,828 residents[3] on the Navy water line on the island of Oahu reported to emergency rooms and medical facilities complaining of jet fuel exposure.[4] The Government tracked their data and noted their symptoms: skin rashes, gastrointestinal problems, neurological challenges, and respiratory issues.[5]

Over one month after the fuel release, the Government surveyed Red Hill residents through the Centers for Disease Control and the Agency for Toxic Substances and Disease Registry (ATSDR):[6] 86% of participants reported symptoms from their exposure, 66% of whom identified symptoms lasting 30 days or more.[7] A follow up survey ten months after the release in September 2022

---

[3] Dr. M. McGinnis, *Medical Hearing Notes re: Joint Health Services Update - Medical Demand Support Alternative* (Apr. 20, 2022) (PX-1559).

[4] Captain Michael McGinnis, Deposition at 213:22-25 (July 11, 2023) ("Q: So 4500 -- according to your math here, 4500 people reported having symptoms after the Navy water contamination event in November 2021. A: Yes.").

[5] AMR Rol 2 Master Tracker of Complaints and Acute Symptoms Spreadsheet (Jan. 28, 2022) (PX-1303).

[6] Health Impacts Associated with the Joint Base Pearl Harbor-Hickam Water System Contamination, Assessment of Chemical Exposures (ACE) / Epi-Aid Investigation, Final Exit Presentation (Feb. 16, 2022) (hereafter, "Health Impacts") (PX-1182).

[7] Health Impacts (PX-1182).

showed that 80% of participants reported lingering symptoms in the past month.[8]

Just this week, Col. John Oh, M.D., Chief of the Occupational and Environmental

Health Division of the Defense Health Agency Public Health, held a webinar for

medical professionals and the affected community, relaying that people are still

reporting symptoms and that the Red Hill health crisis was not likely to diminish

"any time soon."[9]

Plaintiffs are among those thousands made sick by the Government's

contamination of their water.

### A.    The Government Foresaw the Risks at Red Hill

A series of foreseeable failures by Government employees at the Red Hill

Bulk Fuel Storage Facility culminated in the catastrophic release of 20,000 gallons

of jet fuel into the facility in May 2021, and a subsequent release into the lower

access tunnels in November 2021, some of which flowed into and contaminated

the water system, injuring Plaintiffs.

In 1943, the Government activated the Red Hill Bulk Fuel Storage Facility, a

series of 20 massive tanks built underground and capable of holding 12.5 million

---

[8] Impacts Associated with the Joint Base Pearl Harbor-Hickam Water System
Contamination: Follow-up, Assessment of Chemical Exposure (ACE) / Epi-Aid Exit
Presentation, (Oct. 13, 2022) (PX-1185).

[9] DHA Red Hill Health Response Webinar Video, Col. J. Oh (Apr. 9, 2024) (PX-2396).

gallons of fuel each to power military assets in the Pacific.[10] The fuel tanks are "approximately 100 feet" above two important aquifer systems that source water for Oahu.[11] Within the fuel facility sits the pump station for the Red Hill Well (Navy Well 2254-01) that "feeds into the Navy's [Joint Base Pearl Harbor Hickam] Water System.[12] The vertical well shaft is located within the Red Hill Pump Station.[13] The pump station is within the lower access tunnel in Adit 3 and 600 feet from the tunnels' entrance.[14]

Since at least the 1940s, the Government has known the risks associated with the operation of the Red Hill facility and the danger of contaminating Oahu's vital aquifers just 100 feet beneath the fuel tanks.[15] Military personnel, contractors,

---

[10] Command Investigation into the 6 May 2021 and 20 Nov 2021 Incidents at the Red Hill Bulk Fuel Storage Facility, Final Report of RDML C. Cavanaugh, Cavanaugh Report (Jan. 14, 2022) (hereafter, "Cavanaugh Report") (PX-1464) at ¶4; Interim Update - Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan (Jan. 2008, updated Aug. 2014) (hereafter, "Groundwater Protection Plan") (PX-1250) at 10.

[11] Cavanaugh Report, ¶ 36.

[12] RADM James P. Waters III, USN, Supplement to Command Investigation into the 6 May 2021 and 20 November 2021 Incidents at Red Hill Bulk Fuel Storage Facility, to Vice Chief of Naval Operations (15 Apr 2022) (hereafter, "Waters Report") (JX-28) at ¶ 1.

[13] Waters Report (JX-28) ¶ 5.

[14] Waters Report (JX-28) ¶ 5.

[15] "It is believed that all who have been connected with the Red Hill project in responsible professional capacities have realized the possibility of contamination of

regulators, and the public have warned the Government again and again about these dangers. These warnings have proved prescient. The Navy released over 175,000 gallons[16] - and up to 2 million gallons by some calculations[17] – into the environment over the course of the facility's life. Time and again, the Government made plans to fix the problems and then failed.

First, the Navy established the Groundwater Protection Plan ("GPP") in 2008 "to mitigate the risk associated with inadvertent releases of fuel" from the facility.[18] The plan was necessary for "long-term mitigation" because "simulations showed hypothetical releases of the propellant (JP-5 and JP-8) most commonly stored in the Facility . . . had the potential to contaminate the water . . . if they are not identified quickly."[19] It was "estimated that a release as small as 16,000 gallons of JP-5 near Tanks 1 or 2 could result" in harmful "benzene concentrations" in the

---

the basal water body of the region from leakage from the underground tanks and pipe lines." Commander Leslie J. Watson to Captain Carl W. Porter, Technical Study of Possibility of Contamination of Basal Water Sources from the Red Hill Underground Fuel Storage (28 June 1949) (PX-1263).

[16] Declaration of Ernest Lau (ECF No. 385) ¶ 13. ("there have been at least 76 documented fuel release incidents (with the potential to release fuel into the environment) involving more than 175,000 gallons of fuel.")

[17] Red Hill Water Alliance Initiative (WAI) Report, State of Hawaii and City and Council of Honolulu, dated Nov. 2023 (PX-1490).

[18] Groundwater Protection Plan (PX-1250).

[19] Groundwater Protection Plan (PX-1250) at 10.

Well.[20] The Plan laid out specific measures to protect the environment and public health, including a rigorous tank maintenance program and leak detection system improvements.[21]

But the Government failed to implement the Groundwater Protection Plan, and the warnings continued. A Government audit in 2010 determined that critical elements of the GPP had not been satisfied, including additional well sampling and reporting requirements.[22] That audit raised particular concerns surrounding the monitoring well within the facility, with testing showing it had "exhibited the highest levels of contamination, especially that of TPH" and exceeded internal levels of concern in 2008, and with concerning detections at the Red Hill Well (which it called the "Navy Well").[23]

> The detection of contaminants at the Navy Well pumping station poses an immediate risk to the potable water sources in the RH area. If the Navy Well becomes contaminated beyond acceptable levels, the Navy and the island of Oahu could potentially lose an important source of drinking water. If this occurs, the Pearl Harbor Water System would be reduced by approximately 24 percent. Additionally, the Navy would be responsible for providing an alternative water source at the Navy Well

---

[20] Groundwater Protection Plan (PX-1250) at 10.

[21] *See, e.g.,* Groundwater Protection Plan (PX-1250).

[22] Quantitative Risk and Vulnerability Assessment, Red Hill Bulk Fuel Storage Facility, (Nov. 12, 2018) (hereafter, "Audit Report") (PX-1489) at 17.

[23] Audit Report (PX-1489) at 12.

as indicated in the GPP.[24]

In January 2014, there was another fuel release: 27,000 gallons of fuel.[25] Although this release did not directly infiltrate the water system, another firestorm of warnings and plans ensued. The Navy entered into a 2015 Administrative Order on Consent with Hawaii's Department of Health and EPA to protect groundwater and safely operate the facility.[26] In the AOC, the Navy committed to "perform all actions required . . . in accordance with all applicable local, state, and federal laws and regulations."[27] The AOC covered tank inspection, repair, and maintenance, release detection, investigation and remediation of releases, groundwater protection and evaluation, and risk and vulnerability assessment.[28] On the EPA's public website explaining the 2015 Administrative Order on Consent, the Government even noted the foreseeability of a piping failure in the lower access tunnels as the "most likely catastrophic release scenario."[29]

---

[24] Audit Report (PX-1489) at 13.

[25] Administrative Order on Consent; In the Matter of: The United States Dept. of the Navy and Defense Logistics Agency, Respondents, Red Hill Bulk Fuel Storage Facility, Oahu, Hawaii; (May 27, 2015) (hereafter, "AOC") (JX-42 at 5).

[26] AOC (JX-42).

[27] AOC (JX-42) at 17.

[28] AOC (JX-42) at 34-36.

[29] Red Hill Bulk Fuel Storage Facility Frequently Asked Questions re: Administrative Order on Consent with the Navy (Sept. 29, 2015) (PX-1282).

Then, the Government commissioned a "risk assessment report" prepared in 2018 that showed a greater than 27% probability of a sudden release of between 1,000 and 30,000 gallons of fuel each year.[30] Mathematically, that meant that the likelihood of such a release occurring over a ten-year period was over 95%.[31]

Later, the Government outlined emergency response requirements to respond to a contamination crisis at the fuel facility. In August 2018, it established an "Integrated Contingency Plan" to ensure that the Navy's spill management team was "adequately prepared to respond to an emergency Oil or Hazardous Substance (OHS) incident."[32] The keeper of the plan was the Navy On Scene Coordinator Representative,[33] who was "designated as the Region's Qualified Individual acting as the incident commander for overseeing environmental emergencies…"[34] and had "full authority and duty" to respond to spills.[35] The plan specifically noted that

---

[30] Audit Report (PX-1489).

[31] The likelihood is calculated using complementary probability. It involves finding the probability of the event not happening each year, raising this to the power of ten for a decade, and then subtracting the result from 100%. This gives a 95.70% chance of the event occurring at least once in ten years.

[32] Commander Navy Region Hawaii (COMNAVREG HI) Integrated Contingency Plan (ICP), (Aug. 2018) (hereafter, "ICP") (PX-1200) at 65.

[33] ICP (PX-1200) at 67.

[34] ICP (PX-1200) at 78.

[35] ICP (PX-1200) at 167.

"Fuel in the water pump station can directly contaminate the JBPHH water supply through the well."[36]

### B.    The Government Contaminated the Water in 2021

The impact of decades of failures and unheeded warnings came to a head in 2021. In May, the Government again failed to heed its own protocols. Federal officers took a shortcut, misaligned valves, and unleashed approximately 20,000 gallons of fuel into the facility. Despite the evident risk of immediate contamination, the May response was marked by negligence: the emergency response plans were not followed. The designated spill-response coordinator never reported to the site as required by the Red Hill Response Plan.[37] The Navy told regulators and the public were told there was no release to the environment without any environmental experts investigating. But the Navy failed to disclose that it had not accounted for 20,000 gallons of lost fuel.[38]

Meanwhile, the Red Hill Fuel Director, Lieutenant Commander Shannon Bencs, tried to warn superiors about improper reporting and safety issues at the

---

[36] ICP (PX-1200) at 329.

[37] Waters Report (JX-28) at Opinions ¶ 1 ("The immediate responses to both spills were largely identical… the NOSC-R did not arrive on scene to conduct an independent evaluation.").

[38] Waters Report (JX-28) at ¶ 197 ("the fuel from the AFFF retention line was 20,000 gallons of fuel that was unaccounted for from the 6 May spill.").

facility after a prior release, to no avail. [39] When she tried to report the extent of the May release and warn of the future problems it portended, she was removed from her post.

On November 20, 2021, the "lost" fuel burst from an improperly installed plastic pipe into the lower access tunnels several hundred feet from the Red Hill Well. But instead of shutting down the well that evening, the Government ignored multiple potential pathways of environmental contamination.[40] The fuel flowed through those pathways and reached the well a few hundred feet away.

The Government's negligent fuel release contaminated the Plaintiffs' water system. Plaintiff expert Dr. Joseph Hughes provides a detailed account of the fuel's fate and transport mechanisms from the point of release to its entry into the water system.[41] Dr. Hughes determined that approximately 2,024 gallons of dangerous JP-5 fuel reached the Red Hill Well.[42] This volume, as he states, was sufficient to create supersaturation conditions evidenced by visible sheens in the water.[43] Dr. Hughes notes that the Government's own records corroborate the severity of the

---

[39] B. Champaign, Email to S. Bencs, Re: Hotline #202100922 (Mar. 11, 2021) (PX-1079).

[40] Cavanaugh Report (PX-1464) at ¶ 257.

[41] Declaration of Joseph Hughes, Ph.D. (ECF No. 406).

[42] Declaration of Joseph Hughes, Ph.D. (ECF No. 406), ¶39.

[43] Declaration of Joseph Hughes, Ph.D. (ECF No. 406), ¶36.

contamination, indicating that the concentration levels detected were substantially above the environmental action levels (EALs).[44]

This JP-5 contamination reached the entirety of the JBPHH water distribution system, including Plaintiffs' homes. Dr. Paul Rosenfeld will explain this extensive impact, highlighting that "the entire system was highly interconnected, and that the entire system was impacted by the November Incident."[45] Up to 5,542 gallons of JP-5 were not recovered post-incident, as stated in "the Navy estimates that a total of 15,415 gallons of fuel were recovered, leaving approximately 5,542 gallons unrecovered."[46] Dr. Rosenfeld estimates that "the most likely amount of JP-5 in the JBPHH water distribution system in the first 10 days was between 2,000 and 2,500 gallons."[47] Chemical fingerprinting linked the contamination directly to the Red Hill Facility spill, demonstrating that "the fuel in the Red Hill Shaft was consistent with JP-5 and the release from the ruptured AFFF fire retention line."[48] Under a well-mixed mass balance model that

---

[44] Declaration of Joseph Hughes, Ph.D. (ECF No. 406), ¶50 ("Using a JP-5 water solubility of 5 mg/L TPH, the average TPH concentration in bailer samples is almost 10 times JP-5's water solubility and confirms the presence of JP-5 LNAPL.").

[45] Declaration of Paul Rosenfeld (ECF No. 375) at ¶ 5.

[46] Declaration of Paul Rosenfeld (ECF No. 375) at ¶ 12.

[47] Declaration of Paul Rosenfeld (ECF No. 375) at ¶ 63.

[48] Declaration of Paul Rosenfeld (ECF No. 375) at ¶ 13.

aligns with government practices at similar sites, such as those used by the Agency

for Toxic Substances and Disease Registry (ATSDR) at Pease Air Force Base and

Camp Lejeune, Dr. Rosenfeld's calculations indicated that this quantity of fuel

resulted in contamination levels significantly exceeding safety thresholds, with

initial estimates of TPH-d concentration ranging from "6,532 µg/L to 8,165

µg/L."[49]

A concentration of 6,532 ug/L is <u>approximately 25 times greater</u> than the

Hawaii Department of Health's 266 ug/L environmental action level for TPH-d.

The Government's own emergency response plan for the water system

assumed that a contaminant would be distributed throughout the system. "*For that

reason, it is best to assume that during the time required to respond to such an

emergency, the contamination has been distributed throughout the system*."[50]

Independent experts corroborate Plaintiffs' experts. Dr. Roger Brewer of the

Hawaii Department of Health, whom Plaintiffs identified as an expert and the

Government failed to challenge on *Daubert* grounds and who will testify by

deposition. Dr. Brewer agreed that "heavily contaminated water was clearly

---

[49] Declaration of Paul Rosenfeld (ECF No. 375) at Opinion ¶ k.

[50] Site Specific Report re: Community Water System (PWS-360) Emergency
Response Plan for Joint Base Pearl Harbor-Hickam (JPBHH), Pearl Harbor,
Hawaii (Jun. 2021) (hereafter "JBPHH Response Plan") (PX-1496) at 48
(emphasis added).

moving through the drinking water system by November 27, 2021."[51] Dr. Diane Felton, Hawaii's State Toxicologist, also testified in her deposition that the JBPHH's water distribution system was "definitely contaminated" and "definitely made people sick."[52]

Lacey Keller's geomapping of all of the complaints into mid-February of 2022 corroborates this contamination across the water system, with small yellow dots representing the Plaintiffs' homes among the mass of complaints.


Figure 13 Complaints Screenshot
(Produced Data: All Complaints - 11/28/2021 to 2/12/2022)



[53]

---

[51] Deposition of Roger Brewer (Aug. 15, 2023) at 98:4-8.

[52] Deposition of Diane Felton (Aug. 21, 2023) at 148:17-149:4.

[53] Keller Appendix A: Charts and Tables (PX-1631) at 29.

