ELLIOT ENOKI #1528
Executive Assistant U.S. Attorney
District of Hawaii
Attorney for the United States, Acting
under Authority Conferred by 28 U.S.C. § 515
SYDNEY SPECTOR #11232
Assistant U.S. Attorney

J. PATRICK GLYNN, Director
CHRISTINA FALK, Assistant Director
ERIC REY, Trial Attorney
Environmental Tort Litigation
Civil Division, U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
(202) 616-4224
eric.a.rey@usdoj.gov

*Attorneys for the United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR. et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | CIVIL NO. 22-cv-00397-LEK-KJM <br><br> THE UNITED STATES' TRIAL BRIEF; CERTIFICATE OF SERVICE <br><br> TRIAL DATE:  April 29, 2024 <br> TIME: 8:30 a.m. <br> JUDGE:  Hon. Leslie E. Kobayashi |

## THE UNITED STATES' TRIAL BRIEF

The United States hereby submits its Trial Brief pursuant to the Court's

Third Amended Scheduling Order. ECF No. 293.

## <u>Table of Contents</u>

I.  Introduction ....................................................................................4

II.  Summary of Disputed Issues for Trial .................................................6

  A.  The Bellwethers' Duration of Exposure Was a Matter of Days. ...................6

  B.  Plaintiffs Were Not Exposed to a Sufficient Dose of JP-5 to Toxicologically Cause Their Alleged Short-Term Health Effects. ................................10

  C.  The Bellwethers' General Damages Award Should Account for the United States' Mitigation Efforts. ....................................................................12

  D.  The Court Should Offset the Bellwethers' Damages By the Per Diem Amounts the United States Already Has Paid and the TriCare Coverage Certain Bellwethers Are Reasonably Probable to Receive. ...............................................13

III.  Disputed Legal Issues .........................................................................15

  A.  The United States' Pending Motions in Limine ...........................................15

    1.  Motion to Exclude Opinions of Treating Providers Per the Parties' Stipulation (ECF No. 278) ................................................................16

    2.  Motion to Exclude Pre-November 2021 Evidence that Needlessly Wastes Time and Presents Cumulative Evidence Given the United States' Stipulation to Liability (ECF No. 280)................................................................17

    3.  Motion to Exclude Irrelevant Testimony on Medical Negligence Since There Are No Medical Negligence Claims in This Trial (281).......................19

    4.  Motion to Exclude Inadmissible Hearsay As to Mr. Feindt's Alleged Lost Wages Claim (ECF No. 284) ..............................................................19

B.    Substantive Disputed Legal Issues ................................................................20

    1.    General and Specific Causation ............................................................20

    2.    Plaintiffs Cannot Meet their Burden with Respect to Specific Causation for Alleged Long-Term Health Effects, Including that Alleged Long-Term Health Effects Resulted in Diminished Earnings. ............................................22

    3.    The Court Should Apportion Any Damages Among Multiple Causes, Including Pre-Existing Conditions and Traumas. ............................................24

    4.    The Court Should Offset the Bellwethers' Damages By the Per Diem Amounts the United States Already Has Paid and the TriCare Coverage Certain Bellwethers Are Reasonably Probable to Receive. ..............................27

E.    Additional Disputed Legal Issues ..................................................................36

F.    Additional Procedural and Evidentiary Disputed Legal Issues .....................37

    1.    New Expert Opinions from Dr. Bird That Were Not Properly Disclosed, and Therefore Should Be Stricken (Again) Under Rule 37(c)(1) ....................37

    2.    Expert Testimony of Mr. Ernie Lau, Dr. DeNovio, and Dr. Norfleet .....40

    3.    Expert Testimony of Dr. John Oh. .........................................................41

    4.    Lay Witnesses, Including the Bellwethers Themselves, Cannot Offer Opinions on Whether the November 2021 Spill Caused Their Alleged Physical Injuries. .............................................................................................42

IV.  Conclusion .......................................................................................................43

## I.  <u>Introduction</u>

What are the Bellwether Plaintiffs' compensatory damages caused by the November 20, 2021, jet fuel (JP-5) spill at the Red Hill Bulk Fuel Storage Facility (Red Hill) impacting the Joint Base Pearl Harbor-Hickam (JBPHH) water system?

That is the sole question at issue in this trial. The United States has admitted that the November 2021 spill resulted from its negligence and that the November 2021 spill resulted in a nuisance. ECF No. 200. The Bellwethers have stipulated "that they are pursuing damages only for injuries arising after the November 20, 2021 spill . . . ." ECF No. 201 ¶ 5.

These stipulations should expedite and streamline the trial. *See Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1245 (9th Cir. 1981) (Rule 36 admissions "expedite trial by establishing certain material facts as true and thus narrowing the range of issues for trial."). Because the United States stipulated to duty and breach, whether the November 2021 spill was foreseeable or avoidable (including the history of or other spills at Red Hill) is irrelevant, as such evidence goes to the undisputed issue of whether a duty was breached[1] and has no impact on the remaining disputed issues—*i.e.*, the nature, extent, and valuation of the Bellwethers' compensatory damages caused by the November 2021 spill. Fed. R.

---

[1] *Pulawa v. GTE Hawaiian Tel*, 143 P.3d 1205, 1214 (Haw. 2006) (explaining the foreseeability component to Hawaii's concept of duty).

Evid. 401-403. Likewise, whether negligent conduct occurred at Red Hill prior to 2021 is irrelevant, as Plaintiffs only seek damages caused by the November 2021 spill.[2] Finally, although the Bellwethers intend to present additional theories for how the United States was allegedly negligent in its response to the November 2021 spill, practically speaking these additional theories are irrelevant: Punitive damages are not recoverable, the United States does not present in this trial a superseding intervening cause defense, and the Bellwethers only receive one recovery irrespective of multiple theories.

The scope of trial has been further narrowed by the Court excluding Plaintiffs' expert opinions regarding "causation of long-term adverse effects from JP-5 exposure, future care needs and medical surveillance, and Plaintiffs' reasonable fear of significant long-term effects from JP-5 exposure . . . ." ECF No. 410 at 25. Therefore, Plaintiffs' claims for long-term adverse health effects, the need for future care, and the need for medical surveillance are not recoverable at trial. *See* ECF No. 411 at 15-17; *see also* ECF No 411 at 15 ("The Motion for Partial Summary Judgment is granted as to Plaintiffs' request for special damages for testing and medical monitoring for future medical injury.").

Therefore, this trial will focus on causation and damages regarding the nature, extent, and valuation of the Bellwethers' alleged short-term health effects,

---

[2] This is the subject of a pending motion in limine. ECF No. 280.

if any, and any inconvenience, and emotional distress caused by the November 2021 spill.

## II.    <u>Summary of Disputed Issues for Trial</u>

The United States does not deny that the Bellwethers—to varying degrees—were distressed, were inconvenienced, and, for some, may have experienced short-term health effects from the November 2021 spill. That does not mean, however, that the Court must accept the Bellwethers' rendition of damages.

In evaluating the Bellwethers' claims, the United States asks the Court to closely scrutinize the following four categories of issues.

### A. <u>The Bellwethers' Duration of Exposure Was a Matter of Days.</u>

Unlike some other chemicals, humans can detect the presence of—and thereby avoid—JP-5 at low levels. The human nose can detect the smell of JP-5 at levels 20- to 200- lower than levels that present toxicological concern.[3]

This—coupled with notices and warnings in press releases, news media, and social media—thankfully limited the Bellwethers' duration of potential exposure to JP-5 in their drinking water to a matter of days. The first complaint of a petroleum odor or taste in the water system was November 27, 2021 (this is also the day Plaintiffs begin their water model). The next day (November 28th), the Aubart and Dietz Bellwethers detected the presence of JP-5 in their water, and therefore ceased

---

[3] ECF No. 332-1 (Trial Declaration of Dr. Prueitt) ¶ 105(a).

consuming it. The following day (November 29th), the Freeman and Jessup Bellwethers also detected the presence of JP-5 in their water, and therefore ceased consuming it. The same day (November 29th), the Hawaii Department of Health (HDOH) issued a public health advisory not to consume or use the JBPHH water ("Health Advisory"). Ms. Witt ceased two days later on December 1, 2021. The Feindt Bellwethers—located the farthest from Red Hill and the closest to an unaffected water source—ceased on December 8, 2021. All the Bellwethers ceased consuming the water because they saw notices online or because they detected a gasoline-like odor in their water.

