LYLE S. HOSODA            3964-0
KOURTNEY H. WONG         10827-0
SPENCER J. LAU           11105-0
HOSODA LAW GROUP, AAL, ALC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaiʻi 96813
Telephone:   (808) 524-3700
Facsimile:    (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com


KRISTINA S. BAEHR        *Pro Hac Vice*
JAMES BAEHR              *Pro Hac Vice*
MARY M. NEUSEL           *Pro Hac Vice*
JUST WELL LAW, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 994-6241
Email: kristina@well.law; jim@well.law; maggie@well.law


FREDERICK C. BAKER       *Pro Hac Vice*
JAMES W. LEDLIE          *Pro Hac Vice*
KRISTEN HERMIZ           *Pro Hac Vice*
CYNTHIA A. SOLOMON       *Pro Hac Vice*
SARA O. COUCH            *Pro Hac Vice*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: fbaker@motleyrice.com; jledlie@motleyrice.com;
khermiz@motleyrice.com; csolomon@motleyrice.com;
scouch@motleyrice.com


*Attorneys for the Plaintiffs*


*(case caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| PATRICK FEINDT, JR., et al.,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>              Defendant. | Civil No. 1:22-CV-00397-LEK-KJM<br>(FEDERAL TORT CLAIMS ACT)<br><br>**PLAINTIFFS' CLOSING ARGUMENT BRIEF; CERTIFICATE OF SERVICE**<br><br>TRIAL DATE:  April 29, 2024<br>JUDGE: Hon. Leslie E. Kobayashi |
| JESSICA WHALEY,  et al.,<br><br>      Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>      Defendant. | CIVIL NO. 1:23-cv-457<br>(FEDERAL TORT CLAIMS ACT)<br><br><br><br>TRIAL DATE: May 12, 2025<br>JUDGE:  Hon. Leslie E. Kobayashi |
| JACLYN HUGHES, et al.,<br><br>      Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>      Defendant. | CIVIL NO. 1:24-cv-00059<br>(FEDERAL TORT CLAIMS ACT)<br><br><br><br>TRIAL DATE: Not Set<br>JUDGE:  Hon. Leslie E. Kobayashi |

**PLAINTIFFS' CLOSING ARGUMENT BRIEF**

# TABLE OF CONTENTS

I. LEGAL STANDARDS ....................................................................................3

   A. CAUSATION........................................................................................4

   B. DAMAGES .........................................................................................6

      1. PAST AND FUTURE PHYSICAL PAIN AND SUFFERING ................................6

      2. MENTAL ANGUISH AND EMOTIONAL DISTRESS .......................................7

      3. LOSS OF ENJOYMENT OF LIFE................................................................8

      4. REASONABLE VALUE OF CARE AND TUTORING FOR MENTAL HEALTH
         INJURIES.............................................................................................8

      5. LOST WAGES .....................................................................................9

II. GENERAL CAUSATION .............................................................................10

   A. JET FUEL CONTAMINATED THE ENTIRE JBPHH WATER SYSTEM –
     INCLUDING THE PLAINTIFFS' HOMES ................................................10

      1. AN ESTIMATED 2,024 GALLONS OF JET FUEL ENTERED THE JBPHH
         WATER DISTRIBUTION SYSTEM AS A RESULT OF THE NOVEMBER 20, 2021
         JET FUEL SPILL ................................................................................10

      2. SIGNIFICANT CONCENTRATIONS OF JET FUEL CONTAMINATION SPREAD
         THROUGHOUT THE JBPHH WATER DISTRIBUTION SYSTEM FOLLOWING
         THE NOVEMBER 20, 2021 SPILL ........................................................14

      3. EACH OF THE PLAINTIFF'S RESIDENCES RECEIVED WATER
         CONTAMINATED WITH JET FUEL ........................................................17

      4. DR. GRAYMAN'S WATER MODELING WORK IS UNRELIABLE AND SHOULD
         NOT BE CREDITED..............................................................................23

   B. The JET FUEL CONTAMINATION CAUSED PHYSICAL INJURY
     AND TRAUMA..................................................................................27

      1. HEALTH EFFECTS .............................................................................27

2.  Dr. Andruska Established Expected Health Effects from Jet
    Fuel Exposure as to Neurological Injuries ...................................41

3.  The Jet Fuel Contamination Caused Life Disruption and Mental
    Harm...........................................................................................42

**III. SPECIFIC CAUSATION EVIDENCE**.......................................................**50**

**A.  Freeman Family**.........................................................................**51**

1.  Nastasia Freeman ......................................................52

2.  D.F. ...............................................................................65

3.  K.F. ...............................................................................68

4.  N.F. ...............................................................................73

**B.  Feindt Family**.............................................................................**78**

1.  Patrick Feindt, Jr. .....................................................79

2.  P.G.F. ...........................................................................87

3.  P.R.F. ...........................................................................92

**C.  Jessup Family** ............................................................................**95**

1.  Sheena Jessup .............................................................97

2.  Beau Jessup ...............................................................103

3.  B.J.J. ...........................................................................109

4.  N.J. .............................................................................114

5.  D.J. .............................................................................119

**D.  Dietz Family**.............................................................................**121**

1.  Richelle Dietz ..........................................................122

2.  B.D. .............................................................................128

3.  V.D. .............................................................................131

**E.  Elizabeth Witt**........................................................................**134**

**F.  Kevin Aubart** ...........................................................................**140**

**IV.  CASE COMPARABLES**..........................................................................**146**

    **A. CHEMICAL CONTAMINATION CASES**............................................147

    **B. EMOTIONAL DISTRESS UNDER THE FTCA**................................149

**V. SPECIFIC ISSUES IDENTIFIED BY THE COURT** ...............................151

    **A. APPORTIONMENT** ...............................................................................151

    **B. THE COLLATERAL SOURCE RULE AND TRICARE COVERAGE** ..............157

**VI. CONCLUSION** .............................................................................................161

# TABLE OF AUTHORITIES

## Cases

*Alban et al. v. ExxonMobil Corp. f/k/a Exxon Corp. & Storto Enterprises Inc.*, No. 03-C-06-0101932OT, LEXIS 422792 (Md. Cir. Ct. Mar. 12, 2009)........ 147, 148

*Alexander v. United States*, 2016 U.S. Dist. LEXIS 58272 (W.D. Wash. May 2, 2016) ................................................................................................158

*Brown v. United States*, 2022 U.S. Dist. LEXIS 219651 (S.D. Miss. May 13, 2020)) ................................................................................................158

*Bynum v. Magno*, 106 Haw. 81 (2004) ....................................................................6

*Cairns v. Dunlap Towing Co.*, JVR No. 501362, ECF No. 21 (W.D. Wash. 2001) ................................................................................................149

*Campano v. United States*, 2018 U.S. Dist. LEXIS 39153 (D. Haw. Mar. 7, 2018), amended in part, 2018 U.S. Dist. LEXIS 157502 (D. Haw. Mar. 27, 2018) .....159

*Carter v. United Sta*tes, 494 F. App'x 148 (2d Cir. 2012) ....................................151

*Carter v. United States*, 725 F. Supp. 2d 346 (E.D.N.Y. 2010) ........... 147, 150, 151

*Carter v. United States*, 760 F. Supp. 2d 281 (E.D.N.Y. 2011) ...........................150

*Castro v. Melchor*, 142 Haw. 1 (2018) ....................................................................8

*Clausen v. M/V NEW CARISSA*, 339 F.3d 1049 (9th Cir. 2003) ............................4

*Cronnon v. Cracker Barrel Old Country Store, Inc.*, No. 20886 (Tenn. Cir. Ct. Jan. 6, 2022) ................................................................................................147

*Galbreath v. United States*, 2022 U.S. Drist. LEXIS 238365 (D. Haw. Feb. 17, 2022) ................................................................................................158

*Gilding v. State*, 130 Haw. 347, 310 P.3d 1048 (App. 2012) ..................................9

*Gonzalez v. United States*, 80 F.4th 183 (2d Cir. 2023) ........................................147

iv

*Greene v. Texeira*, 54 Haw. 231 (1973) ...................................................................10

*Holcombe v. United States*, 584 F. Supp. 3d 225 (W.D. Tex. 2022).....................151

*Jendrusch v. Abbott*, 39 Haw. 506 (1952) ........................................................... 9, 10

*Jerome Schmidt v. United States*, 2020 U.S. Dist. LEXIS 261744 (W.D. Tex. Oct. 8, 2020) ................................................................................................................150

*Kimberly v. State*, 2005 Haw. LEXIS 392 (July 29, 2005) .......................................7

*Lauer v. YMCA*, 57 Haw. 390 (1976) .......................................................................7

*Lawson v. United States*, 454 F. Supp. 2d 373 (D. Md. 2006) .................... 158, 159

*Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193 (9th Cir. 2014) ........................6

*Mitchell v. Branch*, 45 Haw. 128 (1961) .................................................................4

*Molzof v. United States*, 6 F.3d 461 (7th Cir. 1993) ............................................158

*Montalvo v. Lapez*, 77 Haw. 282 (1994)................................................... 8, 152, 153

*Mueller v. Dep't of Pub. Safety*, 570 F. Supp. 3d 904 (D. Haw. 2021) (Gillmor, J.) ................................................................................................................ 152, 153, 155

*Newbury v. Vogel*, 151 Colo. 520 (1963) .............................................................153

*O'Grady v. State*, 140 Haw. 36 (2017) ....................................................................4

*Paeschke v. Gen. Motors LLC*, 2017 WL 5632442 (E.D. Wash. Oct. 11, 2017)......5

*Peake v. Labatad*, 150 Haw. 363 n.9, 501 P.3d 332 (App. 2021) .............................9

*Platt v. Holland Am. Line Inc.*, 2023 U.S. Dist. LEXIS 65279 (W.D. Wash. Apr. 13, 2023)................................................................................................................5

*Scottsdale Insurance Company v. Central Hotel, Inc.*, 2022 WL 4468406 (S.D. Ind., Sept. 26, 2022) ...........................................................................................147

*Taylor v. United States*, 821 F.2d 1428 (9th Cir. 1987) ...........................................3

*Taylor-Rice v. State*, 91 Haw. 60 (1999) ....................................................4

*Vanhoy v. United States*, 2006 WL 3093646 (E.D. La. Oct. 30, 2006)................158

*Walden v. United States*, 31 F. Supp. 2d 1230 (S.D. Cal. 1998) ..........................160

*Warren v. United States,* 669 F. Supp. 3d 987 (D. Haw. 2023) ..........................158

**Statutes**

28 U.S.C. §§ 1346, 2674 ......................................................................3

**Other Authorities**

2009 Jury Verdicts LEXIS 422792 ......................................................148

Haw. Civ. Jury Instr. No. 8.1 ...............................................................6

https://data.bls.gov/cgi-bin/cpicalc.pl ................................................148

**Treatises**

Restatement (Second) of Torts § 433B ................................................153

## PLAINTIFFS' CLOSING ARGUMENT BRIEF

The Federal Tort Claims Act was designed for cases such as this. Those who have been harmed by the negligence of federal officers are entitled to compensation for their injuries. When the Government caused a jet fuel release that contaminated their drinking water, made them sick, scared their families, and disrupted their lives, these Plaintiffs sought relief from this Court under the Federal Tort Claims Act. At trial, they offered credible and compelling testimony about the harm caused to their families. Like tort law itself, the purpose of the FTCA is two-fold: fair compensation and deterrence. Plaintiffs now ask for fair compensation that will not only make them whole but also deter Government officers from engaging in the kind of negligence that led to these events in the first place.

Plaintiffs proved at trial by a preponderance of the evidence that the Government's jet fuel contamination caused their injuries. Because Government officers breached their duty of care, jet fuel entered and contaminated the entire water system, there was enough jet fuel in the water to injure Plaintiffs, and Plaintiffs suffered physical injuries, emotional harm, and life-changing disruption.

In its opening statements and closing arguments at trial, the Government claimed that it "followed the science" in the aftermath of the fuel release, and that according to the science, there was not enough fuel in the water to cause medical harm nor even enough to reach the entire water system. At trial, the Government's

evidence and data showed the opposite to be true. In November 2021, the Navy

knew that its water system was interconnected and that its own policies required

that the Navy disclose the fuel release and issue an immediate warning to *all users*

of the water system to prevent harm. Instead, the Navy chose to issue guidance by

neighborhood – waiting until people reported odor, sheen, and medical complaints

from a given area. That decision was contrary to science and policy.

At trial, the Government's experts did not reckon with the Government's

real-time data that showed that there was an observable sheen throughout the entire

water system by mid-December that indicated high concentrations of jet fuel as the

Navy tracked thousands of reports of acute poisoning symptoms from the very

same area. The Government's water expert, Dr. Walter Grayman, programmed his

model to end on December 5 – before the sticky fuel had reached the western part

of the water system – and acknowledged that his model did not account for the

sheens in those neighborhoods. And the Government's toxicologist, Dr. Robyn

Prueitt, then relied solely on Dr. Grayman's flawed analysis – admitting at trial that

she did not consider *any* of the real-time data or the epidemiological study on the

Red Hill fuel release published by the Government itself. This too was contrary to

science.

Plaintiffs' Closing Argument Brief outlines the evidence relied upon by

Plaintiffs to prove their claims, the compensatory damages sought, comparable

2

verdicts and judgments, and the legal issues the Court directed the parties to address in their briefing.

## I.    LEGAL STANDARDS

Plaintiffs' claims are set forth specifically in their Fifth Amended Complaint (ECF 210), filed December 1, 2023. They assert five operative causes of action stemming from this incident: Negligence; Negligent Undertaking; Nuisance;[1] Infliction of Emotional Distress;[2] and, Premises Liability, Duty to Control Force. The Government has admitted that it breached its duty of care, and the Court has indicated that this admission covers liability for each of these negligence claims. *See* Second Joint Stip. As to Plaintiffs' Nuisance and Negligence Claims (ECF 200). The remaining issues in the case are causation and damages.

According to the FTCA, the Court applies Hawaiʻi state substantive law and federal procedural law to evaluate Plaintiffs' claim against the Government. *Taylor v. United States*, 821 F.2d 1428, 1430 (9th Cir. 1987); *see* 28 U.S.C. §§ 1346, 2674.

---

[1] Count IV) Medical Negligence, Failure to Treat, Delayed Care was asserted in the Complaint but does not apply to any of the Plaintiffs.

[2] Count VI) Spoliation of Evidence was removed from the Fifth Amended Complaint.

### A.    Causation

Under Hawaiʻi law, a plaintiff must prove that the defendant's conduct was the "legal cause" of his or her harm. *O'Grady v. State*, 140 Haw. 36, 43-44 (2017). The Hawaiʻi Supreme Court has adopted the Restatement's definition of legal cause as proximate cause, or a cause that is "legally sufficient to result in liability." *Id.* (citing Black's Law Dictionary 265 (10th ed. 2014); *Mitchell v. Branch*, 45 Haw. 128, 131 (1961). Unless a policy rule or exception applies that relieves the actor from liability, the defendant's conduct is the legal cause if it is a "substantial factor" in bringing about the harm. *Id.* At 44; *Taylor-Rice v. State*, 91 Haw. 60, 74 (1999). To constitute a "substantial factor," the defendant's conduct need not be the whole cause or the only factor. *Id.* At 45. The word "substantial" is used to denote that it has an effect that would lead reasonable people to consider it a cause. *Id.* At 44. The standard was not intended to pose a "significant hurdle to plaintiffs in proving legal causation." *Id.* At 45.

In a toxic tort case, temporality is an especially critical indicator of causation. As the Ninth Circuit has explained, "[w]hile the mere fact that two events correspond in time and space does not *necessarily* mean they are causally related, a temporal relationship between exposure to a substance and the onset of a disease can provide compelling evidence of causation." *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1059 (9th Cir. 2003) (cleaned up); *Platt v.*

4

*Holland Am. Line Inc.*, 2023 U.S. Dist. LEXIS 65279, at *21-22 (W.D. Wash. Apr. 13, 2023).

When the temporal proximity of an exposure and the onset of symptoms is so immediate and the type of injury is so acute, the "inference of causation becomes substantially more reasonable." *Platt*, 2023 U.S. Dist. LEXIS 65279, at *21-22; *West v. Bayer HealthCare Pharms. Inc.*, 293 F. Supp. 3d 82, 95 (D.D.C. 2018) ("The doctors' reliance on temporal proximity as one of a constellation of factors they considered when determining causation in this particular case is especially appropriate, given the *extremely* close proximity between the time Plaintiff West used the potentially contaminated Triad alcohol prep pad and the onset of his infection.").

In acute circumstances, it is less necessary to closely examine all other causes. "[W]here there is a sudden or immediate onset of symptoms, non-expert evidence in combination with expert testimony suggesting a possible cause is sufficient for a [factfinder] to infer causation without engaging in speculation." *Paeschke v. Gen. Motors LLC*, 2017 WL 5632442, at *6 (E.D. Wash. Oct. 11, 2017).

This is true even where the precise details of exposure may be unknown. "Given the difficulties in establishing a medical cause and effect relationship, causation can be proved even when we don't know precisely how the damage

5

occurred, if there is sufficiently compelling proof that the agent must have caused the damage somehow.'" *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014) (cleaned up).

### B.    Damages

In the context of personal injury, compensatory damages seek to restore a plaintiff to his or her position prior to the tortious act. Under Hawai'i law, these damages are divided into two broad categories: general and special.

> General damages . . . include such items as pain and suffering, inconvenience, and loss of enjoyment which cannot be measured definitively in monetary terms. Special damages . . . are often considered to be synonymous with pecuniary loss and include such items as medical and hospital expenses, loss of earnings, and diminished capacity.

*Bynum v. Magno*, 106 Haw. 81, 85 (2004) (internal citations omitted).

### 1.    Past and Future Physical Pain and Suffering

The Hawai'i Civil Jury Instructions state:

> Plaintiff(s) is/are not required to present evidence of the monetary value of his/her/their pain or emotional distress. It is only necessary that plaintiff(s) prove the nature, extent and effect of his/her/their injury, pain, and emotional distress. It is for you, the [factfinder], to determine the monetary value of such pain or emotional distress using your own judgment, common sense and experience.

Haw. Civ. Jury Instr. No. 8.10.

"[T]he proper test for determining damages for physical pain and suffering . . . is what the jury considers will reasonably compensate the plaintiff for the pain and suffering or anguish in light of the intensity and extent thereof as disclosed by the evidence, and . . . such determination must be left to the sound discretion of the [factfinder]." *Kimberly v. State*, 2005 Haw. LEXIS 392, at *90 (July 29, 2005) (citing *Franco v. Fujimoto*, 47 Haw. 408 (1964). "In making the estimate, the [factfinder] may consider the nature and extent of the injuries, the suffering occasioned by the injuries, and the duration and the pain. The jury may consider the age, health, habits, and condition of the injured party before his injury as compared with his condition as a result of the injury." *Lauer v. YMCA*, 57 Haw. 390, 399-400  (citing *McCormick, Handbook on the Law of Damages*, § 88 (1935)).

## 2.    Mental Anguish and Emotional Distress

"Emotional distress includes mental worry, anxiety, anguish, suffering, and grief, where they are shown to exist." Haw. Civ. Jury Instr. No. 8.5. "[M]edical testimony is not a prerequisite for recovery for emotional distress." *Kimberly v. State*, 2005 Haw. LEXIS 392, at *90-91 (July 29, 2005) (*Campbell v. Animal Quarantine Station*, 63 Haw. 557, 564 (1981)).

7

### 3.    Loss of Enjoyment of Life

In Hawai'i, hedonic damages, which include damages for loss of enjoyment of life, are recoverable. *Montalvo v. Lapez*, 77 Haw. 282, 284 n.2 (1994) (quoting Black's Law Dictionary 391 (6th ed. 1990)). "Many tortious acts – particularly involving negligence . . . inflict on the victim what is loosely termed a 'loss of the enjoyment of life,' or a loss of life's pleasures, or the incapacity to lead a normal life, the inability to enjoy one's family, or games, sports, hobbies, avocational skills, and the like." *Castro v. Melchor*, 142 Haw. 1, 11 (2018) (quoting 2 Stuart M. Speiser et al., *The American Law of Torts* § 8:20 (2014)).

A "plaintiff can recover damages stemming from a public nuisance even absent an explicit statutory prohibition of the challenged conduct when the plaintiff has suffered individualized harm." *Haynes v. Haas*, 146 Haw. 452, 453 (2020). "The purpose of damages in public nuisance actions is to compensate plaintiffs who have suffered special harm from past nuisance conduct." *Id.* At 461. Personal injury damages are appropriate for nuisance. *Id.* At 460 ("The Restatement rule would therefore allow Plaintiffs in this case to sue for damages since they are alleging a personal injury.").

### 4.    Reasonable Value of Care and Tutoring for Mental Health Injuries

"To permit an award for future medical . . . expenses, a plaintiff must provide sufficient evidence to show the medical expenses are necessary and the

charges reasonable. . . . Upon such a showing, a plaintiff may recover the
reasonable value of future medical services." *Gilding v. State*, 130 Haw. 347, 310
P.3d 1048 (App. 2012) (internal citations and quotations omitted). In *Gilding*,
testimony from a doctor that a plaintiff would need further care for his injuries,
coupled with testimony and evidence from the plaintiff that his medication and
health expenses cost a certain amount per month, provided sufficient evidence to
support an award of future medical expenses. *Id.*

### 5.    Lost Wages

To recover for past lost income and earning capacity, a plaintiff must prove
the amount of income/wages lost prior to trial as a result of the defendant's
negligence. Under Hawaiʻi law, a plaintiff's testimony alone can be sufficient to
prove lost wages as long as the testimony reasonably establishes the claim. *Peake
v. Labatad*, 150 Haw. 363 n.9, 501 P.3d 332 (App. 2021). Evidence of factors
bearing upon the value of impaired earning capacity resulting from a permanent
injury need not be clear and indubitable to be presented to the factfinder.
*Jendrusch v. Abbott*, 39 Haw. 506, 509 (1952). "Such factors include the nature
and extent of permanent injury, the degree of the mental or physical handicap
resulting from that injury, the age and life expectancy of the victim, the extent to
which his ability to work has been affected, his prior earnings, his occupation,

health and condition and the intellectual and physical avenues of occupation open to him." *Id.* Tax returns are often used as evidence of past earning capacity.

Lost future earnings are a common element of damages arising from personal injuries and are properly chargeable against the tortfeasor. *Greene v. Texeira*, 54 Haw. 231, 242 (1973). To recover for future lost earning capacity, the plaintiff must prove that their earning capacity has been impaired, and they will likely lose future income as a result of the defendant's negligence. This requires showing that the plaintiff's injuries have narrowed their economic opportunities. An award for future lost earning capacity is considered non-pecuniary damages. For both past and future lost income/earning capacity, there must be proof of actual loss resulting from the defendant's negligence. Any award of future damages should be reduced to present value. Overall, the plaintiff must prove the elements of duty, breach, causation, and damages to recover lost income or earning capacity.

## II.    GENERAL CAUSATION

### A.    Jet Fuel Contaminated the Entire JBPHH Water System – Including the Plaintiffs' Homes

#### 1.    An Estimated 2,024 Gallons of Jet Fuel Entered the JBPHH Water Distribution System as a Result of the November 20, 2021 Jet Fuel Spill

On November 20, 2021, a jet fuel release occurred in the Navy's Red Hill Bulk Fuel Storage Facility when a rover train operating in Adit 3 struck and ruptured the fire suppressant retention line resulting in the release of thousands of

10

gallons of jet fuel. Hughes[3] Decl. (ECF 369) at ¶ 12; JX-0028_00112-13 (April 15, 2022 Supplement to Command Investigation into the 6 May 2021 and 20 November 2021 Incidents at Red Hill Bulk Fuel Storage Facility, the "Waters Report"). The Government has admitted that it breached its duty of care to Plaintiffs to exercise ordinary care in the operation of its Red Hill Bulk Fuel Storage Facility, resulting in this November 20, 2021 spill. Second Joint Stip. As to Plaintiffs' Nuisance and Negligence Claims (ECF 200) at ¶ 2.

From its release in Adit 3, the jet fuel began migrating 80 feet downwards through the underlying fractured volcanic basalt and into the Red Hill Well. Hughes, 4/30/24 Tx. At 73:14-18; Hughes Decl. (ECF 369) at ¶¶ 20, 23, 27-30. The jet fuel made its way into the Red Hill Well via multiple pathways, including but not limited to a subsurface drain sump, various direct connections, and large fractures in the bedrock below Adit 3. *Id.*; PX-1620 (schematic of release pathways to the environment).

The bulk of the jet fuel made its way into the Joint Base Pearl Harbor-Hickam (JBPHH) water distribution system "relatively quickly" – in under 24

---

[3] Plaintiffs' expert, Dr. Joseph Hughes, has a B.A. in Chemistry, and both an M.S. and Ph.D. in Civil and Environmental Engineering. He is a registered Professional Engineer and an AAEE Board-Certified Environmental Engineer. He currently holds the position of University Distinguished Professor of Engineering at Drexel University. His area of expertise is environmental engineering. PX-1591 (Curriculum Vitae of Dr. Hughes).

hours. Hughes, 4/30/24 Tx. at 71:11-73:18; Hughes Decl. (ECF 369) at ¶ 27; PX-1483 (May 14, 2022 GSI Letter Report); Darley Decl. (ECF 377-1) at ¶ 24 (NAVFAC Chief Engineer and Director of Planning, Design, and Construction Directorate testifying that the Red Hill geology provided "an efficient path" from Adit 3 to the Red Hill Well).

Jet fuel is less dense than water and largely immiscible – that is, it is generally a nonaqueous phase liquid (NAPL) – and thus when the jet fuel reached the Red Hill Well it tended to float on the water surface.[4] Hughes, 4/30/24 Tx. at 60:15-61:1 & 73:7-18; Hughes Decl. (ECF 369) at ¶¶ 31 & 4(e) at fn. 2 (explaining that the jet fuel at issue here existed as a two-phase contaminant). Because of the rapidly-flowing, high-energy mixing that occurred when the Red Hill Well pump was operating, the pump would draw this NAPL from the water surface down into the Red Hill Well intake and into the JBPHH water distribution system. Hughes Decl. (ECF 369) at ¶ 33; Hughes, 4/30/24 Tx. at 56:22-59:18.

An estimated 2,024 gallons of jet fuel entered the JBPHH water distribution system from November 21, 2021 until November 29, 2021, when the Navy shut down the Red Hill Well. Hughes, 4/30/24 Tx. at 39:7-25; Hughes Decl. (ECF 369)

---

[4] Jet fuel has a solubility of around 5,000 μg/L (as measured by TPH). *See* JX-0011 (Dec. 29, 2021 GSI Memo regarding analysis of samples). At concentrations above 5,000 μg/L, the jet fuel would be present as a floating NAPL, oftentimes referred to as a "sheen." Hughes, 4/30/24 Tx. at 61:2-7; Hughes Decl. (ECF 369) at ¶ 19.

at ¶ 39; *see also* Hughes, 4/30/24 Tx. at 39:7-14. This estimate is conservative

because it is based on bailer samples[5] that were collected in December 2021, after

the Red Hill Well had been shut down.[6] Hughes, 4/30/24 Tx. at 70:12-23; *see also*

Hughes Decl. (ECF 369) at ¶¶ 37-40.

　　While conservative, this estimate of 2,024 gallons of jet fuel entering the

JBPHH water distribution system is reliable because: (1) it squares with the

hundreds of reports of sheen, which required at least 1,100 gallons of jet fuel to

enter the JBPHH water distribution system; (2) it is based on measured values; and

(3) it is less than the lowest estimated volume of jet fuel released into the

subsurface of Navy's Red Hill Bulk Fuel Storage Facility (i.e., 3,446 gallons). *Id.*

at ¶¶ 24, 36, 39.

---

[5] Unlike a low-flow pump sample which is not intended to incorporate any NAPL in the sample, a bailer sample is intended to collect water at the top fraction of the water column and any floating NAPL that would be present. Hughes, 4/30/24 Tx. at 62:16-24, 64:18-21; *see also* Hughes Decl. (ECF 369) at ¶ 46; Hughes, 4/30/24 Tx. at 65:25-66:21, 67:25-68:7 (explaining why samples from the chlorination spigot would likewise not be representative of the concentration of jet fuel entering the JBPHH water distribution system).

[6] Prior to December 2, 2021, the date of the first bailer sample used in calculating the amount of jet fuel entering the water distribution system, Dr. Hughes explained that higher concentrations of NAPL would have been present in the Red Hill Well. Hughes, 4/30/24 Tx. at 70:24-71:8. This is because the bulk of the flow of jet fuel into the Red Hill Well would have occurred within 24 hours after the spill – by November 21, 2021. *Id.* at 71:22-24.

