LYLE S. HOSODA            3964-0
KOURTNEY H. WONG      10827-0
SPENCER J. LAU            11105-0
Hosoda Law Group, AAL, ALC

Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaiʻi 96813
Telephone:  (808) 524-3700
Facsimile:   (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com

KRISTINA S. BAEHR        *Pro Hac Vice*
JAMES BAEHR             *Pro Hac Vice*
MARY M. NEUSEL         *Pro Hac Vice*
Just Well Law, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 994-6241
Email: kristina@well.law; jim@well.law; maggie@well.law

FREDERICK C. BAKER      *Pro Hac Vice*
JAMES W. LEDLIE         *Pro Hac Vice*
KRISTEN HERMIZ          *Pro Hac Vice*
CYNTHIA A. SOLOMON      *Pro Hac Vice*
SARA O. COUCH           *Pro Hac Vice*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: fbaker@motleyrice.com; jledlie@motleyrice.com;
khermiz@motleyrice.com; csolomon@motleyrice.com; scouch@motleyrice.com

*Attorneys for Plaintiffs*

*(case caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| PATRICK FEINDT, JR., et al.,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF<br>AMERICA,<br><br>　　　Defendant. | CIVIL NO. 1:22-cv-397-LEK-KJM<br>(Federal Tort Claims Act)<br><br>**PLAINTIFFS' REBUTTAL TO<br>UNITED STATES' CLOSING<br>ARGUMENT BRIEF (ECF 601)**<br><br>JUDGE:  Hon. Leslie E. Kobayashi |
| JESSICA WHALEY, et al.,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF<br>AMERICA,<br><br>　　　Defendant. | CIVIL NO. 1:23-cv-457-LEK-KJM<br>(Federal Tort Claims Act)<br><br><br><br><br>JUDGE:  Hon. Leslie E. Kobayashi |
| JACLYN HUGHES, et al.,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF<br>AMERICA,<br><br>　　　Defendant. | CIVIL NO. 1:24-cv-59-LEK-KJM<br>(FEDERAL TORT CLAIMS ACT)<br><br><br><br>JUDGE:  Hon. Leslie E. Kobayashi |

**PLAINTIFFS' REBUTTAL CLOSING ARGUMENT BRIEF**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................2

I.   The Government Contaminated the Water ....................................................2

    A.   Significant Concentrations of Jet Fuel Contamination Reached Plaintiff Residences Shortly After the November 2021 Spill ..............2

    B.   The Government's Contention That Exposures to Jet Fuel From the November 20, 2021 Spill Did Not Begin Until November 27 or November 28, 2021, Does Not Withstand Scrutiny............................4

    C.   The Government's Contention That Jet Fuel Did Not Reach the Western Portion of the System is Divorced From the Facts of the Case ...................................................................................6

    D.   The Government's Critiques of Dr. Rosenfeld's Model are Flawed ..12

    E.   Dr. Grayman's Model Is Unreliable.....................................................18

II.  Plaintiffs' Physical Injuries and Impairments Were Caused by the Government's Water Contamination .........................................................20

    A.   Plaintiffs' Acute Injuries Were Caused by the November 2021 Release of JP-5 ........................................................................21

        1.   The Government's "summary" chart is inaccurate and incomplete..............................................................................22

        2.   Dr. Bird addressed each element of causation...........................23

        3.   Plaintiffs were exposed to enough JP-5 to cause adverse health effects. ......................................................................27

        4.   Dr. Bird ruled out other causes of acute symptoms.................28

        5.   Plaintiffs' acute symptoms lasting longer than 2-3 days were caused by the November 2021 release of JP-5. ........................29

        6.   Mrs. Freeman's long-term neurological symptoms were caused by the November 2021 release of JP-5. ...................................34

III.  Plaintiffs' Emotional Distress Was Eminently Reasonable .........................39

IV.  Plaintiffs Satisfied Their Burden with Respect to their Special Damages
     Claims for Future Health Costs, Tutoring Costs, and Lost Wages .............47

     A.   Mrs. Freeman's Special Damages Claims for a Driver were Proven at
          Trial ...............................................................................................47

     B.   Plaintiffs Established that their Need for Future Mental Health
          Services and Tutoring Stems from their Exposure to Toxic Jet Fuel. 49

     C.   Plaintiffs Mr. Feindt and Mrs. Freeman's Lost Wages are Attributable
          to the November 2021 Spill ..............................................................53

          1.   Mr. Feindt's lost wages are attributable to the fuel leak...........54

          2.   Mrs. Freeman's lost wages are attributable to the fuel leak. ....56

V.   The Government is Responsible for Plaintiffs' Injuries ..............................58

     A.   The Government Has Failed to Meet its Burden that Apportionment is
          Appropriate Generally .......................................................................58

          1.   Once legal causation is established, the burden is on the
               defendant to establish that an injury is capable of apportionment
               and to establish the amount of apportionment..........................58

          2.   Certain harms are not divisible nor apportionable, and
               emotional distress is such a harm. ............................................60

     B.   The Government Has Failed to Meet its Burden that Apportionment is
          Appropriate for Any Plaintiff Physical Injury ....................................66

     C.   The Government Has Failed to Meet its Burden that Apportionment is
          Appropriate for Any Emotional Distress ............................................69

VI.  The United States is Not Entitled to Offsets .................................................74

     A.   The United States is Not Entitled to Offsets for Speculative Future
          Tricare Payments Under the Collateral Source Rule ..........................74

     B.   The United States is Not Entitled to Offsets for Social Benefit Per
          Diem Payments Under the Collateral Source Rule..............................80

1.    Offsets for hotel or other dislocation or water expenses are not
       available because plaintiffs do not seek those costs. ................80

2.    Offsets for TLA are not available because TLA is military
       social benefit pay and not intended for inconvenience............81

VII. Plaintiffs' Damages Must Be Proportionate to the Harm and Sufficient to
Deter Future Negligence ...........................................................85

A.    Comparable Cases Support Plaintiffs' Proposed Damages Over the
       Government's ....................................................................87

B.    Pain & Suffering for Acute Injury ......................................90

C.    Pain & Suffering for Long Term Neurological Injury.....................93

D.    Loss of Enjoyment – Life Disruption & Per Diem Offsets................94

1.    The Government's disruption damages do not account for the
       mass confusion it caused at Red Hill. ...........................94

2.    The Government's single case citation is not on point............97

3.    The Government is not entitled to an offset, and its math would
       result in a negative judgment for life disruption.....................97

4.    Plaintiffs' proposed damages for disruption offer more
       appropriate delineations and values. ...........................98

E.    Mental Anguish ...............................................................100

1.    The Government's "proxy" approach is neither supported by
       law nor practical. ................................................100

2.    The Government's theory on trauma and fear is belied by its
       expert, its cited cases, and its own agencies. .........................101

3.    The Government does not account for the breadth of mental
       harm caused by the Navy's negligence at Red Hill...............103

4.    The Government's argument that sexual assault survivors
       receive less in mental anguish would set dangerous
       precedent. ................................................104

5.    Plaintiffs' proposed mental anguish damages are better
supported by the evidence and the law. ...................................105

F.    Mental Health Treatment and Tutoring.............................................107

CONCLUSION ...................................................................................................107

# TABLE OF AUTHORITIES

**Cases**

*Abarca v. Franklin County Water Dist.*, 761 F. Supp. 2d 1007
  (E.D. Cal. 2011) .......................................................................... 14, 15

*Alban et al. v. ExxonMobil Corp. f/k/a Exxon Corp. & Storto Enterprises Inc.*,
  2009 Jury Verdicts LEXIS 422792 (Md. Cir. Ct. Mar. 12, 2009)............. 90, 100

*Aldis v. United States*, 2019 U.S. Dist. LEXIS 217078
  (D. Haw. Oct. 31, 2019)......................................................................77

*Ayers v. New Jersey*, 525 A.2d 287 (N.J. 1987) ................................. 97, 98

*Blotcher v. Stewart*, 45 F. Supp. 3d 1274 (D. Colo. 2014)....................................38

*Bynum v. Magno*, 106 Haw. 81 (2004) ............................................. 59, 82

*Cairns v. Dunlap Towing Co.*, JVR No. 501362, ECF No. 21
  (W.D. Wash. 2001) ...................................................... 89, 90, 102, 107

*Campano v. United States*, 2018 U.S. Dist. LEXIS 39153
  (D. Haw. Mar. 7, 2018)......................................................................75

*Cates v. United States*, 451 F.2d 411 (5th Cir. 1971)............................................81

*Clanton v. United States*, 2016 WL 4123667 (S.D. Ill. Aug. 3, 2016)...................85

*Collier v. Simpson Paper Co.*, 1997 U.S. App. LEXIS 36334
  (9th Cir. Dec. 24, 1997) ...................................................................41

*Crescenta Valley Water Dist. v. Exxon Mobile Corp.*, 2013 U.S. Dist. LEXIS
  189260 (C.D. Cal. Jan. 8, 2013) .......................................................14

*Cronnon v. Cracker Barrel Old Country Store, Inc.*, No. 20886
  (Tenn. Cir. Ct. Jan. 6, 2022) ............................................................93

*D'Ambra v. United States*, 396 F. Supp. 1180 (D.R.I. 1973), *aff'd*, 518 F.2d 275
  (1st Cir. 1975) .................................................................................63

*Deasy v. United States, 99 F.3d 354, 355 (10th Cir. 1996)*....................................79

*Elk v. United States,* 87 Fed. Cl. 70 (2009) ..................................... 62, 73

*Enwright v. Town Ctr. Amusements, Inc.*, 2022 WL 3974441
(Nev. Dist. Ct. Mar. 18, 2022) ...........................................................93

*Erickson v. United States Postal Serv.*, 2021 MSPB LEXIS 4221 (M.S.P.B.
December 10, 2021) ...........................................................................85

*Feeley v. United States*, 337 F.2d 924 (3d Cir. 1964) ............................78

*Finestone v. Fla. Power & Light Co.*, 2006 U.S. Dist. LEXIS 7743
(S.D. Fla. Jan. 6, 2006) ......................................................................17

*Freddy Nobriga Enters. v. State*, 2008 Haw. App. LEXIS 64
(App. Feb. 8, 2008) ............................................................................83

*Gilding v. State*, 130 Hawaiʻi 347 (App. 2012) ............................... 67, 69

*Goodin v. Fid. Nat. Title Ins. Co.*, 2008 WL 4173530 (D. Haw. Sept. 9, 2008).....41

*Gretzinger v. Univ. of Haw. Prof'l Assembly*, 156 F.3d 1236 (9th Cir. 1998)........64

*Henrickson v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142 (E.D. Wash. 2009).......24

*Holcombe v. United States,* 584 F. Supp. 3d 225 (W.D. Tex. 2022)..... 99, 101, 102,
107

*In re Air Crash Disaster at Charlotte, N.C.*, 982 F.Supp. 1101 and 982 F. Supp.
1115 (D.S.C. 1997) ...........................................................................107

*In re Hawaiʻi Fed. Asbestos Cases*, 734, F. Supp. 1563 (D. Haw. 1990) ..............40

*Indymac Venture, LLC v. Leu Okuda & DOI*, 2018 U.S. Dist. LEXIS 232096 (D.
Haw. Jan. 31, 2018) (Mansfield, J.) ...................................................59

*Isham v. PADI Worldwide Corp.*, 2007 U.S. Dist. LEXIS 62419
(D. Haw. Aug. 23, 2007).....................................................................59

*Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287 (8th Cir. 1997)............................63

*Jerome Schmidt v. United States*, 2020 U.S. Dist. LEXIS 261744
(W.D. Tex. Oct. 8, 2020) ...................................................................107

*John & Jane Roes*, *1-100 v. FHP, Inc.*, 985 P.2d 661 (Haw. 1999).......................40

*Kaho'ohanohano v. Dep't of Hum. Servs., State of Haw.*, 178 P.3d 538

(Haw. 2008) ....................................................................................47

*Kiernan v. Fort Hood Family Housing and LendLease*, AAA Case No. 01-22-
0005-4250, Interim Award (Jul. 1, 2024) ........................................... 88, 99, 107

*Leclerq v. the Lockformer Co.*, 2005 U.S. Dist. LEXIS 8602
(N.D. Ill. April 28, 2005) ..................................................................17

*Lillian Carter v. United States*, No. 04-CV-4880 (E.D.N.Y. July 22, 2010) ........107

*Maddux v. Donaldson*, 108 N.W.2d 33 (Mich. 1961) ...........................................66

*Martinez v. Lobster Haven*, 15-CA-007312, 2018 Jury Verdicts LEXIS 105442
(June 7, 2018) ..................................................................................94

*McCook v. Unum Life Ins. Co. of Am.*, 483 F. Supp. 3d 729 (E.D. La. 2020) ........38

*Miyamoto v. Lum*, 104 Hawai'i 1, 13-14, 84 P.3d 509 (2004) ...............................65

*Montalvo v. Lapez*, 77 Hawai'i 282, 294 (1994) ............................................ passim

*Mueller v. Dep't of Pub. Safety*, 570 F. Supp. 3d 904 (D. Haw. 2021) ............ 61, 62

*O'Brien v. County of Kauai*, 2014 WL 1883997 (D. Haw. May 12, 2014) ...........84

*O'Grady v. State*, 140 Hawai'i 36, 46-47 (2017) ....................................................58

*Perez v. United States*, 2023 U.S. App. LEXIS 13678 (9th Cir. June 2, 2023) ......78

*Poole v. Copland, Inc.*, 348 N.C. 260 (1998) .................................................. 62, 73

*Powers v. United States*, 589 F. Supp. 1084 (D. Conn. 1984) ...............................78

*Ramento v. M&M Tanks, Inc.*, 134 Hawai'i 179 (Ct. App. 2014) ..........................84

*Ramsey v. Consol. Rail Corp.*, 111 F. Supp. 1030 (N.D. Ind. 2000) ......................17

*Raymond v. Wilcox Mem'l Hosp.*, 2019 U.S. Dist. LEXIS 114399
(D. Haw. July 10, 2019) ................................................................ 64, 65, 70

*Scottsdale Insurance Company v. Central Hotel, Inc.,* 2022 WL 4468406
(S.D. Ind., Sept. 26, 2022) ...............................................................93

*Siverson v. United States*, 710 F.2d 557 (9th Cir. 1983) .......................................76

*Steigman v. Outrigger Enters.*, 126 Hawai'i 133 (2011)........................................86

*Steward v. Hankins*, 2016 WL 7971939 (E.D. Tex Oct. 7, 2016)..........................38

*Summers v. Missouri Pac. R.R. Sys.*, 897 F. Supp. 533 (E.D. Okla. 1995)............38

*Turner v. Municipality of Anchorage*, 171 P.3d 180 (Alaska 2007) ......................81

*Warren v. United States*, 669 F. Supp. 3d 987 (Apr. 17, 2023) .............................78

*Wiles v. Dep't of Educ.*, 2008 U.S. Dist. LEXIS 145631 (D. Haw. Oct. 3, 2008)..84

**Other Authorities**

*2024 Annual Water Quality Report, Joint Base Pearl Harbor-Hickam Water
System*, NAVFAC,
https://cnrh.cnic.navy.mil/Portals/79/CNRH/Documents/Environmental/Water_
Quality/2024%20Water%20Quality%20Report%20JBPHH.pdf?ver=stBH5KiFa
r9TuB3xHPAuOw%3d%3d (2024)....................................................................95

*About Red Hill Fuel Releases*, UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY WEBSITE, https://www.epa.gov/red-hill/about-red-hill-fuel-releases (last
updated Jun. 17, 2024) .......................................................................................12

City of Phoenix Police Department, BENEFITS,
https://joinphxpd.com/sworn/benefits (last visited Jul. 7, 2024).........................80

Community Health Impacts after a Jet Fuel Leak Contaminated a Drinking Water
System: Oahu, Hawaii, Nov. 2021, S. Miko, et al., J. Water Health, 21(7):956-
971. doi: 10.2166/wh.2023.109. PMID: 37515565, dated Jul. 2023............ 21, 65

*DOH Releases Findings of Independent Forensic Investigation of Navy Water
System*, HAWAII DEPARTMENT OF HEALTH—NEWSROOM,
https://health.hawaii.gov/news/newsroom/doh-releases-findings-of-independent-
forensic-investigation-of-navy-water-system/ (posted on May 22, 2024) ... 10, 92

Hawai'i Civil Jury Instructions Section 7.3...........................................................67

*Healthcare Provider Recommendations to Support Patients Exposed to the
November 2021 Fuel Release at Red Hill*,  DEFENSE HEALTH AGENCY—PUBLIC
HEALTH, https://ph.health.mil/PHC%20Resource%20Library/redhill-doctor-
guidance.pdf (updated Mar. 20, 2024)................................................................33

*Public Health*, U.S. DEPARTMENT OF VETERANS AFFAIRS WEBSITE,
    https://www.publichealth.va.gov/exposures/petroleum/red-hill.asp (last accessed

Red Hill Public Health Information, DEFENSE HEALTH AGENCY WEBSITE,
    https://ph.health.mil/topics/campaigns/red-hill-public-health (last updated Jul. 2,
    2024) ...................................................................................... 11, 92, 93, 103, 104

*Temporary Lodging Allowance*, U.S. DEP'T OF DEF.—DEFENSE TRAVEL
    MANAGEMENT OFFICE WEBSITE..........................................................................84

*Temporary Lodging Allowance*, U.S. DEP'T OF DEF.—DEFENSE TRAVEL
    MANAGEMENT OFFICE WEBSITE,
    https://www.travel.dod.mil/Allowances/Temporary-Lodging-Allowance/ (last
    visited Jul. 6, 2024) ...............................................................................................83

William E. Doyle, *Multiple Causes and Apportionment of Damages*, 43 DEN. L.
    REV. 4 (1966) available at
    https://digitalcommons.du.edu/cgi/viewcontent.cgi?article=3818&context=dlr 66

Wyatt Olson, *Full cost of closing Hawaii's Red Hill fuel facility remains unknown,
    watchdog says*, STARS AND STRIPES (Feb. 15, 2024),
    https://www.stripes.com/theaters/asia_pacific/2024-02-14/gao-report-hawaii-
    fuel-spill-13007050.html .......................................................................................87

## Rules

10 U.S.C. § 632(a)(3).................................................................................................76

Fed. R. Evid. 201(d).................................................................................................80

## Treatises

Restatement (Second) of Torts: Apportionment of Liability § 26.................. passim

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 31 .. 34,
    70, 72

## INTRODUCTION

The Government wants to have it both ways: to receive credit for "tak[ing] responsibility for the November 2021 jet fuel" release at Red Hill while arguing that they are not financially responsible for the consequences of this catastrophe.[1] Despite admitting their spill caused "legally cognizable harm," the Government now makes broad claims that these Plaintiffs suffered no exposure and no real harm, either physical or emotional. The Government alternatively contends that even if there has been some harm, it should receive apportionment for an unknown number of Plaintiffs' life events, prior and subsequent. Finally, the Government seeks offsets for an array of social benefit expenditures, past and speculative. In the end, the Government suggests that the Court issue a judgment amounting to an average of less than $7,000 per Plaintiff, for a grand total of $113,828.

But the Government is wrong on the harm, wrong on the law, and wrong on the damages. Central to the Government's purported "science-based" defense is a denial of the essence of the scientific method: the conclusions must match the observable data. The Government now asks the Court to disregard the observable data, including the thousands of reports of sheens following the spill by residents, the thousands of reports of acute symptoms of hydrocarbon exposure, its own studies and conclusions regarding the physical and emotional effects of

---

[1] United States' Closing Argument Brief (ECF 601) 1 (hereafter, "Gov't Br.").

hydrocarbon exposure, and even the visible emotional distress of Plaintiffs during their live testimony.

Plaintiffs have proven by a preponderance of the evidence that they were exposed to water contaminated with jet fuel, that contaminated water could and did injure Plaintiffs physically and emotionally, and that Plaintiffs experienced life changing inconvenience and dislocation because of the Government's negligence. The Court should appropriately compensate them for these damages so that the purposes of tort law – both compensatory and deterrent – are fulfilled.

## ARGUMENT

### I.    The Government Contaminated the Water

#### A.    Significant Concentrations of Jet Fuel Contamination Reached Plaintiff Residences Shortly After the November 2021 Spill

Under any analysis that accounts for the well-documented evidence of widespread reports of sheen[2] in water from the water distribution system, *see, e.g.,* PX-1995_0114 & _0115,[3] residents on the water distribution system were exposed to

---

[2] It is undisputed that a sheen forms on water at a concentration of approximately 5,000 µg/L. *See, e.g.,* JX-0011 (Dec. 29, 2021 GSI Memo regarding analysis of samples); Hughes, 4/30/24 Tx. 61:2-7; Hughes Decl. (ECF 369) ¶ 19; Grayman, 5/8/24 Tx. 10:10-16.

[3] The Government's attempts to explain away and distance itself from these widespread reports of sheen in water from the water distribution system by JBPHH residents as being merely "anecdotal," *see* Gov't Br. 15, or as a wildly-coincidental (and factually-unsupported) contemporaneous spike in sheens from coffee oils, grease, and dishwashing residue. *See* Gov't Br. 15-16. That position cannot be

2

significant concentrations of jet fuel contamination. Plaintiffs' water modeler, Dr.

Paul Rosenfeld, calculated that residents on the water distribution system were

exposed to contamination levels of approximately 6,532 µg/L. Rosenfeld Decl.

(ECF 374) ¶ 63. Similarly, the Government's water modeler, Dr. Walter Grayman,

calculated that Plaintiffs were exposed to contaminations as high as 5,980 µg/L

(based upon a 6,000 µg/L concentration of JP-5 entering the system), 16,943 µg/L

(based upon a 17,000 µg/L concentration), and 84,962 µg/L (based upon an 85,250

µg/L concentration). *See* DX-3090 (Ex. O to Grayman Decl.).

