UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., et al., | CIV. NO. 22-00397 LEK-KJM |
| Plaintiffs, | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a negligence case involving personal injuries sustained from ingesting and being exposed to drinking water that was contaminated by jet fuel at Joint Base Pearl Harbor Hickam ("JBPHH"). A non-jury trial was conducted from April 29, 2024 to May 13, 2024 in this tort action brought pursuant the Federal Tort Claims Act ("FTCA"), Title 28 United States Code Sections 1346, 2671-80. The parties designated seventeen individuals as bellwether plaintiffs - Kevin Aubart ("Aubart"); Richelle Dietz ("Dietz") and her children B.D. and V.D.; Patrick Feindt, Jr. ("Feindt") and his children T.F.[1] and P.G.F.; Nastasia Freeman ("Freeman") and her children D.F., K.F., and N.F.; Sheena Jessup ("Jessup") and her children B.B.J., B.J.J., D.J., and N.J.; and Elizabeth Witt ("Witt" and collectively

---

[1] The parties refer to T.F. as either T.F., P.F. or P.R.F. For simplicity, the Court refers to him as T.F.

"Plaintiffs").[2] The parties filed post-trial briefing, which the Court has reviewed and carefully considered in addition to the extensive evidentiary record and trial testimony. The Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that should more properly be deemed a conclusion of law and any conclusion of law that should more properly be deemed a finding of fact shall be so construed.

## I. FINDINGS OF FACT

### A.    The JBPHH Water Distribution System and Impact of the November 2021 Fuel Release

1.    The JBPHH water distribution system has a series of wells, shafts, and tunnels, and water is stored in mains and reservoirs where it is pumped through pipelines to deliver fresh water to homes and other places in the water distribution system. [Joint Exh. JX-14 (JBPHH Potable Water System Schematic); Joint Exh. JX-48 (JBPHH Potable Water System Map).] One of the wells that stores water from the aquifer is the Red Hill Shaft, which pumps water to the JBPHH water distribution system. [Declaration of Paul Rosenfeld, Ph.D., filed 4/8/24

---

[2] "There are hundreds of additional Red Hill claimants, . . . ." Fifth Amended Complaint, filed 12/01/23 (dkt. no. 210), at pg. i, n.1; see id., Attachment 1 (List of Plaintiffs).

(dkt. no. 374) ("Rosenfeld Decl.") at ¶ 9;[3] Joint Exh. JX-14
(JBPHH Potable Water System Schematic); Joint Exh. JX-48 (JBPHH
Potable Water System Map).]

2.    The Red Hill Bulk Fuel Storage Facility is located
above the Red Hill Shaft and is an underground fuel storage
complex. [Joint Exh. JX-28 (4/15/22 Supplement to Command
Investigation into the 6 May 2021 and 20 November 2021 Incidents
at Red Hill Bulk Fuel Storage Facility, signed by J.P. Waters
III) ("Waters Report") at 00009-12.]. It was operated by the
United States Navy since 1942. [Declaration of Joseph Hughes,
Ph.D., filed 4/8/24 (dkt. no. 369) ("Hughes Decl.") at ¶ 6.[4]]
This facility is made up of twenty fuel storage tanks
constructed underground within a hillside with volcanic rock
around it. [Id.; Joint Exh. JX-1 (1/14/22 Command Investigation
into the 6 May 2021 and 20 November 2021 Incidents at Red Hill
Bulk Fuel Storage Facility signed by C.J. Cavanaugh) ("Cavanaugh
Report") at 00004, 00007.]

3.    On November 20, 2021, a rover train struck and
ruptured the fire suppression transfer line resulting in the

_____

[3] Plaintiffs' expert Paul Rosenfeld ("Dr. Rosenfeld") has a
Ph.D. in soil chemistry and experience modeling pollution
sources. See Rosenfeld Decl. at ¶¶ 1-2.

[4] Plaintiffs' expert Dr. Hughes's expertise is environmental
engineering. See Hughes Decl. at ¶¶ 1-2.

release of jet fuel in the storage facility. [Hughes Decl. at ¶ 12; Joint Exh. JX-28 (Waters Report) at 00112-13.]

4.    Gravity drew the spilled jet fuel downward and eventually emptied the jet fuel into the Red Hill Shaft, where the jet fuel and water were pumped through the JBPHH water distribution system. [Transcript of Proceedings: Nonjury Trial Day 2, filed 5/14/24 (dkt. no. 578) ("April 30 Trial Transcript") at 71-74 (Dr. Hughes testifying); Hughes Decl. at ¶¶ 20, 23, 27; Plfs.' Exh. PX 1620 (schematic of release pathways to the environment.]

5.    The jet fuel likely started entering the JBPHH water distribution system on November 21, 2021, from the Red Hill Shaft and subsequently increased in amount to the point to which it contaminated the water pumped into housing areas of JBPHH ("Fuel Release"). April 30 Trial Transcript at 39, 71-74 (Dr. Hughes testifying); Hughes Decl. at ¶¶ 20, 23, 27; May 8 Trial Transcript at 45-46 (Dr. Grayman testifying); Plfs.' Exh. PX-1620 (schematic of release pathways to the environment); see also Hughes Decl. at ¶¶ 28-30.

6.    The Red Hill Shaft was shut down by 10 p.m. on November 28, 2021, operated again between 12 p.m. and 2 p.m. on November 29, 2021, and thereafter was not a source of water to the JBPHH water distribution system. [Declaration of Walter M.

Grayman, Ph.D., P.E., filed 4/8/24 (dkt. no. 376) ("Grayman
Decl.") at ¶ 28.b.[5]]

7.    Historically, the JBPHH water distribution system has
been fed by three wells – the Waiawa Shaft, the Aiea-Halawa
Shaft, and the Red Hill Shaft, which all draw freshwater from an
underwater aquifer. [Rosenfeld Decl. at ¶ 30; Transcript of
Proceedings: Nonjury Trial Day 6, filed 5/14/24 (dkt. no. 582)
("May 7 Trial Transcript") at 9 (Dr. Rosenfeld testifying);
Joint Exh. JX-14 (JBPHH Potable Water System Schematic); Joint
Exh. JX-48 (JBPHH Potable Water System Map).] The Red Hill Shaft
has not been operating since November 29, 2021. [Rosenfeld Decl.
at ¶ 30; Grayman Decl. at ¶ 28.b.]

8.    On November 29, 2021, the Government began a
preliminary flushing of the JBPHH water distribution system in
five neighborhoods that was conducted until December 10, 2021,
which involved flushing water from fire hydrants. On
November 30, 2021, residents were also asked to conduct home
flushes. [Rosenfeld Decl. at ¶¶ 34-35; Declaration of Jeremy
Mitchell, filed 4/8/24 (dkt. no. 373) ("Mitchell Decl.") at
¶¶ 16-19, 21-24.[6]]

---

[5] Dr. Grayman is a licensed professional engineer, and he
received a Ph.D. in Civil Engineering from the Massachusetts
Institute of Technology. [Grayman Decl. at ¶ 3.]

[6] At the time of the Fuel Release, Mitchell was the Deputy
Public Works Officer for JBPHH. See Mitchell Decl. at ¶ 2.

9.    The Government subsequently developed a flushing plan for the JBPHH water distribution system, which involved a phased flushing of distribution lines and tanks contaminated by the Fuel Release. See Bird Decl. at ¶ 87(l); Trial Declaration of CDR John Daly, filed 4/8/24 (dkt. no. 357) ("Daly Decl.") at ¶¶ 9-10, 24-25; Joint Exh. JX-8 (Oahu Military Water Response: Resident Resources Water, dated 2/7/22) at 6; Joint Exh. JX-40 (Drinking Water Distribution Recovery Plan, dated December 2021) at 00007-12.] The plan flushed various zones in phases. [Joint Exh. JX-40 (Drinking Water Distribution Recovery Plan, dated December 2021) at 00007-12.] Plaintiffs' residences were in these flushing zones. [Rosenfeld Decl. at ¶ 36, n.34; Stipulated Facts Regarding the Water System, filed 5/7/24 (dkt. no. 548), at ¶¶ 1-7, & Exh. A.] For residences, the flushing activities included draining water heaters, and performing hot water system flushing, and cold water system flushing. [Rosenfeld Decl. at ¶ 37; Trial Declaration of CDR Trevor Bingham, filed 4/8/24 (dkt. no. 356) ("Bingham Decl.") at ¶ 17[7]; Joint Exh. JX-46 (Single Family Home Flushing Plan Checklist and Standard Operating Procedures, dated December 2021) at 00002-7.]

---

[7] During the Navy's response to the Fuel Release, CDR Bingham was the Officer-in-Charge of Facility Flushing, which included residences. See Bingham Decl. at ¶¶ 7, 15.

10.   A drinking water sampling plan was developed to collect water samples from Waiawa Shaft, Halawa Shaft, and Red Hill Shaft as well as from flushing zones. [Rosenfeld Decl. at ¶ 38; Declaration of Sherri Eng, filed 4/8/24 (dkt. no. 367) ("Eng Decl.") at ¶¶ 26-31; Joint Exh. JX-12 (Drinking Water Sampling Plan, dated December 2021) at 00015.] According to the Hawai`i Department of Health ("HDOH"), each flushing zone had to be evaluated individually via lines of evidence and the criteria to remove the existing health advisory was (1) ensuring that no contamination was entering the water system, and (2) ensuring that no contamination remained in the system. [Rosenfeld Decl. at ¶ 40 (referring to HDOH Guidance on the Approach to Amending the Public Health Advisory Addendum 1 (Plfs.' Exh. PX-1228).] Over 10,000 residents were relocated during the flushing activities, beginning in mid-December 2021 until their water supply was certified safe by HDOH after reviewing data provided by the Government for each specific flushing zone. [Id. at ¶ 41, n.39.]

11.   Although estimating the actual concentration of jet fuel entering the water distribution system cannot be determined with certainty, it is reasonably probable that the concentration of jet fuel in the water distribution system began to rise after

November 26 and by November 27, following the Fuel Release. See
Grayman Decl. at ¶¶ 32, 35-36, 41; id., Exh. L.[8]

12.  There were multiple samples taken at the Red Hill
Community Center, Halsey Terrace Community Center, and Hickam
Chapel Center, which are in or near the neighborhoods where
Plaintiffs lived. See id. at ¶ 41.f. Dr. Grayman compared these
sample results to the concentrations of jet fuel in the water
predicted by his drinking water model. Id.; see also id. at
¶¶ 27-47 (describing Dr. Grayman's drinking water modeling
work). For the Red Hill Community Center, the modelled
concentrations of jet fuel in the water began to rise on
November 27 and peak around December 2 or 3, then started to
recede. [Id. at ¶ 41(f)(i).] For the Halsey Terrace Community
Center and the Hickam Chapel Center, the modelled concentrations
began to rise after November 26 and by November 27 and peak
around November 28, then started to recede. [Id. at
¶ 41(f)(ii).] After December 6, 2021, the measured concentration
of jet fuel in the water distribution system from the Fuel
Release was nondetectable or had results below 100 micrograms
per liter for total petroleum hydrocarbons in the diesel range
("TPH-d"). [Id. at ¶¶ 41(b)-(c), 53(a)(i); Def.'s Exh. DX-3086

---

[8] Exhibit L of the Grayman Declaration is also located at
Def.'s Exh. DX-3087.

(HDOH Sample Results); Def.'s Exh. DX-3085 (Navy Sampling Data
Excerpt).]

    B.  **Causation**

    13.  The United States admits that it breached its duty to
Plaintiffs "to exercise ordinary care in the operation of Red
Hill, resulting in the May 6, 2021 and November 20, 2021
spills." [Second Joint Stipulation as to Plaintiffs' Nuisance
and Negligence Claims; Order, filed 11/27/23 ("Second Joint
Stipulation") (dkt. no. 200) at ¶ 2.] The United States admits
that the breach caused "Plaintiffs [to suffer] injuries
compensable under the [FTCA]." [Second Joint Stipulation at
¶ 3.] Because the United States admits it had a duty to
Plaintiffs, and that it breached that duty, [id. at ¶¶ 2-3,] the
issues before the Court are whether the breach was a legal cause
of harm to Plaintiffs and, if so, the measure of damages to be
awarded to Plaintiffs. See O'Grady v. State, 140 Hawai`i 36, 43,
398 P.3d 625, 632 (2017).

    14.  In toxic tort cases, causation "is typically discussed
in terms of generic and specific causation." In re Hanford
Nuclear Rsrv. Litig., 292 F.3d 1124, 1133 (9th Cir. 2002)
(citing Raynor v. Merrell Pharms., Inc., 104 F.3d 1371, 1376
(D.C. Cir. 1997)); see infra at Conclusion of Law ¶ 10. The
Court finds that expert testimony evidence supports a finding of
generic causation: that the chemicals contained in the Fuel

9

Release had the capacity to cause the harm alleged by
Plaintiffs. The United States' expert witness, Dr. Caroline
Tuit, Ph.D. ("Dr. Tuit"),[9] analyzed screening samples and
screening sample methods for JP-5[10] analytes of interest and
considered those "to include petroleum hydrocarbons and
additives associated with JP-5 jet fuel, specifically: benzene
(B), toluene (T), ethylbenzene (E), xylenses (X), naphthalene
(N), 1-methylnaphthalene (1-MN), 2-methylnaphthalene (2-MN)
(collectively, BTEXMN), TPH for gasoline organics [TPH-g],
diesel range organics [TPH-d], and oil-range organics [TPH-o],
and diethylene glycol monomethyl ether (DiEGME)." [Trial
Declaration of Dr. Caroline B. Tuit, filed 4/8/24 (dkt. no. 346)
("Tuit Decl.") at ¶ 13 (brackets in original).] The United
States' expert witness, Dr. Michael J. Kosnett ("Dr. Kosnett"),[11]
recognized studies reporting that exposure to jet fuel is
associated with headache, eye irritation, dizziness, and other

---

[9] Dr. Tuit is an environmental chemist at the environmental
sciences firm Gradient. [Trial Declaration of Dr. Caroline B.
Tuit, filed 4/8/24 (dkt. no. 346) ("Tuit Decl.") at ¶ 1.]

[10] "JP-5" refers jet propulsion 5 jet fuel. See, e.g., Order
Granting in Part and Denying in Part Defendant's Motion to
Exclude the Expert Report and Testimony of Dr. Steven Bird,
[Filed 1/16/24 (Dkt. No. 234)], filed 4/9/24 (dkt. no. 410), at
4.

[11] Dr. Kosnett is a physician who is board-certified in
internal medicine, medical toxicology, and preventive medicine.
[Trial Declaration of Dr. Michael Kosnett, filed 4/8/24 (dkt.
no. 382) ("Kosnett Decl.") at ¶¶ 1, 5.]

neurological symptoms; [Trial Declaration of Dr. Michael
Kosnett, filed 4/8/24 (dkt. no. 382) ("Kosnett Decl.") at ¶ 50;]
and that "high oral doses of jet fuel in experimental animals
and kerosene in humans [have] been shown to cause
gastrointestinal irritation," [id. at ¶ 87].

15.  The Court finds that expert testimony evidence
supports a finding of specific causation: that a particular
plaintiff sustained a particular injury from exposure to the
chemicals contained in the Fuel Release. The United States'
expert witness, Robyn L. Prueitt, Ph.D., DAB ("Dr. Prueitt"),[12]
testified that "[c]ertain health symptoms can occur in
individuals in response to an odorous chemical that is perceived
to be unpleasant or unhealthy at exposure concentrations lower
than the toxicity threshold, but these symptoms are a result of
stress-induced response to perceptions of the odor as a health
risk (i.e., a non-toxicological mechanism)." [Trial Declaration
of Dr. Robyn L. Prueitt, filed 4/8/24 (dkt. no. 332) ("Prueitt
Decl.") at ¶ 9.] The United States' expert witness, Timur
Durrani, MD, MPH ("Dr. Durrani")[13] testified that his methodology

---

[12] Dr. Prueitt is "a board-certified toxicologist with
expertise in toxicology, carcinogenesis, and human health risk
assessment." [Declaration of Dr. Robyn Pruiett, filed 4/8/24
(dkt. no. 332) ("Pruiett Decl.") at ¶ 1.]

[13] Dr. Durrani is a clinical professor of medicine and
pharmacy in the Department of Medicine, Division of Occupational
and Environmental Medicine and the School of Pharmacy at the

in assessing whether there was a causal relationship between the Fuel Release and the individual plaintiffs' injuries involved looking at criteria consisting of general causation; dose; temporality; and differential diagnosis. [Trial Declaration of Timur Durrani, filed 4/8/24 (dkt. no. 384) ("Durrani Decl.") at ¶ 14.] "Temporality" meaning "whether the temporal pattern between the exposure and the medical conditions were consistent with a causal relationship." Id. at ¶ 14.c, see also Kosnett Decl. at ¶ 35. The Court finds that the symptoms and medical conditions reported by Plaintiffs after the Fuel Release and until approximately when the individual plaintiffs reported that they stopped using the household water supplied by the JBPHH water distribution system establishes a temporal pattern consistent with a causal relationship. See Clausen v. M/V NEW CARISSA, 339 F.3d 1049, 1059 (9th Cir. 2003) ("While the mere fact that two events correspond in time and space does not **necessarily** mean they are causally related, a temporal relationship between exposure to a substance and the onset of a disease . . . can provide compelling evidence of causation.") (alterations in original and internal quotation omitted).

_____

University of California, San Francisco, among other roles. [Trial Declaration of Timmur Durrani, filed 4/8/24 (dkt. no. 384) at ¶ 5.]

16.    The Court finds that the actual and specific amount of
jet fuel chemicals that were released into the water supply and
that reached the individual homes is not capable of being
reliably calculated and thus was not proven. The Court also
finds that the actual dose to which each individual plaintiff
was exposed is not required to be proved where: there is
unambiguous and credible evidence that the United States
breached its duty of care; that breach of duty resulted in the
release of jet fuel in the JBPHH water distribution system;
humans' and animals' exposure to the chemicals in jet fuel is
associated with headache, eye irritation, dizziness,
neurological symptoms, and gastrointestinal issues; each of the
Plaintiffs were exposed by ingesting or having skin contact with
water from the JBPHH water distribution system that contained
some dosage of jet fuel after the Fuel Release; and the onset of
symptoms or medical conditions experienced by Plaintiffs
occurred within reasonable temporality of the Fuel Release and
was consistent with specific causation. See Platt v. Holland Am.
Line Inc., CASE NO. 2:20-cv-00062-JHC, 2023 WL 2938172, at *7
(W.D. Wash. Apr. 13, 2023) (citations omitted) (noting that the
"inference of causation becomes substantially more reasonable"
when the injury is acute and the "temporal proximity of the
injury and the onset of symptoms is so immediate"). In short, it
is reasonably inferred that the dose was in an amount sufficient

to cause the ill effects reported within days of the Fuel
Release. Accordingly, the Court finds sufficient evidence
supporting a finding of specific causation as to Plaintiffs, and
as addressed for each individual plaintiff as follows.

17.  At the time of the Fuel Release, Plaintiffs resided in
military housing in the following areas: Aubart lived at 1362
Snyder Court in the Doris Miller community; the Dietz family
lived at 731 Ohana Nui Circle in the Earhart Village
neighborhood; the Feindt family lived at 4838 Yorktown Boulevard
in the Ford Island neighborhood; the Freeman family lived at 185
Halawa View Loop at the Aliamanu Military Reservation
neighborhood; the Jessup family lived at 2632 Stowell Circle in
the Radford Terrace neighborhood; and Witt lived at 203 Signer
Boulevard C in the Officer Field neighborhood. [Stipulated Facts
Regarding the Water System, filed 5/7/24 (dkt. no. 548), at
¶¶ 1-6; id., Exh. A (dkt. no. 548-1) (map of Plaintiffs' homes
in relation to the JBPHH flushing zones); id., Exh. B (dkt. no.
548-2) (modification of Joint Exh. JX-48 to show the approximate
location of Plaintiffs' residences on the JBPHH water system).]

18.  Following the Fuel Release, Plaintiffs experienced
various signs and symptoms after ingesting and using the water
from their home waterlines supplied by the JBPHH water
distribution system for various purposes, such as drinking,
bathing, food preparation, and washing. See Stipulated Order

Relating to Trial Declarations of Dr. Steven Bird (ECF No. 383),
Ms. Cynthia Fricke (ECF No. 399), Ms. Margot Burns (ECF No.
403), and Dr. James Spira (ECF No. 386), filed 4/29/24 (dkt. no.
491), Exh. A (Declaration of Steven B. Bird, MD) ("Bird Decl.")[14]
at ¶¶ 66-67, 68 (admissible portion), 96; Rosenfeld Decl. at
¶ 24. Whether the signs, symptoms and medical conditions
Plaintiffs exhibited were caused by exposure to a particular
dosage of jet fuel in the JBPHH water distribution system, from
a psychological response to reports of the Fuel Release, or a
combination of both, the Court is persuaded by and finds that
the temporal pattern between the exposure and effects reported
is consistent with a causal relationship.

C.    **Physical Pain and Suffering**

1.    **Aubart**

a.    **Acute Symptoms**

19.    In November 2021, Aubart developed a recurrent cough
that lasted over a week. Beginning November 23, 2021, Aubart had
a slight fever that would arise during the coughing spells.
[Declaration of Plaintiff, Kevin Aubart ("Aubart Decl."), filed
4/8/24 (dkt. no. 389), at ¶ 39.]

20.    Around November 24, 2021, Aubart experienced rashes
and eye irritation after showers, bone and joint pain, abdominal

---

[14] Plaintiffs' expert Dr. Bird is a medical toxicologist and
an emergency medicine clinician. [Bird Decl. at ¶¶ 1, 15.]

pain, diarrhea, headaches, fatigue, nausea, sinus issues, and coughing. After showering at night, Aubart would notice rashes on his stomach, chest and arms that itched and lasted until morning. [Id. at ¶¶ 17, 40.] He also had to go to the bathroom frequently. [Id. at ¶ 40.]

21.  Aubart stopped using household water for drinking on November 28, 2021. [Id. at ¶ 27.]

22.  Beginning the week of November 28, 2021, Aubart experienced abdominal issues, including pain, diarrhea and infection. On November 28, 2021, Aubart's brain fog worsened. He could not see clearly, was forgetful, and had difficulty concentrating. [Id. at ¶¶ 37-38, 40.]

23.  After November 28, 2021, his sinus symptoms worsened in occurrence and frequency, including head colds, coughing, postnasal drip and fevers. [Id. at ¶ 39.] Aubart also experienced severe muscle and joint pain, such that he could not reach his arms over his head. [Id. at ¶ 41.]

### b.    Continued Symptoms

24.  By September 26, 2022, the nausea, fatigue, headaches, shoulder pain, and minor rashes had improved. [Plfs.' Exh. PX-2248 (Aubart medical records) at 46 (9/26/22 Kaiser Permanente Internal Medicine clinical notes).] However, Aubart reported continued fatigue and painful headaches until mid-2023. See Kosnett Decl. at ¶ 47; see also Def.'s Exh. DX-3212 (Aubart

16

medical records) at 39 (Kaiser Permanente 5/16/22 internal
medicine office visit note). In June 2023, Aubart reported no
longer experiencing headaches or fatigue, and had no cognitive
complaints. See Kosnett Decl. at ¶ 47; Def.'s Exh. DX-3212
(Aubart medical records) at 3 (Kaiser Permanente initial
treatment plan dated 6/5/23).

c.    <u>**Preexisting Conditions**</u>

25.  Aubart testified that his rashes may have begun two
weeks prior to November 23, 2021. [Transcript of Proceedings:
Nonjury Trial Day 5, filed 5/14/24 (dkt. no. 581) ("May 3 Trial
Transcript") at 92.] Aubart also reported having headaches and
fatigue in July 2019 in connection to litigation related to his
employment that was ongoing until 2023. Def.'s Exh. DX-3212
(Aubart medical records) at 30, 33 (Kaiser Permanente 7/17/19
internal medicine office visit notes), 39 (Kaiser Permanente
5/16/22 internal medicine office visit note); see also Kosnett
Decl. at ¶ 56, May 3 Trial Transcript at 96-97 (Aubart
testifying).

26.  His headaches and fatigue did not resolve prior to the
Fuel Release. See Kosnett Decl. at ¶ 47; Def.'s Exh. DX-3212
(Aubart medical records) at 39 (Kaiser Permanente 5/16/22
internal medicine office visit note).

### d.  <u>Causation and Apportionment</u>

27. A plaintiff is required to prove that a defendant's conduct was a legal cause of the injuries alleged. <u>See</u> <u>infra</u> at Conclusion of Law ¶ 7. The Court finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of Aubart's brain fog was the Fuel Release.

28. Based on the evidence presented, the Court finds that Plaintiffs have proven by a preponderance of the evidence that a legal cause of Aubart's physical symptoms and conditions experienced or diagnosed beginning November 23, 2021 and lasting for approximately one month was the Fuel Release.

29. Plaintiffs do not provide citations to medical evidence or testimony regarding Aubart's continued experience of his acute symptoms, and specifically the duration of Aubart's acute symptoms that he experienced in the weeks immediately following the Fuel Release. While his sinus symptoms worsened after November 28, 2021, Plaintiffs do not cite to medical records demonstrating that Aubart continued to experience his acute symptoms in December 2021 or January 2022. Accordingly, the Court finds that Plaintiffs did not provide sufficient evidence to support recovery for pain and suffering damages for any period longer than one month after the Fuel Release.

30.  Further, the Court must apportion damages for certain
acute symptoms that Aubart experienced prior to and immediately
after the Fuel Release. See Montalvo v. Lapez, 77 Hawai`i 282,
299-300, 884 P.2d 345, 363 (1994); infra at Conclusion of Law
¶¶ 18-20. The Court finds that Aubart was not fully recovered
from rashes, headaches, and fatigue that he was experiencing
prior to the Fuel Release and therefore apportionment is
appropriate for these symptoms. Because there is no evidence to
base apportionment between Aubart's preexisting rashes,
headaches, and fatigue (including those related to his
employment litigation) and the rashes, headaches, and fatigue
caused by the Fuel Release, then damages must be distributed
equally for these symptoms. See Montalvo, 77 Hawai`i at 299-300,
884 P.2d at 362-63. The Court does not apportion damages for the
other acute symptoms Aubart experienced after the Fuel Release.

## 2.  **Dietz**

### a.  **Acute Symptoms**

31.  In the days prior to November 25, 2021, Dietz
experienced stomach pain, vomiting, diarrhea, headaches, burning
in her eyes and throat, and cough and rashes. Declaration of
Plaintiff, Richelle Dietz, filed 4/8/24 (dkt. no. 391) ("Dietz
Decl.") at ¶ 10; see also Kosnett Decl. at ¶¶ 73, 75.

32.   After Thanksgiving of 2021,[15] Dietz experienced a rash, nausea, diarrhea, and stomachache. [Dietz Decl. at ¶ 11; Transcript of Proceedings: Nonjury Trial Day 3, filed 5/14/24 (dkt. no. 579) ("May 1 Trial Transcript") at 36-37 (Dietz testifying), 63 (Bryan Dietz[16] testifying).]

33.   On November 27, 2021, Dietz's throat was burning and felt like it was on fire. Dietz Decl. at ¶ 13; see also Def.'s Exh. DX-3213 (Dietz medical records) at 36 (12/10/21 note).

34.   Shortly after the Fuel Release, Dietz developed brain fog, short-term memory loss, word-finding challenges, attention challenges, and insomnia. [Dietz Decl. at ¶ 60.]

35.   She also had issues sleeping and developed eczema and ocular migraines that made her lose vision. Id. at ¶¶ 56-59; see also Plfs.' Exh. PX-2249 (Dietz medical records) at 756 (11/26/21 note reporting blurred vision).

36.   Dietz stopped using the household tap water for drinking on November 29, 2021. [May 1 Trial Transcript at 29, 44 (Dietz testifying).]

37.   There is conflicting evidence regarding the duration of Dietz's acute symptoms. Dietz stated her family's symptoms

---

[15] Thanksgiving fell on November 25, 2021.

