THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICK FEINDT, JR., ET AL., ) | CIVIL NO. 22-00397 LEK-KJM |
| ) | |
| Plaintiffs, ) | Honolulu, Hawaii |
| ) | |
| vs. ) | April 9, 2026 |
| ) | |
| UNITED STATES OF AMERICA, ) | HEARING ON DEFENDANT'S |
| ) | MOTIONS TO DISMISS |
| Defendant. ) | |
| ) | |
| _____) | |
| ) | |
| JESSICA WHALEY, ET AL., ) | CIVIL NO. 23-00457 LEK-KJM |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____) | |
| ) | |
| JACLYN HUGHES, ET AL., ) | CIVIL NO. 24-00059 LEK-KJM |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LESLIE E. KOBAYASHI
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:    LYLE S. HOSODA, ESQ.
                       Hosoda Law Group
                       Three Waterfront Plaza
                       500 Ala Moana Boulevard, Suite 499
                       Honolulu, Hawaii 96813

                       KRISTINA BAEHR, ESQ.
                       Just Well Law, PLLC
                       2606 W. 8th Street, Unit 2
                       Austin, Texas 78703

For the Defendant      ERIC A. REY, ESQ.
The United States      ROSEMARY C. YOGIAVEETIL, ESQ.
of America:            United States Department of Justice
                       Civil Division
                       1100 L Street NW, Suite 3506
                       Washington, D.C. 20005

Official Court         ANN B. MATSUMOTO, RPR
Reporter:              United States District Court
                       300 Ala Moana Boulevard, Room C-338
                       Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

THURSDAY, APRIL 9, 2026                    2:29 O'CLOCK P.M.

THE COURTROOM MANAGER:  Civil Numbers 22-00397-LEK-KJM, plaintiff Feindt, et al., versus the United States of America; 23-00457, Whaley, et al., versus United States of America; and 24-00059, Hughes, et al., versus United States of America.

This hearing has been called for a hearing on various motions to dismiss.

Counsel, please make your appearances for the record, starting with the plaintiff.

MS. BAEHR:  Kristina Baehr for the service members, Your Honor, and with me is Lyle Hosoda.

THE COURT:  All right.

MR. HOSODA:  Good afternoon, Your Honor.

THE COURT:  Good afternoon to you both.

Mr. Rey.

MR. REY:  Yes, good afternoon, Your Honor.  Eric Rey and Rosemary Yogiaveetil on behalf of the United States.

THE COURT:  All right.  Good afternoon to you both.

MS. YOGIAVEETIL:  Good afternoon, Your Honor.

THE COURT:  Thank you very much for submitting this motion.  I trust that you folks have received the Court's inclination.

MR. REY:  Yes.

THE COURT:  And so I don't mean to limit your

arguments in any way.  I wanted hopefully to be of assistance for you, to provide you with what we're thinking.  So I'm happy for you to direct your arguments in the areas that I've asked questions about.  But if you have other arguments or items that you want to point out to me, I don't mean to limit your ability to do so in any way.

So, Mr. Rey, with your permission, I know that you're the movant, but I thought, given my inclination, that I'd turn first to plaintiffs and have them address some of the issues that I raised.  And then, of course, I'll give you an opportunity to respond.

MR. REY:  Certainly.  Thank you.

THE COURT:  All right.  Very good.

Ms. Baehr, will you be arguing?

MS. BAEHR:  I will, Your Honor.

THE COURT:  All right.  Thank you.

MS. BAEHR:  May I?

THE COURT:  Yes.  Please.

MS. BAEHR:  Your Honor, thank you for the inclination.  It directed us to exactly what you want to hear about, and I want to get right to your questions and address in particular the Johnson factors 3 and 4.  And then we can get to 1 or 2, but I think ultimately you want to talk about 3 and 4.

And with your permission, I'll start with factor Number 4.

