**BRONSTER FUJICHAKU ROBBINS**
A Law Corporation

MARGERY S. BRONSTER 4750
ROBERT M. HATCH 7724
NOELLE E. CHAN 11280
1003 Bishop Street, Suite 2300
Honolulu, Hawaiʻi 96813
Telephone: (808) 524-5644
Facsimile: (808) 599-1881
Email: mbronster@bfrhawaii.com
rhatch@bfrhawaii.com
nchan@bfrhawaii.com

**LITTLE LEGAL, LLLC**

RYAN S. LITTLE 10536
REBECCA M. SALWIN 10699
200 N. Vineyard Blvd
Suite A325, #1261
Honolulu, Hawaiʻi 96817
Telephone: (808) 265-9895
Email: ryan@littlelegal.com
rebecca@littlelegal.com

Attorneys for KRISTINA BAEHR and JUST WELL LAW, PLLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| PATRICK FEINDT, JR., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 1:22-cv-00397-LEK-KJM<br>(Federal Tort Claims Act)<br><br>**KRISTINA BAEHR AND JUST WELL LAW, PLLC'S REPLY REGARDING ORDER TO SHOW CAUSE [ECF NO. 889], FILED AUGUST 20, 2026; CERTIFICATE OF SERVICE** |
| JACLYN HUGHES., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 1:24-cv-00059<br>(Federal Tort Claims Act)<br><br>Judge: Hon. Leslie E. Kobayashi |

**KRISTINA BAEHR AND JUST WELL LAW, PLLC'S REPLY REGARDING ORDER TO SHOW CAUSE [ECF NO. 889], FILED AUGUST 20, 2026**

## I. Hosoda Law Group's Position Statement Confirms that this is a Contract Issue—Not an Ethics Issue

Hosoda Law Group's Position Statement is devoted to whether Ms. Baehr's actions conformed to Mr. Hosoda's understanding of the Lanier Joint Prosecution Agreement ("JPA"). It discusses several aspects of the JPA, including whether

HLG is party to Just Well's retainer agreements, and whether JWL's litigation loans were compensable non-common costs under the JPA. ECF No. 916 at 2-3.

What the Statement does not discuss is professional ethics. It contains no analysis of the Hawaiʻi Rules of Professional Conduct ("HRPC"), no discussion of the ethical principles supposedly implicated by Ms. Baehr's conduct, and no attempt to apply the HRPC provisions on which Mr. Hosoda has premised his Interpleader. Nor does the Statement even attempt to reconcile Mr. Hosoda's allegations with the substantial record evidence Ms. Baehr produced to refute them. That includes considerable evidence demonstrating that Mr. Hosoda knew of and endorsed Ms. Baehr obtaining the litigation funding he later claimed to not know about.

Neither does the Statement respond to the only ethics opinion in the record. David M. Majchrzak, the chair of the American Bar Association's Standing Committee on Ethics and Professional Responsibility—which is responsible for drafting and modifying the Model Rules of Professional Conduct upon which the Hawaiʻi Rules of Professional Conduct are based—concluded that Ms. Baehr's conduct here does not violate the rules of professional conduct. Majchrzak Decl. ¶¶ 16–28. It stands unrebutted.

In sum, the OSC gave Mr. Hosoda the opportunity to identify the evidence and/or legal authority he believed supported his allegations. His Position Statement

offers neither. Indeed, the Statement does not even meaningfully respond to Ms. Baehr's evidence that Mr. Hosoda knew about the loans. Instead, it retreats into a carefully worded contractual argument: that Ms. Baehr's evidence fails to establish HLG's "express written consent . . . to the Loans as required by [paragraphs 8 and 9 of] the JPA."[1] *See* ECF No. 916 at 2.

HLG's Position Statement is rooted in contract for a simple reason: this dispute has never really been about professional ethics. It has always been about fees—both in terms of amount and payment priority. Mr. Hosoda invoked ethics principles in the course of that financial dispute, but when it came time to substantiate those allegations with evidence and ethics law, he could not do so.

## II. The Record Shows that Mr. Hosoda Knew of and Endorsed Litigation Funding from the Outset

Over the course of 2022, Mr. Hosoda made clear that HLG and Just Well needed additional resources to prosecute the Red Hill litigation. *See* ECF No. 912, Ex. 9 (Hosoda: "I agree . . . [Lanier's] willingness to take on the costs makes him the right choice . . . we should just proceed"); Baehr Decl. ¶¶ 12–13.