14

Even the Government's senior-most officers recognize that the Government

contaminated the water system. Admiral Cavanaugh testified, "Clearly we

contaminated – the Navy contaminated the water. That's crystal clear."[54]

### C.   The Government Did Not Issue a Proper Do Not Use Notice

The Government did not provide appropriate warnings not to use the

contaminated water. The Government was required by its own rules to issue a "Do

Not Use." At a minimum, that notice was required to:

- Distributed to everyone on the water line
- Within 24 hours
- Describe the contamination event
- Describe the risk
- Indicate where to get medical attention. [55]

---

[54] Deposition of Rear Admiral Christopher Cavanaugh (June 20, 2023) at 119:23-25 132:19-22.

[55] Waters Report (JX-28) at ¶ 463 ("If there is contamination in the well, the JBPHH Emergency Response Plan requires the installation to isolate the shaft, and issue 'Do Not Drink' notifications until the contaminant has been identified."); JPBHH Response Plan") (PX-1496) at 49 (identifying contents of warning and noting "If a biological, chemical, or radiological agent is introduced into the distribution system which can induce rapid or serious illness or fatality, a do-not-use restriction is necessary, and the distribution system should be taken out of service immediately."); Manual of Naval Preventive Medicine, Chapter 5: Water Quality for Shore Installations, NAVMED P-5010-5 (Jul. 2019) (hereafter, "NAVMED") (PX-1255) (outlining requirements for public notice for "waterborne emergencies like chemical spills"); EPA Drinking Water Public Notification, Figure 1: The Required Elements of a Public Notice: Drinking Water Warning (PX-1173).

At the time, Navy officers maintained that they didn't know where the smell was coming from or what was in the water. But the NAVMED contains a simple decision tree requiring a "do not use" notice when a contaminant is unknown:



**CHAPTER 5**
**WATER QUALITY FOR SHORE INSTALLATIONS**

Figure 5-31-1 Decision Process for Public Notification

1 Jul 2019                                                5-102          56

The Government was required to warn as soon as there was a health risk. And here, the Government was well aware or should have been aware of the risk to

---

[56] NAVMED (PX-1255) at 109.

the water system as soon as the release occurred. The entrance to the Red Hill Well was only 380 feet from the site of the broken AFFF retention line fuel blast on November 20, 2021.[57] The smell of fuel was so strong in the area after the release that residents called 911.[58] That evening, Government responders checked the well area and the groundwater sump, but <u>they did not shut off the well</u>.[59]

At every turn, the Navy reassured the public rather than warn them. On November 21, the Navy released a press release saying that "There are no signs or indications of any releases to the environment, and the water remains safe to drink."[60] On November 22, the Navy sent another press release stating that they had "stopped the release" and again reiterated, "There are no signs or indication of any releases to the environment and the drinking water remains safe."[61]

On November 27, 2021, complaints began to pour in from residents on the water line that their home water smelled of fuel. By November 28, Navy Drinking

---

[57] Waters Report (JX-28) at ¶ 5.

[58] Sophie Cocke, *Odor from Red Hill Fuel Release Sparks 911 Calls*, HONOLULU STAR ADVERTISER (Nov. 23, 2021) (PX-1990).

[59] Cavanaugh Report at ¶¶ 205-206.

[60] *Navy Responds to a Release from a Fire Suppression Drain Line at Red Hill*, Commander, Navy Region Hawaii, Public Affairs Office, Media Release #21- 11, (Nov. 21, 2021) (PX-1502).

[61] *Navy Stops Release of Water and Fuel Mixture*, Commander, Navy Region Hawaii, Public Affairs Office, Media Release #21-12, (Nov. 22, 2021) (PX-1503).

Water Supervisor Joseph Nehl responded to the homes and personally smelled fuel in the homes' water.[62] He then proceeded to the water storage tanks where he personally smelled fuel at the "sample outlet at the bottom of the tank."[63] Because of the proximity of the Red Hill Well to the Navy's fuel blast, Mr. Nehl realized that the contamination "must have been a result of last week's spill."[64] Mr. Nehl personally smelled the fuel both at homes and at the water tanks.[65]

Mr. Nehl called his superiors and Captain James Meyer, the Commanding Officer of Naval Facilities Engineering Systems Command, Hawaii (the command that ran the water system), arrived with several other officers.[66] Captain Meyer said to those assembled: "We need to let the people know."[67]

The Navy, however, did not "let the people know" of the risk of fuel contamination in the water system. Instead, the Navy released a press release that evening that stated:

---

[62] Deposition of Joseph Nehl (May 18, 2023) at 52:17-68:2.

[63] Deposition of Joseph Nehl (May 18, 2023) at 65:4-5.

[64] Deposition of Joseph Nehl (May 18, 2023) at 65:18-19.

[65] Deposition of Joseph Nehl (May 18, 2023) at 64-65 ("Q:… at the tanks, you smelled fuel, correct? A: Yes. Q: Where did you smell the fuel at the tanks? A: We have a sample outlet at the bottom of the tank.").

[66] Deposition of Joseph Nehl (May 18, 2023) at 66:4-14.

[67] Deposition of Joseph Nehl (May 18, 2023) at 67:16-25.

> The Navy is investigating reports of a chemical smell in drinking water at several homes in some of the military housing areas for Joint Base Pearl Harbor Hickam Sunday evening. **There is no indication that the water is not safe. . .**
>
> Navy engineers visited several homes of families who reported the smell and also immediately went to Navy's drinking water wells to investigate. **There was no smell or sign of fuel or chemicals in the water at the Navy's water wells and water tanks . . .**[68]

The release made no mention that the "chemical" smell reported at the homes was a fuel smell. The press release did not mention the November 20 fuel release at all. And the press release reported that there was no smell in the water tanks – the same tanks where Mr. Nehl had smelled fuel that same day.

On the afternoon of November 29, 2021, at the behest of Navy public relations officials and approved by senior leadership, the Commander of Joint Base Pearl Harbor-Hickam emailed residents to reassure them again that the water was **safe**:

> I can tell you at this point that **there are no immediate indications that the water is not safe**. My staff and I are drinking the water on base this morning, and many of my team live in housing and drink and use the water as well. We visited several communities and homes last night to get samples of water, and we talked with residents who had

---

[68] *Navy Investigating, Testing Water at JBPHH Family Housing*, Commander, Navy Region Hawaii Media Release #21-13 (Nov. 28, 2021) (PX-1504) (emphases added).

concerns.[69]

The Government also posted on the Joint Base Pearl Harbor-Hickam Facebook page maintained by JBPHH Public Affairs on November 29 about the water. It stated again:

> The Navy is investigating reports of a chemical smell in drinking water at several homes in some of the military housing areas for Joint Base Pearl Harbor Hickam Sunday evening. There is no immediate indication that the water is not safe. The Navy continues to investigate reports and is testing the water.
>
> Navy engineers visited several homes of families who reported the smell and also immediately went to Navy's drinking water wells to investigate. <u>There was no smell or sign of fuel or chemicals in the water at the Navy's water wells and water tanks.</u>[70]

On November 30, leadership issued a "communications plan" that instructed officials to say that there was "no indication" that the water was not safe and specifically that there was "no indication" that the smell in the water was related to the fuel release:

---

[69] Email Chain between L. Robertson and Capt. E. Spitzer, et al. re: Joint Base Message for Distro to Ohana Military Communities and Hickam Communities (Nov. 29, 2021, 12:55 PM) (PX-1095).

[70] Joint Base Pearl Harbor-Hickam, *The Navy is investigating reports*..., Facebook, (Nov. 29, 2021) (emphasis added) (PX-2238).

= = =

**Q. What is the smell in the water?**
A.  We are investigating this and are working with DOH on sampling and testing the water.

**Q. How many residents did this impact?**
A.  We only received notifications from a small amount of residents but are examining the Navy's water shafts and water tanks to ensure safety of drinking water.

**Q. Was anyone injured?**
A.  We have not heard of any injuries.

**Q. Is the water safe to drink, use for cooking, or for bathing?**
A.  At this time, there do not appear to be any indications that the water is unsafe.

**Q. Is the Navy providing alternate water supplies to residents?**
A.  At this time, there do not appear to be any indications that the water is unsafe.

**Q. When will the water be safe to drink?**
A.  We have no indications that the water is not safe to drink.

**Q. Were there any fuel operations going on at Red Hill over the weekend?**
A.  No.

**Q. Is this possibly a result of the 20 Nov fuel/water mixture release at Red Hill?**
A.  We do not have any indications of this.                                              [71]

The Government did not issue a "do not use" notice as required. The Government did not release any messages connecting the fuel release on November 20 with the fuel smell in the water until a town hall on December 5, 2021.

The Government acknowledged that it never issued a public notice as required by its own policies and protocols: in February 2023, the Government posted an

---

[71] JBPHH Water Quality Communication Plan, Commander Navy Region Hawaii, (Nov. 30, 2021) (PX-1254).

administrative notification that stated that it had not issued the required notice about the November 2021 fuel release.[72]

### D.    Plaintiffs Used Enough of the Water to Get Sick and Suffered Injury

Testimony from the Government itself, Plaintiff and third-party experts will demonstrate the expected health effects stemming from exposure to JP-5 fuel contamination to establish general causation, and specific health effects on each Plaintiff to establish specific causation. Testimony will also clearly establish mental and emotional distress caused by the spill, inconvenience and dislocation from the jet fuel release, and lost wages for Plaintiffs Nastasia Freeman and Patrick Feindt, and other injuries.

### 1.    General Causation: Health Effects

Government documents show the Government's awareness of and acceptance that acute symptoms result from jet fuel exposure. The Government

---

[72] Letter from Capt. M. Washington to G. Lopez, Hawaii Dept. of Health, re: Certification of Unknown Concentrations of Petroleum Based Product Released in Public Water System (Feb. 6, 2023) (PX-1151) ("This notification is being provided to inform the Joint Base Pearl Harbor-Hickam (JBPHH) drinking water system users that the Navy did not provide a required public notification for the November 2021 fuel release in accordance with the prescribed format as required by the HAR.").

itself tracked thousands of people who sought medical attention for their acute

symptoms in the aftermath of the fuel release.[73]

The Government prepared a Red Hill Patient Encounter Flow Chart that

identified "Common symptoms associated with fuel exposure:

> \*Common symptoms associated with
> fuel exposure:
>
> - Nausea, vomiting, diarrhea
> - Headache, dizziness
> - Skin rash or itch
> - Cough, shortness of breath

[74]

The Government released an Oahu Military Water Response Resident Resources

that identified for residents the symptoms of petroleum exposure:

---

[73] Dr. M. McGinnis, *Medical Hearing Notes re: Joint Health Services Update - Medical Demand Support Alternative* (Apr. 20, 2022) (PX-1559).
[74] Patient Encounter Flow Chart for Water Exposure Health Concerns; Healthcare Provider Evaluation and Treatment Guidance for Potential Petroleum Exposure from the Navy Water Distribution System (Feb. 25, 2022) (PX-1170).



**Q.** What happens if I swallow water with petroleum?
**A.** *Drinking water containing petroleum hydrocarbons can cause a upset stomach, cramping, nausea, vomiting, and diarrhea. Your throat and mouth may also get irritated.*



**Q.** What happens if water with petroleum gets on my skin?
**A.** *Petroleum hydrocarbons can irritate the skin (dermal exposure). Continuous exposure can cause itchy rash and peeling skin. After skin contact, always wash with soap and clean water.*



**Q.** What happens if I breathe air that smells like petroleum?
**A.** *Breathing petroleum vapors (also called inhalational exposure) can cause headaches, dizziness, tiredness and respiratory problems like cough and difficulty breathing. Nosebleeds are also possible.*

[75]

The CDC/ATSDR reviewed medical charts of "clinical presentations in encounters during exposure period" and found that among the "[m]ost prevalent symptoms reported as worsening or new persistent" were: headache, anxiety, abdominal pain, and skin rash.[76] The Government released a Report Update on Medical Encounters related to the JP-5 release and stated "Symptoms of JP-5 exposures have been associated with cough, shortness of breath, skin irritation, eye irritation, headache, fatigue, dizziness, and GI complaints (cramping, nausea,

---

[75] Oahu Military Water Response Resident Resources, Safe Waters (Jan. 10, 2022) (PX-1274).

[76] Undetermined Morbidities Related to Drinking Water Contamination Following a 2021 Petroleum Leak on Oahu, Epi-Aid 2023-008, Situation Report #16, CDC/ASTDR (Mar. 9, 2023) (PX-1498).

vomiting, or diarrhea).[77] Furthermore, healthcare provider guidance from the Navy Water Distribution System acknowledged typical symptoms from exposure to petroleum hydrocarbons including headaches, dizziness, upset stomach, nausea, vomiting, diarrhea, abdominal cramping, skin irritation, and respiratory issues.[78]

Multiple Government doctors admitted that known acute effects were experienced by residents in the wake of the jet fuel contamination. Colonel John Oh, M.D., Chief of the Occupational and Environmental Health Division of the Defense Health Agency Public Health, testified to the symptoms related to the exposure:

> I think what we saw largely corresponded to what was the known toxic effects of, you know, JP-5. So it primarily involved, you know, gastrointestinal system, the nausea, vomiting, abdominal pain, dermatologic system, you know, rash, irritation, skin rash, neurologic system, you know, headaches, maybe just kind of confusion.[79]

---

[77] Report Update: Joint Base Pearl Harbor-Hickam DoD-affiliated Housing Residents' Medical Encounters Related to the JP-5 Release, 01 January 2021-30 November 2022, (PX-1493) at p. 4.

[78] Healthcare Provider Evaluation and Treatment Guidance for Potential Petroleum Exposure from the Navy Water Distribution System, (Feb. 25, 2022) (PX-1240).

[79] Deposition of Colonel John Oh, M.D., (June 8, 2023) at 70:1-19.

Dr. Oh likewise agreed that jet fuel can cause skin problems,[80] gastrointestinal

pain and neurological harm,[81] and renal damage.[82] Captain Michael McGinnis,

M.D., testified to acute symptoms from exposure to jet fuel:

> And when you think of that, toxidrome, it's your surfaces that come into contact, perhaps, with the chemical irritant like jet fuel. So that would be skin rashes. It may be lung irritation, coughing. It could be nausea and vomiting. It could be diarrhea, … it could also be headaches from – from inhaling vapor And, so, these types of symptoms are consistent with a toxidrome associated with a jet fuel exposure.[83]

He also stated, "Those types of symptoms, depending on an individual and

whatever the cause is, can last hours, days, weeks, months."[84]

Third-party expert Dr. Roger Brewer of the Hawaii Department of Health

similarly recognized acute health effects in his deposition testimony and Exposure

Assessment:

> Potential acute health affects posed by short-term exposure to relatively high concentrations of hydrocarbons include eye and skin irritation, dermatitis, defatting of skin, dizziness, headache, anesthesia, coughing, gagging, vomiting, griping, diarrhea, depressed respiration and pulmonary edema (ATSDR 2023; NIH 2023). Acute health effects

---

[80] Deposition of Colonel John Oh, M.D., (June 8, 2023) at 197-198:22-1.

[81] Deposition of Colonel John Oh, M.D., (June 8, 2023) at 196:2-21.

[82] Deposition of Colonel John Oh, M.D., (June 8, 2023) at 195:7-18.

[83] Deposition of Captain Michael McGinnis, M.D., (July 11, 2023) at 69:11-70:7.

[84] Deposition of Captain Michael McGinnis, M.D., (July 11, 2023) at 69:9-70:7, 320:8-24.

posed by exposure to high concentration of DiEGME include headache, dizziness, tiredness, nausea, vomiting and eye irritation (NIH 2023, ThermoFisher Scientific 2021). Short-term exposure to high concentrations of 2,6-Di-Tert- Butyl-4-Methylphenol can cause throat irritation, dermatitis, abdominal pain, nausea, confusion and dizziness (NIH 2023).[85]

Dr. Brewer's findings highlighted acute, subchronic, and chronic health risks associated with varying levels and durations of exposure to specific hydrocarbons and additives present in JP-5 jet fuel. Beyond acute, exposure, he also discussed subchronic exposure, spanning weeks to a year, bridges the gap between immediate and long-term effects, impacting various organs and systems with differing degrees of severity based on exposure levels.