Not everyone, however, on the JBPHH water system reported a petroleum odor or taste in their water. Indeed, when the Navy initially responded to complaints on November 28, 2021, an odor was detected by some responders (but not others), and, even then, was only detected in some of the houses on the same block. Despite this initial uncertainty and in an abundance of caution, the Navy shut down the Red Hill Well on the evening of November 28, 2021—about 24-hours from when the first water complaints were received. The Red Hill Well is located beneath the Red Hill Facility. Unbeknownst to the Navy at the time, some of the JP-5 spilled on November 20, 2021, that was not recovered during the response migrated through the subsurface and into the Red Hill Well.

7

As the testimony of United States' water modeler (Dr. Grayman) shows,[4] the Navy's prompt decision to shut-down the Red Hill Well and that the Red Hill Well operated intermittently and only provided a minority of the total daily flow into the JBPHH water system reduced the duration and extent of the November 2021 spill's impacts. For one, the water in the western and northern portions of the system— *i.e.*, those closer to the Waiawa Well that was unaffected by the November 2021 spill—were less affected or unaffected (*e.g.*, Ford Island where the Feindt Bellwethers lived). In addition, the contamination flushed out of the JBPHH water system quickly, such that by December 1, 2021, the water at nearly all the Bellwethers' residences returned to baseline.[5]

This is reflected in the sampling results. Beginning on November 29, 2021, and through December 2021, the Navy and HDOH collected over 200 samples from various locations within the water system and they all came back non-detect or below 100 µg/L (ppb) for TPH-d—the surrogate for detecting JP-5.[6] These were all below HDOH's action level of 266 µg/L, which is the level HDOH determined was "protective of human health"—*i.e.*, a safe dose with a margin for safety for

---

[4] ECF No. 376-1 (Trial Declaration of Dr. Grayman).

[5] *Id.* ¶ 53; ECF No. 376-17 (DX-3091, Grayman Exh. P); ECF No. 376-19 (Grayman Exh. R) (full video demonstrative that will be submitted on a USB on April 22, 2024).

[6] ECF No. 376-11 (DX-3085, Grayman Exh. J); ECF No. 376-12 (DX-3086, Grayman Exh. K).

even children and assuming six years of daily exposure, which did not occur here.[7] These sample results included those collected within the same neighborhoods as, or otherwise near, the Bellwethers' residences.[8]

Moreover, as testified to by Ms. Eng, CDR Daly, and CDR Bingham, the Navy, HDOH, and U.S. Environmental Protection Agency thoroughly and comprehensively remediated the JBPHH to remove remnants of the November 2021 spill before HDOH agreed to lift the November 29, 2021 Health Advisory.[9] This included systematically flushing the water system (*i.e.*, forcing water from the Waiawa Well that was unaffected through the system to remove impacted water), as well as flushing the thousands of residential and non-residential buildings on the water system.[10] Before the HDOH lifted the Health Advisory for a particular group

---

[7] PX-1291 (HDOH, Recommended Risk-Based Drinking Water Action Levels for Total Petroleum Hydrocarbons (TPH) Associated with Releases of JP-5 Jet Fuel (Apr. 20, 2022)) at PX-1291_0002 (the 266 µg/L level "assumes near daily exposure of young children to dissolved-phase TPH-d in tapwater over six years through the use of the water for drinking (ingestion) as well as bathing (dermal exposure," as well as "potential inhalation of vapors during use of the water (e.g., showering and use of dishwashers and washing machines).").

[8] ECF No. 376-1 (Trial Declaration of Dr. Grayman) ¶ 41(f); ECF No. 376-13 (DX-3087, Grayman Exh. L); ECF No. 376-14 (DX-3088, Grayman Exh. M).

[9] ECF No. 367-1 (Trial Declaration of Sherri Eng, Executive Director, Navy Closure Task Force – Red Hill); ECF No. 357-1 (Trial Declaration of CDR John Daly, Navy's Lead on Distribution System Recovery Effort); ECF No. 356-1 (Trial Declaration of CDR Bingham, Officer-in-Charge of Facility Flushing).

[10] ECF No. 357-1 (Trial Declaration of CDR John Daly) ¶¶ 10, 14-15, 21-26, 30-32; ECF No. 356-1 (Trial Declaration of CDR Trevor Bingham) ¶¶ 7-31, 34-35.

of neighborhoods (Zones), the Navy performed post-flushing sampling to confirm that the water was in fact below HDOH's 266 µg/L action level.[11] All of these efforts for the Bellwethers' Zones are thoroughly documented in the reports confirming that each of HDOH's requirements for lifting the Health Advisory had been satisfied.[12]

Since then, the Navy has continued to monitor the JBPHH water system, including for TPH-d. "For example, between March 11, 2022, to March 25, 2024, 8,071 samples (from 5,775 locations within the JBPHH water system) were analyzed for TPH-d—none exceeded [HDOH's action level] of 266 µg/L (266 parts per billion)."[13]

In the end, these facts thankfully and substantially limited the Bellwethers' duration of potential exposure to a matter of days.

**B. Plaintiffs Were Not Exposed to a Sufficient Dose of JP-5 to Toxicologically Cause Their Alleged Short-Term Health Effects.**

The Bellwethers were not exposed to a sufficient dose of JP-5 to toxicologically cause their alleged short-term health effects.[14] The United States'

---

[11] ECF No. 357-1 (Trial Declaration of CDR John Daly) ¶ 36; ECF No. 356-1 (Trial Declaration of CDR Trevor Bingham) ¶¶ 32-33.

[12] ECF Nos. 357-8 to 357-11 (DX-3008, 3009, 3010, and 3011).

[13] ECF No. 367-1 (Trial Declaration of Sherri Eng) ¶ 35.

[14] The same hold for their alleged long-term or latent injuries, but the Court already has excluded such opinions from Plaintiffs' expert (Dr. Bird). ECF No. 325.

experts have comprehensively evaluated the Bellwethers' exposure to JP-5 and its constituents, including using numerous conservative (high-dose) assumptions and even the United States' water modeler (Dr. Grayman) using the highest water concentrations posited by Plaintiffs' expert (Dr. Joseph Hughes). Even under these extremely conservative assumptions, the Bellwethers' exposures were many multiples below (and, in most instances, many orders of magnitude below) levels for which toxicological effects (short-term, long-term, or latent) have been observed scientifically, including levels utilized by regulatory agencies.

Plaintiffs have interpreted these opinions to mean that the United States claims that the Bellwethers' short-term health effects were all in their heads. Not so. The short-term health effects Plaintiffs allege—including headaches, diarrhea, nausea, and rashes—may have been caused by non-toxicological effects from the spill (*e.g.*, stress; perceptions of the odors), but also are very common health effects from other sources, such as infections (including the contemporaneous Covid-19 pandemic) and pre-existing conditions. Indeed, many of the alleged short-term health effects Bellwethers allege pre-dated the November 2021 spill, including: (1) Mr. Feindt's chronic gastrointestinal issues and migraine headaches; (2) Ms. Freeman's psoriasis, palpitations, seizures, brain fog, and other neurological conditions; (3) Mr. Aubart's anxiety, headaches, and "brain fog"; (4) Ms. Dietz's history of GERD and Meniere's disease (an inner ear disease that

causes vertigo, hearing loss, tinnitus); (5) B.D.'s chronic headaches due to Chiari I malformation; (6) V.D.'s cough and wheezing; (7) P.G.F.'s abdominal pain and diarrhea; (7) P.R.F.'s asthma; (8) Ms. Witt's palpitations and rash; and (9) N.F.'s abdominal pain and nausea. All of this makes it even less likely that all these symptoms were caused by the November 2021 spill, as opposed to the Bellwethers' increased awareness of—and focus on—their idiosyncratic health conditions that would have occurred even without the spill. Indeed, many of the Bellwethers did not see a healthcare provider for their alleged short-term health effects and did not begin receiving mental health therapy or counseling—or increase their pre-existing psychiatric medication—in the year-plus after the November 2021 spill.