### 2.    Significant Concentrations of Jet Fuel Contamination Spread Throughout the JBPHH Water Distribution System Following the November 20, 2021 Spill

Once the fuel was introduced into water the system, it spread throughout the entire system over the next several weeks. The JBPHH water distribution system is owned and operated by the Naval Facilities Engineering Systems Command Hawaiʻi. Rosenfeld Decl. (ECF 374) at ¶ 28. The JBPHH water distribution system is a highly interconnected 250-mile system that draws water from three wells – the Waiawa Well, the Halawa Well, and the Red Hill.[7] Rosenfeld,[8] 5/7/24 Tx. at 9:3-17; Rosenfeld Decl. (ECF 374) at ¶¶ 28-30. The JBPHH water distribution system is largely gravity-driven, with 19 pressure zones that maintain equilibrium using two 6-million-gallon storage tanks. Rosenfeld, 5/7/24 Tx. at 9:18-10:1; Rosenfeld Decl. (ECF 374) at ¶¶ 31-32.

---

[7] The Halawa Well was not operating from November 20, 2021, to November 27, 2021, and was shut down on December 3, 2021. Rosenfeld, 5/7/24 Tx. at 9:8-17. The Red Hill Well was shut down on November 29, 2021. Stip. Facts Regarding the Water System (ECF 548) at ¶ 12.

[8] Plaintiffs' expert, Dr. Paul Rosenfeld, has a B.A. in Environmental Studies, an M.S. in Environmental Science, and a Ph.D. in Soil Chemistry. He has extensive experience in evaluating the fate and transport of environmental contaminants, risk and exposure assessment of contaminants released from pollution sources, monitoring and modeling of pollution sources that may cause impacts on human health and ecological systems, and evaluation of odorous chemicals. He is a cofounder and principal at the environmental consulting firm of Soil Water Air Protection Enterprise in Santa Monica, California. *See* PX-1596 (Curriculum Vitae of Dr. Rosenfeld).

Like Dr. Hughes, Plaintiffs' water distribution system expert, Dr. Paul Rosenfeld, similarly and independently concluded that approximately 2,000 gallons of jet fuel entered the JBPHH water distribution system. Rosenfeld, 4/30/24 Tx. at 118:20-23; Rosenfeld Decl. (ECF 374) at ¶ 61.

Dr. Rosenfeld modeled the fate and transport of the jet fuel through the JBPHH water distribution system with a well-mixed model. This well-mixed model has been used to model the fate and transport of contaminants through other water distribution systems. Rosenfeld Decl. (ECF 374) at ¶ 54 (noting that ATSDR has utilized well-mixed models for evaluating contamination at Camp Lejeune and Pease Air Force Base). As Dr. Rosenfeld explained, this model was particularly appropriate for use in this case because a well-mixed model takes into account that the contaminant of concern is a sticky, two-phase contaminant, and the water distribution system is interconnected. Rosenfeld, 4/30/24 Tx. at 115:22-118:2, 120:5-11; Rosenfeld Decl. (ECF 374) at ¶¶ 17-19, 21, 27-33, 36, 42-48, 52, 65; *see also* Rosenfeld Decl. (ECF 374) at ¶ 53 (noting deposition testimony of Navy employees that supports mixing within the JBPHH water distribution system); Rosenfeld Decl. (ECF 374) at ¶ 55 (noting other reasons justifying use of the well-mixed model). Importantly, and as set forth below, the well-mixed model output comported with the observed data.

15

At a volume of 2,000 gallons of jet fuel entering the system, the well-mixed model predicts a concentration of 6,532 µg/L TPH-d across the water distribution system by December 6, 2021. Rosenfeld, 4/30/24 Tx. at 93:10-22; 92:23-93:1. Before December 6, 2021, the concentration of TPH-d in the JBPHH water distribution system was ramping up to this 6,532 µg/L level, and the fuel continued to spread throughout the system. Rosenfeld, 5/7/24 Tx. at 21:15-18; PX-1995_001-0016 (Geo Mapping Data Maps of Drinking Water TPH-d Detections, Figures 1-17).

A concentration of 6,532 µg/L TPH-d is a sufficient concentration to form a sheen (i.e., 5000 µg/L). Rosenfeld, 4/30/24 Tx. at 93:10-22; Grayman, 5/8/24 Tx. at 22:19-23. To put this concentration in a health perspective, 6,532 µg/L is 24.4 times higher than the Environmental Action Level (EAL) for TPH set by the Hawaiʻi Department of Health (HDOH). Rosenfeld, 5/7/24 Tx. at 18:2-10; PX-1291 (HDOH memo setting TPH EAL at 266 µg/L). But as the Government's witnesses admitted, there is no Maximum Contaminant Level for TPH-d in drinking water – that is, there is no safe level of jet fuel in drinking water. Eng, 5/7/24 Tx. at 69:25-70:21.

Here, the well-mixed model output of a concentration of 6,532 µg/L by December 6, 2021, comported with the fact that there were widespread community complaints about water quality throughout the JBPHH water distribution system.

Rosenfeld, 4/30/24 Tx. at 116:2-6; PX-1995_0054 (total complaints 11/28/21-2/12/22; PX-1995_0055 (total complaints Nov. 2021); PX-1995_0056 (total complaints Dec. 2021); PX-1995_0060 (total complaints 11/29/21-12/5/21); PX-1995_0061 (total complaints 12-6/21-12/12/21); Rosenfeld Decl. (ECF 374) at ¶ 48.

This well-mixed model output also comported with the fact that there were reports of a sheen throughout the water distribution system by December 6, 2021. Rosenfeld, 4/30/24 Tx. at 119:4-11; PX-1995_0109 (sheen complaints 11/30/21-2/12/22); PX-1995_0111 (sheen complaints Dec. 2021); PX-1995_0114 (sheen complaints 11/29/21-12/5/21); PX-1995_0115 (sheen complaints 12/6/21-12/12/21). And this well-mixed model output comported with the fact that the predicted concentrations of TPH-d in the water distribution system at Day 500 of the model run closely aligned with the Navy's long-term water monitoring results. Rosenfeld, 4/30/24 Tx. at 120:12-121:7.

### 3. Each of the Plaintiff's Residences Received Water Contaminated with Jet Fuel

Each of the Bellwether Plaintiff residences was on the JBPHH water distribution system and drew water from the JBPHH water distribution system. Stip. Facts Regarding the Water System (ECF 548), ¶¶ 1-9; ECF No. 548-1 (modification of PX-1222_0060 to show pressure zones in which the Bellwether

Plaintiff residences were located);[9] ECF No. 548-2 (modification of JX-0048 to

show the approximate location of the Bellwether Plaintiff residences on the water

system); Rosenfeld, 5/7/24 Tx. at 12:1-10.



Stip. Facts Regarding the Water System (ECF 548-1).

There does not appear to be any dispute between the parties that Elizabeth

Witt, the Dietz family, the Jessup family, Kevin Aubart, and the Freeman family

all received contaminated water from the JBPHH water distribution system.

---

[9] Specifically, the Feindt family resided in Zone A1 (Ford Island), Elizabeth Witt
resided in Zone D2, the Dietz family resided in Zone D3, the Jessup family and
Mr. Aubart resided in Zone F2, and the Freeman family resided in Zone H3. *See*
Stip. Facts Regarding the Water System (ECF 548), ¶¶ 1-6; ECF No. 548-1.

18

Rosenfeld, 5/7/24 Tx. at 19:6-16, 20:7-21:2 (testifying that by December 6, 2021,

all zones in the JBPHH water distribution system, and thus all the Bellwether

Plaintiffs, were receiving concentrations of contaminated water approximating

6,532 µg/L and that prior to December 6, 2021, the concentrations of contaminated

water were "ramping up" so as to affect all Plaintiffs); DX-3090 (Government

expert, Dr. Grayman's hourly modeling results showing positive TPH-d

concentrations at five of the six Bellwether Plaintiff residences);[10] K. Aubart Decl.

(ECF 389) at ¶ 19 (testifying to an observed sheen); R. Dietz Decl. (ECF 391) at ¶

16 (testifying to an observed sheen); N. Freeman Am. Decl. (ECF 572) at ¶¶ 12-13

(testifying to an observed sheen); E. Witt Decl. (ECF 397) at ¶¶ 26-27 (testifying

to an observed sheen); S. Jessup Decl. (ECF 396) at ¶¶ 14, 17, 33, 58 (testifying to

an observed sheen).

        Indeed, the sole dispute between the parties appears to be whether the Feindt

residence, located on Ford Island, received contaminated water from the JBPHH

water distribution system. The Government's claim that contaminated water did

not reach Ford Island, however, does not stand up to scrutiny for at least five

reasons.

_____

[10] As discussed, Plaintiffs dispute the reliability of Dr. Grayman's modeling
outputs for multiple reasons. But even under Dr. Grayman's model, five of the six
Plaintiffs' residences received contaminated water.

First, because the water system is interconnected, there are multiple

connections and multiple pathways whereby water from both the Waiawa Well and

the Red Hill Well reaches Ford Island. Rosenfeld, 5/7/24 Tx. at 14:7-15:7; JX-

0014 (JBPHH water system schematic).

Second, the Documentation to Amend the Drinking Water Health Advisory

for Zone A2 (i.e., Ford Island) contains a map generated by the Navy that

graphically demonstrates that water flows not just west to east of Ford Island, but

also east to west onto Ford Island. Rosenfeld, 5/7/24 Tx. at 15:20-17:15; PX-

1210_0053 (SCADA map showing water flow).

Third, there were sheen complaints on Ford Island beginning the second

week of December 2021. *See* PX-1955_0061 (sheen complaints from 12/6/21-

12/12/21). Compare the Government's data of sheen reports on Ford Island from

the first week of December:

**Figure 115 Weekly Complaints[24]**
**(Sheen Complaint Data, November 29, 2021 - December 5, 2021)**



with the Government's data of sheen reports from the second week of December:

**Figure 116 Weekly Complaints**
**(Sheen Complaint Data, December 6, 2021 - December 12, 2021)**



PX-1995_0014-15. As set forth below, the Government's experts do not account

for this reality because every one of them rely on Dr. Grayman's model that ran

only until December 5, 2021.

Consistent with this timing, the Feindt family observed a sheen in their water

on Ford Island on or about December 11, 2021. PX-2254_0003 (contemporaneous

medical record); P. Feindt, Jr., Decl. (ECF 392) at ¶ 114 ("We saw the sheen on

our water . . . ."). All four Feindt family members presented to Tripler Medical

Center with acute symptoms that same week. *Id.* ¶ 26, 30-31. PX-2252_0034-35;

PX-2253_0005-0011; PX-2253_0047-0084; PX-2254_0003-0004; PX-2254_0010-

0012.

Fourth, the Government's reported health data showed that Ford Island was

as affected as the rest of the water line by December 2021:



22

PX-1995_0027.

Fifth, the long-term monitoring sampling data confirm contamination on Ford Island as the Government continued to detect TPH-d there, similar to the rest of the water system, into 2022 and 2023. Rosenfeld, 5/7/24 Tx. at 17:20-18:1; PX-1955.

In short, there is ample evidence that "significant quantities" of contaminated water reached Ford Island. *See* Rosenfeld, 5/7/24 Tx. at 17:16-19.

### 4.    Dr. Grayman's Water Modeling Work Is Unreliable and Should Not be Credited

The opinions of the Government's water modeling expert, Dr. Walter Grayman, are unreliable for at least three reasons and, therefore, his testimony should be given no weight or credibility by this Court. Because his analysis does not comport with the Government's own test results and observable data, it is inconsistent with the scientific method. For scientific evidence to be reliable, "the principles and methodology used by the expert" must be "grounded in the methods of science." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). Expert opinion may be excluded or disregarded if there is too great an analytical gap between the expert opinion and actual data presented in the case. *GE v. Joiner*, 522 U.S. 136, 146 (1997).

First, as a threshold matter, Dr. Grayman's "best representation of the actual concentration of jet fuel entering the [water distribution] system" is a November

29, 2021, water sample from a pre-chlorination spigot with a non-detect for TPH-d. Grayman, 5/8/24 Tx. at 14:18-25; *see also* Grayman Decl. (ECF 376) at ¶ 41(a). As Dr. Grayman conceded at trial, his "best representation" of the concentration of TPH-d in the JBPHH water distribution system would result in not a single TPH-d detection in the system, no need to relocate residents into hotels, and no need for the Navy to flush the system. Grayman, 5/8/24 Tx. at 16:8-17:3; *see also* Hughes Decl. (ECF 369) at ¶ 47. Knowing his "best representation" of the concentration of TPH-d in the JBPHH water distribution system was in direct contradiction with observed reality, Dr. Grayman did not model this non-detect value. Grayman, 5/8/24 Tx. at 15:10-15. Instead, Dr. Grayman chose to model four other concentrations – 2,000, 6,000, 17,000, and 85,250 μg/L – only one of which (the 85,250 μg/L sample) was tied to any sampling data. Grayman, 5/8/24 Tx. at 13:15-14:7, 19:4-25, 28:16-29:2.

Second, Dr. Grayman's modeling of the water contamination covered only 12 days: from November 24, 2021 to December 5, 2021. Grayman, 5/8/24 Tx. at 12:12-15. While Dr. Grayman was aware of water quality complaints both before and after December 5, 2021, he did not take those complaints into account in his modeling. Grayman, 5/8/24 Tx. at 13:10-12.

As set forth above, Dr. Grayman's opinion that zero TPH-d reached Ford Island (and ultimately resulted in zero TPH-d exposure to the Feindt family who

lived on Ford Island) is therefore unreliable because the drinking water complaints about Ford Island came in after Dr. Grayman's model run ended on December 5th. Grayman, 5/8/24 Tx. at 32:7-33:9; 34:4-16; *see also* PX-1995_0061 (all water complaints from December 6, 2021 – December 12, 2021); PX-1995_0115 (sheen complaints from December 6, 2021 – December 12, 2021). As the data makes clear, it took longer for contamination to reach Ford Island. The Government's contention that the contamination never reached the western side of the JBPHH water system – based on Dr. Grayman's incomplete model – is not credible.

Third, the 2,000 µg/L low-end concentration that Dr. Grayman modeled, and opined was the "best fit" of his four modeled concentrations, Grayman Decl. (ECF 376) at ¶ 43, would not be high enough to create a sheen at residences on the JBPHH water distribution system, which is in direct contradiction with observed reality. Grayman, 5/8/24 Tx. at 18:18-19:16, 21:19-26:13; PX-1995_0115-0116; PX-1183; Hughes Decl. (ECF 369) at ¶ 48; Rosenfeld Decl. (ECF 374) at ¶ 64. Dr. Grayman recognized at trial that a sheen develops at 5,000 ug/L. Grayman, 5/8/24 Tx. at 22:19-23. And there was abundant evidence in this case that a sheen developed throughout the JBPHH water system in December 2021. *See, e.g.*, PX-1995_0014-15, and Plaintiff declarations describing the sheen at their residences.[11]

---

[11] Aubart Decl. (ECF 389) at ¶ 19; B. Dietz Decl. (ECF 390) at ¶ 11; R. Dietz Decl. (ECF 391) at ¶ 16; P. Feindt, Jr. Decl. (ECF 392) at ¶ 114; Beau Jessup Decl. (ECF

Moreover, Dr. Grayman has admitted: (1) that he has no experience

modeling petroleum contamination through a water distribution system, Grayman,

5/8/24 Tx. at 8:23-9:1; (2) that he has no experience modeling a two-phase

contaminant in water distribution system, Grayman, 5/8/24 Tx. at 10:3-8; (3) that

the modeling software he used, EPANET, is incapable of modeling a two-phase

contaminant like JP-5, Grayman, 5/8/24 Tx. at 10:17-24, 11:8-21;[12] (4) that the

water samples that Dr. Grayman used to validate his model were deemed by the

Navy and the Marine Corps as inappropriate and unreliable for conducting an

exposure assessment of individuals who consumed drinking water after the jet fuel

spill, Grayman, 5/8/24 Tx. at 36:16-38:7;[13] and (5) that the fluoride tracer study

---

394) at ¶ 7; B.J.J. Decl. (ECF 395) at ¶ 7; S. Jessup Decl. (ECF 396) at ¶ 33; Witt
Decl. (ECF 397) at ¶ 26; Brian Jessup Decl. (ECF 398) at ¶ 14; K. Freeman Decl.
(ECF 401) at ¶ 7; N. Freeman Decl. (ECF 572) at ¶ 12.

[12] *See also* Rosenfeld Decl. (ECF 374) at ¶ 65 (explaining that EPANET does not
take into account a two-phase contaminant as the case here).

[13] Sherri Eng, the Government's former NAVFAC Environmental Business Line
Leader and Director, Environmental, Commander Navy Region Hawaiʻi, likewise
confirmed that the water sampling conducted in late November and early
December by the Interagency Drinking Water Team, the Navy, and the Hawaiʻi
Department of Health was ultimately unreliable because, *inter alia*, the sampling
was not representative. *See* Eng 5/7/24 Tx. at 70:23-72:4, 74:1-79:7; *see also* PX-
2412 (Navy & Marine Corps. Public Health Center, Determination if Pre-IDWST
Flushing Drinking Water Data Should be Used to Evaluate Human Exposure to JP-
5 Fuel in Drinking Water at the Joint Base Pearl Harbor-Hickam Water
Distribution System).

used to validate his model is unhelpful because unlike jet fuel, fluoride is highly

soluble (a single-phase contaminant) and behaves differently in water than jet fuel,

Grayman, 5/8/24 Tx. at 35:4-36:10.

>    **B.**    **The Jet Fuel Contamination Caused Physical Injury and Trauma**

>        **1.**    **Health Effects**

As a general matter, there is ample evidence from the Government itself

acknowledging that the November 2021 jet fuel release caused medical injury to

some on the JBPHH water line. Dr. Steven Bird[14] opined that this jet fuel release had

the capacity to cause acute health symptoms for those exposed (general causation),

and did in fact cause health symptoms for each of the Plaintiffs (specific causation).

Bird Decl. (ECF 491-1).

---

[14] Plaintiffs' expert, Dr. Steven Bird, is a medical toxicologist and emergency medicine clinician who has practiced in those fields for over twenty years. *See* Bird Decl. (ECF 491-1) at ¶¶ 1 & 4; *see also* PX-1597 (Curriculum Vitae of Dr. Bird). He is a Professor of Emergency Medicine at the University of Massachusetts Medical School and works at the UMass Memorial Health toxicology clinic. *See* Bird Decl. (ECF 491-1) at ¶ 3. He has advised on thousands of different types of potentially toxic exposures, including consultations for the Massachusetts-Rhode Island Poison Center and outside medical facilities around New England. *See id.* at ¶ 9. In his practice of emergency medicine and medical toxicology, he regularly evaluates and advises people exposed or potentially exposed to a variety of toxic substances, including hydrocarbons, regarding current and potential health effects of their exposure. *See id.* at ¶ 10.

a)   **Government and Hawaiʻi Department of Health Data, Reports, and Epidemiological Study Show General Causation for Acute Symptoms**

Government agencies have acknowledged the acute symptoms of jet fuel

exposure. According to the Government:

> Symptoms of JP-5 exposures have been associated with cough, shortness of breath, skin irritation, eye irritation, headache, fatigue, dizziness, and GI complaints (cramping, nausea, vomiting, or diarrhea). These symptoms fall into six broad ICD-10 diagnostic categories used in this report that include Central Nervous system (CNS), Respiratory, Gastrointestinal (BI), Skin, Mucous Membranes, and Toxic Effects.

PX-1493_0004 (Report Update: Description of Joint Base Pearl Harbor-Hickam

DoD-affiliated Housing Residents' Medical Encounters Related to the JP-5

Release, 01 January 2021 - 30 November 2022, EpiData Center, Defense Centers

for Public Health-Portsmouth, prepared Aug. 2023).

Guidance to healthcare providers jointly prepared by the Army, Navy, Air

Force, Marine Corps., and HDOH, dated Feb. 25, 2022, stated:

> Typical symptoms from exposure to petroleum hydrocarbons include CNS: Headaches, dizziness and lightheadedness; Gastrointestinal; Upset stomach, nausea, vomiting, diarrhea, and abdominal cramping; Skin: Irritation and rashes; Mucous membranes: Irritation, epistaxis; Respiratory: Cough and shortness of breath, hydrocarbon pneumonitis.

PX-1240 (Healthcare Provider Evaluation and Treatment Guidance for Potential

Petroleum Exposure from the Navy Water Distribution System (Feb. 25, 2022));

*see also, e.g.*, JX-0008_00017 (Oahu Military Water Response Resident Resources,

2/7/22); PX-1493 at 4 (Report Update: Joint Base Pearl Harbor-Hickam DoD-
affiliated Housing Residents' Medical Encounters Related to the JP-5 Release, 01
January 2021-30 November 2022) ("Symptoms of JP-5 exposures have been
associated with cough, shortness of breath, skin irritation, eye irritation, headache,
fatigue, dizziness, and GI complaints (cramping, nausea, vomiting, or diarrhea)).

In the immediate aftermath of the fuel release, 5,828 people on the JBPHH
water system reported to Government and civilian medical providers. PX-1559; PX-
1995_0027. The Navy itself tracked their symptoms with care in extensive
spreadsheets and maps. *See, e.g.*, PX-1303; PX-1304; PX-1306; PX-1307; PX-1308;
PX-1309; PX-1432; PX-1205_0019-0027 (Description of DoD-affiliated Joint Base
Pearl Harbor-Hickam Housing Residents' Medical Encounters, 25 November 2021 -
31 March 2022, NMCPHC-EDC-TR-203-2022, The EpiData Center, Navy and
Marine Corps Public Health Center (draft), prepared Jun. 2022 [see specifically,
Table 2 "Number of Total Patients with Symptoms Consistent with JP-5 Exposure,
by Diagnostic Category and Age Group, Red Hill Cohort, 25 November 2021 – 31
March 2022"; Table 3 "Screening Patients by ICD-10 Code Consistent with JP-5
Exposure, Red Hill Cohort, 25 November 2021 – 31 March 2022"; and Table 4
"Number of People, by Mental Health Diagnostic Category Identification and Age
Group, Red Hill Cohort, 25 Nov 2021 – 25 March 2022"); PX-1469 (Department of
the Navy Subject: Requirement to Establish a Defense Occupational and

Environmental Health Readiness System (DOEHRS) Incident Report for the Oahu

Military Water Contamination Incident (Version 15), dated Mar. 2022).

According to the Government's Defense Health Agency, the symptoms

reported in the population on the JBPHH water distribution system were consistent

with these expected symptoms from exposure to jet fuel: "Individuals served by the

JBPHH water distribution system reported acute symptoms consistent with

exposure to petroleum products, e.g., rash, nausea, vomiting, headache, eye

irritation, and cough." PX-1242 (01/31/24 DHA Healthcare Provider

Recommendations to Support Patients Exposed to the November 2021 Fuel

Release at Red Hill).

The Government's Centers for Disease Control agreed. PX-1583-1583_0001

(Self-Reported Health Symptom Following Petroleum Contamination of a Drinking

Water System – Oahu, Hawaiʻi, Nov. 2021 – Feb. 2022, A.N. Troeschel, et al.,

Morbidity and Mortality Weekly Report, Vol. 71, No. 21, US Dept. of Health and

Human Services/Centers for Disease Control and Prevention (May 27, 2022),

hereafter "ATSDR Red Hill Study"). The CDC/ATSDR reviewed medical charts of

"clinical presentations in encounters during exposure period" and found that

among the "[m]ost prevalent symptoms reported as worsening or new persistent"

were: headache, anxiety, abdominal pain, and skin rash. PX-1498, Undetermined

Morbidities Related to Drinking Water Contamination Following a 2021 Petroleum

Leak on Oahu, Epi-Aid 2023-008, Situation Report #16, CDC/ASTDR (Mar. 9, 2023).

Third-party expert Dr. Roger Brewer of the HDOH similarly recognized acute health effects in his Exposure Assessment:

> Potential acute health affects posed by short-term exposure to relatively high concentrations of hydrocarbons include eye and skin irritation, dermatitis, defatting of skin, dizziness, headache, anesthesia, coughing, gagging, vomiting, griping, diarrhea, depressed respiration and pulmonary edema (ATSDR 2023; NIH 2023). Acute health effects posed by exposure to high concentration of DiEGME include headache, dizziness, tiredness, nausea, vomiting and eye irritation (NIH 2023, ThermoFisher Scientific 2021).... Short-term exposure to high concentrations of 2,6-Di-Tert- Butyl-4-Methylphenol, a compound in Simple Green, can cause throat irritation, dermatitis, abdominal pain, nausea, confusion and dizziness (NIH 2023).[15]

Dr. Brewer's findings highlighted acute, subchronic, and chronic health risks associated with varying levels and durations of exposure to specific hydrocarbons and additives present in jet fuel.

Dr. Brewer calculated reference doses, reference concentrations, and cancer slope factors to evaluate the risk levels for both cancerous and non-cancerous health outcomes. These calculations reveal that residents and individuals exposed

---

[15] Exposure Assessment: November 2021 Release of JP-5 Jet Fuel into the Joint Base Pearl Harbor Hickam and Connected Drinking Water System, R. Brewer, Hawaiʻi Dept. of Health, dated Jun. 2023, updated Oct. 2, 2023 (PX-1480).

to the fuel contamination face a range of health risks, from low to very high, depending on the specific compounds and exposure scenarios. Dr. Brewer testified that his findings regarding exposure "predicted significant health effects." R. Brewer Dep. (Aug. 15, 2023) (ECF 400-3) at 105:7-24.

Third party expert, Dr. Diana Felton, toxicologist at the HDOH agreed that the exposure was sufficient to make people sick: "[W]e know there was significant amounts of petroleum hydrocarbon in the water because people could smell it and taste it and it made them sick, but we don't know how high it was." D. Felton Dep. (Aug. 21, 2023) (ECF 400-7) at 75:20-76:5.

Finally, researchers from the CDC, ATSDR, and HDOH conducted an epidemiological study to report on the health impacts of the fuel release and published their findings in the Journal of Water & Health. PX-2216_0007-0008 (S. Miko et al., Community Health Impacts after a Jet Fuel Leak Contaminated a Drinking Water System: Oahu, Hawai'i, Nov. 2021, 21 J. Water Health 956 (Jul. 2023)). They found that 86% of 2,289 participants reported new or worsening symptoms after their exposure, and that 75% reported symptoms lasting more than 30 days:

Journal of Water and Health Vol 21 No 7, 957



*Id.* at PX-2216_002; *see also* PX-1182_0006 (Health Impacts Associated with the Joint Base Pearl Harbor-Hickam Water System Contamination, Assessment of Chemical Exposures (ACE) / Epi-Aid Investigation, Final Exit Presentation, dated Feb. 16, 2022).

> **b)** **Government Experts Dr. Robyn Prueitt and Dr. Lyle Burgoon Should be Disregarded for Failing to Consider the Government's Real-Time Data, Reports, and Epidemiological Study**

Dr. Robyn Prueitt, the Government's toxicology expert, did not consider any of these Government studies, reports, or data. She admitted at trial that she did not even consider the single epidemiological study published to date on the 2021 Red Hill fuel release—an article prepared and published by the CDC and ATSDR, agencies of the Government itself. Prueitt, 5/8/2024 Tx. at 95:6-96:10. And she

33

also chose not to consider the thousands of medical complaints made in the

immediate aftermath of the fuel release from all over the Navy water line. *Id.* at

96:11-97:2. Her reference list of materials considered does not include any of the

contemporaneous reports, ATSDR/CDC studies, or doctors' guidelines prepared

by Government agencies in the aftermath of the fuel release. Prueitt Reliance

Materials (ECF 332-3). Relying solely on Dr. Grayman, she simply concluded that

there was not sufficient fuel in the water to cause a toxicological effect for any one

of the 17 Plaintiffs—notwithstanding the statements to the contrary made by CDC,

ATSDR, Defense Health Agency, and HDOH. *See* Prueitt Decl. (ECF 332-1).

And Dr. Prueitt also admitted that if Dr. Grayman's calculations were

incorrect as to amount or timing, then her causation analysis would be equally

incorrect. Dr. Robyn Pruiett, 5/10/24 Tx. at 93:6-21.

The same would be true of Dr. Lyle Burgoon, who relies on Grayman and

Prueitt. Burgoon Decl. at ¶ 11 (ECF 358-1). As set forth above, Grayman's

analysis should be disregarded because it does not comport with the observable

data of sheens throughout the system by mid-December. The opinions of

Drs. Prueitt and Burgoon should therefore be disregarded as well because they fail

to consider the Government's own data and publications, and because they rely on

a failed model by Dr. Grayman.

c)    **Dr. Bird Reliably Concluded that Exposure to this Fuel Release Could Cause Acute Symptoms (General Causation)**

Plaintiffs' expert, Dr. Steven Bird, by contrast, considered the Government's data and research outlined above, along with extensive medical literature, to reach his opinions on acute symptoms.

He outlined the kinds of acute symptoms attributable to exposure to jet fuel.

> Studies support that acute symptoms of JP-5 exposure would include skin irritation and rash; abdominal pain; vomiting; diarrhea; headache; irregular menstrual cycles; anxiety; and other neurological symptoms.