To put these concentration levels in perspective, the Hawai'i Department of

Health (HDOH) has set the Environmental Action Level for TPH at 266 µg/L. *See*

PX-1291. Under Dr. Rosenfeld's model, the concentration of jet fuel at the Plaintiff

---

credited. The data demonstrating the widespread sheen was systematically
collected *by the Navy itself. See, e.g.,* PX-1455 (water quality complaint database).
Moreover, the Navy's own data is corroborated *by the separate findings* of the
ATSDR, *see* PX-1183_0022 (finding that 31.64% of respondents reported sheen in
their drinking water) and the HDOH, *see* PX-1236_0006 (finding that reports of
sheen were "widespread" by November 27, 2021). Finally, and importantly, the
Navy's own data is corroborated by members of each of the Plaintiff families
observing sheen in their water. *See* Aubart Decl. (ECF 389) ¶ 19; B. Dietz Decl.
(ECF 390) ¶ 11; R. Dietz Decl. (ECF 391) ¶ 16; P. Feindt, Jr. Decl. (ECF 392) ¶
114; Beau Jessup Decl. (ECF 394) ¶ 7; B.J.J. Decl. (ECF 395) ¶ 7; S. Jessup Decl.
(ECF 396) ¶ 33; Witt Decl. (ECF 397) ¶ 26; Brian Jessup Decl. (ECF 398) ¶ 14; K.
Freeman Decl. (ECF 401) ¶ 7; N. Freeman Decl. (ECF 572) ¶ 12. Given these
widespread reports of sheen, Dr. Grayman's low-end value of contamination based
upon a 2,000 µg/L concentration of JP-5 entering the system – which by his own
admission would be too low to create a sheen *anywhere* in the water distribution
system, *see* Grayman, 5/8/24 Tx. 22:7-17 – is facially wrong, *see* Hughes Decl.
(ECF 369) ¶ 49.

residences was nearly 25 times higher than the HDOH Environmental Action Level. And under Dr. Grayman's model, the concentrations of jet fuel at the Plaintiff residences were between 22 and 318 times higher than the action level.

Furthermore, there is *no* Maximum Contaminant Level for TPH-d – that is, there is no safe level of jet fuel in drinking water. *See* Eng, 5/7/24 Tx. 69:25-70:21.

**B.    The Government's Contention That Exposures to Jet Fuel From the November 20, 2021 Spill Did Not Begin Until November 27 or November 28, 2021, Does Not Withstand Scrutiny**

The Government begins its next argument with an incorrect assumption: it contends that the parties' water modeling experts agree that the jet fuel began to enter the water distribution system on November 27, 2021. *See* Gov't Br. 4. The Government is incorrect for at least two reasons.

*First*, as an initial matter, it was Dr. Hughes, not Dr. Rosenfeld, who was tasked with determining when the JP-5 from the Red Hill Well first began being taken up into the water distribution system. *See* Hughes Decl. (ECF 369) ¶ 2. And Dr. Hughes unequivocally testified that the bulk of the JP-5 entered the water distribution system on November 21, 2021, less than 24 hours after the fuel spill. *See* Hughes, 4/30/24 Tx. 71:11-73:18; Hughes Decl. (ECF 369) ¶ 27[4].

---

[4] The fuel continued to enter the distribution system from November 21, 2021, until November 29, 2021, when the Navy shut down the Red Hill Well. *See* Hughes, 4/30/24 Tx. 39:7-25; Hughes Decl. (ECF 369) ¶ 39.

*Second*, and in any event, Dr. Rosenfeld never testified that jet fuel first made its way into the water distribution system on November 27, 2021. Dr. Rosenfeld simply confirmed that "day one" of his model begins on November 27, 2021. Before November 27, he testified that "the concentration [of JP-5] was building up to the point where it got to 2,000 gallons around the 27th or 28th or 29th" at points on the water distribution system, *see* Rosenfeld, 4/30/24 Tx. 117:16-21, and hence when the observable impacts of the contamination (e.g., odor, taste, and sheen) were readily noticeable among residents on the water system.[5] *See also* PX-1236_0027 (HDOH finding that "[h]eavily contaminated water was moving through the drinking water system by November 27th").

Indeed, Dr. Rosenfeld testified that many individuals could have been exposed to jet fuel early on without knowing it – as the contamination levels in the water distribution system were building up and before reports of odor, taste, and

---

[5] It was on December 6, 2021, "day ten" of Dr. Rosenfeld's model, in which Dr. Rosenfeld testified that the JP-5 had reached "equilibrium" – that is, when *all* zones in the JBPHH water distribution system, and thus all Plaintiffs, were receiving equal concentrations of contaminated water approximating 6,532 µg/L. *See* Rosenfeld, 5/7/24 Tx. 19:11-16, 20:7-21:18 (prior to December 6, 2021, the concentrations of contaminated water were "ramping up" to equilibrium around the entire water system). This ramping up to equilibrium across the water distribution system is readily observable in Lacey Keller's geomapping of the water complaints during this timeframe. *See* PX-1995_0055-56, _0059-60, _0111, & _0114.

sheen began.[6]  *See* Rosenfeld, 5/7/24 Tx. 25:11-27:23 (testifying that odor is

subjective depending upon the individual and therefore many people may have

been exposed to JP-5 via drinking or showering prior to the JP-5 reaching

equilibrium.); *see also* Rosenfeld Decl. (ECF 374) ¶ 19, n. 15 (noting that "odor

detection by humans is subjective and therefore does not represent a fixed value").

HDOH's findings are in accord with Dr. Rosenfeld, which note that:

> [W]ide variability in the ability to smell or taste fuel and other
> contaminants in the water were reported. Some residents were able to
> detect jet fuel odors at likely low concentrations, while others in the
> same household were unable to detect any sign of contamination, even
> at what were likely very high concentrations.

PX-1236_0007.

### C.    The Government's Contention That Jet Fuel Did Not Reach the Western Portion of the System is Divorced From the Facts of the Case

Although the Government does not dispute that water contaminated with jet

fuel made its way to the Aubart, Dietz, Freeman, Jessup, and Witt residences, it

erroneously denies that contaminated water made its way to Ford Island (where the

Feindt family resided) and to other points western on the water distribution system.

---

[6] Dr. Grayman's analysis, which is tethered entirely to when odor, taste, and sheen reports from residents on the water distribution system began, is thus flawed from the get-go as exposure could have occurred in individuals whose senses could not pick up the elevating concentrations.

*See* Gov't Br. 13-18. In support of its contention, the Government advances five arguments – each of which can be readily disposed of.

*First,* the Government's argument that the water pumped from the Waiawa Well "served as a barrier" against the contaminated water getting to Ford Island, *see* Gov't Br. 15 (citing Grayman, 5/8/24 Tx at 61:7-14), is contradicted by the testimony from the Navy's own employees that water from the Red Hill Well easily and routinely mixes with the water distribution system. *See* Rosenfeld Decl. (ECF 374) ¶ 53; Rosenfeld, 5/724 Tx. 10:2-5 (citing Government testimony). Moreover, Dr. Grayman, admittedly qualifies his "barrier" opinion as limited to the period up to December 5, 2021. *See* Grayman, 5/8/24 Tx. 61:7-14. As reflected by the Government's own data, sheen reports on Ford Island did not spike until the second week of December – *after Dr. Grayman's model stopped*. PX-1995_0115.

*Second*, the Government takes issue with Plaintiffs' characterization of PX-1210, the Navy's map of the distribution system. *See* Gov't Br. 15. The water line between Zone B1 and Ford Island, however, is plainly bi-directional, *see* PX-1210_0053, and is metered as such, *see* PX-1210_0049-_0054. Further, the Navy concedes that "the potential for contamination [from Zone B1] to enter this zone [i.e., Ford Island] cannot be ruled out with 100% certainty." *See* PX-1210_0050. The Government states that Dr. Grayman's modeling rules this possibility out, *see*

Gov't Br. 15 n. 4, but that is incorrect. Dr. Grayman's modeling arbitrarily stopped on December 5.[7]

*Third*, as explained in footnote 3, *supra*, the Government's attempts to explain away sheen reports are flatly contradicted by the evidence. *See* Gov't Br. 15-17. In fact, the Government relied on these sheen reports in real time to add areas to the "impacted" list and provide purported guidance and services accordingly. *See* McGinnis Decl. (ECF 378-1) ¶ 16; PX-1111 (Feindt Ford Island Notice); PX-1175. Those impacted lists eventually included all neighborhoods on the system. *Id.*

*Fourth*, the Government's assertion that the reports of medical issues on Ford Island "prove[] little" should not be credited. *See* Gov't Br. 15-16. The Government has not explained why the Navy-collected medical data from Ford Island is less reliable than the Navy-collected data from other neighborhoods on the water distribution system. Moreover, had there been no medical issues on Ford Island, then it would have made no sense to include Ford Island or other western residents in the CDC/ATSDR studies or to put them under a health advisory.[8] From

_____

[7] Moreover, for the reasons discussed in Plaintiffs' opening brief, *see* Pls. Br. 23-27, and for the additional reasons discussed below, Dr. Grayman's model is irretrievably flawed.

[8] *See, e.g.*, PX-1195_0002 (Undetermined Morbidities Related to Drinking Water Contamination Following a 2021 Petroleum Leak on the Island of Oahu, HI, Preliminary Results from Defense Health Agency (DHA) Medical Chart

November 30, 2021 through December 31, 2021, there were 128 reported medical

complaints of acute symptoms from Ford Island, 99 from Iroquois Point, and 93

from Pearl City. *See* PX-1308, PX-1309, PX-1443, PX-1455.

*Fifth*, the Government's argument that the TPH-d detections in the long-term

sampling program that were relied upon by Dr. Rosenfeld are not from jet fuel is

without merit. *See* Gov't Br. 16. The Government's argument relies entirely on the

testimony of Sherri Eng, who has no educational training in chromatographic

fingerprinting and who does not even know if the third-party contractor doing the

fingerprinting considered the degradation of JP-5 over time. *See* Eng, 5/7/24 Tx at

85:1-87:8. Sherri Eng's testimony at trial on this point was simply *ipse dixit* and, in

any event, not linked to the 500-day sampling data relied upon by Dr. Rosenfeld.

Simply put, the evidence with respect to the scope of the contamination of

the water distribution system all points to contamination of the *entire* water

distribution system (including Ford Island) and *not just the eastern portions*. *See,*

*e.g.,* PX-1995_0054-108 (water complaints from entire system); PX-1995_0109-

137 (sheen complaints from entire system); PX-1995_0025-53 (medical

---

Abstraction, EPI-Aid Investigation 2023-08 Exit Briefing Presentation, dated May
25, 2023 [showing Ford Island under a health advisory on January 5, 2022]); PX-
1195_0024 & __0033 (together showing that of the 38 individuals on Ford Island
whose medical records were chosen, extracted, and reviewed by the DHA Epi-Aid,
22 reported one or more new, persistent or worsening, pre-existing symptom or
condition.).

complaints from entire system); PX-1995 (showing long-term sampling showing

TPH-d detections from entire system); PX-2216_0002 (S. Miko et al., Community

Health Impacts after a Jet Fuel Leak Contaminated a Drinking Water System: Oahu,

Hawai'i, Nov. 2021, 21 J. Water Health 956 (Jul. 2023, (hereafter, "Miko") ["The

[JBPHH DWDS] serves over 9,600 civilian and military households, schools, and

workplaces all of whom had variable exposure to JP-5."]). Indeed, even the Navy's

Safe Waters Website continues to report on the entire Navy water distribution

system, including the western neighborhoods.[9]

The Navy's litigation position is not shared by any other responding

government agency. For example, this May, the HDOH announced that it

"disagrees with the Navy's conclusion that certain drinking water zones could not

have been contaminated by the Red Hill Shaft during the November 2021

emergency."[10] State toxicologist, Diana Felton, likewise testified that "at the

Department of Health and the Poison Center, we received calls from every

---

[9] *See* Joint Base Pearl Harbor-Hickam Safe Waters, jbphh-safewaters.org.

[10] The Government's Brief asks the Court to take judicial notice of current
government websites. Gov't Br. 93 n.34 (citing *EVO Brands, LLC v. Al Khalifa
Group LLC*, 657 F. Supp. 3d 1312, 1321 (C.D. Cal. 2023) and *Daniels–Hall v.
Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010). HDOH set forth its position
on its government website at *DOH Releases Findings of Independent Forensic
Investigation of Navy Water System*, HAWAII DEPARTMENT OF HEALTH—
NEWSROOM, https://health.hawaii.gov/news/newsroom/doh-releases-findings-of-
independent-forensic-investigation-of-navy-water-system/ (posted May 22, 2024).

neighborhood on the Navy water system…." D. Felton Dep. (Aug. 21, 2023) (ECF 400-7) 75:7-17.

And because the defendant under the Federal Tort Claims Act is the United States, the Government is not entitled to favor the position of the Navy to the exclusion of the findings of federal agencies like the Defense Health Agency (DHA), Department of Veterans Affairs (VA), Centers for Disease Control (CDC), or Environmental Protection Agency (EPA). The new Government-funded Red Hill health registry, the CDC and ATSDR studies, and the Defense Health Agency's ongoing medical efforts make no distinction as to whether a resident lived on the eastern or western portion of the water system.[11] In fact, the CDC and ATSDR intentionally included the western neighborhood of Iroquois Point to ensure participation of civilians, ultimately concluding that symptoms reported across the water system were consistent with fuel exposure. PX-1182 (ACE investigation, "initial efforts focused on Iroquois Point").

Moreover, the DHA's Secretarial Designation (SECDES) authorizes medical assessment and care as part of the DOD response to the November 2021 Red Hill fuel release. One qualification for SECDES is having residence in housing served by the JBPHH Water Distribution System between Nov. 20, 2021, and March 18,

---

[11] *Red Hill Public Health Information*, DEFENSE HEALTH AGENCY WEBSITE, https://ph.health.mil/topics/campaigns/red-hill-public-health/ (last updated Jul. 2, 2024).

2022. *Id.* The DHA also points to the DOEHRS exposure incident report and

registry, which includes all military families and personnel served by the JBPHH

water system. *Id.* And the EPA publicly proclaims that "[a]pproximately 93,000

U.S. Navy water system users were impacted by the contaminated drinking water"

– i.e., the entire water system.[12]

### D. The Government's Critiques of Dr. Rosenfeld's Model are Flawed

The Government advances two flawed critiques of Dr. Rosenfeld's model.

*First*, the Government argues that because Dr. Rosenfeld's model did not

account for water leaving the water distribution system, his methodology is

rendered unreliable. *See* Gov't Br. 7-8. Not so. The flaw in the Government's

argument is the same one that infected and rendered unreliable Dr. Grayman's

EPANET modeling analysis: the Government, like Dr. Grayman, improperly treats

the jet fuel as a single-phase contaminant rather than the two-phase contaminant

that it is. *See* Hughes Decl. (ECF 369) at 4, fn. 2. And as a two-phase contaminant,

it behaved differently in the water distribution system.

Unlike water, the undissolved liquid phase of jet fuel – the nonaqueous or

NAPL phase – is very sticky, and as such it persisted within the water distribution

system. *See* Rosenfeld, 4/30/24 Tx. 116:14-118:2 ("[B]ecause of the chemical and

---

[12] *About Red Hill Fuel Releases*, UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY WEBSITE, https://www.epa.gov/red-hill/about-red-hill-fuel-releases (last
updated Jun. 17, 2024).

the stickiness, it's really reluctant to leave, which made the well-mixed model more appropriate."); Rosenfeld, 5/7/24 Tx. 25:15-26:3 (". . . [T]he fuel gummed up the pipes, and it basically stuck there. And when you mix fuel with water, it gets sticky."); Rosenfeld, 4/30/24 Tx. 89:25-90:2 (agreeing that whatever was in the water distribution system persisted); *id.* at 120:6-8 ("[T]he bottom line is it – because of the chemical, because of its stickiness, its reluctance to leave, this [well-mixed] model fit the data really well.").

In its own reports, the Government has acknowledged that components of the JP-5 contamination behaved differently in the water system. *See, e.g.,* PX-1210_0059 (JP-5 isn't a single contaminant . . . . JP-5 constituents have different water solubility and octanol-water partitioning coefficients. . . . Additionally, the different materials [in the water distribution system] may be more prone to soaking up some JP-5 contaminants and not others depending on their characteristics. . . .").

It was thus entirely appropriate for Dr. Rosenfeld not to factor in jet fuel leaving the water distribution system. Indeed, not factoring in jet fuel leaving the water distribution system rendered his modeling input of 2,000 gallons of JP-5 conservative. *See* Rosenfeld Decl. (ECF 374) ¶ 60 n. 54 (noting amount of JP-5 entering the system would have been higher if factored in); Rosenfeld, 4/30/24 Tx. 87:20-88:9. In sum, not factoring in jet fuel leaving the water distribution system is a positive feature of the well-mixed model used by Dr. Rosenfeld, it is not a bug.

*Second*, the Government contends that the Court should disregard Dr. Rosenfeld's opinions because he did not compare his results to certain drinking water sampling data from JX-0044 (Immediate Drinking Water Sampling Plan) or DX-3255 (collection of drinking water sampling results from January 2022 to May 2023) that had been collected on days 50, 100, 150, and 300 of Dr. Rosenfeld's model. *See* Gov't Br. 9-12. The Government's argument is misplaced.

Plaintiffs do not dispute the general premise in the cases cited by the Government that having a well calibrated and validated model is important. *See Crescenta Valley Water Dist. v. Exxon Mobile Corp.*, 2013 U.S. Dist. LEXIS 189260 (C.D. Cal. Jan. 8, 2013), and *Abarca v. Franklin County Water Dist.*, 761 F. Supp. 2d 1007 (E.D. Cal. 2011). But the Government is projecting. Unlike Dr. Grayman who ignored *all* data after December 5, 2021, *see* Grayman, 5/8/24 Tx. 12:12-15, as explained more fully below, Dr. Rosenfeld's model is indeed well-calibrated and validated. *See* Pls. Br. 16-17.

In any event, there is no rule that a model must exactly match all field sampling data. Such a requirement would be untenable. *See, e.g., Abarca*, 761 F. Supp. 2d at 1074 ("it is undisputed that modeling is not an exact science."); *Crescenta Valley Water Dist.*, 2013 U.S. Dist. LEXIS 189260 at *27 (same). The *Abarca* court in fact specifically deferred to the groundwater expert's choice not to calibrate / validate his model against certain field data that the expert deemed

unreliable. *See* 761 F. Supp. 2d at 1071.

Therefore, in using his well-mixed model, Dr. Rosenfeld used a mass balance

equation to calculate various JP-5 concentration scenarios, ultimately opining that

the most likely JP-5 contaminant amount that entered the JBPHH water distribution

system was 2,000 gallons, which translated into a contaminant concentration level of

6,532 ug/L. *See* Rosenfeld Decl. (ECF 374) ¶¶ 58-63. Dr. Rosenfeld testified that he

validated the accuracy of 2,000 gallons of JP-5 in the JBPHH distribution system

with the hundreds of reports of sheen widely observed throughout the JBPHH water

distribution system, which required a concentration of at least 5,000 ug/L of JP-5.

*See* Rosenfeld Decl. (ECF 374) ¶¶ 59, 62-63; Rosenfeld, 4/30/24 Tx. 93:17-22; *see*

*also* 5/7/24 Tx. 18:15-19:20. Dr. Rosenfeld also testified that Dr. Hughes's

independent calculation of 2,024 gallons of JP-5 entering the water distribution

system further validated his well-mixed mass balance calculation. *See* Rosenfeld

Decl. (ECF 374) ¶ 61. Finally, Dr. Rosenfeld validated his calculation by confirming

that 2,000 gallons of JP-5 aligned with the post-flushing TPH-d detections in the

Safe Waters Long-Term Monitoring Data on Day 500 of his model.[13] *See* Rosenfeld

---

[13] The Government tries to make much of the fact that the modeling outputs for
days 50, 100, 150, and 300 do not exactly align with the water sampling data. *See*
Gov't Br. 9-12. But Dr. Rosenfeld testified that the flushing of the system from the
end of December 2021 to March 2022 added additional water to the water
distribution system, which may have driven down the JP-5 concentrations and
affected the water sampling data on days 50, 100 and 150. *See* Rosenfeld, 4/30/21
Tx. 113:16-114:16. Another reason that the water sampling on days 50, 100, 150 and

Decl. (ECF 374) ¶ 60; Rosenfeld, 4/30/24 Tx. 120:12-121:7.

The Government's insistence that the Immediate Drinking Water Sampling Plan (JX-0044) should have been used to calibrate Dr. Rosenfeld's well-mixed model for November and December is wrong. *See* Gov't Br. 9. As the Government is aware, the data contained in JX-0044 (approximately 160 JBPHH drinking water sampling results from November and December of 2021) was deemed inappropriate and unreliable by the Navy and the Marine Corps for conducting an exposure assessment of individuals who consumed drinking water after the jet fuel spill. *See* Grayman, 5/8/24 Tx. 36:16-38:7; Eng, 5/7/24 Tx. 70:23-72:4, 74:1-79:7. Consistent with these findings, Dr. Rosenfeld testified that he purposely did not use the late November and early December 2021 data to calibrate his model because it was erratic and inconsistent with community observations of sheen. *See* Rosenfeld Decl. (ECF 374) n. 53; Rosenfeld, 4/30/24 Tx. 94:13-95:4.

Finally, Dr. Rosenfeld did not "ignore" or "cherry pick" certain water sampling data to arrive at his mass balance calculations. Water sampling data *was simply not an input* in his mass balance calculations. *See* Rosenfeld Decl. (ECF 374) ¶¶ 57-58. Thus, the case law cited by the Government for the proposition that

---

300 may not exactly align with his model is that after time, the JP-5 became so tacky and sticky from oxidation and mixing with water, that it stuck to the pipe sidewalls and slowly dissolved into the distribution system, *see* Rosenfeld, 4/30/21 Tx. 116:14-23, and thus, may not have been detected by the sampling process.

modeling opinions that "ignore" relevant sample results to reach a predetermined conclusion should be excluded, *see* Gov't Br. 11-12, is inapplicable to the facts here. For instance, in *Leclerq v. the Lockformer Co*., 2005 U.S. Dist. LEXIS 8602 at *13-15 (N.D. Ill. April 28, 2005), the court held that the opinions of the third-party defendants' expert hydrogeologist were unreliable because he selectively ignored 17 "uncontested" non-detect soil samples. Here, as noted above, the water sampling data was not used by Dr. Rosenfeld in his mass balance modeling, and in any event, the reliability of the immediate drinking water sampling data in this case has been discredited. Similarly, in *Finestone v. Fla. Power & Light Co*., 2006 U.S. Dist. LEXIS 7743 at *38-39 (S.D. Fla. Jan. 6, 2006), in computing the average amount of Co-60, the plaintiffs' expert only used 32 samples that had measurable levels of Co-60, but ignored without explanation, 27 samples with no Co-60. And in *Ramsey v. Consol. Rail Corp*., 111 F. Supp. 1030, 1037-38 (N.D. Ind. 2000), the plaintiff's modeling expert ignored 8 years of non-detect results in opining that certain chemicals had reached the plaintiff's well. Nothing of that sort occurred here. There is no factual dispute that JP-5 made its way into the JBPHH water distribution system and that Plaintiffs were exposed to the contaminated water.