[16] Bryan Dietz is married to Dietz. [Dietz Decl. at ¶ 1.]

continued through the first week of December. [Dietz Decl. at
¶ 25.][17] She also stated most of her symptoms started to calm
down by December 2 or 3, 2021. May 1 Trial Transcript at 25
(Dietz testifying); see also Kosnett Decl. at ¶ 75; Def.'s Exh.
DX-3213 (Dietz medical records) at 36 (12/10/21 note stating
"everything has been okay for about a wk and a half," noting
that symptoms peaked on 11/29 and "[o]ver the next 1.5 weeks, Sx
have subsided signif"). The Court finds by a preponderance of
the evidence that Dietz's symptoms began to cease by December 3,
2021.

### b.    Symptoms and Conditions Since December 3, 2021

38.  Dietz experienced episodic nausea throughout 2022.
Kosnett Decl. at ¶ 74; see also Def.'s Exh. DX-3213 (Dietz
medical records) at 48 (1/17/22 Hawaii Pacific Health provider
notes).

39.  She developed a rash in February 2022 under her arm,
and it spread to her abdomen in June 2022. [Def.'s Exh. DX-3213
(Dietz medical records) at 34 (6/23/22 Kitagawa Dermatology note
noting rash on chest starting two weeks prior).] She was

---

[17] Dietz stated that her family continued to experience
burning sensations, stomach pain, vomiting and diarrhea through
the first week of December. [Dietz Decl. at ¶ 25.] The Court
is unable to differentiate which of these symptoms applied to
which of her family members, and thus is unable to attribute
these symptoms to B.D. and V.D. The Court attributes these
symptoms to Dietz.

diagnosed with dermatitis, which is currently under better control. [Id. at 32-34 (2/22/23, 12/15/22, and 6/23/22 notes from Kitagawa Dermatology); Kosnett Decl. at ¶¶ 82-83.]

40.  Dietz underwent a partial hysterectomy in April 2023 for the removal of a paraovarian cyst. [Def.'s Exh. DX-3213 (Dietz medical records) at 64-65 (4/28/23 Queen's Medical Center operative report). Prior to the cyst removal, she experienced intense abdominal pain, nausea, and dizziness. Dietz Decl. at ¶ 56; see also Def.'s Exh. DX-3213 (Dietz medical records) at 65 (4/28/23 Queen's Medical Center operative report noting history of severe menorrhagia, dysmenorrhea, and pelvic pain).

41.  In October 2023, Dietz reported a sheen in the water in her home, and she experienced symptoms of rash, diarrhea, headaches, and nausea. [Dietz Decl. at ¶ 43.]

c.  **Preexisting Conditions**

42.  Dietz has a history of gastroesophageal reflux disease ("GERD") since about the age of sixteen. See May 1 Trial Transcript at 17 (Dietz testifying); Def.'s Exh. DX-3213 (Dietz medical records) at 35 (5/27/22 medical record noting GERD since age 16); see also Kosnett Decl. at ¶¶ 72, 95. Dietz's symptoms of GERD are associated with "severe abdominal pain up to 10/10," nausea and diarrhea. [Def.'s Exh. DX-3213 (Dietz medical records) at 80 (10/21/22 medical record).] Dietz took Omeprazole for nearly as long as she has been diagnosed with GERD, but

discontinued use in late 2022. [May 1 Trial Transcript at 17 (Dietz testifying).]

43. Dietz also has a history of irritable bowel syndrome ("IBS"). Id. at 17 (Dietz testifying); see also Def.'s Exh. DX-3213 (Dietz medical records) at 35 (5/27/22 medical record).

44. Dietz was diagnosed with Meniere's disease in 2013, and at the time she was diagnosed she presented with symptoms of vertigo, nausea, vomiting and tinnitus. [May 1 Trial Transcript at 18 (Dietz testifying).] Dietz's episodes of Meniere's disease are associated with tinnitus and dizziness, and the last episode she experienced prior to the Fuel Release occurred sometime in 2020. [Kosnett Decl. at ¶ 79, Def.'s Exh. DX-3213 (Dietz medical records) at 41 (6/23/23 medical record).] The only Meniere's disease symptom Dietz appeared to experience at the time of the Fuel Release was minor dizziness. [Kosnett Decl. at ¶ 84.5.]

### d.  **Causation and Apportionment**

45. The Court finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of Dietz's brain fog, short-term memory loss, word-finding challenges, attention challenges, eczema, and ocular migraines that made her lose vision, was the Fuel Release.

46. Based on the evidence presented, the Court finds that Plaintiffs have proven by a preponderance of the evidence that a

legal cause of Dietz's other physical symptoms and conditions from November 26, 2021 to December 3, 2021 was the Fuel Release. The Court also finds that Plaintiffs have not proven by a preponderance of the evidence that a legal cause of Dietz's physical symptoms and conditions experienced or diagnosed after December 3, 2021 was the Fuel Release. See O'Grady, 140 Hawai`i at 44, 398 P.3d at 633. The Court also finds that Plaintiffs have not proven by a preponderance of the evidence that the sheen reported in October 2023 was caused by the Fuel Release or actions attributable to Defendant.

47.  The Court finds that Dietz was not fully recovered from GERD and IBS at the time of the Fuel Release and therefore apportionment is appropriate. Because there is no evidence to base apportionment between Dietz's preexisting medical conditions and the same or similar conditions - such as nausea and diarrhea - caused by the Fuel Release, then damages must be distributed equally for these conditions. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. The Court does not apportion damages for the other acute symptoms Dietz experienced after the Fuel Release.

### 3.  **B.D.**

48.  B.D. was approximately ten years old in November 2021. See Dietz Decl. at ¶ 1 (noting B.D. was thirteen years old as of April 7, 2024).

24

a.   **Acute Symptoms**

49.   After Thanksgiving in 2021, B.D. experienced nausea,
vomiting and diarrhea. [May 1 Trial Transcript at 19, 36 (Dietz
testifying); Dietz Decl. at ¶ 12.] He experienced a spike in the
duration and severity of his preexisting headaches. [Dietz Decl.
at ¶¶ 12, 49-50; May 1 Trial Transcript at 39-40 (Dietz
testifying).] B.D. lost the ability to balance and could not
feel things strongly on parts of his body. [May 1 Trial
Transcript at 19 (Dietz testifying).] He had sensations of
burning or heat in his extremities. [Dietz Decl. at ¶ 12; May 1
Trial Transcript at 19-20 (Dietz testifying).] After the Fuel
Release, B.D. also experienced gastrointestinal issues and
rashes. [May 1 Trial Transcript at 63 (Bryan Dietz testifying).]
B.D. lost feeling in his right hand and back, and had spots that
felt hot on his ankles and feet. [Dietz Decl. at ¶ 51; Def.'s
Exh. DX-3218 (B.D. medical records) at 1 (1/4/22 Stanford
Medicine Children's Health progress note).] B.D. also had a sore
throat, dry skin, and fatigue. [Dietz Decl. at ¶ 26.]

50.   The Dietz family stopped using the household tap water
for drinking on November 29, 2021. [May 1 Trial Transcript at
29, 44 (Dietz testifying); Declaration of Bryan Dietz, filed
4/8/24 (dkt. no. 390) ("B. Dietz Decl.") at ¶¶ 7-9.]

51.  B.D.'s symptoms started to calm down by December 2 or 3, 2021. [May 1 Trial Transcript at 25 (Dietz testifying);[18] Def.'s Exh. DX-3213 (Dietz medical records) at 36 (12/10/21 note stating "everything has been okay for about a wk and a half").] The Court finds by a preponderance of the evidence that B.D.'s symptoms began to cease by December 3, 2021.

### b.  Preexisting Conditions

52.  B.D. was diagnosed with Chiari I malformation of the brain in 2016. Dietz Decl. at ¶ 4; see also Def.'s Exh. DX-3218 (B.D. medical records) at 7 (7/19/21 medical record, noting diagnosis of Chiari I malformation at age 5). B.D. has a history of having headaches, and these headaches started increasing in March 2021. See May 1 Trial Transcript at 20 (Dietz testifying); Dietz Decl. at ¶ 4; Def.'s Exh. DX-3218 (B.D. medical records) at 1.

53.  B.D. experienced numbness in his extremities in August 2021. [May 1 Trial Transcript at 23 (Dietz testifying).]

54.  Dietz has informed B.D.'s teachers that symptoms of B.D.'s Chiari I malformation include severe headaches, memory

---

[18] Dietz stated that her family continued to experience burning sensations, stomach pain, vomiting and diarrhea through the first week of December. [Dietz Decl. at ¶ 25.] The Court is unable to differentiate which of these symptoms applied to which of her family members, and thus is unable to attribute these symptoms to B.D.

loss, decreased sensations to hot and cold, and poor balance.
[Id. at 21.]

### c.    Symptoms and Conditions Since December 3, 2021

55.  Dietz testified that B.D.'s headaches differed after
the Fuel Release. [May 1 Trial Transcript at 20 (Dietz
testifying).] While B.D.'s headaches used to resolve quickly, he
began having migraines for the first time. These migraines last
for hours or even days, during which B.D. lies in bed under the
covers and vomits into a bowl next to his bed. [Dietz Decl. at
¶ 49.] After the Fuel Release, he could not manage the pain and
vomiting caused by the migraines. [Id. at ¶ 50.]

56.  B.D. underwent brain surgery for his preexisting
Chiari I malformation in March 2022. [Id. at ¶ 52; May 1 Trial
Transcript at 23-24 (Dietz testifying).]

57.  After the surgery, B.D.'s headaches changed in
character. B.D.'s headaches substantially improved, but he has
since developed migraines. [May 1 Trial Transcript at 55 (Bryan
Dietz testifying).]

### d.    Causation and Apportionment

58.  The Court finds that Plaintiffs have not shown by a
preponderance of the evidence based on credible and qualified
medical evidence that a legal cause of B.D.'s loss of balance,
diminished capacity to feel sensation on parts of his body,

including loss of feeling in his right hand and back; and
sensation of burning or heat in his extremities was the Fuel
Release.

59. Based on the evidence presented, the Court finds that
Plaintiffs have proven by a preponderance of the evidence that a
legal cause of B.D.'s physical symptoms and conditions
experienced from November 26, 2021 to December 3, 2021
(specifically, gastrointestinal issues including nausea,
vomiting, and diarrhea; rashes; sore throat; dry skin; fatigue;
and a spike in the severity of preexisting headaches) was the
Fuel Release. The Court also finds that Plaintiffs have not
proven by a preponderance of the evidence that a legal cause of
B.D.'s physical symptoms and conditions experienced or diagnosed
after December 3, 2021 was the Fuel Release. See O'Grady, 140
Hawai`i at 44, 398 P.3d at 633.

60. As to B.D.'s preexisting condition, Chiari I
malformation, the Court finds that Plaintiffs have not proven by
a preponderance of the evidence based on credible and qualified
medical evidence that B.D.'s preexisting condition was
exacerbated or otherwise worsened by the Fuel Release, other
than physical symptoms and conditions between November 26 and
December 3, 2021. The Court finds that B.D. experienced
headaches from his preexisting condition at the time of the Fuel
Release and therefore apportionment is appropriate. Because

28

there is no evidence to base apportionment between B.D.'s preexisting medical condition which causes headaches, and the same condition exacerbated by the Fuel Release, then damages must be distributed equally as to this condition. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. The Court does not apportion damages for the other acute symptoms B.D. experienced between November 26 and December 3, 2021.

### 4.    V.D.

61.  V.D. was approximately three years old in November 2021. See Dietz Decl. at ¶ 1 (noting V.D. was five years old as of April 7, 2024); Declaration of Dr. Andrew Clark, filed 4/8/24 (dkt. no. 366) ("Clark Decl.") at ¶ 35.

### a.    Symptoms

62.  In the days prior to Thanksgiving in 2021, V.D.'s bottom hurt while bathing, and she screamed and cried during this bathing incident. [Dietz Decl. at ¶ 10; May 1 Trial Transcript at 34-35 (Dietz testifying).] It took her twenty to thirty minutes to calm down. [May 1 Trial Transcript at 34-35 (Dietz testifying).]

63.  During Thanksgiving weekend of 2021, V.D.'s stomach hurt and she had a rash on her stomach. [May 1 Trial Transcript at 36 (Dietz testifying).]

64.  After Thanksgiving, V.D. experienced stomach pain, vomiting, and diarrhea. [Dietz Decl. at ¶ 12.] V.D. also

29

experienced dry skin, and pain in her vaginal area. [B. Dietz Decl. at ¶ 17.][19] V.D. also developed shortness of breath after the Fuel Release. [May 1 Trial Transcript at 24 (Dietz testifying).]

65. The Dietz family stopped using the household tap water for drinking on November 29, 2021. [May 1 Trial Transcript at 29, 44 (Dietz testifying); Declaration of Bryan Dietz, filed 4/8/24 (dkt. no. 390) ("B. Dietz Decl.") at ¶¶ 7-9.]

66. Most of V.D.'s symptoms started to calm down by December 2 or 3, 2021. See May 1 Trial Transcript at 25 (Dietz testifying); Def.'s Exh. DX-3213 (Dietz medical records) at 36 (12/10/21 note stating "everything has been okay for about a wk and a half").[20] The Court finds by a preponderance of the evidence that V.D.'s symptoms began to cease by December 3, 2021.

67. V.D. also had a cough that developed into severe wheezing. [B. Dietz Decl. at ¶ 17; Dietz Decl. at ¶ 54.] Her mother noted V.D. seemed to have a weak immune system, and her

---

[19] It is unclear whether V.D.'s pain in the vaginal area is the same symptom as the pain she experienced while bathing.

[20] Dietz stated that her family continued to experience burning sensations, stomach pain, vomiting and diarrhea through the first week of December. [Dietz Decl. at ¶ 25.] The Court is unable to differentiate which of these symptoms applied to which of her family members, and thus is unable to attribute these symptoms to V.D.

"colds began lasting weeks rather than days." Dietz Decl. at
¶ 27; see id. at ¶ 54. When she would get a cold, it would take
two or three weeks and sometimes "a round of steroids for her to
recover." [Id. at ¶ 54.] V.D. was eventually diagnosed with
asthma. Id.; see also Def.'s Exh. DX-3219 (V.D. medical records)
at 5 (2/13/23 medical notes with asthma diagnosis).] It is not
clear when V.D.'s severe wheezing began after the Fuel Release.

68.  V.D. had tonsil surgery in June 2023, after which her
colds began to last a normal amount of time, and she began
sleeping better. [Dietz Decl. at ¶ 55.]

### b.  Preexisting Conditions

69.  V.D. has a history of wheezing that predates the Fuel
Release. See May 1 Trial Transcript at 24-25 (Dietz testifying);
Durrani Decl. at ¶¶ 31-32. V.D. saw a doctor for wheezing, among
other symptoms, at least twice in 2018, and at least twice in
2019. [May 1 Trial Transcript at 25 (Dietz testifying); Def.'s
Exh. DX-3219 (V.D. medical records) at 58, 61-62, 71, 92-93.]

70.  V.D. also has a history of cough that predates the
Fuel Release. See May 1 Trial Transcript at 25 (Dietz
testifying); Durrani Decl. at ¶ 33; see also Def.'s Exh. DX-3219
(V.D. medical records) at 34, 59-61, 83, 88, and 90. A July 1,
2021 medical record reflects V.D. had a cough that morning.
[Def.'s Exh. DX-3219 (V.D. medical records) at 34.]

71.  In February 2021, V.D. had dry skin and a history of eczema. <u>See</u> May 1 Trial Transcript at 25 (Dietz testifying).

### c.  <u>Causation and Apportionment</u>

72.  Based on the evidence presented, the Court finds that Plaintiffs have proven by a preponderance of the evidence that a legal cause of V.D.'s physical symptoms and conditions from November 26, 2021 to December 3, 2021 was the Fuel Release. The Court also finds that the Plaintiffs have not proven by a preponderance of the evidence that a legal cause of V.D.'s physical symptoms and conditions experienced or diagnosed after December 3, 2021, including her asthma diagnosis, was the Fuel Release. <u>See</u> <u>O'Grady</u>, 140 Hawai`i at 44, 398 P.3d at 633.

73.  The Court finds that there is no evidence presented that V.D. was still experiencing eczema, wheezing and cough immediately prior to the Fuel Release and therefore apportionment is not appropriate for these conditions. The Court also does not apportion damages for the other acute symptoms V.D. experienced between November 26 and December 3, 2021.

### 5.  <u>Feindt</u>

### a.  <u>Acute Symptoms</u>

74.  Around Thanksgiving of 2021, Feindt had headaches and experienced nausea. [Declaration of Plaintiff, Patrick Feindt, filed 4/8/24 (dkt. no. 392) ("Feindt Decl.") at ¶ 16;

Declaration of Amanda Feindt, filed 4/8/24 (dkt. no. 393) ("A.
Feindt Decl.") at ¶ 11.[21]

75.    The Feindt household stopped using the household tap
water for drinking on December 9, 2021. [Feindt Decl. at ¶ 21;
Transcript of Proceedings: Nonjury Trial Day 1, filed 5/14/24
(dkt. no. 577-1) ("April 29 Trial Transcript") at 212 (Feindt
testifying).]

76.    On December 11, 2021, Feindt went to the emergency
room because he was lightheaded, vomiting, had contractions in
his stomach, had intense diarrhea, was seeing stars, had brain
fog and had a severe migraine. [April 29 Trial Transcript at 192
(A. Feindt testifying), 228-30 (Feindt testifying); April 30
Trial Transcript at 8-9 (Feindt testifying); Feindt Decl. at
¶¶ 25-27.] That morning, Feindt had an intense headache and
vomited once, but tolerated a normal meal afterward. [Plfs.'
Exh. PX-2252 (Feindt medical records) at 34-35 (12/11/21 medical
record).]

77.    In the following days, Feindt had trouble controlling
his bowels and was constantly rushing to the bathroom. [Feindt
Decl. at ¶ 33.] During this time, Feindt also experienced
coughing, burning in his nose and mouth, muscle pain, extreme

---

[21] Amanda Feindt is married to Feindt. [A. Feindt. Decl. at
¶ 5.]

malaise, brain fog, and short-term memory loss. [Id. at ¶ 73; A. Feindt Decl. at ¶ 71.]

78.  Feindt was still sick when the family moved into a hotel on December 14, 2021. See April 30 Trial Transcript at 11-12 (Feindt testifying).

79.  It is not clear when Feindt's acute symptoms ended.

### b.  Continued Symptoms

80.  On March 10, 2022, after moving back into their house, Feindt's symptoms returned: he began vomiting, having diarrhea, was dizzy and lethargic, coughing, and having migraines. [A. Feindt Decl. at ¶ 60; April 30 Trial Transcript at 15 (Feindt testifying).]

81.  After Feindt moved to Colorado in April 2022, Feindt's condition worsened and he started to experience "intermittent dizziness and vertigo, chronic pain, headaches, and elevated mast cells, which causes signs and symptoms similar to an allergic reaction." A. Feindt Decl. at ¶ 72; see Feindt Decl. at ¶ 50.

82.  In May 2022, Feindt had pain in his right flank, right back, and right testicle that was so severe he went to the emergency room, where he was diagnosed with potential hernias. See Plfs.' Exh. PX-2252 (Feindt medical records) at 73-90 (5/22/22 medical record); Feindt Decl. at ¶ 74. He has felt this pain for over two years. [Feindt Decl. at ¶ 78; Kosnett Decl. at

¶ 127.] At the time of trial, Feindt experienced this testicular pain. [April 30 Trial Transcript at 22-23 (Feindt testifying).]

83.  Feindt had three procedures to address his gastric issues. [Feindt Decl. at ¶¶ 74-79; A. Feindt Decl. at ¶ 73; April 30 Trial Transcript at 20-22 (Feindt testifying).] Feindt had a hernia repair in June 2022, and a cholecystectomy in November 2022. See Kosnett Decl. at ¶ 127 (citing Def.'s Exh. DX-3214 (Feindt medical records) at 152-53 (5/12/23 medical record)); Feindt Decl. at ¶ 74. He has been diagnosed with mastocytosis of the gastrointestinal track. See Kosnett Decl. at ¶ 136; Feindt Decl. at ¶ 76.

84.  In December 2022, Feindt thought he was having a stroke, and was so lethargic he could not keep his eyes open. [Feindt Decl. at ¶ 81.] He was hospitalized for eight days for a severe headache and vertigo from late December 2022 through early January 2023. See Kosnett Decl. at ¶ 121; Def.'s Exh. DX-3214 (Feindt medical records) at 98-118, 176-77 (12/29/22 and 1/4/23 medical records). He was diagnosed with the principal problem of status migrainosus, and with active problems including enteroviral meningitis and vertigo. Def.'s Exh. DX-3214 (Feindt medical records) at 176 (1/4/23 medical record); see also id. at 98-118 (12/29/22 medical record).

85.  Feindt reports still being in pain, and his body taking more time to recover after physical activity. [Feindt

35

Decl. at ¶¶ 84-85.] He continues to experience migraine symptoms
and right-sided abdominal pain and flank pain. [Kosnett Decl. at
¶¶ 122, 127.]

### c.    Preexisting Conditions

86.  Feindt had gastrointestinal issues in October 2017.
See Def.'s Exh. DX-3214 (Feindt medical records) at 35 (10/31/17
medical note); see also Kosnett Decl. at ¶ 130. Feindt
experienced gastrointestinal issues for several months prior to
the Fuel Release. [Def.'s Exh. DX-3214 (Feindt medical records)
at 88 (12/11/21 medical record).]

87.  During May 2021, Feindt experienced abdominal pain,
diarrhea, vomiting and migraine headaches. See April 29 Trial
Transcript at 209, 211 (Feindt testifying); Kosnett Decl. at
¶ 117. That summer of 2021 he also experienced nausea and
fatigue. See April 29 Trial Transcript at 209 (Feindt
testifying). In August 2021, Feindt began to experience brain
fog. See id. at 211 (Feindt testifying). He reported
experiencing headaches since the beginning of November 2021.
Def.'s Exh. DX-3214 (Feindt medical records) at 88 (12/11/21
medical record); see also April 29 Trial Transcript at 212-13
(Feindt testifying).

### d.    Causation and Apportionment

88.  The Court finds that Plaintiffs have not shown by a
preponderance of the evidence based on credible and qualified

medical evidence that a legal cause of Feindt's brain fog and migraines was the Fuel Release.

89.  Based on the evidence presented, the Court finds that Plaintiffs have shown by a preponderance of the evidence that a legal cause of Feindt's other physical symptoms and medical conditions beginning around November 26, 2021 and lasting for approximately one month was the Fuel Release. Plaintiffs have provided evidence that Feindt was still experiencing symptoms on December 13, 2021. However, as explained above, Plaintiffs do not provide citations to medical evidence or testimony regarding Feindt's continued experience of his acute symptoms in later December or January. Evidence before the Court indicates that Feindt took a leave of absence between December 14, 2021 and January 10, 2022, and he took sick leave for the work pay period ending December 19, 2021. [Def.'s Declaration of Erick C. West ("West Decl."), filed 5/8/24 (dkt. no. 563) at ¶ 46.] The Court finds that Plaintiffs did not provide sufficient evidence to allow Feindt to recover for pain and suffering damages after January 10, 2022. The Court finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of Feindt's physical symptoms and medical conditions experienced or diagnosed after January 10, 2021 was the Fuel Release. See O'Grady, 140 Hawai`i at 44, 398 P.3d at 633.

37

90.  The Court finds that Feindt was not fully recovered from gastrointestinal issues, headaches, and brain fog at the time of the Fuel Release and therefore apportionment is appropriate for these symptoms. Because there is no evidence to base apportionment between Feindt's preexisting medical conditions of gastrointestinal issues, headaches, and brain fog, and the same or similar conditions such as lightheadedness, vomiting, stomach contractions, diarrhea, and seeing stars, caused by the Fuel Release, then damages must be distributed equally for these conditions. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. The Court does not apportion damages for the other acute symptoms Feindt experienced between November 25, 2021 and January 10, 2022.

### 6.  P.G.F.

91.  P.G.F. was approximately four years old in November 2021. See Feindt Decl. at ¶ 1 (noting P.G.F. was six as of April 6, 2024); A. Feindt Decl. at ¶ 63 (noting P.G.F. was four years old when she had trouble adjusting after moving to Colorado).

### a.  Acute Symptoms

92.  On December 13, 2021, P.G.F. experienced severe abdominal pain, vomiting, and diarrhea. April 29 Trial Transcript at 191 (A. Feindt testifying); A. Feindt Decl. at ¶¶ 39, 75; April 30 Trial Transcript at 9 (Feindt testifying);

see also Plfs.' Exh. PX-2253 (P.G.F. medical records) at 47-49, 55-57 (12/13/21 medical records). She lost control of her bowels. [April 30 Trial Transcript at 9 (Feindt testifying).] Her vomiting was so intense it progressed to dry heaving. [Id.]

93. P.G.F. also experienced sleep issues before Christmas in 2021. See A. Feindt Decl. at ¶ 57.

94. The Feindt household stopped using the household tap water for drinking on December 9, 2021. [Feindt Decl. at ¶ 21; April 29 Trial Transcript at 212 (Feindt testifying).]

95. P.G.F.'s symptoms improved by December 19, 2021. [April 29 Trial Transcript at 214-15 (Feindt testifying); Joint Exh. JX-10 (12/19/21 text message from Feindt to his father).]

96. By late January 2022, P.G.F.'s symptoms of diarrhea, vomiting and nausea had completely resolved. See April 29 Trial Transcript at 215-16 (Feindt testifying); Def.'s Exh. DX-3224 (P.G.F. medical records) at 201 (1/20/22 medical record).

### b.   Symptoms Since December 19, 2021

97. P.G.F. has lung damage, and continues to have a recurring cough, abdominal pain, rashes, elevated mast cells, and shortness of breath. [Feindt Decl. at ¶¶ 64-65; A. Feindt Decl. at ¶ 77.]

98. P.G.F. underwent a bronchoscopy due to chronic cough in December 2022, which found airway edema, and a CT scan, which found bronchial wall thickening. See Def.'s Exh. DX-3224 (P.G.F.

medical records) at 181-82, 186-87 (12/6/22 medical record); see
also Durrani Decl. at ¶ 94.

99.  P.G.F. also had behavioral setbacks and regression in
her toilet training and language development. [A. Feindt Decl.
at ¶ 76; April 29 Trial Transcript at 194 (A. Feindt
testifying).]

### c.  Preexisting Conditions

100. P.G.F. experienced abdominal pain in late October
2021. See Plfs.' Exh. PX-2253 (P.G.F. medical records) at 47
(12/13/21 medical note indicating P.G.F. had abdominal pain for
the last six weeks); April 29 Trial Transcript at 213-14 (Feindt
testifying).

101. P.G.F.'s symptoms of nausea, vomiting, and diarrhea
also began around the beginning of November 2021. [Plfs.' Exh.
PX-2253 (P.G.F. medical record) at 44.]

102. P.G.F. had a history of cough prior to the Fuel
Release. See Durrani Decl. at ¶ 95 (noting cough was reported
fifteen times in P.G.F.'s medical records prior to the alleged
exposure date); see, e.g., Def.'s Exh. DX-3224 (P.G.F. medical
records) at 210 (1/30/20 medical record indicating two-week
history of cough), 222 (3/3/21 medical record noting history of
asthma and ongoing chronic cough that recently improved with
medication), 276 (11/19/19 medical record noting "barky cough"
during exam), 283 (10/15/18 medical record noting "complaints of

non-productive cough"), 303 (4/5/18 medical record noting
coughing for five days). Feindt testified P.G.F.'s cough began
in May 2021. April 29 Trial Transcript at 213; see also Durrani
Decl. at ¶ 91 (noting A. Feindt stated P.G.F.'s cough, along
with other symptoms, began in spring of 2021).

### d. Causation and Apportionment

103. The Court finds that Plaintiffs have shown by a
preponderance of the evidence that a legal cause of P.G.F.'s
symptoms and medical conditions beginning December 13, 2021 to
December 19, 2021 was the Fuel Release. The Court also finds
that Plaintiffs have not shown by a preponderance of the
evidence based on credible and qualified medical evidence that a
legal cause of P.G.F.'s physical symptoms and medical conditions
of chronic cough, airway edema, bronchial wall thickening,
behavioral setbacks and regression in toilet training and
language development was the Fuel Release. See O'Grady, 140
Hawai`i at 44, 398 P.3d at 633.