The Ninth Circuit for factor Number 4 looks to the nature of the activities at issue:  What were the plaintiffs doing at the time?

And it's bound by Feres.  So with your permission, Your Honor, we have a binder for you of the cases and of a couple of other documents.

Do you have it in front of you?

THE COURT:  I do.

MS. BAEHR:  It's organized by letter, which is very helpful.  So under F is Feres.  And if you would turn with me to the last page of the Feres case.

THE COURT:  All right.

MS. BAEHR:  Page 146, the paragraph on the right side.

You'll remember, Your Honor, that before the Court decided Feres, it decided a case called Brooks.  And so it spent some time here describing how Brooks and Feres were different.  And it says:  It has contended that all of these considerations were before the Court in the Brooks case, and that allowance of recovery to Brooks requires a similar holding of liability here.

The actual holding in the Brooks case can support liability here only by ignoring the vital distinction there stated.  The injury to Brooks did not arise out of or in the course of military duty.  Brooks was on furlough, driving along

the highway, under a compulsion of no orders or duty and on no military mission.  And that's the language that the Ninth Circuit will point to.

A government-owned-and-operated vehicle collided with him.  Brooks's father, riding in the same car, recovered for his injuries, and the government did not further contest the judgment but contended that there could be no liability to the sons solely because they were in the Army.  This Court rejected the contention, primarily because Brooks's relationship while on leave was not analogous to that of a soldier injured while performing duties under orders.

So the Ninth Circuit has taken this paragraph and has really homed in on "duties under orders" and on "mission" and "compulsion," were they compelled.

And the other aspect of this paragraph that the Ninth Circuit has homed in on is:  What about civilians?  Were civilians similarly situated?  And you see here that the Supreme Court was bothered by the fact that a father and a son in the same car had a different result.

So when we take this here to the Ninth Circuit, and we look at how the Ninth Circuit has interpreted this factor Number 4, every case in the Ninth Circuit looks to were they under orders.

And, of course, they're easy cases.  There's the case Scherer, which was a helicopter.  Of course, they were under

orders.  The plane, of course, they were under orders, in Stencel.

THE COURT:  Wait.  The language is "activity incident to service."  It's not "under orders."  Incident to the service.

So I would push back on that and say it's much broader than "under orders."

What is your position with regard to that?

MS. BAEHR:  When you interpret "incident to service," the Ninth Circuit focuses on these words "under orders."  So those are the words of the Ninth Circuit over and over again in the cases.

THE COURT:  Right.  But Feres talks about incident to service, right?

MS. BAEHR:  That's right.

THE COURT:  So we can't go with the narrower view of the Ninth Circuit.  I mean, I do want to give, you know, deference to Ninth Circuit law, but I think Supreme Court law is what ultimately controls it.

And that's why I sort of indicated to you, particularly in the last part of my inclination, you know, thinking about what is incident to service.  The housing that they were in was only because of their military service, right?

So how do I reconcile that with this language "arise out of or in the course of activity, incident to service"?

MS. BAEHR:  It's a great question, and it's a tough call.

THE COURT:  Yeah.

MS. BAEHR:  In this particular case, Brooks was also in that place because he was in the service.  And so it's a question of how broad you look at it.

In the Ninth Circuit, which is --

THE COURT:  Well, Brooks was on furlough, though, right?  So he -- so he was -- you know, he was clearly, you know, out of service.  You know, he was -- he was not -- you know, and I understand fully what you folks are saying, is that, you know, those service members were at home doing their everyday household activities, no different from anyone else except for the fact they were doing it in housing that was given to them incident to their service.

So help me, if I can't get around that part of it, right?  So that it does bother me that it is seemingly a pretty harsh outcome of the doctrine; but nonetheless, I would have to apply it.  Where, you know, these individuals are doing everyday activities that clearly, you know, don't relate to their military service.  But it's the location of where they're doing it and why they get to do their everyday activities in that housing.