In October 2022, with Mr. Hosoda's endorsement, the JWL/HLG consortium affiliated with the Lanier Law Firm, with whom they later

[1] Note, however, that paragraphs 8 and 9 of the JPA concern modification of the JPA itself. They have nothing to do with litigation loans.

signed the Joint Prosecution and Attorneys' Fee Agreement ("JPA") at issue here. ECF No. 797-14. The JPA allocated 10% of the attorneys' fees to HLG, and 45% each to Just Well and Lanier.

After Lanier withdrew, Mr. Hosoda made clear his desire for a replacement partner, largely out of financial concerns. Ms. Baehr then researched new partners and emailed Mr. Hosoda for his input. In late March 2023, Ms. Baehr, Mr. Hosoda, and Jim Baehr discussed financing options over lunch in Honolulu, including partnering with and accepting loans from Motley Rice; they openly discussed that any litigation loans would be repaid and reimbursed before any of them was paid a share of attorneys' fees. Baehr Decl. ¶ 22; *see also* J. Baehr Decl. ¶ 10. Importantly, HLG's Position Statement neither denies nor refutes Ms. Baehr and Jim Baehr's understandings of these conversations.

On March 16, 2023, Ms. Baehr emailed Mr. Hosoda Motley Rice's proposed terms, including disclosure of the Motley Rice loans. ECF No. 912, Ex. 15. On March 25, 2023, Ms. Baehr emailed Mr. Hosoda and Jim Baehr that it was "important to spend time just the three of us talking through the funding and partnership options," including Motley Rice. ECF No. 912, Exs. 14 and 16. On April 2, 2023, Ms. Baehr solicited Mr. Hosoda's input and made clear that "we are in this together" and that she "value[d] [their] respective opinions." ECF No. 912, Ex. 16.

Less than a week after receiving Motley Rice's terms, Mr. Hosoda endorsed the deal, saying "I do not think we have much choice. We have to join forces with someone like Motley." ECF No. 912, Ex. 17. Mr. Hosoda did not say or otherwise indicate that he lacked information about the deal's terms or that he wanted more information.

This candor typifies Ms. Baehr's communications with Mr. Hosoda about the loans. It also corroborates the parties' agreement to repay litigation loans before taking any fees. In the absence of such an agreement, Ms. Baehr would have had little reason to involve Mr. Hosoda so extensively in decisions concerning Just Well's litigation financing. Instead, she would have simply made those decisions on her own according to her own best interests. Yet she repeatedly sought Mr. Hosoda's input, disclosed financing terms to him, and obtained his agreement before proceeding. Thus, Ms. Baehr's conduct corroborates her and Jim Baehr's sworn statements regarding their understandings that litigation loans would be repaid before fees were disbursed. Baehr Decl. ¶¶ 21–22, 28–30; J. Baehr Decl. ¶ 10; Johanson Decl. ¶ 8.

More importantly, the record bears no indication of deceit or dishonesty on the part of Ms. Baehr.

## III. HLG Did Not Need Court Intervention to Facilitate Settlement

HLG's Position Statement claims that this Order to Show Cause was necessary to bring about a settlement with Ms. Baehr. Not so.

The record clearly shows that Ms. Baehr was willing to address and resolve HLG's concerns well before this OSC issued.

On June 5, 2026, Ms. Baehr told Mr. Hosoda that she wanted to share with him spreadsheets concerning the anticipated recovery. ECF No. 912, Ex. 36. She had done that several times with Mr. Hosoda and Jim Baehr over the years, as she wanted them all to be on the same page regarding the financial picture of the litigation.

Three days later, Ms. Baehr walked Mr. Hosoda through a "waterfall" spreadsheet that modeled fee distributions under various scenarios. ECF No. 912, Ex. 39. The meeting was purely informational. Ms. Baehr made no demands or take-it-or-leave-it offers, and remained open to adjusting the consortium's fee distribution plan in light of the forecasted projections. ECF No. 912, Exs. 37, 39; Baehr Decl. ¶¶ 42–43.

Ms. Baehr maintained that approach throughout June. On June 10, 2026, she told Mr. Hosoda: "I know you need liquidity sooner and I want to find something that works. I'm open to a compromise. What does fair look like to you?" ECF No. 912, Ex. 41.

Instead of responding to that communication, Mr. Hosoda sent Ms. Baehr a formal demand giving her four days to accept his terms, stating that he had "already begun preparing a charging lien" that he would "have no choice but to file," and noting that "[t]his is a public filing." ECF No. 912, Ex. 43. Yet, Ms. Baehr remained conciliatory, telling Mr. Hosoda that she was "proud of our work together" and looked forward to "finding a resolution that works for all." ECF No. 912, Ex. 45. She then attended mediation on June 25, and four days later, offered to adopt Mr. Hosoda's earlier proposal for a 10% unsubordinated share of JWL's portion—before any loan repayments, cost reimbursements, or attorneys' fees. ECF No. 912, Ex. 47.