Dr. Brewer calculated reference doses, reference concentrations, and cancer slope factors to evaluate the risk levels for both cancerous and non-cancerous health outcomes. These calculations reveal that residents and individuals exposed to JP-5 contamination face a range of health risks, from low to very high,

---

[85] Letter from R. Brewer, Hawaii Dept of Health, to Agency for Toxic Substances and Disease Registry (ATSDR) re: Response to Technical Review - Exposure Assessment: Nov 2021 Release of JP-5 Jet Fuel into the Joint Base Pearl Harbor Hickam and Connect Drinking Water Systems, with Nov. 6, 2023 Technical Review Report attachment, dated Nov. 20, 2023 (PX-1155).

depending on the specific compounds and exposure scenarios. Dr. Brewer testified that his findings regarding exposure "predicted significant health effects."[86]

Plaintiffs' expert Dr. Steven Bird outlines the kinds of acute injuries attributable to exposure to jet fuel.[87]

> 90.    Studies support that acute symptoms of JP-5 exposure would include skin irritation and rash; abdominal pain; vomiting; diarrhea; headache; irregular menstrual cycles; anxiety; and other neurological symptoms.[88]

Dr. Bird supported his determination with an extensive review of academic literature and scientific studies,[89] including many reports released by the Government such as the ATSDR's Toxicological Profile for JP-5, JP-8, and Jet A Fuels.[90]

Just this week, Dr. Oh, of the Defense Health Agency, further reported to health providers that patients affected by Red Hill continue to experience health

---

[86] Deposition of Roger Brewer (Aug. 15, 2023) at 105:7-24.

[87] Declaration of Steven Bird, M.D. (ECF No. 383) at ¶ 90.

[88] Declaration of Steven Bird, M.D., (ECF No. 383) at ¶ 90.

[89] *See, e.g.,* Reliance Materials (PX-2209), (PX-2210), (PX-2213), (PX-2215), (PX-2217), (PX-2218), (PX-2227), (PX-2327), (PX-2328), (PX-2329), (PX-2330), (PX-2331), (PX-2332), (PX-2333).

[90] Agency for Toxic Substances and Disease Registry (ATSDR), Toxicological Profile for JP-5, JP-8, and Jet A Fuels (PX-2186).

effects—and neurological injuries in particular.[91] Plaintiffs' expert for Nastasia
Freeman, Dr. Kristin Andruska, provided declaration testimony regarding the
neurological effects of fuel contamination. Adverse neurological effects of jet fuel
exposure were documented by the Hawaii Department of Health, CDC, and
ATSDR.[92] The largest percentage of reported symptoms in individuals exposed to
jet fuel at the Red Hill facility were related to the nervous system, accounting for
62% of reported symptoms.[93] Symptoms experienced by affected individuals, were
consistent with known adverse neurological and neurobehavioral effects of jet fuel
exposure. These symptoms included headaches, dizziness, seizures/convulsions,
confusion, difficulty concentrating, difficulty remembering things, anxiety,
depression, and post-traumatic stress syndrome.[94]

By all accounts, residents also suffered trauma from exposure to
contaminated water in the homes where they expected to be safe. The trauma was
compounded by feelings of betrayal by the Government to whom they had
entrusted their family's lives. Dr. Storage testified that mental trauma can cause
brain injury. As a result, toxic exposure can lead to a double-brain injury—injury

---

[91] DHA Red Hill Health Response Webinar Video, Col. J. Oh (Apr. 9, 2024) (PX-2396).

[92] Declaration of Kristin Andruska, M.D., (ECF No. 364) at ¶84-87.

[93] Declaration of Kristin Andruska, M.D., (ECF No. 364) at ¶85.

[94] Declaration of Kristin Andruska, M.D., (ECF No. 364) at ¶ 86-87.

from the exposure itself, as well as from the emotional trauma. Trauma itself causes physiological changes in the brain and can alter brain function.[95]

### 2.    Specific Causation: Health Effects

Each of the Plaintiffs provided declaration testimony regarding the health effects of consuming the contaminated water, as further explained below. Further, after thoroughly reviewing their medical records and the literature and conducting clinical interviews, Plaintiffs' expert Dr. Bird opined that the following acute symptoms were attributable to the water contamination:

- Kevin Aubart: Abdominal pain, diarrhea, nausea, joint pain, fatigue, anxiety, headaches, and brain fogginess.

- Richelle Dietz: Abdominal pain, nausea, vomiting, diarrhea, burning of eyes and throat, headaches, a cough, rash, and anxiety.

- B.D.: Acute headaches, balance disturbances, abdominal pain, nausea, diarrhea, general fatigue, dry skin, sore throat, and anxiety.

- V.D.: Abdominal pain, vomiting, diarrhea, shortness of breath with decreased exercise tolerance, wheezing, dry skin, and a cough.

- Patrick Feindt, Jr.: Headaches, nausea, vomiting, diarrhea, a cough, burning sensation in nose and mouth, muscle pain, general malaise, memory loss, and alteration in mood.

---

[95] Declaration of Steven Storage, M.D. (ECF No. 387) ¶10-11.

- P.G.F. (or "P.F."): Cough, abdominal pain, vomiting, diarrhea, regression in toilet training, language development, and behavior.

- P.R.F. (or "T.F."): Abdominal pain, nausea, vomiting, diarrhea, headaches, a cough and wheezing (exacerbation of asthma), anxiety, and fear.

- Sheena Jessup: Abdominal pain, nausea, a rash, cough, eye irritation, headaches, anxiety, fatigue, numbness, and problems with balance.

- Beau Jessup: Abdominal pain, nausea, headaches, burning of throat, a cough, balance problems, irritated eyes, a rash, and muscle aches.

- B.J.J.: Abdominal pain, nausea, diarrhea, throat burning, eye irritation, a rash, headaches, fatigue, muscle aches, and anxiety.

- N.J.: Abdominal pain, vomiting, diarrhea, a cough, eye irritation, headaches, anxiety, and behavior abnormalities.

- D.J.: Diarrhea, eye irritation, and dry skin.

- Nastasia Freeman: Seizures, headaches, visual changes, abdominal pain, nausea, vomiting, diarrhea, a rash, exacerbation of psoriasis, and menstrual irregularities.

- K.F.: Abdominal pain, nausea, vomiting, diarrhea, a cough, rash, and headaches.

- N.F.: Abdominal pain, nausea, vomiting, diarrhea, a cough, wheezing, headaches, tinnitus, and severe body and bone pain.

31

- D.F.: Abdominal pain, vomiting, and diarrhea.

- Elizabeth Witt: Menstrual irregularities, palpitations, abdominal pain, abdominal cramping, a rash, and acute anxiety.

Plaintiffs' expert Dr. Kristin Andruska concludes that jet fuel exposure from the Navy's Red Hill Facility was, more likely than not, a substantial contributing factor to Plaintiff Nastasia Freeman's subsequent neurologic symptoms.[96] Dr. Andruska details Freeman's extensive medical history, noting her pre-existing seizure disorder and describes the onset of new and worsened neurological symptoms following the exposure in November 2021[97] She asserts that such contamination can cause neurological conditions like this, stating, "Toxic exposure to jet fuel may affect the nervous system, including neurologic and neuropsychiatric symptoms."[98] She further notes, "Mrs. Freeman suffered from a profound neurologic syndrome...once triggered, the toxic exposure started a neurologic and neuropsychiatric cascade that has not yet been fully reversed."[99] Dr. Andruska concludes that Freeman's exposure to jet fuel was a substantial contributing factor to her subsequent neurologic symptoms, which are consistent

---

[96] Declaration of Kristin Andruska, M.D. at ¶ 90.

[97] Declaration of Kristin Andruska, M.D. at ¶ 43, ¶ 47, ¶ 80.

[98] Declaration of Kristin Andruska, M.D. (¶ 28).

[99] Declaration of Kristin Andruska, M.D. (¶ 95).

with known effects of jet fuel toxicity and differ notably from her baseline condition. She emphasizes the clear temporal relationship between the exposure and symptom onset, underscoring that "jet fuel exposure precedes the onset of her new and more frequent symptoms."[100]

Plaintiffs' expert Dr. Steven Storage will provide testimony regarding Mrs. Freeman's mental trauma and brain injury following her toxic exposure. Dr. Storage will explain that Mrs. Freeman's symptoms of neurological and psychiatric distress began following this exposure, and these symptoms are indicative of brain injury from both the toxic exposure and subsequent emotional trauma.[101] He will also describe specific findings from brain imaging studies, including SPECT scans, that demonstrate abnormalities consistent with injuries from toxic exposure.[102]

Furthermore, Dr. Storage will testify about the long-term effects of this trauma, noting that Mrs. Freeman continues to suffer from cognitive impairments, such as attention deficits and memory loss, which correlate with her diagnosed conditions and brain imaging findings[103] He will conclude that based on his assessment and the imaging results, the toxic exposure at Mrs. Freeman's home

---

[100] Declaration of Kristin Andruska, M.D. (¶ 93).

[101] Declaration of Steven Storage, M.D. ¶ 14.

[102] Declaration of Steven Storage, M.D., ¶¶ 35, 37, 38.

[103] Declaration of Steven Storage, M.D. at ¶ 42.

was a substantial factor in bringing about her neurological and psychiatric symptoms.[104]

### E.    The Plaintiffs' Experiences

Each of the Plaintiffs' declarations detail the health effects after their exposure to jet-fuel, the inconvenience and dislocation their families endured, and the emotional distress they experienced because of their exposure.

### 1.    Kevin Aubart

Kevin Aubart, a 58-year-old military veteran, dealt with the contaminated water while living at 3162 Snyder Court, Honolulu, HI, in the Doris Miller Park neighborhood, a military housing residence serviced by the Joint Base Pearl Harbor-Hickam water system.[105] He and his wife of 30 years, Saori, moved to Hawaii in 2016 for Aubart to continue his work as a civilian for the US Army. Aubart enjoyed the overseas-like setting of Hawaii and chose Navy Housing to be surrounded by service members, who shared a common understanding of his former military life.[106]

In late November, Aubart experienced mysterious ailments like upset stomachs and saw his dog suffer several seizures. On November 28, the smell and

---

[104] Declaration of Steven Storage, M.D. at ¶ 14.

[105] Declaration of Kevin Aubart (ECF No. 389).

[106] Declaration of Kevin Aubart at ¶¶ 10-12.

appearance of the water clearly indicated contamination to both him and his wife. Although Aubart received mixed messages from the military minimizing the issue, it was clear to him something was wrong.[107]

The immediate health effects around the time of the fuel contamination were significant for both Aubart and his wife. Aubart suffered from rashes, eye irritations, joint and abdominal pain, headaches, and fatigue.[108] Their pet, a toy poodle named Coco, experienced multiple seizures, which Aubart later attributed to contaminated ice cubes he had given to Coco on hot days.[109]

---

[107] Declaration of Kevin Aubart at ¶¶ 14-20.

[108] Declaration of Kevin Aubart at ¶ 39 ("I experienced sinus symptoms as well that worsened in occurrence and frequency after November 28, 2021. These included head colds, coughing, postnasal drip, and fevers."); ¶ 42 ("Other symptoms I experienced after exposure to the contaminated water included headaches, light sensitivity, nausea, and sore throats."); ¶ 40 ("I experienced rashes and eye irritation. This started in early November 2021, but began happening every time I took a hot shower after the 28th. I would get a rash all over my stomach and chest, as well as eye irritation."); ¶ 41 ("I also began to experience severe muscle and joint pain after November 28, 2021. There was so much pain in my arms and shoulders that I could not reach over my head, and I couldn't do the things I loved like play the guitar.").

[109] Declaration of Kevin Aubart at ¶¶ 17-18.

The contamination led to inconvenience and dislocation for Aubart and his family.[110] Despite efforts to mitigate exposure by using bottled water and reducing use of tap water, the living conditions became unbearable. Aubart was provided a hotel, but logistical challenges related to finding a place for their pet that led his wife to refuse to leave the house led to most of his time still being spent at the contaminated residence and commuting to the hotel for showers. Eventually, in April 2023, the Aubarts felt they had no choice but to move to a new home in Waipahu, driven by ongoing concerns over the safety of their previous home's water supply.[111]

The long-term effects of the contamination include ongoing mental health and emotional distress for Aubart.[112] Aubart suffers from anxiety, stress, irritability,

---

[110] Declaration of Kevin Aubart at ¶ 58 (commuting to hotels for showers); ¶ 58 (loss of time); ¶ 47 (arguments); ¶ 58 (canceling daughter's visit); ¶ 57 (having to move homes).

[111] Declaration of Kevin Aubart at ¶ 27-29, 35.

[112] Declaration of Kevin Aubart at ¶ 43 ("My mental health suffered from this event, including anxiety, stress, irritability, and sleep apnea."); ¶ 47 ("The jet fuel spill caused significant marital problems that have not been resolved. […] These disagreements caused stress in our marriage and between the two of us. It caused me even more stress because I felt so much guilt. Our closeness was affected by this. Our sexual intimacy was affected and diminished. During that time we were not able to have a relationship as husband and wife, because we were in conflict while dealing with a life-changing crisis."); ¶ 48 ("At work, I began having a harder time concentrating and remembering even simple things, even people's names whom I've known for years. […] This had a negative impact on my work

and sleep disturbances, which he attributes to the trauma of the contamination and his perceived betrayal by the government. These feelings are compounded by fears of potential long-term health effects, such as cancer, due to exposure. Aubart's sense of betrayal is deepened by the Government's initial downplaying of the contamination and his long history of service to the same Government.[113]

### 2.    The Dietz Family

The Dietz family lived in military housing on 731 Ohana Nui Circle in Honolulu, Hawaii, in the Earhart Village neighborhood which was serviced by the Joint Base Pearl Harbor-Hickam water distribution system.[114] Richelle Dietz is a 37-year-old mother and wife of Navy Chief Petty Officer Bryan Dietz, who had moved to the idyllic locale in February 2021 with their 13-year-old son B.D. and 5-year-old daughter V.D.. Richelle recounts her efforts to overcome a childhood of poverty through education, her mother's death, and the charter school she attended to eventually become a director at work, enabling her to support her husband's Navy career across various states.[115]

---

performance and my relationships with others. I got increased anxiety and even suffered from an anxiety attack at work in April 2022.")

[113] Declaration of Kevin Aubart at ¶ 43-45, 61.

[114] Declaration of Richelle Dietz (ECF No. 391).

[115] Declaration of Richelle Dietz at ¶ 1-5.

Acute symptoms such as stomach pain, vomiting, and severe headaches struck the family in late November 2021. The family initially mistook the cause for a foodborne illness post-Thanksgiving but soon uncovered the truth when Richelle and Bryan noticed a strong smell of jet fuel and an oily sheen on their tap water, a symptom corroborated by numerous community members on social media. The severity of the situation dawned on them when health symptoms escalated, and Richelle experienced a panic attack at a Navy town hall meeting due to the lack of clarity and dismissal from Navy officials about the situation.[116]

Each family member suffered acute symptoms during the time of the fuel contamination.[117] B.D. experienced a significant increase in the severity and

---

[116] Declaration of Richelle Dietz at ¶9-14; Declaration of Bryan Dietz at ¶6-9.

[117] Declaration of Richelle Dietz at ¶ 10 ("I had stomach pain, vomiting and diarrhea."); ¶ 11 ("Then many of us developed a rash. I have attached a true and accurate photo of one of my rashes on my face at Tab D (PX-1066)."); ¶ 10 ("My eyes and throat burned….") ¶ 13 ("My throat is burning. I feel like I just drank gasoline."); ¶ 10 ("I was having splitting headaches."); ¶ 10 ("I developed a cough…"). B.D. (13-year-old son): Declaration of Richelle Dietz, ¶ 12 ("He had a huge spike in the severity and regularity of his headaches."); ¶ 12 ("He began to lose his ability to keep his balance and we noticed he couldn't feel things strongly on parts of his body."); ¶ 12 ("Our son, B.D., also experienced nausea, vomiting and diarrhea."); ¶ 26 ("B.D. also dealt with general fatigue…");¶ 26 ("B.D. also dealt with general fatigue, dry skin, sore throat, severe anxiety, and headaches."). V.D. (5-year-old daughter) Declaration of Richelle Dietz, at ¶ 17 ("And our entire family had been experiencing stomach pain, diarrhea, and nausea); ¶ 10 ("We had no idea what was causing her pain so reached out to her doctor.") Declaration of Bryan Dietz, ¶ 17 ("V.D. had… pain in her vaginal area…"). Declaration of

frequency of headaches, a loss of balance, and numbness. His pre-existing Chiari malformation was exacerbated, leading to debilitating migraines that affected his schooling and quality of life. V.D. exhibited severe pain during baths, along with stomach distress. The entire family experienced gastrointestinal issues and various skin and neurological symptoms.[118]

The family was subjected to unenviable inconvenience.[119] They were forced to rely on bottled water for all basic needs, jury rig a makeshift showering arrangement which added stress and financial strain, and struggle to keep the kids in school.