### C. The Bellwethers' General Damages Award Should Account for the United States' Mitigation Efforts.

The Court's general damages award in this case should consider the United States' mitigation efforts in response to the November 2021 spill. For one, within a few days the first water complaints, the United States delivered bottled water and alternative water (*e.g.*, for cooking and bathing) to the Bellwethers' residences and offered alternative showering and laundry facilities, further reducing their out-of-pocket expenses and generalized inconvenience.

In addition, the United States offered to pay for all the Bellwethers to relocate from their homes to alternative housing off the JBPHH water system. The

United States paid for the Freeman Bellwethers to stay at a hotel from December 3, 2021, to February 2, 2022 (when they left the island) and paid or reimbursed the Feindt Bellwethers to stay at hotels from December 13, 2021, to March 6, 2022. The United States also paid or reimbursed Mr. Aubart for a hotel from December 5, 2021, through January 9, 2022. Mr. Aubart elected to just to use the hotel to shower a few times a week and otherwise continued to live in his home. The Dietzs, Jessups, and Witt Bellwethers found that the inconvenience and other concerns of living in hotels outweighed their concerns about living in their homes.

The United States provided these goods and services—bottled water, hotel rooms, showering, and laundry facilities—free of charge. This not only mitigates and offsets the Bellwethers' out-of-pocket monetary costs, but it also substantively lessens the amount of annoyance and inconvenience suffered during the spill and its aftermath. The United States respectfully submits that these facts should be reflected in the Court's award.

**D. <u>The Court Should Offset the Bellwethers' Damages By the Per Diem Amounts the United States Already Has Paid and the TriCare Coverage Certain Bellwethers Are Reasonably Probable to Receive.</u>**

Finally, the Bellwethers' damages in this case should be offset in at least two respects. First, the per diem amounts the United States has paid all the Bellwethers (or their family on their behalf) should offset the Bellwethers' recovery in this case. The United States already paid each of the Bellwether families (even those

who remained in their homes) thousands of dollars in per diems for meals, incidental costs, and generalized disruption of daily life. These payments occurred while or immediately after the Health Advisory was in effect (November 2021 – February or March 2022, depending on the neighborhood).

Second, assuming *arguendo* that the Court awards special damages for future psychological care,[15] the Court should offset such damages for the Jessup, Feindt, and Dietz Bellwethers, as this care will be provided to them free of charge by the United States through TriCare (uniformed services health care benefit program). To be clear, future TriCare offsets is a secondary issue that the Court needs to reach only if it concludes that costs for future psychological care should be awarded.

*          *          *

In the end, the United States does not deny that the Bellwethers—to varying degrees—were distressed, were inconvenienced, and, for some, may have experienced short-term health symptoms from the November 2021 spill. The

---

[15] Future medical care has been excluded, and so the only demanded future care remaining is future psychological care. ECF No. 410 at 21-22 ("Plaintiffs' life care planning experts Margot Burns ('Burns') and Cynthia Fricke ('Fricke'), prepared life care plans based in part on Dr. Bird's opinion that Plaintiffs will need medical surveillance and treatment for long-term illnesses. . . . Both Burns's and Fricke's opinions are excluded to the extent that they rely upon the excluded opinions of Dr. Bird."). Burns's and Fricke's opinions on the costs of future medical care are based exclusively on Dr. Bird.

parties, however, have been unable to agree upon the appropriate level of compensatory damages. The United States respectfully requests that the Court award the compensatory damages that it determines are reasonable and appropriate based on the evidence and analogous cases. *E.g.*, *Murphy v. United States*, No. CIV. 06-00304 BMK, 2009 WL 454627, at *3 (D. Haw. Feb. 23, 2009) (approximately $30,000 in general damages for surgical contamination, including for fear of breast cancer); *Cairns v. Dunlap Towing Co.*, C00-1562Z, (W.D. Wash. 2001) ECF Nos. 16 (plaintiff alleged chemical poisoning, headaches, emesis, and emotional distress after he consumed for approximately 10 days drinking water contaminated with antifreeze and thereafter was diagnosed with ethylene glycol toxicity syndrome, major depressive disorder, and post-traumatic stress disorder) & 21 (awarding, after a bench trial, $35,000 in general damages).

## III.   **Disputed Legal Issues**

The United States considers the following to be the "significant disputed issues of law, including foreseeable procedural and evidentiary issues." ECF No. 293.

### A. **The United States' Pending Motions in Limine.**

The United States has four pending motions in limine, which the United States summarizes below and does not restate in their entirety. The Court's decisions on these motions have the potential to streamline the trial. The United

States is evaluating how it can streamline its trial presentation due to the Court's recent rulings (ECF Nos. 410 & 411) and will do the same in light of the Court's forthcoming decisions on these motions in limine.

### 1. *Motion to Exclude Opinions of Treating Providers Per the Parties' Stipulation (ECF No. 278).*

First, the United States moved to exclude opinions of treating providers (including Dr. Bird parroting treating providers' treatment and medication opinions) who, pursuant to the parties' stipulation (ECF No. 179), cannot testify at trial due to Plaintiffs disclosing them late. ECF No. 278. In response, Plaintiffs withdrew Dr. Keifer as a treating provider (ECF No. 296 at 2), but otherwise oppose the United States' motion and argue that Dr. Bird is not parroting the opinions of treating providers. ECF No. 296.

But on medications, Plaintiffs conceded in the face of Dr. Bird's deposition testimony that: "On the subject of medications Dr. Bird has testified that **he is not offering** opinions on medications and doses the Plaintiffs have been prescribed by their treating physicians." ECF No. 296 at 15 (emphasis added). In other words, he parrots the opinions of the treating providers.

On diagnoses, as the Court's recent decision excluding Dr. Bird's opinions makes clear, Dr Bird "did not medically examine the individual Plaintiffs." ECF No. 19-20. As a result, the Court concluded that he could not provide a differential diagnosis. *Id.* at 20 ("As Defendant has ably pointed out, Dr. Bird fails to provide a

differential diagnosis."). For the same reason, he could not diagnose the Plaintiffs and had to instead parrot the diagnoses of the treating providers. *See* ECF No. 278-1 at 10-15. As detailed in the United States' pending motion in limine, that is improper and should be excluded. ECF No. 278.

### 2. *Motion to Exclude Pre-November 2021 Evidence that Needlessly Wastes Time and Presents Cumulative Evidence Given the United States' Stipulation to Liability (ECF No. 280).*

Second, the United States moved to exclude under Fed. R. Evid. 403 the "undue delay, wasting time, or needlessly presenting cumulative evidence" of pre-November 20, 2021 operation or maintenance of Red Hill because of: (1) the United States' stipulation regarding negligence and nuisance (ECF No. 200); (2) Plaintiffs' stipulation that they are pursuing damages only for injuries arising after the November 20, 2021 spill . . . ." (ECF No. 201 ¶ 5); and (3) the United States admitting to the 473 findings of fact and 39 opinions in the Navy's comprehensive April 15, 2022 investigation report. ECF No. 280.

Since this motion was filed, Plaintiffs have submitted testimony and voluminous exhibits regarding pre-November 2021 conduct at the Red Hill Facility. *See, e.g.*, ECF No. 385 (Declaration of Mr. Lau) (totaling, with attachments, 1,640 pages).[16] Earlier today, Plaintiffs filed a motion to call LCDR

---

[16] Many of Mr. Lau's testimony and exhibits are also improper expert testimony and should be disregarded for that additional reason too. *See infra* at Section III.F.2.

Bencs to testify live at trial regarding wholly pre-November 2021 conduct at Red Hill to purportedly establish that the May and November 2021 spills were "foreseeable and preventable." ECF No. 439-1 at 3.[17] LCDR ceased working at Red Hill in May 2021. JX-0001_0005 ("LCDR Shannon Bencs, SC, USN was the Fuels Director from 30 May 2020 to 12 May 2021.")