Bird Decl. (ECF 491-1) at ¶ 90.

In stark contrast to the Government's experts, Dr. Bird supported his determination with an extensive review of academic literature and scientific studies,[16] including many reports released by the Government such as the

---

[16] *See, e.g.,* Reliance Materials (PX-2209; Kilburn, K.H. and R. H. Warshaw, *Neurotoxic effects from residential exposure to chemicals from an oil reprocessing facility and superfund site.* Neurotoxicology and Teratology 17(2) 89-102, 1995), (PX-2210; Kponee, et al., *Petroleum contaminated water and health symptoms: a cross-sectional pilot study in a rural Nigerian community.* Environmental Health 14:86, 2015), (PX-2213; LeMasters, Grace, *Female reproductive effects of exposure to jet fuel at U.S. Air Force bases.* University of Cincinnati, DAMD17-96-2-6015, 1999), (PX-2215; Lyons, R.A., et al., *Acute health effects of the Sea Empress oil spill.* J. Epidemiol. Community Health 53(5):306-10, 1999), (PX-2217; Muhammad, F., et al., *Effect of in vivo jet fuel exposure on subsequent in*

ATSDR's Toxicological Profile for JP-5, JP-8, and Jet A Fuels (PX-2186).

Voluminous scientific literature demonstrates the acute and chronic health effects

of exposure to jet fuel and/or the components of jet fuel. Bird Decl. (ECF 491-1) at

¶ 87(o); *see also*, PX-2186 (ATSDR, Toxicological profile for JP-5, JP-8, and Jet

A fuels, U.S. Department of Health and Human Services (2017) [referencing

hundreds of relevant studies]); PX-2215 (Acute Health Effects of the Sea Empress

Oil Spill, R.A. Lyons, et al., J. Epidemiol. Community Health, 53(5):306-10, dated

---

*vitro dermal absorption on individual aromatic and aliphatic hydrocarbon fuel constituents.* Journal of Toxicology and Environmental Health, Part A, 68:9, 719-37, 2005), (PX-2218; Ng, Tze Pin, et al., *Menstrual function in workers exposed to toluene,* British Journal of Industrial Medicine 49:799-803, 1992), (PX-2227; Thurston, Sally W., et al., *Petrochemical exposure and menstrual disturbances,* American Journal of Industrial Medicine 38:555-64, 2000), (PX-2327; Gallucci, Randle M., et al., *JP-8 jet fuel exposure induces inflammatory cytokines in rat skin,* International Immunopharmocology 4:1159-69, 2004), (PX-2328; Kabbur, Mahendra B., et al., *Effect of JP-8 jet fuel on molecular and histological parameters related to acute skin irritation,* Toxicology and Applied Pharmacology 175:83-88, 2001), (PX-2329; Kanikkannan, Narayanasamy, et al., *Percutaneous absorption and skin irritation of JP-8 (jet fuel),* Toxicology 161:1-11, 2001), (PX-2330; Tormoehlen, L.M., et al., *Hydrocarbon toxicity: A review,* Clinical Toxicology 52:5, 479-89, 2014), (PX-2331; Porter, H.O., *Aviators intoxicated by inhalation of JP-5 fuel vapors,* Aviat. Space Environ. Med. 61:654-56, 1990), (PX-2332; Reutman, Susan R., *Evidence of reproductive endocrine effects in women with occupational fuel and solvent exposures,* Environmental Health Perspectives 110:805-11, 2002), and (PX-2333; Kuppusamy, Saranya, et al. *Total Petroleum Hydrocarbons: Environmental Fate, Toxicity, and Remediation.* Springer, 2020).

May 1999 [retrospective cohort study of urban population exposed to a large oil
spill]).

In this case, there were no reliable, real-time measurements of water
concentration of jet fuel in the water distribution system. As a result, Dr. Bird
found that it was not appropriate to do an individual calculation of each Plaintiff's
exposure. Bird, 5/3/24 Tx. at 13:12-17.[17] He nevertheless concluded that there was
sufficient evidence to determine, to a reasonable degree of medical certainty, that the
Plaintiffs were exposed at levels sufficient to cause medical injury.

> Despite the absence of adequate data at the time of the highest levels of
> exposure, this subsequent water testing which estimated the TPH present
> in the water, together with the thousands of adverse health reports of
> residents on the water supply line and reports of fuel sheen, taste, and
> smell in the tap water, and other lines of evidence demonstrated that the
> water on the JBPHH water system was contaminated with sufficient jet
> fuel to cause adverse health effects.

Bird Decl. (ECF 491-1) at ¶ 80, 88.

The Government's own guidance is consistent with Dr. Bird's approach:
"When the exposure intensity, the level of exposure at the tap in each residence, is
unknown, medical encounters may be used as a surrogate to assess the impact on the
health of the exposed population." Bird Decl. (ECF 491-1) at ¶ 87(f) (quoting PX-

---

[17] The Government's toxicology expert, Dr. Robyn Prueitt, agrees that no one
knows what any given Plaintiff was exposed to in terms of TPH in November 2021.
Prueitt, 5/8/24 Tx. at 93:22-25.

1205_0014, Residents' Medical Encounters 25 November 2021-31 March 2022, The
EpiData Center, Navy and Marine Corps Public Health Center).

In addition to the Government and HDOH data and documents described
above, Dr. Bird also considered other lines of evidence in reaching his opinion.

First, thousands of water quality complaints consistent with significant levels
of jet fuel in the JBPHH water system were reported as early as November 28,
2021, which included Medical Encounters Related to the JP-5 Release. Bird Decl.
(ECF 491-1) at ¶ 87(c) ("On November 28, 2021, the HDOH and the Hawai'i
Poison Center began receiving reports of a fuel-like taste, odor, and sheen in the
drinking water at JBPHH complaints of fuel smell, taste, and sheen in the tap water
throughout the system); Bird, 5/3/24 Tx. at 16:16-25 (reports of sheen and odor
and "the concentration of water was high enough to give a sheen."); PX-
1288_0001 (HDOH Emergency Order); PX-1455 (Water Quality Complaints by
Neighborhood); PX-1493_0003 (Report Update: Description of Joint Base Pearl
Harbor-Hickam DoD-affiliated Housing Residents); PX-1291 (HDOH Risk-Based
Drinking Water Action Levels for TPH); PX-1183_0022 (CDC/ATSDR Epi-Aid
ACE Investigation (Jan. 21, 2022) reporting that of those who participated in the
CDC survey, 35.8% smelled petroleum or gasoline and 31.64% noticed a sheen on
the surface of their water).

Ms. Lacey Keller then mapped those complaints in November and December 2021 on JBPHH by time and location, showing that the health complaints largely mirrored the complaints of water quality in the same areas. Bird Decl. (ECF 491-1) at ¶ 87 (h); *see also* Keller Decl. (ECF 371); PX-1995 (Geo Mapping Data Maps, Figures 1-138).

Second, Dr. Bird considered the data and calculations of experts in this case. Third party expert, HDOH's Dr. Brewer conducted an extensive exposure assessment. Bird Decl. (ECF 491-1) at ¶ 87(i); *see also*, PX-1236_0072-0082 (Attachment 5) (Brewer June Exposure Assessment); PX-1480_0004-0005 (Brewer October Update). He also considered the calculations performed by Dr. Paul Rosenfeld. Bird Decl. (ECF 491-1) at ¶ 87 (j); *see also* Rosenfeld Decl. (ECF 374).

Third, the Government undertook significant response efforts consistent with exposure. The military offered evacuation to all personnel in residences served by the JBPHH water system. Bird Decl. (ECF 491-1) at ¶ 87 (k); *see also* PX-1203 (Army Evacuation Memo that determined on December 2, 2921 "that unusual and emergency circumstances exist that warrant an authorized evacuation to a designated safe haven of all impacted personnel. . . ."). And the military undertook efforts to flush the entire JBPHH water system – a process that took many months. Bird Decl.

39

(ECF 491-1) at ¶ 87(l); *see also* JX-0008_0006 (Water Response Resident

Resources (Feb. 7, 2022); Rosenfeld, 4/30/2024 Tx. at 116:14-23.

Fourth, the health complaints of symptoms related to Red Hill have continued

to the persist. Bird Decl. (ECF 491-1) at ¶ 87(p); *see also* PX-1242 (Defense Health

Agency Provider Fact Sheet); PX-1184_0001 (Healthcare Encounter Analysis (Nov.

24, 2023), that reviewed 653 medical records in February through March of 2023

and found 55% had "worsened or new persistent symptom."); PX-1583 (ATSDR

Red Hill Study that stated, "Most participants reported experiencing one or more

new or worsened symptoms after the incident (1,980; 87%), many of whom reported

symptoms lasting ≥30 days. (1,493; 75%).")); Bird, 5/3/24 Tx. at 51:20-52:6

(studies by the CDC and ATSDR "consistently demonstrate that people had acute

effect, and those effects oftentimes persist.").

It is for this very reason that a health registry is being created to monitor

persons on the JBPHH water system. Bird Decl. (ECF 491-1) at ¶ 87(m); PX-1242

(Defense Health Agency Provider Fact Sheet); *see also* PX-1184_0001 (Healthcare

Encounter Analysis, Nov. 24, 2023) (CDC Medical Record Review of 653 medical

records in Feb-Mar 2023 that was requested by Defense Health Agency Public

Health "reinforced need for an independent Red Hill Registry.").

In light of this evidence, Dr. Bird reliably opined that each of the Plaintiffs

received a sufficient toxicological exposure to jet fuel from the November 20

40

release to cause the acute harms described below. Bird Decl. (ECF 491-1) at ¶ 142. The Government's assertions to the contrary defy reason. If there were not enough fuel to cause any toxicological effect, why would the Government have evacuated the residents, flushed the water distribution system, and be spending significant resources in perpetuity to monitor for long-term health effects?

### 2. Dr. Andruska Established Expected Health Effects from Jet Fuel Exposure as to Neurological Injuries

In her analysis of the possible neurological impacts that JP-5 exposure could cause, Dr. Kristin Andruska[18] reviewed the relevant medical and scientific literature and government documents and reports from the CDC, U.S. Department of Health and Human Services, the HDOH, and the ATSDR. Andruska, 5/3/24 Tx. at 141:10-23. She researched "jet fuel exposure, for neurological symptoms, for similar petroleum hydrocarbon exposures, and reviewed all of the relevant literature." *Id.* at 142:2-6. The Government documents she reviewed as well as the academic and medical literature she reviewed included epidemiological studies. *Id.*

---

[18] Plaintiffs' expert, Dr. Kristin Andruska, earned a PhD in biochemistry, molecular biology and biophysics, and is a practicing neurologist, with fellowship training in movement disorders. *See* ECF 364-1 (Curriculum Vitae of Dr. Andruska). She has expertise in neurologic and neurodegenerative diseases. Andruska Decl. (ECF 364) at ¶ 5. She has experience with toxic exposures, both in the legal context and in her normal clinical practice. Andruska, 5/3/24 Tx. at 125:1-4.

at 142:7-25. This literature also included the study of affected individuals at Red Hill conducted by the HDOH, CDC, and ATSDR that found that the largest percentage or reported symptoms in exposed individuals were those of the nervous system (62%). Andruska Decl. (ECF 364) at ¶¶ 36, 85, *see also* PX-1583 (ATSDR Red Hill Study). She testified that "it is generally recognized by public health officials and the academic literature that exposure to contaminated water such as at Red Hill can cause neurological symptoms." Andruska Decl. (ECF 364) at ¶ 27.

Ultimately, Dr. Andruska found that "[t]he symptoms observed and recorded by public health officials regarding the Red Hill jet fuel leak are consistent with the reported neurological symptoms identified in the academic literature documenting similar oil spills and their effects on the impacted population," *id.* at ¶ 38, and opined that "more likely than not, to a reasonable degree of medical certainty in the field of neurology, toxic exposure to jet fuel may affect the nervous system, including neurological and neuropsychiatric symptoms." *Id.* at ¶ 27.

### 3. The Jet Fuel Contamination Caused Life Disruption and Mental Harm

The Government's jet fuel release also caused widespread mental harm. As set forth in more detail below as to each family, the Plaintiffs collectively

presented compelling testimony about the impact that these events had on their

mental health.[19]

Because the Navy did not follow its own emergency protocol, there was

widespread confusion, fear, and feelings of betrayal in the aftermath of the release.

First, the Navy told residents that there was "no indication that the water was not

safe."[20] Then, the Navy waited to issue guidance by neighborhood depending on

_____

[19] *See, e.g.* N. Freeman, 04/30/24 Tx. at 150:1-6; P. Feindt, Jr., Decl. (ECF 392) at l
¶ 99; P. Feindt, Jr., 04/30/24 Tx. at 13:4-14; S. Jessup, 04/30/24 Tx. at 156:16-25;
Beau Jessup Decl. (ECF 394) at ¶ 23, 28, 30; R. Dietz Decl. (ECF 391) at ¶¶ 66, 70,
72, 73.

[20] In closing argument, the Government pointed to a November 29 press release
advising that residents not ingest the water if it had an odor. 5/13/24 Tx. at 54:3-5.
But that is not the release that the Navy actually distributed to residents. In emails
and Facebook posts on November 29, the Joint Base Commander made no mention
of the fuel release the week before and reassured residents that the water was safe:
"I can tell you at this point that there are no immediate indications that the water is
not safe. My staff and I are drinking the water on base this morning, and many of
my team live in housing and drink and use the water as well." PX-1095 (Email
Chain between L. Robertson and Capt. E. Spitzer, Nov. 29, 2021); "There is no
immediate indication that the water is not safe. The Navy continues to investigate
reports and is testing the water. Navy engineers visited several homes of families
who reported the smell and also immediately went to Navy's drinking water wells
to investigate. There was no smell or sign of fuel or chemicals in the water at the
Navy's water wells and water tanks." PX-2238 (Joint Base Pearl Harbor-Hickam,
Facebook, Nov. 29, 2021). Those statements were not true—Navy engineers *had*
smelled fuel at the water tanks. Then, on November 30, leadership issued a
"Communications Plan" that instructed officials to say that there was "no
indication" that the water was not safe and specifically that there was "no
indication" that the smell in the water was related to the fuel release. PX-1254
(JBPHH Water Quality Communication Plan, Commander Navy Region Hawai'i,
Nov. 30, 2021). The Navy did not release any messages connecting the fuel release

complaints and went so far as to "clear" certain neighborhoods early, only later to

add them back to the list. McGinnis Decl. (ECF No 378-1) at ¶ 16; PX-1111

(12/3/21 Navy notice sent to Feindts clearing Ford Island and other

neighborhoods); PX-1175 (12/9/21 Navy notice distributed to Feindts in Ford

Island). But importantly, the Navy's Emergency Response Plan required that

notice of any contamination event at Red Hill be given immediately and to all

residents on the water system because "it is best to assume that during the time

required to respond to such an emergency, the contamination has been distributed

throughout the system." PX-1496_0047 (Site Specific Report re: Community

Water System (PWS-360) Emergency Response Plan for Joint Base Pearl Harbor-

Hickam (JPBHH), Pearl Harbor, Hawaiʻi (Jun. 2021)). And to the extent the Navy

did yet know the constituents, its policy required it to issue a "do-not-use notice" to

all users. PX-1255_0109 (Manual of Naval Preventative Medicine, Chapter 5:

Water Quality for Shore Installations). The Navy's decision not to follow its own

protocols and to wait for people to report contamination instead added insult to

injury for the physical and mental health of the residents.

---

with the fuel smell in the water until a town hall on December 5, 2021. PX-1511
(Town Hall Meeting Dec. 5, 3 p.m., Hokulani Community Center). The Navy later
acknowledged that it had not issued the proper public notification. PX-1151
(Administrative Notification).

The families were then without clean water at home for several months until the Government lifted the advisories in February and March 2022. Even then, many of the families testified that they did not feel safe at home, either because symptoms returned when they moved back into their homes from hotels or because the water continued to show signs of contamination. Five of the six families eventually left their homes earlier than intended due to this crisis and moved off base or left the state altogether. And at least one family left military service altogether. Others contemplated departure.

Parents testified that they felt deprived of their right to protect their own children. They then struggled to get the right medical care, as jet fuel exposure is not a common event. And now they worry about the health effects in the future, both for themselves and for their children. For any given health issue, or developmental delay, they will always have this exposure and wonder in the back of their minds. And this fear is eminently reasonable. If the Government itself is tracking ongoing symptoms and monitoring for long-term latent disease at enormous cost, surely it is reasonable for parents to be concerned as well. PX-1242 (DHA Provider Fact Sheet); PX-1178 (Red Hill Health Response, DHA Presentation, Jan. 9, 2024); PX-1206 (Decision Paper on Red Hill Registry, DHA).

The collective disruption and trauma were well documented. The CDC/ATSDR study found that the incident "disrupted the lives of thousands of

45

persons" and there were "reported symptoms such as those related to . . . *mental health*" that "were consistent with previous studies of exposure to petroleum hydrocarbons." PX-1583 (ATSDR Red Hill Study). In 2023, the Miko study for ATSDR/CDC/HDOH reported that "[m]ost adult and child participants experienced one or more new or worsened symptoms consistent with petroleum hydrocarbon exposure, with the most frequently reported complaints and symptoms" including "*mental health*." PX-2216_0010 (S. Miko et al., Community Health Impacts after a Jet Fuel Leak Contaminated a Drinking Water System: Oahu, Hawaiʻi, Nov. 2021, 21 J. Water Health 956 (Jul. 2023)).

Plaintiffs' expert Dr. Melissa Vargo,[21] a clinical psychologist with a specialization in trauma and post-traumatic stress disorder, conducted clinical interviews and psychological evaluations of the adult Plaintiffs, as well as standardized self-report tools like the PTSD Checklist (PCL-5). Vargo Decl. (ECF 388) at ¶¶ 1-27. Dr. Vargo discussed the general causation of psychological

---

[21] Plaintiffs' expert, Dr. Melissa Vargo, has a doctorate degree in clinical psychology and is a clinical psychologist in Kailua, Hawaiʻi and appointed mental health examiner for the State of Hawaiʻi. *See* Vargo Decl. (ECF 388) at ¶ 1-2; *see also* PX-1595 (Curriculum Vitae of Dr. Vargo). She practices a Trauma Informed Model of Care and previously served as the Chair of the Trauma Informed Model of Care at Hawaiʻi State Hospital. Vargo Decl. (ECF 388) at ¶ 2. She also provides witness testimony in both federal and state Hawaiʻi courts as a certified forensic examiner for the State of Hawaiʻi. *Id.* at ¶¶ 4-5. Dr. Vargo is knowledgeable about PTSD and other mental health impacts related to exposure to traumatic events. *Id.* at ¶ 9.

injuries following traumatic events like water contamination, explaining that such events can lead to significant psychological distress and mental health conditions such as PTSD, anxiety disorders, and depression. *Id.* at ¶¶ 42-43, 46-48. Dr. Vargo supported her findings with literature reviews and comparisons to other recognized traumatic events, including the water contamination crisis in Flint, Michigan, which similarly led to increased rates of mental health disorders among affected populations. *Id.* at ¶ 46. She offered detailed accounts of each Plaintiff's psychological assessment, noting the direct correlation between their symptoms and the Red Hill contamination exposure. *Id.* at ¶¶ 55-56.

Dr. Steven Storage[22], Nastasia Freeman's treating psychiatrist, testified that those who have experienced a toxic exposure event can appear with a double brain injury—the physiological change from the toxic exposure itself, as well as the physiological change from the trauma of the exposure. Storage Decl. (ECF 387) at ¶¶ 10-11, and Storage, 5/1/24 Tx. at 80:22-81:2, 96:10-22. He too cited to research

---

[22] Plaintiffs' expert, Dr. Steven Storage, is a psychiatrist at the Amen Clinic in Encino, California. Storage Decl. (ECF 387) at ¶ 4. He has done residency training in both adult and child psychiatry, *see also* PX-2402 (Curriculum Vitae of Dr. Storage), and research in neuroimaging, Storage Decl. (ECF 387) at ¶ 3. Dr. Storage is also an Associate Professor at the University of Southern California. *Id..* at ¶ 4. Dr. Storage specializes in neuroimaging of psychiatric disorders, understanding the effects of toxic substances on the brain, and psychosomatic medicine. *Id.* at ¶ 2. In his experience as a psychiatrist, he has evaluated patients for both toxic exposure and trauma. *Id.* at ¶ 5. Dr. Storage is a psychiatric treating provider for Mrs. Nastasia Freeman. *Id.* at ¶ 1.

after Flint that showed that those exposed to contaminated water experienced PTSD at high levels even five years after the onset of the water crisis. Storage Decl. (ECF 387) at ¶ 10-11 (citing Flint PTSD Study). And in dealing with the repercussions of the exposure, individuals may experience significant emotional trauma, which also has a detrimental impact on brain functioning. *Id*. at ¶¶ 11-12. This trauma can relate to fear for one's safety, fear for the safety of one's family, and a fundamental loss of sense of security and stability. *Id.;* Storage, 5/1/24 Tx. at 96:23-97:22. And the trauma may manifest into symptoms including depression, hypervigilance, anxiety, mood swings, and other post-traumatic symptoms. Storage Decl. (ECF 387) at ¶ 10-12.

This is particularly true for individuals who experience toxic exposure in their own homes, where they expect to be safe and have a sense of refuge and control. When toxic exposure occurs at home, it can be far more emotionally traumatic than exposures in other settings. *Id.* at ¶ 12.

These events also had a mental impact on the children. Dr. Andrew Clark,[23] Plaintiffs' expert who specializes in child psychiatry, testified that the

---

[23] Plaintiffs' expert, Dr. Andrew Clark, is a licensed physician with Board Certifications in Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry. He completed separate residencies in Pediatrics and Psychiatry at Boston City Hospital, a residency in Child and Adolescent Psychiatry at Massachusetts General Hospital, and a fellowship in Infant and Parent Mental Health at the University of Massachusetts. He previously served as an Instructor in

contamination had a pronounced impact on children's mental health, causing

symptoms like anxiety, depression, and PTSD, exacerbated by their environmental

and social disruptions. Clark Decl. (ECF 366) at ¶¶ 24-30 Each of the minor

Plaintiffs experienced significant traumatic events connected to the fuel

contamination, which has led to a range of psychological stressors and mental

health diagnoses such as Other Specified Trauma and Stressor Related Disorder.

*Id.* at ¶¶ 24-30 Opinion 1, ¶ 28; Opinion 2, ¶ 31. Dr. Clark noted that the affected

minors are at a long-term risk for further psychological issues, recommending

specific treatments like individual therapy and, in some cases, psychiatric

evaluation and medication to address their ongoing symptoms. *Id.* at ¶¶ 90-104.

The Government's expert witnesses likewise admitted that the incident

caused mental harm. Dr. Eric Smith conducted psychological examinations of the

Plaintiffs and testified at trial that "during the time of Red Hill, [Plaintiffs] would

have experienced anxiety, worry, fear, and . . . also reported the physical symptoms

that they had at that time. Smith Decl. at ¶ 10; Smith, 5/13/24 Tx. at 26:3-5.

Moreover, Dr. Smith admitted that being a victim of contamination of jet fuel in

---

Psychiatry at Harvard Medical School and a Clinical Associate in Psychiatry at
Massachusetts General Hospital and is currently an Assistant Professor in
Psychiatry at Boston University School of Medicine. His expertise includes post-
traumatic stress disorder and other mental health impacts related to exposure to
traumatic events. *See* Clark Decl. (ECF 366) at ¶¶ 1-3, and 6; *see also* ECF 366-1
(Curriculum Vitae of Dr. Clark).

one's home can be a traumatic event, and that anxiety, depression, and stress-related symptoms are common following a traumatic event. *Id.* at 26:16-23. Dr. Smith testified that he expected the Plaintiffs to have emotional distress, fear, anxiety, anger, resentment, and other trauma, for a period of time. *Id.* at 30:1-4. He then testified that when an individual removes themselves from the stressor, they do immediately feel a sense of relief of being away from it, but it doesn't mean that all of their symptoms go away. *Id.* at 33:16-21.

The Government's physician life care planner, Dr. Jennifer Canter, opined that this was a community trauma event, and recommended that a Plaintiff who experienced any result of the fuel release seek psychological care even now, more than two years later. *See* Canter Dep., M.D., (ECF 400-4) at 126:25-128:2. She recommended short-term cognitive behavioral therapy or short-term counseling support for <u>all</u> Plaintiffs. *Id.*

## III.    SPECIFIC CAUSATION EVIDENCE

As detailed below, Dr. Bird testified that each Plaintiff suffered acute injury from their exposure. Given the temporality of their acute symptoms, it is difficult to see how a doctor could conclude otherwise. And, indeed, the Government's retained physicians offered *no opinion* on acute injury. Durrani Decl. (ECF 384-1) at 16 ("I addressed only the Minor Bellwether Plaintiffs' claims of long-term injury and do not offer opinions on their alleged acute injuries"); Kosnett Decl.

(ECF No. 382-1) at ¶ 49 (addressing specific causation only for long-term effects). Because they offered no opinion on acute injury, the Plaintiffs did not cross-examine Dr. Durrani and Dr. Kosnett at trial. Their opinions are irrelevant to the issues before the Court.

Meanwhile, all mental health experts on both sides agreed that these events caused emotional distress for Plaintiffs.

Below, Plaintiffs set forth specific causation evidence for each family, along with requests for general damages for pain and suffering, mental anguish, loss of enjoyment of life (including impairment), and special damages for therapy costs and lost wages.

### A.    Freeman Family

The Freeman family, including Navy Lieutenant Junior Grade (LTJG) Koda Freeman, his wife Nastasia, and their three children, K.F., N.F. and D.F., resided at 185 Halawa View Loop in the Aliamanu Military Reservation, military housing serviced by the JBPHH water distribution system. Their ordeal began in late November 2021 when the family, along with visiting relatives and their pets, started experiencing symptoms such as dizziness, nausea, and vomiting. Initially unaware of the water contamination, their situation worsened rapidly. N. Freeman Am. Decl. (ECF 572) at ¶¶ 6-23; K. Freeman Decl. (ECF 401) at ¶¶ 5-7. When LTJG Freeman recognized the smell of jet fuel in their tap water from his prior

51

naval service, he knew something was wrong. The lack of clear and reliable guidance from authorities left the family in a state of distrust. K. Freeman Decl. (ECF 401) at ¶¶ 8-14. As Nastasia began having daily seizures, the impact of the contamination forced the Freemans into a disorienting pattern of relocation and instability. N. Freeman Am. Decl. (ECF 572) at ¶¶ 25-29. The persistent health issues have been paralleled by a loss of faith in institutional support, mental trauma, and fear, further deepening the emotional and psychological toll on the family. *Id.* at ¶ 103, 109, 115.

### 1.    Nastasia Freeman

#### a)    Pain & Suffering (Past & Future)

Mrs. Freeman experienced serious injury because of her exposure to jet fuel contamination which led to pain and suffering after November 20, 2021. Her pain and suffering continues into the future because of her neurological condition.

Mrs. Freeman "had a seizure disorder that really had been dormant, and that started to come back up . . . a shift in mood, headaches, vomiting. . . . the seizures after the contamination[.]" K. Freeman, 4/29/24 Tx. at 158:9-24. On December 9, 2021, she had a virtual health appointment and "expressed concern about my family's exposure and [her] resurgence of seizure activity, as well as insomnia, migraines, and psoriasis." N. Freeman Am. Decl. (ECF 572) at ¶ 35. She had been seizure free for over two and a half years and clear of psoriasis since June 2021. N.

Freeman 4/29/24 Tx. at 135:16-136:23; PX-2255_1491 (Medical Composite – N. Freeman).

Mrs. Freeman suffered intense, acute symptoms from the fuel exposure. She testified that she "was suffering intense abdominal pain, vomiting, diarrhea, memory loss, skin rashes, brain fog, eye irritation, seizures, and teeth and gum issues." N. Freeman Am. Decl. (ECF 572) at ¶ 39; Andruska Decl. (ECF 364) at ¶¶ 47-48; Bird Decl. (ECF 491-1) at ¶ 96(q). In early December of 2021, she was having "multiple seizures" a day and could not "go a day without." N. Freeman Am. Decl. (ECF 572) at ¶ 40; N. Freeman, 4/29/24 Tx. at 136:19. Her menses also stopped for a couple of months after exposure from the fuel release. PX-2255_1173 (Medical Composite – N. Freeman).

Dr. Bird concluded that the release of jet fuel into the JBPHH water system was a substantial contributing cause of Mrs. Freeman's seizures (preexisting), headaches and visual changes as well as abdominal pain, nausea, vomiting, diarrhea, a rash, exacerbation of her psoriasis, and menstrual irregularities. *See* Bird Decl. (ECF 491-1) at ¶ 96(q). His opinion is unrebutted by the Government's physician, Dr. Kosnett.