### E.    Dr. Grayman's Model Is Unreliable

In its brief, the Government attempts to bolster Dr. Grayman's modeling

work on this case. *See* Gov't Br. 12-21. But there is no escaping the fact that Dr.

Grayman's modeling work was fundamentally flawed.

As noted in Plaintiffs' opening brief, Dr. Grayman has no experience

modeling petroleum contamination in a water distribution system, *see* Pls.' Br. 27,

and as already noted, his EPANET-based modeling does not take into account the

two-phase nature of jet fuel, *see id.* 27-28.[14]

In its brief, the Government mounts no real defense to the cutoff of

Dr. Grayman's model at December 5, 2021 despite hundreds of reports of fuel

thereafter. The Government cannot at once claim that there was no fuel exposure

on the western side of the system and then exclude the data from that area.

Nor does the Government defend Dr. Grayman's use of the non-detect

modeling scenario or the 2000 µg/L modeling scenario – scenarios that are entirely

inconsistent with the observed data, and hence methodologically unsound. *See*

Gov't Br. 19. Rather, the Government chooses to defend the higher-level scenarios

used by Dr. Grayman that were all capable of creating sheen in the drinking water

---

[14] The Government incorrectly asserts that Dr. Rosenfeld modeled on a single
phase. *See* Gov't Br. 18 n. 6. The testimony cited by the Government, however,
makes clear that Dr. Rosenfeld's well-mixed model *does* take into account the two
phases of petroleum contamination. *See* Rosenfeld, 6/30/24 Tx. 86:1-21.

of residents drawing water from the JBPHH water distribution system. *Id.* As noted

above, the contamination from these higher-level scenarios are all multiple times

higher than the HDOH's Environmental Action Level for TPH, and thus would

have resulted in significant exposures to Plaintiffs.

The Government also asserts that Plaintiffs have "selectively quote[d] and

misconstrue[d] PX-2412. *See* Gov't Br. 19-21. Not so. It is the Government that

has fundamentally misconstrued PX-2412 – which was *not* an investigation into

the fate and transport of the jet fuel through the JBPHH water distribution system.

The authors of PX-2412 did not do modeling to determine whether there had been

a system-wide impact to the water distribution system. Nor did the authors model

to determine when residents on the water distribution system would have first been

exposed to the jet fuel contamination. Rather, PX-2412 is a technical memorandum

"to determine if the pre-IDWST flushing drinking water sampling data . . . can be

used to evaluate exposure to JP-5 fuel in JBPHH drinking water associated with

the 20 November JP-5 fuel release at Red Hill."  PX-2412_0002. And, as noted,

PX-2412 unequivocally concluded that the pre-IDWST flushing drinking water

sampling – sampling used by Dr. Grayman to calibrate and validate his model –

"would not be appropriate for use in conducting an exposure assessment of

individuals who consumed drinking water that was impacted by the JP-5 fuel

release." *See* PX-2412_0027-_0028; Pls.' Br. 27-28. Simply put, Dr. Grayman used

unreliable data to validate his work. And the Government's reliance on cherry-picked lines from PX-2412 that are both irrelevant to its purpose and lacking in analytical support is unavailing.

In the end, there is one inescapable conclusion that can be derived from Dr. Hughes's, Dr. Rosenfeld's, and Dr. Grayman's work in this case: under any analysis that accounts for the well-documented and indisputable evidence of widespread reports of sheen in water from the water distribution system, residents on that system were exposed to significant concentrations of jet fuel contamination.

## II.    Plaintiffs' Physical Injuries and Impairments Were Caused by the Government's Water Contamination

The Government asks this Court to deny the reality and experience of Plaintiffs in November of 2021 and the months following. Plaintiffs each suffered acute physical injuries caused by the Government's negligence, and Nastasia Freeman suffered the resurgence of her seizure disorder and other long-term neurological harm. Plaintiffs have shown that the negligent release of JP-5 into the water system was a substantial contributing cause of each of Plaintiffs' acute new, worsening, or returning symptoms, *see, e.g.,* Bird Decl. (ECF 491-1) ¶¶ 56, 96, as well as Mrs. Freeman's long-term harm, *see, e.g.,* Andruska Decl. (ECF 364) ¶¶ 29, 30, 95, 96. As set forth below, the Government's arguments to the contrary are belied by its own real-time data, medical records, government documents, and testimony of on-the-ground experts Diana Felton, MD, and Roger Brewer, PhD.

### A.    Plaintiffs' Acute Injuries Were Caused by the November 2021 Release of JP-5

Medical experts in this case found that each Plaintiff suffered acute injuries for which the release of JP-5 into the water system was a substantial contributing factor.[15] *See, e.g.*, Bird Decl. (ECF 491-1) ¶ 96. The Government's argument that Plaintiffs seek compensation for a "wide array" of acute physical effects without expert support is flat wrong.[16] Gov't Br. 25.

---

[15] Despite the Government's insistence otherwise, *see, e.g.*, Gov't Br. 25 n. 10, its experts did not opine on the cause of acute injuries. Dr. Durrani explicitly stated that, "[a]s noted in my report, I addressed only the Minor Bellwether Plaintiffs' claims of long-term injury and do not offer opinions on their alleged acute injuries." Durrani Decl. (ECF 384-1) ¶ 26. And Dr. Kosnett similarly provided no causation opinions on the acute injuries of Plaintiffs. *See, e.g.,* Kosnett Decl. (ECF 382-1) ¶ 2. And neither of these experts offered opinions regarding the duration of symptoms from exposure. *See generally* Durrani Decl. (ECF 384-1); Kosnett Decl. (ECF 382-1).

[16] The majority of symptoms for which the Government alleges there is no expert support are symptoms Dr. Bird has found would be expected from hydrocarbon exposure, *see e.g.*, Bird Decl. (ECF 491-1) ¶¶ 90-95; and were reported by multiple Plaintiffs and other individuals on the water system, *see* PX-2216 (Community Health Impacts after a Jet Fuel Leak Contaminated a Drinking Water System: Oahu, Hawaii, Nov. 2021, S. Miko, et al., J. Water Health, 21(7):956-971. doi: 10.2166/wh.2023.109. PMID: 37515565, dated Jul. 2023). These symptoms include, insomnia, migraines, brain fog, eye irritation, teeth and gum issues, lesions, red eyes, loss of skin pigmentation, nausea, headaches, tremor, stomach contractions, diarrhea, muscle aches, dizziness, burning in throat, dizziness, face tingling, difficulty focusing, mood swings, nosebleeds, rash, short term memory loss, word-finding challenges, attention challenges, coughing, sinus problems, dry and itchy skin. *See generally* Gov't Br. Ex. A (ECF 601-1).

The Court has already addressed this issue, providing that Plaintiff's description of their medical symptoms, whether supported by expert testimony or not, goes to

### 1.    The Government's "summary" chart is inaccurate and incomplete.

The Government's "summary" chart of Plaintiffs' acute injuries is incomplete and inaccurate, and therefore, unreliable. *See* Gov't Br. Ex. A (ECF 601-1). By way of example, the chart fails to reference Patrick Feindt's emergency room visit on December 11, 2021, despite the testimony of the Feindts and relevant medical records regarding Mr. Feindt's acute symptoms that day. *Compare*, *e.g.*, *id.* at 10 *with* Bird, 5/3/24 Tx. 21:12-22:2; A. Feindt, 4/29/24 Tx. 191:15-20, 192:2-10; P. Feindt, 4/29/24 Tx. 212:19-21, 228:21-229:3, 229:18-25; P. Feindt, 4/30/24 Tx. 8:21-9:3; P. Feindt Decl. (ECF 392) ¶25; PX-2252_0034-35 (Medical Composite – Patrick Feindt, Jr.).

The summary also incorrectly identifies the following symptoms as unsupported by expert testimony—even though Dr. Bird directly addressed them: Nastasia Freeman's psoriasis and reports of vision changes, *compare* Gov't Br. Exhibit A (ECF 601-1) at 2 *with* Bird Decl. (ECF 491-1) ¶¶ 90-95, 96(q); and

---

their negligent infliction of emotional distress claim. Specifically, the Court provided that Plaintiffs are not "medical professionals, and I'm not going to take their testimony in saying as a medical professional can they say with reasonable medical probability that, you know, the jet fuel in the water caused these medical conditions. But they can testify how they felt, what they thought people were telling them or not telling them, because it's not being offered for the truth of the matter asserted, but it is their perception as the Plaintiff on what was happening or how they were treated, and then how it affected them for purposes of their negligent infliction of emotional distress." 4/29/94 Tx. 93:7-18.

D.F.'s abdominal/stomach pain, *compare* Gov't Br. Exhibit A (ECF 601-1) at 8

*with* Bird Decl. (ECF 491-1) ¶¶ 90-95, 96(n).

### 2.    Dr. Bird addressed each element of causation.

The parties agree that certain elements must be met to show specific

causation for Plaintiffs' acute injuries, and that temporality, though important, is

not the only factor. *See, e.g.,* Gov't Br. 22, 27 (quoting from Order Granting in Part

and Denying in Part Defendant's Motion to Exclude the Expert Report and

Testimony of Dr. Steven Bird, ECF 410 (Bird Order)). Dr. Bird, of course, did not

limit his analysis to temporality.

Dr. Bird researched whether the exposure in this case was capable of causing

certain acute medical symptoms and conditions. He determined that the literature

supports acute symptoms of JP-5 exposure including skin irritation and rash,

abdominal pain, vomiting, diarrhea, headaches, irregular menstrual cycles, anxiety,

and other neurological symptoms. *See, e.g.,* Bird Decl. (ECF 491-1) ¶¶ 90-92.[17] He

also opined that toxic exposure exacerbates preexisting conditions, including

causing increased intensity or frequency of symptoms. *Id.* ¶ 94.

Dr. Bird considered the medical literature. The Government, quoting

---

[17] Consistent with Dr. Bird's findings, the Government "does not dispute that, at sufficient dose and duration, exposure to JP-5 could cause certain health effects, such as headaches, gastrointestinal symptoms such as nausea or diarrhea, or skin rash." Gov't Br. 26 n. 11.

*Henrickson v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142 (E.D. Wash. 2009),

argues that Plaintiffs have not provided an epidemiological study indicating that

the relative risk of any health effect from JP-5 is 2.0.[18] Gov't Br. 23. This is both

untrue and not required. Dr. Bird reviewed over 250 publications, which included

human case studies and epidemiological studies with relative risk of health effects

at 2.0 or higher. *See e.g.*, Bird Decl. (ECF No. 491-1) ¶¶ 26, 46, 84, 85; Bird,

5/3/24 Tx. 38:9-41:6. For example, Dr. Bird reviewed the Lyons study, a case

control human epidemiological study that identified and compared the symptoms

experienced by people exposed to oil released from the oil tanker, the Sea

Empress, to symptoms experienced by unexposed people 12 to 30 miles away. *See*

PX-2215 Lyons, R.A., Temple, J.M., Evans, D., Fone, D.L., & Palmer, S.R., *Acute*

---

[18] The court in *Henrickson* provides that "[i]n general epidemiology studies are probative of *general causation*: a relative risk greater than 1.0 means the product has the capacity to cause the disease. 'Where the study properly accounts for potential confounding factors and concludes that exposure to the agent is what increases the probability of contracting the disease, the study has demonstrated general causation-that exposure to the agent is capable of causing [the illness at issue] in the general population.'" (citation omitted). *Henrickson*, 605 F. Supp. 2d at 1158. The Court found that [i]n the Ninth Circuit, such studies can also be probative of *specific causation*, but only if the risk is greater than 2.0." *Id.* Notably, though, the Restatement (Third) of Torts generally rejects the doubling requirement: "any judicial requirement that plaintiffs must show a threshold increase in risk or a doubling in incidence in a group study to satisfy the burden of proof of specific causation is usually inappropriate. As long as there is adequate evidence of general causation, courts should permit the parties to attempt to show, based on the sorts of evidence described above, whether the plaintiff's disease was more likely than not caused by the agent." § 28(c)(3).

*Health Effects of the Sea Empress Oil Spill*, 53 J. Epidemiol. Community Health 306 (1999) (hereafter "Lyons"); Bird, 5/3/24 Tx. 39:5-22. The study examined "symptoms consistent with a hydrocarbon toxidrome" (defining characteristics of hydrocarbon exposure), *see id.* at 35:11-23, and found that the relative risk in the exposed group was 2 or greater for headaches, nausea, sore eyes, rash, cough, sore throat, amongst other symptoms. *See id.* at 38:22-40:25; PX-2215, Table 2.[19]

Lyons concluded that people living in exposed areas reported higher rates of physical and psychological symptoms than control areas. Symptoms significantly associated with exposure after adjustment for anxiety and health beliefs were those expected from the known toxicological effect of oil, suggesting a direct health effect on the exposed population. PX-2215. "We conclude that after conservative allowances are made for bias, the physical health of the exposed group remained significantly worse than the control population." PX-2215-0003.[20]

---

[19] Of note, Dr. Prueitt, ignoring observable data and relevant science, did not even consider the Lyons or the Miko study. *See* Prueitt, 5/8/24 Tx. 94:16-95:5, 95:6-9.

[20] The logistic regression odds ratios for symptoms in the exposed population adjusted for age, sex, anxiety score, and smoking status included headaches (3.93), nausea (2.41), sore eyes (3.59), sore throat (2.89), itching skin (2.31), rash (2.26), blisters (5.99), shortness of breath (2.31), and weakness (2.04). *See* PX-2215_0003 (Table 2). In the case of the Sea Empress, unlike Red Hill, individuals were exposed only via inhalation and possible dermal exposure. They did not drink the water. Without exposure via ingestion, vomiting and diarrhea did not have an odds ratio great than 2 in the exposed population, though it was greater than 1 for diarrhea (1.56) and close to 1 for vomiting (.97). *See* Bird, 5/3/24 Tx. at 49:16-25

Dr. Bird looked at temporality and found a close relationship between the symptoms he found were caused by JP-5 exposure and the time of the fuel release, as well as the time Plaintiffs smelled, tasted, or saw fuel in their tap water. *See* Bird Decl. (ECF No. 491-1) ¶¶ 76, 95[21]. The Court has previously opined from Dr. Bird's report that the temporality met the requirement for biological plausibility. Bird Order (ECF 410) 18.

The Government also argues that Plaintiffs began experiencing their claimed symptoms days before the contaminated water could have reached any house, and therefore such symptoms could not have been caused by the fuel release. *See* Gov't Br. 28. That is not true. The bulk of the jet fuel made its way into the water distribution system in under 24 hours on November 20 or 21 and then ramped up. *See, e.g.,* Hughes, 4/30/24 Tx. 71:11-73:18; Hughes Decl. (ECF 369) ¶ 27; Rosenfeld, 4/30/24 Tx. 93:10-22, 92:23-93:1.[22]

---

& 56:1-5; PX-2213_0003, Table 2.

[21] The Government points out that Mrs. Witt did not smell JP-5 in her water, suggesting her water was not contaminated. Gov't Br. 24. As Dr. Felton has explained, smell is a "very rough measure" and it is "not always accurate." And "there may have been cases of people who couldn't smell it." D. Felton Dep. (Aug. 3, 2023) (ECF 400-7) 130:14-131:7. That Mrs. Witt did not smell fuel in her water does not mean it wasn't contaminated. In a text on December 10, Ms. Witt notes that she saw a sheen in her water that day. *See* Witt Decl. (ECF 397) ¶ 26; *see also, supra*, Section I.B.

[22] The Government's argument that Plaintiffs selectively rely on Dr. Rosenfeld's calculations falls flat. Gov't Br. 34-35. In fact, Dr. Rosenfeld's concentration

The Government's purported timeline also disregards inhalation and/or dermal exposure to the contaminated water – noting only the day each Plaintiff ceased "consuming" the water. *See* Gov't Br. 23-24. But Plaintiffs were exposed to JP-5 via *three* pathways, ingestion, dermal, and inhalation. *See, e.g.*, Bird Decl. (ECF No. 491-1) ¶ 62(a). Exposure via *any* of these pathways alone can result in acute symptoms. *See, e.g., id.* ¶ 68. "[E]ven if a person at JBPHH drank bottled water and not tap water, but continued to shower or otherwise use the water, that persons would have had significant exposure to jet fuel from other exposure pathways." *Id.* ¶ 72. Dr. Brewer specifically found that inhalation exposure from use of the water for cooking, washing and bathing was at times high enough to cause immediate and acute health effects. *See* PX-1479_0019-20 (Exposure Assessment: November 2021 Release of JP-5 Jet Fuel dated Aug. 7, 2023).

### 3.    Plaintiffs were exposed to enough JP-5 to cause adverse health effects.

Dr. Bird also assessed whether each Plaintiff was exposed to enough JP-5 to cause health effects. He found that they were, and the Court concluded this criterion of causation was met. *See* Bird Order (ECF 410) 18-19. The Court found that it is not necessary to use a dose-response relationship so long as an expert uses

---

estimates are a line of evidence Dr. Bird not only examined but on which he based his ultimate conclusions regarding each Plaintiff's exposure. *See, e.g.*, Bird Decl. (ECF 491-1) ¶ 87(J).

methods generally accepted in the scientific or medical community to establish
specific causation.[23]

Still the Government persists in its argument that a dose should have been
calculated even when the data does not exist, and even when the Government's
estimated results contradict observable facts – including that thousands of people
on the water line used the water and soon after got sick. In fact, given the amount
and consistency of acute poisoning reports throughout the water line, the
Government found that the widespread health reports could be used as a proxy to
show that there was in fact sufficient exposure for people to get sick. *See* PX-
1205_0014 (Residents' Medical Encounters Related to the JP-5 Release).

### 4. Dr. Bird ruled out other causes of acute symptoms.

After finding that the dose of JP-5 was sufficient to cause adverse health
effects, Dr. Bird analyzed whether the exposure was in fact a substantial
contributing factor in causing any specific acute disease in each particular Plaintiff.
*See, e.g.*, Bird Decl. (ECF No. 491-1) ¶ 38. In doing so, Dr. Bird conducted a
differential etiology that considered the medical condition and history of each
Plaintiff and weighed all other available evidence.[24] *See id.* ¶¶ 36-37, 39-43; *see*

---

[23] Dr. Bird is not the only expert in this case who did not employ a dosage-
response model but nonetheless found via other analyses that there was enough JP-
5 to cause adverse health effects. *See, e.g.*, D. Felton Dep. (Aug. 3, 2023) (ECF
400-7) 75:20-76:5.
[24] A differential etiology serves the same legal purpose as a differential diagnosis.

*also* 5/3/24 Tr. 44:6-44:22 (Court acknowledging Dr. Bird's analytical process).

The Government suggests that Dr. Bird did not consider COVID-19 as a cause of Plaintiffs' symptoms. Gov't Br. 36. This is incorrect. Dr. Bird testified that "we actually have COVID testing on most of them and many of them did develop COVID *after* the Christmas holidays…." Bird, 5/3/24 Tr. 60:2-13 (emphasis added). Simply put, their COVID symptoms postdate the onset of their acute symptoms from their JP-5 exposure. Further, none of the Government's medical experts attributed COVID as the cause of any of Plaintiffs' acute symptoms. *See generally* Gordon Decl. (ECF 345-1); Gordon, 5/9/24 Tx.; Durrani Decl. (ECF 384-1); Kosnett Decl. (382-1) ¶ 166 (while Dr. Kosnett noted that Koda Freeman tested positive for COVID on December 28, 2021, he also noted that Mrs. Freeman reported she did not.).

### 5.    Plaintiffs' acute symptoms lasting longer than 2-3 days were caused by the November 2021 release of JP-5.

Some of Plaintiffs' acute symptoms that began, worsened, or returned shortly after the fuel release lasted longer than 2-3 days.[25] These symptoms were

---

Restatement (Third) of Torts § 28c(4): "Courts frequently refer to the elimination of other known causes for a plaintiff by employing the medical terminology of differential diagnosis. Assessing whether other causes can be ruled out (or in) as potential causes of a plaintiff's disease can provide probative evidence of specific causation. This technique is more accurately described as a 'differential etiology.'"

[25] *See, e.g.*, Elizabeth Witt (skin issues lasted through the month of December, *see* Elizabeth Witt Decl. (ECF 397) at ¶ 11, and her abdominal pain lasted three days,

*see* PX-2264_0003-0004 (Medical Composite – Elizabeth Witt [12/6/21, "Last Sunday – Tuesday had bad abdominal pain not related to periods"]. Her palpitations peaked around Christmas, Witt Decl. (ECF 397) at ¶¶ 10-11); B.J.J. (Abdominal pain, nausea, and diarrhea lasted until the 2nd or 3rd week of December. *See* Bird Decl. (ECF 491-1) at ¶ 114(d)); N.J. (Abdominal pain, vomiting, and severe diarrhea resolved around mid-December. *See* Bird Decl. (ECF 491-1) at ¶ 116(d)); D.J. (His mother reported on December 7, 2021 that his abdominal cramping, vomiting, and diarrhea were "[d]oing better since stopping drinking the water." *See* PX-2262_0001-0003 (Medical Composite – D.J.)); B.B.J. (He had not complaints of nausea, diarrhea, abdominal pain, and headaches by 2/7/22 child health examination. *See* PX-2260_0005-0009 (Medical Composite – B.B.J.); Sheena Jessup (By December 22, 2021 cough, nausea, rash, and fatigue have resolved. Reported that abdominal pain was present over the past 6 months "with increase in pain over the past 10days to a 8/10 pain score." "She states the abdominal pain as something she has never experienced in her life and feels like somebody is squeezing her organs inside of her." PX-2259_0051-0053 (Medical Composite – Sheena Jessup)); P.G.F. (Her symptoms improved by December 19, 2021. *See* JX-10 (12/19/21 text message between Patrick Feindt, Jr. and his father), Patrick Feindt, 4/29/24 Tx. at 214:11-215:10. Her diarrhea, vomiting, and nausea had completely resolved by January 20, 2022. DX-3224, p. 201 [Medical Composite - P.G.F.]), Patrick Feindt, 4/29/24 Tx. at 215:19-216:4; P.R.F. (Diarrhea and acute vomiting were both resolved by December 15, 2021. They vacated their house "last night to move into a hotel." *See* PX-2254_0050 - 0052 (Medical Composite – P.R.F.)); Patrick Feindt, Jr. (Headaches, nausea, vomiting, and diarrhea improved when the family moved off base on December 14, 2021. *See* Bird Decl. (ECF 491-1) at ¶ 111(d), Patrick Feindt Decl. (ECF 392) at ¶¶ 30-32); B.D. (B.D.'s family stopped using tap water entirely on November 30th. A week or so after stopping the use of tap water their GI symptoms seemed to begin to improve. *See* Bird Decl. (ECF 491-1) at ¶ 107(e)); V.D. (After Thanksgiving 2021, "V.D. had stomach pain, vomiting, and diarrhea." *See* Richelle Dietz Decl. (ECF 391) at ¶12. Those symptoms began on or about November 26, 2021, and lasted approximately one week. *See* Bird Decl. (ECF 491-1) at ¶ 108(c)); Richelle Dietz ("The burning sensations, stomach pain, vomiting, and diarrhea continued for our family through the first week of December." Richelle Dietz Decl. (ECF 391) at ¶ 25. The family completely stopped using the water on November 29th, 2021, and most of B.D.'s, V.D.'s, and her own symptoms started to calm down by December 2nd and 3rd. *See* Richelle Dietz, 5/1/24 Tx. at 29:1-3, 25:15-17. *See* DX-3213, p. 35-40 [Richelle Dietz Medical Composite]); K.F. (developed a red rash on his buttocks, lower back, and arms that went away when they moved to a

consistent with those expected from hydrocarbon exposure, consistent with

symptoms that others at Red Hill reported, and found by Dr. Bird to be caused by

exposure to contaminated water. Pls.' Br. 26-31; Bird Decl. (ECF 491-1) at § 96.