104. The Court finds that P.G.F. was not fully recovered
from abdominal pain, nausea, vomiting, and diarrhea at the time
of the Fuel Release and therefore apportionment is appropriate.
Because there is no evidence to base apportionment between these
preexisting conditions and the conditions caused by the Fuel
Release, then damages must be distributed equally for these
conditions. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at

41

362-63. The Court does not apportion damages for the other acute symptoms P.G.F. experienced between December 13, 2021 and December 19, 2021.

### 7. **T.F.**

105. T.F. was approximately twenty months old in November 2021. See Feindt Decl. at ¶ 42.

### a. **Acute Symptoms**

106. Around Thanksgiving of 2021, T.F. experienced nausea, diarrhea, vomiting and headaches. Feindt Decl. at ¶ 16; see also A. Feindt Decl. at ¶ 78 (testifying that immediately after the Fuel Release, T.F. experienced nausea, vomiting, diarrhea, and headaches).

107. The Feindt household stopped using the household tap water for drinking on December 9, 2021. [Feindt Decl. at ¶ 21; April 29 Trial Transcript at 212 (Feindt testifying).]

108. On December 11, 2021, T.F. went to the emergency room because he was vomiting uncontrollably, dry heaving, had trouble breathing, and had diarrhea. [Feindt Decl. at ¶ 25; April 29 Trial Transcript at 190-91 (A. Feindt testifying), 229-30 (Feindt testifying); Plfs.' Exh. PX-2254 (T.F. medical records) at 10-12.]

109. By December 15, 2021, his diarrhea was resolved. [Plfs.' Exh. PX-2254 (T.F. medical records) at 51 (12/15/21 medical record).]

110. T.F. also experienced sleep issues before Christmas in 2021. See A. Feindt Decl. at ¶ 57.

111. T.F.'s symptoms had improved by December 19, 2021. [April 29 Trial Transcript at 214-15 (Feindt testifying); Joint Exh. JX-10 (12/19/21 text message from Feindt to his father).]

### b.    Symptoms After December 19, 2021

112. T.F. began to be treated for asthma in January 2022. [Plfs.' Exh. PX-2254 (T.F. medical records) at 132 (2/23/24 medical record).] T.F. has lung damage and continues to experience asthma and coughing. [Feindt Decl. at ¶¶ 67, 72; A. Feindt Decl. at ¶ 79; April 30 Trial Transcript at 24-25 (Feindt testifying); Plfs.' Exh. PX-2254 (T.F. medical records) at 132 (2/23/24 medical record). T.F. had to undergo extensive evaluation for his asthma and cough, including a bronchoscopy and CT scan of his chest. Def.'s Exh. DX-3225 (T.F. medical records) at 77-81 (10/3/22 medical record), 88-91 (9/15/22 medical record); see also Durrani Decl. at ¶ 123.

113. T.F. continues to experience abdominal pain, dermatitis, asthma and elevated mast cells. [A. Feindt Decl. at ¶ 79.]

### c.    Preexisting Conditions

114. T.F.'s cough, diarrhea and wheezing began in May 2021. [April 29 Trial Transcript at 198 (A. Feindt testifying); id. at 214 (Feindt testifying).]

115. Amanda Feindt testified his cough has continued from May 2021 to the time of trial. [April 29 Trial Transcript at 198 (A. Feindt testifying).]

### d.    Causation and Apportionment

116. The Court finds that Plaintiffs have shown by a preponderance of the evidence that a legal cause of T.F.'s symptoms and conditions from November 26, 2021 to December 19, 2021 was the Fuel Release. The Court also finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of T.F.'s physical symptoms and conditions experienced or diagnosed after December 19, 2021, including asthma, lung damage, abdominal pain, dermatitis, and elevated mast cells, was the Fuel Release.

117. The Court finds that T.F. was not fully recovered from the condition that caused coughing and wheezing at the time of the Fuel Release and therefore apportionment for those conditions is appropriate. Because there is no evidence to base apportionment between T.F.'s preexisting medical condition that caused coughing and wheezing and the same conditions caused by the Fuel Release, then damages must be distributed equally for these conditions. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. The Court does not apportion damages for the other

44

acute symptoms T.F. experienced between November 26, 2021 and
December 19, 2021.

8.   **Freeman**

a.   **Acute Symptoms**

118. Freeman vomited on November 26, 2021. [Amended
Declaration of Plaintiff, Nastasia Freeman ("Freeman Decl."),
filed 5/13/24 (dkt. no. 572), at ¶ 7.]

119. By November 28, 2021, Freeman had headaches, a rash on
her arm, and sores and lesions on her scalp, feet, and hands.
She felt like her blood was on fire. Freeman Decl. at ¶ 8; see
also April 29 Trial Transcript at 133 (Freeman testifying);
Joint Exh. JX-52 (11/29/21 email from Freeman).] Freeman also
experienced nausea during this time. See Kosnett Decl. at ¶ 163.

120. The Freeman household stopped drinking the household
water on November 29, 2021. [Freeman Decl. at ¶ 10; Declaration
of Koda Freeman,[22] filed 4/8/24 (dkt. no. 401) ("K. Freeman
Decl.") at ¶ 9; April 29 Trial Transcript at 115-16 (Freeman
testifying).]

121. Freeman's symptoms of nausea and vomiting abated when
she and her family moved to a hotel on December 3, 2021. See
Kosnett Decl. at ¶¶ 162-63.

---

[22] Koda Freeman is Freeman's husband. [K. Freeman Decl. at
¶ 1.]

122. On December 8, 2021, Freeman wrote a note to her doctor in which she noted that she had stomach issues, a rash, vomiting, diarrhea, persistent headaches, blurred vision, as well as numbness and tingling commonly associated with her seizure disorder. Def.'s Exh. DX-3215 (Freeman medical records) at 243 (12/8/21 correspondence by Freeman); see also Kosnett Decl. at ¶ 164. On December 9, 2021, Freeman noted concerns regarding insomnia, migraines, and psoriasis to her doctor. [Freeman Decl. at ¶ 35.]

123. On December 29, 2021, Freeman experienced abdominal pain, vomiting, diarrhea, memory loss, skin rashes, brain fog, eye irritation, seizures, and teeth and gum issues. [Id. at ¶¶ 38-39.]

124. In early December, Freeman was having multiple seizures a day. [Id. at ¶ 40; April 29 Trial Transcript at 136 (Freeman testifying).]

125. Freeman's preexisting seizure disorder was dormant for two and a half years prior to November 2021. Freeman Decl. at ¶ 32; see also April 29 Trial Transcript at 158 (K. Freeman testifying); Def.'s Exh. DX-3215 (Freeman medical records) at 257 (12/9/21 medical record noting "seizure free over the last year and a half").

126. Her seizures felt different in that, before the Fuel Release, she would completely lose consciousness during seizures

46

but, following the Fuel Release, she had some awareness during
the seizures. April 29 Trial Transcript at 136 (Freeman
testifying); see also Freeman Decl. at ¶ 33; Declaration of Dr.
Kristin Andruska, filed 4/8/24 (dkt. no. 364) ("Andruska
Decl.")[23] at ¶ 50.

127. By December 29, 2021, her seizures continued to
increase in frequency and severity to multiple seizures a day,
lasting from thirty seconds to five minutes. She became
disoriented, panicked, and would sometimes lose consciousness
during these episodes. Freeman Decl. at ¶¶ 38-40; see also
April 29 Trial Transcript at 136 (Freeman testifying regarding
the frequency of her seizures in early December 2021).

128. Freeman's menses also stopped for a couple of months
after the Fuel Release. [Plfs.' Exh. PX-2255 (Freeman medical
records) at 1173 (9/13/22 medical record).]

### b.   Ongoing Symptoms

129. Freeman continues to experience seizures, as well as
cardiovascular, dermatological, gastrointestinal, vestibular,
urinary/renal, endocrine, musculoskeletal, reproductive,
integumentary, respiratory, lymphatic, circulatory and
neurological dysfunction. [Freeman Decl. at ¶ 58.] Some of her

---

[23] Plaintiffs' expert Kristin Andruska, M.D. ("Dr.
Andruska") is a physician-scientist, board-certified by the
American Board of Psychiatry and Neurology, and is a fellowship-
trained Movement Disorders Specialist. [Andrusak Decl. at ¶ 1.]

most persistent problems are psoriasis and a wound on her foot.
[Id. at ¶ 59.]

130. Since February 2022, Freeman's seizures got worse, and
were very frequent. Id. at ¶¶ 53, 55; April 29 Trial Transcript
at 141 (Freeman testifying); see also April 29 Trial Transcript
at 158-60 (K. Freeman testifying regarding the severity of
Freeman's seizures following the Fuel Release).

131. Freeman was hospitalized at Walter Reed Army Medical
Center at the end of July 2022. See Freeman Decl. at ¶ 60.

132. As of September 2022, Freeman's bleeding during menses
is heavier and painful. [Plfs.' Exh. PX-2255 (Freeman medical
records) at 1173 (9/13/22 medical record).]

133. In January 2023, Freeman went to Naval Hospital Camp
Pendleton Emergency Department for chest and body pain. [Freeman
Decl. at ¶ 61; Kosnett Decl. at ¶ 172.] She was given the wrong
dosage of medication, which caused her to collapse and lose
consciousness, and she was taken by ambulance to the hospital.
[Freeman Decl. at ¶ 61; Kosnett Decl. at ¶ 172.]

### i. **Vestibular Dysfunction**

134. Dr. Andruska testified that, in October 2022, Freeman
underwent testing that documented vestibular dysfunction. [May 3
Trial Transcript at 132, 140.] She opined that the testing
showed Freeman had dysfunction of two systems: her visual system
and her vestibular system. [Id. at 140.] The vestibular system

48

controls balance and posture, as well as consciousness, memory and learning. [Id.]

135. Plaintiffs cite to medical records that demonstrate medical professionals suspected Freeman had issues with her vestibular function, that she was evaluated for these issues, and that she was recommended for vestibular physical therapy. See Plfs.' Rebuttal Closing Argument Brief, filed 7/12/24 (dkt. no. 603) ("Plfs.' Rebuttal Brief") at 34 n.28 (citing Freeman's medical records).

136. Freeman was evaluated at Walter Reed National Military Medical Center "with serial EEG and MRI which ruled out seizure as cause of dizziness but rather more vestibular etiology." [Def.'s Exh. DX-3215 (Freeman medical records) at 246 (9/12/22 Office and Clinic Notes signed by Aaron John Fortes and Anna G. Concepcion, PA).] She was evaluated for "abnormal sensation of increased pressure in her head, brain fog, and dizziness." [Id. at 105 (7/25/22 Walter Reed assessment).] Her discharge diagnosis was epilepsy and vertigo. [Plfs.' Exh. PX-2255 (Freeman medical records) at 1082 (7/28/22 discharge summary).] She later engaged in vestibular physical therapy. See, e.g., id. at 678 (10/17/22 medical record), 805-08 (10/25/22 medical record).

137. No medical record was presented reflecting a specific diagnosis of Freeman for vestibular dysfunction. See, e.g.,

Def.'s Trial Declaration of Dr. Barry Gordon, filed 4/8/24 (dkt. no. 345) ("Gordon Decl.") at ¶ 26.bb.[24]

138. The United States' expert Barry Gordon, M.D. ("Dr. Gordon") testified that Freeman does not have a long-term organic neurological problem from exposure. [Id. at ¶ 52.] Dr. Gordon diagnosed Freeman with psychogenic seizures, or seizures caused by a psychological process rather than abnormal electrical discharges to the brain. Gordon Decl. at ¶ 20, see also id. at ¶ 21; Def.'s Trial Declaration of Dr. Eric. S. Smith, filed 4/8/24 (dkt. no. 360) ("Smith Decl.") at ¶ 210.[25]

### ii.   Neurological Symptoms

139. Plaintiffs' expert Steven Storage, M.D. ("Dr. Storage")[26] opined that Freeman's brain fog, attention and concentration deficits, symptoms consistent with post-traumatic stress, gait disturbances, major depression, and worsening of the symptoms of her underlying seizure disorder were caused by the Fuel Release and the resulting trauma. See Declaration of

---

[24] Dr. Gordon is a board-certified neurologist, and his subspecialty is behavioral neurology. [Gordon Decl. at ¶¶ 6, 8.]

[25] The Government's expert Eric S. Smith, Ph.D. ("Dr. Smith"), is a clinical and forensic psychologist. [Smith Decl. at ¶ 1.]

[26] Dr. Storage is Freeman's current psychiatric treating provider, and is a psychiatrist at the Amen Clinics in Encino, California. [Declaration of Steven Storage, M.D., filed 4/8/24 (dkt. no. 387) ("Storage Decl.") at ¶ 1.]

Steven Storage, M.D., filed 4/8/24 (dkt. no. 387) ("Storage Decl.") at ¶ 15. Dr. Storage also described singe-photon emission computed tomography ("SPECT") brains scans that were taken of Freeman's brain. He noted these scans show irregularities that are indicative of injury. [Id. at ¶¶ 28-39.]

c.    **Preexisting Conditions**

140. Freeman has had a seizure disorder since her early childhood. See April 29 Trial Transcript at 107-08 (Freeman testifying); Kosnett Decl. at ¶ 170; Def.'s Exh. DX-3215 (Freeman medical records) at 262 (1/4/22 medical record).] Her disorder has historically been associated with four symptoms: loss of consciousness with tonic convulsions, focal awareness seizures characterized by brief problems with comprehension and loss of train of thought, episodic loss of balance or dizziness lasting for minutes to hours, and a chronic migraine that began in her late teens. [Kosnett Decl. at ¶ 170.]

141. Freeman testified that her seizures were dormant for two and a half years before beginning again during the week of Thanksgiving in 2021. Freeman Decl. at ¶ 32; see also K. Freeman Decl. at ¶¶ 25, 56 (noting Freeman's seizures had been dormant); Def.'s Exh. DX-3215 (Freeman medical records) at 257 (12/9/21 medical record noting "seizure free over the last year and a half"). Freeman testified that her last seizure prior to October

or November 2021 was in May 2019. [April 29 Trial Transcript at 135-36, 138 (Freeman testifying).]

142. Freeman had previously taken a medication for her seizures, which she had discontinued at the beginning of 2020. Def.'s Exh. DX-3215 (Freeman medical records) at 257-58 (12/9/21 medical record); see also Kosnett Decl. at ¶ 165.

143. Freeman's menstrual irregularities began in May 2021. See Plfs.' Exh. PX-2255 (Freeman medical records) at 599 (8/29/22 medical record).

144. In July 2021, Freeman experienced abdominal issues, including pain, diarrhea and vomiting. [April 29 Trial Transcript at 107-08 (Freeman testifying).] In August 2021, Freeman started to experience headaches. [Id.] Beginning in October or November 2021, Freeman had a cough. Freeman started to experience memory loss and confusion around October 2021. [Id.]

### d.    **Causation and Apportionment**

145. The Court finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of Freeman's physical symptoms and medical conditions of menstrual irregularities; neurological issues such as attention and concentration deficits, brain fog, memory loss; symptoms consistent with post-traumatic stress; gait disturbances; major depression; worsening

of symptoms of her underlying seizure disorder; cardiovascular, vestibular, urinary/renal, endocrine, musculoskeletal, reproductive, integumentary, respiratory, and lymphatic issues; circulatory and neurological dysfunction; psoriasis; sores and lesions; migraines; and her foot wound was the Fuel Release. See O'Grady, 140 Hawai`i at 44, 398 P.3d at 633.

146. The Court finds Freeman had a predisposition to psychogenic injury. Montalvo, 77 Hawai`i at 294, 884 P.2d at 357 ("Such 'predisposition to injury' or other special sensitivity is often involved in the context of the so-called 'thin skull' or 'eggshell skull' plaintiff.").

147. The Court finds that Plaintiffs have shown by a preponderance of the evidence that a legal cause of Freeman's headaches, coughing, rash, vomiting, diarrhea, and stomach pain, and subsequent psychogenic seizures - seizures caused by a psychological process, rather than abnormal electrical discharges to the brain - after November 26, 2021 and lasting approximately one and a half months was the Fuel Release.

148. Plaintiffs offer evidence that Freeman experienced abdominal pain, vomiting, diarrhea, memory loss, skin rashes, eye irritation, seizures, and teeth and gum issues on December 29, 2021. See supra at Finding of Fact ¶ 123. However, Plaintiffs do not provide citations to medical evidence or testimony regarding Freeman's continued experience of these or

53

other acute symptoms Freeman experienced, and specifically the
duration of these and other acute symptoms that Freeman
experienced in the weeks immediately following the Fuel Release.
Plaintiffs do not cite to medical records demonstrating that
Freeman continued to experience her acute symptoms that the
Court has found were caused by the Fuel Release, aside from her
seizures, in January 2022. Accordingly, the Court finds that
Plaintiffs did not provide sufficient evidence to allow Freeman
to recover damages for the foregoing symptoms, beginning in
January 2022. See O'Grady, 140 Hawai`i at 44, 398 P.3d at 633.

    149. Further, the Court finds that it must apportion
damages for certain acute symptoms that Freeman experienced
prior to and immediately after the Fuel Release. The Court finds
that Freeman was asymptomatic for seizure disorder at the time
of the Fuel Release and therefore apportionment is not
appropriate for this condition. The Court also finds that
Freeman had not recovered from the condition or conditions that
caused headaches and cough at the time of the Fuel Release and
therefore apportionment is appropriate for these conditions.
Because there is no evidence to base apportionment between
Freeman's preexisting medical condition or conditions that
caused headaches and cough and the same conditions caused by the
Fuel Release, damages must be distributed equally for these
conditions. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at

362-63. The Court does not apportion damages for the other acute symptoms Freeman experienced beginning November 26, 2021 and lasting approximately one and a half months.

### 9.  D.F.

150. D.F. was approximately four years old in November 2021. See Freeman Decl. at ¶ 1 (noting D.F. was seven years old as of May 13, 2024).

### a.  Acute Symptoms

151. By November 28, 2021, D.F. had diarrhea, nausea, stomach pain, headaches, and was vomiting. Freeman Decl. at ¶¶ 8-9; see also April 29 Trial Transcript at 133-34 (Freeman testifying); Joint Exh. JX-52 (11/29/21 email from Freeman).

152. The Freeman household stopped drinking the household water on November 29, 2021. [Freeman Decl. at ¶ 10; K. Freeman Decl. at ¶ 9; April 29 Trial Transcript at 115-16 (Freeman testifying).]

153. The family resided in a hotel beginning December 3, 2021. [Freeman Decl. at ¶ 25; Kosnett Decl. at ¶ 162; April 29 Trial Transcript at 116-117 (Freeman testifying).]

154. D.F.'s symptoms of nausea and vomiting abated when the Freeman family moved to a hotel. See Kosnett Decl. at ¶ 163.

### b.    Symptoms and Conditions
### Since December 3, 2021

155. During this time, D.F.'s preexisting behavioral difficulties escalated.[27] Freeman Decl. at ¶¶ 64-65; see also Clark Decl. at ¶ 68.

156. In December 2021 he was diagnosed with autism. Def.'s Exh. DX-3228 (D.F. medical records) at 14 (12/15/21 medical report noting "D.F. does meet the DSM-5 criteria for autism spectrum disorder"); see also Clark Decl. at ¶ 65.

157. After the family moved away from Hawai`i on February 2, 2022, D.F.'s symptoms of fatigue, diarrhea, red eyes, eye twitching, skin rash, and respiratory issues greatly improved. See Freeman Decl. at ¶ 53, Plfs.' Exh. PX-2258 (D.F. medical records) at 129-31 (10/12/22 medical record). He also began speaking again. [Freeman Decl. at ¶ 66.]

158. D.F. experienced tremors in his hands and dizziness. [April 29 Trial Transcript at 166-67 (K. Freeman testifying); id. at 146-47 (Freeman testifying); Freeman Decl. at ¶¶ 67-68.] In April 2022, he had an episode where he lost balance and lost consciousness. His parents took him to the hospital, where upon receiving care he regained consciousness. [Freeman Decl. at

---

[27] It is not clear precisely when D.F.'s preexisting behavioral difficulties escalated. Compare Freeman Decl. at ¶ 65 with Def.'s Exh. DX-3228 (D.F. medical records) at 7-20 (11/17/21 and 12/15/21 medical reports).

¶¶ 68-70; April 29 Trial Transcript at 144-47 (Freeman testifying).]

159. D.F. continues to experience headaches, vomiting, memory loss, absence seizures, and tremors. [April 29 Trial Transcript at 145-47 (Freeman testifying), 166-67 (K. Freeman testifying); Freeman Decl. at ¶¶ 71-73.]

### d. <u>Causation and Apportionment</u>

160. The Court finds that Plaintiffs have shown by a preponderance of the evidence that a legal cause of D.F.'s physical symptoms and medical conditions beginning November 28, 2021 and ending on December 3, 2021 for nausea and vomiting, and at some point no longer than one month after the Fuel Release for his remaining symptoms, was the Fuel Release.

161. Plaintiffs do not provide citations to medical evidence or testimony regarding D.F.'s continued experience of his acute symptoms after December 3, 2021. Accordingly, the Court finds that Plaintiffs did not provide sufficient evidence to allow D.F. to recover for pain and suffering damages for any period longer than one month after the Fuel Release. Further, the Court finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of D.F.'s diagnosis of autism and escalation of behavioral difficulties was the Fuel Release.

### 10. K.F.

162. K.F. was approximately seven years old in November 2021. See Freeman Decl. at ¶ 1 (noting K.F. was ten years old as of May 13, 2024).

### a. Acute Symptoms

163. K.F. vomited on November 26, 2021. [Freeman Decl. at ¶ 7.]

164. By November 28, 2021, K.F. had diarrhea, vomiting, nausea, stomach pain, and headaches. [Id. at ¶¶ 8-9; April 29 Trial Transcript at 133-34 (Freeman testifying); Joint Exh. JX-52 (11/29/21 email from Freeman).

165. The Freeman household stopped drinking the household water on November 29, 2021. [Freeman Decl. at ¶ 10; K. Freeman Decl. at ¶ 9; April 29 Trial Transcript at 115-16 (Freeman testifying).]

166. The family resided in a hotel beginning December 3, 2021. [Freeman Decl. at ¶ 25; Kosnett Decl. at ¶ 162; April 29 Trial Transcript at 116-117 (Freeman testifying).]

167. K.F.'s symptoms of nausea and vomiting abated when the Freeman family moved to a hotel. See Kosnett Decl. at ¶ 163.

168. In the wake of the Fuel Release, K.F. lost pigment in his skin, developed rashes after showering, and had bloody noses. [April 29 Trial Transcript at 157-58 (K. Freeman testifying).]

b.    __Continued Symptoms__

169. The family moved from Hawai`i on February 2, 2022.
[Freeman Decl. at ¶ 53.]

170. At some point, K.F. experienced stomach pain,
vomiting, headaches and a bloody nose. [K. Freeman Decl. at
¶ 43.] Since the Fuel Release, Freeman testified that K.F.
experiences bloody noses, periumbilical pain, gastrointestinal
issues, vomiting, constipation, weight loss, enlarged lymph
nodes, bloody stools, bloating, migraines, GERD with
esophagitis, nervous system dysfunction, dizziness and fainting.
[Freeman Decl. at ¶ 75.]

171. K.F. had abnormal lab results in August 2022, which
noted concerning areas in his liver, kidney, and pancreas. At
that time, K.F. had blood in his urine and stool. [Id. at ¶ 74.]

c.    __Causation and Apportionment__

172. The Court finds that Plaintiffs have not shown by a
preponderance of the evidence based on credible and qualified
medical evidence that a legal cause of K.F.'s loss of pigment in
his skin and bloody noses was the Fuel Release.

173. The Court finds that Plaintiffs have shown by a
preponderance of the evidence that a legal cause of K.F.'s
stomach pain, diarrhea, nausea, vomiting, and headaches
beginning November 28, 2021 and ending on December 3, 2021 for

nausea and vomiting, and at some point no longer than one month afterward for his remaining symptoms, was the Fuel Release.

174. The Court also finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of K.F.'s physical symptoms and medical conditions one month after the Fuel Release, including stomach pain, vomiting, headaches, rashes, abnormal lab results in August 2022, periumbilical pain, gastrointestinal issues, constipation, weight loss, enlarged lymph nodes, bloody stools, bloating, migraines, GERD with esophagitis, nervous system dysfunction, dizziness and fainting was the Fuel Release.

### 11. **N.F.**

175. N.F. was approximately eleven years old in November 2021. See April 29 Trial Transcript at 147 (Freeman testifying that N.F. turned fourteen recently).

#### a. **Acute Symptoms**

176. N.F. vomited on November 26, 2021. [Freeman Decl. at ¶ 7.]

177. By November 28, 2021, N.F. became increasingly ill. N.F. had diarrhea, vomiting, nausea, stomach pain, and headaches. Id. at ¶¶ 8-9; see also April 29 Trial Transcript at 158 (K. Freeman testifying); id. at 133-34 (Freeman testifying); Joint Exh. JX-52 (11/29/21 email from Freeman). N.F. also had

pain in his body. [April 29 Trial Transcript at 157-58 (K. Freeman testifying).]

178. The Freeman household stopped drinking the household water on November 29, 2021. [Freeman Decl. at ¶ 10; K. Freeman Decl. at ¶ 9; April 29 Trial Transcript at 115-16 (Freeman testifying).]

179. The family resided in a hotel beginning December 3, 2021. [Freeman Decl. at ¶ 25; Kosnett Decl. at ¶ 162; April 29 Trial Transcript at 116-117 (Freeman testifying).]

180. N.F.'s symptoms of nausea and vomiting abated when the Freeman family moved to a hotel. See Kosnett Decl. at ¶ 163.

### b.    Symptoms and Conditions Since December 3, 2021

181. In mid-August 2022, N.F. had an event where he was in a lot of pain, and his body felt like it was on fire. He woke up and lost mobility: he could not stand or put his clothes on or do anything. His father had to lift him and carry him to get him to the hospital. April 29 Trial Transcript at 147-48 (Freeman testifying); Freeman Decl. at ¶ 81; see also K. Freeman Decl. at ¶ 46.

182. Koda Freeman testified that N.F. now has migraines, stomach issues, aches, a nerve issue that makes him sensitive to touch, and his bones hurt. [K. Freeman Decl. at ¶ 46.] Freeman testified that, since exposure, N.F. was diagnosed with

petroleum product toxicity, musculoskeletal issues, soft tissue masses, gastrointestinal problems, ENT issues, fatigue, periumbilical pain, weight loss, cough and wheezing, tinnitus, joint pain and myalgias, polyarthritis, inflammatory arthritis, abnormal labs, gastritis, autonomic nervous system disease, migraines, and Amplified Muscular Pain Syndrome ("AMPS"). [Freeman Decl. at ¶ 78.] N.F. experiences dizziness while standing, discomfort while wearing backpack, memory and executive function issues. [Clark Decl. at ¶ 50.]

### c.   Preexisting Conditions

183. In September 2021, N.F. experienced muscle and joint pain. [April 29 Trial Transcript at 109 (Freeman testifying).]

184. In October 2021, N.F. experienced abdominal pain and wheezing. [Id. at 109-10 (Freeman testifying); Plfs.' Exh. PX-2256 (N.F. medical records) at 69-71 (10/26/21 and 10/28/21 medical record); Durrani Decl. at ¶¶ 133-34.]

### d.   Causation and Apportionment

185. The Court finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of N.F.'s migraines was the Fuel Release.

186. The Court finds that Plaintiffs have shown by a preponderance of the evidence that a legal cause of N.F.'s physical symptoms and medical conditions beginning November 28,

2021 and ending on December 3, 2021 for nausea and vomiting, and at some point no longer than one month afterward for his remaining systems, was the Fuel Release.

187. The Court finds that N.F. was not fully recovered from abdominal pain, muscle pain, and joint pain prior to the Fuel Release, and therefore apportionment is appropriate for the similar conditions he experienced immediately after the Fuel Release: stomach pain and pain in his body. Because there is no evidence to base apportionment between N.F.'s preexisting conditions of abdominal pain, muscle pain, and joint pain; and N.F.'s stomach pain and pain in his body caused by the Fuel Release, damages must be distributed equally for these conditions. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. The Court does not apportion damages for the other acute symptoms N.F. experienced between November 26, 2021 and December 3, 2021.