Do I just ignore that part of it, the fact that they're in the housing because of their military service, so it

can't be incident to service?

MS. BAEHR:  In the Fifth Circuit, there's a clear rule.  If it's on base, it's incident to service.  So it doesn't matter whether it's private or public, whatever they're doing, if it's on base, it's incident to service, because they wouldn't be there but for the service.

But the Ninth Circuit has a much more narrow view.  And so here in the Ninth Circuit we look not to the location, not to the house, but to the nature of the activity.

So, for example, in the Spletstoser case, it was a rape case, she was there on orders.  It was actually a military conference that she was going to, or it was a conference sponsored by the military.  So the military paid for her housing.

THE COURT:  Right.

MS. BAEHR:  But the Ninth Circuit still said that we're going to look to the activity instead of to who paid for the housing.

But you ask an important question because you talk a lot in your minute order about Camp Lejeune and is this different from Camp Lejeune.

THE COURT:  Yeah.

MS. BAEHR:  And in the Ninth Circuit, you know, the other point that I was going to get to you from this paragraph is the Ninth Circuit cares about whether a civilian could have

been injured.

And not -- not any civilian, but a civilian who's not associated with the military. And that's the bright-line rule that the Ninth Circuit says.

So if it had -- if military personnel, whether they're DoD or military, had access to, let's say, the road, or the place, or the house, then in that case it would be barred.

But if a civilian, who's not military personnel, had access, then it's not barred by the Feres doctrine.

So when we look at this particular housing -- and, Your Honor, we may need to move to amend our complaint to make this more clear.

In the 1990s, the government privatized this housing. And when it did that -- and I have here in the supplemental materials a summary for you about the private -- privatization, but -- but it brought those houses into the marketplace, and it said specifically: We want to bring military housing into the marketplace.

And so what it did was it made that military housing not just accessible to military families but also to non-military civilians, so people who have no association whatsoever with the United States military, including Hawaii police officers, Hawaii firemen, civilians who work for the Hawaiian government, and then a host of civilians who work for contractors not associated with the military.

So this particular housing, unlike in Camp Lejeune, which was before 1990 --

THE COURT:  Right.

MS. BAEHR:  -- this particular housing was accessible to non-service member families.

In Spletstoser, they asked:  Could a civilian have rented that room?  And so we can ask the same question here:  Could a civilian have rented this house?  And it turns out that the answer is yes.  That's if we focus on the housing.

But what if we focus on the water?  Is the water incident to service?  On the one hand you'd say, well, government provides the water, these are people working for the government, this is incident to service.

In Camp Lejeune, the water sources were only for the base.  I did a deep dive into this after I read your minute order.

But here, this water, you may remember -- and I have a map in here to remind you -- also went to Iroquois Point, an entire neighborhood that is only civilian housing.  And we actually have plaintiffs here -- and again, we can make it by -- make it clear because there is a fact issue.  There are -- so there were military service members in that civilian housing as well.

So there's civilian housing, and then there's military housing, both of which were open to civilians.  And

because of that, I think in the Ninth Circuit, because civilians had access, the bar cannot apply.

THE COURT:  Okay.

MS. BAEHR:  I think I got to the third factor as well in that same question, because we talked about whether it was incident to service --

THE COURT:  Yeah.

MS. BAEHR:  -- in terms of the benefit.

THE COURT:  Right.

MS. BAEHR:  But let me just summarize the -- point you to, Your Honor, the specific words of Spletstoser and the Ninth Circuit.

The test for a benefit incident to service is whether a service member has access to the benefit to the exclusion of the civilian public.

And there's a whole several pages in that opinion where they then go through all of their prior cases.  And one of your questions, Your Honor, was:  Do we have to apply the Ninth Circuit -- you know, the Ninth Circuit cases?

And I think in the Ninth Circuit we do, because in each Ninth Circuit opinion they don't look outside the circuit; they look only to their prior opinions where they have a very nuanced but consistent and narrow approach to the Feres doctrine.