Again, Mr. Hosoda did not respond. Instead, he filed his Interpleader. Even then, Ms. Baehr continued trying to resolve the dispute. On July 11, she reminded Mr. Hosoda that he had promised a proposal concerning the percentage he wanted to be paid up front, and stated that she was "happy to consider (with the lender and counsel)" and that she hoped they could "reach agreement" and "put[] this behind us." ECF No. 912, Ex. 48. He never responded to her email.

Thus, the record thoroughly disproves HLG's claim that this OSC was necessary to facilitate a settlement. Ms. Baehr respected Mr. Hosoda, valued their professional relationship, and had been working for weeks to find a fair resolution

before HLG filed anything. She did not need the threat of an ethics proceeding to take his concerns seriously or negotiate in good faith. She was already doing both.

## IV. HLG Used this OSC to Sidestep the Lanier Agreement, Not Enforce It

The key questions here have always been: 1) is the Lanier agreement in effect; and 2) are JWL's litigation loans compensable costs? Again, these are contracts questions, not ethics questions.

Ms. Baehr repeatedly attempted to work through these questions with Mr. Hosoda, but he largely refused to engage—opting instead to use unfounded ethics allegations as leverage against Ms. Baehr in a renegotiation of their fee split. The August 27, 2026 Fee Allocation Agreement gives HLG an unsubordinated 12.5% of the total attorneys' fees—more than the 10% the Lanier Agreement originally contemplated, and more than the 11.11% owed when the *pari passu* provision was triggered. Importantly, the August 27 agreement specifically exempts Mr. Hosoda from the cost-reimbursement provisions of the Lanier Agreement. Thus, Mr. Hosoda obtained both a larger share of the fees and a dramatically better economic position: his entire 12.5% is paid ahead of the litigation debt, without HLG contributing a single dollar toward repayment of the financing that made the litigation possible.[2]

---

[2] Notably, despite demanding an accounting from Ms. Baehr, HLG has offered no evidence—either in this proceeding or during the negotiation of the August 27

HLG's Position Statement now emphasizes that a settlement "would not have occurred without the OSC." ECF No. 916 at 2–3. Ms. Baehr disputes that characterization for the reasons discussed above. But even accepting it for argument's sake, the point proves nothing about whether Ms. Baehr violated HRPC Rules 8.4(c) or 1.5(f). At most, it shows that the OSC altered the parties' bargaining positions and helped HLG obtain financial terms in the Fee Allocation that are more favorable than those provided by any prior agreement between the parties. A favorable agreement obtained while opposing counsel is defending against an OSC is not evidence of the underlying ethical misconduct the OSC was issued to examine.

## V. Conclusion

HLG's Position Statement confirms what the record already demonstrates. The dispute that precipitated this OSC was a dispute over the parties' contractual rights to attorneys' fees and the priority of litigation debt—not professional misconduct. Mr. Hosoda knew of and endorsed the litigation financing, understood that the loans would be repaid before attorneys' fees were distributed, and was repeatedly invited to work toward a resolution long before court intervention became involved. The only ethics opinion in the record concludes that Ms. Baehr's

agreement—to substantiate that HLG has performed 12.5% of the services to the clients.

conduct violated no rule of professional conduct, and HLG has offered neither contrary authority nor contrary expert testimony. Further, HLG is willing continue working with Just Well, and indicates that Just Well may be “critical” to “clos[ing] out the remaining Red Hill cases.”

The OSC should therefore be discharged.

DATED: Honolulu, Hawai‘i, September 17, 2026.

*/s/ Robert M. Hatch*
MARGERY S. BRONSTER
ROBERT M. HATCH
NOELLE E. CHAN

*/s/ Ryan S. Little*
RYAN S. LITTLE
REBECCA M. SALWIN

Attorneys for KRISTINA BAEHR and
JUST WELL LAW, PLLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| PATRICK FEINDT, JR., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 1:22-cv-00397-LEK-KJM<br>(Federal Tort Claims Act)<br><br>**CERTIFICATE OF SERVICE** |
| JACLYN HUGHES., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 1:24-cv-00059<br>(Federal Tort Claims Act)<br><br>Judge: Hon. Leslie E. Kobayashi |

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed and served on counsel of record via the U.S. District Court's CM/ECF electronic filing system.

DATED: Honolulu, Hawaiʻi, September 17, 2026.

*/s/ Robert M. Hatch*
MARGERY S. BRONSTER
ROBERT M. HATCH
NOELLE E. CHAN

*/s/ Ryan S. Little*
RYAN S. LITTLE
REBECCA M. SALWIN

Attorneys for KRISTINA BAEHR and
JUST WELL LAW, PLLC