---

Richelle Dietz, ¶ 10 ("When we bathed her, V.D. cried and screamed 'my butt hurts.'"); Declaration of Bryan Dietz, ¶ 17 ("V.D. had dry skin, a rash on her stomach…"); Declaration of Richelle Dietz, ¶ 27 ("V.D.'s cough led to severe wheezing, colds began lasting weeks rather than days.") and Declaration of Bryan Dietz, ¶ 17 ("V.D. had . . . a cough that developed into severe wheezing.").

[118] Declaration of Richelle Dietz at ¶12; ¶26-27; Declaration of Bryan Dietz at ¶13-17.

[119] Declaration of Richelle Dietz at ¶ 31 ("We only consumed water from bottles or jugs we purchased, which quickly became expensive."); ¶ 32 ("To shower, we found a vinyl camp shower in the garage and heated the water in a tea kettle. The camping shower could only hold a few gallons of water, so the experience was cold, stressful, and uncomfortable for our family."); ¶ 26 ("B.D. also dealt with general fatigue, dry skin, sore throat, severe anxiety, and headaches. As a result, he missed a significant amount of time in school."); Declaration of Bryan Dietz, ¶ 31 ("B.D. became so afraid of triggering a headache, he stopped going outside and doing the things he loved."); Declaration of Richelle Dietz, ¶ 66 ("V.D., who used to love playful bathtime, now fights us to get in showers and baths.").

The long-term emotional implications of the crisis have been life changing for the family.[120] The emotional toll was considerable, with Richelle and B.D. grappling with anxiety and panic attacks. Richelle fears the long-term health consequences of the exposure, likening their predicament to the Camp Lejeune water contamination. The family's sense of security and trust in government

---

[120] Declaration of Richelle Dietz, ¶ 23 ("At that town hall, the Navy officers claimed that they didn't know what was in the water... I raised my hand to ask a question, and after the Navy gave a dismissive answer, I began to feel shaky, lightheaded, and dizzy. I thought I might pass out on the spot."), and ¶ 65 ("I continue to suffer from panic attacks. I often have them when I pull into our driveway or at night around the same time in the evening when we found out about the water from our neighbors."); ¶ 59 ("I became so stressed I stopped sleeping. I average 5-6 hours of actual sleep time a night, often waking in panic."); ¶ 63 ("None of those experiences caused me the stress and anxiety that I've experienced since Red Hill... I lost the notion that there were 'good guys,' and I lost trust in institutions generally."); ¶ 69 ("We have been under an incredible amount of stress, which has negatively impacted our marriage. There is no intimacy when you are trying to make it through the day."); Declaration of Bryan Dietz, ¶ 18 ("B.D.'s anxiety went through the roof, too... And he was worried about his brain and his health. He has always been a sensitive kid."); ¶ 38 ("B.D. also worries about his own health—when he will get another migraine, and how long these migraines will last... It feels like he's not even a kid anymore."). Declaration of Richelle Dietz, ¶ 53 ("As a now thirteen-year-old, he has to make impossible choices himself about what activities will or will not give him a migraine... This is not the childhood that a boy deserves, this isn't the childhood he had before 2021."); Declaration of Bryan Dietz, ¶ 22 ("V.D. cried and hated it. The entire experience was traumatic for our family."; Declaration of Richelle Dietz, ¶ 66 ("V.D., who used to love playful bathtime, now fights us to get in showers and baths.").

institutions that Bryan has served for years has been irrevocably shattered, leading to an upcoming move off the island to safeguard their health and well-being.[121]

### 3.    The Feindt Family

Amanda and Patrick Feindt resided in military housing on Ford Island at 4838 Yorktown Blvd., Honolulu, HI, a residence serviced by the Joint Base Pearl Harbor-Hickam water distribution system.[122] Amanda, an Army officer, along with her husband Patrick, a PGA golf professional, initially enjoyed their life in Hawaii, where they were raising their two young children, P.G.F. ("P.F.") and P.R.F. ("T.F."). Patrick was thriving in his role at a local golf simulator business.[123]

Around the time of the fuel spill, the entire family experienced acute health symptoms, including severe headaches, abdominal pain, nausea, vomiting, and diarrhea.[124] Their daughter P.F. suffered from rashes and shortness of breath,

---

[121] Declaration of Richelle Dietz, ¶31-32; ¶59; ¶70; Declaration of Bryan Dietz, ¶20-22; ¶34-36).

[122] Declaration of Amanda Feindt (ECF No. 393); Declaration of Patrick Feindt, Jr. (ECF No. 392).

[123] Declaration of Patrick Feindt ¶ 88-91.

[124] Declaration of Patrick Feindt, Jr. at ¶ 73 ("At the time of the fuel release, I experienced headaches, nausea, vomiting, diarrhea, coughing, burning in my nose and mouth, muscle pain, brain fog, and short-term memory loss."); Declaration of Amanda Feindt, ¶ 35 ("Patrick and T.F. had diarrhea and were vomiting uncontrollably. We immediately took them to the emergency room."); Declaration of Patrick Feindt, Jr., ¶ 16 ("In November of that year, over Thanksgiving, our entire household started coming down with symptoms—diarrhea, nausea,

followed by developmental regression. Their young son T.F. developed a bad

cough and wheezing. The family made frequent medical visits as they suffered

from persistent symptoms.

The fuel release inconvenienced and dislocated the family.[125] They relocated

multiple times to hotels to avoid exposure, significantly disrupting their daily lives.

They moved their family of four from their home to a hotel, faced with the

---

vomiting, headaches.”); Declaration of Amanda Feindt, ¶ 75 (“P.F. suffered from
coughing, abdominal pain, vomiting, and diarrhea immediately following the jet
fuel exposure.”); ¶ 39 (“Two days later, on December 13, 2021, P.F. woke with
severe abdominal pain, vomiting, and diarrhea.”); ¶ 76 (“P.F. also suffered
significant regressions in her toilet training, language development, and behavior
that continue to impact her.”); ¶ 77 (“P.F. continues to suffer from shortness of
breath, rashes...”); Declaration of Amanda Feindt, ¶ 78 (“Immediately following
the jet fuel leak, T.F. suffered from abdominal pain, nausea, vomiting, diarrhea,
debilitating headaches, and developed a bad cough and wheezing (exacerbation of
his asthma) and anxiety and fear due to being so ill.”).

[125] Declaration of Patrick Feindt, ¶ 32 (“The next day, we moved into a hotel. We
paid for it out of pocket because we did not want to have to wait to be reimbursed,
and we were desperate to get out of our home as quickly as possible.”); Part 3/3, ¶
95 (“In December 2023, I lost this job. I have never been fired in my whole life.
But I know that I am not the same PGA Professional that I used to be.”), Part 3/3, ¶
108 (“The family dynamic has been tough, and the family dynamic continues to be
tough because of my wife’s health, her career and the possibility of medical
retirement—not to mention the retaliation she has faced...”); Declaration of
Amanda Feindt, Part 2/3, ¶ 76 (“She also suffered significant regressions in her
toilet training, language development, and behavior that continue to impact her.”),
¶ 104 (“She will not drink water unless it is bottled, and she carries her own water
bottle everywhere.”); ¶ 55 (“T.F. too had to change schools and miss his little
buddies on the street..”).

challenge of managing their health in unfamiliar and temporary settings. This

constant movement added stress and disrupted the children's routines and

schooling.[126] Finally, they moved off the island and had to live apart for months so

that Mr. Feindt could work while Major Feindt was assigned to a soldier recovery

unit.

In the long term, the Feindts have faced lasting mental and emotional

distress due to the contamination.[127] Patrick suffered a job loss due to his

---

[126] Declaration of Amanda Feindt ¶ 30; Declaration of Patrick Feindt ¶ 32.

[127] Declaration of Patrick Feindt, ¶ 98 ("But the fuel release has changed me as a
person. I'm in pain all the time, and the pain makes me grouchy. I'm definitely not
fun to be around anymore."), ¶ 99 ("I have emotions about this whole experience
that I never felt in my life. Sometimes embarrassed, sometimes humiliated,
sometimes depressed. I am now in therapy for the first time."), ¶ 108 ("These
experiences have affected our romance and intimacy together. Not only were we
separated for six months, but it is hard to be intimate even when we are together.
The stress of it all has taken its toll."), ¶ 95 ("In December 2023, I lost this job. I
have never been fired in my whole life. But I know that I am not the same PGA
Professional that I used to be."); Declaration of Amanda Feindt, ¶ 76 ("She also
suffered significant regressions in her toilet training, language development, and
behavior that continue to impact her."), ¶ 104 ("P.F. now has a fear of water. She
will not drink water unless it is bottled, and she carries her own water bottle
everywhere. P.F. believes that whenever someone is sick, it is because of the water
they drank."), ¶ 76 again ("P.F. now goes to trauma therapy."), ¶ 105 ("Both P.F.
and T.F. now have a fear of doctors. They relate doctors to blood draws and shots
that they call pokies. Many times we have to correlate lab draws with sedations
such as MRIs or procedures to reduce the trauma and anxiety."); Declaration of
Amanda Feindt, ¶ 78 ("T.F. also developed a bad cough and wheezing
(exacerbation of his asthma) and anxiety and fear due to being so ill."), ¶ 71 ("He

deteriorating health, which impacted his professional capabilities and passion for golf. Both Amanda and Patrick have experienced depression, anxiety, and a sense of betrayal by the military institution they served. Their children, too, have faced ongoing health and developmental challenges, leading to long-term medical care and therapy. The entire family has struggled with the emotional and psychological fallout from the crisis, grappling with ongoing fears about their long-term health and well-being.[128]

### 4.    The Freeman Family

The Freeman family, including Koda Freeman, his wife Nastasia ("Tasia"), and their three children, K.F., N.F. and D.F., resided at 185 Halawa View Loop in the Aliamanu Military Reservation, military housing serviced by the Joint Base Pearl Harbor-Hickam water distribution system. Their ordeal began over the Thanksgiving week of 2021 when the family, along with visiting relatives and their

---

has had anxiety. And he severely struggled with behavioral issues after we moved to VA, and he had to see a behavioral specialist for the first time. He is now in play therapy."), ¶ 105 again ("Both P.F. and T.F. now have a fear of doctors. They relate doctors to blood draws and shots that they call pokies. Many times we have to correlate lab draws with sedations such as MRIs or procedures to reduce the trauma and anxiety.").

[128] Declaration of Amanda Feindt ¶ 77-79; Declaration of Patrick Feindt ¶ 95-97.

pets, started experiencing symptoms like dizziness, nausea, and vomiting. Initially

unaware of the water contamination, their situation worsened rapidly.[129]

When Koda recognized the smell of jet fuel in their tap water from his prior

naval service, he knew something was wrong. However, the family received

conflicting information from military and health officials, which added to their

confusion and distress.[130] The lack of clear and reliable guidance from authorities

left the family in a state of distrust and fear, as multiple acute symptoms such as

severe gastrointestinal issues, skin rashes, and neurological symptoms like memory

loss and brain fog set in.[131]

---

[129] Declaration of Nastasia Freeman (ECF No. 402); Declaration of Koda Freeman
(ECF No. 401) ¶¶ 5-7.

[130] Declaration of Koda Freeman ¶¶ 8-14.

[131] Declaration of Nastasia Freeman, ¶ 7 ("My friend, Keri, her children, N.F.,
K.F., and I all vomited. We thought it was food poisoning from Thanksgiving
dinner."), ¶ 8 ("I developed a rash on my arms with sores and lesions on my scalp,
feet, and hands. D.F., K.F., and N.F. had stomach pain, nausea, diarrhea and
vomiting. By Sunday, November 28th, my boys had become increasingly ill with
diarrhea, vomiting, and red eyes. D.F., K.F., and N.F. had headaches..."), ¶ 10 ("I
was experiencing splitting headaches during that time."), ¶ 32 ("I began having
seizures again after they were dormant for two and a half years."), ("K.F. also had
blood in his urine and reported blood in his stool."), ¶ 65 ("The disruptions of the
water crisis were especially disruptive to D.F., who was already struggling with
routines and daily living. His behaviors escalated, and he was diagnosed with level
2 autism in January 2022 before we left the island."), ¶ 71 ("D.F. is still having
neurological challenges, including memory loss, and absence seizures at school."),
¶ 67 ("He had tremors, which were especially scary.").

The impact of the contamination forced the Freemans into a disorienting

pattern of relocation and instability.[132] They moved between hotels due to the

unlivability of their home, disrupting their children's education and Nastasia's

---

[132] Declaration of Nastasia Freeman, ¶ 25 ("Around December 2nd or 3rd, my family checked into the Hilton Hawaii Village... The Navy only had a contract with the hotel for a certain amount of time, so the hotel made us check out by noon on the 15th. We went back to our home where we stayed until we were able to check into another hotel—the Sheraton Waikiki—on the afternoon of the 16th."); ¶ 26 ("During our time at the Hilton Hawaii, I would have to go home frequently because I had to conduct my therapy appointments from my home office. Due to HIPAA, my appointments could not be conducted from the hotel room with my three boys in attendance."); ¶ 28 ("It was over an hour each way from the hotel and the commute was exhausting for all of us."); ¶ 27 ("I couldn't drive because of my seizures. So several times a week, Koda would drive me back to our home and I would complete my work and virtual appointments with D.F., while our older boys would either be at school or would stay in other rooms of the house."); ¶ 29 ("By the time we moved to the Sheraton Waikiki, I recall going to the house less often because we continued to get sicker and sicker. My work was impacted, I had to decrease my caseload because there were many times I couldn't even lift my head, and the boys were struggling as well."); ¶ 73 ("K.F., my oldest son, had his own set of challenges. He was unable to participate in many of his social activities. He also had to limit contact with his friends. K.F. experienced limitations in his movement and physical activities due to illness, often needing assistance and support with daily tasks."); ¶ 89 ("N.F. also had to transition to home hospital schooling, disrupting his regular educational routines."); ¶¶ 64-65 (D.F. experienced regression in his developmental milestones, including speech and toilet training, which added stress and inconvenience for the family. D.F.'s behavioral difficulties escalated due to disruptions from the water crisis, requiring additional attention and care from our family."); ¶ 88 ("we got a call from D.F.'s school principal asking us to consider putting D.F. in the home hospital school program because this year due to illness, D.F. had missed 50 percent of school.").

ability to conduct her work as a mental health counselor. The frequent transitions

between their temporary accommodations and their home for various logistical

needs significantly compounded the family's stress. The Freemans knew they had

to get off the island, with Mrs. Freeman's military neurologist telling her her

seizures were a "breakthrough consequence" of her exposure and that she needed

to get care in California.[133] The Freemans submitted a request for a humanitarian

relocation within the military – and went through an ordeal of delay and reprisal –

that finally culminated in them moving in with family in California to get treatment

while searching for a new home.[134]

Over the longer term, the family has continued to endure significant and

lasting emotional distress.[135] Nastasia, in particular, has suffered from intensified

---

[133] Declaration of Nastasia Freeman, ¶ 43. ("In January 2022, my Tripler neurologist, Dr. Blattner, told me that he felt the recurrence of seizures was a breakthrough consequence of the toxic exposure. He determined that our family should return to California where there was more comprehensive medical care available.").

[134] Declaration of Nastasia Freeman, ¶¶ 43-54.

[135] Declaration of Nastasia Freeman, ¶ 103 ("I see my children so isolated—day in and day out—and I fear the negative psychological and social effects that will have on them in the future."), ¶ 109 ("We learned that we couldn't believe what anyone told us."), Conclusion, ¶ 115 ("The Navy harmed us. They stripped us from the life we had as individuals and as a family, the life we were giving our children, and the life we prayed our children and we would have years from now."), ¶ 90 ("Financially, my work as a therapist ground to a halt because of our family's medical challenges."); Part 3/4, ¶ 88 ("K.F. spent a year and a half in the program, and N.F. has been in the program for well over two years. They also suffered

seizure activity, a previously controlled condition that returned with severity

following the exposure. The persistent health issues have been paralleled by a loss

of faith in institutional support, mental trauma, and fear, further deepening the

emotional and psychological toll on the family.