Perhaps such evidence would have been relevant, if the United States were arguing that it did not owe a duty of care to the Bellwethers in operating the Red Hill Facility. But nearly a year ago, the United States admitted[18] and then stipulated[19] that it would not be making such an argument. Since then, the United States has reaffirmed and admitted that the May and November 2021 spills were the result of it breaching its duty of care.[20] It is a waste of time and needlessly cumulative for the Bellwethers to present voluminous additional evidence

---

[17] Additional reasons Plaintiffs argue LCDR Bencs must testify live is for this Court to provide a collateral forum to adjudicate her recently dismissed *qui tam* action. ECF No. 439-1 at 7 & 9.

[18] PX-1569 (responses to Requests for Admission 8 and 9) (Apr. 19, 2023).

[19] *See* ECF No. 98 ¶ 2 (May 10, 2023) ("The United States does not dispute that, between May 6, 2021, and November 20, 2021, the United States breached its duty of care to the Resident Plaintiffs to exercise ordinary care in the operation of Red Hill, resulting in the May 6, 2021 and November 20, 2021 spills.").

[20] *See, e.g.*, ECF No. 200 ¶ 2 ("The United States admits that, between May 6, 2021, and November 20, 2021, the United States breached its duty of care to the Resident Plaintiffs to exercise ordinary care in the operation of Red Hill, resulting in the May 6, 2021 and November 20, 2021 spills."); ECF No. 210 ¶¶ 467, 481 (admitting to breaches of various duties of care related to the May 2021 and November 2021 spills).

regarding the United States' pre-November 2021 conduct at Red Hill to argue admitted or stipulated issues—*i.e.*, the United States breached a duty of care (*e.g.*, creation of an undertaking;[21] foreseeability[22]) that resulted in the May and November 2021 spills.

None of the pre-November 2021 conduct makes the cause or extent of the Bellwethers' alleged post-November 2021 injuries any more or less probable. Therefore, it is needlessly cumulative and a waste of time.

### 3. *Motion to Exclude Irrelevant Testimony on Medical Negligence Since There Are No Medical Negligence Claims in This Trial (ECF No. 281).*

Third, the United States moved to exclude as irrelevant testimony by Plaintiffs or their experts concerning medical negligence because none of the Bellwethers are pursuing a medical negligence claim. ECF No. 281.

### 4. *Motion to Exclude Inadmissible Hearsay As to Mr. Feindt's Alleged Lost Wages Claim (ECF No. 284).*

Finally, the United States moved to exclude, as inadmissible hearsay, the alleged out-of-court statements by Mr. Feindt's former boss (Benn McCallister)

---

[21] *Williams v. United States*, 711 F. Supp. 2d 1195, 1207 (D. Haw. 2010) (explaining that Hawaii follows the Restatement (Second) of Torts § 324A for imposition of a duty under the Good Samaritan—also known as negligent undertaking—doctrine).

[22] *Pulawa v. GTE Hawaiian Tel*, 143 P.3d 1205, 1214 (Haw. 2006) (explaining the foreseeability component to Hawaii's concept of duty).

regarding Mr. Feindt's alleged pay increase. ECF No. 284. Mr. McCallister will

not be testifying at trial and is not on Plaintiffs' initial disclosures.

**B.** **Substantive Disputed Legal Issues**

Beyond the pending Motions in Limine, the United States foresees the

following disputed substantive legal issues.

### 1. General and Specific Causation

The Court's recent opinion articulates the appropriate standard for general

and specific causation in this case, such that the standards should not be reasonably

in dispute at trial. ECF No. 410 at 11, 15-16.

Consistent with these standards, the United States' experts estimated the

Bellwethers' dose and compared it to levels associated with adverse toxicological

effects. Dr. Prueitt, for example, scoured the scientific literature and regulatory

values for the various constituents within JP-5, providing a comprehensive analysis

of the various levels known to cause toxicological effects.[23] She then compared

these levels to the Bellwethers' estimated dose to JP-5 and its various constituents,

using the water and air concentration data provided by Drs. Grayman and Burgoon,

respectively, and various conservative assumptions.[24] Since the Bellwethers' doses

were all below (and most by many orders of magnitude) levels that cause adverse

---

[23] ECF No. 332-1 (Trial Declaration of Dr. Prueitt) ¶¶ 63-101, and exhibits cited
therein.

[24] *Id.* ¶¶ 110-151 and exhibits cited therein.

toxicological effects (even with the aforementioned conservative assumptions), Dr. Prueitt concluded that the Bellwethers were not exposed to a sufficient dose of JP-5 or its constituents to cause their alleged health effects (past, present, or future).[25] Drs. Kosnett and Durrani, in turn, performed in-person medical examinations of the Bellwethers and reviewed their extensive medical records to conduct a differential diagnosis of each Bellwether.[26] Based on these evaluations and reviews, and considering Dr. Prueitt's dose estimates and relevant literature, they reach the same conclusion—the Bellwethers were not exposed to a sufficient dose of JP-5 or its constituents to cause their alleged health effects (past, present, or future).[27] Dr. Gordon, who is a neurologist, performed a similar analysis for Ms.

---

[25] *Id.* ¶¶ 152-155; *see also* ECF Nos. 332-28 to 30 (Demonstratives AA, AB, and AC, depicting the margin between Mr. Aubart's estimated dose and the higher levels at which toxicological effects may begin to be expected). Dr. Prueitt "selected Mr. Aubart for these demonstratives because he is the most representative of the Plaintiffs at the low end of the range of" the margins—*i.e.*, others have even greater margins between their dose and the higher levels at which toxicological effects may begin to be expected.  ECF No. 332-1 (Trial Declaration of Dr. Prueitt) ¶ 144.

[26] ECF No. 382-1 (Trial Declaration of Dr. Kosnett) ¶¶ 10-13, 37-39, 47, 57-61, 72, 84, 98-102, 115-133, 148-151, 163-189, 200-203, 215-222, 241-244, 259-264, 277-280; ECF No. 384-1 (Trial Declaration of Dr. Durrani) at PageID.28498-99, 28504-07, 28511-16, 28519-22, 28525-29, 28531-38, 28541-46, 28549-53, 28556-59, 28562-63.

[27] ECF No. 382-1 (Trial Declaration of Dr. Kosnett) ¶¶ 16-34, 51-55, 61, 89-93, 102, 138-43, 151, 193-97, 203, 231-35, 244, 269-74, 280; ECF No. 384-1 (Trial Declaration of Dr. Durrani) at PageID.28491, 28497, 28499.

Freeman (due to her alleged neurological symptoms) and reached the same conclusion.[28]

Although there may be uncertainty as to the Bellwethers' precise dose, the United States followed the more scientifically defensible and rigorous approach of bounding that uncertainty with conservative assumptions that overestimated their dose. These conservative assumptions allow the United States' experts—and the Court—to conclude that, even at levels that exceed the Bellwethers' likely doses, there is still considerable margin between the Bellwethers' doses and the levels at which toxicological effects are expected.[29]

## 2. *Plaintiffs Cannot Meet their Burden with Respect to Specific Causation for Alleged Long-Term Health Effects, Including that Alleged Long-Term Health Effects Resulted in Diminished Earnings.*

The Court already has excluded the opinions of Plaintiffs' toxicologist (Dr. Bird) regarding causation of long-term effects and medical surveillance for failing to meet the requirements of specific causation. *E.g.*, ECF No. 410 at 21 ("Dr. Bird provides little by way of principles and methodology to support his opinions that exposure to jet fuel causes specific long-term illnesses."); *id.* at 19 ("The Court concludes that Dr. Bird did not consider other known causes since he testified that

---

[28] ECF No. 345-1 (Trial Declaration of Dr. Gordon)

[29] *See supra* n.22; *see also* ECF No. 382-1 (Trial Declaration of Dr. Kosnett) ¶ 53; ECF No. 382-5 (Demonstrative Exhibit B).

he did not medically examine the individual Plaintiffs, nor did he provide a differential diagnosis for each of them . . . ."). As this Court has recognized, Plaintiffs' claims for long-term health effects from exposure must be supported by expert testimony, and—after the Court's ruling excluding Dr. Bird's opinions on long-term health effects—they have so such evidence to offer. *See* ECF No. 411 at 16-17. Accordingly, Plaintiffs cannot meet their burden to show specific causation of long-term health effects.