Mrs. Freeman also suffered long-term neurological symptoms from her exposure to jet fuel from the Red Hill facility. Andruska Decl. (ECF 364) at ¶¶ 28-30; *see* Andruska, 5/3/24 Tx. at 124:8-12. For example, in October 2022, Mrs.

Freeman was diagnosed with vestibular dysfunction. Andruska Decl. (ECF 364) at
¶ 55; Andruska, 5/3/24 Tx. at 132:8-17 ("discussing how Mrs. Freeman's
vestibular dysfunction was diagnosed in a laboratory via computerized dynamic
posturography testing.); *see also id.* at 139:6-141:4 (testifying there is "concrete
data that led to her diagnosis of vestibular dysfunction…You cannot fake the
results in such a test."). And as of July 2023, Mrs. Freeman reported "continued
challenges with speech that cause marked frustration. She replaces words with the
wrong word, stumbles on words, and speech is slurred. She was told she was
having 'focal aware seizures' in addition to what she already had." Andruska Decl.
(ECF 364) at ¶ 77.

According to Dr. Andruska, Mrs. Freeman's medical history shows a
marked post-exposure increase in the frequency and character of both her
headaches/migraines and seizures/spells. *Id.* at ¶¶ 49, 88, 50. These spells typically
happened at least once per day and often several times daily. *Id.* at ¶ 89. In
contrast, her baseline seizure frequency was one seizure every one to one-and-a-
half years. *Id.*

Dr. Andruska concluded there was specific causation in Mrs. Freeman's
case, relying on an interview and review of more than 19,000 pages of medical
records and a contemporaneous log that Mrs. Freeman kept in real time of her
symptoms. *See* Andruska Decl. (ECF 364) at ¶¶ 19-23; Andruska, 5/3/24 Tx. at

130:1-7, 130:21-131:3. She also relied on Mrs. Freeman's treating physicians who evaluated and examined her closer to the time of her exposure. *Id.* at 122:18-25; Andruska Decl. (ECF 364) at ¶ 25. Dr. Andruska's opinions are further supported by the close temporal nature of Mrs. Freeman's exposure to the onset of her symptoms. *Id.* at ¶¶ 26, 93; Andruska, 5/3/24 Tx. at 128:5-129:6.

In performing her differential diagnosis, Dr. Andruska ruled out other causes. She concluded that Mrs. Freeman did not have idiopathic intracranial hypertension. Andruska, 5/3/24 Tx. at 133:7-20. And Dr. Andruska disagrees with the Government's experts, Dr. Smith and Dr. Gordon, that Mrs. Freeman's injuries are a conversion disorder. *Id.* at 145:3-10 (ruling out because there was computerized dynamic posturography testing "that clearly demonstrates and documents vestibular dysfunction."); *see also id.* at 145:19-146:3.

Dr. Andruska found that Mrs. Freeman's symptoms are largely consistent with the established adverse neurological and neurobehavioral effects of jet fuel components. Andruska, 5/3/24 Tx. at 127:5-15 ("Mrs. Freeman's symptoms were consistent with both the expected symptoms reported in the literature of individuals exposed to jet fuel and with other individuals in the Red Hill area . . . that had a similar exposure."); *see also* Andruska Decl. (ECF 364) at ¶ 84.

Significantly, upon complete removal from exposure (*i.e.*, by leaving her home in Hawai'i), Mrs. Freeman has gradually seen a reduction and stabilization

of many neurologic symptoms. *See* Andruska Decl. (ECF 364) at ¶ 94. Dr.

Andruska found this consistent with the findings in the HDOH, CDC, and ATSDR

study that most people reported improvement after switching to an alternative

water source, and further supports that symptoms were exposure related. *Id.*; PX-

1583_0001 (ATSDR Red Hill Study ); *see also* Andruska, 5/3/24 Tx. at 128:25-

129:1.

Dr. Andruska considered other causes for Mrs. Freeman's symptoms

improving after she stopped drinking the water and moving away from Oahu, *id.* at

128:19-21, and she found that jet fuel exposure from the Navy's Red Hill facility

was, more likely than not, a substantial contributing factor to Mrs. Freeman's new

and worsened neurologic symptoms beginning in November 2021. Andruska Decl.

(ECF 364) at ¶¶ 28-30, 95, & 96; Andruska, 5/3/24 Tx. at 124:8-12; 144;1-4.

Dr. Storage likewise documented long-term harm for Mrs. Freeman. Storage

Decl. (ECF 387) at ¶¶ 10-11. After ruling out other causes of her brain

abnormalities including autism, substantial physical injury, and substance abuse,

Dr. Storage concluded, "[b]ased on her medical history, psychometric testing, and

the timing of her symptoms, … that exposure and the resulting trauma are primary

causes of Nastasia's neurological and psychiatric symptoms including worsening

of an underlying seizure disorder that had been previously well-controlled, brain

fog, attention and concentration deficits, symptoms consistent with post-traumatic

stress, gait disturbances, and major depression." Storage Decl. (ECF 387) at ¶¶ 15-16, 28-44. Dr. Storage ultimately concluded "to a reasonable degree of medical certainty that Nastasia's exposure to jet fuel was a substantial factor in bringing about the neurological injuries and symptoms that she presented in both clinical analysis and brain imaging." Storage Decl. (ECF 387) at ¶ 14.

Her husband LTJG Freeman testified that Mrs. Freeman struggled with basic activities of living:

> You know, she was just having a hard time getting around in general. She was very foggy. She would routinely forget conversations that we would have throughout the day. You know, she was struggling trying to even – you know, she owned her own practice, so trying to keep up with her clients was – was a struggle.

K. Freeman, 04/29/24 Tx. at 159:19-24.

He worried that Mrs. Freeman was in danger of dying:

> Q.    And were there times in these periods that you were worried that she was in danger of dying?
>
> A.    Yes.
>
> Q.    And why?
>
> A.    So the – there was a really rough patch where we just – we couldn't get anything figured out. Again, she was just like a shell of her – of the person that she was. You know, it was like a routine where the boys, you know, would ask me, like, What's going on with mom? And I would just – I didn't want to alarm them, so I would just tell them she's going to be fine; but realistically at this point, we had reached out to you guys, right, to write a will for Tasha 'cause nothing was – nothing was getting better.

57

> She was in a lot of pain. She was having seizures all the time. I
> mean, she essentially just lay on the couch most of the days. . . .
>
> We sat down, and we had a whole conversation about writing
> letters to the boys and what she would miss.

*Id.* at 160:4-19, 24-25.

Mrs. Freeman respectfully requests an award of **$400,000** in compensation for past pain and suffering, an award of **$200,000** in compensation for future pain and suffering due to her neurological injury, and an award of **$100,000** for physical impairment due to her neurological injury. *See* Damages Chart, attached hereto as Ex. 1.

### b)    Nastasia Freeman Mental Anguish & Emotional Distress

Mrs. Freeman experienced profound mental anguish and emotional distress because of the Government's water contamination of her and her family. She met the clinical criteria for post-traumatic stress disorder and generalized anxiety disorder.[24] Vargo Decl. (ECF 388) at ¶ 55d. Following the exposure, she experienced repeated, disturbing, and unwanted memories of the incident, distressing dreams, dissociative reactions such as flashbacks or feeling numb, and

---

[24] Mrs. Freeman met the criteria for the latter before exposure, but her symptoms were "well-managed." Vargo Decl. (ECF 388) at ¶ 55d.

58

intense psychological distress at exposure to cues that symbolize an aspect of the trauma, such as water. *Id.*

Mrs. Freeman experiences persistent negative beliefs and expectations about herself and others related to the exposure, a persistent state of anger and guilt, markedly diminished interest in significant activities, and a feeling of detachment from others. *Id.* Mrs. Freeman has experienced fatigue, difficulty concentrating, irritability, and sleep disturbance. And her anxiety has caused clinically significant distress and impairment in the social, occupational, and other aspects of her functioning. *Id.* When Dr. Vargo interviewed her, Mrs. Freeman stated:

> I was mentally gone, I was in physical pain, I was experiencing fatigue, nausea from my medications. . . . I left my body and was experiencing dissociation. . . . I was trying to advocate for myself, but I could not. . . . I had kids who were vomiting, peeing and pooping blood, and nobody would see him. . . . I was constantly in fear that something was going to happen. . . .

*Id.*

Mrs. Freeman now experiences excessive anxiety and worry that she has found difficult to control. *Id.* At trial, Mrs. Freeman discussed this constant worry for her children:

> I worry all the time. You know, I worry if my kids are going to wake up. You know, there were nights that I stayed up. . . . [T]here were weeks that I stayed up and I'd fall asleep briefly, and then still go check on the kids all the time because they were in pain, because they were sick.

> [W]ill the kids have cancer? . . . [T]here's fears for them, too, right, like
> every single day…

N. Freeman, 04/29/24 Tx. at 150:23-25, 151:1-3, 150:15, 150:18-19

At trial, Mrs. Freeman testified that she believed her children were witnessing her slow death. *See* N. Freeman, 04/29/24 Tx. at 150:1-6. "I'm surprised we lived through it," she said. *Id.* at 151:4. She further testified about her worry for her children during the crisis:

> I was worried that he [N.F.] was going to die – all of my children,
> honestly. . . . I think with the things that they experienced, these are
> things that you don't hear of. Your kids are healthy, and it seemed to
> be getting worse, right? So they've have a symptom, and then it's just
> severe, severe, severe, and now you have another symptom, and it's just
> like that over and over and over, and it feels like it's never going to go
> stop.

*Id.* at 148:18-149:7. Mrs. Freeman was so concerned for her health and that of her children that she left her home to move to California. N. Freeman Decl. (ECF 572) at ¶ 43.

Mrs. Freeman and her family no longer trust water. *Id.* at ¶ 101. They will no longer drink tap water again, or even filtered water from the refrigerator. *Id.* Mrs. Freeman is also deeply distressed because she believes that the Government turned its back on her and her family despite her husband's many years of service. *Id.* at ¶ 104.

Dr. Vargo recommended that Mrs. Freeman receive cognitive and psychological care in the form of an initial psychiatric diagnostic evaluation, exposure therapy twice weekly for six months, cognitive behavioral therapy once weekly for six months, and twenty-four therapy sessions in her lifetime for treatment of psychological triggers related to the Red Hill incident. Vargo Decl. (ECF 388) at ¶ 65; *see also*, Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9 (Government's expert agreed that incident had psychological impact); Canter Dep., M.D. (ECF 400-4) at 126:25-128:2 (Government life care planner agreed that Plaintiffs should get treatment). Plaintiffs' life care planner, Margot Burns,[25] costed out these recommended therapies and programs. Burns Decl. (ECF 524) at ¶¶ 298 and 299. Plaintiffs' accounting expert, Garret Hoe,[26] then calculated the present

---

[25] Plaintiffs' expert, Margot Burns, has a B.S. in Psychology and English and a M.S. in Rehabilitation Counseling. She is a Certified Rehabilitation Counselor and a Certified Life Care Planner. She has over thirty years of experience as a vocational consultant and over eighteen years as a life care planner. For life care plans, Ms. Burns utilizes the methodology accepted by the International Academy of Life Care planners and taught by the Institute of Rehabilitation Education and Training (formerly Intellicus). Her methodology for cost research is also commensurate with the Standards of Practice and Consensus Statements for life care planning established by the International Association of Rehabilitation Professionals. *See* Burns Decl. (ECF 524) at ¶¶ 4-5, 9-10; *see also* ECF 403-1, Tab A.

[26] Plaintiffs' expert, Garret Hoe, is a Certified Public Accountant and has a B.S. in History. He is an expert in the fields of accounting and financial analysis with over twenty years of experience. He has provided damage analyses and in-depth financial and accounting analyses in matters involving fraud, embezzlement,

value of her medical care and related services in the amount of $57,752.02. Hoe

Decl. (ECF 545) at ¶¶ 39-40.

   Mrs. Freeman respectfully requests an award of **$250,000** in compensation

for mental anguish and emotional distress and **$57,752.02** in special damages for

mental health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c)    Nastasia Freeman Loss of Enjoyment of Life & Disruption

   The jet fuel contamination caused profound dislocation and loss of

enjoyment of life for Mrs. Freeman and her family. The Freemans had to move

between hotels as their home was unlivable; at one point they had to return to their

home to wait for the check-in time at the next hotel. N. Freeman Am. Decl. (ECF

572) at ¶ 25. The frequent transitions between their temporary accommodations

and their home for various logistical needs significantly compounded Mrs.

Freeman's stress, particularly considering that she could not conduct her therapy

appointment work from the hotel room and had to make the one-hour trip back and

forth to home each way to conduct such sessions. *Id.* at ¶ 26, 28. Because of the

recurrence of her seizure disorder, Mrs. Freeman could not drive herself and had to

---

personal injury, bankruptcy, and breach of contract. He is a member of the
American Institute of Certified Public Accountants (AICPA) and the Hawaii
Society of Certified Public Accountants. His opinions were rendered in compliance
with Section 1.300.001 of the AICPA's Code of Professional Conduct. *See* Hoe
Decl. (ECF 545) at ¶¶ 2-4, 12; *see also* ECF 404-1.

be driven by her husband. *Id.* at ¶ 27. Her ability to conduct work suffered. *Id.* at ¶ 73.

Ultimately, Mrs. Freeman and her husband felt they had no choice but to move off the island, with Mrs. Freeman's military neurologist telling her that her seizures were a "breakthrough consequence" of her exposure and that she needed to get care in California. *Id.* at ¶ 43. The Freemans submitted a request for a humanitarian relocation within the military – and went through an extensive ordeal of delay and reprisal – that finally culminated in them moving in with family in California to get treatment. *Id.* at ¶¶ 43-54. From the beginning of February to April of 2022, they had no choice but to live in one room in the house of their extended family as they searched for a new home. N. Freeman, 4/29/24 Tx. at 142:16-25.

Mrs. Freeman respectfully requests an award of **$150,000** in compensation for loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### d)   Nastasia Freeman Lost Wages

At the time of the fuel leak, Mrs. Freeman was a licensed psychotherapist, certified trauma provider, and certified integrated mental health provider, who owned her own mental health consulting practice. Her practice has not recovered since December 2021 due to her and her family's weekly doctor visits,

hospitalizations, and their continued experience of negative impacts from the fuel

leak. N. Freeman Am. Decl. (ECF 572) at ¶¶ 80, 81, and 82.

Based on the average earnings of a mental health practitioner per the Bureau

of Labor Statistics ($63,627), Plaintiffs' accounting expert, Garret Hoe, calculated

Mrs. Freeman's lost earnings capacity. Hoe Decl. (ECF 545) at ¶¶ 77, 78, and 79.

Mr. Hoe also calculated her lost earning capacity based on a base annual earnings

capacity of $55,618 ($4,634.84 x 12 months) per her financial records and statistics

from the Bureau of Labor Statistics, U.S News and World Report, and Ziprecruiter

(Hawaiʻi) on the earnings of mental health practitioners. *Id.* at ¶ 86.

Mr. Hoe testified that the best measure of one's earnings is what they report

to the federal government, because one has to report the income and pay the

requisite taxes. It is the reason why Mr. Hoe used tax returns to analyze Mrs.

Freeman's earnings. Bank statements would not provide an accurate representation

because they may include deposits for amounts billed and collected in the same

month or other amounts that are lagging from prior months as is often the case for

businesses. Moreover, some bank statements may not clearly discern the source of

the deposit, especially for deposits from loans that were taken out. Loan deposits

should not be considered mitigating earnings, and one could erroneously classify

them as such based on bank statements. Hoe, 05/07/24, Tx. at 49:12-50:17.

The Government's expert accountant, Erick West, calculated Mrs. Freeman's lost earnings for this period to be in the range of $52,219 to $69,731. West Decl. (ECF 563-1) at ¶ 3. Plaintiffs accept the sum of $69,731 for Mrs. Freeman's lost past and future wages.

Mrs. Freeman respectfully requests an award of **$69,731** in special damages for lost wages. *See* Damages Chart, attached hereto as Ex. 1.

### 2.    D.F.

#### a)    D.F. Pain & Suffering

Mrs. Freeman testified that by November 28, 2021, "my boys were increasingly ill with diarrhea, vomiting, and red eyes." N. Freeman Am. Decl. (ECF 572) at ¶ 9; *see also* PX-2244 (N. Freeman - Facebook Post re: Family Symptoms, dated Nov. 29, 2021). On November 29, 2021, Mrs. Freeman reported these symptoms to the HDOH. PX-2258_0121 (Medical Composite – D.F. (11/29/2021 email to HDOH from N. Freeman, "Our water has been affected and has a fuel odor and oil like film. We became I'll [sic] yesterday . . . [M]y three sons have a had a headache, diarrhea, and vomiting.")).

Dr. Bird concluded that the release of JP-5 into the JBPHH water system was a substantial contributing cause of D.F.'s abdominal pain, vomiting, and diarrhea from his exposure to jet fuel. *See* Bird Decl. (ECF 491-1) at ¶ 96(n). His opinion is unrebutted by the Government's physician, Dr. Durrani.

LTJG Freeman testified to the marked health and psychological changes in

D.F. after the water contamination:

> For [D.F.], you know, when we moved to Hawaiʻi, he was fine. He was
> a normal kid. And when we left, he wasn't speaking and he was back
> in diapers. So for him, I mean, he had to relearn how to talk and do
> everything normal little kids do. And now he has seizures. And he tests
> -- like tremors, stuff that he didn't have before. So tremors, so where is
> that going to go? I have no idea.

K. Freeman, 04/29/24, 166:24-167-5.

D.F. respectfully requests an award of **$75,000** for pain and suffering. *See*

Damages Chart, attached hereto as Ex. 1.

### b)    D.F. Mental Anguish & Emotional Distress

D.F. experienced mental anguish and emotional distress because of the

Government's water contamination. Dr. Clark reviewed D.F.'s medical records and

interviewed his parents, finding that D.F. experienced substantial deterioration in

his function that continued until he left Hawaiʻi in February 2022. Clark Decl.

(ECF 366) at ¶ 68. This included substantial deterioration of speech, regression in

toilet training, difficulties with balance, grasp and coordination, erratic sleep, and

general withdrawal and lassitude. *Id.* This was in addition to the symptoms of

vomiting and physical discomfort. *Id.*

After D.F. was seen by his developmental pediatrician, Dr. Cole, in

November and December 2021, he was diagnosed with Autism Spectrum Disorder,

mild to moderate range following an extensive evaluation. *Id.* at ¶65. Mrs.

Freeman believes D.F. now seems to need control over everything because he lost

control over what happened to him. N. Freeman Decl. (ECF 572) at ¶ 105 ("He lost

control over his speech, his schooling, and even his bowels."). He has had

difficulty adapting to change because it is outside his control. *Id.* D.F. fears that he

will not recover and that his condition will get worse. *Id.* at ¶ 103.

D.F. observed his mother collapse and be taken away in a stretcher. LJTG

Freeman testified to the emotional effect this had on him:

> So they've never seen anything like that before. I mean, it was hard.
> They were all upset, crying. And I'm trying to console them and let
> them know that hey, everything's going to be fine, while I'm also trying
> to call 911 and get those guys out there. So, I mean, they were -- they
> were devastated. Their mom got loaded up on a stretcher.

K. Freeman, 4/30/24 Tx. at 165:10-15.

As noted above, Government experts, Dr. Smith and Dr. Canter, agree that

D.F., and the other Plaintiffs, experienced emotional distress following the fuel

release. Dr. Canter recommends psychological care. *See, e.g.,* Dep. of Jennifer

Canter, M.D. (ECF 400-4) at 126:25-128:2, and Smith, 5/13/24 Tx. at 25:19-28:2,

29:17-30:9.

D.F. respectfully requests an award of **$100,000** for mental anguish and

emotional distress. *See* Damages Chart, attached hereto as Ex. 1.

67

### c)    D.F. Loss of Enjoyment of Life & Disruption

The water contamination led to life disruption and loss of enjoyment of life

for D.F., exacerbated by his special needs. D.F. had to move back and forth

between hotels with his family, with commutes of an hour each way. N. Freeman

Am. Decl. (ECF 572) at ¶ 25. D.F. had to drive with his mother so that she could

conduct her therapy work appointments in privacy. *Id.* at ¶ 27. D.F. also went

through the difficult process of moving from his home in Hawaiʻi, to one room at

his relatives' house in California, and then to their new house. *Id.* at ¶¶ 43-54;

Nastasia Freeman, 4/29/24 Tx. at 142:16-25. D.F.'s "behavioral difficulties

escalated due to disruptions from the water crisis." N. Freeman Am. Decl. (ECF

572) at ¶¶ 64-65.

D.F.'s life at school changed dramatically. He "missed 50 percent of school"

and his school principal asked the Freemans to put him in home hospital school

programs." *Id.* at ¶ 88. All of this led to a markedly different and diminished life

because of the water contamination.

D.F. respectfully requests an award of **$150,000** in compensation for loss of

enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### 3.    K.F.

### a)    K.F. Pain & Suffering

K.F. experienced health symptoms that led to physical pain and suffering

due to the Government's contamination of his water with jet fuel. By November

28, 2021, K.F. was suffering from vomiting and diarrhea as well as bloody noses, headaches, rashes after showers, and a loss of pigment in his skin. K. Freeman, 4/30/24 Tx. at 157:24-158:5. In late November and early December 2021, K.F. also began complaining of abdominal pain and developed a persistent dry cough. Bird Decl. (ECF 491-1) at ¶ 120(d).

Dr. Bird concluded that the release of JP-5 into the JBPHH water system was a substantial contributing cause of K.F.s' abdominal pain, nausea, vomiting, diarrhea, a cough, rash, and headaches as a result of exposure to jet fuel. *See id.* at ¶ 96(o).

LTJG Freeman testified to the health changes he observed in K.F.

In [K.F.], yeah, he had bloody noses, headaches; you know, when he would take showers, he could come out, he would have rashes. He started to lose all of the color in his skin. So he's naturally, you know, tanned, and he lost all -- kind of pigment in his skin.

K. Freeman, 4/30/24 Tx. at 158:1-5.

K.F. experiences such fear during blood work that his father has to hold him down:

[K.F.'s] blood work is still abnormal. And so he's had to give blood so many times because we need to keep monitoring that he's afraid of needles. So each time he has to go give blood, we have to hold him down. And then, you know, as a parent, that's horrible. You have to hold your kid down just to try to see if they're going to be okay. And we don't know 'cause we don't have answers for that either.

69

K. Freeman, 4/30/24 Tx. at 166:16-23.

K.F. respectfully requests an award of **$75,000** in compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)    K.F. Mental Anguish & Emotional Distress

The fuel release led to life changing mental anguish and emotional distress for K.F. Prior to the water contamination, K.F. was friendly and relaxed, and used to feel as if soccer was his life. *See* Clark Decl. (ECF 366) at ¶ 57. Following his exposure, K.F. is unable to attend school and his limited physical endurance has left him unable to play soccer. *Id.* As discussed above, K.F. has also developed anxiety about his medical care, with specific anxiety regarding blood draws. K. Freeman, 4/29/24 Tx. at 166:16-23. In addition, during the brief time he attended school in fall 2022, he experienced anxiety about throwing up while there. Clark Decl. (ECF 366) at ¶ 58.

The loss of the ability to play soccer removed "a primary vehicle for his psychological development, physical activity, and simple joy." *Id.* at ¶ 58. Dr. Clark compared K.F.'s experience of staying out of school while dealing with ongoing disabling physical symptoms and medical appointments to a child with a pediatric cancer, whose illness often removes typical developmental pathways. *Id.* He compared K.F.'s anxiety around his blood draws and doctor's visits to the

70

anxiety and post-traumatic symptoms of medically ill children who have endured too many aversive experiences as part of their medical care. *Id.* at ¶ 60-61.

Mr. Freeman testified that cancer is a big worry for all of his children, especially K.F. K. Freeman, 04/29/24 Tx. at 166:15-16. Like his siblings, K.F. witnessed his mother collapse and wheeled away on a stretcher. K. Freeman, 4/30/24 Tx. at 165:10-15 ("They were all upset, crying. . . . [T]hey were devastated. Their mom got loaded up on a stretcher.).

Dr. Clark testified that the fuel release has placed K.F. at a substantially increased risk of developing a psychiatric disorder in the years to come, while also putting him at risk of failing to achieve expected developmental milestones and endangering his long-term psychological adjustment. Clark Decl. (ECF 366) at ¶ 63. He opined that K.F. meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V. *Id.*

Dr. Clark recommended an initial psychological evaluation for K.F., forty-eight sessions of individual therapy for treatment of anxiety and general support, and three hours a week of tutoring over 60 weeks for educational catchup. Clark Decl. at ¶ 95. Plaintiffs' life care planner Margot Burns costed out these recommended therapies and programs. *See* Burns Decl. (ECF 524) at ¶¶ 354 and 356; *see also*, Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9 (Government's expert agreed that incident had psychological impact); Canter Dep., M.D. (ECF 400-4) at

71

126:25-128:2 (Government life care planner agreed that Plaintiffs should get

treatment). Plaintiffs' accounting expert, Garret Hoe, then calculated the present

value of the recommended care and related services in the amount of $20,009.50.

*See* Hoe Decl. (ECF 545) at ¶¶ 37 and 38.

K.F. respectfully requests an award of **$100,000** in compensation for mental

anguish and emotional distress and **$20,009.50** in special damages for mental

health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c)    K.F. Loss of Enjoyment of Life & Disruption

The water contamination led to life disruption and loss of enjoyment of life

for K.F. Specifically, K.F. lost the ability to play soccer which removed "a primary

vehicle for his psychological development, physical activity, and simple joy."

Clark Decl. (ECF 366) at ¶ 58. This disrupted an important "developmental task"

of a 10-year-old boy which "revolve around competence and focused activity, with

playground sports a common passion for children of this age." *Id.*

Like the rest of his family, K.F. had to move back and forth between the

hourlong commute from the family's home and their hotel. N. Freeman Am. Decl.

(ECF 572) at ¶ 25. K.F. went through the same emotionally taxing process of

moving from his home in Hawai'i, to one room at his relatives' house in

California, and then to their new house. *Id.* at ¶¶ 43-47a, 52-54; Nastasia Freeman,

4/29/24 Tx. at 142:16-25. The water contamination left K.F. "unable to participate

in many of his social activities" and he "had to limit contact with his friends." N.

Freeman Am. Decl. (ECF 572) at ¶ 73. His physical activities were likewise

limited, and he needed "assistance and support with daily tasks." *Id.*

K.F. respectfully requests an award of **$75,000** in compensation for loss of

enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### 4.    N.F.

#### a)    Pain & Suffering

By November 28, 2021, N.F. was suffering from vomiting and diarrhea and

around this time, N.F. "started having some abdominal pains, a lot of headaches, a

lot of pain in his body." K. Freeman, 4/29/24 Tx. at 158:6-8. N.F. also developed a

cough with wheezing and "severe muscle/bone pain associated with fatigue." Bird

Decl. (ECF 491-1) at ¶ 121(d).

Dr. Bird concluded that the release of JP-5 into the JBPHH water system

was a substantial contributing cause of N.F.'s abdominal pain, nausea, vomiting,

and diarrhea, as well as a cough, wheezing, headaches, tinnitus, and severe body

and bone pain as a result of his jet fuel exposure. *See id.* at ¶ 96(p). His opinion is

unrebutted by the Government's physician, Dr. Durrani.

Mrs. Freeman described the pain that N.F. was in due to the health effects of

the contamination.

So with [N.F.], he was having a lot of pain, and it wasn't like he could
-- he couldn't identify it, and he just felt like his whole body was on

73

fire, everything hurt. But he woke up one morning, and he couldn't stand. He couldn't put his clothes on, he couldn't do anything. He was extremely frustrated. He was crying, he was distraught. But he lost mobility, and that had never happened prior. It was the first time, so of course we were all scared.

My husband ended up carrying him in. For just kind of the picture, my son, who was 14, is 6-foot, and my husband is 5-7 on a good day. But my husband had to lift him and take him out because he couldn't walk. And we took him to the hospital, and he was just in a lot of pain -- so much pain that he asked me while we were at the hospital if he was going to die.