Although many of Plaintiffs' acute symptoms did resolve quickly, the

Government focuses on those symptoms that did not end in 2-3 days and asserts

that they could not have been caused by the JP-5 exposure. That position is

incorrect. Acute symptoms from JP-5 exposure can last for weeks. *See* Bird, 5/3/24

Tx. 47:10-49:12; *see also* PX-1493 (Report Update: Residents' Medical

Encounters Related to the JP-5 Release). As Dr. Bird testified, if an individual has

preexisting conditions, "they can have longer symptoms." *See* Bird, 5/3/24 Tx.

48:2-3. Many Plaintiffs had at least one pre-existing conditions including skin and

---

hotel the first week of December 2021. Bird Decl. (ECF 491-1) at ¶¶ 120(d),
119(e)); Nastasia Freeman (Symptoms of runny nose, diarrhea, vomiting, cough,
and burning eyes around the time of contamination improved when switching to a
different water source. *See* PX-2255_1304-1305 (Medical Composite – Nastasia
Freeman)); D.F. (Fatigue, diarrhea, redness of eyes, skin rash, respiratory issues,
and eye twitching "seemed greatly improved since leaving HI. *See*
PX_2258_0129-0131 (Medical Composite – D.F.). Family left Hawaii in February
2022. *See* N. Freeman Decl. (ECF 572) at ¶ 1); N.F. (When the family moved to
California, his abdominal pain, nausea, vomiting, and diarrhea improved. Bird
Decl. (ECF No. 491-1) at ¶ 121(f). Family left Hawaii in February 2022. *See* N.
Freeman Decl. (ECF 572) at ¶ 1; Family left Hawaii February 5, 2022. *See* N.
Freeman Decl. (ECF 572) at ¶ 53); Kevin Aubart ("[D]etected fuel in 11/21 via
smelling their water from the sink/toilet. Still lives in same place. Noticed
nausea/fatigue, headaches, shoulder pain, minor rashes. Since then has improved
…" *See* PX-2248_ (Medical Composite - Kevin Aubart)).

neurological conditions that Dr. Bird found was exacerbated by their exposure to the contaminated water. *See* Bird Decl. (ECF No. 491-1) ¶ 94; Bird, 5/3/24 Tx. 47:10-48:4, 18:6-10.

The persistence of symptoms – notwithstanding the "half-life" of JP-5 exposure – has been documented by the Government's own agencies. The CDC, ATSDR, DHA, and HDOH have each reported that a large percentage of individuals exposed to JP-5 at Red Hill had acute symptoms that continued long after their exposure ceased. *See, e.g.,* D. Felton Dep. (Aug. 3, 2023) (ECF 400-7) at 204:5-23 (CDC/ATSDR noted that it conducted a second survey of the individuals on the water line in September 2022 was because they had people in the May survey reported that their symptoms had gone on for more than 30 days). Their published study showed that 81% of adults and 52% of children surveyed reported symptoms that continued over 30 days. PX-2216_0008 (Miko Study).

In fact, as recently as January 2024, the Defense Health Agency reported:

> Some patients have continued to report persistent symptoms. Defense Health Agency (DHA) has not developed a unifying explanation for these heterogeneous symptoms, and this remains an area of active investigation. Although JP-5 has a half-life of less than 1 day and does not persist in the body 2 years following the exposure, the long-term health risks of exposure to JP-5 and fuel additives are unknown. DHA and the Agency for Toxic Substances and Disease Registry are currently planning an independent third-party Red Hill exposure registry to monitor individuals' health and quality of life.

32

PX-1242 (Healthcare Provider Recommendations to Support Patients Exposed to

the Nov. 2021 Fuel Release at Red Hill, Defense Health Agency Fact Sheet). The

DHA's current guidance to doctors, updated in March 2024, noted that

neurological symptoms in particular have been persistent.[26]

      Dr. Bird addressed this exact issue when he testified that in determining the

length of time acute symptoms, one should not consider half-life or how fast your

body eliminates the chemical (pharmacokinetics), but rather what the chemical

does to your body (pharmacodynamics). *See* Bird, 5/3/24 Tx. 48:24-49:15. For

example, studies by the CDC and ATSDR "consistently demonstrate that people

had acute effect, and those effects oftentimes persist." *See id.* at 51:20-52:6. *See*

*also, id.* at 52:7-55:7. As Dr. Brewer explained, labeling a health effect as "acute"

just "documents how quickly the health effects occurred. If you get hit by a car,

that's an acute effect. It happened within a fraction of a second. But you could

have health effects lasting long after that." 8/15/23 Brewer Dep. 144:14-19.[27]

---

[26] *See* DHA Fact Sheet No. 027-0424, *Healthcare Provider Recommendations to Support Patients Exposed to the November 2021 Fuel Release at Red Hill*, DEFENSE HEALTH AGENCY—PUBLIC HEALTH, https://ph.health.mil/PHC%20Resource%20Library/redhill-doctor-guidance.pdf (updated Mar. 20, 2024).

[27] *See also* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 31 ("When an actor's tortious conduct causes harm to a person that, because of a preexisting physical or mental condition or other characteristics of the person, is of a greater magnitude or different type than might reasonably be expected, the actor is nevertheless subject to liability for all such harm to the

### 6.    Mrs. Freeman's long-term neurological symptoms were caused by the November 2021 release of JP-5.

Mrs. Freeman has experienced debilitating neurological injuries including vestibular dysfunction, migraines, headaches, and seizures that began soon after the November 20, 2021 fuel release and that were caused, worsened, or reactivated by the same. *See* Pls.' Br. 53-54. The Government's repeated assertion that Mrs. Freeman suffered no physical neurological injury after the fuel release contradicts factual evidence and expert testimony. Gov't Br. 41.

For instance, the Government continues to dispute that Mrs. Freeman was diagnosed with vestibular dysfunction. Gov't Br. 39, n. 14, & 42 (relying on Dr. Gordon). But medical records demonstrate that Mrs. Freeman was suspected of, tested for, diagnosed with, and treated for vestibular dysfunction. *See, e.g.*, Andruska Decl. (ECF 364) ¶¶ 24, 54, 55, 67, 82.[28]

---

person.").

[28] *See also* DX-3215, p. 105 (7/25/22 Walter Reed assessment after admission to the EMU "for evaluation of abnormal sensation of increased pressure in her head, brain fog, and dizziness." "Vertigo: Not clearly LH, more like persistent vertigo. Continuous since Nov2021. Most consistent with PPPD by description, though workup ongoing."); PX-2255_1082 (Walter Reed Discharge Diagnosis 7/28/22 – Epilepsy, Vertigo); PX-2255_0349 (Referral request from Steven M. Belknap, PA-C, MPAS 8/15/22. "Evaluate and Treat Vestibular disorder Prefers NMCSD ENT (Recently had neurolgy [sic] consult at Walter Reed for seizures that needed specialized testing-sent from San Diego). Found to have vestibular dysfunction and advised to have ENT evaluation."); DX-3215, p. 246 (9/12/22 "Patient was evaluated at Walter Reed Medical with serial EEG and MRI which ruled out seizure as cause of dizziness but rather more vestibular etiology."); PX-2255_0678

The Government ignores medical records and relies on Dr. Gordon's uncited assertions that Walter Reed found that Mrs. Freeman's spells were "psychogenic and caused by the psychological process." *See* Gov't Br. 42. But that is not what Walter Reed found. Dr. Gordon incorrectly assumes that if Mrs. Freeman's episodes during her video-EEG testing were not found to be epileptic, then her symptoms were all in her head. Mrs. Freeman's EEG testing was conducted to rule out seizures as the cause of her symptoms of "abnormal sensation of increased pressure in her head, brain fog, and dizziness" that began in November 2021. DX-3215, p. 246; *see also* Andruska Decl. (ECF 364) ¶ 92 (finding that vestibular dysfunction was new to Mrs. Freeman since November 2021). When the EEG did not find her episodes epileptic in nature, doctors suggested a vestibular cause, and then diagnosed and treated her for vestibular dysfunction. *Id.*

---

(10/17/22 Otolaryngology recommends vestibular PT); PX-2255_0019 (Diagnosis: Vestibular disorder, 10/17/22, Anna Concepcion G, PA); PX-2255_0805-808 (10/25/22 physical therapy assessment, testing, and exercises – "Pt demonstrates impaired sensory organization per SOT with deficits in visual and vestibular systems." "Composite SOT: 59); PX-2255_478 (1/4/23 neurology consult. "Per patient her actual real seizure last occurred Dec 2021. After this she had a number of events that were found to be nonepileptic and were actually vestibular dysfunction, was admitted to an EMU for this."); PX-2255_1312 (3/17/22 evaluation for jet fuel contaminated water exposure by Geoffrey Jacoby, MD. "She reports compliance with the treatment program [vestibular and somatosensory home exercise program] and states that her symptoms have begun to improve."). Dr. Bird also found that "Nastasia underwent vestibular testing and has been diagnosed with a vestibular disorder. Bird Decl. (ECF 491-1) ¶ 122(f).

Moreover, psychogenic causes and conversion disorder are diagnoses of

exclusion that no Government expert undertook. *See* Andruska, 5/3/24 Tx. 145:3-

10 ("Fundamental to the diagnosis of conversion disorder is that there is no better

or more accurate medical reason or medical diagnosis for a patient's symptoms.").

To the extent that stress and trauma contributed to Mrs. Freeman's injuries, they

were nevertheless caused by the Government's negligence. Dr. Prueitt

acknowledged in her testimony that any "stress-induced" symptoms were caused

by "the stress of the incident itself and the perception of the individuals" – i.e.,

caused by the Government's release of jet fuel into their drinking water supply.

*See, e.g.*, Prueitt, 5/8/24 Tx. 96:22-97:15. Long accepted tort principles dictate that

"the fact that the harm results solely through the internal operation of the fright or

other emotional disturbance *does not protect the actor from liability*." Restatement

(Second) of Torts § 436 (emphasis added).

Plaintiffs have met their burden to show that the Government's negligence

caused Mrs. Freeman's vestibular disorder, as well as her headaches, migraines,

seizures, and spells. *See* Pls.' Br. 53-57. Dr. Andruska established expected health

effects from JP-5 exposure as to neurological injuries, *see id.* at 41-42, and that

Mrs. Freeman suffered long-term neurological symptoms from her exposure to jet

fuel, *id.* at 53-56. Her opinions are supported by and consistent with Dr. Bird's

opinions regarding general causation, which she "partially relied" on for general

causation in this case and then came to her own conclusions. Andruska, 5/3/24 Tx. 125:10-17. *See* Bird Order (ECF 410) at 14 (finding Dr. Bird's opinion on general causation are sufficiently reliable and admissible and denying Governments' request to exclude the expert report of Kristin Andruska because she relied on Dr. Bird's general causation opinions).

Dr. Andruska's opinions regarding specific causation are reliable. In determining whether the JP-5 caused each of Mrs. Freeman's neurological symptoms, she found a close temporal relationship between the exposure and the symptoms, performed a differential diagnosis and considered other causes for the symptoms, found that her symptoms are largely consistent with the literature and what others reported experiencing at Red Hill, and found that Mrs. Freeman's symptoms lessened after exposure stopped. *See* Pls.' Br. 54-56.

Further supporting the reliability of her opinions, Mrs. Freeman's treating physician, Dr. Storage, also concluded that exposure to JP-5 was the primary cause

of Mrs. Freeman's neurological and psychiatric symptoms.[29] *See* Pls.' Br. 56-57.[30]

_____

[29] Dr. Storage's opinions regarding Nastasia Freemen are also based on reliable methodology. Gov't Br. 40. His opinions are based on both his clinical assessment, and objective testing. Storage Decl. (ECF 387) ¶ 7. His assessment included his review of Mrs. Freeman's medical history, clinical examination of Nastasia Freeman, and SPECT imaging. *Id.* The SPECT imaging "further bolstered and supported [his] opinions." *Id. See also* Storage, 5/1/24 Tx. 86:23-87:6 (testifying that the SPECT scans support his findings that Mrs. Freeman suffered from trauma. "The SPECT scans help support that finding, but yeah, based on clinical assessment alone, I have reached that conclusion.").

Courts have found SPECT testing for brain injury and diagnostic support to be reliable. For example, in *Blotcher v. Stewart*, 45 F. Supp. 3d 1274, 1282 (D. Colo. 2014), the court found that "[b]rain SPECT imaging has been tested, reviewed, and determined to be scientifically valid. It has value if used as intended, *i.e.,* used as the clinician deems appropriate together with other patient information to form a differential and ultimately a final diagnosis of the patient's condition." Specifically, "[B]rain SPECT imaging has been shown to be a sufficiently reliable methodology of detecting abnormalities in cases of suspected traumatic brain injury." *Id.* at 1283. The court further found that SPECT images "consistent with" a traumatic brain injury will be allowed and helpful to the finder of fact in determining whether there are abnormalities in the Plaintiff's brain. *Id.* at 1283. *See also Steward v. Hankins*, 2016 WL 7971939, at *2 (E.D. Tex Oct. 7, 2016) (finding that in the situation where an expert relied on Plaintiff's self-reported symptoms and medical history, in conjunction with the SPECT scan findings, to reach a diagnosis, his opinion regarding SPECT scans is both reliable and admissible.). The Government's reliance on *Summers v. Missouri Pac. R.R. Sys.,* 897 F. Supp. 533, 540 (E.D. Okla. 1995), *aff'd*, 132 F.3d 599 (10th Cir. 1997) is misplaced as the question that Court faced there was ultimately whether SPECT scans were a reliable means to test for "the recognized medical condition of chemical sensitivity," not brain trauma. And although the court in *McCook v. Unum Life Ins. Co. of Am*., 483 F. Supp. 3d 729, 740 (E.D. La. 2020), provided that SPECT results by themselves may not satisfy causation, if found to be reliable, they may be used "to give weight to other evidence and findings." That is exactly what Dr. Storage has used them for.

[30] In his evaluation of Mrs. Freeman, Dr. Jacoby also found that Mrs. Freeman's symptoms of runny nose, diarrhea, vomiting, cough, and burning eyes around the

### III.    Plaintiffs' Emotional Distress Was Eminently Reasonable

Plaintiffs demonstrated that they suffered significant emotional distress –

and that this distress was eminently reasonable. Plaintiffs in this case are military

or prior military families who are accustomed to frequent relocations, modest

living conditions, and extended deployment family separations as sacrifices they

take on to serve their nation. And yet, despite these resilient backgrounds, the

Court witnessed all of them recount how their exposure to contaminated water was

uniquely traumatic. *See* Pls.' Br. 42-50, 51-140. To suggest that the consistent

emotional reactions of randomly selected bellwether families and the

Government's selections are unreasonable defies common sense. These families

were deeply affected by the incident and their decisions to leave Hawaiʻi – a place

they loved – demonstrates the severity of their distress.

While the Government concedes that "Plaintiffs experienced stress, anxiety,

and worry in the days after they learned about the November 2021 fuel spill,"

Gov't Br. 43, it then proceeds to trivialize these concerns. Specifically, the

_____

time of contamination that improved when switching to a different water source
are consistent with that of other exposed families. He further found that her
additional symptoms of worsening skin condition, worsening seizure control, and a
new report of cognitive complaints and dizziness were also "consistent with self-
reported symptoms experienced by others" and that "Mrs. Freeman describes
overall improvement in her health since removal from exposure but continues to
report multiple health complaints that significantly reduce her quality of life." PX-
2255_1304-1305 (3/17/22 evaluation for jet fuel contaminated water exposure by
Geoffrey Jacoby, M.D.)

Government contends that there should be some durational limit on Plaintiffs'
emotional distress from the Government having contaminated their homes,
threatened their health, and upended their lives. Gov't Br. 42-49.

As an initial matter, the Government fails to point to a *single* legal authority
to support its position. And in fact, the cases it does cite have nothing to do with
limiting emotional distress based upon temporality. In *In re Hawai'i Fed. Asbestos
Cases*, 734, F. Supp. 1563, 1568-69 (D. Haw. 1990), the court simply noted that to
have a viable claim of emotional distress, there must be an actual underlying
compensable harm that triggered the emotional distress. And in that case, the court
held there was not, reasoning that "[i]n many of the asbestos cases before this
court, it is unclear whether a plaintiff has suffered a compensable injury at all." *Id.*
Therefore, the court held that the plaintiffs' fear of developing cancer, without an
underlying compensable physical injury, did not support the plaintiffs' claims of
emotional distress. *Id.* And in *John & Jane Roes, 1-100 v. FHP, Inc.*, 985 P.2d 661
(Haw. 1999), another case cited by the Government, the plaintiffs were individuals
who had been exposed to HIV positive blood, none of whom manifested any
symptoms or injuries. The certified question before the court was whether the State
of Hawai'i should recognize a cause of action for fear of developing AIDS where
an individual can prove exposure to HIV positive blood without demonstrating an
underlying predicate harm. *Id.* at 662.

The Government's reliance on *Collier v. Simpson Paper Co*., 1997 U.S. App. LEXIS 36334 (9th Cir. Dec. 24, 1997) is also misplaced. Like the other cases relied upon by the Government, there was a total absence of physical injury on the part of all appellants. 1997 U.S. App. LEXIS 36334 at *11-12 (discussing the standard for recovering for fear of cancer in the absence of any physical injury or illness). And finally, in *Goodin v. Fid. Nat. Title Ins. Co*., 2008 WL 4173530 (D. Haw. Sept. 9, 2008), the plaintiff had brought a contract claim and the court noted the well-established proposition that damages for emotional distress and mental anguish are not generally recoverable in contract. In short, the Government's insistence that Plaintiffs' emotional distress claims be temporally limited is neither well supported nor well taken.

Here, each of Plaintiffs demonstrated underlying compensable acute physical injuries from their exposure to the jet fuel. *See* Pls. Br. And *in addition* to their physical injuries, Plaintiffs suffered significant and reasonable emotional distress. Indeed, as the Court heard at trial, Plaintiffs faced significant life disruption, including evacuation to hotels, using public showers, loss of relations and relationships, and ultimately, for many of them, leaving Hawai'i. These disruptions added to their emotional distress and the sense of instability and insecurity. *See e.g*., PX-2249_0795 (Medical Composite - Richelle Dietz ["C/o depression, anxiety, fatigue with increased anxiety, panic, headache and depression

since December 2021-early 2022. She continues to wake up with anxiety and panic most mornings and c/o restless sleep still. Struggling to keep up with routine stressors and daily tasks due to anxiety including hypervigilance, avoidance and feeling easily overwhelmed with fears of contamination and impact on her family's health. At night she has nightmares about her circumstances related to contamination."]); PX-2264_217 (Medical Composite - Elizabeth Witt ["Established 30 y o pregnant female requesting to discuss water contamination issues. Has been living in Hickam housing since Aug 2021… Experienced excess night sweats, palpitations, anxiety, headaches and had rashes since exposure, and worried about her unborn child. …"]).

Plaintiffs' lack of trust in the Government and feelings of institutional betrayal further exacerbated their emotional distress when these Plaintiffs had spent their lives serving their nation. The Government's failure to provide accurate warnings, inadequate remediation efforts, and inconsistent assurances undermined Plaintiffs' faith in the institutions responsible for their safety.

Plaintiffs had every reason to question the Government's response to this crisis, as the Government led with misinformation and minimized concerns. The Government's attempt to argue that they did everything correctly is contradicted by the facts, even with Plaintiffs' limited leeway to present evidence on the Government's failures to warn and remediate.

The Government itself has repeatedly acknowledged emotional harms
caused by the spill – noting in multiple documents an increase in anxiety after the
spill lasting for months. The CDC, ATSDR, and DHA reported high incidence of
anxiety in the Red Hill community after the fuel release. *See e.g.,* PX-1583; (A.N.
Troeschel et al., *Self-Reported Health Symptom Following Petroleum
Contamination of a Drinking Water System – Oahu, Hawaiʻi, Nov. 2021 – Feb.
2022*, 71 Morbidity & Mortality Wkly. Rep. 665 (U.S. Dep't of Health & Hum.
Servs./Ctrs. for Disease Control & Prevention, May 27, 2022); PX-2216_0002
(Miko Study). In fact, the Miko Study recognized that "water contamination events,
in general, are associated with long-term adverse psychological and social effects
like anxiety and health worries, decreased trust in public health officials, financial
hardships, stigma, and difficulties seeking help." *Id; see also* PX-1182_0006 (ACE
investigation, listing anxiety as an acute symptom from exposure to aromatic
hydrocarbons found in the literature); PX-1182_0032 (Hundreds of participants
self-reported new mental health symptoms including anxiety, insomnia, agitation,
tense-nervous, depressed, paranoia); PX-1241 (Healthcare Provider Evaluation and
Treatment Guidance for Potential Petroleum Exposure from the Red Hill Fuel Spill,
Defense Health Agency, dated Jan. 2023 ["the Red Hill fuel spill was a traumatic
and stressful time for many of the military families affected by the spill. Some of
these individuals may also be experiencing symptoms of depression, anxiety, or

PTSD associated with the fuel spill."]).