188. The Court also finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of N.F.'s symptoms and conditions after December 3, 2021, including his hospitalization in August 2022; petroleum product toxicity; musculoskeletal issues; soft tissue masses; gastrointestinal problems, including stomach pain and diarrhea; ENT issues; fatigue; pain in his body, including periumbilical pain, and joint pain and myalgias;

weight loss; cough and wheezing; tinnitus; polyarthritis; inflammatory arthritis; abnormal labs; gastritis; autonomic nervous system disease; and AMPS was the Fuel Release. <u>See</u> <u>O'Grady</u>, 140 Hawai`i at 44, 398 P.3d at 633.

### 12. **Jessup**

#### a. **Acute Symptoms**

189. Between November 22 and 25, 2021, Jessup experienced headaches, nausea, dizziness, and stomach pain. She later experienced loss of balance. <u>See</u> Declaration of Brian Jessup, filed 4/8/24 (dkt. no. 398) ("B. Jessup Decl.") at ¶ 9;[28] Declaration of Plaintiff, Sheena Jessup, filed 4/8/24 (dkt. no. 396) ("Jessup Decl.") at ¶ 10.[29]

190. The following week, she continued to get sick, and experienced diarrhea, stomach pain, and nausea, as well as dizziness when in her house. [Jessup Decl. at ¶ 16.]

191. Jessup reported her symptoms of fever, chills, nausea, vomiting, diarrhea, bloating, change in stool consistency, abdominal pain, headache, lethargy, muscle aches, and rash were

---

[28] Brian Jessup is Jessup's husband. [B. Jessup Decl. at ¶ 3.]

[29] Jessup testified that her family developed similar symptoms the week of November 22, 2021, including headaches, nausea, dizziness and abdominal pains. [Jessup Decl. at ¶ 10.] The Court credits this testimony as to Jessup, but because the Court cannot determine if each individual member of her family experienced these symptoms, the Court does not consider this testimony in relation to her children's symptoms.

ongoing since late October and increased the week of
November 22, 2021. [Def.'s Exh. DX-3216 (Jessup medical records)
at 43-44 (12/7/21 Chronological Medical Record signed by
Jessup).]

192. The Jessup family stopped using the household water
for drinking on November 29, 2021. [Jessup Decl. at ¶¶ 11-12,
14, 16-18; April 30 Trial Transcript at 128-30 (Jessup
testifying).] However, on November 29, 2021, Jessup drank a gulp
of coffee that was made from tap water, and it burned her
throat. The burn lasted a long time. [Id. at ¶ 17; see also
Kosnett Decl. at ¶ 210.]

193. On December 6, 2021, the Jessup family tried to move
into a hotel, but the arrangement did not work. [B. Jessup Decl.
at ¶ 22; Jessup Decl. at ¶¶ 34-38.] The family lived at home
without household water for six months. [B. Jessup Decl. at
¶ 23; Jessup Decl. at ¶¶ 40-43 (describing washing clothes and
bathing without household water).][30]

194. On December 7, 2021, Jessup reported her esophagus
feeling like it was on fire, her voice being hoarse, her stomach
being constantly upset, increased headaches, dizziness and loss
of balance and coordination. [Def.'s Exh. DX-3216 (Jessup

---

[30] The Jessup family returned to washing clothes in their
washing machine in March 2022. [Jessup Decl. at ¶ 55.]

medical records) at 43-44 (12/7/21 Chronological Medical Record signed by Jessup).]

195. In early to mid-December, Jessup was still experiencing abdominal pain. See Plfs.' Exh. PX-2259 (Jessup medical records) at 51-52 (12/22/21 primary care note).

196. By December 22, 2021, Jessup's cough, nausea, rash, and fatigue had resolved. See id. at 52-53. At that time, Jessup reported abdominal pain present over the last six months, with an increase in the last ten days to an 8/10 pain scale. [Id.]

197. After the Navy flushed Jessup's home on two separate occasions – once in December 2021 and once in February 2022 - Jessup testified that her family experienced "an influx of symptoms." April 30 Trial Transcript at 144; see Kosnett Decl. at ¶ 238, Plfs.' Exh. PX-1055 (2/23/22 Facebook post by Jessup, and texts), Jessup Decl. at ¶¶ 52-53. Jessup testified she felt lightheaded after the flushes. [April 30 Trial Transcript at 145.] Jessup described experiencing increased symptoms after the second flush, including dizziness, nausea, face tingling, headaches, nosebleeds, burning eyes, skin burning, and rashes. [Plfs.' Exh. PX-1055 (2/23/22 Facebook post by Jessup, and texts); Jessup Decl. at ¶ 53.][31]

---

[31] The Court credits Jessup's experience of these symptoms after the flushing of her home, but because the Court cannot determine if each individual member of her family experienced

198. Jessup and her children moved out of their house and from Hawai`i on May 14, 2022 and Brian Jessup remained in Honolulu to live and work out of his office. Jessup Decl. at ¶¶ 61, 63, <u>see also</u> B. Jessup Decl. at ¶¶ 19, 29.

### b.    <u>Continued Symptoms</u>

199. Jessup testified that some of her symptoms lasted a few months: abdominal pain, nausea, face tingling, brain fog, loss of balance, difficulty focusing, eye irritation, muscle aches, fatigue, rashes, sore/dry throat, shakiness, and numbness in extremities. [Jessup Decl. at ¶ 26.] This contradicts medical records documenting that her cough, nausea, rash, and fatigue had resolved by December 22, 2021. <u>See</u> Plfs.' Exh. PX-2259 (Jessup medical records) at 52-53 (12/22/21 primary care note). Jessup stated that her symptoms of shakiness, mood swings, numbness, balance problems, and fatigue continued while she lived on O`ahu, and abated since she left the island. [Jessup Decl. at ¶ 71.]

200. Jessup also experienced and continues to experience heavy menses that is worse than she ever experienced prior to the Fuel Release. [<u>Id.</u>]

---

these symptoms, the Court does not consider this testimony in relation to her children's symptoms.

### c.    <u>**Preexisting Conditions**</u>

201. Jessup's abdominal pain began in July 2021. [Def.'s Exh. DX-3216 (Jessup medical records) at 46 (7/16/21 medical record noting "almost daily" abdominal pain); Plfs.' Exh. PX-2259 (Jessup medical records) at 51-52 (12/22/21 medical note reporting abdominal pain over the past six months); <u>see also</u> Kosnett Decl. at ¶ 220 (describing past abdominal pain).

202. Jessup experienced fever, chills, nausea, diarrhea, change in stool consistency, bloating, vomiting, abdominal pain, headaches, lethargy, muscle aches, and rash in October 2021, and there is no evidence that these medical issues resolved before the Fuel Release. [Def.'s Exh. DX-3216 (Jessup medical records) at 43-44 (12/7/21 Chronological Record of Medical Care); <u>see also</u> April 30 Trial Transcript at 127-28 (Jessup testifying regarding the foregoing medical record).]

### d.    <u>**Causation and Apportionment**</u>

203. The Court finds that Plaintiffs have shown by a preponderance of the evidence that a legal cause of Jessup's symptoms and conditions from November 26, 2021 through December 22, 2021 was the Fuel Release. The Court finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of Jessup's symptoms and conditions after December 22, 2021 was the Fuel Release. The Court also finds that Plaintiffs

have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of Jessup's heavy menses; throat burning; brain fog; face tingling; loss of balance; difficulty focusing; fatigue; sore/dry throat; mood swings; eye irritation; shakiness; numbness in extremities; and increased symptoms after the Navy flushed their home water system was the Fuel Release. See O'Grady, 140 Hawai`i at 44, 398 P.3d at 633.

204. The Court finds that Jessup was not fully recovered from symptoms of fever, chills, nausea, vomiting, diarrhea, bloating, change in stool consistency, abdominal pain, headache, lethargy, muscle aches, and rash at the time of the Fuel Release and therefore apportionment is appropriate. Because there is no evidence to base apportionment between Jessup's preexisting symptoms of fever, chills, nausea, vomiting, diarrhea, bloating, change in stool consistency, abdominal pain, headache, lethargy, muscle aches, and rash and the symptoms caused by the Fuel Release, then damages must be distributed equally for these conditions. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. The Court does not apportion damages for the other acute symptoms Jessup experienced between November 26, 2021 and December 22, 2021.

### 13. **B.B.J.**

205. B.B.J. was approximately fifteen years old at the time of the Fuel Release. See Jessup Decl. at ¶ 1 (noting B.B.J. was eighteen years old as of 4/6/24).

### a. **Acute Symptoms**

206. During the week of November 22, 2021, B.B.J. experienced severe stomach pain, nausea, headaches, and diarrhea. See Plfs.' Exh. PX-2260 (B.B.J. medical records) at 2 (12/7/21 Chronological Record of Medical Care regarding B.B.J.); Declaration of Plaintiff [B.B.J.], filed 4/8/24 (dkt. no. 394) ("B.B.J. Decl.") at ¶ 8. These symptoms continued the following week. See April 30 Trial Transcript at 138 (Jessup stating B.B.J. was "very sick to his stomach, saying he didn't want to eat" around 11/29/21).

207. B.B.J. attested that around the time of the Fuel Release, in addition to stomach pains, nausea and headaches, he experienced burning in his throat, coughing, intermittent eye irritation, and muscle aches. B.B.J. Decl. at ¶ 8; see also Jessup Decl. at ¶ 23.

208. The Jessup family stopped using the household water for drinking on November 29, 2021. [Jessup Decl. at ¶¶ 11-12, 14, 16-18; April 30 Trial Transcript at 128-30 (Jessup testifying).]

209. Jessup testified that the family continued to get sick over the next week with symptoms of diarrhea, stomach pain, and nausea, [Jessup Decl. at ¶ 16,] although the Court cannot attribute these symptoms to any particular plaintiff other than Jessup because no specific evidence was proffered that would support such a finding.

210. B.B.J. had trouble with his balance, memory, and ability to concentrate during late November 2021 to February 2022. B.B.J. Decl. at ¶¶ 11, 13; see also Jessup Decl. at ¶ 23.

211. B.B.J. testified that he woke up one day and felt so off-balance that he perceived his entire bedroom as tilted and fell twice trying to get to the stairs. [April 30 Trial Transcript at 163-64.]

212. On December 6, 2021, the Jessup family tried to move into a hotel, but the arrangement did not work. [B. Jessup Decl. at ¶ 22; Jessup Decl. at ¶¶ 34-38.]

**b.    Symptoms After December 6, 2021**

213. In addition to difficulties with balance, memory, and ability to concentrate, B.B.J. experienced severe nosebleeds in January 2022. B.B.J.'s nosebleeds appear to have begun around January 2022. [April 30 Trial Transcript at 152 (Jessup testifying B.B.J.'s nosebleeds "began about the January timeframe").] Jessup testified about two incidents where B.B.J. had a nosebleed that was "gushing," and he was choking on the

71

amount of blood coming from his nose. [Id.] B.B.J. testified
that one day he woke up and his sheets were covered in blood
from his nosebleeds. [April 30 Trial Transcript at 164.]

214. B.B.J.'s initial symptoms of headaches, nausea,
abdominal pain, and diarrhea had resolved by February 7, 2022.
See Plfs.' Exh. PX-2260 (B.B.J. medical records) at 6 (2/8/22
primary care note).

215. In January or February 2022, B.B.J. began to have a
tremor in his hands. [B.B.J. Decl. at ¶ 11; April 30 Trial
Transcript at 159 (B.B.J. testifying that his tremors began a
month and a half after exposure), 152-53 (Jessup testifying);
see also Durrani Decl. at pg. 27, ¶ 47.[32]]

216. Both of B.B.J.'s hands shake, and his legs also shake.
See Jessup Decl. at ¶ 74; B.B.J. Decl. at ¶ 22; Transcript of
Proceedings: Nonjury Trial Day 4, filed 5/14/24 (dkt. no. 580)
("May 2 Trial Transcript") at 14 (B. Jessup testifying).

217. B.B.J. also developed a stutter. See B.B.J. Decl. at
¶¶ 22, 24; Jessup Decl. at ¶ 74; May 2 Trial Transcript at 14
(B. Jessup testifying).

218. B.B.J.'s eye also twitches. See Declaration of
B.J.[J.], filed 4/8/24 (dkt. no. 395) ("B.J.J. Decl.") at ¶ 21.

---

[32] Paragraph 47 appears to be misnumbered, and is after
Paragraph 58. See Durrani Decl. at pg. 27.

219. He first saw a neurologist on April 23, 2024 for his tremors. [April 30 Trial Transcript at 159 (B.J.J. testifying).]

220. After the Navy flushed the Jessup's home on two separate occasions – once in December 2021 and once in February 2022 - Jessup testified the family experienced "an influx of symptoms." April 30 Trial Transcript at 144; see Kosnett Decl. at ¶ 238; Plfs.' Exh. PX-1055 (2/23/22 Facebook post by Jessup, and texts); Jessup Decl. at ¶¶ 52-53.[33] Jessup stated that B.B.J.'s symptoms of nosebleeds and his eyes burning increased after flushing. [Jessup Decl. at ¶ 23.] She also testified that B.B.J. felt as if he could not stand straight and was leaning to the left in the wake of flushing. [April 30 Trial Transcript at 144-45.]

221. B.B.J. moved from Hawai`i on May 14, 2022 and his father remained in Honolulu to live and work out of his office. Jessup Decl. at ¶ 63, see also B. Jessup Decl. at ¶¶ 19, 29.

c.    **Causation and Apportionment**

222. The Court finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of B.B.J.'s balance

---

[33] As noted above, Jessup testified these symptoms included dizziness, nausea, face tingling, headaches, nosebleeds, burning eyes, skin burning, and rashes, but the Court is unable to attribute all these symptoms to B.B.J. See Plfs.' Exh. PX-1055 (2/23/22 Facebook post by Jessup, and texts); Jessup Decl. at ¶ 53 (describing the 2/23/22 Facebook Post).

problems; memory difficulties; stuttering; tremors; and inability to concentrate was the Fuel Release.

223. Plaintiffs do not present evidence that B.B.J.'s symptoms of stomach pain, diarrhea, nausea, and headaches continued after December 6, 2021 (one week from November 29, 2021). The Court therefore concludes that B.B.J.'s symptoms of stomach pain, diarrhea, nausea, and headaches dissipated by December 6, 2021. The Court finds that Plaintiffs have shown by a preponderance of the evidence that the Fuel Release was a legal cause of B.B.J.'s symptoms of stomach pain, diarrhea, nausea, and headaches from November 22, 2021 to December 6, 2021.

224. The precise dates and duration that B.B.J. experienced burning in his throat, coughing, intermittent eye irritation, and muscle aches is unclear from the evidence submitted. Plaintiffs do not provide citations to medical evidence or testimony regarding the duration of B.B.J.'s symptoms of burning in his throat, coughing, intermittent eye irritation, and muscle aches in the immediate wake of the Fuel Release. Accordingly, the Court finds that Plaintiffs did not provide credible evidence to allow B.B.J. to recover for pain and suffering damages for his symptoms of burning in his throat, coughing, intermittent eye irritation, and muscle aches for any period longer than December 6, 2021.

225. The Court also finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that the Fuel Release was a legal cause of B.B.J.'s severe stomach pain; nausea; headaches; diarrhea; intermittent eye irritation; muscles aches; coughing; and burning in his throat; after December 6, 2021.

### 14.  **B.J.J.**

226. B.J.J. was approximately thirteen years old at the time of the Fuel Release. See Jessup Decl. at ¶ 1 (noting that B.J.J. was sixteen years old as of 4/6/24).

### a.  **Acute Symptoms**

227. The week of November 22, 2021, B.J.J. experienced nausea, lethargy, abdominal pain, diarrhea, burning in the throat and stomach, and a sore in her throat. [Plfs.' Exh. PX-2261 (B.J.J. medical records) at 2 (12/7/21 Chronological Record of Medical Care describing B.J.J.'s symptoms).] B.J.J. also felt lightheaded and dizzy. [B.J.J. Decl. at ¶ 7.]

228. The week of November 28, 2021, B.J.J. developed rashes. [Jessup Decl. at ¶¶ 16, 24.]

229. The Jessup family stopped using the household water for drinking on November 29, 2021. [Jessup Decl. at ¶¶ 11-12, 14, 16-18; April 30 Trial Transcript at 128-30 (Jessup testifying).]

230. Jessup testified that the family continued to get sick over the next week with symptoms of diarrhea, stomach pain, and nausea, [Jessup Decl. at ¶ 16,] although the Court cannot attribute these symptoms to any particular plaintiff other than Jessup because no specific evidence was proffered that would support such a finding.

231. On December 6, 2021, the Jessup family tried to move into a hotel, but the arrangement did not work. [B. Jessup Decl. at ¶ 22; Jessup Decl. at ¶¶ 34-38.]

232. B.J.J. reported experiencing symptoms of nausea, diarrhea, abdominal pain, sore in her throat, and lethargy on December 7, 2021. [Plfs.' Exh. PX-2261 (B.J.J. medical records) at 2 (12/7/21 Chronological Record of Medical Care describing B.J.J.'s symptoms).] There is a lack of evidence that these symptoms continued past December 7, 2021.

**b.    Symptoms after December 7, 2021**

233. Around February 20, 2022, B.J.J. developed a rash on her face and arm after showering once with the household tap water. [B.J.J. Decl. at ¶ 12; Jessup Decl. at ¶ 52; May 2 Trial Transcript at 31-32 (B.J.J. testifying); Plfs.' Exh. PX-1055 (2/23/22 Facebook post by Jessup, and texts).][34]

---

[34] As noted above, Jessup testified her family experienced an increase in symptoms after the Navy flushed their home, however, the Court is unable to attribute these symptoms to B.J.J. See Plfs.' Exh. PX-1055 (2/23/22 Facebook post by Jessup,

234. The family left Hawai`i on May 14, 2022 and her father remained in Honolulu. [Jessup Decl. at ¶ 63, <u>see also</u> B. Jessup Decl. at ¶¶ 19, 29.]

235. Since leaving Hawai`i, B.J.J.'s menstrual periods have changed and become so severe that is seems like it will not stop. [May 2 Trial Transcript at 37 (B.J.J. testifying).]

236. She also worries about her ability to have children in the future. [<u>Id.</u>] She is now also anemic. [<u>Id.</u> at 38.]

          c.   **<u>Causation</u>**

237. The Court finds that Plaintiffs have shown by a preponderance of the evidence that a legal cause of B.J.J.'s symptoms and conditions from November 22, 2021 through December 7, 2021 was the Fuel Release. The Court also finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of B.J.J.'s symptoms and conditions after December 7, 2021 was the Fuel Release.

          **15.  <u>D.J.</u>**

238. D.J. was ten months old at the time of the Fuel Release. <u>See</u> Jessup Decl. at ¶ 12.

---

and texts); Jessup Decl. at ¶ 53 (describing the 2/23/22 Facebook Post).

a.    **Acute Symptoms**

239. Beginning November 22, 2021, D.J. experienced vomiting, fever, change in stool consistency, and rash. The fever lasted twenty-four hours and began at the first onset of symptoms. [Plfs.' Exh. PX-2262 (D.J. medical records) at 2-3 (12/7/21 Chronological Record of Medical Care).]

240. The week of November 28, 2021, D.J. continued to vomit, his eyes were irritated, and he had diarrhea. [Jessup Decl. at ¶ 25.]

241. D.J. also looked disoriented on two specific occasions between January and March 2022. Id.; April 30 Trial Transcript at 145 (Jessup testifying); see also Clark Decl. at ¶ 87.

242. The Jessup family stopped using the household water for drinking on November 29, 2021. [Jessup Decl. at ¶¶ 11-12, 14, 16-18; April 30 Trial Transcript at 128-30 (Jessup testifying).]

243. Jessup testified that the family continued to get sick over the next week with symptoms of diarrhea, stomach pain, and nausea, [Jessup Decl. at ¶ 16,] although the Court cannot attribute these symptoms to any particular plaintiff other than Jessup because no specific evidence was proffered that would support such a finding.

244. On December 6, 2021, the Jessup family tried to move into a hotel, but the arrangement did not work. [B. Jessup Decl. at ¶ 22; Jessup Decl. at ¶¶ 34-38.]

245. On December 7, 2021, Jessup reported that D.J.'s abdominal cramping, vomiting, and diarrhea were "[d]oing better since stopping drinking the water." [Plfs.' Exh. PX-2262 (D.J. medical records) at 2-3 (12/7/21 Chronological Record of Medical Care).] There is no evidence that these symptoms continued after December 7, 2021.[35]

### b.    Preexisting Conditions

246. D.J. had been sick on and off since late October 2021. [Def.'s DX-3223 (D.J. medical records) at 2 (12/7/21 Chronological Record of Medical Care).]

### c.    Causation and Apportionment

247. The Court finds that Plaintiffs have shown by a preponderance of the evidence that a legal cause of D.J.'s symptoms and conditions from November 22, 2021 to December 7, 2021 was the Fuel Release. The Court also finds that the preponderance of the evidence establishes that D.J.'s symptoms and conditions were resolved by December 7, 2021. Apportionment

---

[35] As noted above, Jessup testified her family experienced an increase in symptoms after the Navy flushed their home, however, the Court is unable to attribute these symptoms to D.J. See Plfs.' Exh. PX-1055 (2/23/22 Facebook post by Jessup, and texts); Jessup Decl. at ¶ 53 (describing the 2/23/22 Facebook Post).

is not appropriate as there is no evidence that D.J. continued to be sick from October to November 27, 2021.

### 16. **N.J.**

248. N.J. was approximately four years old at the time of the Fuel Release. See Jessup Decl. at ¶ 1 (noting N.J. was seven years old as of 4/6/24).

#### a. **Symptoms**

249. N.J. experienced fever, chills, nausea, vomiting, diarrhea, abdominal pain, headache, lethargy, and change in stool consistency beginning in late October 2021. [Plfs.' Exh. PX-2263 (N.J. medical records) at 2 (12/7/21 Chronological Record of Medical Care).] There is no evidence that these medical issues resolved before the Fuel Release, aside from his fever. See Plfs.' Exh. PX-2263 (N.J. medical records) at 2 (12/7/21 Chronological Record of Medical Care).

250. The Jessup family stopped using the household water for drinking on November 29, 2021. [Jessup Decl. at ¶¶ 11-12, 14, 16-18; April 30 Trial Transcript at 128-30 (Jessup testifying).]

251. The week after November 29, 2021, N.J. had stomach pain and diarrhea.[36] [Jessup Decl. at ¶¶ 16, 22.]

---

[36] As noted above, Jessup testified that the family continued to get sick over the next week with symptoms of diarrhea, stomach pain, and nausea, [Jessup Decl. at ¶ 16,] although the Court cannot attribute these symptoms to a

252. On December 6, 2021, the Jessup family tried to move into a hotel, but the arrangement did not work. [B. Jessup Decl. at ¶ 22; Jessup Decl. at ¶¶ 34-38.]

253. As of December 7, 2021, N.J. routinely had abdominal pain, and continued to experience chills, nausea, vomiting, diarrhea, abdominal pain, headache, lethargy, and change in stool consistency. [Plfs.' Exh. PX-2263 (N.J. medical records) at 2 (12/7/21 Chronological Record of Medical Care).

254. N.J.'s eyes would burn when the Government would flush the Jessup's home in December 2021 and February 2022. [Jessup Decl. at ¶¶ 22, 52-53; Plfs.' Exh. PX-1055 (2/23/22 Facebook post by Jessup, and texts).]³⁷

255. N.J. experienced skin discoloration and burning pain in May and June 2022. [Jessup Decl. at ¶ 63.] In May 2022, he bathed in the water at a hotel on Ford Island, and felt like his skin was burning, especially on the back of his legs. He lost pigment in those burned areas for months afterward. [Id. at

_____

particular plaintiff other than Jessup because no specific evidence was proffered to support such a finding.

³⁷ As noted above, Jessup testified her family experienced an increase in symptoms after the Navy flushed their home, however, the Court is unable to attribute these symptoms to N.J. See Plfs.' Exh. PX-1055 (2/23/22 Facebook post by Jessup, and texts); Jessup Decl. at ¶ 53 (describing the 2/23/22 Facebook Post).

¶ 63; Plfs.' Exh. PX-1056 (photograph of the back of N.J.'s legs showing skin discoloration).]

### b.  <u>Causation and Apportionment</u>

256. The Court finds that Plaintiffs have shown by a preponderance of the evidence that a legal cause of N.J.'s symptoms and conditions from November 26, 2021 through December 7, 2021 was the Fuel Release. The Court also finds that Plaintiffs have not shown by a preponderance of the evidence based on credible and qualified medical evidence that a legal cause of N.J.'s symptoms and conditions after December 7, 2021 was the Fuel Release.

257. The Court finds that N.J. was not fully recovered from symptoms of fever, chills, nausea, vomiting, diarrhea, abdominal pain, headache, lethargy, and change in stool consistency, at the time of the Fuel Release and therefore apportionment is appropriate. Because there is no evidence to base apportionment between N.J.'s preexisting symptoms of chills, nausea, vomiting, diarrhea, abdominal pain, headache, lethargy, and change in stool consistency, and the same symptoms caused by the Fuel Release, then damages must be distributed equally for these conditions. <u>See</u> <u>Montalvo</u>, 77 Hawai`i at 299-300, 884 P.2d at 362-63.

### 17.  Witt

#### a.  Acute Symptoms

258. In November 2021, Witt began having excessive night sweats and heart palpitations. [Declaration of Plaintiff, Elizabeth Witt, filed 4/8/24 (dkt. no. 397) ("Witt Decl.") at ¶ 10.] The heart palpitations occurred several times a week, and sometimes she felt short of breath during the episodes. [Id. at ¶ 48.]

259. After Thanksgiving of 2021, Witt experienced intense stomach cramping and abdominal pain, dry and itchy skin on her arms and legs after showering, and rashes on her arms. [Id. at ¶ 11.]

260. She experienced bad abdominal pain beginning on November 28, 2021, which lasted three days. See Plfs.' Exh. PX-2264 (Witt medical records) at 4 (Chronological Record of Medical Care).]

261. Witt began to experience dry skin on her arms and legs on December 1, 2021, which lasted one month. [Witt Decl. at ¶ 11; April 30 Trial Transcript at 180 (Witt testifying).]

262. Witt had approximately three rashes in December 2021 that lasted overnight. [April 30 Trial Transcript at 177, 180, 187-88 (Witt testifying); Plfs.' Exh. PX-1058 (photograph of a rash Witt got after showering on December 8 or 9, 2021).]

263. On December 1, 2021, Witt stopped using the household water for drinking. [Witt Decl. at ¶ 12.]

264. On December 6, 2021, Witt experienced chills, bloating, headaches, abdominal pain and rashes. See id. at ¶ 17; Plfs.' Exh. PX-2264 (Witt medical records) at 3 (Chronological Record of Medical Care). Witt's facial acne was also exacerbated at that time. [Witt Decl. at ¶ 17.]

265. Witt's symptoms of skin irritations, rashes, abdominal pain and cramping resolved when she moved off-island in March 2023. [Witt Decl. at ¶¶ 42, 49.]

### b.   Continued Symptoms

266. Witt also continued to experience heart palpitations, though they became less frequent when she moved away from Oʻahu in March 2023. She now experiences heart palpitations "a couple of times every few months." Witt Decl. at ¶ 48, see id. at ¶ 42.

267. Witt continued to experience night sweats, although now they occur less frequently, approximately once a month. [Id. at ¶ 47.]

### c.   Preexisting Conditions

268. Witt had menstrual irregularities, including increased menstrual cramping and menstrual blood flow beginning in September 2021 that continued for her next several cycles. See Kosnett Decl. at ¶ 264.

269. Witt reported chills, bloating, abdominal pain, headache and rash beginning in August 2021 that were ongoing as of December 6, 2021. See Plfs.' Exh. PX-2264 (Witt medical records) at 4 (Chronological Record of Medical Care); April 30 Trial Transcript at 179-80 (Witt testifying as to the onset of symptoms).