So under the -- what is exclusion of the civilian

public, you know, Costo was a case about rafting.  That was exclusive to the service members.  Only service members could go on that trip.  They found the bar --

THE COURT:  But McConnell has the boating accident where you could rent boats, and it was open to the public as well as service members.

But the unfortunate decedent, right, was a service member and he was -- the boat rental was as a result of his active-duty status, I believe.

MS. BAEHR:  It's a great question.

THE COURT:  Yeah.

MS. BAEHR:  It wasn't open to the public.  It was open to military personnel and their guests.

So -- and that is true of Bon.  It's true of each of the cases, Your Honor, where -- let's see.  Costo, only military -- military personnel and their -- and their guests.  Latchum only took military personnel and their guests.

And then Bon was only military personnel and their guests, whereas in the Dreier case you had someone who was -- who was hiking and they were in an area that was only for service members.  But because civilians sometimes had access to that, the Court found that the bar didn't apply.  So even though it was recreation, it didn't apply.

And so in these recreation cases, the Ninth Circuit looks to two questions.  One is:  Were they under orders?

So if they were on the rafting trip, they were under orders, because it was a military trip.  They were under military orders when they were on the rafting trip.

THE COURT:  Right.  But we know that's not the case where it applies, right, orders.  That's not being contended. That's not a contention.

MS. BAEHR:  I'm sorry?  Which is not --

THE COURT:  Well, the service members involved in this particular case were -- it's not like they were on active-duty orders to be in that house, right?  And to use whatever utilities provided to their house.

They -- their connection to the house and the utilities provided was that they got it as a result of their military status, right?  They were provided housing.

And you're making the point that the housing wasn't exclusive to active military, that it was offered to non-military.  And so that's why we're talking about this, right, incident to service, right?  And so I've set forth in the inclination about the fact that they had the military -- they had the housing because of their military service benefit, right?  They were given that.

And then, you know, I hear what you're saying about trying to make an argument about the water and should that be incident to service.  But I'm looking at it, and I don't see anything that indicates I should look otherwise, that any

utilities provided to the house come with the house.  It's not like they contract separately.  I mean they pay for Wi-Fi or something, but not for water and electricity, and sewage.

So it's incident to the housing that they have.  And the housing is incident to a military benefit.  So I understand your argument saying, well, you have to look at that this housing area was exclusive to those who were serving in the military, and you're making the point -- although it's not in the record at this time -- that this housing area was also made available to non-military, and therefore it shouldn't serve as a bar.

Okay.  So that's one way of looking at it.  But I think when you look at the language that I'm supposed to follow, is it incident to service.  And so I pointed out, you know, the fact that they were in that house that provided those utilities was because of their military service.

So I understand your argument.  You're saying no, I should look more broadly and see if the housing, although a significant number, I assume, of people who reside in that area were residing because the housing was part of their military benefits but that also because it was, for lack of a better word, mixed use, right?  You have non-military people also being able to reside, that it should therefore not be considered incident to service.

So not look at why they're in that particular house

but if that housing area was in any way restricted to military only.  I mean, is that fair?

MS. BAEHR:  That --

THE COURT:  Okay.

MS. BAEHR:  That's exactly right.  And I think that's the test in the Ninth Circuit.

In the Fifth Circuit, the way you're describing is exactly the way it is.

THE COURT:  Right.

MS. BAEHR:  Because it's very clear.

THE COURT:  Yeah.

MS. BAEHR:  And, you know, the Ninth Circuit is more -- has taken this narrower nuanced approach, where it's not about the location, it's about the activity, the physical activity at the time.

But your question about they were getting BAH, which is the housing allowance, when the government privatized the housing, it really said you have choice.  You have this allowance, but you can spend it however you like.  You can -- in fact, we -- I have two clients here today, Your Honor.  Many of them have moved on.  But he's a service member, and they just bought a house.  And so they're using their BAH for their mortgage.