### 5.    The Jessup Family

The Jessup family, including Sheena, her husband Brian, and their four

children—Beau, B.J.J., N.J., and D.J.— resided in the Radford Terrace

neighborhood at 2632 Stowell Circle, Honolulu, HI, a military housing residence

---

academically. Both missed being able to bond and socialize with friends at
school."), ¶ 106 ("He asks if he is going to get better, or if he's going to get worse.
He asks if he will be able to play soccer. He is anxious about his health and he is
just a kid."), Conclusion, ¶ 108 ("His pain makes it hard for him to stand
sometimes—how could he play basketball or a game with friends?"), ¶ 107 ("His
social life has been replaced with laying in bed with cold packs on his head for his
migraines. He takes medication that has side effects. Sometimes he can't go
outside because light hurts. He is just a teenager, and he is missing out on an
ordinary teenage life."); ¶ 64 ("While we were in base housing in Hawaii, D.F.
regressed in his developmental milestones. Our vibrant kid suddenly stopped
speaking, and he went back to diapers. The disruptions of the water crisis were
especially disruptive to D.F., who was already struggling with routines and daily
living. His behaviors escalated, and he was diagnosed with level 2 autism in
January 2022 before we left the island."), ¶ 114 ("He had started to make friends,
and he had a routine at preschool. The water crisis pulled the rug out from under
him.").

serviced by the Joint Base Pearl Harbor-Hickam water distribution system. Sheena

initially loved their life in Hawaii, before the discovery of fuel in their water.[136]

The family started experiencing unusual health symptoms in November

2021. Sheena discovered the contamination indirectly through her job at Target,

where panicked customers and a Facebook post alerted her to the issue, leading to

the realization that their tap water was contaminated. This was confirmed by the

smell and visible sheen of fuel in their home's water, despite conflicting public

communications from military officials about the safety of the water.[137]

In the immediate aftermath, the Jessup family suffered a range of acute

health effects including headaches, nausea, dizziness, and severe skin and

respiratory reactions.[138] Sheena Jessup experienced severe esophageal pain from

---

[136] Declaration of Sheena Jessup (ECF No. 396) at ¶¶ 1-5.

[137] Declaration of Sheena Jessup (ECF No. 396) at ¶11, ¶15.

[138] Declaration of Sheena Jessup, ¶ 10 ("our family developed similar symptoms at once, including headaches, nausea, dizziness, and abdominal pains."), ¶ 16 ("Even though we quit using the tap water, our family continued to get sick over the course of the next week with diarrhea, stomach pain and nausea."), ¶ 17 ("The coffee burned my esophagus immediately, not because it was hot but because it felt like gasoline."), ¶ 26 ("I developed anxiety, abdominal pain, nausea, and diarrhea."); ¶ 23 ("Beau had stomach pain, frequent nose bleeds suddenly, burning of the throat, rashes, dizziness, and a cough. Most worrisome, we noticed that his hands were shaking and that he was having trouble with balance. He had brain fog and headaches."); ¶ 24 ("B.J.J. too had stomach pain and skin rashes."), ¶ 52 ("But then she immediately developed a rash on her face and her arms. I texted a friend true and accurate photos attached at Tab K (PX-1055)."); ¶ 22 ("He said that his

drinking coffee made with contaminated water and her children developed rashes

and gastrointestinal symptoms. Their struggles with the physical symptoms of the

contamination were particularly severe for N.J., who has autism and a mast cell

disease, making him vulnerable to the effects of the contamination.[139] The acute

development of a lingering hand tremor in Beau Jessup not only caused him social

pain and anxiety but threatens to end his dreams of serving in the military.[140]

 The Jessups endured inconvenience and dislocation due to the fuel spill.[141]

The challenges included cramped and inadequate accommodations at a hotel

---

eyes burned, especially on the flushing days. He also has severe feeding issues and
drank formula from a bottle, even at the age of 4 and 5. He needed a lot of water.
He also developed tummy pain, and diarrhea."); ¶ 25 ("D.J. experienced many of
the same, although he was so much younger as a baby. He too had vomiting and
diarrhea, and eye irritation.").

[139] Declaration of Sheena Jessup (ECF No. 396) at ¶10, ¶17, ¶19.

[140] Declaration of Beau Jessup (ECF No. 394) at ¶¶ 22-27; Declaration of Sheena
Jessup at ¶ 79 ("Beau in particular is afraid of getting cancer and that his tremors
won't get better or may get worse.").

[141] Declaration of Sheena Jessup, ¶ 36; "N.J. was acting out, jumping between the
beds and trying to open the door. And because the room didn't have WiFi, my big
kids weren't able to log into their classes or do their homework" (Declaration of
Sheena Jessup, ¶ 37); "It was immediately apparent this was not a workable option
for my family. We showered while we were there, and then I packed us up, and
headed home—crying and emotional because I didn't know what to do"
(Declaration of Sheena Jessup, ¶ 38). The necessity to move to separate locations
for safety further complicated their situation, as detailed by Sheena, "Brian and I
made the difficult decision to live in separate locations to get our children to safety.
He stayed behind to finish his service. He slept in his office for five months
because we couldn't afford another housing allowance" (Declaration of Sheena
Jessup, ¶ 61); "Instead, the kids and I moved to Peoria, Arizona, near family"

arranged by the Navy, where heavy rain led to a flooded parking garage and they were assigned only one small room for all six members, causing discomfort and emotional stress for Sheena and the children. The family ultimately moved in with family in Arizona to escape the contaminated water, while husband Brian slept in his office for five months because they couldn't afford another housing allowance.[142]

The long-term effects of the contamination have been profound, affecting both the physical and mental health of the Jessups.[143] Sheena and her children

_____

(Declaration of Sheena Jessup, ¶ 62); "We moved out of our house on May 14, 2022. As we were transitioning home, we stayed at a hotel on Ford Island. This was the first time I let N.J. bathe in water" (Declaration of Sheena Jessup, ¶ 63). The daily challenges included fear of insufficient water supply and complicated bathing routines, as Sheena explains, "The kids and I were excited to get a hotel, and to get to take a normal shower" (Declaration of Sheena Jessup, ¶ 34); "Eventually, we began to receive daily rations from neighborhood water distribution stations, but this was still incredibly stressful because we were always in fear of not having enough" (Declaration of Sheena Jessup, ¶ 40); "To take a bath, we would first boil two pots of water for each person – one for soapy water, and one for rinsing water" (Declaration of Sheena Jessup, ¶ 43).

[142] Declaration of Sheena Jessup, ¶¶ 61-63.

[143] Declaration of Sheena Jessup, ¶ 26 ("I developed anxiety, abdominal pain, nausea, and diarrhea."), ¶ 38 ("crying and emotional because I didn't know what to do."); ¶ 74 ("He now has anxiety as well. He becomes embarrassed about this at school and doesn't want to talk about it at home."), ¶ 79 ("Beau in particular is afraid of getting cancer and that his tremors won't get better or may get worse."); ¶ 73 ("B.J.J. … now struggles with anxiety, depression."), ¶ 69 ("She has ADHD, and the transition has been hard for her…"); ¶ 21 ("The disturbances in routine were drastic and impacted every aspect of our life. He couldn't cope with all the changes, and his therapy routines became disrupted."), ¶ 80 ("I'm also afraid for

continue to experience anxiety and emotional distress, with ongoing concerns about potential future health impacts such as cancer. The family's trust in institutional support has eroded, especially in military medical services, which they felt were inadequate in addressing or acknowledging the severity of the contamination and its effects on their health. They harbor a persistent fear and mistrust of tap water and an overall feeling of having been abandoned by the military organization they were part of, which has deeply impacted their psychological well-being and family dynamics to this day.[144]

### 6. Elizabeth Witt

Elizabeth Witt resided in military housing in the Officer Field neighborhood at 203 Signer Blvd. C, Honolulu, HI, a home serviced by the JBPHH water distribution system. Mrs. Witt came from a military family and moved frequently due to her father's career in the Air Force. She married Konner Witt, who was stationed in Hawaii as a Captain in the Air Force. They moved to Hickam Air Force Base in August 2021 with their dog.[145]

Mrs. Witt experienced acute health symptoms such as excessive night sweats and heart palpitations in November 2021. After returning from a Thanksgiving trip,

---

N.J. who is terrified of any medical testing. If it's determined that he needs medical testing, he'll have to be sedated because of his autism.").

[144] Declaration of Sheena Jessup (ECF No. 396) at ¶76, ¶85, ¶86.

[145] Declaration of Elizabeth Witt (ECF No. 397) at ¶ 2-5.

she encountered intense stomach cramping and skin issues. Mrs. Witt's immediate health effects included a range of acute symptoms such as chills, bloating, abdominal pain, headaches, and rashes.[146] These symptoms were particularly troubling as they exacerbated her pre-existing anxiety.[147] On December 1, she noticed a Facebook post from the Hawaii Department of Health about potential petroleum in Navy water lines.[148]

    The Witts faced considerable inconvenience during the water crisis. They had to relocate temporarily to a hotel, which was difficult with their dog, leading them to return to their home despite ongoing contamination.[149]

---

[146] Declaration of Elizabeth Witt (ECF No. 397) at ¶ 10 ("In November 2021, I began having excessive night sweats and heart palpitations."), ¶ 11 ("When we got back, I had intense stomach cramping... I also got dry and itchy skin on my arms and legs after showering, with rashes on my arms."), ¶ 17 ("On December 6, I visited the white tent and reported my acute symptoms including chills, bloating, abdominal pain, headaches, and rashes.").

[147] Declaration of Elizabeth Witt at ¶ 17.

[148] Declaration of Elizabeth Witt (ECF No. 397) at ¶ 10-12.

[149] Declaration of Elizabeth Witt, ¶ 21 ("Around December 9, we were finally relocated to a hotel in downtown Waikiki. But we were assigned to a tiny room, in the middle of the holiday season. We had only one parking spot, and we had our dog, Hunter. To get up to our room on the 25th floor, we had to take an escalator. Hunter is afraid of escalators. She is a big dog, and we would have to carry her up the escalator."); ¶ 24 ("For all these reasons, we decided to go back home and limit our water usage as much as possible."); ¶ 25 ("At first, I purchased bottled water from the commissary. Then we began receiving water from the Navy's water distribution sites. The water was on a first come, first serve basis, meaning that we had to make sure we were in line early for water before it ran out. We then had to

Over the long term, the ordeal left significant mental and emotional scars.

Mrs. Witt bore a son since the contamination, and now suffers heightened anxiety,

fear for her family's health, and distrust of government and military institutions

tasked with ensuring their safety. This ongoing stress has affected her marriage and

quality of life, leading to a family decision to leave military service – despite the

loss of GI Bill benefits for her young son – in order to pursue a safer environment

for their family.[150]

### F.    Plaintiffs' Experts on Psychological and Emotional Harm

Plaintiffs' experts will testify to the mental distress, anxiety, and institutional

betrayal engendered by the Government's water contamination and its aftermath,

although "medical testimony is not a prerequisite for recovery for emotional

distress." *Kimberly v. State*, No. 23954, 2005 Haw. LEXIS 392, at *90-91 (July 29,

2005). Plaintiffs' expert Dr. Melissa Vargo, a clinical psychologist with a

specialization in trauma and post-traumatic stress disorder, conducted clinical

interviews, psychological evaluations, and standardized self-report tools like the

PTSD Checklist (PCL-5), to the adult Plaintiffs.[151] Dr. Vargo discusses the general

---

lug heavy water jugs from the water drop or store, in our car, into our home just to
have access to clean water."); ¶ 26 ("We tried to rig up a water bottle shower, but it
was impossible. So, we took very short showers.").

[150] Declaration of Elizabeth Witt (ECF No. 397) at ¶ 50, 58, 60.

[151] Declaration of Melissa Vargo, M.D. (ECF No. 388) at ¶¶ 1-27.

causation of psychological injuries following traumatic events like water

contamination. She explains that such events can lead to significant psychological

distress and mental health conditions such as PTSD, anxiety disorders, and

depression.[152] Dr. Vargo supports her findings with literature reviews and

comparisons to other recognized traumatic events, such as the water contamination

crisis in Flint, Michigan, which similarly led to increased rates of mental health

disorders among affected populations.[153]

      Dr. Vargo also provides specific examples of how the Plaintiffs have been

affected by the Red Hill contamination, detailing symptoms consistent with PTSD

and other anxiety-related disorders. These include avoidance behaviors, negative

emotional states, and hyperarousal symptoms, which persisted beyond one month,

indicating long-term psychological impact.[154] She offers detailed accounts of each

Plaintiff's psychological assessment, noting the direct correlation between their

symptoms and the Red Hill contamination exposure.[155] Dr. Vargo identified the

following psychological effects for each adult Plaintiff from the fuel release:

---

[152] Declaration of Melissa Vargo, M.D. ¶¶ 42-43, 46-48.

[153] Declaration of Melissa Vargo, M.D. ¶¶ 46.

[154] Declaration of Melissa Vargo, M.D. ¶¶ 49-55.

[155] Declaration of Melissa Vargo, M.D. ¶¶ 55-56

- Kevin Aubert: Experiences repeated, disturbing, and unwanted memories, distressing dreams, dissociative reactions, intense psychological distress, avoidance behaviors, negative emotional state, diminished interest in activities, inability to feel positive emotions, irritable behavior, hypervigilance, and difficulties with concentration.

- Richelle Dietz: Suffers from excessive anxiety and worry, restlessness, fatigue, difficulty concentrating, irritability, muscle tension, sleep disturbances, and significant distress impacting work and interpersonal relationships.

- Patrick Feindt, Jr.: Reports repeated, disturbing memories, distressing dreams, dissociative reactions, intense psychological distress, avoidance behaviors, negative emotional state, diminished interest in significant activities, irritable behavior, hypervigilance, exaggerated startle response, concentration difficulties, and acknowledges symptoms of depression and hopelessness.

- Nastasia Freeman: Suffers from repeated, disturbing memories, distressing dreams, dissociative reactions, intense psychological distress at trauma-related cues, avoidance behaviors, persistent negative beliefs, persistent anger and guilt, detachment from others, hypervigilance, problems with

concentration, sleep difficulties, generalized anxiety with excessive worry, difficulty controlling worry, fatigue, irritability, and sleep disturbance.

- Sheena Jessup: Experiences repeated, disturbing memories, distressing dreams, dissociative reactions, intense psychological distress at trauma-related cues, avoidance behaviors, persistent negative beliefs and expectations about herself, persistent anger and guilt, detachment from others, irritable behavior, angry outbursts, concentration problems, and sleep difficulties.

- Elizabeth Witt: Suffered marked distress out of proportion to the severity of the stressor during pregnancy, exacerbated anxiety related to pregnancy and living conditions, and anxiety symptoms decreased substantially after moving away from the contaminated area.

Dr. Vargo makes treatment recommendations for each Plaintiff based on the individual assessments and include a combination of cognitive behavioral therapy and exposure therapy to address their trauma and anxiety symptoms.[156]

Dr. Andrew Clark will testify to the psychological injuries experienced by the minor Bellwether Plaintiff as a result of the jet fuel contamination of the water supply at Red Hill. The contamination had a pronounced impact on children's

---

[156] Declaration of Melissa Vargo, M.D. ¶¶ 57-67.

mental health, causing symptoms like anxiety, depression, and PTSD, exacerbated by their environmental and social disruptions[157] Each of the Plaintiffs experienced significant traumatic events due to the Red Hill jet fuel water contamination, which has led to a range of psychological stressors and mental health diagnoses such as Other Specified Trauma and Stressor Related Disorder.[158] Dr. Clark noted that the affected minors are at a long-term risk for further psychological issues, recommending specific treatments like individual therapy and, in some cases, psychiatric evaluation and medication to address their ongoing symptoms.[159]

The specific psychological issues for the minor Plaintiffs he evaluated: Dr. Andrew Clark specifically evaluated the following minor Plaintiffs:

- B.D.: Exacerbated anxiety issues related to the water contamination and ongoing psychological impacts.[160]

- P.G.F.: Exhibited behavioral changes and potential ADHD symptoms, which worsened after the contamination incident.[161]

---

[157] Declaration of Andrew Clark, M.D. (ECF No. 366) ¶¶ 24-30.

[158] Declaration of Andrew Clark, M.D. ¶¶ 24-30 Opinion 1, ¶28; Opinion 2, ¶31.

[159] Declaration of Andrew Clark, M.D. ¶¶ 90-104.

[160] Declaration of Andrew Clark, M.D. ¶¶ 33-34.

[161] Declaration of Andrew Clark, M.D. ¶¶ 36-44.

- P.R.F.: Has begun to "exhibit significant behavioral challenges both at home and at day care" and meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V.[162]

- N.F.: Suffered from a range of debilitating medical and psychological symptoms, including depression and social isolation.[163]

- K.F.: Experienced severe anxiety, particularly regarding medical care, and lost significant aspects of his childhood activities like soccer.[164]

- D.F.: Developmental and speech regressions post-contamination, with a diagnosis of Autism Spectrum Disorder considered.[165]

- Beau Jessup: Showed neurological symptoms, anxiety, and self-injurious behavior, which were connected to the stress from the water crisis.[166]

- B.J.J.: Faced depression and anxiety, which were exacerbated by the crisis and its impact on her social and family environment.[167]

---

[162] Declaration of Andrew Clark, M.D. ¶¶ 45-48.

[163] Declaration of Andrew Clark, M.D. ¶¶ 49-56.