The same applies to Ms. Freeman's and Mr. Feindt's claims that their alleged long-term health effects from the November 2021 spill diminished their capacity to work, and therefore resulted in lost wages. *See Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*, 172 P.3d 1021, 1043-44 (2007) (in complex cases, where the "causal relationship between the violation of a duty and an injury" are beyond the "everyday experience, observations, and judgment" of the factfinder, Hawaii law requires expert testimony to prove causation) (quoting *Bernard v. Char*, 903 P.2d 676, 682 (Haw. App. 1995)); *see also Lake v. Ohana Mil. Cmtys., LLC*, No. CV 16-00555 LEK, 2019 WL 4794536, at *17 (D. Haw. Sept. 30, 2019) (holding that whether a housing area "could be considered unsafe and uninhabitable" required expert testimony because it "requires knowledge that is beyond the 'everyday experience, observations, and judgment' of" the

factfinder) (quoting *Exotics Hawaii-Kona*, 172 P.3d at 1043-44), *vacated on other grounds,* 14 F.4th 993 (9th Cir. 2021).

Thus, the only health effects that remain at issue are short-term health effects. As to these, Plaintiffs cannot carry their burden of proof on specific causation, especially when the Court compares the comprehensive and conservative approach of the United States' experts to Dr. Bird's failure to conduct a differential diagnosis or consider the Bellwethers' dose.

### 3. The Court Should Apportion Any Damages Among Multiple Causes, Including Pre-Existing Conditions and Traumas.

A "defendant should not be made to pay for injuries he did not cause." *Montalvo v. Lapez*, 884 P.2d 345, 362 (Haw. 1994). In the context of pre-existing medical conditions that are not "fully recovered," "dormant," or "latent," a tortfeasor is only liable for his respective portion of the damages: the factfinder "must apportion." *Id.* at 363. The same applies when there are multiple causes of the alleged injuries. *See id.* at 362. "If the [finder of fact] is unable to apportion, even roughly, then it must divide the damages equally among the various causes." *Id.* Importantly, in determining whether a plaintiff's pre-existing condition is "dormant," "latent," or "fully recovered from," that "is a question of fact for which medical testimony is especially appropriate." *Id.* Even if "fully recovered from any pre-existing condition" or it is otherwise "dormant or latent," a tortfeasor is liable

only for the incremental "aggravation" and not the entire condition. *Id.* at 362 n.16 & 363.

These principles are especially salient to Plaintiffs' claims of psychological injuries and will require judicious application. The Court, as finder of fact, will need to consider the Plaintiffs' preexisting psychological conditions and significant trauma histories. For instance, Mses. Jessup, Dietz, and Freeman have substantial histories of abuse, violence, and other trauma. Even though Plaintiffs are only entitled to the incremental "aggravation" of any trauma-response injuries, their experts never considered these other traumas. Indeed, Plaintiffs' expert, Dr. Vargo, was *not even aware* that these traumas ever occurred, and her verbatim notes indicate that she only ever asked about Red Hill. But when one is only aware of a single *potential* cause for a given effect, that cause is always going to seem both *actual* and *substantial*.[30]

In conducting the *Montalvo* causal analysis, this Court is not limited to the cherries picked by Plaintiffs' experts. Rather, the United States' expert, Dr. Smith, performed thorough and meaningful psychological examinations. These showed that each Bellwether claiming psychological injury had (1) preexisting mental

---

[30] The United States, of course, does not argue that victims of prior traumas cannot have future trauma, or that their recovery should be less simply because of their trauma histories. However, by excluding these other potential causes, the Plaintiffs' experts undermine the reliability of their methodology and skew their opinions to a preordained outcome.

health challenges, (2) other traumas or psychological causes, or (3) some combination of both. This goes far beyond the tragic trauma histories discussed above (and ignored by Plaintiffs' experts). Ms. Witt, for instance, has preexisting depression and anxiety symptoms that were treated for years with an anti-depressant—the dose of which never increased during the spill or its aftermath. Mr. Feindt also has struggled for years with ongoing, chronic pain, which pre-dated the spill. And Mr. Aubart had several lengthy *pro se* lawsuits against the United States—which impacted him greatly and caused substantial anxiety and frustration. After considering all these preexisting conditions and other traumatic experiences (that Plaintiffs' experts ignored), Dr. Smith explains that none of the Bellwether Plaintiffs have lasting, ongoing psychological injuries requiring future mental-health treatment that were caused by Red Hill.

This, of course, is not to say that Bellwethers never suffered any stress or anxiety from the November 2021 spill and the few months thereafter. The United States' psychologist—and the United States itself—recognizes that there likely would have been short-term, at-the-time annoyance, inconvenience, stress, and anxiety during the spill and its immediate aftermath. That is only natural, and that is indeed compensable. But that does not mean the Court should credit causation opinions as to long-term psychological effects based on etiology-blind assessments (as with Dr. Vargo) or for children who were never examined (as with Dr. Clark).

26

### 4. The Court Should Offset the Bellwethers' Damages By the Per Diem Amounts the United States Already Has Paid and the TriCare Coverage Certain Bellwethers Are Reasonably Probable to Receive.

Like most jurisdictions, Hawaii law follows the collateral source rule, which "in general, provides that benefits or payments received on behalf of a plaintiff, from an independent source, will not diminish recovery from the wrongdoer." *Warren v. United States*, 669 F. Supp. 3d 987, 1027-28 (D. Haw. 2023). As explained below, the per diems the United States already has paid the Bellwethers and the TriCare coverage the Bellwethers have received—or certain Bellwether are reasonably probable to receive in the future—are not collateral sources, and therefore should offset these Bellwethers' damages award.

### a. The Court Should Offset the Bellwethers' Recovery by the Per Diem Amounts the United States Already Paid to Prevent Double Recovery.

"A payment made by a tortfeasor or by a person acting for him to a person whom he has injured" is not a collateral source—*i.e.*, "is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability." Restatement (Second) of Torts § 920A (1979) (cited in *Bynum v. Magno*, 101 P.3d 1149, 1154 (Haw. 2004)). This clearly means the payments and other benefits the United States has paid to the Bellwethers should be credited against the United States' liability in this case. While the hotels, bottled water, laundry and shower facilities, and other mitigation efforts are difficult to quantify

27

for these purposes, the per diem amounts paid to the Bellwethers are straightforward. For simplicity, the United States recommends that the Court credit these per diem payments against the adult Bellwether's recovery, as the payments were made to the adults and not the minors and presumably the adults decided how to spend these funds.

The United States paid Mr. Aubart a total of $18,788.55 in per diems ($11,291.55 for December 3, 2021, to January 9, 2022, and $7,497 for January 10, 2022, to March 13, 2022) that should offset his recovery. *See* DX-3040_00001; DX-3038_00005.

The Feindt Bellwethers have received $18,263.28 from the United States in per diems that should offset their recovery. On December 16, 2021, Mr. Feindt received on behalf of himself and his two minor children—who are also Bellwethers (P.R.F. and P.G.F.)—an advance of $7,330.80 from the United States. DX-3024_00015.  On January 20, 2022, Mr. Feindt applied for payments on behalf of himself, P.R.F, and P.G.F. for the period beginning December 13, 2021, and received an additional $3,270.38 from the United States. DX-3024_00001 & 4. On February 14, 2022, Mr. Feindt applied for payment again on behalf of himself, P.R.F, and P.G.F. for the period ending February 14, 2022, and received an additional $7,662.10 from the United States. DX-3022_00001 & 4. These

$18,263.28 in payments were in addition to the $6,009.12 the United States paid Mr. Feindt to reimburse him for hotels. DX-3026_0004 to 24.