N. Freeman, 4/30/24 Tx. at 147:22-148:11.

N.F. respectfully requests an award of **$75,000** in compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)    N.F. Mental Anguish & Emotional Distress

N.F. experienced mental anguish and emotional distress in the wake of the Government's negligent fuel release. Before the contamination, N.F. was described as "engaged and active, with a good group of friends." Clark Decl. (ECF 366) at ¶ 49. Since his exposure, he experienced a number of "disabling medical conditions including nausea and vomiting, migraine headaches, and chronic severe body pain that has been diagnosed as Amplified Musculoskeletal Pain Syndrome." *Id.* His sixth-grade experience was fragmented by disruptions and illnesses, and he spent nearly the entirety of seventh grade at home due to illness. *Id.* at ¶ 50. He rarely leaves home except for medical appointments, and his peer interactions are

limited to online video games. *Id.* He experiences dizziness when standing, discomfort while wearing a backpack, and has executive and memory function difficulties. *Id.*

N.F. has reported experiencing a range of emotional responses to the water contamination, including initial anger, frustration, and withdrawal. *Id.* at ¶ 51. More recently, he has become depressed and at times hopeless. *Id.* He has also experienced psychological setbacks, in that he lost the peer community he had developed in Hawaiʻi with school and friends, and his medical condition has limited his ability "to construct a new community" in California. *Id.* at ¶ 52. He is at increased risk of failing to establish a coherent mature sense of identity, and in developing satisfying peer and romantic relationships in the future. *Id.*

Given that all of the Freeman children were exposed to jet fuel, the family unit is less able to adequately address N.F.'s increased needs. *Id.* at ¶¶ 53-54. As a result, N.F. has become depressed and feels particularly low at times when his physical health is poor, which is often. *Id.* at ¶ 55. He has been characterized by his treating providers as "depressed and stressed" with similar concerns for anxiety. *Id.* N.F. is at a substantially increased risk of developing a psychiatric mood disorder in the years to come. *Id.* at ¶¶ 53-56.

N.F. also worries whether he will develop cancer in the future. His father testified about his worry about cancer for all of his children and said of N.F.:

So for [N.F.], we had to do a bone scan. So we had to go to Point Loma University in order to conduct the bone scan. And the bone scan in the Children's Department is also the cancer wing. And so when we go in there and he goes in and he does his bone scan, we come out, and the first question is, "Hey, dad is that going to be me?"

So that is my worry right? He still has high markers that we don't have answers for that we have to continue to monitor.

K. Freeman, 04/29/24 Tx. at 166:6-14.

As noted, Dr. Smith and Dr. Canter agree that N.F., and the other Plaintiffs, experienced emotional distress following the fuel release. Dr. Canter recommends psychological care. *See, e.g.,* Dep. of Jennifer Canter, M.D. (ECF 400-4) at 126:25-128:2, and Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9.

Dr. Clark recommended an initial psychological evaluation, forty-eight sessions of individual therapy for treatment of depressed mood and general support, and three hours a week of tutoring over sixty weeks for educational catchup. Clark Decl. (ECF 366) at ¶ 95; *see also*, Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9 (Government's expert agreed that incident had psychological impact); Canter Dep., M.D. (ECF 400-4) at 126:25-128:2 (Government life care planner agreed that Plaintiffs should get treatment). Plaintiffs' life care planner, Margot Burns, costed out these recommended therapies and programs. Burns Decl. (ECF 524) at ¶¶ 319, 322. Plaintiffs' accounting expert, Garret Hoe, then calculated the present value of the recommended care and related services in the amount of $20,009.50. Hoe Decl. (ECF 545) at ¶¶ 41, 42.

76

N.F. respectfully requests an award of **$100,000** in compensation for mental anguish and emotional distress and **$20,009.50** in special damages for mental health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c)     N.F. Loss of Enjoyment of Life & Disruption

The Government's water contamination disrupted and diminished N.F.'s life. N.F. also found himself commuting back and forth with his parents from their home to their hotel room. N. Freeman Am. Decl. (ECF 572) at ¶ 25. N.F. had to move from his home in Hawaiʻi, to sharing one bedroom in his relatives' home in California, to his new house. *Id.* at ¶¶ 43-54; N. Freeman, 4/29/24 Tx. at 142:16-25. "N.F. also had to transition to home hospital schooling, disrupting his regular educational routines." N. Freeman Am. Decl. (ECF 572) at ¶ 89.

N.F.'s social life and schooling changed markedly as well. His sixth-grade experience was fragmented by disruptions and illnesses, and he spent nearly the entirety of seventh grade at home due to illness. Clark Decl. (ECF 366) at ¶ 50. While once an active youth, he now rarely leaves home except for medical appointments, and his peer interactions are limited to online video games. *Id.*

N.F. respectfully requests an award of **$75,000** in compensation for loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### B.    Feindt Family

Amanda and Patrick Feindt resided in military housing on Ford Island at 4838 Yorktown Blvd., Honolulu, HI, a residence serviced by the Joint Base Pearl Harbor-Hickam water distribution system. Patrick, a PGA golf professional, accompanied his wife to her station in Hawai'i. They initially enjoyed their life there, where they were raising their two young children, P.G.F. (or P.F.) and P.R.F. (or T.F.). Patrick was thriving in his role at a local golf simulator business. P. Feindt, Jr., Decl. (ECF 392) at ¶¶ 88-91.

Mandy and Patrick testified that they initially trusted the Navy when it claimed that Ford Island was "cleared" of any contamination on December 3, 2021. But as set forth above, the Government began receiving more reports of sheen and medical complaints on Ford Island the second week of December. The Army then notified the Feindts to stop using their water on December 9, 2021, which they did. On December 11 and December 13, they experienced acute symptoms and all four family members sought care at Tripler Medical Center. *Id.* ¶ 16, 26, 30-31, 73; A. Feindt Decl. (ECF 393) at ¶¶ 35, 39, 75-78.

Thereafter, the fuel release dislocated their family. They relocated multiple times to hotels to avoid exposure, significantly disrupting their daily lives. This constant movement added stress and disrupted the children's routines and schooling. P. Feindt, Jr., Decl. (ECF 392) at ¶¶ 32. Their symptoms returned when

they moved back to their house once it was "cleared," and they finally moved off the island. They later had to live apart for months so that Mr. Feindt could work while Major Feindt was assigned to a soldier recovery unit. In the long term, Mr. Feindt and their two children have faced lasting mental and emotional distress from the contamination.

### 1.    Patrick Feindt, Jr.

#### a)    Patrick Feindt, Jr., Pain & Suffering

Patrick Feindt, Jr., experienced pronounced pain and suffering as a result of the Government's water contamination. Mr. Feindt testified that "at the time of the fuel release, I experienced headaches, nausea, vomiting, diarrhea, coughing, burning in my nose and mouth, muscle pain, brain fog, and short-term memory loss." Patrick Feindt, Jr., Decl. (ECF 392) at ¶ 73. On December 11, 2021, he came down with a severe migraine and was vomiting: "I had headaches before. I never really experienced like migraine-itis … it was brutal. It was a brutal headache that kept getting worse …" P. Feindt, Jr., 4/29/24 Tx. at 228:21-229:3, 229:18-25.

Major Feindt testified that "Patrick was vomiting, he was lightheaded, he was telling me that he could see stars in his eyes, ocular migraines, I guess is what they're called. And he just kept saying, '"Mandy, I feel off.'" A. Feindt, 4/29/24 Tx. at 192:7-10. Mr. Feindt said, "I had to go into a dark room, got really nauseous, I started projectile vomiting." P. Feindt, Jr., 4/30/24 Tx. at 8:25-9:1.

Mr. Feindt also had intense diarrhea and was having contractions in his stomach. Patrick Feindt, Jr., Decl. (ECF 392) at ¶ 25; *see also* PX-2252_0034-35 (Medical Composite – Patrick Feindt, Jr. (12/11/21 Emergency Documentation)). His symptoms became so bad that he was advised to go to the emergency room. Patrick Feindt, Jr., Decl. (ECF 392) at ¶ 26. At the emergency room he told them he had brain fog in addition to the vomiting and migraines. P. Feindt, Jr., Decl. (ECF 392) at ¶ 27. "I said it was like I was living in a fog." *Id.* "[T]hat fog continued. I have to write things down to remember them. … I still find myself forgetting what I have been asked to do seconds earlier." *Id.* at ¶ 82. Prior to November 20, 2021, Mr. Feindt testified that he had some minor GI issues in his prior life, but "[n] one of those symptoms compared to what I have one through in the last two and a half years." *Id.* at ¶ 79. Since the fuel release, he has had "intense gastro-intestinal problems" that he never had before. *Id.* at ¶ 74.

Mr. Feindt was still sick when he moved into the hotel. "We were trying to get control of ourselves and our bodies and trying to be as productive, I guess, as we possibly could to, you know, kind of not let our kids see us, how bad we were." P. Feindt, Jr., 4/30/24 Tx. at 11:22-12:2.

On March 10, after 84 days in hotels, *id.* at 16:6-17, the Feindt family moved back home, and Mr. Feindt "started vomiting again, with diarrhea, dizziness. He was lethargic." A. Feindt Decl. (ECF 393) at ¶ 60.

I started getting sick again, coughing, the headaches, which turned out
to be migraines, didn't know what migraines really were. I mean, I'd
had some bad sinus headaches and some ocular migraines, but to have
full-fledged migraines, it's a different ball game. It's different. …
They're -- they come out of nowhere. It's oddities, kaleidoscope vision,
I guess is the best way that I could explain it. It's not necessarily vertigo,
but it's kaleidoscope vision, and it's nauseating. And if it happens to
you when you're driving, it's pretty scary.

P. Feindt, Jr., 4/30/24 Tx. at 15:16-16:5.

Dr. Bird concluded that the release of JP-5 into the JBPHH water system

was a substantial contributing cause of Patrick Feindt's: headaches, nausea,

vomiting, and diarrhea as well as a cough, burning sensation in his nose and

mouth, muscle pain, general malaise, memory loss, and alteration in mood as a

result of his jet fuel exposure. Bird Decl. (ECF 491-1) at ¶ 96(f).

Patrick Feindt, Jr., respectfully requests an award of **$200,000** in

compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

>   **b)     Patrick Feindt, Jr., Mental Anguish & Emotional
>           Distress**

Patrick Feindt suffered mental anguish and emotional distress due to the

Government's contamination of his family's water.

He testified that he was scared for his own health and that of his children:

Q.     Were you scared for your own health?

A.     I was, to the extent, you know, I was . . . 42 or so, and . . . I've
       lived a long life, but I was scared for myself. And if I were to,
       you know, drop dead tomorrow, it wouldn't be as big of a deal
       as if my kids, who have their whole life to live, or my wife and

the goals that she still has to achieve. But I was just like, you
know, I'm okay if I were to go, but, you know, they have a long
life to live.

P. Feindt, Jr., 04/30/24 Tx. at 13:4-14.

Mr. Feindt testified that he has "emotions about this whole experience that I
never felt in my life." P. Feindt, Jr., Decl. (ECF 392) at ¶ 99. He has felt
embarrassed, humiliated, and depressed. *Id.* He is concerned about finances and
worries that they won't be able to pay for the health problems they are
experiencing now and to come. P. Feindt, Jr., Decl. (ECF 392) at ¶ 103. These
worries are exacerbated because he knows that his wife plans to leave the service
because of this ordeal. *Id.*

The struggles of his children distress him greatly. P.G.F. has a fear of water
and carries her own bottle of water everywhere she goes. *Id.* at ¶ 104. She believes
that whenever someone is sick, it's because of the water they drank. *Id.* Both she
and her brother, P.R.F., now have a fear of doctors. *Id.* at ¶ 105. They have trauma
and anxiety over doctor visits and relate them to blood draws and shots. *Id.* And
the experience of having to get medical care because of the exposure has only
made the trauma worse. *Id.* He fears the news he may receive when his family sees
their providers. The biggest fear is cancer. He stated, "I'm scared to death that one
of us is going to go to a doctor and we're going to have cancer." P. Feindt, Jr.,
4/30/24 Tx. at 29:12-15.

According to Dr. Vargo, Mr. Feindt met the criteria for a diagnosis of post-traumatic stress disorder. Vargo Decl. (ECF 388) at ¶ 55c. Since his exposure, he has experienced repeated, disturbing, and unwanted dreams and memories, and dissociative reactions where he feels or acts as though the contamination is recurring. *Id.* He has intense and prolonged psychological distress at exposure to internal or external cues that symbolize an aspect of the trauma. *Id.* He has experienced avoidance and attempts to avoid memories or thoughts associated with the trauma. *Id.* He has experienced fear and anger, diminished interest or participation in significant activities such as golf, and a persistent inability to experience positive emotions. *Id.* He has angry outbursts without provocation, hypervigilance, an exaggerated startle response, and difficulties with concentration. *Id.*

Mr. Feindt also has symptoms of depression and hopelessness. *Id.* He described the reasons for this to Dr. Vargo:

> I remember everything… my son's chemical burns, my wife having uncontrollable stomach contractions as if she was giving birth, peeing blood, uncontrollable vomiting, loss of control of bowels (i.e., had to wear depends), living in hotels for days, having to move back into the house after the Navy and the Department of Health confirmed clear and getting ill immediately after.

*Id.* He expressed a loss of trust in the leaders that he believes have poisoned his family and shown no compassion. *Id.*

As noted, Dr. Smith and Dr. Canter agree that Mr. Feindt, and the other

Plaintiffs, experienced emotional distress following the fuel release. Dr. Canter

recommends psychological care. *See, e.g.,* Dep. of Jennifer Canter, M.D. (ECF

400-4) at 126:25-128:2, and Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9.

Dr. Vargo recommended a psychological evaluation, cognitive behavioral

therapy once weekly for six months, and twenty-four therapy sessions in his

lifetime for treatment of psychological triggers related to the Red Hill incident.

Vargo Decl. (ECF 388) at ¶ 64; *see also*, Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-

30:9 (Government's expert agreed that incident had psychological impact); Canter

Dep. (ECF 400-4) at 126:25-128:2 (Government life care planner agreed that

Plaintiffs should get treatment). Plaintiffs' life care planner Margot Burns costed

out these recommended therapies and programs. Burns Decl. (ECF 524) at ¶¶ 88-

89. Plaintiffs' accounting expert, Garret Hoe, then calculated the present value of

the recommended care and related services in the amount of $10,168.08. Hoe Decl.

(ECF 545) at ¶¶ 33 and 34.

Patrick Feindt, Jr., respectfully requests an award of **$250,000** in

compensation for mental anguish and emotional distress and **$10,168.08** in special

damages for mental health treatment. *See* Damages Chart, attached hereto as Ex. 1.

84

### c) Patrick Feindt, Jr., Loss of Enjoyment of Life & Disruption

The fuel release substantially inconvenienced and dislocated Patrick Feindt. His family went from riding bikes, enjoying playgrounds, and maximizing time with their kids as they were growing up to moving into cramped hotel rooms. P. Feindt, Jr., 4/29/24 Tx. at 6:12-19. Because of occupancy and per diem rates, they had to relocate to <u>seven</u> hotels over that time to avoid continued exposure, significantly disrupting their daily lives. A. Feindt, 4/29/24 Tx. at 192:20-193:15; P. Feindt, Jr., Decl. (ECF 392) at ¶ 32.

As parents, they had made progress with their daughter, P.G.F., who had had some behavioral challenges. Then she regressed. While at a busy hotel in Waikiki, P.G.F. decided to "run away," significantly disturbing Mr. Feindt. P. Feindt, Jr., 4/29/24 Tx. at 14:6-14.

> What really got me was she wasn't the same -- the same person. Her brain wasn't working the same to the aspect to where we would go out into the little play area near the hotel, and it's a very busy part of Waikiki, and, you know, my dad alarm is going off that, you know, this is the spot that you need to stay close to your kids. And in her mind, she thought it would be funny to run away. And let me tell you, she's fast…"

*Id.*

The constant movement added stress and disrupted the children's routines and schooling, waylaying Patrick's life as a father. A. Feindt Decl. (ECF 393) at ¶ 30; P. Feindt, Jr., Decl. (ECF 392) at ¶ 32. Finally, they had to make significant

efforts to move off the island, with Major Feindt having to reach out to the

Secretary of the Army to ask to leave. A. Feindt, 4/29/24 Tx. at 197:6-11. This led

to living apart from his wife in Virginia for months as she was assigned to a soldier

recovery unit in Colorado. P. Feindt, Jr., Decl. (ECF 392) at ¶¶ 58-59.

Patrick Feindt, Jr., respectfully requests an award of **$150,000** in

compensation for loss of enjoyment of life. *See* Damages Chart, attached hereto as

Ex. 1.

### d)      Patrick Feindt, Jr., Lost Wages

At the time of the fuel leak, Mr. Feindt had a bachelor's degree in business

and an associate degree in golf course operation and grounds management. He has

been a golf professional since 2003. He began employment at The Golf Sim in

2021 and was one of the employees who helped open the simulator at the Ala

Moana Roger Dunn Golf. *See* Hoe Decl. (ECF 545) at ¶¶ 2 and 60.

The Golf Sim was an exclusive teaching and club fitting studio, and he was

the project manager. He built the store, created the programs, and trained the staff.

He designed the simulator and store layout to include the right fixtures, lighting,

audio/visual equipment, merchandise displays, and V1 high-speed cameras. He

was the director of instruction and a mentor to over 65 students. He had a three-

year plan to build three facilities across the island and the family had planned to

extend their military orders for an extra year so that he could achieve that goal. He

also received quarterly bonuses along with 50% of golf instruction and 30% of golf
club fittings. P. Feindt, Jr. Decl. (ECF 392) at ¶¶ 88-91.

After the fuel release, Mr. Feindt was so ill that he needed to take a month
off from work while the family attempted to find stability. He could not receive
commissions or his quarterly incentives while he was out. He rejoined the Golf
Sim for only a few months before needing to leave due to his wife's
Compassionate Reassignment. *Id.* at ¶¶ 92-93.

The Government's expert accountant, Erick West, calculated Mr. Feindt's
past and future wage loss for this period to be in the range of $74,822 to $93,009.
West Decl. (ECF 563) at ¶ 2. Mr. Feindt accepts the sum of $93,009 for his past
and future wage loss.

Patrick Feindt, Jr., respectfully requests an award of **$93,009** in
compensation for lost wages. *See* Damages Chart, attached hereto as Ex. 1.

        **2.**       **P.G.F.**

            **a)**      **P.G.F. Pain & Suffering**

P.G.F. experienced pain and suffering due to acute symptoms caused by the
fuel exposure. On December 13, 2021, P.G.F. "lost control of her bowel sometime
during the night and woke up. . . . And then she started to vomit, and she was
vomiting so much that it started to progress into dry heaving." P. Feindt, Jr.,
4/30/24 Tx. at 9:6-20. Major Feindt similarly testified that "[P.G.F.] ended up

waking up, she had diarrhea; there was diarrhea all over her, and she was also

projectile vomiting, and she continued to do so." A. Feindt, 4/30/24 Tx. at 191:24-

192:1.

Her parents took her to the ER. "I've never seen my daughter in that kind of

situation before where she was that sick . . . ." P. Feindt, Jr., 4/30/24 Tx. at 9:6-20;

*see also* PX-2253_0047-0084 (On December 13, 2021, patient presents at ER with

"abdominal pain and vomiting that started this morning. . . . The father said that . .

. the patient awoke at 4am complaining of worsening abdominal pain and

vomiting. She had 6-7 episodes of vomiting in the morning and was not able to

keep down any fluids." Assessment/Plan: "Contact with and (suspected) exposure

to water pollution."); *see also* PX-1045 (P.G.F - Photograph of Health Issues (1)).

After the fuel release, P.G.F. continued to suffer from coughing, abdominal

pain, vomiting, and diarrhea. A. Feindt Decl. (ECF 393) at ¶¶ 75, 76. P.G.F. also

suffered regression in her toilet training, language development, and behavior that

continue to impact her to this day. *Id.*

Dr. Bird concluded that the release of JP-5 into the JBPHH water system

was a substantial contributing cause of P.G.F.'s cough, abdominal pain, vomiting,

diarrhea, as well as a regression in her toilet training, language development, and

behavior. *See* Bird Decl. (ECF 491-1) at ¶ 96(e). His opinion is unrebutted by the

Government's physician, Dr. Durrani.

P.G.F. respectfully requests an award of **$75,000** in compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)     P.G.F. Mental Anguish & Emotional Distress

Following her exposure, P.G.F. experienced a precipitous deterioration in her behavior, attention, impulse control, emotional regulation, neediness, aggression, and volatility. Clark Decl. (ECF 366) at ¶ 39. This included documented statements of "I'm going to set this house on fire," and "I'm going to take you to the roof and throw you off the building." *Id.* This sudden change alarmed her parents. *Id.*

Dr. Clark also noted that P.G.F. had post-traumatic stress symptoms that were related to her experiences during the water crisis. *Id.* at ¶ 41. This included spontaneously breaking into tears because of water related issues. *Id.* She continues to worry that the water is unsafe to drink, and providers noted that she would refuse to drink water. *Id.* Her therapist, Deanne Kitrell, has given her a diagnosis of Other Specified Trauma and other stressor related disorder. *Id.*

The dramatic loss of structure caused by the water crisis, including her family's displacement from their home, likely contributed to her dysregulation. *Id.* at ¶ 42. Moreover, she has suffered "a global precipitous exacerbation of her behavioral and developmental vulnerabilities," which has set her back substantially in her development course and has left her fragile emotionally. *Id.* at ¶ 43. She is at

a significant risk of regression in the context of any additional stressor and is at risk of developing worsening anxiety and post-traumatic symptoms as well. *Id.* at ¶ 43.

Major Feindt testified as to her child's emotional changes. Prior issues had been resolved before the spill and P.G.F. had "graduated from the therapy that we were in." A. Feindt, 4/29/30 Tx. at 194:11-16. But "after the November spill, [P.G.F.'s] behavior issues, her regression as far as potty training, outbursts, anger, they all came back worse than they'd ever been before." *Id.*

Mr. Feindt testified that P.G.F. now attends trauma therapy, and during a very recent appointment she drew a picture of what he later found out was "a magic unicorn that drank bad water and got sick." P. Feindt, Jr., 04/30/24 Tx. at 28:14-15; *see also* PX-2409 (Photograph of P.G.F.'s Unicorn Drawing); *see also* P. Feindt, Jr., Decl. (ECF 392) at ¶¶ 104 and 105, and A. Feindt Decl. (ECF 393) at ¶¶ 92, 94, and 97. She is clearly still dealing with the trauma of her exposure.



PX-2409.

Dr. Clark recommended an initial psychological evaluation for P.G.F., forty-eight sessions of individual therapy for treatment of anxiety, ADHD, and behavior support, and twenty-four sessions of parent-child interactive therapy. Clark Decl. (ECF 366) ¶ 97; *see also*, Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9 (Government's expert agreed that incident had psychological impact); Canter Dep. (ECF 400-4) at 126:25-128:2 (Government life care planner agreed that Plaintiffs should get treatment). Plaintiffs' life care planner Margot Burns costed out these therapies and programs. *See* Burns Decl. (ECF 524) at ¶¶ 147 and 149. Plaintiffs' accounting expert, Garret Hoe, then calculated the present value of the recommended care and related services in the amount of $14,860.09. *See* Hoe Decl. (ECF 545) at ¶¶ 29, 30.

P.G.F. respectfully requests an award of **$150,000** in compensation for mental anguish and emotional distress and **$14,860.09** in special damages for mental health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c)      P.G.F. Loss of Enjoyment of Life & Disruption

The jet fuel contamination disrupted and diminished P.G.F.'s enjoyment of life. She too had to move to seven different hotels with her parents. A. Feindt, 4/29/24 Tx. at 192:20-193:15; P. Feindt, Jr., Decl. at ¶ 32.

The water contamination led to "significant regressions in her toilet training, language development, and behavior that continue to impact her." A. Feindt Decl. (ECF 393) at ¶ 76. She now had "outbursts, anger" that were "worse than they'd ever been." A. Feindt, 4/29/24 Tx. at 194:14-16.

Her family's move off of the island led to an absence from her father for months at a pivotal developmental time in life. P. Feindt, Jr., Decl. at ¶ 58. P.G.F. The crisis fundamentally changed P.G.F.'s relationship to water as she will no longer "drink water unless it is bottled" and now "carries her own water bottle everywhere." A. Feindt Decl. (ECF 393) at ¶ 104.

P.G.F. respectfully requests an award of **$150,000** in compensation for loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### 3.    P.R.F.

#### a)    P.R.F. Pain & Suffering

Following the jet fuel release, P.R.F. suffered from physical pain and suffering: abdominal pain, nausea, vomiting, diarrhea, and debilitating headaches, as well as a severe cough and wheezing (exacerbation of his asthma) and anxiety. *See* A. Feindt Decl. (ECF 393) at ¶ 78. On December 11, 2021, P.R.F. was vomiting "all over the floor" and "[the family] proceeded to go to the emergency room." *See* P. Feindt, Jr., 4/29/24 Tx. at 229:4-17*; see also* PX-2254_0010-0012 (Medical Composite – P.R.F. 12/11/2021 Emergency Documentation.); *see also*

PX-2254_0003-0004 (12/11/2021 Screening Questions for Investigation of

Potential Exposure to Waterborne Illness identifies abdominal pain starting

12/9/2021, fever, nausea, vomiting, lethargy beginning on 12/11/21).

Mr. Feindt described the trip to the hospital:

We had to pull over to the side of the road 'cause he started puking, and
obviously freaked us out cause of the way that he was -- you know, he's
itty-bitty, and the way that he sits back into his seat, we were afraid he
was going to regurgitate and choke on his own vomit.

P. Feindt, 4/29/24 Tx. at 230:6-11.

The breathing problems that P.R.F. experienced after the contamination

require continued care. Mr. Feindt testified that he now takes two inhalers a day. P.

Feindt, 4/30/24, 25:1.

And look, I mean, people have breathing problems, I get it. But for a 3-
or a now 4-year-old to be . . . on the equivalent of what a 12-year-old is
supposed to take, it's just mind boggling, and it's as scary as hell.

*Id.* at 25:2-5.

Dr. Bird concluded that the release of JP-5 into the JBPHH water system

was a substantial contributing cause P.R.F.'s abdominal pain, nausea, vomiting,

diarrhea, and headaches, as well as a cough and wheezing (an exacerbation of his

asthma), anxiety, and fear as a result of his jet fuel exposure. *See* Bird Decl. (ECF

491-1) at ¶ 96(g). His opinion is unrebutted by the Government's physician, Dr.

Durrani.

93

P.R.F. respectfully requests an award of **$75,000** in compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)    P.R.F. Mental Anguish & Emotional Distress

Dr. Clark opined that following his exposure, P.R.F. has had a difficult time adjusting to living in Virginia apart from his mother and sister and has begun to exhibit significant behavioral challenged both at home and at day care. *See* Clark Decl. (ECF 366) at ¶ 47. These symptoms and anxiety are in addition to what his parents have testified seeing in his fear of doctors. P. Feindt, Jr., Decl. (ECF 392) at ¶ 105, and A. Feindt Decl. (ECF 393) at ¶ 97.

Dr. Clark recommended an initial psychological evaluation for P.R.F. Clark Decl. (ECF 366) at ¶ 91; *see also*, Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9 (Government's expert agreed that incident had psychological impact); Canter Dep. (ECF 400-4) at 126:25-128:2 (Government life care planner agreed that Plaintiffs should get treatment). Plaintiffs' life care planner Margot Burns costed out this evaluation. Burns Decl. (ECF 524) at ¶ 147 and 149. Plaintiffs' accounting expert, Garret Hoe, then calculated the present value of the recommended care and related services in the amount of $284.50. Hoe Decl. (ECF 545) at ¶¶ 29-30.

P.R.F. respectfully requests an award of **$75,000** in compensation for mental anguish and emotional distress and **$284.50** for mental health treatment (an initial psychological evaluation). *See* Damages Chart, attached hereto as Ex. 1.

**c)**    **P.R.F. Loss of Enjoyment of Life & Disruption**

The jet fuel contamination disrupted and diminished P.R.F.'s enjoyment of

life. P.R.F. also had to move to seven different hotels with his parents. A. Feindt,

4/29/24 Tx. at 192:20-193:15; P. Feindt, Jr., Decl. (ECF 392) at ¶ 32. His family's

move separated him from his mother for six months at a critical age of young

development. *Id.* at ¶ 58-59 ("[P.R.F.] missed his mom and started acting out"). He

had to "change schools" – a move that led him to "miss his little buddies on the

street." A. Feindt Decl. (ECF 393) at ¶ 55.

P.R.F. respectfully requests an award of **$75,000** in compensation for loss of

enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

**C.**    **Jessup Family**

The Jessup family, including Sheena, her husband Brian, and their four

children—Beau, B.J.J., N.J., and D.J.— resided in the Radford Terrace

neighborhood at 2632 Stowell Circle, Honolulu, HI, a military housing residence

serviced by the Joint Base Pearl Harbor-Hickam water distribution system.

Sheena discovered the contamination while at work at Target, where

panicked customers alerted her to the issue, leading to the realization that their tap

water was likely contaminated. This was confirmed by the smell and visible sheen

of fuel in their water. In the immediate aftermath, the Jessup family suffered a

range of acute health effects including headaches, nausea, dizziness, and severe

skin and respiratory reactions. S. Jessup Decl. (ECF 396) at ¶¶ 10, 16-17, 22-26, 52. Their struggles with the physical symptoms of the contamination were particularly severe for N.J., who has autism and a mast cell disease, making him especially vulnerable to both the health effects and disruption caused by the contamination. *Id.* at ¶¶ 10, 17, 19. The acute development of a lingering hand tremor in Beau Jessup not only caused him social pain and anxiety but appears to have ended his dreams of serving in the military. *Id.* at ¶ 79. Beau Jessup Decl. (ECF 394) at ¶¶ 22-27.