Plaintiffs' expert on trauma, Dr. Melissa Vargo, performed a methodologically sound psychological evaluation of each of the adult Plaintiff and found notable emotional distress caused by their exposure to the contaminated water. *See* Vargo Decl. (ECF 388) ¶¶ 17-43; *see also* Pls. Br. 46-47, 58-61 (discussing mental anguish and emotional distress for Nastasia Freeman); 83-84 (same for Patrick Feindt); 98-101 (same for Sheena Jessup); 124-126 (same for Richelle Dietz); 136-138 (same for Elizabeth Witt); 142-145 (same for Kevin Aubart). Dr. Vargo used multiple self-report tools and clinical interviews. *See, e.g.*, Vargo Decl. (ECF 388) ¶¶ 17-41. She found that "[e]ach Bellwether plaintiff identified Red Hill as a source of anxiety, trauma, fear, and/or concern during their assessment." *Id.* ¶ 54. Their symptoms included unwanted memories, nightmares, flashbacks, avoidance of trauma-related stimuli, negative thoughts and feelings, and heightened arousal and reactivity, and causing distress and functional impairment. *See, e.g.*, ¶ 55. Ultimately, she found they all met the criteria for PTSD, anxiety, or adjustment disorder as a result of the fuel release. *See, e.g.,* ¶ 55(a) (Mr. Aubart, PTSD); ¶ 55(c) (Mr. Feindt, PTSD); ¶ 55(d) (Mrs. Freeman, PTSD), ¶ 55(e) (Mrs. Jessup, PTSD); ¶ 55(b) (Mrs. Dietz, Anxiety); (Mrs. Witt, Adjustment Disorder). Dr. Vargo demonstrated that Plaintiffs live with ongoing fear and anxiety as a result of the fuel leak, including traumatic or other

neurological disorders, depression, anxiety about water or visits to medical

providers, and fear of future medical conditions like cancer. Such fears are not

bounded by "epidemiological studies" but by the common sense that drinking jet

fuel can lead to very bad health outcomes. *Id*.

Similarly, Dr. Clark conducted a thorough evaluation of each of the minor

Plaintiffs, ensuring that the evaluations were meticulous and evidence-based. Clark

Decl. (ECF 366) ¶¶ 15-21. He found that each minor Plaintiff experienced a

traumatic event: the Red Hill jet fuel water contamination. *See, e.g., id.* ¶ 22. He

further found that the contaminated water caused disruption to the family life of

each minor Plaintiff which substantially contributed to many of the minor

Plaintiffs' mental health symptoms and diagnoses. *See id.* ¶¶ 23-24; *see also* Pls.

Br. 48-49, 66-67 (discussing mental anguish and emotional distress for D.F.); 70-

72 (same for K.F.); 74-76 (same for N.F); 89-91 (same for P.G.F); 94 (same for

P.R.F); 104-107 (same for Beau Jessup); 110-112 (same for B.J.J.); 115-117 (same

for N.J.); 119-120 (same for D.J.); 129-130 (same for B.D); 133 (same for V.D).

The Government's contention that Plaintiffs' fear of future harm is

unreasonable, *see e.g.*, Gov't Br. 42-47, is disingenuous and without legal or

scientific support. Even its own expert, Dr. Smith, conceded that it is reasonable

for fear of a disease (even if such a belief is unfounded) will negatively affect an

individual's well-being. Gordon Decl. (ECF 345-1) ¶ 30; *see also* Gordon 5/9/24

Tx. 27:19-28:25. And Dr. Gordon opined "it is well-known that having a belief that a disease is present, even if false, such as a belief that neurologic conditions are due to an alleged exposure, can have a significant negative consequence for an individual's well-being and behavior (*e.g.*, see the DSM-V 2013 diagnostic categories of illness, anxiety disorder, and somatic symptom disorder.)" *Id.*; *see also* D. Felton Dep. (Aug. 21, 2023) (ECF-361-1) at 36:21-38:15 (discussing how there are long-term behavioral health impacts from traumatic events such as the jet fuel spill: "[There is] a clear direct link to, you, this traumatic event that people experienced and resulting difficulties with…anxiety, depression, post-trauma syndrome, and many other things that can be related to experiencing a traumatic event such as this was.").

The Government also points to Plaintiffs' prior trauma, seeking to undermine a causal connection between the spill and Plaintiffs' emotional state (and to apportion it all away). Plaintiffs will more fully address those issues below, but the Government cannot avoid the well-established "eggshell plaintiff" doctrine, which means that for purposes of causation, it must take a Plaintiff as it finds them.

And finally, the Government's contention that the adult Plaintiffs cannot recover for their emotional distress experienced as a result of their minor children's injuries is also without merit. Gov't Br. 49-50. In *Kaho'ohanohano v. Dep't of Hum. Servs., State of Haw.*, 178 P.3d 538, 584 (Haw. 2008), the only case relied

upon by the Government, the Hawaiʻi Supreme Court did in fact award damages to the minor child's father, who did not himself suffer any underlying injury, but where he witnessed his minor child's physical and emotional suffering. As discussed previously, all Plaintiffs in this case have incurred their own underlying physical injuries in addition to suffering emotional distress as a result of their exposure to the jet fuel. Plaintiffs' emotional distress from witnessing the physical and emotional suffering of their minor children is reasonable and compensable.

In sum, Plaintiffs' emotional distress claims in this case include their emotional distress and mental anguish in the immediate aftermath of the spill, as well as their long-term psychological conditions that developed or worsened as a result of experiencing this trauma. Such emotional distress in response to a life-changing and upending event is eminently reasonable and is well documented in the medical and scientific literature.

## IV. Plaintiffs Satisfied Their Burden with Respect to their Special Damages Claims for Future Health Costs, Tutoring Costs, and Lost Wages

### A. Mrs. Freeman's Special Damages Claims for a Driver were Proven at Trial

Contrary to the Government's argument, Plaintiffs proved the specific causation with respect to Mrs. Freeman's medical need for a driver as result of her exposure to jet fuel. Dr. Andruska testified that she reviewed over 19,000 medical records for Mrs. Freeman and established a neurologic baseline that predated her

toxic exposure. The medical records following the fuel leak document an onset of new neurologic symptoms and exacerbation of existing neurologic symptoms for Mrs. Freeman. Andruska, 5/3/24 Tx. 138:9-5.

Moreover, Dr. Andruska testified that Mrs. Freeman also underwent vestibular testing in October 2022 of all three of her balance systems (eyes, brain, and inner ear), and the results were that she had dysfunction of two of those three systems that control her balance and posture. *Id*. at 139:6-140:11. Most importantly, the test cannot be faked. *Id.* at 140:2-4. As such, the results of her test, along with her well-documented history of reporting symptoms such as dizziness, nausea, ringing in ears, difficulty walking, and trouble with balance, are all consistent with her documented vestibular dysfunction, and provide a more concrete medical diagnosis than the Government's position that she is simply "making them up." *Id.* at 144:5-146:3.

Given her medical diagnosis of vestibular dysfunction, and the deterioration of two of three of her balance systems, Mrs. Freeman is not advised to drive following her exposure. Therefore, her special damages include having a driver so she can meet the basic need of attending her medical appointments and receiving healthcare. This was costed out by Ms. Burns to be a reasonable ten hours per week for two years and based on a good faith estimate of the amount of healthcare that she was unable to access during the time she could not drive (and there being

48

no indication that she stopped driving prior to her exposure). Burns, 5/3/24 Tx. 68:11-69:10. For these reasons, Plaintiffs have not only shown that her vestibular dysfunction was a specific result of the fuel leak, but that having a driver allows her to receive the care necessary to live with her new and exacerbated neurological symptoms without causing harm to herself or others on the road.

### B.   Plaintiffs Established that their Need for Mental Health Services and Tutoring Stems from their Exposure to Toxic Jet Fuel.

The Government seeks to discredit the methodologies employed by Plaintiffs' mental health experts in evaluating acute and long-term effects of their exposure to jet fuel. This position is disproven not only by each mental health expert's respective declaration, but by their testimony and responses to the Government's cross-examination. Moreover, each mental health expert possessed not only extensive certification and expertise in their respective fields (the Government did not challenge either Dr. Vargo or Dr. Clark on their qualifications at trial), but also employed industry-standard tests and evaluation methodologies to determine whether, and to what extent, each Plaintiff experienced new or exacerbated psychological symptoms following their exposure. Pls. Br. 46-47; Vargo Decl. (ECF 388).

With respect to Dr. Vargo, she employed three tests: the Post-Traumatic Stress Disorder Checklist Civilian Version (PCL-5), the Beck Depression Inventory II, and the Beck Anxiety Inventory. Vargo Decl. (ECF 388) ¶ 19. At

trial, the Government chose to question her only on the PCL-5. It asked whether Dr. Vargo was aware of various traumatic events within the lives of some of the adult Plaintiffs prior to preparing her reports, to which she responded she did not. Vargo, 5/2/24 Tx. 62:9-63:7. But the Government then attempted, and continues to attempt in its Closing Brief, to undermine the validity of Dr. Vargo's clinical methodology by concluding that by not knowing about those particular traumatic events, she could not differentiate the psychological harm resulting from those events with that from the spill. Dr. Vargo disproved this argument in her response: "That's not correct…So specifically, we're looking at the PCL-5 With the Life Events Criterion. There are many questions within that that I did cover within my forensic interview prior to this. And so if we're talking about whether or not those questions were asked within a psychosocial interview, those questions were specifically asked. And when I asked those questions, the individuals reported that they did not experience those symptoms or they did, which was included within the report." *Id.* at 63:11-21. Moreover, her use of the PCL-5 as a standalone assessment for PTSD symptomology is a consistent and widely accepted practice in her field and was performed in conjunction with a "clinically structured interview [with] questions based on a review of the literature within a trauma-informed care model [and where] different questions were asked as needed to provide appropriate follow-up. Vargo Decl. (ECF 388) ¶¶ 26-28 (emphasis added).

Dr. Vargo's diagnoses were derived from industry standard methodologies and with the exception of a couple individuals[31], her interviewed Plaintiffs did not report 1) incurring any psychological problems historically, or 2) having any prior psychological diagnoses with exception. Vargo, 5/2/24 Tx. 68:25-69:9.

The same is true for Dr. Clark. The Government contends that Dr. Clark's opinions lack "intellectual rigor" because the methodology he applied in evaluating the minor Plaintiffs differed from "new patients." Gov't Br. 53-54. Dr. Clark's methodologies and approach to evaluating, as he testified to by declaration and at trial, rebut this characterization. In his twenty-seven years of performing over one hundred forensic psychiatric analyses, Dr. Clark's methodology included seeking information from multiple sources: 1) medical records, 2) interviews with the parents, 3) interviews with the child, and 4) relevant medical literature. Clark, 5/2/24 Tx. 95:15-96:10, Clark Decl. (ECF 366) ¶¶ 14-21. He interviewed, via Zoom, the parents of the Plaintiff families, with each interview lasting between sixty to ninety minutes, and an additional interview with the Jessup daughter. *Id.* at 98:1-6, 100:19-23. Based upon his experience and expertise, he found Zoom to be a reliable tool to conduct his interviews and parallel to the information he could

---

[31] The Government's footnote 18 was addressed by Dr. Vargo's declaration and testimony in that she determined Mrs. Jessup had pre-existing Adjustment Disorder with mixed Anxiety and Depressed Mood (DSM-V code 309.28). Vargo Decl. (ECF 388) ¶ 56e.

51

derive from working in person. *Id.* at 98:24-99. His methodology is industry standard for forensic psychiatrists. *Id.* at 96:11-16, 96:7-18.

Dr. Clark used this methodology to determine the tutoring needs of K.F. and D.F. He interviewed the Freeman family and found that D.F. experienced substantial deterioration in his function and was later diagnosed with Autism Spectrum Disorder, mild to moderate range. Clark Decl. (ECF 366) ¶¶ 65 and 68. He found that K.F. was at risk of developing a major psychiatric disorder in the years to come, at risk of failing to achieve major developmental milestones, and met the criteria for Other Specific Trauma and Stressor Related Disorder per the DSM-V. *Id.* ¶ 63. It is for these reasons that Dr. Clark recommended tutoring for these children to catch up in their educational development despite the major psychological setbacks caused by the fuel leak.

Dr. Clark determined, based upon his experience and expertise, that he had gathered sufficient information to form his opinions on each of the Plaintiff families. *Id.* at 99:5-14. And his opinions for all the minor Plaintiffs, except Beau Jessup, were unchanged even after receiving and reviewing all the additional information presented in this case, including the raw data and interviews from Dr. Smith. *Id.* at 100:9-16. For Beau, Dr. Clark recognized Beau had been "more profoundly affected" by his water contamination experience than he had first understood from his interview and investigation. *Id.* at 99:18-100:8. And he

testified to this Court that Beau was already an anxious young man who had some

difficulty early on, but experienced 1) a loss of his friend group, 2) concern over

his own medical condition, and 3) a higher level of conflict within his family, all of

which can be attributed to the fuel leak. *Id.* at 102:2-20. The fact that Dr. Clark did

not fully appreciate the magnitude of Beau's challenges in his initial investigation

does not undermine his methodology or invalidate in any way that it is widely

accepted and industry standard in the field of forensic psychiatry.

### C.    Plaintiffs Mr. Feindt and Mrs. Freeman's Lost Wages are Attributable to the November 2021 Spill

The Government retained and presented Mr. West to evaluate and determine

Mr. Feindt and Ms. Freeman lost earnings due to the water contamination. West

Amd. Decl. (ECF 563-1) ¶¶ 37-107. For Mr. Feindt, Mr. West evaluated his lost

earnings and presented two Alternatives based on a difference in base annual

salary at The Golf Sim (Alternative 1 at $65,000 vs. Alternative 2 at $85,000). *Id.* ¶

74. Mr. West recognized that Mr. Feindt incurred wage losses following the fuel

leak – the major question for him was whether the $20,000 raise at The Golf Sim

was realized in 2022. If there was insufficient basis for that raise, Mr. West would

not have presented Alternative 2. The same reasoning applies for Mrs. Freeman,

where Mr. West presented two Alternatives based on a difference in whether she

further mitigated her damages by acquiring an average of four new private patient

one-hour sessions per week by January 1, 2024. *Id.* at 105. If Mr. West believed

there was sufficient basis that this mitigation had occurred by January 2024, then

he would not have presented Alternative 2. He did not for either Mr. Feindt or Mrs.

Freeman, and as such, presents them as credible evaluations of their loss earnings

"with reasonable economic certainty and based on generally accepted data sources

and methodologies used by forensic economists." *Id.* ¶¶ 38 and 76.

The Government then contends that Mr. West's evaluations are effectively

moot and cannot be accepted by Plaintiffs because they have not established that

their lost earnings were caused by the Navy's water contamination. The testimony

for each individual and that of their families disproves that contention.

### 1.    Mr. Feindt's lost wages are attributable to the fuel leak.

The Government attempts to break down Mr. Feindt's lost earnings into two

periods, before and after his family's move away from their contaminated home.

Gov't Br. 59-62. Their sole justification for not attributing his lost earnings to the

water contamination is that the Feindts were not exposed to jet fuel at levels that

would make them sick. Plaintiffs previously addressed this argument. As such, the

Court should assess damages for Mr. Feindt for his lost earnings pursuant to

Mr. West's calculations under Alternative 2, as Plaintiffs established at trial the

basis for his salary raise in 2022.[32]

---

[32] Mr. Feindt testified that in 2022, his salary at The Golf Sim would be increased
to $85,000 per year upon his one-year anniversary and that his commissions were
to be the same (50% of golf instruction and 30% of golf club fittings). This was in

Second, the Feindts' decision to relocate from Hawaiʻi to Colorado was entirely due to the fuel leak and their need to escape from their contaminated home. The disastrous series of events following the fuel leak such as constant moving between hotels for months and recurring sicknesses among all family members caused the Feindts to make the difficult decision to move to Colorado.[33] For Mr. Feindt, this meant leaving his established job, one that he loved, and relocating to an entirely new environment while attempting to take care of his sick children, sick wife, and his own symptoms. *Id.* ¶¶ 53-56, 60-87.

It was both entirely reasonable for the Feindts to leave their contaminated

_____

line with equivalent managers who worked at The Golf Sim. *Id.* ¶ 91. Moreover, Mr. Feindt testified that his manager's November 4, 2021 email (PX-1002) was not raising concerns with respect to his raise to $85,000 per year, but the concept of opening more stores across the island and the salary increase of $20,000 per store due to the extra responsibilities Mr. Feindt would have in running the stores and developing the clientele, and the manager's expectations of the hours Mr. Feindt would be working based on the raise. P. Feindt, Jr., 04/29/24 Tx. 220:7-221:22.

[33] P. Feindt, Jr. Decl. (ECF 392) ¶ 16-17 (Feindts fell sick after Thanksgiving but reassured that the water was safe); ¶ 21 (Feindts instructed over a week later to not use the water); ¶ 25-28, 30-31 (continued illness); ¶ 32 (relocated to hotel); ¶ 34-36 (Government "flushed" the Feindts home despite not returning the results of testing for fuel); ¶ 37 (Government released water heater water into the Feindt's yard); ¶¶ 39-40 (life disruption in tiny hotel rooms, constant moving between hotels for over 84 days); ¶¶ 43, 45 (children regressed developmentally and family lost important hobbies that they previously did together); ¶ 47 (Mrs. Feindt hospitalized in March 2022); ¶¶ 48-50 (symptoms returned after moving back to Ford Island home, Feindts decided to move to Colorado and Mrs. Feindt filed for compassionate reassignment).

home for a safer abode in Colorado, and for Mr. Feindt to experience difficulty finding work equivalent to the job he once had as he struggled to take care of himself and his sick family. As such, Mr. West's Alternative 2 analysis appropriately captures Mr. Feindt's lost earnings for these periods.

### 2. Mrs. Freeman's lost wages are attributable to the fuel leak.

Likewise for Mrs. Freeman, Plaintiffs have proven specific causation. Moreover, Mrs. Freeman testified at trial that following her exposure to jet fuel, she needed to close some of her client accounts. N. Freeman, 4/29/24 Tx. 127:12-22. She testified that pursuant to her code of ethics, there was a process she needed to follow to terminate her clients. *Id.* By the time she moved to California in February 2022, she had already closed some of her clients, sent out closure letters, and made referrals. *Id.* at 127:16-22. This testimony is consistent with her bank records. *See* PX-1607. In October 2021, Mrs. Freeman earned $4,129.05 via BetterHelp. *Id.* at p. 2. Contrast that with February 2022 where she earned $1,266.76, a more than 50% reduction in income. *Id.* at p.15.

Furthermore, Mrs. Freeman testified consistently with her deposition testimony that she reduced her workload between November 2021 and October 2022 but did not completely stop her practice. *See* N. Freeman, 4/29/24 Tx. 129:17-22. Mr. West confirmed this reduction, and his subsequent timeline of events and calculations support her testimony and Plaintiffs' acceptance of

Alternative 2. *See* West Decl. (ECF 563-1) ¶ 81. Due to her deteriorating health, Mrs. Freeman paused her practice entirely in October 2022 before resuming in spring 2023. *See* N. Freeman, 4/29/24 Tx. 130:10-13; West Decl. (ECF 563-1) ¶¶ 82-83. Beginning in April 2023, Mrs. Freeman began seeing clients again and Mr. West calculated that she worked an average of 3 days per week, or 1.57 clinical hours of work per workday. *See* West Decl. (ECF 563-1) ¶ 83. From July 2023 onward, Mr. West calculated that Mrs. Freeman's average revenue was $577.49 per week. *Id.* ¶ 84. Mr. West concluded that based on a reasonable growth rate of 2.1%, Mrs. Freeman would average $118.37 per each one-hour private session she performed in 2024. *Id.* ¶ 90. Mr. West then assumes that *if* Mrs. Freeman could add four additional one-hour sessions per week, or nearly *double* her clinical hours, she would reach her pre-incident level of earnings. *Id.* ¶ 92. Mr. West then concludes that Mrs. Freeman could reach that level at the earliest by January 2024 (Alternative 1), but based on a *conservative* assumption, she would reach it by January 2025 (Alternative 2). *Id.* ¶ 93-94.

Given the extensive neurological effects experienced by Mrs. Freeman following her exposure, and Mr. West's assumption that she needs to nearly double her workload to reach full mitigation of lost wages, Alternative 2 is the appropriate measure of damages.[34]

---

[34] The Government contends that all lost earnings should end by October 2023,

**V.     The Government is Responsible for Plaintiffs' Injuries**

**A.     The Government Has Failed to Meet its Burden that Apportionment is Appropriate Generally**

The Government misconstrues fundamental issues of causation and

apportionment throughout its brief.

**1.     Once legal causation is established, the burden is on the defendant to establish that an injury is capable of apportionment and to establish the amount of apportionment.**

As an initial matter before the damages inquiry, the factfinder must first

determine legal causation. In Hawaiʻi, legal causation is determined by a finding

"that the defendant's conduct was a substantial, as opposed to a negligible or

trivial, factor in causing the harm. In other words, a substantial factor is one that a

reasonable person would consider to have contributed to the harm." *O'Grady v.

State*, 140 Hawaiʻi 36, 46-47 (2017). While the burden at this phase is on the

plaintiff, this "substantial factor" standard "is not meant to serve as a significant

burden to plaintiffs in establishing factual causation." *Id.*

Once legal causation is established, the defendant takes the plaintiffs as it

finds them for the damages inquiry. *Montalvo v. Lapez*, 77 Hawaiʻi 282, 294

---

when Mrs. Freeman testified that she "went back" to work. N. Freeman, 4/29/24
Tx. 129:23-25. However, as the Government concedes, its own expert Mr. West
did not analyze this data point. The Government attempts to paint Mrs. Freeman's
return to work as a complete return with a full post-incident caseload, when this
was not testified to by Mrs. Freeman or considered by Mr. West.

(1994); Hawaiʻi Civil Jury Instructions § 7.3, Pre-Existing Injury or Condition. A tortfeasor is responsible for all actions it causes, even if "a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct." Restatement (Second) of Torts § 461.[35]

Next, the factfinder considers the possibility of apportionment. Damages are initially presumed to be "indivisible" – not apportionable. "Unless sufficient evidence permits the factfinder to determine that damages are divisible, they are indivisible." The Restatement (Second) of Torts at Comment g. Section 26 of Restatement (Second) of Torts: Apportionment of Liability provides:

> (a) When damages for an injury can be divided by causation, the factfinder first divides them into their indivisible component parts and separately apportions liability for each indivisible component part under Topics 1 through 4.
> (b) Damages can be divided by causation when the evidence provides a reasonable basis for the factfinder to determine:
> (1) that any legally culpable conduct of a party or other relevant person to whom the factfinder assigns a percentage of responsibility was a legal cause of less than the entire damages for which the plaintiff seeks

---

[35] "Hawaiʻi state courts frequently cite to [the Restatement (Second) of Torts] in tort actions." *Indymac Venture, LLC v. Leu Okuda & DOI*, 2018 U.S. Dist. LEXIS 232096, at *22-23 (D. Haw. Jan. 31, 2018) (Mansfield, J.) (collecting cases); *see also Bynum v. Magno*, 106 Haw. 81, 86 n. 12 (2004) ("This court has many times relied on the Restatement (Second) of Torts as persuasive authority."). Where "superceded by Restatement (Third) of Torts," Hawaii courts also "rely on the Restatement (Third) of Torts." *Isham v. PADI Worldwide Corp.*, 2007 U.S. Dist. LEXIS 62419, at *18 (D. Haw. Aug. 23, 2007).

recovery and

(2) the amount of damages separately caused by that conduct.