270. Witt also has a history of migraine headaches that began in August 2020. See Kosnett Decl. at ¶ 261; Def.'s Exh. DX-3217 (Witt medical records) at 34 (12/15/21 medical record noting migraines).

271. Witt also experienced night sweats prior to the Fuel Release, beginning in approximately March 2021, that were ongoing at the time of the Fuel Release. See Witt Decl. at ¶ 10; Plfs.' Exh. PX-2264 (Witt medical records) at 212 (March 2022 medical record noting one year history of night sweats). Witt's heart palpitations were first reported in August 2021, and were ongoing at the time of the Fuel Release. [Def.'s Exh. DX-3217 (Witt medical records) at 6 (5/6/22 K. Yearwood treatment note stating "complaints of frequent palpitations since Aug[ust] 2021").]

d. **Causation and Apportionment**

272. The Court finds that Plaintiffs have not shown by a preponderance of the evidence that the Fuel Release caused

Witt's heart palpitations, night sweats, and menstrual
irregularities.

273. The Court finds that Plaintiffs have shown by a
preponderance of the evidence that a legal cause of Witt's
initial symptoms and conditions (except for her heart
palpitations, night sweats, and menstrual irregularities) from
November 26, 2021 to December 6, 2021 was the Fuel Release. The
Court also finds that Plaintiffs have not shown by a
preponderance of the evidence based on credible and qualified
medical evidence that a legal cause of Witt's symptoms and
conditions after December 6, 2021 was the Fuel Release, with the
exception of Witt's dry skin on her arms and legs, which lasted
until January 1, 2022.

274. The Court finds that the United States has shown by a
preponderance of the evidence that Witt had preexisting
conditions that had not resolved by the Fuel Release, and these
conditions were abdominal pain, migraine headaches, chills,
bloating, and rashes. The Court finds based on credible evidence
that, where Witt's injuries are the same conditions as her
preexisting conditions, the preexisting conditions and the
injuries caused by the Fuel Release must be apportioned. See
Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. Because the
parties did not present testimony apportioning between the two
causes, the Court must apportion equally to each of them. Id.

86

The Court does not apportion damages for the other acute symptoms Witt experienced after the Fuel Release.

### D. **Emotional Distress**

275. The United States' expert Dr. Smith testified that water contamination of jet fuel in one's home can be a traumatic event. [Transcript of Proceedings: Nonjury Trial Day 10, filed 5/14/24 (dkt. no. 586) ("May 13 Trial Transcript") at 26.] He opined that there is no evidence to support, to a reasonable degree of probability, that the Fuel Release caused or worsened any of the Plaintiffs' psychological injuries. [Smith Decl. at ¶ 14.] Dr. Smith testified that there is no evidence to support that any of the Plaintiffs will experience long-term psychological injuries or need future mental health therapies. [Id. at ¶ 16.]

276. Plaintiffs' expert Melissa Vargo, M.A., Psy.D. ("Dr. Vargo"), a clinical psychologist who specializes in the treatment of post-traumatic stress disorder ("PTSD"), testified that the Fuel Release was a traumatic event for each of the adult Plaintiffs. [Declaration of Dr. Melissa Vargo ("Vargo Decl.") at ¶¶ 1, 8-10, 53-54.]

277. Plaintiffs' expert Andrew Clark, M.D. ("Dr. Clark"), a physician with board certifications in psychiatry, child and adolescent psychiatry and forensic psychiatry, testified regarding each minor Plaintiff's mental status and the impact of

the water contamination on their mental health. [Clark Decl. at
¶¶ 1, 7-8.] Dr. Clark concluded that the Fuel Release was a
traumatic event for each minor Plaintiff, and that the exposure
to the contaminated water "substantially contributed to many of
the minor Bellwether Plaintiffs' mental health symptoms and
diagnoses." Id. at ¶ 24, see also id. at ¶¶ 22-23.

278. The Court finds that Plaintiffs have proven by a
preponderance of the evidence that the Fuel Release was a
traumatic event for most of the individual Plaintiffs, that it
affected their mental health and was a legal cause of emotional
distress for those individual Plaintiffs. For Plaintiffs V.D.,
T.F., D.F., K.F., N.F., B.B.J., B.J.J., D.J., N.J., and Witt,
the Court finds that the Plaintiffs have not proven by a
preponderance of the evidence that the Fuel Release was a
traumatic event that affected their mental health and was a
legal cause of emotional distress.

### 1.    **Aubart**

279. Aubart testified that he had never had issues with his
mental health before the Fuel Release, and after the Fuel
Release he experienced anxiety, stress, irritability and sleep
apnea. [Aubart Decl. at ¶ 43.] Aubart had difficulty sleeping,
and sought treatment from a therapist and psychiatrist. [Id.]
Aubart described "long-term fear," associated with the Fuel
Release. [Id. at ¶ 45.]

280. Aubart attested that his lifestyle changed after the Fuel Release, he became "unsociable, anti-government and bitter." [Id. at ¶ 46.] Aubart attested that, after the thirty-seven years he spent in public service, the Fuel Release made him distrust the government. [May 3 Trial Transcript at 111.]

281. Aubart described marital issues that he attributes to the Fuel Release. Aubart attested that both he and his wife felt physically ill, which led to tension in their relationship. [Aubart Decl. at ¶ 47.] Further, he and his wife argued about the water contamination and his wife's continued use of the water, which "caused [him] a lot of stress and guilt." [Id.]

282. Aubart also stated that the Fuel Release negatively impacted his work and relationship with others. Aubart attested that he had a hard time concentrating and remembering simple things, which made him scared and embarrassed. Aubart explained that his anxiety increased, and he had an anxiety attack at work in April 2022. [Id. at ¶ 48.]

283. Finally, Aubart testified that he became stressed and anxious about his dog, Coco, who he cares deeply for and describes as "like another member of the family." Id. at ¶ 3; see id. at ¶ 49; see also May 3 Trial Transcript at 101 (Aubart describing Coco as his "best friend"). Aubart felt bad about unknowingly giving Coco contaminated water, [Aubart Decl. at ¶ 49,] particularly because Coco experienced seizures two to

three times a week around the time of the Fuel Release, [id. at ¶ 18]. Aubart testified about becoming scared after researching jet fuel in the water and reading about the poisoning of the water in Flint, Michigan. [May 3 Trial Transcript at 104-05.]

284. Dr. Smith determined that there is no evidence to support that the Fuel Release caused or worsened any psychological injury that Aubart experienced. [Smith Decl. at ¶ 56.]

285. Dr. Vargo opined that Aubart met the criteria for PTSD. Vargo noted that, since the exposure, Aubart experienced: "repeated, disturbing, and unwanted" dreams, memories, and flashbacks in which "he feels, or acts as if the contamination [is] recurring;" [Vargo Decl. at ¶ 55.a;] and avoidance, or attempts to avoid distressing thoughts and feelings, [id.]. Further, Dr. Vargo opined that Aubart experienced negative emotional states such as fear or anger, diminished interest in significant activities, an inability to experience positive emotions, and "irritable behavior and angry outbursts with little or no provocation, hypervigilance, an exaggerated startle response and difficulties with concentration." [Id.]

286. Aubart's testimony is discredited by the fact that he has documented severe emotional distress from other sources prior to and during the time of the Fuel Release, including a dispute at his workplace, and pro se litigation that he was

engaged in for five years. See Smith Decl. at ¶¶ 36-37; May 3
Trial Transcript at 96 (Aubart testifying). Aubart reported a
history of anxiety and depression dating back to 2017 when
Aubart reported a "false statement by [his] supervisor at his IT
job in the military. [Aubart] said [his] supervisor then accused
him of lying and of engaging in criminal conduct and stripped
[Aubart] of all of his duties." [Def.'s Exh. DX-3212 (Aubart
medical records) at 39 (5/16/22 Kaiser Permanente integrated
behavioral health telephone appointment notes).] Aubart's
lawsuit was ongoing in November of 2021, and was not resolved
until June of 2023. See May 3 Trial Transcript at 112-13 (Aubart
testifying). When this lawsuit resolved, Aubart's stress
improved. See Kosnett Decl. at ¶ 47, Def.'s Exh. DX-3212 (Aubart
medical records) at 3 (Kaiser Permanente initial treatment plan
dated 6/5/23).

    287. The Court finds that the United States has shown by a
preponderance of the evidence that Aubart's emotional distress
preexisted the Fuel Release and that legal causes of his
emotional distress included his employment issues and the
lawsuit stemming from his employment, which were unresolved and
ongoing at the time of the Fuel Release. Thus, the Court must
apportion Aubart's emotional distress damages. See Montalvo, 77
Hawai`i at 299-300, 884 P.2d at 362-63. Because the parties did

not present testimony apportioning between the causes, the Court must apportion equally among them. See id.

288. The Court concludes that Plaintiffs have not shown by a preponderance of the evidence that Aubart will need future psychological or mental health care for emotional distress caused by the Fuel Release.

### 2. **Dietz**

289. Dietz testified that though she has gone through significant trauma in her life,[38] "[n]one of those experiences caused [her] the stress and anxiety that [she has] experienced since Red Hill." [Dietz Decl. at ¶ 63.]

290. Dietz testified she had not experienced a panic attack prior to a town hall she attended on November 30, 2021 hosted by the Navy related to the water contamination. [Id. at ¶ 23; May 1 Trial Transcript at 37.] At that town hall, Dietz had a panic attack. See Dietz Decl. at ¶ 23, May 1 Trial Transcript at 37-38 (Dietz testifying).

291. Dietz's experience in the wake of the Fuel Release trying to care for B.D. felt "a little impossible and extremely defeating." [May 1 Trial Transcript at 40 (Dietz testifying).] Dietz testified she felt "totally helpless." [Id.]

---

[38] Dietz states she: "grew up in scarcity, lived in an abusive household, lost my mother as a teen, sent the man I loved off to combat zones, and in 2020, dealt with a family member who threated our family's safety." [Dietz Decl. at ¶ 63.]

292. The stress during this time also negatively impacted her marriage and intimacy. [Dietz Decl. at ¶ 69.]

293. Dietz testified that she "lost all trust in the people that are supposed to ensure that we are safe," [May 1 Trial Transcript at 39,] and attested that she will "never be able to trust the government again," [Dietz Decl. at ¶ 78]. Dietz described always having "the sense that there were 'good guys' in the government that would protect [her] from harm if all else failed," but her experience with the Fuel Release made her lose trust in this notion and in institutions generally. [Id. at ¶ 63.] She stated that her entire family has proudly served in the military, and it feels "heartbreaking" to be left behind by that same government. [Id. at ¶ 84.] Dietz attested that the disconnect between her lived experience and the Navy's statements regarding the Fuel Release "is traumatizing in itself." [Id. at ¶ 81.]

294. Dietz stated she is worried about her children, her husband, and herself getting cancer. [Id. at ¶ 70.] Dietz worries B.D. will have migraines or worse for the rest of his life, and that her daughter will not be able to have children. She fears her children will not be able to afford the costs of care if they get sick. [Id. at ¶¶ 74-76.]

295. Dietz testified that she worries about water, and has continued to use bottled water to drink, brush her teeth and

cook, and likely always will. [Id. at ¶ 66.] She worries she
will never be able to think about water, much less drink it,
without anxiety again. [Id. at ¶ 77.]

296. Dr. Vargo opined that Dietz met the clinical criteria
for generalized anxiety disorder. [Vargo Decl. at ¶ 55.b.] Dr.
Vargo testified that Dietz experienced excessive anxiety that is
difficult to control for at least six months concerning water
contamination issues, occurring more days than not. Dr. Vargo
opines that Dietz is restless, irritable, her sleep is
disturbed, and her anxiety impairs her work and interpersonal
relationships. [Id.]

297. Dr. Smith opined that "[a]ny stress or anxiety that
she suffered at that time related to the [Fuel Release] has long
since abated and she is currently at the baseline at which [he]
would expect her to be had the spill never occurred." [Smith
Decl. at ¶ 75.] Dr. Smith opined that the Fuel Release did not
cause or worsen any psychological injuries that Dietz has
experienced, [id. at ¶ 88,] and that "[t]here is no evidence to
support, to a reasonable degree of psychological probability,
that Ms. Dietz will experience long-term psychological injuries
or need future mental health therapies" stemming from the Fuel
Release, [id. at ¶ 90].

298. As explained above, Dietz has a child with a serious
medical condition. B.D. was diagnosed with Chiari I malformation

of the brain in 2016. See Dietz Decl. at ¶ 4; Def's Exh. DX-3218
(B.D. medical records) at 1 (1/7/22 pediatric neurosurgery
clinic note). Dietz testified, "[s]urgery terrified me, but we
had to do something to help him, we were desperate." [Dietz
Decl. at ¶ 52.] The Court finds that B.D.'s serious medical
condition is a significant source of emotional distress for
Dietz.

299. The Court finds that the United States has shown by a
preponderance of the evidence that Dietz's emotional distress
from excessive anxiety preexisted the Fuel Release, that a legal
cause of her emotional distress is her child's serious medical
condition, and that this emotional distress was exacerbated by
his brain surgery. Apportionment must therefore be applied. See
Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. Because the
parties did not present testimony apportioning between the
causes, the Court must apportion equally among them. See id.

300. The Court concludes that the United States is liable
for damages resulting from aggravation of Dietz's preexisting
psychological condition as well as her predisposition to
psychological injury. Id., 77 Hawai`i at 294, 884 P.2d at 357
("Such 'predisposition to injury' or other special sensitivity
is often involved in the context of the so-called 'thin skull'
or 'eggshell skull' plaintiff.").

301. The Court concludes that Plaintiffs have proven by a preponderance of the evidence that Dietz will need future psychological or mental health care for emotional distress caused by the Fuel Release. Because her emotional distress is also partially caused by her son's serious medical condition, her future care cost for emotional distress must be apportioned equally between her emotional distress that predated the Fuel Release, the emotional distress from the Fuel Release, and her emotional distress from her son's serious medical condition. See id.

302. Plaintiffs produced evidence that the cost for Dietz's future psychological or mental health care is $21,968.14. See Declaration of Garret J. Hoe, CPA, filed 5/6/24 (dkt. no. 545) ("Hoe Decl.") at ¶¶ 25-26; Vargo Decl. at ¶ 63; Plfs.' Affirmative Deposition Transcript Designations, filed 4/8/24 (dkt. no. 400), Exh. 4 (11/14/23 Deposition of Jennifer Canter, M.D. ("Canter Depo.")) at 126:25-128:2; Stipulated Order Relating to Trial Declarations of Cynthia Fricke (ECF 399), filed 5/2/24 (dkt. no. 523), Exh. C (updated Dietz life care plan report, dated 4/26/24).

303. Dietz is awarded **$7,322.71** in special damages after apportionment among the legal causes, which is one-third of the total amount of the future care costs opined at trial.

### 3.    **B.D.**

304. Following the Fuel Release, Bryan Dietz noted B.D.'s
"anxiety went through the roof . . . he was worried about his
brain and his health." B. Dietz Decl. at ¶ 18; see also Dietz
Decl. at ¶ 67. Bryan Dietz testified that "instead of [B.D.]
embracing the world" as he did when he first arrived in Hawai'i,
he "tries to really avoid the world as he gets older . . . he
just doesn't trust it." [May 1 Trial Transcript at 65-66.] Dietz
states B.D. experiences anxiety about water, medical
appointments, and being outside the house, despite seeing a
therapist. [Dietz Decl. at ¶ 68.] Bryan Dietz also described
home as a place where B.D. used to feel safe, but no longer
does. [B. Dietz Decl. at ¶ 37.]

305. Bryan Dietz described an incident where B.D. saw the
family dog, who B.D. is very fond of, have a seizure while going
for a walk, and B.D. did not know how to respond to it. May 1
Trial Transcript at 66; see also Dietz Decl. at ¶¶ 3, 61. Bryan
Dietz also described how showering in a vinyl camp shower after
the Fuel Release was traumatizing to B.D. [B. Dietz Decl. at
¶ 22.]

306. Dr. Clark opined that while B.D. had anxiety and
anxiety-related conditions prior to 2021, the Fuel Release
substantially contributed to B.D.'s anxiety. [Clark Decl. at
¶¶ 33-34.] Dr. Clark opined that B.D. meets the diagnostic

criteria for Other Specified Trauma and Stressor Related
Disorder under the DSM-V.[39] [Id. at ¶ 34.]

307. Dr. Smith opined that B.D. experienced anxiety and
worry since the Fuel Release, but any such anxiety or stress has
"long since abated and he is currently at the baseline at which
[Dr. Smith] would expect him to be had the spill never
occurred." Smith Decl. at ¶ 101, see also id. at ¶ 100. Dr.
Smith opined that the Fuel Release did not cause or worsen any
psychological injuries that B.D. has experienced, [id. at
¶ 108,] and that "[t]here is no evidence to support, to a
reasonable degree of psychological probability, that B.D. will
experience long-term psychological injuries or need future
mental health therapies" stemming from the Fuel Release, [id. at
¶ 110].

308. The Court finds that the Fuel Release was not a legal
cause for certain aspects of B.D.'s emotional distress,
specifically B.D.'s distress from witnessing his family's dog
having a seizure.

309. The Court finds that the United States has shown by a
preponderance of the evidence that B.D.'s emotional distress
manifested by anxiety and anxiety-related conditions prior to
2021, and thus preexisted the Fuel Release. The Court finds that

---

[39] The DMS-V is the Diagnostic and Statistical Manual of
Mental Disorders, Fifth Edition. See Smith Decl. at ¶ 55.

legal causes of his emotional distress are his serious medical condition and other unknown factors, and that his emotional distress was exacerbated by his brain surgery for his Chiari I malformation medical condition. The Court finds that the Fuel Release exacerbated B.D.'s anxiety and worry but, by the time he was evaluated by Dr. Smith, both had abated and returned to the level of anxiety and worry that he had before the Fuel Release. Thus, he is entitled to general damages for emotional distress from after the Fuel Release until his examination by Dr. Smith on September 8, 2023.

310. As to future care, the Court concludes that Plaintiffs have not shown by a preponderance of the evidence that B.D. will need future psychological or mental health care for emotional distress caused by the Fuel Release.

### 4. **V.D.**

311. Bryan Dietz described how showering in a vinyl camp shower after the Fuel Release was traumatizing to V.D., and she cried and hated it. [B. Dietz Decl. at ¶ 22.] V.D. used to love baths, but now fights with her parents when getting into a shower or bath. [Dietz Decl. at ¶ 66.]

312. Dr. Smith testified V.D. had "little if any recollection" of the Fuel Release and had not been affected by her parents' behavior regarding the Fuel Release. [Smith Decl. at ¶ 113.] Dr. Smith opined that the Fuel Release did not cause

or worsen any psychological injuries that V.D. has experienced,
[id. at ¶ 120,] and that "[t]here is no evidence to support, to
a reasonable degree of psychological probability, that V.D. will
experience long-term psychological injuries or need future
mental health therapies" stemming from the Fuel Release, [id. at
¶ 122].

313. Dr. Clark simply noted that V.D. was doing well at the
time of his evaluation. [Clark Decl. at ¶ 35.]

314. The Court concludes that Plaintiffs have not shown by
the requisite proof that the Fuel Release was a substantial
factor in causing V.D.'s emotional distress nor that V.D.
requires future psychological or mental health care for any
emotional distress caused by the Fuel Release.

### 5. Feindt

315. Feindt testified that he has "emotions about this
whole experience that I never felt in my life," ranging from
embarrassment to humiliation and depression. [Feindt Decl. at
¶ 99.] He testified that he has been distressed for over two
years, and does not think it will stop. [Id. at ¶ 102.] Feindt
testified that after the Fuel Release he is often grouchy and
not fun to be around. [Id. at ¶ 98.]

316. Feindt testified that he is and was scared for his own
health and the health of his children and wife. See April 30
Trial Transcript at 13; Feindt Decl. at ¶ 101. He testified,

"I'm scared to death that one of us is going to go to a doctor
and we're going to have cancer." [April 30 Trial Transcript at
29.] He is also concerned that his family will be unable to
afford existing and potential future health problems,
particularly because his wife left her job due to the experience
with the Fuel Release. [Feindt Decl. at ¶ 103.]

317. Feindt also testified that this experience has
negatively affected his marital intimacy. [Id. at ¶ 108.]

318. Dr. Vargo opined that Feindt met the criteria for a
diagnosis of PTSD with anxiety. [Vargo Decl. at ¶ 55.c.]
Following the Fuel Release, Dr. Vargo opined that Feindt
experienced, for over a month: "repeated, disturbing, and
unwanted" dreams, memories, and flashbacks in which "he feels,
or acts as if the contamination [is] recurring;" [id.;] and
avoidance – attempts to avoid distressing thoughts and feelings,
[id.]. Further, Dr. Vargo opined that Feindt experienced
negative emotional states such as fear or anger, diminished
interest in significant activities such as golf, an inability to
experience positive emotions, and "irritable behavior and angry
outbursts with little or no provocation, hypervigilance, an
exaggerated startle response and difficulties with
concentration," [id.]. Finally, Dr. Vargo noted Feindt had
symptoms of depression and hopelessness. [Id.]

319. Dr. Smith opined that his diagnoses of Feindt, which include PTSD and Somatic Symptom Disorder, stemmed from Feindt's debilitating chronic pain, which predated the water contamination and continues today. [Smith Decl. at ¶ 137.] Dr. Smith opined that the Fuel Release did not cause or worsen any psychological injuries that Feindt has experienced, [id. at ¶ 155,] and that "[t]here is no evidence to support, to a reasonable degree of psychological probability, that Mr. Feindt will experience long-term psychological injuries or need future mental health therapies" stemming from the Fuel Release, [id. at ¶ 157].

320. The Court finds that the United States has shown by a preponderance of the evidence that Feindt's emotional distress preexisted the Fuel Release and is ongoing, and that a legal cause of his emotional distress is his chronic pain from other causes, which did not resolve before the Fuel Release. The Court also finds that credible evidence supports a finding that the Fuel Release exacerbated his preexisting emotional distress. Apportionment must therefore be applied. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. Because the parties did not present testimony apportioning between the causes, the Court must apportion equally to each of them. Id.

321. As for future care, the Court concludes that Plaintiffs have not shown by a preponderance of the evidence

that Feindt will need future psychological or mental health care
for emotional distress caused by the Fuel Release.

   **6.** **P.G.F.**

 322. P.G.F. had significant behavioral issues that predated
the Fuel Release by years. See Smith Decl. at ¶ 162. Prior to
the Fuel Release, P.G.F. could be defiant, and have extreme
meltdowns when asked to transition to a new activity. Medical
records in 2020 discuss the possibility of an Attention Deficit
Hyperactivity Disorder ("ADHD") diagnosis. See Clark Decl. at
¶ 36; see also Smith Decl. at ¶ 162 (opining that P.G.F. "very
likely" had diagnosable ADHD years before the Fuel Release).
P.G.F. also had a language delay, for which she attended speech
therapy. [April 29 Trial Transcript at 194 (A. Feindt
testifying).] Her mother testified that prior to the Fuel
Release, P.G.F. had difficulty with toilet training, anger, and
outbursts which had subsided prior to the Fuel Release, but came
back worse than before after the Fuel Release. [Id.]

 323. Prior to January of 2022 and for the following few
months, P.G.F.'s behavior and emotional regulation markedly
declined. See Clark Decl. at ¶¶ 37-39. Amanda Feindt testified
that prior to the Fuel Release, P.G.F. had graduated from the
therapy she was in, but after the Fuel Release, her "behavior
issues, her regression as far as potty training, outbursts,

anger, they all came back worse than they'd ever been before."
[April 29 Trial Transcript at 194.]

324. P.G.F. was separated from her father and brother for
six months beginning in May 2023 when the Feindt family moved
away from Hawai`i. [Feindt Decl. at ¶¶ 57-59.]

325. P.G.F. now has a fear of water: she will not drink
water unless it is bottled, and carries her own water bottle
everywhere. See Feindt Decl. at ¶ 104; A. Feindt Decl. at ¶ 92.
When others are sick, P.G.F. attributes the cause to water
regardless of the circumstances. When her mother was sick in
April 2024, P.G.F. asked her why she drank the water, and told
her not to do so. [Feindt Decl. at ¶ 104.]

326. P.G.F. also has a fear of doctors, injections, and
blood draws. P.G.F. screams or yells when in medical facilities.
See A. Feindt Decl. at ¶ 97; Feindt Decl. at ¶ 105.

327. At the time of trial, P.G.F. was attending trauma
therapy, and working on a book about a unicorn that helps people
avoid contaminated water. [Feindt Decl. at ¶ 104.] At a recent
appointment she drew a picture of "a magic unicorn that drank
bad water in Hawaii and got sick." [April 30 Trial Transcript at
28 (Feindt testifying); see also Plfs.' Exh. PX-2409 (P.G.F.'s
drawing).

328. Dr. Clark opines that P.G.F. "appears to have some
post-traumatic stress symptoms (but not PTSD)" associated with

104

the Fuel Release, and that P.G.F. meets the diagnostic criteria

for Other Specified Trauma and Stressor Related Disorder under

the DSM-V. Clark Decl. at ¶ 41; see id. at ¶ 44. P.G.F.

spontaneously begins crying about water-related issues, and

continues to worry the water is unsafe to drink. [Id. at ¶ 41.]

Dr. Clark opined the loss of structure around the time of the

Fuel Release "likely contributed to her dysregulation," and that

she has been set back developmentally and is now somewhat

emotionally fragile. Id. at ¶ 42; see id. at ¶ 43.

329. Dr. Smith opined that the Fuel Release did not cause

or worsen any psychological injury that P.G.F. may have

experienced, [Smith Decl. at ¶ 170,] and that "[t]here is no

evidence to support, to a reasonable degree of psychological

probability, that P.G.F. will experience long-term psychological

injuries or need future mental health therapies" stemming from

the Fuel Release, [id. at ¶ 172].

330. The Court finds that P.G.F.'s emotional distress

predated the Fuel Release and that a legal cause of P.G.F.'s

emotional distress is from medical conditions that did not

resolve before the Fuel Release. The Court also finds that

P.G.F.'s existing emotional distress was exacerbated by the Fuel

Release. Further, the United States has proven by a

preponderance of the evidence that a legal cause of P.G.F.'s

emotional distress and behavioral issues after the Fuel Release

105

is her separation from family members. Thus, the emotional distress must be apportioned between the Fuel Release, separation from her family members, and P.G.F.'s preexisting emotional distress from her medical conditions, which she had before the Fuel Release. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. Because the parties did not present testimony apportioning between the causes, the Court must apportion equally to each of them. See id.

331. From a review of the evidence, the Court concludes that Plaintiffs have proven by a preponderance of the evidence that P.G.F. will need future psychological or mental health care for emotional distress caused by the Fuel Release. Because her emotional distress is also due to her preexisting medical conditions and her separation from family members, her future care cost for emotional distress must be apportioned equally among these causes. See id.

332. Plaintiffs produced evidence that the cost for P.G.F.'s future psychological or mental health care is $14,860.09. [Clark Decl. at ¶ 97; Canter Depo. at 126:25-128:2; Declaration of Expert, Margot Burns, filed 5/2/24 (dkt. no. 524) ("Burns Decl.") at ¶¶ 147, 149; Stipulated Order Relating to the Trial Declarations of Margot Burns (ECF 524) and Garret Hoe (ECF 519 and 545), Exh. A, Tab D (Future Care Needs Assessment for P.G.F) at PageID.41266-67; Hoe Decl. at ¶¶ 29-30.]

333. P.G.F. is awarded **$4,953.36** in special damages after apportionment among the legal causes, which is one-third of the total amount of the future care opined at trial.

### 7.   **T.F.**

334. No evidence was presented that T.F. had documented behavioral issues prior to the Fuel Release. Dr. Smith did not examine T.F. because he was too young. See Smith Decl. at ¶ 173. T.F. was three years old at the time of Dr. Clark's opinion, and Dr. Clark did not outline any behavior problems T.F. exhibited before the Fuel Release. See Clark Decl. at ¶¶ 45-48.

335. Currently, T.F. is afraid of doctors, shots and giving blood. T.F. screams or yells when in medical facilities. See A. Feindt Decl. at ¶ 97; Feindt Decl. at ¶ 105. Dr. Clark also described T.F.'s difficulty adjusting to living in Virginia apart from his mother and sister, and behavioral challenges. [Clark Decl. at ¶ 47.]