The BAH has become just a form of their general compensation that they have the choice.

So when I keep pointing to are they under orders, the Ninth Circuit is asking do they have choice here, which I think is -- is what we have.  Here they have -- they have a choice of where to be and they can be on -- on base or off base.

And importantly, I think, this question of but the government paid for it, that's -- that was true in Spletstoser.  The government paid for her housing when she went to the conference, and she was -- she was attacked by her superior.  So accord -- in the Fifth Circuit, that case would absolutely be barred by the Feres doctrine because it's incident to service, she was on a military trip.

But in the Ninth Circuit they're taking a more narrow view.  And I'll just -- I'll close with this, Your Honor, because I appreciated -- I appreciated your words to our clients at the end of trial, and I appreciated your comments in your minute order where you felt like this was not the fair result.

And I used to represent the United States before I started my law firm.  And it was such an honor to say Kristina Baehr for the United States.  It never got old.  But here, this is very important and it's such an honor to say Kristina Baehr for the service members.  It's just such an important issue.  And in many cases we'd have to reach an unfair result.  But here in the Ninth Circuit, because of this case law that focuses on access to civilians and on this question of whether

they were under orders and on mission, because that's how the Ninth Circuit looks at it, we can and should reach the fair result here and find that the service members are entitled to recover for their injuries.

THE COURT:  All right.  Thank you very much.

MS. BAEHR:  Thank you, Your Honor.

THE COURT:  Mr. Rey.

MR. REY:  Thank you, Your Honor.  Eric Rey for the United States.

The United States' motion to dismiss the Whaley complaint should be granted for the reasons outlined in the Court's inclination order and because, as numerous courts have found throughout the country, the Feres doctrine bars claims analogous to those that the plaintiffs allege here.  Those cases, as the Court indicated in the inclination order, arise from the contamination at Camp Lejeune.

This case, just like the Camp Lejeune cases, is indistinguishable from Feres.  As the Court indicated, it would like us to focus on the first -- I'm sorry -- the third and the fourth factors of the Ninth Circuit's test, so I'll do that here.  Before doing so, I want to reiterate what's in our briefing; and that is, none of these factors in and of themselves is dispositive.  It is again a totality of the circumstances test if the Court is going to evaluate this case under the four-factor test.  And all of those in evaluating

under the totality of the circumstances weighs in favor of applying Feres.

With respect to the third factor, which is the benefits accruing to plaintiffs, it's noted on page 16 of our motion.

Courts look at this in two different ways. One is the disability and medical benefits the service member receives as a result from the injury, and also whether the activity generally that they were engaged in is a benefit to service.

On the first one, as in terms of disability, there is no dispute as I understand it in this case that the service members are entitled to and have received medical benefits, and would, if necessary, receive disability benefits. Plaintiffs don't dispute that in their opposition.

So instead, we're really focusing, as this Court just mentioned with Ms. Baehr, on whether their military housing was a benefit to service.

And there I'd like to direct you to the plaintiffs' only allegations, because that is the record on this motion. This is a facial motion to dismiss. Plaintiffs have asked the Court to accept all of their allegations as true; and those include, on page romanette xii, that the alleged -- that the impacted water system provided water to military service members assigned to serve their country there.

These folks would not have been there but for their

service for the United States.

In paragraph 9 of their complaint they alleged that the Navy owns and operates the water system that provides drinking water to the military community and facilities associated with the base, including the military housing.

And then for each of what I called the highlighted plaintiffs, the five plaintiffs that they provide more than just the one verbatim paragraph, they allege for all of those that they lived in military housing.

And then Count 5, on premises liability, they repeatedly alleged that the United States not only owned and occupied and possessed Red Hill itself, and the water system, but also the military housing that all of these plaintiffs lived in.