[164] Declaration of Andrew Clark, M.D. ¶¶ 57-63.

[165] Declaration of Andrew Clark, M.D. ¶¶ 64-70.

[166] Declaration of Andrew Clark, M.D. ¶¶ 71-74.

[167] Declaration of Andrew Clark, M.D. ¶¶ 75-81.

- N.J.: A young boy with Autism Spectrum Disorder, who experienced regression in behavior and missed critical therapy due to the crisis[168] ¶¶82-86).

- D.J.: A 10-month-old at the time of the contamination during a young and vulnerable age.[169]

Dr. Clark's declaration concludes with a treatment plan for each minor.[170]

Plaintiffs' expert Dr. James L. Spira will testify about the psychological and health impacts of the jet fuel contamination and the military's response on the Plaintiffs' trust in the military and Government. Dr. Spira will conclude that the plaintiffs' lasting psychological trauma is a direct result of not only the physical exposure to contaminants but also the institutional betrayal by the Navy, reflecting a pattern of denial by military health authorities observed in other instances of environmental exposure in military contexts.[171]

### G.    Lost Wages and Earnings

Plaintiffs Nastasia Freeman and Patrick Feindt suffered lost wages and lost earnings because of the jet fuel contamination.

---

[168] Declaration of Andrew Clark, M.D. ¶¶ 82-86.

[169] Declaration of Andrew Clark, M.D. ¶¶ 87-89.

[170] Declaration of Andrew Clark, M.D. ¶¶ 93-104.

[171] Declaration of James Spira, M.D., (ECF No. 386) ¶¶ 103-122.

Nastasia Freeman's declaration testimony addresses her lost wages claim in detail. She discusses how the water contamination significantly impacted her work as a professional counselor, resulting in substantial financial losses.[172] Nastasia's role in her business involved managing and participating in client appointments, projects, and maintaining a high level of performance.[173] She was earning a steady income from her business, with prospects for growth and increased earnings over time.[174] The contamination's adverse effects on her health forced her to take extended leaves of absence, reducing her ability to work and earn income.[175] Despite attempts to return to work, ongoing health issues prevented her from fully realizing her earning potential.[176] This situation resulted in lost wages, missed business opportunities, and financial instability for her and her family.[177]

Patrick Feindt's declaration testimony discusses his lost wages claim for his work at Roger Dunn Golf Hawaii, LLC in February 2021 as he took on the role of project manager for The Golf Sim.[178] He worked long hours, was engaged in

---

[172] Declaration of Nastasia Freeman, ¶¶ 47-52.

[173] Declaration of Nastasia Freeman, ¶ 47.

[174] Declaration of Nastasia Freeman, ¶ 48.

[175] Declaration of Nastasia Freeman, ¶¶ 49-50.

[176] Declaration of Nastasia Freeman, ¶ 51].

[177] Declaration of Nastasia Freeman, ¶ 52].

[178] Declaration of Patrick Feindt, ¶ 88.

mentoring and instruction, and found satisfaction in his work.[179] Patrick was earning a base salary of $65,000 and was on track for pay increases, projected to reach $105,000 by 2023 based on performance and expansion plans.[180] However, the jet fuel release impacted his health, forcing him to take a substantial leave from work, which resulted in lost commissions and his quarterly incentive.[181] Despite a brief return to work, ongoing health issues and a compassionate reassignment for his active duty spouse prevented the realization of expected income.[182]

Plaintiffs' expert Garret J. Hoe, CPA, in his declaration, discusses his specific methodologies for calculating lost earnings and other financial damages for both Plaintiffs. Mr. Hoe's declaration discusses his analysis of a host of documentation relating to both Plaintiffs, including tax returns, earning statements, correspondence relating to his wage increases, and employment records. Mr. Hoe interviewed both Plaintiffs to further establish the factual basis for their losses. He also specifically outlines his lost earnings analysis for Patrick Feindt, Jr., including the calculation of damages due to a forced resignation and his adjustments for

---

[179] Declaration of Patrick Feindt, ¶ 89.

[180] Declaration of Patrick Feindt, ¶ 91.

[181] Declaration of Patrick Feindt, ¶ 92.

[182] Declaration of Patrick Feindt, ¶ 93.

future earnings.[183] Mr. Hoe also calculates Nastasia Freeman's lost earnings as a

mental health practitioner and the impact of the fuel leak on her business

operations.[184] Mr. Hoe applies appropriate methodological adjustments such as

inflation and present value discounting.[185]

### H.    Long Term Physical Injury

Dr. Andruska's unchallenged expert testimony regarding Nastasia

Freeman's physical injury discusses several long-term injuries and conditions that

Nastasia Freeman suffered following exposure to jet fuel contamination, as

evidenced in her extensive medical history and ongoing symptoms.

- Neurological and Neurodegenerative Symptoms: Dr. Andruska notes that
  Freeman developed new and worsened neurological symptoms, including
  headaches, dizziness, confusion, and memory problems, which are
  consistent with the known effects of jet fuel toxicity. These symptoms began
  shortly after the exposure and have persisted, indicating a long-term
  impact.[186]

---

[183] Declaration of Garret Hoe (ECF No. 404) ¶¶ 51-74.

[184] Declaration of Garret Hoe, ¶¶ 76-93.

[185] Declaration of Garret Hoe, ¶¶ 64, 72-73.

[186] Declaration of Kristin Andruska, M.D., at ¶ 29, ¶ 80-82, ¶ 84-85.

- Vestibular Dysfunction: Mrs. Freeman was diagnosed with vestibular dysfunction, which affects balance and spatial orientation. This condition led to symptoms such as dizziness, nausea, and imbalance, which have required ongoing management and treatment, including vestibular physical therapy.[187]

- Seizure Disorders: While Mrs. Freeman had a history of seizure disorders, there was a notable exacerbation of her condition following the jet fuel exposure. This included an increase in the frequency and severity of seizures and spells, which were different in character from her previous episodes.[188]

- Cognitive and Language Impairments: Mrs. Freeman experienced significant cognitive challenges, including memory lapses, confusion, and difficulty with word-finding, which impacted her ability to work and perform daily activities. These symptoms have been persistent and continue to cause significant distress.[189]

- Psychological Impact: Alongside the physical symptoms, Mrs. Freeman also suffered from increased anxiety, PTSD, and other mental health issues related to her exposure and ongoing health problems. These symptoms have

---

[187] Declaration of Kristin Andruska, M.D., at ¶ 55, ¶ 64, ¶ 67.

[188] Declaration of Kristin Andruska, M.D., at ¶ 40, ¶ 81, ¶ 90.

[189] Declaration of Kristin Andruska, M.D., at ¶ 74, ¶ 77.

been both a direct neurological consequence of the exposure and a response
to the chronic nature of her physical ailments.[190]

## II.    ELEMENTS OF CAUSES OF ACTION

Plaintiffs seek redress for the Government's negligence, negligent
undertaking, nuisance, negligent infliction of emotional distress, and premises
liability/duty to control force, as detailed in the Fifth Amended Complaint.

### A.    Negligence

The Navy has admitted Negligence in this case. Second Joint Stipulation as
to Plaintiffs' Nuisance and Negligence Claims, ECF No. 200 (D. Haw. Nov. 27,
2023). The Government failed to operate the Red Hill facility properly, breaching
its duty of care and directly causing harm to Plaintiffs. To prevail on a negligence
claim under Hawaii law, a plaintiff must prove four elements: (1) a duty, or
obligation, recognized by the law, requiring the defendant to conform to a certain
standard of conduct, for the protection of others against unreasonable risks; (2) a
failure on the defendant's part to conform to the standard required, which is a
breach of the duty; (3) a reasonably close causal connection between the conduct
and the resulting injury; and (4) actual loss or damage resulting to the interests of
another. *Takayama v. Kaiser Found. Hosp.*, 82 Hawai'i 486, 498-99, 923 P.2d 903,
915-16 (1996). A plaintiff must prove that the defendant's conduct was the legal

---

[190] Declaration of Kristin Andruska, M.D., at ¶ 86, ¶ 109.

cause of his or her injuries as one of the prima facie elements of negligence. *Estate of Frey v. Mastroianni*, 146 Hawai'i 540, 549-50, 463 P.3d 1197, 1206-07 (2020). The defendant's conduct is the legal cause of the harm to the plaintiff if (a) the actor's conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which the actor's negligence has resulted in the harm. *Id.* (internal punctuation omitted).

To meet their burden of proof, Plaintiffs must prove by a preponderance of the evidence that defendant was negligent and that such negligence was a legal cause of plaintiffs' injuries and/or damages. Plaintiffs must also prove the nature and extent of their injuries and/or damages. Haw. Civ. Jury Instr. No. 3.2.

### 1.    Duty

The Government has admitted that it had a duty to safely operate the Red Hill Bulk Fuel Storage Facility, establishing this element. Second Joint Stipulation as to Plaintiffs' Nuisance and Negligence Claims, ECF No. 200 (D. Haw. Nov. 27, 2023).

### 2.    Breach

The Government has admitted to a breach of the duty of due care in its operation of the Red Hill Bulk Fuel Storage Facility, establishing this element. Second Joint Stipulation as to Plaintiffs' Nuisance and Negligence Claims, ECF No. 200 (D. Haw. Nov. 27, 2023).

### 3.    Cause

Plaintiffs will establish a "a reasonably close causal connection between the conduct and the resulting injury." As outlined extensively above, Plaintiffs will testify to the onset of acute injuries consistent with exposure to fuel contamination in close temporal and geographic proximity to the Government's admitted jet fuel release into their water system. Plaintiffs' experts will demonstrate how the jet fuel contamination infiltrated the water system and reached Plaintiffs' homes in sufficient quantities to cause the injuries Plaintiffs complain of. Plaintiffs' acute injuries closely match thousands of other reports around the same time, and the kinds of symptoms that even the Government's own witnesses would expect to see and actually observed. The Government's published studies through the CDC and ATSDR support that the effects of the jet fuel spill continued for residents months after the contamination supposedly ended.

Plaintiffs will also testify to a wide array of mental health and emotional injuries, as outlined extensively above. Plaintiffs' experts will establish that deep seated anxiety, mental trauma, and even institutional betrayal could be and were caused by the Government's contamination of Plaintiffs' water system. This betrayal was significant enough that servicemember families such as the Freemans, Dietzs, Feindts, and Witts have made the difficult choice to leave the military, and

67

Kevin Aubart and the Jessups harbor hard feelings for the government their family served until retirement.

Plaintiffs will testify to the inconvenience and dislocation caused by the Government's contamination of their water source. As outlined above, this inconvenience included large families being moved into small hotel rooms for months, attempting to live daily lives without a source of potable tap water by setting up makeshift showers, and relying on insufficient bottled water for the activities of daily life. It extended to Plaintiffs' who requested to or did move out of their homes or back to the mainland – and the difficulty associated with uprooting a family and moving hundreds of miles away.

### 4.    Harm/Damages

The Elements of Damages portion of this trial brief discusses in greater detail the damages claimed for each Plaintiff in this matter.

### B.    Negligent Undertaking

By undertaking to provide safe drinking water and appropriately maintain the fuel storage facility, the Government acted negligently, exacerbating the harm to Plaintiffs. Hawaii's Good Samaritan law provides that liability arises when one voluntarily undertakes a duty, and then fails to perform with due care. *Williams v. United States*, 711 F. Supp. 2d 1195, 1207 (D. Haw. 2010). The Supreme Court has repeatedly found that the United States can be held liable under the Federal

Tort Claims Act if a private person would face good Samaritan liability under state law. *United States v. Olson*, 546 U.S. 43 (2005). Once the Government makes the decision to act, it is liable if it does so negligently. "Hawaii case law relating to the voluntary assumption of a duty or undertaking has generally followed the Restatement (Second) of Torts (1965)." *Tabieros v. Clark Equip. Co.,* 944 P.2d 1279, 1301–02 (Haw. 1997). The Restatement provides that "

> One who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person . . . is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm.

The Restatement (Second) of Torts § 324A (1965).

Under Hawaii law, a person who voluntarily undertakes to render services to another, which they should recognize as necessary for the other's protection, is liable for physical harm resulting from their failure to exercise reasonable care in performing their undertaking. Liability arises if their failure to exercise such care increases the risk of harm, or if the harm is suffered because of the other's reliance upon the undertaking. *See, e.g., Geremia v. State*, 58 Haw. 502, 573 P.2d 107 (1977).

The Government undertook the responsibility to provide safe drinking water and to maintain the fuel storage facility safely but did so in a manner that was negligent, thus exacerbating the risk and harm to Plaintiffs. The Government also

69

took on additional explicit undertakings such as the Final Groundwater Protection Plan established in 2008 and the 2015 Administrative Order of Consent with the EPA and the State of Hawaii which laid out specific measures to protect the environment and public health.

The Navy admittedly failed to implement crucial components of these and other operational requirements, recognized in its own audit reports and investigations, including following operations orders for proper opening and closing sequences of valves, the use of steel for the fire suppression system's retention line, the implementation of an appropriate leak detection system the approval or installation of requested sensors that would warn of leaks, or the maintenance of video cameras placed around the facility to monitor for leaks or investigate past leaks.

Most damningly, the Government failed to follow its own emergency response plans for the Red Hill facility and the water system it was operating. "If there is contamination in the well, the JBPHH Emergency Response Plan requires the installation to isolate the shaft, and issue 'Do Not Drink' notifications until the contaminant has been identified."[191] The Government did not issue a "Do Not Drink" notification even though the plans assumed system-wide contamination.[192]

---

[191] Waters Report, Finding of Fact ¶ 463.

[192] JPBHH Response Plan (PX-1496) at 48.

The Government admitted that it failed in its reporting requirements in February

2023.[193] These failed undertakings constitute actionable negligence under Hawaii's

"Good Samaritan" law and caused avoidable harm to Plaintiffs.

### C.    Nuisance

The contamination interfered with Plaintiffs' right to use and enjoy their

property, causing significant discomfort and inconvenience. A nuisance under

Hawaii law is defined as anything that unlawfully annoys or damages another,

works hurt, inconvenience, or damage, or anything that disturbs one in the free use,

possession, or enjoyment of their property or which renders its ordinary use or

physical occupation uncomfortable. *Haynes v. Haas*, 146 Hawai'i 452, 458-59, 463

P.3d 1109, 1115-16 (2020). "A nuisance, to be a public nuisance, must be in a

public place, or where the public frequently congregate, or where members of the

public are likely to come within the range of its influence." *Id.*

The Government has admitted that it created a nuisance that harmed

Plaintiffs, at least for as long as the water advisory was in effect for each of the

---

[193] Letter from Capt. M. Washington to G. Lopez, Hawaii Dept. of Health, re:
Certification of Unknown Concentrations of Petroleum Based Product Released in
Public Water System (Feb. 6, 2023) (PX-1151) ("This notification is being
provided to inform the Joint Base Pearl Harbor-Hickam (JBPHH drinking water
system users that the Navy did not provide a required public notification for the
November 2021 fuel release in accordance with the prescribed format as required
by the HAR.").

Plaintiffs' homes. Second Joint Stipulation as to Plaintiffs' Nuisance and

Negligence Claims, ECF No. 200 (D. Haw. Nov. 27, 2023). This cause of action

has been established, and Plaintiffs are owed compensable damages. The damages

available for nuisance will be discussed more fully in the damages portion of this

brief.

### D.    Negligent Infliction of Emotional Distress (NIED)

The contamination and the Government's mishandling of the crisis caused

Plaintiffs' significant emotional and mental anguish. The elements of an NIED

claim include: (1) negligent conduct by the defendant; (2) serious emotional

distress suffered by the plaintiff; (3) the defendant's negligent conduct was the

legal cause of the serious emotional distress; and (4) physical injury to a person,

property, or a mental illness. *Morioka v. Lee*, 134 Hawai'i 114 (App. 2014).

"[A]n NIED claim is nothing more than a negligence claim in which the

alleged actual injury is wholly psychic and is analyzed utilizing ordinary

negligence principles." *Doe Parents No. 1 v. State, Dep't of Educ.,* 100 Hawai'i

34, 69, 58 P.3d 545, 580 (2002) (internal citation and quotation marks omitted).

The Hawaii Supreme Court has recognized NIED claims even absent a

distinct, non-psychological injury when "they involve circumstances which

guarantee the genuineness and seriousness of the claim." *Rodrigues v. State*, 52

Haw. 156, 171, 472 P.2d 509, 519 (1970); *Goran Pleho, LLC v. Lacy,* 144 Haw.

224, 238–39, 439 P.3d 176, 190–91 (2019). Under Hawai'i law, a spouse's claim of emotional distress, based on an injury to her husband, is a 'derivative' claim sounding in tort." *Brown v. KFC Nat'l Management Co.,* 82 Hawai'i 226, 240–41, 921 P.2d 146, 160–61, *reconsideration denied,* 82 Hawai'i 360, 922 P.2d 973 (1996).