The other Bellwether families received similar payments that should offset their recovery. Plaintiffs dispute this, contending that these amounts should not offset the Bellwethers' recovery because they were paid to non-Bellwether family servicemembers. However, their families received additional sums because the Bellwethers were listed as spouses or dependents. *E.g.*, DX-3038_00006; *see also* PX-1524_0005 to 8. To ignore these payments the United States made to the Bellwethers families on the technicality of whether the payment was made directly to a Bellwether or a non-Bellwether family member would (1) result in a windfall; (2) treat similarly situated Plaintiffs differently based on whether they were affiliated with the Army (like Aubart and Feindt) who paid non-service members directly or the Navy or Air Force (the remainder of the Bellwethers) who paid the servicemember on behalf of the family; and (3) send the message that, in response to future exigencies, the United States or any other tortfeasor should wait to make any payments or elevate paperwork over getting money into the hands of those affected.

To the extent Plaintiffs contend that some portions of these funds were for non-Bellwether servicemembers (and therefore the non-Bellwether's portion should not offset the Bellwethers' recovery), the solution is to do the math and not

just exclude all the payments. For example, the Dietz family received $1,785.00 per several ten-day periods—*i.e.*, $178.50 per day. DX-3061_00014 to 15. This corresponds with the stated rate listed for married and 2 dependents under 12. DX-3038_00006. This exceeds the rate for single person ($77.35 if Mr. Dietz, non-Bellwether servicemember applied just for himself, DX-3038_00006) by $101.15 per day—*i.e.*, the Navy paid the Dietz family an additional $101.15 per day for the Dietz Bellwethers (Ms. Dietz, B.D. and V.D.). *See* DX-3061_00002 to 11 (listing Ms. Dietz, B.D., and V.D. as dependents).

The chart below summarizes this analysis for the Dietz, Freeman, Jessup, and Witt Bellwethers, including the resulting offsets for each set of Bellwethers.

| | Rec'd in 10 Day Period | Daily Rate Rec'd | Minus $77.35 | Dates Received | Number of Days Received | Total Per Diem Offset |
|---|---|---|---|---|---|---|
| Dietz | $1,785[31] | $178.50 | $101.15 | 12/13/21-3/13/22[32] | 103 | $10,418.45 |
| Freeman | $2,082.50[33] | $208.25[34] | $130.90 | 12/3/21-1/11/22[35] | 40 | $5,236.00 |

---

[31] DX-3061_00014 to 15.

[32] *Id.*

[33] DX-3064_00006 to 7.

[34] Matches the rate for married with 3 children all under 12. DX-3038_00006.

[35] DX-3064_00006 to 7.

| | Rec'd in 10 Day Period | Daily Rate Rec'd | Minus $77.35 | Dates Received | Number of Days Received | Total Per Diem Offset |
|---|---|---|---|---|---|---|
| Jessup | $2,618.00[36] | $261.80[37] | $184.45 | 12/3/21-3/13/22[38] | 101 | $18,629.45 |
| Witt | Not needed | $119.00[39] | $41.65 | 12/3/21-3/15/22[40] | 103 | $4,289.95 |

> b. *TriCare Is Also not a Collateral Source, and Therefore Should Offset Past Medical Expenses and Future Expenses (if Any) for Certain Bellwethers for Whom It Is Reasonably Probable Will Have Future TriCare Coverage.*

TriCare—a government-provided health insurance program—is also not a collateral source. *See Murphy v. United States*, No. CIV. 06-00304 BMK, 2009 WL 454627, at *6 (D. Haw. Feb. 23, 2009) ("The vast majority of courts to consider this issue . . . have concluded that TriCare/CHAMPUS benefits are *not* a collateral source, holding that they are benefits derived from general revenues of the United States." (quoting *Lawson v. United States*, 454 F. Supp. 2d 373, 414 (D.

---

[36] DX-3033_00010 to 12.

[37] Matches the rate for married with 4 children, of which 2 are under 12 and 2 are over 12. DX-3038_00006.

[38] DX-3033_00010 to 13.

[39] *E.g..*, DX-3045_00001; DX-3046_00001. This is also consistent with the rate for married with dependent—*i.e.*, Ms. Witt. DX-3038_00006

[40] DX-3045; DX-3046; DX-3047; DX-3048; DX-3049; DX-3050.

Md. 2006))). Therefore, the Bellwethers are not entitled to recovery for medical expenses already covered by TriCare. *E.g.*, *Murphy*, 2009 WL 454267, at *6.[41]

As for future care, the Court has excluded the opinions of Plaintiffs' expert (Dr. Bird) "regarding causation of long-term adverse effects from JP-5 exposure, future care needs and medical surveillance." ECF No. 410 at 2; *see also* ECF No. 411 at 16-17. Therefore, all that remains is potential future psychological care.[42] As explained by Dr. Smith, the Bellwethers do not require any such future psychological care due to the November 2021 spill.[43] Consequently, the Court should not award any special damages for future psychological care in this case.

Even if the Court were to award some future psychological care expenses for certain Bellwethers, it should hold that TriCare offsets the future medical expenses for 11 of the 17 Bellwethers (Jessups, Feindts, and Dietzs). Courts have held that future medical care costs can be offset by Department of Defense health care programs, such as TriCare. *See, e.g.*, *Dempsey v. United States*, 32 F.3d 1490, 1495

---

[41] It is unclear whether the Bellwethers will seek to recover for past medical expenses paid by TriCare.

[42] Future medical care has been excluded. ECF No. 410 at 21-22 ("Plaintiffs' life care planning experts Margot Burns ('Burns') and Cynthia Fricke ('Fricke'), prepared life care plans based in part on Dr. Bird's opinion that Plaintiffs will need medical surveillance and treatment for long-term illnesses. . . . Both Burns's and Fricke's opinions are excluded to the extent that they rely upon the excluded opinions of Dr. Bird."). Burns's and Fricke's opinions on the costs of future medical care are based exclusively on Dr. Bird.

[43] ECF No. 360-1 (Trial Declaration of Dr. Smith).

(11th Cir. 1994) (offsetting future medical costs by CHAMPUS—TriCare's predecessor—in the case of a retiree's dependent); *Short v. United States*, 908 F. Supp. 227, 239 (D. Vt. 1995) (same for veteran's future care).

Plaintiffs oppose TriCare offsetting any future costs, citing *Galbreath v. United States*, No. CV 20-00373 LEK-KJM, 2022 WL 18717579 (D. Haw. Feb. 17, 2022). For several reasons, the Court should reach a different conclusion here than in *Galbreath* and similar cases. First, unlike *Galbreath*, the United States only raises this future TriCare offset argument with respect to those Bellwethers who have secured—or have nearly secured—TriCare coverage by their spouse or parent (1) obtaining 20 years of service already (Jessups); (2) securing full retirement benefits in the midst of trial (Feindt); or (3) being on the verge of 20 years of service (Dietz). ECF No. 359-1 (Trial Declaration of Dr. Ruck) ¶¶ 29-31; *compare Galbreath*, 2022 WL 18717579, at *2 (TriCare coverage too speculative because servicemember still needed to serve eight more years to complete the 20 years of service). The United States also conservatively contends that the TriCare offset should apply to the Jessup, Feindt, and Dietz Bellwether children only until they reach the age of 21, even though it could in fact extend until they reach 23 if they are enrolled in college.[44]

---

[44] ECF No. 359-1 (Trial Declaration of Dr. Ruck) ¶ 33; ECF No. 360-1 (Trial Declaration of Carmen DeLeon) ¶¶ 19-20, 22-25, 27-28; ECF No. 368-4 (DX-

Second, the United States has submitted testimony for Dr. Ruck (Chief Medical Officer for the TriCare Health Plan at the Defense Health Agency) and Ms. DeLeon (Nurse Consultant, TriCare Health Plan, Clinical Oversight & Integration Section) regarding whether and how TriCare covers the various future care Plaintiffs claim for the Jessup, Feindt, and Dietz Bellwethers.[45] Therefore, in this case, the Court is neither left to dig "through TRICARE's regulations on its own" nor has it been presented with no evidence regarding TriCare. *Contra Warren v. United States*, 669 F. Supp. 3d 987, 1029 (D. Haw. 2023) ("The only evidence regarding TRICARE was testimony from D.G.W.'s parents, and it was mixed.").