Although the home was flushed three times, it still made the family dizzy indoors months later. PX-1055 (S. Jessup Facebook Post, dated Feb. 23, 2022; S. Jessup Decl. (ECF 396) at ¶¶ 22, 23, 46-53. The Jessup family ultimately moved to Arizona, while husband Brian slept in his office for five months because they couldn't afford another housing allowance. *Id.* at ¶¶ 61-63. Sheena and her children continue to experience anxiety and emotional distress, with ongoing concerns about potential future health impacts such as cancer. They harbor a persistent fear and mistrust of tap water and an overall feeling of having been abandoned by the military organization they were part of, which has deeply impacted their psychological well-being and family dynamics. *Id.* at ¶¶ 76, 85, 86.

1.    Sheena Jessup

a)    **Sheena Jessup Pain & Suffering**

Sheena Jessup experienced physical pain and suffering because of her exposure to water contaminated by the Government. She testified that the family stopped drinking the water on the night of November 29, 2021, when she came home to find her tap water "reek[ing] of fuel." S. Jessup Decl. (ECF 396) at ¶¶ 11-14; S. Jessup, 4/30/2024 Tx. at 129:14-120:2.

In the wake of the contamination, Mrs. Jessup and her family experienced multiple acute symptoms. These included "headaches, nausea, dizziness, . . . abdominal pains," and loss of balance. S. Jessup Decl. (ECF 396) at ¶ 10. Even though the family "quit using the tap water," they "continued to get sick over the course of the next week with diarrhea, stomach pain and nausea." *Id.* at ¶ 16. Mrs. Jessup also accidentally ingested coffee that "burned" her esophagus and "felt like gasoline." *Id.* at ¶ 17.

Mrs. Jessup testified that she "developed anxiety, abdominal pain, nausea, and diarrhea. My face tingled, I had brain fog, loss of balance, and difficulty focusing. And I had eye irritation, muscle aches, fatigue, rashes, and a sore, dry throat. I had shakiness, and occasional numbness in my extremities." S. Jessup Decl. (ECF 396) at ¶ 26; *see also* DX-3216, p. 43-44 (S. Jessup Medical Composite – 12/7/2021 Water Contamination Concerns, "My esophagus feels like

it's on fire, my voice is constantly hoarse, my stomach has been upset non-stop

(this last week being the worst). Increased headaches, dizziness and loss of balance

& coordination.").

Dr. Bird concluded that the release of JP-5 into the JBPHH water system

was a substantial contributing cause of Mrs. Jessup's abdominal pain and nausea,

as well as a rash, cough, eye irritation, headaches, anxiety, fatigue, numbness, and

balance problems as a result of her exposure to jet fuel. *See* Bird Decl. (ECF 491-

1) at ¶ 96(m). His opinion is unrebutted by the Government's physician, Dr.

Durrani.

Mrs. Jessup respectfully requests an award of **$75,000** in compensation for

pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)    Sheena Jessup Mental Anguish & Emotional Distress

Mrs. Jessup endured mental anguish and emotional distress because of the

contamination.

Mrs. Jessup worries about her four children and how they were impacted:

> My four children. They're all -- they're all I love, and they're all I live
> for, all I care about, and I believe they were impacted by this leak, both
> physically and emotionally, extensively. And there's nothing worse that
> I've ever experienced in my life than watching my children have these
> symptoms, have to be taken away from their dad to get to a safe home.
> All of this was foreseeable. All of this was prevent[a]ble. And . . . I'm
> worried that they've permanently impacted my life . . . emotionally and
> physically.

98

S. Jessup, 4/30/2024 Tx. at 156:16-25.

Mrs. Jessup feels a deep sense of betrayal regarding the Government's

contamination and follow-on actions that increases her mental anguish:

> I supported my husband and his career. I signed up to support him in
> his service in the military. I knew what I signed up for, and I absolutely
> loved being a naval spouse. I did not sign up for them to take my time.
> This is my time, this is my family, and -- and they took it. Not only did
> they take it, they made my family sick. They made us separate to the
> point that my husband missed out on five months of [D.J.'s] beginning
> stages of life that he already had to miss with two of our other children
> to serve his country. I think we've given a lot to this country and we
> both made huge sacrifices.

*Id.* at 149:18-150:3.

She testified about her emotional distress in seeing the effects of B.J.J.'s

exposure. *Id.* at 150:11-25. Adding to Mrs. Jessup's distress is her belief that B.J.J.

may have also developed a neurological or hormonal condition attributable to her

abnormal menstrual cycle. *Id.* at 151:23-25.

Mrs. Jessup also had to watch her son, Beau, have nosebleeds that were so

severe that he nearly choked on blood. *Id.* at 152:12-24. And when she took him to

a neurologist, she had to watch him struggle with the exams. *Id.* He could not

perform the test with his right hand. *Id.* She watched his tremors escalate from his

hand to his legs, and he now has a stutter. *Id.* She later found out from Beau that an

essential tremor has disqualified him from a military career. She cried because his

99

hope and future of a military career was taken from him by the fuel release. *Id.* at 154:4-18.

Dr. Vargo testified that Mrs. Jessup met the criteria for post-traumatic stress disorder following her family's exposure. Vargo Decl. (ECF 388) at ¶ 55e. Mrs. Jessup has experienced repeated, disturbing, and unwanted memories of the incident, distressing dreams, dissociative reactions (i.e., flashbacks), and intense psychological distress at exposure to internal or external cues that symbolize and resemble an aspect of the trauma, such as water. *Id.*

Mrs. Jessup experiences persistent and exaggerated negative beliefs and expectations about herself, such as questioning her ability to protect her children. *Id.* She experiences a persistent state of anger and guilt and has a diminished interest in significant activities and a feeling of detachment from others. *Id.* She has had irritable and angry outbursts, problems with concentration, and difficulties with sleep. *Id.*

Mrs. Jessup stated in her interview with Dr. Vargo that the most difficult part was dealing with the unknowns of the fuel exposure. *Id.* She worries about her children's future and has internalized the feeling that she exposed her children to harm – the anxiety of these feelings has crippled her. *Id.* She said, "the guilt is eating me alive." The fatigue, brain fog, and forgetfulness that resulted from her

exposure have not gone away. *Id.* She refuses to trust the tap water even after moving to a new home. *Id.*

Dr. Vargo recommended an initial psychological evaluation, exposure therapy twice weekly for six months, cognitive behavioral therapy once weekly for six months, and 24 therapy sessions in her lifetime for treatment of psychological triggers related to the Red Hill incident. Vargo Decl. (ECF 388) at ¶ 66; *see also*, Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9 (Government's expert agreed that incident had psychological impact); Canter Dep. (ECF 400-4) at 126:25-128:2 (Government life care planner agreed that Plaintiffs should get treatment). Margot Burns costed out these recommended therapies and programs. Burns Decl. (ECF 524) at ¶¶ 440 and 441. Plaintiffs' accounting expert, Garret Hoe, then calculated the present value of the recommended care and related services in the amount of $20,887.24. Hoe Decl. (ECF 545) at ¶¶ 47 and 48.

Mrs. Jessup respectfully requests an award of **$250,000** in compensation for mental anguish and emotional distress and an award of **$20,887.24** for mental health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c)     Sheena Jessup Loss of Enjoyment of Life & Disruption

Sheena Jessup endured disruption, dislocation, and loss of enjoyment of life due to the fuel spill. The jet fuel contamination eliminated her family's ability to use the water in their home.

Mrs. Jessup attempted to use a provided hotel, but the experience proved utterly unworkable: one room for a family of six, with no internet for the children to do their homework, and a tiny shower she was barely able to enter. S. Jessup Decl. (ECF 396) at ¶¶ 36-38; Sheena Jessup, 4/30/24 Tx. at 140:22-142:7. The day she went to the hotel was the "heaviest rain day" she had experienced in four years living in Hawaiʻi and the parking garage was "completely flooded." *Id.* at 141:4-7. The experience left her in tears and was "an absolute and utter nightmare." *Id.* at 140:22-23; S. Jessup Decl. (ECF 396) at ¶ 38.

Instead, the family struggled to live in a house without water. They picked up "daily rations" of water and lived with the constant "fear of not having enough." *Id.* at ¶ 40. To take a bath, they would have to boil multiple pots of water for each member of the family. *Id.* at ¶ 43. Mrs. Jessup testified about the public showers provided by the Government, and that she could not allow her teenage daughter, B.J.J., to take a public shower with strangers all around her. S. Jessup, 04/30/24 Tx. at 142:10-23.

Ultimately, the family's ongoing symptoms at home and lack of clean water led Mrs. Jessup and her children to separate from their father to move in with family in Arizona. *Id.* at ¶¶ 61-62. Mrs. Jessup endured five months apart from her husband as he finished his duties, compounding her loss of enjoyment of life. *Id.* at ¶ 61.

102

Mrs. Jessup respectfully requests an award of **$150,000** in compensation for loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### 2.    Beau Jessup

### a)    Beau Jessup Pain & Suffering

Beau Jessup endured pain and suffering due to the Government's contamination of his water. He testified that he experienced acute symptoms in late November and early December 2021, that included feeling off balance. "It was just one – one day I woke up and I couldn't catch any balance. My whole room was tilted to the left. I think I fell twice trying to get to the stairs." *See* Beau Jessup, 4/30/2024, Tx., 163:22-164:16. He also had severe nosebleeds, stomach pains, nausea, headaches, burning in his throat, coughing, and small hand tremors which started a month and a half into the jet fuel exposure. *Id.* at 159:13-16; *see also* Beau Jessup Decl. (ECF 394) at ¶ 8; *see also* PX-2260_0001-0002 (Medical Composite – Beau Jessup  - 12/7/2021 Water Contamination Concerns, identifies nausea, diarrhea, headache beginning the week of November 22, 2021).

Mrs. Jessup testified that after the exposure, "Beau had stomach pain, frequent nose bleeds suddenly, burning of the throat, rashes, dizziness, and a cough. Most worrisome, we noticed that his hands were shaking and that he was having trouble with balance. He had brain fog and headaches." S. Jessup Decl. (ECF 396) at ¶ 23.

Dr. Bird concluded that the release of JP-5 into the JBPHH water system was a substantial contributing cause of Beau Jessup's abdominal pain, nausea, and headaches, as well as burning of his throat, a cough, balance problems, irritated eyes, a rash, and muscle aches. *See* Bird Decl. (ECF 491-1) at ¶ 96(j). His opinion is unrebutted by the Government's physician, Dr. Durrani.

Before the jet fuel contamination, Beau did not have any notable medical history. *Id.* at 115a-b. After the contamination, Dr. Bird discussed his tremors:

> B.B.J. was seen by a physician in July 2023 for tremors. A referral to neurology was made. I visualized B.B.J.'s tremor on a video call. There is a symmetrical fine tremor of both hands. The tremor is worse if he is tired and is sometimes worse first thing in the morning. B.B.J. does not have any difficulty with vision or eye pain, any difficulty with his bowel or bladder function, or any gait abnormalities. He also does not have sensory changes or focal weakness.

*Id.* at 115(e).

Beau Jessup respectfully requests an award of **$150,000** in compensation for pain and suffering and **$100,000** in compensation for physical impairment. *See* Damages Chart, attached hereto as Ex. 1.

### b)    Beau Jessup Mental Anguish & Emotional Distress

Beau Jessup experienced mental anguish and emotional distress because of the Government's contamination of his water. After the exposure, his pediatrician noted his anxiety. PX-2260 (Medical Composite); Clark Decl. (ECF 366) at ¶ 71. Beau described himself as depressed and reportedly engaged in cutting behavior in

the period after his exposure. *Id.* Beau had to transfer to a new high school for his junior year, which is generally challenging for a teenager. *Id.* at ¶ 72. Mrs. Jessup reported that Beau experienced bullying at his new high school. *Id.* He is constantly self-conscious about his tremors and is made fun of for stuttering. Beau Jessup, 4/30/2024 Tx. at 165:7-166:4.

Given the stress that Beau was experiencing, the notable anxiety, and the history of self-injurious behavior, Dr. Clark concluded that he was at an elevated risk of developing a severe mood or anxiety disorder at some point in the future. Clark Decl. (ECF 366) at ¶ 73. Dr. Clark believed that the concerns raised by his cutting reflect a lack of effective coping strategies to manage the emotional distress stemming from all the changes and challenges arising from his exposure. *Id.* Dr. Clark further testified that Beau meets the diagnostic criteria for Other Specific Trauma and Stressor Related Disorder under the DSM-V. *Id.* at ¶ 74.

Beau testified that he is worried about what his future may look like after the fuel release. Beau Jessup Decl. (ECF 394) at ¶ 23. His anxiety and depression have "gotten much worse." *Id.* Beau also fears for his family, especially his younger brothers, in that someone could possibly develop cancer in the future or other long-lasting impacts as a result of their exposure. *See* Beau Jessup Decl. (ECF 394) at ¶¶ 28, 30.

Beau's emotional concern is rooted in the temporal symptoms he experienced after the fuel release that he had never experienced before exposure to the contaminated water. Beau Jessup, 05/02/24 Tx. at 164:9-16. The physical symptoms that resulted, including the hand tremors, stuttering, and shakes in his legs, scare him, and evoke embarrassment and anger. Beau Jessup Decl. (ECF 394) at ¶ 24.

Beau also recently learned that his tremors "disqualified" him from his dream job. Beau Jessup, 05/02/24 Tx. at 164:18-20. The thought that the same branch of the military that hurt him and his family, could reject him based on the injuries it caused, has brought further anxiety, stress, worry, anger, and sadness to Beau. He felt betrayed. Beau Jessup Decl. (ECF 394) at ¶¶ 25-27, 29.

Beau reasonably believes that the fuel release caused his tremors and reasonably associates the mental distress of them to the fuel spill:

> From my personal belief yes, 'cause I haven't – have no genetic disposition form my knowledge and my extended family that I should have this. I had no signs beforehand, and I had not even thought anything of it when I had experienced it in the acute symptoms when I was there. And it has gotten nothing but significantly worse, where it has been a nuisance in my everyday life and makes me look around and pay attention to those that notice it as well.

Beau Jessup, 04/30/24 Tx. at 165:7-16.

When asked why he still wanted to join the Navy he testified:

My father, he's the biggest role model throughout my life. He's the reason I try so hard at everything. He showed me that you can get through anything if you try hard enough, and he got to where he was because he's an amazing man and the best father I could ask for. And I wanted to follow in his footsteps. And I've been denied the opportunity to do so by a condition that did not start until after the jet fuel exposure and has persisted and worsened since.

Beau Jessup, 05/02/24, Tx. 164:24-25, 165:1-6.

Dr. Clark recommended an initial psychological evaluation and twenty-four sessions of individual psychotherapy (cognitive behavioral) to address anxiety. Clark Decl. (ECF 366) ¶ 101; *see also*, Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9 (Government's expert agreed that incident had psychological impact); Canter Dep. (ECF 400-4) at 126:25-128:2 (Government life care planner agreed that Plaintiffs should get treatment). Plaintiffs' life care planner Margot Burns costed out these recommended therapies and programs. Burns Decl. (ECF 524) at ¶¶ 459-461. Plaintiffs' accounting expert Garret Hoe then calculated the present value of the recommended care and related services in the amount of $5,409.50. *See* Hoe Decl. (ECF 545) at ¶¶ 43 and 44.

Beau Jessup respectfully requests an award of **$150,000** in compensation for mental anguish and emotional distress and an award of **$5,409.50** for mental health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c) Beau Jessup Disruption – Loss of Enjoyment of Life & Disruption

Beau Jessup experienced disruption, dislocation, and loss of enjoyment of life due to the fuel spill. Beau suffered through the efforts to use the hotel room. S. Jessup Decl. (ECF 396) at ¶¶ 36-38; *see also* S. Jessup Tx., 4/30/24, 140:22-142:7. He endured life in a home without clean water, boiling pots of water to bathe. S. Jessup Decl. (ECF 396) at ¶ 43. With these additional chores, Beau as the eldest bore the brunt. Beau Jessup, 4/30/24 Tx. at 162:16-163:21. He now had to do chores such as washing dishes and bathing with "boiled water," he described a whole wall in his garage "stacked with water bottles, some for daily use of chores," and he had to wash and fill his brother's "sippy cups." *Id.* These chores "took up most of" Beau's day to accomplish and interrupted his schooling. *Id.* Ultimately, he too had to separate from his father to move in with family in Arizona. S. Jessup Decl. (ECF 396) at ¶¶ 61-62. Beau Jessup lost five months of time with his father – "the biggest role model" in his life. Beau Jessup, 4/30/24 Tx. at 164:24-25; S. Jessup Decl. (ECF 396) at ¶ 61.

Beau Jessup respectfully requests an award of **$150,000** in compensation for loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### 3.    B.J.J.

#### a)    B.J.J. Pain & Suffering

B.J.J. suffered physical pain and suffering because of the water

contamination. Mrs. Jessup testified that B.J.J. had stomach pain and skin rashes

from the contaminated water. S. Jessup Decl. (ECF 396) at ¶ 24; *see also* PX-1055

(B.J.J. – Photographs of Health Issues (3)); *see also* PX-2261_0001-0003 (Medical

Composite – B.J.J. [12/7/2021 Water Contamination Concerns, identifies nausea,

diarrhea, lethargy, and abdominal pain beginning the week of 11/22/21. "My

daughter has had a burning throat and stomach; she also developed a sore in her

throat as well 4 days following time increase in fuel smells (11/29)"]).

B.J.J. stated that around the time she heard about the jet fuel leak, "I

remember feeling a little dizzy and lightheaded." *See* B.J.J. Decl. (ECF 395) at ¶ 7.

She testified that she took a shower in February after their family had received a

"non-detect" that suggested that the water was safe. B.J.J., 5/2/2024 Tx. at 31:11-

32:4; see also S. Jessup, 4/30/2024 Tx. at 145:15-147:4. She got "burns, rashes on

my arms… burned my skin." B.J.J., 5/2/2024 Tx. at 31:11-32:4

Dr. Bird concluded that the release of JP-5 into the JBPHH water system

was a substantial contributing cause of B.J.J.'s abdominal pain, nausea, and

diarrhea, throat burning, eye irritation, a rash, headaches, fatigue, muscle aches,

and anxiety as a result of her jet fuel exposure. *See* Bird Decl. (ECF 491-1) at ¶ 96(i). His opinion is unrebutted by the Government's physician, Dr. Durrani.

B.J.J. respectfully requests an award of **$75,000** in compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)    B.J.J. Mental Anguish & Emotional Distress

B.J.J. experienced mental anguish and emotional distress after the jet fuel exposure. Following the release, B.J.J. was diagnosed with generalized anxiety disorder by her treating physician. Clark Decl. (ECF 366) at ¶ 76. Dr. Clark opined that B.J.J. suffers from Major Depressive Order and "is experiencing a great deal of irritability as a result" that has led to uncharacteristic "heated conflict with her mother." *Id.* at ¶ 77. B.J.J. meets the diagnostic criteria for Other Specific Trauma and Stressor Related Disorder under the DSM-V. *Id.* at ¶ 80.

B.J.J. has experienced a number of stressors and losses associated with the jet fuel spill. *Id.* at ¶ 78. She had to leave her school and friends and transfer into a new community where she struggled to fit in. *Id.*

B.J.J. experienced diminishment of family relationships because of the spill. She was separated from her father for five months and "missed him a great deal during that time." *Id.* The events following the fuel release have greatly strained the family and has likely made her relationship with her mother more volatile. *Id.*

On leaving her friends and community behind, she testified:

Q.    When you moved, did you leave anybody behind?

A.    Yes. I left behind three very good friends there, and my school…
that was the longest time I … was able to stay in a house due to
my dad being in the military. And so I definitely felt like that was
more of like my home area. And so it was definitely difficult
leaving that.

B.J.J., 05/01/24 Tx. at 33:10-16. Regarding her separation from her father

and how it was different from prior deployments, she testified:

A.    On deployment, you always knew that he was provided for, and
that he would have everything he needs there, and that he would
be safe. Staying [in Hawaiʻi], you knew that he was still around
that water… he was in this crammed little area. He had no one…
it was just entirely different as an experience just him being there
because we couldn't handle a situation that he still had to live in
because he had to stay there with the water.…

Q.    Did you miss him?

A.    I definitely missed my dad. I mean, we always miss him when he
had to leave, but it had been such a long time since he had been
on a deployment or anything like that, and definitely missed him
during that experience.

*Id.* at 33:22-25, 34:1-7, 34:16-20.

B.J.J.'s current episode of depression warrants intervention and Dr. Clark

believes she will need to go on antidepressant medication. Clark Decl. (ECF 366)

at ¶ 79. B.J.J. is at an increased risk of any number of unwelcome outcomes to

treatment, including treatment resistant depression, recurrent episodes of

depression, self-injurious behaviors (such as cutting), substance abuse disorder,

and suicide. *Id.*

111

B.J.J. worries for her family because of the water's effect on them. She

worries for her brother Beau, that his tremors won't go away, and what that means

for him. She worries about her own health. She worries that she can't one day

become a mother because of what the exposure has done to her body. She worries

that the rashes on her skin may one day turn to cancer, and if she will be able to

pay for medication if she does. B.J.J. Decl. at ¶¶ 23, 27, and 28. She is anxious

about using water – she gets nervous if the water she drinks ever tastes off in any

way. *Id.* at ¶ 25. She struggles with depression after losing contact with her friends

from Hawai'i. *Id.* at ¶ 26.

As noted, Dr. Smith and Dr. Canter agree that B.J.J., and the other Plaintiffs,

experienced emotional distress following the fuel release. Dr. Canter recommends

psychological care. *See, e.g.,* Dep. of Jennifer Canter, M.D. (ECF 400-4) at

126:25-128:2, and Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9.

Dr. Clark recommended a psychological evaluation for consideration of

medication, forty sessions of individual psychotherapy to address depression, 24

follow up psychopharmacology sessions, and twelve sessions of parent guidance

for her parents for assistance and support in managing her mood and behavioral

challenges. Clark Decl. (ECF 366) at ¶ 102; *see also*, Smith, 5/13/24 Tx. at 25:19-

28:2, 29:17-30:9 (Government's expert agreed that incident had psychological

impact); Canter Dep. (ECF 400-4) at 126:25-128:2 (Government life care planner

agreed that Plaintiffs should get treatment). Plaintiffs' life care planner Margot Burns costed out these recommended therapies and programs. Burns Decl. (ECF 524) at ¶¶ 479-481. Plaintiffs' accounting expert Garret Hoe then calculated the present value of the recommended care and related services in the amount of $11,373.50. Hoe Decl. (ECF 545) at ¶¶ 45 and 46.

B.J.J. respectfully requests an award of **$75,000** in compensation for mental anguish and emotional distress and an award of **$11,373.50** for mental health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c)    B.J.J. Disruption – Loss of Enjoyment of Life & Disruption

B.J.J. endured disruption, dislocation, and loss of enjoyment of life due to the fuel spill. She suffered through her family's efforts to use the hotel room. S. Jessup Decl. (ECF 396) at ¶¶ 36-38; S. Jessup, 4/30/24 Tx. at 140:22-142:7. She lived without water in her home for six to eight months, boiling pots of water to bathe. B.J.J., 5/2/24 Tx. at 28:7-9; S. Jessup Decl. (ECF 396) at ¶ 43. This period of time was "very difficult." B.J.J., 5/2/24 Tx. at 28:12. Her little brothers needed "their needs met. They need their bottles washed, they need their food cooked." *Id.* at 28:12-18. She needed to go down "every day to get cases of water." *Id.* at 28:19-20.

> We had to pour all of it to fit it into this giant pot, and that's what we would use to boil the water and bathe. We would have to use that to…wash bottles and also to cook food, and that's -- like washing

clothes. That's just -- we would have to do all of that because we couldn't get that water on the boys' skin.

*Id.* at 28:21-29:1. B.J.J. also lost her father for five months as she moved in with family in Arizona to escape the contamination. S. Jessup Decl. (ECF 396) at ¶¶ 61-62. This had an enormous impact on her and her siblings:

> Me and my brother definitely missed my dad, and I know that the kids -- the kids definitely missed him. I think I remember my little…brother, [N.J.], he would be like, 'Where's dad?' And my little baby brother, [D.J.], he would always just get -- they would just get so ecstatic when he would get on the phone or just -- you could just know that they missed him and missed him being there.

B.J.J., 5/2/24 Tx. at 34:16-35:4.

B.J.J. respectfully requests an award of **$75,000** in compensation for loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

## 4.     N.J.

### a)     N.J. Pain & Suffering

N.J. experienced pain and suffering due to the water contamination. Mrs. Jessup testified that:

> [o]f all of us, N.J. was the most affected at this time. Not only is N.J. on the autism spectrum, but he also has a mast cell disease, putting him most at risk from exposure. . . . The disturbances in routine were drastic and impacted every aspect of our life. N.J. couldn't cope with all the changes, and his therapy routines became disrupted. We lost progress at a critical time in his development.

S. Jessup Decl. (ECF 396) at ¶¶ 19-22. N.J. also developed stomach pain and diarrhea and said that his eyes burned. *Id.*

Dr. Bird concluded that the release of JP-5 into the JBPHH water system was a substantial contributing cause of N.J.'s abdominal pain, vomiting, diarrhea, a cough, eye irritation from the exposure, headaches, anxiety, and behavior abnormalities as a result of his jet fuel exposure. Bird Decl. (ECF 491-1) at ¶ 96(k).

N.J. had "severe feeding issues" and drank formula from a bottle, even at the age of 4 and 5. He needed a lot of water." S. Jessup Decl. (ECF 396) at ¶ 22. This led to "tummy pain, and diarrhea. He said that his eyes burned, especially on the flushing days." *Id.* Even months after the ostensible exposure had ended, as the family was leaving the island, N.J. bathed in the water at their Ford Island hotel. S. Jessup Decl. (ECF 396) at ¶ 63. N.J. experienced "burning" pain and he lost pigment on his legs. *Id.*

N.J. respectfully requests an award of **$75,000** in compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)    N.J. Mental Anguish & Emotional Distress

N.J. experienced mental anguish and emotional distress because of the water contamination. N.J. has autism and the family had worked hard to accommodate his routine. S. Jessup Decl. (ECF 396) at ¶ 20. It was "drastic[ally] disrupted by the fuel release, which affected N.J. deeply. *Id.* at ¶ 21. N.J. is particular about how he

drinks water, including the cup and the temperature of the water. He absolutely hated bathing from a pot. *See* S. Jessup Decl. (ECF 396) at ¶¶ 2 and 20. He could not cope with all the changes that the fuel release brought, and his therapy routines became disrupted. *Id. a*t ¶ 21. He lost progress in his development at a critical time. *Id.* N.J. began to refuse to even go into the therapy building or cooperate at all. *Id.* at ¶ 21.

During the flight to Arizona after the family moved out of the affected home, N.J. suffered an "extreme autistic meltdown." *Id.* at ¶ 65. His mother had to hold him down while he screamed and kicked for almost the entirety of the six-hour flight. *Id.* He "chewed up all his nails" and began chewing his mother's, something he had never done before. *Id.* His mother needed to keep her hands in his mouth and let him chew her nails up so that he would stop screaming. *Id.*

As noted, Dr. Smith and Dr. Canter agree that N.J., and the other Plaintiffs, experienced emotional distress following the fuel release. Dr. Canter recommends psychological care. *See, e.g.,* Dep. of Jennifer Canter, M.D. (ECF 400-4) at 126:25-128:2, and Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9.

Dr. Clark opined that N.J., as a young child faced with significant stress, would regress in some ways and revert to a younger or less developed set of behaviors. Clark Decl. (ECF 366) at ¶ 82. In addition, children with autism

typically do not adjust to change readily and can be exceptionally resistant. *Id.* Dr.

Clark was not surprised by N.J.'s regression due to the crisis. *Id.*

The treatment of Autism Spectrum Disorder requires intensive in-person

therapy, often for several hours a week, especially for children such as N.J. who

have a severe language based disability. *Id.* at ¶ 83. Following the fuel release, N.J.

began to refuse to engage with his familiar therapist and was then moved to

Arizona where he was placed on a waitlist for two months to begin therapy with a

new therapist. *Id.* Because of the fuel release, he missed about eight months of

treatment and has only recently begun to work with a set of therapists that are

helpful to his development. *Id.* Dr. Clark opines that N.J. experienced a significant

degree of regression as a result of not engaging with therapy at all for eight

months. *Id.*

The jet fuel contamination was a substantial contributor to N.J.'s regression

and delayed effective therapy for him, and likely has resulted in him failing to

achieve developmental gains that he would have otherwise – gains that he may

never make up. *Id.* at ¶ 84-85.

N.J. respectfully requests an award of **$75,000** in compensation for mental

anguish and emotional distress. *See* Damages Chart, attached hereto as Ex. 1.