Otherwise, the damages are indivisible and thus the injury is indivisible.

The burden of proving apportionment rests squarely on the "party alleging

that damages are divisible" – here, the Government. *Id.* at Comment h. The policy

underlying the rule was clear:

> d. The reason for the exceptional rule placing the burden of proof as to apportionment upon the defendant or defendants is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned. In such a case the defendant may justly be required to assume the burden of producing that evidence, or if he is not able to do so, of bearing the full responsibility.

Since the Government seeks to avoid responsibility for indivisible damages

and to apportion damages, the burden for both rests squarely on it.

### 2. Certain harms are not divisible nor apportionable, and emotional distress is such a harm.

Importantly, certain kinds of harms are simply not divisible or

apportionable. The Restatement (Second) of Torts explicitly recognizes this:

> Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division. Death is that kind of harm, since it is impossible, except upon purely arbitrary basis for the purpose of accomplishing the result, to say that one man has caused half of it and another the rest. The same is true of a broken leg, or any single wound, or the destruction of a house by fire, or the sinking of a barge.

Such harms can be apportioned, if at all, only upon the basis of a prior reduction in value of what has been destroyed. By far the greater number of personal injuries, and of harms to tangible property, are thus normally single and indivisible.

§ 433A, Comment i. The Restatement further explains:

Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.

*Id.*

The logic of these principles leads to the conclusion that emotional distress is the kind of harm that is indivisible and non-apportionable. This is the background for *Mueller*'s holding that emotional distress was incapable of division on any logical or reasonable basis. *See Mueller v. Dep't of Pub. Safety*, 570 F. Supp. 3d 904, 911 (D. Haw. 2021) ("emotional injuries are not distinct harms that could readily be apportioned out by the jury such as in a [physical injury] accident"). The plaintiff's pre-existing mental health issues complicated the matter, making it impractical to separate emotional distress damages attributable to the defendant's actions from other causes. *Id.* Therefore, the court held the defendant responsible for the entire harm of emotional distress. *Id.* Indeed, considering the complexity of people's emotional experiences over the course of a life, emotional distress seems far more akin to indivisible injuries such as death or a barn fire

61

begun through multiple causes than to discrete and measurable physical injuries such as one tortfeasor breaking one leg and another breaking the other, or even multiple, successive tortfeasors separately injuring the plaintiff's back over the course of several accidents as in *Montalvo*.

Well-reasoned cases from across the country have overwhelmingly declined to parse and apportion emotional distress, even when faced with horrific prior traumas. One reason is the perverse outcome that would result, where a plaintiff with significant prior trauma would face a more difficult causation burden or receive less recovery than a plaintiff without such a past – in essence overruling the well-established "eggshell skull" rule of Restatement § 31; *see also*, *Poole v. Copland, Inc.*, 348 N.C. 260, 263 (1998) (applying "eggshell" plaintiff rule to woman with long history of sexual abuse from multiple tortfeasors seeking recovery for workplace sexual harassment that led to emotional distress including PTSD, dissociative disorder, and depression and finding no apportionment).

In *Elk v. United States,* 87 Fed. Cl. 70 (2009), a woman sued the Government after she experienced sexual assault and suffered PTSD. Defendant's expert argued that "other 'significant stressors" in plaintiff's life caused her emotional injury, including prior diagnosis of depression, loss of grandparents, a boyfriend's suicide, dropping out of college and being precluded from entering the Army. The Court rejected the defendant's arguments on causation and

apportionment because the focus on plaintiffs' "prior emotional problems seemingly proceeds from the faulty notion that they somehow relieve defendant from liability." *Id.* The Court turned to the "eggshell skull" principle, noting that "it is well-accepted that the chain of causation is not broken simply because a victim has a fragile psyche." *Id.* Even assuming mere aggravation of a preexisting condition, it was "incumbent" on a defendant "to show how the subsequent injury and the damages associated therewith should be apportioned." *Id.*

The weight of authority in other circuits follows this logical approach. *See, e.g.*, *D'Ambra v. United States*, 396 F. Supp. 1180, 1180 (D.R.I. 1973), *aff'd*, 518 F.2d 275 (1st Cir. 1975) (no rational basis for apportionment between viewing the child's death and holding defendant liable for the entire psychoneurosis); *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1294 (8th Cir. 1997) (affirming the Special Master's finding that there was no showing that the emotional harm plaintiffs suffered was divisible and holding that this finding should have foreclosed the defendant's ability to apportion damages).

Much like this well-considered authority, *Mueller* correctly stated the law regarding emotional distress and the Government's fruitless attempt to find a case in which emotional distress was apportioned only underscores that point. The Government cites two cases for the proposition that emotional distress is apportionable, *Gretzinger v. Univ. of Haw. Prof'l Assembly*, 156 F.3d 1236 (9th

63

Cir. 1998) and *Raymond v. Wilcox Mem'l Hosp.*, 2019 U.S. Dist. LEXIS 114399,

at *16-17 (D. Haw. July 10, 2019). Both are distinguishable upon the most cursory

review. *Gretzinger*, an unpublished Ninth Circuit opinion that "is not appropriate

for publication and may not be cited to or by the courts of this circuit except as

provided by Ninth Cir. R. 36-3," [36] was about the admissibility of evidence on

causation – a fundamentally different and prior question than apportionment for

damages. The case never even got to the damages phase in which apportionment

would matter. The Government's best case in its effort to deprive Plaintiffs of

appropriate emotional distress damages is *dicta from an unpublished opinion*.

   The Government's reliance on *Raymond* is equally misplaced. That case

concerned a potentially inconsistent jury verdict in which a jury attributed all

damages to defendant on its special verdict form after answering "yes" to

preexisting condition and "yes" to "aggravation." *Raymond*, 2019 U.S. Dist.

LEXIS 114399 at *8-9. The defendant argued for a new trial because "the jury

'failed to properly apportion damages to Plaintiff's pre-existing condition.'" *Id.* at

*6-7. The court held the jury's verdict was not inconsistent for several reasons,

including that "the jury might have determined that Plaintiff suffered from a pre-

---

[36] The Government complains that Plaintiffs' briefing does not address *Gretzinger* while failing to inform the Court that the Ninth Circuit instructed litigants not to rely on it. Gov't Br. 69.

existing condition; that his condition was aggravated by Defendant's conduct; but that the only damages Plaintiff suffered were those resulting from direct and unique injuries inflicted by Defendant." *Id.* at *15. The court essentially validated this approach: despite preexisting conditions that were aggravated, the jury's decision not to apportion was appropriate.[37] These two cases – in which no one actually apportioned emotional distress damages – are profoundly weak justifications for what the Government asks the Court to do. The Government has failed to meet its burden that emotional distress damages are apportionable.

The Government's briefing reveals a fundamental misunderstanding regarding the apportionment doctrine's burden of proof. It repeatedly complains of Plaintiffs "offer[ing] no evidence" that various conditions were dormant before the spill. *See, e.g.*, Gov't Br. 71. It further complains that Plaintiffs' experts "made no effort to apportion." *Id.* at 72. But when the apportionment doctrine expanded before *Montalvo*, the key to the new system was that it shifted the burden to prove apportionment to the party seeking to apportion, lest injustice result:

---

[37] The Government also asserts that *Montalvo* itself was really about emotional injury. It was not, and the Supreme Court of Hawaiʻi has subsequently made even clearer how it views the case narrowly: "In *Montalvo*, this court was faced with *the narrow issue of whether a plaintiff could recover for injuries resulting from negligent medical treatment*. 77 Hawaii at 300, 884 P.2d at 363." *Miyamoto v. Lum*, 104 Hawaiʻi 1, 13-14, 84 P.3d 509, 521-22 (2004). Mental anguish from a physical injury is a separate harm from emotional distress under the Restatement. *See, e.g.,* Restatement (Second) of Torts § 456.

The device which has been adopted to solve the problem under consideration, that is, apportionment of cause and damage in the multiple cause case, is ingenious. It uses a method which has become increasingly popular - the shifting of the burden of proof.

William E. Doyle, *Multiple Causes and Apportionment of Damages*, 43 DEN. L.

REV. 4 (1966) available at

https://digitalcommons.du.edu/cgi/viewcontent.cgi?article=3818&context=dlr.

A Michigan case put the policy well:

When we impose upon an injured plaintiff the necessity of proving which impact did which harm in a chain collision situation, what we are actually expressing is a judicial policy that it is better that a plaintiff, injured through no fault of his own, take nothing, than a tortfeasor pay more than his theoretical share of the damages accruing out of a confused situation which his wrong has helped to create.

*Maddux v. Donaldson*, 108 N.W.2d 33, 35 (Mich. 1961). It is the Government that is required to present evidence and prove that apportionment is appropriate for each and every one of the claimed harms, not Plaintiffs. *See, e.g.*, *Schmidt v. United States*, 2020 U.S. Dist. LEXIS 263069, at *5 (W.D. Tex. Mar. 20, 2020) (Ezra, J.) (while plaintiff bears the burden on causation, "Defendant must show that the damages claimed by Plaintiff should be offset or discounted due to a preexisting condition."). It has not met its burden.

## B.    The Government Has Failed to Meet its Burden that Apportionment is Appropriate for Any Plaintiff Physical Injury

The Government failed to present sufficient evidence to justify

apportionment of any physical, preexisting conditions at trial. Hawaiʻi law is clear that, "Only when the pre-existing condition is <u>not</u> dormant or latent are damages apportioned between the pre-existing condition and the injuries from the accident." *Gilding v. State*, 130 Hawaiʻi 347 (App. 2012) (underline in original). The Hawaiʻi Civil Jury Instructions Section 7.3 defines a latent condition as one that "was not causing pain, suffering, or disability at the time of the subject incident." *Id.*

In *Gilding*, which analyzed and applied *Montalvo*, there was conflicting medical testimony about prior neck and back pain, including an expert's testimony that plaintiffs "condition, result of the fall . . . is attributed *both* to his pre-existent cervical degenerative changes as well as to the effects of that fall." *Id.* (emphasis added). The expert nevertheless conceded that plaintiff was an "eggshell" plaintiff with worsened medical records after the accident. The lower court ultimately found the defendant "liable for damages for the aggravation of Gilding's pre-existing but dormant condition. Because SOH is liable for all damages legally caused by Gilding's September 15, 2006 accident, circuit court did not err when it did not apportion damages." *Id.*

The facts lead to the same conclusion here. The Government points to three Plaintiffs in its brief: B.D. (Chiari syndrome headaches), Patrick Feindt (history of migraines and GI distress), and P.R.F. (asthma). Gov't Br. 70-71. Testimony at trial indicated that each of these Plaintiffs' conditions – which by their accounts

were well-managed before the spill – dramatically worsened after the Government's negligent spill.

While B.D. suffered from a preexisting Chiari malformation of the brain his symptoms were "well managed, and he lived life with minimal restrictions and interruptions." R. Dietz Decl. (ECF 391) ¶ 4. The jet fuel contamination led to a "massive uptick in these new types of headaches" that were "lasting for days." R. Dietz, 5/1/24 Tx. 39:15-24. Patrick Feindt's prior well-managed issues also proliferated after the jet fuel release: he experienced a different type of migraine after the exposure, "full-fledged" migraines that he called "a different ball game" P. Feindt, Jr., 4/30/24 Tx. 15:21-22, and far worsened GI issues, *id.* at 20:11-20. And P.R.F.'s asthma deteriorated to the point that he was taking two inhalers a day. P. Feindt, 4/30/24, 25:1. *See also* Bird Decl. (491-1) ¶ 112(f) ("P.R.F.'s asthma was exacerbated around this time, with more difficulty breathing than before."). He had to undergo extensive evaluation of his worsened asthma to include a bronchoscopy and CT scan of his chest which found acute and chronic inflammation. Durrani Decl. (ECF 384-1) ¶ 123 & Ex. I (ECF-384-1) 80 (P.R.F. Medical Composite [P.R.F. is a 2 year old male with toxic exposure to jet fuel with persistent cough that presents for flexible bronchoscopy with BAL and CT Chest]).

This situation is no different than that of the plaintiff in *Gilding* – where there was conflicting testimony on the role that pre-existing degenerative disease

played in Gilding's injury from the fall – but ultimately the court determined the prior condition was latent and did not apportion. *Gilding*, 130 Hawaiʻi at 310.

Furthermore, the Government's efforts to apportion should fail because none of these Plaintiffs are pursuing long-term medical expenses

The Government takes issue with Dr. Bird's reticence to apportion. Gov't Br. 71. But it is the Government's burden to prove that apportionment is appropriate – and for the Government's experts to testify as to what amount of apportionment is correct. The Government's experts chose not to render that opinion. For his part, Dr. Bird is entitled to treat the harms as indivisible – as the law presumes. *See* Restatement (Second) of Torts: Apportionment of Liability § 26, Comment g. If the Government sought apportionment, it could have introduced its own expert testimony on apportionment. Ultimately, the decision is the factfinders, who may rely on a range of evidence. *Gilding*, 130 Hawaii at 347. Even if a factfinder chooses apportionment, they can rely upon fact witness testimony and can roughly apportion only a small (or zero) percentage to the prior condition according to the Government's own citation. *Raymond*, 2019 U.S. Dist. LEXIS 114399 at *8-9.

### C.    The Government Has Failed to Meet its Burden that Apportionment is Appropriate for Any Emotional Distress

Contrary to the Government's arguments, the Court's *in limine* rulings on long-term health causation do not limit Plaintiffs' recovery for emotional distress –

or have any bearing on whether that emotional distress was caused by the spill.

Simply because there are limited epidemiological studies regarding jet fuel

poisoning does not mean that the thousands of gallons of jet fuel the Government

spilled into the water did not affect Plaintiffs' health. Nor should it allow the

Government to escape all responsibility for its negligence.[38] There is even less of

an argument available that the Government's negligence did not cause any

compensable emotional injury. Emotional distress is, of course, a different kind of

injury than physical injury or even mental anguish at a physical injury, and the

defendant is liable for that separate injury as well. Restatement § 456 ("If the

actor's negligent conduct has so caused any bodily harm to another as to make him

liable for it, the actor is also subject to liability for (a) fright, shock, or other

emotional disturbance resulting from the bodily harm or from the conduct which

---

[38] The Restatement recognizes the trend away from over reliance on epidemiologic studies. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 (c)(3) states:

> Epidemiologic studies are expensive and can take considerable time to design, conduct, and publish. For disease processes with long latency periods, valid studies cannot be performed until the disease has manifested itself. As a consequence, some plaintiffs may be forced to litigate long before epidemiologic research is available. Indeed, sometimes epidemiologic evidence is impossible to obtain, which may explain why neither the plaintiff nor the defendant is able to proffer supportive epidemiology. Thus, most courts have appropriately declined to impose a threshold requirement that a plaintiff always must prove causation with epidemiologic evidence..."

causes it, and (b) further bodily harm resulting from such emotional disturbance.").

The grief and worry for a physical injury and the emotional distress at the incident are two different compensable injuries. "Thus one who is struck by a negligently driven automobile and suffers a broken leg may recover not only for his pain, grief, or worry resulting from the broken leg, but also for his fright at seeing the car about to hit him." *Id.* at Comment e. Finally, emotional distress can itself lead to compensable physical injury – and can rely on different evidence.

> Where the tortious conduct results in bodily harm, and makes the actor liable for it, there may be recovery for any further bodily harm resulting from the emotional disturbance. Thus, where a pregnant woman is struck by a negligently driven automobile and injured, she may recover damages for a miscarriage resulting from her fright or shock, even though the medical evidence is that it was brought about solely by her mental reaction to the injury, and not by the injury itself.

*Id.* at Comment f. Here, the Government is liable for the acute health injuries Plaintiffs experienced because of the Government's jet fuel spill, the mental anguish those injuries gave them, the emotional distress the jet fuel spill caused, and any injuries that resulted from that emotional distress.

A key limitation of apportionment doctrine is that "[a]pportionment of liability depends on findings of legally culpable conduct and legal causation. Apportionment of liability depends on findings that each person was legally culpable and was a legal cause of all or some of the damages." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26, Comment m. Instead of

directing the Court to any other legally culpable individual, the Government

instead improperly seeks to burden shift to Plaintiffs and asks the Court to slash

Plaintiffs' damages for any conceivable prior or subsequent life event that might

come to mind. This cannot be the purpose of the apportionment doctrine when

faced with a defendant claims to have "taken responsibility" for negligence.

Finally, even if emotional injuries could be apportioned, compelling

evidence was presented that any emotional injuries were latent, dormant, or well-

managed by the time of the jet fuel spill. Dr. Vargo testified at trial that none of

Plaintiffs raised any historic emotional injuries that where a cause for current

concern at the time of the fuel spill. Vargo, 5/2/24 Tx. 69:2-9. Dr. Vargo

specifically determined that "there were no specific symptoms that they were

experiencing within the collateral data that I reviewed and within the clinical

interview that they reported." *Id.* Thus, even Plaintiffs' emotional injuries were

somehow apportionable, pre-existing emotional and psychological conditions were

asymptomatic until the Government contaminated Plaintiffs' water with jet fuel.

The Government's efforts to claim that Mr. Feindt's physical pain – which

they seek an offset for – also entitle them to an offset for his emotional distress

shows their strategy of death by a thousand cuts. Mr. Feindt testified that the

Government's contamination made his pain "a different ball game" and led to his

emotional distress. P. Feindt, Jr., 4/30/24 Tx. 15:16-16:5; Pls. Br. 79-86. So too for

others. Mrs. Dietz testified that the water contamination flared up B.D.'s previously well-managed headaches in intensity and severity that led to his surgery. Pls. Br. 128-130. Dr. Bird attributed B.D.'s acute headaches to the spill. *Id.* These emotional distresses related to the spill.

Mrs. Jessup's prior sexual trauma is no more appropriate as the basis for apportionment as it was in the *Elk* or *Poole* cases. Ironically, the Government confidently asserts "this past trauma" from years ago "is causing present symptoms" while it demands a durational limit on the emotional impact of its relatively recent contamination of Plaintiffs' water. Mrs. Jessup's candid testimony was clear: despite being a resilient military family that had faced multiple challenges, the water crisis and its aftermath were the worst things that she had "ever experienced" in her life. S. Jessup, 4/30/24 Tx. 156:16-25.

The Jessups' emotional distress about Beau's neurological symptoms are directly related to the water contamination because the families' belief that those symptoms are related to the water contamination is eminently reasonable. Beau had no notable medical history before the contamination and his tremors began in close temporality after the water contamination. Pls. Br. 104; see also Durrani Decl. ¶ 47. ("B.B.J.'s development of tremor and tinnitus reportedly began in January or February 2022 following the exposure, which may indicate a temporal relationship."). Dr. Bird evaluated and attributed the tremors to the contamination

– which the Jessups know. Pls. Br. 104. The Government has pointed to no other potential causes for the malady. Whether or not limitations of present science could satisfy the Court's epidemiological requirements for long term medical harm, the emotional distress inquiry is different and based on reasonableness and common sense, which have been satisfied. Furthermore, even if the tremors were caused by a somatic or stress-induced reaction to the contamination, the Government is still responsible for those consequences. Restatement (Second) of Torts § 436.

Contrary to the Government's assertions, Beau's bullying is directly related to the water contamination. The Jessups identified water contamination as the reason for their early move to Arizona from Hawaiʻi that required Beau to leave a school he loved. Adjustment difficulties to a new school were caused by the move, which was caused by the Government's actions. The Jessup's move was a reasonable effort to escape contamination considering their experiences with continued water issues and rashes even after being told their water was "clear."

## VI.    The United States is Not Entitled to Offsets

The United States is not entitled to offsets, either for speculative payments under the Tricare program or for social benefit payments made to Plaintiffs during the crisis that the Government created.

### A.    The United States is Not Entitled to Offsets for Speculative Future Tricare Payments Under the Collateral Source Rule

The Government is not entitled to offsets for speculative future Tricare

payments because it failed to meet its burden to demonstrate that 1) Tricare has

vested for two of the three identified families; 2) Tricare will cover the future care

that Plaintiffs need for the remaining family members; and, most importantly, 3)

that Tricare is even likely to pay for that future care.

     As an initial matter and for very good policy reasons, the Government bears

the burden on this question. *Campano v. United States*, 2018 U.S. Dist. LEXIS

39153, *76 (D. Haw. Mar. 7, 2018), amended in part, 2018 U.S. Dist. LEXIS

157502 (D. Haw. Mar. 27, 2018). The policy rationale undergirding the rule,

outlined in the Restatement (Second) of Torts, is that

> a benefit that is directed to the injured party should not be shifted *so as to
> become a windfall for the tortfeasor*. If the plaintiff was himself
> responsible for the benefit, as by maintaining his own insurance . . . the
> law allows him to keep it for himself.

*Siverson v. United States*, 710 F.2d 557, 559 (9th Cir. 1983) (quoting Comment (b)

of the Restatement (Second) of Torts § 920A at 514 (1979)) (emphasis added). The

Government failed to meet its burden and should not receive the windfall.

     *First*, Tricare will only be available to families if Plaintiffs are eligible

because of retirement (presumably what the Government means by "vested"). But

the Government failed to demonstrate that the Tricare program has vested for two

of the three families named. The only individual that has actually retired from

military service is Chief Petty Officer Brian Jessup. The Government incorrectly

claims that because Major Feindt has served for 18 years she "has statutorily

secured TriCare coverage." Gov't Br. 90. This statement represents a fundamental

misunderstanding of the military retirement system and is contradicted by the plain

text of the statute relied upon. The sole authority the Government points to, 10

U.S.C. § 632(a)(3), is not about Tricare "vesting" but about the "Effect of failure

of selection for promotion." The provision in full states:

> (3) if on the date on which he is to be discharged under paragraph (1)
> he is within two years of qualifying for retirement under section 7311,
> 8323, or 9311 of this title, be retained on active duty until he is qualified
> for retirement and then retired under that section, unless he is sooner
> retired or *discharged under another provision of law*.