336. T.F. was separated from his mother and sister for six months beginning in May 2023 when the Feindt family moved away from Hawai`i. [Feindt Decl. at ¶¶ 57-59.]

337. Dr. Clark opined that the disruptions associated with the Fuel Release will interfere with T.F. developing secure attachments to his parents. [Clark Decl. at ¶ 48.] Dr. Clark opined that T.F. meets the diagnostic criteria for Other

107

Specified Trauma and Stressor Related Disorder under the DSM-V.
[Id.]

338. The Court finds that T.F. is currently experiencing
emotional distress but that Plaintiffs have not proven by a
preponderance of the evidence that a legal cause of T.F.'s
emotional distress is from the Fuel Release. Further, the United
States has proven by a preponderance of the evidence that a
legal cause of this emotional distress and behavior is T.F.'s
separation from family members. The Court finds that the Fuel
Release was not a substantial factor in causing T.F.'s emotional
distress. See Est. of Frey v. Mastroianni, 146 Hawai`i 540, 550,
463 P.3d 1197, 1207 (2020).

339. For the same reason, the Court concludes that
Plaintiffs have not shown by a preponderance of the evidence
that T.F. will need future psychological or mental health care
for emotional distress caused by the Fuel Release.

### 8.  Freeman

340. Freeman stated that some of her fears are so
overwhelming that she "can barely breathe when [she] think[s]
about them." [Freeman Decl. at ¶ 102.] Freeman testified she
worries all the time. [April 29 Trial Transcript at 150-51.]

341. Freeman testified about a time when she gave up, where
she felt like she was going to die. [April 29 Trial Transcript
at 149-50.] Freeman testified she told her husband she wanted to

do paperwork for a do-not-resuscitate order. [Id. at 149.] She
described feeling as if her children were witnessing her "slow
death" and not wanting them to witness that. [Id. at 150.]
Freeman stated she wrote letters for each of her children and
her husband in case she passed away. [Id.]

342. Freeman continues to worry about her own health and
her children's health. [Id. at 148, 150-51.] Freeman testified
she was worried that her children were going to die. [Id. at
148.]

343. Freeman testified about two medical incidents
involving D.F. and N.F. respectively that were particularly
distressing. In one incident, D.F. was playing, then screamed
and fell to the floor unconscious. Freeman and her husband
rushed D.F. to the hospital, where the nurse initially could not
wake him up. D.F. was unconscious for around five minutes.
During this incident, Freeman was worried D.F. was going to die.
[Id. at 144-45.] In a separate incident, N.F. woke up, and lost
mobility to the point where he could not stand or put his
clothes on. He felt like his body was on fire and was crying.
Freeman testified she and her husband took N.F. to the hospital,
and N.F. asked her if he was going to die. [Id. at 147-48.]

344. Freeman stated that she worries about her previously
healthy children developing severe symptoms and it "feel[ing]
like it's never going to [] stop." [Id. at 148.] Freeman stated

she fears that she and her children will not recover from their conditions associated with the Fuel Release, and worries that their conditions will get worse. She also fears the negative psychological and social effects of her children being so isolated. See Freeman Decl. at ¶ 103.

345. Freeman testified she worries that her children will get cancer; that she will not be able to find the source of abnormal labs; that her children will become depressed; that her son will never play soccer again, and that she worries that she, her children, or her husband will not wake up in the morning. She testified she is surprised they were able to live through it. [April 29 Trial Transcript at 150-51.]

346. Freeman stated that she distrusts the water and will never drink tap water again. See Freeman Decl. at ¶ 101. She also fears bodies of water because she is afraid that she will lose consciousness in the water and drown, though she previously loved to swim. [Id. at ¶ 102.]

347. Freeman attested that the fact her husband has served his country for so many years exacerbates her distress over the Government's actions and inactions related to the Fuel Release. [Freeman Decl. at ¶ 104.] Freeman stated that the Government has "made my family sick, destroyed our lives, and turned its back on us[.]" [Id.]

348. Dr. Vargo opined that Freeman currently suffers from
PTSD and generalized anxiety disorder. [Vargo Decl. at ¶¶ 55.d,
56.d.] Dr. Vargo opined that Freeman had generalized anxiety
disorder prior to the Fuel Release, which the Fuel Release
exacerbated. [Id. at ¶ 56.d.] Dr. Vargo opined Freeman was not
experiencing PTSD symptoms immediately prior to the Fuel
Release. [Id.] Following the Fuel Release, Dr. Vargo opines that
Freeman experienced: "repeated, disturbing, and unwanted"
dreams, memories and flashbacks related to the Fuel Release,
avoidance, persistent anger and guilt, a diminished interest in
significant activities, a feeling of detachment from others,
hypervigilance, difficulty with concentration and sleep,
excessive anxiety and worry occurring more days than not that is
difficult to control, irritability, and "persistent and
exaggerated negative beliefs or expectations about herself and
others[.]" [Id. at ¶ 55.d.] Dr. Vargo opined that Freeman's
anxiety causes impairment in social and occupational
functioning. [Id.] Freeman told Vargo during the interview that
she was "constantly in fear that something was going to happen."
[Id.]

349. Dr. Smith opined that the Fuel Release did not cause
or worsen any of Freeman's psychological injuries, [Smith Decl.
at ¶ 212,] and that "[t]here is no evidence to support, to a
reasonable degree of psychological probability, that Ms. Freeman

will experience long-term psychological injuries or need future mental health therapies" stemming from the Fuel Release, [id. at ¶ 214]. Dr. Smith also testified regarding the significant past traumas Freeman has experienced. See id. at ¶¶ 184-87, 207, 211.

350. Plaintiffs produced evidence that the cost for Freeman's future psychological or mental health care is $57,752.02. See Hoe Decl. at ¶ 39; Stipulated Order Relating to the Trial Declaration of Margot Burns (ECF 403), filed 5/3/24 (dkt. no. 530) ("Updated Burns Exhibits"), Exh. G (Future Care Needs Assessment: Nastasia Freeman) at PageID.41127-31; Burns Decl. at ¶¶ 298-99.

351. This amount is based in part on Dr. Vargo's recommendation for mental health treatment. Dr. Vargo recommended Freeman for an initial psychiatric diagnostic evaluation, exposure therapy twice weekly for six months, cognitive behavioral therapy once weekly for six months, and twenty-four therapy sessions in her lifetime of treatment of psychological triggers related to the Fuel Release. [Vargo Decl. at ¶ 65.] The amount also includes the cost of a driver for Freeman for two years for transportation to medical appointments due to her inability to drive with her seizure disorder. See Updated Burns Exhibits, Exh. G (Future Care Needs Assessment: Nastasia Freeman) at PageID.41130.

352. The Court finds that the Fuel Release was not a legal cause for certain aspects of Freeman's emotional distress, specifically Freeman's distress from the incident where D.F. was rushed to the hospital unconscious, and the incident where N.F. lost mobility and had to be taken to the hospital.

353. The Court finds that Freeman's emotional distress from past traumas preexisted the Fuel Release and did not resolve before the Fuel Release. The Court also finds that Freeman's existing emotional distress was exacerbated by the Fuel Release. Thus, the emotional distress must be apportioned between the preexisting emotional distress that was exacerbated by the Fuel Release, emotional distress related to her children's health issues for which the Fuel Release is not a legal cause, and Freeman's preexisting emotional distress. See Montalvo, 77 Hawai`i at 299-300, 884 P.2d at 362-63. Because the parties did not present testimony apportioning between the causes, the Court must apportion equally to each of them. See id.

354. The Court concludes that the United States is liable for damages resulting from aggravation of Freeman's preexisting psychological condition as well as her predisposition to psychological injury. See id., 77 Hawai`i at 294, 884 P.2d at 357 ("Such 'predisposition to injury' or other special sensitivity is often involved in the context of the so-called 'thin skull' or 'eggshell skull' plaintiff.").

113

355. From a review of the evidence, the Court concludes
that Plaintiffs have proven by a preponderance of the evidence
that Freeman will need future psychological or mental health
care for emotional distress. Because her emotional distress is
also due to her preexisting psychological condition and
emotional distress from past traumas, which had not resolved,
and her emotional distress from her children's health issues for
which the Fuel Release was not a legal cause, her future care
cost for emotional distress must be apportioned equally among
the emotional distress from the Fuel Release, emotional distress
from her children's health issues for which the Fuel Release was
not a legal cause, and her preexisting emotional distress. See
id., 77 Hawai`i at 299-300, 884 P.2d at 362-63.

356. After apportionment, Freeman is awarded **$19,250.67** as
special damages for future psychological or mental health care.

    9.   **D.F.**

357. Prior to the Fuel Release, D.F. experienced a
regression in his speech, and "a more general sense of
withdrawal." [Clark Decl. at ¶ 65.] His parents sought a
pediatrician in August 2021 to address these conditions. [Id.]
The pediatrician assessed D.F. as behind in certain milestones,
referred him for a speech and language evaluation, and to a
developmental pediatrician. Dr. Clark opined that D.F.'s
function deteriorated after the family moved to Hawai`i in the

114

summer of 2021, including a regression in speech and toilet training, erratic sleep and general withdrawal. [Id. at ¶¶ 68-69.]

358. A developmental pediatrician saw D.F. in November and December 2021, and elicited a history of concern regarding D.F.'s language at age three and four. [Def.'s Exh. DX-3228 (D.F. medical records) at 7-8 (12/15/21 consultation notes); id. at 15-16 (11/17/21 medical note).] In September 2022, D.F. was found to have expressive and receptive language delays. [Id. at ¶¶ 65-66.] Dr. Smith noted that a developmental pediatrician diagnosed D.F. with Autism Spectrum Disorder, but other examiners have disagreed with that diagnosis. Smith Decl. at ¶ 260; see also Clark Decl. at ¶ 65.

359. Dr. Clark opined that D.F. currently meets the diagnostic criteria for Other Specified Trauma and Stressor Related Disorder under the DSM-V. [Clark Decl. at ¶ 70.] Dr. Clark opined that D.F.'s function deteriorated after the family moved to Hawai`i in the summer of 2021, and he has suffered lasting changes to his emotional fragility, confidence, and tendency to become overwhelmed. [Id. at ¶¶ 69-70.]

360. Freeman testified that D.F. appears to need to control everything "because he lost control over what happened to him" - his speech, his schooling, and even his bowels. [Freeman Decl.

at ¶ 105.] Freeman stated that change is hard for D.F. now.
[Id.]

361. Koda Freeman testified about an incident in which
Freeman collapsed, became unconscious, and had to be taken to
the hospital in an ambulance. [April 29 Trial Transcript at 162-
65.] Koda Freeman stated that his children were all crying and
were devastated as they watched their mother be loaded onto a
stretcher. [April 29 Trial Transcript at 165.] There is no
evidence supporting that the Fuel Release was a legal cause of
this incident.

362. Dr. Smith did not diagnose D.F. with any condition.
See Smith Decl. at ¶ 275. Dr. Smith opined that the Fuel Release
did not cause or worsen any of D.F.'s psychological injuries,
[id. at ¶ 276,] and that "[t]here is no evidence to support, to
a reasonable degree of psychological probability, that D.F. will
experience long-term psychological injuries or need future
mental health therapies" stemming from the Fuel Release, [id. at
¶ 278].

363. From a review of the evidence, the Court concludes by
a preponderance of the evidence that D.F.'s behavioral
difficulties preexisted the Fuel Release. The Court finds that
Plaintiffs have not shown by a preponderance of the evidence
that the Fuel Release is a legal cause of his psychological
injuries. Rather, the evidence supports a finding that legal

116

causes of his emotional distress are his behavioral and emotional issues that the Court has found are unrelated to the Fuel Release. For the same reason, the Court concludes that Plaintiffs have not shown by a preponderance of the evidence that D.F. will need future psychological or mental health care for emotional distress caused by the Fuel Release.

### 10.  <u>K.F.</u>

364. No evidence was presented that K.F. had any diagnosed mental health conditions or behavioral issues before the Fuel Release. Dr. Clark noted that before the Fuel Release, K.F. was healthy and well-adjusted. <u>See</u> Clark. Decl. at ¶ 57.

365. Dr. Smith noted that K.F. could be predisposed to anxiety problems. [Smith Decl. at ¶ 243.]

366. After the Fuel Release, K.F. attended home hospital school due to the severity of his illnesses and spent a year and a half in the program. [Freeman Decl. at ¶ 89.] K.F. was in home hospital school for a year and a half, and during this time he missed socializing with his friends at school. [<u>Id.</u>]

367. He became unable to play soccer, which was a "primary vehicle for psychological development, peer interaction, physical activity and simple joy." Clark Decl. at ¶ 60; <u>see</u> <u>id.</u> at ¶ 57.

368. Dr. Clark opined that K.F. meets the diagnostic criteria for Other Specified Trauma and Stressor Related

Disorder under the DSM-V. [Clark Decl. at ¶ 63.] Dr. Clark
reported that K.F. was unable to attend school or play soccer at
the time of his examination. [Id. at ¶ 57.] Dr. Clark opined
that for K.F., soccer had likely been a "primary vehicle for
psychological development, peer interaction, physical activity
and simple joy." [Id. at ¶ 60.] Dr. Clark opined that K.F.
suffered learning loss from two years of fragmented schooling.
[Id. at ¶ 59.] Dr. Clark opined that K.F. is at an increased
risk of developing a psychiatric disorder and failing to achieve
developmental milestones. [Id. at ¶ 63.]

369. Dr. Smith diagnosed K.F. with "Other Specified Anxiety
Disorder." [Smith Decl. at ¶ 253.] Dr. Smith opined that the
Fuel Release did not cause or worsen any of K.F.'s psychological
injuries, [id. at ¶ 254,] and that "[t]here is no evidence to
support, to a reasonable degree of psychological probability,
that K.F. will experience long-term psychological injuries or
need future mental health therapies" stemming from the Fuel
Release, [id. at ¶ 256].

370. Koda Freeman described K.F. as being afraid of needles
and having anxiety about blood draws. [April 29 Trial Transcript
at 166.]

371. Like his siblings, K.F. also experienced distress when
he witnessed his mother getting loaded onto a stretcher while
unconscious before getting into an ambulance. See id. at 162-65

118

(K. Freeman testifying). There is no evidence supporting that the Fuel Release was a legal cause of this incident.

372. The Court finds that Plaintiffs have shown by a preponderance of the evidence that K.F. has an anxiety disorder and sustained emotional distress, but Plaintiffs have not carried their burden of proof regarding the Fuel Release being a legal cause of his emotional distress. Rather, the evidence supports a finding that legal causes of his emotional distress are the unknown causes that prevented him from attending school with his peers. The Court therefore finds that the Fuel Release was not a substantial factor in causing K.F.'s emotional distress. See Est. of Frey, 146 Hawai`i at 550, 463 P.3d at 1207. For the same reason, the Court concludes that Plaintiffs have not shown by a preponderance of the evidence that K.F. will need future psychological or mental health care for emotional distress caused by the Fuel Release.

> **11.  N.F.**

373. N.F.'s nausea and vomiting, migraine headaches, and chronic severe body pain diagnosed as AMPS have kept him out of school. See Clark Decl. at ¶¶ 49-50, see also Smith Decl. at ¶¶ 216-19. N.F. attended home hospital school due to the severity of his illnesses and has been in the program for over two years. [Freeman Decl. at ¶ 89.] N.F.'s sixth grade year was disrupted by the Fuel Release and illness, his seventh-grade

119

year was spent almost entirely at home due to his illness, and
at the time of testimony he was completing his eight grade
classes in the home hospital program. See Clark Decl. at ¶ 50;
Smith Decl. at ¶ 216.

374. Dr. Clark opined that N.F. meets the diagnostic
criteria for Other Specified Trauma and Stressor Related
Disorder under the DSM-V. [Clark Decl. at ¶ 56.] Before the Fuel
Release he had a good group of friends, and afterward his peer
interactions were limited to online video games. [Id. at ¶¶ 49-
51.] Dr. Clark reported that N.F. responded to the Fuel Release
with anger, frustration and withdrawal, and has more recently
become depressed. [Id. at ¶ 51.] Dr. Clark stated that N.F.
becomes depressed particularly when his health is poor, which is
often. [Id. at ¶ 55.] Dr. Clark opined that N.F. is at an
increased risk of developing a psychiatric mood disorder and of
failing to achieve developmental milestones. [Id. at ¶¶ 52, 56.]

375. Dr. Smith opined that the Fuel Release did not cause
or worsen any of N.F.'s psychological injuries, [Smith Decl. at
¶ 234,] and that "[t]here is no evidence to support, to a
reasonable degree of psychological probability, that N.F. will
experience long-term psychological injuries or need future
mental health therapies" stemming from the Fuel Release, [id. at
¶ 236].

120

376. Like his siblings, N.F. also experienced distress when he witnessed his mother getting loaded onto a stretcher while unconscious before getting into an ambulance. See April 29 Trial Transcript at 162-65 (K. Freeman testifying). There is no evidence supporting that the Fuel Release was a legal cause of this incident.

377. As noted above, the Court determined that the Fuel Release was not a legal cause of N.F.'s physical symptoms and illness after December 3, 2021. The Court therefore finds that the Fuel Release was not a substantial factor in causing N.F.'s emotional distress. See Est. of Frey, 146 Hawai`i at 550, 463 P.3d at 1207. Rather, the evidence supports a finding that legal causes of his emotional distress are the unknown causes for his pain and medical problems that occurred after December 3, 2021 and that prevented him from attending school with his peers for over two years. For the same reason, the Court concludes that Plaintiffs have not shown by a preponderance of the evidence that N.F. will need future psychological or mental health care for emotional distress caused by the Fuel Release.

## 12. **Jessup**

378. Jessup worries about her own health and the health of her four children. She worries about her neurological symptoms and the possibility of her getting cancer. [April 30 Trial Transcript at 156 (Jessup testifying).]

121

379. Jessup's emotional distress was exacerbated by her belief that B.J.J. may have developed a hormonal or neurological condition associated with B.J.J.'s irregular menstrual cycle from the Fuel Release, and watching her daughter suffer through severe periods. [Id. at 150-52.]

380. Jessup experienced emotional distress watching her son B.B.J. have severe nosebleeds that caused him to choke on his blood, and watching his tremors escalate and him develop a stutter. [Id. at 152-53.] She cried when B.B.J. determined he could not pursue his dream of a military career due to his tremor. [Id. at 152-54.]

381. Jessup also testified she was "terrified" about the possibilities that exposure to contaminated water would have for her son N.J., who has a mast cell disease that is triggered by trauma to his skin. [Jessup Decl. at ¶ 19.]

382. Jessup feels betrayed by the Government because of her husband's military service to the United States, and the sacrifices their family has made to serve their country. [April 30 Trial Transcript at 149-50 (Jessup testifying).] Jessup testified that, in return, the Government "made [her] family sick" and robbed her family of important memories and time together. Id. at 149, see id. at 150.

383. Jessup also stated that she was distressed by her separation from her husband when she and her children moved away

from Hawai`i, and her husband missing out on five months of
D.J.'s early life. [Id. at 149-50.]

384. Dr. Vargo opined that Jessup met the criteria for PTSD
after the Fuel Release. [Vargo Decl. at ¶ 55.e.] Dr. Vargo
opined that Jessup suffered from Adjustment Disorder with Mixed
Anxiety and Depressed Mood, and ADHD, before the Fuel Release,
which exacerbated her preexisting ADHD. [Id. at ¶ 56.e.]
Following the Fuel Release, Dr. Vargo opined that Jessup
experienced: "repeated, disturbing, and unwanted" dreams,
memories, and intense psychological distress in response to cues
related to water; avoidance, or attempts to avoid thinking about
her family's exposure to contaminated water; "persistent and
exaggerated negative beliefs or expectations about herself";
persistent anger and guilt; less interest in significant
activities; feeling detached from others; irritable behavior and
angry outbursts; and difficulties with sleep and concentration.
[Id. at ¶ 55.e.] Jessup told Dr. Vargo that "the anxiety related
to what I have exposed my children to is crippling . . . Guilt
is eating me alive." [Id.]

385. Dr. Smith testified regarding the significant past
traumas Jessup has experienced. See Smith Decl. at ¶¶ 281-92,
298-300, 311-12. Jessup also experienced postpartum depression
and anxiety from January 2021 to July 2022. See id. at ¶¶ 295-
97. Dr. Smith opined that the Fuel Release did not cause or

worsen any of Jessup's psychological injuries, [id. at ¶ 315,]
and that "[t]here is no evidence to support, to a reasonable
degree of psychological probability, that Ms. Jessup will
experience long-term psychological injuries or need future
mental health therapies" stemming from the Fuel Release, [id. at
¶ 317].

386. Plaintiffs produced evidence that the cost for
Jessup's future psychological or mental health care is
$20,887.24. See Hoe Decl. at ¶¶ 47-48; Vargo Decl. at ¶ 66;
Canter Depo. at 126:25-128:2; Burns Decl. at ¶¶ 440-41.

387. The Court finds that the Fuel Release was not a legal
cause for certain aspects of Jessup's emotional distress,
specifically her distress stemming from witnessing B.B.J.'s
nosebleeds and tremors, the potential impact of B.B.J.'s tremors
on his choice of career, and her concern stemming from her
daughter's irregular menstrual cycle.

388. The Court finds that a legal cause of Jessup's
emotional distress is the Fuel Release. The Court also finds
that the following are legal causes of Jessup's emotional
distress during and subsequent to the Fuel Release: (1) the
preexisting postpartum depression and anxiety she experienced
from January 2021 to July 2022 which had not resolved before the
Fuel Release; (2) her diagnosis of Adjustment Disorder with
Mixed Anxiety and Depressed Mood; and (3) her children's serious

124

medical conditions for which the Court has determined that the
Fuel Release was not a legal cause. Thus, the emotional distress
must be apportioned among all these legal causes. See Montalvo,
77 Hawai`i at 299-300, 884 P.2d at 362-63. Because the parties
did not present testimony apportioning between the causes, the
Court must apportion equally among these causes. See id.

389. The Court concludes that the United States is liable
for damages resulting from the aggravation of Jessup's
preexisting psychological condition as well as her
predisposition to psychological injury. See id., 77 Hawai`i at
294, 884 P.2d at 357 ("Such 'predisposition to injury' or other
special sensitivity is often involved in the context of the so-
called 'thin skull' or 'eggshell skull' plaintiff."). After
reviewing the evidence, the Court concludes that Plaintiffs have
proven by a preponderance of the evidence that Jessup will need
future psychological or mental health care for emotional
distress.

390. Because her emotional distress is also due to her
preexisting psychological condition and emotional distress
unrelated to the Fuel Release, her future care cost for
emotional distress must be apportioned among the emotional
distress from the Fuel Release, her emotional distress caused by
her children's serious health conditions unrelated to the Fuel
Release, and her preexisting emotional distress from postpartum

depression and anxiety, and her depression. See id., 77 Hawai`i
at 299-300, 884 P.2d at 362-63.

391. After apportionment, Jessup is awarded **$6,962.41** as
special damages for future psychological or mental health care.

### 13. **B.B.J.**

392. B.B.J. experienced emotional distress from his
symptoms that occurred following the Fuel Release. His hand
tremors, stuttering and legs shaking scare him. B.B.J. Decl. at
¶¶ 22-23. B.B.J. testified that his anxiety and depression have
"gotten much worse" since the Fuel Release. Id. at ¶ 23. B.B.J.
testified that he feels "embarrassed and angry," [id. at ¶ 24,]
and "very self-conscious," [April 30 Trial Transcript at 165,]
when someone notices his tremors. He testified he "tr[ies] not
to think about it, but it's impossible." [B.B.J. Decl. at ¶ 24.]
B.B.J. stated that his close friends make fun of him for his
stutter, and that it is frustrating to give presentations.
[April 30 Trial Transcript at 165-66.]

393. B.B.J. testified that he missed his father when he
moved to Arizona ahead of his father, and he was worried about
his father's health when his father stayed behind in Hawai`i.
[B.B.J. Decl. at ¶¶ 19-20.]

394. When his family moved, B.B.J. had to leave his school
that he was fond of, with good teachers and friends. [April 30
Trial Transcript at 161-62 (B.B.J. testifying).]

395. B.B.J. also worries about his future. [B.B.J. Decl. at
¶ 23.] B.B.J. testified that his "dream is to join the Navy like
[his] dad" after he graduates from high school, [id. at ¶ 25,]
but he worries that he will be unable to because of his tremors,
[id. at ¶ 26]. See also April 30 Trial Transcript at 164-65
(B.B.J. testifying).

396. B.B.J. feels betrayed and disappointed by the
Government, particularly because his father spent "the majority
of his life" working for the Government. [B.B.J. Decl. at ¶ 29.]

397. B.B.J. also is angry on behalf of his younger
brothers. He testified that "[t]hey didn't deserve any of this."
[Id. at ¶ 28.]

398. B.B.J. is "constantly afraid" that he or one of his
family members will get cancer or other long-term impacts from
the Fuel Release. [Id. at ¶ 30.]

399. Dr. Clark opined that B.B.J. meets the diagnostic
criteria for Other Specified Trauma and Stressor Related
Disorder under the DSM-V. [Clark Decl. at ¶ 74.] Dr. Clark
reported that B.B.J. experienced a moderate level of anxiety
about his medical issues. [Id. at ¶ 71.] Dr. Clark reported that
B.B.J. described himself as depressed last year. [Id.]

400. Dr. Smith noted that B.B.J. reported a lifelong
history of anxiety and "depressive symptoms." [Smith Decl. at
¶ 319.] Dr. Smith detailed distressing or anxiety-inducing

127

incidents that B.B.J. experienced, including harassment from peers. [Id. at ¶¶ 319-21.] Dr. Smith opined that the Fuel Release did not cause or worsen any of B.B.J.'s psychological injuries, [id. at ¶ 347,] and that "[t]here is no evidence to support, to a reasonable degree of psychological probability, that B.B.J. will experience long-term psychological injuries or need future mental health therapies" stemming from the Fuel Release, [id. at ¶ 349].

401. The Court finds that legal causes of B.B.J.'s emotional distress are from preexisting anxiety and depressive symptoms, serious medical conditions from currently unknown causes, and traumatic emotional events related to family, schooling, and peers, that occurred after and are unrelated to the Fuel Release. Based on Dr. Smith's testimony, the Court therefore finds that the Fuel Release was not a substantial factor in causing B.B.J.'s emotional distress. See Est. of Frey, 146 Hawai`i at 550, 463 P.3d at 1207.

402. For the same reason, the Court concludes that Plaintiffs have not shown by a preponderance of the evidence that B.B.J. will need future psychological or mental health care for emotional distress caused by the Fuel Release. The Court therefore declines to award special damages for future mental health treatment.

### 14. **B.J.J.**

403. B.J.J. testified that she worries about many issues:
her health and whether she will be able to have kids one day,
[B.J.J. Decl. at ¶ 27,] her skin and getting rashes from the
Fuel Release, getting cancer, being able to afford medical care
if someone in her family gets cancer, [id. at ¶¶ 28-29,] and her
brother B.B.J.'s tremor and the possible consequences of him
having a tremor, [id. at ¶ 23]. B.J.J. also stated that she
developed anxiety about using water and gets nervous when water
tastes "off." [Id. at ¶ 25.]

404. B.J.J. described the difficulty leaving Hawai`i and
her good friends there and starting at a new school in Arizona.
[Id. at ¶¶ 18, 26.] B.J.J. testified it was particularly
difficult because she lived in Hawai`i the longest out of
anywhere she has lived because her father is in the military.
[May 2 Trial Transcript at 33.]

405. B.J.J. testified she now struggles with depression.
[B.J.J. Decl. at ¶ 26.]

406. B.J.J. testified that she missed her father during the
months they were separated, and she worried about his safety
staying in Hawai`i around contaminated water. See May 2 Trial
Transcript at 33-34.