So based on their own allegations, these -- the military housing was a benefit to their service.  And I think it's useful just to pause here for a minute to note the similarities between these allegations and the allegations in Feres itself.

In that case, the plaintiff alleged that the military was negligent for maintaining the defective heating plant and maintaining the defective fire watch that could have prevented and warned the decedent of the fire in his military housing.

Just as in -- the Court found in the Perez case that the Court cites in the inclination order, these allegations are

indistinguishable from what's before the Court here.

In this case, plaintiffs allege that the United States, specifically the Navy, negligently maintained the Red Hill fuel reserve that served the Joint Base Pearl Harbor-Hickam, as well as the water system, and also were negligent -- the Navy was negligent in its response.  And as a result, the service members were injured.

This case is indistinguishable from Feres.  And as the Ninth Circuit has repeatedly explained, really what courts should do in the Feres doctrine, when presented, is compare it to other fact patterns.

And that's in looking at Feres as well as the Camp Lejeune cases you have a consistent application of the Feres doctrine here.

THE COURT:  So Ms. Baehr raises -- and she's making a distinction with Camp Lejeune, the fact that the housing was on base; where she is arguing that the housing here, while housing some military families, also was available for rent by non-military families and was not clearly on base or on some sort of military-controlled area.

Should the Court make that kind of distinction, that Feres is in these types of housing-related tort claims, is limited to housing on base, clearly under the control and only available to military service members and their families?

MR. REY:  No, Your Honor.  And to do so would

contradict a lot of Ninth Circuit precedent.  And plaintiffs seem to be arguing here that Feres only applies if no civilian in the same situation could have been -- could have brought a claim.  Essentially, they wouldn't have been harmed.  And that's certainly not the test.

If you look at the Ninth Circuit recreational cases that we cite in our brief, McDonald as you just -- McConnell, excuse me, as you just mentioned, occurred on a public lake, and both McConnell and Bon and Costo and Latchum were all situations in which not only active-duty service members but certain civilian employees also could rent those materials.

So plaintiffs' counsel was mentioning only military personnel in those cases.  To be clear, those courts said civilian military personnel as well.  So it is not a case in the Ninth Circuit where no -- in order for Feres to apply the activity had to be exclusively and only for active-duty service members.  So that's not the test.

And also, the Ninth Circuit's medical malpractice cases involving Feres that we cited in our brief, Daniel, Atkinson's, and Valente [verbatim], similarly hold that the Feres doctrines apply, even though those hospitals and those providers were providing care also to civilian patients.

Feres, Your Honor, also supports the Court's inclination to view the fourth factor in terms of what is the broader category of activity that plaintiffs were engaged in,

i.e., residing in military housing, and not what they were doing or allegedly doing at the precise moment that they were allegedly exposed.

In Feres, the Court's analysis turned on the fact that the decedent was in military housing.  There wasn't any analysis of what was he doing at the exact moment that the fire occurred.  In fact, in other subsequent cases interpreting Feres, including Lanus that we point out in our brief, the courts mentioned the decedent was asleep.  And certainly it's just as personal an activity as plaintiffs allege here.  But nonetheless, the Feres doctrine still applied.

And that's the same with respect to the Ninth Circuit's recreational cases of Bon, Costo, and McConnell, where the Ninth Circuit has held that purely recreational activities, which one could construe similarly to the type of personal activities plaintiffs allege here, were nonetheless still barred by the Feres doctrine.

And in fact, in Latchum, which I think is a very useful precedent for this Court, it was also affirmed by the Ninth Circuit, although an unreported decision, Judge Mollway from this Court agreed with the view that the Court has taken in its inclination order not to view things too narrowly.

In Latchum, plaintiffs made a very similar argument. They said that the Court should only examine what the decedent was doing the moment he was shot, arguing he was merely

standing on the porch of a cabin that he was renting from the Army.  And the Court disagreed, saying they needed to view this in terms of what sort of activity he was doing generally, and that was renting the cabin from the Army.