### 1.    Negligent Conduct

The Government stipulated to a breach of the standard of care through its operational failures at Red Hill, establishing this element. Second Joint Stipulation as to Plaintiffs' Nuisance and Negligence Claims, ECF No. 200 (D. Haw. Nov. 27, 2023).

### 2.    Serious Emotional Distress

The second element is that the plaintiff must have suffered serious emotional distress. The standard for serious emotional distress in Hawaii is such that a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case. *Rodrigues v. State*, 52 Haw. 156, 173-74 (1970); *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 17 (1989). The Plaintiff need not "exhibit physical symptoms of mental distress in order to recover" nor even "actually witness the tortious event in order to recover for emotional distress." *Id.*

73

Here, Plaintiffs suffered serious emotional distress after finding out they had consumed water contaminated with jet fuel by the Government they trusted. As outlined above, Plaintiffs will describe the profound anxiety they experience in the wake of the contamination. Plaintiffs such as Kevin Aubart or Patrick Feindt who had never previously had any need for mental health services found themselves anxious, depressed, bitter and in need of treatment.

Plaintiffs' experts such as Dr. Clark, Dr. Vargo, and Dr. Spira will testify to the mental distress, anxiety, and institutional betrayal engendered by the Government's water contamination and its aftermath.

In their reliance materials, these experts turned to studies after the Flint water contamination that found severe emotional distress after the Flint water crisis. One such study evaluated the long-term psychiatric outcomes of the Flint water crisis and found significant mental health challenges among adults in the community. A cross-sectional survey conducted with a household probability sample of 1,970 adults revealed that, even five years after the crisis began, over 20% exhibited symptoms of depression within the past year. Additionally, close to a quarter displayed signs of posttraumatic stress disorder, and over 10% were likely struggling with both conditions, highlighting the enduring impact of

74

environmental water disasters on mental health.[194] Another study found that poor perceptions of tap water quality during the Flint water crisis were predictive of PTSD symptomatology, independent of socio-demographics.[195] The findings highlight the profound mental health impact water crises can have on affected populations.

### 3.    Cause

The third element is that the defendant's negligent conduct must have been the legal cause of the serious emotional distress. *Morioka v. Lee*, 134 Hawai'i 114, 334 P.3d 777 (App. 2014). Plaintiffs themselves attribute their mental distress to the discovery and aftermath of the jet fuel in their water. Furthermore, Plaintiffs' experts thoroughly reviewed Plaintiffs' medical records and personal histories and opine that the mental health trauma experienced by Plaintiffs arose because of or were exacerbated by the Government's water contamination.

---

[194] Reuben A. et al., *Prevalence of Depression and Posttraumatic Stress Disorder in Flint, Michigan, 5 Years After the Onset of the Water Crisis*, 5 JAMA Netw. Open e2232556 (2022), https://doi.org/10.1001/jamanetworkopen.2022.32556 (PX-1581).

[195] DJ Kruger et al., Toxic Trauma: Household Water Quality Experiences Predict Posttraumatic Stress Disorder Symptoms During the Flint, Michigan, Water Crisis, 45 Community Psychol. 957 (2017), https://doi.org/10.1002/jcop.21898 (PX-1585).

In a negligence action, "legal cause" refers to a cause that is legally sufficient to result in liability. *O'Grady v. State*, 140 Hawaii 36, 398 P.3d 625 (2017). "Legal cause" embodies both the concept of factual causation and the defendant's scope of liability. *Id*. Courts apply a two-step analysis for determining whether the defendant's conduct was the legal cause of the plaintiff's injuries; the defendant's conduct is the legal cause of the harm to the plaintiff if the actor's conduct is a substantial factor in bringing about the harm, and there is no rule of law relieving the actor from liability because of the manner in which his or her negligence has resulted. *Id*.

The first prong of the test for legal causation in a negligence action involves a factual determination-whether the defendant's conduct was a substantial factor in bringing the harm, and the second prong involves a legal determination – whether there is any rule of law relieving the actor from liability because of the manner in which the harm resulted from the conduct. *Id*. For the first prong, the plaintiff need only prove that the act was a cause in fact of plaintiff's injury. The plaintiff need not prove that the defendant's act was the only or whole cause of plaintiff's injuries, only that it was a cause. *Id*. Whether a defendant's conduct was a substantial factor in causing the harm is one that a reasonable person would consider to have contributed to the harm. *Id.*

76

The Government's contamination of the Plaintiffs' water source was a substantial factor in bringing about their harm and there is no rule of law relieving the Government liability for this.

### 4. Harm

The fourth element is physical injury to a person, property, or a mental illness. In this case, each of the Plaintiffs experienced acute physical symptoms attributable to the jet fuel. The Supreme Court of Hawaii has conclusively held NIED compensable even in the absence of physical injury. *First Ins. Co. v. Lawrence*, 77 Hawai'i 2, 9 (1994). Where, as here, the Plaintiffs have all experienced physical injury, the liability is even clearer.

In *Masaki v. General Motors Corp*., 71 Hawaii 1, 780 P.2d 566 (1989), the Supreme Court of Hawaii held that a couple that wasn't even at the scene of their son's accident could recover for NIED because "it was reasonably foreseeable for Appellants to have anticipated the Masakis' emotional distress. The fact that the Masakis did not witness the accident is not a bar to recovery, but rather is a factor in determining the degree of mental stress suffered." *Masaki v. General Motors Corp.*, 71 Hawaii 1, 780 P.2d 566 (1989). Likewise, in *John & Jane Does, 1-100 v. PHP, Inc.*, 91 Hawaii 470, 985 P.2d 661 (1999), the Supreme Court of Hawaii held that fear is a compensable injury.

### E.    Premises Liability/Duty to Control Force

The Government failed to control the hazardous substance that it unleashed

and failed to adequately warn Plaintiffs of the risk posed by that force harming

Plaintiffs. Although generally a lessor is not liable for dangerous conditions that

develop after a lessee has taken possession, a lessor remains liable for "physical

harm caused by a dangerous condition upon that part of the land retained in the

lessor's control" but necessary to the safe use of the part leased. Restatement

(Second) of Torts § 361 (1965).[196] As the rule explains:

> A possessor of land who leases a part thereof and retains in his own
> control any other part which is necessary to the safe use of the leased
> part, *is subject to liability to his lessee and others lawfully upon the land*
> *with the consent of the lessee or a sublessee for physical harm caused*
> *by a dangerous condition upon that part of the land retained in the*
> *lessor's control*, if the lessor by the exercise of reasonable care
>
> (a)    could have discovered the condition and the risk involved, and

---

[196] As the Government notes, no explicit Hawaii authority has adopted Restatement
(Second) of Torts, Section 355, or the exception found at Section 361. However,
Hawaii courts have frequently applied and adopted the Restatement generally. "We
note that the Hawaii courts have found the Restatement persuasive in other areas of
tort law as well. *See, e.g., Wolsk v. Hawaii*, 711 P.2d 1300, 1302 (Haw. 1986)
(applying the Restatement to determine whether the state is liable for criminal
conduct of third parties on state property); *Collins v. Greenstein*, 61 Haw. 26, 595
P.2d 275, 283-86 nn. 10-12, 14-15 (Haw. 1979) (relying on several Restatement
sections); *Molokoa Village Development Co. v. Kauai Electric Co.*, 60 Haw. 582,
593 P.2d 375, 381 n. 1 (Haw. 1979) (adopting the rule in Restatement (Second) of
Torts § 551 (1977) to govern liability for nondisclosure by a party to a business
transaction)." *Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1425 n.4 (9th Cir. 1986).

(b)    could have made the condition safe.[197]

*Id*. (emphasis added). The rule specifically applies to a "water system" retained in the lessor's control. As Comment b to the rule notes: "It applies also to any other part of the land the careful maintenance of which is essential to the safe use of [a] portion of land leased to the various lessees, such as the . . . *water system*." *Id*. (emphasis added). The second illustration to the rule specifically involves dangerous conditions in a water system:

> 2. A leases to B, a dentist, an office in which A supplies hot and cold water from a central heating plant. Through the carelessness of A's janitor, to whom A entrusts the repairing of the heating system, the hot water is permitted to run in the cold water pipes. C, a patient of B, goes to the washstand to wash his hands and turns on the cold water spigot, which admits boiling hot water, scalding C's hands. A is subject to liability to C.

*Id.*

In order for premises liability to lie under Hawaii law, "Defendant need not have exclusive control to have sufficient control over the land/property/building. Several persons or entities may each have sufficient control as owners, occupiers, or otherwise, even though their control is only partial or joint." Haw. Civil Jury Instr. No. 17.2.

---

[197] *See also* Restatement (Second) of Property: Landlord & Tenant § 17.4 (same).

Liability can also be established under Hawaii law on a premises liability

theory absent ownership entirely.

PREMISES LIABILITY – NON-OWNER, NON-OCCUPIER; ELEMENTS

> To prevail on a claim of negligence against a defendant who/which
> did not own, occupy or control the land/property/building, plaintiff(s)
> must prove all of the following elements:
> 1. Defendant(s) affirmatively took action to induce plaintiff(s) to
> engage in conduct on/in the land/property/building on/in which
> plaintiff(s) sustained injury; and
>
> 2. Defendant's action created a false appearance of safety upon which
> plaintiff(s) relied to his/her/their detriment; and
>
> 3. Defendant's action was a legal cause of injury to plaintiff(s).
>
> *Geremia v. State*, 58 Haw. 502, 573 P.2d 107 (1977); *Lansdell v.
> County of Kauai*, 110 Hawaii 189, 130 P.3d 1054 (2006).

Haw. Civil Jury Instr. No. 17.5.

The Government has admitted that it owns and operates the Red Hill Bulk

Fuel Facility and the Joint Base Pearl Harbor Hickam water distribution system

that serviced each of the Plaintiff's homes. While the Plaintiffs homes are operated

by privatized companies under the Military Housing Privatization Act under long

term leases, the Government may and did retain its ability to "furnish utilities and

services . . . in connection with any military housing acquired or constructed

pursuant to the exercise of any authority or combination of authorities under this

subchapter if the military housing is located on a military installation." 10 U.S.C.S. § 2872a.

The Government maintained significant control over Plaintiffs' homes.[198] It was sufficient control to direct the public-private ventures to distribute its messages to residents, enter onto the homes to investigate for water contamination, and enter onto the homes to conduct remediation efforts. *See, e.g., Wemple v. Dahman*, 103 Hawai'i 385, 393 (2004) "the test for determining liability is degree of control rather than mere ownership").

Furthermore, Defendant took affirmative action to induce Plaintiffs to engage in conduct on the property – continue their use of the water – by which they sustained injuries. Namely, in the wake of the contamination and after water supervisor Joseph Nehl had smelled fuel at homes and at the water tanks, and the officer in charge of the water system said, "We've got to let the people know" on the afternoon of November 28, 2021 – the Government instead sent multiple press

---

[198] *See, e.g.*, S. Tanoue, NAVFAC Public-Private Ventures (PPV) Program Overview (Jun. 6, 2017) available at https://planning.hawaii.gov/wp-content/uploads/P3_Jun-6-17_01_Pres-Navy-PPV.pdf (PX-1177); Plaintiff's leases (PX-1013-1017) (in which the Government maintains the ability to control access to the property); the Base Commander's message sent to residents through the military housing providers (PX-1097); and Deposition of Captain Erik Spitzer at 215:1-216:8 (A. There are numerous homes . . . that reside off the secure perimeter installation but are built on Navy-owned land. Q. Okay. And so the land that these houses were built on was owned by the US government? THE WITNESS: That is my understanding.").

releases, Facebook posts, and messages claiming that there "was no indication that the water is not safe." This outreach – in defiance of the clear requirement in the Government's emergency plans to issue "Do Not Use" notices when the contamination was unknown – extended to coordinating a message from the Base Commander that was distributed to all of the Plaintiff-residents of the public-private ventures. This message stated "I can tell you at this point that **there are no immediate indications that the water is not safe**. *My staff and I are drinking the water on base this morning, and many of my team live in housing and drink and use the water as well.*"

Such a statement from the senior leader of the base in a military environment "created a false appearance of safety" under the law – that the water was safe enough to continue drinking and using and residents should be drinking it. The Government thus took affirmative action to draft the statement, approve the statement through the chain of command, and order the public-private venture housing companies to distribute the statement. The Government's statement was a legal cause of injury to Plaintiffs because Plaintiffs continued using the water – either for drinking or other uses – after receiving the statement and the confusion involved in the conflicting and minimizing statements increased their mental harm and sense of institutional betrayal.

## III.    ELEMENTS OF DAMAGES[199]

Plaintiffs seek compensatory damages for injuries suffered due to the

Government's negligent contamination of their water. "The general rule in

measuring damages is 'to give a sum of money to the person wronged which as

nearly as possible, will restore him to the position he would be in if the wrong had

not been committed.'" *Rodrigues v. State*, 52 Haw. 156, 167, 472 P.2d 509, 517

(1970) (citing McCormick, Damages § 137 at 561 (1935)).

Hawaii jury instructions regarding damages outlines several categories of

damages relevant to Plaintiffs:

ELEMENTS OF DAMAGES

If you find for plaintiff(s) on the issue of liability, plaintiff(s) is/are
entitled to damages in such amount as in your judgment will fairly and
adequately compensate him/her/them for the injuries which he/she/they
suffered.

In deciding the amount of such damages, you should consider:

1. The extent and nature of the injuries he/she/they received, and also
the extent to which, if at all, the injuries he/she/they received are
permanent;

---

[199] Plaintiffs recognize that their claims for the reasonable value of medical
services for the Plaintiffs long term physical damages have been affected by the
Court's rulings on the admissible testimony of Dr. Steven Bird regarding long-term
harm. Plaintiffs respectfully preserve all appellate rights regarding that issue.

2. The deformity, scars and/or disfigurement he/she/they received, and also the extent to which, if at all, the deformity, scars and/or disfigurement are permanent;

3. The reasonable value of the medical services provided by physicians, hospitals and other health care providers, including examinations, attention and care, drugs, supplies, and ambulance services, reasonably required and actually given in the treatment of plaintiff(s) and the reasonable value of all such medical services reasonably probable to be required in the treatment of plaintiff(s) in the future;

4. The pain, emotional suffering, and disability which he/she/they has/have suffered and is/are reasonably probable to suffer in the future because of the injuries, if any; and

5. The lost income sustained by plaintiff(s) in the past and the lost income he/she/they is/are reasonably probable to sustain in the future.

Haw. Civ. Jury Instr. No. 8.9

In this case, Plaintiffs seek compensation for:

1. Past and future pain and suffering

2. Past and future emotional distress

3. The reasonable value of medical services for Nastasia Freeman's care and Plaintiffs' mental health care

4. Lost income sustained by Plaintiffs' Nastasia Freeman and Patrick Feindt

5. Loss of enjoyment of life and property

6. Loss of consortium – marital and filial

7. Disfigurement – for Beau Jessup's hand tremor caused by acute injury

**A.    The Government Must Compensate Plaintiffs for Pain and Suffering**

PAIN AND SUFFERING

Plaintiff(s) is/are not required to present evidence of the monetary value of his/her/their pain or emotional distress. It is only necessary that plaintiff(s) prove the nature, extent and effect of his/her/their injury, pain, and emotional distress. It is for you, the [factfinder], to determine the monetary value of such pain or emotional distress using your own judgment, common sense and experience.

Haw. Civ. Jury Instr. No. 8.10

"[T]he proper test for determining damages for physical pain and suffering . . . is what the jury considers will reasonably compensate the plaintiff for the pain and suffering or anguish in light of the intensity and extent thereof as disclosed by the evidence, and . . . such determination must be left to the sound discretion of the [factfinder]." *Kimberly v. State*, No. 23954, 2005 Haw. LEXIS 392, at *90 (July 29, 2005) (citing *Franco v. Fujimoto*, 47 Haw. 408, 424, 390 P.2d 740, 750 (1964). "In making the estimate, the [factfinder] may consider the nature and extent of the injuries, the suffering occasioned by the injuries, and the duration and the pain. The jury may consider the age, health, habits, and condition of the injured party before his injury as compared with his condition as a result of the injury." *Lauer v. YMCA*, 57 Haw. 390, 399-400, 557 P.2d 1334, 1340 (1976) (citing *McCormick, Handbook on the Law of Damages*, § 88 (1935)).