Third, none of the Bellwethers are asserting medical negligence claims, and therefore some courts' concerns that a TriCare offset would require treatment by the tortfeasor is inapplicable here. *Molzof v. United States*, 6 F.3d 461, 468 (7th Cir. 1993) (medical negligence case). Moreover, even if the Bellwethers were asserting medical negligence claims, this would not be a persuasive reason to refuse to recognize a TriCare offset, as none of the medical negligence claims in for the

---

3166) (costing care under age 21 for minor); ECF No. 368-5 (DX-3167) (same); ECF No. 368-7 (DX-3169) (same); ECF No. 368-8 (DX-3170) (same); ECF No. 368-9 (DX-3171) (same); ECF No. 368-10 (DX-3172) (same); ECF No. 368-12 (DX-3174) (same); ECF No. 368-13 (DX-3175) (same).

[45] ECF No. 359-1 (Trial Declaration of Dr. Ruck); ECF No. 360-1 (Trial Declaration of Carmen DeLeon).

*Feindt* non-Bellwethers pertain to negligent psychological care—*i.e.*, the only potential future care remaining.

The present case clears many of the case-specific factual and procedural hurdles other courts have relied upon to decline offsetting future medical expenses with TriCare and presents the question of whether TriCare can ever offset future medical expenses. Two additional considerations for the Court while it answers this question. For one, the Jessup, Feindt, and Dietz Bellwethers have continued to receive medical care through TriCare in the approximately 2.5 years since the November 2021 spill, indicating that they are willing and able to use TriCare to cover the cost of their care.[46] In addition, some courts that have rejected TriCare offsets have done so because the court cannot say for certain that TriCare will continue, and that the benefits will not shrink. *E.g.*, *Galbreath*, 2022 WL 18717579, at *2. But that imposes a higher standard on the United States to offset future medical costs than on Plaintiffs to receive them, as Plaintiffs only must prove that future medical costs are reasonably probable. *See Mew Sun Leong v. Honolulu Rapid Transit Co.*, 472 P.2d 505, 508 (Haw. 1970) ("'Reasonable medical certainty' is not required for future expenses. All that is required is

---

[46] ECF No. 390 (Trial Declaration of Bryan Dietz) ¶ 41 (noting that the family uses TriCare Select); ECF No. 396 (Trial Declaration of Sheena Jessup) ¶ 84 (noting that the family uses TriCare Prime); DX-3224 at pp. 27 & 158 (noting TriCare coverage for P.G.F in October 2022 and June 2023, respectively).

probability."). Future TriCare coverage satisfies a reasonably probable standard, especially given its long track record and consistency, as testified to by Dr. Ruck. ECF No. 359-1 (Trial Declaration of Dr. Ruck) ¶¶ 8-11.

For these reasons, the Court should apply offsets for amounts already paid to the Bellwethers, for TriCare's coverage of past medical costs, and—for the Jessup, Feindt, and Dietz Bellwethers—for TriCare coverage that is reasonably probable to occur for their future care.

### E. **Additional Disputed Legal Issues**

The United States anticipates additional disputed legal issues, but none as significant to the overall resolution of this case than those outlined above. For example, as noted above, Plaintiffs intend to introduce voluminous evidence regarding the United States' pre-November 2021 conduct at Red Hill to argue in various ways that the United States breached a duty of care (*e.g.*, creation of an undertaking;[47] foreseeability[48]). But, as noted above and given the parties' stipulations and admissions, this evidence has no bearing on any of the disputed issues—*i.e.*, (1) whether the November 2021 spill caused the Bellwethers' alleged

---

[47] *Williams v. United States*, 711 F. Supp. 2d 1195, 1207 (D. Haw. 2010) (explaining that Hawaii follows the Restatement (Second) of Torts § 324A for imposition of a duty under the Good Samaritan—also known as negligent undertaking—doctrine).

[48] *Pulawa v. GTE Hawaiian Tel*, 143 P.3d 1205, 1214 (Haw. 2006) (explaining the foreseeability component to Hawaii's concept of duty).

damages or (2) the nature or extent of the Bellwethers' damages in this case. *See supra* at 4-5 & 17-19.

Likewise, Plaintiffs intend to present evidence that the United States bears liability under various additional legal theories (such as, premises liability, duty to control force, and negligent disposal of samples) but none of these change the nature or extent of the Bellwethers' damages in this case. Therefore, although the United States disputes several of these additional theories, these additional theories are not significant in terms of the overall outcome of this case.

The question for this trial remains: what are the Bellwether Plaintiffs' compensatory damages caused by the November 2021 spill? That answer does not change depending on whether the November 2021 spill or its impacts on the Bellwethers were the result of the United States breaching 1, 5, or 25 different duties of care—the compensatory damages are the same.

### F.  Additional Procedural and Evidentiary Disputed Legal Issues

The United States foresees the following disputed procedural and evidentiary legal issues.

#### 1.  *New Expert Opinions from Dr. Bird That Were Not Properly Disclosed, and Therefore Should Be Stricken (Again) Under Rule 37(c)(1).*

During a February 22, 2024, hearing in this case, the Court indicated that it was inclined to strike an affidavit from Dr. Bird that Plaintiffs filed in opposition to

the United States' partial motion for summary judgment because it went beyond Dr. Bird's expert reports. Feb. 22, 2024 Hr'g Tr. 10:17-11:19. The Court subsequently struck Dr. Bird's affidavit under Rule 37(c)(1) for this precise reason. ECF No. 282 at 3-4 (Feb. 26, 2024) (summary ruling); 411 at 7-14 (Apr. 10, 2024) (superseding order).

During the same February 22, 2024, hearing, the Court informed Plaintiffs that, if they wanted to supplement Dr. Bird's opinions, they should follow the requirements of Rule 26 and not supplement via an affidavit in response to the United States' motion. Feb. 22, 2024 Hr'g Tr. 13:7-14:6. Plaintiffs, however, chose not to follow the Court's instruction and instead waited for over 45 days (and after the deadline for supplementing expert reports under Rule 26, *see* Fed. R. Civ. P. 26(e)(2) & (a)(3)) to include these additional opinions in Dr. Bird's trial declaration.

The Court already has held that Rule 37(c)(1) bars Plaintiffs from introducing new opinions from Dr. Bird in the December 28, 2023 affidavit, especially given the differences between this affidavit and his prior reports and that expert discovery closed on November 20, 2023. ECF No. 411 at 10-14.

Rule 37(c)(1) also bars Plaintiffs from introducing the same new opinions at trial. *Id.* at 9 ("Rule 37(c)(1) gives teeth to th[e] [expert disclosure] requirement by forbidding **the use at trial** of any information required to be disclosed by Rule

26(a) that is not properly disclosed.") (quoting *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001))) (emphasis added); *accord* Fed. R. Civ. P. 37(c)(1).

Dr. Bird's Trial Declaration includes verbatim language this Court already struck in Dr. Bird's Affidavit. *Compare e.g.*, ECF No. 383 (Trial Declaration of Dr. Bird) (hereinafter, "Bird Decl.") ¶¶ 81-86, *with* ECF No. 221-2 (Affidavit of Dr. Bird) (hereinafter, "Bird Aff.") ¶¶ 26-29 (regarding why calculation of dose is not necessary); Bird Decl. ¶ 79, *with* Bird. Aff. ¶ 24 (regarding the reliability of TOC testing); Bird Decl. ¶ 87(j), *with* Bird. Aff. ¶ 30 (j) (regarding reliance on specific water concentration calculations performed by Dr. Paul Rosenfeld, and the import of those calculations for Plaintiffs' exposure); Bird Decl. ¶ 87, *with* Bird. Aff. ¶ 30 (regarding bases for Dr. Bird's opinions, several of which are not in his reports, including a report by the Navy Marine Corps Public Health Center regarding the initial health response to the November 20, 2023 fuel spill, and defueling of the Red Hill Facility). The Court should once again strike these new opinions.