### c)    N.J. Loss of Enjoyment of Life & Disruption

N.J. experienced disruption, dislocation, and loss of enjoyment of life due to the fuel spill. All of this was exacerbated by his difficulties coping with the loss of water and routine related to his Autism Spectrum Disorder, discussed extensively above.

He also suffered through the family's attempt to use the hotel room. S. Jessup Decl. (ECF 396) at ¶¶ 36-38; Sheena Jessup, 4/30/24 Tx. 140:22-142:7. He lived without water in his home for months, boiling pots of water to bathe. S. Jessup Decl. (ECF 396) at ¶ 43. Because of his cutaneous mastocytosis, N.J. had to be extremely careful around the water because this condition could be triggered by "any injury to his skin." Sheena Jessup, 4/30/24 Tx. at 139:20-25. He also relied on feeding from a bottle, and the lack of clean water impacted the daily aspects of his life.

N.J. also lost his father for five months as the family left for Arizona to escape the contamination. S. Jessup Decl. (ECF 396) at ¶¶ 61-62. This had a profound impact on him as he would ask for his father who would not be there. B.J.J., 5/2/24 Tx. at 34:16-35:4.

N.J. respectfully requests an award of **$150,000** in compensation for loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

118

### 5. D.J.

#### a) D.J. Pain & Suffering

D.J. experienced physical pain and suffering because of his exposure to contaminated water. Mrs. Jessup testified that D.J. vomited and had diarrhea, and eye irritation during the contamination period. S. Jessup Decl. (ECF 396) at ¶ 25; *see also* PX-2262_0001-0003 (Medical Composite – D.J. – 12/7/2021 Water Contamination Concerns, identifies fever, vomiting, rash, and change in stool consistency as beginning 11/22/2021. "Doing better since stopping drinking the water.").

Dr. Bird concluded that the release of JP-5 into the JBPHH water system was a substantial contributing cause of D.J.'s diarrhea as well as eye irritation and dry skin from the jet fuel exposure. Bird Decl. (ECF 491-1) at ¶ 96(l).

D.J. respectfully requests an award of **$75,000** in compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

#### b) D.J. Mental Anguish & Emotional Distress

D.J. experienced mental anguish and emotional distress because of the contamination. D.J. was a 10-month-old at the time of his exposure and currently 3 years old. His mother noted that the air quality in the home became very poor following the fuel release, and D.J. looked as though he was "in a fog" until she

brought him out of the house. Clark Decl. (ECF 366) at ¶ 87; Burns Decl. (ECF 524) at ¶¶ 507-508.

The jet fuel contamination may have exposed D.F. to toxic chemicals at a young and vulnerable age, with unknown long-term effects on his cognitive and behavioral functioning. Clark Decl. (ECF 366) at ¶¶ 88-89.

As noted, Dr. Smith and Dr. Canter agree that D.J., and the other Plaintiffs, experienced emotional distress following the fuel release. Dr. Canter recommends psychological care. *See, e.g.,* Dep. of Jennifer Canter, M.D. (ECF 400-4) at 126:25-128:2, and Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9.

D.J. respectfully requests an award of **$75,000** in compensation for mental anguish and emotional distress. *See* Damages Chart, attached hereto as Ex. 1.

### c)    D.J. Loss of Enjoyment of Life & Disruption

D.J. experienced disruption, dislocation, and loss of enjoyment of life due to the fuel spill. He too suffered through the efforts to use the hotel room. S. Jessup Decl. (ECF 396) at ¶¶ 36-38; S. Jessup, 4/30/24, 140:22-142:7. He lived without water in his home for months, boiling pots of water to bathe. S. Jessup Decl. (ECF 396) at ¶ 43.

D.J. also lost his father for five months as he moved in with family in Arizona to escape the contamination. *Id.* at ¶¶ 61-62. This impacted him

120

emotionally during a critical time in his development. B.J.J., 5/2/24 Tx. at 34:16-
35:4. B.J.J. testified that:

> And my little baby brother, [D.J.], he would always just get -- they
> would just get so ecstatic when he would get on the phone or just -- you
> could just know that they missed him and missed him being there.

*Id.*

D.J. respectfully requests an award of **$75,000** in compensation for loss of

enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### D.    Dietz Family

The Dietz family lived in military housing on 731 Ohana Nui Circle in

Honolulu, Hawai'i, in the Earhart Village neighborhood which was serviced by the

Joint Base Pearl Harbor-Hickam water distribution system. Richelle Dietz is a 37-

year-old mother and wife of Navy Chief Petty Officer Bryan Dietz, who had

moved to Hawai'i in February 2021 with their 13-year-old son B.D. and 5-year-old

daughter V.D.

Acute symptoms such as stomach pain, vomiting, and severe headaches

struck the family in late November 2021. The family initially mistook the cause for

a foodborne illness post-Thanksgiving but soon uncovered the truth when Richelle

and Bryan noticed a strong smell of jet fuel and an oily sheen on their tap water.

The severity of the situation dawned on them when health symptoms escalated, and

Richelle experienced a panic attack at a Navy town hall meeting. R. Dietz Decl.

(ECF 391) at ¶¶ 9-14, 23; B. Dietz Decl. (ECF 390) at ¶¶ 7-19.

The family lived without clean running water at home for months. They

were forced to rely on bottled water for all basic needs, jury rig a makeshift

showering arrangement which added stress and financial strain. R. Dietz Decl.

(ECF 391) at ¶¶ 31-32. As the only Plaintiff family still in the home that made

them sick, the Dietz's still do not trust their water. They are finally moving off the

island to safeguard their health and well-being.

### 1.    Richelle Dietz

#### a)    Richelle Dietz Pain & Suffering

Richelle Dietz experienced physical pain and suffering due to her exposure to

contaminated water. Mrs. Dietz testified that on November 27, 2021, her throat was

burning and that on November 28, 2021, the family smelled fuel in our water and

saw an oily sheen. R. Dietz Decl. (ECF 391) at ¶ 13, ¶¶ 14-16. She testified that her

family developed acute symptoms by Thanksgiving weekend: "I thought we all

developed food poisoning, honestly, because it was nausea and the diarrhea and just

not feeling well, and your stomach was aching." R. Dietz, 5/1/24 Tx. at 36:24-37:3.

"The burning sensations, stomach pain, vomiting, and diarrhea continued for our

family through the first week of December." R. Dietz Decl. (ECF 391) at ¶ 25. A

contemporaneous medical record reports: "Pt called and said that her and her family

has been affected w contaminated water situation on base on Thanksgiving. Was dealing with extreme burning pain in throat and stomach, 'was on fire,' pain rate was 10/10. Had diarrhea, and vomiting." DX-3213, pp. 35-40 (R. Dietz Medical Composite – 12/10//21).

She testified that shortly after the fuel release she also developed brain fog, short term memory loss, word-finding challenges, attention challenges, and insomnia. R. Dietz Decl. (ECF 391) at ¶ 60. Mrs. Dietz further testified that she started having panic attacks, the first of which was brought on by a town hall related to the fuel release on November 30, 2021. R. Dietz, 5/1/24 Tx. at 37:16-38:11, 45:7-13.

The family completely stopped using the water on November 29, 2021, and some of B.D.'s, V.D.'s, and her own symptoms started to calm down by December 2 and 3, 2021. *See* R. Dietz, 5/1/24 Tx. at 29:1-3, 25:15-17.

Dr. Bird concluded that the release of JP-5 into the JBPHH water system was a substantial contributing cause of Richelle Dietz's abdominal pain, nausea, vomiting, and diarrhea, burning of her eyes and throat, headaches, a cough, rash, and anxiety as a result of her jet fuel exposure. *See* Bird Decl. (ECF 491-1) at ¶ 96(d).

Mrs. Dietz respectfully requests an award of **$75,000** in compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

123

### b)    Richelle Dietz Mental Anguish & Emotional Distress

Richelle Dietz endured mental anguish and emotional distress due to the fuel release. Following the contamination, Richelle Dietz met the criteria for generalized anxiety disorder. Vargo Decl. (ECF 388) at ¶ 55b. Since her exposure, she has experienced excessive anxiety and worry that is difficult to control and occurred more days than not. *Id.* She has felt restless, is easily fatigued, experiences difficulties concentrating, is irritable, and experiences muscle tension and sleep disturbance. *Id.* Her anxiety and physical symptoms associated with anxiety have caused her clinically significant distress and impairment in her work and social relationships. *Id.*

Mrs. Dietz has also experienced increased episodes of nausea since her exposure, which started after she heard that the water was contaminated – she threw up because of the stress. *Id.* Her memory has deteriorated and required her to write things down in notebooks and calendars. *Id.* She compared her increased anxiety to being in a war zone, where her continual focus on protecting her children and addressing their water-related activities caused her performance at work to drop off, and for her to miss work entirely. *Id.*

Prior to the Navy's town hall regarding the water contamination, Mrs. Dietz never experienced a panic attack. R. Dietz, 5/1/2024 Tx. at 37:16-38:10; R. Dietz Decl. (ECF 391) at ¶ 23, 64-65. Since then, she continues to suffer from them. R.

Dietz, 5/1/2024 Tx. at 37:16-38:10; R. Dietz Decl. (ECF 391) at ¶ 23, 64-65. She

could not reconcile what the Navy was telling her and her family, and what she

knew to be true. *Id.*

She worries about all aspects of her family's exposure. She worries about the

water and the need to always use filters and bottled water. She fears whether she,

B.D., V.D., or her husband, Bryan Dietz, will get cancer. She wonders whether any

ailment she discovers, such as her swollen thyroid, is related to the contaminated

water. She will always wonder whether she would have had ailments if her family

had never moved onto the Navy's water line and questions the choices her family

has made to be here. She worries about always having to worry, and if she will

ever be able to not relive the night she found out her family's water was

contaminated. *Id.* at ¶¶ 66, 70, 72, 73.

When asked about her experience as a mother to a special needs child in

December 2021, following the fuel leak, she testified:

> It felt a little impossible and extremely defeating because we had spent
> years getting things in place to make his life comfortable and easy, and
> it was just thrown on its head and completely dismantled. And I felt
> totally helpless.

R. Dietz, 05/01/24 Tx. at 40:10-13.

She fears that her son will have to live with migraines, or worse, for the rest

of his life. She fears her daughter will not be able to have her own children. She

fears her children won't have the finances that they need if they get sick in the

future. And she fears she can never think about or drink water without anxiety

again. R. Dietz Decl. (ECF 391) at ¶¶ 74-77. She feels betrayed by her own

government. Her distrust has only grown after seeing the Navy deny the harm and

the disconnect between their position and her own experience. *Id.* at ¶ 78.

> She testified:

> I can't trust the people that are saying it's safe, or I don't trust them.
> And we're still – our house is still testing positive for TPH-d, and I
> worry about what any more little doses or exposure can mean for my
> kids and for me.

R. Dietz, 05/01/24 Tx. at 40:17-20.

For Mrs. Dietz's care, Dr. Vargo recommended an initial psychiatric

diagnostic evaluation, cognitive behavioral therapy once weekly for twelve

months, and 24 therapy sessions in her lifetime for treatment of her psychological

triggers related to the Red Hill incident. Vargo Decl. (ECF 388) at ¶ 63; *see also*,

Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9 (Government's expert agreed that

incident had psychological impact); Canter Dep. (ECF 400-4) at 126:25-128:2

(Government life care planner agreed that Plaintiffs should get treatment).

Plaintiffs' life care planner Cynthia Fricke[27] costed out these recommended

---

[27] Plaintiffs' expert, Ms. Cynthia Fricke, is a licensed registered nurse in the State
of Hawaiʻi with additional certifications in case management and life care
planning.  Fricke Decl. (ECF 491-2) at ¶ 3; *see also* PX-1588 (Curriculum Vitae of
Ms. Fricke). She has been a registered nurse for approximately forty (40) years and
a certified life care planner for twelve (12) years. Fricke Decl. (ECF 491-2) at ¶ 3.

therapies and programs. *See* Fricke Attachment Compositive at Tab C (ECF 523-1,

p.71). Plaintiffs' accounting expert, Garret Hoe, then calculated the present value

of the recommended care and related services in the amount of $21,968.14. Hoe

Decl. (ECF 545) at ¶¶ 25-26.

Mrs. Dietz respectfully requests an award of **$250,000** in compensation for

mental anguish and emotional distress and **$21,968.14** in special damages for

mental health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c)    Richelle Dietz Loss of Enjoyment of Life & Disruption

Richelle Dietz suffered significant disruption and loss of enjoyment of life

due to the water contamination. The family was subjected to unenviable

inconvenience for months on end.

In the wake of the contamination, they only "consumed water from bottles or

jugs" that they purchased, "which quickly became expensive." R. Dietz Decl. (ECF

391) at ¶ 31; R. Dietz, 5/1/24 Tx. at 28:20-25. To shower, they rigged up a "a vinyl

camp shower in the garage and heated the water in a tea kettle. The camping

shower could only hold a few gallons of water, so the experience was cold,

stressful, and uncomfortable." R. Dietz Decl. (ECF 391) at ¶ 32. The family

---

She is also a certified nurse life care planner. *See id.* Ms. Fricke is the founder and
owner of Island Legal Nurse Consulting, LLC, a case management, and life care
planning consulting business. *Id.*

modified their home's water infrastructure, installing filters that they purchased for

their showers and under their kitchen sink. R. Dietz, 5/1/24 Tx. at 44:19-23.

Mrs. Dietz respectfully requests an award of **$150,000** in compensation for

loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### 2.    B.D.

#### a)    B.D. Pain & Suffering

B.D. experienced physical pain and suffering due to the Government's

negligent fuel spill. After the contamination, B.D. experienced nausea, vomiting

diarrhea, and a rash. *See* R. Dietz, 5/1/24 Tx. at 19:16-20:7, 20:19, 36:20-23*; see*

*also* PX-1042 (B.D. Photographs of Rash). He lost his ability to keep his balance,

he couldn't feel things, sensations, or temperatures strongly, and he experienced

neuropathy. *See* R. Dietz, 5/1/24 Tx. at 19:16-20:7, 20:19, 36:20-23*.*

B.D. has Chiari malformation which had been managed but now he

experienced a spike in the severity and regularity of his headaches. *Id.* "These

headaches presented very differently…." *Id.* This was particularly difficult for B.D.

because he would previously seek relief for his Chiari condition with hot showers

that would give him relief. R. Dietz, 5/1/24 Tx. at 39:25-40:4. Now this was no

longer possible because the family didn't "have enough water for the day to give"

B.D. a hot shower. *Id.*

B.D. also experienced general fatigue, dry skin, sore throat, and severe. *See*

R. Dietz Decl. (ECF 391) at ¶ 26.

Dr. Bird concluded that the release of JP-5 into the JBPHH water system

was a substantial contributing cause of B.D.'s acute headaches and balance

disturbances, as well as abdominal pain, nausea, diarrhea. general fatigue, dry skin,

sore throat, and anxiety. *See* Bird Decl. at ¶ 96(b).

B.D. respectfully requests an award of **$75,000** in compensation for pain and

suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)      B.D. Mental Anguish & Emotional Distress

B.D. endured mental anguish and emotional distress due to the jet fuel

contamination. Dr. Clark testified that the jet fuel contamination contributed

substantially to B.D.'s anxiety (which was preexisting) due to the associated

stressors and disruptions. Clark Decl. (ECF 366) at ¶ 34. Moreover, B.D.'s

exposure has placed him at a future elevated risk of developing a more severe

anxiety disorder. *Id.* Dr. Clark has opined that B.D. meets the diagnostic criteria

for Other Specified Trauma and Stressor Related Disorder under the DSM-V. *Id.*

Mr. Deitz testified that his anxiety went through the roof. "[H]e was worried

about his brain and his health." B. Dietz Decl. (ECF 390) at ¶ 18. B.D. also

experienced seeing his beloved dog, Rocket, who "sleeps with him every night,"

"seizing up right on the . . . grass" and did not know how to respond. R. Dietz.

Decl. ECF 391) at ¶ 4; B. Dietz, 5/1/24 Tx. at 66:3-9.

Mrs. Dietz has observed that B.D. worries about the water and doesn't

understand why the Navy didn't prevent the harm. R. Dietz Decl. (ECF 391) at ¶

67a. She further reported that B.D.'s neurologist believes his increased migraines

are partly a result of his extreme anxiety. *Id.* at ¶ 68. And despite seeing a therapist,

he still experiences anxiety with water, medical appointments, and being outside

the house. *Id.*

Dr. Clark recommended an initial psychological evaluation, forty-eight

sessions of individual psychotherapy for help with anxiety and support. Clark Decl.

at ¶ 100; *see also*, Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9 (Government's

expert agreed that incident had psychological impact); Canter Dep. (ECF 400-4) at

126:25-128:2 (Government life care planner agreed that Plaintiffs should get

treatment). Plaintiffs' life care planner Cynthia Fricke costed out these

recommended therapies and programs. *See* Fricke Decl. (ECF 429) at ¶¶ 55, 57-60.

Plaintiffs' accounting expert Garret Hoe then calculated the present value of the

recommended care and related services in the amount of $17,924.78. *See* Hoe

Decl. (ECF 545) at ¶¶ 23 and 24.

B.D. respectfully requests an award of **$100,000** in compensation for mental

anguish and emotional distress and **$17,924.78** in special damages for mental

health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c)    **B.D. Loss of Enjoyment of Life & Disruption**

The water contamination disrupted B.D.'s life and led to a profound loss of

enjoyment of life. Like the rest of his family, he had to switch to consumption of

bottled water for all purposes. R. Dietz Decl. (ECF 391) at ¶ 31; R. Dietz, 5/1/24

Tx. at 28:20-25. He too had to shower in the rigged-up camp shower with water

heated from a kettle. R. Dietz Decl. (ECF 391) at ¶ 32.

The water contamination impacted B.D.'s play. "B.D. became so afraid of

triggering a headache, he stopped going outside and doing the things he loved."

Bryan Dietz Decl. (ECF 390) at ¶ 31. B.D. "stopped wanting to go out and be a kid

at all. He would just stay inside because he was afraid that he would, you know,

trigger another headache." R. Dietz, 5/1/24 Tx. at 39:12-24.

B.D. respectfully requests an award of **$150,000** in compensation for loss of

enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### 3.    **V.D.**

### a)    **V.D. Pain & Suffering**

After Thanksgiving 2021, "V.D. had stomach pain, vomiting, and diarrhea."

R. Dietz Decl. (ECF 391) at ¶ 12. Those symptoms began on or about November

26, 2021, and lasted approximately one week. Bird Decl. (ECF 491-1) at ¶ 108(c).

Additionally, V.D. developed shortness of breath, her tummy hurt, she cried in the

bath, and had a rash on her stomach. *See* R. Dietz, 5/1/24 Tx. at 24:20-22, 36:8-14.

V.D.'s cough "led to severe wheezing, colds began lasting weeks rather than

days." R. Dietz Decl. (ECF 391) at ¶ 27; *see also*, Bryan Dietz Decl. (ECF 391) at

¶ 17 ("V.D. had . . . a cough that developed into severe wheezing.").

V.D. had a bath around Thanksgiving weekend that caused her notable pain:

Q.    I want to take you to Thanksgiving weekend, November 2021.
      Did you give Victoria a bath around that time?

A.    Yeah, we did.

Q.    What was that like?

A.    We didn't notice anything, actually, until she started to scream,
      and we -- you know, she just said, 'My bottom hurts, my bottom
      hurts,' and she was wailing.

      And so we took her out, and we checked her, and we couldn't see
      anything that should be causing this kind of screaming and crying.
      And so we -- we didn't know what to do.

R. Dietz, 5/1/24 Tx. at 34:19-35:9.

Dr. Bird concluded that the release of JP-5 into the JBPHH water system

was a substantial contributing cause of V.D.'s abdominal pain, vomiting, and

diarrhea, as well as shortness of breath with decreased exercise tolerance and

wheezing, dry skin, and a cough. *See* Bird Decl. (ECF 491-1) at ¶ 96(c).

V.D. respectfully requests an award of **$75,000** in compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)     V.D. Mental Anguish & Emotional Distress

While V.D. is still young, her mother still worries that she will develop medical conditions as she gets older that she cannot financially address or won't be able to have her own children.

As described above, V.D. had a painful bath that has affected her relationship to water. R. Dietz Decl. (ECF 391) at ¶¶ 66, 75, and 76. V.D. used to love playful bathtime but now she fights her parents to get into showers and baths. *Id.*

As noted, Dr. Smith and Dr. Canter agree that V.D., and the other Plaintiffs, experienced emotional distress following the fuel release. Dr. Canter recommends psychological care. *See, e.g.,* Dep. of Jennifer Canter, M.D. (ECF 400-4) at 126:25-128:2, and Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9.

V.D. respectfully requests an award of **$75,000** in compensation for mental anguish and emotional distress. *See* Damages Chart, attached hereto as Ex. 1.

### c)     V.D. Loss of Enjoyment of Life & Disruption

V.D.'s life was also disrupted by the fuel release in ways that diminished her enjoyment of life. Like the rest of her family, she had to switch to consumption of bottled water for all purposes. R. Dietz Decl. (ECF 391) at ¶ 31; R. Dietz, 5/1/24

Tx. at 28:20-25. She too had to shower in the rigged-up camp shower with water heated from a kettle. R. Dietz Decl. (ECF 391) at ¶ 32. V.D. reacted to being put in the water, saying that her "tummy hurt" and crying in the bath. R. Dietz, 5/1/24 Tx. at 36:15-16. The water contamination disrupted her view of water: V.D. "used to love playful bathtime," but "now fights" her parents to get in showers and baths. R. Dietz Decl. (ECF 391) at ¶ 66. "She would not take baths because she would say it burned, and she started to develop a rash on her belly." B. Dietz, 5/1/24 Tx. at 63:22-24.

V.D. respectfully requests an award of **$75,000** in compensation for loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### E.    Elizabeth Witt

Elizabeth Witt resided in military housing in the Officer Field neighborhood at 203 Signer Blvd. C, Honolulu, HI, a home serviced by the JBPHH water distribution system. Mrs. Witt came from a military family and moved frequently due to her father's career in the Air Force. She married Konner Witt, who was stationed in Hawaiʻi as a Captain in the Air Force, and together they moved to Hickam Air Force Base in August 2021. She learned of the contamination when she returned from a trip the weekend after Thanksgiving, and the events quickly triggered her anxiety as she struggled to find accurate information about what had happened. Witt Decl. (ECF 397) at ¶ 13. Her anxiety worsened when she learned

she was pregnant, and then later when she brought her newborn home to a house
that she still did not believe was safe. With her encouragement, her husband took a
position off island—and out of his career track—to get them out of the
contamination. They ultimately decided to leave the service altogether after this
experience. *Id.* at ¶¶ 41-45.

a)       **Elizabeth Witt Pain & Suffering**

Elizabeth Witt experienced pain and suffering due to the water
contamination. Mrs. Witt testified that after Thanksgiving "I had intense
stomach cramping that I had never had before. I also got dry and itchy skin on
my arms and legs after showering, with rashes on my arms. My skin issues
continued through the month of December." Witt Decl. (ECF 397) at ¶ 11; *see
also* PX-1058 (Witt, Elizabeth - Photograph of Skin Issue). A contemporaneous
medical record reports: "Last Sunday – Tuesday had bad abdominal pain not
related to periods." PX-2264_0003-0004 (Medical Composite – Elizabeth Witt
– 12/6/21). At trial, Mrs. Witt testified to taking a shower on December 9 that
led to a painful rash. Witt, 4/30/24 Tx. at 188:3-14. She also developed anxiety
around this time. *See* Bird Decl. (ECF 491-1) at ¶ 113(c).

Dr. Bird concluded that the release of JP-5 into the JBPHH water system
was a substantial contributing cause of Elizabeth Witt's menstrual irregularities
and palpitations, as well as abdominal pain, abdominal cramping, a rash, and

135

acute anxiety as a result of her jet fuel exposure. *See* Bird Decl. (ECF 491-1) at ¶ 96(h).

Mrs. Witt respectfully requests an award of **$75,000** in compensation for pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)    Elizabeth Witt Mental Anguish & Emotional Distress

The jet fuel contamination left Elizabeth Witt with mental anguish and emotional distress. Because of her exposure, Mrs. Witt met the criteria for adjustment disorder with anxiety and depression. Vargo Decl. (ECF 388) at ¶ 55f. Since her exposure, she has experienced marked distress and has experienced exacerbated anxiety related to her pregnancy and "living on base in place with a history of petroleum hydrocarbons." *Id.* She has experienced immense anxiety and frustration from not knowing what was in the water, how long they would need to live with bottled water, what they were exposed to, and how it would impact life going forward. *Id.*

Mrs. Witt worries about what she and her family have been exposed to, what the full cocktail of chemicals is that was released into her home and drinking water. She worries about her future health, including cancer and a host of other illnesses that could come about. She worries that, like her friend who was stationed at Camp Lejeune, she will also develop cancer. Witt Decl. (ECF 397) at ¶¶ 51-52.

She testified:

> Q.    What health impact do you think could happen? What – when you say you worry about the health impact, is there anything in particular you are thinking about?

> A.    Yeah. Cancer is one that definitely come up. Again, you see things or these people that were exposed at Camp Lejeune and, you know, Flint. That is something that definitely I worry about for him, [Konner] and myself as well. And any neurological impact that this has, especially as he was – it's his formidable couple of first weeks of life – or weeks of being in utero, as well as weeks of life.

Witt, 4/30/24 Tx. at 199:2-11.

She was fearful during her pregnancy. After the birth of N.W., she worries about genetic abnormalities and toxins being passed onto her baby. She testified that she worried that her birth complications were a result of her exposure:

> A.    So for me, I had, you know, excessive bleeding afterwards that almost required a transfusion. I also – I stayed an extra day because of the loss of blood and the issues with placenta and the umbilical cord, and then [N.W.] was kept an extra day due to respiratory issues.

> Q.    Were you worried that those complications were from your exposure to water?

> A.    Yes.

*Id.* at 195:8-15.

And then when she brought the newborn home, she found "just being in that home where [she knew that there was contamination was extremely -- extremely nerve-racking." *Id.* at 195:23-25.

137

She worries that she did not protect her children enough as a mother. She

worries about water and will never again trust military-provided water. Witt Decl.

(ECF 397) at ¶¶ 53-54, *see also* Witt, 4/30/24 Tx. at 198:7-199:11.

Dr. Vargo recommended an initial psychiatric diagnostic evaluation,

cognitive behavioral therapy once weekly for six months, and twenty-four therapy

sessions in her lifetime for treatment of psychological triggers related to the Red

Hill incident. Vargo Decl. (ECF 388) at ¶ 67; *see also*, Smith, 5/13/24 Tx. at

25:19-28:2, 29:17-30:9 (Government's expert agreed that incident had

psychological impact); Canter Dep. (ECF 400-4) at 126:25-128:2 (Government life

care planner agreed that Plaintiffs should get treatment). Plaintiffs' life care

planner Margot Burns costed out these therapies and programs. Burns Decl. (ECF

524) at ¶ 575 and 577. Plaintiffs' accounting expert Garret Hoe then calculated the

present value of the recommended care and related services in the amount of

$9,062.64. Hoe Decl. (ECF 545) at ¶¶ 49 and 50.

Mrs. Witt respectfully requests an award of **$100,000** in compensation for

mental anguish and emotional distress and **$9,062.64** in special damages for mental

health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c)    Elizabeth Witt Loss of Enjoyment of Life & Disruption

Elizabeth Witt faced considerable disruption and loss of enjoyment of life

because of the water crisis. She and her husband had to turn to bottled water for

water needs in their home, sometimes purchased from the store and other times

"lug[ged]" from water distribution sites that they had to get to early lest they ran

out. Witt Decl. (ECF 397) at ¶ 25. They tried to relocate temporarily to a hotel,

where they were "assigned to a tiny room in the middle of the holiday season." *Id.*

at ¶ 21. They had to carry their heavy dog up an escalator. *Id.* This arrangement did

not work for them, and they ultimately decided to return home and do their best to

limit "water usage as much as possible." *Id.* They tried to "rig up a water bottle

shower, but it was impossible." *Id.* at ¶ 25. She considered using the camp showers

that the military set up around the base, but this too was untenable:

> Like I mentioned, it looked like something out of a deployment. My
> sister, when she came to visit, she did go and use them at some point. I
> remember her telling me that the water was lukewarm, there were a
> bunch of young men that were standing outside kind of manning the
> stations. It was in a field, so I just did not feel comfortable walking
> down there with flip-flops and a beach towel to quickly rinse off in
> lukewarm water, which then I believe at some point remember people
> questioning where that water was coming from.

Witt, 4/30/24 Tx. at 191:4-16.

She testified that it was particularly challenging to deal with the water crisis

once she brought a baby home given all the ways that water is used to care for a

newborn baby, including bathing, washing bottles, and washing breast pump parts

that need to stay sterile. *Id.* at 195:17-196:11.