10 U.S.C. § 632(a)(3). According to the clear language of the law, Major Feindt

remains legally subject to discharge "under another provision of law" until she

actually retires. The same is true of Petty Officer Dietz. Tricare "vests" only upon

retirement, not at 18 years of service, and the Government can point to no legal

authority that says otherwise. Even Chief Petty Officer Jessup's retirement does

not resolve the question, as this court recently rejected an offset for Tricare

coverage for a dependent in an FTCA case despite the fact that the servicemember

had fully retired and Tricare had vested. *Aldis v. United States*, 2019 U.S. Dist.

LEXIS 217078, at *138 (D. Haw. Oct. 31, 2019). Coverage for family members is

indeed "dependent" on their relationship to the Tricare sponsor, can be severed

through all manner of circumstances, and is thus even more speculative.

76

*Second*, the Government has failed to demonstrate that Tricare will actually cover the mental health services that Plaintiffs need. The Government's Tricare witness, Ms. Carmen DeLeon, admitted prerequisites to coverage of mental health treatment, including 1) the mental health treatment must be determined to be medically or psychologically necessary, DeLeon, 5/9/24 Tx. 51:16-19; 2) the determination of necessity would be made by Tricare, *id.* at 51:20-22; 3) the mental disorder must be associated with a clinically significant behavioral or psychological syndrome or pattern involving distress, *id.* at 52:2-7; 4) care must be provided by Tricare-authorized individual providers and Tricare-qualified institutional providers, *id.* at 52:11-17, and 5) claims for treatment are subject to review according to Tricare's claim processing procedures, *id.* at 52:18-21.

The Government also failed to demonstrate that any eligibility requirements or benefits would not change in the future. Ms. DeLeon admitted the fundamental mutability of Tricare, with a program manual that has had 125 changes since inception. *Id.* at 60:24-61:20. The manual online goes so far as to provide redlines to track recent changes, *id.* at 61:12-17, precisely because changes are so frequent.

*Third*, the Government failed to demonstrate that Plaintiffs want to get mental health services from their tortfeasor or that Tricare would meet their needs. *See, e.g.*, *Warren v. United States*, 669 F. Supp. 3d 987, 1029 (Apr. 17, 2023) . Courts are reluctant "to deny the plaintiff the freedom to choose his [future]

77

medical provider and, in effect, to compel him to undergo treatment from his

tortfeasor." *Id.*; *see also, Perez v. United States*, 2023 U.S. App. LEXIS 13678, at

\*6-7 (9th Cir. June 2, 2023); *Powers v. United States*, 589 F. Supp. 1084 (D. Conn.

1984); *Feeley v. United States*, 337 F.2d 924 (3d Cir. 1964). The *Feeley* court

explained the policy rationale well:

> A victim of another's tort is entitled, we think, to choose, within
> reasonable limits, his own doctor and place of confinement, if such care
> is necessary. To force a plaintiff to choose between accepting public
> aid or bearing the expense of rehabilitation himself is an unreasonable
> choice. The plaintiff may not be satisfied with the public facilities; he
> may feel that a particular private physician is superior; in the future
> because of over-crowded conditions he may not even be able to receive
> timely care.

*Id.* at 934-35. In *Deasy v. United States*, the court went so far as to provide a

reversionary trust of $ 3,993,971 so that a veteran could receive all future

healthcare needs outside the VA system after he had been poorly treated by a VA

psychiatrist. The Tenth Circuit affirmed. 99 F.3d 354, 355 (10th Cir. 1996).

In this case, Ms. DeLeon admitted that there are currently not enough mental

health providers nationwide available through Tricare. DeLeon, 5/9/24 Tx. 54:6-7.

In other words, there is no guarantee that Plaintiffs will find providers through the

system in any reasonable period of time.

*Fourth*, and most importantly, the Government failed to prove that Tricare

will cover this care because Tricare is the "*payor of last resort*." Ruck Decl. (ECF

359-1) ¶ 20; PX-2416; DeLeon, 5/9/24 Tx. 58:18-21 (testifying that Tricare will not process a claim before another health insurer "if they have other health coverage"). The only individual actually retired from military service is Chief Petty Officer Jessup, who moved to Arizona and now serves as a "police officer" there. Brian Jessup Decl. (ECF 398) ¶ 14. The Government introduced no evidence to demonstrate that his job insurance will not cover his family's future health treatment.[39] The Government's argument that this alternative "underscores the fact that their future care will be covered by health insurance and will greatly reduce, if not obviate, any out-of pocket costs borne by Plaintiffs" misses the point of the collateral source rule. Gov't Br. 90. The Government tortfeasor is not entitled to benefits accrued by Chief Petty Officer Jessup through his service as a police officer and that job's insurance program. It is only entitled to offsets if the Government is or will make those payments. *See* Restatement (Second) of Torts [citation] ("If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance . . . the law allows him to keep it for himself.").

The tortfeasor is not entitled to the "windfall" for Mr. Jessup's labors and diligence. The same would be true for Major Feindt or Petty Officer Deitz if and

---

[39] Public service jobs tend to cover health insurance. *See, e.g.,* City of Phoenix Police Department, Benefits, https://joinphxpd.com/sworn/benefits (last visited Jul. 7, 2024). The Court can take judicial notice of various government websites under Fed. R. Evid. 201(d).

when they retire and get a job – and the Government presented no evidence that they were unlikely to get another job. In fact, Petty Officer Dietz testified that he intended to get another job. Brian Dietz Decl. ECF 390 ¶ 49.

Notably, the Government points to no court opinions in this district or circuit in which a court has granted offsets for speculative future TRICARE payments. There is no reason this case should be the first.

**B.    The United States is Not Entitled to Offsets for Social Benefit Per Diem Payments Under the Collateral Source Rule**

Next, the Government argues that it should receive offsets for Temporary Lodging Allowance (TLA)[40] payments as well as credit for hotel expenses. It is wrong on both counts.

**1.    Offsets for hotel or other dislocation or water expenses are not available because plaintiffs do not seek those costs.**

As a threshold matter, TLA payments or offsets for hotel expenses are not available because Plaintiffs do not seek costs for any expenses incurred. An offset for damages must correspond with the damage category claimed – not to general damages owed by the tortfeasor. *See, e.g.*, *Turner v. Municipality of Anchorage*, 171 P.3d 180, 188 (Alaska 2007) ("A defendant seeking an offset for a joint tortfeasor's payment must prove that the prior payment was for the same expenses

---

[40] The Government mistakenly refers to these payments as "Temporary Lodging Assistance." Gov't Br. at 97.

for which it is liable."); *see also Cates v. United States*, 451 F.2d 411 (5th Cir.

1971) (United States denied offset when no showing that prior payments for

"maintenance and cure" duplicated the "maintenance and cure and medical

expense items" assessed against the government).

Here, Plaintiffs have made no claim for expenses or lodging costs caused by

the Government's negligence as one of their requested damages – and there is no

authority to use these payments to "offset" the other categories of damages that

Plaintiffs did claim. Revealingly, the Government does not cite a case for their

hotel offset mitigation request. As the Government bears the burden on all offsets,

it has not carried it as to expenses and hotel costs.

### 2. Offsets for TLA are not available because TLA is military social benefit pay and not intended for inconvenience.

Moreover, and in any event, TLA payments are not available as an offset

because TLA is a social benefit pay and not intended for inconvenience.

Hawai'i has adopted the Restatement (Second) of Torts § 920A's rule on the

"Effect of Payments Made to an Injured Party." *Bynum v. Magno*, 106 Hawai'i 81,

86 (2004). Under that rule, while payments made by a tortfeasor to an injured party

are generally "credited against his tort liability," there are several notable

exceptions. Exceptions include employment benefits, gratuities, and social

legislation benefits. Restatement (Second) of Torts § 920A.

For example, in *Bynum*, the court concluded that "Medicare/Medicaid are

social legislation programs" and that "Medicaid/Medicare programs provide

benefits for plaintiffs from a source wholly independent of and collateral to the

tortfeasor[.]" 106 Hawai'i at 88-89 (citation and quotation marks omitted). Like the

programs addressed in *Bynum*, TLA is military social benefit pay for increased

expenses. The Department of Defense's Financial Management Regulation, DoD

7000.14-R, outlines the military service's ability to provide TLA:

### 6804 TEMPORARY LODGING ALLOWANCE

> TLA is intended to partially pay a Service member for higher than
> normal expenses incurred by a Service member or dependent while
> occupying temporary lodging OCONUS. OCONUS TLA is available
> when it is necessary for a Service member or dependent to occupy
> temporary lodging upon arrival at, or immediately before leaving, a
> PDS OCONUS, or during other periods as specified in this section.
> Personal inconvenience to a Service member or dependent is never a
> determining factor. TLA is not intended, and must not be used, for the
> personal enrichment of a Service member, including authorization or
> approval of TLA Special (see paragraph 680410).

*Temporary Lodging Allowance*, U.S. DEP'T OF DEF.—DEFENSE TRAVEL

MANAGEMENT OFFICE WEBSITE,

https://www.travel.dod.mil/Allowances/Temporary-Lodging-Allowance/

(last visited Jul. 6, 2024). Because the payments are a general social benefit

of military service, they should not be offset under the collateral source rule.

Moreover, these benefits cannot be offsets for nuisance damages. In

Hawai'i, nuisance damages are predicated on inconvenience:

allegations amount to a nuisance claim by falling within the realm of acts "which unlawfully annoy[] or [do] damage to another, anything that works hurt, inconvenience, or damage, anything which annoys or disturbs  one in the free use, possession, or enjoyment of his property or which renders its ordinary use or physical occupation uncomfortable, and anything wrongfully done or permitted which injures or annoys another in the enjoyment of his legal rights."

*Freddy Nobriga Enters. v. State*, 2008 Haw. App. LEXIS 64, at *12-13 (App. Feb. 8, 2008). Here, Department of Defense regulations make clear that Temporary Lodging Allowances are not intended to remedy inconvenience. The Department of Defense's Financial Management Regulation states plainly that "*Personal inconvenience to a Service member or dependent is never a determining factor*" in the provision of Temporary Lodging Allowance. *Temporary Lodging Allowance*, U.S. Dep't of Def.—Defense Travel Management Office Website (emphasis added). By its terms it should not be considered an offset for nuisance or negligence damage based on inconvenience.

Indeed, the collateral source rule has been read to exclude even the presentation of evidence of social benefit payments in trial. *See O'Brien v. County of Kauai*, 2014 WL 1883997, at *1 (D. Haw. May 12, 2014) (granting motion *in limine* and holding that "any evidence of Medicaid/Medicare payments shall be excluded" because they are "fully protected by the collateral source rule."); *see also Ramento v. M&M Tanks, Inc.*, 134 Hawai'i 179 (Ct. App. 2014) (holding that "social security retirement benefits received by [a plaintiff] were subject to the

collateral source rule and that such benefits could not properly be considered in

calculating [the plaintiff's] damages for lost past income."); *see also, Wiles v.*

*Dep't of Educ.*, 2008 U.S. Dist. LEXIS 145631, at *5 (D. Haw. Oct. 3, 2008)

("Plaintiffs' recovery cannot be diminished by the fact that the State of California

is responsible for funding Bryan's future educational and residential services"

because they were social legislation benefits).

Courts in other jurisdictions have likewise held that evidence of Medicare

payments in the context of FTCA claims involving the Government, especially any

future or predicted Medicare payments, should be precluded. *See, e.g., Clanton v.*

*United States*, 2016 WL 4123667, at *2 (S.D. Ill. Aug. 3, 2016).

The same analysis applies to Temporary Lodging Allowance payments,

which are social benefit payments specific to military personnel. Indeed, the

Government has cited no case that has held that the Government may claim offsets

for TLA reimbursements. Cases in other contexts have rejected offsetting tax-free

military benefit payments for good reason. TLA is a tax-free entitlement akin to a

servicemembers Basic Allowance for Housing (BAH) or Basic Allowance for

Subsistence (BAS). Courts have rejected offsetting these sorts of payments in other

contexts because they are special pay provided to servicemembers for specific

needs unique to their military service:

> The purpose of the allowances is to offset costs incurred by military service
> members for specific needs. . . . Permitting the appellant to retain the

allowances and combat pay does not unjustly enrich him or make him more
than whole. Rather, the additional 'income' is the result of the appellant's
extra effort (in the case of service in combat) and costs he incurred as a
result of military service (in the case of BAS and BAH allowances). The
agency is not entitled to deduct those amounts or include them in its
calculations of the appellant's offsetting income.

*Erickson v. United States Postal Serv.*, 2021 MSPB LEXIS 4221, *12-13

(M.S.P.B. December 10, 2021). The same rationale applies for TLA, which is

designed to assist service members and their families during the transition to a new

duty station when permanent housing is not immediately available. TLA has

nothing to do with the damages at issue in this case, and the Court should not make

new law here by creating new offsets that defy the collateral source rule.[41]

## VII. Plaintiffs' Damages Must Be Proportionate to the Harm and Sufficient to Deter Future Negligence

According to the Supreme Court of Hawai'i, "tort law is primarily designed

to vindicate social policy." *Steigman v. Outrigger Enters.*, 126 Hawai'i 133, 141

(2011) (quoting *Francis v. Lee Enterprises, Inc.*, 89 Haw. 234, 239, 971 P.2d 707,

712 (1999)). It has two central purposes. First, tort law seeks to fairly compensate

---

[41] The Government also erroneously asserts that Mrs. Witt received $6,000 to
$7,000 in per diem payments. Gov't Br. 98. Mrs. Witt testified that payments were
"paid to my husband." Witt, 4/30/24 Tx. 184:2-3. The Government also attempted
– and failed – to enter into evidence documents reflecting those payments to her
husband. *Id.* at 185:15-23. Mrs. Witt's husband is not a plaintiff in this matter and
in the year 2024 there is no legal justification for the Government to offset any
payments it owes to Mrs. Witt for payments made to him. The same principle
applies to all of the servicemember dependents.

injured plaintiffs. *Id.* "Second, tort law seeks to prevent injury where possible by providing incentive to deter negligent acts." *Id.* To accomplish these goals, compensation must be sufficient to deter future negligence by the tortfeasor.

The Government's approach to these representative families—and potentially to the thousands of plaintiffs to follow in related cases—does not accomplish these goals. At the lower bounds, the Government proposes an average of $6,651 per Plaintiff. *See* ECF No. 601-2 (Gov't Damages Chart). If one were to multiply this average by the approximate 8,000 remaining Red Hill claimants, the Government would pay a total of $53 million to those injured by the Navy's November 2021 fuel release. And yet the Government has already allocated more than $1.2 billion to cleaning up the Red Hill fuel facility.[42] The disparity between these figures is troubling. Once again, the Navy values its asset far above the people it harmed. And to follow their lead would further incentivize the Navy to continue a pattern of neglect – at risk to human health.[43]

---

[42] *See* Wyatt Olson, *Full cost of closing Hawaii's Red Hill fuel facility remains unknown, watchdog says*, STARS AND STRIPES (Feb. 15, 2024), https://www.stripes.com/theaters/asia_pacific/2024-02-14/gao-report-hawaii-fuel-spill-13007050.html.

[43] The 2023 Consent Order entered by the Navy and the EPA documents a pattern of conduct at Red Hill that led to the harm experienced by Plaintiffs and other residents, including "concerns related to inadequate system maintenance, inadequate operations, maintenance and recordkeeping program, no operator safety training program, incorrect chemical storage, no written valve exercise program, no written flushing plan, no written cross connection control program, failure to

A.    **Comparable Cases Support Plaintiffs' Proposed Damages Over the Government's**

The Government's Brief claims that its overall figures (including all damages categories) are in line with comparable cases. Gov't Br. 100. That is not true. To the extent that there is a "going rate" for toxic exposure in a home, it is not $6,000 – or even $60,000 – in 2024.

For example, just last week, an arbitration panel provided for $974,081 in mental anguish to the Kiernan family, a military family of five, after they were sickened by mold exposure in base housing and moved to a rotation of hotel rooms for three months. *Kiernan v. Fort Hood Family Housing and LendLease*, AAA Case No. 01-22-0005-4250, Interim Award (Jul. 1, 2024) (attached as Exhibit 1). The interim arbitration award, signed by Chair and former Texas Supreme Court justice, Raul Gonzalez, noted that the privatized housing landlords had "failed to heed warnings" and failed to provide a "safe and healthy home." *Id.* at 3.

The aftermath of the Kiernan's exposure at home, including reporting to the chain of command, "increased the stress and anxiety of living and working at the

---

issue a Tier 1 public notification of the fuel leak contamination of the Red Hill Shaft, insufficient coverage by qualified operators, an inadequate Emergency Response Plan, and an inadequate System Risk and Resilience Assessment." Consent Order at 13, available at the EPA's website, *Red Hill: 2023 Administrative Consent Order*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY WEBSITE, https://www.epa.gov/red-hill/2023-consent-order (last updated Jun. 13, 2024).

military base." *Id.* at 6. The panel noted the unique circumstances of military

housing that becomes unsafe and yet is provided in conjunction with employment

and health benefits: "By intertwining employment with future medical benefits and

potential negative health ramifications to those living in unsuitable housing,

Respondents engaged in an unconscionable course of conduct to American military

families." *Id.* at 7. The experience ultimately led Sgt. Kiernan to separate from the

military altogether. *Id.* at 8. The mental anguish portion of the damages—before

trebling for unconscionable conduct – amounted to $194,816 per family member.

The *Cairns* case relied upon by the Government further illustrates the point

precisely because Mr. Cairns' exposure did not occur at home and did not involve

a family. In its brief, the Government states that after a bench trial, a federal judge

assessed $35,000 in general damages for Mr. Cairns' exposure to water

contamination during a 10-day voyage at sea. Gov't Br. 100. But that is not quite

right. The Government does not account for the additional $20,295 provided by the

*Cairns* judgment in "maintenance," a form of per-diem damages under maritime

law that includes emotional harm. Pls. Br. 148-149; *Cairns v. Dunlap Towing

Co.*, JVR No. 501362, ECF No. 21, 1-2 (W.D. Wash. 2001); *Id.*, ECF No. 16 at 18.

Mr. Cairns was assessed damages of $55,295 ($98,483 today) for the emotional

harm of his exposure to water contaminated with antifreeze. Pls. Br. 148-149.

The *Cairns* judgment is telling for three reasons: *First*, it does not include

88

any loss of a safe home, temporary or otherwise. As a result, it does not include

either the disruption of losing safe water at home, or the mental anguish of

experiencing toxic exposure in the one place that you expect to feel safe. *Second*,

Mr. Cairns did not undergo harm as a father. He did not experience the unique

torment as a sick parent taking care of children sick from exposure. Any judgment

for a Plaintiff here, then, must far exceed $98,483.

Third, as the Government indicates, *Cairns* highlights the impact that an

acute toxic water exposure can have on mental health. Gov't Br. 100-101. The

Government explains that Mr. Cairns expressed repeated concern about the

potential health consequences of his exposure to the point that he contacted the

EPA and then sought therapy for anxiety. *Id.* The *Cairns* court correctly

compensated for the worry of future health consequences – notwithstanding the

timing of exposure or lack of specific scientific evidence as to dose, duration, or

risk. The Government does not contend that the *Cairns* court got it wrong.

In addition, the Government does not address the *Alban* case, which is

especially instructive here as a community event that affected 300 plaintiffs whose

water was contaminated with fuel leaked by the negligence of an Exxon employee.

*Alban et al. v. ExxonMobil Corp. f/k/a Exxon Corp. & Storto Enterprises Inc.*,

2009 Jury Verdicts LEXIS 422792 (Md. Cir. Ct. Mar. 12, 2009) (verdict of

$144,331,810–more than $213,109,000 today). In *Alban*, plaintiff parents testified

that they feared for their present and future health and the health of their children, that they had had their lives disrupted, that they had to monitor their children and prevent them from using water from the faucet and playing in their yards, that they had to use bottled water for drinking, washing clothes and cooking, and that many had no choice but to shower in the contaminated water. *Id.* For at least four plaintiffs, the jury assessed general damages over the Maryland then-cap of $650,000 for non-economic damages. *Id.* ($959,737 as adjusted).

Finally, the Government asks the Court to consider a variety of other acute exposure cases. Gov't Br. 101. But those cases also do not include the unique distress of toxic exposure at home. Nor do they address the experience of poisoning that affects every member of the family at once, resulting in the displacement of the family, while sick, and while trying to manage a crisis in a community that is also in crisis. And they do not include the mental anguish of feeling poisoned by a military institution that plaintiffs trusted with their life's work, their health, their homes, and their family.

### B.    Pain & Suffering for Acute Injury

The Government next turns to specific categories. It proposes $0-15,000 for pain and suffering from acute poisoning symptoms. Gov't Br. 103. Plaintiffs propose $75,000 per Plaintiff, and up to an additional $125,000 for Plaintiffs who experienced more severe and longer acute injuries. Pls. Br. (ECF 595-1).

As a threshold matter, the Government's claim that there was not sufficient fuel in the water to have *any* health effect is not tenable given its own data tracking thousands of reports of poisoning symptoms throughout the JBPHH water line. Pls. Br. 28-32 (reciting Government data). Nor is it consistent with the Government's announcement just last month that it will spend $27.2 million to fund a medical registry to track health outcomes of those directly impacted by the Red Hill water crisis. [44] Nor is it consistent with the Government's ongoing treatment of those affected with long-term cognitive challenges from the Red Hill contamination. *Id.* If there weren't sufficient fuel to cause any effect, why would the Government be tracking health effects at significant cost and continuing to educate treating providers in 2024 about ongoing symptoms of the exposure?

The same is true for the Government's claim that the western portion of the JBPHH water system was unaffected by the fuel release. Gov't Br. 102. The Navy's new position is not shared by any other responding government agency. In May, the HDOH announced that it "disagrees with the Navy's conclusion that certain drinking water zones could not have been contaminated by the Red Hill

---

[44] The Government's Defense Health Agency publishes its latest efforts on the Red Hill health response, including the registry, at its government website: Red Hill Public Health Information, DEFENSE HEALTH AGENCY WEBSITE, https://ph.health.mil/topics/campaigns/red-hill-public-health (last updated Jul. 2, 2024).

Shaft during the November 2021 emergency."[45] Neither the Government's new

registry nor ongoing medical care makes any distinction as to whether a resident

lived on the eastern or western portion of the water line.[46] Any distinction as to

damages in this case would wreak havoc for the claimants to follow, as the

Government does not indicate where to draw its arbitrary line between the eastern

and western portions.