407. Dr. Clark opined that B.J.J. suffers from Major
Depressive Order and "is experiencing a great deal of

irritability as a result" and has had uncharacteristic "heated conflict" with her mother in the several months prior to Dr. Clark's testimony. [Clark Decl. at ¶ 77.] Dr. Clark opined that B.J.J. meets the diagnostic criteria for Other Specific Trauma and Stressor Related Disorder under the DSM-V. [Id. at ¶ 80.] Dr. Clark opined that B.J.J.'s current episode of depression warranted intervention. [Id. at ¶ 79.]

408. Dr. Smith opined that the Fuel Release did not cause or worsen any of B.J.J.'s psychological injuries, [Smith Decl. at ¶ 371,] and that "[t]here is no evidence to support, to a reasonable degree of psychological probability, that B.J.J. will experience long-term psychological injuries or need future mental health therapies" stemming from the Fuel Release, [id. at ¶ 373].

409. The Court finds that legal causes of B.J.J.'s emotional distress are from serious medical conditions from unknown causes; traumatic emotional events surrounding family; being separated from her father; moving from a familiar and treasured school to another; and being separated from peers, and that the Fuel Release was not a legal cause of her emotional distress. Based on Dr. Smith's testimony, the Court finds that the Fuel Release was not a substantial factor in B.J.J.'s emotional distress. See Est. of Frey, 146 Hawai`i at 550, 463 P.3d at 1207.

410. For the same reason, the Court concludes that
Plaintiffs have not shown by a preponderance of the evidence
that B.J.J. will need future psychological or mental health care
for emotional distress caused by the Fuel Release. The Court
therefore declines to award special damages for future mental
health treatment.

### 15. D.J.

411. D.J. was ten months old at the time of exposure and at
the time of testimony did not need mental health services.
[Clark Decl. at ¶¶ 87, 89.]

412. The Court finds that Plaintiffs have not proven by a
preponderance of the evidence that the Fuel Release was a legal
cause of emotional distress to D.J. Therefore, the Court
declines to award special damages for future mental health
treatment to D.J.

### 16. N.J.

413. Jessup opined that her son, N.J., who is on the autism
spectrum and has a mast cell disease, was the "most affected" of
her family by the Fuel Release. [Jessup Decl. at ¶ 19.] Jessup
explained that "what may seem like small disturbances to routine
affect him deeply." [Id. at ¶ 20.] Jessup testified the
disturbances to his routine following the Fuel Release were
"drastic," and N.J. "couldn't cope with all the changes." [Id.

at ¶ 21.] N.J.'s therapy routine was disrupted, and he
eventually refused to cooperate entirely. [Id.]

414. Jessup testified that N.J. is particular about how he
drinks water, including the cup and temperature of the water.
[Id. at ¶ 20.] Jessup also described an "extreme autistic
meltdown" that N.J. suffered on the flight from Hawai`i to
Arizona, during which he screamed, kicked, and chewed Jessup's
nails. [Id. at ¶ 65.]

415. Dr. Clark opined that N.J.'s reported regression
around the time of the Fuel Release and his missed opportunities
for effective therapy has likely resulted in his failing to
achieve developmental gains. [Clark Decl. at ¶ 84.] Dr. Clark
opined that the Fuel Release substantially contributed to N.J.'s
regression since. [Id. at ¶ 85.]

416. Dr. Smith opined that the Fuel Release did not cause
or worsen any psychological injury N.J. has experienced, [Smith
Decl. at ¶ 380,] and that "[t]here is no evidence to support, to
a reasonable degree of psychological probability, that N.J. will
experience long-term psychological injuries or need mental
health therapies" stemming from the Fuel Release, [id. at
¶ 382].

417. There is no credible medical evidence that the Fuel
Release was a legal cause of N.J.'s autism or that N.J.'s autism
was exacerbated by the Fuel Release. The Court cannot conclude

132

that Plaintiffs have proven by a preponderance of the evidence
that the Fuel Release was a legal cause of emotional distress to
N.J. The credible evidence supports a conclusion that the
decision to move from Hawai`i was disruptive to and upsetting
for N.J. and resulted in his regression and missed opportunities
for therapy. Plaintiffs have not proven by a preponderance of
the evidence that the Fuel Release was a legal cause for the
family's choice to move out of state.

418. The Court finds that Plaintiffs have not proven by a
preponderance of the evidence that the Fuel Release was a legal
cause of emotional distress to N.J. The Court therefore declines
to award special damages to N.J. for future mental health
treatment.

### 17. **Witt**

419. Witt testified that she worried about her future
health, including cancer. [Witt Decl. at ¶¶ 51-52.] Witt also
testified about her concern for the health of her son, N.W., and
the health of her unborn child. [Id. at ¶ 53; April 30 Trial
Transcript at 198-99.] Witt worried about passing on toxins to
N.W. because she showered in contaminated water while pregnant
with him, particularly because N.W. spent an extra day in the
hospital when he was born. [Witt Decl. at ¶¶ 53-54; April 30
Trial Transcript at 195 (Witt testifying).] Witt had
complications with N.W.'s birth, which she worried were due to

her exposure to contaminated water. [April 30 Trial Transcript at 195 (Witt testifying).]

420. Witt also worried about exposing N.W. to contaminated water at the early stages of his life, which she described as "extremely nerve-wracking." [Id. at 195.] Witt was nervous about using a pump to breastfeed and washing the pump in water. [Id. at 196.]

421. Witt testified she cried when making difficult decisions about how to keep N.W. safe, such as moving away from her husband during N.W.'s early years. [Id. at 197.]

422. Witt testified that she and her husband decided that her husband would leave the military, which meant sacrificing N.W.'s opportunity to receive the GI Bill and she and her husband losing health insurance. Witt described her frustration and anger over these financial sacrifices. [Id. at 197-98.]

423. Witt also stated that the stress of the water contamination negatively impacted her marriage and her physical intimacy with her husband. [Witt Decl. at ¶ 40.]

424. Dr. Vargo opined that Witt suffers from adjustment disorder with anxiety and depression. [Vargo Decl. at ¶¶ 55.f, 56.f.] Dr. Vargo opined Witt experienced distress "out of proportion" to the severity of the stressor. [Id. at ¶ 55.f.] Witt reported there was "nowhere that [she] felt safe," and that

134

she tried to leave Oʻahu once a month, which only made her feel more disconnected. [Id.]

425. Dr. Smith noted that Witt has a long history of being treated for anxiety, was prescribed medication to treat her anxiety symptoms, and continued to take the medication at the same dose during the period of water contamination. [Smith Decl. at ¶¶ 390-92, 401.] Dr. Smith noted that though Witt "had some mild adjustment issues with anxiety during the Red Hill incident, she did not need to increase her medication, [or] take additional medication[.]" [Id. at ¶ 402.] Dr. Smith opined that the Fuel Release did not cause or worsen any psychological injury Witt has experienced, [id. at ¶ 409,] and that "[t]here is no evidence to support, to a reasonable degree of psychological probability, that [Witt] will experience long-term psychological injuries or need future mental health therapies" stemming from the Fuel Release, [id. at ¶ 411]. The Court finds that Witt's medication and treatment for her anxiety disorder continued unchanged after the Fuel Release.

426. The Court finds that a legal cause of Witt's emotional distress is her preexisting anxiety disorder for which she was receiving medical treatment and medication prior to the Fuel Release. Credible evidence supports that the Fuel Release did not worsen Witt's psychological condition. See Smith Decl. at ¶¶ 390-92, 401.

427. The Court therefore finds that the Fuel Release was not a substantial factor in causing Witt's emotional distress. See Est. of Frey, 146 Hawai`i at 550, 463 P.3d at 1207.

428. For the same reason, the Court concludes that Plaintiffs have not shown by a preponderance of the evidence that Witt will need future psychological or mental health care for emotional distress caused by the Fuel Release. The Court therefore declines to award damages for emotional distress and for special damages for future mental health treatment.

**E. Loss of Enjoyment**

429. Plaintiffs also seek hedonic damages, or damages for loss of enjoyment of life. See Plfs.' Closing Argument Brief, filed 6/4/24 (dkt. no. 595) at 8; Fifth Amended Complaint, filed 12/01/23 (dkt. no. 210), at ¶ 576.f. The Court finds Plaintiffs have shown by a preponderance of the evidence that the Fuel Release was a legal cause of loss of enjoyment of life and awards $1,000 to each Plaintiff as hedonic damages.

**1. Aubart**

430. Aubart stopped using household water for drinking on November 28, 2021, and beginning on November 30, 2021 he only took short showers and began to use bottled water to brush his teeth. Aubart Decl. at ¶ 27; see also May 3 Trial Transcript at 106-07 (Aubart testifying). He continued to use his dishwasher, but would rinse dishes off with bottled water when bottled water

was available. [Aubart Decl. at ¶ 27.] Aubart stayed at a hotel
for one day, at which point he moved back into his home, but
would commute to the hotel for showers three or four times a
week from December 2021 through mid-February 2022. [Id. at ¶ 28;
May 3 Trial Transcript at 87-88 (Aubart testifying).] He would
shower either at a hotel or in his home. [May 3 Trial Transcript
at 106-07 (Aubart testifying).]

431. Driving to procure bottled water and to shower at the
hotel was inconvenient. [Aubart Decl. at ¶ 29.] Not being able
to use his household tap water disrupted his routine, and made
him "completely change [his] habits[.]" [May 3 Trial Transcript
at 106 (Aubart testifying).]

432. Aubart also had to cancel holiday plans with his
daughter who he rarely sees, because she could not stay with
them due to the contaminated water. [Id. at 108 (Aubart
testifying).]

433. Aubart testified that prior to the Fuel Release, he
used to relax by playing guitar, but he no longer would after
the Fuel Release due to fatigue, muscle pain, and loss of
motivation. [Aubart Decl. at ¶ 46; May 3 Trial Transcript at 97
(Aubart testifying he played guitar more after April or May
2023).]

434. As stated above, Aubart and his wife had disagreements
about the water contamination, which caused Aubart stress and

137

guilt. [Aubart Decl. at ¶ 47; May 3 Trial Transcript at 107-08
(Aubart testifying).] These issues affected their closeness and
diminished their sexual intimacy. [Aubart Decl. at ¶ 47.]

435. Aubart testified that his quality of life did not
improve until he moved to a new home around May 2023. [May 3
Trial Transcript at 97 & 110 (Aubart testifying).]

### 2.  **Dietz**

436. Dietz stopped using the tap water in her home for
drinking, cooking, and showering on November 29, 2021. [May 1
Trial Transcript at 29, 44 (Dietz testifying).] Dietz's efforts
to avoid drinking, cooking, rinsing fruits or vegetables, and
showering with the tap water in her home "required an incredible
amount of work." Dietz Decl. at ¶ 31; see id. at ¶¶ 30-32. The
family used a camp shower, which they initially heated with
water in a tea kettle, before upgrading to an electric camp
shower. [Id. at ¶¶ 32, 34.] Showering with the camp shower was
"cold, stressful, and uncomfortable." [Id. at ¶ 32.] The Navy
did not provide sufficient non-potable water, and the water they
did provide was later recalled due to bacteria contamination.
[Id. at ¶ 34.] It was also difficult to acquire water because
large water jugs were sold out. [Id.]

437. Instead of cooking at home as was typical, the Dietz
family went to restaurants to eat, and sought out restaurants
further away from their house because they did not know the

138

extent of the water contamination. [Id. at ¶ 33.] Eating at restaurants was also difficult due to V.D.'s many food allergies. [Id.]

### 3.   B.D.

438. The Dietz family's switch to a camp shower was difficult for B.D. because he associated hot showers with relief from his headaches, and the family was not able to allow him to have hot showers as frequently due to not having enough non-contaminated water. [May 1 Trial Transcript at 39-40 (Dietz testifying).]

439. B.D.'s father testified that after the Fuel Release, B.D. "became so afraid of triggering a headache, he stopped going outside and doing the things he loved." [B. Dietz Decl. at ¶ 30.] Dietz testified that B.D. "stopped wanting to go out and be a kid at all. He would just stay inside because he was afraid that he would, you know, trigger another headache." [May 1 Trial Transcript at 39 (Dietz testifying).]

### 4.   V.D.

440. V.D. hated the family's switch to using the camp shower, and would cry when showering. [Dietz Decl. at ¶ 32.] V.D. used to love baths, but now fights to get into showers and baths. [Id. at ¶ 66.]

5.    **Feindt**

441. The Feindt household stopped using the household water
for drinking, washing clothes, and showering on December 9,
2021. [Feindt Decl. at ¶ 21; April 29 Trial Transcript at 212
(Feindt testifying).] Feindt moved into a hotel December 14,
2021. [Feindt Decl. at ¶¶ 30-32.] He and his family stayed in
hotels in Waikiki for eighty-four days. [Id. at ¶ 39.] Due to
hotel availability, they had to move hotels multiple times.
[Feindt Decl. at ¶ 40.] The family stayed at seven different
hotels before moving off the island. [April 29 Trial Transcript
at 193 (A. Feindt testifying).]

442. Sometimes the hotel elevators were not working, thus
requiring Feindt to go up the hotel stairs with his two young
children. [Feindt Decl. at ¶ 40.] While living in hotels, Feindt
could not do many of his hobbies, such as playing instruments or
singing. [Id. at ¶ 45.] Celebrating Christmas was also different
for the family. [A. Feindt Decl. at ¶ 53, Feindt Decl. at ¶ 46.]

443. Feindt also testified he no longer wants to play golf,
a sport he has loved for the last thirty years of his life.
Feindt Decl. at ¶ 84; see also April 29 Trial Transcript at 196
(A. Feindt testifying).

444. Feindt's life was also disrupted by his move to
Virginia in May 2023. See Feindt Decl. at ¶¶ 57-59. The family
decided to leave the island due to the water contamination and

140

their health issues. [April 29 Trial Transcript at 196-97 (A.
Feindt testifying).] Feindt moved with his son T.F., and apart
from his wife and daughter, P.G.F. The family was separated for
six months. See Feindt Decl. at ¶¶ 57-59.

### 6.    P.G.F.

445. P.G.F. experienced many of the same disruptions as her
father: moving to different hotels and ultimately moving off-
island due to the water contamination. See April 29 Trial
Transcript at 192-93 (A. Feindt testifying); Feindt Decl. at
¶¶ 32, 39-41. While living in hotels, P.G.F. could no longer
play with neighborhood friends, lost the routine of daycare, and
had issues sleeping. [A. Feindt. Decl. at ¶¶ 56-57.]

446. P.G.F.'s behavior dramatically changed, and she would
run away, and act recklessly and aggressively. [Feindt Decl. at
¶¶ 41, 44.] P.G.F. missed the time before the Fuel Release that
she spent with her happy and healthy parents. [Id. at ¶ 43.]

447. When the family moved off-island, P.G.F. lived with
her mother in Colorado for six months and was separated from her
father and brother. During this time P.G.F. missed her father.
[Id. at ¶¶ 58-59.]

### 7.    T.F.

448. T.F. experienced the same disruptions as the rest of
his family: moving to different hotels and ultimately moving
off-island due to the water contamination. See April 29 Trial

141

Transcript at 192-93 (A. Feindt testifying); Feindt Decl. at
¶¶ 32, 39-40, 42. While living in hotels, T.F. could no longer
play with neighborhood friends, lost the routine of daycare, and
had issues sleeping. [A. Feindt. Decl. at ¶¶ 56-57.] As a
toddler, he did not have space in the hotels to play on the
floor, and he did not have his crib and lost the ability to
sleep on his own. [Feindt Decl. at ¶ 42.]

449. T.F. missed the time before the Fuel Release that he
spent with his happy and healthy parents. [Id. at ¶ 43.]

450. When the family moved off-island, T.F. lived with his
father in Virginia for six months and was separated from his
mother and sister. During this time T.F. missed his mother. [Id.
at ¶¶ 57-59.]

### 8.   Freeman

451. The Freeman household stopped drinking the household
water on November 29, 2021, and had stopped using the household
water for any other purpose by December 3, 2021. [Freeman Decl.
at ¶ 10; K. Freeman Decl. at ¶ 9; April 29 Trial Transcript at
115-16 (Freeman testifying).]

452. Freeman and her family resided in a hotel beginning
December 3, 2021. [Freeman Decl. at ¶ 25; Kosnett Decl. at
¶ 162; April 29 Trial Transcript at 116-17 (Freeman
testifying).] Due to the Navy's contract, the family had to
check out of the hotel on December 15 and stay at their home

142

until they could check into a different hotel in the afternoon on December 16, 2021. [Freeman Decl. at ¶ 25.]

453. Between December 3 and 15, 2021, Freeman had to commute back to her home to conduct her therapy appointments from her home office so her children would not to be in the same room, in order to comply with legal requirements. [Id. at ¶ 26.] She could not drive at this time due to her seizures, so her husband drove her several times a week. [Id. at ¶ 27.] The commute was over an hour each way, and was exhausting. [Id. at ¶ 28.] They would often leave the hotel in Waikiki, drive to school, drive back to Waikiki, hear their kids were sick, and drive back to school. [Id.]

454. Following the Fuel Release, her husband described Freeman's difficulty engaging in everyday life: she had a hard time walking around, and felt foggy. [April 29 Trial Transcript at 159-60 (K. Freeman testifying).]

455. Freeman and her family ultimately moved to California in February 2022 due to her and her family's illness. [Freeman Decl. at ¶¶ 43-44, 49, 53.] The Freeman family lived in one room in Freeman's mother's house in California for approximately three months before the family bought a house in April. [Id. at ¶ 54, April 29 Trial Transcript at 141-43 (Freeman testifying).]

### 9.  D.F.

456. D.F. experienced many of the same disruptions that his mother did: living in different hotels and ultimately moving off-island and staying in one room with the rest of his family for three months. [Freeman Decl. at ¶¶ 25, 53-54; April 29 Trial Transcript at 141-43 (Freeman testifying).] D.F. commuted between the hotel and the house when Freeman conducted her work appointments at the house. [Freeman Decl. at ¶¶ 26-28.]

457. D.F. has missed a significant portion of school, and his social development and academics have suffered. [Id. at ¶ 88.]

### 10.  K.F.

458. K.F. experienced many of the same disruptions as the rest of his family: living in different hotels and ultimately moving off-island and staying in one room with the rest of his family for three months. [Freeman Decl. at ¶¶ 25, 53-54; April 29 Trial Transcript at 141-43 (Freeman testifying).]

### 11.  N.F.

459. N.F. experienced many of the same disruptions as the rest of his family: living in different hotels and ultimately moving off-island and staying in one room with the rest of his family for three months. [Freeman Decl. at ¶¶ 25, 53-54; April 29 Trial Transcript at 141-43 (Freeman testifying).]

### 12.  **Jessup**

460. The Jessup family stopped using the household water
for drinking on November 29, 2021. [Jessup Decl. at ¶¶ 14, 18;
April 30 Trial Transcript at 128-29 (Jessup testifying).] The
family lived at home without household water for six months. [B.
Jessup Decl. at ¶ 23; Jessup Decl. at ¶¶ 41-43 (describing
washing clothes and bathing without household water).][40]

461. On December 6, 2021, the Jessup family tried to move
into a hotel, but the arrangement did not work. [B. Jessup Decl.
at ¶ 22; Jessup Decl. at ¶¶ 34-38.] Jessup testified that the
day she took her children to the hotel was an "utter nightmare."
[April 30 Trial Transcript at 140.]

462. Jessup's efforts to acquire safe water were
disruptive: sometimes her family went to the water distribution
center twice a day to get sufficient water. [Jessup Decl. at
¶ 40.]

463. Jessup took particular care to not allow the
contaminated water to touch her son N.F.'s skin, because he has
a mast cell disease. [April 30 Trial Transcript at 138-39
(Jessup testifying).]

464. Doing the laundry in a large tub with boiled water for
the family of six was "excruciating." [Jessup Decl. at ¶ 41.]

---

[40] The Jessup family returned to washing clothes in their
washing machine in March 2022. [Jessup Decl. at ¶ 55.]

465. Bathing was also more difficult, as each family member
would use two pots of boiled water – one with soap and one
without. [Id. at ¶¶ 42-43.] Because Jessup and her husband would
bathe after all the children, it often was late at night, so she
would shower in the contaminated water. [Id. at ¶¶ 43-44.]
Jessup and her husband often argued about this, but she
testified that she was "so tired that [she] didn't know what
else to do." [Id. at ¶ 45.]

466. Jessup was exhausted and stressed during this time.
[Id. at ¶ 42.]

467. Jessup and her children moved out of their house and
away from Hawai`i on May 14, 2022 due to the water
contamination, despite originally intending to remain there
longer so her son could finish high school. [Id. at ¶¶ 62-63.]
Her husband remained in Honolulu, and they were separated until
October 2022. [Id. at ¶ 61; B. Jessup Decl. at ¶ 29.]

            13.  **B.B.J.**

468. B.B.J. experienced many of the same disruptions as his
mother during this time: he lived without using the household
tap water for months before moving off-island to Arizona in May
2022. See B. Jessup Decl. at ¶ 23; Jessup Decl. at ¶¶ 40-43, 61-
63.

469. B.B.J. testified that because he was the eldest
sibling, he took more responsibility for doing the water-related

chores, including boiling water, getting water, and filling his younger brother's bottles with bottled water. B.B.J. testified that his chores took significantly more time, and prevented him from hiking and going to the beach. [April 30 Trial Transcript at 162-63 (B.B.J. testifying).]

470. When his family moved, B.B.J. had to switch schools and leave behind friends. [April 30 Trial Transcript at 161-62 (B.B.J. testifying).]

### 14. **B.J.J.**

471. B.J.J. experienced many of the same disruptions that her family experienced during this time: she also lived without using the household tap water for months before moving off-island to Arizona in May 2022. See B. Jessup Decl. at ¶ 23; Jessup Decl. at ¶¶ 40-43, 61-63.

472. B.J.J. testified that she would collect water daily from a park where the military was handing out cases. Her family would boil this water to use for cooking and washing, and for washing her brother's bottles. [May 2 Trial Transcript at 28-30 (B.J.J. testifying).] B.J.J. also testified to the difficulty bathing with the boiled water during that time. [Id. at 30.]

473. B.J.J. stated that the lack of household tap water made it more difficult to do activities like going to the beach, because her family did not have enough water to wash off sand and saltwater. [Id. at 31.]

147

474. B.J.J. described the difficulty leaving Hawai`i and her friends and school there and starting at a new school in Arizona. [B.J.J. Decl. at ¶¶ 18-20.]

### 15.  <u>D.J.</u>

475. D.J. experienced many of the same disruptions that his family experienced during this time: he lived without using the household tap water for months before moving off-island to Arizona in May 2022. <u>See</u> B. Jessup Decl. at ¶ 23; Jessup Decl. at ¶¶ 40-43, 61-63.

### 16.  <u>N.J.</u>

476. N.J. experienced many of the same disruptions that his family experienced during this time: he lived without using the household tap water for months before moving off-island to Arizona in May 2022. <u>See</u> B. Jessup Decl. at ¶ 23; Jessup Decl. at ¶¶ 40-43, 61-63.

### 17.  <u>Witt</u>

477. On December 1, 2021, Witt stopped using the household water and began using bottled water for drinking, cooking, and brushing her teeth. [Witt Decl. at ¶ 12.] She took very short showers using the household water because it was too difficult to use bottled water to shower. [<u>Id.</u> at ¶ 26.] In January, Witt stopped using the dishwasher, and used potable water to wash dishes until March 2022. [<u>Id.</u> at ¶¶ 27-28.]

478. Witt described the difficulty getting potable water from the Navy's distribution sites: it was first come, first-served, so she had to get there early, and had to lug heavy jugs into her car and then into her home. [Id. at ¶ 25.]

479. Witt and her husband decided to leave the island due to the water contamination, and ended up moving multiple times. [April 30 Trial Transcript at 196-97, 199 (Witt testifying).]

## F. Economic Loss

### 1. Feindt

480. At the time of the Fuel Release, Feindt was employed as the Director of Fitting and Instruction at The Golf Sim from March 5, 2021 through April 2, 2022. [West Decl. at ¶ 39.]

481. Feindt claims he was to receive a $20,000 raise to a base annual salary of $85,000 at around March 2022. [Id. at ¶ 41.] No credible evidence was adduced by Plaintiffs supporting this claimed increase in compensation.

482. Feindt took a leave of absence between December 14, 2021 and January 10, 2022, which resulted in a calculated loss of $6,538 from lost wages and commission income, although he was paid $1,250 in sick leave compensation for the period ending December 19, 2021. [Id. at ¶ 46.]

483. Feindt was unemployed and collected unemployment benefits while living in Colorado from May 3, 2022 to May 17, 2023, but certified he was capable of working during this time

period, and had a contract to work at Peterson Space Force Base
but chose not to fulfill it. [Id. at ¶ 47.]

484. In May 2023, Feindt became the General Manager of The
Federal Club, a private golf club in Glen Allen, Virginia. [Id.
at ¶ 49.]

485. For the leave of absence between December 14, 2021 and
January 10, 2022 which resulted in a calculated loss of $6,538
from lost wages and commission income, the Court deducts $1,250
because Feindt was compensated in that amount as sick leave
compensation for the period ending December 19, 2021. The Court
finds a loss of $5,288, which must be apportioned equally among
Feindt's preexisting medical conditions of gastrointestinal
issues, and headaches, and the conditions caused by the Fuel
Release from December 14, 2021 to January 10, 2022. The Court
therefore awards the amount of **$2,644 in economic damages** to
Feindt.

486. Based on the evidence presented, the Court finds that
Plaintiffs have not shown by a preponderance of the evidence
based on credible evidence that a legal cause of Feindt's loss
of employment and employment opportunities after January 10,
2022 was the Fuel Release. See O'Grady, 140 Hawai`i at 44, 398
P.3d at 633. Therefore, Feindt's claim for economic loss after
January 10, 2022 cannot be granted.

2.  **Freeman**

487.  At the time of the Fuel Release, Freeman was operating a business from her home as a licensed Mental Health Counselor and had been providing counseling services remotely from her home in Hawai`i beginning in October 2021. [West Decl. at ¶ 77.] At that time, she was licensed to see clients residing in Florida. [Id.]

488.  She received payment for her services directly into her Navy Federal Credit Union business checking account. [Id. at ¶ 78.] Her checking account shows her account deposits beginning to decline in December 2021 and continuing until February 2022, which is when she relocated to Temecula, California. [Id. at ¶¶ 81-82.] In California she continued to see clients until October 2022, when she took a leave of absence. [Id.]

489.  Her deposits decreased dramatically from June 2022 through October 2022. [Id. at ¶ 78.] She rebranded her business in April 2023 and began seeing clients again, but the deposits for March 2022 through July 2023 are substantially lower than those deposits recorded for October 2021 and November 2021. [Id. at ¶¶ 78, 83.]

490.  After July 2023, Freeman obtained licensure in the states of California and Texas, thereby increasing her access to patients. [Id. at ¶ 88.]

491. Based on the evidence presented, the Court finds that
Plaintiffs have not shown by a preponderance of the evidence
based on credible evidence that a legal cause of Freeman's
decline in income was the Fuel Release. See O'Grady, 140 Hawai`i
at 44, 398 P.3d at 633. Therefore, Freeman's claim for economic
loss cannot be granted.

**E.    Tutoring Costs**

492. The Court finds that there is no credible evidence
supporting that the Fuel Release is a legal cause for N.F.'s or
K.F.'s inability to attend school with their peers. Accordingly,
the Court declines to award damages for K.F.'s and N.F.'s
tutoring costs.

**F.    Offsets**

493. The United States contends that it is entitled to
offsets for two categories of payments to Plaintiffs:
(1) payments it likely will make for the future treatment of the
Dietz, Feindt, and Jessup families, and (2) the free hotel
benefit and per diem Temporary Lodging Allowance ("TLA")
payments made to Plaintiffs. See Def.'s Closing Argument Brief,
filed 6/25/24 (dkt. no. 601) at 86-87. Because the Court has
awarded future mental health care costs to Dietz, P.G.F.,
Freeman, and Jessup, the argument is only applicable to the
future mental health costs awarded to Dietz, P.G.F. and Jessup.
The Court addresses each claimed offset category in turn.

152

### 1.  Offsets for Future Mental Health
### Care for Dietz, P.G.F. and Jessup

494. The Government argues Plaintiffs' damages award should be reduced or offset based on payments it is reasonably probable it will make to certain plaintiffs through TRICARE. [Def.'s Closing Argument Brief at 87-97.] TRICARE is a health care benefit program for United States service members. <u>See</u> Def.'s Declaration of Richard Ruck, filed 4/8/24 (dkt. no. 359) ("Ruck Decl.") at ¶¶ 6-7, 12.