Likewise, here, plaintiffs' activity was renting military housing in which they alleged that they were exposed.

I think the Court's practical concerns, as it noted in its inclination order, are also very well founded. Although, on this record we have a very limited exposure window, as this Court knows from the related cases.

We have, you know, folks, plaintiffs, same counsel, related plaintiffs have alleged an exposure of a much greater time period, multiple weeks, including after they went back to work and the like.

So -- and as we pointed out in our motion, the highlighted plaintiffs, those five, all alleged then, you know, injuries related to activities they did subsequently.  You know, Major Feindt alleges claims of unlawful retaliation. Petty Officer Wallace alleges claims having to do with the mistreatment by his command.  And plaintiff Jessup alleges he was exposed as a Navy diver actually responding to the Red Hill fuel incident.

So this again is why the fourth factor applies.  The courts here are very concerned, Ninth Circuit is very concerned about a case that's going to require the Court to examine

whether one military member was negligent against another.  And that's happening here.

Plaintiffs in their complaint allege, you know, the commander of the joint base was negligent in response, was negligent in the communications to the service members, should have provided us more information.  These are much closer entanglements of the military judgment calls than the cases the plaintiffs rely on in their briefing.

And one last point, Your Honor, before I sit down; and that is, also, I want to note that the first factor here is also a big distinguishing factor between this case and a lot of cases that plaintiffs rely upon.

Here, plaintiffs allege the Navy negligently operated the strategic fuel reserve for Red Hill that supplied the military with fuel for all the ships passing through, stationed at Pearl Harbor, all the airplanes.

Therefore, the alleged negligence in this case is an even stronger nexus to the military service than the cases plaintiffs rely on.  And it looks a lot more like the Preferred Insurance Co. case that we cite in our brief, where you had an airplane crash, damaged property from service members, and Feres still applied even though those service members had nothing to do with the maintenance/operation of that airplane.

So in conclusion, Your Honor, we would ask the Court to grant the United States' motion to dismiss for the reasons

set forth in our -- our briefing as well as in the Court's inclination order.

Thank you.

THE COURT:  All right.  Thank you very much.

All right.  Ms. Baehr, I'll give you a last word and then I'm going to take the matter under advisement.

MS. BAEHR:  Thank you, Your Honor.

The first question is:  What about Feres?  He was sleeping.  It was the barracks.  And the way that the Ninth Circuit has interpreted Feres is to ask this question:  Is the barracks accessible to people beyond the military?  And in -- I mean the answer is probably no, right?  Because there's a big difference between privatized military housing, that's operated by privatized landlords who are slumlords, as we know, and military housing, that is the barracks, which is for service members who are under orders when they're in -- in the military barracks.

These recreational cases, Your Honor, the distinction between all of them -- and I've reviewed them all again this morning -- the distinction is -- that the Ninth Circuit makes is whether there are military personnel, which includes DoD and civilians, or non-military personnel.  That's the Ninth Circuit distinction.

And in this case, it was accessible to non-military personnel, including Hawaiian civilians.

That is the test.  In Latchum --

THE COURT:  Would you agree with Mr. Rey's argument that the analysis does not focus on what the -- a plaintiff is doing at the time, the activity, but really the location and why the plaintiff was at that location, whether that's related to military service or not, or incident to military service?

And I just say that because clearly, if we were looking at what the individual was doing, whether they were washing or preparing food, or in some instances they may be smoking a cigarette, right?  But they're on military orders.

Clearly, the fact that they were doing some -- a personal recreation, like smoking a cigarette, would be of no moment.  I would focus on whether they were under military orders, if they were, you know, in the military performing services on behalf of the military, Such as in a war zone or, you know, practicing exercises and so forth.

So really isn't what they're doing at the time really not part of the equation in evaluating whether it was incident to service, why they were there was incident to service?