85

In this case, Plaintiffs will each testify to the pain and suffering they experienced as a result of the Government's water contamination. As outlined extensively above, Plaintiffs experienced meaningful physical pain after the water contamination: rashes, diarrhea, gastrointestinal issues, and neurological issues such as seizures.

## B.   The Government Must Compensate Plaintiffs for Emotional Distress.

"Emotional distress includes mental worry, anxiety, anguish, suffering, and grief, where they are shown to exist." Haw. Civ. Jury Instr. No. 8.5 "[M]edical testimony is not a prerequisite for recovery for emotional distress." *Kimberly v. State*, No. 23954, 2005 Haw. LEXIS 392, at *90-91 (July 29, 2005) (*Campbell v. Animal Quarantine Station*, 63 Haw. 557, 564, 632 P.2d 1066, 1070 (1981)).

Plaintiffs experienced lasting emotional distress during and after the experience. They describe in their declarations a range of distress: anxiety, fear, betrayal, and profound loss. Although not required for emotional harms, Plaintiffs testimony is supported by expert testimony regarding their emotional pain and suffering, including Dr. Bird's declaration testimony regarding their anxiety, Dr. Clark and Dr. Vargo's testimony regarding their specific mental health responses to the incident, and Dr. Spira's testimony regarding their deep sense of institutional betrayal.

### C.    The Government Must Compensate for the Value of Reasonable Medical Care for the Bellwether Plaintiffs' Mental Health Injuries

"To permit an award for future medical . . . expenses, a plaintiff must provide sufficient evidence to show the medical expenses are necessary and the charges reasonable… Upon such a showing, a plaintiff may recover the reasonable value of future medical services." *Gilding v. State*, 130 Hawai'i 347, 310 P.3d 1048 (App. 2012) (internal citations and quotations omitted). In *Gilding*, testimony from a doctor that a plaintiff would need further care for his injuries, coupled with testimony and evidence from the plaintiff that his medication and health expenses cost a certain amount per month, provided sufficient evidence to support an award of future medical expenses. *Id.*

Dr. Clark and Dr. Vargo provide testimony regarding future mental health treatments that Plaintiffs require because of their contamination. These expert doctors analyzed patient records, conducted clinical interviews with patients, and provided treatment recommendations for both adult and minor Plaintiffs. Notably, the Government's life care planner agreed that all those on the Navy water line should be entitled to mental health treatment for the community trauma that they experienced.

### 1.    A Tricare Offset is Not Appropriate for Future Medical Care

An offset for Tricare is not appropriate for Plaintiffs' mental health injuries,

particularly considering that they do not want additional care from the Government

that gave them emotional distress. "The issue of whether the Government is

entitled to an offset is an affirmative defense on which the Government bears the

burden of proof." *Vanhoy v. United States*, Civil Action No. 03-1090, 2006 WL

3093646, at *8 (E.D. La. Oct. 30, 2006); *Silong v. United States*, No. CV F 06-

0474 LJO DLB, 2007 WL 2580543, at *15 (E.D. Cal. Sept. 5, 2007) ("The

government asserts an affirmative defense of offset"); *see also Siverson v. United

States*, 710 F.2d 557, 560 (9th Cir. 1983); *Harvey v. United States*, Civil Action

No. 3:09CV122-S, 2013 WL 2898785, at *3 (W.D. Ky. June 13, 2013). The

Defendant has the burden of proving what amounts will be paid by Tricare in the

future. *See Lawson v. United States*, 454 F. Supp. 2d 373, 415 (D. Md. 2006).

For future medical expenses, "the courts have consistently held that such

expenses are recoverable." *Molzof v. United States*, 6 F.3d 461, 467 (7th Cir.

1993); *see also Burch v. United States*, No. 3:02-cv-556-J-25HTS, 2006 WL

4876954, *15 (M.D. Fla. Feb.3, 2006) ("The Court awards future medical

expenses... without reduction or set-off for any Tricare benefits which might

otherwise be available in the future"). The collateral source rule in FTCA cases

only applies to past payments. *Kennedy v. United States*, No. CV08-02988 GAF

(OPx), 2009 WL 3348404, at *10 (C.D. Cal. Oct. 13, 2009). The U.S. District Court for the District of Hawaii has also consistently held that the award for future medical expenses shall not be reduced or set-off for any Tricare benefits as they rely on presumptions that are "too speculative" such as continued military service, preservation of a marriage, and long-term viability and availability of the Tricare program." *Campano v. USA*, Case No. 1:15-cv-00439-KSC, ECF No. 107, page 2-3 (June 5, 2017).

No authority would support a Tricare set-off in this case. *Galbreath v. United States*, No. 20-00373 LEK-KJM, 2022 U.S. Dist. LEXIS 238365, at *6 (D. Haw. Feb. 17, 2022) ("The cases to which Defendant USA cites in support of its contention, however, concerned whether TRICARE benefits were a collateral source for purposes of past medical expenses."). The Government will not be able to show that any Plaintiff may continue military service until their retirement, or that their service may not end with a court-martial separation that would deprive them of their benefits. The Government will not be able to show that any Plaintiff will remain married, therefore changing Tricare beneficiary status. Even if the Government could establish that Plaintiffs would be eligible for Tricare in the future, they will not be able to provide evidence regarding what Tricare would pay in the future and the amount that Tricare would pay for those services. Without knowing (1) what care Tricare might cover in the future and (2) the associated fees

89

and out-of-pocket costs, it is impossible to calculate the value of the unknown

future Tricare payments. Finally, it would have to provide competent evidence of

the present value of such hypothetical future care. *Walden v. United States*, 31 F.

Supp. 2d 1230, 1235 (S.D. Cal. 1998) (citations omitted). It cannot do so. Tricare

offsets are inappropriate.

### D. The Government Must Compensate for Lost Income and Earning Capacity for Plaintiffs Nastasia Freeman and Patrick Feindt

To recover for past lost income and earning capacity, a plaintiff must prove

the amount of income/wages lost prior to trial as a result of the defendant's

negligence. Under Hawaii law, a plaintiff's testimony alone can be sufficient to

prove lost wages as long as the testimony reasonably establishes the claim. *Peake*

*v. Labatad*, 150 Hawai'i 363 n.9, 501 P.3d 332 (App. 2021). Evidence of factors

bearing upon the value of impaired earning capacity resulting from a permanent

injury need not be clear and indubitable to be presented to the factfinder.

*Jendrusch v. Abbott*, 39 Haw. 506, 509 (1952). "Such factors include the nature

and extent of permanent injury, the degree of the mental or physical handicap

resulting from that injury, the age and life expectancy of the victim, the extent to

which his ability to work has been affected, his prior earnings, his occupation,

health and condition and the intellectual and physical avenues of occupation open

to him." *Id.* Tax returns are often used as evidence of past earning capacity.

Lost future earnings are a common element of damages arising from personal injuries and are properly chargeable against the tortfeasor. *Greene v. Texeira*, 54 Haw. 231, 242, 505 P.2d 1169, 1176 (1973). To recover for future lost earning capacity, the plaintiff must prove that their earning capacity has been impaired, and they will likely lose future income as a result of the defendant's negligence. This requires showing that the plaintiff's injuries have narrowed their economic opportunities. An award for future lost earning capacity is considered non-pecuniary damages.

For both past and future lost income/earning capacity, there must be proof of actual loss resulting from the defendant's negligence. Any award of future damages should be reduced to present value. Overall, the plaintiff must prove the elements of duty, breach, causation, and damages to recover lost income or earning capacity.

Plaintiffs Nastasia Freeman and Patrick Feindt will prove lost income and earning capacity. By declaration, they provide testimony of the impact of the water contamination on their lost earnings. For Mrs. Freeman, the health effects of the jet fuel contamination required her to take on less work as a counselor, leading to lower income. For Mr. Feindt, the health effects of the jet fuel contamination impacted his ability to fulfill his job as a golf instructor and receive expected pay. Expert witness Garrett Hoe's declaration lays out his analysis of a host of

documentation relating to both Plaintiffs, including tax returns, earning statements, correspondence relating to his wage increases, and employment records. Moreover, Mr. Hoe interviewed both Plaintiffs to further establish the factual basis for their losses, and to appropriately calculate their lost earnings.

**E.    The Government Must Compensate for Plaintiffs' Loss of Enjoyment of Life and Loss of Enjoyment of Property**

**1.    Loss of enjoyment of life and property**

In Hawaii, hedonic damages, which include damages for loss of enjoyment of life, are recoverable. *Montalvo v. Lapez*, 77 Hawai'i 282, 284 n.2, 884 P.2d 345, 347 n.2 (1994) (quoting Black's Law Dictionary 391 (6th ed. 1990)). "Many tortious acts—particularly involving negligence . . . inflict on the victim what is loosely termed a 'loss of the enjoyment of life,' or a loss of life's pleasures, or the incapacity to lead a normal life, the inability to enjoy one's family, or games, sports, hobbies, avocational skills, and the like.". *Castro v. Melchor*, 142 Hawai'i 1, 11, 414 P.3d 53, 63 (2018) (quoting 2 Stuart M. Speiser et al., The American Law of Torts § 8:20 (2014)).

A person may also recover loss of use damages if they are deprived of the use of their property due to the tortious conduct of another. *Fukida v. Hon/Haw. Serv. & Repair*, 97 Hawai'i 38, 45 (2001). The value of the property, in and of itself, is not determinative in assessing "loss of use" damages. *Id.* The loss is generally measured as the period of time "to effect repairs." *Id.*

Plaintiffs will testify as to the loss of enjoyment of their lives. Hobbies and practices that Plaintiffs had previously enjoyed became difficult. Time and energy that could have been spent with friends and family was instead devoted to suffering physical symptoms from water contamination, commuting back and forth to faraway hotels, and searching for answers online as to what would happen to their children. Plaintiffs' declarations speak to the loss of enjoyment in their family – including marital strains and rising irritation – for which damages are available and discussed more fully below.

Plaintiffs also experienced the loss of enjoyment of their property due to the Government's contamination. They lost the use of their water and were forced to come up with makeshift solutions to drink, cook, bathe, and brush their teeth. They were shuffled from hotels to hotels over the course of months, to live in cramped room with large families, or to move out of their homes. All of this constitutes compensable damage under Hawaii law.

The plaintiffs are also entitled to nuisance damages for inconvenience, injury, and fear. A "plaintiff can recover damages stemming from a public nuisance even absent an explicit statutory prohibition of the challenged conduct when the plaintiff has suffered individualized harm." *Haynes v. Haas*, 146 Hawai'i 452, 453 (2020). "The purpose of damages in public nuisance actions is to compensate plaintiffs who have suffered special harm from past nuisance

conduct." *Id.* at 461. Personal injury damages are appropriate for nuisance. *Id.* at 460 ("The Restatement rule would therefore allow Plaintiffs in this case to sue for damages since they are alleging a personal injury.").

Here, Plaintiffs will testify persuasively to suffering significant inconvenience and dislocation, as outlined extensively above. The Aubart, Feindt, Freeman, Jessup, and Witt families all had to shuffle back and forth to hotels for the normal use of water. For the Dietz family, they had to create makeshift shower arrangements to avoid the use of contaminated water. The Aubart family packed up and left a home they had lived in for many years to escape their fears of contamination, while the Feindt, Freeman, Jessup, and Witt families moved thousands of miles away to the mainland. The Feindt's and Freeman's and Witt's all struggled with bureaucratic military compassionate reassignment policies to try to get somewhere with safer water and better treatment.

As Plaintiffs are not seeking financial reimbursement, any Government provision of hotel rooms or temporary duty pay for servicemember families during this time is not relevant and should not be an offset to Plaintiffs' damages. The principles of basic tort law would countenance against allowing the tortfeasor to offset negligence damages with gratuitous, social benefit payments made. *Bynum v. Magno*, 106 Hawai'i 81, 92, 101 P.3d 1149, 1160 (2004) (citing Restatement § 920A, cmt. b (explaining that "it is the tortfeasor's responsibility to compensate for

all harm that he causes, not confined to the net loss that the injured party

receives").

### F. The Government Must Compensate for Plaintiffs' Loss of Consortium – Marital and Filial

Hawaii negligence law allows for recovery of loss of consortium – both

marital and filial. *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 22, 780 P.2d 566, 578

(1989) (holding that filial consortium is available for injury to even an adult child).

The loss of consortium claim is individual to each spouse and to each child.

The civil jury instructions outline damages for loss of martial consortium:

> LOSS OF CONSORTIUM
>
> If you find that defendant(s) is/are liable, you may allow
> plaintiff _____ a fair and reasonable compensation for the
> loss and impairment of _____'s ability to perform services as
> wife/husband, because of her/his injuries.
>
> In determining the amount of such compensation, you are to
> consider the loss and impairment of her/his companionship, aid,
> assistance, comfort and society, and services to her husband/his
> wife in performing her/his domestic and household functions, if
> any.
>
> The services provided by a wife/husband to her husband/his
> wife may often be of such character that no one can say what
> they are worth. The relationship between spouses is a special
> and unique one, and the actual facts of the case, considered
> together with your own experience, must guide you in deciding
> what amount would fairly and justly compensate the
> husband/wife for his/her loss.

Haw. Civ. Jury Instr. No. 8.6.

Plaintiffs' declarations identified marital strains and loss of consortium created by the jet fuel release:

- Kevin Aubart: "The jet fuel spill caused significant marital problems that have not been resolved. […] These disagreements caused stress in our marriage and between the two of us. It caused me even more stress because I felt so much guilt. Our closeness was affected by this. Our sexual intimacy was affected and diminished. During that time we were not able to have a relationship as husband and wife, because we were in conflict while dealing with a life-changing crisis."[200]

- Richelle Dietz: "We have been under an incredible amount of stress, which has negatively impacted our marriage. There is no intimacy when you are trying to make it through the day."[201]

- Patrick Feindt: "These experiences have affected our romance and intimacy together. Not only were we separated for six months, but it is

---

[200] Declaration of Kevin Aubart, ¶ 47.

[201] Declaration of Richelle Dietz, ¶ 69.

hard to be intimate even when we are together. The stress of it all has taken its toll."[202]

- Sheena Jessup: "Brian and I made the difficult decision to live in separate locations to get our children to safety. He stayed behind to finish his service. He slept in his office for <u>five months</u> because we couldn't afford another housing allowance."[203]

- Elizabeth Witt: "This took a toll on our marriage because we felt differently about staying on the island. The stress of the situation impacted our physical intimacy." Declaration of Elizabeth Witt, ¶ 40.

The declarations also identified that because of the contamination both adult and minor Plaintiffs also experienced a loss of filial consortium. As the Hawaii Supreme Court has recognized, "children are valued for their society and companionship . . . intangible elements of love, comfort, companionship, and society have emerged as the predominant focus of consortium actions." *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 21, 780 P.2d 566, 577 (1989). Plaintiffs' declarations, described extensively above, outline instances of loss of filial comfort and companionship because of the Government's contamination.

---

[202] Declaration of Patrick Feindt, ¶ 108.

[203] Declaration of Sheena Jessup, ¶ 61.

### G.    The Government Must Compensate for Plaintiff Beau Jessup's Tremor

Hawaii law also allows for recovery for disfigurement or deformity.

The Hawaii civil jury instructions notes that compensation is available for:

> "The deformity, scars and/or disfigurement he/she/they received, and also the extent to which, if at all, the deformity, scars and/or disfigurement are permanent;"

Haw. Civ. Jury Instr. No. 8.9(2).

Beau Jessup developed a hand tremor in the wake of the water contamination.[204] This disfigurement both increases his social anxiety and portends the potential end of his dreams to join the Navy and serve his country as his father did. In sad irony, Beau Jessup has been disfigured by the very entity that he wants to serve.

## IV.    Conclusion

Plaintiffs therefore respectfully submit this trial brief to assist the Court in the upcoming trial. Plaintiffs are amenable to briefing additional issues as they arise and as requested by the Court.

---

[204] Declaration of Beau Jessup (ECF No. 394) at ¶¶ 22-27; Declaration of Sheena Jessup at ¶ 79 ("Beau in particular is afraid of getting cancer and that his tremors won't get better or may get worse.").

DATED:  Honolulu, Hawaii, April 15, 2024.

*/s/ Lyle S. Hosoda*
LYLE S. HOSODA
KOURTNEY H. WONG
SPENCER J. LAU

*/s/ Kristina S. Baehr*
KRISTINA S. BAEHR
JAMES BAEHR
MARY M. NEUSEL

*/s/ Frederick C. Baker*
FREDERICK C. BAKER
CYNTHIA A. SOLOMON
JAMES W. LEDLIE
KRISTEN HERMIZ
SARA O. COUCH

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed and served on counsel of record via the U.S. District Court's CM/ECF electronic filing system.

*/s/ Kristina Baehr*
Kristina Baehr

99