Equally as egregious—but mooted by the Court's April 10, 2024 order excluding Dr. Bird's opinions on causation of long-term adverse effects from JP-5 exposure, future care needs, and medical surveillance, *see* ECF No. 410—Plaintiffs attempted to minimize the impact from the Court's February 26, 2024 summary

ruling on the motion to exclude Dr. Bird's opinions (ECF No. 282 1-3) by recasting his stricken medical monitoring opinions into treatment opinions and even adding wholly new treatment recommendations for several Bellwethers. *See* Bird. Decl. ¶ 140. Dr. Bird concedes this was done because of the "Court Order in this case excluding opinions on Medical Surveillance." Bird Decl. ¶ 135. These new recommendations were provided to Plaintiffs' life care planners on April 4 and April 5, 2024. *Id.* ¶ 135. Although the Court's April 10, 2024 Order excluding Dr. Bird's future care opinions moots these new opinions of Dr. Bird and the life care planners (ECF No. 410 at 20-22), these new opinions are emblematic of Plaintiffs' flagrant disregard for Rule 26 and why Dr. Bird's other new opinions in his trial declaration should be stricken under Rule 37(c)(1).

### 2. *Expert Testimony of Mr. Ernie Lau, Dr. DeNovio, and Dr. Norfleet.*

Plaintiffs' Trial Declaration for Mr. Ernie Lau, Manager & Chief Engineer, Honolulu Board of Water Supply, contains his and two other individuals' (Dr. DeNovio and Dr. Norfleet) opinions based on "scientific, technical, or other specialized knowledge," and, as such, should have been included in Plaintiffs' expert disclosures due by July 24, 2023—nearly nine months ago. ECF No. 192 ¶ 3a; Fed. R. Civ. P. 26(a)(2)(C); Fed. R. Evid. 701 & 702. Plaintiffs did not disclose Mr. Lau, Dr. Denovio, or Dr. Norfleet in their Federal Rule of Civil Procedure 26(a)(2) disclosures. ECF Nos 139 & 154. Therefore, they are prohibited from

offering their Rule 702 testimony at trial. Fed. R. Civ. P. 37(c)(1); *Yeti*, 259 F.3d 1106-07; *accord* ECF No. 411 at 9. This includes the 130-page expert testimony of Dr. Norfleet (ECF 385-15) and 19-page expert testimony of Dr. DeNovio (ECF No. 385-2) from another proceeding, as well as the testimony regarding Mr. Lau's scientific, technical, or other specialized knowledge (ECF 385 ¶¶ 43, 42, 11, 19, 23, 25, 26, 35; ECF No. 385-6; 385-13; 385-14; 385-17).

### 3. *Expert Testimony of Dr. John Oh.*

Plaintiffs intend to rely on various statements from Dr. John Oh (Defense Health Agency) to support their case, but they removed Dr. Oh from their Rule 26(a)(2)(C) expert disclosures. *Compare* ECF No. 139 at 3 (listing Dr. Oh), *with* ECF No. 169 at 1-4 (removing Drs. Oh and Nakamura). Consequently, they cannot offer Dr. Oh's expert testimony at trial. *See* ECF No. 411 ("9 ("Rule 37(c)(1) gives teeth to th[e] [expert disclosure] requirement by forbidding **the use at trial** of any information required to be disclosed by Rule 26(a) that is not properly disclosed.") (quoting *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001))) (emphasis added); *accord* Fed. R. Civ. P. 37(c)(1).

Plaintiffs withdrew Dr. Oh from their expert disclosures in response to the United States noting that, since Dr. Oh is a current government employee and did not treat any of the Bellwethers, it is not permissible for Plaintiffs to designate him as one of their testifying experts. *Zambito v. United States*, No.

18CV3612GRBSIL, 2022 WL 950467, at *4 (E.D.N.Y. Mar. 29, 2022)

(prohibiting expert testimony from a current U.S. employee against the United

States) (collecting cases); 5 C.F.R. § 2635.805 ("An employee shall not serve,

other than on behalf of the United States, as an expert witness, with or without

compensation, in any proceeding before a court or agency of the United States in

which the United States is a party or has a direct and substantial interest, unless the

employee's participation is authorized by the agency under paragraph (c) of this

section."). Dr. Oh did not observe the May or November 2021 spills, did not treat

any of the Bellwethers, and is not a toxicologist. ECF No. 432-1 (Deposition

Transcript of Dr. Oh) at 136:9-10 ("And I'll admit, I am not like a medical

toxicologist"). In addition, his opinions whether residences' fears or concerns are

reasonable are inadmissible for the same reasons the Court already held that Drs.

Bird and Spira may not offer similar opinions. *See* ECF No. 410 at 22-23; ECF No.

353 at 14-15.

### 4. *Lay Witnesses, Including the Bellwethers Themselves, Cannot Offer Opinions on Whether the November 2021 Spill Caused Their Alleged Physical Injuries.*

Hawaii tort law, which the FTCA applies in this case, requires Plaintiffs to

prove causation. *E.g.*, *Montalvo v. Lapez*, 884 P.2d 345, 359 (Haw. 1994) ("[The]

plaintiff has the burden of proving that the damages were legally caused by a

defendant's negligence.").[49] In complex cases, where the "causal relationship between the violation of a duty and an injury" are beyond the "everyday experience, observations, and judgment" of the factfinder, Hawaii law requires expert testimony to prove causation. *See Exotics Hawaii-Kona, Inc.*, 172 P.3d at 1043-44 (quoting *Char*, 903 P.2d at 682); *see also Lake*, 2019 WL 4794536, at *17 (holding that whether a housing area "could be considered unsafe and uninhabitable" required expert testimony because it "requires knowledge that is beyond the 'everyday experience, observations, and judgment' of" the factfinder) (quoting *Exotics Hawaii-Kona*, 172 P.3d at 1043-44), *vacated on other grounds,* 14 F.4th 993 (9th Cir. 2021); *accord* ECF No. 411 at 16. For these reasons, lay witnesses in this case, including the Bellwethers themselves, cannot testify to whether exposure to JP-5 from the November 2021 spill caused the Bellwethers' alleged health effects.

## IV.   <u>Conclusion</u>

Given the parties' stipulations and the Court's pretrial rulings, the April 29, 2021, trial should focus on causation and damages regarding the nature, extent, and valuation of the Bellwethers' short-term health effects, if any, and inconvenience,

---

[49] *Kaanapali Tours, LLC v. Hawaii Dep't of Land & Nat. Res.*, No. CIV. 11-00555 LEK, 2012 WL 1080999, at *8 (D. Haw. Mar. 29, 2012) (Kobayashi, J.) (negligence); *Lake v. Ohana Mil. Communities, LLC*, No. CV 16-00555 LEK, 2019 WL 4794536, at *22 (D. Haw. Sept. 30, 2019) (Kobayashi, J.) (nuisance), vacated on other grounds, 14 F.4th 993 (9th Cir. 2021).

and emotional distress caused by the November 2021 spill. The United States does not deny that the Bellwethers—to varying degrees—suffered some of these injuries. The United States respectfully requests that the Court award the compensatory damages for these injuries that it determines are reasonable and appropriate based on the evidence, including the scientific testimony.

Dated: April 15, 2024                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney
                                         General, Civil Division

                                         CHETAN PATIL
                                         Acting Deputy Assistant Attorney
                                         General, Torts Branch

                                         J. PATRICK GLYNN
                                         Director

                                         CHRISTINA FALK
                                         Assistant Director

                                         */s/ Eric Rey*
                                         ERIC REY
                                            DC Bar No. 988615
                                         CAROLINE STANTON
                                         ROSEMARY YOGIAVEETIL
                                         LUCAS R. WHITE
                                         ALANNA HORAN
                                         ANNA ELLISON
                                         MARIANNE KIES
                                         KENNETH HAYWOOD
                                         KAILEY SILVERSTEIN
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Torts Branch
                                         Environmental Tort Litigation
                                         1100 L Street, NW
                                         Washington, DC 20002
                                         (202) 616-4224
                                         eric.a.rey@usdoj.gov

                                         *Attorneys for Defendant,*
                                         *United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2024, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*/s/ Eric Rey*
ERIC REY