139

This disruption continued for months and was so significant that Elizabeth and her husband made the hard choice to leave Konner's job early for a different post in Alabama. Witt, 4/30/24 Tx. at 196:12-197:11. To do so, they had to pick up and move homes.

They then made the life changing choice to leave military service altogether and revoke their son's GI Bill election. *Id.* at 197:12-25. Mrs. Witt testified that she would not have made this decision "but for the water contamination." *Id.* at 197:22.

Mrs. Witt respectfully requests an award of **$100,000** in compensation for loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

### F.    Kevin Aubart

Kevin Aubart, a 58-year-old military veteran, dealt with the contaminated water while living at 3162 Snyder Court, Honolulu, HI, in the Doris Miller Park neighborhood, a military housing residence serviced by the Joint Base Pearl Harbor-Hickam water system. He and his wife of 30 years, Saori, moved to Hawaiʻi in 2016 for Mr. Aubart to continue his work as a civilian for the US Army.

In late November, Mr. Aubart experienced mysterious ailments like upset stomach, eye irritation, and joint pain. Aubart Decl. (ECF 389) at ¶¶ 40-42. Their pet, a toy poodle named Coco, experienced multiple seizures, which Mr. Aubart

later attributed to contaminated ice cubes he had given to Coco on hot days. *Id.* at ¶ 18.

On November 28, the smell and appearance of the water clearly indicated contamination to both him and his wife. Although Aubart received mixed messages from the military minimizing the issue, it was clear to him something was wrong. *Id.* at ¶¶ 14-20. He urged the Navy to issue clear warnings and took it upon himself to warn his neighbors when he felt that the Navy was failing.

Despite efforts to mitigate exposure by using bottled water and reducing use of tap water, the living conditions became unbearable. Eventually, in April 2023, the Aubarts felt they moved to a new home in Waipahu, driven by ongoing concerns over the safety of their water supply. *Id.* at ¶ 35.

### a)    Kevin Aubart Pain & Suffering

Kevin Aubart experienced physical pain and suffering in the wake of the Government's water contamination. In late November 2021, Mr. Aubart started to experience rashes and eye irritation after showers, bone and joint pain, abdominal pain, diarrhea, severe headaches, fatigue, nausea, sinus problems and coughing. Aubart Decl. (ECF 389) at ¶¶ 17, 19, 37-42; *see also* Aubart, 5/3/24 Tx. at 101:21-102:22; *see also* PX-2248_0046. (Medical Composite - Kevin Aubart, 9/26/22 Office Progress Notes.). Mr. Aubart testified that on

141

November 28, 2021, he could smell fuel in the water and could see a visible

sheen. Aubart, 5/3/24 Tx. at 101:21-102:22.

Dr. Bird concluded that the release of JP-5 into the JBPHH water system

was a substantial contributing cause of Kevin Aubart's abdominal pain,

diarrhea, nausea, joint pain, fatigue, anxiety, headaches, and brain fogginess.

Bird Decl. (ECF 491-1) at ¶ 96(a).

Mr. Aubart respectfully requests an award of **$75,000** in compensation for

pain and suffering. *See* Damages Chart, attached hereto as Ex. 1.

### b)    Kevin Aubart Mental Anguish & Emotional Distress

Mr. Aubart experienced mental anguish and emotional distress because of

the jet fuel contamination. Mr. Aubart met the criteria for post-traumatic stress

disorder. Since the exposure, he has been experiencing repeated, disturbing, and

unwanted memories and dreams. He has had dissociative reactions, such as

flashbacks, in which he feels or acts as though the contamination is recurring. He

has intense and prolonged psychological distress at exposure to internal and

external cues resemble or symbolize an important aspect of his trauma, such as

taking showers. *See* Vargo Decl. (ECF 388) at ¶ 55a, *see also* Aubart Decl. (ECF

389) at ¶ 43.

He has also experienced avoidance, or efforts to avoid distressing memories

or thoughts/feelings that are closely associated with the contamination, and

avoidance of external reminders (i.e., people or places) that can arouse distressing memories or thoughts/feelings associated with his trauma. Vargo Decl. (ECF 388) at ¶ 55a. He has also experienced a negative emotional state (fear and anger), diminished interest or participation in activities such as playing his guitar, and a persistent inability to experience positive emotions. *Id.* He has experienced irritable behavior and angry outbursts without provocation, hypervigilance, and difficulties with concentration. *Id.* Mr. Aubart has reported increases in feelings of anxiety and symptoms of trauma since his exposure stating that "everything was dark, we resented the Navy and wanted to get out" and "people do not realize how we could be afraid of the shower…I was always afraid to take a shower, we would not drink the water even after they said that it was safe." *Id.*

Mr. Aubert has long-term fear related to the fuel leak and worries that he will develop cancer because of his exposure. Aubart Decl. (ECF 389) at ¶¶ 45-46. He has become unsociable, anti-government, and bitter, and found it difficult to live normally during the water crisis because his symptoms caused him so much pain, stress, and anxiety. *Id.*

When asked about the long-term emotional impact of the fuel leak, he testified:

> [Y]ou know, I spent 37 years of my life in public service, over 30 of that in the military and Army civilian, and it caused me to really distrust the government. And it causes us to fear some possible long-term health

effects we might get from our exposure of jet fuel, and also the concern
here in Hawai'i that the water may not be safe.

Aubart, 05/03/24 Tx. at 111:14-20.

The water crisis has also strained his marital relationship, such as arguments

with his wife, which in turn has caused him substantial stress and guilt because he

has a hard time accepting her continuing to use the water. It affected their

closeness and intimacy. Aubart Decl. (ECF 389) at ¶ 47. His symptoms also

affected his work relationships and performance, and he would feel embarrassed

when he had difficulty concentrating and would forget even simple things, such as

people's names that he's known for years. He even suffered an anxiety attack at

work in April 2022. *Id.* at ¶ 48. He is deeply distressed by the harm the fuel spill

has caused his dog Coco, who he testified was his "best friend." Aubart, 05/03/24

Tx. at 101:9-12. It increased his stress and anxiety seeing the contamination's

effect on her, and he felt guilty for unknowingly giving her contaminated water

while giving her ice cubes to cool her off. Aubart Decl. (ECF 389) at ¶ 49.

As noted, Dr. Smith and Dr. Canter agree that Mr. Aubart, and the other

Plaintiffs, experienced emotional distress following the fuel release. Dr. Canter

recommends psychological care. *See, e.g.,* Dep. of Jennifer Canter, M.D. (ECF

400-4) at 126:25-128:2, and Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9.

Dr. Vargo recommended an initial psychiatric diagnostic evaluation,

exposure therapy twice weekly for six months, cognitive behavioral therapy once

weekly for six months, and twenty-four therapy sessions in his lifetime for treatment of psychological triggers related to the Red Hill incident. Vargo Decl. at ¶ 62; *see also*, Smith, 5/13/24 Tx. at 25:19-28:2, 29:17-30:9 (Government's expert agreed that incident had psychological impact); Canter Dep. (ECF 400-4) at 126:25-128:2 (Government life care planner agreed that Plaintiffs should get treatment). Plaintiffs' life care planner Cynthia Fricke costed out these therapies and programs. Fricke Decl. (ECF 491-2) at ¶ 86, 91-92, and Tab F. Plaintiffs' accounting expert Garret Hoe then calculated the present value of the recommended care and related services in the amount of $27,622.41. Hoe Decl. (ECF 545) at ¶¶ 21, 22.

Mr. Aubart respectfully requests an award of **$100,000** in compensation for mental anguish and emotional distress and **$27,622.41** in special damages for mental health treatment. *See* Damages Chart, attached hereto as Ex. 1.

### c)    Kevin Aubart Loss of Enjoyment of Life & Disruption

The water contamination led to disruption and loss of enjoyment of life for Kevin Aubart. Mr. Aubart was forced to cancel his holiday with his daughter who he "hardly" saw because "there's no way we could have her come here when we had jet fuel in our water." Aubart, 5/03/24 Tx. at 108:5-8; Aubart Decl. (ECF 389) at ¶ 47. Mr. Aubart testified that the contamination required him and his family to "completely change [their] habits." Aubart, 5/03/24 Tx. at 106:13-20. For daily

living, he now had to procure and purchase bottled water on his own as the

Government was "rationing" it. *Id.* He had to limit the use of his showers at home

substantially. *Id.*

    While Mr. Aubart was provided a hotel, logistical challenges with his

beloved pet and his wife's refusal to leave the house meant that most of his time

was still being spent at the contaminated residence and commuting to the hotel for

showers. Aubart Decl. (ECF 389) at ¶ 58. The contamination led to an increase in

arguments and tension with his wife, who was a "homebody" who refused to leave

their home. Aubart, 5/03/24 Tx. at 107:23-108:4; Aubart Decl. (ECF 389) at ¶ 47.

And then, in April 2023, the Aubarts felt they had no choice but to move to a new

home in Waipahu, driven by ongoing concerns over the safety of their previous

home's water supply. Aubart Decl. at ¶¶ 27-29, 35.

    Mr. Aubart respectfully requests an award of **$100,000** in compensation for

loss of enjoyment of life. *See* Damages Chart, attached hereto as Ex. 1.

## IV.    CASE COMPARABLES

    The Court may find guidance in "prior awards involving similar torts,

similar injuries or both." *Carter v. United States*, 725 F. Supp. 2d 346, 360

(E.D.N.Y. 2010). A court may consider comparable jury verdicts or bench awards.

*Gonzalez v. United States*, 80 F.4th 183, 197 (2d Cir. 2023) (affirming FTCA

judgment where district court considered jury verdicts and federal bench trial awards as guidance).

### A.    Chemical Contamination Cases

Chemical ingestion cases have led to significant jury verdicts in several jurisdictions. As a general rule, "[d]amages for claims involving the ingestion of foreign objects or chemicals can…readily exceed one million dollars." *Scottsdale Insurance Company v. Central Hotel, Inc.*, 2022 WL 4468406, at *10 (S.D. Ind., Sept. 26, 2022) (citing *Enwright v. Town Ctr. Amusements, Inc.*, 2022 WL 3974441 (Nev. Dist. Ct. Mar. 18, 2022) (awarding $8 million to plaintiff who ingested cleaning solution in beer served by defendant brewery); citing *Cronnon v. Cracker Barrel Old Country Store, Inc.*, No. 20886 (Tenn. Cir. Ct. Jan. 6, 2022) (awarding $9.3 million to plaintiff who was served chemicals instead of water by defendant restaurant).

*Alban* is particularly instructive here as a water contamination case because it involved multiple plaintiffs who suffered physical, mental and emotional injuries caused by the ingestion and exposure to fuel (gasoline) contaminated water. A Maryland jury returned a verdict of over $144 million dollars to over 300 plaintiffs who had their groundwater was contaminated by a 26,000 gallon gasoline leak from an ExxonMobil service station. *Alban et al. v. ExxonMobil Corp. f/k/a Exxon*

147

*Corp. & Storto Enterprises Inc.*, No. 03-C-06-0101932OT, LEXIS 422792 (Md. Cir. Ct. Mar. 12, 2009).

In *Alban*, the plaintiffs' psychiatry expert opined that several of the plaintiffs had developed various emotional injuries as a result of the contamination, which resulted in fear, anxiety, embarrassment, humiliation and invasion of privacy. *See* 2009 Jury Verdicts LEXIS 422792. The plaintiffs testified about their desire to move into a beautiful rural setting, the impact of having to watch an aesthetically rich neighborhood devolve into an industrial disaster zone, how they fear for their present and future health and the health of their children, who they had to constantly monitor and prevent from using water from the faucet and playing in their yards, how they had to use bottled water for drinking, washing clothes and cooking, and how they had no choice but to shower in the contaminated water. *Id.* On a per plaintiff basis, this verdict amounts to **$712,801** in today's dollars.[28]

The Government has cited *Cairns*, where the plaintiff drank water contaminated by antifreeze during a 10-day deep-sea towing operation. *Cairns v. Dunlap Towing Co.*, JVR No. 501362, ECF No. 21, 1-2 (W.D. Wash. 2001). Although Mr. Cairns experienced some acute symptoms, they were gone by the time he presented for medical care. *Id.*, ECF No. 16 at 14 (Cairns Trial Brief, Oct.

---

[28] Inflation adjustments are made using the Government's calculator: https://data.bls.gov/cgi-bin/cpicalc.pl.

148

23, 2001). He presented instead with serious concern about his future health. *Id.* He

was awarded $35,000 in general damages ($62,673 today), and another $20,295 in

"maintenance" ($35,810 today), another form of per-diem damages under maritime

law to account for medical and emotional harm. *Id.*; ECF No. 21; ECF No. 16 at 18

(asking judge to award maintenance and noting that the remedy is available even

without physical injury). Cairns, then, was awarded a total of $98,483 for the

emotional harm of his exposure. This number is consistent with the proposals of

Plaintiffs, as Mr. Cairns was not displaced from his home by the exposure, did not

lose access to clean water at home for months, nor was he tasked with taking care

of a sick family while he was sick himself. And he worried for future health only

for himself—not for any children exposed. Importantly, the *Cairns* court must have

concluded that Mr. Cairns' concern for his future health was reasonable—

notwithstanding the short length of exposure.

### B.    Emotional Distress Under the FTCA

Federal district courts have awarded significant recoveries for non-economic

emotional distress damages in FTCA cases. As counsel explained in closing

argument, a continuum of judgments may be illustrative. The Court may find that

the Plaintiffs suffered mental anguish that was somewhere between more

significant than a minor car accident, less significant than witnessing a mass

shooting, and perhaps more akin to the fear and trauma caused by a home invasion.

In *Schmidt v. United States*, a plaintiff sought recovery after a relatively minor car accident caused by government negligence. *Jerome Schmidt v. United States*, 2020 U.S. Dist. LEXIS 261744, at *1 (W.D. Tex. Oct. 8, 2020). The court analyzed and rejected the plaintiff's claims for long-term medical injury damages but gave recovery of $200,000 for pain and suffering because of the aggravation of plaintiff's existing PTSD, anxiety, and neck pain (now equivalent to **$240,831**). *Id.* at *28.

In *Carter v. United States*, negligence on the part of the United States Postal Service led to a wrongful home search by law enforcement. *Carter v. United States*, 725 F. Supp. 2d 346 (E.D.N.Y. 2010).[29]  After the incident, plaintiff suffered nightmares, was diagnosed with PTSD, and ultimately moved upstate "because of the fear she associated with her house." *Id.* at 352. Absent any physical harm (and no real danger) and accounting for "other stressors" in plaintiff's life, the court reviewed other verdicts and determined that an award of $300,000 for her emotional distress was appropriate (**$431,466** today). *Id.* at 360-361. Importantly, in *Carter*, the plaintiff was not actually held at gun-point or in real danger—

---

[29] The Government moved the district court to amend the judgment and reduce the award. The court denied that motion. *Carter v. United States*, 760 F. Supp. 2d 281, 282 (E.D.N.Y. 2011). The Government then appealed to the Second Circuit, which reversed on other grounds and did not address the amount of the award. *Carter v. United States*, 494 F. App'x 148, 151 (2d Cir. 2012).

nevertheless, the court found that the plaintiff's feelings of danger, even for just one day, required a significant award. *Id.* Here, too, Dr. Storage testified that toxic exposure at home is particularly traumatizing because it is an invasion of a place where you expect to feel safe. Storage Decl. (ECF 387) at ¶ 10-12.

Finally, in the most recent mass tort case to come to trial against the United States, the court awarded damages to witnesses to a church shooting in Sutherland Springs, Texas. For those who were not seriously injured, the average non-economic award was around $1.3 million. *Holcombe v. United States*, 584 F. Supp. 3d 225 (W.D. Tex. 2022). In that case, the Government used the same physician life care planner, Dr. Jennifer Canter. In this case, Dr. Canter likened the two incidents of community trauma and opined that the Plaintiffs should receive the same psychological care that she recommended for the Sutherland Springs victims. J. Canter Dep. (ECF 400-4) at 126:25-128:2.

## V. SPECIFIC ISSUES IDENTIFIED BY THE COURT

### A. Apportionment

Whether apportionment for physical injuries is available to a defendant under Hawai'i law depends on whether the plaintiff has recovered from any pre-existing condition (i.e., the condition was dormant or latent) or whether the plaintiff's pre-existing condition is "not fully resolved" (i.e., the condition was not dormant or latent). *Montalvo,* 77 Haw. at 300. If the former, then the tortfeasor is

liable for all damages legally caused by the tortious conduct. *Id.* If the latter, then

the factfinder should apportion among the various causes. *Id.* If the factfinder is

unable to apportion – even roughly – then it must divide the damages equally

among the various causes. *Id.* To the extent that there is a subsequent injury not

caused by the tortious conduct at issue, the factfinder should similarly apportion

those damages. *Id.*

Apportionment is akin to an affirmative defense. *Mueller v. Dep't of Pub.

Safety*, 570 F. Supp. 3d 904, 911 (D. Haw. 2021) (Gillmor, J.) (internal citations

omitted) ("A defendant gets the benefit of apportionment of damages only if there

is a reasonable basis for determining the contribution of each cause to a single

harm, if not the defendant is liable for the whole."). A defendant asserting an

apportionment defense bears the burden of proof. *See* Restatement (Second) of

Torts § 433B; *Mueller*, 570 F. Supp. 3d at 910 (noting Hawaiʻi courts look to the

Restatement for guidance).

Applying this law to Plaintiffs' physical injuries, the evidence has not shown

– with limited exceptions – that any of the Plaintiffs had pre-existing physical

conditions that were not dormant or latent before the November 2021 jet fuel spill,

and therefore the Government is liable for all damages caused by that spill. *See

Montalvo*, 77 Haw. at 300. *Montalvo* does not stand for the proposition that all

physical conditions must be apportioned – indeed, it cited approvingly the

*Newbury* case where the plaintiff had an "arthritic condition" and the tortfeasor was held responsible for all damages to that plaintiff because, presumably, the arthritic condition was latent, dormant, and well managed at the time of the tortious car accident (sometimes called the eggshell plaintiff rule). *Montalvo v. Lapez*, 77 Hawaiʻi282, 294 (1994) ("The *Newbury* rule is well [] established…") (citing *Newbury v. Vogel*, 151 Colo. 520 (1963)).

Applying these principles to this case, Nastasia Freeman's seizure disorder was "dormant" before the spill and well-managed. K. Freeman, 4/29/24 Tx. at 158:9-24; Storage Decl. (ECF 387) at ¶¶ 15-16, 28-44. She had been seizure-free for over two and a half years and clear of psoriasis since June 2021. N. Freeman 4/29/24 Tx. at 135:16-136:23. As Dr. Andruska testified, after the release the fundamental character and frequency of Mrs. Freeman's seizures changed markedly because of the contamination. Andruska Decl. (ECF 364) at ¶ 49; ¶ 88-89; ¶ 50.

B.D. suffered from a preexisting Chiari malformation of the brain. Again, though, Mrs. Dietz testified that "[w]e had his symptoms well managed, and he lived life with minimal restrictions and interruptions." R. Dietz Decl. (ECF 391) at ¶ 4. Before the fuel contamination, the situation was "familiar" and B.D.'s headaches "were short." R. Dietz, [Day], 39:15. The jet fuel release dramatically upended this condition:

> We saw this massive uptick in these new types of headaches . . . And
> these new headaches were lasting for days. And they were causing him
> to throw up. And we had to—we bought ice packs for his head, and he
> would go in his room and close the door. And he stopped wanting to go
> out and be a kid at all. He would just stay inside because he was afraid
> that he would, you know, trigger another headache.

*Id.* at 39:15-24.

Patrick Feindt had headaches and gastrointestinal issues before November 2021. However, the severity of his symptoms became markedly worse after his family's exposure to contamination, so much so that he visited the emergency room. PX-2252_0034-35 (Medical Composite – Patrick Feindt, Jr. (12/11/21 Emergency Documentation). He experienced a different type of migraine after the exposure: "full-fledged" migraines that he called "a different ball game." P. Feindt, Jr., 4/30/24 Tx. at 15:21-22. His gastrointestinal issues worsened to the point that he underwent gastrointestinal surgery in May 2022 which he had never done before. *Id.* at 20:11-20.

Notably, in contrast to physical injuries, apportionment is unavailable to a defendant under Hawaiʻi law for emotional distress damages. *See Mueller*, 570 F. Supp. 3d at 910 (noting that "Defendants have not cited to, and the Court has been unable to locate, any cases where a court has found that apportionment is available where the harm is limited to emotional distress" and that the emotional harms at

issue "are not distinct harms that could readily be apportioned out by the jury such as in a [physical injury] accident").

The Plaintiffs are not aware of any emotional distress injuries that they have suffered that can be properly characterized as "unrelated," "subsequent," or "successive" emotional distress injuries. Plaintiffs and their experts traced the emotional distress that they discussed at trial to the jet fuel spill. Indeed, the Government has not met its burden to show that any subsequent or successive causes of emotional distress are not traceable to the jet fuel spill.

With respect to Plaintiff's emotional distress injuries, the Government is thus liable for all damages caused by the November 2021 jet fuel spill. *See Mueller*, 570 F. Supp. 3d at 910. Moreover, even assuming arguendo that apportionment were appropriate for past emotional distress injuries (it is not), Dr. Vargo testified that at the time of the fuel spill, none of the Plaintiffs raised historic emotional injuries as causes of *current concern*. Vargo, 5/2/2024 Tx. at 69:2-9.

> Because I specifically asked the individuals whether or not they had incurred any psychological problems historically, and they said that they had not. In addition to that, they didn't have any prior psychological diagnoses with exception. . . But because of that, there were no specific symptoms that they were experiencing within the collateral data that I reviewed and within the clinical interview that they reported.

*Id.*

Accordingly, apportionment of subsequent emotional injuries would likewise be inappropriate. Plaintiffs attribute their injuries, emotional and physical, to the jet fuel contamination – as did Plaintiffs' experts. *See* Bird Decl. (ECF 491-1); Andruska Decl. (ECF 364); Vargo Decl. (ECF 388); Clark Decl. (ECF 366).

The Government's experts suggested that the physical injuries are stress-based responses to the jet fuel contamination. Prueitt Decl. (ECF 332-1) at ¶ 9 ("Certain health symptoms can occur in individuals in response to an odorous chemical that is perceived to be unpleasant or unhealthy at exposure concentrations lower than the toxicity threshold. However, these symptoms are a result of stress-induced responses to perceptions of the odor as a health risk…"). Importantly, though, the cause remains the same. As Dr. Pruiett testified:

Q.    What caused the stress of the incident?

A.    *The incident itself* and the perception of the individuals.

Dr. Caroline Pruiett, 5/10/24, Tx at 97:13-15 (emphasis added). Given that it was the same negligent tortfeasor that caused "the incident" that led to the stress, apportionment is inappropriate.

### B.    The Collateral Source Rule and TRICARE Coverage[30]

TRICARE is the uniformed services health care benefit program for active-duty service members. *See* Ruck Decl. (ECF 359-1) at ¶ 7. As currently structured, TRICARE has multiple different types of plans, and multiple different eligibility criteria. *See Id.* at ¶¶ 15-21.

The Government freely concedes that TRICARE "has not remained static." *Id.* at ¶ 8 ("Coverage plans have also been modified over the years."); Deleon, 5/9/24 Tx. at 60:13-15 & 61:18-20 (testifying that covered services under TRICARE regulations have changed historically and it is possible that that they are likely to change in the future); *Id.* at 62:11-16 (agreeing with statement that TRICARE has been "nothing but change" and "for sure" TRICARE will continue to evolve). The Government also concedes that TRICARE eligibility changes based on numerous life events. Deleon, 5/9/24 Tx. at 55:12-14.

Courts applying the collateral source rule to TRICARE have generally concluded that *past* TRICARE payments are not "collateral," and can therefore offset recovery for purposes of those benefits already paid. *Warren v. United States,* 669 F. Supp. 3d 987, 1028 (D. Haw. 2023). However, courts have also concluded that *future* TRICARE benefits are too speculative to be included as an

---

[30] Plaintiffs do not address issues of per diem offsets in this Brief. In compliance with the Court's Order, they will do so in their Reply Brief.

offset to any potential award as the TRICARE benefits may not yet have vested
and/or the TRICARE program is subject to change in the future. *See id.* at 1028-29
(citing *Lawson v. United States*, 454 F. Supp. 2d 373, 415 (D. Md. 2006);
*Alexander v. United States*, 2016 U.S. Dist. LEXIS 58272, *6 (W.D. Wash. May 2,
2016); *Galbreath v. United States*, 2022 U.S. Drist. LEXIS 238365, *8 (D. Haw.
Feb. 17, 2022); *Brown v. United States*, 2022 U.S. Dist. LEXIS 219651, *28 (S.D.
Miss. May 13, 2020)). Courts have also reasoned that including *future* TRICARE
benefits as an offset would be inappropriate in that it would deny the plaintiff the
freedom to choose his/her future medical provider and, in effect, compel the
plaintiff to undergo treatment from the tortfeasor. *See Molzof v. United States*, 6
F.3d 461, 468 (7th Cir. 1993).

"The issue of whether the Government is entitled to an offset [for TRICARE
benefits] is an affirmative defense on which the Government bears the burden of
proof." *Vanhoy v. United States*, 2006 WL 3093646, at *23 (E.D. La. Oct. 30,
2006); *see also Campano v. United States*, 2018 U.S. Dist. LEXIS 39153, *76 (D.
Haw. Mar. 7, 2018), amended in part, 2018 U.S. Dist. LEXIS 157502 (D. Haw.
Mar. 27, 2018) ("Defendant has not met its burden of adducing sufficient credible
evidence to establish its entitlement to and/or the amount of any offset against any
of the costs of Marites' future care needs. Consequently, Defendant is not entitled
to any offset from any source against Marites' future care costs."); *Lawson*, 454 F.

Supp. 2d at 415 (Government has the burden of proving what amounts will be paid by TRICARE in the future).

The Government has not carried its burden of establishing an entitlement to an offset as to *future* TRICARE benefits. While the Government did present some evidence regarding potential TRICARE coverage for three of the Plaintiff families (Jessup, Feindt, and Deitz)[31], it did not present evidence that the Government will *in fact* pay for any future care for the Plaintiffs. Critically, the Government conceded that if a Plaintiff gets another job – as Mr. Jessup has – TRICARE will always be the secondary payor with respect to that plaintiffs' other health care. *See* PX-2416; Ruck Decl. (ECF 359-1) at ¶ 20 ("Tricare is the payor of last resort."). As noted in *Lawson*, 454 F. Supp. 2d at 415:

> [T]here can be no assurance that the Tricare/CHAMPUS program will continue for the balance of Mrs. Lawson's life, nor that the benefit levels will never change. An offset based on speculative benefits would be an injustice because it would force Mrs. Lawson alone to bear the entire risk that her husband will continue to be employed by the Air Force, and that he will do so for the time required for him to attain retirement benefits which will continue without change for the rest of her life.

Moreover, even if the Government were able to establish that Plaintiffs would be eligible for TRICARE in the future, it did not and cannot provide

---

[31] In only one of the families identified had the health care sponsor, Mr. Jessup, actually retired from service with retirement benefits.

evidence regarding what services TRICARE will *in fact* pay for in the future or the amount that TRICARE will *in fact* pay for those services. As noted above, TRICARE is not a static program. Without knowing (1) what care TRICARE will cover in the future and (2) the associated fees and out-of-pocket costs, it is impossible to calculate the value of the unknown future TRICARE payments. Simply put, the Government cannot satisfy its burden of proving it is entitled to a set-off against Plaintiffs' award for future medical care because it has not (and cannot) established the value of the services that may be covered by TRICARE in the future.

And because the Government has not produced competent evidence of the medical care TRICARE will provide in the future, it cannot produce competent evidence of the present value of such future care. *See Walden v. United States*, 31 F. Supp. 2d 1230, 1235 (S.D. Cal. 1998) (citations omitted) (any award for future benefits, including future medical care, must be discounted to present value). Simply put, the indeterminate nature of the TRICARE program precludes offsetting future TRICARE costs. To do so would be to engage in impermissible speculation.

## VI.    CONCLUSION

Plaintiffs therefore respectfully submit this Closing Argument Brief to assist

the Court in its deliberations and respectfully request a judgment of the sums set

forth herein.


DATED:  Honolulu, Hawai'i, June 4, 2024.

*/s/ Lyle S. Hosoda*                    */s/ Kristina S. Baehr*
LYLE S. HOSODA                     KRISTINA S. BAEHR
KOURTNEY H. WONG              JAMES BAEHR
SPENCER J. LAU                       MARY M. NEUSEL

                                               */s/ Frederick C. Baker*
                                               FREDERICK C. BAKER
                                               CYNTHIA A. SOLOMON
                                               JAMES W. LEDLIE
                                               KRISTEN HERMIZ
                                               SARA O. COUCH

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was

filed and served on counsel of record via the U.S. District Court's CM/ECF

electronic filing system.

<u>*/s/ Kristina Baehr*</u>
Kristina Baehr

162