The Government then claims that $15,000 would be sufficient to compensate

for exposure to jet fuel. Gov't Br. 103. But the Government cites only four

arbitration awards without attaching the awards or providing sufficient details to

support their application to this case. *Id*. To the contrary, the caselaw reveals that

fact finders often assess damages at well over $1 million for acute chemical

exposures. Pls. Br. 147; *Scottsdale Insurance Company v. Central Hotel, Inc.,*

2022 WL 4468406, at *10 (S.D. Ind., Sept. 26, 2022).

That a toxic exposure was brief does not render the exposure unharmful or

---

[45] The DOH set forth its position on its government website at *DOH Releases Findings of Independent Forensic Investigation of Navy Water System*, STATE OF HAWAII, DEPARTMENT OF HEALTH, NEWS RELEASES FROM DEPARTMENT OF HEALTH, https://health.hawaii.gov/news/newsroom/doh-releases-findings-of-independent-forensic-investigation-of-navy-water-system/ (last updated May 22, 2024.

[46] Red Hill Public Health Information, DEFENSE HEALTH AGENCY WEBSITE, https://ph.health.mil/topics/campaigns/red-hill-public-health (last updated Jul. 2, 2024).

worthy of less in damages. The Government does not address cited jury verdicts reflecting significant damages for acute food poisoning that by definition have a short exposure: *Enwright v. Town Ctr. Amusements, Inc*., 2022 WL 3974441 (Nev. Dist. Ct. Mar. 18, 2022) ($8 million verdict to plaintiff who ingested cleaning solution in beer served by defendant brewery); *Cronnon v. Cracker Barrel Old Country Store, Inc*., No. 20886 (Tenn. Cir. Ct. Jan. 6, 2022) ($9.3 million verdict to plaintiff who was served chemicals instead of water). *See also Martinez v. Lobster Haven*, 15-CA-007312, 2018 Jury Verdicts LEXIS 105442 (June 7, 2018) (jury verdict of $6.3 million in non-economic damages for food poisoning causing nerve damage).

Here, where Plaintiffs reported burns to the esophagus, skin lesions that felt like "daggers," rashes that felt like jelly-fish stings, vomiting, diarrhea, intense abdominal pain, headaches, migraines, and other acute poisoning symptoms, a judgment of $75,000 for pain and suffering is conservative and appropriate.

## C.    Pain & Suffering for Long Term Neurological Injury

Because the Government contends that Nastasia Freeman did not experience a resurgence in seizures or neurological injury from her exposure, the Government does not provide any damages analysis to rebut her request for $400,000 in compensation for past pain and suffering, $200,000 for future pain and suffering, and $100,000 for physical impairment due to her neurological injury.

**D.    Loss of Enjoyment – Life Disruption & Per Diem Offsets**

The Government proposes $5,000 to $15,000 for loss of enjoyment and life disruption after the Red Hill water crisis. Gov't Br. 104-105. Those numbers are not reasonable and do not account for the turmoil created by the Navy itself.

**1.    The Government's disruption damages do not account for the mass confusion it caused at Red Hill.**

The Government claims that "within days" it provided hotels and bottled water, boldly declaring that the Navy's response minimized any inconvenience or disruption to Plaintiffs. Gov't Br. 1. But the Government's brief does not recognize the massive confusion that the Navy itself created, nor the failures that led to that confusion in the first place. Had the Navy responded immediately and appropriately, it would have turned off the water source on November 20 after thousands of gallons of fuel spewed in Adit 3 so close to the Red Hill well head. And had the Navy followed its own policies and basic notice requirements, it would have issued a "Tier 1 Notice" about the fuel release to warn all residents to immediately cease use of the water until safety could be confirmed.[47] Instead, the

---

[47] Just this week, the Navy admitted again in its 2024 Water Report that it had failed to issue the required Tier 1 Notice after the November 2021 fuel release: "In last year's Water Quality Report, the Navy was required to publish its failure to provide a Tier 1 Public Notification within 24-hours of national primary drinking water regulation violations and other situations as determined by the State as required by Hawaii Administrative Rules (HAR) 11-20-18(b)(1)(G)." *2024 Annual Water Quality Report, Joint Base Pearl Harbor-Hickam Water System*, NAVFAC, https://cnrh.cnic.navy.mil/Portals/79/CNRH/Documents/Environmental/Water_Qu

Navy allowed families to get sick and report acute poisoning symptoms by

neighborhood, while it hosted town halls and assured people that the water

"remained safe" – all while failing to disclose for days that there had been an

enormous fuel release. As it turns out, there was a Communications Plan that

dictated this botched response. *See* Pls. Br. 42-43; *id.* n.20.

The fallout from these failures was felt by all who experienced them.

Richelle Dietz had her first panic attack ever at the Navy's townhall, where

officers were dismissing concerns about the water. R. Dietz Decl.

(ECF 391) ¶¶ 9-14, 23; B. Dietz Decl. (ECF 390) ¶¶ 7-19. Families often felt that

they were faced with impossible choices – to stay or not to stay in Hawaiʻi; to

leave the service altogether, or not; to go to a hotel, or not. The hotels were

sometimes 30 minutes from home, where people had beloved pets, like Coco.

Some who took advantage of the hotel option found themselves taking care

of special needs kids without their home therapies or routines. Patrick Feindt had

tears as he testified about almost losing his challenged daughter, P.F., as she tried

to run away in the Waikiki holiday crowds. Feindt, Jr., 4/29/24 Tx. 14:6-14.

Sheena Jessup declined the hotel option after she learned that her family

would be allotted a small single room for a family of six. Her autistic son bounced

---

ality/2024%20Water%20Quality%20Report%20JBPHH.pdf?ver=stBH5KiFar9Tu
B3xHPAuOw%3d%3d (2024).

from bed to bed as her 10-month-old baby tried to find room to crawl. She and her teenagers testified about months of living at home without access to clean water. S. Jessup Decl. (ECF 396) ¶¶ 36-38; Sheena Jessup, 4/30/24 Tx. 140:22-142:7.

Meanwhile, the makeshift showers provided were not appropriate for children, teenagers, or women showering alone. S. Jessup, 04/30/24 Tx. 142:10-23; Witt, 4/30/24 Tx. 191:4-16. Several plaintiffs testified that the Government did not provide enough water to cover their basic needs, and they were always anxious about securing enough – particularly on an island where bottled water came in short supply. Sheena Jessup, 4/30/24 Tx. at 142:25-143:16; Richelle Dietz, 5/1/24 Tx. at 40:3-4; E. Witt Decl. (ECF 397) at ¶¶ 25-26. Sheena Jessup's anxiety of access to water lingers to the extent that she now hordes bottled water in her garage in Arizona. B.J. Decl. (ECF 395) at ¶ 24. Moreover, the Freemans testified that some of the alternative water that the Government provided was *also* contaminated – with bacteria. N. Freeman Decl. (ECF 572) at ¶ 20. Incredibly, the Government issued the proper notice not to use the water with bacteria—even though it never issued the required notice not to use the water with jet fuel.

And then when the Government "flushed" homes, it sent inexperienced junior military personnel, who instilled little confidence and failed to follow basic flushing protocols—adding to the stress of Plaintiffs desperate for safe homes. *See, e.g.*, PX-1055 (S. Jessup Facebook Post, dated Feb. 23, 2022); S. Jessup Decl.

(ECF 396) ¶¶ 22, 23, 46-53.

### 2.    The Government's single case citation is not on point.

The Government cites only a single case for the basis of its $10,000 baseline

for life disruption: *Ayers v. New Jersey*, 525 A.2d 287, 290 & 293 (N.J. 1987). But

that case dealt only with the inconvenience of water. During the outage, the

township delivered water to the homes of the *Ayers* plaintiffs. They did not have to

go find and bring water home as the *Feindt* Plaintiffs did. Moreover, *Ayers*

involved none of the confusion or turmoil that was caused by the Navy's failures in

this case. And because they were appropriately warned, the *Ayers* plaintiffs were

not acutely sick and navigating inconveniences while sick. The *Ayers* plaintiffs

didn't find life so disruptive as to require moving. In this case, all but one of these

representative families ultimately left their home and neighborhood earlier than

intended because of the water crisis. [48] And the Dietz family testified that they are

leaving soon. R. Dietz, 5/1/24 Tx. 46:6-16.

### 3.    The Government is not entitled to an offset, and its math would result in a negative judgment for life disruption.

Importantly and as set forth above, Plaintiffs have already credited the

Government hotel fees and expenses by not seeking economic damages for any

---

[48] N. Freeman Decl. (ECF 572) ¶¶ 49 and 53-54; E. Witt Decl. (ECF 397) ¶¶ 39-43; S. Jessup Decl. (ECF 396) ¶¶ 61-63; P. Feindt Decl. (ECF 392) ¶¶ 47-50; K. Aubart Decl. (ECF 389) ¶ 35.

expenses or displacement. But the Government seeks to discount those payments anyway – subtracting far more in economic credits than the Government proposes to provide for this category of corresponding non-economic damages.

For example, the Government claims that Mr. Aubart should receive only $10,000 for disruption and inconvenience for the Red Hill crisis. ECF No. 601-2. And yet the Government seeks to subtract $24,000 in expense reimbursements that allegedly alleviated that inconvenience. *Id.* In other words, the Government proposes that the Court offer an overall *negative* judgment for inconvenience. With that subtraction, Government asks the Court to find a total of <u>zero</u> in damages. *Id.*

The Government's math is especially troubling because non-economic damages typically far exceed economic damages. *See, e.g.*, Ex. 1, *Kiernan*, Interim Award at 10 ("Panel finds and values the Kiernans' mental anguish at five times the value of the non-medical economic damages, multiplied by five – one for each member of the family."). This is particularly true in FTCA cases, where there are often fewer economic losses for covered health expenses, or cases involving harms that are more emotional than physical. *See, e.g.*, *Holcombe v. United States,* 584 F. Supp. 3d 225 (W.D. Tex. 2022).

### 4. Plaintiffs' proposed damages for disruption offer more appropriate delineations and values.

The Government's approach also makes ill-advised distinctions between Plaintiffs. For example, the Government doubles the inconvenience for the

Freemans because they left the island. Gov't Br. 105. But families who remained on island often had equal or worse disruption because they lived for months without clean running water. The Jessup children offered compelling testimony about the disruption of hauling and boiling water for baths and taking care of the extra feeding for their siblings. *See, e.g.*, Beau Jessup, 4/30/24 Tx. 162:16-163:21.

Similarly, the Government claims that children over 12 experienced more disruption than children younger than 12. Gov't Br. 104-105. But the lived experiences of Plaintiffs showed that their children's lives were disrupted no matter what age they were. Toddlers need their routines just as teenagers need time for their schoolwork. A more pronounced difference could be made between children with special needs and those without as the disruption of therapy and services can make a critical difference in development.

Plaintiffs do agree that caregiver adults should receive more compensation for life disruption than those who were not caring for children or elders.

Plaintiffs' proposed judgment, then, makes more sense as to these representative Plaintiffs. Plaintiffs proposed a judgment of $150,000 for life disruption for adults caring for dependents (whether they moved or not); $100,000 for other adults; $150,000 for special needs minors; and $75,000 for all other minors. *See Alban*, 2009 Jury Verdicts LEXIS 422792 ($959,737 for plaintiffs that had had their lives disrupted by water contamination, had to monitor their children

to prevent them from using water from the faucet and playing in their yards, had to use bottled water for drinking, washing clothes and cooking, and had no choice but to shower in the contaminated water).

### E.    Mental Anguish

The parties' difference in approach is most pronounced for mental anguish.

### 1.    The Government's "proxy" approach is neither supported by law nor practical.

The Government contends that Plaintiffs do not need any mental health assistance and claims that any money that has been allocated for mental health treatment should be used instead as proxies for mental anguish. Gov't Br. 109-110. The Government therefore urges that the Court to issue a judgment of "no more than" $5,273 to $25,640 for mental anguish. *Id.* at 111. But the Government cites no authority for this proxy approach. And, indeed, such an approach would be impossible to administer across the thousands of plaintiffs to follow.

The more appropriate approach would be to award consistent damages for mental anguish just as the parties propose for the earlier categories of pain and suffering and life disruption. The court's judgment of non-economic damages in *Holcombe*, the last mass tort against the United States to reach trial is instructive. *Holcombe v. United States*, 584 F. Supp. 3d 225 (W.D. Tex. 2022). The *Holcombe* court did not condition mental anguish damages on the cost of therapy. Rather, the *Holcombe* court assessed consistent damages across plaintiffs according to where

the plaintiff was situated (in the church or outside the church), the plaintiff's

relationship to other victims, and whether the plaintiff suffered any injury. For

plaintiffs present but not seriously injured, the average non-economic judgment

was approximately $1.3 million. *Id.*

### 2. The Government's theory on trauma and fear is belied by its expert, its cited cases, and its own agencies.

Importantly, the Government does not address the testimony by Dr. Jennifer

Canter, its own retained life care planner here and in *Holombe*, that the two

incidents of community trauma – the Sutherland Springs shooting and the Red Hill

crisis – had a similar psychological impact requiring similar treatment. Canter Dep.

(ECF 422-1) (Nov. 14, 2023) 127:1-33:2. Dr. Canter is right. The lasting emotional

impact of a mass community water contamination event is well documented.

Storage Decl. (ECF 387) ¶10-11 (citing Reuben, A, et al. "Prevalence of

Depression and Posttraumatic Stress Disorder in Flint Michigan, 5 Years After the

Onset of the Water Crisis").

Moreover, the Government's proposed mental anguish damages are far

below even the Government's own cited comparables. For example, the

Government proposes mental anguish damages that are a fraction of the $98,000

(as adjusted) in damages assessed in *Cairns* for emotional harm. Mr. Cairns was

compensated in large part for his fear of future health consequences of his

exposure to contaminated water. There is nothing unreasonable about his fear –

just as there is nothing unreasonable about the fear expressed by Plaintiffs that they may experience health effects akin to families from Camp Lejeune, NC or Flint, Michigan. There is a very real mental health consequence of acute exposure as experienced by Mr. Cairns, the Flint victims, and Plaintiffs. Because they know of their exposure in real time, they have years to worry and wait for the other shoe to drop for themselves or their children. And any given health symptom can become a cause for worry and wonder whether it is related or not to their exposure to jet fuel.

The Government's argument that Plaintiffs' fear is unreasonable is further belied by the Government's own conduct and admissions. The DHA's recommendations to medical providers indicates that "some patients have continued to report persistent heterogenous symptoms" and that the DHA "is investigating the cause of persistent symptoms and reports of neurologic conditions" as of March 2024 – well over two years after the fuel release.[49] The VA now "encourages" veterans to file claims for long-term disability related to Red Hill.[50] The CDC and ATSDR have published three public health assessments

---

[49] Again, the Government's Brief notes that the Court may take judicial notice of Government websites. Gov't Br. 93 n.34. The Defense Health Agency publishes its latest efforts on the Red Hill health response at Red Hill Public Health Information, DEFENSE HEALTH AGENCY WEBSITE, https://ph.health.mil/topics/campaigns/red-hill-public-health/ (last updated Jul. 2, 2024).

[50] *Public Health*, U.S. DEPARTMENT OF VETERANS AFFAIRS WEBSITE, https://www.publichealth.va.gov/exposures/petroleum/red-hill.asp (last accessed

considering the health impact of the Red Hill fuel crisis, and are in the midst of

conducting yet another study of the health of communities near the Red Hill

facility.[51] And in June, the DHA announced that the University of Hawai'i will be

conducting the planned third-party registry under a federal grant of $27.2 million.[52]

If all these federal agencies are actively expressing concern about the long-term

health of those impacted by the Red Hill fuel release, surely it is reasonable for

affected Plaintiffs to worry for themselves and their children.

### 3. The Government does not account for the breadth of mental harm caused by the Navy's negligence at Red Hill.

Plaintiffs' mental anguish goes well beyond worry about health. The

Government's brief does not acknowledge the mental anguish of experiencing

toxic exposure at home – especially during the pandemic when home was expected

to be an oasis of safety. Gov't Br. 106-11. Nor does the Government acknowledge

Plaintiffs' experiences of betrayal by the military to whom they have dedicated

their lives – the same institutions that are expected to provide safe housing and

---

July 12, 2024).

[51] *Red Hill Public Health Assessment Introductory Factsheet,* AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY WEBSITE, https://www.atsdr.cdc.gov/sites/red-hill/red-hill-pha-fact-sheet.html (last reviewed Jan. 17, 2024).

[52] *Public Health*, U.S. DEPARTMENT OF VETERANS AFFAIRS WEBSITE, https://www.publichealth.va.gov/exposures/petroleum/red-hill.asp (last accessed July 12, 2024).

good healthcare. *Id.* Nor the feelings of guilt experienced by parents who were not able to protect their children from harm. *Id.* Nor the helpless feelings as they tried to find medical care for "jet fuel exposure" – a rare malady. *Id.* Nor the fear and worry of watching sick family members in the midst of acute poisoning. *Id.* Nor the change in approach to water, an essential element, or worry that something similar will happen again. Indeed, young P.R.F. is still in trauma therapy in 2024, coloring a picture of a unicorn vomiting after drinking water in paradise. PX-2409.

### 4. The Government's argument that sexual assault survivors receive less in mental anguish would set dangerous precedent.

In its brief, the Government publicly discloses the sexual assault histories of female Plaintiffs and argues that their mental anguish damages for this water contamination crisis should be apportioned and reduced. Gov't Br. 77-78; 83. That position is contrary to policy and common sense. Mothers who are survivors of sexual violence did not experience *less* mental anguish from the Red Hill poisoning than mothers who have not experienced sexual violence. The Government invites dangerous precedent in asking the Court to discount damages in a mass environmental tort case for women (or men, for that matter) who are survivors of sexual abuse. The Government cites no case where a court has done so, and for good reason.

Moreover, the comparison of a given plaintiff's life tragedies only highlights

the enormity of this one. Ms. Dietz, Ms. Freeman, and Ms. Jessup have

experienced significant abuse or violence in their lives, and yet they described the

Red Hill crisis as *more* traumatic than prior experiences. *See, e.g.*, R. Dietz Decl.

(ECF 391) ¶ 63; S. Jessup, 4/30/24 Tx. at 156:16-25. Koda Freeman, who has seen

combat, was brought to tears on the stand in this case. Brian Jessup, who has also

seen combat, similarly expressed emotion. Research conducted after the Flint crisis

found that victims of that community water crisis experienced PTSD in similar

rates as deployed veterans. Storage Decl. (ECF 387) ¶10-11 (citing Reuben, A., et

al. "Prevalence of Depression and Posttraumatic Stress Disorder in Flint,

Michigan, 5 Years After the Onset of the Water Crisis" (finding that "presumptive

mental disorders were highly prevalent among Flint residents … and enhanced in

comparison with prior rates reported among … military veterans after

deployment.")). One must wonder how these events could possibly be as upsetting

as violence. And the answer is in part that this crisis involved *their children* and

their inability to protect their own children (or pets) from harm imposed by the

institutions they have served. That the harm could have easily been avoided had

the institutions just followed their own policies added to the trauma.

### 5.    Plaintiffs' proposed mental anguish damages are better supported by the evidence and the law.

Here, Plaintiffs propose that the Court assess $250,000 in damages for

mental anguish for parents, $100,000 for other adults, $75,000 for children.

Plaintiffs propose an additional $25-75,000 for the children who experienced

additional distress (separation from a parent, fear of a parent's death, particular

impact on a special need, and ongoing fear of water). ECF 595-1.

These figures are more consistent with supporting cases, including *Cairns*

($98,000 for emotional harm to single adult fearful for future health impact after

exposure on ship) and *Kiernan* ($195,000 for mental anguish to each family

member after exposure at home, moving to hotels for three months, and added

anguish of military housing entangled with employment and healthcare).

They are also consistent with the range of damages set forth in FTCA cases

for traumatic events caused by federal officers. Pls. Br. 142-143; *Jerome Schmidt*

*v. United States*, 2020 U.S. Dist. LEXIS 261744, at *28 (W.D. Tex. Oct. 8, 2020)

($240,000 for aggravation of plaintiff's existing PTSD, anxiety, and neck pain);

*Lillian Carter v. United States*, No. 04-CV-4880 (E.D.N.Y. July 22, 2010) ($431k

for home intrusion and resulting PTSD); *Holcombe v. United States*, 584 F. Supp.

3d 225 (W.D. Tex. 2022) ($1.3m average non-economic damages for victims

present but not seriously injured).

In fact, Plaintiffs' proposals are conservative in comparison to other FTCA

judgments for general damages related to PTSD. *Deasy*, 99 F.3d at 355 (affirming

general damages of $600,000, adjusted as $1.2m, for plaintiff who suffered PTSD

after poor treatment by VA medical providers for chronic illness); *In re Air Crash*

*Disaster at Charlotte, N.C.*, 982 F.Supp. 1101 and 982 F. Supp. 1115 (D.S.C. 1997) (assessing general damages of $300,000 and $550,000—$592,210 and $1.02m as adjusted today – for two plaintiffs who suffered from PTSD after a plane crash caused by federal officers).

### F.    Mental Health Treatment and Tutoring

Finally, the Government claims that Plaintiffs have not shown that they are entitled to mental health services or tutoring. Gov't Br. 111. Not so. Plaintiffs' experts have opined as to the mental health needs of each Plaintiff, and both parties' economists have accordingly priced out the care. And here again, the Government does not reckon with the testimony of its retained physician life care planner, who testified that she would encourage Plaintiffs to seek post-trauma counseling, even years later. Canter Dep. at 127:1-33:2.

### CONCLUSION

Plaintiffs respectfully submit their Rebuttal Brief to the United States Closing Argument Brief to assist the Court in its deliberations and respectfully request an award of sums as set forth in Plaintiffs' Closing Argument Brief (ECF 595).

DATED:  Honolulu, Hawai'i, July 12, 2024.

*/s/ Lyle S. Hosoda*             */s/ Kristina S. Baehr*
LYLE S. HOSODA                KRISTINA S. BAEHR
KOURTNEY H. WONG              JAMES BAEHR
SPENCER J. LAU                MARY M. NEUSEL

                             */s/ Frederick C. Baker*
                             FREDERICK C. BAKER
                             CYNTHIA A. SOLOMON
                             JAMES W. LEDLIE
                             KRISTEN HERMIZ
                             SARA O. COUCH
        *Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was

filed and served on counsel of record via the U.S. District Court's CM/ECF

electronic filing system.


                             */s/ Kristina S. Baehr*
                             Kristina S. Baehr