495. The parties agree that the right to continued TRICARE coverage has vested for the Jessup family because Brian Jessup retired from the military in March 2023 after twenty years of service. <u>See</u> Def.'s Closing Argument Brief at 90, Plfs.' Rebuttal Brief at 75, B. Jessup Decl. at ¶ 1. However, the parties contest whether the continued right to TRICARE coverage has vested for P.G.F. and Dietz. <u>See</u> Def.'s Closing Argument Brief at 90, Plfs.' Rebuttal Brief at 75-76. As to P.G.F., the service member in her family Amanda Feindt had not retired at the time of trial, and the parties dispute whether her family would be able to avail themselves to TRICARE benefits upon her retirement. <u>See</u> Def.'s Closing Argument Brief at 90, Plfs.' Rebuttal Brief at 75-76, April 29 Trial Transcript at 176 (A. Feindt testifying she will reach 18 years of service one week after her trial testimony). Likewise, the service member in

Dietz's family, her husband Bryan Dietz, had not retired at the
time of trial, and the parties dispute whether Dietz will be
able to avail herself to TRICARE benefits upon his retirement.
See Def.'s Closing Argument Brief at 90, Plfs.' Rebuttal Brief
at 75-76, May 1 Trial Transcript at 66-67 (B. Dietz testifying
that he plans to retire from the military in 2027).

496. It is too speculative for this Court to apply TRICARE
offsets when the benefit has not vested. P.G.F. could not secure
the benefit of TRICARE coverage upon her mother's future
retirement from military service for a plethora of reasons. The
same is true for Dietz. However, even if the Court were to
assume arguendo that it is reasonably probable that P.G.F. and
Dietz would be entitled to TRICARE coverage upon the military
member's retirement, the Government fails to demonstrate that it
is reasonably probable that the cost of P.G.F.'s and Dietz's
future mental health therapy appointments would be paid by
TRICARE.

497. Reducing a damages award due to potential TRICARE
coverage of future mental health treatment is too speculative
because the TRICARE program may be subject to change in the
future. See Galbreath v. United States, Civil No. 20-00373 LEK-
KJM, 2022 WL 18717579, at *2 (D. Hawai`i Feb. 17, 2022)
("[N]either the parties nor the Court can say with any
reasonable certainty that the TRICARE program will continue for

the balance of [the plaintiffs' child's] life or that the
benefits will never change."); Brown v. United States, [CIVIL
ACTION NO. 3:17CV551TSL-RHW,] 2020 WL 6811121, at *11 (S.D.
Miss. May 13, 2020) ("future Tricare benefits are too
speculative to provide the basis for any reduction of or offset
against future medical expenses. . . . Indeed, there is no
guarantee that the program will continue to exist, or that it
will continue to exist in its current form, for the remainder of
[the plaintiff's] life expectancy"); Transcript of Proceedings:
Nonjury Trial Day 8, filed 5/14/24 (dkt. no. 584) ("May 9 Trial
Transcript") at 60-62 (Carmen DeLeon testifying that there have
been 125 changes to the TRICARE manual since its inception,
agreeing that the TRICARE website has a function to show
redlines or changes to TRICARE regulations, and agreeing that it
is possible covered services would change in the future); Ruck
Decl. at ¶ 8 ("Since its creation, TRICARE has not remained
static . . . Coverage plans have also been modified over the
years."). While it is true that here the future mental health
therapy could be conducted within a number of years rather than
for the entire duration of an individual plaintiff's lifetime,
the potential for coverage to change during even a limited time
period is still significant. See Burns Decl. at ¶¶ 147, 149,
440-41 (costing Jessup's and P.G.F.'s future recommended mental
health treatments to 2027); Vargo Decl. at ¶¶ 63, 66

(recommending, among other things, twenty-four therapy sessions in Dietz's and Jessup's lifetime).

498. Calculating the appropriate offset for TRICARE payments for Dietz, P.G.F., and Jessup is speculative for the additional reason that TRICARE is the second payer, meaning that if Dietz, P.G.F. or Jessup has other insurance besides TRICARE, a claim for treatment would be paid through the other, primary insurance before TRICARE. See May 9 Trial Transcript at 58-59 (DeLeon testifying); Ruck Decl. at ¶¶ 17, 20. Here, Jessup's husband retired from his military service and gained employment in another field. [B. Jessup Decl. at ¶¶ 1, 5.] Therefore, whether Jessup would use TRICARE for future mental health treatment payments is speculative, and the United States does not offer sufficient credible evidence to demonstrate that Jessup's future mental health therapy appointments would be paid for by TRICARE. Similarly, even assuming arguendo P.G.F. and Dietz are covered by TRICARE for the period that their mental health therapy appointments are projected to occur, they may have other insurance coverage that would cover these costs for some of the relevant time period.

499. Even if Dietz, P.G.F. and Jessup were able to use TRICARE for some portion of the time period that they are projected to attend mental health therapy, they may not be able to avail themselves to mental health care through TRICARE.

156

Testimony was provided that there are not currently enough
mental health providers available nationwide through TRICARE, so
even if Dietz, P.G.F. or Jessup were entitled to pay for a
portion of their mental health care treatment through TRICARE,
and got approved by TRICARE for such services, it is possible
these services would not be available. See May 9 Trial
Transcript at 54 (DeLeon testifying that there is a nationwide
shortage of mental health providers in the TRICARE system).

500. The Court shares the reluctance of other courts to not
require a plaintiff to seek health care from its tortfeasor. See
Warren v. United States, 669 F. Supp. 3d 987, 1029 (D. Hawai`i
2023) (citing Molzof v. United States, 6 F.3d 461, 468 (7th Cir.
1993)); see also 32 C.F.R. § 199.17(a)(6)(ii)(A) (noting that
TRICARE Prime "generally features use of military treatment
facilities and substantially reduced out-of-pocket costs for
care provided outside MTFs [military treatment facilities].
Beneficiaries generally agree to use military treatment
facilities and designated civilian provider networks and to
follow certain managed care rules and procedures.").

501. Finally, the Court finds persuasive the reasoning
stated by another district court in declining to apply offsets
to future TRICARE health benefits; that is, because TRICARE
operates akin to a private health insurer, rather than as a
double payment for a tort award. See Alexander v. United States,

CASE NO. 3:14-cv-01774-RJB, 2016 WL 1733521, at *2 (W.D. Wash. May 2, 2016); see also 32 C.F.R. § 199.17; Roemen v. United States, 4:19-CV-4006-LLP, 2023 WL 7386424, at *4 (D.S.D. Nov. 8, 2023) (likening TRICARE coverage to a private health insurance, and noting that in instances where a private insurer is a tortfeasor, a plaintiff is entitled to insurance benefits as well as the full damages award). At the time of trial, the Jessup family used TRICARE Prime, and the Dietz family used TRICARE Select. [Jessup Decl. at ¶ 84; B. Dietz Decl. at ¶ 41.] As of June 2023, P.G.F. also used TRICARE Prime. [Def.'s Exh. DX-3224 (P.G.F. medical records) at 158 (6/13/23 office visit note).] TRICARE Prime beneficiaries do not pay if the member is on active duty, but all other beneficiaries pay annual enrollment fees and copays. [Ruck Decl. at ¶ 18.] TRICARE Select beneficiaries also pay enrollment fee and copays. [Id. at ¶ 19.] For this reason, even if the Government had provided sufficient evidence of reasonably probable TRICARE offsets that were calculable to a reasonable certainty – which it did not – reducing an individual plaintiff's damages award based on a TRICARE offset is improper because plaintiffs are entitled to both the full damages award and the TRICARE benefit.

502. For the foregoing reasons, the Court concludes that Defendant has not met its burden of demonstrating that an offset for TRICARE benefits for future health treatment applies, and

the Court declines to reduce any of Plaintiffs' damages awards
on this basis.

## 2. <u>Offsets for Per Diem and Hotel Payments</u>

503. The United States contends that payments it made to
certain Plaintiffs or Plaintiffs' family members should offset
damages for inconvenience or annoyance. These payments included
per diem TLA payments and the provision of a free hotel room to
some of the Plaintiffs' families. [Def.'s Closing Argument Brief
at 97-99.] The Government proposes deducting the TLA payments
from the total damages award for each adult plaintiff. <u>See</u>
Def.'s Closing Argument Brief at 112; <u>id.</u>, Exh. B. (Damages
Chart) at 2, 7, 10, 16, 19, 20.

504. TLA payments are "intended to partially pay a Service
member for higher than normal expenses" incurred while occupying
temporary lodgings, presumably to be used for meals and
incidental expenses. Temporary Lodging Allowance, U.S. Dept. of
Defense, Defense Travel Management Office,
https://www.travel.dod.mil/Allowances/Temporary-Lodging-
Allowance/ (last visited 8/7/25). TLA payments are available to
service members "when it is necessary for a Service member or
dependent to occupy temporary lodging . . . Personal
inconvenience to a Service member or dependent is never a
determining factor for the authorization of TLA." [<u>Id.</u>]

159

505. The Government does not cite any legal authority in which a court has reduced a damages award due to TLA payments. It is unclear what category of damages the Government intends this offset to apply to. Plaintiffs did not seek damages for housing or associated expenses from having to leave their homes due to the water contamination. The Court has only awarded damages for emotional distress, physical pain and suffering, and loss of enjoyment of life. Neither the TLA payments nor the hotel benefit compensated Plaintiffs for these losses, such that Plaintiffs would doubly recover by receiving both the damages award and these benefits. See Pike v. United States, 652 F.2d 31, 34-35 (9th Cir. 1981) (concluding that none of the damages the district court awarded pursuant to the FTCA compensated for what the veteran's benefits compensate for, and determining no set-off for the veteran's benefits received was warranted). Accordingly, the Court declines to apply an offset for the Government's TLA payments or provision of hotel rooms.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Applicable Law

1. The FTCA "allows a plaintiff to bring certain state law tort suits against the Federal Government." Brownback v. King, 592 U.S. 209, 210-11 (2021) (citing 28 U.S.C. § 2674; § 1346(b)). Because Plaintiffs bring this action pursuant to the FTCA, [Fifth Amended Complaint at ¶ 1,] the Court has

160

jurisdiction over the instant action pursuant to Title 28 United States Code Section 1346(b)(1). Venue is proper pursuant to Title 28 United States Code Section 1402.

2.    In actions brought under the FTCA, the United States is liable where a private person would be liable for the same act or omission under the laws of the state within which the act or omission occurred. See 28 U.S.C. § 1346(b)(1) (directing that liability is determined "in accordance with the law of the place where the act or omission occurred."); 28 U.S.C. § 2674. The alleged acts and omissions that form the basis of Plaintiffs' claims occurred in Hawai`i. Thus, the Court applies Hawai`i state substantive law and federal procedural law to evaluate Plaintiffs' claims against the United States. See Taylor v. United States, 821 F.2d 1428, 1430, 1432 (9th Cir. 1987); see also 28 U.S.C. §§ 1346, 2674.

**B.    Burden of Proof**

3.    As to each of their claims, Plaintiffs have the burden to prove the claim and the amount of damages. See Tourgeman v. Nelson & Kennard, 900 F.3d 1105, 1109 (9th Cir. 2018) ("It is one of the most basic propositions of law that the plaintiff bears the burden of proving his case, including the amount of damages.'" (ellipsis, citations, and internal quotation marks omitted)).

4.    "A party proves something under the preponderance of evidence standard when the existence of the contested fact is more probable than its nonexistence." Borrson v. Weeks, 155 Hawai`i 490, 496, 567 P.3d 195, 201 (2025) (quotation omitted).

**C.    <u>Liability</u>**

5.    The United States admits that it breached its duty to Plaintiffs "to exercise ordinary care in the operation of Red Hill, resulting in the May 6, 2021 and November 20, 2021 spills." [Second Joint Stipulation as to Plaintiffs' Nuisance and Negligence Claims; Order, filed 11/27/23 ("Second Joint Stipulation") (dkt. no. 200) at ¶ 2.] The United States also "admits that the November 20, 2021 spill . . . caused a nuisance for" Plaintiffs that "lasted for as long as [HDOH's November 29, 2021] advisory was in effect for each [of their] residence[s.]" Id. at ¶ 1; see also Stipulated Facts Regarding the Water System, filed 5/7/24 (dkt. no. 548), at ¶¶ 1-7, and Exhs. A & B (indicating that each Plaintiff resided on a portion of the JBPHH water system); Joint Exh. JX-5 (11/29/21 HDOH public health advisory). The United States admits that the breach caused "Plaintiffs [to suffer] injuries compensable under the [FTCA]." [Second Joint Stipulation at ¶ 3.]

6.    Because of these admissions, the issues before the Court are whether the breach was a legal cause of harm to Plaintiffs and, if so, the measure of damages to be awarded to

Plaintiffs. See O'Grady, 140 Hawai`i at 43, 398 P.3d at 632. By
a preponderance of the evidence, the Court finds and concludes
that Defendant is liable under the FTCA and with the application
of Hawai`i law.

**D.    Causation**

7.    A plaintiff is required to prove that the defendant's
conduct was the legal cause of injuries as an element of a
negligence action. O'Grady, 140 Hawai`i at 43, 398 P.3d at 632
(citing Mitchell v. Branch, 45 Hawai`i 128, 132, 363 P.2d 969,
973 (1961) (adopting the Restatement (First) Of Torts § 431 (Am.
Law Inst. 1934) definition of legal cause)). This is a two-step
analysis involving a factual determination of whether a
defendant's conduct was "a substantial factor in bringing about
the harm," and whether "there is any rule of law relieving the
actor from liability . . . ." O'Grady, 140 Hawai`i at 44, 398
P.3d at 633 (citations omitted). Under the substantial factor
prong, a "defendant's conduct need not have been the whole cause
or the only factor in bringing about the plaintiff's injuries"
but must have been more than "a negligible or trivial[] factor
in causing the harm." Est. of Frey, 146 Hawai`i at 550, 463 P.3d
at 1207 (describing the first step of the two-step analysis in
determining legal cause) (quotation omitted).

8.    This test "extends to negligence claims against
medical professionals." Id. In medical negligence cases, expert

163

medical testimony is required to determine "'whether there is a causal relationship between the violation of a duty and an injury to the patient.'" Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co., 116 Hawai`i 277, 300, 172 P.3d 1021, 1044 (2007) (quoting Bernard v. Char, 79 Hawai`i 371, 377, 903 P.2d 676, 682 (App. 1995)); see also id. ("Clearly, a jury of lay persons generally lacks the knowledge to determine the factual issues of medical causation[.]").

9.    There is no controlling Hawai`i law specifically addressing the test for legal causation in toxic tort cases. The Court must therefore predict how the Hawai`i Supreme Court will decide the issue. See Judd v. Weinstein, 967 F.3d 952, 955–56 (9th Cir. 2020). The Court predicts that the Hawai`i Supreme Court would hold that the same test applied in medical negligence cases would extend to toxic tort actions. Namely, that expert testimony is required to determine causation.

10.    In toxic tort cases,

> [c]ausation . . . is typically discussed in terms of generic and specific causation. See e.g., Raynor v. Merrell Pharms., Inc., 104 F.3d 1371, 1376 (D.C. Cir. 1997). General, or "generic" causation has been defined by courts to mean whether the substance at issue had the capacity to cause the harm alleged, while "individual causation" refers to whether a particular individual suffers from a particular ailment as a result of exposure to a substance. See Bonner v. ISP Technologies, Inc., 259 F.3d 924, 928 (8th Cir.2001); Sterling [v. Velsicol Chem. Corp.], 855 F.2d [1188,] at 1200 [(6th.

164

Cir. 1988)] (explaining the difference between
generic and individual causation); In re "Agent
Orange" [Product Liab. Litig. MDL No.381], 818
F.2d [145] at 165 [(2d. Cir. 1987)] ("[t]he
relevant question . . . is not whether Agent
Orange has the capacity to cause harm, the
generic causation issue, but whether it did cause
harm and to whom. That determination is highly
individualistic, and depends upon the
characteristics of individual plaintiffs (e.g.
state of health, lifestyle) and the nature of
their exposure to Agent Orange"); Jones v.
Allercare, Inc., 203 F.R.D. 290, 301 (N.D. Ohio
2001) ("relevant question in this case will not
be whether the products have the capacity to
cause harm, but whether the products caused harm
and to whom. Thus, the real causation issue in
this case is individual, not general, in
nature"). See also Hilao v. Estate of Marcos, 103
F.3d 767, 788 (9th Cir. 1996) (Rymer, J.
dissenting in part and concurring in part)
(contrasting "generic causation — that the
defendant was responsible for a tort which had
the capacity to cause the harm alleged — with
individual proximate cause and individual
damage").

! 
In re Hanford Nuclear Rsrv. Litig., 292 F.3d at 1133.

11.  While causation and correlation can exist

simultaneously, correlation is insufficient to carry a

plaintiff's burden for the causation element of a negligence

claim, where a court finds a lack of credible evidence

establishing a causal relationship between exposure to toxins

and occurrence of disease. See Cho v. State, 115 Hawai`i 373,

393-94, 168 P.3d 17, 37-38 (2007).

12.  The Court finds that Plaintiffs fail to prove by a

preponderance of the evidence that there is specific causation

for the Fuel Release to have been a legal cause of heavy or irregular menstrual bleeding; [Kosnett Decl. at ¶ 192 ("Exposure to JP-5 or similar hydrocarbon mixtures is not a recognized risk factor for causing or exacerbating heavy menstrual bleeding[.]");] autism; cancer; suppressed immune system; meningitis; hernias; arthritis; brain fog; migraines; bloody noses or tremors.

### E.   <u>Damages</u>

13.   "It is well-settled that all tort claims require that damages be proven with reasonable certainty." <u>Exotics</u>, 116 Hawai`i at 292, 172 P.3d at 1036 (citation omitted).

14.   "A personal injury plaintiff is generally entitled to recover damages for all the natural and proximate consequences of the defendant's wrongful act or omission." <u>Dunbar v. Thompson</u>, 79 Hawai`i 306, 315, 901 P.2d 1285, 1294 (App. 1995) (citation omitted). There are two categories of recoverable damages: general damages and special damages. <u>Id.</u>

> *General damages* "encompass all the damages which naturally and necessarily result from a legal wrong done. Such damages follow by implication of law upon proof of a wrong," <u>Ellis v. Crockett</u>, 51 Haw. 45, 50, 451 P.2d 814, <u>819</u> (1969) (citation omitted), and include such items as physical or mental pain and suffering, inconvenience, and loss of enjoyment which cannot be measured definitively in monetary terms. 22 Am.Jur.2d <u>Damages</u> § 41 at 65 (1988). *Special damages* are the "natural but not the necessary result of an alleged wrong and . . . depend on the circumstances peculiar to the infliction of

166

> each particular injury." <u>Ellis</u>, 51 Haw. at 50,
> 451 P.2d at 819 (citations omitted). Special
> damages are often considered to be synonymous
> with pecuniary loss and include such items as
> medical and hospital expenses, loss of earnings,
> and diminished capacity to work. 22 Am.Jur.2d
> <u>Damages</u> § 41 at 65.

<u>Id.</u> (italics in original).

15. Under Hawai`i law, the issue of whether a plaintiff
has sustained emotional distress is within the discretion of the
trier of fact and medical testimony is not a prerequisite for
recovery for emotional distress. <u>Campbell v. Animal Quarantine
Station</u>, 63 Haw. 557, 564, 632 P.2d 1066, 1070-71 (1981).

16. Hedonic damages – a species of general damages – are
recoverable under Hawai`i law, <u>Montalvo</u>, 77 Hawai`i at 301, 884
P.2d at 364, and compensate plaintiffs for the loss of life's
pleasures, including enjoying family, games, hobbies, and the
like, <u>see</u> <u>Castro v. Melchor</u>, 142 Hawai`i 1, 11, 414 P.3d 53, 63
(2018) (quoting 2 Stuart M. Speiser et al., <u>The American Law of
Torts</u> § 8:20 (2014)).

17. The factfinder must determine the appropriate amount of
damages that will compensate plaintiffs for pain and suffering,
and in doing so "may consider the nature and extent of the
injuries, the suffering occasioned by the injuries, and the
duration and the pain. The [factfinder] may consider the age,
health, habits, and condition of the injured party before his
injury as compared with his condition as a result of the

injury." Lauer v. Young Men's Christian Ass'n of Honolulu, 57
Haw. 390, 399-400 557 P.2d 1334, 1340 (1976).

### 1. Apportionment

18.  If a plaintiff's preexisting condition was not fully
resolved or not dormant at the time of an accident, then the
factfinder must apportion between the preexisting condition and
the injuries caused by the accident. Montalvo, 77 Hawai`i at
300, 884 P.2d at 363. If the factfinder is unable to apportion,
then damages must be distributed equally among the accidents.
Id., 77 Hawai`i at 299-300, 884 P.2d at 362-63 (adopting the
dissent in Matsumoto v. Kaku, 52 Haw. 629, 484 P.2d 147 (1971)).

19.  On the other hand, if the factfinder determines that a
plaintiff had fully recovered from preexisting injuries and then
suffered injuries from an accident, there is no apportionment.
Id., 77 Hawai`i at 300, 884 P.2d at 363.

20.  Where, however, a plaintiff suffers injuries from
another source after an accident caused by a defendant and these
injuries were not caused by this defendant, then the factfinder
must apportion between these causes and, if the factfinder is
unable to apportion, then damages must be distributed equally.
Id., 77 Hawai`i at 299-300, 884 P.2d at 362-63.

### 2. Economic Loss

21.  Special damages "include such items as . . . loss of
earnings . . . ." Lima v. Deutsche Bank Nat'l Tr. Co., 149

Hawai`i 457, 466, 494 P.3d 1190, 1199 (2021) (quoting <u>Bynum v. Magno</u>, 106 Hawai`i 81, 85-86, 101 P.3d 1149, 1153-54 (2004)).

22.  "While expert testimony is helpful to establish lost wages, it is not required." <u>S&G Labs Hawaii, LLC v. Graves</u>, 712 F. Supp. 3d 1364, 1372 (D. Hawai`i 2024).

### 3.  <u>Offsets</u>

23.  Defendant has the burden of proving its entitlement to an offset from economic damages. <u>See</u> <u>Warren</u>, 669 F. Supp. 3d at 1027 (citing <u>Siverson v. United States</u>, 710 F.2d 557, 560 (9th Cir. 1983); <u>Brown v. United States</u>, 2020 WL 6811121, at *11 (S.D. Miss. May 13, 2020)).

24.  Another court in this district has explained:

> Like most jurisdictions, Hawaii law follows the collateral source rule, which "in general, provides that benefits or payments received on behalf of a plaintiff, from an independent source, will not diminish recovery from the wrongdoer." <u>Bynum</u>, 106 Haw. at 86, 101 P.3d at 1154. "Under the collateral source rule, a tortfeasor is not entitled to have its liability reduced by benefits received by the plaintiff from a source wholly independent of and collateral to the tortfeasor[.]" <u>Id.</u> (quoting <u>Sam Teague, Ltd. v. Hawai`i Civil Rights Comm`n</u>, 89 Haw. 269, 281, 971 P.2d 1104, 1116 (1999)) (internal quotation marks and citation omitted). The collateral source rule does not generally apply when the benefit is derived from the defendant. <u>See, e.g.</u>, <u>McLean v. Runyon</u>, 222 F.3d 1150, 1156 (9th Cir. 2000).
>
> One question, then, is whether a source—such as TRICARE—is "independent" or "wholly independent" from the tortfeasor. In this context, courts sometimes apply a test that

169

"government payments are collateral if the
payments come from 'a special fund that is
separate and distinct from general government
revenues' and to which the plaintiff has
contributed." Mays v. United States, 806 F.2d
976, 977 (10th Cir. 1986) (quoting Berg v. United
States, 806 F.2d 978, 985 (10th Cir. 1986)). As
the Ninth Circuit reasoned in discussing medicare
benefits, "[c]ourts distinguish between those
benefits that come from unfunded general revenues
of the United States (deductible) and those that
come from 'a special fund supplied in part by the
beneficiary or a relative upon whom the
beneficiary is dependent' (nondeductible)."
Siverson, 710 F.2d at 560 (quoting United States
v. Harue Hayashi, 282 F.2d 599, 603 (9th Cir.
1960)).

That is, under this reasoning, if TRICARE
benefits are from a "special fund" then they are
collateral, but if they are paid from general
government revenues then they are from the
Defendant itself—meaning that such payments are
not "wholly independent" from the tortfeasor—thus
entitling a tortfeasor to an offset. Some cases
have thus concluded that TRICARE benefits are
paid from the general treasury and are not
"collateral," at least for purposes of benefits
already paid. See, e.g., Murphy v. United States,
2009 WL 454627, at *6 (D. Haw. Feb. 23, 2009)
(applying collateral source rule to offset a past
payment under a "TriCare Prime Program"); Lawson
v. United States, 454 F. Supp. 2d 373, 415 (D.
Md. 2006) ("The vast majority of courts to
consider this issue, however, have concluded that
Tricare/CHAMPUS benefits are not a collateral
source, holding that they are benefits derived
from general revenues of the United States, and
that an award must be reduced to the extent of
such benefits.") (citing Mays).

Warren, 669 F. Supp. 3d at 1027–28.

25. The parties provided no evidence regarding TRICARE's

current source of funding, such as whether the funds come

completely from general taxpayer funds, or from a "special fund."

26.    Courts are wary of finding such offsets appropriate for future care because such benefits are speculative for at least two reasons: (1) the fact that such benefits may not be vested if the military member has not yet retired, and (2) the TRICARE program is subject to change in the future, meaning benefits may not continue to be available, or at least be available in their current form. See Warren, 669 F. Supp. 3d at 1028-29.

27.    Courts are also wary of limiting a plaintiff's choice in future treatment by requiring a plaintiff to seek treatment from their tortfeasor. See, e.g., Molzof, 6 F.3d at 468.

### III.  AWARD AND CONCLUSION

28.    The Court finds, by a preponderance of the evidence, that Defendant is liable to Plaintiffs, and that Plaintiffs have proven Plaintiffs suffered general damages for pain and suffering, and, in the case of some Plaintiffs, emotional distress, and awards each as follows:

29.    **General Damages** for pain and suffering, and, in the case of some Plaintiffs, emotional distress:

Aubart – $37,500

Dietz - $37,500

B.D. - $20,000

171

       V.D. - $10,000

       Feindt - $37,500

       P.G.F. - $10,000

       T.F. - $3,000

       Freeman - $60,000

       D.F. - $10,000

       K.F. - $25,000

       N.F. - $50,000

       Jessup - $37,500

       B.B.J. - $75,000

       B.J.J. - $75,000

       D.J. - $5,000

       N.J. - $10,000

       Witt - $37,500

30. The Court further finds, by a preponderance of the evidence, that Plaintiffs have proven that certain plaintiffs will incur special damages for future medical expenses caused by Defendant's negligence and that the present-day value of those expenses are awarded as follows:

       Dietz - $7,322.71

       P.G.F. - $4,953.36

       Freeman - $19,250.67

       Jessup - $6,962.41

31. The Court declines to award special damages for future medical or mental health treatment to any other plaintiff.

32.   The Court further finds, by a preponderance of the evidence, that Plaintiffs have proven that one plaintiff has incurred special damages for economic loss and awards as follows:

>    Feindt - $2,644

33.   The Court declines to award special damages for economic injury or wage loss to any other plaintiff.

34. Lastly, the Court finds, by a preponderance of the evidence, that Plaintiffs have proven that they have suffered hedonic damages for loss of enjoyment of life for each of Plaintiffs in the amount of $1,000.

>    IT IS SO ORDERED.

>    DATED AT HONOLULU, HAWAII, August 7, 2025.



/s/ Leslie E. Kobayashi

Leslie E. Kobayashi
Senior U.S. District Judge

**PATRICK FEINDT, JR., ET AL. VS. UNITED STATES OF AMERICA; CV 22-00397 LEK-KJM; FINDINGS OF FACT AND CONCLUSIONS OF LAW**