MS. BAEHR:  I think you could reach that conclusion if we didn't have this body of Ninth Circuit case law where they reached the opposite conclusion.  And in Spletstoser, Your Honor, this is one of the most recent cases.  It came out in 2022.

And if you want to turn to me -- and I don't, of

course, want to read the whole thing.

THE COURT:  Sure.  But what part of it did you want to?

MS. BAEHR:  But section 3, the third Johnson factor, this is where they go through and they talk about each of the cases that the government has cited.  And they say as to respect to every single one of them that it was not accessible to civilians; it was only accessible to military personnel.

And then when you get to the fourth Johnson factor, it describes in the last two paragraphs exactly what she was doing.  It is unimaginable that plaintiff would have been under orders to submit to Hyten's sexual advances or that she was performing any sort of military mission in conjunction with the alleged assault.

Rather Spletstoser, like the plaintiffs in Johnson and Schoenfeld, stood in exactly the same position as a civilian, and there can be no doubt that if Hyten had engaged in the same conduct with a civilian staying at the hotel, he would have been subject to legal action.

Notably, the tortious activities here were far more personal than those in Johnson.

And then it goes on to talk about her -- her getting dressed and her going to bed.

So -- so I think this is -- this is the law that governs how the Ninth Circuit thinks about it.  And instead of

looking to the location, it's looking to the individual activities, including getting dressed.

And then, of course, they deal -- and -- and this is -- what's so interesting about this body of case law is it is informed so much by the prior cases in the Ninth Circuit.

In the conclusion here of this case, they describe why they went on and on, why it took them so long to tell you that the Feres doctrine was not barred, did not apply, and it, you know, just describes how the Ninth Circuit, at least, must do a case -- this case, this heavy case analysis looking at the various factors.

THE COURT:  Okay.

MS. BAEHR:  Thank you.

THE COURT:  Thank you for that.  I thank you very much for this binder as well, and I will go through it with my law clerk and, you know, really consider all of the arguments that both sides have brought up.  I appreciate your time and the care that you've taken with presenting me with the information and responding to my inclination.

Mr. Rey, you have something?

MR. REY:  Yes, Your Honor.  Your Honor, with respect to the binder, if the Court's going to keep it, I would just note an objection to the supplemental information tab toward the end.

THE COURT:  Okay.

MR. REY:  The first tab, privatized housing, was not part of the briefing or provided to us before today.

THE COURT:  Yes.  That's fair enough.  I won't consider that.

MR. REY:  Okay.  And the same for the plaintiffs' housing tab.

THE COURT:  Yeah, I think everything in the supplemental information I'm not going to take into account.

I think the case law is -- I recognize largely mostly the cases that they -- they cited.  But if there's any cases that you feel I should not take a look -- I don't remember Barranco being -- I remember that case.

MS. BAEHR:  This includes both, Your Honor.

THE COURT:  Okay.

MS. BAEHR:  The cases that the government cited and the cases that we cited.

THE COURT:  Okay.  All right.  Any objection to me taking a look at that?

MR. REY:  None to the cases themselves, Your Honor.

THE COURT:  Those -- yes, those.  And I won't take a look at the supplemental information.  I think, you know, whether or not the plaintiffs are allowed to amend is the subject of another day.  So I won't take into account the supplemental information.

MR. REY:  Thank you.

THE COURT:  All right.  Thank you very much.

MS. BAEHR:  Thank you, Your Honor.

THE COURT:  I wish all of you a good day.  And we stand in recess.  Thank you.

THE COURTROOM MANAGER:  All rise.

Court is now adjourned.

(The proceedings concluded at 3:10 p.m.)

COURT REPORTER CERTIFICATE

I, Ann B. Matsumoto, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. Sec. 753 the foregoing is a complete, true, and correct transcript of the stenographically recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, April 15, 2026.

/s/ Ann B. Matsumoto
ANN B. MATSUMOTO, RPR